**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK SCHMITZ, SUZANNE SCHMITZ, DIANE FOLEY, individually, and for the estate of JAMES FOLEY, JOHN W. FOLEY, JOHN E. FOLEY, MARK FOLEY, KATHRYN SIMPSON, RICHARD MUELLER II, individually, and for the estate of KAYLA MUELLER, MARSHA MUELLER, ERIC MUELLER, ARTHUR SOTLOFF, individually, and for the estate of STEVEN SOTLOFF, SHIRLEY SOTLOFF, LAUREN SOTLOFF, ALDENE LEE, ESTEFANI VALDEZ, KATRINA GRAHAM, JAMES GRAHAM II, STEPHANY KERN, DAVID SCHIAVONI, NOE OROSCO SR., APRIL HESS, KATHERINE MEEKS, LEROY CAIN JR., PATRICK RUSSELL, ELIZABETH RUSSELL, J.R. by and through her next friend Patrick Russell, K.K. by and through his next friend Patrick Russell, SUSAN WEST, SHERRI SPRINGATE, CHRISTOPHER BOREA, KIM BOREA, ANDREW BISSON, LAURALEE BISSON, RICHARD BISSON, CHRISTOPHER BISSON, VICTORIA JOHNSON, BRANDON CLEVENGER, NANCY CLEVENGER, ROGER KURTZ, STEPHANIE KURTZ, DARLENE SEIGART, CONNIE MADORE, RONNIE MADORE, RICHARD WITTEVEEN, TRENT WITTEVEEN, HEATHER KAUFMAN, DIANE SALYERS, KELLI WINKLER, NORMA ESTES, DANIEL SEBBAN, JANICE RIEWER, RICHARD RIEWER, SONDRA ADKINS, JOSEPH CANTRELL III, PATRICIA GRASSBAUGH, BELINDA BREWSTER, CHASSITY MCCANDLESS, RONALD SUMNER, ROBIN WALLACE, RICKEY WALLACE, SARAH WALLACE, RACHEL TUCKER, KIMBERLY SCHMIT, LESLIE WHITE, JEREMY PEARSON, KENNETH LOCKER SR., CARMON PETTERS, LORIE SOUTHERLAND, APRIL HARKINS, ROBERT HARKINS JR., ANSELMO MARTINEZ JR., GALDINA IBARRA, MICAH MONTGOMERY, MICHAEL SUMMERS, NANETTE WEST, CLARK WEST, KARA WEST, KELLI ANDERSON, CARTER WEST, CHRISTINA BAKER, DAVID DEHN JR., LILLIAN COSTELLO, DEBRA SPRINGMAN, DARRYL | Case No. _____<br><br>JURY TRIAL DEMANDED |

LINDER, SHIRLEY WADE, GARY WADE, LYNN
ZINDARS, KENNETH ZINDARS, MICHAEL
LYNCH III, LINDA BALOGA, SHANNON
OWENS, ANN SCHEIBNER, TYLER
SCHEIBNER, LOUISE SCHEIBNER, DIANE
COTTRELL, DAVID SCHEIBNER, JOHN
HERNANDEZ, ANGELA HERNANDEZ, BRETT
WOLF, SHEENA MCCLOUD, AIDAN
MCCLOUD, L.M. by and through his next friend
Sheena McCloud, M.O. by and through her next
friend Kevin Harrington, RAYMOND  OLSON,
ASHLEY MONSCHKE, PATTY JETT, SHELIA
TOWNS, CHARLES BOOKER, BRENDA
BOOKER, DEBORAH RAY, WALTER  RAY, JILL
FREDERIKSEN, MARTHA CABE, MELANIE
PIONK, BRANDON PIONK, ASHLEY PIONK,
DILLON PIONK, SANDRA PIONK, DUANE
PIONK, JOSHUA PIONK, LAURA MCBRIDE,
MARSHALL MCBRIDE, SARAH LAMBERT,
SHEILA MARSHALL, ANDREW MARSHALL,
NATALIE JACKSON, PHYLLIS CRAIG, JOEL
SEXTON-CRAIG, RACHAEL PUTMAN,
MENESIA SPADE, KELLY INMAN, BRANDI
YANEZ, KENNETH ANDERSON, ROBIN
MALLARD, MOSE MALLARD III, TERRENCE
MALLARD, XIOMARA HALL, G.H. by and
through her next friend Xiomara Hall, MILDRED
HALL, DOLORES WILSON, MARGIE BELL,
XAVIER ARIAS, CRISTIAN ARIAS, DONNA
OPICKA, DANIEL OPICKA, I.O. by and through his
next friend Julia Ward, ELIA DOMINGUEZ,
ANTONIO DOMINGUEZ, ELIA ORTIZ,
KATHERINE SHRADER, MARY ALLEN, JOHN
SAVAGE, RACHEL HALL, A.H. by and through
her next friend Rachel Hall, STEPHANIE FORREST,
B.F. by and through his next friend Stephanie Forrest,
J.F. by and through his next friend Stephanie Forrest,
BECKY JOHNSON, BRITTENY WOODS, JOSEF
PAUTSCH, ALEX RUNYAN, MATTHEW
SCHRIER, TRACY CARRICO, TIMOTHY DAVIS,
STEPHANIE BOVA, LAVETTE CURRY, NIKI
MARTIN, BILLIE SHOTLOW, MICHAEL
SHOTLOW, RYAN NEWELL, MAREN HESLA,
HELEN DEPRIMO, JOSEPH DEPRIMO, JODI
CALABRO, DANIELLE FEDIW, GERALD
FINLEY, JENNIFER LEFORS, JOHN FINLEY,

JOSHUA FINLEY, KATHY LAY for the estate of
KURT ZWILLING, ALEXANDER ZWILLING,
LESLY GARCIA, MARICRUZ GARCIA
VELASQUEZ, VICTOR GARCIA, RAMSSES
GARCIA, JENNA VANOSDALE, CARLENE
CROSS, MICHAEL BOGAR, CARISE
MARTINDALE, MICAEL BOGAR, JASE
BROSTROM, MARY BROSTROM, DAVID
BROSTROM, BLAKE BROSTROM, RENDA
RIGGINS, JONATHANBENTON, ELIZABETH
BENTON, H.B. by and through her next friend
Elizabeth Benton, S.B. by and through her next friend
Elizabeth Benton, G.B. by and through her next
friend Elizabeth Benton, MARIA AVNERI,
EDUARDO GARCIA, JACOB AVNERI, CRYSTAL
DELEO, JACOB LERNER, HANNAH COX,
CHARLOTTE ALLEN, MATTHEW ALLEN,
AUSTIN NELAMS, LINDA GRIECO, RALPH
GRIECO, JENNIFER BURCH, REGINA BYTHER,
N.W. by and through her next friend Regina Byther,
JESSE WATSON, SUSIE SCHULTE, ROBERT
SCHULTE, TODD SCHULTE, JANICE YORK,
MICHAEL STRATTON, DEBORAH YOUNG,
STEVEN STRATTON, FRANKLIN LITTLE,
DEAN COLEMAN, HOLLY INGRAM, C.A.I. by
and through her next friend Holly Ingram,
GWENDOLYN FRENCH, LAQUITTA FRENCH,
LATOYA FRENCH, PATRICIA GREEN,
ALMUTH GREEN JR., JESSE GREEN, ANDREA
STEFFEY, A.G.S. by and through her next friend
Andrea Steffey, RACHEL HUMPF, DENNIS
STEFFEY, HEATHER JACKSON, DAVID
HUMPF, KIM SOLA, COLLIN CLEAVER, AIDAN
CLEAVER, MINDYLOU PARESI, ELIZABETH
PARESI, JANET PARESI, TERRY PARESI,
SANTINA CARTISSER, ALEXANDRA
VANDENBROEK, BARBARA BROWN, HAROLD
BROWN SR., PAULA RICH, REGINA BROWN,
DANA BERNHARDT, MARY L. WISE, MARY H.
WISE, ETHAN PRUSINSKI, DANICA THOMAS,
L.T. by and through her next friend Danica Thomas,
BLAINE REDDING, MARTHA LOONEY,
GLENDA WILLARD, MICHELLE HOCK,
JORDAN PLUNK, RANEE MASSONI, JUSTIN
PLUNK, MARTA TORRES, GABRIEL NEGRON,
MARVIN NEGRON, JOSE NEGRON, MARIBEL

NEGRON, CRISTINE MITTLER, JOYCE
TURNER, TERRY MITTLER, ALEXANDER
MITTLER, MISTY BARCLAY, LINDA
REYNOLDS, GLENN CHISHOLM, KARMA
CHISHOLM, AUDREY CAMPBELL, ARTHUR
CAMPBELL, TINA CAMPBELL, KIMBERLEY
WHIPPLE, DAVID WHIPPLE, SEAN WHIPPLE,
BRIAN CLYBURN, JOSE ALEMAN, STEPHANIE
HAGER, ANN GOULD, JAMES GOULD,
JULIANNA SYMKOWIAK, ROGER POOCK,
BECKY POOCK, SHEILA  GOOD, CHARLES
ADKINS, VELVET ADKINS, BETHANY
BENTON, DINEEN SNYDER, EDWARD
SNYDER, NATASHA SNYDER, DAMIEN
SNYDER, FELICIA GROSS PANIAGUA,
SOCORRO GROSS PANIAGUA, CARLOS GROSS
RIOS SR., CARLOS GROSS PANIAGUA,
FRANCISCO BRISEÑO GUTIERREZ, LUIS
BRISEÑO ALVAREZ, AUGUST WILDMAN,
M.G.C. by and through his next friend August
Wildman, R.X.C. by and through his next friend
August Wildman, CORBIN CABRERA, GILLIAN
CABRERA, RONALD HOPKINS, SUZANNE
MARTINEZ, JD PROSSER, ROBERT CABRERA,
DANIEL CABRERA, GLORIA TRELFA, ROBERT
DARROUGH, JUDITH DARROUGH, DONALD
NEWMAN SR., AMANDA NEWMAN, CHARLES
LIGON, ARIELL TAYLOR, individually, and for the
estate of CHRISTOPHER BROWN, ALEX
ROZANSKI, CHRISTOPHER ROSEBROCK,
DAVID LAU, HAMIDE LAU, M.L. by and through
her next friend David Lau, K.L. by and through his
next friend David Lau, ALEXANDER LAU,
VIVIAN PERRY, JAMMIE SMITH, MICHELLE
RAUSCHENBERGER, LEROY LAU JR., HOLLY
ABRAHAM, KIMBERLY METCALF, CLARENCE
METCALF, KARYN STONE, LAWRENCE
MARTA, TAYLOR MARTA, SARAH
SCHWALLIE, THOMAS SCHWALLIE, RYAN
TIMONEY, DIANE TIMONEY, GREGORY
TIMONEY, JULIE ELLIS, BRIAN ELLIS,
VANESSA ANZURES, VICTOR ELLIS, NATHAN
RIMPF, SHEILA RISTAINO, SHAWN GRIFFIN,
CAROL GRIFFIN, DANIEL GRIFFIN, MATT
GRIFFIN, MARK WORLEY, MONA BETZEN,
GREGORY WORLEY, JAMES WORLEY, CODY

WORLEY, MARY BORDER, KATHERINE
ABREU-BORDER, DELAYNIE PEEK, NATALIE
SCHMIDT, A.L.S. by and through his next friend
Natalie Schmidt, LEEANN SCHMIDT, PHILLIP
SCHMIDT, BRANDON SCHMIDT, CHERYL
ATWELL, ERIN RIEDEL, LONA GAMBONE, L.D.
by and through his next friend Bridgett DeHoff,
KIRK GOLLNITZ, TYLER GOLLNITZ, JAN
HURNBLAD SPARKS, GARRY SPARKS, ERIK
SPARKS, ZACHARY SPARKS, JANE SPARKS,
CAMERON STUART, KATY STUART, JERRY
HARDISON, JUSTINA HARDISON, CEDRIC
GORDON, ADRIAN SHERROD, CONCHETTA
DIAZ, CEDRIC GORDON SR., EDWARD KLEIN,
SHERRY SKEENS, PAUL JAYNE, ADAM JAYNE,
GARRETT SKEENS, AYZIA JAYNE, Z.S., by and
through her next friend Kent Skeens, TRENT
SKEENS, KENT SKEENS, CASSIE
RICHARDSON, JOHN MEANS, TAMMIE
SCHOONHOVEN, A.R.S. by and through her next
friend Tammie Schoonhoven, A.M.S. by and through
her next friend Tammie Schoonhoven, DEBORAH
SCHOONHOVEN, CHRISTOPHER
SCHOONHOVEN, SHEESHTA PERRY, HELENA
DAVIS, C.D., by and through his next friend Helena
Davis, MARY SMEDINGHOFF, THOMAS
SMEDINGHOFF, REGINA SMEDINGHOFF,
JOAN SMEDINGHOFF, MARK SMEDINGHOFF,
SAMUEL SHOCKLEY, MIRANDA LANDRUM,
G.L., by and through his next friend Miranda
Landrum, B.L., by and through her next friend
Miranda Landrum, JANET LANDRUM, JAMES
LANDRUM, TRACEY PRESCOTT, JACOB
PRESCOTT, AARON PRESCOTT, JOSHUA
PRESCOTT, CHRISTINE PHILLIPS, S.P., by and
through her next friend Christine Phillips, MARIA
CARDOZA, RAMIRO CARDOZA SR., RAMIRO
CARDOZA JR., CHET MURACH, WILLIAM
MURACH, SAMANTHA MCNAMARA, BRENDA
DAEHLING, KIRK DAEHLING, ADAM
DAEHLING, KAYLA DAEHLING, JOANNA
GILBERT, JESSICA BENSON, ADAM
HARTSWICK, LIESELOTTE ROLDAN,
MATTHIAS ROLDAN, ANGEL ROLDAN,
SAMANTHA ROLDAN, NANCY MULLEN,
MIRIAM MULLEN, WILLIAM MULLEN,

BRANDON KORONA, LORRIA WELCH, BARRY
WELCH, ZACKARY WELCH, BRUCE NICHOLS,
JEANNE NICHOLS, M.N., by and through her next
friend Bruce Nichols, MARTHA SMITH, THOMAS
WICKLIFF, MICHELLE ROTELLI, SETH
WAKELING, ADRIANA WAKELING, NANCY
WILSON, ASHLEY PETERS, G.P., by and through
his next friend Ashley Peters, DEBORAH PETERS,
DENNIS PETERS, ALISON POHN, JOHN
MCCARTHY, DANIEL HUGHES, KRISTINE
ZITNY, KATHLEEN ALEXANDER, PATRICIA
HUGHES, PATRICIA GOINS, PAUL GOINS III,
JANICE CARUSO, DANA RAINEY, EMMITT
BURNS, ESTA SMITH, JOE TORIAN, NATHAN
TORIAN, JIMMY SMITH, EMILY TORIAN,
ALBERTO DIAZ, KAYLA DIAZ, N.J.D., by and
through his next friend Kayla Diaz, N.J.D., by and
through her next friend Kayla Diaz, FRANCES
DIAZ, MAXIMO DIAZ, ANTHONY DIAZ,
MATTHEW DIAZ, CAREY DUVAL, MICHELLE
RILEY, RODNEY RILEY, JULIE MARTIN,
BRIAN MARTIN, CATHERINE MARTIN,
ELIZABETH MARTIN, KELLI DODGE, B.C.D. by
and through his next friend Kelli Dodge, P.A.D. by
and through her next friend Kelli Dodge,
KATHLEEN MCEVOY, PATRICK MCEVOY,
MICHELLE MCEVOY, JANICE PROCTOR,
LUANN VARNEY, SUMMER SUTTON, ERIN
GOSS, HARRIET SUTTON, WENDY SHEDD,
TRECIA HOOD, FREDDIE SUTTON, ANNIE
MCBRIDE, CHESTER MCBRIDE SR.,
ALEXANDRA MCCLINTOCK, D.M., by and
through his next friend Alexandra McClintock,
JOYCE PAULSEN, GEORGE MCCLINTOCK III,
KEVIN KING, and STEPHANIE MILLER,

Plaintiffs,

v.

ERICSSON INC., and
TELEFONAKTIEBOLAGET LM ERICSSON,

Defendants.

## <u>COMPLAINT FOR VIOLATION OF THE ANTI-TERRORISM ACT</u>

Ryan R. Sparacino
Geoffrey P. Eaton
Eli J. Kay-Oliphant
Tejinder Singh
Shuman Sohrn
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
tejinder.singh@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION .............................................................................................................. 1

THE DEFENDANTS .......................................................................................................... 13

JURISDICTION AND VENUE ......................................................................................... 16

FACTUAL ALLEGATIONS .............................................................................................. 16

I.     AL-QAEDA AND ISLAMIC STATE ATTACKED AMERICANS IN
AFGHANISTAN, IRAQ, AND SYRIA AS PART OF AL-QAEDA'S AND
ISLAMIC STATE'S TRANSNATIONAL TERRORIST CAMPAIGNS TO
EXPEL THE UNITED STATES FROM THE MIDDLE EAST .............................. 16

     A.     Al-Qaeda Waged A Global Terrorist Campaign To Expel The United
States From Iraq, Afghanistan, And The Rest Of The Middle East ................... 18

     B.     Islamic State Waged A Global Terrorist Campaign To Expel The United
States From Iraq, Afghanistan, And The Rest Of The Middle East ................... 42

II.     DEFENDANTS AIDED AL-QAEDA AND ISLAMIC STATE .............................. 46

     A.     Defendants Pursued A Corruption-Based Business Model In Iraq ..................... 46

          1.     Defendants Operated In An Insecure And Corrupt Iraqi Contracting
Environment That Encouraged Protection Payments ..................................... 47

          a.     Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money
Operation in Iraq from 2004 through 2014 .................................................... 50

          b.     Islamic State Ran a Sophisticated Protection Money Operation in Iraq
from 2014 through 2021 ................................................................................ 53

          2.     Multinational Corporations Commonly Structured Their Operations In
Iraq To Funnel Protection Money Payments To Al-Qaeda, Al-Qaeda-
in-Iraq, And Jabhat Al-Nusra ......................................................................... 55

     B.     Defendants Made Protection Money Payments To Al-Qaeda, Al-Qaeda-in-
Iraq, And Islamic State And Intentionally Obstructed U.S. Government
Counterterrorism Efforts Targeting Such Foreign Terrorist Organizations ........ 67

III.     DEFENDANTS' AID FACILITATED AL-QAEDA AND ISLAMIC STATE
ATTACKS ON AMERICANS IN IRAQ, AFGHANISTAN, AND SYRIA ............. 92

     A.     Al-Qaeda Comprised A Globally Integrated Terror Network That Relied
Upon A Cooperative, Corporate Model Internally And With Other Allied

Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign Against The United States ........................................................................ 92

1.    Al-Qaeda's Integrated Global Network ............................................. 92

2.    Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists.................... 96

3.    Al-Qaeda's Multi-National Corporation Model ............................................. 97

4.    Al-Qaeda Relied Upon Protection Money Payments And Donations To Fund Its Global Terrorist Campaign ............................................................ 103

5.    In Collaboration With Iran's Islamic Revolutionary Guard Corps, Al-Qaeda Used Iranian Territory To Securely Move Money, Fighters, Communications, And Material Between Afghanistan And Iraq In Order To Facilitate Attacks Against Americans In Both Places.................. 106

6.    Value Flow To Al-Qaeda And Al-Qaeda-In-Iraq Aided Al-Qaeda's And Al-Qaeda-In-Iraq's Attacks Against Americans In Iraq, Syria, And Afghanistan From 2007 Through 2016................................................... 108

a.    Funds Raised By Al-Qaeda Or Al-Qaeda-In-Iraq In Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan....... 109

b.    Al-Qaeda Redeployed Al-Qaeda-In-Iraq Terrorists To Afghanistan And Pakistan To Facilitate Al-Qaeda's Attacks Against Americans In Afghanistan ......................................................................................... 111

c.    Al-Qaeda Facilitated Al-Qaeda-In-Iraq's Provision Of Key Training And Expertise To Terrorists Targeting Americans In Afghanistan.............. 114

d.    Al-Qaeda-In-Iraq Provided Logistical Aid To Al-Qaeda Core ................... 116

B.    Al-Qaeda Polyterrorists Facilitated Transnational Cooperation Between Al-Qaeda's Branches In Iraq, Iran, Afghanistan, Pakistan, And Syria, And Facilitated Al-Qaeda's Terrorist Campaigns In Each Country .......................... 117

1.    Abu Musab al-Zarqawi ................................................................ 118

2.    Sulayman Khalid Darwish ............................................................ 120

3.    Muhsin al-Fadhli ......................................................................... 122

4.    Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri)...................................... 124

5.    Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani .......................... 125

6.    Sirajuddin Haqqani ..................................................................... 126

7.       Ahmed Jan Wazir ................................................................. 130

8.       Ezedin Abdel Aziz Khalil (aka Yasin al-Suri) ................................. 131

9.       Umid Muhammadi ................................................................ 132

10.      Sangeen Zadran .................................................................. 132

11.      Mustafa Hajji Muhammad Khan ................................................ 133

12.      Adel Radi Saqr al-Wahabi al-Harbi ........................................... 134

13.      Abdul Rauf Zakir ............................................................... 135

14.      Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni ...................... 136

15.      Abd al-Rahman Mustafa al-Qaduli ............................................. 137

16.      Abu Afghan al-Masri ........................................................... 138

C.       Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks,
         Infrastructure, Ideology, Tactics, Techniq ues, And Procedures, And
         Followed Al-Qaeda's Globally Integrated Terror Network Model That
         Facilitated Cooperation Between Islamic State Branches ................... 138

1.       Islamic State Emulated Al-Qaeda ............................................. 139

2.       Islamic State Operated As An Integrated Global Network ................... 140

3.       Islamic State Followed A Multi-National Corporation Model ................ 141

4.       Islamic State Relied Upon Protection Money Payments And Donations
         To Fund Its Global Terrorist Campaign ...................................... 142

5.       Value Flow To Islamic State Aided Islamic State's Attacks Against
         Americans In Iraq, Syria, And Afghanistan .................................. 142

a.       Islamic State Funds Raised In Iraq Funded Islamic State Attacks In
         Iraq, Syria, And Afghanistan ................................................. 143

b.       Islamic State Redeployed Its Terrorists In Iraq To Afghanistan And
         Pakistan To Establish And Lead Islamic State's Branch There ............. 144

c.       Islamic State's Terrorists in Iraq and Syria Provided Key Training and
         Expertise to Islamic State's Terrorists In Afghanistan and Pakistan
         Targeting Americans in Afghanistan .......................................... 147

d.       Islamic State Terrorists In Iraq Provided Key Logistical Aid To
         Islamic State's Branch In Afghanistan And Pakistan ....................... 147

iii

IV.   DEFENDANTS KNEW THEY WERE AIDING ATTACKS ON
      AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC
      STATE ............................................................................................................ 148

   A.   Defendants Admitted They Engaged In Illegal Transactions That
        Foreseeably Caused Protection Money To Flow To Terrorists And
        Obstructed United States Counterterrorism Efforts............................................ 148

   B.   Defendants Knew They Operated In A Hyper-Corrupt Environment In
        Which Corporations Commonly Made Protection Payments To Terrorists....... 154

        1.   Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt ............ 156

        2.   Defendants Knew Corruption In Iraq Was Inextricably Connected To
             Terroristic Violence ......................................................................................... 160

        3.   Defendants Knew They Did Business In Geographies That Were
             Insecure And Targeted By Terrorists.............................................................. 162

        4.   Defendants Knew Multinational Corporations' Illicit Transactions In,
             Or Relating To, Iraq, Afghanistan, And Syria Were Routinely
             Designed To Route Protection Payments To Al-Qaeda And Islamic
             State Branches Operating In The Middle East................................................ 167

        5.   Defendants Knew Al-Qaeda's And Islamic State's Terrorist
             Campaigns In Iraq And Afghanistan Were Inextricably Linked ................. 174

   C.   Defendants Knew Their Illicit Iraqi Transactions Caused Protection
        Money To Flow To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ............... 176

        1.   Defendants Knew Their Illicit Transactions With Iraq-Related
             Intermediaries Caused Protection Payments To Flow To Terrorists ........... 182

        a.   Defendants Knew Their Illicit Transactions With Iraqi Partners Caused
             Protection Payments To Flow To Terrorists................................................. 199

        b.   Defendants Knew Their Illicit Transactions With Consultants For Iraq-
             Related Matters Caused Protection Payments To Flow To Terrorists.......... 201

        c.   Defendants Knew Their Illicit Transactions with Security,
             Transportation, and Logistics Contractors in Iraq, Syria, Jordan,
             Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to
             Flow to Terrorists......................................................................................... 203

        2.   Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-
             Based Protection Payments To Flow To Terrorists, And Intended For
             Their Officers, Employees, Agents, Partners, Consultants, And

Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists ................................................................................ 206

a.      Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists ............ 207

b.      Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit Iraqi Transactions Would Facilitate Covert Protection Payments To Terrorists ................................................................................ 209

3.      Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Conceal Their Protection Payments .................... 211

D.      Defendants Knew Al-Qaeda's Role .................................................... 212

1.      Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States ........................................................................ 212

2.      Defendants Knew Protection Payments Aided Al-Qaeda .......................... 221

3.      Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq ............... 227

4.      Defendants Knew Al-Qaeda-In-Iraq Aided Al-Qaeda ................................ 231

a.      Defendants Knew Al-Qaeda-In-Iraq Funded Al-Qaeda ............................ 234

b.      Defendants Knew Al-Qaeda-In-Iraq Terrorists Served Al-Qaeda In Afghanistan, Pakistan, And The Persian Gulf ................................ 236

c.      Defendants Knew al-Qaeda-In-Iraq Provided Key Training to Al-Qaeda and the Taliban ................................................................ 241

d.      Defendants Knew Al-Qaeda-In-Iraq Provided Key Logistical Aid To Al-Qaeda ................................................................................ 244

E.      Defendants Knew Islamic State's Role .................................................... 246

1.      Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States ........................................................................ 246

2.      Defendants Knew Protection Payments Aided Islamic State ...................... 250

3.      Defendants Knew Islamic State's Core In Iraq And Syria Facilitated Attacks By Islamic State's Branch In Afghanistan .................................... 258

a.      Defendants Knew Islamic State Core Funded Islamic State's Branch In Afghanistan ................................................................ 258

       b.     Defendants Knew Islamic State Core Served Islamic State's Branch In Afghanistan .................................................................................. 261

  F.    Defendants Knew The U.S. Government Opposed Their Protection Payments ....................................................................................... 262

V.    DEFENDANTS FRAUDULENTLY CONCEALED THEIR AID ........................ 270

  A.    Defendants Fraudulently Concealed Their Protection Payments And Donations To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ......................... 270

  B.    Defendants Knew Their Concealment Of Their Protection Payments And Donations Aided Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ................... 277

VI.    DEFENDANTS' AID WAS SUBSTANTIAL ........................................................ 278

  A.    Defendants Provided Support Tailored To The Violence At Issue Here ........... 278

  B.    The Amount Of Money, And Concealment Of The Same, Were Both Significant ................................................................................... 285

  C.    Defendants Had Culpable Mental States ............................................. 287

  D.    Defendants Had A Close Relationship To The Tortfeasors ......................... 288

  E.    The Duration Of Support Was Long ................................................... 289

VII.    DEFENDANTS' AID HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES ...................................................................................... 289

VIII.    ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ USED DEFENDANTS' ASSISTANCE TO COMMIT ATTACKS THAT KILLED AND INJURED PLAINTIFFS IN IRAQ, AFGHANISTAN, AND SYRIA ........... 299

  A.    Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In Iraq, Syria, And Afghanistan From 2017 Through 2021 ......................................................................................... 299

  B.    Al-Qaeda and Al-Qaeda-in-Iraq Committed, Planned, and Authorized the Attacks that Injured Plaintiffs in Iraq And Syria From 2005 Through 2013 ...... 299

  C.    Al-Qaeda Committed, Planned, and Authorized the Attacks that Injured Plaintiffs in Afghanistan From 2007 through 2016, Which Were Facilitated By Al-Qaeda-In-Iraq ......................................................... 302

IX.    THE ISLAMIC STATE ATTACKS ..................................................... 308

  The August 26, 2021 Suicide Attack In Afghanistan (Jared Schmitz Family) ............... 308

The November 22, 2012 Kidnapping Attack, And Subsequent Hostage Taking, Torture, and Murder in Syria (James Foley Family) .......................................... 309

The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, and Murder in Syria (Kayla Mueller Family) ...................................... 310

The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, and Murder in Syria (Steven Sotloff Family) ...................................... 312

The April 29, 2017 IED Attack In Iraq (Weston Lee Family)...................................... 313

X.    THE AL-QAEDA AND AL-QAEDA-IN-IRAQ ATTACKS IN IRAQ AND SYRIA.................................................................................................................. 314

The June 23, 2005 Suicide Attack In Al Anbar (Ramona M. Valdez Family).............. 314

The August 1, 2005 Suicide Attack In Al Anbar (James R. Graham III Family) ......... 314

The November 15, 2005 Suicide Attack In Al Anbar (Nickolas D. Schiavoni Family)................................................................................................................ 315

The December 9, 2005 Suicide Attack In Baghdad (Adrian N. Orosco Family) .......... 316

The April 11, 2006 Suicide Attack In Al Anbar (Kenneth D. Hess Family)................. 317

The September 13, 2006 Suicide Attack In Baghdad (Marcus A. Cain Family)........... 318

The January 5, 2007 IED Attack In Al Anbar (Patrick R. Russell Family) .................. 319

The January 15, 2007 IED Attack In Nineveh (John E. Cooper Family)...................... 320

The January 19, 2007 IED Attack In Nineveh (Russell P. Borea Family) .................... 320

The January 20, 2007 IED Attack In Al Anbar (Jeffrey D. Bisson Family) ................. 321

The January 26, 2007 IED Attack In Diyala (Alan R. Johnson Family)....................... 322

The February 8, 2007 IED Attack In Al Anbar (Ross A. Clevenger Family) ............... 323

The February 11, 2007 IED Attack In Al Anbar (Russell A. Kurtz Family) ................ 324

The February 14, 2007 IED Attack In Diyala (Carl L. Seigart and Ronnie G. Madore Jr. Families) .......................................................................................... 325

The February 18, 2007 IED Attack In Al Anbar (Brett A. Witteveen Family)............. 326

The March 5, 2007 IED Attack In Saladin (Justin M. Estes Family)............................ 327

The March 17, 2007 IED Attack In Diyala (Benjamin L. Sebban Family)................... 328

The March 23, 2007 IED Attack In Al Anbar (Greg N. Riewer Family) ...................... 329

The April 4, 2007 IED Attack In Baghdad (Joseph H. Cantrell IV Family) ................ 330

The April 7, 2007 IED Attack In Diyala (Jonathan D. Grassbaugh, Levi K. Hoover, and Rodney L. McCandless Families) ................................. 331

The April 14, 2007 IED Attack In Al Anbar (Brandon L. Wallace and Joshua A. Schmit Families) ................................................................. 333

The April 23, 2007 IED Attack In Al Anbar (Brice A. Pearson, Kenneth E. Locker Jr., and Michael J. Rodriguez Families) ................................. 334

The May 6, 2007 IED Attack In Diyala (Jason R. Harkins Family) ............................. 336

The May 18, 2007 IED Attack In Baghdad (Anselmo Martinez III Family) ................ 337

The May 22, 2007 IED Attack In Baghdad (Robert J. Montgomery Jr. Family) .......... 338

The May 28, 2007 IED Attack In Diyala (James E. Summers III, Kile G. West, and Zachary D. Baker Families) ........................................................ 339

The June 2, 2007 IED Attack In Saladin (Dariek E. Dehn Family) ............................. 341

The June 2, 2007 IED Attack In Nineveh (Jeremiah D. Costello Family) .................... 341

The June 19, 2007 IED Attack In Diyala (Darryl W. Linder Family) ........................... 342

The July 17, 2007 IED Attack In Saladin (Patrick L. Wade Family) ........................... 343

The July 24, 2007 IED Attack In Diyala (Matthew R. Zindars and Robert A. Lynch Families) ................................................................................ 344

The July 26, 2007 IED Attack In Diyala (Michael A. Baloga Family) ......................... 345

The August 11, 2007 IED Attack In Baghdad (William D. Scates Family) .................. 346

The August 30, 2007 IED Attack In Nineveh (Daniel E. Scheibner Family) ............... 347

The September 7, 2007 IED Attack In Nineveh (Jason J. Hernandez Family) ............. 348

The September 11, 2007 IED Attack In Kirkuk (Brett R. Wolf Family) ...................... 349

The September 14, 2007 IED Attack In Baghdad (Christopher M. McCloud Family) ................................................................................................. 350

The September 18, 2007 IED Attack In Diyala (Nicholas P. Olson Family) ................ 351

The October 14, 2007 IED Attack In Baghdad (Justin S. Monschke Family) .............. 352

The October 24, 2007 IED Attack In Nineveh (Robin L. Towns Sr. Family)............... 352

The November 14, 2007 IED Attack In Diyala (Kenneth R. Booker Family) .............. 353

The December 20, 2007 Suicide Attack In Diyala (Jeremy E. Ray Family)................. 354

The January 5, 2008 IED Attack In Diyala (Jason F. Lemke Family) .......................... 355

The January 9, 2008 IED Attack In Diyala (Jonathan K. Dozier, Matthew I. Pionk, and Zachary W. McBride Families) ........................................................ 356

The January 28, 2008 IED Attack In Nineveh (Evan A. Marshall, James E. Craig, and Joshua A.R. Young Families) .................................................................... 358

The March 10, 2008 IED Attack In Diyala (Phillip R. Anderson and Torre R. Mallard Families)................................................................................................. 360

The March 30, 2008 IED Attack In Al Anbar (William G. Hall Family) ..................... 361

The April 14, 2008 IED Attack In Al Anbar (Dean D. Opicka Family) ....................... 363

The June 25, 2008 IED Attack In Nineveh (Alejandro A. Dominguez Family) ............ 364

The September 24, 2008 Suicide Attack In Diyala (Michael J. Medders Family)......... 365

The November 14, 2008 IED Attack In Al Anbar (Aaron M. Allen Family) ................ 365

The December 4, 2008 Suicide Attack In Nineveh (John J. Savage Family)................. 366

The April 10, 2009 Suicide Attack In Nineveh (Bryan E. Hall, Edward W. Forrest Jr., Gary L. Woods Jr., and Jason G. Pautsch Families)..................................... 367

The July 21, 2010 IED Attack In Diyala (Michael L. Runyan Family) ........................ 370

The December 31, 2012 Kidnapping Attack, And Subsequent Hostage Taking And Torture, In Aleppo, Syria (Matthew Schrier).............................................. 371

XI.      THE AL-QAEDA ATTACKS IN AFGHANISTAN ................................................ 372

The July 23, 2007 IED Attack In Kabul (Adam J. Davis, Michael S. Curry Jr., and Travon T. Johnson Families) ............................................................................. 373

The January 7, 2008 IED Attack In Nangarhar (Ryan J. Newell Family)..................... 375

The January 14, 2008 Complex Attack In Kabul (Thor D. Hesla Family).................... 375

The May 20, 2008 IED Attack In Ghazni (Jeffrey F. DePrimo Family) ....................... 376

The May 31, 2008 IED Attack In Nangarhar (James M. Finley Family)....................... 377

ix

The July 13, 2008 Complex Attack In Nuristan (Gunnar W. Zwilling, Israel Garcia, Jason D. Hovater, Jason M. Bogar, Jonathan P. Brostrom, Pruitt A. Rainey, Jonathan R.C. Benton Families) ............................................................. 378

The August 1, 2008 IED Attack In Kunar (Jair De Jesus Garcia Family) ..................... 383

The August 22, 2008 IED Attack In Ghazni (Brian E. Studer Family) ........................ 384

The September 11, 2008 IED Attack In Nangarhar (Jacob R. Lerner Family) ............. 385

The September 20, 2008 IED Attack In Kunar (Nathan M. Cox Family) ..................... 385

The October 14, 2008 IED Attack In Kunar (Cory J. Bertrand Family) ....................... 386

The October 27, 2008 Suicide Attack In Baghlan (Kevin D. Grieco Family) ............... 387

The January 17, 2009 IED Attack In Kabul (Simone A. Robinson Family) ................. 388

The January 18, 2009 IED Attack In Kabul (Jesse W. Watson Family) ...................... 389

The May 20, 2009 IED Attack In Kabul (Roslyn L. Schulte Family) ........................... 390

The May 26, 2009 Suicide Attack In Kapisa (Mark E. Stratton II Family) .................. 391

The July 24, 2009 Complex Attack In Nuristan (Justin D. Coleman Family) ............... 392

The August 21, 2009 Complex Attack In Kunar (Matthew L. Ingram Family) ............. 393

The September 30, 2009 Suicide Attack In Khost (Alex French IV Family) ................ 394

The October 16, 2009 IED Attack In Ghazni (Anthony G. Green Family) ................... 395

The October 25, 2009 IED Attack In Laghman (Brandon K. Steffey Family) ............. 396

The November 19, 2009 Suicide Attack In Zabul (John J. Cleaver Family) ................. 397

The December 30, 2009 Suicide Attack In Khost (Dane C. Paresi, Harold Brown Jr., and Jeremy J. Wise Families) .................................................................... 398

The March 16, 2010 Suicide Attack In Helmand (Allen R. Thomas Family) ............... 401

The June 7, 2010 IED Attack In Kunar (Blaine E. Redding Family) ........................... 402

The June 21, 2010 Suicide Attack In Kunar (Andrew R. Looney Family) ................... 403

The June 25, 2010 Complex Attack In Kunar (Jared C. Plunk Family) ........................ 403

The July 10, 2010 Complex Attack In Kunar (Carlos J. Negron Sr. and Shaun M. Mittler Families) ............................................................................................. 405

The August 17, 2010 IED Attack In Kunar (Benjamen G. Chisholm Family) .............. 406

The October 4, 2010 IED Attack In Kabul (Karl A. Campbell Family) ........................ 407

The November 5, 2010 IED Attack In Ghazni (Blake D. Whipple Family) .................. 408

The December 5, 2010 Suicide Attack In Paktia (Nicholas J. Aleman Family) ............ 409

The February 27, 2011 IED Attack In Ghazni (Kristopher J. Gould Family) ............... 410

The April 13, 2011 IED Attack In Laghman (Donald L. Nichols Family) ................... 411

The April 16, 2011 Suicide Attack In Laghman (Charles L. Adkins Family) ............... 412

The June 4, 2011 IED Attack In Laghman (Brett P. Benton and Devin A. Snyder
    Families) ................................................................................................. 413

The July 31, 2011 IED Attack In Kunar (William B. Gross Paniagua Family) ............. 415

The September 25, 2011 IED Attack In Laghman (Francisco J. Briseño-Alvarez
    Jr. Family) .............................................................................................. 416

The October 29, 2011 Suicide Attack In Kabul (David E. Cabrera, James M.
    Darrough, and Christopher R. Newman Families) ............................................. 417

The December 11, 2011 IED Attack In Kunar (Charles S. Ligon Family) ................... 420

The April 3, 2012 IED Attack In Kunar (Christopher L. Brown Family) ..................... 421

The April 4, 2012 Suicide Bombing Attack In Faryab (Nicholas J. Rozanski,
    Christopher J. Rosebrock, and David W.H. Lau Families) ................................. 422

The April 22, 2012 IED Attack In Ghazni (Michael J. Metcalf Family) ....................... 424

The May 7, 2012 IED Attack In Ghazni (Chase S. Marta and Jacob M. Schwallie
    Families) ................................................................................................. 425

The May 20, 2012 Suicide Attack In Uruzgan (Ryan G. Timoney Family) ................. 427

The June 1, 2012 Complex Attack In Khost (Vincent J. Ellis Family) ........................ 428

The July 8, 2012 IED Attack In Ghazni (Nathan J. Rimpf Family) .............................. 429

The August 8, 2012 Suicide Attack In Kunar (Kevin J. Griffin Family) ...................... 429

The August 11, 2012 IED Attack in Helmand Province (Mark G. Worley Family) ...... 430

The September 1, 2012 Complex Attack In Ghazni (Jeremie S. Border and
    Jonathan P. Schmidt Families)........................................................................ 431

The September 15, 2012 Complex Attack in Helmand Province (Bradley W. Atwell and Christopher K. Raible Families).......................................................... 433

The September 26, 2012 Suicide Attack In Logar (Jonathan A. Gollnitz and Orion N. Sparks Families)............................................................................................ 435

The September 30, 2012 IED Attack in Kandahar Province (Cameron J. Stuart Family)..................................................................................................................... 437

The October 1, 2012 Suicide Attack In Khost (Jeremy F. Hardison Family) ............... 438

The October 13, 2012 IED Attack in Zabul Province (Brittany B. Gordon Family) ..... 439

The October 22, 2012 IED Attack in Kandahar Province (Edward W. Klein Family)..................................................................................................................... 440

The November 3, 2012 IED Attack in Paktia Province (Ryan P. Jayne Family)........... 440

The November 16, 2012 Complex Attack in Paktika Province (Joseph A. Richardson Family)............................................................................................... 442

The November 18, 2012 IED Attack in Helmand Province (Dale W. Means Family)..................................................................................................................... 442

The December 15, 2012 IED Attack In Kabul (Mark H. Schoonhoven Family) ........... 443

The February 22, 2013 IED Attack in Helmand Province (Jonathan D. Davis Family)..................................................................................................................... 445

The April 6, 2013 Suicide Attack In Zabul (Anne T. Smedinghoff Family)................. 446

The March 17, 2013 IED attack in Kandahar Province (Samuel R. Shockley Family)..................................................................................................................... 447

The May 4, 2013 IED Attack in Kandahar (Brandon J. Landrum, Brandon J. Prescott, Francis G. Phillips IV, Kevin Cardoza, and Thomas P. Murach Families) ................................................................................................................. 448

The May 14, 2013 IED Attack in Kandahar (Mitchell K. Daehling, William J. Gilbert, and Adam S. Hartswick Families)........................................................ 451

The May 16, 2013 Suicide Attack In Kabul (Angel Roldan Jr. Family) ....................... 453

The June 2, 2013 an IED attack in Nimruz Province (Sean W. Mullen Family) ........... 454

The June 23, 2013 IED Attack in Paktika (Brandon Korona Family)............................ 455

The July 23, 2013 IED Attack in Wardak (Nickolas S. Welch and Rob L. Nichols Families) ................................................................................................................. 456

The August 12, 2013 IED Attack in Logar (James T. Wickliff Chacin Family)............ 458

The September 26, 2013 IED Attack in Wardak (Seth T. Wakeling Family) ............... 459

The October 6, 2013 IED Attack in Kandahar (Cody J. Patterson and Joseph M.
        Peters Families).................................................................................................. 460

The January 17, 2014 Complex Attack In Kabul (Alexis L. Kamerman Family).......... 461

The February 10, 2014 IED Attack In Kabul (Michael A. Hughes and Paul E.
        Goins Jr. Families).............................................................................................. 462

The February 15, 2014 Complex Attack in Helmand Province (Aaron C. Torian
        Family)................................................................................................................ 464

The August 12, 2014 IED Attack in Kandahar (Alberto D. Diaz Family) ................... 465

The August 24, 2014 Suicide Attack In Nangarhar (Carey G. Duval Family).............. 467

The November 24, 2014 IED Attack In Kabul (Joseph W. Riley Family).................... 467

The December 12, 2014 IED Attack in Parwan (Wyatt J. Martin Family) ................... 468

The August 22, 2015 Suicide Attack In Kabul (Corey J. Dodge, Richard P.
        McEvoy, and Barry D. Sutton Families) ............................................................. 469

The December 21, 2015 Suicide Attack In Parwan (Chester J. McBride III
        Family)................................................................................................................ 472

The January 5, 2016 Complex Attack in Helmand (Matthew Q. McClintock
        Family)................................................................................................................ 473

The August 7, 2016 Kidnapping, Subsequent Hostage Taking, And Torture in
        Kabul Province and Pakistan (Kevin King Family) ........................................... 474

CLAIMS FOR RELIEF ................................................................................................. 475

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
[All Defendants:  Aiding-And-Abetting Liability, Attack Predicate] ........................ 475

JURY DEMAND ............................................................................................................ 477

PRAYER FOR RELIEF ................................................................................................. 477

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act, 18 U.S.C.

§ 2333, on behalf of American service members and civilians who were killed or wounded while

serving their country in Iraq, Afghanistan, and Syria between 2005 and 2021, as well as their

families.  While these men and women worked to support humanitarian efforts in the Middle

East, they were attacked by Foreign Terrorist Organizations ("FTOs") al-Qaeda, al-Qaeda-in-

Iraq, and Islamic State, which LM Ericsson and Ericsson Inc. (collectively, "Defendants" or

"Ericsson") helped finance and logistically aid. Specifically, from 2004 until at least February

15, 2022, Defendants – themselves and through their intermediary partners, consultants, and

subcontractors – made substantial protection payments to al-Qaeda, al-Qaeda-in-Iraq, and

Islamic State in U.S. dollars sourced from America and in free state-of-the-art communications

devices, such as U.S. communications technologies, like cell phones and tablets, that provided

encryption while doubling as a cash equivalent.  Starting no later than 2013, Ericsson also

provided logistical aid to al-Qaeda and Islamic State by intentionally obstructing vital U.S.

government counterterror efforts through their repeated lies to the government about the

terrorists, their operations, and Ericsson's related conduct, which provided key "cover" and

"concealment" to al-Qaeda's and Islamic State's fundraising rackets while these FTOs were

killing and kidnapping Americans.

2.      After the U.S. military's post-9/11 invasions of Afghanistan and Iraq, al-Qaeda

and its regional branches, led by al-Qaeda-in-Iraq (which evolved into Islamic State, aka ISIS

and ISIL, in 2014), collaborated to expel the United States from the Middle East by sponsoring

waves of attacks against Americans throughout the region.  Reliable funding was vital to that

goal.  By 2005, al-Qaeda's branches in Iraq and Syria—most notoriously, al-Qaeda-in-Iraq under

the leadership of notorious terrorist Abu Musab al-Zarqawi—began systematically extracting

protection payments from international businesses operating in the Iraqi and Syrian geographies in which al-Qaeda-in-Iraq posed a threat.  To that end, al-Qaeda's branches in Iraq and Syria approached companies operating in their areas of influence and demanded money.  The terrorists motivated companies to pay by presenting them with a choice:  either meet the terrorists' monetary demands and help fund terrorist attacks, or else spend even more money on expensive security measures to fend off the risk of future attacks.

3.      LM Ericsson and Ericsson Inc. agreed to the terrorists' demands. Under Ericsson's business model, LM Ericsson's primary goal in Iraq between 2003 and 2022 was to sell goods, technologies, and services manufactured, provided, or serviced by Ericsson Inc. because LM Ericsson's large-scale infrastructure projects in Iraq usually required Ericsson Inc.'s goods, technologies, and services. To maximize their profits, Defendants funded the terrorists to leave them alone.  The payments saved Ericsson money: it was cheaper to pay off al-Qaeda and Islamic State than to invest in the security necessary to mitigate the terrorists' threats.  And the payments generally worked as intended.  Paying the terrorists reduced the frequency with which Defendants faced the threat of terrorists attacking their assets in the region, and it allowed them to cut corners on security, too.

4.      LM Ericsson and Ericsson Inc. financed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through protection payments from at least 2004 until at least 2019.  The allegations of such payments below include (but are not limited to) contracts on which Defendants made payments; identities of subcontractors they used to facilitate the flow of money; indications of how they concealed payments on their books; and examples of specific payments made by each.  Some details varied over time (e.g., different subcontractor buffers) while others endured (e.g., the use of a corrupt consultant as a buffer for more than a decade). Throughout, however, LM Ericsson's

and Ericsson Inc.'s objective was the same – to ensure that Defendants' funds reached the terrorists so that Ericsson's lucrative Iraqi projects, and attendant profits, continued flowing.

5.      On behalf of Ericsson Inc., LM Ericsson often (but not always) paid these designated FTOs through Ericsson's local subcontractors, in an effort to reduce the risk the payments would be traced back to them.  Many projects in Iraq involved chains of subcontractors – in which a prime contractor funneled both the work and the money through layers of additional corporate entities – and Ericsson exploited that structure to facilitate payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Indeed, Ericsson often hired local subcontractors intending for those companies to deliver "security" for Defendants' projects by paying off al-Qaeda-in-Iraq and Islamic State.  Those protection payments were typically structured in one of two ways.  First, the payments often took the form of transfers that Defendants routed to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents through Defendants' own intermediaries – purpose-built "buffers" between Ericsson and the terrorists so Ericsson could claim, as it now does, that it has no idea where its money went. Alternatively, the payments sometimes comprised direct cash payments from Ericsson's employees or agents, funded by Defendants' uncontrolled Iraqi slush funds that Defendants (or their subcontractors) financed through their transactions.  Either way, the logic was the same.  Defendants decided that buying off the terrorists was the most efficient way to operate their businesses while managing their own security risks – even though doing so jeopardized American lives.

6.      Ericsson's protection payments adhered to the common practice followed by most multinational corporations, including telecoms firms, that routinely engaged in substantial illicit financial transactions related to lucrative large-scale projects while operating in contested Iraqi, Afghan, Syrian, and Turkish geographies in which al-Qaeda and Islamic State posed a threat

from the mid-2000s through the present day.  Most companies that were willing to engage in illicit transactions, like Ericsson, viewed terrorist protection payments as the cost of doing business, and they often admitted as much.  Investigations by U.S. military intelligence agencies, Congress, and journalists all confirmed that such admissions matched the reality on the ground. Under that prevailing practice by western corporations and foreign telecom companies that tolerated illicit payments in Iraq, like Ericsson, companies that willingly participated in the criminal economy in Iraq as the cost of doing business there typically paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists amounts worth at least 10 percent – and often much more – of the thing being "protected" or the income being earned.

7.     Defendants bribed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State so that the FTOs would allow LM Ericsson to sell Ericsson Inc.'s U.S.-sourced technology, goods, and services in Iraq.  By doing so, Ericsson participated in one of the FTOs' longest-running and most effective terrorist finance schemes: the collection of protection money from corrupt multinational corporations that were willing to place their own business interests above the national security interests of the United States and the safety of American lives in the Middle East. By offering a percentage of their profits as well as free U.S.-manufactured technology and goods to the terrorists as tribute, Ericsson redirected terrorist violence away from Defendants' Middle Eastern operations – and toward honest businesses and people, including Plaintiffs.

8.     LM Ericsson and Ericsson Inc. supported al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for a simple reason:  it was the cost of doing business in one of Ericsson's most important profit centers worldwide.  Ericsson's protection payments aided and abetted terrorism by funding al-Qaeda's and Islamic State's attacks against Americans in Iraq, Afghanistan, and Syria. Although Defendants made their payments in Iraq, those payments aided al-Qaeda, al-Qaeda-in-

Iraq, and the Islamic State in Iraq, Afghanistan, and Syria, facilitating attacks on Americans in all those geographies. That is because these FTOs maintained global operations, under which financial, technical, and logistical resources raised in one jurisdiction flowed through to the others to support their global terrorist campaign against Americans.

9.       In February 2022, LM Ericsson and Ericsson Inc. admitted that their money may have flowed to anti-American terrorists from at least 2011 through at least 2019.  The companies announced that they had "identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes," and admitted that their "[i]nvestigators could not determine the ultimate recipients of these payments."

10.       Following Ericsson's blockbuster admission in February 2022, observers worldwide understood what Ericsson had conceded: it was a serial corporate criminal in Iraq that likely routed vast sums of protection money to terrorist groups operating branches there. As one telecom-industry publication put it, "[a]fter years of investigation, Ericsson has said that its employees may have funded terrorism in Iraq and the Middle East …. Ericsson intended to avoid Iraqi authorities, and as such, paid money to ISIS and other terrorist organizations controlling some [transport] routes at that time. … All of this points to a serious implication; Ericsson, whether unwittingly or otherwise, funded terrorist activities" in Iraq throughout the 2010s.

11.       Indeed, Defendants continued bribing terrorists, obstructing U.S. counterterrorism efforts, and threatening American lives even while Ericsson assured the U.S. Department of Justice ("DOJ"), Securities and Exchange Commission ("SEC"), Defendants' shareholders, and the public, including Plaintiffs, that Ericsson no longer paid bribes to win work—while also

hiding Ericsson's earlier terrorist payoffs under the absurd pretense that a publicly traded company's bribes to al-Qaeda and Islamic State were not "material."

12.     Defendants are not ordinary corporations, and do not stand accused of routine corporate misdeeds.  LM Ericsson is an admitted corporate criminal, pleaded guilty to violating the Foreign Corrupt Practices Act ("FCPA") in 2019, and paid more than $1 billion in combined penalties to DOJ and SEC as part of a Deferred Prosecution Agreement ("DPA") relating to its decades-long, enterprise-wide pattern of bribery and corruption throughout the world.

13.     After Ericsson's recent admission regarding funding the terrorists, the United States government has concluded that LM Ericsson breached its DPA, and is now actively investigating LM Ericsson a second time, because Ericsson's conduct made a mockery of U.S. law and regulators, including DOJ and SEC.

14.     Other governments are also investigating.  For example, in April 2022 the Swedish judiciary announced the opening of an investigation into "possible corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of bribes to ISIS."

15.     U.S. and European law enforcement will not have to look far for evidence that Defendants intended to engage in serial criminal wrongdoing in Iraq, directly undermine U.S. national security, and finance the growth of al-Qaeda, al-Qaeda-in-Iraq, and Islamic State just to fatten Defendants' bottom lines.  After Islamic State seized Mosul, for example, Defendants rejected the "the strong recommendation" of their top lawyer in the Middle East to invoke force majeure and exit the area "because," Ericsson calculated, "it would be 'premature' and 'destroy [Ericsson's] business.'"  Instead, LM Ericsson and Ericsson Inc. paid off Islamic State, literally using the word "please" and "thank[ing]" Islamic State for its "cooperation" with Ericsson.

16.     Ericsson's tactics were befitting the criminal outfit Defendants operated. In 2017, for example, Defendants chose to move their goods in Iraq using the "Speedway" as opposed to the "legal way" – the former involved payoffs to terrorists and greater profits for Defendants, while the latter avoided enriching terrorists but burdened Ericsson with lower profit margins from its Iraq business.  LM Ericsson and Ericsson Inc. rejected following what their own employees called the "legal way."

17.     It is impossible to overstate Defendants' culpability.  As but one example, in 2014 Defendants and Asiacell (one of their "strategic partners" in Iraq) effectively offered up one of their Iraqi subcontractors as a human sacrifice to Islamic State. As that subcontractor explained: "Ericsson put pressure on my company, and my company put pressure on me," resulting in his capture and detention by Islamic State.  In the victim's own words, Defendants "destroyed" him when they effectively "sold" him to Islamic State. Transacting business with terrorists at the cost of innocent human lives, while repugnant to most, was business as usual for Ericsson in Iraq.

18.     Ericsson's conduct supported al-Qaeda's and Islamic State's global terrorist campaign against Americans in Iraq, Afghanistan, and Syria.  When Ericsson paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State not to attack them, they were not reducing the overall threat of terrorist violence; they were redirecting the attacks to other targets – including Plaintiffs and their family members.  At the same time, Ericsson's financing intensified the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Protection money was quantitatively significant – by most accounts al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's largest (or second largest) funding source overall – and such FTOs' substantially similar and highly disciplined process for extracting it made for an especially potent form of terrorist finance.  Even relatively low-dollar protection payments had an outsized effect on al-Qaeda's, al-Qaeda-in-

Iraq's, and Islamic State's terrorist capabilities by subsidizing salaries and weapons for multiple terrorists.  Ericsson's decision to make larger, regular, six- and seven-figure payments had an even greater effect:  it translated directly into substantial numbers of terrorists, weapons, and bombs that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to kill and injure Americans in Iraq, Afghanistan, and Syria.  Plaintiffs bore the consequences.

19.     Protection payments in Iraq also aided al-Qaeda's attacks in Afghanistan, where al-Qaeda and the Taliban were always fused. As the Honorable John D. Bates of this District found on July 19, 2022, "Al-Qaeda provided significant operational support to the Taliban in planning and authorizing terrorist attacks" against Americans in Afghanistan.[1] And on August 1, 2022, President Biden confirmed that the United States military executed a strike in Kabul in 2022 that killed al-Qaeda emir Ayman al-Zawahiri, who met his end at a Haqqani Network safe house befitting al-Qaeda's decades-long fusion with the Taliban, including its Haqqani Network.

20.     Defendants knew that they were dealing with al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State, because the people and entities that Defendants interacted with held themselves out as representatives of these terrorist organizations (including issuing demands and receipts in the terrorist organizations' names)—and because it was common knowledge among sophisticated contractors in the area that these terrorist organizations were seeking protection payments in Iraq and using those payments to support their terrorist affiliates. Indeed, Ericsson's own CEO and attorneys have acknowledged in connection with a subsequent internal investigation (the substance of which was leaked to investigative journalists) that they cannot say with any confidence that Ericsson's money did not flow to terrorists. Coming from sources with every incentive to deny that Ericsson supported terrorists, that is a stark admission.

---

[1] *Cabrera, et al. v. Islamic Republic of Iran*, 2022 WL 2817730, at *9 (D.D.C. July 19, 2022).

21.     Beyond paying al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directly, Defendants also knew that their partners, consultants, and subcontractors were using the money they received through their illicit transactions with Defendants to flow through Defendants' protection money to terrorists on Defendants' behalf.  With respect to the Iraqi corruption econmomy – meaning the economy concerning illicit transactions in Iraq – that practice was an open secret in the Iraqi and Syrian areas that were contested by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State and was communicated repeatedly to firms operating (or transporting goods) there. When Defendants paid their crooked local partners, consultants, and subcontractors for "security" in that environment, they knew full well where the money was going.  Given what Ericsson knew about the payments it was making, the operating environment in Iraq, and the sophistication of the FTOs' protection-money schemes, it is a virtual certainty that Ericsson's money ultimately ended up in the hands of violent terrorists.

22.     Defendants necessarily knew that by making protection payments to terrorists, they were playing a role in violent terrorism. As practiced by criminal foreign telecom companies like Ericsson, the entire point of corporate protection payments is to appease violent actors so that they will not direct violence at the corporation's valuable physical assets (such as infrastructure sites) and goods (such as product shipments).  Thus, any corporation who makes protection payments necessarily intends that the money will reach the violent actor. More specifically, robust public information explained to contractors that terrorist organizations in Iraq were soliciting protection payments from corporations to fund their ongoing campaigns of terrorist violence against Americans. And the specific FTOs at issue here – al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – were globally notorious for putting their resources, including

protection money funds, to violent ends. That is why the U.S. government publicly designated them as FTOs in the first place.

23.     Consistent with that understanding, the U.S. government has long opposed the payment of protection money to terrorist organizations. An Assistant Attorney General said it plainly in a 2007 criminal resolution concerning similar conduct: "corporations are on notice that they cannot make protection payments to terrorists." Multiple agencies set up task forces designed to interrupt the flow of protection money to terrorists in Iraq and Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive. Applicable regulations and financial rules also required companies to ensure that their contracting practices – including the money spent by their subcontractors – did not finance terrorism.  Defendants violated those requirements and concealed their payments in part because they knew the U.S. government considered such payments to be illegal.  Thus, Ericsson paid off terrorists even while knowing that the U.S. government publicly opposed protection payments and tried to stop them.

24.     LM Ericsson and Ericsson Inc. aid to terrorists did not end at money, although that was plenty.  Defendants provided key logistical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2004 through at least February 15, 2022 by providing critical cover and concealment for their protection rackets.  LM Ericsson did so by paying off the terrorists while simultaneously keeping secret their knowledge of the protection rackets that were instrumental in financing attacks on Americans in Iraq, Afghanistan, and Syria.  Defendants did so even when they had affirmative legal obligations requiring disclosure to the U.S. government and Defendants' shareholders, among others.

25.     By fraudulently concealing the FTOs' protection rackets when it had a duty to share what it knew, LM Ericsson and Ericsson Inc. also provided vital operational aid to the

functioning of al-Qaeda's, al-Qaeda-in-Iraq's and Islamic State's protection rackets—

independent of the U.S. dollars that Defendants paid such FTOs—by depriving the U.S.

government, LM Ericsson's shareholders, and Plaintiffs of actionable intelligence and accurate

information, which prevented U.S. military, intelligence, law enforcement, shareholder, and

litigation pressure that would otherwise make it harder for the terrorists to extract comparable

value from their protection rackets in Iraq.  Specifically, Ericsson knew who was soliciting

money on behalf of terrorists; knew which subcontractors were funneling corrupt payments to

the terrorists; and knew which geographies were focal points for terrorists—but instead of

disclosing that information, Ericsson held it close for its own benefit.  This conduct was in direct

conflict with the position of the U.S. government and terrorism scholars, who have long

emphasized that public-private cooperation is a key tool in the U.S. government's

counterterrorism strategy to protect American lives. The corollary is equally true: corporate

obstruction aids the FTOs' terrorist attacks against Americans.

26.    Ericsson's payments funded attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic

State that were acts of "international terrorism."  18 U.S.C. § 2333(a).  At all relevant times, the

United States designated al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as FTOs, which reflected

their status as three of the world's deadliest terrorist groups.  Since the start of U.S.-led

humanitarian efforts in Iraq, Syria, and Afghanistan following 9/11, each FTO's core purpose

has been to expel Americans from Iraq, Syria, and Afghanistan and overthrow Iraq's and

Afghanistan's then-existing U.S.-backed democratic governments, which mission succeeded in

Afghanistan in August 2021  To date, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State have

collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded

roughly 30,000 more, primarily in Iraq and Afghanistan, but also in Syria and other countries in the Middle East, Europe, Asia, and Africa. Defendants' payments helped finance those attacks.

27.    Plaintiffs' allegations are not speculative or implausible. They are based on witnesses with direct and indirect knowledge of the alleged facts; LM Ericsson's and Ericsson Inc.'s admissions; leaked internal LM Ericsson and Ericsson Inc. company data; LM Ericsson's and Ericsson Inc.'s public and private and statements, including emails and quotes memorialized by Ericsson investigators; reports and recommendations by LM Ericsson's compliance personnel; declassified military and intelligence agency reporting; U.S. diplomatic and military cables (as published online); Congressional factfinding; Executive branch reports to Congress; United Nations and Financial Action Task Force reports; media accounts; and Plaintiffs' recollections.

28.    Plaintiffs are U.S. citizens, and their family members, who served in Iraq, Syria, and Afghanistan between 2005 and 2021 and who were killed or wounded in terrorist attacks committed by al-Qaeda, al-Qaeda-in-Iraq, and/or Islamic State, often working together with other groups as part of global anti-American terrorist coalitions. Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act ("ATA"), through which Defendants are liable because they aided and abetted al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks in Iraq, Afghanistan, and Syria. 18 U.S.C. § 2333(d)(2). Plaintiffs accordingly seek justice under the ATA's aiding-and-abetting provision, which Congress enacted "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations

or persons that engage in terrorist activities against the United States." Justice Against Sponsors

of Terrorism Act ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016).

**THE DEFENDANTS**

29.     Defendant Ericsson Inc. is a wholly owned subsidiary of Telefonaktiebolaget LM

Ericsson.  It is incorporated in Delaware, and its principal place of business is in Plano, Texas.

Ericsson Inc. has an agent in this District.

30.     Defendant Telefonaktiebolaget LM Ericsson (individually, "LM Ericsson" and

collectively with Ericsson Inc. "Ericsson" or "Defendants") is publicly traded on the NASDAQ

under the ticker ERIC.  Ericsson is incorporated in the Kingdom of Sweden ("Sweden"), and its

principal place of business is in Stockholm, Sweden.

31.     From 2000 through 2022, LM Ericsson was a multinational telecommunications

equipment and service company headquartered in Stockholm, Sweden. From 2000 through 2022,

LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated

entities. The subsidiaries, including Ericsson Inc., acted as divisions of the parent, rather than

separate and independent entities.

32.     LM Ericsson's global business operated as a singular "One Ericsson"

organization, combining Ericsson's manufacturing, R&D, and other arms under the control of

LM Ericsson headquarters in Stockholm to deliver complete products and services to its global

customers.  In 2007, for example, an LM Ericsson employee publicly explained that LM

Ericsson's business strategy was to achieve long-term growth based on the interrelationships of

the various technological products offered by LM Ericsson's subsidiaries to operators of mobile

networks and fixed communication systems throughout the world, which LM Ericsson marketed

through "portfolio" and "bundled" offerings. In 2012, similarly, LM Ericsson's CEO at the time,

Hans Vestberg, publicly described Ericsson's globally integrated "One Ericsson" business

model, which drew on Ericsson's global employees, technologies, and services – including those

in the U.S. – to optimize value for Ericsson's operations and shareholders:

> Any strategic decision we take in the Company, we build on these three
> competitive advantages. And those three competitive advantages, we think we're
> unique in the industry to have. [We have] the technology leadership that we're
> investing in. It is the foundation for our Company to see that we're there. … We
> have the service leadership,… And then, we take care of our global scale which is
> unique. Basis in 180 countries, basically working with all operates in the world,
> we have a unique possibility to take care of the global scale, everything from
> working in an efficient way globally, using IT support, but also seeing that we use
> the [O]ne Ericsson across the globe. … Then it comes to commercial
> management. As I said, this is a key for us, we work as [O]ne Ericsson. We work
> globally to keep control where the commercials [i.e., the contractual bids,
> relationships, and projects worldwide in which LM Ericsson and Ericsson Inc.
> collaborated with other Ericsson entities as "One Ericsson,"] are going, and that's
> very important when we are in this moment in time in this industry.

33. Ericsson Inc. was a wholly owned subsidiary of LM Ericsson that operated in the

United States, served as Ericsson's vital technology hub in the United States, and regularly sold

goods (through LM Ericsson) to customers in the Middle East. Throughout this period, Ericsson

Inc. manufactured and serviced core communications network products including, but not

limited to, antennas, transmitters, switching systems, and other gear used to build wireless

telecommunications networks. Ericsson Inc. primarily served network operators, transportation

companies, utilities, and broadcasters, and specialized in offering full-spectrum consulting,

network build-out, network optimization, and network management and maintenance services.

34. Under its "One Ericsson" approach, to which Defendants always adhered, LM

Ericsson and Ericsson Inc. routinely collaborated with one another through cross-functional

teams based and led in the United States by U.S. personnel who reported to both LM Ericsson

and Ericsson Inc. management.  LM Ericsson's and Ericsson Inc.'s U.S.-based cross-functional

teams developed products for Ericsson Inc., helped LM Ericsson win and execute bids on behalf

of Ericsson Inc., enabled Ericsson Inc.'s services and technologies to benefit LM Ericsson, and

were responsibe for assessing LM Ericsson's and Ericsson Inc.'s legal and compliance risks worldwide flowing out of extreme risk geographies like Iraq, including Defendants' anti-corruption and associated terrorist finance risks, technology- and diversion-related anti-terrorism risks, and overlapping corporate social responsibility portfolios, *e.g.*, sustainable development and corporate responsibility, in which these concerns were core considerations. On May 13, 2014, for example, LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald, explained how Ericsson Inc. in the United States and LM Ericsson in Sweden partnered closely with their respective divisions around the world through Ericsson's reliance upon cross-functional teams:

> When I set up [LM Ericsson's Sustainability and Corporate Responsibility Program], it was really important to me that key functions in the [C]ompany were part of it. So I didn't run it just as part of the corporate responsibility program. I really made sure over this two-year period that we had, for example, executives from our sourcing department, security, our government affairs, our different business units, sales and marketing, so we had cross-functional representation on the team. That was part of the business learning program. The whole idea … to running a sustainability function within a company is you have to integrate across the organization and into the relevant functions. I see my role as guiding that, but if sourcing doesn't run the responsible sourcing program or if the product lines don't run with the design from [the beginning], it won't really work. You can never get the scale or the impact having just a separate sustainability organization. That's not my goal. It's really about integration into the business.

35.     Ericsson Inc. was essential to LM Ericsson's ability to market its full-spectrum, turnkey network communications systems in the Middle East. Among other reasons, Ericsson Inc.'s personnel, expertise, products, and intellectual property holdings meant that it was impossible for LM Ericsson to service its customers in the Middle East without the substantial involvement of Ericsson Inc. throughout. For example, LM Ericsson's ability to market its radio base stations, including the RBS 6000, to customers in the Middle East depended upon LM Ericsson's access to Ericsson Inc.'s American technologies and services.

## JURISDICTION AND VENUE

36.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C.

§ 1331.

37.     This Court has personal jurisdiction over each of the Defendants under Federal

Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

38.     Venue is proper in this District under 18 U.S.C. § 2334(a) because Plaintiffs Todd

Schulte and Maren Hesla reside in the District of Columbia.  Venue is also proper in this District

under 18 U.S.C. § 2334(a) because Defendant Ericsson Inc. has an agent in this District.  Venue

is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the

events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     AL-QAEDA AND ISLAMIC STATE ATTACKED AMERICANS IN AFGHANISTAN, IRAQ, AND SYRIA AS PART OF AL-QAEDA'S AND ISLAMIC STATE'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST

39.     Ericsson's conduct occurred against the backdrop of three decades of al-Qaeda

history, during which al-Qaeda and its branches in Afghanistan, Iraq, Syria, and elsewhere

survived as a globalized terrorist campaign in which such FTOs needed Defendants' money to

kill and injure Americans.  In this section, Plaintiffs describe that background, which can

generally be broken out for present purposes into four eras:  (1) 1992 through 2002, when al-

Qaeda emerged as a threat and executed a series of attacks targeting Americans overseas and in

the United States, culminating in 9/11 and the immediate American campaign in Afghanistan

thereafter; (2) 2003 through 2007, when al-Qaeda's terrorist campaign focused on Iraq as the top

theater in which to attack and kill Americans; (3) 2008 through 2013, when al-Qaeda's terrorist

campaign in Afghanistan greatly accelerated; and (4) 2014 through 2022, when Islamic State

emerged as an al-Qaeda splinter group and conducted its own terrorist campaign targeting Americans in Iraq, Afghanistan, Syria, Europe, and Africa.

40.     Defendants' payments supported acts of international terrorism that killed and injured Plaintiffs.  In this section, Plaintiffs identify the terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them.  Each worked in concert and shared resources, personnel, and operational plans.

41.     In Iraq, due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, support for the one benefited the other.  Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects:  they enabled wide-ranging terrorist attacks against Americans in Iraq and Syria, executed mostly by al-Qaeda-in-Iraq in Iraq and Syria, but supported by (and sometimes jointly committed with) al-Qaeda.

42.     In Afghanistan, al-Qaeda and its allies also coordinated, causing the U.S. government to conclude that the resulting terrorist superstructure was a "Syndicate" composed of al-Qaeda, the Taliban, and other allied FTOs.  Osama bin Laden himself conceived of al-Qaeda as the leader of a terrorist coalition, including the Taliban, across Pakistan and Afghanistan.  Due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, on the one hand, and the Taliban, on the other, support for the one benefited the other.  Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects:  they enabled wide-ranging terrorist attacks against Americans in Iraq, Afghanistan, and Syria executed by al-Qaeda. (Islamic State followed this approach, as well, so Defendants' payments to Islamic State produced similar crosscutting effects on ISIS's capabilities in all three countries.)

43.     Each of the terrorist entities identified below used indiscriminate violence against American armed forces members serving as part of Operation Iraqi Freedom (in Iraq) and

Operation Enduring Freedom (in Afghanistan), as well as civilians, to achieve political ends. Their primary goal was to intimidate and coerce the U.S. government to withdraw Coalition personnel from Iraq and Afghanistan, and to affect such conduct by mass destruction, assassination, and kidnapping.  The terrorists also sought to intimidate the newly elected (and U.S.-backed) recognized governments of Iraq and Afghanistan.

44.     None of the terrorist entities identified below adhered to the Geneva Conventions or the laws of war.  Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.  None was associated with a recognized government.  And none was waging a civil war, nor did any have a legitimate claim to sovereignty over Iraq or Afghanistan.

### A.     Al-Qaeda Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East

45.     Osama bin Laden established and operationalized al-Qaeda in the late 1980s. Ever since, al-Qaeda has been a global terrorist organization notoriously targeting Americans.[2]

46.     From the early 1990s through approximately 1998, al-Qaeda was based primarily in Africa, where it developed its various economic theories and associated terrorist tradecrafts, including how to operationalize protection rackets and leverage intermediaries to move money.

47.     In 1996, bin Laden issued a *fatwa* authorizing attacks against Americans worldwide. In 1998, bin Laden issued another fatwa, in which he instructed al-Qaeda operatives "to kill the Americans and their allies – civilians and military," which bin Laden commanded was "an individual duty for every Muslim who can do it in any country in which it is possible to do it." That same year, al-Qaeda committed simultaneous attacks targeting U.S. embassies in

---

[2] Al-Qaeda translates as "the base" in Arabic.  This name is a reference to bin Laden's vision of al-Qaeda serving as a consortium of allied jihadist groups (under bin Laden's leadership).

Kenya and Tanzania, which it facilitated through an array of cells around the world. Thereafter, al-Qaeda relocated the bulk of its terrorists from Africa to its then-existing camps in Afghanistan, which it established in 1996.

48.     On October 8, 1999, the United States designated al-Qaeda as an FTO, and it has maintained that designation ever since.

49.     In 2000, al-Qaeda committed an attack against the USS Cole while it was docked in Yemen, which attack al-Qaeda executed from its safe-haven in Afghanistan.

50.     From its headquarters in Afghanistan, al-Qaeda planned and executed the September 11, 2001 terrorist attacks against the United States.

51.     In the wake of the 9/11 attacks, the United States demanded that the Taliban stop harboring al-Qaeda and turn Osama bin Laden over to U.S. custody.  The Taliban refused. Instead, eight days after 9/11, Taliban leader Mullah Omar issued an "Order" decreeing that "[a]ll the infidel powers of the world have united against the [Taliban]" and instructing Taliban mujahedin to be "ready" to "mak[e] sacrifices" to "defeat" the "infidel powers."

52.     On October 7, 2001, the United States initiated Operation Enduring Freedom and invaded Afghanistan.  The operation's purpose was to destroy the Taliban regime and degrade Afghanistan's utility as a base of operations for anti-American terrorists, including al-Qaeda.

53.     U.S. forces quickly defeated the Taliban contingent in Kabul.  By November 2001, the Taliban fled Kabul, and the following month it abandoned Kandahar, its historical stronghold in southern Afghanistan. Rank-and-file Taliban fighters dispersed back into the countryside, while the Taliban leadership – including Mullah Omar – scattered with most taking refuge in Pakistan but some decamping to Iran and Iraq.  One such al-Qaeda terrorist was Abu Musab al-Zarqawi, who had joined al-Qaeda in Afghanistan in the late 1990s.  *Infra* III.B.1.

54.    In the decades after 9/11, al-Qaeda committed acts of terrorism against Americans in the Middle East, including Afghanistan, Iraq, and Syria, to intimidate the United States to expel the U.S. from the Middle East.[3]

55.    From the mid-2000s throughout the 2010s, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda's leadership in Afghanistan and Pakistan – which many people dubbed "al-Qaeda core" or "AQC"[4] – remained key to the funding, training, and logistics of its branches (like al-Qaeda-in-Iraq) and affiliates (like the Taliban, including its Haqqani Network).[5]  Plaintiffs outline al-Qaeda's relevant history in this section.

56.    Afghanistan and Iraq were the first two primary theaters of mass anti-American terror by al-Qaeda and its branches after 9/11, with the United States invading Afghanistan in October 2001 and Iraq in March 2003, respectively, and remained so for the first decade after

---

[3] Bin Laden claimed that "the American soldier was just a paper tiger "; al-Qaeda intended to "bleed[] America to the point of bankruptcy "; and al-Qaeda justifiably targeted American civilians because "the American people [were] the ones who choose other government[s] by way of their own free will ," "[t]he American people [were] the ones who pa[id] the taxes which fund[ed] the planes that bomb [al-Qaeda] in Afghanistan, … and … Iraq."

[4] At all times, al-Qaeda comprised far more than simply al-Qaeda core.  In this Complaint, references to "al-Qaeda" mean the entire network, like the FTO designation, while references to "al-Qaeda core" mean al-Qaeda's Afghanistan, Pakistan, and Iran-based senior leadership.

[5] Al-Qaeda's web of relationships are commonly described as "branches," "franchises," "affiliates," "alliances," and the like.  As used in this Complaint, an al-Qaeda "branch" comprises another designated terrorist organization for which the leadership and members are formally part of al-Qaeda through, *inter alia*, their oath of loyalty to al-Qaeda and Usama bin Laden, and later, Ayman al-Zawahiri, and an al-Qaeda "affiliate" comprises another designated terrorist organization for which the leaders and members have closely integrated with al-Qaeda to the point of being fused, but have not formally pledged an oath of allegiance.  Al-Qaeda-in-Iraq and Jabhat al-Nusra were al-Qaeda branches, while the Taliban (including its Haqqani Network) were al-Qaeda affiliates.  Even then, however, al-Qaeda's intricate terrorist superstructure included additional overlap points.  For example, it was not uncommon for terrorists who served an al-Qaeda affiliate to be members of al-Qaeda itself, even if the broader organization had not sworn an oath to al-Qaeda.  For example, Sirajuddin Haqqani was both a sworn member of al-Qaeda and a leader of an al-Qaeda affiliate (the Taliban).

9/11.  In the second decade after 9/11, however, al-Qaeda and its branches expanded into Syria, among other places, following the same al-Qaeda playbook, using al-Qaeda's resources, deploying al-Qaeda's personnel, and ultimately being a part of al-Qaeda based upon their oath of alleigence (which al-Qaeda accepted).  Although there is substantial temporal overlap, Plaintiffs address Afghanistan, Iraq, and Syria in that order, roughly tracing the explosion of protection money strategies across all al-Qaeda-affiliated terrorist groups, which began in the mid-2000s.

57.     In Afghanistan and Pakistan, al-Qaeda and the Taliban, including its Haqqani Network, operated as part of an al-Qaeda-led "Syndicate" of terrorists, working in Afghanistan and Pakistan as joint venture partners sharing the common purpose of conducting terrorist attacks against Americans to expel the United States from Afghanistan.

58.     In December 2001, the United Nations passed Resolution 1386, authorizing the International Security Assistance Force ("ISAF," often called the "Coalition"), whose mandate was to assist the newly formed Afghan government in rebuilding the country.

59.     From late 2001 through late 2002, al-Qaeda relocated most of its leadership to Pakistan, Iran, and Iraq, and was busy planning long-term terrorist campaigns against America in Afghanistan and Iraq, which al-Qaeda correctly anticipated the United States would invade.

60.     Starting in 2002, al-Qaeda and its affiliated clerics began calling for jihad against the United States in the event of an American invasion of Iraq.  For example, al-Qaeda terrorist "thought leader" Abu Qatada publicly boasted to international media that al-Qaeda and its branches and affiliates would launch a jihad against Americans and their Iraqi allies just as al-Qaeda had launched a similar jihad against America and its Afghan allies following the U.S. invasion of Afghanistan after 9/11, and stated:  "The growth of American tyranny … and its plan to attack Iraq and establish an 'Iraqi Karzai' will necessitate an even fiercer battle." Al-Qaeda's

leaders messaged to its terrorists and sympathizers that the American presence in Iraq was an American "plot" to kickstart a religious war between Sunnis and Shiites to divide the Muslim world so that the "Crusaders" (the United States) and "Jews" (Israel) could divide and conquer it.

61.    As 2003 began, al-Qaeda viewed Iraq and Afghanistan as linked campaigns presenting two primary objectives.  *First*, reconstitute al-Qaeda's leadership outside of the areas that America could immediately attack within Afghanistan, and help the Taliban regenerate itself as an anti-American terrorist group based in Pakistan, so that al-Qaeda had a reliable haven from which to plan and facilitate terrorist attacks against Americans throughout the Middle East. *Second*, al-Qaeda sought to prepare for, and eventually launch, a new terrorist campaign against Americans in Iraq.  Both goals dominated al-Qaeda strategy from 2003 through 2007.

62.    With respect to Afghanistan, in 2003, Mullah Omar formed the Quetta Shura, a leadership council that functioned as the group's governing body.  Thereafter, the Taliban regenerated as a deadly terrorist group intent on expelling the United States from Afghanistan, overthrowing the recognized government of Afghanistan, and re-establishing Islamic rule.

63.    With respect to Iraq, in early 2003, al-Qaeda anticipated the U.S. invasion of Iraq and prepared for Iraq's emergence as a primary theater for al-Qaeda's anti-American jihad. Iraq was a top al-Qaeda top priority in 2003.  Even though al-Qaeda and its ally the Taliban would successfully rebuild themselves by 2005-2006 into a formidable terrorist threat to Americans in Afghanistan, al-Qaeda core's attention was also substantially focused on Iraq in 2003 becasue al-Qaeda's leadership in Afghanistan and Pakistan viewed Iraq as the most promising theater in which al-Qaeda could kill Americans at scale from 2003 through 2007.

64.    On March 19, 2003, the United States invaded Iraq. U.S. troops seized control of Baghdad a few weeks later, and on April 9, 2003, Saddam Hussein's government fell. Shortly

thereafter, the Coalition Provisional Authority ("CPA") began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

65.     Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy.

66.     As it did in Afghanistan, al-Qaeda responded to America's involvement in Iraq with a campaign of terror that leveraged core al-Qaeda expertise, funds, logistics, and financial management skills with local al-Qaeda branches' fighters and funding streams, through a continuous two-way carousel of terrorist value flow between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda's branches in Afghanistan, Iraq, and Syria.

67.     Al-Qaeda responded to the U.S. invasion in three primary ways.  First, al-Qaeda unleashed a flood of propaganda and *fatwas* calling for violent attacks on Americans in Iraq. Second, al-Qaeda relied upon its secret agreement with the IRGC to secure a direct land corridor, through Iran, that connected Iraq and al-Qaeda's sanctuaries in Afghanistan and Pakistan. Third, al-Qaeda intensified its support for its eventual Iraqi branch led by Zarqawi.

68.     Al-Qaeda spent most of 2003 building up its presence inside Iraq, with a focus on indoctrination, propaganda, recruiting, operationalizing the Sunni insurgency, and the development of the illicit networks necessary to smuggle terrorists, money, and weapons into Iraq to attack Americans there. On April 25, 2003, al-Qaeda issued a *fatwa* that declared jihad in Iraq and called on all pious Muslims to help attack and kill Americans there. In the summer of 2003, Zarqawi directly communicated to bin Laden and Zawahiri in writing that Zarqawi's group in Iraq wished to be officially designated as "al-Qaeda-in-Iraq." In his message to bin Laden and

Zawahiri, Zarqawi described a new terrorist force to attack the United States under al-Qaeda's banner and led in-country by Zarqawi.  Zarqawi asserted that his terrorist campaign against the U.S. in Iraq was the real "field of jihad" and sought bin Laden's blessing for an expanded terrorist campaign against Americans in in Iraq and throughout the Middle East.  Zarqawi therefore requested al-Qaeda core's strategic aid in Iraq. By late 2003, Sunni jihadist networks throughout Iraq were nesting their operational-level activities under the ideological, strategic, and financial umbrella of al-Qaeda, which flowed a river of aid to the nascent Sunni insurgency.

69.     On or about November 2003, Osama bin Laden personally approved al-Qaeda's direct role funding Sunni terrorists in Iraq, when he authorized the establishment of regular monthly payments of $1.5 million, ordinarily denominated in U.S. dollars, and distributed to finance the leadership cells and "start-up" costs of al-Qaeda affiliated terrorists in Iraq.  Al-Qaeda continued making such payments to al-Qaeda's terrorist allies in Iraq throughout bin Laden's tenure, and on information and belief, al-Qaeda continued making regular payments of a similar amount to al-Qaeda-in-Iraq until the latter split from al-Qaeda in 2014, which payments were at all relevant times supervised by senior personnel from al-Qaeda "core" in Afghanistan and Pakistan.

70.     By late 2003, al-Qaeda had established a deadly Sunni terrorist insurgency against Americans in Iraq, every member of which was an al-Qaeda-affiliated U.S.-government-designated Foreign Terrorist Organization, which al-Qaeda led alongside one of its most notorious terrorist leaders, Abu Musab al-Zarqawi.

71.     From 2004 onward, al-Qaeda remained a persistent threat in Iraq while simultaneously vastly expanding its activities in Afghanistan and Syria. By then, Zarqawi had well more than 1,000 well-trained terrorists under his command throughout the country.  While

his grand Sunni terrorist coalition conducted attacks throughout Iraq, their primary area of operations were: (a) the Sunni Triangle, a central Iraqi region traced by Tikrit in the north, Ramadi in the southwest, and Baghdad in the southeast, that supplied Saddam's power base; (b) northern Iraq, including Mosul and Kirkuk, which sat astride key facilitation routes used by al-Qaeda and al-Qaeda-in-Iraq; and (c) the Iraqi/Syrian border, which al-Qaeda and al-Qaeda-in-Iraq cultivated as part of their network to move foreign fighters from dozens of countries into Iraq, who often entered Iraq via Syria.

72.     In a January 2004 letter to al-Qaeda attributed to Zarqawi by the U.S. government, Zarqawi asked for al-Qaeda's aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> We need to create armies of mujahidin … to fight the enemy—the Americans …
> We are continuing to train ourselves and strengthen our ranks.  We will strike at
> them with suicide operations and car bombs. … If you are of the same opinion, if
> you adopt it as your program, … and you are convinced by the idea of fighting the
> infidels, we will be your soldiers, under your banner, obeying your orders …

73.     Powered in substantial part by the reliable, potent, and hard-to-trace U.S. dollars afforded to al-Qaeda by its protection rackets in Iraq, al-Qaeda launched a devastating terrorist campaign in Iraq in 2004 that was designed to expel America from Iraq and the Middle East, which al-Qaeda and its branches have pursued ever since.

74.     In the spring of 2004, al-Qaeda further escalated its support for the Sunni terrorist insurgency in Iraq from its safe havens in Iran, Afghanistan, and Pakistan.  On March 24, 2004, al-Qaeda called for Muslims "to take part in jihad against the United States in Iraq."

75.     In April 2004, Zarqawi led a large group of terrorists against American forces in Fallujah.  In so doing, he quickly became the face of the Sunni insurgency in Iraq, which enabled him to rapidly scale up al-Qaeda's enterprise there. Boasting about his ability to transit between

Iran, Iraq, and Syria in support of his attacks against Americans there, on May 25, 2004, Zarqawi declared: "I am global, and no land is my country."

76.     By late 2004, al-Qaeda-in-Iraq had effectively seized Ninewa and Anbar provinces and conducted attacks throughout Iraq.  Even when Coalition forces experienced success in one area, e.g., Fallujah, al-Qaeda-in-Iraq's resources allowed the group to seamlessly reconstitute its headquarters elsewhere.  In late 2004, for example, al-Qaeda surged in Mosul in response to U.S. pressure on the terrorists in Fallujah.

77.     In October 2004, the United States launched a concerted campaign against al-Qaeda's presence in Iraq that focused on Zarqawi and his network.

78.     On October 15, 2004, the United States designated al-Qaeda-in-Iraq as a Specially Designated Global Terrorist ("SDGT"), and it has maintained that designation ever since. The next day, the U.S. military launched a major counterterrorism campaign against al-Qaeda in its Fallujah stronghold in Anbar Province.

79.     On October 17, 2004 – the day after the start of the comprehensive American campaign to oust al-Qaeda from Fallujah – Zarqawi's group, Tawhid wal Jihad, publicly declared that it was joining al-Qaeda in order to coordinate the Sunni campaign against Americans in Iraq under one in-theater leader, a "prince," (i.e., Zarqawi) who was acting on behalf of, and supported by, al-Qaeda's *emir* (i.e., bin Laden), to whom al-Qaeda-in-Iraq and each AQI operative swore an oath of loyalty (the *bayat*).  Zarqawi did so in a boldly titled public oath, entitled "The Tawhid wal Jihad Movement, its Emir [Zarqawi], and its Fighters Have Joined the Cause of al-Qaeda and Sworn Allegiance to Sheikh Osama bin Laden," in which Zarqawi declared, "We announce that Tawhid and Jihad, its princes and soldiers, have pledged allegiance to the leader of the mujahedin, Osama bin Laden," and  he signed "Abu Musab Al-Zarqawi, commander of the Tawhid wal Jihad

movement."   Unambiguously and publicly confirming the Tawhid wal Jihad's status as an al-Qaeda affiliate, Zarqawi announced that Tawhid wal Jihad would now be known as "al-Qaeda in the Land of Two Rivers," i.e., al-Qaeda-in-Iraq.[6]   In his declaration, Zarqawi recognized bin Laden's authority, publicly embraced al-Qaeda's terrorist campaign against Americans in Iraq, and urged all others to do so.[7] That same day, bin Laden formally accepted Zarqawi's and al-Qaeda-in-Iraq's public declaration of fealty and commitment to al-Qaeda's global organization. In his acceptance announcement, bin Laden's first directive to his new branch in Iraq was to grow al-Qaeda's presence in Iraq while partnering with local Iraqis: "My greatest wish is for you to keep the resistance alive and growing, to increase the number of local Insurgents and give the Iraqis more decision-making powers."

80.    Zarqawi's and bin Laden's public proclamations on October 17, 2004 formally merged al-Qaeda with al-Qaeda-in-Iraq, through a relationship in which the latter was a branch of the former. Such status endured until AQI's departure from al-Qaeda in February 2014. Though al-Qaeda-in-Iraq had many brandings over time,[8] it was one organization – Iraq's al-Qaeda branch

---

[6] This was Zarqawi's second loyalty oath to al-Qaeda, because he was already a long-standing member of al-Qaeda who had sworn fealty to bin Laden, and Tawhid wal Jihad was already al-Qaeda's widely recognized affiliate in Iraq.  The date chosen for the announcement, however, demonstrated the tight nexus between al-Qaeda and al-Qaeda-in-Iraq with respect to Sunni extremists' efforts to rally against the U.S. presence in Iraq.

[7] Zarqawi's declaration provided, in part, "O Sheikh of the mujahidin, if you cross the sea, we shall cross it with you.  If you give orders, we shall listen; if you forbid, we shall obey.  You are the designated leader for the armies of Islam against all infidels, Crusaders, and apostates."

[8] Zarqawi's al-Qaeda affiliate has had various names since its creation, including Tawhid wal Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura Council (from January 2006 through October 2006), the Islamic State of Iraq (from October 2006 through April 2013), Islamic State in Iraq and Syria, aka ISIS (from April 2013 through June 2014) and finally the Islamic State (from June 2014 through present).  While the names changed, at all relevant times, the organization built by Zarqawi with Iran's backing pursued attacks against Americans in Iraq.  In this Complaint, Plaintiffs collectively refer to all such groups, prior to al-

– and pursued a consistent mission at all times between October 2004 and February 2014: support the terrorist campaign against America led by al-Qaeda, including its emir, by targeting Americans in Iraq and Syria and facilitating al-Qaeda operations in Afghanistan and Pakistan for the purpose of permitting al-Qaeda to create a "jihad wave" stretching from Afghanistan to Iraq that would support an al-Qaeda-led caliphate that would grow throughout the Middle East, including Afghanistan, Iraq, and Syria.

81.     Al-Qaeda's merger with al-Qaeda-in-Iraq was mutually beneficial.  For bin Laden and the al-Qaeda core he led, al-Qaeda-in-Iraq was immediately the most active and violent branch of al-Qaeda's global franchise, and by late 2004, bin Laden had determined that Iraq should be a central front of al-Qaeda's terrorist campaign against Americans in the Middle East. Zarqawi concurred regarding the centrality of Iraq to al-Qaeda's terrorist campaign against Americans in the Middle East and declared, in fall 2004:  "The spark has been lit here in Iraq and its heat will continue to intensify—by Allah's permission—until it burns the Crusader Armies in Dabiq."  By referencing Dabiq, Zarqawi explicitly connected al-Qaeda's terrorist campaign against the United States in Iraq with a global conflict against America through which Islam would triumph over the West in Armageddon.

82.     From late 2004 thorugh 2014, al-Qaeda-in-Iraq deployed a vast network of terrorists throughout Iraq, which was estimated at approximately 15,000 members, a substantial percentage of whom were foreign fighters who came from outside Iraq and often had prior relationships, experience, training, or indoctrination with or from al-Qaeda "core," which always sourced terrorist talent for al-Qaeda-in-Iraq until their split in 2014.

_____

Qaeda's split from Islamic State in February 2014, as "al-Qaeda-in-Iraq" or "AQI" and Plaintiffs refer to the group post-February 2014 split as "Islamic State," "ISIS," or "ISIL."

83.     Al-Qaeda-in-Iraq maintained notorious strongholds in Anbar province in western Iraq and Ninewa Province in northern Iraq, including their respective capitals, Ramadi and Mosul.  For example, the U.S. government described Mosul as the "strategic center of gravity" for al-Qaeda-in-Iraq, and one senior commander of U.S. forces observed that "If AQI had a Pentagon, it would be in Mosul."

84.     Al-Qaeda-in-Iraq also maintained large cells throughout Iraq, which were in each instance commanded by hand-selected Zarqawi lieutenants, including in Baghdad (Umar Bazyani), northern Iraq (Husain Salim), and Anbar (Abu Azzam Abdallah).  Zarqawi also prioritized building cells at key transport and smuggling nodes for al-Qaeda and al-Qaeda-in-Iraq and stood up AQI cells in an array of other Iraqi cities and provinces including Samarra (on the approach to Baghdad), Diyala (near the border with Iran, and a critical waypoint on the road to Lebanon), and al-Qaim (on the border of Syria).

85.     Like other al-Qaeda branches, al-Qaeda-in-Iraq relied upon a hierarchical organization in which there was both top-down leadership as well as local initiative by provincial leaders in order to conduct terrorist operations throughout Iraq.

86.     Al-Qaeda-in-Iraq modeled al-Qaeda's corporate approach, including al-Qaeda's reliance upon top-down bureaucracies to manage the terrorist finances, logistics, recruiting, and communications of al-Qaeda and al-Qaeda-in-Iraq terrorists as a precursor to al-Qaeda's desired global caliphate.  Like its parent al-Qaeda, al-Qaeda-in-Iraq also maintained detailed corporate structures, bylaws, committees, and the like, who, in turn, used al-Qaeda-in-Iraq letterhead, forms, receipts, and permission slips.

87.     Al-Qaeda-in-Iraq operated provincial shadow governments that roughly tracked the provincial structure of the Iraqi government.  Al-Qaeda-in-Iraq divided each province into

geographic sectors, each of which had an administrator who oversaw smaller highly bureaucratized operational units, such as "brigades," "battalions," or "groups."

88.     Al-Qaeda-in-Iraq organized its bureaucracy similarly at the province and sector levels, both of which relied upon administrative emirs who operationalized its cross-cutting terrorist logistics, finance, and attack planning needs, including bureaucracies governing "movement and maintenance," "legal," "military," "security," "medical," "spoils," and "media."

89.     At all times, al-Qaeda-in-Iraq relied upon the same al-Qaeda-designed corporate structures, including an array of commitees governing the group's media, terrorist attack planning, and financial affairs. Through its emulation of al-Qaeda's model, al-Qaeda-in-Iraq also, among other things, paid salaries to its members, provided comprehensive training to its recruits, had detailed expense reimbursement processes, and required prospective members or guests to fill out a detailed application form to join al-Qaeda-in-Iraq.

90.     Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al-Qaeda-in-Iraq ensured that funds raised in one part of Iraq could be redeployed both to other parts of Iraq as well as to fund al-Qaeda "core" in Afghanistan and Pakistan, or facilitate the flow of al-Qaeda and al-Qaeda-in-Iraq terrorists between Iraq, Syria, Iran, Afghanistan, Pakistan, and the Persian Gulf from 2004 through 2014.

91.     Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, AQI relied upon local fundraising schemes, including protection rackets, as a key source of funding for operations in Iraq and Syria, and flowing money, fighters, and logistical aid to al-Qaeda in Afghanistan, Pakistan, Iran, and the Gulf from 2004 through 2014.

92.     On December 17, 2004, the U.S. State Department designated al-Qaeda-in-Iraq as an FTO, and it has maintained that designation ever since.

93.     By the start of 2005, al-Qaeda-in-Iraq had cemented al-Qaeda's control over the Sunni insurgency targeting Americans in Iraq.  This represented a tectonic shift in the Sunni insurgency, which was dominated thereafter by al-Qaeda-linked terrorists, often non-Iraqi Arabs who served as polyterrorists for al-Qaeda core and AQI under bin Laden's franchise model.

94.     In June 2005, al-Qaeda core transmitted instructions to Zarqawi concerning the overall goals of the Iraqi campaign and means to achieve them.  Al-Qaeda emphasized two points above all.  *First*, Iraq remained central to al-Qaeda's global strategy, and al-Qaeda core's instruction to al-Qaeda-in-Iraq was to continue to focus on reestablishing the caliphate in Iraq; as al-Qaeda core put it: "The victory of Islam will never take place until a Muslim state is established in the manner of the Prophet in the heart of the Islamic world, specifically in the Levant, Egypt, and the neighboring states of the Peninsula and Iraq."  *Second*, al-Qaeda-in-Iraq's primary goal was to expel the United States from Iraq and the Middle East.

95.     In July 2005, Zarqawi transmitted a detailed four-phase plan to al-Qaeda core in Afghanistan and Pakistan according to which Phase One was to expel the United States from Iraq, Phase Two was to develop an Islamic Emirate of Iraq to the point that al-Qaeda could declare a caliphate, Phase Three was to extend al-Qaeda's "jihad wave" to the other countries of the Middle East, including Afghanistan, and Phase Four was to initiate a direct clash with Israel.

96.     Throughout 2005, al-Qaeda-in-Iraq expanded its suicide bombing networks in Iraq (and the broader Middle East, which supported it) side-by-side with the growth of its protection rackets in Iraq.  Most of al-Qaeda-in-Iraq's suicide bombers were foreigners, usually Arabs, who were often personally selected by Zarqawi for their dedication to al-Qaeda's mission. Al-Qaeda-in-Iraq followed al-Qaeda's suicide bombing playbook, including al-Qaeda's tactic of

having suicide bombers officially join the organization prior to the attack as a means of cementing their psychological commitment to what al-Qaeda terms its "martyrdom operations."

97.     Ascendant throughout the country, al-Qaeda-in-Iraq leaders met in May 2006 to finalize their plans to establish a caliphate over several provinces in Iraq, including Anbar, Salahuddin, Diyala, and Ninewa provinces.  At this meeting, Zarqawi instructed his al-Qaeda-in-Iraq subordinates to communicate to their cells that all agents of the United States were to be killed immediately without prior approval from their superiors. The meeting ended with Zarqawi distributing cash payments, denominated in U.S. dollars, ranging from $500 to $10,000 to selected lieutenants to finance their attacks.

98.     Zarqawi did not live to see his caliphate. On June 7, 2006, American forces killed Zarqawi in an airstrike on an al-Qaeda-in-Iraq safehouse in Diyala Province.

99.     Al-Qaeda quickly designated al-Qaeda polyterrorist (and Zawahiri lieutenant) Abu Ayyub al-Masri as Zarqawi's successor and leader of al-Qaeda-in-Iraq. Masri's rapid succession meant that, while Zarqawi's death was a righteous act that brought a measure of justice to many, it did not slow down al-Qaeda-in-Iraq's advance across the country.

100.     Indeed, by late 2006, al-Qaeda-in-Iraq was more powerful than ever and committing more – and more lethal – attacks against Americans throughout Iraq.

101.     On October 12, 2006, al-Qaeda rebranded al-Qaeda-in-Iraq as the Islamic State of Iraq (or "ISI"), for which it announced a purported cabinet and governance structure, and claimed authority over the provinces of Anbar, Baghdad, Diyala, Kirkuk, Salah al-Din, and Ninewa, as well as parts of Babil and Wasit provinces.  This announcement, fully supported by al-Qaeda core, was the first time any al-Qaeda affiliate openly declared territorial control, and

the elevation of Abu Umar al-Baghdadi gave al-Qaeda-in-Iraq's leadership a partial Iraqi face

(while AQI's leader, Abu Ayyub al-Masri, was Egyptian, Abu Umar al-Baghdadi was Iraqi).

102.    By the end of 2006, al-Qaeda-in-Iraq so dominated the Sunni insurgency that

most of the remaining Sunni groups were assimilated into AQI or, at a minimum, compelled to

facilitate AQI attacks against Americans even if they remained nominally outside of the group.

103.    Al-Qaeda's resurgence in Iraq also coincided with its renewal in Afghanistan and

Pakistan.  By early 2006, al-Qaeda and a rebuilt Taliban began staging terrorist attacks on

American forces there with increasing frequency.  These two developments created a vicious

feedback loop, in which al-Qaeda-affiliated terrorists could fund, staff, and supply one another's

attacks from their respective havens in Iraq, Iran, Afghanistan, and Pakistan.

104.    By the start of 2007, the U.S. government recognized that al-Qaeda's presence in

Iraq had grown so extensive as to threaten the viability of the Iraqi state.

105.    In February 2007, the U.S. "surged" tens of thousands of additional American

forces in Iraq to halt the explosive growth of al-Qaeda-in-Iraq throughout much of the country.

This was accompanied by a string of statements in which senior U.S. officials repeatedly

identified al-Qaeda-in-Iraq as the driving force of the anti-American insurgency there.  On

February 27, 2007, Director of the Defense Intelligence Agency Lieutenant General Michael

Maples publicly characterized al-Qaeda-in-Iraq as "the largest and most active of the Iraq-based

terrorist groups."  On April 26, 2007, the top American commander in Iraq, General David

Petraeus, called al-Qaeda-in-Iraq "probably public enemy number one."  On July 12, 2007, the

U.S. military spokesman in Iraq, Brigadier General Kevin Bergner, observed that AQI was

responsible for 80% to 90% of suicide attacks, and defeating AQI was a focus of U.S. operations.

106.    From the start of the surge in early 2007, al-Qaeda-in-Iraq experienced meaningful pressure across multiple fronts in Iraq for the first time in its existence.  As such, al-Qaeda and AQI terrorists operated along parallel tracks in which some continued the assault in Iraq, while others redeployed from Iraq to al-Qaeda's havens along the Afghanistan/Pakistan border.

107.    At the same time, al-Qaeda core in Afghanistan had spent years patiently rebuilding itself, and its Taliban proxy, and stood poised to dramatically intensify its terrorist campaign in Afghanistan and Pakistan in 2007.  These parallel dynamics meant that al-Qaeda had a ready-made safety valve for its al-Qaeda-in-Iraq terrorists if they needed to flee American forces in Iraq – the haven afforded to al-Qaeda "core" by the Taliban in Afghanistan and Pakistan. Indeed, starting in 2007 and continuing until 2014 al-Qaeda-in-Iraq terrorists melted back to al-Qaeda's traditional havens in Afghanistan and Pakistan, where they joined al-Qaeda's pre-existing joint cells in Afghanistan or its training and bomb-making camps in Pakistan.  Such al-Qaeda-in-Iraq turned al-Qaeda in Afghanistan operatives helped power al-Qaeda's resurgence in Afghanistan and Pakistan when Plaintiffs were injured there between 2007 and 2016.

108.    Returning to Iraq, throughout 2007, al-Qaeda-in-Iraq focused on accelerating its wave of terror across Iraq while its terrorists also melted back to Afghanistan and Pakistan, and prioritized attacks against Americans in Ninewa Province (where AQI sought to secure Mosul as its long-term base of operations), Anbar and Salah al-Din Provinces (which served as AQI strongholds and key transit points), Diyala Province (which was an al-Qaeda-in-Iraq stronghold that keyed AQI's national logistics chain as well as ability to attack Baghdad), and Baghdad Province (which was a focal point of AQI's "spectacular" attacks).

109.     By fall 2007, the U.S. military's surge had begun to show success against al-Qaeda-in-Iraq, putting pressure on AQI in Anbar Province and the belts around Baghdad upon which AQI relied to attack Americans in Iraq's capital.  These developments alarmed al-Qaeda "core" in Afghanistan and Pakistan, which viewed the attacks in Iraq as one of the centerpieces of their global campaign against America.  As al-Qaeda-in-Iraq's fighters began coming under pressure from both American forces and their allied Iraqi counterparts during the period known as the "Awakening," al-Qaeda core began plotting to secure the services of as many al-Qaeda fighters whom the core had seconded to AQI as possible while simultaneously redoubling their support for al-Qaeda-in-Iraq.

110.     On October 21, 2007, Osama bin Laden publicly released an audio recording, titled "Message to the People of Iraq" and broadcast worldwide by *al-Jazeera*, in which bin Laden praised "the champions of the Fedayee [martyrdom] operations . . . rushing with their car bombs into the midst of the [U.S.] armored vehicles."  Explicitly supporting al-Qaeda-in-Iraq, bin Laden offered his most strenuous criticism for those who had abandoned al-Qaeda and al-Qaeda-in-Iraq's campaign against the "Crusaders" (i.e., Americans). Bin Laden closed by urging "our people in Iraq" to recommit themselves to the campaign against the United States despite the Coalition's growing advantage over al-Qaeda-in-Iraq.[9]

111.     Al-Qaeda and al-Qaeda-in-Iraq continued al-Qaeda's terrorist campaign against Americans in Iraq and Syria from 2008 through its split with al-Qaeda in February 2014, and continued to always support al-Qaeda's campaign against Americans in Afghanistan.

---

[9] Bin Laden exhorted: "You refused to abandon the homeland to the unbelievers, or allow their tanks to roar between the Tigris and Euphrates. . . . You massacred the enemy and applied yourself to fighting them, until they became prisoners of their bases and the Green Zone, fearing danger. So continue to make the soldiers of unbelief drink from the bitter cup of death, and leave not one of them on the soil of Iraq."

112.     In 2009, al-Qaeda-in-Iraq leader Masri declared that "large, courageous, and targeted operations are necessary to break the bones of the infidels" (i.e., Americans) in Iraq. On June 30, 2009, Multi-National Force-Iraq (MNF-I) withdrew from Iraqi cities as part of the plan for the eventual departure of most U.S. forces from Iraq.  In response, al-Qaeda-in-Iraq launched a new wave of spectacular attacks throughout the rest of 2009 designed to show AQI's continued nationwide threat while simultaneously advancing al-Qaeda's strategic narrative (for fundraisers and recruits) that al-Qaeda and AQI were victoriously forcing America out of Iraq. Al-Qaeda's and al-Qaeda-in-Iraq's nationwide bombing campaign throughout 2009 showed to all that both FTOs remained potent threats to Western interests and businesses in Iraq, including the Iraqi companies they subcontracted. During this time, al-Qaeda and AQI continued to boast thousands of terrorist operatives inside Iraq, who sustained their attack tempo throughout the country.

113.     The pace of al-Qaeda-in-Iraq's terrorist campaign increased throughout 2010.

114.     In 2010, al-Qaeda and its affiliated organizations, including al-Qaeda-in-Iraq, were ascendant.  According to a State Department cable dated February 12, 2010, as published online, "Current information suggests that al-Qaida and affiliated organizations continue to plan terrorist attacks against U.S. interests in multiple regions, including Europe, Asia, Africa, and the Middle East. These attacks may employ a wide variety of tactics including suicide operations, assassinations, kidnappings, hijackings, and bombings."

115.     Indeed, by 2010, every metric confirmed that al-Qaeda was far stronger than it had been when it executed its attacks on 9/11, principally because of the financial, operational, logistical, training, and safe havens it derived from the interplay between al-Qaeda core in Afghanistan/Pakistan and al-Qaeda's key subsidiaries like al-Qaeda-in-Iraq, which facilitated a

regular flow of fighters, logistical aid, funds, training, and other key aid to al-Qaeda core and, through al-Qaeda core, to other al-Qaeda affiliates, like the Taliban.

116.    On April 19, 2010, Coalition forces killed al-Qaeda's and al-Qaeda-in-Iraq's top two leaders in Iraq, the polyterrorists Masri and Abu Umar al-Baghdadi. Then-Vice President Joe Biden observed at the time that "[t]heir deaths [were] potentially devastating blows to al Qaeda Iraq." After Masri was killed, he was succeeded by al-Qaeda and al-Qaeda-in-Iraq operative Abu Bakr al-Baghdadi al-Husseini al-Qurashi (commonly known as Abu Bakr al-Baghdadi), who led al-Qaeda-in-Iraq thereafter.

117.    Al-Qaeda continued its dominance of al-Qaeda-in-Iraq's leadership after Masri and Abu Umar al-Baghdadi were taken out on April 9, 2010, when al-Qaeda installed another senior al-Qaeda core terrorist into al-Qaeda-in-Iraq's command structure by appointing longstanding bin Laden lieutenant Nu'man Salman Mansur al-Zaydi as al-Qaeda-in-Iraq's "Minister of War" for Iraq.  In this role, Zaydi was effectively the number 2 al-Qaeda-in-Iraq terrorist, behind only Abu Bakr al-Baghdadi.

118.    As of late 2010, al-Qaeda and al-Qaeda-in-Iraq endured in Iraq through their strongholds in Ninewa Province, from which the terrorists continued to successfully threaten and attack Americans throughout much of Iraq, including Ninewa, Anbar, Baghdad, and Diyala.

119.    Al-Qaeda's fortunes in Iraq, and those of its affiliate there, further improved in 2011.  In the spring of 2011, civil war erupted in Syria.  This afforded al-Qaeda and al-Qaeda-in-Iraq with an expanded chessboard.  While Syria had long been a haven for al-Qaeda and al-Qaeda-in-Iraq (owing to the Assad regime's calculated embrace of both groups in an effort to help kill Americans in Iraq), the Syrian geographies available to them were somewhat limited.

From 2011 onward, however, the map expanded greatly for al-Qaeda and al-Qaeda-in-Iraq, which sought to rapidly grow into the void created by the conflict.

120.     In mid-2011, al-Qaeda instructed al-Qaeda-in-Iraq to establish an al-Qaeda/al-Qaeda-in-Iraq affiliate in Syria.  Following al-Qaeda's instruction, al-Qaeda-in-Iraq supplied its resources, terrorists, and logistical networks in support of the creation of a new al-Qaeda affiliate in Syria, which the terrorists named Jabhat al-Nusra, meaning the "Victory Front."  Among other things, al-Qaeda-in-Iraq leader Abu Bakr al-Baghdadi personally appointed al-Qaeda-in-Iraq terrorist, Abu Mohammad al-Jolani, as head of Jabhat al-Nusra.

121.     In so doing, al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra relied upon the same al-Qaeda-crafted protection money playbook and strategies, al-Qaeda designed organizational and management practices, and often even the same "polyterrorist" operatives who were simultaneously members of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra.

122.     Operating under orders from al-Qaeda core in Pakistan, al-Qaeda-in-Iraq took advantage of the opportunity in Syria afforded by events in 2011 and 2012 to greatly expand al-Qaeda's and al-Qaeda-in-Iraq's activities and attacks in Iraq and Syria, by greatly expanding all such FTOs' operations in both countries.  Eventually, some al-Qaeda-in-Iraq-operated cells in Syria began referring to themselves as Jabhat al-Nusra, which naming convention itself highlighted the inter-relationship with al-Qaeda.[10]

---

[10] Jabhat al-Nusra means the Victory Front, a reference to the group serving as a front of the then-existing Islamic Army of the Levant (i.e., al-Qaeda-in-Iraq).  Until al-Qaeda separated from ISIS in 2014, Jabhat al-Nusra was a part of, and funded by, al-Qaeda-in-Iraq.  Even after 2014, terrorist finance payments (and financiers) supporting Jabhat al-Nusra also ordinarily supported ISIS for a simple reason:  most Jabhat al-Nusra terrorists defected to ISIS after 2013, and those that did not were "polyterrorists" who financially supported both Jabhat al-Nusra and ISIS.

123.    From 2011 through 2013, al-Qaeda-in-Iraq resumed its expansion across Iraq and Syria, and boasted thousands of terrorist operatives dedicated to facilitating al-Qaeda's and al-Qaeda-in-Iraq's terrorist campaign against Americans in the Middle East.

124.    In 2013, al-Qaeda and al-Qaeda-in-Iraq rebranded al-Qaeda-in-Iraq, which they began interchangeably calling "Islamic State of Iraq" in 2006, as Islamic State in Iraq and Syria (or "ISIS") or Islamic State in Iraq and the Levant (or "ISIL"). Specifically, on April 8, 2013, al-Qaeda and al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi announced that Islamic State in Iraq (i.e., al-Qaeda-in-Iraq) had merged with al-Qaeda's and al-Qaeda-in-Iraq's Syrian affiliate, Jabhat al-Nusra, and formed Islamic State of Iraq and Syria.

125.    Even after being rebranded as the ISIS, al-Qaeda-in-Iraq (while publicly calling itself ISIS and ISIL) continued to be al-Qaeda's branch in Iraq until on or about February 2014, when al-Qaeda and ISIS formally separated.  The following day, Abu Mohammed al-Jolani, the leader of Jabhat al-Nusra, rejected Baghdadi's announcement as premature, while professing Jabhat al-Nusra's continued fealty to al-Qaeda, which Jolani invited to mediate the dispute.

126.    For the remainder of 2013, al-Qaeda core, led by Zawahiri and his lieutenants, attempted to mediate the disagreement between Baghdadi and Jolani.  While al-Qaeda core was doing so, a substantial number of Jabhat al-Nusra terrorists joined al-Qaeda-in-Iraq.

127.    Despite their disagreements, al-Qaeda-in-Iraq and Jabhat al-Nusra continued to closely cooperate on tactical matters in Iraq and Syria throughout 2013.

128.    By the end of 2013, Western and Iraqi analysts were publicly and privately observing how al-Qaeda-in-Iraq had successfully regrouped into a terrorist force that was greater in size, capabilities, and threat as it posed to the United States from 2003 through 2007.  Among other concerns, such analysts often warned that:  (1) al-Qaeda-in-Iraq's renewed strength could

spillover beyond Iraq and further aid al-Qaeda attacks against Americans throughout the region, including Syria and Afghanistan, based upon al-Qaeda's cross-pollination model; (2) al-Qaeda-in-Iraq's terrorist campaign could threaten Americans throughout Iraq with attacks that were more lethal and sophisticated than before; and (3) stakeholders should assume al-Qaeda-in-Iraq would continue growing, and that such growth would continue to fuel violence by other al-Qaeda branches (like al-Qaeda core) and affiliates (like the Taliban) around the world.  All three warnings were correct on the merits and widely shared views amongst Western and Iraqi businesses, officials, media, and NGOs in Iraq.

129.    By the end of 2013, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda core provided key funding, training, and logistical aid to its branches and affiliates. Indeed, its branch in Iraq, al-Qaeda-in-Iraq, ended the year by seizing Fallujah.

130.    As 2014 began, al-Qaeda-in-Iraq was on the march in Iraq and Syria, having freshly seized most of Anbar Province, while moving forward to attempting a complete takeover of Ninewa province (already an al-Qaeda-in-Iraq stronghold at the time). In January 2014, al-Qaeda-in-Iraq complemented its December 2013 seizure of Fallujah by seizing a comparable target in Syria, the city of Raqqa, which AQI declared to be its capital upon seizure. In February 2014, al-Qaeda-in-Iraq split with al-Qaeda and rebranded itself as the "Islamic State."

131.    With respect to Afghanistan, from 2003 through 2004, under the Quetta Shura's leadership, guided by the instrumental hands of al-Qaeda's experts, the Taliban regenerated as a deadly terrorist group intent on expelling America from Afghanistan, overthrowing the recognized government of Afghanistan, and re-establishing Islamic rule.  To that end, in 2005

and early 2006, al-Qaeda and a rebuilt Taliban began staging terrorist attacks on U.S. forces, Afghan government personnel, and civilians with increasing frequency.[11]

132.    Al-Qaeda's posture in Afghanistan from 2007 to 2015 was closely linked to the developments described above.  While al-Qaeda and al-Qaeda-in-Iraq renewed and expanded their terrorist campaigns in Iraq and Syria, their primary focus from 2008 through 2013 shifted to Afghanistan – because that was where they could kill the most Americans.[12]

133.    Al-Qaeda's resurgence continued largely unabated between 2007 and 2016, as al-Qaeda-in-Iraq terrorists, funds, and material melted back into al-Qaeda via al-Qaeda's havens in Afghanistan and Pakistan.  During this period, al-Qaeda led a Syndicate of affiliated terrorists that supported al-Qaeda's efforts against the United States and the overthrow of the lawfully elected government of Afghanistan by the Taliban, including its Haqqani Network.  From 2007 through 2016, al-Qaeda and its Syndicate partners focused on suicide bomb attacks against Americans throughout Afghanistan, as well as attacks against Americans in Kabul, and in geographies in Afghanistan and Pakistan where joint al-Qaeda/Taliban cells operated, including, but not limited to, Nuristan, Nangarhar, Kunar, Laghman, Ghazni, and the Haqqani-controlled areas in both countries.

134.    Al-Qaeda's activities in Afghanistan and Pakistan dramatically escalated in 2007. At around that time, al-Qaeda's formulation of its Syndicate of al-Qaeda-affiliated FTOs and SDGTs was fully built, and the Syndicate was actively sponsoring attacks against Americans

---

[11] The Taliban insurgency included the Haqqani Network, an especially violent part of the Taliban concentrated in southeastern and eastern Afghanistan.

[12] Al-Qaeda's rationale for its strategic escalation in Afghanistan from 2008 through 2013 mirrored the group's earlier basis for focusing on Iraq from 2003 through 2007:  in both instances, the geography in question represented the location in the Middle East in which al-Qaeda could attack and kill the most Americans possible.

throughout the Middle East, principally by committing attacks against Americans in Afghanistan and by facilitating attacks against Americans in Iraq through al-Qaeda's training, logistical aid, recruiting, and fundraising networks in Afghanistan, Pakistan, and the Middle East.

135.    Collectively, al-Qaeda and al-Qaeda-in-Iraq committed many of the attacks in furtherance of al-Qaeda's campaigns in Iraq, Syria, and Afghanistan that killed and injured Plaintiffs in Iraq and/or Afghanistan. *See infra* Part X (Iraq); XI (Afghanistan).

> **B.    Islamic State Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East**

136.    On February 3, 2014, al-Qaeda-in-Iraq split from al-Qaeda core and Jabhat al-Nusra and asserted its identity as ISIS, which was led by former al-Qaeda/al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi.

137.    On June 29, 2014, Abu Bakr al-Baghdadi announced from Mosul – long Islamic State's Iraq headquarters – that the group known as al-Qaeda-in-Iraq and ISIS was now a caliphate that would henceforth be known as "Islamic State."

138.    Powered by its rapid expansion and burgeoning protection rackets in Iraq and Syria, Islamic State quickly established a branch in Afghanistan, using at least hundreds of Islamic State fighters from Iraq, as well as substantial Islamic State resources from Iraq.

139.    From Islamic State's formation in 2014 through the present, Islamic State has sought to expel Americans from the Middle East through a campaign of terrorist violence targeting Americans worldwide, all of which was in service of Islamic State's existence as a purported "caliphate" dedicated to propagating its radical Salafist Sunni terrorist ideology. David S. Cohen, Under Secretary for Terrorism and Financial Intelligence, at the Treasury Department, publicly stated in 2014 that Islamic State "terrorists have slaughtered thousands of innocent people" and

"threaten[ed  "American personnel and facilities in Iraq," and "could ultimately pose a direct threat to [U.S.] citizens … outside of the Middle East."

140.     The U.S. State Department designated Islamic State's predecessor, al-Qaeda-in-Iraq, as an FTO on December 17, 2004, and it has maintained that designation ever since, which has at all times applied to Islamic State. The U.S. State Department has also designated Islamic State's branches as FTOs.  On January 14, 2016, for example, the U.S. designated Islamic State's Afghanistan Branch, known as Islamic State's Khoroson Province or "ISIS-K" as an FTO.

141.     In the summer of 2014, Islamic State rapidly surged throughout Iraq.  On June 10, 2014, ISIS completed its seizure of long-standing al-Qaeda-in-Iraq/Islamic State stronghold Mosul in Ninewa Province.  On June 11, 2014, Islamic State seized Tikrit. On June 18, 2014, the government of Iraq formally requested that the United States military conduct strikes against Islamic State terrorists in Iraq. On June 21, 2014, Islamic State seized three pivotal towns touching upon key Iraqi transporation routes from Turkey, Jordan, and Syria to the rest of Iraq, including the strategic border crossing between Syria's Deir Ezzor province and Iraq. On August 2, 2014, Islamic State conquered Sinjar and Zumar, which forced thousands of Yazidi civilians to flee. On August 3, 2014, Islamic State captured the strategically critical Mosul Dam, and a few weeks later, Islamic State completed its seizure of Raqqa province in Syria.

142.     On August 7, 2014, President Obama announced an escalation of the American military response to Islamic State, including airstrikes designed to weaken Islamic State's ability to terrorize civilians, including Yazidis, in the vicinity of Sinjar, Iraq. The U.S. counterterrorism campaign against Islamic State would eventually be known as Operation Inherent Resolve.

143.    About six weeks later, on September 22, 2014, Islamic State spokesman Abu Muhammad al-Adnani called for attacks on U.S. citizens around the world in retaliation for American airstrikes against Islamic State terrorists in Iraq.

144.    By the end of October 2014, Islamic State had seized control of territory in Iraq and Syria equal in size to the United Kingdom, in which more than ten million people resided. Such geographies included Aleppo, Raqqah and Deir es-Zor governorates in Syria, and Anbar, Diyala, Ninewa, and Salah al-Din provinces in Iraq.  As a result, Islamic State's profile and power were a first in the history of contemporary terrorism, and Islamic State exercised authority over a wide array of industrial and commercial activities in Iraq and Syria.

145.    Powered by its protection rackets and afforded ample freedom of movement through their deal with Iraqi Kurdish leaders, Islamic State continued its advance in Iraq and Syria throughout the rest of 2014, 2015, and most of 2016.

146.    In 2016, Islamic State ranked as the world's deadliest terrorist organization that year, having carried out more than 1,400 attacks that killed more than 7,000 people in 2016.

147.    On October 16, 2016, U.S.-supported Iraqi forces began their attempt to expel Islamic State from Mosul.  The resulting U.S./Iraqi campaign would last more than eight months and entail intense waves of terrorist attacks by Islamic State.

148.    On June 29, 2017, the Iraqi government declared victory over Islamic State in the final major sector being contested in Mosul, and Iraqi Prime Minister Haider al-Abadi officially declared victory over Islamic State in Mosul ten days later, on July 9, 2017.  Within weeks, Islamic State was also defeated in its Syrian redoubt in Raqqa.

149.    By 2017, Islamic State's spread to Afghanistan was undeniable.  On April 13, 2017, the U.S. military demonstrated the scale of the threat posed by the spread of Islamic State

terror networks from Iraq to Afghanistan when American forces deployed "the mother of all bombs" – the largest non-nuclear weapon in the U.S. arsenal, and colloquially known as the "MOAB" – against tunnels and caves that were used by Islamic State in Afghanistan, which killed dozens of Islamic State terrorists there. On April 27, 2017, Abdul Hasib, the leader of Islamic State's branch in Afghanistan, was killed in a joint U.S.-Afghan special forces raid in Nangarhar Province. On May 3, 2017, Islamic State executed a suicide bombing attack that targeted a NATO convoy traveling on a civilian thoroughfare in Kabul, Afghanistan, which killed and maimed dozens of civilians. On June 15, 2017, Islamic State publicly announced that it had seized the complex of caves in Tora Bora, Afghanistan, upon which al-Qaeda had infamously relied in its escape from American forces in late 2001. On July 14, 2017, the U.S. military reported that it had killed Islamic State's head in Afghanistan, Abu Sayed, in an airstrike on Islamic State's Afghanistan stronghold in Kunar. On July 31, 2017, Islamic State attacked the Iraqi embassy in Kabul, Afghanistan, killing two and injuring three. On August 10, 2017, U.S. forces killed several senior Islamic State terrorists in Afghanistan, including Islamic State's emir there Abdul Rahman, in an airstrike.

150.    In December 2017, Islamic State's caliphate in Iraq substantially collapsed, as most Islamic State terrorists melted away to either resume their more traditional insurgent tactics in Iraq and Syria (where there were more nearly 10,000 Islamic State operatives or supporters as of early 2018), or, alternatively, re-deploy to Afghanistan (where Islamic State was experiencing rapid growth at the time). Many chose the latter.

151.    On October 26, 2019, American special forces killed Islamic State's leader, Abu Bakr al-Baghdadi, in a U.S. raid in Idlib, Syria. Five days later, Islamic State confirmed Baghdadi's death and announced that his successor was Ibrahim al Hashemi al-Qurayshi.

## II.     DEFENDANTS AIDED AL-QAEDA AND ISLAMIC STATE

### A.     Defendants Pursued A Corruption-Based Business Model In Iraq

152.     LM Ericsson and Ericsson Inc. operated lucrative businesses in which their profits depended upon transactions in, and transporting lucrative goods through, Iraq, Syria, and Turkey. LM Ericsson operated as one of the largest telecom companies in Iraq, which required regular transportation of goods throughout Iraq as well as Syria and Turkey.  LM Ericsson and Ericsson Inc. earned at least $1.9 billion combined in net profits in Iraq alone from 2003 through 2019 through large-scale U.S.-government and U.S.-funded Iraqi-government contracts – and logistically supported other companies in Iraq and Syria.

153.     To increase their profit margins by redirecting attacks away from their business interests, Defendants knowingly facilitated protection money or "tax" payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists in Iraq and Syria between at least 2004 and at least 2019, and thereby provided millions in U.S. dollars to these FTOs each year.

154.     The specifics of Ericsson's protection payments and obstruction of American counterterrorism efforts in the the United States and the Middle East are discussed in Parts II, IV, V, VI, and VII.  To lay the groundwork for those allegations, the next two sections describe the contracting environment in geographies that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State between 2003 and 2022 and survey the evidence that illicit Iraq-related transactions by multi-national corporations, including Defendants, commonly served as vehicles to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq and Syria.

1.      **Defendants Operated In An Insecure And Corrupt Iraqi Contracting Environment That Encouraged Protection Payments**

155.    LM Ericsson's and Ericsson Inc.'s protection payments and obstruction of American counterterrorism activities against al-Qaeda-in-Iraq and Islamic State occurred in contracting environments in Iraq marked by widespread insecurity and endemic corruption.

156.    From 2004 through 2022, al-Qaeda and al-Qaeda-in-Iraq (2004-2014) and Islamic State (2014-2022) successfully extracted protection money payments throughout Iraq because they controlled or contested key transportation nodes relevant to shipping nearly anything nearly anywhere in the country including, but not limited to, key geographies astride transportation routes linking the Iraq with Jordan and Syria (through Qaim, in western Iraq), Turkey (through Mosul and Erbil, in northern Iraq), the Persian Gulf (through the western and southern approaches to Baghdad, in central Iraq), and Iran (through Diyala, in eastern Iraq).

157.    Throughout this period, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operationalized their protection rackets vis-à-vis commerce conducted throughout Iraq, not just the areas these terrorists controlled or contested.  This was a function of geography and then-existing transportation routes. In short, most companies shipped their products overland from northern or western Iraq, rather than using the port at Umm Qasr in Southern Iraq.  The terrorists controlled or contested key chokepoints relevant to all transportation routes, and thus financially benefitted from protection money payments even when the projects in question were built in areas of Iraq far outside their strongholds in Anbar, Baghdad, Ninewa, Kirkuk, and Diyala.  The same held true for shipments of lucrative goods throughout Iraq, including consumer electronics.

158.    In the decade prior to the U.S. invasion in 2003, the rule of law broadly collapsed in Iraqi society, as nearly all Iraqi elites engaged in corruption.

159.    Following the 2003 invasion, al-Qaeda-affiliated clerics explicitly blessed corruption and criminality as long as it related to financing attacks against Americans in Iraq through a series of *fatwas* that turbocharged the willingness of Iraqis to engage in corruption.

160.    These messages were favorably received throughout Iraq, as the security climate worsened after 2003 and corruption became entrenched to a level it had not achieved even under Saddam.  From 2003-2020, Iraq was one of the most corrupt countries in the world – falling into a category some refer to as "hyper-corruption." In Transparency International's Corruption Perceptions Index – widely considered the most authoritative measure of country-level corruption – Iraq ranked near the very bottom each year.  In 2007, for example, Transparency International ranked Iraq 161st out of 163 countries.  Such rankings reflected longstanding traditions of corruption that affected virtually every level of Iraqi civil society.

161.    The U.S. government concurred.  In a since-declassified study of al-Qaeda finance in Iraq in the mid-2000s, the U.S. military's Central Command ("CENTCOM"), which is responsible for U.S. operations throughout the Middle East, including Iraq, Afghanistan, and Syria, observed that the "rampant corruption" that Saddam Hussein's regime programmatically pursued from the late 1990s until 2003 set the conditions for terrorists to later leverage corruption as a key source for terrorist finance and logistics flow.

162.    When LM Ericsson and Ericsson Inc. sought to profit off the Iraqi market, Defendants faced an equally corrupt business environment.  When LM Ericsson and Ericsson Inc. sought to profit from economic transactions in this corruption-based economy – including those linked to U.S. government dollars directly through U.S. government contracts or indirectly through Iraqi government contracts funded by the U.S. government – they therefore faced unusually high corruption and money laundering risks, including the associated terrorism risks.

48

163.    Western corporations operating in Iraq used the same corruption manners and means to route payoffs to corrupt government officials who could influence their business and similarly payoff terrorists who could influence their business, and knowingly structured their transactions to exploit their corrupt business environments as the cost of doing business.  They did so by laundering money through a latticework of local partners including, but not limited to, their local customers (for whom elite western bribe-paying companies, not the customer, held the real power), and their subcontractors – hired for ostensible tasks such as security, transportation, logistics, sales, government relations, and business intelligence, among others – that could make corrupt payoffs downstream while (in theory) maintaining plausible deniability for the corporations, like LM Ericsson and Ericsson Inc., whose money they were diverting to terrorists.

164.    Some projects had as many as five different companies in the contracting chain:  a prime contractor, acting in a supplier and agent role (e.g., LM Ericsson), would interface with the customer, usually the U.S. or Iraqi government, as well as any key stakeholders like the World Bank, to facilitate large-scale contracts involving the sale of goods or services manufactured by the supplier's affiliated manufactuer (e.g., Ericsson Inc.); the prime contractor would then outsource performance or implementation of key aspects of the contract to a partner (including its customer) or a subcontractor; the partner or subcontractor would hire another partner or subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf.  This structure allowed the final subcontractor to make corrupt payments while the companies higher up in the chain denied involvement; it also ensured that there was always a demand for more work, as the jobs in question were rarely completed on time (if ever).

165.    These same contracting practices typically led to poor-quality work that undermined U.S. reconstruction objectives in Iraq.

166.    Enormous amounts of American taxpayer dollars disappeared into this web of corrupt contractors and subcontractors.  With prime contractors abdicating their oversight role, in part to maintain plausible deniability over the protection payments they were encouraging, subcontractors rarely spent the U.S. dollars provided by their U.S. government, Iraqi government, and/or World Bank-funded customers on the intended projects.

167.    Western contractors' exploitation of chains of unethical subcontractors in Iraq and Afghanistan was widely understood to be corrupt.  A 2009 study for the U.S. Agency for International Development ("USAID") detailed that "perceptions of rampant corruption include corruption in the donor community, due to the high costs, bureaucratic procedures, and layers of contracting and subcontracting in many projects."  A 2011 report by the U.S. Senate Committee on Foreign Relations likewise criticized the widespread "use of large numbers of contractors" as inviting "corruption through multiple subcontractors."  The prevailing criticism of such practices led General Petraeus to issue formal contracting guidance in 2010 that emphasized the importance of "contract[ing] with vendors that have fewer sub-contractors.  Excessive sub-contracting tiers provide opportunities for … insurgents to divert contract money from its intended purpose."  Although not the only cause, Defendants' use of multiple contracting tiers enabled them to make enormous profits while delivering substandard work.  It also, as alleged below, helped them fund al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for nearly two decades.

a.    **Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money Operation in Iraq from 2004 through 2014**

168.    From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq jointly managed and profited from a sophisticated, nationwide protection money operation in Iraq, through which al-

Qaeda and al-Qaeda-in-Iraq successfully extracted protection payments throughout Iraq using their ability to control or contest vital transportation nodes relevant to transporting nearly anything nearly anywhere in Iraq.

169.    In 2003 and 2004, al-Qaeda, including its polyterrorist leader Abu Musab al-Zarqawi, spearheaded the development of al-Qaeda's and al-Qaeda-in-Iraq's protection rackets in Iraq and Syria, which Zarqawi and his allies operated to profit from protection "taxes" applied to commercial activities in any Iraqi territories that al-Qaeda and al-Qaeda-in-Iraq could contest – which applied to most of the country.  To do so, Zarqawi did not have to build these protection rackets from scratch.  Instead, al-Qaeda just took them over from the incumbent owners (usually, middlemen affiliated with Saddam), declared that al-Qaeda was now in charge, and followed al-Qaeda's protection money playbook thereafter.

170.    Al-Qaeda-in-Iraq's surge throughout Iraq in 2004 was powered by al-Qaeda-in-Iraq's wholesale adoption of al-Qaeda's protection money playbook, which bin Laden and his lieutenants pioneered in Africa and trained its branches and affiliates upon in Afghanistan.  For al-Qaeda, al-Qaeda-in-Iraq offered the first ever test case of al-Qaeda's protection money tactics in an environment in which large numbers of Western firms were operating, as prior rackets targeted businesses in Sudan and Somalia.

171.    By summer 2004, al-Qaeda (through Zarqawi and others) had fully operationalized al-Qaeda's protection rackets in Iraq and parts of Syria.  To do so, al-Qaeda and its local branches communicated to companies doing business in these geographies that companies could absorb expense guard costs or take the easier and more profitable route of simply paying protection money or "taxes" to al-Qaeda and its branches, like al-Qaeda-in-Iraq.

172.    Zarqawi and al-Qaeda-in-Iraq took to al-Qaeda's protection money scheme with a zeal that matched the intensity of al-Qaeda's terrorist campaign in Iraq that it financed.  Al-Qaeda and al-Qaeda-in-Iraq collected "taxes" and "fees" throughout the life cycle of significant economic transactions in Iraq that involved transportation of valuable products (as LM Ericsson's and Ericsson Inc.'s business interests in Iraq ordinarily did). Those payments included, but were not limited to, $400-$500 per-vehicle "tolls" at or near border crossings in Qaim, Erbil, Mosul, Diyala, similar "tolls" at key chokepoint geographies in and near Baghdad, "fees" assessed on a project basis, and/or "taxes" assessed on an estimated income basis.

173.    Al-Qaeda-in-Iraq followed the bin Laden protection money playbook by having a specific bureaucracy dedicated to collecting and redistributing protection money payments from companies with business interests in geographies that were controlled or contested by al-Qaeda or an al-Qaeda subsidiary.  For example, al-Qaeda-in-Iraq operated what it euphmestically referred to as "Spoils Groups," which were AQI terrorist finance and logistics cells that AQI had specifically designated to facilitate al-Qaeda and al-Qaeda-in-Iraq operations through the collection and redistribution of protection money at an industrial scale.[13]

174.    By April 2005, al-Qaeda-in-Iraq's protection rackets had been running for more than a year, and Zarqawi was using them to rapidly expand-Qaeda's terrorist campaign, opening up new fronts in Baghdad and Diyala provinces. Protection rackets in Anbar province alone, for example, yielded several million U.S. dollars per month, which flowed back to al-Qaeda-in-Iraq and, through it, al-Qaeda core as well.

---

[13] Al-Qaeda affiliate the Taliban, including its Haqqani Network, followed a similar playbook, calling their protection money bureaucracy the "Contractors and Organisations Commission."

175.    Al-Qaeda's continued expansion throughout Iraq in 2006, through al-Qaeda-in-Iraq, was powered by the latter's protection rackets, which were in full bloom throughout the country.  According to confidential U.S. government assessments at the time, al-Qaeda-in-Iraq was raising US$70 million to US$200 million a year from criminal activities like its protection rackets.  Indeed, U.S. assessments also concluded that al-Qaeda-in-Iraq's criminal rackets income stream was so pronounced that AQI ran a surplus, which AQI used to fund al-Qaeda core in Afghanistan and Pakistan in keeping with its status as an al-Qaeda branch under the latter's corporatist model.

176.    By the spring of 2006, and continuing through 2014, al-Qaeda-in-Iraq's terrorist finance network had grown so much that AQI required additional bureaucracies in key provinces in order to adequately manage its money. These bureaucracies flowed money, including *khums* donations mandated as kickbacks to superiors, and created direct links between AQI cell leaders and their operatives and agents who extracted, as one CENTCOM document put it, "money from the government contracting process," including from Western companies like Defendants.

**b.    Islamic State Ran a Sophisticated Protection Money Operation in Iraq from 2014 through 2021**

177.    Islamic State continuously ran a sophisticated protection money operation in Iraq and Syria from 2014 through 2021. Throughout, Islamic State's campaign in Iraq, Syria, and Afghanistan was powered by its protection rackets in Iraq and Syria.  According to one confidential U.S. government report published in 2015, Islamic State raised hundreds of millions of U.S. dollars through protection money it extracted from businesses in Iraq.

178.    As Islamic State seized territory in Iraq, it intensified al-Qaeda-in-Iraq's longstanding protection rackets, and formalized them into a purported system of universal taxation that applied to all territory controlled or contested by Islamic State.

179.    Islamic State's Finance Council oversaw its protection rackets and illicit taxation of goods and cash that transited territory where Islamic State operated.

180.    Under Islamic State's taxation system, Islamic State established a series of "taxes" and "fees," which it collected from businesses with interests in geographies controlled or contested by Islamic State, as well as companies transporting goods through the same places via Islamic State checkpoints, all under the pretense of such payments serving as *zakat* (donations or taxes that the terrorists claimed were mandated under applicable Islamic principles).

181.    Islamic State also expanded al-Qaeda-in-Iraq's prior taxation system on trucks, and eventually increased the rate to $1,000 per truck, which was ordinarily paid in U.S. Dollar-denominated transactions.

182.    In late 2014, Islamic State reached what amounted to a global protection money agreement with every major Kurdish party in Iraq, which the two sides reached even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria. Simply put, the leading Kurdish groups in Iraq prioritized their own local interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today. Under this accord, Kurdish agents collected protection money for Islamic State.

183.    As the Coalition expanded its airstrikes against Islamic State's oil and gas fields, Islamic State's protection rackets assumed even greater importance to Islamic State's ability to launch attacks against Americans around the world.  In September 2016, for example, Islamic State intensified its protection money-related collections to offset funding losses from elsewhere. Through these rackets, Islamic State generated millions in monthly cash flow – mostly

denominated in U.S. dollars – from businesses in Iraq, which Islamic State styled as *zakat*, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.

184.    Throughout 2017, Islamic State relied more and more upon its protection rackets as Coalition pressure shrunk the geographic footprint of territory the terrorists controlled.

185.    Islamic State's loss of its caliphate in late 2017 did not end its protection rackets, which continued largely unabated.  Islamic State's control of, or ability to contest, the territories it seized in Iraq and Syria endured from 2014 through at least 2019 because Islamic State maintained control of key chokepoints throughout Iraq and Syria from which it exerted power over companies with business interests there.

### 2.    Multinational Corporations Commonly Structured Their Operations In Iraq To Funnel Protection Money Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Jabhat Al-Nusra

186.    Al-Qaeda and Islamic State used threats of terrorist violence to extract protection money from corrupt international companies doing business in the parts of Iraq, Syria, and Turkey in which LM Ericsson and Ericsson Inc. did business.  Such threats were particularly frequent in (though not limited to) geographic areas that al-Qaeda-in-Iraq and Islamic State controlled.  By 2004, al-Qaeda-in-Iraq had achieved control of wide swaths of central, western, and northern Iraq, and had havens in Syria, Iran, Afghanistan, and Pakistan.  By 2005, al-Qaeda and al-Qaeda-in-Iraq had consolidated Sunni anti-American terrorism in Iraq and Syria under al-Qaeda's organization, which control (or ability to contest) al-Qaeda, through al-Qaeda-in-Iraq (until 2014), and Islamic State (from 2014 through present) leveraged on the ground in Iraq into protection payments.  "In Iraq and Afghanistan," concluded a Congressional study in 2011, "U.S. funds have been diverted to insurgents … as a cost of doing business" and "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing

reconstruction projects."  Al-Qaeda and al-Qaeda-in-Iraq perfected that practice by threatening businesses until (and sometimes even after) they met the FTOs' financial demands.

187.    The FTOs' threats presented companies with a choice:  alert the government and seek the U.S. military's aid while investing in legitimate security to protect Defendants' projects, shipments, and facilities in Iraq, or instead save time and money by paying al-Qaeda-in-Iraq and Islamic State to direct their attacks elsewhere.  Contractors, including Defendants' agents, typically chose the former option.  Simply put, many with business interests in Iraq paid knowing full well the money would be used for bombs and weapons to take the lives of others.

188.    Al-Qaeda and al-Qaeda-in-Iraq consistently extracted protection money payments from Western companies with business interests in Iraq, like Defendants, and the subcontractors who served as their agents, throughout the period from 2004 through 2014, usually doing so monthly.  The case of one long-standing business owner in Mosul named Abdali was typical:  his business made regular monthly protection payments to al-Qaeda-in-Iraq, and later Islamic State, consistently from 2004 through 2017, which he justified as a cost of doing business.

189.    Companies, including Defendants, rationalized their payments to al-Qaeda-in-Iraq and Islamic State by framing them as a necessary cost of business.  But the payments were unnecessary – even from the standpoint of Defendants' own security needs – and counterproductive.  In reality, they chose to pay not because of any reconstruction imperative in Iraq, but because it served their financial interests.  By diverting money to al-Qaeda-in-Iraq and Islamic State, the payments lowered the projects' quality and undermined whatever alleged counterinsurgency benefits they might have otherwise delivered.

190.    Although some contracts required the U.S. government to reimburse the prime contractor for local security costs, that did not eliminate the profit motive for Defendants to

orchestrate protection payments.  Even on "cost plus" contracts, where profits were pegged to a fixed percentage of the government's costs, such payments benefited the prime contractor in two significant ways.  *First*, had Defendants implemented legitimate, more-expensive security measures, that would have raised the cost of their proposals on the front end and jeopardized their ability to win as many contracts.  Making protection payments kept their proposed security costs artificially deflated and lowered the price of their bids, thereby helping them obtain the contracts in the first place.  *Second*, protection payments offered a simpler and less time-consuming way of purchasing project security, which freed up internal resources for Defendants to undertake more projects overall.  Had they spent the time and effort – even apart from the expense – needed to implement legitimate security, they would have been able to perform fewer projects, and thus would have made less money on an aggregate basis.

191.    As a negotiating ploy, al-Qaeda-in-Iraq and Islamic State terrorists occasionally threatened or even attacked employees or agents affiliated with corporations that were paying protection money, albeit less frequently than those that elected not to pay.  For that reason, a corporation's experience facing actual or threatened attacks was not inconsistent with it having made protection payments.  Often, such threats were merely an indication of ongoing negotiations over the amount to be paid.  On balance, though, corporations who paid al-Qaeda-in-Iraq and Islamic State bought themselves relative security (in the related geographies in Iraq and Syria) at an attractive price.

192.    Multinational corporations, including Defendants, often routed money to al-Qaeda and Islamic State through their contractor networks, using contractors as their agents to guide the money home to the FTOs as intended.  Just as delegating contract performance to corrupt

subcontractors worsened the quality of the services provided, *see supra* II.A.1, so too did it create opaque pools of money from which to pay off al-Qaeda and ISIS.

193.    Multinational corporations, including Defendants, used their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them by paying off Iraqi insurgents with protection money, resulting in American money sustaining al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. As explained below, Defendants both actively facilitated and benefited from such payments that their agents and subcontractors delivered on their behalf.  *See infra* ¶¶ II.B.

194.    Cargo Iraq, a now-infamous Iraqi security subcontractor, offers an example. Cargo Iraq was one of the largest private-security companies in Iraq, and it made its money on subcontracts to protect convoys ferrying goods and fuel between Iraq, Jordan, and Syria.  In that capacity, Cargo Iraq worked for LM Ericsson and Ericsson Inc. in Iraq.

195.    Cargo Iraq was profitable because it paid al-Qaeda-in-Iraq and Islamic State. Companies that outsourced security to Cargo Iraq were, in effect, knowingly hiring al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to provide security for company resources and shipments in terrorist-influenced geographies in Iraq and Syria.  Decisions to hire Cargo Iraq for security supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with money and intelligence that undermined American interests.

196.    Middle East Shipping Services ("MESS") is another example.  MESS was a Middle East shipping subcontractor based in Amman, Jordan, and used by numerous large U.S. and European corporations operating in Iraq.  MESS's specialty was shipping product overland from Jordan, Turkey, and/or Syria into Iraq.  In discussions with the State Department, MESS's

CEO admitted that MESS paid U.S. Dollar-denominated protection money to anti-American terrorists in Iraq.  For example, according to a 2004 State Department cable, as published online,

> Amman-based Middle East Shipping Services (MESS) … maintains offices in Baghdad, Basra and Umm Qasr inside Iraq … MESS provides transportation and shipping services for contractors within Iraq, most notably Bechtel Corporation. … [A]fter renting a warehouse in Baghdad, … MESS eventually had to pay 'protection money' to a group of Iraqis who accused the company of collaborating with coalition forces. Despite [MESS's] providing cash for 'protection,' the MESS warehouse was burned to the ground … [MESS never] approached the CPA for security assistance [because MES did not want to] confirm[] … that [MESS] was directly in league with U.S. troops.

197.     Cargo Iraq and MESS illustrate a broader pattern in which companies, including Defendants, knowingly (or recklessly) paid protection money to al-Qaeda-in-Iraq and Islamic State.  The widespread existence of such protection-money payments has been confirmed by congressional investigators, U.S. and Iraqi officials, industry participants, and journalists.

198.     For starters, Congress's Commission on Wartime Contracting documented the pattern of how "[i]n Iraq and Afghanistan, U.S. funds" were "diverted to insurgents" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects."

199.     U.S. military officials also documented the pattern.  A since-declassified 2007 study by U.S. Central Command ("CENTCOM") concluded that the number one aspect of al-Qaeda-in-Iraq's "funding strategy" was to "[e]xploit the Coalition's civil-military reconstruction contracts by gathering information on reconstruction or economic development initiatives to gauge which Iraqi contractors [were] most likely to win Coalition contracts"; "[t]he contractors were then targeted for … extortion[] or co-opting to force them to contribute a part of their profits to AQI."  As Major General Rick Lynch, commander of U.S. forces in central Iraq in

2007, explained:  "I tell a lot of my soldiers: A good way to prepare for operations in Iraq is to watch the sixth season of '*The Sopranos*.' … You're seeing a lot of Mafioso kind of activity."

200.    The Iraq Threat Finance Cell ("IFTC"), an interagency group that drew on law-enforcement and intelligence assets to interdict insurgent funding sources, performed a series of sophisticated audits of Sunni insurgent financing, and reached the same conclusion.  As former senior Treasury official Juan Zarate summarized in 2015, "the Iraq threat finance cell" was "created in 2006 to look at how Al Qaida in Iraq and the insurgents were funding themselves" and concluded that the terrorists "were engaged in" criminal activities which were "[a]ll the things we're talking about now" (in 2015 with respect to ISIS) "they were doing on a -- on a micro scale then" (i.e., during al-Qaeda-in-Iraq's heyday in the mid-2000s).

201.    Iraqi officials also confirmed the practice.  For example, Fawzi Hariri, an Iraqi cabinet member who headed its Anbar Reconstruction Committee, publicly stated in 2007 that U.S. rebuilding funds certainly had gone into terrorists' pockets.

202.    Those protection payments continued despite mounting concerns raised by U.S., British, and Iraqi leaders that multinational corporations who made protection payments financed terrorist attacks by al-Qaeda-in-Iraq, Islamic State, and their allies.  *See infra* IV.F.

203.    Multinational corporations that cut corners in Iraq by paying off terrorists, including Defendants, routed their value transfers to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through two primary channels:  (i) knowing direct transactions with the FTOs, through which corporations, including Defendants, directly provided illegal communications, economic, and technical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; and (ii) knowing payments to the FTOs routed through intermediaries that corporations, including Defendants, controlled and intentionally used, mafia-style, as a "buffer" between Defendants and these FTOs to which

Defendants specifically intended to pay – and did pay – millions of U.S. dollars for "protection" from at least 2004 through at least 2019.

204.    In both value transfer approaches, Defendants deliberately facilitated protection payments payments to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through illegal terrorist finance transactions that included: (1) commission payments to the FTOs, which were cash bribes that were often U.S. Dollar-denominated and infamously called "commissions" as a euphemism for payoffs in Iraq and Syria since the 1990s; (2) "free goods" payments to the FTOs using cash equivalents donated through highly lucrative U.S.-manufactured goods supplied "free of charge" through a notorious decades-long Iraqi and Syrian corruption strategy specifically intended to covertly route substantial value flow from corporations to violent actors; and (3) financial and technical aid to the FTOs through their facilitation of the FTOs' protection rackets, corrupt black market transactions, and illicit communications technologies acquisitions, all of which facilitated al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's attacks against Americans in Iraq, Afghanistan, and Syria from 2004 through at least 2019.

205.    In every instance, each Defendant intended al-Qaeda-in-Iraq and Islamic State to receive the value from Defendants, which flowed substantial U.S. Dollar cash payments, and free goods payments in valuable U.S. manufactured and/or U.S.-sourced, and terrorism embargo-restricted, communications technologies and other cash equivalents that the FTOs used as weapons of terror or resold on black markets in Iraq and Syria (for $2,000 per American smartphone) to al-Qaeda-in-Iraq and Islamic State agents, in payments that Defendants intended to serve as protection payment or "tax" with the specific intent, by Defendants, to cause the above cash flow to reach these FTOs in order to maximize Defendants' profits from the payoffs to the FTOs.

206.     When using intermediaries, Defendants employed similar processes to funnel money to al-Qaeda-in-Iraq and Islamic State in Iraq.  Defendants paid the money as protection: they decided that the cheapest way to shield their projects from attack was to pay al-Qaeda-in-Iraq and Islamic State to leave them alone and instead attack other targets – like Plaintiffs and their family members.  As detailed in this section, similar payments were pervasive throughout the Iraqi and Syrian geographies that were contested by al-Qaeda-in-Iraq and Islamic State and supplied the FTOs – directly when they were the recipient, and indirectly when another of the two were the recipient through their mutual sharing – with an important stream of financing to fund their terrorist attacks across the parts of Iraq, Afghanistan, and Syria controlled or contested by al-Qaeda-in-Iraq and/or Islamic State (and their local branches) from 2000 through 2022.

207.     Defendants followed several shared strategies to operationalize their protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

208.     *First*, Defendants negotiated payments with senior terrorists from these FTOs (e.g., a regional representative of al-Qaeda-in-Iraq).  Al-Qaeda emphasized a rigorous process for negotiating an appropriate level of protection money or "tax" paid by a multi-national corporation.  In 2007, for example, CENTCOM concluded in a since de-classified study of terrorist finance in Iraq, among other things, that:

a.     "AQI was able to stop vehicles, including tractor trailers, from entering or exiting the Waleed and Trebil border crossing in order to extort payments of up to $200."

b.     "AQI collected intelligence on … the contracting process through a former contractor" and had sources who "reported the names of any individual awarded a major contract to local AQI leaders along with the cash value so that AQI extortion cells could determine the appropriate amount of money to demand from a given contractor without derailing the project."

c.     "[T]he AQI amir for the Tamim and 5 Kilo districts of [Ramadi] was considered powerful enough by local contractors that no work could take place in the area without his approval, which usually came with the condition that he would receive up to 50% of the profit. Qutayba's situation was the norm and AQI extortion of Iraqi contracts was the

standard practice in Ramadi and throughout much of Anbar. Under the new policies set down since the rise of [AQ/AQI polyterrorist Masri] AQI operatives refined their method of extortion to demanding protection money in return for 'guaranteeing' that new contracts were allowed to occur free of insurgent attacks."

**d.**    "[O]ne of the primary financiers of AQI in Fallujah" "received $90,000 payments from tribal and religious figures who worked for Islamic NGOs" and "then had this money returned to various AQI cells in Fallujah to cover the purchase of vehicles and weapons."

209.    Other U.S. Army publications also confirmed how al-Qaeda-in-Iraq/Islamic State leaders "financed" cells through protection "money from contractors working for the coalition."

210.    The procedure through which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State extracted those payments was straightforward.  At in-person meetings conducted either directly with the corporation (inclusive of the corporation's agents) or through an intermediary, al-Qaeda, AQI, and Islamic State operatives negotiated the rate.  Defendants usually agreed to pay.

211.    Al-Qaeda practices confirm its branches' systematic tactic of extracting protection payments from large firms doing business in the geographies they contested in Iraq, such as Defendants.  In general, al-Qaeda terrorists kicked back a fixed percentage of any money seized in terrorist attacks as "*khums*" (an Islamic tax) to al-Qaeda's leadership; the remaining four-fifths was given to those on the frontline in Iraq.  However, any money or property seized without fighting from Western projects or businesses – such as the fruits of successful negotiations with a European telecommunications company – was sent to leadership to be spent on attacks against Americans by al-Qaeda and its regional branches in the Middle East.

212.    Al-Qaeda created these rules and norms to ensure that protection money would benefit the broader al-Qaeda organization, both worldwide (i.e., al-Qaeda core) and in Iraq, Afghanistan, and Syria as the three most important terror zones to al-Qaeda core, al-Qaeda-in-Iraq, and Jabhat al-Nusra, rather than individual terrorists outside of senior leadership ranks. (Islamic State later followed the same al-Qaeda approach.)

213.     *Second*, in addition to high-level negotiations with senior al-Qaeda-in-Iraq and Islamic State terrorists, Defendants also paid protection money to local al-Qaeda-in-Iraq and Islamic State cell leaders in the areas where they were operating.

214.     Defendants sometimes made these more-localized payments directly and sometimes routed such payments through Defendants' agents or subcontractors.  Most often under this second approach, corporations routed their payments through "middlemen" known as "consultants" and/or subcontractors that arranged payment on their clients' behalf, through U.S. dollars routed through the corporation and usually falsely described as being for purported service (which were not provided) such transportation, logistics, security, research, government relations, and legal counsel.[14]  The consultants and subcontractors paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by making cash payments through the intermediaries, corruptly routing value through illicit "free goods" deals designed to be monetized on the black market, or providing embargoed U.S. technical and financial aid, and communications tech, to the FTOs. Under all three strategies, the logic of the payments was simple:  they reduced the threat of attacks on the corporations' own projects at an attractive price.

215.     Companies paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection money in relatively predictable percentages on each project they undertook in Iraq and Syria.  The percentages could vary based on several factors, including contract size, location, and the particular al-Qaeda-in-Iraq and Islamic State terrorists involved.  But overall, many analysts

---

[14] In Iraq, as in many hyper-corrupt jurisdictions, multinational corporations often rely upon in-country external counsel, often local litigation firms, who facilitate protection payments styled as "settlements" and the like.  This is a notorious aspect of the corruption economy in Iraq, which Defendants knew because they employed (or were served by) local Iraqi agents who had a sophisticated understanding of the Iraqi economy, including how bribes were commonly paid, and it was commonly known in Iraq that Middle Eastern law firms were a popular vehicle to route large-dollar payoffs.

estimated a largely consistent 10% or greater across-the-board "tax" that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State levied on every economically significant project, and often a much higher percentage.

216.    Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State always maintained potent protection rackets from 2004 through 2022.  From the early 2000s through 2014, under the same scheme, protection payments to al-Qaeda-in-Iraq delivered protection payment-related value (e.g., cash flow, illicit technologies flow) to al-Qaeda and Jabhat al-Nusra.  That was the result of all three groups following the bin Laden playbook on cross-pollination, which they applied to the protection rackets for a host of reasons, including ensuring the continued facilitation of all such groups' relationships with one another.  From 2014 through 2021, Islamic State continued these same protection money operations in Iraq and Syria, and protection money payments to Islamic State in either country also benefited Islamic State's branch in Afghanistan.

217.    Corporations, including Defendants, usually concealed their protection payments from their own shareholders, the U.S. government, and others, by inflating their costs and fraudulently describing their protection money payments as legitimate security, transportation, consulting, and/or humanitarian expenses.  For example, as one Iraqi company officer publicly explained in 2007, the contractors often set their prices up to four times the going rate because contractors budgeted fifty percent (50%) for payoffs to terrorists in exchange for the safe passage of their supply convoys, so that of every $1 million he received, $500,000 flowed through to al-Qaeda and al-Qaeda-in-Iraq.  Similar ratios continued after Islamic State assumed control of al-Qaeda-in-Iraq's protection money operation in Iraq in 2014, and continued through 2022.

218.    As explained below, LM Ericsson and Ericsson Inc. followed that practice and paid protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State including through their

agents and subcontractors, using one or more of the methods described above.  *See infra* II.B.  In doing so, they both orchestrated and knowingly benefited from their agents' and subcontractors' payments.  Defendants actively orchestrated the payments by obtaining the underlying government contracts to pay for the work (or licenses to conduct it) that needed "protection" from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; by retaining and outsourcing security to the corrupt agents and subcontractors they knew would pay money to terrorists; by encouraging their agents and subcontractors to make the payments, either explicitly or implicitly; by supplying the financing that the agents and subcontractors used to make the payments; and then by knowingly approving reimbursement of the payments.  Agents' and subcontractors' contracts with Defendants typically required Defendants to review and approve their expenses, and Defendants knowingly accepted expense reports that hid or mischaracterized the payoffs.  Throughout, Defendants had the right to control their agents' and subcontractors' security activities and knew that their agents and subcontractors were acting on their behalf.

219.     When the agents and subcontractors paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, they did so as part of their performance under their contracts with Defendants.  The agents and subcontractors would have been unable to make protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State without Defendants' money and approval.  Defendants supplied the funds for the protection payments because they, even more than their agents and subcontractors, financially benefited from them.  Indeed, the core purpose of the payments was to benefit Defendants by shielding their projects from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attack at an affordable price.  To obtain that benefit, Defendants needed and intended for their money to reach al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

**B.     Defendants Made Protection Money Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State And Intentionally Obstructed U.S. Government Counterterrorism Efforts Targeting Such Foreign Terrorist Organizations**

220.     LM Ericsson and Ericsson Inc. made protection payments to al-Qaeda and al-Qaeda-in-Iraq agents in Iraq and Syria from 2004 through at least 2014, and to Islamic State agents in Iraq and Syria from 2014 through at least 2019.  And to conceal what they did, LM Ericsson and Ericsson Inc. intentionally obstructed United States counterterrorism efforts targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2013 until at least 2022. *See infra* Part V.[15]

221.     LM Ericsson was the Ericsson business unit that oversaw transactions in Iraq, through LM Ericsson's own officers, directors, employees and agents (including LM Ericsson's C-Suite) as well as LM Ericsson's wholly owned subsidiary, Ericsson Iraq, which served as the in-country representative for LM Ericsson and its subsidiaries around the world, including Ericsson Inc., under Ericsson's global "One Ericsson" business model.

222.     At all times, LM Ericsson (on its own, and through its agent, Ericsson Iraq) acted as Ericsson Inc.'s sales agent in Iraq and was responsible for securing lucrative contracts in Iraq that typically involved both entities.

223.     LM Ericsson (on its own, and via LM Ericsson's agent, Ericsson Iraq) ordinarily served in a *supplier* and *agent* role, as the Ericsson entity that negotiated with counterparts in Iraq and facilitated payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents.

---

[15] Even now, it remains to be seen whether LM Ericsson and Ericsson Inc. will continue obstructing U.S. counterterrorism efforts through their unprecedented misconduct.  For that reason, Plaintiffs do not wish to imply that Defendants' obstruction is over as of the date of this Complaint.  Discovery will determine when, if at all, Ericsson ever changed course.

224.    Ericsson Inc. ordinarily served in a *manufacturer* and *principal* role, who manufactured the goods, and provided the services, that LM Ericsson (on its own and through Ericsson Iraq) sold to its customers in Iraq which were secured by Ericsson's protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through at least 2019.

225.    LM Ericsson and Ericsson Inc. sought to profit from the Iraqi marketplace and were willing to pay anyone to do so, including terrorists. While they did so, LM Ericsson and Ericsson Inc. operated with an understanding of the economic threat that insurgents posed to Ericsson's profitability and went to extreme lengths to assess how Ericsson employees would perform under terrorist threat.[16]

226.    From at least 2000 through at least 2019, LM Ericsson and Ericsson Inc. relied upon a business model built upon illegal payments to third parties who could positively or negatively influence Ericsson's bottom line.  Simply put, throughout this period, LM Ericsson and Ericsson Inc. were corporate criminals engaged on a decades-long, multi-national corporate crime spree that encompassed the United States, Europe, the Middle East, Africa, and Asia.

227.    From 2000 through at least 2019, LM Ericsson's global bribery scheme relied on a litany of criminal tactics, including but not limited to:

a.      fraudulent due diligence reports that concealed corrupt relationships;

b.      sham contracts used to corruptly route value to illicit recipients;

c.      fake invoices used to further conceal corrupt payments;

d.      explicit contemporaneous written admissions as to LM Ericsson's corrupt conduct;

e.      the creation, maintenance, and use of off-the-books slush funds so that LM Ericsson, its subsidiaries, and their agents could make corrupt payments;

---

[16] For example, in 2000, LM Ericsson employees coordinated "mock hijackings" of other LM Ericsson employees (the former doing so unbeknownst to the latter), which at least once resulted in others calling law enforcement during an exercise.

**f.**     deliberate mischaracterization of corruption-related expenses as being related to "travel," "consulting," "supply costs," "material consumption," "customer service," "cost of sales," "entitlements," "settlements," "fridge," and "marketing and sales support";[17]

**g.**     willful failure to implement internal controls necessary to prevent corrupt payments; and

**h.**     the improper recording of LM Ericsson's, and its subsidiaries's, corrupt payments on LM Ericsson's books and records, which were sent to shareholders and regulators in the U.S.

228.     LM Ericsson's global bribery scheme also routinely relied upon American personnel, emails, bank accounts, and products.

229.     United States Attorney for the Southern District of New York Geoffrey S. Berman summarized Ericsson's global business model from 2000 through at least 2016: "Through slush funds, bribes, gifts, and graft, Ericsson conducted telecom business with the guiding principle that 'money talks.'"

230.     Assistant Attorney General Brian A. Benczkowski summarized Ericsson's global business model from 2000 through at least 2016: "Ericsson's corrupt conduct involved high-level executives and spanned 17 years and at least five countries, all in a misguided effort to increase profits.  Such wrongdoing called for a strong response from law enforcement."

231.     The Securities and Exchange Commission summarized Ericsson's global business model from 2011 through at least 2017: "LM Ericsson … engag[ed] in a large-scale bribery scheme involving the use of sham consultants to secretly funnel money to government officials in multiple countries" and "Ericsson's subsidiaries … in Vietnam, Indonesia and Kuwait … maintain[ed] slush funds, us[ed] code names, and create[ed] sham transactions and invoices."

---

[17] Ericsson subsidiaries' characterization of certain payoffs as being related to a "fridge" demonstrates the pervasiveness of the misconduct through LM Ericsson and its subsidiaries, as well as the obvious nature of the fraud (within Ericsson), given absurd "expenses" like "fridge."

232.    Steve Peikin, Co-Director of the SEC Enforcement Division, summarized Ericsson's global business model from at least 2011 through at least 2017: "Ericsson engaged in an egregious bribery scheme for years, spanning multiple continents, by surreptitiously using slush funds and funneling money through sham intermediaries."

233.    From 2003 through at least 2019, LM Ericsson and Ericsson Inc. relied upon the same entities – e.g., LM Ericsson and Ericsson's offices in the Middle East – and used the same schemes – e.g., slush funds – at issue in Ericsson's Deferred Prosecution Agreement to route value to needed recipients, be they an official in Djibouti or an Islamic State terrorist in Iraq.

234.    From 2003 through 2022, LM Ericsson and Ericsson Inc. pursued growth in the Middle East market in general and in Iraq in particular.

235.    After Baghdad fell in April 2003, LM Ericsson quickly went to work lobbying U.S. government representatives in Washington, D.C. to facilitate Ericsson's retention by the U.S.-controlled Coalition Provisional Authority, and later the U.S.-influenced Iraqi government, to build and sustain Iraq's post-war telecommunications infrastructure.

236.    Iraq was a key market for LM Ericsson and Ericsson Inc., both of which viewed Iraq as a "virgin" market, *i.e.*, a new market that required a complete rebuild from top-to-bottom, and therefore promised unusually robust profits for Ericsson. In 2009, for example, Bo-Erik Dahlström, LM Ericsson's Head of Market Unit Middle East, publicly stated that "we regard [Iraq] as [] one of the most strategic markets for growth for Ericsson."

237.    About their own profits, at least, Defendants were correct: collectively, LM Ericsson and Ericsson Inc. executed billions in contracts in Iraq and Syria from 2004 through 2022.  For each of those contracts, LM Ericsson and Ericsson Inc. maintained a general policy of engaging in fraudulent transactions to aid al-Qaeda, al-Qaeda-in-Iraq, Islamic State, and other

terrorists in Iraq and Syria by facilitating regular U.S. dollar-denominated protection payments to such FTOs to protect the projects they implemented in terrorist-controlled or -influenced regions, and by obstructing U.S. counterterrorism policy by fraudulently concealing their protection money relationships with such FTOs in Iraq from U.S. government personnel whom Defendants knew served in key counterterrorism roles.

238.    From 2004 through at least February 15, 2022, LM Ericsson and Ericsson Inc. maintained Ericsson's general policy as described because doing so was vital to Ericsson's bottom line during a period when Ericsson was under tremendous competitive pressure and financial stress, and Iraq was a rare, consistent, financial bright spot for Defendants.  That policy applied to each of the contracts Ericsson implemented in Iraq and Syria, including the contracts in either country that required transportation through the other, as well as each of the fraudulent communications LM Ericsson and Ericsson Inc. caused to be published inside the United States, concerning transactions, services, communications, and other conduct in furtherance of the illicit payments Ericsson made on Iraq-related contracts that included, but were not limited to:

a.    2004 Asiacell Networks Contract: On or about 2004, Wataniya Telecom, on behalf of Asiacell, contracted with LM Ericsson and Ericsson Inc. under a global frame agreement to expand Asiacell's network in central Iraq, including Baghdad and the surrounding areas, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq. [18]

b.    2004 Korek Network Expansion Contract: On or about 2004, Korek contracted with LM Ericsson and Ericsson Inc. to expand Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

c.    2006 Korek Base Stations Contract:  On or about 2006, Korek contracted with LM Ericsson and Ericsson Inc. to build RBS 6000 base stations throughout Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which

---

[18] On information and belief, while Wataniya Telecom exited Asiacell on or about 2007, Ericsson's services under this agreement continued thereafter until completion.

work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

d.    2008 ITPC Network Deployment Contract:  On or about 2008, the Iraqi Telecommunications and Post Company ("ITPC"), a state-owned company responsible for Iraq's fixed-line infrastructure, contracted with LM Ericsson and Ericsson Inc. to execute the initial deployment of ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

e.    2009 Asiacell Network Expansion Contract:  On or about 2009, Asiacell contracted with LM Ericsson and Ericsson Inc. to expand Asiacell's network throughout Asiacell geographies in Iraq, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

f.    2009 Korek Billing System Contract:  On or about 2009, Korek contracted with LM Ericsson and Ericsson Inc. to modernize Korek's billing systems throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

g.    2011 Korek Network Expansion Contract:  On or about 2011, Korek contracted with LM Ericsson and Ericsson Inc. to expand Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

h.    2012 Asiacell Business Transformation Partnership Contract:  On or about 2012, Asiacell contracted with LM Ericsson and Ericsson Inc. to provide consultancy services covering Asiacell's "business transformation" under a three-year "partnership" agreement between Asiacell and Defendants, which work Defendants performed in Iraqi areas that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State controlled or contested.

i.    2012 Korek Field Maintenance Contract:  On or about 2012, Korek contracted with LM Ericsson and Ericsson Inc. to provide field maintenance services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

j.    2013 ITPC Network Upgrade Contract:  On or about 2013, the ITPC contracted with LM Ericsson and Ericsson Inc. to upgrade the ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

k.    2013 Korek Billing Contract:  On or about 2013, Korek contracted with LM Ericsson and Ericsson Inc. to provide Ericsson's comprehensive suite of billing services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

l.    2014 Asiacell Base Stations Contract:  On or about 2014, Asiacell contracted with LM Ericsson and Ericsson Inc. to support Asiacell's "Golden Province" initiative by upgrading Asiacell's core network infrastructure with new RBS 6000 base stations to

prepare for LTE adoption, which work Defendants performed in Iraqi areas that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State controlled or contested.

**m.**   2015 Korek Spare Parts Services Management Contract:  On or about 2015, Korek contracted with LM Ericsson and Ericsson Inc. to manage the inventory of spare parts necessary to the maintenance of Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

**n.**   2016 Asiacell Network Upgrade Contract:  On or about 2016, Asiacell contracted with LM Ericsson and Ericsson Inc. to upgrade Asiacell's "backbone" network to facilitate Asiacell's value-added services, including, but not limited to, Asiacell's proprietary mobile payment system, "AsiaHawala," which work Defendants performed in Iraqi areas that Islamic State controlled.

**o.**   2016 Korek LTE Upgrade Contract:  On or about 2016, Korek contracted with LM Ericsson and Ericsson Inc. to provide core network updates in preparation for Korek's adoption of LTE services throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

**p.**   2017 Korek IP Network Contract:  On or about 2017, Korek contracted with LM Ericsson and Ericsson Inc. IP network updates to Korek's network computing infrastructure through the provision of Ericsson services that depended upon Ericsson's ability to procure technology from another U.S. company, which was performed throughout Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by Islamic State.

**q.**   2019 Asiacell Network Optimization Contract:  On or about 2019, Asiacell contracted with LM Ericsson and Ericsson Inc. to provide a suite of network expansion, network design, and optimization services under a managed services agreement, which work Defendants performed in Iraqi areas that Islamic State controlled or contested.

239.   On information and belief, LM Ericsson and Ericsson Inc. were parties to, or otherwise provided goods or services pursuant to, every major Ericsson contract in Iraq from 2004 through 2022, including, but not limited to, each contract set forth above.

240.   LM Ericsson's and Ericsson Inc.'s public statements after Ericsson's latest criminal scandal emerged in February 2022, and the relevations contained in Defendants' internal documents—first leaked and reported by the media on February 15, 2022—offer some indications of LM Ericsson's and Ericsson Inc.'s general policy of protection payments and obstruction of U.S. government counterterrorism, including, but not limited to:

a.  <u>Ericsson Admitted Its Conduct After the Ericsson Leak in 2022</u>:  After the leak went public in February 2022 and blew the lid off Defendants' aid to FTOs, LM Ericsson and Ericsson Inc. have admitted, in sum and substance, that they facilitated the flow of protection payments in Iraq from at least 2011 through at least 2019, and that DOJ had concluded that LM Ericsson's conduct in Iraq constituted a "breach" of Ericsson's DPA.

b.  <u>The Ericsson Leak in 2022 Revealed Ericsson's Contemporaneous Office Discussions about Protection Payments to Terrorists</u>:  Prior to at least February 15, 2022, LM Ericsson and Ericsson Inc. concealed the fact that beginning in at least 2014, LM Ericsson's and Ericsson Inc.'s officers, employees, and agents frequently discussed Ericsson's protection payments.  The prevailing understanding among many such persons was that Ericsson paid Islamic State – either directly or through its Iraqi partners, consultants, subcontractors, or slush funds – to secure its projects in Iraq, including its transportation needs.  Those discussions occurred in hushed tones and were rarely out in the open; management usually avoided documenting the practice in official meetings. But the typical view expressed by multiple LM Ericsson and Ericsson Inc. officers, employees, and agents was that Ericsson had to pay terrorists to proceed with its work in unstable areas in Iraq.

c.  <u>The Ericsson Leak in 2022 Revealed Ericsson's Permission Letters to Terrorists in Iraq</u>: Prior to at least February 15, 2022, LM Ericsson and Ericsson Inc. concealed the fact that LM Ericsson and Ericsson Inc. requested "permission letters" from terrorists in Iraq granting them formal authority to work in Iraq, which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State issued only to contractors that had made the necessary protection payments.

d.  <u>The Ericsson Leak in 2022 Revealed Ericsson's Indifference to Funding Consequences in Iraq</u>:  Prior to at least February 15, 2022, LM Ericsson and Ericsson Inc. concealed the fact that LM Ericsson and Ericsson Inc. had a documented track record of expressed indifference to where their money went in Iraq.  For example, Ericsson admitted that it did not know, and until 2022 did not care, where its money went. That philosophy, prevalent throughout Defendants' operations, led it to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to maximize Ericsson's profits from customers in the Iraqi and Syrian geographies in which such groups operated.

e.  <u>The Ericsson Leak in 2022 Revealed Ericsson's Uncontrolled Iraqi Slush Funds</u>:  Prior to at least February 15, 2022, LM Ericsson and Ericsson Inc. concealed the fact that Defendants operated, and benefited from, an uncontrolled slush fund in Iraq—which Defendants intentionally created and sustained by deliberately avoiding placing rigorous controls on what their partners, consultants, and contractors could do with Ericsson's money inside Iraq even though Iraq posed extraordinarily unique counterterrorist finance risk—as a strategy designed to create purpose-built buffers between Defendants and the terrorists they paid. Defendants did so to permit Ericsson to route payments to terrorists through Defendants' partners, consultants, contractors, and slush funds, which LM Ericsson and Ericsson Inc. encouraged while often avoiding the details.

f.  <u>The Ericsson Leak in 2022 Revealed Ericsson's Use of Rewards and Punishments in Its Iraqi Business</u>:  Prior to at least February 15, 2022, LM Ericsson and Ericsson Inc.

74

concealed the fact that LM Ericsson and Ericsson Inc. rewarded their officers, employees and agents who facilitated protection payments to terrorists, while simultaneously punishing persons who questioned their conduct.

241.    LM Ericsson's and Ericsson Inc.'s payments were consistent with foreign-headquartered telecommunications companies' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage. *See supra* II.A.2.  In following that standard practice, LM Ericsson and Ericsson Inc. caused protection payments to flow to terrorists that were, on information and belief, worth at least 10 percent of LM Ericsson's and Ericsson Inc.'s Iraqi contracts' value.  As a result, across their contracts, LM Ericsson and Ericsson Inc. made payments to al-Qaeda and al-Qaeda-in-Iraq worth at least several million dollars per year from 2004 through 2014, and LM Ericsson and Ericsson Inc. made payments to Islamic State worth at least several million dollars per year from 2014 through at least 2019.

242.    From 2005 through at least 2019, LM Ericsson and Ericsson Inc. used a broad array of strategies to route protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, including, but not limited to, protection payments to such FTOs that LM Ericsson and Ericsson Inc. routed through: (1) Ericsson's strategic "partners" in Iraq; (2) Ericsson's consultants on behalf of LM Ericsson and Ericsson Inc.; (3) Ericsson's security, logistics, and transportation subcontractors on behalf of LM Ericsson and Ericsson Inc.; and (4) Ericsson's slush funds, upon which Ericsson's employees and contractors relied on behalf of LM Ericsson and Ericsson Inc. At all times, such conduct by Ericsson's allies was understood by all, including LM Ericsson and Ericsson Inc., and intended by all, including Defendants, to be on behalf of LM Ericsson and Ericsson Inc. as protection from the FTOs to aid Ericsson's business in Iraq.

243.    ***Strategic Partners.***  Close cooperation between LM Ericsson and Ericsson Inc. and their strategic partners in Iraq, like Asiacell and Korek, was a hallmark of Ericsson's protection money strategy in Iraq from 2005 through at least 2019.

244.    From 2004 through 2022, LM Ericsson and Ericsson Inc. viewed Asiacell as one of Ericsson's key strategic partners in Iraq, and Asiacell likewise viewed LM Ericsson and Ericsson Inc. as a key strategic partner of Asiacell.

245.    Even though LM Ericsson was, on paper, the supplier, and Ericsson Inc. was on paper the manufactuer, while Asiacell was the customer, their mutual agreement that the Ericsson-Asiacell relationship was between two partners was apt.  Nowhere more so than with respect to protection money payments.

246.    From 2005 through at least February 15, 2022, while LM Ericsson, Ericsson Inc., and Asiacell served as partners to one another, LM Ericsson and Ericsson Inc. (through LM Ericsson) coordinated closely with Asiacell regarding any protection money payments made to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

247.    When Asiacell made its protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Asiacell often did so through LM Ericsson and/or LM Ericsson's subcontractors. For example, according to leaked LM Ericsson and Ericsson Inc. internal documents, "[e]vidence suggests that Asiacell [] engaged in smuggling and potential illegitimate payments directly and through Ericsson."

248.    True to their partnership, LM Ericsson and Ericsson Inc. were willing to do the same thing on Asiacell's behalf that Asiacell did on Ericsson's behalf:  pay off terrorists.

249.    As a result, from 2005 through at least 2019, LM Ericsson, Ericsson Inc., and Asiacell were generally both involved, directly or indirectly, whenever protection money payments were made to terrorists in connection with Ericsson-related projects for Asiacell.

250.    According to leaked LM Ericsson and Ericsson Inc. internal documents, Defendants also relied upon U.S.-manufactured "free goods," including sophisticated free

American consumer communications technologies like Apple iPads, as cash equivalents to make corrupt payments to support Ericsson's business in Iraq. Such high-tech, embargoed, free goods provided vital communications support to the terrorists, and gave them a fungible cash-equivalent that they could, and often did, monetize through the black markets that were endemic throughout the Middle East from 2003 through 2022.

251.   The Ericsson leaks in 2022 also revealed that LM Ericsson—on behalf of itself and key Ericsson divisions and manufacturers, like Ericsson Inc., that LM Ericsson promoted in Iraq in LM Ericsson's supplier role—also deployed another popular tactic in the corporate corruption and illicit finance toolkit from 2003 through 2022 known by some as **"offloading."**

252.   Before Plaintiffs allege LM Ericsson's offloading conduct, Plaintiffs first briefly explain "offloading" as a concept.  Offloading is a notorious corruption strategy that was always (and remains) especially popular with corrupt European and American multinational corporations that desire to make large streams of regular and predictable illicit payments to known recipients.  In such instances, criminal corporations, including LM Ericsson, sometimes follow an offloading strategy in which they negotiate with a trusted intermediary ally, like a strategic partner or captive subcontractor, in order to "offload" some aspect of that illicit payment stream to the intermediary ally.  Such ally, in turn, typically does not have the same legal exposure as the partner doing the offloading (e.g., the difference between a U.S. company and an Iraqi firm), and therefore agrees to serve the offloading function in exchange for some benefit, such as off-books cash payoffs, commericially unreasonable terms (in the ally's favor) on another aspect of their contract, free goods, and so on.  As a result, when western corporations and local partners engage in a pattern of transactions reflecting offloading tactics to facilitate corrupt payments by a western company (usually the offloader) through a local partner (usually

the intermediary), the local partner typically can expect to charge a fee of some sort, and yield a substantial profit from the offloading relationship (a win/win for both sides of this criminal coin).

253.    Offloading was a popular strategy that some multinational corporations used during the terrorist scandal relating to Saddam's use of off-books payoffs from large multinational corporations during the United Nation's Oil-for-Food program from 1998 through 2003 as a source of terrorist finance.  *See infra* ¶¶ 594-97.  LM Ericsson and Ericsson Inc. ordinarily hired consultants and subcontractors who had substantial illicit economy experience during the Oil-for-Food era, and therefore would have been readily familiar with how to operationalize, and sustain, an offloading scheme for terrorist finance, like that which LM Ericsson and Ericsson Inc. purused with its Iraqi partners, Asiacell and Korek.

254.    The history of LM Ericsson's behavior in Iraq, as first revealed during the 2022 Ericsson leaks, is consistent with Defendants' widespread following of an offloading strategy in Iraq.  LM Ericsson and Ericsson Inc. relied on an offloading strategy to route some of their protection money value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Defendants did so by, among other things, routing cash payments through intermediaries.  Moreover, on information and belief, Defendants also negotiated below-rate terms on certain commercial aspects of their deals with Asiacell and Korek for the purpose of, and with the specific intent to, facilitate Asiacell's and Korek's protection payments to terrorists on behalf of such Iraqi customer and its partner, Ericsson. Such negotiations are exactly how offloading works: one party agrees to commercially unreasonable terms designed to illicitly route excess value to the other, and the other, in turn, uses such excess value to make the illicit payment at issue (while keeping some for themselves as a fee for managing the transaction). Given LM Ericsson's "One Ericsson" model, which places tremendous scrutiny on the commercial terms at issue, offloading as practiced by

Ericsson necessarily involved both its C-Suite (which had to approve the egregious deals) and its cross-functional commercial, legal, compliance, and technical teams in the United States (which had to approve and operationalize such egregious deals).

255.    For that reason, when corporations, like Ericsson, embrace offloading as a corruption strategy, the criminal rot tends to spread far and wide throughout the organization, as it requires a team effort to sustain an offloading scheme at a large multinational corporation. Thus, offloading schemes tend to be practiced by only the most brazen of corporate criminals, as they are one of the maximilast ways (from an organizational perspective) a corporation can route illicit payments to third parties.  Simply put, one-off dirty consultants are far easier.  But for large scale payments, offloading offers superior efficiency advantages for the criminal enterprise. Defendants practiced an all-of-the-above approach, in which they used more common illicit transfer strategies (*e.g.*, slush funds and corrupt consultants) while also embracing an offloading approach through their relationships with strategic partners and subcontractors.

256.    As a result of Defendants' adherence to such offloading practices, even corrupt payments with Asiacell and Korek that did not on their own transfer money to the terrorists – e.g., a large off-books cash payment to officers, employees, or agents of Asiacell or Korek – still often flowed to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because LM Ericsson and Ericsson Inc. (via LM Ericsson's role as Ericsson Inc.'s agent in Iraq) agreed with its Iraqi partners like Asiacell and Korek that everyone involved would help everyone else with their protection money needs.  On information and belief, LM Ericsson and Ericsson Inc. regularly routed large-value protection payments through its partners via such an "offloading" strategy.[19]

---

[19] Given offloading is the most effective way to conceal illicit payments (that's why it exists, after all), Plaintiffs have only scratched the surface, and discovery is likely to reveal additional instances of Defendants' offloading relationships.

257.   **Consultants.**  LM Ericsson and Ericsson Inc. leveraged Ericsson's long-standing consultants in Iraq to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

258.   According to leaked LM Ericsson and Ericsson Inc. internal documents, Defendants paid **al-Awsat Telecommunications Service Company ("al-Awsat")** to serve as a conduit in order to route tens of millions of dollars to others, through consulting work where the ultimate beneficiary could not be identified, there was "deficient proof of work, and the money ultimately ended up in a Jordanian bank account."[20]  These were three classic indicia of a company routing value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq.  According to leaked LM Ericsson and Ericsson Inc. internal documents,

> In interviews, [at least two witnesses] stated that Al-Awsat were paid 500k USD under the label "Security Service" without a clear scope of delivery. … In [an] interview [with LM Ericsson and Ericsson Inc., a witness] stated that the amount was requested to be added by [chief of LM Ericsson's Iraq Country Unit] Tarek Saadi … In interviews with [LM Ericsson and Ericsson Inc., one or more witnesses] has confirmed that no security services from Al-Awsat have been rendered, and in reference to the 500k USD … [i]t has not been possible to trace the ultimate beneficiary of this money.

259.   According to leaked LM Ericsson and Ericsson Inc. internal documents, Defendants authorized al-Awsat and its proprietor, Jawhar Surchi, to execute agreements on Defendants' behalf.  Indeed, according to leaked LM Ericsson and Ericsson Inc. data, Surchi and al-Awsat were so synonymous with LM Ericsson and Ericsson Inc. that al-Awsat's firm name over time simply came to be referred to as "Ericsson."

260.   According to leaked internal LM Ericsson and Ericsson Inc. documents, one or more Ericsson employees told LM Ericsson's and Ericsson Inc.'s investigators that Ericsson

---

[20] Notably, al-Awsat means "the middle" in Arabic, referencing Ericsson's use of al-Awsat as a "buffer" between Ericsson and the parties Ericsson needed to pay off as the price of doing business in Iraq.

directed large U.S. Dollar-denominated "commission" and "security services" payments to al-Awsat "regardless of whether there were deliveries ongoing or not," which were classic indicia of a company routing value to al-Qaeda, AQI, and Islamic State through an intermediary.

261.    From at least 2005 through at least 2017, LM Ericsson and Ericsson Inc. relied upon the services of al-Awsat and its sister company, Alawsatiya, to route illicit funds through suppliers.[21]  During this period, Defendants caused al-Awsat and Alawsatiya to be paid at least $10.5 million.  According to LM Ericsson and Ericsson Inc., "[t]he 10.5M USD paid to Alawsatiya into Al-Awsat's accounts was not reflected in their accounts at all, and therefore we are unable to ascertain who the ultimate beneficiary owner was for this money." On information and belief, al-Awsat and Alawsatiya diverted a substantial percentage of this money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2017.

262.    On information and belief, LM Ericsson and Ericsson Inc. retained other consultants from 2005 through at least 2019, which Defendants used to route protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, through these FTOs' agents in Iraq.

263.    ***Security, Logistics, and Transportation Subcontractors.*** LM Ericsson and Ericsson Inc. also relied upon LM Ericsson's security, logistics, and transporation suppliers, with whom Defendants contracted, to route Ericsson's protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2019.

264.    During this period, LM Ericsson and Ericsson Inc. relied upon, among others, **Security and Logistic Services ("SLS")**, which was a supplier to Ericsson, and **Cargo Iraq**, which was also an Ericsson contractor, albeit one Defendants tried to conceal on their books.

---

[21] According to al-Awsat's owner, Jawhar Surchi, Alawsatiya was a "secondary contractor" that served as an extension of al-Awsat.

265.     LM Ericsson and Ericsson Inc. intended for their security, logistics, and transportation suppliers to divert a substantial amount of the sums they were paid by Ericsson to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because the suppliers understood that LM Ericsson and Ericsson Inc. affirmatively desired that they pass on such money to the terrorists in order to secure a more favorable business environment in Iraq for Ericsson.

266.     ***Slush Funds.***  According to leaked LM Ericsson and Ericsson Inc. documents, Defendants maintained an **"uncontrolled slush fund"** that Ericsson operationalized through its employees and subcontractors.  LM Ericsson "used" its longtime subcontractor Security and Logistics Services ("SLS") "to provide cash for transportation services."  SLS did not provide legitimate services, but chose to simply pay the terrorists.  According to leaked LM Ericsson and Ericsson Inc. internal documents, Ericsson's "suppliers were used as an uncontrolled slush fund between 2016-2018" and Ericsson "cannot rule out that other suppliers [had] been used in [a] similar manner until today."

267.     LM Ericsson's personnel in Iraq went to great lengths to create slush funds in every manner possible.  For example, LM Ericsson's personnel working on Asiacell-related contracts developed a scrapping scheme in which LM Ericsson employees used unrecorded cash from the sale of decommissioned equipment to pay for illicit off-books expenses.

268.     LM Ericsson operated its scrapping scheme as a slush fund generation tactic from at least 2014 through at least 2017.  According to LM Ericsson and Ericsson Inc.:

> A scrapping scheme was established, which involved selling decommissioned equipment owned by Asiacell on a swap project for 2000 sites, including Nokia and Huawei sites.  Ericsson's Asiacell KAM [i.e., Key Account Manager] and Operations teams have been using the unrecorded cash as a 'slush fund' for other expenses. … Over 188K USD between 2014-2017 has been identified by the investigation.  The spent included hotels, dinners, bonuses for contractors, parties, personal expenses, taxis and miscellaneous purchases.  This process does not follow any of the four Ericsson routines for handling cash.

269.    On information and belief, some of the sums described above, including but not limited to "bonuses for contractors" and "personal expenses" were euphemisms for payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and Defendants' scrapping scheme was another mechanism through which Ericsson created the purpose-built slush funds it needed for its payoffs, including to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2014 through 2017.

270.    The **2014 Asiacell Base Stations Contract**, *supra* ¶ 238(l), offers a good illustration of Defendants' general practice of making protection payments to terrorists in Iraq. Throughout the spring and summer of 2014, LM Ericsson faced an imminent financial crisis, causing it to announce major restructuring, impairments, and the need to substantially increase revenue. Against this backdrop of intense corporate pressure, in the summer of 2014, while LM Ericsson and Ericsson Inc. began working under the 2014 Asiacell Base Stations Contract, Islamic State was rampaging across Iraq, including the northern Iraqi geographies in which Ericsson's work was being performed.  Given Islamic State's universal taxation practices, and use of such tax revenue to finance terrorism, every responsible company exited the areas seized by ISIS.  LM Ericsson and Ericsson Inc., however, stayed.

271.    On June 10, 2014, Islamic State seized Mosul. The next day, instead of planning their departure, LM Ericsson and Ericsson Inc. were looking for contractors to work on a project upgrade being performed under the 2014 Asiacell Base Stations Contract. One or more of LM Ericsson and Ericsson Inc.'s employees and/or agents expressed concern about the security environment in Iraq and encouraged Ericsson to invoke its "force majeure" clause in the Asiacell contract so that Ericsson would not have to work in or near Islamic State-held territory, and the issue was escalated to Ericsson's regional management.

272.     According to leaked LM Ericsson and Ericsson Inc. internal documents, an "email review" of Defendants' emails showed that Ericsson "persever[ed] to maintain business continuity" in northern Iraq "[i]n the weeks following the capture of Mosul by ISIS on 10 June 2014." For example, during this period, an LM Ericsson manager emailed one of Ericsson's subcontractors operating in Islamic State-controlled territory and instructed him as follows: "Kindly let's keep each other updated daily so that whenever there's any window to perform activity if the security situation allows, so that we grab any chance available."

273.     Between on or about June 11, 2014 and on or about June 17, 2014, Tom Nygren, LM Ericsson's Vice President and General Counsel for the Middle East Region, strongly recommended that Defendants invoke force majeure and withdraw from the Iraqi geographies controlled by Islamic State.

274.     On June 18, 2014, Rafiah Ibrahim, Head of Ericsson's Middle East & Africa Region, and Tarek Saadi, then-head of Ericsson's Iraq Country Unit, rejected Mr. Nygren's recommendation.  According to LM Ericsson and Ericsson Inc., "[d]espite the strong recommendation from Tom Nygren," "Rafiah Ibrahim" "and Tarek Saadi" "decide[d] not to invoke force majeure because it would be 'premature' and 'destroy [Ericsson's] business.'"

275.     According to LM Ericsson and Ericsson Inc., Roger Antoun, an Ericsson manager who worked on the 2014 Asiacell Base Station Contract, said the proposal by Ericsson's employees to invoke force majeure was "escalated" to LM Ericsson's global headquarters and Mr. Antoun "raised it verbally as well."  On information and belief, LM Ericsson's senior global leadership sided with Ms. Ibrahim and Mr. Saadi, and approved Defendants' continued business in Islamic State-controlled territory.

276.     On July 13, 2014, LM Ericsson conducted a meeting of its regional leadership for the Middle East, during which meeting the participants openly discussed continuing to do business in Islamic State-controlled territory.  At this meeting, LM Ericsson's senior executive for the Middle East and Africa, Ms. Ibrahim, shared information with the group that Islamic State's abductions in Iraq were "impacting business."  Ms. Ibrahim and LM Ericsson's senior Middle East management team, however, concluded that "for now," there would be "no changes," meaning that Ericsson would continue to do business in Iraqi territory controlled by Islamic State even though Defendants understood the risks in doing so.

277.     The day after LM Ericsson's meeting, on July 14, 2014, according to leaked LM Ericsson and Ericsson Inc. documents, Ericsson asked Asiacell, which Ericsson viewed as one of its Iraqi "partners," to request "permission from 'local authority ISIS'" to permit Ericsson to continue to work in Mosul even after Islamic State fully seized the city in Summer 2014.

278.     Later that summer, LM Ericsson and Asiacell prepared a letter to Islamic State requesting permission from Islamic State to continue working in northern Iraq. Among other things, LM Ericsson and its "partners" at Asiacell asked Islamic State to "[p]lease facilitate the mission of the technical team … of Ericsson which is contracted by Asiacell for the maintenance and setting up of the towers" and "thank[ed]" Islamic State for its "cooperation." According to a leaked LM Ericsson and Ericsson Inc. report, Ericsson could not rule out the possibility that this financed terrorism in Iraq.

279.     LM Ericsson and Asiacell then caused an engineer named Affan – who had been working for LM Ericsson's subcontractor, Orbitel, on tower tests in Mosul – to deliver Ericsson's and Asiacell's permission letter to Islamic State in-person at ISIS's office in Mosul.

280.    LM Ericsson and Asiacell insisted that the work continue and sent Affan to deliver their letter to Islamic State even though LM Ericsson and Asiacell understood that Islamic State terrorists had previously detained several other workers performing services under Defendants' 2014 Asiacell Base Stations Contract.

281.    LM Ericsson communicated directly with Affan prior to his interaction with Islamic State to instruct him to hand-deliver Ericsson's and Asiacell's permission letter to ISIS.

282.    LM Ericsson also communicated with its Iraqi subcontractor, Orbitel, which employed Affan on LM Ericsson's behalf, in order to pressure Orbitel to deliver LM Ericsson's and Asiacell's letter to Islamic State.  As Affan put it, "Ericsson put pressure on my company, and my company put pressure on me."

283.    After Affan hand-delivered the joint LM Ericsson/Asiacell letter to Islamic State, he was contacted by Islamic State terrorists and instructed to appear at a meeting point. When Affan did so, he was detained by a sheikh, Haji Saleh, who was an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecommunications businesses in northern Iraq. Haji Saleh told LM Ericsson's senior manager in Iraq that LM Ericsson must pay millions of U.S. dollars to Islamic State in order to work in Northern Iraq.

284.    According to leaked LM Ericsson and Ericsson Inc. internal documents, an Islamic State "sheikh" – on information and belief, Haji Saleh – called an LM Ericsson project manager in Iraq, Rabbah Dannawi, and told Mr. Dannawi that Ericsson and its employees were "infidels," Islamic State was demanding that Ericsson pay a religious tax of millions of U.S. dollars, and Mr. Dannawi was "reachable" even in Oman or Lebanon; Mr. Dannawi "hung up the phone." Thereafter, Affan frantically called back but no one from LM Ericsson returned his calls.

285.    LM Ericsson, Asiacell, and Orbitel abandoned Affan for several weeks, while he was placed under house arrest by Islamic State.  Describing how LM Ericsson treated him, Affan put it simply: "They sold me."  Referring to LM Ericsson, Affan said: "They destroyed me."

286.    After a few weeks, Islamic State terrorists told Affan that he was free to leave. Islamic State did so because LM Ericsson and Ericsson Inc. facilitated the payment of millions of U.S. dollars to Islamic State as a "business tax", which Islamic State previously communicated to LM Ericsson must be paid for Defendants to do business in Islamic State controlled- or contested-territories northern Iraq. According to leaked LM Ericsson and Ericsson Inc. documents, an Ericsson manager admitted that Ericsson worked through Asiacell to make "arrangements to obtain the release of the hostage and to let Ericsson continue the work in Mosul."  Based on his personal observations, Affan also concluded that LM Ericsson made protection money payments to Islamic State.  On information and belief, LM Ericsson routed some of these payments to Islamic State through, among other terrorists, Haji Saleh, an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecom firms in northern Iraq.

287.    Defendants did not merely limit themselves to the payment of "business taxes" to Islamic State. From at least 2014 through at least 2017, LM Ericsson and Ericsson Inc. also facilitated the payment of "customs taxes" to Islamic State, which Islamic State assessed on trucks traveling through or near territory controlled by Islamic State.

288.    As part of the 2014 Asiacell Base Stations Contract, for example, LM Ericsson and its partner Asiacell had to transport expensive cell towers and equipment from Erbil in northern Iraq to Ramadi in western Iraq.  According to leaked LM Ericsson and Ericsson Inc. documents, Defendants' transportation contractor, Cargo Iraq, had two options: the "legal way" and the "Speedway."  While the "Speedway" was both longer (as the crow flies) and more

expensive (in terms of illicit payments), it offered one advantage: although the "Speedway"

required protection payments (styled as customs taxes) to Islamic State, it was much faster than

the "legal way" because it avoided the lawful Iraqi checkpoints that the Iraqi government

established throughout the country in an attempt to halt Islamic State's rapid advance at the time.

 289. LM Ericsson and Ericsson Inc. chose the "Speedway" because Ericsson

calculated it would make more money by doing so.  On information and belief, this was because,

among other reasons, Defendants' contracts with Asiacell and Korek harshly penalized project

delays.  In short: Defendants bribed Islamic State so that Ericsson could avoid paying substantial

late fees to its Iraqi customers.

 290. According to leaked LM Ericsson and Ericsson Inc. documents, Defendants

regularly paid thousands of dollars per truck to transport their equipment on the "Speedway"

through Islamic State's territory while providing services under the 2014 Asiacell Base Stations

Contract.  For example, in March 2017, according to such Ericsson documents, Ericsson paid

$22,000 per truck for three loads on a single day. According to such leaked Ericsson data,

> Roger Antoun stated in an interview that Ericsson had paid an illegal 'Speedway'
> option to the transporter Cargo Iraq [] for faster transportation of equipment in
> Iraq.  According to Roger Antoun, Cargo Iraq were engaged by Ericsson, on
> instruction by non-government customer Asiacell, for transportation during 2016
> and 2017. With the specific purpose to circumvent the official customs.  That had
> been increased to 25% from 10%-15% by the government since the ISIS invasion
> [in 2014]. Cargo Iraq were not registered as an Ericssion supplier and were paid
> in cash through Security and Logistic Services (SLS), a supplier to Ericsson.  The
> timeframe and geographic areas covered by these transportations indicate that
> areas controlled by local militias, including ISIS, has been passed.

 291. Collectively, LM Ericsson and Ericsson Inc. facilitated at least several million

U.S. dollars' worth of such "customs tax" payments to Islamic State terrorist to transport goods

on the "Speedway" from at least 2014 through at least 2019.  Indeed, the transactions above,

which describe only one day in March 2017, resulted in more than $60,000 flowing from

Defendants to Islamic State. Indeed, in a leaked report, LM Ericsson and Ericsson Inc. themselves concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that Cargo Iraq engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

292.    The **2004 Asiacell Networks Contract**, *supra* ¶ 238(a), offers another good illustration of Defendants' general practice of making protection money payments to terrorists in Iraq from at least 2004 through at least 2019. From 2004 through approximately 2008, LM Ericsson and Ericsson Inc. expanded Asiacell's network throughout central and northern Iraq, including Baghdad and Mosul. Throughout, Defendants and Asiacell viewed one another as strategic "partners," in the same way they were a decade later.

293.    While Defendants built out Asiacell's network in central Iraq from 2004 through 2008, al-Qaeda and al-Qaeda-in-Iraq ran sophisticated protection money operations that specifically focused on extracting business taxes and customs taxes from telecommunications businesses in central Iraq and/or shipping equipment through northern Iraq, both of which described Defendants' services to, and partnership with, Asiacell.

294.    From 2004 through at least 2008, al-Qaeda and al-Qaeda-in-Iraq collectively extracted millions of U.S. dollars each year from persons affiliated with 2004 Asiacell Network Contract. The U.S. government has determined that al-Qaeda-in-Iraq extracted large amounts of protection money from persons associated with the 2004 Asiacell Network Contract from on or about 2005 through at least on or about 2008, which included monthly six-figure business taxes in al-Qaeda-in-Iraq-contested provinces, including Ninewa and Baghdad, where Ericsson performed under the 2004 Asiacell Network Contract.

295.     LM Ericsson and Ericsson Inc. played a key role in the Asiacell-related protection money payments to al-Qaeda and al-Qaeda-in-Iraq from 2004 through at least 2008.

296.     Defendants did not limit their protection money payments in Iraq to Asiacell-related work.  Ericsson's corruption was programattic throughout Iraq and extended specifically to Ericsson's work for Korek.  According to leaked LM Ericsson and Ericsson Inc. internal documents, Elie Moubarak, Ericsson's account manager for Korek, engaged in "corruption and financial irregularities" in order to facilitate Ericsson's business in Iraq. On information and belief, LM Ericsson and Ericsson Inc. also routed protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2019 in connection with Ericsson's Korek-related work as described above.

297.     In each instance above, LM Ericsson authorized the payment to the terrorists, coordinated such payment, and was positioned to veto such payment but chose not to because LM Ericsson prioritized its profits over the risk that payments would facilitate terrorist violence.

298.     Ericsson Inc. also actively participated in the protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, including by: (a) manufacturing and/or procuring devices they knew or recklessly disregarded were being used by their affiliate, LM Ericsson; (b) registering to do business with Asiacell, knowing that Asiacell ordinarily encouraged protection payments by its partners as the cost of doing business; (c) submitting paperwork to the United States government, Iraqi government, Asiacell, and Korek confirming LM Ericsson's authority to negotiate and execute corrupt contracts on its behalf. Indeed, under Defendants' offloading approach, close cooperation between related corporate entities is vital to the long-term success of any offloading scheme, including the one obviously practiced by LM Ericsson and Ericsson Inc. in Iraq from at least 2004 through at least 2019.

299. Indeed, the events alleged above are merely examples and reflect the tip of what is likely an historically large legal iceberg, as LM Ericsson went to unusual lengths to conceal its protection payments to terrorists. *See infra* Part V.  Discovery is therefore likely to reveal additional violative relationships, strategies, and payments.

300. LM Ericsson's and Ericsson Inc.'s protection payments delivered substantial monetary value, usually in U.S. dollars, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through 2022.  Given the size of Defendants' business in Iraq, the frequency of its contracts, LM Ericsson's admissions about Iraq, and the Iraqi projects for which Defendants were contracted, Ericsson's total protection payments – including direct cash payments through LM Ericsson's uncontrolled slush funds and Defendants' intermediary partners, consultants, and contractors – delivered at least several million U.S. dollars per year in total value value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2004 through at least 2019, and the vast sums Ericsson paid facilitated the terrorists' financial reserves for several years thereafter. As a result, Islamic State was still likely benefitting from Ericsson's 2019 largesse, for example, in February 2022 when leaked Ericsson internal documents revealed Defendants' aid to terrorists.

301. Independently, and in addition to the payments themselves, Ericsson's participation in the FTOs' protection-money rackets gave it firsthand access to important information about how terrorists were raising money in Iraq.  No later than 2013 (when it was under investigation by the U.S. government for foreign bribery), Ericsson was required to disclose this information to the U.S. government and others, but it chose not to in an effort to conceal its own complicity with terrorists.  Thus, Ericsson hid information about the protection-money rackets, including the identities of terrorist actors (*e.g.*, Haji Saleh), corrupt contractors and subcontractors (*e.g.*, al-Awsat), and details regarding how money was solicited and collected

that allowed the FTOs' finance mechanism to flourish. This concealment independently aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's violence.

## III.   DEFENDANTS' AID FACILITATED AL-QAEDA AND ISLAMIC STATE ATTACKS ON AMERICANS IN IRAQ, AFGHANISTAN, AND SYRIA

### A.   Al-Qaeda Comprised A Globally Integrated Terror Network That Relied Upon A Cooperative, Corporate Model Internally And With Other Allied Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign Against The United States

302.   Al-Qaeda's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, al-Qaeda's: (1) integrated global network, which disregarded national boundaries; (2) doctrinal emphasis on unity amongst Islamist groups, and cooperation with otherwise hostile groups that were also targeting the United States, which comprised a "joint operations" model to terrorist campaigns that revolutioned terrorism; (3) multi-national corporation model, which emphasized partnership between al-Qaeda branches and affiliates; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; (5) use of Iranian territory as a safe haven and logistical pipeline through a secret deal with the Iranian regime to connect al-Qaeda opeartives in Iraq, Iran, and Afghanistan; and (6) practice of flowing value from al-Qaeda-in-Iraq to al-Qaeda and its partners in Afghanistan and Pakistan.

#### 1.   Al-Qaeda's Integrated Global Network

303.   Al-Qaeda served as a global network and umbrella group that organized the anti-American terrorist campaigns of its branches (like al-Qaeda-in-Iraq) and affiliates or allies (like the Taliban).

304.   Al-Qaeda operated in both a centralized and decentralized manner, extracting advantage from what each approach offered. While al-Qaeda's core set the strategy, facilitated attacks, provided fighters and funding, and led the overall campaign, al-Qaeda's branches around

the world had autonomy to conduct operations on a cellular level.  This balanced approach modeled that of the U.S. military (which also relied upon a chain-of-command that facilitated local innovation), and made al-Qaeda far more formidable.

305.    Throughout al-Qaeda's more than 25-year history, al-Qaeda has operated as a highly structured organization, rather than a loose network.

306.    At all times, thousands of al-Qaeda operatives served al-Qaeda's global terrorist network worldwide.

307.    After 9/11, the United States government launched a globalized war against al-Qaeda and its branches and affiliates, to which al-Qaeda replied with an equally globalized response.  In the twenty years after 9/11, al-Qaeda and its branches and affiliates used shared strategies, training sites, terrorist operatives (who wore multiple organizations' hats and were known as "polyterrorists"), financiers, and the like, under al-Qaeda's multi-national corporation approach to efficiencies across borders.   As a result, while geographies grew over time to encompass Syria and other countries in the Middle East, Africa, and Europe, al-Qaeda and its allies pursued consistent approaches that drew resources, personnel, and expertise, from a global latticework of cells in Afghanistan, Pakistan, Iraq, Syria, Lebanon, Jordan, and dozens of other nations on every continent but Antarctica.  This was made possible by al-Qaeda's long-time service as a terrorist innovation hub in which transnational al-Qaeda terrorists trained al-Qaeda branches and affiliates regarding terrorist practices, including terrorist fundraising tactics, techniques, and procedures.

308.    Al-Qaeda's post-9/11 strategy reflected bin Laden's long-standing vision of al-Qaeda (and him, specifically) as the leader of a grand terrorist coalition across Iraq, Afghanistan,

and Pakistan.   Due to the mutually reinforcing ties between al-Qaeda and its Sunni allies –

including their practice of cross-donations to each other – support for one benefited all.

309.    Under al-Qaeda's global network approach, al-Qaeda, al-Qaeda-in-Iraq, and their

allies collaborated in Iraq, Syria, Afghanistan, Pakistan, the U.A.E., Europe, Africa, and

elsewhere to carry out terrorist attacks against Americans worldwide during the relevant period.

310.    Al-Qaeda's network exemplified how terrorist networks twisted the benefits of an

interconnected, global environment to serve their agenda by operating as a multinational

enterprise with operations in more than 60 countries.  Al-Qaeda's global activities were

coordinated through the use of personal couriers and communication technologies emblematic of

the era—cellular phones, encrypted e-mail, internet chat rooms, and online videos. Members of

al-Qaeda traveled from continent to continent with the ease of a vacationer or business traveler in

an age marked by unprecedented mobility and migration, paid for by the funds al-Qaeda raised

through, among other things, front businesses, protection rackets, and donations.

311.    Indeed, al-Qaeda experts have long warned against attempts to treat al-Qaeda core

in Afghanistan and Pakistan as a separate operational, financial, logistical, and doctrinal

organization from al-Qaeda subsidiaries like al-Qaeda-in-Iraq and Jabhat al-Nusra.  Instead, to

properly understand how al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra plan and execute

attacks, one must consider al-Qaeda's relationships with its subsidiaries like al-Qaeda-in-Iraq

and Jabhat al-Nusra, which operated from 2001 through 2014 as part of a single structure in

which al-Qaeda facilitated attacks by al-Qaeda-in-Iraq and Jabhat al-Nusra in their capacity as

al-Qaeda subsidiaries serving as part of al-Qaeda's integrated global terrorist organization.

312.    Al-Qaeda's global network approach also comported with its transnational

corporate model.  As a result, al-Qaeda, al-Qaeda-in-Iraq, and their allies regularly pursued fused

terrorist finance and logistics strategies, *e.g.*, joint al-Qaeda and Haqqani Network cells in Europe, Afghanistan, or Pakistan, and/or allied terrorist finance and logistics strategies, *e.g.*, al-Qaeda and al-Qaeda-in-Iraq collaborating to distribute ransoms paid to either group to al-Qaeda's other global franchises and partners between their respective global cells and financiers for the shared purpose of routing funds, arms, and fighters to terrorist cells targeting Americans in the Middle East.

313.    After 9/11, the al-Qaida network demonstrated how terrorists could use the advantage of technology to disperse leadership, training, and logistics not just regionally but globally because establishing and moving cells in virtually any country was relatively easy in a world where more than 140 million people lived outside of their country of origin and millions of people crossed international borders every day.

314.    Thus, al-Qaeda benefited from a flexible, transnational network structure, enabled by modern technology, in which terrorists worked together in funding, sharing intelligence, training, logistics, planning, and executing attacks. Under this approach, al-Qaeda terrorists with objectives in one country or region drew strength and support from branches in other countries or regions, producing a mutually reinforcing, dynamic al-Qaeda network structure.

315.    Through al-Qaeda's global network, al-Qaeda terrorists enjoyed a force-multiplier effect by establishing links with other like-minded organizations around the globe, and the resultant terrorist interconnectivity, changed the nature of terrorism.

316.    Al-Qaeda-in-Iraq was al-Qaeda's most important affiliate outside of Afghanistan/Pakistan, served as an indispensable component of al-Qaeda's global terrorist finance, logistics, operational, and communications infrastructure, and vice versa.  Through their shared networks, al-Qaeda and al-Qaeda-in-Iraq greatly facilitated, and greatly enhanced the

lethality of, each other's attacks in Afghanistan, Iraq, Syria, and elsewhere. This outcome was the entire point of al-Qaeda's and al-Qaeda-in-Iraq's respective terrorism "business models." With respect to al-Qaeda, al-Qaeda core's terrorism "business model" sought to facilitate attacks against Americans around the world through al-Qaeda core's ability to leverage the resources of al-Qaeda-in-Iraq to facilitate attacks by al-Qaeda core around the world, which was a prime motivation for al-Qaeda core's support for al-Qaeda-in-Iraq in the first instance, and was also the direct result of bin Laden's transactional and franchise-based approach to transnational terrorism. Likewise, al-Qaeda-in-Iraq's terrorism "business model" also sought to facilitate attacks against Americans around the world through al-Qaeda-in-Iraq's ability to leverage both its own financial and logistical resources from its protection rackets in Iraq, but also through the network resources provided by al-Qaeda core in Afghanistan and Pakistan.

317.    With respect to its operations outside of Iraq, al-Qaeda-in-Iraq prioritized the Afghanistan/Pakistan region as key theater in which it would facilitate attacks against Americans. This reflected al-Qaeda-in-Iraq's institutional viewpoint that AQI's Iraqi strongholds, like Mosul, represented the best location for the capital of a global caliphate that would expand westward to Syria and eastword into Afghanistan.

### 2.    Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists

318.    At all times, al-Qaeda emphasized unity with other Islamists – as long as they sought to attack America. Under this approach, al-Qaeda's strategy, under bin Laden and thereafter, was to use its money, polyterrorists, and good offices to try to build bridges and otherwise unite Islamists who targeted American in order to expel the U.S. from the Middle East.

319.    Al-Qaeda's doctrinal emphasis on unity, and the cooperation with other terrorists demanded by it, served al-Qaeda's programattic interests by positioning al-Qaeda as the leader of an anti-American vanguard, facilitating cooperation with potential Islamist allies who might

otherwise be enemies (like the IRGC), and promoting an ethos that was broadly consistent with al-Qaeda's emphasis on a "joint cell" model in which al-Qaeda terrorists ordinarily co-located with their branch or affiliate/ally, such as a joint al-Qaeda/Taliban cell in Afghanistan, through which al-Qaeda further expanded its reach.

### 3.    Al-Qaeda's Multi-National Corporation Model

320.    Al-Qaeda followed a corporate model in which it operated as a devolved network hierarchy in which al-Qaeda core facilitated attacks, approved campaigns and geographies targeting Americans, provided training and technical expertise, supported logistics and smuggling, operated a transnational travel network of safe havens for operatives to move between Iraq/Syria and Afghanistan/Pakistan (often through Iran via al-Qaeda's deal with the IRGC), and enabled cross-pollination between its branches and affiliates, and al-Qaeda-in-Iraq, the Taliban (including the Haqqanis), and Jabhat al-Nusra with al-Qaeda core and each other.

321.    Al-Qaeda's post-9/11 strategy leaned into its broader corporate approach to Islamist terror.  After 9/11, al-Qaeda leaned heavily intso its strategic doctrinal emphasis on corporate and cooperative game-theoretic principles, including concepts such as cooperation theory, franchising, and joint ventures.  This reflected al-Qaeda's tactical and operational fusion with its affiliates in Afghanistan and Pakistan.

322.    Under al-Qaeda's corporate model, al-Qaeda core leaned heavily into al-Qaeda's subsidiaries like al-Qaeda-in-Iraq when the former was under pressure and the latter were not (as was the case from 2003 through 2008), and al-Qaeda core also served as a haven for the same subsidiaries, like al-Qaeda-in-Iraq, when the tables were turned and the subsidiaries were under pressure while the core was stronger (as was the case from 2008 through 2014). Al-Qaeda's interdependence and joint venture with its allies in Iraq, Afghanistan, and Pakistan continued throughout the period in which Plaintiffs were killed and injured.

323.    **Oath of Allegiance.** Al-Qaeda required every al-Qaeda branch (like al-Qaeda-Arabian-Peninsula), subsidiary (like al-Qaeda-in-Iraq), and affiliate (like the Taliban, including its Haqqani Network) to swear an oath of allegiance to al-Qaeda (who often swore a reciprocal oath to its counterpart), follow al-Qaeda's playbook concerning terrorist operations, finance, logistics, doctrine, and communication.

324.    **Structure.** Another reflection of al-Qaeda's corporate approach was al-Qaeda's goal of establishing and maintaining a top-down global bureaucracy through which al-Qaeda "core" managed the terrorist finances, logistics, recruiting, and communications of al-Qaeda branches as a precursor to al-Qaeda's desired global caliphate.  Accordingly, al-Qaeda maintained detailed bylaws, committees, and the like, who, in turn, used al-Qaeda letterhead, forms, receipts, and permission slips.

325.    At all times, al-Qaeda relied upon a substantial corporate structure with an array of commitees governing the group's media, terrorist attack planning, and financial affairs. Through these structures, al-Qaeda relied upon top-down Chief Executive Officers, paid salaries to its members, offered vacation (as long as the request was made ten weeks in advance), provided comprehensive training to its recruits, and required every prospective member or guest to fill out a detailed application form to join al-Qaeda or attend a Qaeda-sponsored camp.

326.    Al-Qaeda had an official organizational structure, with formalized hierarchy and official positions. Al-Qaeda was led worldwide by an emir, to whom all branches (and their members) pledged allegiance.  Al-Qaeda's emir was advised by the Shura Council.  Al-Qaeda also maintained a Military Committee, Political Committee, Media Committee, Administrative and Financial Committee, Religious Committee, and Foreign Affairs Committee each of which had a formal structure, objectives, and authorities.

327.     Al-Qaeda also had a formal relationship structure that ran from al-Qaeda "core" in Afghanistan and Pakistan to al-Qaeda's branches, including al-Qaeda-in-Iraq.  Among other things, al-Qaeda's emir appointed a representative co-located with the leadership of each affiliate to act as a direct channel to al-Qaeda core in Afghanistan and Pakistan.  Through its direct chain of command that emanated from al-Qaeda "core" to al-Qaeda's branches, including al-Qaeda-in-Iraq, al-Qaeda's branches reinforced their subordination to al Qaeda "core."

328.     Al-Qaeda also ensured that its branches, including al-Qaeda-in-Iraq, followed an organizational structure similar to that of al-Qaeda core.

329.     **Franchises.**  After 9/11, al-Qaeda often conducted its attacks against the United States through al-Qaeda branches, like al-Qaeda-in-Iraq.  In such cases, the attack in question was committed by al-Qaeda and its affiliate.

330.     True to its corporate model, al-Qaeda followed a "franchise" model around the world after 9/11, under which al-Qaeda "branches" included "branches" (like al-Qaeda-In-Iraq and Jabhat al-Nusra) and "affiliates" or "allies" (like the Taliban, including its Haqqani Network), operated as part of al-Qaeda's network and cross-pollinated with all the other above-referenced FTOs.

331.     In the decades after 9/11, al-Qaeda's "core" in Afghanistan/Pakistan established al-Qaeda branches (also known as "franchises") in Iraq (i.e., al-Qaeda-in-Iraq), Syria (i.e., al-Qaeda-in-Iraq and later Jabhat al-Nusra), and elsewhere, through which al-Qaeda raised funds and resources, which flowed from the affiliates in Iraq, Syria, and elsewhere, back to al-Qaeda "core" in Afghanistan to facilitate al-Qaeda attacks against Americans worldwide.

332.     The value flowed both directions.  For example, after al-Qaeda-in-Iraq's official accession to al-Qaeda's global organization, al-Qaeda core escalated the flow of funds, fighters,

and logistical aid to al-Qaeda-in-Iraq, and al-Qaeda provided at least $1,000,000 per month in total value to al-Qaeda-in-Iraq thereafter.

333.    From 2004 through 2014, al-Qaeda-in-Iraq was al-Qaeda's top wholly owned subsidiary, and responsible for more support to al-Qaeda "core" than any other al-Qaeda branch or affiliate.  Because of the parent/subsidiary and franchisor/franchisee relationship between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda-in-Iraq in Iraq and Syria, aid to one necessarily benefited the other.  Indeed, this result was the entire point of bin Laden's corporate model in the first place:  to maximize the potency of al-Qaeda's campaign against America by leveraging the financial, logistical, and operational capabilities of al-Qaeda's branches, and vice versa.

334.    At all times, such two-way value flows – in which al-Qaeda core provided funds, logistical aid, and fighters to al-Qaeda-in-Iraq in Iraq and Syria, while al-Qaeda-in-Iraq also provided funds, logistical aid, and fighters to al-Qaeda core in Afghanistan and Pakistan – were a hallmark of al-Qaeda's relationships with its branches, including al-Qaeda-in-Iraq.

335.    **Command and Control.**  Under al-Qaeda's corporate model, when any al-Qaeda subsidiary, like al-Qaeda-in-Iraq, facilitate attacks against Americans, or the growth of al-Qaeda, outside of the subsidiariy's al-Qaeda-assigned territory, the subsidiary must communicate directly with al-Qaeda core, receive al-Qaeda's authorization, follow al-Qaeda's plan, and strictly adhere to al-Qaeda doctrine.

336.    These al-Qaeda rules applied, for example, when al-Qaeda-in-Iraq worked with Sirajuddin Haqqani to establish a two-way Iraq/Syria to Afghanistan/Pakistan training pipeline from 2005 through 2014 in which al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, the Taliban (including its Haqqani Network), and other al-Qaeda affiliates and "Syndicate" members, like

Lashkar-e-Taiba, all jointly trained in cross-pollinating terrorist networking sessions that epitomized bin Laden's "first principles" view of al-Qaeda's terrorist business model.

337.    Al-Qaeda's core also maintained a designated representative co-located with each al-Qaeda affiliate, including al-Qaeda-in-Iraq, who interacted with affiliate leadership and ensured that the relationship ran directly through the affiliate's leadership in Iraq to al-Qaeda core's leadership in Afghanistan and Pakistan.

338.    **Cross-Pollination.**  Al-Qaeda core's emphasis on command-and-control did not stifle innovation amongst its branches and affiliates.  To the contrary, al-Qaeda also encouraged horizontal relationships amongst branches and affiliates as long as it was mediated by al-Qaeda, e.g., al-Qaeda-brokered cooperation between the Taliban and AQI for the mutual benefit of both.

339.    The service by al-Qaeda "core" as a hub for cross-pollination amongst al-Qaeda's various branches like al-Qaeda-in-Iraq was another reflection of al-Qaeda's "franchise" approach to anti-American terrorism.  For example, from 2003 through 2013, al-Qaeda core facilitated substantial training programs conducted by al-Qaeda-in-Iraq terrorists at al-Qaeda camps in Afghanistan and Pakistan, which were for the mutual benefit of the al-Qaeda-in-Iraq terrorists providing the training (who used the opportunity to network, improve their own skills, and develop new fundraising relationships) as well as al-Qaeda-affiliated terrorists in the camps (e.g., the Taliban, who learned from al-Qaeda-in-Iraq how to more effectively attack U.S. armor).

340.    While Iraq was al-Qaeda's top focus from 2003 through 2006, Afghanistan was always at least number two and assumed Iraq's place in the top slot for al-Qaeda after 2009, which status it occupied until the United States departure in 2021.

341.    The foregoing history is relevant because Iraq (inclusive of parts of Syria) and Afghanistan constituted al-Qaeda's top-two priorities at all relevant times, and al-Qaeda

aggressively pursued cross-pollination of strategies, personnel, fundraisers, and the like between these geographies.  In such a dynamic learning environment for the terrorists, successful strategies were quickly "ported" from one geography to another (which geographies themselves, al-Qaeda and its branches generally rejected on principle and ignored in practice).[22]

342.    Al-Qaeda's living/learning approach to cross-pollinating knowledge and practices amongst its branches had a devastating effect on Americans in Iraq, Syria, and Afghanistan.

343.    **Finance.**  Through decades of terrorist operations facilitated by its corporate model, al-Qaeda developed a comprehensive infrastructure designed to route money anywhere in the world al-Qaeda, and its franchises and partners needed resources.

344.    True to its multinational corporate structure, al-Qaeda (the parent) devised and oversaw the financial bureaucracy of al-Qaeda-in-Iraq (the subsidiary)throughout Iraq, which al-Qaeda-in-Iraq operationalized and executed at the the national, provincial, and local levels throughout Iraq and purpose built to ensure that the protection money paid to al-Qaeda-in-Iraq at any level was optimized to maximize the lethality of al-Qaeda-in-Iraq's terrorist campaign in Iraq and Syria by ensuring that al-Qaeda-in-Iraq senior leadership could redirect payments from one province to another, as necessary, to maximize the tempo of their terrorist campaign and ensure that protection money payments to local or provincial AQI terrorists were passed up the chain, ultimately reaching AQI's national finance emir).

---

[22] Al-Qaeda and its affiliates rejected nearly every major border and geographic concept relevant to today's Middle East, as themselves having been the creations of the infidels.  Al-Qaeda and its allies, as a result, often organized themselves along transnational lines, for example, an al-Qaeda affiliate that is based in a geographic territory that straddles several countries.

345.    **Safe Haven.** Al-Qaeda core's sanctuary in Afghanistan and Pakistan also served as a permenant safe haven for al-Qaeda affiliate terrorists who needed to flee their own geographies once the pressure grew too intense.

346.    **Learning Organizations.** Al-Qaeda and its branches, including al-Qaeda-in-Iraq, were "learning organizations" in which operatives were allowed to criticize leaders, and encouraged to evaluate operations afterwards to learn from them and port lessons throughout the broader al-Qaeda network.

### 4.    Al-Qaeda Relied Upon Protection Money Payments And Donations To Fund Its Global Terrorist Campaign

347.    From 2004 through 2014, al-Qaeda's protection rackets in Iraq and Syria provided substantial cash flow to both al-Qaeda's local branches in Iraq and Syria, but also al-Qaeda's "core" leadership in Afghanistan and Pakistan.  Al-Qaeda continuously operated, and profited from, al-Qaeda-in-Iraq's protection rackets until al-Qaeda-in-Iraq split with al-Qaeda in 2014 to become Islamic State. In so doing, al-Qaeda's network, like a multinational enterprise with operations in more than 60 countries, seamlessly moved its protection money profits between branches, like al-Qaeda-in-Iraq, and al-Qaeda core.

348.    For decades, al-Qaeda has relied upon protection money payments and donations as key sources of revenues with which to finance its terrorist operations. In so doing, al-Qaeda doctrine emphasized taking advantage of the protection money opportunities afforded by environments in which the central state was weak, al-Qaeda had a strong presence, and corruption was endemic.

349.    Throughout the 1990s, al-Qaeda funded its operations through two primary income streams: protection rackets and donations.  Al-Qaeda extracted protection payments and

large contributions from businesses in the Persian Gulf, which al-Qaeda used to fund operations that targeted Americans and its allies in the Middle East.

350.     Al-Qaeda's decades-long doctrinal emphasis on fundraising through the collection of protection money – which al-Qaeda regularly euphemistically termed as "taxes," "donations," "fees," or *zakat* – was also a reflection of bin Laden's, and al-Qaeda's organizational, obsession with securing regular, predictable, income streams that were less susceptible to interdiction by al-Qaeda's Western enemies.

351.     Al-Qaeda's reliance on protection money as a foundation of the global network intensified after 9/11.  Al-Qaeda recognized, as deceased al-Qaeda financial chief Sa'id al-Masri stated, "without money, jihad stops."  Accordingly, al-Qaeda raised extensive revenue from the protection rackets operated by al-Qaeda's branches, which allowed al-Qaeda and its branches to generate significant revenue by exploiting the business communities in Iraq and Syria through protection money-related tax revenue, which al-Qaeda and its branches obtained through sophisticated protection rackets throughout Iraq and Syria, including extracting payments for the use of public highways.

352.     Al-Qaeda core directly oversaw – and profited from – the protection rackets operated by al-Qaeda branches, including al-Qaeda-in-Iraq.  Al-Qaeda "core" did so by installing at least one trusted al-Qaeda core terrorist into the protection money operation of each al-Qaeda affiliate.  In Iraq, for example, al-Qaeda core's protection money designee was a personal representative of bin Laden and reported directly to bin Laden.

353.     Al-Qaeda's strategy in Iraq and other geographies key to its ability to launch attacks in Iraq (e.g., Syria, Jordan, and Afghanistan) was simple:  wipe out any internal opposition in the protection rackets from anyone not belonging to an al-Qaeda-affiliating (and al-

Qaeda-dues-paying) group so that al-Qaeda (including its branches) could exercise a monopoly on the best protection rackets in Iraq and other al-Qaeda-contested geographies in the regions that sustained al-Qaeda's operations, like Iraq.

354.    By 2011, al-Qaeda and its branches had targeted Iraq, Afghanistan, and Syria above all else in which to kill Americans, and al-Qaeda and its branches had developed and fully operationalized industrial-scale protection rackets designed to finance operations by both al-Qaeda core and its regional allies in all three countries, having built its rackets in Iraq and parts of Syria by 2004, in Afghanistan by 2005/2006, and in most of the rest Syria by 2011.

355.    Al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra also cross-pollinated the funds they raised from protection rackets in Iraq and Syria because all three FTOs relied upon the same networks of financiers in Iraq and Syria.

356.    While al-Qaeda's branches in Iraq and Syria were the first al-Qaeda allies after 9/11 to pursue industrial-scale protection rackets to fund attacks, they were not the last.

357.    While al-Qaeda was pursuing its full-scale terrorist campaign in Iraq from 2003 through 2005, al-Qaeda and its allies in Afghanistan, including the Taliban and the Taliban's Haqqani Network, were carefully studying al-Qaeda's terrorist campaign in Iraq to optimize the terrorists' ability to attack and kill Americans in Afghanistan (and Iraq).

358.    Under al-Qaeda's tutelage – and following more than two years of "proof of concept" in Iraq courtesy of al-Qaeda's Iraqi branch – the Taliban imported al-Qaeda's and al-Qaeda-in-Iraq's protection money playbook and strategy into Afghanistan, like how the Taliban (including its Haqqani Network) imported al-Qaeda's calcium ammonium nitrate fertilizer-based bomb strategy from al-Qaeda-in-Iraq.

359.     From 2004 through 2014, al-Qaeda and al-Qaeda-in-Iraq jointly ran a sophisticated protection money operation in Iraq and Syria to finance their operations in, among other places, Iraq, Syria, Afghanistan, and Pakistan.

360.     Al-Qaeda's and al-Qaeda-in-Iraq's protection money operation endured throughout the period from 2004 thorugh 2014, during which time al-Qaeda and its branches used protection money payments to finance their terrorist attacks against Americans in Afghanistan, Iraq, and Syria from the-2000s through at least 2015.

**5.     In Collaboration With Iran's Islamic Revolutionary Guard Corps, Al-Qaeda Used Iranian Territory To Securely Move Money, Fighters, Communications, And Material Between Afghanistan And Iraq In Order To Facilitate Attacks Against Americans In Both Places**

361.     Al-Qaeda was able to seamlessly transfer terrorists, funds, weapons, communications, and expertise between Iraq and Afghanistan from 2005 through 2022 due to its secret deal with Iran. From al-Qaeda's perspective, the ability to transit Iran was vitally important for its ability to facilitate attacks in Iraq and Afghanistan through the combined geographic landbridge of Pakistan-Afghanistan-Iran-Iraq-Syria, and Iranian havens also protected key al-Qaeda leaders from U.S. strikes.

362.     Following the 9/11 attacks on the United States and subsequent routing of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, the IRGC met with senior al-Qaeda leaders who had fled Afghanistan into Iran to offer military aid to support al-Qaeda's fight against America.  The IRGC hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002.

363.     Under this secret deal between the IRGC and al-Qaeda after 9/11, the IRGC intensified its material support for al-Qaeda's terrorist campaign against Americans around the world.  Through the secret deal between the IRGC and al-Qaeda and the aid that the former provided to the latter thereafter, the IRGC was the proximate and but-for cause of al-Qaeda's

survival as a terrorist organization after 9/11 and the al-Qaeda-linked terrorist attacks against Americans in Iraq, including Plaintiffs, that inevitably followed.

364.    Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by the IRGC.  For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving aid that the IRGC had been providing to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "main artery for funds, personnel, and communication."

365.    The U.S. government has also recognized these connections through the close partnership between the IRGC and al-Qaeda after the secret deal between the two.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between the IRGC and al-Qaeda.  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities."  The Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South

Asia."  Indeed, al-Qaeda has honored its commitment to the IRGC despite its attacks on Shiite Muslims elsewhere in the Middle East.

### 6. Value Flow To Al-Qaeda And Al-Qaeda-In-Iraq Aided Al-Qaeda's And Al-Qaeda-In-Iraq's Attacks Against Americans In Iraq, Syria, And Afghanistan From 2007 Through 2016

366.    Al-Qaeda and al-Qaeda-in-Iraq viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate an al-Qaeda-led caliphate there.

367.    Osama bin Laden repeatedly called for al-Qaeda supporters from around the world, including Iraq, to facilitate al-Qaeda's attacks against Americans in Iraq and Afghanistan through his public statements from 2001 through 2011.

368.    Under al-Qaeda's organizational structure, a substantial portion of the value that flowed to al-Qaeda-in-Iraq while it operated as al-Qaeda's branch in Iraq from October 2004 through February 2014 flowed through al-Qaeda-in-Iraq and benefited al-Qaeda's "core" in Afghanistan and Pakistan.  This occurred because al-Qaeda and al-Qaeda-in-Iraq conducted an integrated campaign against the United States in Iraq and Afghanistan, through which al-Qaeda-in-Iraq flowed funds, fighters, training and expertise, and logistical aid to al-Qaeda in Afghanistan and Pakistan, facilitating al-Qaeda's, and its Syndicate allies', attacks against Americans in Afghanistan from 2007 through 2016.

369.    The U.S. government agreed.  For example, in June and July 2006, the U.S. government publicly emphasized the intimate relationship between al-Qaeda core in Afghanistan/Pakistan and al-Qaeda-in-Iraq in public statements or publications:

a.    U.S. officials published an authenticated bin Laden audiotape in which bin Laden called for holy war in Iraq and stated that al-Qaeda's "banner of jihad ha[d] not fallen" and al-Qaeda vowed to "keep up [al-Qaeda's and its subsidiaries'] fight to bleed [the United States'] money dry, kill [America's] men so that ([U.S.] forces) go home defeated" and

al-Qaeda and its subsidiaries would "continue [their] fight against [America and Americans] everywhere, in Iraq, in Afghanistan, in Somalia and in Sudan";

**b.**     U.S. officials publicly stated that bin Laden had publicly mourned Zarqawi and urged his and Zarqawi's supporters to continue to attack Americans in Iraq;

**c.**     U.S. officials publicly stated that bin Laden's public statements reflected "a recognition on [bin Laden's] part how important Al-Qaeda in Iraq [was] in pursuing Al-Qaeda's central strategy"; and

**d.**     U.S. officials publicly stated that "Ayyub al-Masri [was] an Egyptian national and a senior Al-Qaeda leader in Iraq" who was '[t]rained in Afghanistan and Pakistan," and served "an explosives expert specializing in the construction of Vehicle-Borne [IEDs], the same bombs responsible for large numbers of US troop casualties."

> **a.     Funds Raised By Al-Qaeda Or Al-Qaeda-In-Iraq In Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan**

370.    From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq relied upon the same parent/subsidiary-inspired, al-Qaeda-designed, al-Qaeda-in-Iraq executed protection rackets to optimize al-Qaeda's global terrorist capabilities by ensuring that al-Qaeda core leveraged al-Qaeda-in-Iraq's network through al-Qaeda core's receipt of a percentage of all income from al-Qaeda-in-Iraq's protection money racket, all of which was in accordance with the Qaeda core's protection money playbook used by bin Laden and his lieutenants.

371.    Al-Qaeda directly and substantially participated in al-Qaeda-in-Iraq's protection rackets through al-Qaeda's personnel and practice.  Al-Qaeda installed al-Qaeda "core" lieutenants into the al-Qaeda-in-Iraq's protection money bureaucracy inside Iraq to ensure that al-Qaeda core received its proper share.  Al-Qaeda core also ensured that al-Qaeda-in-Iraq also operated purpose-built bureaucracies designed to route a percentage of all al-Qaeda-in-Iraq back to al-Qaeda "core" in Afghanistan and Pakistan to facilitate al-Qaeda's global jihad against Americans.  Among other things, al-Qaeda-in-Iraq maintained an internal account known as the

"General Treasury," which al-Qaeda-in-Iraq used to flow a percentage of all its Iraq-based income back to al-Qaeda "core" in Afghanistan and Pakistan.

372.    Senior al-Qaeda core terrorists documented their need for funds from al-Qaeda-in-Iraq in order to conduct attacks against Americans in Afghanistan.  In July 2005, for example, Zawahiri instructed Zarqawi to transmit $100,000 to al-Qaeda in Afghanistan.  Similarly, in May 2007, a senior al-Qaeda leader in Afghanistan, Shaykh Mustafa Abu al-Yazid highlighted al-Qaeda core's group's desperate need for funds from its Iraqi branch:

> As for the needs of the Jihad in Afghanistan, the first of them is financial. The Mujahideen of the Taliban … lack funds. And there are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of Jihad. They also need personnel from their Arab brothers and their brothers from other countries in all spheres: military, scientific, informational and otherwise.... And here we would like to point out that those who perform Jihad with their wealth should be certain to only send the funds to those responsible for finances and no other party, as to do otherwise leads to disunity and differences in the ranks of the Mujahideen.

373.    While al-Qaeda and its branches' names evolved over time, this core relationship between protection money and two-way positive cash flow for al-Qaeda and its allies remained constant at all relevant times.[23]

374.    Al-Qaeda-in-Iraq directly funded al-Qaeda "core" from 2004 through 2014 through at least five channels, usually through U.S. dollar-denominated payments.  *First*, al-Qaeda-in-Iraq made large U.S. dollar-denominated cash payments to al-Qaeda core upon the latter's request, which were smuggled by al-Qaeda and/or al-Qaeda-in-Iraq operatives from Iraq, Syria, and the Persian Gulf (where they raised money) to al-Qaeda "core" in Afghanistan and Pakistan. *Second*, al-Qaeda-in-Iraq paid al-Qaeda "core" a percentage of its net income (or

---

[23] Even after al-Qaeda and ISIS split in 2014, the same protection rackets continued to fund the global operations of both FTOs and their respective regional affiliates worldwide.

"excess funding") befitting its status as a branch of al-Qaeda. *Third*, al-Qaeda-in-Iraq provided

vital logistical aid that enabled al-Qaeda core's other money-making rackets to generate more

cash flow.  For example, al-Qaeda-in-Iraq helped al-Qaeda core move narcotics through Iraq and

into the Middle East for distribution, which generated cash flow for al-Qaeda core and its

Taliban partner in Afghanistan and Pakistan. *Fourth*, al-Qaeda-in-Iraq's successful attacks also

directly strengthened al-Qaeda core's ability to raise funds and sign new recruits (who ordinarily

contributed to both al-Qaeda and al-Qaeda-in-Iraq) in order to facilitate attacks against

Americans in Afghanistan by materially strengthening al-Qaeda's ability to successfully present

bin Laden's strategic narrative to the broader pool of global terrorist-curious followers whom

were choosing between al-Qaeda and another organization by giving al-Qaeda the ability to

present itself to such prospective financiers and new terrorist recruits as both the senior leader of

the global jihadist cause, but also the one with the greatest capabilities and track record of killing

Americans after 9/11, which helped it raise more money. *Fifth*, al-Qaeda, al-Qaeda-in-Iraq, and

Jabhat al-Nusra also cross-pollinated the funds they raised from protection rackets in Iraq and

Syria because all three relied upon the same networks of financiers in Iraq and Syria.

375.    Al-Qaeda-in-Iraq collectively routed more than one million U.S. dollars per year,

in cash, goods, and other value, to al-Qaeda core in Afghanistan and Pakistan each year from

2004 through 2014, which al-Qaeda core used to facilitate attacks against Americans in

Afghanistan from 2004 through 2015.

> **b.     Al-Qaeda Redeployed Al-Qaeda-In-Iraq Terrorists To Afghanistan And Pakistan To Facilitate Al-Qaeda's Attacks Against Americans In Afghanistan**

376.    Zarqawi himself recognized that Iraq was but one front in al-Qaeda's larger

campaign against the United States. As Zarqawi promised (in writing), if al-Qaeda failed in Iraq,

al-Qaeda's al-Qaeda-in-Iraq operatives would, as Zarqawi put it, "pack out [their] bags and search for another land, as is the sad, recurrent story in the arenas of jihad."

377.    From the 1990s through 2021, the mountainous areas in the Afghanistan/Pakistan border were always the world's most iconic safe haven for al-Qaeda and its members.

378.    Consistent with this ethos, al-Qaeda regularly redeployed al-Qaeda-in-Iraq terrorists to Afghanistan and Pakistan in order to facilitate al-Qaeda's attacks against Americans in Afghanistan and Pakistan (where the al-Qaeda-in-Iraq terrorists were folded into pre-existing joint al-Qaeda/Taliban cells) and Iraq (through the relationships that al-Qaeda-in-Iraq terrorists developed while deployed in Afghanistan and Pakistan).

379.    In so doing, al-Qaeda core and al-Qaeda-in-Iraq were simply following the time-honored al-Qaeda playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed, or cross-pollinated, with al-Qaeda terrorists in other theater. Al-Qaeda did this time and again from the 1990s through 2021, including with respect to the movement of its terrorists into, and out of, Afghanistan, Somalia, Sudan, Bosnia, Chechnya, Iraq, and Syria.

380.    Al-Qaeda's use of al-Qaeda-in-Iraq terrorists in Afghanistan and Pakistan began under Zarqawi, who deployed elite al-Qaeda-in-Iraq terrorist operatives to Afghnanistan to demonstrate his (and al-Qaeda-in-Iraq's) subordinate status and as tribute to bin Laden. This approach was consistent with Zarqawi's, and bin Laden's, desire for al-Qaeda-in-Iraq to support terrorist operations by al-Qaeda's other branches worldwide.

381.    Al-Qaeda's use of al-Qaeda-in-Iraq terrorists to Afghanistan and Pakistan intensified dramatically from 2006 through 2010, when a substantial portion of al-Qaeda-in-Iraq's terrorists in Iraq, including hundreds of fighters in the leadership and senior ranks, fled

Iraq for al-Qaeda's historic mountain havens in Afghanistan and Pakistan.  Al-Qaeda-in-Iraq terrorists continued redeploying from Iraq to Afghanistan until at least 2014.

382.    Al-Qaeda's strategy of having al-Qaeda-in-Iraq terrorists melt away back to Afghanistan and Pakistan to augment the joint al-Qaeda/Taliban cells there from 2007 through 2014 reflected al-Qaeda's view, shared amongst jihadists around the world at the time, that Iraq had been a defeat, but Afghanistan offered the prospect of victory over the Americans.

383.    Al-Qaeda facilitated these redeployments, which were like prior al-Qaeda redeployments out of parts of Afghanistan in the months following 9/11.  While there were exceptions, in general, most of non-Iraqi Arabs who joined al-Qaeda-in-Iraq (e.g., an Egyptian) who departed Iraq joined al-Qaeda in Afghanistan and Pakistan, where such terrorists often had pre-existing relationships through their training, travel, finance, or indoctrination, while most of the Iraqi members of al-Qaeda-in-Iraq melted away to Syria, where they benefited from centuries-long tribal and smuggling networks.

384.    Al-Qaeda-in-Iraq terrorists whom al-Qaeda redeployed to Afghanistan and Pakistan were amongst the most elite of al-Qaeda's operatives worldwide, having survived the Darwinian process in Iraq through which U.S. forces eliminated the less capable operatives. As a result, these al-Qaeda-in-Iraq terrorists greatly augmented the capabilities and experience of the joint al-Qaeda/Taliban cells they served while in Afghanistan and Pakistan, including the effectiveness of al-Qaeda's suicide bomb, IED, and complex attacks.

385.    Given their extraordinary capabilities, al-Qaeda strategically marbled its al-Qaeda-in-Iraq operatives throughout al-Qaeda's organization in Afghanistan and Pakistan, with a particular emphasis on reinforcing the existing al-Qaeda strongholds in Nangarhar, Nuristan, Kunar, and Laghman Provinces (al-Qaeda's historic haven in Afghanistan), Ghazni Province

(where al-Qaeda terrorist Ahemed Jan Wazir led a joint al-Qaeda/Taliban cell), and the Haqqani territories in Afghanistan and Pakistan.

386.    Al-Qaeda-in-Iraq collectively routed at least hundreds of terrorists to al-Qaeda core in Afghanistan and Pakistan each year from 2004 through 2014, whom al-Qaeda core used to facilitate attacks against Americans in Afghanistan from 2004 through 2015.

>    **c.    Al-Qaeda Facilitated Al-Qaeda-In-Iraq's Provision Of Key Training And Expertise To Terrorists Targeting Americans In Afghanistan**

387.    Al-Qaeda and al-Qaeda-in-Iraq, along with most Islamists, viewed Iraq as the central front against America from 2003 through at least 2007. Al-Qaeda and al-Qaeda-in-Iraq worked to make the insurgency in Iraq what Afghanistan was to the earlier generation of jihadists — a melting pot for jihadists from around the world, a training ground, and an indoctrination center.  In so doing, al-Qaeda and al-Qaeda-in-Iraq ensured that a substantial number of fighters who had traveled to Iraq could return to their home countries, augmented with new skills and experienced existing extremist networks in the communities to which they returned.  Given Iraq's status in al-Qaeda's campaign against the United States, al-Qaeda organized al-Qaeda-in-Iraq so that the latter could provide training and expertise to the former.

388.    Al-Qaeda-in-Iraq terrorists publicly confirmed their status as teachers of terror to allied Islamists around the world.  For example, in 2007, senior al-Qaeda-in-Iraq terrorist Abu Omar al-Baghdadi publicly boasted, "one of the (enemy) devils was right in saying that if Afghanistan was a school of terror, then Iraq is a university of terrorism. … The fear of the American [M]arines has disappeared from the hearts of the people of the world, as the mujahideen have become thousands from the few … after the fall of the infidel Baath regime."

389.    Al-Qaeda's use of al-Qaeda-in-Iraq trainers provided another key mechanism through which al-Qaeda facilitated attacks against Americans in Afghanistan.  Before 9/11, al-

Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005, al-Qaeda began bringing AQI instructors from Iraq to train the Taliban how to fight Americans.

390.    Al-Qaeda depended upon al-Qaeda-in-Iraq to furnish Iraq-experienced operatives, who furnished training and expertise to al-Qaeda core and al-Qaeda's allies in Afghanistan, including the Taliban and its Haqqani Network. This relationship permitted al-Qaeda-in-Iraq the ability to export tactical innovations gleaned in Iraq to al-Qaeda's terrorists, and their partners, operating in Afghanistan and Pakistan. As Mullah Dadullah, a key Taliban commander, publicly stated in 2006, "we have 'give and take' relations with the mujahidin in Iraq."

391.    Such cross-pollination benefits extended to the Haqqani Network as well. For example, al-Qaeda leveraged al-Qaeda-in-Iraq trainers to teach the Haqqanis how to conduct suicide bomb attacks against Americans based upon innovations and lessons learned from Iraq.

392.    The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly hosted by the Taliban. One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

393.    Al-Qaeda also facilitated relationships between al-Qaeda-in-Iraq and al-Qaeda and Taliban (including Haqqani Network) terrorists based in Afghanistan and Pakistan, through which such groups' Afghanistan and Pakistan-based terrorists traveled to Iraq and embedded with al-Qaeda-in-Iraq to attack Americans as part of what al-Qaeda euphemistically termed "live fire training exercises" before returning to Afghanistan and Pakistan with their new skills. Through al-Qaeda-facilitated, al-Qaeda-in-Iraq-furnished, live-fire training exercises in Iraq, al-Qaeda and the Taliban, including its Haqqani Network, enhanced the lethality of their suicide bomb, IED, and complex attacks against Americans in Afghanistan.

394.    Al-Qaeda's use of al-Qaeda/al-Qaeda-in-Iraq polyterrorist trainers revolutionized al-Qaeda's use of suicide bombings, IEDs, and complex attacks in Afghanistan, and directly enhanced the lethality of the joint al-Qaeda/Taliban cells that committed the attacks that killed and injured Plaintiffs in Afghanistan from 2007 through 2016.  Through its al-Qaeda-in-Iraq trainers, al-Qaeda was able to train more terrorists, build more bombs, plan more attacks, and execute more operations from 2007 through 2016.

395.    Al-Qaeda-in-Iraq trainers provided al-Qaeda terrorists, and their allies, in Afghanistan and Pakistan with lessons-learned from Iraq that offered cross-cutting efficiencies fro al-Qaeda's terrorist enterprise in Afghanistan and Pakistan.  For example, al-Qaeda-in-Iraq terrorists helped al-Qaeda import sophisticated bomb triggers, design concepts, and proven strategies to defeat American countermeasures, all of which enhanced al-Qaeda's and its partners' IED and suicide bomb attacks against Americans in Afghanistan.

396.    Al-Qaeda-in-Iraq's training of al-Qaeda's and the Taliban's Afghanistan and Pakistan operatives occurred in a range of training camps around the world including, but not limited to, camps in Afghanistan, Pakistan, Iraq, Iran, Syria, and Somalia

### d.    Al-Qaeda-In-Iraq Provided Logistical Aid To Al-Qaeda Core

397.    Al-Qaeda doctrine emphasized leveraging the logistical strengths of al-Qaeda's branches to facilitate operations by al-Qaeda core. Al-Qaeda and al-Qaeda-in-Iraq recognized that al-Qaeda's operations against the United States in Iraq, Syria, Afghanistan, and Pakistan were part of a single al-Qaeda campaign that was linked by common financial, human recourses, travel, and communications needs.

398.    As a legacy of the extensive network that Zarqawi and his lieutenants built from the late 1990s through 2006, al-Qaeda-in-Iraq at all times until 2014 operated extensive and sophisticated logistics networks inside Iraq, which were supported by al-Qaeda-in-Iraq's

extensive logistical network throughout the Middle East, North Africa, and Europe, including, but not limited to, Iran, Afghanistan, and Pakistan. Within Iraq, al-Qaeda-in-Iraq had dedicated logistics officers for each province, who coordinated with the al-Qaeda-in-Iraq's Finance Council to ensure that money, terrorists, and material flowed where necessary to maximize the lethality of al-Qaeda-in-Iraq's campaign against the United States in the Middle East.

399.    Al-Qaeda leveraged al-Qaeda-in-Iraq's extensive global logistics networks to fund, arm, equip, and manage al-Qaeda's terrorist campaign in Afghanistan and Pakistan.

400.    Al-Qaeda's strategy of leveraging the logistics networks of its branches, like al-Qaeda-in-Iraq, was one of the core mechanisms through which al-Qaeda facilitated al-Qaeda core's own operations in Afghanistan and Pakistan.

401.    Through al-Qaeda-in-Iraq's global logistics network, al-Qaeda raised funds, recruited new terorrists, and facilitated transactions on the Taliban's behalf, all of which facilitated attacks against Americans in Afghanistan by joint al-Qaeda/Taliban cells there.

### B.    Al-Qaeda Polyterrorists Facilitated Transnational Cooperation Between Al-Qaeda's Branches In Iraq, Iran, Afghanistan, Pakistan, And Syria, And Facilitated Al-Qaeda's Terrorist Campaigns In Each Country

402.    Al-Qaeda relied heavily upon multi-hatted terrorists, known as "polyterrorists" who served as members of more than one terrorist organization, e.g., a terrorist who served in both al-Qaeda and the Taliban's Haqqani Network.  Al-Qaeda's embrace of polyterrorists, whom al-Qaeda deployed worldwide, fueled the interconnections between al-Qaeda's "core" in Afghanistan and Pakistan and its branches, including in Iraq and Syria.

403.    As another manifestation of its multinational corporate-inspired approach to terror, al-Qaeda core routinely shared terrorist finance facilitators, logisticians, ratlines, and safe houses with its operatives from its branches in Iraq, Syria, and Afghanistan, including al-Qaeda-

in-Iraq (in Iraq, Syria, Afghanistan, and Pakistan), Jabhat al-Nusra (in Syria), and with the

Taliban, including its Haqqani Network (in Afghanistan, Pakistan, the U.A.E., Iraq, and Syria).

404.    Al-Qaeda's and its branches reliance on "polyterrorists" after 9/11 was another

reflection of al-Qaeda's franchise-approach to terrorism.  At all times, al-Qaeda's and its

branches' terrorist enterprise benefited from al-Qaeda operatives who were "polyterrorists."  By

design, Pakistan-based al-Qaeda operatives were often members of other al-Qaeda branches,

most commonly, al-Qaeda-in-Iraq (in Iraq and Syria) or affiliates (like the Haqqani Network and

Lashkar-e-Taiba (in Afghanistan and Pakistan)).  Typically, al-Qaeda's and its affiliates'

polyterrorist operatives or agents served the group's transnational terrorist activities in support of

attacks against Americans in Afghanistan, Iraq, Syria, and other al-Qaeda-targeted areas.

### 1.    Abu Musab al-Zarqawi

405.    Al-Qaeda-in-Iraq was founded and originally led by a Jordanian national who had

been a senior member of al-Qaeda since the 1990s:  Ahmad Fadil Nazzal Al-Khalayleh, better

known by his *nom de guerre*, Abu Musab al-Zarqawi.  Until his death, Zarqawi was a notorious

anti-American terrorist who, among other things, was a known senior member of al-Qaeda, and

known to have personally decapitated at least one American hostage in Iraq on camera.

406.    Abu Musab al-Zarqawi was an al-Qaeda polyterrorist who served as a member of,

among other groups, al-Qaeda and al-Qaeda-in-Iraq. Introduced to bin Laden in 1998, Zarqawi

rose quickly through the ranks.  By 2000, Zarqawi had established himself as al-Qaeda's most

indispensable terrorist operator and was a critical al-Qaeda leader in Afghanistan.  In 2001,

Zarqawi took the oath of allegiance to al-Qaeda and Osama bin Laden.  Written by bin Laden

himself, Zarqawi declared as his oath to al-Qaeda and bin Laden personally: "I recall the

commitment to God, in order to listen to and obey my superiors, who are accomplishing this task

with energy, difficulty, and giving of self, and in order that God may protect us so God's words

are the highest and his religion victorious." Zarqawi adhered to this oath until his death in 2006; at all times, he was a senior al-Qaeda terrorist.

407.    By the summer of 2001, Zarqawi was a well-known senior al-Qaeda operative, and was equally well-versed in every aspect of the al-Qaeda terrorist playbook that he later imported into Iraq.  Indeed, he was so well-established that a 30-page guide to al-Qaeda in Afghanistan for new al-Qaeda recruits specifically identified Zarqawi as one of the al-Qaeda leaders there who could be contacted by recruits for aid regarding religious, logistical, or lodging needs in-country.

408.    Less than a year after joining al-Qaeda, Zarqawi had so demonstrated his terrorist talent and trustworthiness that the group permitted him to establish his own al-Qaeda training camp near the border with Iran in Herat, Afghanistan, which Zarqawi did with al-Qaeda's financial and logistical support.  After he set up al-Qaeda's camp in Herat, Zarqawi regularly traveled between Herat and Kabul on behalf of al-Qaeda.  Herat was known then (and now) as a key site of terrorist activity, as the hub that opens the way to Iraqi Kurdistan through Iran.  Zarqawi's frequent travels back and forth between Herat, Afghanistan, and Iraqi Kurdistan – accomplished via Iran – were to secure al-Qaeda's survival after 9/11.  Bin Laden correctly anticipated that the United States would expel al-Qaeda and its Taliban protectors from Afghanistan after 9/11 and planned for a "progressive redeployment" of al-Qaeda to two locations: Pakistan (where bin Laden and Zawahiri planned to regroup) and Iraqi Kurdistan (where bin Laden contemplated Zarqawi would regroup).

409.    During the U.S. invasion of Afghanistan in the months after 9/11, it became apparent to al-Qaeda that it needed to strategically redeploy to Pakistan, Iran, and Iraq.  Al-Qaeda instructed Zarqawi to flee Afghanistan through Iran into Iraq to set up al-Qaeda-in-Iraq. Zarqawi did so in early 2002, when he eluded capture by American forces and obtained urgent

medical care in an escape that was organized by Iran. Soon after, at the direction of al-Qaeda core and with the aid of IRGC leader Qassem Soleimani, Zarqawi founded what became AQI.

410.    By the onset of the U.S. presence in Iraq in 2003, Zarqawi turned al-Qaeda-in-Iraq into the primary Sunni terrorist threat against Americans there by working with al-Qaeda to mobilize the coalition of anti-American Sunni terrorists in Iraq under al-Qaeda's banner – carried in Iraq by AQI – and conducting a series of mass-casualty strikes against prominent U.S. and international targets in Iraq in 2003.

411.    On September 24, 2003, the United States and United Nations both designated Zarqawi as a terrorist based upon his relationship with al-Qaeda.  Both designations recognized Zarqawi as an al-Qaeda terrorist, the global nature of Zarqawi's network, and the key threat that Zarqawi and al-Qaeda posed to Americans in Iraq.  Among other things, the Treasury Department determined that Zarqawi and his al-Qaeda-affiliated terrorists "[m]aintain[ed] contacts throughout Europe, the Middle-East, and Western Asia - in Pakistan, Iran, Yemen, Iraq, Malaysia, Afghanistan" and "acted for or on behalf of Al-Qaeda."

412.    Until his death in 2006, Zarqawi and the al-Qaeda terrorists he led in Iraq targeted Americans.  According to Zarqawi, al-Qaeda's first "enemy" was "[t]he Americans" because Americans "are the most cowardly of God's creatures" and "are an easy quarry, praise be to God. We ask God to enable us to kill and capture them to sow panic among those behind them …."

413.    On June 7, 2006, Zarqawi was killed in an American military strike.  In his comments thereafter, President Bush stated that Zarqawi's death was "a severe blow to al Qaeda, and … a significant victory in the war on terror."

### 2.    Sulayman Khalid Darwish

414.    At all relevant times, Sulayman Khalid Darwish was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Darwish provided

financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Darwish was a key fundraiser

and recruiter for al-Qaeda and al-Qaeda-in-Iraq.

415.    On January 25, 2005, the United States designated Darwish as a Specially

Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly

stated, among other things, that Darwish: enabled "cash flows to the Iraqi insurgency and al

Qaida"; "was designated … for providing financial and material support to the al-Zarqawi

Network and al Qaida"; was a " terrorist financier" who "support[ed] Zarqawi, who has launched

violent acts against [U.S. troops"; was part of "the financial backbone of the Iraqi insurgency and

al Qaida"; was "a member of the Advisory (Shura) Council of the Zarqawi organization and

served as one of Zarqawi's operatives"; was "involved in fundraising and recruiting for the

organization"; was "a close associate of Zarqawi and one of the most prominent members of the

Zarqawi Network in Syria"; "received training on Zarqawi's orders in the following areas:

weapons, topography, artillery training, electronics training, explosives production and the use of

explosives" "[w]hile in Afghanistan"; "received training in Afghanistan, Iran, Turkey and

Lebanon in document forging and is considered an expert in preparing forged documents for the

Zarqawi Network"; "handle[d] mostly financial issues for Zarqawi, collecting, and distributing

funds for him" including "donations of $10,000-$12,000 to Zarqawi in Iraq every 20-25 days";

and "was essential to recruiting and dispatching terrorist operatives … for operations [],

particularly Iraq. For example, Darwish contacted jihadists who had been in Afghanistan and

who were, by 2004, scattered in different countries; he recruited among these jihadists for

fighters to join Zarqawi in Iraq."

416.    On January 25, 2005, the United Nations followed the U.S. lead and designated

Darwish pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime.

417.     On October 26, 2008, Darwish was killed by a U.S. military strike in Syria.

### 3.     Muhsin al-Fadhli

418.     From the early 2000s until his death in 2015, Muhsin al-Fadhli was a veteran al-Qaeda polyterrorist who served as a member of al-Qaeda and al-Qaeda-in-Iraq. In that polyterrorist role, Fadhli served as a key Persian Gulf-based leader for al-Qaeda and al-Qaeda-in-Iraq and a major facilitator for Zarqawi personally. Fadhli supported Iraq-based al-Qaeda and al-Qaeda-in-Iraq operatives to facilitate attacks against U.S. forces. Fadhli also served as one of al-Qaeda's and al-Qaeda-in-Iraq's Iran-based facilitators and helped enable the free flow of al-Qaeda operatives, funds, and material between Afghanistan, Pakistan, Iran, Iraq, and Syria.

419.     On February 15, 2005, the United States designated Fadhli as a Specially Designated Global Terrorist based on Fadhli's service as an operative for al-Qaeda and al-Qaeda-in-Iraq.[24]  Announcing the designation, the Treasury Department publicly stated, among other things, that Fadhli "was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network and al Qaida" because, among other things, Fadhli was "an individual whose efforts were helping to finance the Iraqi insurgency, as well as al Qaida," provided "financial ties" that "the al-Zarqawi Network depend[ed] on to perpetrate acts of horror and violence," was "an al Qaida leader in the Gulf countries," "fought alongside the Taliban and al Qaida in Afghanistan where he served as a bodyguard and second-in-command for an al Qaida leader," "fought against Russian forces in Chechnya, where he trained in the use of firearms, antiaircraft guns and explosives," was among the select few al-Qaeda operatives who "in early September, 2001, … received forewarning that U.S. interests would be

---

[24] Muhsin al-Fadhli was also known as Abu Majid Samiyah, Abu Samia, Muhsin Fadhil 'Ayyid, and Muhsin Fadil Ayid Ashur al-Fadhli.  He was sanctioned under all such names.

struck," his "support for terrorism extend[ed] to Iraq where he … provid[ed] support to fighters against U.S. … forces and [was] considered a major facilitator connected to the brutal terrorist, Abu Musab al-Zarqawi," including "solidify[ing] the support of key financial backers sponsoring attacks," through "tapes … showing evidence of successful attacks in Iraq."

420.    On February 17, 2005, the United Nations followed the U.S. lead and sanctioned Fadhli pursuant to paragraphs U.N. Security Council Resolution 1526 (2004) based upon his status as a key operative for al-Qaeda and al-Qaeda-in-Iraq and his being associated with Al-Qaida, Usama bin Laden or the Taliban for participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of Al-Qaida.  In so doing, the U.N. made findings consistent with those of the United States.

421.    On October 18, 2012, the United States government announced a $7 million bounty on Fadhli under its Rewards for Justice program.  In so doing, the U.S. determined, among other things, that Fadhli: "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network," was "wanted by Saudi authorities" and "authorities in Kuwait" "in connection with [his] terrorist activities," had "replaced Ezedin Abdel Aziz Khalil (better known as Yasin al-Suri) as al-Qaida's senior facilitator and financier in Iran," "was among the few trusted al-Qaida leaders who received advance notification that terrorists would strike the United States on September 11, 2001," "led" "Al-Qaida elements in Iran" that were "working to move fighters and money through Turkey to support al-Qaida-affiliated elements in Syria," "assisted al-Qaida in moving multiple operatives from Pakistan via Iran and Turkey to destinations in Europe, North Africa, and Syria, and [was] believed likely to continue moving experienced al-Qaida operatives to reinforce and gain influence in these areas."

422.    On July 8, 2015, Fadhli was killed in an American airstrike in Syria, after being deployed there by al-Qaeda core to play a similar role as he played in Iraq the decade prior. Announcing the strike, the Department of Defense stated, among other things, that "Muhsin al-Fadhli" was "a longtime al-Qaida operative" and "a senior al-Qaida facilitator who was among the few trusted al-Qaida leaders who received advance notification of the Sept. 11, 2001, terrorist attacks," whose "death" "degrade[d] and disrupt[ed] ongoing external operations of al-Qaida against the United States."

### 4.    Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri)

423.    Abu Hamza al-Muhajir, aka Abu Ayyub al-Masri, was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Muhajir provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Muhajir was an al-Qaeda core member who learned his terrorist tradecraft at al-Qaeda camps in Afghanistan, and long-standing confidante of Ayman al-Zawahiri (who was himself a former member of Zarqawi's organization Egyptian Islamic Jihad before its merger with al-Qaeda in the 1990s) and had also been a student of Zawahiri.  Among other roles for al-Qaeda core, Mujahir served as the coordinator for all al-Qaeda jihad volunteer operations from Europe and the Middle East before al-Qaeda deployed him from Afghanistan to Iraq to assume the executive officer position under Zarqawi. His *nom de guerre* meant "Abu Hamza, the Migrant," referencing his transnational role and identity.

424.    In 2006, Muhajir replaced Zarqawi as leader (*emir*) of al-Qaeda-in-Iraq, which role he continued to serve until his death in 2010.  As a Zawahiri lieutenant, Muhajir's elevation to emir of al-Qaeda-in-Iraq reinforced al-Qaeda's control of al-Qaeda-in-Iraq.  Like Zarqawi, Muhajir pledged allegiance to al-Qaeda "core" in his own personal capacity and in his role as leader of al-Qaeda-in-Iraq.

425.     On April 18, 2010, Muhajir was killed in a U.S. military strike. Commenting on the event, General Raymond Odierno, commander of U.S. Forces-Iraq, stated that Muhajir's death was "potentially the most significant blow to al Qaeda in Iraq since the beginning of the insurgency" because Muhajir directly linked al-Qaeda-in-Iraq to al-Qaeda "core" in Afghanistan and represented "the foreign element of al Qaeda that was established here," i.e., in Iraq.

### 5.     Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani

426.     Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani, aka Abu Shaheen, was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Mashhadani provided logistical and material support to al-Qaeda and al-Qaeda-in-Iraq.

427.     From 2003 through at least 2007, Mashhadani served as the highest ranking Iraqi in al-Qaeda core's senior management team in Afghanistan and Pakistan and played a key role helping al-Qaeda and al-Qaeda-in-Iraq fulfill bin Laden's vision of bringing all al-Qaeda-affiliated groups into a unified jihadi structure. Mashhadani helped Zarqawi and his successor, Muhajir, create a truly integrated terrorist force in Iraq through a global jihadist collective that gave Iraqi locals a lead role since they knew the terrain, but afforded al-Qaeda overall command. His efforts also helped al-Qaeda and al-Qaeda-in-Iraq to vertically integrate key operations, including their suicide bombing network, to maximize the potency of their attacks against Americans in Iraq.

428.     On July 4, 2007, Mashhadani was captured by U.S. forces during a raid in Mosul. Announcing the capture, the Department of Defense observed that Mashhadani served as a link between al-Qaeda core and al-Qaeda-in-Iraq. According to Brigadier General Kevin Bergner, who served as the U.S. military's spokesperson in Iraq at the time:  Mashhadani was the highest-ranking Iraqi in the al-Qaeda in Iraq leadership when he was captured; Mashhadani carried messages from bin Laden and Zawahri to the head of al-Qaeda in Iraq, Muhajir; Mashhadani

admitted to interrogators that al-Qaeda's global leadership provided "directions," and "continue[d] to provide a focus for operations" and "continue[d] to flow foreign fighters into Iraq, foreign terrorists," all to facilitate al-Qaeda's terrorist campaign agaisnt America there through al-Qaeda-in-Iraq; and Mashhadani's role demonstrated that there was "a clear connection between al-Qaida in Iraq and al-Qaida senior leadership outside Iraq," because "[w]hat we've learned from not just from the capture of al-Mashhadani but from other al-Qaida operatives is that there [was] a flow of strategic directions of prioritization, of messaging and other guidance that [came] from al-Qaida senior leadership to the al-Qaida in Iraq leadership."

### 6.   Sirajuddin Haqqani

429.    Sirajuddin Haqqani (globally known as, and in this complaint, "Siraj") was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, including al-Qaeda core, and the Taliban, including its Haqqani Network.  Siraj provided financial and material support to al-Qaeda and the Taliban. Siraj was the son of bin Laden's long-standing ally, mentor, and protector, Jalaluddin Haqqani, who was the most iconic Islamist terrorist in Afghanistan and Pakistan after bin Laden (and a far bigger deal there than bin Laden before 9/11).  Siraj grew up observing his father Jalaluddin play a leadership role coordinating more than half a dozen separate Islamist insurgent groups that had all united in an alliance to attack Soviet forces in Afghanistan to drive the Soviet Union out.  Like the phenomenon of the children of professional coaches going into coaching themselves because they grew up marinating in it and becoming great coaches as a result, Siraj's unparalleled biography and personal networks made him the hub of al-Qaeda and Taliban terror.

430.    On September 13, 2007, the United Nations sanctioned Sirajuddin Haqqani pursuant to the U.N.'s al-Qaeda-Taliban sanctions regime. In its designation, the U.N. concluded, among other things, that Sirajuddin "participat[ed] in the financing, planning,

facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of", "recruit[ed] for" or "otherwise support[ed] acts or activities of" "the Taliban" and "Al-Qaida"; was "one of the most prominent, influential, charismatic and experienced leaders within the Haqqani Network … and [had] been one of the major operational commanders of the network since 2004"; was "a key conduit for terrorist operations in Afghanistan and supporting activities in the Federally Administered Tribal Areas of Pakistan."

431.   By 2008, Sirajuddin Haqqani was simultaneously: (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, its terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

432.   Sirajuddin Haqqani's service on al-Qaeda's military council necessarily means that Sirajuddin Haqqani swore an oath of allegiance to al-Qaeda, because al-Qaeda only permitted sworn al-Qaeda members to serve on its councils.

433.   On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" and the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura" in 2012.

434.   Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

435.    Other than Osama bin Laden, Sirajuddin Haqqani was the single most important al-Qaeda leader in Afghanistan and Pakistan after 9/11.  By joining al-Qaeda management, Sirajuddin achieved a level of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the terrorists' campaign.

436.    Sirajuddin Haqqani was also, like his father Jalaluddin Haqqani, famous for his pragmatism in defense of his extremism.  Sirajuddin was willing to do deals and make trades with people, groups, and governments whom he may otherwise wish to kill if the deal in question made it more likely that al-Qaeda and the Taliban, including its Haqqani Network, could kill Americans in Afghanistan.

437.    Sirajuddin Haqqani was the most important transnational Syndicate leader and played a vital role in harmonizing the various strategies and tactics, as well as promoting network efficiencies.  Thus, for example, if an al-Qaeda-in-Iraq operative needed secure travel into Paktika Province (a Haqqani Network stronghold), the AQI terrorist could contact someone from the Haqqani clan and make the necessary arrangements.

438.    By the mid-2000's, Sirajuddin Haqqani had spearheaded the emergence of a network of al-Qaeda training camps in North Waziristan, Pakistan, which leveraged the services of dual-hatted al-Qaeda/al-Qaeda-in-Iraq terrorists (the "Arabs") who imported bomb-related lessons learned from Iraq.

439.    According to a declassified 2008 Defense Intelligence Agency intelligence report, "[Sirajuddin] Haqqani" was "affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan" including, but not limited to "an AQ training center in Miram Shah Dand"; "an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah"; "[a]n AQ training facility called 'Shaki Masood'; and

"[a]nother AQ training facility is located at Spin-Qamar in Masood District of Northern

Waziristan."  According to the same DIA report, at least several hundred "Arabs" – i.e., dual-

hatted al-Qaeda/al-Qaeda-in-Iraq polyterrorist) Over 80 Arabs receive training there (NFI) –

collectively served in Sirajuddin Haqqani's al-Qaeda camps in 2008 alone.

440.    In spring 2010, Sirajuddin Haqqani publicly embraced his status as a member of

al-Qada and the Talban during an interview that was widely disseminated around the world.  In

the interview, the questioner asked Sirajuddin whether the "mujahideen who emigrate[d] to the

land of the Khorasan" – meaning al-Qaeda's foreign fighters in Afghanistan – "form[ed] any

obstacle or burden on the Afghan people." In response, Sirajuddin noted that al-Qaeda's foreign

fighters "enlighten the road for [fighters from Taliban Afghanistan and Pakistan] and they resist

against the cross worshippers by cooperating with us and us with them in one trench."

441.    In June 2010, an al-Qaeda memorandum sent to bin Laden himself documented

Sirajuddin's terrorist operations in Afghanistan and Pakistan on behalf of al-Qaeda.

442.    In 2011, Sirajuddin Haqqani published and distributed 10,000 copies of a book

authored by Sirajuddin in which he encouraged Islamists to follow al-Qaeda's ways, praised al-

Qaeda because it "terrifie[d]" its foes, and endorsed attacks against the United States worldwide.

443.    When Plaintiffs were attacked by al-Qaeda in Iraq and Afghanistan between 2007

and 2014, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted

deep cooperation amongst al-Qaeda (including its subsidiaries like al-Qaeda-in-Iraq), the Taliban

(including its Haqqani Network), and the IRGC (including Hezbollah and the Qods Force).

444.    When Plaintiffs were attacked by al-Qaeda in Iraq and Afghanistan between 2007

and 2014, Sirajuddin Haqqani served as the top Syndicate "polyterrorist" responsible for

coordinating key transnational-facing aspects of al-Qaeda's terrorist campaign in Afghanistan and, in coordinating with other al-Qaeda and affiliated terrorists worldwide.

445.    To this day, Sirajuddin Haqqani remains a senior member of al-Qaeda and a terrorist wanted by the United States for murder.[25]

### 7.    Ahmed Jan Wazir

446.    From the mid-2000s until late 2013, Ahmed Jan Wazir was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role he provided financial and material support to al-Qaeda and the Haqqani Network. In 2008, al-Qaeda and the Taliban (including its Haqqani Network) jointly appointed Wazir to lead their combined cell in Ghazni Province, Afghanistan.  Thereafter, Wazir served as an operative for al-Qaeda and the Taliban, including its Haqqani Network, until his death in late 2013. Wazir led a joint al-Qaeda/Taliban cell based in Ghazni, which committed attacks against Americans in Ghazni and in Kabul (the latter, as a part of the Kabul Attack Network).

447.    On June 21, 2011, the U.S. designated Wazir as an SDGT.

448.    On January 6, 2012, the United Nations followed the U.S. lead and designated Wazir under its al-Qaeda/Taliban sanctions regime.  In its designation, the U.N. observed that "Taliban and Al-Qaida militants appointed Ahmed Jan Wazir as a Taliban commander in Ghazni Province" "[i]n 2008" and, among other things, that Wazir: served as a "[k]ey commander of the Haqqani Network"; "[a]ct[ed] as deputy, spokesperson and advisor for Haqqani Network senior

---

[25] For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans (he still is). Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the terrorists' successful campaign on Kabul in August 2021.  Today, Sirajuddin Haqqani serves as the terrorist responsible for the "Islamic Emirate of Afghanistan's" borders and guns, while his brothers have responsibilities relevant to intelligence and information.

leader Sirajuddin Jallaloudine Haqqani"; "[l]iaise[d] with the Taliban Supreme Council"; had

"travelled abroad" "with senior Haqqani Network members to the Gulf"; "[l]iaise[d] with and

provide[d] Taliban commanders in Ghazni … with money, weapons, communications equipment

and supplies";"conduct[ed] meetings on behalf of the Haqqani Network"; "represented the

Haqqani Network at the Taliban's shura and has served as a conduit between the Haqqani

Network and the Taliban in Ghazni Province, Afghanistan"; and "provided" other terrorists "in

Ghazni Province with money and supplies, including weapons and communications equipment."

449.    On November 21, 2013, Wazir was killed by an American strike in Ghazni.

**8.    Ezedin Abdel Aziz Khalil (aka Yasin al-Suri)**

450.    At all relevant times, Ezedin Abdel Aziz Khalil (aka Yasin al-Suri) was an al-

Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role

Khalil provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other

roles, Khalil served as a key Iran-based facilitator for al-Qaeda and al-Qaeda-in-Iraq.

451.    On July 28, 2011, the United States designated Khalil as a Specially Designated

Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among

other things, that Khalil: was  "a prominent Iran-based al-Qa'ida facilitator, operating under an

agreement between al-Qa'ida and the Iranian government" who led a "key" "al-Qa'ida network"

in "Iran" "since 2005" that "serve[d] as the core pipeline through which al-Qa'ida moves money,

facilitators and operatives from across the Middle East to South Asia" and was "a critical transit

point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan" that "al-Qa'ida"

operated pursuant to the "secret deal" between "Iran" and "al-Qa'ida" that "allow[ed] [al-Qa'ida]

to funnel funds and operatives through [Iran's] territory" and "much-needed support" to "al-

Qa'ida's senior leadership";  "move[d] money and recruits from across the Middle East into Iran,

then on to Pakistan for the benefit of al-Qa'ida senior leaders"; "collected funding from various

donors and fundraisers throughout the Gulf and is responsible for moving significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq"; and "facilitated the travel of extremist recruits for al-Qa'ida from the Gulf to Pakistan and Afghanistan via Iran."

### 9.    Umid Muhammadi

452.    At all relevant times, Umid Muhammadi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Muhammadi provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Muhammadi was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq.

453.    On July 28, 2011, the United States designated Muhammadi as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Muhammadi: was "an al-Qa'ida facilitator and key supporter of al-Qa'ida in Iraq (AQI)"; "petitioned Iranian officials on al-Qa'ida's behalf"; had "been involved in planning multiple attacks in Iraq"; had "trained extremists in the use of explosives"; and had "received training in Afghanistan on the use of rockets and chemicals."

### 10.    Sangeen Zadran

454.    Sangeen Zadran was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role Zakir provided financial and material support to al-Qaeda and the Taliban from the late 2000s until his death in 2013. Zadran proudly and publicly identified as an al-Qaeda "brother" – i.e., an al-Qaeda member.  In September 2009,

al-Qaeda's media wing, Sahab, published an interview with Zadran in which Zadran explained

that his relationship with al-Qaeda was the same as his relationship with the Taliban.[26]

455.    On August 16, 2011, the United States designated Zadran as a Specially

Designated Global Terrorist.  Announcing the designation, the State Department publicly stated,

among other things, that Zadran: was "the Shadow Governor for Paktika Province, Afghanistan

and a commander of the Haqqani Network"; "help[ed] lead fighters in attacks across

Southeastern Afghanistan"; was "believed to have planned and coordinated the movement of

hundreds of foreign fighters into Afghanistan," i.e., al-Qaeda; was "connected to many [IED]

attacks"; and "act[ed] as a senior lieutenant to Haqqani Network leader Sirajuddin Haqqani."

456.    On September 5, 2013, Zadran was killed by a U.S. military strike in Pakistan.

### 11.    Mustafa Hajji Muhammad Khan

457.    Mustafa Hajji Muhammad Khan was an al-Qaeda polyterrorist who operated as a

member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khan provided financial and material

support to al-Qaeda and al-Qaeda-in-Iraq, from 2003 until his death in 2012. Among other roles,

Khan was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq, in which role he enabled the

movement of fighters and funds amongst Iraq, Afghanistan, Pakistan and the Persian Gulf.

458.    On March 14, 2011, the United Nations sanctioned Khan pursuant to the U.N.'s

al-Qaeda/Taliban sanctions regime.  According to the U.N.'s designation, among other things,

"Mustafa Hajji Muhammad Khan" was "an Al-Qaida [] facilitator, courier and operative since at

---

[26] Zadran stated: "Al-Qaeda and Taliban all are Muslims and we are united by the brotherhood of Islam. We do not see any difference between Taliban and Al-Qaeda, for we all belong to the religion of Islam. Sheikh Usama has pledged allegiance to … Mulla Muhammad Umar and has reassured his leadership again and again. There is no difference between us, for we are united by Islam and the Sharia governs us."

least 2003" and "serve[d] as a representative of the Al-Qaida leadership to the former head of Al-Qaida in Iraq [], … Abu Musab al-Zarqawi."

459.    On September 7, 2011, the United States designated Khan as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Khan: "acted as an al-Qa'ida facilitator, courier and operative since at least 2003"; "facilitated activities for senior Pakistan-based al-Qa'ida operatives"; had "also been active in facilitating the travel of al-Qa'ida members, including escorting an individual to meet with another al-Qa'ida member in 2009"; "recruited a facilitator" "[o]n al-Qa'ida's behalf," "who helped [Khan] move people and money between Gulf countries and Pakistan"; "helped al-Qa'ida reestablish logistic support networks in Pakistan"; and "served as a messenger between al-Qa'ida and former al-Qa'ida in Iraq leader Abu Musab al-Zarqawi."

460.    On October 1, 2012, Khan was killed in a U.S. military strike in Pakistan.

### 12.    Adel Radi Saqr al-Wahabi al-Harbi

461.    At all relevant times, Adel Radi Saqr al-Wahabi al-Harbi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Harbi provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Harbi served al-Qaeda and al-Qaeda-in-Iraq through his role as Muhsin al-Fadhli's deputy. In such capacity, Harbi connected al-Qaeda operatives in Iraq and Afghanistan.

462.    On October 18, 2012, the United States designated Harbi as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Harbi was a "key member of an al-Qa'ida network operating in Iran and led by Iran-based al-Qa'ida facilitator Muhsin al-Fadhli" who "serve[d] as the deputy to al-Fadhli," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf of al-Qa'ida" by helping "operate a core pipeline that moves al-Qa'ida money and fighters through

Iran to support al-Qa'ida activities in South Asia" was "believed to have sought funds to support al-Qa'ida attacks," and "travel[ed] to Afghanistan to join al-Qa'ida and providing technical support … to the terrorist group" "[b]efore joining the Iran-based al-Qa'ida network."

463.    On October 18, 2012, the United States government announced a $5 million bounty on Harbi under its Rewards for Justice program.  In so doing, the U.S. determined, among other things, that Harbi was "an Iran-based al-Qaida facilitator and deputy to al-Fadhli" who "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf of al-Qaida," "sought funds to support al-Qaida attacks" and was "wanted by Saudi authorities" for "traveling to Afghanistan to join al-Qaida and providing technical support" to it.

464.    Harbi currently facilitates al-Qaeda operations from his haven in Iran.

### 13.    Abdul Rauf Zakir

465.    Abdul Rauf Zakir was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role Zakir provided financial and material support to al-Qaeda and the Taliban, including its Haqqani Network from the late 2000s until his death prior to 2020.  Among other roles, Zakir was a key lieutenant of Sirajuddin Haqqani (himself an al-Qaeda polyterrorist) and was a facilitator for al-Qaeda and the Haqqani Network.

466.    On November 5, 2012, the U.S. designated Zakir as an SDGT.  Announcing the designation, the State Department observed, among other things, that Zakir was "the chief of suicide operations for the Haqqani Network and the operational commander in Kabul, Takhar, Kunduz, and Baghlan Provinces, Afghanistan"; Zakir was "responsible for the Haqqani Network's training program, which include[d] instruction in small arms, heavy weapons, and basic [IED] construction"; Zakir "approached Haqqani Network leader Sirajuddin Haqqani in 2008, requesting financial aid in exchange for expanding the group's influence and operations

into northern Afghanistan"; and Zakir had "become a trusted associate and confidant of

Sirajuddin" and was "involved in many … high-profile suicide attacks."

467.    On November 5, 2012, the United Nations followed the U.S. lead and designated

Zakir under the U.N.'s al-Qaeda/Taliban sanctions regime.  In its designation, the U.N.

recognized, among other things, the same facts provided by the United States when it designated

Zakir as an SDGT.

468.    At some point between 2017 and 2019 (the exact date is a secret), Zakir was

killed in an American airstrike targeting al-Qaeda operatives in Ghazni Province, Afghanistan

who were embedded with the Taliban, including its Haqqani Network.  Zakir was killed

alongside other al-Qaeda operatives, including Zakir's protectee:  Hamza bin Laden, the son and

senior male heir of Osama bin Laden.  By the time Hamza was killed, he was a key al-Qaeda

terrorist in his own right, designated by the U.S. as an SDGT on January 5, 2017.

### 14.    Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni

469.    At all relevant times, Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni was

an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which

role Juhni provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among

other roles, Juhni performed various logistics and leadership functions for al-Qaeda in

Afghanistan and Pakistan, including arranging the payment of funds, passing messages and

arranging meetings for senior al-Qaeda figures.  In 2013, al-Qaeda assigned Juhni to al-Qaeda-

in-Iraq, and Juhni relocated from Pakistan to Syria to support al-Qaeda efforts in Syria.  During

this time, he maintained an affiliation with al-Qaeda's leadership in Afghanistan and Pakistan.

470.    On May 14, 2014, the United States designated Juhni as an SDGT.  Announcing

the designation, the Treasury Department stated, among other things, that Juhni was "designated

for acting for or on behalf of al-Qa'ida"; had "performed various administrative duties for al-

136

Qa'ida, including arranging the payment of funds, passing messages and arranging meetings for senior al-Qa'ida figures"; "provided logistical support to al-Qa'ida in Afghanistan" "[b]etween 2006 and 2009"; "was responsible for al-Qa'ida's communications courier network in Waziristan in late 2008, and by mid-2009, was in charge of al-Qa'ida administrative affairs for several areas in North and South Waziristan"; "served on al-Qa'ida's Central Shura Council and as the al-Qa'ida Chief of Security responsible for counterintelligence"; "traveled to Syria accompanied by several individuals to … support al-Qa'ida efforts in Syria" while "he maintained an affiliation with al-Qa'ida leadership in the Federally Administered Tribal Areas of Pakistan."

### 15.  Abd al-Rahman Mustafa al-Qaduli

471.    At all relevant times, Abd al-Rahman Mustafa al-Qaduli was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Qaduli provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Qaduli was an Islamic cleric who lived in Northern Iraq.  He joined Al-Qaeda in 2004, and was rapidly promoted up the ranks, working with al-Qaeda leader Abu Musab al-Zarqawi and becoming Al-Qaeda's liaison for operations with Afghanistan and Pakistan and, in such capacity, coordinated between al-Qaeda's leadership and its branch in Iraq.

472.    On May 14, 2014, the United States designated Qaduli as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Qaduli: "joined al-Qa'ida in 2004 under the command of now-deceased AQI leader Abu Musab al-Zarqawi and served as Zarqawi's deputy and the AQI emir of Mosul, Ninawa Province, Iraq"; "was an assistant to al-Zarqawi while in al-Qa'ida and previously served as AQI's representative to al-Qa'ida senior leadership in Pakistan"; and "traveled … to Pakistan on behalf of al-Zarqawi to conduct an interview, which was then to be provided to al-Qa'ida leaders in Afghanistan."

### 16.    Abu Afghan al-Masri

473.    Abu Afghan al-Masri was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra, in which role Abu Afghan al-Masri provided financial and material support to al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra. Among other roles, he was a key facilitator for al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra. Like al-Qaeda leader Ayman al-Zawahiri, Abu Afghan al-Masri was an Egyptian who originally joined al-Qaeda in Afghanistan.  While serving al-Qaeda in Afghanistan, Abu Afghan al-Masri facilitated ties to terrorist groups operating throughout the Middle East, including groups responsible for attacking U.S. forces in Afghanistan and Iraq. After the conflict erupted in Syria, al-Qaeda "core" redeployed Abu Afghan al-Masri to Syria to facilitate al-Qaeda-in-Iraq's expansion in Syria, and to convert Syria into another haven from which al-Qaeda could launch attacks against the United States.

474.    On November 18, 2016, U.S. forces killed Abu Afghan al-Masri in an airstrike in Syria.  Commenting on the event, the Department of Defense publicly stated that "Abu Afghan al-Masri" was "a senior Al Qaeda leader" who "originally joined Al Qaeda in Afghanistan, later moved to its Syrian affiliate"; "had ties to terrorist groups operating throughout Southwest Asia, including groups responsible for attacking U.S. and coalition forces in Afghanistan and those plotting to attack the West"; "had a senior leadership role in Al Qaeda"; "helped organize Al Qaeda activities and was directly affiliated with senior [Qaeda] leaders" in Afghanistan"; and was so important that his "removal from the battlefield represent[ed] another blow to Al Qaeda in Syria and demonstrate[ed] continued U.S. determination to target Al Qaeda leaders wherever they pose[d] a threat to the U.S."

### C.    Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks, Infrastructure, Ideology, Tactics, Techniques, And Procedures, And

**Followed Al-Qaeda's Globally Integrated Terror Network Model That Facilitated Cooperation Between Islamic State Branches**

475.     Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, Islamic State's:  (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) a multi-national corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.

### 1.     Islamic State Emulated Al-Qaeda

476.     Islamic State self-identified as the heir to bin Laden's legacy.

477.     Islamic State relied upon al-Qaeda and al-Qaeda-in-Iraq operatives who switched allegiance to Islamic State to fuel its rapid growth.

478.     Islamic State copy-catted or otherwise absorbed al-Qaeda's:  hatred of the United States and targeting of Americans in the Middle East to drive the U.S. from the region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures.

479.     Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe houses, logistics pipelines, facilitators, and protection rackets (including the associated relationships with business and their agents) in Iraq and Syria.

480.     Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of al-Qaeda-in-Iraq from its inception in 2014 through the present.  For example, Islamic State's finance apparatus was structurally similar to that of al-

Qaeda-in-Iraq, and Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars.

481.    Islamic State was devoted to the al-Qaeda-in-Iraq protection money framework and strategy.  Like its predecessor, Islamic State relied upon protection money payments from Western contractors and corporations, like Defendants.  As Under Secretary Cohen publicly explained in in 2014, Islamic State "mimic[ked]" "AQI's extortion networks" in order to finance its attacks.  Indeed, leveraging al-Qaeda in Iraq's experience running protection rackets, Islamic State  extracted protection payments even when it did not control territory.

482.    Like al-Qaeda and al-Qaeda-in-Iraq, Islamic State also embraced the use of "polyterrorists."  Indeed, Islamic State professed to be even more willing than other organizations to embrace such terrorists, as Islamic State attempted to position itself as a "catchall" pan-Islamist organization that welcomed the involvement of terrorists from other groups, whom Islamic State used to further augment their ranks through "hybridized" cells.

## 2.    Islamic State Operated As An Integrated Global Network

483.    Like al-Qaeda, Islamic State operated as a globally integrated terrorist network, led by a "core" but operationalized by terrorists in dozens of countries, including branches throughout the Middle East.

484.    Terrorists from Islamic State's "core" in Iraq and Syria committed attacks against Americans in Iraq, Syria, and Afghanistan, and on a few occasions in Europe and Africa.

485.    Islamic State's globally integrated network was always led by Islamic State's emir, who was also known as the "caliph" at certain times.

486.    Under Islamic State's globally integrated approach, every Islamic State terrorist associated with any Islamic State branch pledged allegiance to the emir, who was sometimes known as the caliph.

### 3. Islamic State Followed A Multi-National Corporation Model

487.    Islamic State generally embraced, often to the letter, al-Qaeda's and al-Qaeda-in-Iraq's multinational-corporate-inspired governance and business models, including al-Qaeda's use of branches, command-and-control system, organizational structures, and ideological mission.

488.    Islamic State also continued al-Qaeda-in-Iraq's tactic of undercutting their competition in the illicit marketplace.

489.    Confiscated Islamic State terrorist training manuals revealed that Islamic State, like al-Qaeda-in-Iraq, aimed to build out a formal and centralized terrorist-run state, supported by an array of administrative functions that focused on collecting "taxes" from companies with business interests in Islamic State's territory and creating terrorist training camps so that Islamic State could grow its caliphate beyond Iraq and Syria, with a particular emphasis on Afghanistan.

490.    Islamic State's "Military Council" was charged with the defense of the Caliphate, i.e., conducting terrorist attacks against America and its Iraqi allies.

491.    Islamic State's "Fighters Assistance Council" funded foreign fighters through Islamic State revenues in Iraq and Syria, including the flow of such fighters between Islamic State's Iraq/Syria core and its branch in Afghanistan.

492.    Islamic State had a sophisticated, well-developed, and complex financial structure.  Islamic State's Finance Council was a cabinet level entity that managed Islamic State's revenue and expenditures derived from illicit proceeds from occupation of territory, including Islamic State's protection rackets and illicit taxation of goods and cash that transited territory where Islamic State operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and managed it all with a Chief Financial Officer. Islamic State's Finance Council oversaw the financial infrastructure of the

organization and managed Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated "taxation offices" replete with financial auditors.

### 4.    Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Global Terrorist Campaign

493.    Islamic State also modeled al-Qaeda's and al-Qaeda-in-Iraq's doctrinal emphasis on the use of protection rackets and donations as two cornerstones of the group's terrorist finance strategy. In so doing, Islamic State adopted the same tactics, techniques and procedures as practiced by al-Qaeda and al-Qaeda-in-Iraq.

494.    From 2014 through 2021, Islamic State relied upon sophisticated protection rackets in Iraq and Syria to finance Islamic State's operations in Iraq and Syria, as well as Islamic State's operations through key Islamic State branches, including Afghanistan.

### 5.    Value Flow To Islamic State Aided Islamic State's Attacks Against Americans In Iraq, Syria, And Afghanistan

495.    Islamic State viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate Islamic State's caliphate there.

496.    Abu Bakr al-Baghdadi, the leader of Islamic State until his death in 2019, repeatedly called for Islamic State supporters worldwide to facilitate Islamic State's attacks against Americans in Iraq, Afghanistan, and Syria through his public statements from 2014 through 2019.

497.    Baghdadi's history confirms the interconnections between Islamic State's activities in Iraq/Syria and Afghanistan/Pakistan: Baghdadi himself took refuge with Zarqawi's former allies in the Datta Khel region of North Waziristan, Pakistan between 2012 and 2013.

498.    Under Islamic State's organizational structure, copycatted from al-Qaeda, a substantial portion of the value that flowed to Islamic State in Iraq and Syria from 2014 through 2021 flowed through Islamic State's "core" there and and benefited Islamic State's "Khorosan" branch in Afghanistan and Pakistan.  This occurred because Islamic State conducted an integrated campaign against the United States in Iraq, Syria, Afghanistan, and Pakistan through which Islamic State's "core" in Iraq and Syria flowed funds, fighters, training and expertise, and logistical aid to Islamic State's branch in Afghanistan and Pakistan, facilitating Islamic State's attacks against Americans in Afghanistan from 2014 through 2021, including its August 2021 suicide bomber attack at Kabul International Airport, which killed thirteen Americans, including Lance Corporal Jared M. Schmitz, whose family are Plaintiffs.

<strong>a.    Islamic State Funds Raised In Iraq Funded Islamic State Attacks In Iraq, Syria, And Afghanistan</strong>

499.    Islamic State generally copy-catted, or absorbed, al-Qaeda's and al-Qaeda-in-Iraq's approach to sharing funds between geographies, as well as al-Qaeda's and al-Qaeda-in-Iraq's universal preference for U.S. dollars.

500.    From 2014 through 2021, Islamic State's fundraising activities in Iraq and Syria directly funded Islamic State's branch in Afghanistan from 2014 through 2021 through at least five al-Qaeda-inspired channels.  *First*, from 2014 through 2017, Islamic State's "core" in Iraq and Syria provided the essential "start-up capital" upon which Islamic State's branch in Afghanistan and Pakistan depended to get itself established in the first instance.  *Second*, Islamic State's "core" in Iraq and Syria made regular cash payments to Islamic State's branch in Afghanistan and Pakistan for the specific purpose of facilitating the latter's attacks against Americans. *Third*, Islamic State's "core" in Iraq and Syria provided key logistical aid that enabled Islamic State's branch in Afghanistan and Pakistan to derive more cash from Islamic

State's money-making rackets in South Asia.  For example, Islamic State's "core" helped Islamic State's branch in Afghanistan and Pakistan move fundraisers through the key Middle Eastern geographies in which Islamic State solicited donations.  *Fourth*, Islamic State's successful attacks in Iraq also directly strengthened Islamic State's branch in Afghanistan's and Pakistan's ability to raise funds and sign new recruits (who ordinarily financially contributed to Islamic State) in order to facilitate attacks against Americans in Afghanistan by materially strengthening Islamic State's ability to successfully present Baghdadi's strategic narrative to the broader pool of global terrorist-curious followers whom were choosing between Islamic State and another organization (like al-Qaeda) by giving Islamic State the ability to present itself to such prospective financiers and new terrorist recruits as both the senior leader of the global jihadist cause, but also the one with the greatest capabilities and track record of success killing Americans after 9/11. *Fifth*, Islamic State "core" in Iraq and Syria stockpiled their cash haul from their Iraqi and Syrian protection rackets throughout Iraq from 2014 through 2017, in anticipation of a global insurgency thereafter.  Such cash stockpiles totaled hundreds of millions of U.S. dollars and continued to facilitate attacks by Islamic State and its branches through 2021.

501.    Islamic State's "core" in Iraq and Syria collectively routed millions of U.S. dollars from 2014 through 2021 in cash, goods, and other value to Islamic State's branch in Afghanistan and Pakistan from 2014 through 2021, including at least several hundred thousand U.S. dollars per year derived from its protection rackets in Iraq, which Islamic State used to facilitate attacks against Americans in Afghanistan from 2014 through 2021.

>   **b.      Islamic State Redeployed Its Terrorists In Iraq To Afghanistan And Pakistan To Establish And Lead Islamic State's Branch There**

502.    Islamic State continued al-Qaeda's and al-Qaeda-in-Iraq's practice of redeploying terrorists from Iraq and Syria to Afghanistan and Pakistan in order to facilitate terrorist attacks

against Americans in Afghanistan and Pakistan (where the arriving Islamic State terrorists were folded into pre-existing Islamic State cells in the border region) and Iraq and Syria (through the relationships that Islamic State terrorists developed while in Afghanistan and Pakistan).

503.   In so doing, Islamic State followed al-Qaeda's time-honored playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed, or cross-pollinated, with terrorists in other theater. Al-Qaeda and al-Qaeda-in-Iraq, from whose ranks Islamic State populated its fighters, routinely did so from the 1990s through 2021.

504.   Islamic State's strategy of having Islamic State "core" terrorists in Iraq and Syria melt away back into Afghanistan and Pakistan to augment the Islamic State branch there from 2014 through 2021 followed the al-Qaeda playbook and reflected Islamic State's view, shared amongst jihadists around the world at the time, that its loss of a caliphate in Iraq and Syria was merely a setback, and Afghanistan offered the prospect of victory over the Americans.

505.   Islamic State "core" terrorists from Iraq and Syria whom Islamic State redeployed to its branch in Afghanistan and Pakistan were amongst the most elite of Islamic State's operatives worldwide, having survived the Darwinian process in Iraq in which U.S. forces eliminated the less capable operatives. As a result, these Islamic State terrorists greatly augmented the capabilities and experience of Islamic State cells they served while in Afghanistan and Pakistan, including the effectiveness of Islamic State's suicide bomb attacks.

506.   Islamic State's use of Islamic State "core" terrorists in Iraq and Syria to facilitate the operations of Islamic State's branch in Afghanistan and Pakistan began with the formation of the Afgnanistan/Pakistan branch, which was accomplished by the flow of at least hundreds of hardened Islamic State veterans from Iraq in 2014 and 2015.

507.     Islamic State's use of Islamic State "core" terrorists in Iraq and Syria to facilitate the operations of Islamic State's branch in Afghanistan continued from 2014 through 2021.

508.     On December 27, 2016, Russia, China, and Pakistan publicly warned that Islamic State activity in Iraq and Syria was generating a new Islamic State threat in Afghanistan and Pakistan.  Their warnings were validated only weeks later when Islamic State executed a massive suicide bomb attack in Kabul, Afghanistan on February 7, 2017, another spectacular attack in Pakistan on February 16, 2016, and a third such attack in Kabul on March 8, 2017.

509.     On February 4, 2018, a senior U.S. official publicly stated that Islamic State terrorists in Iraq were "going underground" and "dispersing to other safe havens."  (Afghanistan was a top safe haven for Islamic State, as it had recently secured a significant expanse of geography, including Tora Bora, that was internationally infamous as an Islamist terrorist safe haven.)

510.     On March 7, 2019, General Joseph Votel, commander of CENTCOM, warned Congress, via testimony, that Islamic State was laying in wait in anticipation of its resurgence, and explained that Islamic State made a "calculated decision to preserve the safety of their families and preservation of their capabilities by" (among other things) "going to ground in remote areas and waiting for the right time to resurge."  Afghanistan was one such area.

511.     Collectively, Islamic State routed more than 1,000 terrorists from Iraq to Afghanistan, including at least hundreds of terrorists from Islamic State's "core" in Iraq and Syria to its branch in Afghanistan and Pakistan each year from 2014 through 2021, whom Islamic State's branch in Afghanistan and Pakistan used to facilitate attacks against Americans in Afghanistan from 2004 through 2015.

c. **Islamic State's Terrorists in Iraq and Syria Provided Key Training and Expertise to Islamic State's Terrorists In Afghanistan and Pakistan Targeting Americans in Afghanistan**

512.    Islamic State, along with most Islamist terrorists globally, viewed Iraq as one of the central fronts against America from 2014 through 2021.

513.    Given Iraq's status both with respect to Islamic State's "caliphate" (from 2014-2017) and its terrorist campaign against the United States (at all times), Islamic State organized the relationships between its "core" in Iraq and Syria and its key branch in Afghanistan so that the former could provide training and expertise to the latter.

514.    Islamic State depended upon Islamic State's "core" in Iraq and Syria to furnish Iraq- and Syria-experienced operatives, who furnished training and expertise to Islamic State's branch in Afghanistan.  Just as al-Qaeda leveraged al-Qaeda-in-Iraq to enhance the lethality of Qaeda's bombing campaign in Afgnanistan, Islamic State's relationship between its "core" and its Afghanistan branch permitted the former the ability to export suicide bombing-related innovations gleaned in Iraq to the latter's operatives in Afghanistan and Pakistan.

515.    Islamic State core's provision of key training to Islamic State's branch in Afghanistan and Pakistan occurred in a range of training camps around the world including, but not limited to, camps in Afghanistan, Pakistan, Iraq, and Syria.

d. **Islamic State Terrorists In Iraq Provided Key Logistical Aid To Islamic State's Branch In Afghanistan And Pakistan**

516.    Islamic State recognized that Islamic State's operations against the United States in Iraq, Syria, Afghanistan, and Pakistan were part of a single Islamic State campaign that was linked by common financial, human recourses, travel, and communications needs.

517.    Islamic State's branch in Afghanistan and Pakistan leveraged Islamic State core's extensive global logistics networks to fund, arm, equip, and manage Islamic State's terrorist campaign in Afghanistan and Pakistan.

518.    Like al-Qaeda, Islamic State's strategy of leveraging the logistics networks of its branches was one of the core mechanisms through which Islamic State "core" facilitated its Afghanistan/Pakistan branch's attacks against Americans from 2014 through 2021.

519.    Through Islamic State core's global logistics network, Islamic State raised funds, recruited new terorrists, and facilitated transactions on behalf of Islamic State's branch in Afghanistan and Pakistan, all of which facilitated attacks against Americans in Afghanistan by by Islamic State cells there.

## IV.   DEFENDANTS KNEW THEY WERE AIDING ATTACKS ON AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE

### A.    Defendants Admitted They Engaged In Illegal Transactions That Foreseeably Caused Protection Money To Flow To Terrorists And Obstructed United States Counterterrorism Efforts

520.    LM Ericsson and Ericsson Inc. have, in sum and substance, admitted that they caused protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2011 through at least 2019 and that they obstructed U.S. counterterrorism efforts until at least February 15, 2022.  In addition to the statements alleged above, *e.g.*, *supra* II.B, additional examples of LM Ericsson's admissions (on its own behalf and as agent for Ericsson Inc.) include, but are not limited to:

a.      Via its CEO, Mr. Ekholm: "We . . . received communication from the DOJ about a breach notice related to our DPA, and we're currently engaging with the DOJ about this matter. What I can say now is that it's our assessment that the resolution will likely result in monetary and other measures. However, the magnitude of these cannot, at this time, be

reliably estimated. As this process is ongoing, we remain limited in what we can say about the historical events covered in the Iraq investigation and related matters."[27]

**b.**   "Ericsson has been active in Iraq since the lifting of a UN embargo led to the reopening of the telecoms equipment market. Since then, Ericsson has continued its work in the country, including during periods of civil unrest.  Iraq is one of a number of countries where increased concerns about security and risk to colleagues' well-being is closely monitored. The company has processes in place to manage security risks, covering both employees and subcontractors."[28]

**c.**   "[LM Ericsson and Ericsson Inc.'s] investigating team [] identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. Investigators could not determine the ultimate recipients of these payments. Payment schemes and cash transactions that potentially created the risk of money laundering were also identified."[29]

**d.**   "[An] investigation [by LM Ericsson and Ericsson Inc. relating to unusual expenses] included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. It found serious breaches of compliance rules and the Code of Business Ethics. It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation."[30]

**e.**   "As a result of the investigation, several employees were exited from the company and multiple other disciplinary and other remedial actions were taken. This included closing gaps in our internal processes in the region and incorporating lessons from the investigation into our ethics and compliance program."[31]

**f.**   "Ericsson terminated a number of third-party relationships and prioritized the Iraq country business for enhanced training and awareness activities, policies and procedures, and third-party management processes."[32]

---

[27] Telefonaktiebolaget LM Ericsson (ERIC) CEO Börje Ekholm on Q1 2022 Results - Earnings Call Transcript (Apr. 14, 2022), https://tinyurl.com/mw2yzrv9.

[28] LM Ericsson, *Press Release: Update: Iraq Media Inquiries* (Feb. 15, 2022).

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

**g.**     Via its CEO, Börje Ekholm: LM Ericsson and its subsidiaries had identified "unusual expenses" relating to Iraq "dating back to 2018."[33]

**h.**     Via its CEO, Mr. Ekholm: in sum and substance, LM Ericsson and its subsidiaries (as paraphrased by a reporter, with Mr. Ekholm's quote) "may have made illicit payments, but that the company had often struggled to identify the final beneficiary … [because] '[w]e [i.e., LM Ericsson and its subsidiaries] can't determine where money sometimes really goes, but we can see that it has disappeared.'"[34]

**i.**     Via its CEO, Mr. Ekholm: "What we [i.e., LM Ericsson and its subsidiaries] are seeing is that transport routes have been purchased [by LM Ericsson and its agents] through areas that have been controlled by terrorist organisations, including ISIS."[35]

**j.**     "[Ericsson] has previously acknowledged publicly that it had failed to implement sufficient internal controls, including internal controls designed to deter and detect corruption. Over the last years, Ericsson has made significant investments in compliance which has enabled the company to uncover and address past misconduct.  Since the beginning of 2017 when we started the turnaround of our company, we have invested extensively in enhanced compliance systems and processes."[36]

**k.**     Via its CEO, Mr. Ekholm: LM Ericsson could not disprove that its money flowed to Islamic State: "The question on financing armed factions cannot be substantiated."[37]

**l.**     Via its CEO, Mr. Ekholm, on July 14, 2022: "We also continue to engage with the U.S. … DOJ [and] SEC in relation to the 2019 Iraq investigation and the DPA breaches."[38]

**m.**     "[M]edia will focus on the conduct of business in unstable regions where terrorist organizations and corruption are present."[39]

---

[33] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq, Report Says; A Leaked Internal Report by the Swedish Business Shows Corruption and Terrorist-Linked Transactions Between 2011 and 2019* (Feb. 28, 2022), https://tinyurl.com/v93j5szx.

[34] Sydney P. Freedberg, Maggie Michael and Amir Musawy, *The Ericsson List: Leak Exposes Ericsson's Secret Dealings With ISIS Amid Iraq Corruption Spree*, Int'l Consortium of Investigative Journalists (Feb. 27, 2022), https://tinyurl.com/5yjnnjyr.

[35] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq*, *supra*.

[36] LM Ericsson, *Press Release: Update on Deferred Prosecution Agreement* (Mar. 2, 2022).

[37] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS*, Washington Post (Mar. 2, 2022).

[38] Telefonaktiebolaget LM Ericsson (NASDAQ:ERIC) Q2 2022 Earnings Conference Call (July 14, 202), https://tinyurl.com/yhn6duxc.

[39] LM Ericsson, *Press Release: Comment Regarding Recent Media Inquiries* (Feb. 8, 2022).

521.    Widespread media coverage confirms that LM Ericsson and Ericsson Inc. tried to pull a fast one on the U.S. government, its shareholders, and American victims of terrorism, including Plaintiffs, and only came clean once a heroic whistleblower leaked the evidence of Ericsson's continued corporate crime spree and deception.  Only then, once caught, did Ericsson admit its culpability.  Examples of such reports include, but are not limited to:

a.    *Voice & Data*, February 2022:  "After years of investigation, Ericsson has said that its employees may have funded terrorism in Iraq and the Middle East. While it remains under investigation, the statements issued by [LM Ericsson] have all but confirmed it … Ericsson itself reported that the illicit payments might not have stopped until 2019 …. Notably, [LM Ericsson] has noted that during a period that lasted the entire 2010s, it found 'serious breaches' of compliance rules and the Code of Business Ethics. … A media statement [by LM Ericsson]… read, 'It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; improper use of sales agents and consultants'. Let us break this down. 1. Making a monetary donation without a clear beneficiary: means that company funds were misappropriated, potentially going towards funding terrorist activities in Iraq and the Middle East. 2. Paying a supplier for work without a defined scope and documentation: a way to cover up the transfer of funds. 3. Funding inappropriate travel and expenses: using money to bribe ISIS for access to certain roads. This could also be used as a method to cover up fund transfers to terrorist beneficiaries. 4. Improper use of sales agents and consultants: this can mean a lot of things, such as sales agents being used as middlemen, to begin with. Furthermore, the investigating team also identified payments to intermediaries and the use of alternative transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. This means that Ericsson intended to avoid Iraqi authorities, and as such, paid money to ISIS and other terrorist organizations controlling some routes at that time. Of course, the investigators could not determine the ultimate recipients of these payments. However, Ericsson did note that that did create a risk of money laundering. All of this points to a serious implication; Ericsson … funded terrorist activities during the time. However, Ericsson has said that none of its employees were 'directly involved' in funding any terrorist organization. Which really is not a great defense, to be honest." [40]

b.    *Guardian*, February 2022:  "Confidential documents have revealed how … [LM Ericsson] is alleged to have helped pay bribes to the Islamic State terrorist group in order to continue selling its services after the militants seized control of large parts of Iraq.  … The leak of internal investigations at Ericsson, [] also found that the firm had put its

---

[40] Voice & Data, *Ericsson Has to Sleep in the Bed it Made in Iraq* (Feb. 17, 2022), 2022 WLNR 4973266.

contractors at risk and allowed them to be kidnapped by the militants ....”[41] “In addition to the findings about the alleged payments to [Islamic State], the investigations uncovered allegations [LM Ericsson] was involved in corruption in at least 10 countries across four continents.  That would suggest a pattern of wrongdoing by Ericsson that is far wider than what the telecoms giant publicly admitted to in 2019, when it entered into a $1bn [] settlement with the [DOJ].”[42] “[Ericsson’s] [i]nvestigators concluded that the multinational firm was likely to have been involved in channelling bribes to [Islamic State] to allow its products to be transported across parts of Iraq that were held by the terrorists.”[43] “[Ericsson’s] payments [to Islamic State] … were [also] made through a slush fund run by contractors working for the Swedish multinational, according to [Ericsson’s] investigators.”[44] “The leaked documents also show how Ericsson jeopardised their contractors in Iraq in the pursuit of profits, as managers strove to continue the firm’s commercial operations even after [Islamic State] took control of Mosul. According to investigators, emails showed ‘this persistence resulted in the kidnapping of [contractors] while doing fieldwork for Ericsson’. The investigators added that even after the kidnapping, Ericsson sought to carry on doing business in the area.”[45]

c.   *The National*, February 2022:  “[LM Ericsson] has been accused of spending ‘millions of dollars’ to smuggle equipment into ISIS-controlled territory in Iraq … in a leaked internal report by the company obtained by the International Consortium of Investigative Journalists. …  The ICIJ said that between 2011 and 2019, Ericsson made payments ‘to sustain its business in Iraq, financing slush funds, trips abroad for defence officials and payoffs through middlemen to corporate executives and possibly terrorists’. ‘The internal investigation describes a pattern of bribery and corruption so widespread, and company oversight so weak, that millions of dollars in payments couldn’t be accounted for — all while Ericsson worked to maintain and expand vital cellular networks in one of the most corrupt countries in the world.’”[46]

d.   *Agence France Presse*, April 2022:  “[LM Ericsson’s CEO] Borje Ekholm conceded in a newspaper interview … that some Ericsson employees may have bribed [Islamic State] members for road transport through areas controlled by [ISIS] in Iraq. The admission was made before the publication of a report by the [ICIJ] revealing that an internal Ericsson

---

[41] Rob Evans and Michael Safi, *Revealed: Leaked Files Show How Ericsson Allegedly Helped Bribe Islamic State*, Guardian (Feb. 27, 2022).

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq, Report Says; A Leaked Internal Report by the Swedish Business Shows Corruption and Terrorist-Linked Transactions Between 2011 and 2019* (Feb. 28, 2022), https://tinyurl.com/v93j5szx.

investigation from 2019 was never made public. The internal probe had identified possible corruption between 2011 and 2019 in the group's Iraqi operations."[47]

e. _National Iraqi News Agency_, April 2022:  "The Swedish judiciary announced … the opening of an investigation into possible corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of bribes to ISIS elements in Iraq. According to Attorney General Lev Gortz, the investigation covers the period from 2011 to 2019. 'We have good reasons to believe that corruption may have been committed in Iraq during this period, and therefore we considered it necessary to open a preliminary investigation,' Gortz [said]. … [LM Ericsson's] CEO, Borje Ekholm, admitted in a newspaper interview [] that some Ericsson employees may have bribed ISIS elements to move overland through ISIS-controlled areas in Iraq."[48]

f. _International Consortium of Investigative Journalists_, June 2022:  "The [SEC] is probing … Ericsson over its conduct in Iraq following company admissions that it may have made payments to the Islamic State terrorist group. … The announcement comes nearly five months after the [ICIJ] and 30 media partners … detail[ed] a widespread pattern of alleged corruption and graft, [and] revealed that [LM Ericsson] had paid tens of millions of dollars in suspicious payments from 2011-2019 to sustain its business in Iraq. … Days after the Ericsson List was published, U.S. prosecutors told the company that it had breached a 2019 criminal settlement agreement by failing to fully disclose the misconduct in Iraq and that the department was weighing whether Ericsson or its executives would face new fines or prosecution for breaking terms of the deal."[49]

522. **White-collar crime scholars** also confirmed that LM Ericsson's conduct comprised an admission of wrongdoing.  As former federal prosecutor Michael Volkov, author of the widely-read _Corruption, Crime, and Compliance_, summarized on June 15, 2022:

> Ericsson is having a tough time. First, in 2019, Ericsson settled FCPA charges with the Justice Department and the SEC for a total of $1 billion (with a B). Second, Ericsson had an independent compliance monitor appointed for a three-year term under its deferred prosecution agreement. And then — last year, Ericsson was notified by DOJ that it failed to conduct a proper internal investigation in Iraq because it failed to disclose additional misconduct to DOJ, most of which centered on bribery payments made to ISIS terrorists … DOJ has another opportunity to resolve the Ericsson matter to confirm prior policy statements highlighting a tough stance on recidivists — those defendants that

---

[47] Agence France Presse English Wire, _Sweden Opens Criminal Probe Into Ericsson Iraq Graft_ (Apr. 20, 2022).

[48] National Iraqi News Agency, _Sweden Opens an Investigation Into Possible Corruption Crimes for Ericsson in Iraq_ (Apr. 21, 2022).

[49] Maggie Michael, _US Securities Regulator Opens Probe into Ericsson's Conduct in Iraq_, Int'l Consortium of Investigative Journalists (June 9, 2022), https://tinyurl.com/cce5atpr.

> have multiple violations of the FCPA or violated deferred or non-prosecution
> agreements. … DOJ is lining up against Ericsson to bring a major enforcement
> action for violating their 2019 deferred prosecution agreement by failing to
> disclose bribery conduct in Iraq involving illegal payments to ISIS. Last year,
> DOJ announced that Ericsson violated its deferred prosecution agreement by
> failing to disclose deficiencies in its prior internal investigation. Specifically, DOJ
> claimed that Ericsson failed to provide certain documents and factual information
> about bribery conduct. The alleged violations focus on Ericsson's conduct in Iraq.
> … In March 2021, DOJ alerted Ericsson of its multiple breaches of its settlement
> agreements for failing to disclose to the government that it paid bribes to ISIS to
> gain access to transport routes in Iraq.[50]

523.   Even Defendants' admissions did not go nearly as far enough:  Defendants

fatuously implied that it was some mystery where their illicit payments went, when Defendants

were well aware that the only plausible explanation was that Defendants' intermediaries paid al-

Qaeda, al-Qaeda-in-Iraq, and Islamic State on Defendants' behalf.

**B.      Defendants Knew They Operated In A Hyper-Corrupt Environment In
Which Corporations Commonly Made Protection Payments To Terrorists**

524.   Defendants knew they operated in an Iraqi business environment that posed

extreme terrorist finance risks because Iraq was hyper-corrupt and Western companies there –

and their regional and local partners, consultants, and contractors – routinely made protection

payments as the cost of doing business. These conditions were always obvious to Defendants.

525.   Defendants knew that the facts throughout this section, *infra* IV.B, applied with

equal force to business transactions made throughout Iraq, including in northern Iraq (including

Mosul and Erbil), central Iraq (including Baghdad), and western Iraq (including Anbar).

526.   LM Ericsson and Ericsson Inc. are sophisticated companies that specialize in

performing work in high-risk countries like Iraq.  Given their integrated business model in which

the latter serves as a division of the former, and the contractual role they undertook to monitor

---

[50] Michael Volkov, *SEC Joins DOJ in Probe of Ericsson ISIS Bribery Payments*, Corruption,
Crime & Compliance (June 15, 2022), 2022 WLNR 18715111.

the local security environment, Defendants each monitored open-source reporting on the risks of operating in Iraq, Syria, and other risky environments in which they operated. As part of those efforts, Defendants' standard practice would have been to conduct basic research on the local market and the mechanics of local subcontracting. Even cursory research of that nature would have uncovered the reports and statements alleged in this Section IV, or other similar reports.

527.    On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations below, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Defendants officers, employees, and agents in the United States, Sweden, and Iraq, Defendants' corporate security departments in all three countries, and Defendants' in-house sales, legal, and compliance teams, all of whom would have regularly received the reports, or similar ones, referenced herein.

528.    Defendants' management, and their compliance, legal, and corporate security departments, also subscribed to intelligence reporting services that further alerted them to the link between their corrupt contracting practices and terrorist finance. For example, Strategic Forecasting Inc., popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world. Stratfor regularly reported on protection payments in Iraq, including by directly emailing Defendants copies of media reports.

529.    On information and belief, based on purported Stratfor subscription lists (as published online), one or more executives, employees, or agents of Defendant LM Ericsson, and one or executives, employees, or agents of Defendant Ericsson Inc. had access to Stratfor's intelligence services when those messages were transmitted. The recipient list included at least five (5) employees of Defendants who regularly received the type of updates alleged above.

155

### 1.   Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt

530.   From 2000 through 2022, LM Ericsson's and Ericsson Inc.'s senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that Iraq was a hyper-corrupt business environment in which payoffs were routine and it was unusual for a major transaction to move forward *without* an illicit payment.

531.   **United States government reports**, including those by the Department of Defense ("DOD"), Special Inspector General for Iraq Reconstruction (or "SIGIR"), and Lead Inspector General for Operation Inherent Resolve (or "LIGOIR") alerted Defendants that they operated in a hyper-corrupt environment in which the risk of financial crime was extreme.[51]

---

[51] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Oct. 30, 2005) ("Corruption was endemic in the prior regime, and its legacy of corruption still burdens the country."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 21 (Dec. 2006) ("[C]orruption is rampant."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 4, 129 (Jan. 30, 2007) ("Corruption continues to plague Iraq. … Corruption continues to limit the ability … to manage reconstruction efforts and key areas of economic policy. …  Transparency International ranks Iraq 161st of 163 countries measured."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 5, 99 (Apr. 30, 2007) ("SIGIR has repeatedly observed that corruption is a significant impediment … funds have been subject to improper diversion. … Because of the deteriorating security …, sectarian political climate, and outdated laws, anticorruption experts believe that opportunities for corruption have increased."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 147 (Apr. 30, 2008) ("[T]he World Bank listed Iraq as … lacking corruption controls."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2008 Report to Congress*, at 5 (Jan. 9, 2009) ("Corruption in Iraq remains a significant problem."); Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Jan. 30, 2009) ("[General Raymond Odierno:] Corruption is still a huge problem across the board … [that] will take quite a long time to solve it. … [C]orruption is worse now in Iraq than it has been since the 2003 invasion.") (quoting, inter alia, General Ray Odierno, Commander of U.S. Forces – Iraq); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at 11 (Jan. 29, 2010) ("One of Iraq's primary economic challenges going forward is … endemic corruption … [that] increased risk to both the investment capital and the business model.").

532.    **Terrorism scholars** also routinely reported that corruption in Iraq was endemic and impacted the specific areas in which LM Ericsson conducted business.  On July 1, 2009, for example, the U.S. Army War College published *Criminals, Militias, and Insurgents: Organized Crime in Iraq*, an extensive analysis of the nexus between corruption and terrorist finance in Iraq that was authored by terrorist finance scholar Dr. Phil Williams,[52] which reported that:

a.    "The legacy of Saddam Hussein, the debilitating consequences of sanctions, … and the rise of anomic conditions after [2003], perpetuated a culture of corruption."[53]

b.    "[T]he U.S. presence brought with it a massive injection of cash for reconstruction, much of which was handled … ad hoc … with little oversight. The reconstruction program provided enormous opportunities for corporate malfeasance on the U.S. side. … The result was that Iraq rapidly metamorphosed into one of the most corrupt countries in the world. According to Transparency International's Corruption Perceptions Index for 2007, Iraq was ranked number 178, below Haiti, and above only Somalia and Myanmar."[54]

c.    "[C]orruption in Iraq is both pervasive and endemic [and] … corruption is both top down and bottom up, coming from within government and from outside. It is both a political and economic condition on the one side, and an instrument of criminal organizations, militias, insurgents, and terrorists and their sympathizers and associates on the other."[55]

d.    "The various forms of corruption in Iraq … [includes] criminal corruption. Critically, corruption is not only a condition characterizing governments and bureaucracies but also an instrument used by criminal organizations to advance their illicit business interests and protect the illicit markets in which they operate. The use of corruption as an instrument, of course, is much easier where direct and factional corruption is endemic."[56]

---

[52] Dr. Phil Williams, *Criminals, Militias, and Insurgents: Organized Crime in Iraq* (U.S. Army War College July 1, 2009), https://tinyurl.com/5yab72a8. In the Forward, Douglas C. Lovelace, Jr., explained that, given "the vulnerability of conflict and post-conflict situations to organized crime" and the inextricable linkage between such crime and terrorism in Iraq, Afghanistan, and other conflict areas, protecting Americans in such places "require[d]" "a holistic … strategy in which security, development, and the rule of law complement[ed] one another."  *Id*. at vii.

[53] *Id*. at 199.

[54] *Id*. at 199-200. Of course, Iraq was near the top of the corruption meter even before the 2003 invasion.  For example, the Oil-for-Food scandal was the largest collective FCPA scandal of all time.  But after 2003, Iraq regularly occupied one of the top-3 slots.

[55] *Id*. at 207.

[56] *Id*. at 208-09.

533.     In 2010, the National Defense University publication, *Prism*, published another

analysis by Dr. Williams concerning the nexus between organized crime and terrorism in Iraq.[57]

Dr. Williams reported, among other things, that:

**a.**     "The development of a 'political-criminal nexus' [in Iraq] mirrored that in many other
parts of the world … [and] undermined U.S. interests [in Iraq.]"[58]

**b.**     "[T]he injection of large amounts of money for economic reconstruction without
adequate control or oversight and no plan for effective disbursement exacerbated both
crime and corruption [in Iraq]."[59]

**c.**     "Reconstruction moneys tempted … U.S. corporations and contractors [to engage in
corruption]—many of which performed abysmally in terms of task completion.
Reconstruction was vital but its implementation, in spite of all the efforts of the [SIGIR],
facilitated and encouraged the growth of corruption and organized crime."[60]

534.     **Media reports** regularly alerted Defendants that Iraq was endemically corrupt

and large deals there usually involved big payoffs.[61]  Indeed, reports routinely alerted

---

[57] Dr. Phil Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future
Contingencies*, Prism, Vol. 1, No. 2, Published by Institute for National Strategic Security,
National Defense University (2010), https://tinyurl.com/4f6x8nra.

[58] *Id*. at 61.

[59] *Id*.

[60] *Id*.

[61] *E.g.*, Rod Nordland and Michael Hirsh, *The $87 Billion Money Pit; It's The Boldest
Reconstruction Project Since The Marshall Plan. And We Cannot Afford To Fail. But Where Are
The Billions Really Going?*, Newsweek (Nov. 3, 2003) (cover story) ("American companies are
barred by law from paying bribes … abroad. But Iraq is still largely a lawless place. And one
company director for a British firm … in Baghdad says that makes all the difference. 'I've never
seen corruption like this by expatriate businessmen. It's like a feeding frenzy,' he says. … One
prominent Iraqi businessman said he was told he'd have to raise his bid by $750,000 to get a
major contract, so long as he kicked back that amount to the contractor's rep. … *Newsweek*
witnessed such behavior directly: An Iraqi-Anglo joint venture did a relatively small job in the
magazine's Baghdad bureau. When a final price had been agreed, the company's Iraqi manager
said, 'Shall we add a commission of 10 percent?' Commission? 'Well, you would keep that of
course,' he said. In other words, a kickback. When *Newsweek* declined, he said, 'You're the first
one who didn't want a commission.'"), 2003 WLNR 3489142; John Heilprin, *Army Probes
Wide-Ranging Contractor Fraud*, Associated Press, *republished in* Intelligencer (Jan. 28, 2007)
("From high-dollar fraud to conspiracy to bribery and bid rigging, Army investigators have
opened up to 50 criminal probes involving battlefield contractors in the war in Iraq and the U.S.

Defendants that Iraq's telecommunications sector was endemically corrupt throughout both the

Saddam and post-Saddam eras.  In 2004, for example, a *Washington Times* article concerning

telecoms companies operated in Iraq reported, among other things, that:

a.    The Iraqi government "is investigating whether illegal payoffs were made to secure cell
      phone contracts …, said [L. Paul] Bremer [former head of the CPA]."

b.    "Mr. Bremer ordered the cell phone contract investigation after receiving a memorandum
      [] from John A. Shaw, the [D]eputy [U]ndersecretary of [D]efense for [I]nternational
      [T]echnology [S]ecurity, who said the contracts should be revoked because of fraud."

c.    "Mr. Shaw states in a June 14 memorandum to [Mr. Bremer] that an investigation by his
      office had uncovered 'fraud on the Ministry of Communications by Orascom, Atheer and
      AsiaCell,' three companies that … won cell phone licenses for three regions of Iraq."

d.    "A [U.S. government] report … states that … bribes [were used] to secure cell phone
      contracts worth $500 million. … [A U.S. government] report states that payments were
      made to two Iraqi officials, two British contractors and two American officials as part of
      the fix.  Pentagon investigators have said bribes of up to $11.5 million were paid to Iraqis
      and other foreign nationals to win the contracts for the three companies …"

e.    "Mr. Bremer said corruption remains a major problem in Iraq[:]  … '[C]orruption in the
      Iraqi system … [is] a serious problem… [a]nd institutionalized.'"

f.    "Mr. Bremer … also said the U.N. [O]il-for-[F]ood program was corrupt 'throughout.'
      Contracts for that program, which was designed to provide humanitarian goods to
      Saddam's regime, included 10 percent to 19 percent 'kickers' that were payoffs."[62]

      535.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and

others published other reports, studies, statements, and maps that alerted Defendants as to the

hyper-corrupt nature of the Iraqi business environment in which they did business.

---

fight against terrorism…"), 2007 WLNR 2014425; Dave Zweifel (Editor Emeritus of *The
Capital Times*), Editorial, *War Profiteers Work Their Schemes In Iraq*, Capital Times (Mar. 10,
2008) ("American corporations have long taken advantage of the nation's taxpayers in a time of
war, and the war that our country is fighting in Iraq is no exception. … [The] *Chicago Tribune*
outlined just how pervasive war profiteering is … [today] in [Iraq] …To put it mildly,
[]contractors don't give the U.S. and its taxpayers discounts … War is a good time to make
money and that's exactly what military contractors do.  … There's gold in them thar
battlefields."), 2008 WLNR 4748217.

[62]  Bill Gertz, *Iraq Probing Cell Phone Deals Reported Payoffs By Saddam Ally Under Scrutiny*,
Washington Times (July 8, 2004), 2004 WLNR 812238.

### 2. Defendants Knew Corruption In Iraq Was Inextricably Connected To Terroristic Violence

536. Defendants knew that their corrupt payments in Iraq foreseeably aided terrorists. From 2000 through 2022, LM Ericsson's and Ericsson Inc.'s senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that corruption in Iraq, like that which Defendants practiced as a matter of strategy, was always inextricably linked to terrorist violence given the unique features of the Iraqi business, political, and terrorist context.

537. **United States government reports** alerted Defendants that corrupt practices in Iraq foreseeably aided terrorists there. On August 10, 2006, for example, President George W. Bush publicly observed that, "corruption" "impedes our efforts to" "combat" anti-American "terrorism."[63] Similar reports repeatedly alerted Defendants.[64]

---

[63] President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006).

[64] *E.g.*, President George W. Bush, Proclamation No. 7750, 69 Fed. Reg. 2287 (Jan. 14, 2004) ("I have determined that … persons who have committed, participated in, or are beneficiaries of corruption in … [foreseeably risked] serious adverse effects on … the security of the United States against … terrorism."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 7 (Apr. 30, 2006) ("Corruption is another form of insurgency in Iraq."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, November 2006 Report to Congress*, at 5 (Nov. 30, 2006) ("Iraq … must effectively deal with militias … However, a range of … factions that pursue their own interests through the use of … extortion, bribery, and corruption is threatening accomplishment of these actions."); Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at Introduction, 9 (July 30, 2007) ("SIGIR views" "the endemic corruption" "in Iraq" "as a 'second insurgency.'" "According to the U.S. Embassy's Anti-Corruption Strategy, the endemic corruption problem in Iraq … funds illegal actors and activities, including terrorism[.]"); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2008 Report to Congress*, at 6 (Mar. 7, 2008) ("Corruption, in the form of extortion, theft and bribery, is rampant in parts of the [Government of Iraq] and business sector. Corruption in the … transport industries is [] linked to the financing of extremists."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 32 (Apr. 30, 2008); The White House, *National Security Strategy* 38, 49 (May 2010) ("[P]ervasive corruption is a …severe impediment to development and global security. … Transnational criminal threats …  cross borders[,]… subverting government institutions through corruption and harming

538.     **Media reports** and **terrorism scholars** also routinely reported that corruption in Iraq was inextricably linked to terrorist violence.  In 2009, for example, Dr. Williams' study published by the U.S. Army War College reported that "[c]orruption in Iraq also often leads to or entails violence, which is not always characteristic of corruption elsewhere."[65]  Indeed, "[c]orruption in Iraq is [] closely related to violence: both are instruments of criminal organizations and are typically used by these organizations as part of their risk management strategies."[66]  As a result, according to Dr. Williams, "corruption, organized crime, and insurgent and militia violence become difficult to disentangle analytically, let alone physically disrupt. One American official averred that 'corruption funds the insurgency, so there you have a very real threat to the new state.'"[67]  In 2010, likewise, Dr. Williams reported that "[c]orruption in Iraq was [] integrally related to violence."[68]  In 2014, similarly, *Thomson Reuters* published an analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez regarding the nexus between Iraqi

---

[American] citizens worldwide. … The crime-terror nexus is a serious concern as terrorists use criminal networks for logistical support and funding."); U.S. Dep't of Justice and Securities and Exchange Commission, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 2-3 (Nov. 14, 2012) ("The Costs of Corruption … [C]orruption [] undercuts good governance and impedes U.S. efforts to… combat … terrorism across the globe."); U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 26-27 (Aug. 24, 2015) ("The U.S. government has observed that numerous terrorist organizations worldwide engage in criminal activity to fund their organizations and operations. Globally, [al-Qaeda], [Islamic State], [and] the Haqqani Network …, for example, are known to be financed … by proceeds derived from … extortion. … [B]oth criminal organizations and terrorist groups continue to develop international networks and establish alliances. … [L]ooking forward, … the risk that [terrorist groups] will collaborate with [] criminal organizations increases. Collaboration can serve as a force multiplier for both criminal and terrorist groups, bolstering their capabilities, strengthening their infrastructure, and increasing their wealth.").

[65] Dr. Williams, *Criminals, Militias, and Insurgents*, *supra*, at 208.

[66] *Id*. at 210.

[67] *Id*. at 211.

[68] Dr. Williams, *Organized Crime in Iraq*, *supra*, at 48-49.

corruption and Islamic State violence and the "convergence between commodities and terrorism":

> [a] common feature in many conflict zones is the weakening of the society's value system. Any kind of person is involved in every kind of business. This generalized break down of values is particularly true for the territory controlled by the Islamic State. For nearly thirty years people in the region have been involved in various forms of black market and smuggling activities, first to get around the dictatorships in the region, then to circumvent the Oil-For-Food program in the 90s, and today to ensure funding of the Islamic State.[69]

539.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that corruption in Iraq was inextricably tied to terroristic violence.

### 3.    Defendants Knew They Did Business In Geographies That Were Insecure And Targeted By Terrorists

540.    From 2000 through 2022, LM Ericsson's and Ericsson Inc.'s senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that their Iraq-related business required transactions in Iraq, and transportation through, Iraqi, Turkish, and Syrian routes that were specifically targeted by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

541.    Defendants also knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State targeted companies and individuals associated with the United States specifically because they wanted to be paid: (a) larger amounts of protection money; and (b) in U.S. dollars, which was the currency of choice for every FTO in Iraq and Afghanistan.

542.    **United States government reports and statements** alerted Defendants that their Iraqi business was conducted in an insecure environment and that their transportation and

---

[69] Jean-Charles Brisard and Damien Martinez, *Islamic State: The Economy-Based Terrorist Funding*, at 6 (Thomson Reuters Accelus Oct. 2014), https://tinyurl.com/2d26cvxx.

logistics networks were specifically at high risk for illicit payments.  In 2007, for example, the SIGIR reported that, "Security continues to pose a significant threat to reconstruction in" the "transportation and communications" "sector" "in Iraq," including "telecommunications."[70]

543.    In 2010, U.S. Army Brigadier General Jeffrey Buchanan publicly stated, that, with respect to "al Qaeda," "al Qaeda in Iraq" "remain a threat," "remain dangerous[,]" "[a]nd [al-Qaeda-in-Iraq is a] part of the [al-Qaeda] network" and thus "includes al Qaeda's ability to recruit Iraqi fighters, al Qaeda's ability to bring foreign fighters across the border into Iraq, their ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money."[71]  In that context, BG Buchanan observed that "al Qaeda continues to change its tactics and how it adapts" and "[b]ecause [al-Qaeda's and al-Qaeda-in-Iraq's] financial networks have been so degraded, they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of the country."[72]

544.    From 2004 through 2022, **U.S. government-published maps** identified threatened geographies in Iraq that overlapped with Defendants' business areas, including:

---

[70] Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 103 (July 30, 2007).

[71] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

[72] *Id.*

**Figure 1**[73]



**Figure 2**[74]



545. **Media reports** and **terrorism scholars** alerted Defendants that their business

required transportation through terrorist-controlled or contested areas. In 2007, for example, the

*Associated Press* reported that while "[t]he threat from al-Qaida … has been significantly

reduced," its allies had "established 'almost mafia-like presence' in some areas" like Baghdad

---

[73] Peter Bergen, Joseph Felter, Vahid Brown, and Jacob Shapiro, Combating Terrorism Center at West Point, Harmony Project, *Bombers, Bank Accounts, & Bleedout. Al-Qa'ida's Road In and Out of Iraq*, at 84 (2008) (emphasis in original), https://apps.dtic.mil/sti/pdfs/ADA484494.pdf.

[74] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 5 (May 6, 2017).

according to "the top U.S. commander in Iraq," "Gen. David Petraeus," who "stressed" that "al-Qaida remains a very dangerous and very lethal enemy of Iraq."[75]

546.    In 2009, similarly, Dr. Williams's report published by the U.S. Army War College also identified insecure Iraqi geographies – which overlapped with areas where Defendants conducted business – that were notoriously targeted by Sunni terrorists like al-Qaeda-in-Iraq (and later, Islamic State) for protection money payments from western corporations, and their partners, consultants, and subcontractors:

a.      "[O]rganized crime did not suddenly arise from the chaos of invasion and occupation but had deep roots in an authoritarian and corrupt state subject to international sanctions."[76]

b.      "[T]he actions of the international community in the 1990s unintentionally widened and intensified the scope of organized crime and the illicit economy. By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[77]

c.      "An additional factor" that facilitated al-Qaeda-in-Iraq's criminal terrorist finance strategies "was 'the collapse of road security,' especially in the Sunni triangle."[78]

d.      "Parasitic taxes on commerce, reconstruction, and the transportation of oil (whether it is part of the licit trade or stolen and diverted) are highly profitable."[79] "Extortionists have few, if any, start-up costs, especially if they already have a reputation for violence; payments tend to be recurring; and, in Iraq, the number of businesses which could be targeted grew as the reconstruction process gradually became more effective."[80]

e.      "In …2004, as opposition in Iraq developed into a full-blown insurgency, the occupying forces lost control of the highways. This allowed insurgents to extort money from contractors (both American and Iraqi) involved in [] reconstruction [], and from [] truck

---

[75] Associated Press, *Petraeus: Al-Qaida Presence in Baghdad Has Been 'Significantly Reduced'* (Oct. 28, 2007) (internal quotations omitted), https://tinyurl.com/hr58hszp.

[76] Williams, *Criminals, Militias, and Insurgents*, *supra*, at x.

[77] *Id*. at xi (emphasis added).

[78] *Id*. at 125.

[79] *Id*. at 159.

[80] *Id*.

drivers, whether carrying legal loads such as … reconstruction materials or engaged in theft and smuggling. For Sunni insurgents, the legality or illegality of the load was irrelevant. Indeed, they not only subjected drivers to extortion, but confiscated 'a portion of the … goods transported through the areas they control' as a tax for safe passage. One contractor noted that the insurgents would sometimes 'hijack a truck…' to illustrate their power and establish their credibility.  Gradually, however, the process became institutionalized and, as with extortion elsewhere, the threat itself was sufficient."[81]

**f.**    "[E]xtortion and skimming are [] pervasive [and] … are real moneymakers in Iraq."[82]

**g.**    "Profits were clearly extensive, enduring, and highly lucrative" to "violent actors in Iraq's post-Hussein conflict milieu."[83]

**h.**    "[M]ilitias—because they provide protection to particular segments of the population—have enormous opportunities for both extortion and black market activities. Markets in Baghdad resemble those in Moscow in the 1990s when even small market stallholders were required to make protection payments—often under the guise of ostensibly legitimate fees—in return for which they were allowed to continue selling."[84]

547.    In 2010, a National Defense University publication, *Prism*, published another analysis by Dr. Williams in which he reported, among other things, that

U.S. operational units appreciated the organized crime component … As early as July 2004, Marine commanders were acknowledging that it was difficult to overemphasize the importance of organized crime in the insurgency. . . . The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties.[85]

548.    Similar reports were published over the next decade.  In 2015, for example, Dr. Jonathan Schanzner of the Foundation for Defense of Democracies reported that the Turkish government "allowed extremists of various stripes to go in" to Iraq and Syria and "it's actually

---

[81] *Id*. at 158.

[82] *Id*. at 162.

[83] *Id*.

[84] *Id*. at 158.

[85] Williams, *Organized Crime in Iraq*, *supra*, at 55.

created a security problem on the other side of the Turkish border" in Iraq and Syria where "there is infrastructure there representing Nusra front, ISIS, other Salafi and jihadi groups."[86]

549.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that they did business in Middle Eastern geographies in which terrorists extracted protection money.

### 4.    Defendants Knew Multinational Corporations' Illicit Transactions In, Or Relating To, Iraq, Afghanistan, And Syria Were Routinely Designed To Route Protection Payments To Al-Qaeda And Islamic State Branches Operating In The Middle East

550.    From 2000 through 2022, LM Ericsson's and Ericsson Inc.'s senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that multinational corporations' illicit transactions in, or relating to, Iraq, Afghanistan, and Syria, were routinely designed to route protection payments to al-Qaeda-affiliated terrorists in geographies, like Iraq, Syria, and Afghanistan, where they posed a severe threat.

551.    **United States government reports** alerted Defendants that their illicit Iraq-related transactions foreseeably caused protection money to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  In April and August 2010, for example, DOD reported that "[d]espite" its "serious … losses, [al-Qaeda-in-Iraq] is still capable of conducting" attacks and "continues its efforts to gain funds through widespread extortion efforts."[87]

---

[86] Dr. Jonathan Schanzer (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *House Financial Services Committee hearing on Task Force to Investigate Terrorism Financing* (Apr. 22, 2015), 2015 WLNR 12099026.

[87] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to Congress*, at 34 (Apr. 29, 2010); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010).

552.    **Media reports** alerted Defendants that multinational corporations doing business in or near terrorist-contested geographies routinely facilitated protection payments to terrorists as the cost of doing business using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

a.    *St. Louis Post-Dispatch*, October 1999:  "Businessmen are still aiding bin Laden … [and] are continuing to transfer tens of millions of dollars … U.S. intelligence officials [said] the payments are 'protection money'…"[88]

b.    *Scotsman*, September 2001:  "al-Qaeda … runs an international network of up to 80 front companies in more than 50 countries … Financial backing for al-Qaeda's terrorist activities [inter alia] comes from 'protection money' …."[89]

c.    *Newsweek*, May 2008:  "Al Qaeda in Iraq is no stranger to racketeering. The group has long raised money through [criminal] activities … The group's spies also … tell Al Qaeda leaders about businesses own[ed] [by high profile persons in Iraq] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses."[90]

d.    *American Forces Press Service*, October 2009:  "[A] Mosul-based al-Qaida in Iraq cell leader … served as the former extortion ringleader for the region … [and was] suspected of extorting money from companies in Mosul.  … the [] team found and apprehended a man suspected of using extortion money to fund attacks … [who was] alleged to be closely associated with extortion network members operating in northern Iraq."[91]

e.    *Australian*, December 2010:  "[T]he Commission on Wartime Contracting said … billion[s] in U.S. funds were lost to waste and fraud in Iraq … over a decade through lax oversight of contractors, poor planning, and payoffs to … insurgents."[92]

f.    *CBS News*, August 2014:  "Much of the funding for [] Islamic State… is coming from extortion … a counterterrorism source told CBS News … primarily from citizens of European countries, including employees of corporations who quietly pay … the source

---

[88] St. Louis Post-Dispatch, *World* (Oct. 29, 1999), 1999 WLNR 931817.

[89] Ilona Amos, *Spotlight Put On Bin Laden Links With UK*, Scotsman (Sept. 17, 2001), 2001 WLNR 2379387.

[90] Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008), https://tinyurl.com/4ezvphc9.

[91] American Forces Press Service, *Iraqis Arrest Bombing Suspects in Baghdad*, Defense Department Documents (Oct. 26, 2009), 2009 WLNR 21347934.

[92] Hugh Tomlinson and Giles Whittell, *Pentagon Billions Probed; War On Terror Mired In Graft*, Australian (Dec. 29, 2010), 2010 WLNR 25535341.

told CBS News…."[93]  "A CBS News report … reveals that a Scandinavian corporation recently paid [] $70,000 … and it is this method that ISIS is gathering funds."[94]

g.  _Telegraph_, September 2016:  "Lafarge allegedly paid taxes to ISIL to protect its cement making business in Syria … [and agreed] to pay taxes to [Islamic State] in return for continuing its operations in Syria. … [LaFarge] bought the site in 2007 before beginning operations there in 2011.  _Le Monde_ reported in June that it had seen letters sent by Lafarge managers in Syria 'revealing arrangements that Lafarge made with the jihadist group to continue production until September 19, 2014.' …  [A] 'pass stamped with an ISIL stamp and endorsed by ISIL's finance chief in the Aleppo region' proves [LaFarge] had struck a deal with ISIL to allow for free circulation of its goods …'"[95]

553.    Media reports alerted Defendants that when telecommunications companies – like

Defendants – that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were

present engaged in illicit transactions, such activity routinely was intended to cause protection

payments to reach terrorists as the cost of doing business using mechanisms like that used by

Defendants in Iraq.  Such reports included, but were not limited to:

a.  _Washington Post_, November 2007:  "A good way to prepare for operations in Iraq is to watch … '_The Sopranos_,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the group 'gets a lot of money through extortion….' … The racketeering operations extended to nearly every type of business in [Mosul], including … a cellphone company, which paid the insurgents $200,000 a month."[96]

b.  _Times Record News_, August 2008:  "[T]he Taliban [] expand[ed] 'their extortion campaign, [and] demand[ed] that businesses pay 'protection money' … there were

---

[93] CBS News, _"Multiple Kidnappings For Ransom" Funding ISIS, Source Says_ (Aug. 21, 2014), https://tinyurl.com/ymv4r77v.

[94] CBS News (Washington, D.C.), _CBS News: 'Multiple Kidnappings For Ransom' Bring ISIS Funding_ (Aug. 21, 2014), https://tinyurl.com/an8v4r7b.

[95] Henry Samuel, _Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To Isil' And Environmental Concerns_, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.

[96] Amit R. Paley, _Iraqis Joining Insurgency Less for Cause Than Cash_, Wash. Post (Nov. 20, 2007).

several cell phone companies operating in [] Afghanistan, the Taliban went to the … companies and offered not only 'protection,' but damage to a competitor, for a price.' " [97]

c.  <u>Agence France Presse</u>, September 2012:  " 'Revenue extorted from nationwide enterprises such as … mobile telephone operators … goes to the Taliban Financial Commission which answers to the Taliban leadership,' said the report. . . .  'Estimates of Taliban income from contracts funded by the United States and other overseas donors range from 10 percent to 20 percent of the total, usually by the Taliban agreeing protection money with the contractor or demanding a cut.' " [98]

d.  <u>Canadian Press</u>, June 2013: "[In] Mosul and the surrounding countryside, … al-Qaida was never really routed … Michael Knights, an analyst … who closely follows regional security issues, said al-Qaida in Iraq has long generated cash from businesses … through extortion of large firms such as mobile phone companies." [99]

e.  <u>Independent</u>, October 2013:  "Al-Qa'ida is once again making ground attacks on cities like Fallujah … The same is true of … Mosul …, where ISIS is reported to levy protection money on everybody from the local green-grocer to satellite phone … companies – bringing in monthly revenue of $8m." [100]

f.  <u>Business Insider</u>, December 2015:  "ISIS … pulls in hundreds of millions of dollars from 'taxing' … those who live in the territory the group controls in Iraq and Syria.  ISIS is thought to make as much as $800 million or $900 million from residents and businessmen in its territory, American and European officials [said] … the militants have created a complex financial system to extract as much money as possible from individuals and businesses. ISIS charges import taxes, rent for businesses, fines for breaking laws, utility bills, and income tax.  … ISIS' 'Office of Resources' controls the group's … operations … [relating to] … mobile-phone companies …" [101]

554.  **Terrorism scholars** alerted Defendants that their transactions posed a severe risk

of routing protection payments to terrorists. Dr. Williams's 2009 study, for example, was

---

[97] Times Record News, *Anatomy Of Terror* (Aug. 21, 2008), 2008 WLNR 31329261.

[98] Agence France Presse, *Taliban Made $400mn In 2011 From Taxes, Extortion: UN* (Sept. 11, 2012), https://www.nation.co.ke/news/world/Taliban-made--400-mn/1068-1504748-w0sl0a/index.html.

[99] Sameer N. Yacoub and Adam Schreck, *Spreading Shakedowns and Distrust of Authorities Embolden Al-Qaida in Iraq's Restive Mosul*, Canadian Press (June 20, 2013).

[100] Patrick Cockburn, *As Syria Disintegrates, So Too Does Iraq*, Independent (Oct. 29, 2013), 2013 WLNR 27123183.

[101] Pamela Engel, *ISIS Has Found A Huge Money-Making Method That Is 'Impervious To Sanctions And Air Raids',* Business Insider (Dec. 2, 2015).

published by the U.S. Army War College and documented an extensive analysis of protection rackets operated by terrorists in Iraq – including the key role played by intermediaries in lubricating the entire protection money economy there.[102]  Dr. Williams reported, *inter alia*, that:

a.     "In an insecure environment, especially one characterized by sectarian … conflict, nonstate actors often emerge as protectors—at least of their particular sect …"[103]

b.     "As one observer notes: 'AQI in certain parts of Iraq is basically running protection rackets … and engaging in criminality.'"[104]

c.     "One businessman involved in construction noted that there were two options: 'one, they give you the contract for a price but then you have to provide your own security; the other deal is that for a certain percentage of the contract they will provide you with gunmen.'"[105] "In his last four contracts, the businessman had paid $500,000 in bribes."[106]

d.     "In [Diyala] Province in July 2007, AQI … extorted about $3,000 from a local sheikh almost in passing."[107] "Much more has probably been obtained from white collar criminals in Mosul who reportedly have also been targeted by AQI."[108]

e.     "Larger businesses are also subject to extortion and generally find it preferable to make payoffs than to incur the risks and costs associated with resistance."[109]

f.     "As one military spokesman notes, '[t]he racketeering operations extended to nearly every type of business in the city, including a Pepsi plant, cement manufacturers, and a cellphone company, which paid the insurgents $200,000 a month."[110]

g.     "For contractors and subcontractors, of course, these payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[111]

---

[102] Williams, *Criminals, Militias, and Insurgents*, *supra*.

[103] *Id*. at 147.

[104] *Id*. at 232-33.

[105] *Id*. at 160.

[106] *Id*.

[107] *Id*. at 233.

[108] *Id*.

[109] *Id*. at 158.

[110] *Id*.

[111] *Id*. at 159.

h.      "Knowing that extortion payments are required for the movement of supplies and people, contractors inflated their bids accordingly."[112]

i.      "Extortion from contractors involved in construction projects also had a debilitating impact, increasing the costs of most projects and offering opportunities for diversion of funds to insurgent groups."[113]

555.    In 2010, the National Defense University published another analysis by Dr. Williams concerning terrorist protection rackets in Iraq.[114]  Among other things, Dr. Williams reported that, with respect to "the range of criminal activities perpetrated by … political groups using crime to fund their cause":

> Extortion (and its less malevolent concomitant, protection) became pervasive. And the reconstruction efforts multiplied the opportunities. Large amounts of money for reconstruction were poured into Iraq with inadequate oversight … Iraqis were awarded contracts with protection money almost invariably built in, some of which went to … the insurgency.[115]

556.    Similarly, in 2014, *Thomson Reuters* published its analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez, which detailed Islamic State's continuation of al-Qaeda-in-Iraq's protection money operation, and warned the multinational corporations who subscribe to *Thomson Reuters* (owner of, *inter alia*, Westlaw) that illicit transactions in Iraq foresseably facilitated protection money payments to Islamic State:

a.      "In its quest to establish administrative and civil control over its conquered territory, the [Islamic State] has implemented taxes on a variety of commercial activities. In Mosul alone, [Islamic State] is believed to raise US$8 million in taxes each month. Such taxes include the following:
— a tax on all goods;
— a tax on telecommunication companies;
— a tax on cash withdrawals from bank accounts;
— a 5% tax collected for social welfare and other public purposes on all salaries;
— a road tax of US$200 in Northern Iraq;

---

[112] *Id*.

[113] *Id*. at 259.

[114] Williams, *Organized Crime in Iraq*, *supra*.

[115] *Id*. at 48-49.

—— an US$800 custom tax per truck entering Iraq …;
—— a tax on looting archeological sites (20% in Aleppo, 50% in Raqqa); and
—— a protection tax for non-Muslim communities (known as jizya)."[116]

**b.**   "In total, the extortion/tax system imposed in areas under its control in Iraq and Syria could generate as much as US$30 million per month for IS, or US$360 million a year."[117]

**c.**   "Today these methods of funding by extortion are common to many different terrorist groups across the globe. However, in the case of the Islamic State, there is a relative ingenuity in imposition of these new taxes. In the short term, Western groups already operating in the area could find themselves exposed to this pernicious funding mechanism and thereby constrained by the payment of protection money. For several years a multinational company made regular payment of protection money to the Colombian terrorist group the Revolutionary Armed Forces of Colombia [("FARC")] … in exchange for ensuring the 'security' of the company. This type of scenario could also occur in the areas held by the Islamic State."[118]

**d.**   "It is known that the Islamic State not only gets its funding from [*inter alia*, taxation], but that it has diversified from the known traditional avenues, and is using more unusual methods to generate its funds. This is the risk that the compliance community must face on a daily basis, not only dealing with a large majority of known risks (conventional terrorism financing for some countries, for certain entities)."[119]

**e.**   "The compliance community has a clear idea of the inherent risks … Various criminal cases including those linked to bribery has prompted companies … to take action and put in place measures and processes to both increase control over, and to mitigate their exposure to these risks. The emergence of the Islamic State…, and the necessity to identify its financing channels is proving to be a stress test for [] compliance teams."[120]

557.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and

others published other reports and statements that alerted Defendants that multinational

corporations' illicit transactions in, or relating to, Iraq, Afghanistan, and Syria, were routinely

designed to route protection payments to the branches of terrorist groups operating there.

---

[116] Brisard and Martinez, *supra*, at 5.

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.* at 7.

### 5.   Defendants Knew Al-Qaeda's And Islamic State's Terrorist Campaigns In Iraq And Afghanistan Were Inextricably Linked

558.   Defendants knew that al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's integrated global terrorist campaigns against the United States linked Iraq and Afghanistan.

559.   One of the central lessons that has been made abundantly clear again and again since the mid-2000s has been the close and intimate relationship between al-Qaeda and Islamic State terrorists in Iraq and Afghanistan.  Both groups, and their branches, in both countries, viewed the Iraq and Afghanistan terrorist campaigns against America as part of the same integrated effort to drive the United States out of the Middle East.

560.   United States government reports and statements alerted Defendants as to the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq, and the similarly inextricable connection between Islamic State "core" in Iraq and Syria and Islamic State's "branch" in Afghanistan.  For starters, U.S. military documents confirmed the vital nature of the Iraq/Afghanistan linkage.  For example, according to a declassified report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies": "[r]eflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

561.   The cornerstones of U.S. counterterrorism policy, as reported by the State Department, included the recognitions that:  (i) "[a]l-Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and

other associates throughout the Middle East, Southeast Asia, Africa, and Europe who continue working to carry out future attacks against U.S. interests."[121]

562.    Consensus intelligence assessments prepared by the U.S. government known as National Intelligence Estimates (each, an "NIE") also confirmed the intimate relationship between al-Qaeda and its most important subsidiary, al-Qaeda-in-Iraq.  In 2006, for example, a published NIE concerning al-Qaeda and al-Qaeda-in-Iraq determined, among other things, that:

a.    "Al-Qa'ida, now merged with Abu Mus'ab al-Zarqawi's network, is exploiting the situation in Iraq to attract new recruits and donors and to maintain its leadership role."

b.    "Bin Ladin, [] al-Zawahiri, and al-Zarqawi," were "particularly" "key [al-Qaeda] leaders," whose loss "in rapid succession, probably would cause [AQ] to fracture…"

c.    "[T]he Iraq jihad is shaping a new generation of terrorist leaders and operatives; perceived jihadist success there would inspire more fighters to continue the struggle elsewhere. The Iraq conflict has become the 'cause celebre' for jihadists, … cultivating supporters for the global jihadist movement."

d.    "Zarqawi … could broaden his popular appeal and present a global threat. The increased role of Iraqis in managing the operations of al-Qaida in Iraq might lead veteran foreign jihadists to focus their efforts on external operations."

563.    In 2007, the United States published another NIE that assessed, *inter alia*:

a.    "Al-Qa'ida is and will remain the most serious terrorist threat …, as its central leadership continues to plan high-impact plots, while pushing others in extremist Sunni communities to mimic its efforts and to supplement its capabilities. We assess the group has protected or regenerated key elements … including: a safehaven in the Pakistan Federally Administered Tribal Areas (FATA), operational lieutenants, and its top leadership."

b.    "[A]l-Qa'ida will continue to enhance its capabilities … through greater cooperation with regional terrorist groups. Of note, we assess that al-Qa'ida will [] seek to leverage the contacts and capabilities of al-Qa'ida in Iraq [], its most visible and capable affiliate …"

---

[121] U.S. Dep't of State, *Country Reports on Terrorism 2005* at 218 (Apr. 2006); *see also* U.S. Dep't of State, *Country Reports on Terrorism 2006* at 270 (Apr. 2007) (same); *U.S. Dep't of State, Country Reports on Terrorism 2007* at 299 (Apr. 2008) (same); U.S. Dep't of State, *Country Reports on Terrorism 2008* at 318 (Apr. 2009) (same); U.S. Dep't of State, *Country Reports on Terrorism 2009* at 275 (Aug. 2010) (same).

**c.**   "[I]ts association with AQI helps al-Qa'ida to energize the broader Sunni extremist community, raise resources, and to recruit and indoctrinate operatives…."

564.   The United Nations' al-Qaeda/Taliban/Islamic State experts[122] concur.  For example, the U.N. Security Council's al-Qaeda sanctions monitoring team reported in 2006, among other things, that "[t]he Taliban have also continued to benefit from a close relationship with Al-Qaida and related foreign groups."

565.   Al-Qaeda's leadership agreed.  From 2003 through 2022, al-Qaeda's and al-Qaeda-in-Iraq's leaderships (and later Islamic State's leadership) viewed Iraq and Afghanistan as a single linked campaign against the "Crusaders," i.e., the United States.  Such FTOs' approach obliterated geographic boundaries with respect to their operations in these two countries – facilitated throughout by Iran's IRGC, which permitted al-Qaeda and its branches to operate a landbridge connecting Iraq and Afghanistan through Iran.

566.   From 2001 through his end in 2011, Osama bin Laden's public statements regularly confirmed al-Qaeda's and al-Qaeda-in-Iraq's view that attacks against Americans in Iraq and Afghanistan were part of the same terrorist campaign.

567.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State inextricably linked their campaigns in Iraq and Afghanistan together.

**C.   Defendants Knew Their Illicit Iraqi Transactions Caused Protection Money To Flow To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**

568.   Defendants knew that they were supplying funding to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were intent on attacking Americans in Iraq, Syria, and

---

[122] Reflecting their common heritage, for most of the relevant period, the same or substantially related United Nations sanctions regime governed al-Qaeda, the Taliban (including its Haqqani Network), al-Qaeda-in-Iraq, Jabhat al-Nusra, and Islamic State.

Afghanistan.  Defendants knew they engaged in corrupt practices of funneling their illicit payments through partners, consultants, and contractors, *infra* IV.C.1, slush funds, *infra* IV.C.2, and deliberately deficient internal controls, *infra* IV.C.3 , only heightens Defendants' culpability. Defendants intentionally used the contracting process to insulate themselves from the illicit payments on paper, but that process – offloading responsibility to local partners, consultants, and contractors several layers removed – was simply their technique for encouraging the payments while avoiding responsibility.  The protection payments may often have been physically delivered by an intermediary, but Defendants knew they were occurring and purposefully orchestrated them.  That is because Defendants could only obtain their desired business outcome by ensuring that their money actually reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Had Defendants' partners, consultants, and contractors spent the money on some other, legitimate purpose, rather than directing it to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants would not have obtained the security benefit they wanted.

569.    From 2004 through 2022, LM Ericsson's and Ericsson Inc.'s senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that Defendants' illicit transactions in Iraq foreseeably caused protection money to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Plaintiffs' allegations exclusively concern LM Ericsson's and Ericsson Inc.'s understanding of the foreseeable counterterrorist finance risks posed by Defendants' ***illicit*** Iraq-related transactions. Plaintiffs do not allege that LM Ericsson and Ericsson Inc. knew their Iraq-related conduct foreseeably aided terrorists targeting the United States from 2004 through 2022 merely because Defendants did business in Iraq during this time.  Instead, Plaintiffs' allegations

in this Part IV focus on LM Ericsson's and Ericsson Inc.'s knowledge that **illicit** Iraq-related transactions throughout this period foreseeably aided terrorists.

570.    Defendants knew their illicit Iraq-related transactions facilitated protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

571.    From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that illicit transactions pursued by Western corporate and contracting parties were typically designed for the purpose of causing U.S. dollars to flow to terrorists in Iraq, including al-Qaeda and al-Qaeda-in-Iraq (from 2004 through 2014) and Islamic State (from 2014 through 2021), in the form of protection money routed through transactions that were usually plainly illicit on their face.  Because al-Qaeda, al-Qaeda-in-Iraq, and Islamic State always openly demanded the money – and because local agents usually paid it through relatively straightforward, albeit highly illegal, means – western companies on the ground in Iraq were widely aware of the practice.  Defendants were sophisticated companies with billions of dollars in revenues on the line in Iraq.  They knew this prevailing understanding that their illicit Iraq-related transactions were foreseeably flowing to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

572.    Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's own public statements alerted Defendants that their illicit Iraq-related transactions would be used to facilitate murderous attacks on Americans. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State openly proclaimed that the protection money was for terrorism.  The demands for payments, which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State themselves tied to the insurgency, alerted Defendants to the connection between the payments and terrorist violence.

573.     Defendants' illicit transactions were also the fruits of Defendants' negotiation of their payments in circumstances that left no doubt about whom they were financing.  With respect to the large-scale payments negotiated directly with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, LM Ericsson and Ericsson Inc. (or their agents) met with high-level representatives acting on behalf of such group who openly represented their respective Financial Commissions (each maintained one).  The payments to local al-Qaeda, al-Qaeda-in-Iraq, and Islamic State regional cell leaders likewise occurred via negotiations with cell leaders who openly identified as al-Qaeda, al-Qaeda-in-Iraq, and Islamic State members.  Given the al-Qaeda- and Islamic State-controlled or contested geographies in which Defendants operated, Defendants assuredly knew that the intermediaries they were paying off through their illicit Iraqi transactions worked for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

574.     Al-Qaeda and Islamic State memorialized their respective protection rackets (al-Qaeda, through AQI, from 2004 through 2014, Islamic State from 2014 through 2021) in documents that further notified Defendants that they were financing terrorists.  Most prominently, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State often conveyed their demands for protection payments in so-called "Night Letters."  Night Letters – whose name comes from their frequent delivery during the night – were documents on official al-Qaeda, al-Qaeda-in-Iraq, or Islamic State letterhead bearing the respective group's insignia.  Although Night Letters could convey a variety of threats, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commonly sent them to companies to demand protection payments.  Night Letters were a staple of the terrorist playbook, widespread in Iraq, particularly in areas of al-Qaeda or Islamic State control, and were one of the principal means through which al-Qaeda and Islamic State communicated their demands for protection money to companies, including Defendants.

575.    Similarly, after effecting the illicit transactions that routed protection payments, companies regularly received so-called "tax receipts" from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, providing them with documentation proving they had paid their dues to the terrorists.  For example, Islamic State's Financial Commission, following the al-Qaeda playbook, encouraged the provision of tax receipts as a way of further standardizing and accounting for the revenue raised through their protection rackets – the largest in world history at the time.  And those tax receipts – like the Night Letters – appeared on Islamic State letterhead and made clear on their face that protection money was intended for Islamic State's benefit.  On information and belief, Defendants or their agents received Night Letters and tax receipts from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in connection with their projects in Iraq.

576.    Defendants did not believe – nor was it true – that their protection payments were necessary for them to avoid imminent death or serious bodily injury.  After 2004, al-Qaeda and Islamic State typically did not extract protection payments by physically confronting companies and threatening immediate violence; rather, the threats were often vaguer and futuristic – as in the protection letters described in this complaint.  Many times, those threats were directed at Defendants' equipment or projects, rather than their personnel.  Given the non-immediate nature of the threats, Defendants could notify the U.S. government of al-Qaeda's and Islamic State's protection rackets and try to enlist the military's aid in responding.  But rather than avail themselves of such options, Defendants decided that the simplest (and most profitable) option was to pursue the illicit transactions necessary to make the payments al-Qaeda, al-Qaeda-in-Iraq, and Islamic State demanded.

577.    Indeed, Defendants knew that their large, regular protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State strengthened such FTOs' racketeering enterprise

both through funding its operation, and by generally causing dramatic inflation in the prices –
and associated terrorist finance extracted by the FTOs – attendant to the illicit economy in Iraq.
As a result, Defendants' large-scale protection money payments had a snowball effect for the
terrorists, by raising the price of the economic activity generally. Ericsson's conduct therefore
perversely made it so that only large multi-national corporations could consistently secure
reliable protection money arrangements with these FTOs, because for everyone else, the prices
were often too high due to the inflation caused by Defendants. Thus, Defendants knew that their
conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire
protection money racket while simultaneously (b) causing dramatic price inflation, pricing out
people at the lower end of the new illicit economy Defendants helped birth and sustain.

578.   Although Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and
Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal
nexus was not limited to such FCPA violations. Whether or not Defendants technically violated
the FCPA, or their contractual obligations to their U.S. and Iraqi customers, their transactions
with an intermediary with the specific intent of routing protection money directly to terrorist
groups targeting the United States – which intermediaries flowed through Defendants' resources
to their intended terrorist recipients – supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with
U.S. dollars, sourced from the U.S. transactions processed by U.S. banks in the U.S., and
valuable U.S. free goods, including valuable American high-tech communications technologies
that provided encrypted communication and doubled as cash-equivalents in Iraq, like the iPads
that LM Ericsson regularly sourced from the United States and used as cash equivalents in its
corrupt transactions in the Middle East, which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used
to fund attacks against Americans in Iraq, Afghanistan, and Syria.

579.    While each of the above items on its own alerted Defendants, specific aspects of their illicit transactions and corrupt business practices also further alerted them that they were facilitating the flow of protection payments to terrorists, including, but not limited to, Defendants' corrupt payments in Iraq involving: (1) illicit transactions with strategic partners, consultants, and contractors; (2) slush funds; and (3) intentionally deficient internal controls.

### 1.    Defendants Knew Their Illicit Transactions With Iraq-Related Intermediaries Caused Protection Payments To Flow To Terrorists

580.    Defendants knew, and intended, that their illicit transactions with their partners, consultants, and contractors were designed to, and were, for facilitating protection payments through such intermediaries on behalf of Defendants.

581.    Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-described partners (like Asiacell), consultants (like al-Awsat), and security, transportation, and logistics contractors (like SLS and Cargo Iraq) was a tactic to conceal Defendants' regular protection payments to terrorists.

582.    Defendants knew their illicit transactions with intermediaries facilitated protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

583.    Defendants knew that the excessive fees they illicitly routed to their intermediary partners, consultants, and contractors were red flags for unlawful payments.[123]

---

[123] *See*, *e.g.*, DOJ & SEC, *supra*, at 22 (Nov. 14, 2012) ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

584.    Defendants knew that their inability to document the services provided by their intermediary partners, consultants, and contractors was a red flag that such intermediaries were passing value along to another, i.e., the terrorists.[124]

585.    Defendants knew that a substantial percentage of corrupt value they helped flow to their intermediaries reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For example, as one Iraqi company officer publicly explained in 2007, the "contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage" – so that of every $1 million he received, $500,000 was flowed through to the FTOs.[125]

586.    **United States federal criminal prosecutions** alerted Defendants that their illicit transactions through their intermediaries facilitated protection payments to terrorists. On March 19, 2007, Chiquita Brands International, Inc. ("Chiquita"), a multinational banana supplier, pleaded guilty in this District to having provided material support to the United Self-Defense Forces of Colombia ("AUC") in Colombia.[126] Chiquita had routed protection payments to the

---

[124] *Id*. at 60 ("DOJ's and SEC's FCPA enforcement actions demonstrate that third parties, including agents, consultants, and distributors, are commonly used to conceal the payment of bribes … in international business transactions. Risk-based due diligence is particularly important with third parties … some guiding principles always apply. First, … companies should understand the qualifications and associations of its third-party partners … The degree of scrutiny should increase as red flags surface. Second, companies should have an understanding of the business rationale for including the third party in the transaction … [and] should understand the role of and need for the third party and ensure that the contract terms specifically describe the services to be performed [and] … payment terms … Moreover, companies may want to confirm and document that the third party is actually performing the work for which it is being paid and that its compensation is commensurate with the work being provided. Third, companies should undertake some form of ongoing monitoring of third-party relationships.").

[125] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

[126] *See* Plea Agreement, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. filed Mar. 19, 2007), Dkt. 11.

AUC – then designated as a Specially Designated Global Terrorist – "through various intermediaries," and had falsely accounted for them as "security payments."[127]  Chiquita later argued that it paid AUC protection money "under threat of violence," but DOJ responded that the "payments were illegal and could not continue."[128]  It thus charged Chiquita with (and Chiquita pleaded to) the federal crime of transacting with a Specially Designated Global Terrorist.[129]  In so doing, Chiquita admitted that "[f]or several years Chiquita paid [an FTO] by check through various intermediaries[,]" it "recorded these payments in its corporate books and records as 'security payments' or payments for 'security' or 'security services' and it "never received any actual security services in exchange for the payments."[130]

587.    In DOJ's 2007 press release announcing Chiquita's criminal plea deal, an Assistant Attorney General declared: "Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations. . . . Thanks to … this prosecution, that funding stream is now dry and corporations are on notice that they cannot make protection payments to terrorists."[131]  The U.S. Attorney for this District further warned:  "Funding a terrorist organization can never be treated as a cost of doing business. . . .  American businesses must take note that payments to terrorists are of a whole different category.  They are crimes."[132]

---

[127] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007) ("*Chiquita Brands International Pleads Guilty*").

[128] *Id.*

[129] *See* 50 U.S.C. §§ 1701, 1705; 31 C.F.R. §§ 594.201(a), 594.701(c); Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).

[130] *Chiquita Brands International Pleads Guilty.*

[131] *Id.*

[132] *Id.*

588.    On information and belief, Defendants were aware of the *Chiquita* settlement and its clear message that the U.S. government considered protection payments illegal.  The settlement received extensive scrutiny among the international business community and was the subject of recurring media coverage.  Media outlets describing the settlement included *United Press International* on March 14, 2007, the *Washington Times* on March 19, 2007, the *Associated Press* the next day, and the *Washington Post* on August 2, 2007.[133]

589.    **United States government reports** alerted Defendants that their illicit transactions through intermediaries foreseeably aided terrorists. In 2011, for example, the Final Report of the U.S. Congress' Commission on Wartime Contracting in Iraq and Afghanistan documented to Congress (and Defendants) that:

> Another significant cost of overseas-contingency contracting is diversion— payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects. … In Iraq and Afghanistan, significant … issues include: … diversion of contract funding to the insurgency … In Iraq and Afghanistan, U.S. funds have been diverted to insurgents … as a cost of doing business … While there is no official estimate of the amount of U.S. funds diverted to insurgents, it certainly comes to a significant percentage of a project's cost. … Because they directly strengthen the insurgency, diverted funds pose far more danger than other kinds of waste and have a disproportionately adverse impact on the U.S. effort.[134]

590.    The Commission on Wartime Contracting's above finding was widely reported in the media.  As the *Boston Globe* summarized, for example, "[t]he final report by the Commission on Wartime Contracting found at least $31 billion has been lost during the past decade through

---

[133] *See* United Press Int'l, *Chiquita To Pay $25M For Terrorist Payoffs* (Mar. 14, 2007); Matt Apuzzo, *Chiquita Pleads Guilty To Doing Business With Terrorists*, Assoc. Press (Mar. 20, 2007); *Chiquita Pleads To Protection Payoffs*, Wash. Times (Mar. 19, 2007); Carol D. Leonnig, *In Terrorism-Law Case, Chiquita Points to U.S.*, Wash. Post (Aug. 2, 2007).

[134] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting: Controlling Costs, Reducing Risks*, at 32, 70, 73-74 (Aug. 2011).

lax oversight of contractors, poor planning, and payoffs to … insurgents in … Iraq."[135]  The

Associated Press and others also published similar reports.[136]

591.    In 2012, DOJ and SEC jointly warned sophisticated multinational corporations,

like Ericsson, that "DOJ's and SEC's FCPA enforcement actions demonstrate that third parties,

including agents, consultants, and distributors, are commonly used to conceal [] [corrupt]

payment[s]" "in [] business transactions,"[137] and such "corruption" "impedes U.S. efforts to"

"combat … terrorism."[138]

592.    In 2018, reports publicly submitted to Congress by the Lead Inspector General for

Operation Inherent Resolve noted highlighted the extreme terrorist finance risks posed by illicit

transactions in Iraq and alerted Defendants, among other things, that:

a.    "ISIS … generate[d] income from extortion, taxation, and illicit trafficking activities,"
facilitated by "middlemen who engaged in transactions with the group."[139]

b.    "The [FBI] reported that while ISIS did not appear to have links to transnational criminal
organizations, it was involved with income-generating crimes and as a result had formed
connections with preexisting smuggling and black market networks in the region."[140]

c.    An "unstable security situation" near Syria's border with Iraq "raised the risk that
combatants might divert humanitarian assistance," and "the risks of humanitarian
assistance being diverted to armed groups … included … imposition of taxes, duties, and
fees on USAID implementers and beneficiaries; [and al-Qaeda-affiliated terrorists']

---

[135] Stephanie Ebbert, *Brown Returns From US War Zone; Reservist Trained In Afghanistan*,
Boston Globe (Sept. 2, 2011), 2011 WLNR 17388152.

[136] *See*, e.g., Richard Lardner, *AP Exclusive: Up To $60B In War Funds Said Wasted*, AP Online
(Aug. 30, 2011) ("As much as $60 billion in U.S. funds has been lost to waste and fraud in Iraq
and Afghanistan over the past decade through lax oversight of contractors, poor planning and
payoffs to warlords and insurgents, an independent panel investigating U.S. wartime spending
estimates.").

[137] DOJ & SEC, *supra*, at 60.

[138] *Id*. at 2-3.

[139] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve,
*Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018).
[140] *Id*.

control of local councils and [contractor's] camp management that assist USAID implementers identify eligible beneficiaries."[141]

593.   **European government reports** alerted Defendants that their illicit transactions with, or through, their intermediaries were foreseeably designed to route protection payments to terrorists. In 2017, for example, a report published by the European Parliament concerning Islamic State's terrorist finance strategies alerted Defendants that, with respect to the protection money operation created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, "[t]he case of the Swiss … conglomerate LafargeHolcim" was "typical of" the al-Qaeda-in-Iraq/Islamic State protection money "*modus operandi*" in geographies the terrorists controlled."[142] Lafarge's "management wanted to remain operational despite the seizure of territory by [Islamic State]" and therefore "obtained" Islamic State's "permission to pass through checkpoints in exchange for paying taxes."[143] Referring to Islamic State, Lafarge "admit[ed] that 'unacceptable' arrangements had been made to protect its cement factory" and "recognised that its local branch belonging to Lafarge 'handed funds over to third parties in order to come to an arrangement with a certain number of armed groups," "targeted by sanctions', without being able to identify their ultimate recipient."[144]

594.   The history, media, and litigation attendant to multinational corporations' illicit payments to Iraqis revealed by the the **United Nations' Oil-for-Food Program scandal** from

---

[141] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2018–September 30, 2018*, at 55 (Nov. 5, 2018).

[142] European Parliament, Directorate-General for External Policies, Policy Department, *The Financing of the 'Islamic State' in Iraq and Syria (ISIS)*, at 11 (Sept. 2017), https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as did the European Parliament, that Islamic State followed the same protection money-related tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.

[143] *Id*.

[144] *Id*.

1998 to 2003 alerted Defendants that their intermediaries were foreseeably paying protection money to terrorists on Defendants' behalf.  The Oil-for-Food scandal alerted Defendants that intermediaries often served as conduits for illicit payments in Iraq by no later than 2005, when the scandal was already a major matter subject to multiple investigations worldwide, including several by U.S. authorities.[145] Through their knowledge of the Oil-for-Food scandal, Defendants knew that the routing of programatic illicit payments to violent actors in Iraq through notorious intermediaries in Iraq, Lebanon, Syria, and Jordan was a universal feature of Iraqi society during the five years immediarely prior to the U.S. invasion in 2003.

595.    The Oil-for-Food scandal alerted Defendants that the use of sham consulting deals to route payments was a signature strategy in the Iraqi corruption economy, and that such notorious use of intermediaries to route illicit payments in Iraq under the Oil-for-Food program birthed a worldwide scandal and was, at all relevant times, the largest collective FCPA scandal in U.S. history.[146] In 2012, for example, a joint report by DOJ and SEC noted in 2012, "SEC

---

[145] *See*, *e.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 111 (Jan. 30, 2006) ("GAO, other congressional investigators, the Defense Intelligence Agency Iraq Survey Group, and others have reported that Iraq gained billions in illicit revenues through smuggling and corruption [under the U.N. Oil-for-Food program]."); Stuart W. Bowen, Jr., Special Inspector General for Iraq Reconstruction, *Hard Lessons: The Iraq Reconstruction Experience*, at 6 (Feb. 2, 2009) ("[B]eneath the sanctions and authorized oil sales, an illicit economy flourished [under Oil-for-Food]. Institutionalized corruption infected both the government and the supporting UN programs, spawning powerful criminal elements within Iraq.").

[146] Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505 (D.D.C. Aug. 23, 2007), ECF No. 1; Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862 (D.D.C. May 11, 2009), ECF No. 1; Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448 (D.D.C. Mar. 17, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Daimler AG*, No. 10-cv-00473 (D.D.C. Mar. 22, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258 (D.D.C. July 27, 2010), ECF No. 1; Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648 (D.D.C. Sept. 29, 2010), ECF No. 1; Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686 (D.D.C. Apr. 8, 2011), ECF No. 1; Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, No. 11-cr-00099-RBW (D.D.C. Apr. 8, 2011), ECF No. 1-1; Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733 (S.D. Tex. Nov. 26, 2013), ECF No. 4.

charged [a] former CEO … for his role in schemes to bribe Iraqi[s] … in connection with the United Nations Oil-For-Food Programme and to bribe Iraqi[s] … to purchase the company's fuel additives," for which "the company used false invoices and sham consulting contracts to support large bribes that were passed on to foreign officials through an agent, and the bribes were mischaracterized as legitimate commissions and travel fees in the company's books and records."[147]

596.   The Oil-for-Food scandal alerted Defendants to the prominent role that universal taxes or kickbacks played in illicit Iraqi dealings because Defendants knew that Saddam's regime imposed a 10% After Sales Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[148]  The Oil-for-Food scandal alerted Defendants that the recipients of illicit payments in Iraq ordinarily collected these payments from multinational corporations ostensibly to pay for consulting services, but in reality such companies simply gave Saddam's regime illicit cash flow free of U.N. oversight. Defendants knew that, according to the Volcker Commission, recipients of illicit payments in Iraq sometimes collected their payoffs without memorializing them in a contract: the "ten percent fee" was often paid "without labeling it an 'after-sales-service' fee or without inserting an after-sales-service provision in the applicable contract."[149] Defendants knew that multinational corporations typically concealed illicit payments on their books by routing them through third-party intermediaries, like "consultants" or suppliers, who acted as their sales agents in Iraq.

---

[147] DOJ & SEC, *supra*, at 44 n.5.

[148] Volcker Report at 276.

[149] *Id*. at 249.

597.     The Oil-for-Food scandal also alerted Defendants that Western companies routed these corrupt payments to Saddam's regime through notorious intermediaries even though the public purpose of the international sanctions program (which such transactions, like Defendants' here, circumvented) was to choke off violent terrorism like Saddam's ability to finance terrorist activities.[150] In fact, it was widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers through the Oil-for-Food Program to finance international terrorist attacks.[151]  Indeed, public reports from Congress, media outlets, third-party watchdogs, and non-governmental organizations from 2004 through 2007 concerning Iraq's Oil-For-Food scandal further alerted Defendants that their suspicious payments to intermediaries in Iraq, Syria, Jordan, and Lebanon relating "trucking," "shipping," "logistics," "security," and "commissions" – among other classic Iraqi euphemisms – foreseeably enabled anti-American terrorist finance because that was exactly what had most recently happened under Saddam.[152]

---

[150] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[151] *See*, *e.g.*, Cynthia R. Fagen, *Iraq's Oil for Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), https://tinyurl.com/3t9fha7u; Statement of Chairman Henry Hyde, *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), https://tinyurl.com/59ncafjx; David Marr, *Report Ties Iraq Terrorism To Payoffs*, Sydney Morning Herald (Oct. 6, 2006) (prominent multinational corporation's "kickbacks to Saddam Hussein" during the "oil for food scandal," which the company and its intermediaries "disguised as trucking fees," "may have financed terrorism"), 2006 WLNR 26874182.

[152] *See generally id*.

598.     **Anti-Terrorism Act litigation** alerted Defendants that their illicit transactions with fronts or intermediaries in geographies at an elevated risk for terrorist finance, including Iraq, foreseeably facilitated protection payments to terrorists on Defendants' behalf.

599.     On March 12, 2008, American victims of FTO-affiliated kidnappers in Colombia sued Chiquita, the iconic American banana company, for making protection payments to the terrorist group FARC. *See* Compl. ¶¶ 1-2, *Julin et al. v. Chiquita Brands Int'l, Inc.*, No. 08-cv-20641 (S.D. Fla. Mar. 12, 2008), ECF No. 1. Among other things, plaintiffs alleged that:

a.     "In order to disguise the payments, and ensure their continued and undetected flow to FARC, Chiquita and/or Banadex [Chiquita's wholly owned subsidiary] at times placed false names and non-existent employees on their payroll, providing those funds on local paydays to regional FARC commanders." *Id*. ¶ 192.

b.     "Chiquita assisted … FARC terrorists on how to create front[s] … Through this deception, Chiquita … continue[d] its secret practice of covertly channeling funds to FARC, [and] was also able to mislead regulators, auditors, or anyone else examining Chiquita and Banadex's books-and-records. [Chiquita] could point to the false front[s] … to (falsely) record its payments to FARC as legitimate [] expenses." *Id*. ¶ 193.

c.     "Chiquita also drew up fictitious contracts with legitimate, operating organizations, or alternatively overvalued existing contracts it maintained with such organizations, for the express purpose of burying (in its bookkeeping) its secret payments to FARC." *Id*. ¶ 194.

600.     On January 2, 2009, American victims of attacks committed by FTOs funded by Saddam during Oil-for-Food sued defendants who allegedly routed illicit payments to Iraqis to secure lucrative Iraqi business. *See* Compl. ¶¶ 1-2, *Abecassis et al. v. Oscar S. Wyatt, Jr., et al.*, No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), ECF No. 3.  Plaintiffs alleged, *inter alia*, that:

a.     "Defendants provided illegal, financial and material support for known terrorists" funded by Iraqi sponsors of terrorism during the Saddam era by routing value "through third-party intermediaries at inflated prices …, knowing that part of the [] price was being used to pay illegal surcharges and kickbacks" that financed terrorism. *Id*. ¶¶ 1, 4.

b.     "To conceal these illegal surcharge payments, [Defendant] … deposit[ed] millions of dollars in a bank account controlled by [the Iraqi terrorist sponsor] at the Jordan National Bank in Amman, Jordan." *Id*. ¶ 171.

c.    "To conceal these illegal surcharge payments, [Defendant] agreed to pay [its business partner] inflated commission[s] … on the original []transactions, with knowledge and expectation that the [business partner] would then make the surcharge payments to the [Iraqi terrorist sponsor]." *Id*. ¶ 175.

d.    "[Defendant] purchased [goods] from … third parties, knowing that premiums paid to the third parties were used to pay illegal surcharges and kickbacks to [the Iraqi terrorist sponsor]." *Id*. ¶ 177.

601.    On October 17, 2017, American victims of attacks committed by Iraqi terrorists funded by illicit payments to the Iraqi Ministry of Health such terrorists controlled sued five medical supply companies who allegedly, *inter alia*, made corrupt payments to the terrorist-controlled Ministry. *See* Compl. ¶¶ 1-2, *Atchley et al. v. AstraZeneca UK Ltd., et al.*, No. 17-cv-02136 (D.D.C. Oct. 17, 2017), ECF No. 1.[153]  Among other things, plaintiffs alleged that:

a.    "The distribution stage presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. The standard Kimadia sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery. Meeting these conditions required the sign-off of multiple MOH officials, including the Kimadia Deputy Director General of Imports, individual warehouse managers, and members of the Facilities Protection Service nominally providing 'security' for the shipments. As detailed in the *Contract Management* article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process." *Id*. ¶ 155.

b.    "Like Saddam had done under Oil-for-Food, the [Iraqi terrorists] also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales 'services,' 'warranties,' 'equipment donations,' 'contractual facilities,' 'maintenance,' and 'training.' Corrupt payments through sham services agreements was the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH." *Id*. ¶ 156.

c.    "The inventory stage similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers. Kimadia's standard sales contract imposed steep penalties on companies whose goods did 'not comply with specifications' (e.g., failed MOH testing) or went 'missing.' That gave the Facilities Protection Service, whose members guarded

---

[153] Plaintiff Martha Looney is also a Plaintiff in *Atchley*. On August 17, 2007, her son, then-PFC, Andrew R. Looney, was injured by a Jaysh al-Mahdi bomb attack in Iraq, which caused PFC Looney to suffer a partial right foot amputation, shrapnel in his leg, and burns and laceration to his hand. After substantial rehab, and a promotion, SGT Looney deployed to Afghanistan in 2010, where he was killed in a suicide attack. Sparacino PLLC and undersigned counsel, Ryan R. Sparacino, serves as co-counsel for Plaintiffs in *Atchley*.

MOH warehouses, significant leverage over medical-goods suppliers: if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (e.g., by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in the contract. That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers." *Id*. ¶ 157.

**d.**   "Defendants' … sham 'training' and 'travel' expenses … functioned as a slush fund for cash payments to [] Jaysh al-Mahdi agents." *Id*. ¶ 160.[154]

602.   On January 4, 2022, the United States Court of Appeals for the D.C. Circuit decisively rejected every core legal argument advanced by Defendants in *Atchley*, broadly ruling that corrupt payments to terrorists in Iraq, including protection payments, supported liability under the ATA.[155] Defendants knew about the D.C. Circuit's *Atchley* ruling, which received significant media coverage,[156] and further incentivized Defendants to continue concealing their corrupt payoffs to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – which LM Ericsson and Ericsson Inc. continued doing until their internal documents leaked about six weeks later.

603.   Defendants knew about plaintiffs' corruption- and protection money-related ATA allegations in *Chiquita*, *Abecassis*, and *Atchley*, which alerted Defendants that their own illicit

---

[154] In *Atchley*, the intermediary question concerned Defendants' allegedly intentional use of buffers, like consultants from Lebanon and Jordan and local Iraqi "scientific bureaus," to route payoffs to terrorists who controlled the Iraqi Ministry of Health; the intermediary question in *Atchley* was not properly whether the Iraqi Ministry of Health was an intermediary because the D.C. Circuit determined the Ministry was a front for terrorists, not an intermediary.

[155] *See generally Atchley et al. v. AstraZeneca UK Ltd., et al.*, 22 F.4th 204 (D.C. Cir. 2022).

[156] *See*, *e.g.*, Andrew C. Nichols, Esq. (Charis Lex P.C.), *D.C. Circuit Continues Its War On Acronyms*, DC Circuitry (Jan. 11, 2022) ("Last week, the D.C. Circuit revived the claims of victims of terrorist attacks in Iraq against U.S. [] companies and their foreign suppliers, who allegedly secured [] contracts by paying off the terrorists."); *see also* Mike Scarcella, *Update 1-U.S. Court Revives Lawsuit Against Pfizer, Others On Iraq Terrorism Funding Claims*, Reuters Gulf Financial News (Jan. 4, 2022); Khorri Atkinson, *DC Circ. Revives Terror-Funding Case Against AstraZeneca*, Law360 (Jan. 4, 2022); Ross Todd, *Litigator of the Week: Kellogg Hansen's Josh Branson Revives an Anti-Terrorism Act Suit Against Big Pharma Companies*, AmLaw Litigation Daily (Jan. 7, 2022).

transactions through intermediaries foreseeably caused protection payments to flow to terrorists on Defendants' behalf.  Defendants knew about these ATA lawsuits because, among other reasons, such cases were widely covered in the media, relevant to Defendants' business, and known to Defendants' employees and agents, including, but not limited to, Defendants' legal, sales, management, and compliance personnel in Iraq, Sweden, and the United States.

604.   **Media reports** and **terrorism scholars** alerted Defendants that their illicit transactions through intermediaries were foreseeably routing protection payments to terrorists on Defendants' behalf.  In 2007, for example, *McClatchy* published a blockbuster report by Hannah Allam, who led the Cairo desk of its award-winning Middle East bureau, which reported that illicit transactions associated with western companies operating in Iraq were foreseeably, if not usually, for purposes of facilitating the flow of protection money through such western companies' intermediaries to al-Qaeda and al-Qaeda-in-Iraq on behalf of the western company, which protection payments, in turn, financed terrorist attacks against Americans in the Middle East.[157] Ms. Allam and *McClatchy* reported, *inter alia*, that:

a.     "Iraq's deadly insurgent groups have financed their war against U.S. troops in part with hundreds of thousands of dollars in U.S. rebuilding funds that they've extorted from Iraqi contractors in Anbar province."

b.     "The payments, in return for the insurgents' allowing supplies to move and construction work to begin, have taken place since the earliest projects in 2003, Iraqi contractors, politicians and interpreters involved in reconstruction efforts said."

c.     "A fresh round of rebuilding spurred by the U.S. military's recent alliance with some Anbar tribes -- 200 new projects are scheduled -- provides another opportunity for militant groups such as al-Qaida in Iraq to siphon off more U.S. money, contractors and politicians warn."

d.     "An [United States] embassy spokesman" in Baghdad "said … that 'in terms of contracting practices, we have checks and balances in our [U.S. government] contract

---

[157] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

awarding system to prevent any irregularities from occurring. Each contracted company is responsible for providing security for the project.'"

**e.** "Providing that security is the source of the extortion, Iraqi contractors say. A U.S. company with a reconstruction contract hires an Iraqi subcontractor to haul supplies along insurgent-ridden roads. The Iraqi contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage."

**f.** "One Iraqi official said the arrangement makes sense for insurgents. By granting safe passage to a truck loaded with $10,000 in goods, they receive a 'protection fee' that can buy more weapons and vehicles."

**g.** "Sometimes the insurgents take the goods, too."

**h.** "Suleiman … displayed a stack of photos [that] … showed crumbling, half-finished structures overgrown with weeds and surrounded by patchworks of electrical wires. He blamed such failures on …'[t]hose responsible for these projects' … [who gave] money to al-Qaida. Frankly, gunmen control contracting in Anbar,' he said."

**i.** "None of the Iraqi contractors agreed to speak on the record -- they risk losing future U.S. contracts and face retaliation from insurgent groups. Some of the Iraqis interviewed remain in Fallujah or Ramadi on the U.S. payroll; others had fled to Arab countries and Europe after they deemed the business too risky.  '''I put it right in my contracts as a line item for 'logistics and security,'' said one Iraqi contractor who is still working for a major American company with several long-term projects in Anbar. 'The Americans think you're hiring a security company, but how you execute it is something else entirely. This is how it's been working since Day One.'"

**j.** "One Iraqi contractor who is working on a U.S.-funded rebuilding project in the provincial capital of Ramadi said he faced two choices when he wanted to bring in a crane, heavy machinery and workers from Baghdad: either hire a private security company to escort the supplies for up to $6,000 a truck, or pay off locals with insurgent connections. He chose the latter, and got $120,000 for a contract he estimates to be worth no more than $20,000. 'The insurgents always remind us they're there,' the contractor said. 'Sometimes they hijack a truck or kidnap a driver and then we pay and, if we're lucky, we get our goods returned. It's just to make sure we know how it works.' 'Insurgents control the roads,' he added. 'Americans don't control the roads -- and everything from Syria and Jordan goes through there.'"

**k.** "An Iraqi who used to work as an interpreter for Titan Corp., the U.S. company that supplies local interpreters to U.S. forces in Iraq, said he witnessed countless incidents of insurgents shaking down contractors during the two years he spent as a translator on a U.S. military base in Anbar.  He said he was stunned when, from early 2004 to his departure in summer 2006, a parade of sheiks with known insurgent connections were awarded contracts worth hundreds of thousands of dollars."

**l.**     "Fawzi Hariri, a member of the Iraqi Cabinet and head of the government's Anbar Reconstruction Committee, said some U.S. rebuilding funds certainly have gone into insurgents' pockets …"[158]

605.     *McClatchy*'s report received widespread coverage and re-publication.[159]  A week later, one newspaper's editorial board – in a piece titled "'Insurgent tax'" – noted Ms. Allam's "telling report" "about the inextricable circumstances burdening the American mission in Iraq," in which "she relayed how Iraqi insurgents have financed their operations, including attacks on American troops, with American money extorted from Iraqi contractors."[160] With respect to the question of "[h]ow" "the extortion work[ed]":

> American companies hire Iraqi subcontractors to help with reconstruction projects. Those subcontractors supply their own security. They do so by paying off Iraqi insurgents with protection money. … This "insurgent tax" isn't cheap. One Iraqi contractor explained … that he sets his price knowing that 50 percent or more will go to insurgents. The result is doubly damaging. Reconstruction proceeds more slowly, as money gets diverted. … [and] the cash fuels the insurgency … as weapons and soldiers flow into Iraq. …  [T]he violence has generated an economy of its own, American money sustaining the insurgents.[161]

606.     From 2004 through 2022, similar reports published by the media and terrorism scholars alerted defendants that their illicit transactions with intermediaries were foreseeably routing protection payments to terrorists.  Such reports included, but were not limited to:

---

[158] *Id.*

[159] *See, e.g.*, Hannah Allam, *Militants Extort Rebuilding Funds; Iraqi Contractors Pay 'Insurgent Tax' with U.S. Money Earmarked for Infrastructure*, Myrtle Beach Sun News (Aug. 27, 2007), 2007 WLNR 16672127; Hannah Allam, *Militants Siphon Off Rebuilding Funds*, News & Observer (August 27, 2007), 2007 WLNR 16691310; Hannah Allam, *Conflict In Iraq: Insurgents Use Extorted U.S. Money to Fight Troops; Through Extortion, Anti-American Insurgents are Obtaining Some of the Money Intended for the U.S. Rebuilding Effort in Iraq*, Miami Herald (August 27, 2007), 2007 WLNR 16667609; Hannah Allam, *Iraqi Militants Taking a Cut of Contract Funds / Insurgents Extort Money for Safe Passage of Goods, Workers Report*, Houston Chronicle (Aug. 27, 2007), 2007 WLNR 16732391.

[160] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.

[161] *Id.*

a.   _Courier Mail_, November 2005:  "The [] Opposition [] demanded a royal commission into alleged kickbacks paid by the Australian Wheat Board to Saddam … AWB … paid almost $300 million to Jordanian company Alia to truck wheat into Iraq under the UN's [O]il-for-[F]ood program …Alia … channelled the money back to the regime. Despite Alia increasing the cost of transporting wheat into Iraq by 400 per cent in four years, AWB has insisted it was an unwitting pawn of Saddam. … [Future Australian Prime Minister] Kevin Rudd said ... [that] under UN sanctions … Australian companies … [caused] '$300 million to be paid illegally to Saddam …' he said. 'This slush fund is still available to the Iraqi insurgency and poses a continuing threat to [] troops in Iraq.'"[162]

b.   Dr. Phil Williams, July 2009:  "By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[163] "For contractors and subcontractors, of course, [protection] payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[164] "While the scale of extortion is impossible to determine, in a culture where baksheesh and 'fixers' have long been necessary and in which the United States has spent enormous amounts on reconstruction, it is almost certainly in the millions of dollars."[165] "[T]he appropriation of organized crime methodologies by key Iraqi power centers increased the resilience of insurgents, terrorists, and militias."[166]  Thus,"analysis [must] be broadened to include targets beyond those groups directly attacking U.S. forces. Financiers, facilitators, and criminal groups working with insurgents also need to be on the target list."[167]

c.   Jean-Charles Brisard and Damien Martinez, October 2014:  "[I]t is very likely that, given the amounts involved, … anti-money laundering teams and specialized suppliers are well positioned to identify dubious middlemen. It has emerged that the [Islamic State] is making use of the old networks put in place by the Baath Party to circumvent the Iraq Oil-For-Food program."[168] "[I]f organizations across the globe do not take steps to conduct a thorough assessment of all of the possible [terrorist finance] risks, they could find themselves engaged in the financing structure of one of the most violent terrorist groups in the world. …  There is a consensus among compliance officers today that the Islamic State is a clear and present danger … Islamic State is making use of well-

---

[162] Steven Wardill, _Full Probe Demanded Into Wheat Contracts_, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.

[163] Williams, _Criminals, Militias, and Insurgents_, _supra_, at xi.

[164] _Id_. at 159.

[165] _Id_.

[166] _Id_. at 262.

[167] _Id_. at 263.

[168] Brisard and Martinez, _supra_, at 7.

established facilitators and money laundering networks, some of which were set up decades ago, to take care of the financial side of the organization … All this information placed end to end should in theory be able to highlight every dubious situation, commercial transaction or operation.[169]

d.   <u>*Newsweek*, November 2014</u>:  "At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS also depends on the steady income it extracts from private donors, the heavy taxation and extortion it levies on its captive population … The …extortion that go toward funding ISIS's day-to-day operations provide a steady cash flow, [former governor of Nineveh province Atheel] al-Nujaifi says. … [E]xtortion, … [] help fund[s] ISIS's day-to-day operations …"[170]

e.   <u>*Telegraph*, September 2016</u>:  "Lafarge allegedly paid taxes to ISIL … [and] has been accused of making arrangements with [Islamic State] … In order to keep making cement Lafarge bought licences from and paid taxes to ISIL middle-men …."[171]

f.   <u>*Construction Europe*, April 2017</u>:  "Swiss-listed cement firm LafargeHolcim has been asked to divulge any relationship it has had with militant groups … follow[ing] recent allegations that senior executives … agreed to pay protection money to [] terrorist organisations.  …  An inquiry into Lafarge[] … has been opened by prosecutors in Paris, and French human rights groups have filed a lawsuit, alleging the firm had 'business relations' with ISIS.  While already admitting that 'significant errors of judgement' were made at the plant, which was evacuated in 2014, … LafargeHolcim said, 'The local company provided funds to third parties to work out arrangements with a number of... armed groups, including sanctioned parties, in order to maintain operations."[172]

g.   <u>*Globe and Mail*, June 2018</u>:  "France has put cement giant LafargeHolcim under formal investigation over allegations of terrorist financing … [based on] allegations that Lafarge paid the Islamic State and other terrorist groups in Syria more than US$15-million between 2011 and 2014 for supplies and assurances they wouldn't attack the company's new plant … eight former Lafarge executives, including two former [CEOs], have been put under formal investigation over allegations of terrorist financing. … [T]he FBI has launched an investigation. … 'The activities of Lafarge … are a perfect illustration of

---

[169] *Id*. at 9-10.

[170] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

[171] Henry Samuel, *Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To ISIL' And Environmental Concerns*, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.

[172] Construction Europe, *Syria Questions For LafargeHolcim: Possible Terrorist Links Investigated At Swiss-Based Company After "Significant Errors Of Judgement" Were Made* (Apr. 1, 2017), 2017 WLNR 13774661.

how multinationals can fuel conflicts …,' said Miriam Saage-Maass, legal director at ECCHR. … Lafarge executives were determined to keep [] operating as the country's civil war escalated and other western companies pulled out. … Lafarge executives often disguised the payments as 'donations' and relied on a pair of intermediaries, including a [] consultant, to make the payments to rebel groups. The relationship between the company and [Islamic State] became so formalized, [ISIS] issued travel permits to Lafarge workers and the company paid a 10-percent 'tax' to the terrorists."[173]

607.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that Defendants' illicit transactions with, or through, their intermediaries were foreseeably designed to route protection payments to terrorists on Defendants' behalf.

608.   Indeed, in addition to alerting Defendants that their illicit Iraq-related transactions with intermediaries were routinely used to route illicit payments, from 2004 through 2022, sources like those described throughout this section alerted Defendants that each of their specific intermediary "buffer" tactics foreseeably routed protection payments to terrorists, including LM Ericsson's and Ericsson Inc.'s reliance upon: (a) Iraq-headquartered companies that LM Ericsson touted as a "partner," like Asiacell and Korek; (b) Iraqi, Jordanian, or Lebanese consultants, like al-Awsat; and (c) security, transporation, logistics contractors, like SLS and Cargo Iraq.

### a.    Defendants Knew Their Illicit Transactions With Iraqi Partners Caused Protection Payments To Flow To Terrorists

609.   Defendants knew their illicit transactions with their Iraq intermediary partners, like Asiacell and Korek, facilitated protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

---

[173] Paul Waldie, *Lafarge Under Investigation In France Over Allegations Of Terrorist Financing*, Globe and Mail (June 29, 2018), 2018 WLNR 19862585.

610.   **Media reports** alerted Defendants that illicit transactions involving Iraq-headquartered companies that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like the Defendants' "partners" Asiacell and Korek – routinely were for purposes of routing protection payments to such terrorists as the cost of doing business using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

a.   <u>Knight Ridder</u>, November 2005:  "Ahmed, a [] resident with long-standing ties to local insurgent groups, … said businesses … had been paying local insurgents protection money, as much as $70,000 a month. Al-Qaida in Iraq demanded the money.  'Al-Qaida said they needed the money to operate….' he said."[174]

b.   <u>New York Times</u>, December 2013:  "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely self-financing. … In Mosul, most of the security force members who are not from the area have left the city, and Al Qaeda controls whole sections of territory."[175]

c.   <u>Australian Broadcasting Corporation</u>, January 2014:  "In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses, according to the US-based Council on Foreign Relations (CFR)."[176]

d.   <u>NPR</u>, April 2014:  "In Mosul, the extortionists prey on thousands with regular demands and threats. The story of one small business owner shows how it works.  Tawfik ran a computer shop in Mosul until last year. … He says he left Mosul after an anonymous caller demanded about $114,000 for jihad, or holy war … Several other people interviewed said the problem of extortion is entrenched and ongoing."[177]

e.   <u>Daily Mail</u>, June 2014:  "According to the Council on Foreign Relations, ISIS was already extorting taxes from Mosul businesses before its takeover…".[178]

---

[174] Mohammed Al Dulaimy (Knight Ridder Foreign Service), *Al-Qaida in Iraq, Local Insurgents at Odds*, *republished in* St. Paul Pioneer Press (Nov. 13, 2005), 2005 WLNR 18333033.

[175] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

[176] Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014), 2014 WLNR 425449.

[177] Alice Fordham, *For Extremists In Syria, Extortion Brings Piles Of Cash From Iraq*, NPR (Apr. 21, 2014), https://tinyurl.com/5ejx25y7.

[178] Michael Seamark, *Jihadi Terror Group PLC*, Daily Mail (June 19, 2014), 2014 WLNR 16625914.

611.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their Iraqi partners were foreseeably making protection payments to terrorists on Defendants' behalf.

> **b.    Defendants Knew Their Illicit Transactions With Consultants For Iraq-Related Matters Caused Protection Payments To Flow To Terrorists**

612.    Defendants knew their illicit transactions with their Middle Eastern intermediary consultants, like al-Awsat, facilitated protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

613.    **Media reports** alerted Defendants that their illicit transactions with their Iraqi, Jordanian, and Lebanese consultants, including Barzani-affiliated Kurdish intermediaries – like those who served as Defendants' agents in Iraq – foreseeably aided terrorists because such consultants notoriously had longstanding protection arrangements with Sunni terrorists, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and therefore illicit transactions involving such consultants was a crimson red flag for protection payments.  On top of the reports above, such media reports also included, but were not limited to:

a.      _UPI_, July 2014:  "Prime Minister Nouri al-Maliki …, in a nationally televised broadcast …, blamed Kurds for allegedly protecting insurgents in their capital city of Erbil and for allowing the militant group Islamic State to use Erbil as a base of operations."[179]

b.      _Newsweek_, November 2014:  "Interviews with Iraqi, Kurdish, European, Syrian and American government officials, analysts and intelligence agents sketch a portrait of ISIS's robust, sprawling, and efficient financial operation. … At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS is probably getting help from its oil-rich neighbors … [D]espite their hostility to ISIS, the Kurds in Iraq,

---

[179] Ed Adamczyk, _Kurds Pull Out of Iraqi Government, Except for Parliament Members_, UPI NewsTrack (July 11, 2014).

Turkey and Syria have all done deals with ISIS, often through middlemen. … The regional Kurdish government in Iraq recently arrested some of its own citizens along with a number of Kurdish politicians and security officials for acting as intermediaries … on behalf of ISIS. … [and] ISIS members [] infiltrated Erbil, Iraqi Kurdistan's capital…."[180]

c.   *Foreign Affairs*, December 2014.  "ISIS' enemies are getting richer from [Islamic State-related] trade, too: Kurdish part-time smugglers who facilitate ISIS' oil sales can earn up to $300,000 each month. A Kurdish newspaper recently published a list of people involved with ISIS … The list includes individuals with the last names of several Kurdish ruling families ... Kurdish facilitators also provide goods to ISIS, including trucks, gas cylinders (for cooking and heating), gasoline, and other necessary commodities."[181]

d.   *Carnegie Council*, March 2015:  "It seemed … ISIS would be content to own Mosul. There was an understanding [] between [] ISIS … and Masoud Barzani, [] president of the Kurdistan regional government, that [ISIS] would not attack the Kurds."[182]

e.   *New York Times*, November 2015:  "'[T]he United States and its allies have concentrated their efforts on trying 'to stop [ISIS] from getting access to the financial system' … That has also proved to be difficult. The Islamic State trades with individuals and businesses in the countries it is fighting, selling … to Kurds in Iraq …, among others."[183]

614.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their illicit transactions with, or through, their Iraq-related consultants were foreseeably routing protection payments to terrorists on Defendants' behalf.

---

[180] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

[181] Louise Shelley, *How ISIS Makes Bank*, National Herald Tribune (Pakistan) (Dec. 3, 2014), 2014 WLNR 34092636 (republication of article published by *Foreign Affairs* (subscription)).

[182] David L. Phillips (*Author of The Kurdish Spring: A New Map of the Middle East*), *quoted in* Carnegie Council Transcripts and Articles (Blog), *The Kurdish Spring: A New Map Of The Middle East* (Mar. 20, 2015), 2015 WLNR 8346795.

[183] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, New York Times (Nov. 29, 2015).

c.   **Defendants Knew Their Illicit Transactions with Security, Transportation, and Logistics Contractors in Iraq, Syria, Jordan, Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to Flow to Terrorists**

615.   Defendants knew their illicit transactions with their Iraq, Syria, Jordan, Turkey, Qatar, U.A.E., and Lebanon-based intermediary security, transportation, and logistics contractors, like SLS and Cargo Iraq, facilitated protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.  Through such persons, and media coverage, Defendants knew that, like the *Associated Press* reported in 2006, "[t]he route to Jordan and Syria goes through Anbar province, a stronghold of Sunni insurgents."[184]

616.   **Media reports** and **terrorism scholars** alerted Defendants that illicit transactions involving security contractors that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like the ones Defendants used – routinely operated to route protection payments to such terrorists as the cost of doing business using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

a.   *Associated Press*, July 2007:  "On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network and two individuals suspected of planning attacks against coalition forces. … Iraqi police detained four suspects allegedly engaged in extorting protection money from local contractors and using the funds to finance al Qaeda in Iraq activities."[185]

b.   *Akron Beacon Journal*, September 2007:  "American companies" "suppl[ied] their own security" "[and by] paying off Iraqi insurgents with protection money" "[resulting in] American money sustaining the insurgents."[186]

---

[184] Sameer N. Yacoub, *Sectarian Divisions Change Baghdad's Image As A City Of Religious Coexistence,* AP Worldstream (July 3, 2006).

[185] Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007).

[186] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.

c.   _Los Angeles Times_, September 2010:  "The report, released [] by the inspector general of the U.S. Agency for International Development, says subcontractors hired to protect a development project near Jalalabad may have paid more than $5 million to the militants through local authorities. . . . The report says local authorities often demand a 20% 'protection tax' in such circumstances.  Under those deals – along the lines of extortionist protection rackets in the U.S. – the Taliban … promises that they won't attack … their equipment and won't try to halt the contract work…."[187]

d.   _Christian Science Monitor_, October 2010:  "The Senate investigation also turned up mounting evidence to suggest that largely unmonitored Pentagon contracts with private security companies … may also be lining the pockets of Taliban insurgents who agree not to attack convoys in exchange for cash.  'If you want to know the driving force of corruption in Afghanistan, it's not Afghan culture,' warns Anthony Cordesman, a security specialist at the Center for Strategic and International Studies in Washington. 'It's American contracting.'"[188]

617.   Media reports and terrorism scholars also alerted Defendants that their illicit transactions with their transportation and logistics companies – like the ones Defendants used – operating in areas where al-Qaeda or Islamic State-affiliated terrorists were present likely operated to route protection money to terrorists as the cost of doing business using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

a.   _Inter Press Service_, September 2008:  "Often … logistics companies have to pay protection money … In one route, between the capitals of Kandahar and Urozgan provinces [in Afghanistan], contractors pay millions in protection money …"[189]

b.   Dr. Phil Williams, July 2009:  "Truckers" "pa[id] $500 for protection money [per truck]."[190] "Truckers were willing to cooperate with 'smuggling gangs, pay bribes or use forged papers … [and] the whole process was lubricated by pervasive corruption …"[191] "The going rate for allowing [] trucks to pass was typically $500. The huge volume of truck traffic made the practice highly lucrative. With rail and air service inoperable in most of the country, many areas, especially Baghdad, relied on truck convoys for basic

---

[187] Paul Richter, _Audit:  U.S. Government Funds May Have Gone To Taliban_, L.A. Times (Sept. 30, 2010).

[188] Anna Mulrine, _Rogue Security Companies Threaten US Gains In Afghanistan War_, Christian Sci. Monitor (Oct. 21, 2010).

[189] Anand Gopal, _Afghanistan:  Subsidised Fuel Trail Winds Back To Pakistan_, Inter Press Service (Sept. 30, 2008).

[190] Williams, _Criminals, Militias, and Insurgents: Organized Crime in Iraq_, at 84-85.

[191] _Id_. at 85.

goods and reconstruction materials. The dilemma for transportation services was multiple tolls in different locations exacted by different actors—although for those involved … there was often enough money to cover all these tolls."[192]

**c.**     *Washington Post*, March 2010:  "The essential question, said an American executive …, is 'whether you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S. military or contractors."[193]

**d.**     *American Forces Press Service*, April 2010:  "[A] suspected AQI member [was] believed [by the U.S.] to extort money from [] transporters … to fund the terrorist group."[194]

**e.**     *Al Jazeera America*, December 2013:  "[S]ince the U.S. military withdrawal in 2011 … violent attacks have sharply increased. … The number of dead so far this year now rivals 2006 and 2007 figures, when sectarian fighting was at its most feverish … The majority of the recent attacks have been carried out …, primarily, by a branch of Al-Qaeda that has folded in Al-Qaeda in Iraq with its affiliates in Syria to become known as Al-Qaeda in Iraq and Syria (AQIS). The group continues to absorb fighters filing across the 400-mile border the two countries share. … 'Going back to 2006 is the major fear,' [said] Michael Knights, a research fellow at the Washington Institute for Near East Policy … Also solidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local support in cities … where Iraqi security forces have failed to gain a foothold. 'Since 2010 AQIS has been self-funding through organized crime rackets involving … protection payments from large Iraqi companies, plus trucking …' Knights said."[195]

**f.**     *Newsweek*, November 2014:  "ISIS applies a 'tax' to all goods imported to or exported from the city. ISIS even 'taxes' groups providing genuine humanitarian aid in its own war zone. 'ISIS taxes people transporting nearly anything,' says one Lebanese intelligence officer. …"[196]

**g.**     *Washington Post*, December 2014:  "Islamic State … provid[ed] … a salary of up to $1,100 per month … for each fighter's family. The largesse is funded with … the extortion of truckers and others who cross Islamic State territory."[197]

---

[192] *Id.* at 158-59.

[193] *Afghan Corruption*, *supra*.

[194] American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010), 2010 WLNR 6913562.

[195] Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013), https://tinyurl.com/5k57c4vx.

[196] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

[197] Kevin Sullivan and Karla Adam, *Hoping To Create A New Society, The Islamic State Recruits Entire Families*, WashingtonPost.com (Dec. 25, 2014), 2014 WLNR 36516895.

h.    Louise Shelley, September 2015:  "Terrorists … exploit supply chains. … [T]errorists in border areas tax the cross-border flow of goods. … Terrorists share a major concern of legitimate businesses supply chains—as they need to ensure the safe and timely delivery of goods without disruption. … Terrorists make substantial money by controlling supply chains … as well as by taxing … others that pass through borders or territory that they control. The ability to tax the transit of commodities is one key to their financing. Organized crime groups' extortion of trade has been known for a significant period, which is why they are so deeply involved in ports and the trucking industry. Yet terrorist groups on many different continents also profit from exploiting supply chains and taxing trade. … Terrorists often generate revenues by taxing the supply chains that move legitimate … products across territory they control. Through corruption … terrorist groups … bolster their own in key border areas, ports, and other transport hubs. Therefore, they have learned from organized crime the importance of controlling territory and have capitalized on the corporate world's need to move commodities long distances in the increasingly globalized economy."[198]

618.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their illicit transactions with, and through, their security, transportation, and logistics were foreseeably making protection payments to terrorists on Defendants' behalf.

### 2.    Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-Based Protection Payments To Flow To Terrorists, And Intended For Their Officers, Employees, Agents, Partners, Consultants, And Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists

619.    Defendants knew that their strategy to generate hard-to-trace off-the-books cash sources through uncontrolled slush funds for their illicit Iraq-related transactions caused U.S. dollar, cash-based protection payments to terrorists.

---

[198] Louise Shelley, *quoted in* SEC Wire, *George Mason University Founder and Director, Terrorism, Transnational Crime and Corruption Center Louise Shelley, Prepared Testimony Before the House Financial Service Committee Hearing on Could America Do More? An Examination of U.S. Efforts to Stop the Financing of Terror* (Sept. 9, 2015).

a.    **Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists**

620.    Defendants knew their use of uncontrolled Iraqi slush funds was a tactic to conceal Defendants' regular cash-based protection payments to terrorists. Defendants knew their Iraqi slush funds facilitated cash-based protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

621.    **United States government reports** alerted Defendants that their uncontrolled slush funds foreseeably enabled money laundering that was vital to terrorist finance because slush funds provided the untraceable cash that intermediaries acting for terrorists required in order to pass on illicit payments like protection money.  In November 2006, for example, a senior DOJ official publicly observed that "[s]hell corporations and nominees are widely used mechanisms to launder the proceeds from crime, particularly bribery (e.g. to build up slush funds). The ability for competent authorities to obtain and share information regarding the identification of companies and their beneficial owner(s) is therefore essential … for preventing … money laundering."[199]

622.    **Media reports** alerted Defendants that terrorists operating in high-risk environments routinely depended upon uncontrolled slush funds maintained by their funders. Such reports included, but were not limited to:

a.    _UPI_, April 2002:  "Slush funds are not a sovereign prerogative. Multinationals, banks, corporation, religious organizations, political parties, and even non-governmental organizations salt away some of their revenues and profits in undisclosed accounts,

---

[199] Stuart G. Nash (U.S. Associate Deputy Attorney General), _Lack of Ownership Information for Suspect Incorporations Companies – Part 2, Testimony Before the Senate Homeland Security and Governmental Affairs Permanent Investigations Committee_, Congressional Testimony via FDCH (Nov. 15, 2006) (cleaned up), 2006 WLNR 19827292.

usually in offshore havens. … [P]added invoices, sham contracts, fictitious loans, interest accruing on holding accounts, back to back transactions with related entities [were] all [types of transactions] used to funnel money to the slush funds. Such funds are often set up to cover for illicit and illegal self-enrichment, embezzlement, or tax evasion. … BBVA's payments to [terrorist group] ETA may have been a typical payment of protection fees. Both terrorists and organized crime put slush funds to bad use. They get paid from such funds, and maintain their own."[200]

**b.**   _Hindustan Times_, February 2003:  "Delhi Police will interrogate … Abdul Gani Bhat for his alleged role in funding terrorist organisations with slush funds … from Pakistan."[201]

**c.**   _National Post_, February 2004:  "Israel's raids may … chok[ed] off the slush funds used to underwrite terrorism, [and] … help stanch the flow of … blood."[202]

**d.**   _Courier Mail_, November 2005:  "[Future Australian Prime Minister] Kevin Rudd [said]: '[S]lush fund[s] … available to the Iraqi insurgency [] pose[] a … threat to [] troops.'"[203]

**e.**   _Australian_, July 2006:  "Crown prosecutor Mark Dean detailed lurid accounts of jihadi training camps, terror slush funds, secret meetings and bomb-making recipes …"[204]

**f.**   _Daily Telegraph_, August 2006:  "[A] Saudi anti-corruption drive … recogni[zed] that the slush funds associated with other Saudi arms contracts have helped finance terrorism."[205]

---

[200] Sam Vaknin (UPI Senior Business Correspondent), _Analysis: Slush Funds - Part 2_, UPI North American News (Apr. 23, 2002).  The ETA is an al-Qaeda affiliate.  _See_, _e.g._, Juan C. Zarate, _quoted in_ U.S. Dep't of the Treasury, _Testimony of Juan C. Zarate, Deputy Assistant Secretary Executive Office for Terrorist Financing & Financial Crimes U.S. Department of the Treasury_ (Mar. 4, 2004) ("The U.S. has also taken significant actions against non-al Qaida linked terrorist organizations such as … the Basque terrorist group, ETA."), https://tinyurl.com/4xbyyszs. (Plaintiffs note that sources disagree as to the relationship between al-Qaeda and ETA, but regardless of nomenclature, the two FTOs were, at a minimum, allies of convenience.)

[201] Sudhi Ranjan Sen and Vibha Sharma, _Bhat to be Questioned on Terror Funding_, Hindustan Times (Feb. 11, 2003), 2003 WLNR 111300.

[202] Nat'l Post (Canada), Editorial, _Follow the Shekels_ (Feb. 26, 2004), 2004 WLNR 10998196.

[203] Steven Wardill, _Full Probe Demanded Into Wheat Contracts_, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.

[204] Cameron Stewart, _Laughs Turn Cold as Prosecution Puts Case_, Australian (July 25, 2006), 2006 WLNR 12749446.

[205] Roland Gribben, _Defence BAE Lands Arms Deal For A New Generation_, Daily Telegraph (Aug. 19, 2006), 2006 WLNR 14368620.

**g.**    *Indo-Asian News Service*, June 2009:  "With slush funds being increasingly used for financing terrorism, Indian financial institutions are planning to increase investment in their anti-money laundering systems, a survey by … KPMG has found."[206]

**h.**    *Assam Tribune*, March 2011:  "Much of the slush-money stashed away in foreign banks is linked to illegal transactions in narcotics and hawala money-laundering, not to mention obvious terror links … [reflected by] the proliferation of slush-funds abroad …."[207]

**i.**    *Telegraph*, December 2012:  "[M]ilitant groups … are getting involved in [] lucrative … trade and the slush funds earned is a major source of 'sustaining insurgency'."[208]

**j.**    *AllAfrica.com English*, October 2015:  "[Nigerian] President Muhammadu Buhari's charge to the international community … to strengthen mechanisms for dismantling havens for proceeds of corruption … appropriately advertises the receiving countries of illicit fund flows as equally promoters of corruption. … [M]any of the receiver-countries, mostly in the western world, are coming to terms with the fact that uncontrolled movement of slush funds is at the heart of heightening global … terrorism …"[209]

623.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their Iraqi slush funds foreseeably caused facilitation payments to flow to terrorists on Defendants' behalf.

### b.    Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit Iraqi Transactions Would Facilitate Covert Protection Payments To Terrorists

624.    Defendants knew that terrorists craved access to U.S. dollars, most of all the American cash that was the currency of choice for terrorists worldwide.  Indeed, the riskier the operation, the more important it be paid in all cash.

625.    **United States government reports** alerted Defendants that bulk U.S. dollar cash payments and associated cash smuggling were a key strategy to route payments to terrorists.

---

[206] Indo-Asian News Service, *Financial Sector to Strengthen Anti-Money Laundering Systems* (June 18, 2009).

[207] Assam Tribune, Editorial, *Shameful Negligence* (Mar. 14, 2011), 2011 WLNR 5028725.

[208] Wasim Rahman, *Plea to Check Illegal Mining*, Telegraph (India) (Dec. 5, 2012), 2012 WLNR 25931403.

[209] AllAfrica.com English, *On Havens for Slush Funds* (Oct. 15, 2015).

a.    Treasury Department, 2005:  "[O]nce funds are raised for insurgent groups, they must be transported … and disbursed within Iraq. … [T]he physical transportation of cash into Iraq [and] … [r]eliance on currency for transactions … carries significant risks with respect to insurgency financing."[210]

b.    The White House, 2006:  "Funds … provide the fungible, easily transportable means to secure all other forms of material support necessary to the survival and operation of terrorist organizations. Our enemies raise funds through a variety of means, including soliciting contributions from supporters; operating businesses, NGOs, and charitable fronts; and engaging in criminal activity such as … extortion … They transfer funds through several mechanisms, including … cash couriers … Effective disruption of funding sources and interdiction of transfer mechanisms can help our partners and us to starve terrorist networks of the material support they require."[211]

c.    Treasury Department, 2015:  "Combined with the widespread demand for U.S. currency globally, multiple terrorist groups, including AQ and its affiliates, ISIL, Al-Shabaab, Hizballah, and FARC, will continue to use cash smuggling as a less efficient alternative for moving funds globally."[212] "The use of cash is attractive to criminals mainly because of its anonymity, portability, liquidity and lack of audit trail. According to the surveyed cases, since 2007, 18 [terrorist finance]-related prosecutions in the United States have in some way involved the use of cash to transfer funds to terrorist organizations. These cases have involved various FTOs, including core AQ, AQ in Iraq (the predecessor organization to ISIL), AQAP, Al-Shabaab, Hizballah, and FARC."[213]

d.    Treasury Department, 2015:  "People use cash for a variety of reasons, including because it has no fee per transaction, it is readily available and accepted worldwide for consumers, is confidential, cannot be hacked, and does not run out of battery power. Unlike electronic transfers of funds, cash does not leave a digital trace. … The same characteristics that make cash dependable and portable to everyday consumers are also attractive to criminals. …  Recognizing that using cash for unexplained large consumer or commercial purchases can be an indicator of illicit activity, and the initial U.S. AML/CFT statute imposed a cash reporting requirement to mitigate against this risk."[214]

---

[210] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658. The U.S. government addressed this program on or about 2005 through its facilitation of electronic banking throughout Iraq, which obviated Defendants' need to rely upon cash. *Id.*

[211] The White House, *National Strategy for Combating Terrorism*, at 12 (Feb. 2006).

[212] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 56 (Aug. 24, 2015).

[213] *Id.* at 54-55.

[214] U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing, Report to Congress*, at 23 (2020).

e.   LIGOIR, May 2020:  "Treasury and the [U.N.] both reported that ISIS primarily uses cash … funds within and out of Syria and Iraq and through neighboring countries."[215]

626.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their use of cash in Iraq foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

### 3.   Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Conceal Their Protection Payments

627.   Defendants also knew their intentionally deficient internal controls were a feature, not a bug, and were purpose-built to facilitate Ericsson's corrupt payments, including its protection payments to terrorists.

628.   Defendants knew their intentionally deficient internal controls facilitated protection payments to terrorists because Defendants' employees and agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

629.   Defendants also knew their practice of facilitating payments without clear beneficiaries facilitated protection payments to terrorists because Defendants' employees and agents in Iraq knew such fact to be true.

630.   **United States government reports** alerted Defendants that their practice of facilitating illicit payments without clear beneficiaries was a tactic used to conceal terrorist finance.  Such reports and statements included, but were not limited to:

a.   Treasury Department, September 2006:  "[D]onors are encouraged to … consider[] protective measures to prevent … abuse by terrorists. … [E]ffective internal controls … can prevent … terrorist financing …".[216]  "When supplying [] resources …, fiscal responsibility on the part of a [payor] should include: ... determining that the potential

---

[215] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20 (May 13, 2020).

[216] U.S. Dep't of the Treasury, *U.S Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities*, at 2-3 (Sept. 2006).

grantee of … contributions has the ability to … protect the resources from … exploitation by terrorist organizations and/or their support networks …"[217]

b.  DOJ and SEC, November 2012:  "Effective policies and procedures require an in-depth understanding of the company's business model, including its products and services, third-party agents, customers, government interactions, and industry and geographic risks. Among the risks that a company may need to address include the … use of third parties; gifts, travel, and entertainment expenses; … donations; and facilitating and expediting payments. … [Routine corporate internal controls] systems can be a good way to …, if properly implemented, prevent[] and detect[] potential FCPA violations."[218]

c.  LIGOIR, May 2018:  "An ongoing USAID OIG investigation found that employees of a U.S.-based nongovernmental organization knowingly diverted USAID-funded food kits to a militant organization operating in northern Syria … employees of the non-governmental organization … submitted falsified beneficiary lists to USAID to conceal the [terrorists]' participation in the … program."[219]

d.  Senate Finance Committee, December 2020:  "A [] robust and fundamentally sound system of screening and vetting is needed to [ensure] that contributions made to [an entity in a high risk terrorist environment] are not funding illicit organizations."[220]

631.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their intentionally deficient internal controls were a tactic to conceal their protection payments.

**D.  Defendants Knew Al-Qaeda's Role**

**1.  Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States**

632.  Defendants knew that al-Qaeda waged a global terrorist campaign against the United States in which al-Qaeda and its branches and allies in Iraq, Afghanistan, Syria, and elsewhere attacked Americans to drive the United States out of the Middle East.

---

[217] *Id*. at 8.

[218] DOJ & SEC, *supra*, at 48.

[219] Lead Inspector Gen. for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 69 (May 5, 2018).

[220] U.S. Senate Finance Committee Oversight & Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

633.     Defendants knew about al-Qaeda's global terrorist campaign against the United States, including its key focus on Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

634.     **United States government reports** alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States.  The U.S. government long recognized the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq.  For starters, U.S. military documents confirmed the vital nature of the relationship.  For example, according to a declassified report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies."  "Reflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

635.     United States counterterrorism policy also recognized, as cornerstones of the U.S. strategy against al-Qaeda and al-Qaeda-in-Iraq, that (i) "[a]l-Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, and Europe who

continue working to carry out future attacks against U.S. interests."[221] Other U.S. government

reports confirmed the inextricable ties between al-Qaeda's operations in Iraq and Afghanistan.[222]

636.   **Media reports** alerted Defendants to the globally interconnected nature of al-

Qaeda's campaign against the United States.[223]

---

[221] U.S. Dep't of State, *Country Reports on Terrorism 2005* at 218 (Apr. 2006); *see also* U.S. Dep't of State, *Country Reports on Terrorism 2006* at 270 (Apr. 2007); *U.S. Dep't of State, Country Reports on Terrorism 2007* at 299 (Apr. 2008); U.S. Dep't of State, *Country Reports on Terrorism 2008* at 318 (Apr. 2009); U.S. Dep't of State, *Country Reports on Terrorism 2009* at 275 (Aug. 2010).

[222] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2005* at 217 ("al-Qaida's top leaders continue to plot and direct terror attacks worldwide … Over the past four years, al-Qaida, its affiliates and those inspired by the group were also involved in many anti-U.S. or anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 1-2, 4, 34 (Dec. 2006) ("Iraq is vital to regional and even global stability, and is critical to U.S. interests. … It is now a base of operations for international terrorism, including al Qaeda. … Al Qaeda is responsible for … some of the more spectacular acts: suicide attacks, large truck bombs, and attacks on significant religious or political targets. Al Qaeda in Iraq is now largely Iraqi-run and composed of Sunni Arabs. Foreign fighters—numbering an estimated 1,300—play a supporting role or carry out suicide operations. Al Qaeda's goals include … driving the United States out of Iraq. … As one Iraqi official told us, 'Al Qaeda is now a franchise in Iraq, like McDonald's.' Left unchecked, al Qaeda in Iraq could continue to incite violence … A chaotic Iraq could provide a still stronger base of operations for terrorists who seek to act regionally or even globally. Al Qaeda will portray any failure by the United States in Iraq as a significant victory that will be featured prominently as they recruit for their cause in the region and around the world. Ayman al-Zawahiri, deputy to Osama bin Laden, has declared Iraq a focus for al Qaeda: they will seek to expel the Americans and then spread 'the jihad wave to the secular countries neighboring Iraq.'"); David S. Cohen (Under Secretary for Terrorism and Financial Intelligence, Treasury Dep't), *quoted in* U.S. Dep't of the Treasury, *Remarks of Under Secretary for Terrorism and Financial Intelligence David Cohen before the Center for a New American Security on "Confronting New Threats in Terrorist Financing"*, (Mar. 4, 2014) ("al-Qa'ida 'core' [] spawned numerous affiliates that recruit[ed] their own jihadists, organize[d] their own operations, and raise[d] their own funds"), https://home.treasury.gov/news/press-releases/jl2308.

[223] *E.g.*, Newsweek, *Terror Goes Global*, *republished by* PR Newswire, *International And Asia Highlights And Exclusives - February 19, 2001 Issue* (Feb. 11, 2001) ("[Newsweek] COVER: 'Terror Goes Global' … Intelligence officials tell Newsweek that they believe … Al Qaeda [] is trying to forge ties with Hizbullah, Hamas and Palestinian Islamic Jihad. … Increasingly linked by the Internet, Islamic extremists are on the move and in contact with each other … Bin Laden's movement has gone as transnational as any global corporation."); Kathy Gill, *OBL Death Is*

637.   **Terrorism scholars** alerted Defendants to the globally interconnected nature of

al-Qaeda's campaign against the United States, including, but not limited to:

a.   Dr. Matthew Levitt, 2003:  "Al-Qaeda successfully built an entrenched and sophisticated
international logistical and financial support network of the kind that eventually
facilitated the attacks of September 11."[224]

b.   Professor Jimmy Gurulé 2008:  "Since the September 11, 2001 terrorist attacks, al Qaeda
emerged as the head of a global Islamist terror movement, comprised of dozens of deadly
jihadist groups" and "[s]everal members of the al Qaeda terror movement [were]
designated as FTOs."[225] "[Al-Qaeda] used its substantial financial resources to establish
links, leverage support and maintain the loyalty of more than 20 militant jihadist groups
globally" and "provided financial assistance to these terrorist surrogates to underwrite
specific jihadi operations, purchase weapons, and train thousands of their members at al
Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[226]

c.   Leah Farrall, 2011:  "When the pressure on al Qaeda eased between 2003 and 2006,
because the United States was focusing less on Afghanistan, the group was able to
regenerate its capacity and intensify its planning for global operations. But the U.S. drone
campaign against al Qaeda in Pakistan's tribal areas has again put pressure on it, and the
group has [] tapped … its franchises, particularly AQI. In 2008, for example, it asked
AQI to carry out attacks against Danish interests in retaliation for a Danish newspaper's
publication of cartoons … When subsidiaries do carry out attacks outside their territories,
al Qaeda requires that they be conducted within set parameters. For example, al Qaeda
heavily encourages suicide attacks and repeated strikes on preapproved classes of targets,

---

*Symbolic*, Moderate Voice (May 2, 2011) ("*Foreign Affairs* noted … Al Qaeda is stronger today
than when it carried out the 9/11 attacks. Accounts that contend that it is on the decline treat the
central al Qaeda organization separately from its subsidiaries and overlook its success in
expanding its power and influence through them."), 2011 WLNR 8478998; Alan Clendenning,
*Terror 'Franchises' A Huge Risk*, Associated Press, *republished by* Herald News (May 19, 2011)
("They … send bombs to the United States from Yemen and mount bloody attacks in Iraq and
Pakistan. These homegrown terror groups worldwide are informally dubbed al-Qaida franchises.
… Rohan Gunaratna, who heads the Center for Political Violence and Terrorism Research …,
predicted that al-Qaida and the franchises are 'likely to pose an enduring threat in the foreseeable
future.' Al-Qaida now has about 10 major franchises, although the Afghanistan-Pakistan group
has splintered into smaller and more dangerous ones. Al-Qaida provides ideological inspiration
and sometimes direct training and funding. The franchises have goals within their own regions
but also international aspirations, which include U.S. … targets."), 2011 WLNR 9988400.

[224] Dr. Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on
Post-Modern Terrorism (Sept. 8, 2003), https://tinyurl.com/5pdjpkza.

[225] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism*
89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé").

[226] *Id*. at 73.

such as public transportation, government buildings, and vital infrastructure. Once a location has been authorized, the branch and the franchises are free to pursue plots against it. But al Qaeda still emphasizes the need to consult the central leadership before undertaking large-scale plots, plots directed against a new location or a new class of targets, and plots utilizing a tactic that has not been previously sanctioned …"[227]

d.    Daniel Byman, 2012:  "From the start, … al-Qa'ida was unusual: it was both a group with its own agenda and operations, as well as a facilitator for other terrorist groups. So al-Qa'ida in the 1990s carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen and, at the same time, acted as 'quartermaster for jihad,' … Thus, from its inception, al-Qa'ida was immensely concerned with its relationship with outside groups. While, traditionally, groups with a similar mindset who operate in the same theater as one another compete fiercely for money and recruits, for al-Qa'ida, the attitude was different. Al-Qa'ida did still compete with other Salafi-jihadist groups, but at the same time, it believed that its own mission entailed furthering their aims. In order to fulfill this mission, it trained fighters from these other groups and undertook propaganda efforts on behalf of their causes."[228] "Al-Qa'ida has always been both a group with its own agenda and a facilitator of other terrorist groups. This meant that it not only carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen throughout the 1990s, but it helped other jihadist groups with funding, training, and additional logistical essentials. … After September 11, 2001, this process of deepening its relationship with outside groups took off, and today a number of regional groups bear the label 'al-Qa'ida' in their name, along with a more local designation. Some of the most prominent affiliates include al-Qa'ida of Iraq (AQI) …"[229] "While there are clear benefits for an affiliate in linking with al-Qa'ida, there are also rewards for the al-Qa'ida core: • Mission Fulfillment and Reach. Having a diverse array of affiliates helps al-Qa'ida extend its reach … • Relevance. Especially since 9/11, … [s]ome of the most notorious "al-Qa'ida" attacks attempted since 9/11 have in fact been carried out by affiliate groups. • Logistics. Beyond the ability to carry out attacks, affiliates offers al-Qa'ida access to their media resources, recruiters, and other core parts of their organizations. • Hardened Fighters. Since its inception, al-Qa'ida has sought members who are experienced and dedicated. Many of the affiliates who come to al-Qa'ida do so with just such a cadre."[230]

e.    Juan Zarate, 2013: "Treasury's [counterterrorism] strategy … aimed at targeting networks of key financial actors and nodes in the terrorist support system.  The point was … to make it harder for individuals who were financing terrorists … Our analyses therefore focused on the networks of actors and institutions providing the financial

---

[227] Leah Farrall (Former Senior Counterterrorism Intelligence Analyst with the Australian Federal Police), *How Al Qaeda Works: What the Organization's Subsidiaries Say About Its Strength*, Foreign Affairs (Mar. 1, 2011), 2011 WLNR 29001382.

[228] Daniel Byman (Saban Ctr. for Mid. E. Policy at the Brookings), *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at 3 (Aug. 2012), https://tinyurl.com/m4nuskbs.

[229] *Id*. at iv.

[230] *Id*. at v.

backbone to terrorist enterprises.  Interestingly, we found that there were all-purpose financiers who would give to multiple causes—'polyterror' supporters."[231]

f.   Thomas Joscelyn, 2013:  "The 9/11 commission … pointed [out that] very early on, [] more than two decades ago, … bin Laden [] employed a strategy of … planting seeds in a variety of countries to try and hopefully cultivate … affiliates or branches. … in some spectacular ways, these efforts have actually worked. … al-Qaida's core is not confined … to Afghanistan and Pakistan.  … [b]ased on al-Qaida's literature, including a … published letter from [] al-Zawahiri is that [Afghanistan and Pakistan are] basically where [al-Qaeda's] general command is actually headquartered, and they have a series of committees and advisers surrounding [] al-Zawahiri.  But the general command dispatches operatives around the globe to oversee their interests,… [with] specific operatives who … are in touch with the general command, who have been dispatched by the general command, and they're operating in places such as Egypt, Libya, Syria, Yemen, Sinai …, across the globe, basically. … [R]ecent evidence [suggests] that al-Qaida in Iraq … considered dispatching operatives to launch [an] attack in … the U.S."[232]

638.   The same information sources described throughout this section alerted

Defendants that al-Qaeda and al-Qaeda-in-Iraq's terrorist campaign against the United States

posed a severe terrorism risk in the central, northern, and western Iraqi geographies in which

Defendants conducted business.  Examples of such reports include, but are not limited to:

a.   Iraq Study Group, December 2006:  "Four of Iraq's eighteen provinces are highly insecure—Baghdad, Anbar, Diyala, and Salah ad Din. … In Anbar, the violence is attributable to the Sunni insurgency and to al Qaeda …"[233]

b.   DOD, March 2007:  "Violence in Baghdad, Diyala, and Balad is characterized by sectarian competition for power and influence between AQI and JAM, principally

---

[231] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*").

[232] Thomas Joscelyn (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.

[233] The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 6 (Dec. 2006).

through murders, executions, and high-profile bombings."[234]  "Violence in Anbar is characterized by Sunni insurgents and AQI attacks against Coalition forces."[235]

c.  <u>DOD, September 2007</u>:  "Although Irbil, Dahuk and Sulaymaniyah are generally stable, AQI maintains a presence in those areas and there is some evidence that AQI is increasingly targeting the region. Attacks on infrastructure, such as roads and bridges, have increased …, likely in an effort to hinder … Coalition forces' mobility and undermine local confidence in … Coalition forces' ability to protect them. For example, the Sarahah Highway Bridge (south of Kirkuk), which was destroyed on June 2, [2007,] was a key conduit for transportation between the southern and northern provinces."[236]

d.  <u>DOD, September 2008</u>:  "AQI and affiliated Sunni insurgent groups … remain active in the North, particularly in Ninewa and Tamim Provinces, where the possibility of Kurdish annexation of Ninewa districts and Kirkuk is a polarizing issue."[237]

e.  <u>DOD, January 2010</u>:  "AQI remains the most active and violent group in Iraq and initiates the vast majority of [high profile attacks] in areas such as Anbar Province, Mosul, Kirkuk, Diyala, and Baghdad."[238]

f.  <u>SIGIR, January 2010</u>:  "DoD reports that the al-Qaeda in Iraq (AQI) terrorist network … appear[s] to be targeting mixed urban areas—including those in Ninewa, Tameem, Diyala, and Baghdad provinces …"[239]

639.  Defendants knew about al-Qaeda's role in facilitating attacks involving the Taliban, including its Haqqani Network, in Afghanistan, given the topic's wide coverage in mainstream media outlets.  Examples of such reports include, but are not limited to:

a.  On June 30, 2005, the *Boston Globe* quoted "General David Barno, former head of the US military in Afghanistan, [who] predicted … that most of the [Taliban] would collapse

---

[234] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress*, at 14 (Mar. 2, 2007).

[235] *Id.*

[236] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2007 Report to Congress*, at 23 (Sept. 14, 2007).

[237] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2008 Report to Congress*, at 27 (Sept. 26, 2008).

[238] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at vii (Jan. 29, 2010).

[239] Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 41 (Jan. 30, 2010).

in the coming 'year or so,' leaving behind a 'small hard-core remnant . . . which is essentially a wholly owned subsidiary of Al Qaeda.'"[240]

**b.**    On May 30, 2007, the *Washington Times* reported that "[t]he Taliban has merged its propaganda and field operations with those of the global al Qaeda network led by Osama bin Laden" and "[t]he Taliban have changed immensely in the last year due to the mentoring they are getting from leading Arab jihadists in Pakistan with al Qaeda, both in the realm of battlefield tactics and media operations, … [and] are doing what works in Iraq and often succeeding… Before his [] death …, the Taliban's military commander, Mullah Dadullah, claimed that the Taliban's planning and operations were one and the same with those of al Qaeda. Afghan officials also said the Taliban's suicide bombing attacks in Kabul and other large cities were approved in advance by senior al Qaeda operatives in Pakistan. 'The Taliban is now an integral part of an internationalized jihad,' said Waheed Mujda, an Afghan writer who served as a deputy minister in the Taliban's government between 1997 and 2001."[241]

**c.**    On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[242]

**d.**    On December 3, 2009, Secretary of State Hillary Clinton testified publicly that the U.S. government viewed al-Qaeda and the Taliban "not as separate independent operators" but "as part of a syndicate of terrorism."[243]

**e.**    On December 15, 2009, the *Wall Street Journal* quoted Admiral Mullen as saying that U.S. officials were "deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[244]

**f.**    On January 5, 2010, the *Wall Street Journal* reported in a front-page article that the December 30, 2009, attack on Camp Chapman was carried out by a bomber working with al-Qaeda, and that the Taliban had claimed responsibility for it.[245]

---

[240] Victoria Burnett, *17 Aboard Downed Copter Feared Dead*, Boston Globe (June 30, 2005), 2005 WLNR 10289401.

[241] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Washington Times (May 30, 2007), 2007 WLNR 10111354.

[242] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[243] S. Hr'g 111-479, at 24.

[244] *Afghan Police Killings Highlight Holes in Security*.

[245] Siobhan Gorman et al., *CIA Blast Blamed on Double Agent*, Wall St. J. (Jan. 6, 2010).

**g.**    On January 21, 2010, Secretary of Defense Robert Gates stated publicly that al-Qaeda and the Taliban "had formed a 'syndicate' of terrorist groups," and that the Taliban was one of the "factions" that was "working under the umbrella of Al Qaeda."[246]

**h.**    On May 28, 2011, the *Washington Post* reported that Secretary Clinton said the goal of United States talks with the Taliban was "to split the Taliban from al-Qaeda."[247]

**i.**    On April 30, 2012, the *Guardian* reported:  "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign.  In particular, it contributes military expertise to the spectacular attacks organised out of Waziristan, it sends groups of fighters from there to the front lines and it inspires."[248]

**j.**    On October 21, 2015, an opinion piece in the *New York Times* described Zawahiri's "oath of fealty" to Mullah Mansour.[249]

640.    Defendants also knew that al-Qaeda and its progeny prized their safe haven in Afghanistan and would foreseeably deploy their terrorist resources there.  As terrorism scholar Colin P. Clarke observed, "[w]ithin the broader jihadi universe, al-Qaeda existed as a central node and maintained connections, linkages, and alliances with a diverse array of groups, including the Afghan Taliban."[250] According to Dr. Clarke, "[i]n many ways, Afghanistan, despite its geographic location outside of the Middle East and North Africa, has served as one of the, if not the, most critical hubs in the global jihad over the past four decades. It is a place that militants have continually returned to, even after other conflicts have drawn them away."[251]

---

[246] *Gates Casts Qaeda As Terror Syndicate.*

[247] Karen DeYoung, *Clinton Sees 'Turning Point' After Brief Visit to Pakistan*, Wash. Post (May 28, 2011), 2011 WLNR 10685527.

[248] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).

[249] Thomas Joscelyn & Bill Roggio, *Are We Losing Afghanistan Again?*, N.Y. Times (Oct. 21, 2015).

[250] Dr. Colin P. Clarke, *After the Caliphate: The Islamic State & the Future Terrorist Diaspora* 24 (Polity 2019).

[251] *Id.*

641.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda waged a globally integrated terrorist campaign against the United States.

### 2.    Defendants Knew Protection Payments Aided Al-Qaeda

642.    Defendants knew protection payments aided al-Qaeda's operations worldwide because Defendants' employees and agents in the United States, Sweden, and Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

643.    **United States government reports and statements** alerted Defendants that their protection payments in Iraq aided al-Qaeda's worldwide campaign, including, but not limited to:

a.    Treasury Department, 2005:  "[T]he Zarqawi Network … use[s] a variety of classic al Qaida-type terrorist financing mechanisms, including: * Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in Syria, Lebanon, Jordan, Iran, and Europe; * Criminal activities, such as … extortion …."[252]

b.    *Defense Department Documents*, January 2007:  "[S]uspected terrorists were captured [] during a raid conducted north of Baghdad that targeted an individual with ties to a senior al Qaeda leader who has … conducted extortion operations …"[253]

c.    U.S. Army, November 2010:  "al Qaeda in Iraq … remain a threat, and they remain dangerous … [and remain] part of the [al-Qaeda] network …[,] [which] includes al Qaeda's ability to … plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money.  … al Qaeda continues to change its tactics and how it adapts.  … they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of [Iraq]."[254]

---

[252] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658.

[253] Def. Dep't Documents, *American Forces Information Service News Articles, Combined Operation Nets Insurgents, Weapons in Baghdad* (Jan. 24, 2007), 2007 WLNR 1420339.

[254] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

d.   Treasury Department, 2015:  "GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [al-Qaeda] requires significant funding. While the cost of an individual terrorist attack can be quite low, maintaining a terrorist organization requires large sums. Organizations require significant funds to create and maintain an infrastructure of organizational support, to sustain an ideology of terrorism through propaganda, and to finance the ostensibly legitimate activities needed to provide a veil of legitimacy for terrorist organizations. As deceased AQ financial chief Sa'id Al-Masri put it: 'without money, jihad stops.' Although financial activities can vary significantly among different terrorist groups, several areas of commonality exist. …  1. *CRIMINAL ACTIVITY*[.] Terrorist groups engage in a range of criminal activity to raise needed funds. Extensive revenue from … criminal activities such as extortion have permitted AQ affiliates and other terrorist groups to generate significant revenue. … [E]xploitation of local populations … has become a key revenue source for numerous terrorist groups worldwide. … this form of pseudo-sovereignty-based fundraising has spread to other un- or under-governed territories around the world, most recently Iraq and Syria."[255]

644.    U.S. government reports also alerted Defendants that their protection payments

via "free goods," comprised of high-tech communications technologies donated to terrorists

through LM Ericsson's and Ericsson Inc.'s uncontrolled Iraqi slush funds and intermediary

partners, consultants, and contractors—which Defendants sometimes facilitated as an in-kind

alternative to cash-based protection payments—also aided al-Qaeda, al-Qaeda-in-Iraq, and

Islamic State.  For example, according to U.S. counterterrorism strategy in 2018:

The technological advances of the past century have created an interconnected world in which it is easier than ever to quickly move people, funding, material, and information across the globe. The backbone of this interconnected system is information technology—largely created and facilitated by the United States Government and private industry—that is increasingly enabling faster transactions of all kinds across the world. Terrorists use these same publicly available technologies to command and control their organizations and to plot attacks, travel, and abuse the global financial system to raise funds and procure weapons, materiel, and basic necessities. Terrorists cannot sustain their operations without these resources. The United States[,] … [a]round the globe, [] will promote effective enforcement of legislation and policies aimed at protecting … communication industries.[256]

---

[255] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015).

[256] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

645.   **Media reports** alerted Defendants that protection money payments in Iraq aided al-Qaeda's operations worldwide.  The media routinely reported that al-Qaeda doctrine emphasized the extraction of protection money as a core fundraising tactic from the late 1990s through 2004. Such reports included, but were not limited to:

a.   _Agence France Press_, October 1998:  "[B]in Laden has … exhausted his own [] fortune, … and now depends on donations [and] … protection money to finance his operations."[257]

b.   _Washington Post_, September 2001:  "The legend of … bin Laden is that of … a business-savvy nomad who has used … a constellation of companies to finance a global network … Ever since his days as a student of economics and finance …, bin Laden has shown a special affinity for raising and managing money. … Bin Laden has built upon those sources and methods to finance his terrorism. … Bin Laden's organization draws large amounts of money from … 'protection money' …, a former senior U.S. official said."[258]

c.   _Sunday Mail_, September 2001:  "Severing the financial arteries that feed [] bin Laden's war machine has become a priority… Intelligence sources believe … [b]usinessmen throughout the Middle East … [were] paying millions of dollars in protection money."[259]

d.   _Mirror (UK)_, October 2001:  "[B]in Laden has bought off the Taliban by giving them [] 70 million and is said to own and operate the vicious regime. The terrorist leader has been secretly funding Mullah Omar Muhammad and his leaders … The money bin Laden gives the Taliban comes from businesses … and protection money from … firms to ensure he keeps his activities in their area to a minimum."[260]

e.   _Herald (Glasgow, Scotland)_, October 2001:  "US government sources told the Washington Post that the CIA has concluded that bin Laden 'owns and operates' the Taliban. … The [Post] was told the money [bin Laden provides to the Taliban] comes

---

[257] Agence France Presse English Wire, _Osama Bin Laden Gets Money From Saudi Royalty: US Intelligence_ (Oct. 10, 1998).

[258] Robert O'Harrow Jr., David S. Hilzenrath, and Karen DeYoung, _Bin Laden's Money Takes Hidden Paths To Agents of Terror; Records Hint at Complex Financial Web_, Washington Post (Sept. 21, 2001), 2001 WLNR 13158661.

[259] Sunday Mail (Australia), _War On Terror; The World Waits; The Money Trail_ (Sept. 23, 2001), 2001 WLNR 5323188.

[260] Andy Lines, _War On Terror: Battlefront: Pounds 70 M It's Honey Money To Aid Taliban, Mirror (UK)_ (Oct. 12, 2001), 2001 WLNR 9358733. On information and belief, most of the referenced payments in this source were primarily denominated in U.S. dollars and/or facilitated by U.S. dollar-denominated transactions, and the Mirror's reference to pounds was merely a conversion by the journalist for its intended U.K. audience.

from three primary sources: legal and illegal businesses or front companies bin Laden operates; protection payments he receives from … companies…; and entities that are masked as charities."[261]

**f.**    *APA (English News Service)*, October 2001:  "An Austrian economics professor …, Prof. Friedrich Schneider said … between ten and 20 per cent of Al Qaida's income came from 'classical' criminal activities such as …'protection money'."[262]

**g.**    *Cleveland Plain Dealer*, November 2001:  "[B]in Laden" "co-opted" "other terror groups … [and] … [h]is … protection rackets … have been exceedingly lucrative."[263]

**h.**    *Associated Press*, February 2002:  "[A]n al-Qaida training manual aimed at teaching Osama bin Laden's followers the best ways to kill thousands of people and spread fear in the United States … [known as] 11-volume 'Manual of Afghan Jihad' … offers advice on how to raise funds for covert operations through extortion."[264]

**i.**    *PA News*, December 2003:  "[A]l Qaida operatives levy a 'tax' on shipments as they pass borders or areas under the terror network's influence, in Iran, Pakistan, Turkmenistan and other countries."[265]

**j.**    *BBC International Reports (Europe)*, October 2004:  "[T]he merging of organized crime and terrorism is a new phenomenon.  BND President Hanning assumes 'that terrorist structures, such as … Al-Qa'idah, finance their fight through the extortion of protection money as well as direct involvement in drug-trafficking.'"[266]

646.    From 2004 through 2014, media reports regularly alerted Defendants that their protection payments in Iraq directly benefited al-Qaeda's worldwide operations.  Such articles included, but were not limited to:

---

[261] Kay Jardine, *West Is 'Thirsty for Bloodshed'*, Herald (Glasgow, Scotland) (Oct. 12, 2001), 2001 WLNR 3862913.

[262] APA (English News Service), *Economics Professor Says Al Qaida Backed By 4.85 Billion Dollars* (Oct. 25, 2001), 2001 WLNR 130475.

[263] Elizabeth Sullivan, *How To Turn A Terrorist Into A Has-Been*, Cleveland Plain Dealer (Nov. 19, 2001), 2001 WLNR 11203968.

[264] Hamza Hendawi, *Al-Qaida Manual Pushes Mass Fatalities Visibility*, Associated Press, *republished in* Wichita Eagle (Feb. 2, 2002), 2002 WLNR 1319548.

[265] Mark Sage, *Bin Laden 'Funding Terror Through Drugs'*, PA News (Dec. 29, 2003).

[266] BBC International Reports (Europe), *German Intelligence Chief Says Bin-Ladin Still Alive* (Oct. 10, 2004).

a.   *Cleveland Plain Dealer*, October 2006:  "There simply are not enough coalition forces in Iraq to be everywhere to impose security. Al-Qaida operatives … seem to be running their own protection rackets …" [267]

b.   *New York Times*, November 2006:  "The insurgency in Iraq is now self-sustaining financially, raising tens of millions of dollars a year from … [inter alia] … crimes …, a classified United States government report has concluded.  [I]ts most surprising conclusion: '… terrorist and insurgent groups in Iraq may have surplus funds with which to support other terrorist organizations outside of Iraq.'"[268]

c.   *Los Angeles Times*, June 2007:  "By January [2007], the Islamic State's proclamations appeared on walls and were circulated in leaflets [in Iraq]. … 'They issued laws and decrees like a real state,' said [an Iraqi victim] ….  Papers demanding protection money were sent to homes [and] Al Qaeda backers flexed their muscle …"[269]

d.   *National Public Radio*, July 2007:  "[Peter Bergen stated:] '… al-Qaida in Iraq is beginning to finance al-Qaida central in the Afghan-Pakistan border, because al-Qaida in Iraq is making a lot of money from … from protection money … and is now, financially, a quite viable organization.'"[270]

e.   *Reuters News*, September 2007:  "[V]igorous fund-raising from protection rackets … helped keep al Qaeda active."[271]

f.   *Reuters News*, December 2007:  "Iraq has pulled back from the brink of civil war, but recent security gains are fragile and still reversible, the top U.S. commander in Iraq, General David Petraeus, said … Petraeus said he viewed Sunni Arab al Qaeda as the main enemy in Iraq… MAFIA RACKETS[.] Petraeus said most attacks were carried out by al Qaeda in northern Iraq, … He said al Qaeda had turned to 'mafia-style' rackets to finance its operations …. Shi'ite militias were involved in similar rackets."[272]

---

[267] Cleveland Plain Dealer, Opinion, *No Honey Coating Only Hard Choices Lie Ahead In Violence-Torn Iraq; It's Time To Explain Them Honestly To The American People* (Oct. 25, 2006), 2006 WLNR 18536168.

[268] John F. Burns and Kirk Semple, *U.S. Finds Iraq Insurgency Has Funds to Sustain Itself*, N.Y. Times (Nov. 26, 2006).

[269] Ned Parker, *The Conflict In Iraq: Baghdad Neighborhood Purged*, Los Angeles Times (June 27, 2007), 2007 WLNR 12080034.

[270] Peter Bergen, *quoted in* NPR Talk of the Nation, *A Closer Look at al-Qaida in Iraq* (July 23, 2007), 2007 WLNR 14086129.

[271] William Maclean, *Refile-Analysis-Algeria Rebel Attacks Test Govt Security Policy*, Reuters News (Sept. 23, 2007).

[272] Ross Colvin, *Petraeus: Iraq Security Fragile, Gains Reversible*, Reuters News (Dec. 29, 2007).

**g.**    *Associated Press*, March 2008:  "The suicide bombers who have killed 10,000 people in Iraq, including hundreds of American troops, usually … come from outside Iraq. … 'Al-Qaida recruits these people from the Middle East and North Africa, hitting them at the most vulnerable time of the life,' said [a] senior [U.S.] analyst[] … The demand for many foreign fighters begins in places such as the dingy back streets of teeming Iraqi cities such as of northern Mosul – where al-Qaida still holds sway. An al-Qaida cell decides it needs two suicide bombers. They put in an order which is funded by money made through racketeering, extortion and kidnapping. That request travels to Damascus and to the facilitators and recruiters training young men in North Africa and Saudi Arabia. Three months later, the bomber is delivered, military investigators and officials say."[273]

**h.**    *Reuters Gulf Financial News*, August 2011:  "Al Qaeda has resurfaced in former Iraqi strongholds … [and has] been carrying out bolder attacks…  Mosul, is seen as one of the last urban strongholds of al Qaeda in Iraq … [Al Qaeda in Ninewa Province] funds operations through extortion …"[274]

**i.**    *Economist*, November 2013:  "al-Qaeda is … making its presence heavily felt, collecting protection money to help pay for its operations. … [Iraqi Prime Minister Maliki's] aides stress that 'al-Qaeda is a common threat to everyone.' Indeed, a group responsible for many of the recent … bombings, [ISIS], gives its allegiance to al-Qaeda."[275]

**j.**    *New York Times*, December 2013:  "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Qaeda's regional affiliate, the Islamic State in Iraq and Syria, has become a potent force in northern and western Iraq. … [S]aid Michael Knights, an expert on Iraqi security …[:] … 'There is one place in the world where Al Qaeda can run a major affiliate without fear of a U.S. drone or air attack, and that is in Iraq and Syria.' … Using extortion … the Qaeda affiliate is largely self-financing."[276]

647.    **Terrorism scholars** alerted Defendants that their protection payments aided al-

Qaeda.  For example, in 2009, Dr. Williams reported that "the proceeds from protection fees …

strengthened nonstate groups and provided resources for their continued challenge to the

---

[273] Patrick Quinn (Associated Press), *US Military Study Of Iraq Detainees Provides Insights Into The Motivations Of Foreign Fighters*, AP Worldstream (Mar. 15, 2008) (emphasis added).

[274] Rania El Gamal, Suadad al-Salhy, Jim Loney, and Ruth Pitchford, *Analysis–Iraq Al-Qaeda Regroups, Shi'ite Militias Threaten*, Reuters Gulf Financial News (Aug. 28, 2011).

[275] Economist, *Civil Strife In Iraq: Going All Wrong* (Nov. 2, 2013), 2013 WLNR 27433452.

[276] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

Baghdad government."[277] According to Dr. Williams, "al-Qaeda" "need funding and are unlikely to remain aloof when others are making money, either legally or through illicit activities" and thus "even if they are not directly involved they are almost certainly imposing some kind of tax or demanding a slice of the profits in return for allowing the trade to operate."[278]

648.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that protection payments aided al-Qaeda's terrorist campaign against the United States.

### 3.    Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq

649.    Defendants knew protection payments aided al-Qaeda-in-Iraq because Defendants' employees and agents in the United States, Sweden, and Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

650.    **United States government reports** alerted Defendants that their protection payments aided al-Qaeda-in-Iraq.[279]

---

[277] Williams, *Criminals, Militias, and Insurgents*, *supra*, at 161.

[278] *Id*. at 177.

[279] *E.g.*, Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("The financing networks of the Iraqi insurgency are complex and diverse.  Insurgents draw on both external financing and on internal Iraqi sources of funds and materiel.  For example, … jihadist groups use … Criminal activities, such as … extortion …"), https://home.treasury.gov/news/press-releases/js2658; U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to*, at 34 (Apr. 29, 2010) ("AQI … continues its efforts to gain funds through widespread extortion efforts."); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010) (same); American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010) ("In … Mosul, Iraqi soldiers and U.S. advisors searched … for a suspected AQI member believed to extort money from [] transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in the deaths or arrests of at least six suspected senior AQI leaders believed to greatly contribute to

651.    **Media reports** alerted Defendants that protection payments provided vital

funding that aided al-Qaeda-in-Iraq's operations in Iraq, Syria, and Afghanistan.[280]

---

funding the terrorist group by their involvement in a highly-organized extortion … ring based in Mosul. … The six … include the overall AQI commander of northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion … network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"), 2010 WLNR 6913562; Julia McQuaid, Jonathan Schroden, Pamela G. Faber, P. Kathleen Hammerberg, Alexander Powell, Zack Gold, David Knoll, and William Rosenau, *Independent Assessment of U.S. Government Efforts against Al-Qaeda, CNA Report Pursuant to Section 1228 of the 2015 National Defense Authorization Act*, at 175 (Oct. 2017) ("AQI/ISI relied on a variety funding streams. In the runup to the founding of AQI … As of 2009, AQI was essentially self-financing, supporting itself through crimes such as extortion …").

[280] *E.g.*, Pamela Hess (UPI Pentagon Correspondent), *Analysis: Zen and The Art of Counterinsurgency*, UPI News (July 29, 2004) ("It is tough to overemphasize the importance of organized crime in the insurgency, Marine commanders say. Millions of dollars flow through the country daily in an unofficial economy and have for the past decade. The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties."); Bilal A. Hibab, *Iraq's Disappearing Oil*, Wilson Quarterly (Sept. 2006) ("A web of corruption and criminality [] is helping to destabilize Iraq, … and financing the country's slide toward chaos … [Al-Qaeda-in-Iraq] [i]nsurgents [in Mosul] attack Iraqi [transportation targets] … in part to force the government to rely on trucks … who usually pay protection money to the insurgents."); Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007) ("On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network … [who allegedly extracted] protection money from local contractors and us[ed] the funds to finance al Qaeda in Iraq activities."); Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008) ("AQI is … increasingly turning to crime to help finance its deadly operations. … Al Qaeda in Iraq is no stranger to racketeering … [and] long raised money through [crime] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses. … That money helped AQI purchase arms, pay salaries and bribes and stage attacks."), https://tinyurl.com/4ezvphc9; Andrew E. Kramer, *Iraqi Christians' Secret: Protection Money To Insurgents*, International Herald Tribune (June 26, 2008) ("[P]rotection money … grew into a source of financing for [al-Qaeda-in-Iraq]. [Protection payments] thus became a secret, shameful and extraordinary complication … 'People deny it, people say it's too complex, and nobody in the international community does anything about it,' said Andrew White, the Anglican vicar of Baghdad. … [M]any … in Iraq paid … knowing full well the money would be used for bombs and weapons to take the lives of others."), 2008 WLNR 11985310; Pamela Hess (Associated Press), *US: Iraqi Fighters Extort,*

228

652.  **Terrorism scholars** alerted Defendants that their protection payments aided al-

Qaeda-in-Iraq worldwide.  Examples of such reports include, but are not limited to:

a.  Professor Robert Looney, 2005:  "[T]he convergence of large segments of the Iraqi
insurgency with elements of organized crime … [and] the insurgency's subtle shift
toward increased reliance on criminal activity has implications that are … important for
the Iraqi economy. Increased criminal activity is effectively stifling attempts to expand
the formal sector. … [A] successful attack on criminal activity in Iraq is as important in
determining the country's future as the outcome of the current anti-insurgency campaign.
One might even venture to say they are largely one and the same. … Insidious criminal
activity is not new to Iraq. In fact, as recent revelations coming out of the United Nations
Oil for Food scandal show, criminal activity has long been pervasive in all areas of Iraqi
society, from the highest levels of official power to the lowly smuggler trying to eke out
an existence during the period of sanctions in the 1990s. … With segments of the
insurgency's financial needs matching or in some cases overriding its political
motivations, an increasing amount of time and effort of these groups is devoted to
creating 'in house' criminal capabilities. …. Complicating matters is the near
impossibility of establishing effective anti-crime programs in an environment of rampant
corruption. … Transparency International [] ranks Iraq as the most corrupt country in the
Middle East …, with the country's corruption actually worsening between 2003 and
2004. Instability, high unemployment and corruption have created a volatile mix that is
ideal for organized crime. … In this environment, Western intelligence agencies are
becoming increasingly worried about the systematic strengthening of ties between

_Kidnap to Raise Funds_, AP DataStream (July 29, 2008) ("Al-Qaida in Iraq is increasingly
embracing extortion … to finance its operations ... [by] demanding protection money of local
businesses."); AP Alert - Business, _Iraqis Arrest Numerous Terrorism Suspects_ (Oct. 14, 2009)
("[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based
in … Mosul. … targeted … those who own or work at construction sites and local businesses …
Extortionists then use the [] money to fund terrorist attacks …"); Associated Press, _Iraqi Forces
Arrest 2 Al-Qaida Suspects_, AP Alert – Terrorism (Sept. 2, 2010) ("Iraqi forces … searched …
for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money from …
contractors and … transportation workers in order to fund terrorist operations …"); Kerry
Murphy (Australian Immigration Lawyer and Arabic Scholar), _What's Eating Syria And Iraq_,
Eureka Street (June 17, 2014) ("The capture of … Mosul by [AQI] is a major concern not just
for Iraq but for the whole Middle East. … Although Zarqawi was killed…, AQI continued. In
towns where it had control or influence, it demanded mafia-style protection payments which
helped fund its operations in Iraq and more recently in Syria."), https://tinyurl.com/y98ah99f;
Jamie Tarabay, _Iraq In 2014: Back To Civil War?_, Al Jazeera America (Dec. 21, 2013)
("[S]olidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local
support in cities … where Iraqi security forces have failed to gain a foothold.  'Since 2010 AQIS
has been self-funding through organized crime rackets involving … protection payments from
large Iraqi companies, plus trucking, smuggling and real estate portfolios,' [Michael] Knights
said."), https://tinyurl.com/5k57c4vx.

terrorists and organized crime. … The current wave of crime and insurgent activity creates, and is in turn supported by, an increasingly sophisticated criminal economy."[281]

**b.**   <u>Douglas Lovelace, 2009</u>:  "[T]he insurgency [in Iraq] was strengthened and sustained by criminal activities," "including" "extortion" aided by "the critical role played by corruption in facilitating and strengthening organized crime," through which "al-Qaeda in Iraq … used criminal activities to fund their campaigns of political violence."[282]

**c.**   <u>Dr. Phil Williams, 2009 and 2010</u>:  "[A] large volume of such" "protection" "payments" … "became a significant revenue source [for anti-American terrorists in post-Saddam Iraq].[283] "Terrorist organizations … use organized crime activities as a funding mechanism. … in Iraq … criminal activities were used … by insurgents … seeking to enhance their resource bases and prosecute their campaigns of violence more effectively. … [E]xtortion … helped to fund much of the violence in Iraq. Extortion was highly profitable partly because of the scale of reconstruction and partly because of the loss of security on Iraqi roads. … Foreign fighters and jihadis groups, especially al-Qaeda in Iraq (AQI), exploited various criminal activities to augment their financial base. … Extortion … [was one of AQI's] core funding activities. …  AQI's criminal activities continue to finance its resistance in and around Mosul. …"[284] "[I]t is important to emphasize that organized crime in Iraq is not something separate from the insurgency, the sectarian conflicts, or the activities of AQI; rather, it is interwoven with these other organizations and activities, … creating negative but very powerful synergistic effects."[285] "[A] critical component of organized crime in Iraq was the appropriation of criminal methods by … jihadis … In many respects this was a familiar pattern. Groups as diverse as the Irish Republican Army, Liberation Tigers of Tamil Eelam, and Revolutionary Armed Forces of Colombia had long used criminal activities as a funding mechanism. For jihadi groups, especially AQI, criminal activities became a critical source of revenue. … Extortion [was among AQI's] … core funding activities."[286] "Organized crime in Iraq in the months and years after March 2003 … finance[ed] the violent opposition to the occupation forces. …

---

[281] Robert E. Looney (Professor of National Security Affairs at the U.S. Naval Postgraduate School), *The Business of Insurgency: The Expansion of Iraq's Shadow Economy*, National Interest (Oct. 1, 2005), 2005 WLNR 29354864.

[282] Douglas C. Lovelace, Jr., *Foreward* ("Lovelace, Jr., Forward"), *published in* Williams, *Criminals, Militias, and Insurgents*, *supra*, at vii-viii.

[283] Williams, *Criminals, Militias, and Insurgents*, *supra*, at 236.

[284] Lovelace, Jr., Forward at ix-xvi. Shiite terrorists also practiced protection rackets.  *See*, *e.g.*, *id.* at xv ("Shiite militias, especially Jaish-Al-Mahdi (JAM), have been among the most powerful and important groups engaged in organized crime in Iraq—although how much has been carried out under the direct control of the organization and how much by rogue factions is uncertain. [] [C]riminal activities [that] provided Mahdi Army members with important revenue streams[] [included] extortion and protection…").

[285] Williams, *Criminals, Militias, and Insurgents*, *supra*, at 13.

[286] Williams, *Organized Crime in Iraq*, *supra*, at 51.

In 2008, the capacity to generate funds through criminal activities enabled al Qaeda in Iraq (AQI) to continue resisting [] the U.S. military."[287]

653.     From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that protection payments aided al-Qaeda-in-Iraq's terrorist campaign against the United States.

### 4.     Defendants Knew Al-Qaeda-In-Iraq Aided Al-Qaeda

654.     Defendants always knew their aid to al-Qaeda-in-Iraq also aided al-Qaeda. For example, as Kenneth Katzman, a Middle East specialist, observed in 2008, "[t]he links between AQ-I and Al Qaeda's central leadership might be tightening, but they are not new."[288]  The same types of sources referenced throughout this section alerted Defendants that al-Qaeda-in-Iraq specifically worked with the Taliban, including its Haqqani Network.  For example, Haqqani scholar Anand Gopal reported in 2009, that "[t]he Haqqanis pioneered the use of suicide attacks in Afghanistan, an import from Al Qaeda in Iraq."[289]

655.     **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan.  For example, according to Mr. Katzman, "on July 24, 2007, President Bush devoted much of a speech to the argument that AQ-I is closely related to Al Qaeda's central leadership" and "noted the following details, including":

a.     "In 2004, Zarqawi formally joined Al Qaeda and pledged allegiance to bin Laden. Bin Laden then publicly declared that Zarqawi was the 'Prince of Al Qaeda in Iraq.' President Bush stated that, according to U.S. intelligence, Zarqawi had met both bin Laden and

---

[287] *Id*. at 47.

[288] Kenneth Katzman (Specialist in Middle Eastern Affairs), CRS Report for Congress, *Al Qaeda in Iraq: Assessment and Outside Links*, at 17 (Aug. 15, 2008), https://tinyurl.com/2p8smj4d.

[289] Anand Gopal, *The Most Deadly US Foe in Afghanistan*, Christian Science Monitor (May 31, 2009), 2009 WLNR 10378180.

Zawahiri. He asserted later in the speech that, according to U.S. intelligence, AQ-I is a 'full member of the Al Qaeda terrorist network.'"

b.    "After Zarqawi's death, bin Laden sent an aide named Abd al-Hadi al-Iraqi to help Zarqawi's successor, al-Masri, but al-Iraqi was captured before reaching Iraq."

c.    "That a captured AQ-I leader, an Iraqi named Khalid al-Mashhadani, had told U.S. authorities that Baghdadi was fictitious. In July 2007, Brig. Gen. Bergner, a U.S. military spokesman, told journalists that Mashhadani is an intermediary between al-Masri and bin Laden and Zawahiri."

d.    "That AQ-I is the only insurgent group in Iraq 'with stated ambitions to make the country a base for attacks outside Iraq.' Referring to the November 9, 2005, terrorist attacks on hotels in Zarqawi's native Jordan, President Bush said AQ-I 'dispatched terrorists who bombed a wedding reception in Jordan.' Referring to an August 2005 incident, he said AQ-I 'sent operatives to Jordan where they attempted to launch a rocket attack on U.S. Navy ships' docked at the port of Aqaba."[290]

656.    The United States government regularly published other reports and statements

alerting Defendants that al-Qaeda-in-Iraq aided al-Qaeda.[291]

657.    **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted

Defendants to the close relationship between al-Qaeda-in-Iraq and al-Qaeda-backed terrorists in

Afghanistan and Pakistan.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team

---

[290] Katzman, CRS Report for Congress, *Al Qaeda in Iraq: Assessment and Outside Links*, at 17-18.

[291] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2004* at 7 (Apr. 2005) ("The apparent mergers or declarations of allegiance of groups such as Abu Mus'ab al-Zarqawi's organization with al-Qa'ida suggest that al-Qa'ida is looking to leverage the capabilities and resources of key regional networks and affiliates — a trend that al-Qa'ida could also use to try to support new attacks in the United States and abroad."); The White House, *Press Release: The Rest of the Story: The NIE Reflects Previous Statements About the War on Terror* (Sept. 26, 2006) ("Terrorists Consider Iraq 'The Central Battlefield' In The War On Terror … [and have] made clear that the most important front in their struggle against America is Iraq – the nation bin Laden has declared the 'capital of the Caliphate.' Hear the words of bin Laden: … 'The most… serious issue today for the whole world is this Third World War… [that] is raging in [Iraq].' … For al Qaeda, Iraq … is the central battlefield where the outcome of this struggle will be decided.'"), https://tinyurl.com/swccct8y.

reported that "[t]he Taliban" "continued to benefit from a close relationship with Al-Qaida and related foreign groups."[292] The U.N. regularly published similar reports between 2005 and 2021.

658.    **Media reports** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan.[293]

659.    **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan.[294]

---

[292] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).

[293] *E.g.*, Robert J. Caldwell, *Our Enemy, The Face Of Evil*, San Diego Union-Tribune (June 27, 2004) ("Zarqawi and his estimated 2,000 armed terrorists in Iraq are subsidiaries of the global al-Qaeda network. Their hate-filled ideology and savage methods are indistinguishable from the devil's brew that produced 9/11."), 2004 WLNR 16950014; Allan Massie, *Focus: Fight Terrorism, But Don't Make Things Worse By Calling It A War*, Scotsman (Sept. 7, 2006) ("Al-Qaeda, or its subsidiary connection, is active in Iraq, in Afghanistan and in the Afghan-Pakistan borderlands."), 2006 WLNR 15488717.

[294] *E.g.*, Peter Bergen, *After the War in Iraq: What Will the Foreign Fighters Do?*, *published in* Combating Terrorism Center at West Point, Harmony Project, *Bombers, Bank Accounts, & Bleedout*, *supra*, at 110-12 ("[A]n Iraqi al-Qa'ida operative, Khalid al Mashadani, [] told his interrogators that he had acted as a conduit between the top leaders of al-Qa`ida in Iraq and bin Ladin and Zawahiri. … Mashadani revealed that there was 'a flow of strategic direction, of prioritization of messaging and other guidance that comes from the Al-Qa'ida senior leadership to the Al-Qa'ida in Iraq leadership. … AQI Attacks Outside of Iraq [were foreseeable because] … AQI [was] the only Iraqi insurgent group that ha[d] attacked American targets outside of the country, and ha[d] repeatedly said it plan[ned] to attack the United States itself."); Bergen, Felter, Brown, and Shapiro, *supra*, at 9, 12 ("AQI is increasingly linked to al-Qa`ida's senior leaders. AQI did not exist before the US invasion, but the organization has grown progressively more integrated with al-Qa`ida Central, especially following Abu Mus'ab al-Zarqawi's death. … "Al-Qa'ida in Iraq demand[ed] our attention because it remain[ed] a tactical threat to American troops and, even in decline, ha[d] the potential to spread violence beyond Iraq's borders."); Daniel Byman, *The Resurgence of al Qaeda in Iraq, Testimony Before the Joint Hearing of the Terrorism, Nonproliferation, and Trade Subcommittee and the Middle East and North Africa Subcommittee of the House Committee on Foreign Affairs*, *republished by* Brookings Institution (Dec. 12., 2013) ("AQI [was] perhaps the most important Al Qaeda affiliate. … Indeed, not only ha[d] it been responsible for the deaths of thousands of Iraqis, it ha[d] sponsored jihadist insurgents next door in Syria and played a significant role in bringing groups like Al Qaeda in the Islamic Maghreb into the Al Qaeda fold.") https://tinyurl.com/2p9hhy4x.

660.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their aid to al-Qaeda-in-Iraq foreseeably aided al-Qaeda's "core" in Afghanistan and Pakistan.  Indeed, as set forth below, these and other sources alerted Defendants to four ways that Qaeda operatives in Iraq aided their counterparts in Afghanistan: (a) funding; (b) fighters; (c) training; and (d) logistics.

### a.    Defendants Knew Al-Qaeda-In-Iraq Funded Al-Qaeda

661.    From 2003 through 2022, Defendants knew that al-Qaeda-in-Iraq funded al-Qaeda's operations in Afghanistan and Pakistan.

662.    **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. In 2010, for example, Brigadier General Jeffrey Buchanan publicly stated that, with respect to "al Qaeda, … al Qaeda in Iraq … remain[ed]  … [a]nd [al-Qaeda-in-Iraq was a] part of [al-Qaeda's] network" which meant that AQI's Iraq capabilities augmented "al Qaeda's … ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money.  … al Qaeda continues to change its tactics and how it adapts … they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of [Iraq].[295]

663.    **Media reports** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. On July 26, 2007, for example, the media reported that a recent "National Intelligence Estimate" published by "all 16 U.S. intelligence agencies produced after painstaking review" determined that "al-Qaida [was] almost as strong as it was just before

---

[295] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

Sept. 11, 2001," "identifie[d] al-Qaida in Iraq (AQI) as the terrorist organization's 'most visible and capable affiliate'" and that while "[t]he public version" of the National Intelligence Estimate did not "say so, [] AQI has raised significant money through criminal activities and [] now subsidiz[ed] al-Qaida central."[296]

664.    **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. Examples included, but were not limited to:

a.    <u>Daniel Byman, 2012</u>:  "al-Qa'ida[] … has sought financial help from affiliates and charged potential recruits for training."[297]

b.    <u>Dr. Matthew Levitt, 2014</u>:  "ISIS … was financially self-sufficient for about eight years as a terrorist and insurgent group before committing itself to running a proto-state. … AQI was financially independent by virtue of engaging in tremendously successful criminal activity enterprises domestically within Iraq. … Ayman al-Zawahiri … ask[ed] Zarqawi for money … when international efforts to target al Qaeda's financial channels were taking their toll on al Qaeda's coffers."[298]

665.    Defendants' knowledge that al-Qaeda-in-Iraq funded al-Qaeda in Afghanistan extended specifically to their own protection payments becuase Defendants knew that al-Qaeda relied upon al-Qaeda-in-Iraq's protection rackets in Iraq to fund al-Qaeda's operations after 9/11. For example, as al-Qaeda scholar Daniel Byman of the Brookings Institution explained, "[t]he documents discovered in Bin Laden's compound in Abbottabad suggests that the Al Qaeda core

---

[296] Porterville Recorder (California), *Editorial: An Increasing Threat From Al-Qaida: U.S.: Terror Group Has Regrouped In Pakistan, And Its Iraq Affiliate Is Raising Money, Gaining Expertise* (July 26, 2007), 2007 WLNR 14301976.

[297] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, *supra*, at 34.

[298] Dr. Matthew Levitt, *quoted in House Financial Services Committee Hearing "Terrorist Financing and the Islamic State." Testimony by Matthew Levitt, Director of the Stein Program on Counterterrorism and Intelligence, The Washington Institute for Near East Policy*, *republished in* U.S. Congressional News (Nov. 13, 2014), 2014 WLNR 32049841.

is now relying on affiliates for funding, rather than the other way around.  Affiliates, in turn, often engage in crime, … to gain money."[299]

666.    Defendants also knew that their financial aid to al-Qaeda also aided the Haqqani Network.  Media reports, for example, alerted Defendants that al-Qaeda funded the Haqqanis.[300]

667.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda-in-Iraq funded al-Qaeda's "core" in Afghanistan and Pakistan.

### b.    Defendants Knew Al-Qaeda-In-Iraq Terrorists Served Al-Qaeda In Afghanistan, Pakistan, And The Persian Gulf

668.    Defendants always knew that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into already-existing joint al-Qaeda/Taliban cells.

669.    **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into already-existing joint al-Qaeda/Taliban cells.  Examples of such reports include, but are not limited to:

a.    The White House, September 2006:  ""Fighters with experience in Iraq are a potential source of leadership for jihadists pursuing these tactics."[301]

b.    Congressional Research Service, August 2008:  "[T]here are indications that ['Al Qaeda in Iraq (AQ-I)'] leaders are relocating from Iraq to join Al Qaeda leaders believed to be in remote areas of Pakistan, near the Afghanistan border. … [I]f accurate, [this] could

---

[299] Daniel L. Byman, *Al Qaeda, the Islamic State, and the Global Jihadist Movement: What Everyone Needs to Know* 196-97 (Oxford Univ. Press 2015).

[300] Anand Gopal, *The Most Deadly US Foe in Afghanistan*, Christian Science Monitor (May 31, 2009) ("Officials say the Haqqanis use money from Al Qaeda-linked sources … to finance their operations."), 2009 WLNR 10378180.

[301] The White House, *Press Release: The Rest of the Story: The NIE Reflects Previous Statements About the War on Terror* (Sept. 26, 2006), https://tinyurl.com/swccct8y.

suggest that AQ-I now perceives Afghanistan as more fertile ground than is Iraq to attack U.S. forces. The relocation of AQ-I leaders to Pakistan could also accelerate the perceived strengthening of the central Al Qaeda organization."[302] "[R]eports of significant AQ-I relocations to the Pakistan tribal areas bordering Afghanistan … suggest that the links are tightening between AQ-I and Al Qaeda's central leadership as represented by Osama bin Laden and Ayman al-Zawahiri. Both Al Qaeda leaders are widely believed to be hiding in areas of Pakistan near the border with Afghanistan, and many assessments since 2007 say that Al Qaeda is enjoying increasing freedom of movement and action in the border regions. If Al Qaeda's ranks are now augmented by an influx of AQ-I fighters from [] Iraq …, it could be argued that Al Qaeda's overall capabilities to … undermine U.S. efforts [in] Afghanistan, have been increased."[303]

c.   <u>Senator Richard Lugar, October 2009</u>:  "[T]he National Intelligence Strategy … explains that violent extremists, quote, 'are planning to use terrorism …to attack the United States. Working in a number of regions, these groups aim to … attack U.S. strategic partners and otherwise challenge U.S. interests worldwide,' … This network of extremist Al Qaida cohorts has sprung up across the globe, and its affiliates have aligned their actions and rhetoric with the core Al Qaida leadership in Pakistan to gain notoriety and financing. The largest Al Qaida affiliate, … remains Al Qaida in Iraq. Some of its foreign fighters are returning home to local terrorist branches. … These and other extremists … are connected to a Pakistan core and its nexus of training, planning and operations."[304]

d.   <u>State Department, June 2020</u>:  "Although al-Qa'ida in Afghanistan and Pakistan has been seriously degraded, key figures among AQ's global leadership, as well as its regional affiliate al-Qa'ida in the Indian Subcontinent (AQIS), continued to operate from remote locations in the region that historically served as safe havens."[305]

670.   **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted

Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in

Afghanistan and Pakistan, where they melted into already-existing joint al-Qaeda/Taliban cells.

In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban"

"continued to benefit from a close relationship with Al-Qaida and related foreign groups" with

---

[302] Kenneth Katzman (Specialist in Middle Eastern Affairs), *CRS Report for Congress, Al Qaeda in Iraq: Assessment and Outside Links*, at CRS-8 (Aug. 15, 2008), https://tinyurl.com/2p8smj4d.

[303] *Id*. at CRS-17.

[304] Senator Richard Lugar (R-IN), *quoted in* CQ-Roll Call Political Transcriptions, *Sen. John Kerry Holds a Hearing on Al Qaida in Afghanistan* (Oct. 7, 2009) (cleaned up), 2009 WLNR 31263570.

[305] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 148 (June 2020).

al-Qaeda supplied "non-Afghans" "found fighting alongside the Taliban, or operating in supporting cells."[306] In 2008, similarly, the same U.N. team published another report that referenced the relocation of al-Qaeda-in-Iraq terrorists to al-Qaeda core in Afghanistan and Pakistan and concluded that "foreign fighters, mainly Uzbeks and Arabs, some of whom may have arrived recently from Iraq [i.e., redeployed AQI operatives] … appear to be playing an increasingly important role as advisers" to the Taliban and, through such role, made a key "contribut[ion] to [the Taliban's] success" against Americans in Afghanistan.[307]

671.    **Media reports** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into already-existing joint al-Qaeda/Taliban cells. Examples include, but are not limited to:

a.    _Ottawa Citizen_, February 2006:  "Al-Qaeda militants are moving from Iraq to Afghanistan to fight with the Taliban, officials said yesterday, after the capture of several suspected foreign guerrillas. Authorities in Nimroz province reported the arrest of four men, three Kashmiri Pakistanis and an Iraqi, in an ominous escalation of the threat to NATO forces. … [T]he Iraqi has admitted to being part of a group of al-Qaeda-linked fighters dispatched from Iraq to fight western forces, including Canadians, in Afghanistan. If true, the revelation would show how al-Qaeda is channelling terror back to the country its leadership was forced to flee after the September 2001 attacks in the United States. … 'There is a big group coming from Iraq,' said the Nimroz governor Ghulam Dusthaqir Azad. 'They're linked to al-Qaeda and fought against U.S. forces in Iraq. They have been ordered to come here. Many are suicide bombers.' … The captured Iraqi … was part of a group of 17 militants travelling individually from Iraq to Afghanistan. 'We handed him over to the anti-terrorism department and they have made several arrests based on information from him,' said Mr. Azad."[308]

b.    _NPR_, September 2006:  "CHADWICK: You talk about the tactics employed in Iraq … and say that indeed you foresee these tactics spreading to central Asia and that the war on terror is observed by fighters in all these areas who are learning from one another. Mr.

---

[306] U.N. Security Council, _Fifth Report of the Analytical Support and Sanctions Monitoring Team_ ¶ 11 (Sept. 20, 2006).

[307] U.N. Security Council, _Eighth Report of the Analytical Support and Sanctions Monitoring Team_ ¶ 22 (May 14, 2008).

[308] Tom Coghlan, _Afghans Arrest Iraqi Sent In By Al-Qaeda: Link Suspected, But Never Proved; Detainee Admits Ties To Terror Group_, Ottawa Citizen (Feb. 3, 2006), 2006 WLNR 26438455.

RASHID: That's very true. … with the Taliban … this current offensive that they have launched against NATO troops in southern Afghanistan, we are seeing quite phenomenally new tactics: brilliant ambushes, the use of explosive devices, suicide bombings. Now a lot of this seems to have come from Iraq."[309]

c.   *ABC News*, July 2008:  "DAVID MUIR (ABC NEWS): … General David Petraeus, said [] that he now sees signs that some al Qaeda fighters are retreating from Iraq and refocusing on Afghanistan. … What are you hearing on the ground [in Afghanistan]? JIM SCIUTTO (ABC NEWS): … US commanders are seeing evidence of that, both in the east and in the south, so are Afghans reporting seeing more foreign fighters, particularly Arab fighters on this side of the border. … Senator Obama's visit today to Jalalabad was telling. Jalalabad is on the Pakistan border and it is Pakistan that both the US and Afghanistan blame for giving refuge to the Taliban and al Qaeda."[310]

d.   *New York Post*, July 2008:  "After intense US assaults, al Qaeda may be considering shifting focus to its original home base in Afghanistan, where American casualties are running higher than in Iraq, the top US commander in Iraq said yesterday. 'We do think that there is some assessment ongoing as to the continued viability of al Qaeda's fight in Iraq,' Gen. David Petraeus said. Whatever the result, Petraeus said no one should expect al Qaeda to give up entirely in Iraq."[311]

e.   *Providence Journal*, August 2008:  "[M]uch of the fighting has shifted from Iraq to Afghanistan. Combat has sharpened in the latter as al-Qaida retreats from Iraq. The flow of foreign jihadists to Iraq has shrunk as more travel to Afghanistan to support al-Qaida and the Taliban. According to Brian Glyn Williams, who researches jihadist Web sites at West Point, 'Iraq is seen as a defeat. The image of Afghanistan is seen as a more pristine jihad.' As U.S. casualties decline in Iraq (13 were killed in July), and as political stability and reconciliation there grow, American soldiers have become four times more likely to be killed in combat in Afghanistan than in Iraq."[312]

f.   *Reuters*, December 2008:  "The [alleged U.S.] document said [former Pakistani ISI Lieutenant-General Hamid] Gul had knowledge of the relocation of al Qaeda fighters from Iraq to the Pakistan-Afghan border region this year …"[313]

---

[309] Ahmed Rashid, *quoted in* NPR Day to Day, *Has U.S. Already Lost Round One in 'War on Terror'?* (Rashid, *Has U.S. Already Lost Round One*) (Sept. 13, 2006), 2006 WLNR 22951747.

[310] ABC World News Saturday, *World News Tonight Saturday* (July 19, 2008), 2008 WLNR 13596167.

[311] N.Y. Post, *Iraqi Qaeda in 'Afghan Retreat'* (July 20, 2008), 2008 WLNR 13673888.

[312] Providence Journal, *Editorial - Shift Toward Afghanistan* (Aug. 7, 2008), 2008 WLNR 31970104.

[313] Simon Cameron-Moore, *Pakistan Ex-Spy Chief: US Wants Him On Terror List*, Reuters News (Dec. 7, 2008).

g.  *Akron Beacon Journal*, February 2009:  "After being defeated in Iraq, al-Qaida has largely retreated to Afghanistan/Pakistan to regroup."[314]

672.  **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda in Afghanistan and Pakistan, where they melted into already-existing joint al-Qaeda/Taliban cells. Examples of such reports include, but are not limited to:

a.  Ahmed Rashid, 2006:  "NATO has told me that there is traffic in men … between Iraq and Afghanistan. … So there's now a kind of cross-fertilization going on, which, of course, is very, very dangerous."[315]

b.  Peter Bergen, Joseph Felter, Vahid Brown, and Jacob Shapiro, 2008:  "There is a strong risk of blowback from Iraq. Relatively small numbers of Jihadis will 'bleedout' to fight elsewhere, but they will likely be very dangerous individuals. … Foreign fighters in Iraq have also acquired a number of useful skills that can be used in future terrorist operations, including massive use of suicide tactics, organizational skills, propaganda, covert communication, and innovative improvised explosive device (IED) tactics. Some AQI fighters that have already trickled out of Iraq have bolstered violent movements in Saudi Arabia and Lebanon. This trend will likely continue. … [F]ighters are most likely to join established Jihadi groups in areas of weak government control, such as Afghanistan."[316]

c.  Michael Lieberman, 2009:  "Bygones were bygones by 2007, when, after retreating from Iraq, al Qaeda was met with open arms back in Afghanistan. As Abdel Bari Atwan (who, like Bergen, has had the pleasure of interviewing bin Laden) notes, 'the alliance between [al Qaeda] and the Taliban is currently stronger than it has ever been.'"[317]

d.  Daniel Byman, 2012:  "[A] group may choose to affiliate with al-Qa'ida [becuase] …• A Haven. One of the most important determinants of a terrorist group's success is whether it has a haven from which to operate. Al-Qa'ida ran training camps, operated safe houses, and otherwise established a large infrastructure in support of terror. These facilities were an attractive resource for groups looking for a safe environment. … • Common Defense. Because groups share havens, training facilities, and so on with al-Qa'ida, when these locations are targeted …, the groups join al-Qa'ida in fighting back."[318]

---

[314] David McGrew, *Opinion: Dangerous Card Check*, Akron Beacon Journal (Feb. 22, 2009), 2009 WLNR 3550673.

[315] Rashid, *Has U.S. Already Lost Round One*, *supra*.

[316] Bergen, Felter, Brown, and Shapiro, *supra*, at 7.

[317] Michael Lieberman (Fellow, Truman National Security Project), *Al Qaeda and the Taliban Still Tied in a Knot*, Moderate Voice (Dec. 17, 2009), 2009 WLNR 25404336.

[318] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, *supra*, at iv-v.

e.   <u>Seth Jones, 2013</u>:  "[A]l-Qaida in Iraq [] regenerate[d] … [and] al-Qaida in Iraq … establish[ed] Jabhat al-Nusra in Syria.  Those were two … devastating steps in that region that the U.S. withdrawal from Iraq at least allowed.  … [T]hat means that … Afghanistan … will be quite important … an active al-Qaida presence up in Kunar, Nuristan and Nangarhar provinces, … create[s] the possibility for a re-establishment of the organization in an area that it does have local allies."[319]

f.   <u>Daniel Byman, 2013</u>:  "AQI-linked conflict is at the heart of the problem of spillover in the Middle East. What happens in Iraq does not stay in Iraq: it has already helped infect Syria, and the furies unleashed by the conflict shape the politics of Iran, Saudi Arabia, Turkey, and other states. ... The spillover may even go beyond the Middle East."[320]

673.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda-in-Iraq operatives regularly deployed to serve al-Qaeda's "core" in Afghanistan and Pakistan.

### c.   Defendants Knew al-Qaeda-In-Iraq Provided Key Training to Al-Qaeda and the Taliban

674.   Defendants always knew that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists, and their Talban (including Haqqani Network) allies in Afghanistan and Pakistan. According to Peter Bergen, "al Qaeda" facilitated training by Sunni terrorist in Iraq for al-Qaeda's allies in Afghanistan, "the senior leadership of the Taliban and al Qaeda have morphed together ideologically and tactically," and "al Qaeda has learned from Iraq, and the Taliban have learned from the playbook in Iraq."[321]

---

[319] Seth Jones (RAND Corp.), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.

[320] Daniel L. Byman, *The Resurgence of al Qaeda in Iraq, Testimony Before the Joint Hearing of the Terrorism, Nonproliferation, and Trade Subcommittee and the Middle East and North Africa Subcommittee of the House Committee on Foreign Affairs*, *republished by* Brookings Institution (Dec. 12., 2013), https://tinyurl.com/2p9hhy4x.

[321] Peter Bergen, *Assessing the Fight Against Al-Qaeda: Hearing Before the Permanent Select Committee on Intelligence* (Apr. 9, 2008), https://tinyurl.com/bdzdsrbb.

675.     Defendants knew that al-Qaeda-in-Iraq trained al-Qaeda and Taliban terrorists through "live fire" training exercises in Iraq.

676.     **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted Defendants that al-Qaeda-in-Iraq provided vital training to al-Qaeda and its Taliban (including Haqqani Network) terrorists in Afghanistan, Pakistan, and Iraq.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban's" "close relationship with Al-Qaida and related foreign groups" were the route through which "Al-Qaida attack techniques have [] become more evident in Afghanistan, with at least 56 suicide bombings  between 1 January and 27 July 2006, compared with 21 in all 2005, and only 10 between September 2001 and December 2004." [322] Moreover, the U.N. reported, "[n]ew explosive devices are now used in Afghanistan within a month of their first appearing in Iraq."[323]  Indeed, reported the U.N., "there have been reports of" "Taliban" from "Afghanistan/Pakistan" "training in [] Iraq."[324] The U.N. regularly published similar reports between 2005 and 2021.

677.     **Media reports** alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists, and their Talban (including Haqqani Network) allies in Afghanistan and Pakistan. Examples include, but are not limited to:

a.     _Philadelphia Inquirer_, April 2006:  "Islamic extremists in Iraq are providing military training and other assistance to Taliban and al-Qaeda fighters from eastern and southern Afghanistan and Pakistan's tribal areas, U.S. intelligence officials [said] … Pakistanis and Afghans are receiving military training in Iraq; Iraqi fighters have met with Afghan and Pakistani extremists in Pakistan; and extremists in Afghanistan increasingly are using homemade bombs, suicide attacks and other tactics honed in Iraq, said U.S. intelligence officials and others who track the issue. Several Afghan and Pakistani 'exchange students' volunteered to join the fight against American and Iraqi forces in Iraq, but they

---

[322] U.N. Security Council, _Fifth Report of the Analytical Support and Sanctions Monitoring Team_ ¶ 11 (Sept. 20, 2006).

[323] _Id_.

[324] _Id_.

were told to return to Afghanistan and Pakistan to train others there, two U.S. intelligence officials said. … Seth Jones, a specialist on Afghanistan … said: '…[T]here is absolutely no question that the partial evidence strongly suggests that there have been increasing contacts between Afghan insurgents and Iraqi insurgents either in Iraq itself or in Pakistan; the trail is going in both directions.' Extremists traveling to or from Iraq mostly are making their way on routes used by drug traffickers and smugglers through Pakistan's province of Baluchistan … and southern Iran … Tactics that have proved effective in Iraq, especially homemade bombs, suicide and car bombs, and secondary ambushes … increasingly are being used in Afghanistan … 'Everybody accepts that there has been a qualitative shift in the sophistication of these attacks,' said Marvin Weinbaum, a former State Department intelligence expert who is now at the Middle East Institute."[325]

b.   *Xinhua News Agency*, April 2007:  "An al-Qaida-related group in Iraq said … that [Iraq] has become 'a university of terrorism' in an audio recording posted [online]. Abu Omar al-Baghdadi … said …, '[O]ne of the (enemy) devils was right in saying that if Afghanistan was a school of terror, then Iraq is a university of terrorism.'"[326]

c.   *Washington Times*, May 2007:  "[The Taliban] gleaned [lessons] from … skills honed in Iraq. … al Qaeda's trusted Arabs have resumed their roles as military trainers and media advisers for the Taliban … al Qaeda trainers [] facilitate travel for Afghan militants who move between Afghanistan and Iraq and regularly 'wave' to each other over the Internet. In one recent video, Abu Laith al-Libi, a senior Libyan trainer for the Taliban in Afghanistan, sends a message of encouragement to Iraqi insurgents from an al Qaeda and Taliban training base inside Afghanistan."[327]

d.   *South China Morning Post*, October 2016:  "Pakistan and Afghanistan are no strangers to veteran jihadis. Both hosted militants who fought for al-Qaeda against US occupation forces in Iraq between 2003 and 2006. … Zarqawi[] lived in the Pakistani city of Peshawar for nine years prior to [9/11]. Hand-picked Afghan and Pakistani militants from groups allied with al-Qaeda subsequently undertook 'live training' tours of Iraq under the tutelage of al-Zarqawi … and others who have since assumed positions of responsibility in [Islamic State]. While there, they learnt new tactics and skills – notably the use of [IEDs] and suicide bombs – and introduced them in Afghanistan … in 2005."[328]

---

[325] Jonathan S. Landay and John Walcott, *Insurgents in Iraq Exporting Tactics; They Are Training Taliban and al-Qaeda fighters, Intelligence Officials Said. Violence Could Escalate in Afghanistan, Complicating U.S. Withdrawal Plans*, Philadelphia Inquirer (Apr. 1, 2006).

[326] Xinhua News Agency, *Militant Group Says Iraq "University of Terrorism"* (Apr. 17, 2007).

[327] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Wash. Times (May 30, 2007), 2007 WLNR 10111354.

[328] Tom Hussain (Pakistan Affairs Analyst), *In Old Stomping Grounds, Reasons To Be Fearful*, South China Morning Post (October 30, 2016), 2016 WLNR 33357299.

678. **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists, and their Talban (including Haqqani Network) allies in Afghanistan and Pakistan. Such reports included, but were not limited to:

a.   <u>Ahmed Rashid, 2006</u>:  "Iraqi/al-Qaida members have come to Afghanistan to train the Taliban here."[329]

b.   <u>Peter Bergen, 2008 and 2009</u>:  "Ability to Export Tactical Innovation[.] … Iraqi suicide and IED tactics are exported from Iraq into the Afghan theater against US … forces. These tactics were learned both by copycatting the Iraqi insurgency and by sending Jihadis to Iraq for on-the-job training. The Taliban has increasingly adopted suicide attacks, [IEDs], and the beheadings of hostages—all techniques that al-Qa'ida perfected in Iraq.  Mullah Dadullah, a key Taliban commander … in 2006 … noted, 'we have 'give and take' relations with the mujahidin in Iraq.' Suicide operations … became prevalent in 2005 after the Taliban saw their success in Iraq.  Members of al-Qa'ida Central such as Abdul Hadi al-Iraqi, Omar al-Farouq and Hassan Ghul have been captured or killed either in Iraq or travelling there."[330] "Al Qaida has influenced the Taliban ideologically and tactically to a very great degree. The reason that we're having an epidemic of suicide attacks and beheadings of hostages and IED attacks is because the Taliban sent people to Iraq to learn from the insurgency, and they copy-catted the insurgency."[331]

679.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda-in-Iraq regularly provided essential training to serve al-Qaeda's "core" and the Taliban, including its Haqqani Network, in Afghanistan and Pakistan.

### d.   Defendants Knew Al-Qaeda-In-Iraq Provided Key Logistical Aid To Al-Qaeda

680.   Defendants always knew that al-Qaeda-in-Iraq terrorists regularly provided key logistical aid to al-Qaeda "core" terrorists in Afghanistan and Pakistan.

---

[329] Rashid, *Has U.S. Already Lost Round One*, *supra*.

[330] Peter Bergen, *After the War in Iraq: What Will the Foreign Fighters Do?*, *published in* Combating Terrorism Center at West Point, Harmony Project, *Bombers, Bank Accounts, & Bleedout*, *supra*, at 112.

[331] Peter Bergen, *quoted in* CQ-Roll Call Political Transcriptions, *Sen. John Kerry Holds a Hearing on Al Qaida in Afghanistan* (Oct. 7, 2009) (cleaned up), 2009 WLNR 31263570.

681.     **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted

Defendants that al-Qaeda-in-Iraq provided key logistical aid to al-Qaeda "core" in Afghanistan

and Pakistan.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that

"[t]he Taliban" "continued to benefit from a close relationship with Al-Qaida and related foreign

groups" with al-Qaeda supplied "non-Afghans" "found fighting alongside the Taliban, or

operating in supporting cells."[332]

682.     **Media reports** and **terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq

terrorists regularly provided key logistical aid to al-Qaeda "core" terrorists in Afghanistan and

Pakistan.  In 2006, for example, NPR interviewed terrorism scholar Ahmed Rashid, who

explained that it was "very true," with respect to "the tactics employed in Iraq and in south

Lebanon and elsewhere," that one should "foresee these tactics spreading to central Asia [i.e.,

Afghanistan and Pakistan] and that the war on terror [was] observed by fighters in all these areas

who are learning from one another" because "there [was] traffic in … materials between Iraq and

Afghanistan … [and] cross-fertilization."[333] In 2008, similarly, terrorism scholar Daniel Byman

reported that al -Qaeda-in-Iraq's "[l]ogistics" "offer[ed] al-Qa'ida access to [al-Qaeda-in-Iraq's

media resources, recruiters, and other core parts of their organizations."[334]

683.     From 2003 through 2022, the U.S. government, media, terrorism scholars, and

others published other reports and statements that alerted Defendants that al-Qaeda-in-Iraq

regularly provided key logistical aid to al-Qaeda's "core" in Afghanistan and Pakistan.

---

[332] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).

[333] Rashid, *Has U.S. Already Lost Round One*, *supra*.

[334] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, *supra*, at v.

### E.    Defendants Knew Islamic State's Role

#### 1.    Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States

684.    Defendants knew that Islamic State waged a global terrorist campaign against the United States in which Islamic State attacked Americans in Iraq, Syria, Afghanistan, and elsewhere to drive the United States out of the Middle East.

685.    Defendants knew about Islamic State's global terrorist campaign against the United States, including its key focus on Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

686.    Defendants knew that Islamic State terorrists in Iraq and Syria would foreseeably redeploy to Afghanistan.[335]

687.    **United States government reports** alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States while Islamic State acted as a caliphate from 2014 through 2017.[336]

---

[335] *See*, *e.g.*, Clarke, *supra*, at 24.

[336] *See*, *e.g.*, The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Islamic State … poses a clear threat to the people of Iraq and Syria, … the broader Middle East, as well as U.S. persons, allies and interests in the region.  Left unchecked, ISIL could pose a growing threat beyond the region …"), http://tinyurl.com/6yce8e3z; Office of the Director of National Intelligence, *Counterterrorism Guide: Islamic State of Iraq and the Levant (ISIL)* (2015) (In June 2014, ISIL unilaterally declared the establishment of an Islamic caliphate and called on all Muslims to pledge allegiance to the group. Since then, ISIL has announced the establishment of eight provinces outside of Iraq and Syria, including in Afghanistan and Pakistan …"), https://tinyurl.com/yckhbv89; U.S. Dep't of State, *Country Reports on Terrorism 2016* at 8 (July 2017) ("ISIS attacks outside its territorial strongholds in Iraq, Syria, and Libya were an increasingly important part of its terrorism campaign in 2016. Most of these attacks took place in countries where ISIS has a declared branch, such as Afghanistan …."); Lead Inspector General for Overseas Contingency

688.    Throughout Islamic State's "caliphate" era from 2014 through 2017, U.S. government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business.[337]

689.    Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.[338]

---

Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2017–September 30, 2017*, at 26 (Nov. 3, 2017) ("ISIS: Global Reach[.]  … Several of the affiliates have acquired funding, weapons, recruitment, and tactics from core ISIS. …ISIS-associated groups were also active in … Afghanistan ...").

[337] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2015* at 178-79 (June. 2016) ("Iraq witnessed a continued surge of terrorist activity in 2015, primarily as a result of the actions of [] Islamic State …, which has occupied large areas of the country since early 2014. … Terrorist groups continued to mount a large number of attacks throughout the country."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2016–December 31, 2016*, at 8 (Feb. 2, 2017) ("[W]hile fighting in Iraq and Syria centered on the battles for Mosul and Raqqah, ISIL militants continued insurgent activity outside of those areas in both countries. For example, ISIL militants reactivated networks in Anbar province and carried out suicide attacks near Karbala in southern Iraq and at checkpoints leading to Fallujah and Amiriyal al-Fallujah."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 47 (May 6, 2017) ("ISIS's [recent] activity signaled that [it] was transitioning … to an insurgency … In Iraq, ISIS's insurgent activity consisted of harassing attacks and suicide bombings in the central and western parts of [Iraq]. … ISIS continued to use IED and VBIED attacks … in Baghdad … [and] suicide and VBIED attacks in Anbar …").

[338] *E.g.*, The White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 2018) ("ISIS remains … the primary transnational terrorist threat to the United States … ISIS retains the financial and material resources and expertise to launch external attacks—including against United States interests—and its senior leaders continue to call for attacks against the United States. The group's global reach remains robust, with eight official branches … regularly conducting terrorist and insurgent operations across Africa, Asia, Europe, and the Middle East."); U.S. Dep't of State, *Country Reports on Terrorism 2018* at 9 (Oct. 2019) ("ISIS's global presence evolved with affiliates and networks conducting attacks in the Middle East, South and East Asia, and Africa. Additionally, battle-hardened terrorists headed home from the war zone in Syria and Iraq or traveled to third countries, posing new dangers."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021) ("Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a

690.    Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business. Such reports included, but were not limited to:

a.    <u>State Department, September 2018</u>:  "ISIS remained a terrorist threat … and continued to carry out suicide, hit-and-run, and other asymmetric attacks throughout [Iraq]."[339]

b.    <u>State Department, October 2019</u>:  "Reverting to clandestine tactics following its loss of territory, ISIS … sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, in particular. Although ISIS maintained the capability to conduct deadly terrorist attacks in Iraq, these attacks resulted in fewer casualties in 2018 than in 2017."[340]

c.    <u>State Department, June 2020</u>:  "ISIS continued to present a serious threat to Iraqi stability … ISIS sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, especially in the areas of disputed control between the Kurdistan Regional Government (KRG) and the federal government …"[341]

d.    <u>LIGOIR, November 2020</u>:  "Kirkuk province consistently ranks as one of the most violent provinces in Iraq … The northern Iraqi province, parts of which are claimed by both the central Iraqi government and the semi-autonomous Kurdistan Regional Government (KRG), remains a focal point of ISIS's rural insurgency in Iraq. Both the territorial dispute and the sectarian divide in Kirkuk aid ISIS's survival in [Kirkuk]'s

---

worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2021–December 31, 2021*, at 23 (Feb. 8, 2022) ("ISIS-Core Leads a Global Organization[.] … ISIS-Core leaders in Iraq and Syria continued to manage the group as a global caliphate, maintaining an element in Iraq and Syria dedicated to overseeing the group's branches around the world. Since 2014, ISIS has incorporated existing jihadist groups or upstart elements into its global organization, expanding into the Arabian Peninsula, South … Asia, Eurasia, Turkey, and Africa. … ISIS leaders provided the group's branches with guidance, media support, and funding.").

[339] U.S. Dep't of State, *Country Reports on Terrorism 2017* at 229 (Sept. 2018).

[340] U.S. Dep't of State, *Country Reports on Terrorism 2018* at 117 (Oct. 2019).

[341] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 117 (June 2020).

challenging physical terrain. … ISIS [] survive[s] as a lingering insurgency in Kirkuk. … ISIS remains most prevalent in the rural and mountainous regions of southern Kirkuk, where [ISIS] is organized in small insurgent cells. In particular, ISIS exploits the rugged terrain of the Hamrin, Qarachokh, and Makhmour Mountains for safe haven and to evade counterterrorism forces …. Similarly, ISIS uses valleys in [Kirkuk] … to launch mostly small-scale attacks, including ambushes, IED attacks, and small-arms fire that target local security elements, civilians, and infrastructure. … ISIS frequently intimidates, coerces, and kidnaps local civilian and tribal leaders [in Kirkuk] … to obtain resources."[342]

e.   LIGOIR, May 2021:  "ISIS remained entrenched in rural areas throughout Iraq and retains freedom of movement, particularly in rugged mountain and desert regions … ISIS continued to exploit ethnic, sectarian, and political tensions… ISIS fighters in Iraq continued to operate in small, mobile cells that primarily conduct simple hit-and-run attacks … ISIS regularly targeted infrastructure, security and military positions, and civilians … ISIS focused its activity during the quarter in Anbar, Diyala, Kirkuk, and Salah ad Din provinces, and in areas surrounding Baghdad and Mosul. … ISIS continues to use the permeable border between Iraq and Syria to smuggle members and affiliates to safe havens it has established in rural and permissive areas, where it can conceal its operations and leaders, avoid security patrols, and intimidate the local population."[343]

f.   State Department, December 2021:  "Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."[344] "While ISIS remains unable to control territory and its leadership ranks have been significantly degraded, the group remains a serious threat to U.S. interests, security in the region, and beyond. In Iraq and Syria, ISIS fighters continued to wage a low-level insurgency, seeking to destabilize the region, recruit new members, and regain territory. … Beyond Iraq and Syria, ISIS branches, networks, and supporters across the Middle East and North Africa remained active, including in the Arabian Peninsula, Libya, the Sinai Peninsula, Tunisia, and Yemen."[345] "Despite its territorial defeat, ISIS continued to conduct operations on a smaller scale, particularly in the North and West [of Iraq], including rural areas … ISIS sought to reestablish footholds in Anbar, Diyala, Kirkuk,

---

[342] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2020–September 30, 2020,* at 20 (Nov. 3, 2020).

[343] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021,* at 16 (May 4, 2021).

[344] U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021).

[345] *Id.* at 112.

Ninewa, and Salah al-Din provinces, especially in the areas of disputed control between the Kurdistan Regional Government and the federal government."[346]

691.    **Terrorism scholars** alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.  For example, in 2018, terrorism scholar Katherine Bauer reported that Islamic State's "most significant recent attacks have been traced back to groups or 'provinces' operating outside of Syria and Iraq."[347]

692.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that Islamic State waged a globally integrated terrorist campaign against the United States.

### 2.    Defendants Knew Protection Payments Aided Islamic State

693.    Defendants knew protection payments aided Islamic State because Defendants' employees and agents in the United States, Sweden, and Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

694.    **United States government reports** alerted Defendants that their protection payments aided Islamic State's caliphate from 2014 through 2017.[348]

---

[346] *Id*. at 120.

[347] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing*, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance, at 4 (Sept. 7, 2018), http://tinyurl.com/mter35be.

[348] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2014* at 354, 9, 171 (June 2015) ("ISIL receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … ISIL … use[d] … criminal activities to raise funds for operational purposes. … ISIL earned up to several million dollars per month through its [] extortion networks … In 2014, ISIL derived income from [*inter alia*] … extortion, illegal 'taxation,' … and foreign donations. … [T]he United States used sanctions to ensure that banks, companies, and citizens across the world did not engage in financial transactions with ISIL."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress, April 1, 2015–June 30, 2015*, at 46 (Aug. 24,

695.    Similar U.S. government reports alerted Defendants that their protection

payments aided Islamic State's "global insurgency" from 2018 through 2022.[349]

---

2015) ("ISIL … use[d] … criminal activities to raise funds for operational purposes. Much of
ISIL's funding, … was [] gathered in Iraq and Syria. ISIL earned up to several million dollars
per month through its [] extortion networks …"); Lead Inspector General for Overseas
Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to
the United States Congress, September 30, 2015*, at 58, 61, 63, 64-5 (Nov. 25, 2015) ("ISIL …
derives most of its revenue from its control of territory[,] [including] extortion/taxation … ISIL's
funds come from several key sources[,] [including] … taxes and extortion from the occupied
territories … Most of these constitute a 'sophisticated extortion racket[] … [R]eceipts that
confirm ISIL is collecting a 20% 'khums tax' … and that the tax collections are being enforced
across the territory it controls. … ISIL also requires local populations in those territories to pay it
a percentage of any salary (largely paid in cash). ISIL further imposes 'taxes' on all types of
business activities. … ISIL 'stands to profit from taxing all of the sources of revenue to the tune
of hundreds of millions of dollars per year.'"); Lead Inspector General for Overseas Contingency
Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress,
October 1, 2015−December 31, 2015*, at 70-72 (Feb. 16, 2016) ("ISIL's extortion [] and taxation
… have funded its military machine for years. … ISIL's administrative apparatus enables it to
generate revenue through taxation … and the collection of fees for everything [including] sales
of goods … [O]il is second only to taxation and extortion as a source of income for ISIL."); U.S.
Dep't of State, *Country Reports on Terrorism 2015* at 6 (June. 2016) ("ISIL relies heavily on
extortion and the levying of 'taxes' on local populations under its control …"); Lead Inspector
General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United
States Congress, January 1, 2017–March 31, 2017*, at 45-46 (May 6, 2017) ("ISIS continued to
be able to finance operations in Iraq and Syria … ISIS generates the majority of its revenue from
… taxes [] and extortion …"); U.S. Dep't of State, *Country Reports on Terrorism 2016* at 408
(July 2017) ("ISIS receives most of its funding from a variety of businesses and criminal
activities … in Iraq and Syria … include[ing] … extortion …"); Lead Inspector General for
Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States
Congress, April 1, 2017–June 30, 2017*, at 23 (Aug. 3, 2017) ("Coalition airstrikes also killed
[ISIS] financial facilitators … and destroyed several ISIS cash storage facilities in Iraq and Syria.
Fawaz al-Rawi and Samir Idris were accused of moving millions of dollars for the ISIS network.
However, … ISIS still generates millions of dollars … from illegal taxation and extortion …").

[349] *E.g.*, U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit
Financing*, at 25 (2018) ("ISIS derives most of its revenue from … the extortion and taxation of
civilian populations and economies in Iraq and Syria … However, ISIS also receives limited
financial support from within the United States. … U.S.-based individuals have raised or
solicited funds specifically for the group itself. These funds are often derived from legitimate
sources as well as from small-scale criminal activity. ISIS financiers and supporters abroad also
send funds to other ISIS supporters or regional affiliates in foreign jurisdictions that may be
routed through the U.S. financial system and may seek to procure sensitive or controlled goods
from U.S.-based companies."); U.S. Dep't of State, *Country Reports on Terrorism 2017* at 304,
132 (Sept. 2018) ("ISIS received most of its funding from a variety of businesses and criminal

696. **Financial Action Task Force reports** alerted Defendants that protection money payments played a key role in financing Islamic State's operations around the world, including in Iraq, Syria, and Afghanistan. In February 2015, for example, the FATF published guidance concerning Islamic State terrorist finance, which concluded, among other things, that:

---

activities … in Iraq and Syria … include[ing] … extortion … In 2017, the Government of Iraq … continued to dismantle ISIS's financial activity and safeguard its financial institutions from exploitation by ISIS. Iraq enforced a national directive to prohibit financial transactions with banks and financial companies located in ISIS-controlled areas. It … prohibited … companies located in ISIS-held areas and those suspected of illicit activity from accessing U.S. banknotes … Iraq also barred ISIS financial facilitators … from Iraq's financial system and froze all of their assets."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2018–December 31, 2018*, at 21-22, 31 (Feb. 4, 2019) ("[T]he bulk of ISIS financial and military resources is generated in Iraq and Syria, … ISIS branches worldwide contribute varying degrees of support to the ISIS leadership … ISIS continued to extort money from both individuals and construction companies seeking to rebuild destroyed infrastructure. … ISIS could insert operatives into the reconstruction effort to siphon off money. … Extortion remains a major source of income for [ISIS] … Independent analysts also suggested that ISIS would likely seek to extort companies engaged in reconstruction in Iraq, and would also insert operatives into reconstruction entities to divert funds to terrorist activities. … [A]part from these efforts, ISIS in Iraq gains revenue from [inter alia] … taxation …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2019–December 31, 2019*, at 41 (Feb. 4, 2020) ("ISIS Generates Revenue Even After Loss of Territory … ISIS continues to generate revenue by [*inter alia*]… extortion, and … front companies."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20, 51 (May 13, 2020) ("[E]ven with its territorial defeat, ISIS continues to generate funds in Syria through extortion … and the use of front companies. … ISIS is increasingly brazen in its revenue-producing activities in Iraq and Syria. … ISIS members [] openly extort[] …. ISIS [is] able to move more freely [and] extort protection money …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 15 (May 4, 2021) ("ISIS generated revenue from extortion, … and moves resources to its safe havens and to operatives throughout Iraq. … ISIS used similar fundraising tactics in Syria, targeting civilian businesses … for possible utilization as front companies."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

a.  "[F]unding is central and critical to [Islamic State's] activities. … ISIL's primary sources of revenue … include … extortion … Cutting off these vast revenue streams is … [an] opportunity … to defeat this terrorist organisation."[350]

b.  "ISIL is operating in vast swathes of land across Syria and northern Iraq, allowing ISIL to exploit the local population and material resources through extortion … ISIL takes advantage of the resources in this domain, … taxing local economies. … ISIL obtains the vast majority of its revenues through local criminal and extortion activities …"[351]

c.  "ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as … extortion, … illicit taxation of goods and cash that transit territory where ISIL operates; … (3) donations …"[352]

d.  "ISIL manages a sophisticated extortion racket by … demanding a portion of the economic resources … [like] how … organized crime groups generate funds. This vast range of extortion, including everything from … vehicle taxes to school fees …, is done under the auspices of providing notional services or 'protection.'"[353]

e.  "ISIL has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies paid."[354]

f.  "Trade of goods and transfers of cash into and out of ISIL-held territory has been significantly disrupted due to the weak security environment. However, according to industry contacts and press reporting, some trade of goods has persisted, as have cash transfers necessary for financing this trade. ISIL is able to impose levies on all goods transiting territory where it operates. ISIL has reportedly imposed specific taxes on the movement of goods in parts of Iraq where it operates, including a road tax of 200 USD in northern Iraq and an 800 USD 'customs' tax on trucks entering Iraq …"[355]

g.  "Some delegations identified terrorist financing risks regarding wire transfers from charitable foundations to conflict zones or areas where ISIL operates. Other risks identified include … raising funds for recipients in a third country which are or are suspected to be part of an organisation [] that engages in violent … activities. These risks are enhanced when the source of the funds and purpose of the transaction is not known or cannot be verified. These instances include transactions not listing any reference or using generic terms such as 'other', 'services' and 'goods'. In some cases, public appeals for

---

[350] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 5 (Feb. 2015), https://tinyurl.com/5b98bmbh.

[351] *Id*. at 10.

[352] *Id*. at 12.

[353] *Id*.

[354] *Id*.

[355] *Id*. at 17.

donations have not correlated with the organisations' stated purpose (e.g. educational, health care or humanitarian relief)."[356]

h.     "ISIL[] will always require funds for operational support and to meet broad organisational requirements. … This report … identif[ied] the most important sources of ISIL funding, particularly … extortion …"[357]

697.     **Media reports** alerted Defendants that protection payments aided Islamic State.

In 2014, for example, *Forbes* analyzed Islamic State's tax rules, which alerted Defendants that

their protection payments directly financed anti-American terrorism:

a.     "Initially, [ISIS] depended on outright violence to raise cash. But as ISIS made the transition to [Islamic State], its revenue extraction became more sophisticated. … ISIL enforced taxes on a variety of commercial activities, including telecommunications companies that had relay towers in ISIL-controlled zones."

b.     "The *New York Times* [] noted the extent to which ISIS is regularizing its … tax process. … 'Many … received official receipts stamped with the ISIS logo … These forms of taxation … increasingly carry the trappings of regularized tax collection."[358]

698.     In 2015, similarly, the *New York Times* reported the typical experience of any

businesses operating inside Islamic State-controlled territory:

a.     "Three times a month, Mohammad al-Kirayfawai hands $300 to fighters from the Islamic State for the privilege of driving his refrigerated truck full of ice cream and other perishables from Jordan to a part of Iraq where the militants are firmly in charge.  The fighters who man the border post treat the payment as an import duty, not a bribe. They even provide a stamped receipt, with the logo and seal of the Islamic State, that Mr. Kirayfawai, 38, needs for passing through other checkpoints on his delivery route."

b.     "Across wide expanses of Syria and Iraq, [] Islamic State … has set up a predatory and violent bureaucracy that wrings every last American dollar … it can from those who live under its control or pass through its territory."

c.     "Islamic State[] … exact[ed] tolls and traffic tickets; rent for government buildings; utility bills for water and electricity; taxes on income, crops and cattle; and fines for smoking or wearing the wrong clothes."

---

[356] *Id*. at 19.

[357] *Id*. at 32.

[358] Joseph Thorndike, *How ISIS Is Using Taxes To Build A Terrorist State*, Forbes (Aug. 18, 2014), https://tinyurl.com/5c3wa2ap.

d.   "'They fight in the morning and they tax in the afternoon,' said Louise Shelley, ... of the Terrorism, Transnational Crime and Corruption Center at George Mason University."

e.   "[A]s Western and Middle Eastern officials have gained a better understanding of the Islamic State's finances over the past year, a broad consensus has emerged that its biggest source of cash appears to be the people it rules, and the businesses it controls."

f.   "Inside that territory, [] Islamic State ... has taken over the legitimate revenue collection operations of the governments it has usurped. And it has ... extract[ed] as much as it can from the people, businesses and property it now controls."

g.   "Another Islamic State department, the Diwan al-Rikaz, or the Office of Resources, oversees ... a long list of other businesses now controlled by the militants. It operates ... mobile phone companies ... skimming revenues from all of them."

h.   "The Islamic State also demands a cut of the revenues earned by small businesses. 'We either pay in [goods] or cash, it depends on the production,' said Tarek, a Syrian ..."

i.   "Officials of the so-called caliphate dislike the term 'tax,' preferring the Islamic term '*zakat*,' which refers to the alms Muslims are required to pay. Although the norm would be 2.5 percent of a person's wealth under typical interpretations of Islamic law, the militants are taking 10 percent, justifying the high rate by saying they are a 'nation in a time of war,' according to a citizen journalist in Raqqa ..."

j.   "Islamic State is extracting as much as $800 or $900 million, possibly more, from residents or businessmen inside the territory it controls."

k.   "[U.S. government] [o]fficials assume that the Islamic State must be circulating the money it collects back out into the regional and global financial system since there have not been signs of the kind of rampant inflation that could result from a large influx of currency into a relatively small economy closed off from the surrounding markets."[359]

699.   From the 2014 through 2017, similar media reports alerted Defendants that

protection payments aided Islamic State's caliphate.[360]

---

[359] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, New York Times (Nov. 29, 2015).

[360] *E.g.*, Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014) ("In ... Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses ..."), 2014 WLNR 425449; APS Diplomat Operations in Oil Diplomacy, *Ninewah Autonomy Efforts & Petroleum Projects* (Mar. 3, 2014) ("Said to have an IRGC-run base in Iran near Iraq's north-eastern province of Diyala, the ISIS extorts money from business owners in Mosul, helping to fund its activities in Iraq and Syria. ... The tactical alliance between the IRGC and the ISIS is one of the strange things despite the fact that the Neo-Salafi group is killing many Iraqi Shi'ite Arabs ..."),

2014 WLNR 5861825; Guy Taylor, *Al-Baghdadi, A Brutal Contender For Bin Laden's Mantle, Emerges In Iraq*, Washington Times (June 13, 2014) ("Under al-Baghdadi's leadership, ISIL's strategy has involved … running 'protection rackets' … in northern Iraq. [] [T]he mafia-style tactics may bring in piles of local cash …"), 2014 WLNR 15982987; Der Spiegel Staff, *The New Face of Terror ISIS; Rise Pushes Iraq to Brink*, *reprinted in* Yerepouni Daily News (Lebanon) (June 26, 2014) ("[F]unding comes from … protection money extorted in Mosul and other Sunni cities in Iraq."), 2014 WLNR 17314098; Lee Smith and Hussain Abdul-Hussain, *On The Origin Of ISIS*, Weekly Standard (Sept. 8, 2014) ("Nor are ISIS's money-raising schemes especially novel in the Middle East. … [one of ISIS's … main source[s] … is taxation …"), 2014 WLNR 38032996; Steven Mufson, *Islamic State Fighters Drawing On Oil Assets For Funding And Fuel*, WashingtonPost.com (Sept. 16, 2014) ("Islamic State has obtained revenue by imposing tariffs, [and] exacting protection money …"), 2014 WLNR 25578145; Economist Intelligence Unit, *MENA Politics: The Pushback*, EIU ViewsWire (March 23, 2015) ("[Islamic State] is left with … extortion and taxes levied in the name of *zakat*, Islamic alms."), 2015 WLNR 8488485; Worcester Telegram & Gazette (MA), Editorial, *Our View: Time to Lead* (Dec. 6, 2015) ("ISIS has grown into the world's most dangerous terrorist organization, financed - some say $50 million per month - by [inter alia] … taxes, tolls and extortion from the people living within or entering its borders."), 2015 WLNR 36138427; Senate Armed Services Committee, Advance Questions for General Joseph L. Votel, U.S. Army Nominee for Commander, U. S. Central Command, Targeted News Service, *Gen. Votel Testifies at Hearing on Nomination to be Commander, U.S. Central Command* (Mar. 9, 2016) ("General Joseph L. Votel" "testi[fied] [that]" "Mosul will remain [Islamic State's] finance hub as [Islamic State] likely will increasingly rely on extortion and tax revenue streams ..."); CNN: Early Start, *Trump Escalates War on News Media; Clinton Returns to California to Fight Sanders; Fierce Fighting in Falluja. Aired 4:30-5a* (June 1, 2016) ("ISIS still has a $2 billion empire thanks in part to new taxes. That's according to a new report from the Center for the Analysis of Terrorism, which … says ISIS made $2.4 billion in 2015. … the main reason why is taxes."), 2016 WLNR 16677887; Pioneer, *ISIS Down, Not Out: Ways To Kill It* (July 9, 2016) ("ISIS first occupied significant stretches of territory in Iraq and Syria … It has raised its finances quite skilfully by … engaging in … extortion, [and] levying of taxes, in territories held by it."), 2016 WLNR 20848601; Patrick Wintour, *Saudi Arabia Must Do More To Prevent Secret Funding Of ISIS, MPs Say*, Guardian (July 12, 2016) ("In a report on … ISIS finances, the [U.K. Parliament] claims [ISIS] in Iraq and Syria is increasingly desperate for more money, … resorting to 'gangsterism and protection rackets' disguised as taxation."), 2016 WLNR 21120198; Vivian Salama, Associated Press, *reprinted in* Canadian Press, *As Territory Shrinks, IS Group Looks For New Money Sources* (Oct. 19, 2016) ("[Former Treasury official Daniel] Glaser said … Islamic State … generated some $30 million per month … from taxation and extortion in 2015. Hisham al-Hashimi, an expert on IS…, said [Islamic State] currently makes about $4 million per month from taxes in Mosul alone. Al-Hashimi said the group charges a 4 per cent income tax on salaries less than $600 per month, and 5 per cent on monthly salaries between $600 and $1,000."); Karen DeYoung and Philip Rucker, *Trump Summons Muslim Nations To Confront 'Islamic Terror Of All Kinds'*, WashingtonPost.com (May 21, 2017) ("Islamic State … has largely funded itself through [inter alia] extortion and taxes … in Syria and Iraq …"), 2017 WLNR 15782138.

700.    From the 2018 through 2022, similar media reports alerted Defendants that

protection payments aided Islamic State's global insurgency.[361]

701.    **Terrorism scholars** alerted Defendants that their protection payments aided

Islamic State.[362]

---

[361] *E.g.*, Jonathan Walker, *Source Of Terror Group's Millions Uncovered In New Report By North MP; Oil, Tax, And Trade Key To Daesh*, Sunday Sun (Apr. 29, 2018) ("ISIS raised billions of pounds from [inter alia] … taxing millions of residents …  ISIS used a number of lucrative revenue streams to finance its operations across the globe …  In recent years [Islamic State] has attempted to make up for the loss of oil revenue by extracting money from the people living in the remaining territory it controls. Almost everything was taxed, including cash withdrawals, salaries, and roads. It also charged a 'protection' tax for non-Islamic residents."), 2018 WLNR 13011934; Ellen Ioanes, *Here's What's Left Of ISIS — And Why They Still Pose A Major Threat*, Business Insider (Aug. 27, 2019) ("[J]ust because ISIS no longer has a caliphate, that doesn't mean it doesn't have influence or power in the places it once controlled — and that it's not still incredibly dangerous. … In both Iraq and Syria, ISIS is making money by … [*inter alia*] extorting civilians, and skimming funds off rebuilding contracts …").

[362] Jean-Charles Brisard and Damien Martinez (Al-Qaeda Scholars), *Islamic State: The Economy-Based Terrorist Funding*, at 5 (Thomson Reuters Accelus Oct. 2014) ("Since its inception, the [Islamic State] has relied on" "criminal activity to fund its activities, targeting businessmen, local politicians and clerics, in addition to foreign nationals."), https://tinyurl.com/2d26cvxx; Professor Jimmy Gurulé, *quoted in House Financial Services Committee Hearing on "Terrorist Financing and the Islamic State"; Testimony by Jimmy Gurule, Law Professor, Notre Dame Law School*, *republished in* U.S. Congressional News (Nov. 13, 2014) ("ISIS is primarily self-funded. … illicit taxation systems are also a significant source of income for ISIS.  …The … ATA could be used against … [persons] that knowingly transfer funds … to … ISIS."), 2014 WLNR 32049937; *Foundation for Defense of Democracies Vice President, Research Jonathan Schanzer, Prepared Testimony Before the House Financial Services Committee Hearing On Task Force TO Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing*, *republished in* SEC Wire (Apr. 22, 2015) ("[O]ne dominant trend we continue to observe: the intersection of terrorism and crime.  Designated terrorist groups … rather easily [] exploit[] existing businesses and levying oppressive taxes and tolls on the populations they dominate. The Islamic State, for example, extracts taxes …"); *Center For Strategic And International Studies Senior Adviser Mr. Juian C. Zarate, Prepared Testimony Before The House Financial Services Committee Hearing On Task Force TO Investigate Terrorism Financing: A Survey Of Global Terrorisim And Terrorist Financing, As Released By The Committee*, *republished in* SEC Wire (Apr. 22, 2015) ("Islamic State is able to tax … the local population - raising taxes and fees as pressure mounts… This model of financing is not new. For years, al Qaida in Iraq had … extorted … to raise money …"); Peter R. Neumann, *Don't Follow The Money: The Problem With The War On Terrorist Financing*, Foreign Affairs (July 1, 2017) ("[O]nly one thing can truly revolutionize a terrorist group's finances: the seizure of territory. Until 2013, ISIS made most of its money from protection

702.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their protection payments aided Islamic State's terrorist campaign.

### 3.    Defendants Knew Islamic State's Core In Iraq And Syria Facilitated Attacks By Islamic State's Branch In Afghanistan

703.    Defendants always knew that Islamic State, like al-Qaeda, pursued a globally interconnected campaign against the United States, and therefore that Defendants' aid to Islamic State's "core" in Iraq and Syria facilitated attacks by Islamic State's "branch" in Afghanistan.

704.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that Islamic State's "core" in Iraq and Syria facilitated attacks against Americans by Islamic State's "branch" in Afghanistan and Pakistan.  Indeed, as set forth below, reports by the U.S. government, media, terrorism scholars, and international organizations alerted Defendants to at least two ways that Islamic State's "core" in Iraq and Syria aided Islamic State's "branch" in Afghanistan and Pakistan: (a) funding; and (b) fighters.

### a.    Defendants Knew Islamic State Core Funded Islamic State's Branch In Afghanistan

705.    Defendants always knew that Islamic State's "core" in Iraq and Syria funded the operations of Islamic State's "branch" in Afghanistan and Pakistan.

---

rackets, Iraq's illicit economy, and, to a much lesser extent, foreign donations. But in 2013 and 2014, the group captured vast swaths of … eastern Syria and northern Iraq. By mid-2014, when ISIS declared its caliphate, some six million to eight million people lived under its rule.  The group's finances skyrocketed … ISIS collects taxes, charges fees, and levies tariffs on trade; the group's 2014 revenues from such measures exceeded $300 million."), 2017 WLNR 22264271.

706.   **U.S. government reports** alerted Defendants that Islamic State's "core" in Iraq and Syria funded the operations of Islamic State's "branch" in Afghanistan.[363]

707.   Indeed, United States government reports and statements alerted Defendants that their protection payments to Islamic State in Iraq foreseeably aided its attacks in Afghanistan.[364]

---

[363] U.S. Office of the Director of National Intelligence, *ISIL Finances: Future Scenarios*, at 17 (Aug. 1, 2016) ("ISIL will need to transfer funding to its affiliates abroad."); U.S. State Dep't, *Country Reports on Terrorism 2016* at 409 (July 2017) ("Funding and External Aid: ISIS-K receives some funding from ISIS."); U.S. State Dep't, *Country Reports on Terrorism 2017* at 305 (Sept. 2018) ("Funding and External Aid: ISIS-K receives some funding from ISIS. Additional funds come from taxes and extortion on the local population and businesses."); U.S. State Dep't, *Country Reports on Terrorism 2018* at 294 (Oct. 2019) ("Funding and External Aid: ISIS-K receives some funding from ISIS. Additional funds come from illicit criminal commerce, taxes, and extortion on the local population and businesses."); Gregory Sullivan (Audit Director, Treasury Department), *Memorandum for Department of Defense Lead Inspector General, Subject: Operation Inherent Resolve - Summary of Work Performed by the Department of the Treasury Related to Terrorist Financing, ISIS, and Anti-Money Laundering for First Quarter Fiscal Year 2021*, at 4 (Jan. 4, 2021) (ISIS continued to move funds in and out of Iraq and Syria, often relying on ISIS facilitators in Turkey and in other financial centers … [ISIS] continued to transfer funds in Iraq and Syria and internationally using money services businesses … located throughout Iraq, Syria, and Turkey."), http://tinyurl.com/erxfykay; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2021–September 30, 2021*, at 23 (Nov. 4, 2021) (ISIS continued to move funds in and out of Iraq and Syria, often relying on ISIS facilitators in Turkey and in other financial centers … [ISIS] continued to transfer funds in Iraq and Syria and internationally using money services businesses … located throughout Iraq, Syria, and Turkey.").

[364] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015) ("GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [Islamic State] requires significant funding. … ISIL [] operates sophisticated extortion rackets throughout Iraq and Syria, including extracting payments for the use of public highways … Through these schemes, ISIL can receive upwards of several million dollars a month of revenue."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2016–September 30, 2016*, at 44 (Nov. 4, 2016) ("To make up the funding gap, ISIL has increasingly resorted to … arbitrary tax increases, which now serve as ISIL's primary source of income. Outside of Iraq and Syria, ISIL continued to operate in concert with local extremist Sunni groups. … In Afghanistan, ISIL elements are active in eastern provinces."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018) ("ISIS continued to generate income from extortion[] [and] taxation, … Arms dealers and other middlemen who engaged in transactions with the group told reporters that the group had transferred as much as $400 million out of Iraq …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July*

708.   **Media reports** alerted Defendants that that Islamic State's "core" relied upon

protection money income in Iraq to fund Islamic State's "branch" operations in Afghanistan.[365]

_____

*1, 2018–September 30, 2018*, at 45-46, 3 (Nov. 5, 2018) ("ISIS remained able to generate revenue from [inter alia] … extortion and taxes … and external donations. It also continued to draw on cash reserves. Overall, … a 'reduced, covert version' of ISIS will survive in Iraq and Syria and will maintain a presence in neighboring countries and affiliates in multiple countries, including Afghanistan … [A]t least some of ISIS's bureaucratic structures remained intact, and ISIS continued to derive revenue from … extortion, and cash reserves."); U.S. Dep't of State, *Country Reports on Terrorism 2018* at 292 (Oct. 2019) ("ISIS received most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … ISIS continues to generate revenue from criminal activities and provides financial support to its network of global branches …"); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

[365] Pamela Engel, *A Top US General Picked Apart Donald Trump's ISIS Policy*, Business Insider (Aug. 13, 2015); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …"); Tom Brooks-Pollock, *Paris Attacks: Where Does ISIS Get Its Money And Weapons From? Where Does ISIS Get Its Money, Guns And Bombs, Both In Europe And In The Middle East?*, Independent Online (Nov. 19, 2015) ("Where does ISIS get its money, guns and bombs, both in Europe and in the Middle East? … To a large extent ISIS is now funding itself – through … [*inter alia*] extortion, [and] taxes …"), 2015 WLNR 34405923; Julianne Geiger, *Is ISIS Back?*, SyndiGate, *reprinted in* Yerepouni Daily News (Oct. 21, 2019) ("Through its extortion … 'subsidiar[y]', ISIS threatened commercial enterprises primarily in eastern Syria and western Iraq in sophisticated protection rackets. … ISIS … 'taxes' netted ISIS around $800 million annually … Taxes included everything from 'welfare' and 'salary' taxes to road taxes, customs taxes for trucks entering Iraq at Syrian checkpoints; non-Muslim protection taxes, and a long list of others. The thing is, ISIS doesn't rely on territory for its economic survival today. It's raised enough to invest and stash away. … In part, that's because its surviving leadership may have smuggled as much as $400 million in cash and gold out of Iraq and Syria. [ISIS]'s extended network will seek to launder this money through front companies in the region … Since the defeat, [ISIS] is raising money through … extortion …"), 2019 WLNR 31720287; Sanjeev Sharma, *Zakat Payments Being Redirected Towards ISIL Affiliates*, Indo-Asian News Service (Feb. 8, 2022) ("Global affiliates of ISIL … raise funds through a variety of methods, including extortion, [and] illicit taxation … ISIL leadership exerts sufficient operational control over its

709.    **Terrorism scholars** alerted Defendants that funds to Islamic State's "core" in Iraq foreseeably aided the operations of Islamic State's "branch" in Afghanistan and Pakistan. In 2018, for example, terrorism scholar Katherine Bauer reported that "[t]he Islamic State's recognition of franchises in eight countries across the Middle East [including Afghanistan] … in November 2014, raised concerns that … [Islamic State] core in Syria and Iraq would share both its wealth and its fundraising expertise with its new affiliates."[366]

710.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that payments to Islamic State's "core" foreseeably financed Islamic State's "branch" in Afghanistan and Pakistan.

> ### b.    Defendants Knew Islamic State Core Served Islamic State's Branch In Afghanistan

711.    Defendants always knew that Islamic State "core" fighters also regularly redeployed to Islamic State's "branch" in Afghanistan and Pakistan, which Islamic State "core" established with its fightesrs in the first instance and used as a safe haven for its fighters thereafter, who, like their al-Qaeda cousins, melted into already-existing Islamic State cells.

712.    **U.S. government reports and statements** alerted Defendants that Islamic State "core" fighters also regularly redeployed to Islamic State's "branch" in Afghanistan.[367]

---

reserves to allow the transfer of significant sums to certain affiliates abroad. … ISIL-K has received in the low hundreds of thousands of dollars from [] ISIL core … ISIL core is assessed to have allocated in excess of $500,000 for the support of ISIL-K.").

[366] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance*, at 3 (Sept. 7, 2018), http://tinyurl.com/mter35be.

[367] *E.g.*, U.S. State Dep't, *Country Reports on Terrorism 2017* at 8 (Sept. 2018) ("ISIS … and [its] affiliates have … adjusted to heightened counterterrorism pressure in Iraq, Syria, Afghanistan, Libya, Somalia, Yemen, and elsewhere. … [T]he return or relocation of foreign terrorist fighters from the battlefield has contributed to a growing cadre of experienced, sophisticated, and connected terrorist networks, which can plan and execute terrorist attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve,*

713.    From 2014 through 2022, Defendants were alerted that their Islamic State's "core" deployed fighters from Iraq and Syria to Islamic State's "branch" in Afghanistan and Pakistan by other reports regularly published by the U.S. government and media.

### F.    Defendants Knew The U.S. Government Opposed Their Protection Payments

714.    The United States government did not approve, publicly or privately, of Defendants' protection payments.  The U.S. government relied on its chosen Western contractors – including Defendants – to take responsibility for ensuring the financial integrity of their contracting practices in Iraq.  At all times, the U.S. government conveyed the message that protection payments violated U.S. law and undermined U.S. foreign-policy objectives in Iraq.

715.    The U.S. government has long been on record that protection payments to terrorists are unlawful – no matter their motivation.  In 2007, for example, an Assistant Attorney General emphasized at a public press conference that "corporations are on notice that they cannot make protection payments to terrorists."[368]

716.    The U.S. government viewed protection payments to terrorists in Iraq and Afghanistan the same way.  Government officials stated that, as with Chiquita's payments to terrorists in Colombia, protection payments to al-Qaeda-affiliated terrorists undermined U.S. reconstruction objectives in Iraq and Afghanistan.  For example, at a House Subcommittee hearing, an Assistant Deputy Defense Undersecretary for Program Support was asked whether

---

*Report to the United States Congress, July 1, 2018–September 30, 2018*, at 46 (Nov. 5, 2018) ("DoD and the United Nations expressed concern about the presence of foreign ISIS fighters in Syria. … Many fighters, it said, have melted into the local population, while others remain in hiding in neighboring countries. … [M]any fighters had made their way to Afghanistan."); U.S. State Dep't, *Country Reports on Terrorism 2018* at 161-62 (Oct. 2019) ("Countries in Central Asia remained concerned about the potential spillover of terrorism from Afghanistan, as well as the potential threat posed by the return of individuals from Central Asia who traveled to Iraq or Syria to fight with terrorist groups, including ISIS.").

[368] U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty*, *supra*.

"facilitation payments . . . to ensure that trucks aren't bothered [are] legal under United States law?"[369]  He responded:  "Clearly, it's not . . . and it's counterproductive to what we're trying to do."[370]  The U.S. Special Inspector General for Afghanistan Reconstruction ("SIGAR") similarly opined that "I don't think that there should ever be or ever condone paying off a [terrorist] entity for anything . . . Obviously that's wrong; it's against the law and counter to any counterinsurgency or reconstruction initiative that we would like to see put in place."[371]

717.    The congressional Commission on Wartime Contracting found it "particularly alarming" that "subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[372]  Based on such statements, Defendants knew that the U.S. government was institutionally opposed to protection-money payments.

718.    Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directly undermined a cornerstone of United States policy specifically designed to protect Americans overseas:  the combating of extortion-related terrorist finance. U.S. government reports and statements alerted Defendants that this was a cornerstone of American policy to prevent terrorism in Iraq, Syria, and Afghanistan.[373]

---

[369] *Hearing on Corruption in Afghanistan Defense Contracting* (statement by Rep. John F. Tierney (D. Mass.)).

[370] *Id.* (statement of Assistant Deputy Undersecretary Gary Motsek).

[371] *Funding The Enemy* at 196.

[372] *CWC Report* at 73.

[373] E.g., Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 6, 2 (Jan. 30, 2006) ("During the past quarter, [SIGIR] continued to advance aggressive oversight of the use of U.S. funds in Iraq's reconstruction. … SIGIR's role in Iraq's reconstruction aims to help secure the overall success of the U.S. effort and thereby honor the sacrifices of the soldiers and contractors killed or wounded. SIGIR's most notable achievements during the past quarter were the arrests of four U.S. citizens for bribery, fraud, and theft involving Iraq reconstruction funds on contracts valued at more than $13 million. These arrests signal that the United States is unequivocally committed to fighting corruption and

promoting accountability on all fronts in Iraq. SIGIR's Audit and Inspections divisions continued to focus oversight on [inter alia] ... the effort to fight corruption in Iraq … SIGIR remains committed to intensifying U.S. efforts to promote an effective anticorruption system … [and] to support anticorruption institutions in Iraq."); U.S. Dep't of Defense, Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with Department of Defense Appropriations Act 2006 (Section 9010), at 3 (May 26, 2006) ("The United States remains committed to … helping Iraqis … establishing … rule of law …,  and fighting corruption."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 119 (July 31, 2006) ("[In] the Corruption Perception Index, compiled by Transparency International[,] Iraq ranks 21st in countries perceived as most corrupt in the world. The U.S. Embassy-Iraq has identified assisting the Iraqi government in its efforts to reduce corruption as one of its highest priorities."); The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Our goal is … to degrade and ultimately destroy ISIL through a comprehensive and sustained counterterrorism strategy so that it's no longer a threat to Iraq, the region, the United States, and our partners. … [T]he United States will carry out a comprehensive strategy to defeat ISIL … [for which] the [] core elements [included] … Disrupting ISIL's Finances … The U.N. Security Council resolution that passed unanimously … demonstrated the broad international consensus to disrupt ISIL's finances. We are [] working aggressively … on a coordinated approach that includes: … limiting ISIL's ability to extort local populations;… and disrupting the flow of external donations to the group.  Our domestic laws also provide additional tools in this effort, enabling us to sanction or prosecute those who fund ISIL's activities."), http://tinyurl.com/6yce8e3z; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, December 17, 2014−March 31, 2015*, at 31-32 (Apr. 30, 2015) ("Several U.S. agencies play a role in disrupting ISIL's ability to fund operations. A broad U.S. government team is arrayed against this problem, including DoS, Treasury, DoD, and the intelligence community … work to accomplish the following strategic goals: … [*inter alia*] • Limit ISIL's ability to extort local populations. • … disrupt[] the flow of external donations to the group. • Prevent ISIL from accessing the financial system. … Some of the ongoing activities to disrupt ISIL's financing include: … Limiting ISIL's ability to extort local populations. ... ISIL [] extorts money in connection with daily transactions ranging from fuel and vehicle movement in ISIL-held territories to school fees for children. The U.S. government is working to limit ISIL's ability to transact extorted monies …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015*, at 59 (Nov. 25, 2015) ("[T]he U.S. government is pursuing a four-part strategy to disrupt ISIL's ability to finance operations: 1. Disrupt ISIL's sources of revenue. Cut off ISIL's ability to generate revenue from … extortion in ISIL-controlled territories … and external donations. 2. Cut off ISIL's access to the regional and international financial systems. Restrict ISIL's ability to move and use its funds by accessing financial systems … and [] limit ISIL's ability to … move funds. 3. Target ISIL's financial leadership and facilitators. Identify and target key financiers within the ISIL structure. 4. Disrupt ISIL's external networks. Deny ISIL access to the international financial network that could support it in resupplying its war effort.").

264

719.     Given the centrality of anti-corruption to U.S. counterterrorism policy in Iraq and Afghanistan after 9/11, protection payments also violated express U.S. government contracting requirements and regulations.  Under the terms of their contracts, prime contractors bore responsibility for ensuring the integrity of U.S. spending in Iraq.  The government further imposed requirements designed to ensure that private contractors lived up to that responsibility.  For example, USAID's contracts contained a "standard clause" reminding its contractors that "U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism.  It is the legal responsibility of the contractor/recipient to ensure compliance with these Executive Orders and laws."[374] CENTCOM contracts followed DOD guidelines that similarly mandated that contracts—and DOD's Contracting Officers, who negotiated and enforced them—must include a standard clause requiring government contractors to comply with all U.S. and Iraqi laws, which included a prohibition on providing material support to terrorists.[375]

720.     Prime contractors were required to include those same clauses in their contracts with – and ensure compliance by – their subcontractors.[376]  The "vetting" requirements were especially strict for any subcontractors that were to be armed under the contracts. Most Defendants' protection payments – whether made directly, or through subcontractors – violated

---

[374] Memo. from Bruce N. Bower, USAID Regional Inspector General to Earl W. Gast, USAID Afghanistan Director, *Review Of Security Costs Charged To USAID's Projects In Afghanistan* (Review Report No. 5-306-10-002-S) at 11 (Sept. 29, 2010), https://tinyurl.com/2p82chxz.

[375] *See* Office of Under Secretary of Defense, *Class Deviation – Implementation Of The Synchronized Predeployment & Operational Tracker (SPOT) To Account For Contractor Personnel Performing In The United States Central Command Area Of Responsibility*, Memorandum for Directors Of Defense Agencies (Oct. 17, 2007).

[376] *See*, *e.g.*, USAID Contract No. DFD-I-00-05-00250, § H.15 (Sept. 27, 2005) ("[t]his provision must be included in all subcontracts/subawards"); USAID Contract No. 306-C-00-11-00506, § H.17 (Oct. 29, 2010) (same).

those requirements and reflected a failure to live up to their responsibility to ensure the legality of their contract spending in Iraq.

721.    Contractors typically concealed their individual payments from the U.S. government (and the Iraqi government) by funneling the money through networks of subcontractors and mischaracterizing the payments in their books and records as "security," "transportation," "logistics" or other similar costs.  For that reason, the U.S. government (and the Iraqi government) was unaware of the specific illegal payments that Defendants made.

722.    As the U.S. government became aware of broader patterns of corruption in Iraq, it implemented a number of programs to curtail illicit payments.  For example, Congress created SIGIR, which scrutinized and audited government contracting as part of a broader anti-corruption mandate.  The U.S. Embassy in Baghdad also aggressively pushed anti-corruption efforts.  The net effect of these various efforts was to elevate anti-corruption to a distinct line of effort in the U.S. strategy in Iraq, and to convey unmistakably to industry participants that protection payments were unacceptable.

723.    The U.S. government also implemented a broader array of programs designed to combat corruption in Iraq.  Defendants' payments fueled the type of corruption that U.S. agencies were attempting to eradicate.

724.    The U.S. government on occasion encouraged companies to hire local Iraqis or employ local Iraqi businesses in connection with some projects.  This was not a license for Defendants to allow their partners, consultants, and contractors to pay terrorists.  On the contrary:  the U.S. government at all times communicated an expectation that Defendants should vet their local partners and take affirmative steps to ensure that the money they paid to those partners did not flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  And the U.S. government

repeatedly made clear that the payment of protection money – or the payment of terrorist "taxes" – in exchange for permission to proceed with U.S.-funded projects was illegal and counterproductive.  Neither USAID nor Multinational Forces-Iraq ever suggested that such payments were either an inevitable consequence or an acceptable cost of implementing U.S.-funded projects in al-Qaeda, al-Qaeda-in-Iraq, or Islamic State areas.

725.     In September 2010, General Petraeus issued formal contracting guidance designed to further discourage protection payments to terrorists.  In the guidance document, General Petraeus emphasized that "[w]here our money goes is as important as the service provided or the product delivered."[377]  He thus instructed contracting officers to "[h]old prime contractors responsible for the behavior and performance of their sub-contractors," with an understanding that "[e]xcessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[378]  At bottom, the U.S. government's goal was to improve its systems and ensure that its "vendors and contractors" did not "empower the wrong people or allow the diversion of funds" to insurgents.[379]  The government took a number of steps to implement that guidance, including by ramping up its vetting efforts and affirmatively suspending or debarring certain contractors with suspected links to insurgents.

726.     Defendants nonetheless remained able to execute their payments to insurgents despite the U.S. government's efforts to stop them, for several reasons.  *First*, in Iraq and Afghanistan, the government often lacked visibility into the subcontracting networks through which the payments flowed and so had to "rely exclusively on prime contractors" to vet and

---

[377] *COMISAF's Contracting Guidance* at 1.

[378] *Id.*

[379] *Id.*

supervise the subcontractors.[380]  When Defendants knowingly funneled protection money through those subcontractors, the structure of the transactions made it difficult for the government to trace the money with enough precision to take corrective action.  Such payments frustrated the U.S. military's policy of identifying and terminating "contracts with supporters of the insurgency."[381]

727.  *Second*, the U.S. government faced staffing shortages that impeded its efforts to fully monitor the large number of contractors and subcontractors operating in Iraq and Afghanistan.  With a limited number of qualified contracting officers available – and a vast network of contracts to supervise – the government lacked the resources to investigate every payment made by Defendants or their subcontractors.  Defendants were able to exploit those resource constraints to conceal their protection payments from U.S. government personnel, when they should have been the ones to flag such issues for the agencies funding their projects with U.S. taxpayer money.

728.  *Third*, the U.S. government relied on the good faith of its contractors to prevent payments to terrorists, because the contractors often had access to better on-the-ground information than did the government.  Due to Defendants' business ties – and the long in-country tenures of many of their personnel, as compared to the typically short rotations of U.S. government deployments – Defendants had unique real-time visibility into where their money was going.  That made it even easier to conceal their payments from U.S. regulators.

729.  Given those constraints, it was Defendants (not the U.S. or Iraqi governments) that had the resources, expertise, and obligation to ensure that their practices did not materially

---

[380] U.S. Special Inspector General for Afghanistan Reconstruction, *Contracting With The Enemy*, at 8, Audit No. 13-6 (Apr. 2013).

[381] *Id.*

support al-Qaeda, al-Qaeda-in-Iraq, or Islamic State. As the U.S. Senate Finance Committee's Oversight and Investigations Unit reported in 2020, when a western company's "work [in] some of the most" "dangerous," "active hotspots for terrorist activity" "generates more than $1 billion in revenue" directly or indirectly through U.S. federal government "grants," "both USAID's and OFAC's processes clearly state that it was the responsibility of the [company] to vet all sub-grantees" and the western company plainly "has a duty to ensure that funds acquired from the U.S. government … do not end up supporting terrorist activity."[382]

730.    In such circumstances, if a western company had "access to the appropriate public information and should have known how, but failed to, properly vet [a contractor] as a sub-grantee, resulting in the transfer of U.S. taxpayer dollars to an organization with an extensive history of supporting … terrorists," it is the company that "bears the sole responsibility for their failure to properly vet [the contractor]" because "[h]ad [the company] employed [reasonable] due diligence … methods …, taxpayer dollars would not have exchanged hands with an organization that is known to fund terrorist organizations."[383] "Particularly concerning," according to the U.S. Senate Finance Committee's Oversight and Investigations Unit, "is [when a western company] attempt[s] to shift the blame to the federal government for [its] own inability to properly vet a subcontractor" for terrorist finance.[384]

731.    In sum, the U.S. government clearly stated its opposition to protection payments and attempted to curtail them.  But those efforts were imperfect, and, at all times, Western

---

[382] U.S. Senate Finance Committee Oversight and Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, at 5-8, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

[383] *Id*. at 10-11.

[384] *Id*.

contractors, including Defendants, functioned as the U.S. government's principal tool against terrorist financing.  But Defendants abused that trust to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State and increase their profit margins.  Ericsson's conduct forms the basis of this lawsuit; Plaintiffs expressly disclaim any challenge to the U.S. government's policy decisions.

## V.    DEFENDANTS FRAUDULENTLY CONCEALED THEIR AID

### A.    Defendants Fraudulently Concealed Their Protection Payments And Donations To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

732.    From 2003 through at least February 15, 2022, LM Ericsson and Ericsson Inc. actively and fraudulently concealed their illicit transactions with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State alleged herein to cloak Defendants' illegal activities.

733.    Eventually, Defendants' scheme was detected – in part.  In 2013, the SEC launched an FCPA investigation of LM Ericsson's and its subsidiaries corrupt practices worldwide, and DOJ launched its own investigation in 2015.

734.    Even then, however, Defendants' fraudulent concealment endured:  from 2013 through 2022, LM Ericsson and Ericsson Inc. represented to DOJ, as well as LM Ericsson's shareholders, that LM Ericsson and Ericsson Inc. were fully cooperating with the United States' then-existing criminal and civil anti-corruption investigations of Ericsson.

735.    On December 6, 2019, LM Ericsson and its subsidiaries admitted to a years-long campaign of corruption in five countries to solidify its grip on telecommunications business, LM Ericsson and its subsidiaries entered into a Deferred Prosecution Agreement with DOJ, and LM Ericsson agreed to pay total criminal and regulatory penalties to the United States government in the amount of $1,060,570,432, one of the largest corruption fines ever imposed.

736.    LM Ericsson and Ericsson Inc. brazenly concealed their payoffs to terrorists throughout the course of DOJ's and SEC's respective investigations.  During the early phase

(from 2013 through 2015), while Defendants were promising cooperation and good corporate citizenship to DOJ and SEC, they plotted to pay off terrorists.  During the middle phase (from 2016 through 2018), Defendants continued their payoffs to Islamic State – and continued lying to everyone else.  Amazingly, while LM Ericsson was finalizing its parallel resolutions with DOJ and SEC in 2019, it was simultaneously making the deliberate – and obviously wrongful – choice to conceal its protection payments, under the pretense that corrupt payments to the world's most notorious, brutal, anti-American terrorist group were not "material."

737.    As *Reuters* observed, LM Ericsson and Ericsson Inc.'s "excuse for not fessing up earlier" – i.e., "that the [Iraq] transactions … didn't meet Ericsson's 'materiality' threshold" – was "unlikely to sit well with the Department of Justice, which takes a dim view of anything less than full disclosure in anti-corruption probes."[385] According to *Reuters*, LM Ericsson's and Ericsson Inc.'s fraudulent concealment "[k]eeping any Iraqi skullduggery under wraps while in negotiations with the Feds is a distinctly bad look" considering "[LM Ericsson]'s 2019 [FCPA] settlement over graft in China, Vietnam, Indonesia, Kuwait and Djibouti made clear that the hefty size of the fine was partly due to Ericsson's foot-dragging."[386]

738.    DOJ agreed.  On March 2, 2022, LM Ericsson publicly admitted: "On March 1, 2022, the DOJ informed Ericsson that the disclosure made by the company prior to the DPA about its internal investigation into conduct in Iraq in the period 2011 until 2019 was insufficient.  Furthermore, it determined that the company breached the DPA by failing to make subsequent disclosure related to the investigation post-DPA." As the *Washington Post* reported, DOJ

---

[385] Ed Cropley, *Ericsson's ISIS Fallout Could Go Beyond Big Fines*, Reuters (Feb. 16, 2022).
[386] *Id.*

"accused … Ericsson of violating a billion-dollar legal settlement by failing to fully disclose evidence of alleged corruption and possible payments to terrorists in Iraq."[387]

739.    The Securities and Exchange Commission concurred.  On June 9, 2022, LM Ericsson reported that the SEC "has notified the Company that it has opened an investigation concerning the matters described in the Company's 2019 Iraq investigation report."[388]

740.    Until at least February 15, 2022, when Ericsson publicly admitted to much of the corrupt conduct alleged herein, none of the Plaintiffs had any knowledge of Defendants' violations alleged herein.  Further, until recently, Plaintiffs could not have discovered, by the exercise of reasonable diligence, that Defendants engaged in the violations alleged herein because Defendants actively and fraudulently concealed these violations to cloak their illegal activities.  Defendants fraudulently concealed their illegal activities, as alleged herein, by, *inter alia*, making false and misleading entries on LM Ericsson's and Ericsson Inc.'s books and records, filing false and/or misleading documents with the U.S. government, and issuing false press releases, reports, and other statements concerning, *inter alia*, their compliance program.

741.    To conceal their unlawful conduct from U.S. authorities and prevent disclosure of the facts to Plaintiffs, Defendants routinely structured illicit transactions to conceal their protection payments on Defendants' books-and-records, including, but not limited to, through Defendants' illicit transactions with their: (i) intermediaries, including their Iraqi partners, consultants, and contractors; (ii) slush funds and cash payoffs; and (iii) deliberately deficient internal controls.

---

[387] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS*, Washington Post (Mar. 2, 2022).

[388] LM Ericsson, *Press Release: Update on Ericsson Engagement with U.S. Authorities* (June 9, 2022).

742.    To conceal their unlawful conduct from U.S. authorities and prevent disclosure of the facts to Plaintiffs, Defendants routinely issued public statements that fraudulently assured LM Ericsson's shareholders that LM Ericsson (a) followed a rigorous compliance policy; (b) was subject to terrorism-related risks, while concealing its protection payments; and (c) was cooperating fully with the U.S. government's investigation of its illicit payments.  LM Ericsson and Ericsson Inc. routinely caused such fraudulent statements to be made to LM Ericsson's shareholders from 2003 through 2022, including, but not limited to:

a.    On June 22, 2004, Ericsson Inc. represented to LM Ericsson's shareholders: "Integrity and ethics has always been a significant part in the way Ericsson conducts business. Ericsson continues to further strengthen this through its Code of Business Ethics and Conduct, which is aimed toward all its employees."[389]

b.    On April 11, 2014, LM Ericsson represented to its shareholders that: (i) LM Ericsson adhered to "a solidified approach to responsible business including rigorous compliance processes"; (ii) LM Ericsson "emphasi[zed]" that "conducting business responsibly takes a full value chain perspective," "begins with supply chain[,] and extends through Ericsson's own operations including the sales process"; and (iii) "we are focused on building a strong foundation for corporate responsibility within the company."[390]

c.    On May 13, 2014, LM Ericsson—acting through its Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald—represented to its shareholders that: "Globally, [corruption] is a huge impediment to doing business in many parts of the world. When you have corrupt societies you also, in general, would have, for example, greater human rights abuses and many other problems … We have a zero tolerance to corruption of the [C]ompany, and so we just put a huge focus on this. We don't want to be involved in the wrong kind of business. It doesn't mean that we're perfect or any company is perfect, but it means we're putting a focus on this, and all of our employees know that this is not the way we're going to do business. So, we have a code of business ethics, and every one of our 114,000 employees is required to acknowledge that they have read and understand this code and the requirements and the principles that we set forth in the code. … Why is it important globally? Because this is really dragging and holding societies down, holding people back, holding back development. … So, we decided to do the human rights impact assessment, and we worked together with Shift to do that. We're just completing that now. It was a quite a

---

[389] Ericsson Inc., *Press Release, Ericsson's Leading Technology Contributes Significantly to Global Sustainable Development*, *published in* Business Wire (June 22, 2004).

[390] LM Ericsson, *Press Release: Ericsson Emphasizes Responsible Business, Energy and Technology for Good in 2013* (Apr. 11, 2014).

huge learning experience. … [T]he main learning with the U.N. guiding principles is really when companies traditionally would look at human rights impacts, [they] would traditionally look at the risks to themselves or to their brand about being present in the market. The new U.N. guiding principles are about the impact on people, the local stakeholders, the local communities. It's not so much like what is Ericsson's risk. Of course, we look at that as well, but we also look at potential negative human rights impact on people, basically. … One huge accomplishment was to get the top-level executive team and the CEO to really see the value and the need to be active in this area and see the benefits of it."[391]

d.    In June 2016, LM Ericsson published a report that fraudulently represented that "During this time, I have felt enormously encouraged by two factors—the revolution in Information and Communications Technology (ICT) and the remarkable corporate leadership being shown by companies like Ericsson which is paving the way for a new Information Age. … Put simply, technology must be combined with a will towards the common good. In our era, that means harnessing it to the global objectives embodied by … [Sustainable Development Goals]. For that, we require truly visionary corporate leadership, when and where it matters. … Now, … Ericsson … [is] helping to lead on the [Sutainable Development Goals]. [Information and Communications Technology] … are being deployed with strong social purpose to deliver improvements … peace-building in South Sudan and beyond."[392]

e.    In June 2016, LM Ericsson—via its CEO, Hans Vestberg—fraudulently represented that: "[C]ompanies like Ericsson are working with others to achieve shared societal goals and collectively tackle global challenges. … In the late 1890s our founding father, Lars Magnus Ericsson coined the phrase that 'access to communication is a basic human need.' Today, this underpins our vision of being a relevant and responsible driver of positive change by using Technology for Good. … [LM Ericsson supported Sustainable Development Goals that] set out a broad range of interconnected economic, social and environmental objectives including more peaceful and inclusive societies[] [and were] [g]lobal and universally applicable … [and promoted] [p]eace, justice & strong institutions[.] Within crisis management, humanitarian aid and peacebuilding, [Information and Communications Technology] has proven to be a powerful tool in areas such as electoral monitoring, through the use of crowdsourcing. Government use of open data increases transparency, empowers citizens, and helps to drive economic growth. … [At LM Ericsson,]" "[r]educing corruption," "fighting crime and terrorism," and "strengthening and improving the equity of fiscal policy," were "core" to achieving the "[Sustainable Development Goals]" to which LM Ericsson professed to adhere.[393]

---

[391] Heather Clancy, *How She Leads: Elaine Weidman-Grunewald, Ericsson*, Greenbiz, (May 13, 2014), https://tinyurl.com/eh3jr2xj.

[392] LM Ericsson, *ICT and SDGs: How Information and Communications Tech. Can Accelerate Action on the Sustainable Development Goals*, at 6 (June 2016) (statement by Dr. Jeffrey Sachs in the forward), https://tinyurl.com/2p8n8scz.

[393] Hans Vestberg, *quoted in* LM Ericsson, *ICT and SDGs*, *supra*, at 7, 18-19, 29.

f.      On March 19, 2017, LM Ericsson and Ericsson Inc. published a statement from LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Ms. Weidman-Grunewald, which fraudulently represented that, with respect to corporate social responsibility, LM Ericsson and Ericsson Inc. were "Turning intentions into impact," and that: "Ericsson's deep-rooted commitment to the [Sustainable Development Goals] is well documented. Technology for Good is the concept we work with every day to address sustainable development challenges like … humanitarian issues, [and] human rights … We recently launched our 23rd Sustainability & Corporate Responsibility Report and are turning our intentions into impact in a number of ways."[394]

g.      On September 18, 2018, LM Ericsson (including through Rafiah Ibrahim, Head of Ericsson Middle East and Africa) represented to its shareholders that LM Ericsson engaged "[i]n an effort to make quality secondary education more accessible in Iraq" purportedly reflected Ericsson's ongoing "work[]" in "Iraq to leverage" "our employees to make a positive impact" in recognition, as Ms. Ibrahim stated, of LM Ericsson's purported efforts to ensure that "girl[s]" in Iraq could "receive [a] quality education."[395]

h.      On July 11, 2019, LM Ericsson represented to its shareholders that: "Under [LM Ericsson's] agreement [with Asiacell], Ericsson will provide network design and optimization as well as expansion services … Ericsson will also offer round-the-clock network monitoring, problem restoration and performance enhancement services."[396]

---

[394] LM Ericsson and Ericsson Inc., *Taking Action On The Sustainable Development Goals* (May 12, 2016) (quoting Ms. Weidman-Grunewald), https://www.ericsson.com/en/blog/2016/5/taking-action-on-the-sustainable-development-goals.

[395] LM Ericsson, *Press Release: Ericsson and Zain Bring 'Connect to Learn' Education Initiative to Iraq* (Sept. 18, 2018). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement was accurate only because LM Ericsson concealed Defendants' gigantic, regular protection payments to Islamic State—which Defendants had been making to ISIS specifically for the more than four years since its February 2014 inception by the time this statement—which LM Ericsson knew, through its own personnel and agents on the ground as well as U.S. government and media reports, directly funded ISIS's rampage against schools for women and girls throughout Iraq, which was the signature issue that Islamic State opposed above nearly all else. LM Ericsson could not accurately describe its true relationship to schools for women and girls in Iraq – i.e., that LM Ericsson was responsible for funding the people blowing them up, burning them down, and murdering everyone inside – so LM Ericsson concealed such fact from its disclosures, including this statement.

[396] LM Ericsson, *Press Release: Asiacell Selects Ericsson Services for Superior User Experiences in Iraq* (July 11, 2019). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement omitted Ericsson's key service to Asiacell as the leader and orchestrator of protection money payments made on both Ericsson's and Asiacell's behalf. LM Ericsson's service as Asiacell's protection money partner

**i.**  On December 6, 2019, LM Ericsson represented to its shareholders that: (i) "The resolution relates to historical FCPA breaches ending Q1 2017"; (ii) "In parallel to the investigations, [LM Ericsson] has since 2016, together with external expert advisors, conducted a comprehensive review of the Company's anti-corruption program …[and] has been taking significant steps to improve its Ethics and Compliance program"; (iii) "Pursuant to the resolutions, Ericsson has agreed to continue enhancing its internal controls and its compliance program"; and (iv) "Reaching a resolution with the US authorities allows us to close this legacy chapter" and "now move forward …"[397]

**j.**  On March 3, 2020, LM Ericsson represented to its shareholders that "[w]e have … a significant proportion of our sales to emerging markets in the … Middle East" and "[o]ur extensive operations are subject to additional risks, including … acts of terrorism."[398]

743.    Each of the statements in the previous paragraph fraudulently concealed LM Ericsson's and Ericsson Inc.'s protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by addressing LM Ericsson's purported operational risks from terrorism in the Middle East while concealing LM Ericsson's payoffs to terrorists in Iraq, the implications of LM Ericsson's payoffs to terrorists in Iraq, and/or the true nature of the services LM Ericsson provided to its Iraqi customers like Korek and Asiacell.

744.    Defendants' affirmative actions as alleged herein were wrongfully concealed and carried out in a manner that was intended to, and did, preclude detection.

---

was a core service (albeit an illegal one) that LM Ericsson provided to Asiacell.  This statement fraudulently concealed such fact.

[397] LM Ericsson, *Press Release: Ericsson Reaches Resolution on U.S. FCPA Investigations* (Dec. 6, 2019).

[398] LM Ericsson, *2019 Annual Report*, at 127 (Mar. 3, 2020). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because LM Ericsson described risks from terrorism without revealing that LM Ericsson's behavior had worsened such risk, by providing a dependable, large-scale, stream of income to terrorists in LM Ericsson's key Middle Eastern markets. This statement fraudulently concealed such fact.

**B.     Defendants Knew Their Concealment Of Their Protection Payments And Donations Aided Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**

745.    Defendants knew that their concealment of the protection payments made to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State on Defendants' behalf aided the terrorists.

746.    **United States government reports and statements** alerted Defendants that their concealment of their protection payments undermined U.S. government counterterrorism efforts. Most obviously, DOJ repeatedly communicated to LM Ericsson and Ericsson Inc. that their illicit payments could harm U.S. national security by facilitating terrorism.  DOJ did so when it published the FCPA Resource Guide in 2012, which documented DOJ's view that corrupt payments foreseeably aided terrorists. On information and belief, DOJ also directly communicated to LM Ericsson and/or Ericsson Inc. that its full cooperation in DOJ's anti-corruption investigation was important to DOJ's ability to carry out its anti-corruption function, which DOJ recognized played an important counterterrorist finance role after 9/11.

747.    Such U.S. government reports specifically emphasized the importance of accurate information from the private sector to the U.S. government's ability to mitigate the terrorist finance and logistics risks that specifically arise in the telecommunications sector.  For example, according to U.S. counterterrorism strategy in 2018:

> Terrorists cannot sustain their operations without [information technology]. The United States and our partners … in the private sector must, therefore, prevent terrorists from using [information technologies sourced from the United States] while safeguarding these resources for legitimate use. To accomplish this, we will increase information-sharing with the private sector …[399]

748.    **Terrorism scholars** alerted Defendants that their concealment of their payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs by undermining

---

[399] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

United States counterterrorism policy, which relied upon complete, and truthful information from multinational corporations conducting business in areas at severe risk for terrorist finance, like Defendants.  In 2014, for example, terrorism scholar Louise Shelley observed that:

> The effort to counter ISIS should also involve Western businesses. The cigarette industry follows the ebb and flow of the illicit cigarette trade. Energy and pharmaceutical companies monitor the movement of their commodities in the region. Transport companies have insights into the dynamics of illicit trade, and insurance companies have insights into kidnapping. That is why public-private partnerships are key. Corporations can share the information they already collect on illicit trade routes, smuggling shipments, and key facilitators. They can also warn consumers not to purchase the counterfeit and smuggled commodities that fund terrorism. For now, the government response to ISIS has not taken the business community enough into account. But without such cooperation, Washington cannot hope to successfully counter the nimble ISIS.[400]

749.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their fraudulent concealment of their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs by obstructing American counterterrorism efforts.

## VI.    DEFENDANTS' AID WAS SUBSTANTIAL

### A.    Defendants Provided Support Tailored To The Violence At Issue Here

750.    Defendants' aid was tailored to the specific violence at issue: Defendants provided U.S. dollars which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State required to finance their terrorist campaigns in Iraq, Afghanistan, and Syria.

751.    Money supplied the lifeblood of the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq and Islamic State.  Financing gave these FTOs the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Americans; and to maintain the vast operational infrastructure needed to sustain the global campaign, including

---

[400] Shelley, *How ISIS Makes Bank*, *supra*.

their key regional branches, in Iraq, Afghanistan, and Afghanistan.[401] As Representative Ted Poe, Chair of the U.S. House of Representatives Subcommittee on Terrorism, stated in 2015, "[t]ime and time again we are reminded of the massive damage that terrorists cause even with just a little money" – "precisely why our government" has "been tasked with stemming the flow of money to terrorist groups." Simply put, according to Congressman Poe, "[w]hen we can separate the terrorists from their money, lives can be saved." Defendants did the opposite.

752.    Ericsson's conduct aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprises. The very nature of the protection-money demands – backed by violent threats conveyed by the same al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were waging a vicious campaign against the United States in Iraq and Afghanistan – ensured a close connection between the payments and subsequent al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks on Americans. Such attacks were a necessary consequence of Defendants' payments. When they paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection money, they were not lessening the overall risk of terrorist violence; they were paying al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to redirect their attacks to other targets. One prevailing slogan among private-security contractors captured that mentality: contractors often said, "you want them to fight Big Army [*i.e.*, the U.S. Army] before they fight you." Defendants' payments accomplished exactly that. They paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to attack Coalition forces rather than Defendants' own businesses.

753.    Defendants' protection payments supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with an important stream of revenue such FTOs used to finance and facilitate

---

[401] Given Islamic State's assumption of al-Qaeda-in-Iraq's protection money operation, including AQI's tactics techniques, and procedures, the points in this section apply equally to ISIS.

terrorist attacks against Americans in Iraq, Afghanistan, and Syria. Defendants' protection payments, which created an income stream overseen directly by leadership of each group, gave al-Qaeda, al-Qaeda-in-Iraq, and Islamic State fungible resources that were vital to such FTOs' ability to sustain al-Qaeda's and Islamic State's respective terrorist enterprises.  For that reason, the Commission on Wartime Contracting observed that, "[i]n Iraq and Afghanistan, significant … issues include[d]" "diversion of contract funding to the insurgency" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects" "as a cost of doing business" at "a significant percentage of a project's cost[,]" which caused "U.S. funds" "[i]n Iraq and Afghanistan" to be "diverted to insurgents" and "directly strengthen[ed] the insurgency" such that Defendants caused "a disproportionate[] adverse impact on the U.S. effort" to combat terrorism in both countries.

754.    Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State institutionalized control of their protection money revenue.  The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State promulgated rules and regulations dictating to local field commanders how to collect (and spend) protection money from foreign businesses. The money flowed both ways – from local commanders up to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's respective Financial Commissions for use by such FTOs' central leadership, and conversely from the leadership back down to local commanders for use in the field in Iraq, Afghanistan, and Syria. That discipline allowed protection money collected from all over Iraq and Syria to finance al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist machine in Iraq, Syria, and Afghanistan.

755.     Defendants' protection payments similarly financed the Haqqani Network.
Defendants' payments to al-Qaeda aided the Haqqani Network because al-Qaeda was a key
Haqqani Network financier and specifically funded Haqqani Network suicide and IED
operations, among others.

756.     Protection payments supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with
the means to buy weapons and explosives for use in terrorist attacks.  Weapons capable of killing
and injuring Americans cost money, and Defendants' protection payments provided al-Qaeda, al-
Qaeda-in-Iraq, and Islamic State, and the Haqqani Network (through al-Qaeda), with a potent
source of funding to cover the cost of their globalized terrorist campaigns targeting the United
States in Iraq, Afghanistan, and Syria.

757.     Protection money payments, like those made by Defendants, delivered the budget
surplus to al-Qaeda-in-Iraq, and later Islamic State "core," that was the direct, but-for cause of
(a) al-Qaeda-in-Iraq's substantial financial transfers to al-Qaeda's "core" in Afghanistan and
Pakistan from 2004 through 2014, and Islamic State core's transfers to Islamic State's branch in
Afghanistan and Pakistan from 2014 through 2022; and (b) al-Qaeda's and al-Qaeda-in-Iraq's
ability to consistently attract the best terrorist "talent" from 2004 through 2014, and Islamic
State's similar ability from 2014 through 2022.

758.     With respect to finance, the sheer volume of Defendants' protection payments
allowed al-Qaeda and al-Qaeda-in-Iraq to generate large budget surpluses that funded al-Qaeda
and al-Qaeda-in-Iraq attacks from 2004 through at least 2016, and allowed Islamic State "core"
in Iraq and Syria to generate large budget surpluses that funded Islamic State's operations during
while acting as a caliphate (2014-2017) and while as a global insurgency (2014-2022). Among
other things, such surpluses gave al-Qaeda, al-Qaeda-in-Iraq, and Islamic State vital "rainy day"

money that funded attacks well after Defendants' payments, which such FTOs used to fund their operations and strategic redeployments, such as when al-Qaeda-in-Iraq personnel transferred to Afghanistan from 2007 through 2014, or when Islamic State core created and operated Islamic State's branch in Afghanistan and Pakistan from 2016 through 2022.

759.    With respect to talent, al-Qaeda-in-Iraq (and later, Islamic State) leveraged budget power to outspend rival Sunni insurgents as AQI consolidated its grip on the entire Sunni insurgency in Iraq (which tactic Islamic State replicated a decade later).  Al-Qaeda-in-Iraq generally paid its rank-and-file around $40-$50 per month (in the 2000s) and $100 per month (in the 2010s, as did Islamic State) and paid its mid-level fighters – the center of gravity for al-Qaeda's terrorist campaign in Iraq – around $200-$400 per month (as did Islamic State).  Al-Qaeda-in-Iraq's and Islamic State's respective budget surpluses due to their protection money riches, however, allowed AQI and ISIS commanders to outspend all challengers and go up to $1,000 per month per fighter; the next closest Sunni insurgent group, in contrast, could not afford to spend more than $250. Iraq's soldiers and police, in contrast, were paid about $150 a month.

760.    Al-Qaeda-in-Iraq's and Islamic State's budget surpluses also funded bonuses that incentivized attacks against Americans in Iraq by rewarding the attackers, which included, but were not limited to:  $10 per day for spies who supported attacks with intelligence; $100 to $200 for a successful IED attack; $500 to $700 for destroying an American vehicle; and $7,000 for shooting down a helicopter.

761.    The effect of protection payments was especially pronounced because they enabled al-Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders to pay recruits who fought against the Coalition in Iraq and Afghanistan for financial (rather than ideological) reasons.  Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders typically operated on thin margins and

faced constant pressure to raise enough money both to pay fighters and to launch attacks. Protection money was essential to fulfilling both needs:  had Defendants refused to pay and cut off that source of revenue, it would have forced al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commanders to, as one U.S. official put it, "deci[de] between paying and feeding [their] troops and launching attacks."  Defendants' payments freed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commanders from that choice and enabled them to retain their fighters while continuing with attacks on Coalition forces in Iraq and Afghanistan.

762.    This financial link applied to protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in all their types.  Due to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's fundraising apparatus, cash payments to local commanders (or the FTO's Financial Commission) flowed to the FTO's leadership for use wherever the terrorists decided to focus their resources.

763.    Protection payments supplied one of the most quantitatively significant sources of terrorist finance for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For each FTO, protection payments were always one of the top two fundraising tactics, and for most of al-Qaeda-in-Iraq's and Islamic State's existence, protection money ranked number one. The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.

764.    Protection payments also strengthened al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by allowing such FTOs to diversify their income.  For designated terrorist groups subject to crippling international sanctions, diversification was critical:  it offered al-Qaeda, al-Qaeda-in-Iraq, and Islamic State a degree of financial resiliency that made each FTO less susceptible to American counterterrorism efforts.  That is why, as the U.S. military began to successfully interdict al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's other revenue sources (such as oil smuggling), al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied increasingly on their

burgeoning protection rackets.  That stream of protection money – particularly from larger, well-financed corporations, including Defendants – supplied reliable funding for the FTOs and, almost as importantly, offered insurance against the risk of other funding sources drying up.

765.    Protection payments from Western companies, including Defendants, were also qualitatively material to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprise because of their unique link to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's leadership. Unlike funding from other sources (such as smaller businesses) that were more often spent locally, Defendants' protection payments generally flowed up al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's organizational chain – or were made directly to top-level al-Qaeda, al-Qaeda-in-Iraq, or Islamic State institutions – and supplied fungible U.S. dollars – often cash – available for use by leadership wherever it saw fit.  In addition, the payments often conferred intelligence benefits to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by providing details about U.S. government, military, and contractor operations in the area.  Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's high-level commanders then used the money and intelligence supplied by Defendants to finance their campaign against the United States in Iraq, Afghanistan, and Syria.

766.    Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's top-down organizational hierarchy ensured that protection money collected locally in one province or country helped to finance al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operations throughout the country or in other key theaters – including areas miles away from the site of the payment.  That was a core reason why al-Qaeda, al-Qaeda-in-Iraq, and Islamic State moved to institutionalize the collection of protection money from large firms, including Defendants:  rather than have commanders spend their protection money locally, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directed the funds into the group's central coffers for use on a nationwide, indeed global, scale. Accordingly,

Defendants' payments did not merely finance attacks in the immediate areas of their projects; al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's process for redistributing those payments made sure that they financed terrorism throughout Iraq, Afghanistan, and Syria.

**B.    The Amount Of Money, And Concealment Of The Same, Were Both Significant**

767.    As explained above, money is the lifeblood of terrorism—especially for al-Qaeda and its progeny, al-Qaeda-in-Iraq and Islamic State. And as the United States explained in a criminal case targeting a member of al-Qaeda's Syndicate in Afghanistan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."

768.    Each year from 2004 through at least 2014, LM Ericsson and Ericsson Inc. caused at least several million U.S. dollars in terrorist finance to flow to al-Qaeda (which funded al-Qaeda's and the Haqqani Network's attacks, and also funded al-Qaeda's aid to to al-Qaeda-in-Iraq), and at least several million U.S. dollars in terrorist finance to flow to al-Qaeda-in-Iraq (which funded al-Qaeda-in-Iraq's attacks and AQI's aid to al-Qaeda and the Haqqani Network).

769.    From 2004 through 2022, Defendants' protection payments likely served as one of the largest funding sources for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

770.    Although al-Qaeda, al-Qaeda-in-Iraq, and Islamic State needed a large amount of money to sustain its terrorist campaign as a whole, each individual attack required less. Although estimates vary, each group often paid many of its rank-and-file fighters $40-$50 per month (during the 2000s) and about $100 per month (during the 2010s), while mid-level commanders were paid between $200-$400 per month. As for many of the signature al-Qaeda-inspired IED types (used by all three FTOs), they usually cost a mere $100 to make.

771.    At those rates, even a single protection payment of $2,000 to al-Qaeda, al-Qaeda-in-Iraq, or Islamic State could finance substantial terrorist violence: in Afghanistan, Iraq, and Syria. A $2,000 payment made in 2007 to al-Qaeda or al-Qaeda-in-Iraq could put twenty terrorists (at $50 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs.[402] In the 2010s, after rank-and-file salaries increased from $50 to $100 in the second decade of the terrorists' campaign, a $2,000 payment made in 2017 to Islamic State could put ten terrorists (at $100 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs. Or the terrorists could spend their $2,000 to purchase about dozens of bags of bomb components, like about 60 bags of calcium ammonium nitrate ("CAN") fertilizer, which their bombmakers could convert into the explosive materials necessary for approximately 260 large CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat an American armored vehicle) or 650 smaller CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat American body armor). And Defendants regularly facilitated protection payments that were many orders of magnitude higher. Those payments materially strengthened the ability of al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to finance the attacks that killed and injured Plaintiffs.

772.    U.S. government studies confirm the dramatic impact that even marginal financial contributions produced for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  For example, one 2010 study by DOD concluded that there was a statistically significant relationship between al-Qaeda-in-Iraq terrorist finance, on the one hand, and successful AQI attacks against targets in Iraq, on the other, concluding that each successful attack in Iraq required an approximately

---

[402] In Iraq, Afghanistan, and Syria, the costs per fighter, IED, and suicide bomb were substantially similar.

$2,700 expenditure from al-Qaeda-in-Iraq. Indeed, this $2,700 figure was conservative, as another methodology projected a cost of approximately $1,200 per attack. The same study concluded that even marginal reductions in al-Qaeda-in-Iraq's terrorist funds corresponded with a statistically significant reduction in AQI's successful terrorist attacks.

773.    Al-Qaeda generally agreed.  In 2010, for example, al-Qaeda publicly boasted in an English language publication that, by al-Qaeda's own accounting, a complex transnational al-Qaeda bomb attack against U.S. targets could be funded for as little as one "$4,200" payment.

774.    LM Ericsson and Ericsson Inc.'s Iraq skullduggery also succeeded in keeping their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State secret from 2004 through February 15, 2022.  As such, Defendants' concealment was also significant.

### C.    Defendants Had Culpable Mental States

775.    Defendants had highly culpable mental states because LM Ericsson and Ericsson Inc. occupied sophisticated positions as, respectively, one of the world's largest, most well-connected companies and its U.S. subsidiary, and well knew that their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would aid anti-American terrorism. Indeed, according to leaked LM Ericsson and Ericsson Inc. documents, Ericsson knew that doing business in Iraq "may in itself pose significant political, financial and legal risks and requires diligent controls." Thus, LM Ericsson and Ericsson Inc.'s decision to pay al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was highly culpable and Defendants chose, like so many others in Iraq at the time, to pay "knowing full well the money would be used for bombs and weapons to take the lives of others."

776.    Defendants' robust culpability is also demonstrated by LM Ericsson's pattern and practice of rewarding its in-house terrorist financiers while retaliating against whistleblowers. After they approved aiding Islamic State, for example, LM Ericsson named Ms. Ibrahim a senior vice president and she became an advisor to its CEO, Börje Ekholm, in 2019.  Mr. Moubarak, for

his part, was promoted to Iraq country manager in 2019. On information and belief, both remain

employed by LM Ericsson to this day. In contrast, Ericsson fired Mr. Antoun in 2019. Such

disparate treatment between involved employees also demonstrated Defendants' intent to seek

profit rather than prevent terrorist finance or even follow basic compliance norms.

777.    Defendants' behavior was especially culpable because a substantial portion of the

payments – i.e., those from 2013 through on or about at least December 2019 – occurred while

LM Ericsson was in active discussions with the U.S. government (first SEC, and later DOJ as

well) in which Ericsson pledged good corporate citizenship, cooperation, and respect for anti-

corruption while simultaneously scheming to route protection payments to al-Qaeda and al-

Qaeda-in-Iraq (from 2013 through February 2014) and Islamic State (from February 2014 until

LM Ericsson's DPA in December 2019).

778.    LM Ericsson was also culpable because it was an anti-corruption recidivist.

**D.    Defendants Had A Close Relationship To The Tortfeasors**

779.    Each Defendant had close relationships to the relevant tortfeasors. LM Ericsson,

through its own personnel and its Iraqi partners, consultants, and contractors, had direct

relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Ericsson Inc., through LM

Ericsson, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

780.    LM Ericsson and Ericsson Inc. also structured their transactions with knowledge

of the closeness of their relationship to the tortfeasor. Defendants' attempts to interpose

intermediaries between themselves and the al-Qaeda, al-Qaeda-in-Iraq, and Islamic State

operatives to whom Defendants' protection money was ultimately paid only highlights the

closeness of Defendants' relationship to the tortfeasors.

288

### E.      The Duration Of Support Was Long

781.      Defendants facilitated the flow of protection payments to al-Qaeda and its progeny for at least fifteen years. LM Ericsson and Ericsson Inc. aided al-Qaeda and al-Qaeda-in-Iraq from at least 2004 through at least 2015. LM Ericsson and Ericsson Inc. aided Islamic State from at least 2014 through at least 2019.

782.      Defendants also obstructed U.S. counterterrorism policy for nearly a decade. From at least 2014 through 2022, LM Ericsson and Ericsson Inc. actively lied to the U.S. government in a manner calculated to impede American counterterrorism efforts by concealing the details of the racket, the payments they had made, and the associated logistics – all of which was the sort of actionable information upon which American counterterrorism strategy depended.

## VII.   DEFENDANTS' AID HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES

783.      Ericsson's protection payments in Iraq required extensive involvement of U.S. personnel and facilities in the global Ericsson mobile business unit, Ericsson Inc., which operated in practice as a division of LM Ericsson's integrated structure rather a traditional subsidiary even though Ericsson Inc. was, on paper, a wholly owned subsidiary of LM Ericsson.

784.      From 2003 through 2022, LM Ericsson – the parent of Ericsson Inc., which was its crown jewel and a wholly owned subsidiary – maintained a substantial Iraq-focused presence in the United States, including in Washington, D.C. (i.e., inside this District) and the broader Washington, D.C. metropolitan area, through the Iraq-related activities, travels, transactions, and communications of LM Ericsson's officers, employees, and agents in the United States, including in Washington D.C. For example, LM Ericsson and Ericsson Inc. always deployed cross-functional Ericsson teams who worked in Ericsson Inc.'s Washington, D.C. office on behalf of Ericsson Inc. and LM Ericsson, in order to advance Ericsson's critical global requirements, which often hinged upon access relationships with key Washington, D.C.

stakeholders, government and non-government alike. According to one former leader of such LM Ericsson and Ericsson Inc. office in Washington D.C., as she/he published online, Ericsson's D.C. office aided LM Ericsson's and Ericsson Inc.'s "influencing plan[s]" in North American as well as Ericsson's "global" "plans", and coordinates directly with LM Ericsson's executives.

785.    As LM Ericsson's wholly owned subsidiary in the United States, and the entity responsible for technical innovation, mobile telephony, customer billing, and enterprise management, Ericsson Inc. was the indispensable ingredient to, and partner in, LM Ericsson's next generation network offering worldwide from 2000 through 2022.  Through Ericsson Inc., LM Ericsson also acquired U.S.-technology from, and collaborated with, other U.S.-based technology companies to design, develop, and manufacture Ericsson products and services that were sold or provided for Ericsson's Iraqi projects and contracts during that period.  Simply put, Ericsson Inc. manufactured the U.S. technology, provided the U.S. services, and facilitated other key U.S. commercial relationships that were indispensable to the integrated networks that LM Ericsson sold to customers worldwide, including Iraq.  As such, like many other multinational companies (e.g., medical supply firms) that leveraged U.S. economic prowess, technical expertise, manufacturing strength, and favorable legal regime for their sales in Iraq, LM Ericsson structured its sales in Iraq to operate as Ericsson Inc.'s exclusive representative in Iraq, consistent with decades-long Iraqi practice.

786.    Ericsson's protection payments were closely tied to the United States.  Ericsson Inc. made payments through LM Ericsson, its sales agent and exclusive representative in Iraq. LM Ericsson obtained contracts with the U.S. government, Iraqi government, Korek, and Asiacell, or subcontracts with other prime contractors for the U.S. government, Iraqi government, Korek, or Asiacell, for Ericsson Inc.'s benefit.

787.    LM Ericsson could not have obtained or implemented telecommunications contracts in Iraq without maintaining a substantial U.S. presence through its regular deployment of LM Ericsson officers, employees, and agents into the United States in order to, *inter alia*, coordinate with Ericsson Inc. for purposes of designing the bid strategy, executing the bid, performing the subsequent work, and managing finances, for the Iraqi contracts alleged herein, and fraudulently conceal LM Ericsson's and Ericsson Inc.'s facilitation of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through false statements to LM Ericsson shareholders that LM Ericsson reached into the United States to issue, often jointly with Ericsson Inc., and sometimes through Ericsson Inc. (i.e., Ericsson Inc. is the primary author of a media statement formally on behalf of LM Ericsson). Such close cooperation was a hallmark of their "One Ericsson" model, which was a popular business model for trans-Atlantic multinational corporate collaboration within one family, as demonstrated by its widespread deployment by other western industries, e.g., medical supply, during Oil-for-Food and reconstruction-era Iraq.

788.    Indeed, LM Ericsson's leadership regularly acted in furtherance of Ericsson's illicit protection money scheme while physically present in the United States.  Such contacts were not fortuitous:  LM Ericsson promoted the cross-pollination of its European and American workforces.  Such practices started at the very top:  LM Ericsson's CEO, Börje Ekholm, lived and worked in the United States while leading LM Ericsson since 2016, including, on information and belief, during the period when Mr. Ekholm approved protection payments from 2016 through 2022.  LM Ericsson authorized Mr. Ekholm to lead them from the United States so that LM Ericsson, through Mr. Ekholm's presence in America, could leverage the unique economic, cultural, technological, and financial networks of the United States. While he led LM Ericsson as its CEO from 2016 through 2022 – including while he helped obstruct U.S.

counterterror efforts – Mr. Ekholm was a resident of the state of Connecticut.  In February 2022, near in time to when Ericsson's Iraq scandal broke, Mr. Ekholm sold his Connecticut home and, on information and belief, relocated to Colorado, where he now resides and has a P.O. Box.

789.    LM Ericsson's protection payments in Iraq (alleged above) involved sales of telecommunications technologies and services manufactured and/or provided largely in the United States, and LM Ericsson's protection payments were intended to maximize the profits that Ericsson Inc., and, by extension, LM Ericsson, derived from contracts in Iraq for the sale of Ericsson Inc.'s specialized goods and services.  On information and belief, consistent with Iraq's standard import contracting practice, LM Ericsson certified to its Iraqi customers during the contract negotiation process that its devices and services were made in, and provided from, the United States, and that it was sourcing the technology and services it sold to its Iraqi customers from the United States. LM Ericsson could not have done this without the support from cross-functional teams operated by Ericsson Inc., which supported LM Ericsson's ability to serve as Ericsson Inc.'s agent in Iraq in their supplier/manufacturer relationship as "One Ericsson."

790.    The object of LM Ericsson's network and radio contracts in Iraq, including on information and belief every contract with Asiacell and Korek, was to provide technology and services, including but not limited to the RBS 6000, that were provided by Ericsson Inc. in the United States, and each was negotiated and executed in whole or in part in the United States; each required extensive communications with Ericsson Inc. personnel located in the United States; and each involved American money that Iraqi customers like Korek and Asiacell used to pay LM Ericsson who, in turn, used such U.S. dollars to pay al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  LM Ericsson obtained the money Ericsson used to pay al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from payments derived from Ericsson Inc.'s services in the United States,

and LM Ericsson made those payments to secure work on projects that were managed by and for the benefit of the same U.S. and World Bank-funded counterparties.  In doing so, LM Ericsson and Ericsson Inc. breached U.S.-based contractual requirements prohibiting material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

791.    Many—and on information and belief all—LM Ericsson contracts in Iraq alleged herein relied on LM Ericsson's contacts with the United States, and were for the purpose of generating business for LM Ericsson's affiliate, Ericsson Inc.  Given LM Ericsson's managerial role overseeing Ericsson's Iraq business on behalf of Ericsson Inc., LM Ericsson personnel often worked with and relied on Ericsson Inc.'s U.S. assets to implement LM Ericsson's Iraqi projects.

792.    LM Ericsson's U.S.-based contacts were important.  The United States led Coalition forces in Iraq and spearheaded the civilian reconstruction effort.  When other entities like the World Bank funded telecommunications projects in Iraq, they did so in close consultation with the U.S. government and in service of U.S. objectives.[403]  LM Ericsson's cooperation with its U.S. affiliate, Ericsson Inc., was thus material in it obtaining work from its Iraqi customers, including Korek and Asiacell. LM Ericsson would not have obtained the Korek and Asiacell contracts alleged herein without promising close coordination with Ericsson Inc. in the United States.  That was particularly true because the subject matters of the Iraqi contracts under which Ericsson was paid from 2004 through 2022 focused heavily on the development of Iraq's mobile network and associated business solutions – the two signature roles played by

---

[403] Many, and on information and belief most, of Defendants' contracts were awarded by Iraqi customers who received World Bank funding, and as such, Defendants' Iraq-related contracts were often governed by the World Bank's standard contractual provisions, which typically required both the funding recipient (e.g., Asiacell) and the prime contractor who would receive the money downstream (e.g., LM Ericsson) to adhere to strict counterterrorism standards that usually included certifications and reporting requirements applicable to both funding recipient and prime contractor who deploys the World Bank's money.

Ericsson Inc. in LM Ericsson's globally integrated corporate network.  LM Ericsson's work in Iraq depended on its relationship with Ericsson Inc.

793.    As a condition of fulfilling the contracts with Korek, Asiacell, and other Iraqi customers for which LM Ericsson and Ericsson Inc. built in protection payments, LM Ericsson agreed to procure letters from one or more key stakeholders in the United States confirming that the technologies and/or services provided by LM Ericsson as the supplier to its Iraqi customers were manufactured in, or provided from, the United States.

794.    From 2004 until 2022, LM Ericsson – for which Ericsson Inc. served as the U.S. divison – maintained its own substantial presence in the United States, including Washington, D.C., through the travel, communications, transactions, and services that LM Ericsson's officer, employees, and agents obtained in, or routed via, Washington, D.C. LM Ericsson's Washington, D.C.-based agents' conduct.  As *Reuters* observed a few days after LM Ericsson's Iraq scandal broke, through "[Mr.] Ekholm," LM Ericsson strategized to, and did, financially "benefit[] from Washington's diplomatic pressure against Huawei [concerning anti-terrorism issues], which drove [Huawei] out of the U.S. and most of Europe" causing Ericsson's "sales" to "soar[]."[404]

795.    LM Ericsson's presence in Washington, D.C. from 2004 until 2022 was accomplished, in part, by LM Ericsson's Washington, D.C.-based compliance and legal agents, LM Ericsson's Washington, D.C.-based public relations agents, LM Ericsson's Washington, D.C.-based lobbyists, and LM Ericsson's Washington, D.C.-based consulting and/or accounting firms—whose Washington, D.C.-based acts occurred in their capacity as agent for LM Ericsson—furthered both LM Ericsson's receipt of U.S. dollars from U.S.-based customers or

---

[404] Reuters, *The Effect of ISIS Case for Ericsson May Go Far Beyond The Fine*, *republished by* NoticiasFinancieras – English (Feb. 18, 2022), 2022 WLNR 5092252.

lenders, which LM Ericsson diverted to terrorists in Iraq in the first instance, and LM Ericsson's

successful concealment of its aid to terrorists and obstruction of U.S. policy thereafter. Examples

of LM Ericsson's routine and direct presence in Washington, D.C. to further its Iraq-related

protection payments and obstruct U.S. counterrorism efforts include, but are not limited to:

a.   LM Ericsson's DOJ and SEC-Facing Presence in Washington, D.C.:  LM Ericsson
routinely interacted with, and facilitated ongoing protection payments by making
fraudulent Iraq-related representations, while present in Washington, D.C., to DOJ's and
SEC's FCPA Units (both receiving the information, and based in, Washington, D.C.),
while LM Ericsson knew of the key role played by DOJ and SEC in protecting
Americans from terrorist threat as recognized by longstanding, widely publicized, official
joint DOJ/SEC pronouncements and knew that LM Ericsson's nearly decade-long
concealment of vital al-Qaeda and Islamic State-related information from the U.S.
government foreseeably aided such terrorists attacks targeting America and its citizens.

b.   LM Ericsson's Customer- and Lender-Facing Presence in Washington, D.C.:  LM
Ericsson routinely deployed its officers, directors, and agents to meet with key
Washington, D.C.-based customers and lenders, including U.S. government military, aid,
and commercial agencies in Washington, D.C., and World Bank stakeholders whom
facilitated billions in Iraq-related revenue for LM Ericsson and Ericsson Inc. which LM
Ericsson secured through the artificial commercial benefits it derived from its protection
payments, which themselves violated LM Ericsson's counterterrorism obligations under
standard U.S. government and World Bank contracts that were oridinarily negotiated in
Washington, D.C. and governed by Washington, D.C. law.

c.   LM Ericsson's Media-Facing Presence in Washington, D.C.:  Through LM Ericsson's
Washington, D.C.-oriented press releases, and Washington, D.C. located officers,
employees, and agents—with whom LM Ericsson and Ericsson Inc. routinely cross-
pollinated under LM Ericsson's unusual "division"-based integrated corporate approach
(in which Ericsson Inc. serves as a division of LM Ericsson rather than the traditional
parent/subsidiary role)—LM Ericsson routinely published joint statements with its
division, Ericsson Inc (which has an agent in this District) statements inside Washington,
D.C. that LM Ericsson specifically intended to use to influence key Iraq-, terrorism-, and
corruption-focused Washington, D.C. media outlets, Washington, D.C.-based journalists,
Washington, D.C.-based opinion-makers, and Washington, D.C.-based think tanks, in
order to protect LM Ericsson's associated branding, which was vital to keep LM
Ericsson's Iraq-related money U.S. dollar pipeline—and Defendants' attendant protection
payments to terrorists—flowing undetected until 2022. Simply put, LM Ericsson knew
that its heavily U.S.-centric business would come under severe pressure in Washington,
D.C. if the U.S. government learned it had been bribing anti-American terrorists
responsible for beheading and blowing up Americans on camera for more than a decade.

796.    LM Ericsson consummated its transactions through the United States banking system, by relying upon U.S.-based accounts to obtain the cash necessary to make Ericsson's slush fund-based protection payments, and wiring the funds necessary to make Ericsson's intermediary-based protection payments. On information and belief, LM Ericsson relied upon the U.S. dollar (or "USD") as its currency of choice for illicit Iraq-related payments in the Middle East. Plaintiffs' belief is based upon, among other things:

a.    the universal preference for USD-denominated payments, which usually required a U.S.-based correspondent bank when the original transaction occurred in Iraq;

b.    LM Ericsson's historical reliance on U.S. dollars routed via U.S. banks when making other corrupt payments to Middle Eastern intermediaries in violation of U.S. law;

c.    LM Ericsson's profile as a multinational corporation that worked continuously in Iraq since the fall of Saddam, which ordinarily entailed heavy reliance upon U.S. dollars routed through the U.S. financial system given the interlocking nature of the U.S. and Iraqi systems (by design) after Saddam; and

d.    LM Ericsson's recognition that the U.S. dollar was a better currency both for tactical reasons (the currency of choice for illicit cash transactions worldwide) and financial reasons (as the world's reserve currency).

797.    LM Ericsson's ability to leverage U.S. markets, relationships, legal protections, technologies, and intellectual property enhanced the potency of the resulting terrorist finance and logistical aid that Defendants provided to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

798.    With respect to Ericsson's cash-based protection money payments, LM Ericsson's ability to reliably and regularly access U.S. dollar-related bank accounts in the United States was essential to Defendants' ability to consistently make the high-dollar, U.S. dollar-denominated bulk cash protection payments demanded by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Such ability, in turn, amplified the lethality of the resulting terrorist finance that flowed through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because the U.S. dollar was the currency of choice for all such FTOs at all times in Iraq, Afghanistan, and Syria because their ability to transact in U.S.

dollars allowed them to, on net, purchase more weapons, pay more fighters, and conduct more operations, owing to the economic advantages presented by the USD over every other currency in Iraq, Afghanistan, Pakistan, Syria, Jordan, Iran, and the Persian Gulf – the jurisdictions that mattered most to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's ability to commit attacks against Americans in Iraq, Afghanistan, and Syria from 2005 through 2022.

799.    With respect to Ericsson's free goods-based protection payments, LM Ericsson's ability to reliably and regularly purchase brand-name American communications devices, including Apple iPads, iPhones, and similarly iconic American consumer technologies, provided a potent stream of hard-to-trace off-books cash equivalents that LM Ericsson—on its own, or through its intermediary partners, consultants, and subcontractors—passed along to terrorists as an alternative to cash payoffs on behalf of LM Ericsson and Ericsson Inc. in order to "protect" their business interests in high-risk markets like Iraq. For example, ever since the late 2000s, iPhones and iPads purchased from the United States have been the gold standard mobile phone of choice for illicit "free goods" donations by corporations to a recipient who can harm or hurt their business outlook. The reason is simple: iPhones and iPads were (and remain) embued with powerful, iconic, and impossible-to-overstate brand (and cash) value because of their association with the United States.[405] In 2019, one commentator explained this global phenomenon:

---

[405] The foregoing is not a criticism of Apple, the U.S. consumer, or telecoms companies that sell Apple products.  Ordinarily, criminals who use free iPhones and iPads obtained in the United States as a cash equivalent alternative used to facilitate corrupt payoffs in the Middle East, like LM Ericsson and Ericsson Inc., do not openly disclose to their seller their intentions to use the devices purchased in the U.S. for illicit reasons overseas.  (Instead, they often cheat the sellers in the U.S. by doing things like breaking the cell phone contracts that the sellers need to earn a profit.) LM Ericsson and Ericsson Inc., however, harbored an illicit intent, distinguishing Ericsson from manufacturers (like Apple) or consumer brands (like Best Buy) that did not double as a decades-long global corruption factory, terrorist financier, and obstructor of U.S. counterterror efforts (like Ericsson).

I got my first iPhone … in early 2012. It wasn't anything … [I] could [] afford [to own] … as a graduate with a starting salary. … Apple was [] the phone to own for a [] person on the make, and when people … were still caught up in the legend of the Apple product, even though most [people] … had no idea how to use most of the features. That didn't matter; it was enough to know that iPhones were "the best." Their global reputations came with an assurance of both status and quality. … [In 2019, even with competition from China,] the iPhone hasn't lost all of its luster. A civil servant friend of mine was still offered a brand-new iPhone as a "gift" in 2016; I've yet to hear of anyone who was bribed with a Huawei.[406]

800.    LM Ericsson's ability to reach into the United States was both the but for cause, and turbocharger thereafter, of Defendants' obstruction of U.S. counterterror efforts.  LM Ericsson's routine communications inside the United States, mostly on information and belief in Washington, D.C., completed LM Ericsson's and Ericsson Inc.'s logistical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because LM Ericsson's U.S. contacts were, on their own, vital acts that enabled additional terrorist violence by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by depriving the U.S. government of the intelligence, investigative leads, and network understandings it needed to attack the protection rackets LM Ericsson financed. If LM Ericsson had not reached into the United States as it did, it would not have been able to obstruct U.S. counterterror efforts as it did.

801.    LM Ericsson also depended upon access to the United States, and U.S. business relationships, software, and personnel, in order to maximize its ability to conceal its decades-long protection payment scheme from U.S. counterterrorist practitioners because LM Ericsson depended upon U.S. relationships and service providers to operate Ericsson's entire virtual private network (or "VPN") system at LM Ericsson's offices in the Middle East, including Iraq, Qatar, Lebanon, and the United Arab Emirates.  LM Ericsson's ability to greatly reduce its odds

---

[406] Yuan Ren, *Opinion: Why My Chinese Dad Switched From an iPhone to a Huawei*, N.Y. Times (Jan. 5, 2019).

of detection by hostile forces – like the U.S. government – was one of the reasons LM Ericsson reached into the U.S. for state-of-the-art VPN services in the first instance.

802.     LM Ericsson's and Ericsson Inc.'s decision to pay protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was also expressly aimed at the United States, because when making those payments, LM Ericsson and Ericsson Inc. knew they were aiding al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks that were designed specifically to influence U.S. policy by killing and injuring American personnel.

## VIII.  ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ USED DEFENDANTS' ASSISTANCE TO COMMIT ATTACKS THAT KILLED AND INJURED PLAINTIFFS IN IRAQ, AFGHANISTAN, AND SYRIA

### A.  Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In Iraq, Syria, And Afghanistan From 2017 Through 2021

803.     Islamic State committed, planned, and authorized the attacks in Iraq, Syria, and Afghanistan that killed or injured Plaintiffs there from 2017 through 2021.

804.     The U.S. government issued one or more reports to Congress that concluded that Islamic State executed each attack against Plaintiffs herein.

### B.  Al-Qaeda and Al-Qaeda-in-Iraq Committed, Planned, and Authorized the Attacks that Injured Plaintiffs in Iraq And Syria From 2005 Through 2013

805.     Al-Qaeda and al-Qaeda-in-Iraq committed, planned, and authorized the attacks that injured Plaintiffs in Iraq and Syria from 2005 through 2013.

806.     Bin Laden always viewed al-Qaeda as the leader of a terrorist joint venture in which al-Qaeda led a broader anti-American jihadist coalition.  As a result, while al-Qaeda sometimes committed attacks itself, it most often acted through its Iraqi branch: al-Qaeda-in-Iraq.

807.     In Iraq, al-Qaeda and al-Qaeda-in-Iraq posed a consistent threat from 2004 through 2014 and continued to operate out of their strongholds in Anbar, Ninewa, and Diyala provinces, from which al-Qaeda-in-Iraq continued to threaten Americans in most of Iraq.

808.    From 2007 through 2014, al-Qaeda and al-Qaeda-in-Iraq committed nearly all the IED and suicide bomb attacks against Americans in Anbar Province, including its capital, Ramadi, and Ninewa province, including its capital, Mosul.

809.    Al-Qaeda-in-Iraq (and later Islamic State) also maintained notorious cells in and around two other key Iraqi provinces:  Baghdad Province, where the terrorists targeted Americans in the capital city, Baghdad, and Diyala Province, where the terrorists targeted Americans in order to secure their own supply lines.  In 2006, for example, al-Qaeda-in-Iraq leader Abu Musab al-Zarqawi was killed in Diyala Province.

810.    With respect to Baghdad, al-Qaeda-in-Iraq maintained several strongholds in the northern and western parts of the city, including the notorious al-Qaeda bastion in the Dora neighborhood in the western part of the city.

811.    From 2007 through 2014, al-Qaeda-in-Iraq (and later Islamic State) were accounted for nearly all the terrorist attacks committed against Americans in Baghdad Province and Diyala Province, other than those which were committed by joint cells of Shiite terrorists comprised of Lebanese Hezbollah and Jaysh al-Mahdi.[407]

812.    Al-Qaeda-in-Iraq deployed a sophisticated suicide bombing network that relied upon terrorist assets and personnel in Iraq, Syria, Afghanistan, Pakistan, Iran, and elsewhere in order to commit attacks against Americans in Iraq and Syria.  Through facilitators in each

---

[407] While al-Qaeda-in-Iraq and Jaysh al-Mahdi contested overlapping parts of Baghdad Province and Diyala Province, the specific geographies and attack types favored by these terrorist groups make their attacks easily distinguishable.  In general, AQI relied upon suicide bomb attacks and large ammonium-nitrate-fertilizer-based IEDs, while Jaysh al-Mahdi relied upon specialized IEDs known as explosively formed penetrators, complex attacks, and 107mm rockets provided by Hezbollah.  With respect to geographies, AQI targeted Americans in Sunni strongholds in Baghdad like Dora in western Baghdad, while Jaysh al-Mahdi targeted Americans in Shiite strongholds in Baghdad like Rustamiyah in eastern Baghdad.

country, al-Qaeda-in-Iraq sustained a pipeline of foreign-born suicide bombers for use in Iraq from 2004 through 2014.

813.    A host of sources documented how al-Qaeda-in-Iraq was responsible for approximately ninety percent (90%) of all suicide bomb attacks committed against Americans in Iraq from 2003 through present.  Among others, the U.S. government concluded that al-Qaeda-in-Iraq was responsible for nearly all the suicide bomb attacks that occurred in Iraq between 2005 and 2008.  These trends continued at all relevant times.  On information and belief, al-Qaeda-in-Iraq and Islamic State are collectively responsible for every successful suicide attack committed against Americans in Iraq and Syria between 2005 and 2022.

814.    Al-Qaeda-in-Iraq's internal assessments were even higher:  analyzing his first nine months of jihad against Americans in Iraq in a January 2004 letter, Zarqawi claimed credit on behalf of AQI for nearly all the suicide attacks against Americans in Iraq, boasting that "[w]e have been the key for all the suicide missions that have taken place, except in the north."

815.    Al-Qaeda-in-Iraq applied – and improved upon, to the betterment of AQI and al-Qaeda core – al-Qaeda's suicide bombing-related tactics, techniques, and procedures.  For example, al-Qaeda and al-Qaeda-in-Iraq both followed procedures designed to indoctrinate the suicide bomber before the attack by making them a member of the organization.  For example, al-Qaeda and al-Qaeda-in-Iraq policy called for the FTO to formally initiate the suicide bomber by having the bomber make the FTO a formal promise – often in the form of a written suicide bombing contract – to blow himself or herself up in the FTO's martyrdom operation targeting Americans in Iraq on behalf of al-Qaeda and al-Qaeda-in-Iraq.

C.   **Al-Qaeda Committed, Planned, and Authorized the Attacks that Injured Plaintiffs in Afghanistan From 2007 through 2016, Which Were Facilitated By Al-Qaeda-In-Iraq**

816.   Al-Qaeda committed, planned, and authorized the attacks that killed and injured Plaintiffs in Afghanistan from 2007 through 2016, which were facilitated by al-Qaeda-in-Iraq's provision of funding, fighters, training, and logistical aid to al-Qaeda "core" in Afghanistan and Pakistan from 2007 through 2014.

817.   Since 9/11, and continuing through the present, Al-Qaeda led the Syndicate and worked jointly with its inseparable ally, the Taliban, with whom al-Qaeda had been essentially fused since before 9/11 and have remained so ever since.  The overlap between the organizations meant that al-Qaeda often played a key role in Taliban and Haqqani Network attacks.

818.   Al-Qaeda's and the Taliban's close relationship continued long after 9/11.  In the years since, it has become clear that the al-Qaeda and Taliban organizations have been fused together:  al-Qaeda terrorists have often worked in close conjunction with Taliban terrorists and the affiliated Haqqani Network and Kabul Attack Network.  In May 2007, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one."  By the end of 2009, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly, noting that "[w]e are deeply concerned about the growing level of collusion between the Taliban and al Qaeda." And as Lieutenant General Ronald L. Burgess, Jr. reported in a February 2010 Hearing of the Senate Select Committee on Intelligence, "al Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."

819.   Often, individual Taliban leaders, like Sirajuddin Haqqani, are also members of al-Qaeda.  For example, in late 2011 or early 2012 the Taliban appointed Sheikh Mohammed Aminullah, who was a member of al-Qaeda, as the head of its Peshawar Regional Military Shura, which was responsible for attacks in northern and eastern Afghanistan.

820.    From 2007 through 2016, al-Qaeda terrorists also regularly attacked U.S. forces alongside Taliban terrorists while operating as part of joint al-Qaeda/Taliban cells.  For example, on July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Nuristan Province, killing nine American soldiers, including Gunnar W. Zwilling, Israel Garcia, Jason D. Hovater, Jason M. Bogar, Jonathan P. Brostrom, Pruitt A. Rainey, and Jonathan R.C. Benton, all of whose families are Plaintiffs.

821.    Al-Qaeda and the Taliban, including its Haqqani Network, maintained joint cells throughout Afghanistan, but focused most of all on three areas for their joint cells:  (1) the N2KL Provinces; (2) the P2K Provinces; and (3) Kabul.  Every Plaintiff herein was attacked by a joint al-Qaeda/Taliban cell operating in one of those geographies, or by a suicide bomber, which was another reliable indication of joint cell activity, as al-Qaeda was heavily involved in nearly all suicide bombings in Afghanistan from 2007 through 2016.

822.    Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. In fact, many terrorist operatives were "dual-hatted," meaning that they were both al-Qaeda and Taliban (including Haqqani Network) members. Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs. Examples are set forth below.

823.    **Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) N2KL Provinces, which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the Taliban, and Lashkar-e-Taiba maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The polyterrorists who ran these joint cells included:

(i)    **Farouq al-Qahtani**, al-Qaeda's emir for eastern Afghanistan who supported the Syndicate's insurgency against U.S. forces and their allies in Afghanistan.

(ii)    **Sakhr al-Taifi**, al-Qaeda's number two in Afghanistan, who, according to ISAF, embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against" "coalition troops throughout eastern Afghanistan," and "supplie[d] weapons and equipment to insurgents."

(iii)    **Mufti Assad**, an al-Qaeda network and "insurgent leader who, according to ISAF, controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who" "train[ed] [] insurgents on how to construct and use [IEDs]."

(iv)    **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces.

(v)    **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks.

(vi)    **Abu Ikhlas al-Masri**, an al-Qaeda commander who helped coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture in December 2010.

(vii)    **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who, according to ISAF, "coordinated attacks against coalition forces," throughout Kunar Province, "conducted training" and helped terrorists with "weapons procurement".

(viii)    **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who, according to DOD, directed al-Qaeda operations in Kunar Province, with specific responsibility for "planning attacks against" "coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" facilitated by his "network" of Taliban terrorists.

(ix)    **Fatah Gul**, an al-Qaeda facilitator who, according to ISAF, "ran terrorist training camps where insurgents learned how to conduct [IED] attacks" in the N2KL area.

824.    From 2007 through 2014, a substantial number of highly trained al-Qaeda-in-Iraq terrorists, including leaders, financiers, bombmakers, and logisticians, redeployed to the joint al-Qaeda/Taliban cells in N2KL in Afghanistan in their capacity as members of al-Qaeda, which augmented such N2KL joint cells' (and Haqqani Pakistani cells') fighting power, finance, logistics, attack planning, IED, and suicide campaigns in Afghanistan.

825.   **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city. This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including its Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing terrorist attacks, each of which executed the Syndicate's CAN fertilizer bomb campaign in Kabul Attack Network-related provinces. Dual-hatted al-Qaeda/Taliban terrorists who ran the cells included:

(i)   **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network.

(ii)   **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban.

826.   From 2007 through 2014, a substantial number of highly trained al-Qaeda-in-Iraq terrorists, including leaders, financiers, bombmakers, and logisticians, redeployed to the joint al-Qaeda/Taliban cells comprising the Kabul Attack Network in their capacity as members of al-Qaeda, which augmented such joint cells' fighting power, finance, logistics, attack planning, IED, and suicide campaigns in Afghanistan.

827.   **Paktia, Paktika, and Khost Provinces ("P2K") Provinces.** Like its N2KL Provinces, the "P2K Provinces" (or "P2K") were a strategically critical area that historically served as a Haqqani stronghold and also operated as a "traditional al-Qaeda safe haven[]."[408]

828.   Al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism in P2K, each of which executed the Syndicate's CAN fertilizer bomb and suicide campaign in Afghanistan. The dual-hatted al-Qaeda/Taliban polyterrorists who ran these P2K-related joint cells included:

---

[408] *Resilient al-Qaeda* at 11-12.

(i)   **Sirajuddin Haqqani**, a member of al-Qaeda's military council, leader of the Quetta Shura Taliban, and commander of the Haqqani Network;

(ii)  **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's military council; and

(iii) **Khalil al-Rahman Haqqani**, Jalaluddin Haqqani's brother and a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and operational commander" for the Haqqani Network, as well as an agent who "acted on behalf of al-Qa'ida" and had "been linked to al-Qa'ida terrorist operations."

829.   From 2007 through 2014, a substantial number of highly trained al-Qaeda-in-Iraq terrorists, including leaders, financiers, bombmakers, and logisticians, redeployed to the joint al-Qaeda/Taliban cells in P2K in Afghanistan—as well as a network of Sirajuddin Haqqani-operated safe houses, training camps, madrassas, and IED and suicide bomb factories in the Haqqani's historic havens in Pakistan, which supported their attacks in P2K—in their capacity as members of al-Qaeda, which augmented such P2K joint cells' (and Haqqani Pakistani cells') fighting power, finance, logistics, attack planning, IED, and suicide campaigns in Afghanistan.

830.   Al-Qaeda's leadership of the Syndicate and co-location with the Taliban in Afghanistan through joint al-Qaeda/Taliban cells reflected the degree to which al-Qaeda and the Taliban became fully and operationally intertwined.  As India's Permanent Representative to the United Nations explained in describing the al-Qaeda-Taliban "syndicate of terrorism," both groups were by 2011 "ideologically and operationally fused."  By the fall of 2009, noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less as a single entity.  The signs of this are everywhere."

831.   The Taliban and al-Qaeda have remained intimately intertwined.  For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced

his acceptance of the pledge the following day.  When Mansour was killed in May 2016,

Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada. Zawahiri

himself was killed in 2022 while sheltering at one of Sirajuddin Haqqani's safehouses in Kabul.

832.    Each of the below attack types was an act of international terrorism committed by

al-Qaeda and the Taliban, including its Haqqani Network, aided by al-Qaeda-in-Iraq.

a.    **Kabul Attack Network Attacks.**  Sirajudin Haqqani planned and authorized the
Syndicate attacks that targeted Kabul – which Sirajuddin Haqqani personally viewed as a
tactical priority – that were committed by joint al-Qaeda/Taliban (including Haqqani
Network)/Lashkar-e-Taiba cells known as the Kabul Attack Network, including such
joint cell's IED and suicide bomb attacks in Kabul and the surrounding provinces.

b.    **Fertilizer Bomb Attacks.**  Alongside al-Qaeda, Sirajjudin Haqqani planned and
authorized al-Qaeda's fertilizer bombing campaign, including, but not limited to, al-
Qaeda's and the Haqqani Network's strategy for:  (i) sourcing fertilizer; (ii) purchasing
and transporting fertilizer; (iii) operating al-Qaeda bombmaking factories hosted at
Sirajuddin's personal network of joint al-Qaeda-Haqqani Network terrorist camps in
Pakistan; and (iv) deploying fertilizer bombs as IEDs and suicide bombs to attack
Americans in Afghanistan.

c.    **Suicide Bomber Attacks.**  Sirajjudin Haqqani planned and authorized al-Qaeda's suicide
bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's
shared strategy for:  (i) planning the targets for suicide bomber attacks in Afghanistan;
(ii) sourcing suicide bombers through al-Qaeda's and the Haqqani Network's long-
standing allies; and (iii) coordinating the "suicide bomber infrastructure" of camps,
madrassas, ratlines, and safehouses, which relied heavily upon al-Qaeda and Haqqani
Network resources and polyterrorists like Sirajuddin.

d.    **Kidnapping Attacks.**  Sirajuddin Haqqani planned and authorized al-Qaeda and Haqqani
Network kidnapping attacks, including the attack against Kevin King, who is a Plaintiff
in this case.

833.    On top of the myriad forms of support detailed above, al-Qaeda also jointly

planned and authorized terrorist attacks that the Taliban carried out.  Those joint planning

sessions often occurred in meetings in which al-Qaeda, the Taliban, and other members of the al-

Qaeda-Taliban syndicate (such as Lashkar-e-Taiba) would confer about particular geographies

and targets to attack.  The close operational coordination not only manifested itself in the Kabul

Attack Network, but also provided a broader terrorist superstructure that organized the

insurgency throughout Afghanistan.  In observing that this superstructure formed an Afghan-Pakistani "Syndicate," a former CIA analyst and White House advisor documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."  Those intimate connections enhanced the lethality of the overall anti-American insurgency.

## IX.   THE ISLAMIC STATE ATTACKS

### The August 26, 2021 Suicide Attack In Afghanistan (Jared Schmitz Family)

834.   On August 26, 2021, a suicide bomber deployed by Islamic State detonated a suicide bomb at Abbey Gate outside of Kabul International Airport in Kabul, Afghanistan (the "Abbey Gate Attack").  Islamic State, an FTO, planned and authorized the Abbey Gate Attack.

835.   The Abbey Gate Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

836.   **Lance Corporal Jared M. Schmitz** served in Afghanistan as a member of the U.S. Marine Corps.  LCpl Schmitz was injured in the Abbey Gate Attack.  LCpl Schmitz died on August 26, 2021 as a result of injuries sustained during the Abbey Gate Attack.

837.   LCpl Schmitz was a U.S. national at the time of the attack and his death.

838.   Plaintiff Mark Schmitz is the father of LCpl Schmitz and a U.S. national.

839.   Plaintiff Suzanne Schmitz is the mother of LCpl Schmitz and a U.S. national.

840.   As a result of the Abbey Gate Attack and LCpl Schmitz's injuries and death, each member of the Jared Marcus Schmitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Schmitz's society, companionship, and counsel.

841.    As a result of the Abbey Gate Attack, LCpl Schmitz was injured in his person and/or property. The Plaintiff members of the Schmitz Family are the survivors and/or heirs of LCpl Schmitz and are entitled to recover for the damages LCpl Schmitz sustained.

### The November 22, 2012 Kidnapping Attack, And Subsequent Hostage Taking, Torture, and Murder in Syria (James Foley Family)

842.    **James W. Foley** served in Syria as a journalist. On November 22, 2012, Mr. Foley was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Syria.  Thereafter, Mr. Foley was held hostage for nearly two years (first detained by AQI, and then detained by Islamic State after AQI became Islamic State in February 2014).  Islamic State terrorists beheaded Mr. Foley on or about August 19, 2014.

843.    Mr. Foley was kidnapped by al-Qaeda-in-Iraq, held hostage by al-Qaeda-in-Iraq and Islamic State, and murdered by Islamic State.

844.    The kidnapping attack on Mr. Foley was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  Mr. Foley was held hostage by Islamic State and executed by Islamic State.

845.    Mr. Foley's kidnapping, subsequent confinement, torture, and beheading would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, the terrorists kidnapped a civilian who was not engaged in hostilities, and the terrorists murdered an unarmed civilian.

846.    Mr. Foley was a U.S. national at the time of the kidnapping and his murder.

847.    Plaintiff Diane Foley is the mother of Mr. Foley and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Foley's estate.

848.    Plaintiff John W. Foley is the father of Mr. Foley and a U.S. national.

849.    Plaintiff Lieutenant Colonel John E. Foley is the brother of Mr. Foley and a U.S. national.

850.    Plaintiff Mark Foley is the brother of Mr. Foley and a U.S. national.

851.    Plaintiff Kathryn Simpson is the sister of Mr. Foley and a U.S. national.

852.    As a result of the November 22, 2012 kidnapping, and 635 days as a hostage during which he was tortured before he was murdered in 2014, each member of the Foley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Foley's society, companionship, and counsel.

853.    As a result of the November 22, 2012 kidnapping, and 635 days as a hostage during which he was tortured before he was murdered in 2014, Mr. Foley was injured in his person and/or property. The Plaintiff members of the Foley Family are the survivors and/or heirs of Mr. Foley and are entitled to recover for the damages Mr. Foley sustained.

**The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, and Murder in Syria (Kayla Mueller Family)**

854.    **Kayla J. Mueller** served in Syria as a humanitarian aid worker. On August 4, 2013, Ms. Mueller was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Syria.  Thereafter, Ms. Mueller was held hostage for nearly two years (first detained by AQI, and then detained by Islamic State after AQI became Islamic State in February 2014).  Islamic State terrorists held Ms. Mueller hostage until she died while in their captivity on or about 2015.

855.    Ms. Mueller was kidnapped by al-Qaeda-in-Iraq, held hostage by al-Qaeda-in-Iraq and Islamic State, and died while in Islamic State captivity as a direct and foreseeable consequence of its kidnapping and hostage taking of her.

856.    The kidnapping attack on Ms. Mueller was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  The hostage-taking (and continued detention) of Ms. Mueller was committed, planned, and authorized by Islamic State, which directly caused Ms. Mueller's death on or about 2015.

857.    Ms. Mueller's kidnapping, subsequent confinement, torture, and death would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists kidnapped a civilian who was not engaged in hostilities.

858.    Ms. Mueller was a U.S. national at the time of the kidnapping and her murder.

859.    Plaintiff Richard Mueller II is the father of Ms. Mueller and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of Ms. Mueller's estate.

860.    Plaintiff Marsha Mueller is the mother of Ms. Mueller and a U.S. national.

861.    Plaintiff Eric Mueller is the brother of Ms. Mueller and a U.S. national.

862.    As a result of the August 4, 2013 kidnapping, and more than 500 days as a hostage during which she was tortured before she was murdered in 2015, each member of the Mueller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Mueller's society, companionship, and counsel.

863.    As a result of the August 4, 2013 kidnapping, and more than 500 days as a hostage during which she was tortured before she was murdered in 2015, Ms. Mueller was injured in her person and/or property. The Plaintiff members of the Mueller Family are the survivors and/or heirs of Ms. Mueller and are entitled to recover for the damages she sustained.

**The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, and Murder in Syria (Steven Sotloff Family)**

864.    **Steven J. Sotloff** served in Syria as a journalist. On August 4, 2013, Mr. Sotloff was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Syria.  Thereafter, Mr. Sotloff was held hostage for more than a year (by AQI until 2014, and by Islamic State thereafter).  Islamic State terrorists beheaded Mr. Sotloff on September 2, 2014.

865.    Mr. Sotloff was kidnapped by al-Qaeda-in-Iraq, held hostage by al-Qaeda-in-Iraq and Islamic State, and murdered by Islamic State.

866.    The kidnapping attack on Mr. Sotloff was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  Mr. Sotloff was held hostage by Islamic State and executed by Islamic State.

867.    Mr. Sotloff's kidnapping, subsequent confinement, torture, and beheading would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, the terrorists kidnapped a civilian who was not engaged in hostilities, and the terrorists murdered an unarmed civilian.

868.    Mr. Sotloff was a U.S. national at the time of the kidnapping and his murder.

869.    Plaintiff Arthur Sotloff is the father of Mr. Sotloff and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of Mr. Sotloff's estate.

870.    Plaintiff Shirley Sotloff is the mother of Mr. Sotloff and a U.S. national.

871.    Plaintiff Lauren Sotloff is the sister of Mr. Sotloff and a U.S. national.

872.    As a result of the August 4, 2013 kidnapping, and 394 days as a hostage during which he was tortured before he was murdered in 2014, each member of the Sotloff Family has

experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sotloff's society, companionship, and counsel.

873.     As a result of the August 4, 2013 kidnapping, and 394 days as a hostage during which he was tortured before he was murdered in 2014, Mr. Sotloff was injured in his person and/or property. The Plaintiff members of the Sotloff Family are the survivors and/or heirs of Mr. Sotloff and are entitled to recover for the damages Mr. Sotloff sustained.

**The April 29, 2017 IED Attack In Iraq (Weston Lee Family)**

874.     On April 29, 2017, Islamic State detonated an IED in Nineveh, Iraq (the "April 29, 2017 Attack").  Islamic State, an FTO, planned and authorized the April 29, 2017 Attack.

875.     The April 29, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

876.     **First Lieutenant Weston C. Lee** served in Iraq as a member of the U.S. Army. 1LT Lee was injured in the April 29, 2017 Attack.  1LT Lee died on April 29, 2017 as a result of injuries sustained during the April 29, 2017 Attack.

877.     1LT Lee was a U.S. national at the time of the attack and his death.

878.     Plaintiff Aldene Lee is the mother of 1LT Lee and a U.S. national.

879.     As a result of the April 29, 2017 Attack and 1LT Lee's injuries and death, each member of the Lee Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Lee's society, companionship, and counsel.

880.     As a result of the April 29, 2017 Attack, 1LT Lee was injured in his person and/or property. The Plaintiff members of the Lee Family are the survivors and/or heirs of 1LT Lee and are entitled to recover for the damages 1LT Lee sustained.

## X.     THE AL-QAEDA AND AL-QAEDA-IN-IRAQ ATTACKS IN IRAQ AND SYRIA

### The June 23, 2005 Suicide Attack In Al Anbar (Ramona M. Valdez Family)

881.    On June 23, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "June 23, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 23, 2005 Attack.

882.    The June 23, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

883.    **Corporal Ramona M. Valdez** served in Iraq as a member of the U.S. Marine Corps.  Cpl Valdez was injured in the June 23, 2005 Attack.  Cpl Valdez died on June 23, 2005 as a result of injuries sustained during the June 23, 2005 Attack.

884.    Cpl Valdez was a U.S. national at the time of the attack and her death.

885.    Plaintiff Estefani Valdez is the sister of Cpl Valdez and a U.S. national.

886.    As a result of the June 23, 2005 Attack and Cpl Valdez's injuries and death, each member of the Valdez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Valdez's society, companionship, and counsel.

887.    As a result of the June 23, 2005 Attack, Cpl Valdez was injured in her person and/or property.  The Plaintiff members of the Valdez Family are the survivors and/or heirs of Cpl Valdez and are entitled to recover for the damages Cpl Valdez sustained.

### The August 1, 2005 Suicide Attack In Al Anbar (James R. Graham III Family)

888.    On August 1, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "August 1, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the August 1, 2005 Attack.

889.    The August 1, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

890.    **Sergeant James R. Graham III** served in Iraq as a member of the U.S. Marine Corps Reserve.  Sgt Graham was injured in the August 1, 2005 Attack.  Sgt Graham died on August 1, 2005 as a result of injuries sustained during the August 1, 2005 Attack.

891.    Sgt Graham was a U.S. national at the time of the attack and his death.

892.    Plaintiff Katrina Graham is the mother of Sgt Graham III and a U.S. national.

893.    Plaintiff James Graham II is the father of Sgt Graham III and a U.S. national.

894.    As a result of the August 1, 2005 Attack and Sgt Graham's injuries and death, each member of the Graham Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Graham's society, companionship, and counsel.

895.    As a result of the August 1, 2005 Attack, Sgt Graham was injured in his person and/or property.  The Plaintiff members of the Graham Family are the survivors and/or heirs of Sgt Graham and are entitled to recover for the damages Sgt Graham sustained.

**The November 15, 2005 Suicide Attack In Al Anbar (Nickolas D. Schiavoni Family)**

896.    On November 15, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "November 15, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the November 15, 2005 Attack.

897.    The November 15, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

898.   **Lance Corporal Nickolas D. Schiavoni** served in Iraq as a member of the U.S. Marine Corps.  LCpl Schiavoni was injured in the November 15, 2005 Attack.  LCpl Schiavoni died on November 15, 2005 as a result of injuries sustained during the November 15, 2005 Attack.

899.   LCpl Schiavoni was a U.S. national at the time of the attack and his death.

900.   Plaintiff Stephany Kern is the mother of LCpl Schiavoni and a U.S. national.

901.   Plaintiff David Schiavoni is the father of LCpl Schiavoni and a U.S. national.

902.   As a result of the November 15, 2005 Attack and LCpl Schiavoni's injuries and death, each member of the Schiavoni Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Schiavoni's society, companionship, and counsel.

903.   As a result of the November 15, 2005 Attack, LCpl Schiavoni was injured in his person and/or property.  The Plaintiff members of the Schiavoni Family are the survivors and/or heirs of LCpl Schiavoni and are entitled to recover for the damages LCpl Schiavoni sustained.

**The December 9, 2005 Suicide Attack In Baghdad (Adrian N. Orosco Family)**

904.   On December 9, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Baghdad, Iraq (the "December 9, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the December 9, 2005 Attack.

905.   The December 9, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

906.   **Sergeant Adrian N. Orosco** served in Iraq as a member of the U.S. Army.  SGT Orosco was injured in the December 9, 2005 Attack.  SGT Orosco died on December 9, 2005 as a result of injuries sustained during the December 9, 2005 Attack.

907.   SGT Orosco was a U.S. national at the time of the attack and his death.

316

908.    Plaintiff Noe Orosco Sr. is the father of SGT Orosco and a U.S. national.

909.    As a result of the December 9, 2005 Attack and SGT Orosco's injuries and death, each member of the Orosco Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Orosco's society, companionship, and counsel.

910.    As a result of the December 9, 2005 Attack, SGT Orosco was injured in his person and/or property.  The Plaintiff members of the Orosco Family are the survivors and/or heirs of SGT Orosco and are entitled to recover for the damages SGT Orosco sustained.

**The April 11, 2006 Suicide Attack In Al Anbar (Kenneth D. Hess Family)**

911.    On April 11, 2006, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "April 11, 2006 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 11, 2006 Attack.

912.    The April 11, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

913.    **Sergeant Kenneth D. Hess** served in Iraq as a member of the U.S. Army.  SGT Hess was injured in the April 11, 2006 Attack.  SGT Hess died on April 11, 2006 as a result of injuries sustained during the April 11, 2006 Attack.

914.    SGT Hess was a U.S. national at the time of the attack and his death.

915.    Plaintiff April Hess is the widow of SGT Hess and a U.S. national.

916.    Plaintiff Katherine Meeks is the mother of SGT Hess and a U.S. national.

917.    As a result of the April 11, 2006 Attack and SGT Hess's injuries and death, each member of the Hess Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hess's society, companionship, and counsel.

918.   As a result of the April 11, 2006 Attack, SGT Hess was injured in his person and/or property.  The Plaintiff members of the Hess Family are the survivors and/or heirs of SGT Hess and are entitled to recover for the damages SGT Hess sustained.

**The September 13, 2006 Suicide Attack In Baghdad (Marcus A. Cain Family)**

919.   On September 13, 2006, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Baghdad, Iraq (the "September 13, 2006 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 13, 2006 Attack.

920.   The September 13, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

921.   **Corporal Marcus A. Cain** served in Iraq as a member of the U.S. Army.  CPL Cain was injured in the September 13, 2006 Attack.  CPL Cain died on September 13, 2006 as a result of injuries sustained during the September 13, 2006 Attack.

922.   CPL Cain was a U.S. national at the time of the attack and his death.

923.   Plaintiff Leroy Cain Jr. is the father of CPL Cain and a U.S. national.

924.   As a result of the September 13, 2006 Attack and CPL Cain's injuries and death, each member of the Cain Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cain's society, companionship, and counsel.

925.   As a result of the September 13, 2006 Attack, CPL Cain was injured in his person and/or property.  The Plaintiff members of the Cain Family are the survivors and/or heirs of CPL Cain and are entitled to recover for the damages CPL Cain sustained.

**The January 5, 2007 IED Attack In Al Anbar (Patrick R. Russell Family)**

926.    On January 5, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "January 5, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 5, 2007 Attack.

927.    The January 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

928.    **Sergeant Patrick R. Russell** served in Iraq as a member of the U.S. Army. On January 5, 2007, SGT Russell was injured in the January 5, 2007 Attack in Al Anbar.  The attack severely wounded SGT Russell, who suffered shrapnel injuries from pelvis to shin, and a collapsed lung, resulting in continued breathing problems and subsequent anxiety attacks due to inability to breathe. As a result of the January 5, 2007 Attack and his injuries, SGT Russell has experienced severe physical and emotional pain and suffering.

929.    Plaintiff SGT Russell was a U.S. national at the time of the attack, and remains one today.

930.    Plaintiff Elizabeth Russell is the wife of SGT Russell and a U.S. national.

931.    Plaintiff J.R., by and through her next friend Patrick Russell, is the minor daughter of SGT Russell. She is a U.S. national.

932.    Plaintiff K.K., by and through his next friend Patrick Russell, is the minor son of SGT Russell. He is a U.S. national.

933.    As a result of the January 5, 2007 Attack and SGT Russell's injuries, each member of the Russell Family has experienced severe mental anguish, emotional pain and suffering.

**The January 15, 2007 IED Attack In Nineveh (John E. Cooper Family)**

934.    On January 15, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "January 15, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 15, 2007 Attack.

935.    The January 15, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

936.    **Staff Sergeant John E. Cooper** served in Iraq as a member of the U.S. Army.  SSG Cooper was injured in the January 15, 2007 Attack.  SSG Cooper died on January 15, 2007 as a result of injuries sustained during the January 15, 2007 Attack.

937.    SSG Cooper was a U.S. national at the time of the attack and his death.

938.    Plaintiff Susan West is the sister of SSG Cooper and a U.S. national.

939.    Plaintiff Sherri Springate is the sister of SSG Cooper and a U.S. national.

940.    As a result of the January 15, 2007 Attack and SSG Cooper's injuries and death, each member of the Cooper Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cooper's society, companionship, and counsel.

941.    As a result of the January 15, 2007 Attack, SSG Cooper was injured in his person and/or property.  The Plaintiff members of the Cooper Family are the survivors and/or heirs of SSG Cooper and are entitled to recover for the damages SSG Cooper sustained.

**The January 19, 2007 IED Attack In Nineveh (Russell P. Borea Family)**

942.    On January 19, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "January 19, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 19, 2007Attack.

943.    The January 19, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

944.    **Sergeant First Class Russell P. Borea** served in Iraq as a member of the U.S. Army.  SFC Borea was injured in the January 19, 2007 Attack.  SFC Borea died on January 19, 2007 as a result of injuries sustained during the January 19, 2007 Attack.

945.    SFC Borea was a U.S. national at the time of the attack and his death.

946.    Plaintiff Christopher Borea is the brother of SFC Borea and a U.S. national.

947.    Plaintiff Kim Borea is the sister of SFC Borea and a U.S. national.

948.    As a result of the January 19, 2007 Attack and SFC Borea's injuries and death, each member of the Borea Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Borea's society, companionship, and counsel.

949.    As a result of the January 19, 2007 Attack, SFC Borea was injured in his person and/or property.  The Plaintiff members of the Borea Family are the survivors and/or heirs of SFC Borea and are entitled to recover for the damages SFC Borea sustained.

**The January 20, 2007 IED Attack In Al Anbar (Jeffrey D. Bisson Family)**

950.    On January 20, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "January 20, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 20, 2007 Attack.

951.    The January 20, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

952.   **Specialist Jeffrey D. Bisson** served in Iraq as a member of the U.S. Army.  SPC Bisson was injured in the January 20, 2007 Attack.  SPC Bisson died on January 20, 2007 as a result of injuries sustained during the January 20, 2007 Attack.

953.   SPC Bisson was a U.S. national at the time of the attack and his death.

954.   Plaintiff Andrew Bisson is the son of SPC Bisson and a U.S. national.

955.   Plaintiff Lauralee Bisson is the mother of SPC Bisson and a U.S. national.

956.   Plaintiff Richard Bisson is the father of SPC Bisson and a U.S. national.

957.   Plaintiff Christopher Bisson is the brother of SPC Bisson and a U.S. national.

958.   As a result of the January 20, 2007 Attack and SPC Bisson's injuries and death, each member of the Bisson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bisson's society, companionship, and counsel.

959.   As a result of the January 20, 2007 Attack, SPC Bisson was injured in his person and/or property.  The Plaintiff members of the Bisson Family are the survivors and/or heirs of SPC Bisson and are entitled to recover for the damages SPC Bisson sustained.

**The January 26, 2007 IED Attack In Diyala (Alan R. Johnson Family)**

960.   On January 26, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "January 26, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 26, 2007 Attack.

961.   The January 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

962.    **Major Alan R. Johnson** served in Iraq as a member of the U.S. military serving in the U.S. Army Reserve.  MAJ Johnson was injured in the January 26, 2007 Attack.  MAJ Johnson died on January 26, 2007 as a result of injuries sustained during the January 26, 2007 Attack.

963.    MAJ Johnson was a U.S. national at the time of the attack and his death.

964.    Plaintiff Victoria Johnson is the widow of MAJ Johnson and a U.S. national.

965.    As a result of the January 26, 2007 Attack and MAJ Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Johnson's society, companionship, and counsel.

966.    As a result of the January 26, 2007 Attack, MAJ Johnson was injured in his person and/or property.  The Plaintiff members of the Johnson Family are the survivors and/or heirs of MAJ Johnson and are entitled to recover for the damages MAJ Johnson sustained.

**The February 8, 2007 IED Attack In Al Anbar (Ross A. Clevenger Family)**

967.    On February 8, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 8, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 8, 2007 Attack.

968.    The February 8, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

969.    **Sergeant Ross A. Clevenger** served in Iraq as a member of the U.S. military serving in the U.S. Army Reserve.  SGT Clevenger was injured in the February 8, 2007 Attack. SGT Clevenger died on February 8, 2007 as a result of injuries sustained during the February 8, 2007 Attack.

970.    SGT Clevenger was a U.S. national at the time of the attack and his death.

971.    Plaintiff Brandon Clevenger is the brother of SGT Clevenger and a U.S. national.

972.    Plaintiff Nancy Clevenger is the stepmother of SGT Clevenger and a U.S. national. Ms. Clevenger lived in the same household as SGT Clevenger for a substantial period of time and considered SGT Clevenger the functional equivalent of a biological son.

973.    As a result of the February 8, 2007 Attack and SGT Clevenger's injuries and death, each member of the Clevenger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Clevenger's society, companionship, and counsel.

974.    As a result of the February 8, 2007 Attack, SGT Clevenger was injured in his person and/or property.  The Plaintiff members of the Clevenger Family are the survivors and/or heirs of SGT Clevenger and are entitled to recover for the damages SGT Clevenger sustained.

**The February 11, 2007 IED Attack In Al Anbar (Russell A. Kurtz Family)**

975.    On February 11, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 11, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 11, 2007 Attack.

976.    The February 11, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

977.    **Sergeant Russell A. Kurtz** served in Iraq as a member of the U.S. Army.  SGT Kurtz was injured in the February 11, 2007 Attack.  SGT Kurtz died on February 11, 2007 as a result of injuries sustained during the February 11, 2007 Attack.

978.    SGT Kurtz was a U.S. national at the time of the attack and his death.

979.    Plaintiff Roger Kurtz is the father of SGT Kurtz and a U.S. national.

980.    Plaintiff Stephanie Kurtz is the sister of SGT Kurtz and a U.S. national.

981.    As a result of the February 11, 2007 Attack and SGT Kurtz's injuries and death, each member of the Kurtz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kurtz's society, companionship, and counsel.

982.    As a result of the February 11, 2007 Attack, SGT Kurtz was injured in his person and/or property.  The Plaintiff members of the Kurtz Family are the survivors and/or heirs of SGT Kurtz and are entitled to recover for the damages SGT Kurtz sustained.

### The February 14, 2007 IED Attack In Diyala (Carl L. Seigart and Ronnie G. Madore Jr. Families)

983.    On February 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "February 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 14, 2007 Attack.

984.    The February 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

985.    **Sergeant Carl L. Seigart** served in Iraq as a member of the U.S. Army.  SGT Seigart was injured in the February 14, 2007 Attack.  SGT Seigart died on February 14, 2007 as a result of injuries sustained during the February 14, 2007 Attack.

986.    SGT Seigart was a U.S. national at the time of the attack and his death.

987.    Plaintiff Darlene Seigart is the mother of SGT Seigart and a U.S. national.

988.    As a result of the February 14, 2007 Attack and SGT Seigart's injuries and death, each member of the Seigart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Seigart's society, companionship, and counsel.

989.    As a result of the February 14, 2007 Attack, SGT Seigart was injured in his person and/or property.  The Plaintiff members of the Seigart Family are the survivors and/or heirs of SGT Seigart and are entitled to recover for the damages SGT Seigart sustained.

990.    **Specialist Ronnie Gene Madore Jr.** served in Iraq as a member of the U.S. Army.

991.    SPC Madore was injured in the February 14, 2007 Attack.  SPC Madore died on February 14, 2007 as a result of injuries sustained during the February 14, 2007 Attack.

992.    SPC Madore was a U.S. national at the time of the attack and his death.

993.    Plaintiff Connie Madore is the mother of SPC Madore Jr. and a U.S. national.

994.    Plaintiff Ronnie Madore is the father of SPC Madore Jr. and a U.S. national.

995.    As a result of the February 14, 2007 Attack and SPC Madore's injuries and death, each member of the Madore Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Madore's society, companionship, and counsel.

996.    As a result of the February 14, 2007Attack, SPC Madore was injured in his person and/or property.  The Plaintiff members of the Madore Family are the survivors and/or heirs of SPC Madore and are entitled to recover for the damages SPC Madore sustained.

**The February 18, 2007 IED Attack In Al Anbar (Brett A. Witteveen Family)**

997.    On February 18, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 18, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 18, 2007 Attack.

998.    The February 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

999.   **Private First Class Brett A. Witteveen** served in Iraq as a member of the U.S. Marine Corps.  PFC Witteveen was injured in the February 18, 2007 Attack.  PFC Witteveen died on February 18, 2007 as a result of injuries sustained during the February 18, 2007 Attack.

1000.   PFC Witteveen was a U.S. national at the time of the attack and his death.

1001.   Plaintiff Richard Witteveen is the father of PFC Witteveen and a U.S. national.

1002.   Plaintiff Trent Witteveen is the brother of PFC Witteveen and a U.S. national.

1003.   Plaintiff Heather Kaufman is the sister of PFC Witteveen and a U.S. national.

1004.   As a result of the February 18, 2007 Attack and PFC Witteveen's injuries and death, each member of the Witteveen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Witteveen's society, companionship, and counsel.

1005.   As a result of the February 18, 2007 Attack, PFC Witteveen was injured in his person and/or property.  The Plaintiff members of the Witteveen Family are the survivors and/or heirs of PFC Witteveen and are entitled to recover for the damages PFC Witteveen sustained.

**The March 5, 2007 IED Attack In Saladin (Justin M. Estes Family)**

1006.   On March 5, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Saladin, Iraq (the "March 5, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 5, 2007 Attack.

1007.   The March 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1008.   **Staff Sergeant Justin M. Estes** served in Iraq as a member of the U.S. Army.  SSG Estes was injured in the March 5, 2007 Attack.  SSG Estes died on March 5, 2007 as a result of injuries sustained during the March 5, 2007 Attack.

1009.   SSG Estes was a U.S. national at the time of the attack and his death.

1010.   Plaintiff Diane Salyers is the mother of SSG Estes and a U.S. national.

1011.   Plaintiff Kelli Winkler is the sister of SSG Estes and a U.S. national.

1012.   Plaintiff Norma Estes is the sister of SSG Estes and a U.S. national.

1013.   As a result of the March 5, 2007 Attack and SSG Estes's injuries and death, each member of the Estes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Estes's society, companionship, and counsel.

1014.   As a result of the March 5, 2007 Attack, SSG Estes was injured in his person and/or property.  The Plaintiff members of the Estes Family are the survivors and/or heirs of SSG Estes and are entitled to recover for the damages SSG Estes sustained.

**The March 17, 2007 IED Attack In Diyala (Benjamin L. Sebban Family)**

1015.   On March 17, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "March 17, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 17, 2007 Attack.

1016.   The March 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1017.   **Sergeant First Class Benjamin L. Sebban** served in Iraq as a member of the U.S. Army.  SFC Sebban was injured in the March 17, 2007 Attack.  SFC Sebban died on March 17, 2007 as a result of injuries sustained during the March 17, 2007 Attack.

1018.   SFC Sebban was a U.S. national at the time of the attack and his death.

1019.   Plaintiff Daniel Sebban is the brother of SFC Sebban and a U.S. national.

1020.   As a result of the March 17, 2007 Attack and SFC Sebban's injuries and death, each member of the Sebban Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Sebban's society, companionship, and counsel.

1021.   As a result of the March 17, 2007 Attack, SFC Sebban was injured in his person and/or property.  The Plaintiff members of the Sebban Family are the survivors and/or heirs of SFC Sebban and are entitled to recover for the damages SFC Sebban sustained.

**The March 23, 2007 IED Attack In Al Anbar (Greg N. Riewer Family)**

1022.   On March 23, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "March 23, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 23, 2007 Attack.

1023.   The March 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1024.   **Staff Sergeant Greg N. Riewer** served in Iraq as a member of the U.S. Army National Guard.  SSG Riewer was injured in the March 23, 2007 Attack.  SSG Riewer died on March 23, 2007 as a result of injuries sustained during the March 23, 2007 Attack.

1025.   SSG Riewer was a U.S. national at the time of the attack and his death.

1026.   Plaintiff Janice Riewer is the mother of SSG Riewer and a U.S. national.

1027.   Plaintiff Richard Riewer is the father of SSG Riewer and a U.S. national.

1028.   As a result of the March 23, 2007 Attack and SSG Riewer's injuries and death, each member of the Riewer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Riewer's society, companionship, and counsel.

1029.   As a result of the March 23, 2007 Attack, SSG Riewer was injured in his person and/or property.  The Plaintiff members of the Riewer Family are the survivors and/or heirs of SSG Riewer and are entitled to recover for the damages SSG Riewer sustained.

**The April 4, 2007 IED Attack In Baghdad (Joseph H. Cantrell IV Family)**

1030.   On April 4, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "April 4, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 4, 2007 Attack.

1031.   The April 4, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1032.   **Corporal Joseph H. Cantrell IV** served in Iraq as a member of the U.S. Army.  CPL Cantrell was injured in the April 4, 2007 Attack.  CPL Cantrell died on April 4, 2007 as a result of injuries sustained during the April 4, 2007 Attack.

1033.   CPL Cantrell was a U.S. national at the time of the attack and his death.

1034.   Plaintiff Sondra Adkins is the mother of CPL Cantrell IV and a U.S. national.

1035.   Plaintiff Joseph Cantrell III is the father of CPL Cantrell IV and a U.S. national.

1036.   As a result of the April 4, 2007 Attack and CPL Cantrell's injuries and death, each member of the Cantrell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cantrell's society, companionship, and counsel.

1037.   As a result of the April 4, 2007 Attack, CPL Cantrell was injured in his person and/or property.  The Plaintiff members of the Cantrell Family are the survivors and/or heirs of CPL Cantrell and are entitled to recover for the damages CPL Cantrell sustained.

### The April 7, 2007 IED Attack In Diyala (Jonathan D. Grassbaugh, Levi K. Hoover, and Rodney L. McCandless Families)

1038.   On April 7, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "April 7, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 7, 2007 Attack.

1039.   The April 7, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1040.   **Captain Jonathan D. Grassbaugh** served in Iraq as a member of the U.S. Army. CPT Grassbaugh was injured in the April 7, 2007 Attack.  CPT Grassbaugh died on April 7, 2007 as a result of injuries sustained during the April 7, 2007 Attack.

1041.   CPT Grassbaugh was a U.S. national at the time of the attack and his death.

1042.   Plaintiff Patricia Grassbaugh is the mother of CPT Grassbaugh and a U.S. national.

1043.   As a result of the April 7, 2007 Attack and CPT Grassbaugh's injuries and death, each member of the Grassbaugh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Grassbaugh's society, companionship, and counsel.

1044.   As a result of the April 7, 2007 Attack, CPT Grassbaugh was injured in his person and/or property.  The Plaintiff members of the Grassbaugh Family are the survivors and/or heirs of CPT Grassbaugh and are entitled to recover for the damages CPT Grassbaugh sustained.

1045.   **Specialist Levi K. Hoover** served in Iraq as a member of the U.S. Army.  SPC Hoover was injured in the April 7, 2007 Attack.  SPC Hoover died on April 7, 2007 as a result of injuries sustained during the April 7, 2007 Attack.

1046.   SPC Hoover was a U.S. national at the time of the attack and his death.

1047.   Plaintiff Belinda Brewster is the mother of SPC Hoover and a U.S. national.

1048.   As a result of the April 7, 2007 Attack and SPC Hoover's injuries and death, each member of the Hoover Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hoover's society, companionship, and counsel.

1049.   As a result of the April 7, 2007 Attack, SPC Hoover was injured in his person and/or property.  The Plaintiff members of the Hoover Family are the survivors and/or heirs of SPC Hoover and are entitled to recover for the damages SPC Hoover sustained.

1050.   **Private First Class Rodney L. McCandless** served in Iraq as a member of the U.S. Army.  PFC McCandless was injured in the April 7, 2007 Attack.  PFC McCandless died on April 7, 2007 as a result of injuries sustained during the April 7, 2007 Attack.

1051.   PFC McCandless was a U.S. national at the time of the attack and his death.

1052.   Plaintiff Chassity McCandless is the sister of PFC McCandless and a U.S. national.

1053.   Plaintiff Ronald Sumner is the brother of PFC McCandless and a U.S. national.

1054.   As a result of the April 7, 2007 Attack and PFC McCandless's injuries and death, each member of the McCandless Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McCandless's society, companionship, and counsel.

1055.   As a result of the April 7, 2007 Attack, PFC McCandless was injured in his person and/or property.  The Plaintiff members of the McCandless Family are the survivors and/or heirs of PFC McCandless and are entitled to recover for the damages he sustained.

### The April 14, 2007 IED Attack In Al Anbar (Brandon L. Wallace and Joshua A. Schmit Families)

1056. On April 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 14, 2007 Attack.

1057. The April 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1058. **Sergeant Brandon L. Wallace** served in Iraq as a member of the U.S. Army. SGT Wallace was injured in the April 14, 2007 Attack. SGT Wallace died on April 14, 2007 as a result of injuries sustained during the April 14, 2007 Attack.

1059. SGT Wallace was a U.S. national at the time of the attack and his death.

1060. Plaintiff Robin Wallace is the mother of SGT Wallace and a U.S. national.

1061. Plaintiff Rickey Wallace is the father of SGT Wallace and a U.S. national.

1062. Plaintiff Sarah Wallace is the sister of SGT Wallace and a U.S. national.

1063. Plaintiff Rachel Tucker is the sister of SGT Wallace and a U.S. national.

1064. As a result of the April 14, 2007 Attack and SGT Wallace's injuries and death, each member of the Wallace Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Wallace's society, companionship, and counsel.

1065. As a result of the April 14, 2007 Attack, SGT Wallace was injured in his person and/or property. The Plaintiff members of the Wallace Family are the survivors and/or heirs of SGT Wallace and are entitled to recover for the damages SGT Wallace sustained.

1066.   **Sergeant Joshua A. Schmit** served in Iraq as a member of the U.S. Army. SGT Schmit was injured in the April 14, 2007 Attack.  SGT Schmit died on April 14, 2007 as a result of injuries sustained during the April 14, 2007 Attack.

1067.   SGT Schmit was a U.S. national at the time of the attack and his death.

1068.   Plaintiff Kimberly Schmit is the mother of SGT Schmit and a U.S. national.

1069.   As a result of the April 14, 2007 Attack and SGT Schmit's injuries and death, each member of the Schmit Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schmit's society, companionship, and counsel.

1070.   As a result of the April 14, 2007 Attack, SGT Schmit was injured in his person and/or property.  The Plaintiff members of the Schmit Family are the survivors and/or heirs of SGT Schmit and are entitled to recover for the damages SGT Schmit sustained.

### The April 23, 2007 IED Attack In Al Anbar (Brice A. Pearson, Kenneth E. Locker Jr., and Michael J. Rodriguez Families)

1071.   On April 23, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 23, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 23, 2007 Attack.

1072.   The April 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1073.   **Sergeant Brice A. Pearson** served in Iraq as a member of the U.S. Army. SGT Pearson was injured in the April 23, 2007 Attack.  SGT Pearson died on April 23, 2007 as a result of injuries sustained during the April 23, 2007 Attack.

1074.   SGT Pearson was a U.S. national at the time of the attack and his death.

1075.   Plaintiff Leslie White is the mother of SGT Pearson and a U.S. national.

1076.   Plaintiff Jeremy Pearson is the brother of SGT Pearson and a U.S. national.

1077.   As a result of the April 23, 2007 Attack and SGT Pearson's injuries and death, each member of the Pearson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Pearson's society, companionship, and counsel.

1078.   As a result of the April 23, 2007 Attack, SGT Pearson was injured in his person and/or property.  The Plaintiff members of the Pearson Family are the survivors and/or heirs of SGT Pearson and are entitled to recover for the damages SGT Pearson sustained.

1079.   **Staff Sergeant Kenneth E. Locker Jr.** served in Iraq as a member of the U.S. Army.  SSG Locker was injured in the April 23, 2007 Attack.  SSG Locker died on April 23, 2007 as a result of injuries sustained during the April 23, 2007 Attack.

1080.   SSG Locker was a U.S. national at the time of the attack and his death.

1081.   Plaintiff Kenneth Locker Sr. is the father of SSG Locker Jr. and a U.S. national.

1082.   Plaintiff Carmon Petters is the sister of SSG Locker Jr. and a U.S. national.

1083.   As a result of the April 23, 2007 Attack and SSG Locker's injuries and death, each member of the Locker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Locker's society, companionship, and counsel.

1084.   As a result of the April 23, 2007 Attack, SSG Locker was injured in his person and/or property.  The Plaintiff members of the Locker Family are the survivors and/or heirs of SSG Locker and are entitled to recover for the damages SSG Locker sustained.

1085.   **Specialist Michael J. Rodriguez** served in Iraq as a member of the U.S. Army.  SPC Rodriguez was injured in the April 23, 2007 Attack.  SPC Rodriguez died on April 23, 2007 as a result of injuries sustained during the April 23, 2007 Attack.

335

1086.   SPC Rodriguez was a U.S. national at the time of the attack and his death.

1087.   Plaintiff Lorie Southerland is the mother of SPC Rodriguez and a U.S. national.

1088.   As a result of the April 23, 2007 Attack and SPC Rodriguez's injuries and death, each member of the Rodriguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rodriguez's society, companionship, and counsel.

1089.   As a result of the April 23, 2007 Attack, SPC Rodriguez was injured in his person and/or property.  The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SPC Rodriguez and are entitled to recover for the damages SPC Rodriguez sustained.

**The May 6, 2007 IED Attack In Diyala (Jason R. Harkins Family)**

1090.   On May 6, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "May 6, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 6, 2007 Attack.

1091.   The May 6, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1092.   **Sergeant Jason R. Harkins** served in Iraq as a member of the U.S. Army. SGT Harkins was injured in the May 6, 2007 Attack.  SGT Harkins died on May 6, 2007 as a result of injuries sustained during the May 6, 2007 Attack.

1093.   SGT Harkins was a U.S. national at the time of the attack and his death.

1094.   Plaintiff April Harkins is the mother of SGT Harkins and a U.S. national.

1095.   Plaintiff Robert Harkins Jr. is the father of SGT Harkins and a U.S. national.

1096.   As a result of the May 6, 2007 Attack and SGT Harkins's injuries and death, each member of the Harkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Harkins's society, companionship, and counsel.

1097.   As a result of the May 6, 2007 Attack, SGT Harkins was injured in his person and/or property.  The Plaintiff members of the Harkins Family are the survivors and/or heirs of SGT Harkins and are entitled to recover for the damages SGT Harkins sustained.

**The May 18, 2007 IED Attack In Baghdad (Anselmo Martinez III Family)**

1098.   On May 18, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "May 18, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 18, 2007 Attack.

1099.   The May 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1100.   **Sergeant Anselmo Martinez III** served in Iraq as a member of the U.S. Army. SGT Martinez was injured in the May 18, 2007 Attack.  SGT Martinez died on May 18, 2007 as a result of injuries sustained during the May 18, 2007 Attack.

1101.   SGT Martinez was a U.S. national at the time of the attack and his death.

1102.   Plaintiff Anselmo Martinez Jr. is the father of SGT Martinez III and a U.S. national.

1103.   Plaintiff Galdina Ibarra is the sister of SGT Martinez III and a U.S. national.

1104.   As a result of the May 18, 2007 Attack and SGT Martinez's injuries and death, each member of the Martinez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Martinez's society, companionship, and counsel.

1105.   As a result of the May 18, 2007 Attack, SGT Martinez was injured in his person and/or property.  The Plaintiff members of the Martinez Family are the survivors and/or heirs of SGT Martinez and are entitled to recover for the damages SGT Martinez sustained.

**The May 22, 2007 IED Attack In Baghdad (Robert J. Montgomery Jr. Family)**

1106.   On May 22, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "May 22, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 22, 2007 Attack.

1107.   The May 22, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1108.   **Sergeant Robert J. Montgomery Jr.** served in Iraq as a member of the U.S. Army. SGT Montgomery was injured in the May 22, 2007 Attack.  SGT Montgomery died on May 22, 2007 as a result of injuries sustained during the May 22, 2007 Attack.

1109.   SGT Montgomery was a U.S. national at the time of the attack and his death.

1110.   Plaintiff Micah Montgomery is the brother of SGT Montgomery Jr. and a U.S. national.

1111.   As a result of the May 22, 2007 Attack and SGT Montgomery's injuries and death, each member of the Montgomery Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

1112.   As a result of the May 22, 2007 Attack, SGT Montgomery was injured in his person and/or property.  The Plaintiff members of the Montgomery Family are the survivors and/or heirs of SGT Montgomery and are entitled to recover for the damages he sustained.

### The May 28, 2007 IED Attack In Diyala (James E. Summers III, Kile G. West, and Zachary D. Baker Families)

1113.   On May 28, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "May 28, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 28, 2007 Attack.

1114.   The May 28, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1115.   **Corporal James E. Summers III** served in Iraq as a member of the U.S. Army. CPL Summers was injured in the May 28, 2007 Attack.  CPL Summers died on May 28, 2007 as a result of injuries sustained during the May 28, 2007 Attack.

1116.   CPL Summers was a U.S. national at the time of the attack and his death.

1117.   Plaintiff Michael Summers is the brother of CPL Summers III and a U.S. national.

1118.   As a result of the May 28, 2007 Attack and CPL Summers's injuries and death, each member of the Summers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Summers's society, companionship, and counsel.

1119.   As a result of the May 28, 2007 Attack, CPL Summers was injured in his person and/or property.  The Plaintiff members of the Summers Family are the survivors and/or heirs of CPL Summers and are entitled to recover for the damages CPL Summers sustained.

1120.   **First Lieutenant Kile G. West** served in Iraq as a member of the U.S. Army. 1LT West was injured in the May 28, 2007 Attack.  1LT West died on May 28, 2007 as a result of injuries sustained during the May 28, 2007 Attack.

1121.   1LT West was a U.S. national at the time of the attack and his death.

1122. Plaintiff Nanette West is the mother of 1LT West and a U.S. national.

1123. Plaintiff Clark West is the father of 1LT West and a U.S. national.

1124. Plaintiff Kara West is the sister of 1LT West and a U.S. national.

1125. Plaintiff Kelli Anderson is the sister of 1LT West and a U.S. national.

1126. Plaintiff Carter West is the brother of 1LT West and a U.S. national.

1127. As a result of the May 28, 2007 Attack and 1LT West's injuries and death, each member of the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT West's society, companionship, and counsel.

1128. As a result of the May 28, 2007 Attack, 1LT West was injured in his person and/or property. The Plaintiff members of the West Family are the survivors and/or heirs of 1LT West and are entitled to recover for the damages 1LT West sustained.

1129. **Corporal Zachary D. Baker** served in Iraq as a member of the U.S. Army. CPL Baker was injured in the May 28, 2007 Attack. CPL Baker died on May 28, 2007 as a result of injuries sustained during the May 28, 2007 Attack.

1130. CPL Baker was a U.S. national at the time of the attack and his death.

1131. Plaintiff Christina Baker is the widow of CPL Baker and a U.S. national.

1132. As a result of the May 28, 2007 Attack and CPL Baker's injuries and death, each member of the Baker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Baker's society, companionship, and counsel.

1133. As a result of the May 28, 2007 Attack, CPL Baker was injured in his person and/or property. The Plaintiff members of the Baker Family are the survivors and/or heirs of CPL Baker and are entitled to recover for the damages CPL Baker sustained.

**The June 2, 2007 IED Attack In Saladin (Dariek E. Dehn Family)**

1134.   On June 2, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Saladin, Iraq (the "June 2, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 2, 2007 Attack.

1135.   The June 2, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1136.   **Sergeant Dariek E. Dehn** served in Iraq as a member of the U.S. Army.  SGT Dehn was injured in the June 2, 2007 Attack.  SGT Dehn died on June 2, 2007 as a result of injuries sustained during the June 2, 2007 Attack.

1137.   SGT Dehn was a U.S. national at the time of the attack and his death.

1138.   Plaintiff David Dehn Jr. is the brother of SGT Dehn and a U.S. national.

1139.   As a result of the June 2, 2007 Attack and SGT Dehn's injuries and death, each member of the Dehn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dehn's society, companionship, and counsel.

1140.   As a result of the June 2, 2007 Attack, SGT Dehn was injured in his person and/or property.  The Plaintiff members of the Dehn Family are the survivors and/or heirs of SGT Dehn and are entitled to recover for the damages SGT Dehn sustained.

**The June 2, 2007 IED Attack In Nineveh (Jeremiah D. Costello Family)**

1141.   On June 2, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "June 2, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 2, 2007 Attack.

1142.   The June 2, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1143.   **Corporal Jeremiah D. Costello** served in Iraq as a member of the U.S. Army. CPL Costello was injured in the June 2, 2007 Attack.  CPL Costello died on June 2, 2007 as a result of injuries sustained during the June 2, 2007 Attack.

1144.   CPL Costello was a U.S. national at the time of the attack and his death.

1145.   Plaintiff Lillian Costello is the daughter of CPL Costello and a U.S. national.

1146.   Plaintiff Debra Springman is the mother of CPL Costello and a U.S. national.

1147.   As a result of the June 2, 2007 Attack and CPL Costello's injuries and death, each member of the Costello Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Costello's society, companionship, and counsel.

1148.   As a result of the June 2, 2007 Attack, CPL Costello was injured in his person and/or property.  The Plaintiff members of the Costello Family are the survivors and/or heirs of CPL Costello and are entitled to recover for the damages CPL Costello sustained.

**The June 19, 2007 IED Attack In Diyala (Darryl W. Linder Family)**

1149.   On June 19, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "June 19, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 19, 2007 Attack.

1150.   The June 19, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1151.  **Corporal Darryl W. Linder** served in Iraq as a member of the U.S. Army.   CPL Linder was injured in the June 19, 2007 Attack.  CPL Linder died on June 19, 2007 as a result of injuries sustained during the June 19, 2007 Attack.

1152.  CPL Linder was a U.S. national at the time of the attack and his death.

1153.  Plaintiff Darryl Linder is the father of CPL Linder and a U.S. national.

1154.  As a result of the June 19, 2007 Attack and CPL Linder's injuries and death, each member of the Linder Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Linder's society, companionship, and counsel.

1155.  As a result of the June 19, 2007 Attack, CPL Linder was injured in his person and/or property.  The Plaintiff members of the Linder Family are the survivors and/or heirs of CPL Linder and are entitled to recover for the damages CPL Linder sustained.

**The July 17, 2007 IED Attack In Saladin (Patrick L. Wade Family)**

1156.  On July 17, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Saladin, Iraq (the "July 17, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 17, 2007 Attack.

1157.  The July 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1158.  **Chief Petty Officer Patrick L. Wade** served in Iraq as a member of the U.S. military serving in the U.S. Navy. CPO Wade was injured in the July 17, 2007 Attack.  CPO Wade died on July 17, 2007 as a result of injuries sustained during the July 17, 2007 Attack.

1159.  CPO Wade was a U.S. national at the time of the attack and his death.

1160.  Plaintiff Shirley Wade is the mother of CPO Wade and a U.S. national.

343

1161.   Plaintiff Gary Wade is the brother of CPO Wade and a U.S. national.

1162.   As a result of the July 17, 2007 Attack and CPO Wade's injuries and death, each member of the Wade Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Wade's society, companionship, and counsel.

1163.   As a result of the July 17, 2007 Attack, CPO Wade was injured in his person and/or property.  The Plaintiff members of the Wade Family are the survivors and/or heirs of CPO Wade and are entitled to recover for the damages CPO Wade sustained.

### The July 24, 2007 IED Attack In Diyala (Matthew R. Zindars and Robert A. Lynch Families)

1164.   On July 24, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "July 24, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 24, 2007 Attack.

1165.   The July 24, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1166.   **Corporal Matthew R. Zindars** served in Iraq as a member of the U.S. Marine Corps. Cpl Zindars was injured in the July 24, 2007 Attack.  Cpl Zindars died on July 24, 2007 as a result of injuries sustained during the July 24, 2007 Attack.

1167.   Cpl Zindars was a U.S. national at the time of the attack and his death.

1168.   Plaintiff Lynn Zindars is the mother of Cpl Zindars and a U.S. national.

1169.   Plaintiff Kenneth Zindars is the father of Cpl Zindars and a U.S. national.

344

1170.   As a result of the July 24, 2007 Attack and Cpl Zindars's injuries and death, each member of the Zindars Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Zindars's society, companionship, and counsel.

1171.   As a result of the July 24, 2007 Attack, Cpl Zindars was injured in his person and/or property.  The Plaintiff members of the Zindars Family are the survivors and/or heirs of Cpl Zindars and are entitled to recover for the damages Cpl Zindars sustained.

1172.   **Lance Corporal Robert A. Lynch** served in Iraq as a member of the U.S. Marine Corps.  LCpl Lynch was injured in the July 24, 2007 Attack.  LCpl Lynch died on July 24, 2007 as a result of injuries sustained during the July 24, 2007 Attack.

1173.   LCpl Lynch was a U.S. national at the time of the attack and his death.

1174.   Plaintiff Michael Lynch III is the brother of LCpl Lynch and a U.S. national.

1175.   As a result of the July 24, 2007 Attack and LCpl Lynch's injuries and death, each member of the Lynch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Lynch's society, companionship, and counsel.

1176.   As a result of the July 24, 2007 Attack, LCpl Lynch was injured in his person and/or property.  The Plaintiff members of the Lynch Family are the survivors and/or heirs of LCpl Lynch and are entitled to recover for the damages LCpl Lynch sustained.

**The July 26, 2007 IED Attack In Diyala (Michael A. Baloga Family)**

1177.   On July 26, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "July 26, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 26, 2007 Attack.

1178.   The July 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1179.   **Private Second Class Michael A. Baloga** served in Iraq as a member of the U.S. Army.  PV2 Baloga was injured in the July 26, 2007 Attack.  PV2 Baloga died on July 26, 2007 as a result of injuries sustained during the July 26, 2007 Attack.  PV2 Baloga was a U.S. national at the time of the attack and his death.

1180.   Plaintiff Linda Baloga is the stepmother of PV2 Baloga and a U.S. national.  Ms. Baloga lived in the same household as PV2 Baloga for a substantial period of time and considered PV2 Baloga the functional equivalent of a biological son.

1181.   As a result of the July 26, 2007 Attack and PV2 Baloga's injuries and death, each member of the Baloga Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Baloga's society, companionship, and counsel.

1182.   As a result of the July 26, 2007 Attack, PV2 Baloga was injured in his person and/or property.  The Plaintiff members of the Baloga Family are the survivors and/or heirs of PV2 Baloga and are entitled to recover for the damages PV2 Baloga sustained.

**The August 11, 2007 IED Attack In Baghdad (William D. Scates Family)**

1183.   On August 11, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "August 11, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the August 11, 2007 Attack.

1184.   The August 11, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1185.   **Staff Sergeant William D. Scates** served in Iraq as a member of the U.S. Army. SSG Scates was injured in the August 11, 2007 Attack.  SSG Scates died on August 11, 2007 as a result of injuries sustained during the August 11, 2007 Attack.

1186.   SSG Scates was a U.S. national at the time of the attack and his death.

1187.   Plaintiff Shannon Owens is the sister of SSG Scates and a U.S. national.

1188.   As a result of the August 11, 2007 Attack and SSG Scates's injuries and death, each member of the Scates Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Scates's society, companionship, and counsel.

1189.   As a result of the August 11, 2007 Attack, SSG Scates was injured in his person and/or property.  The Plaintiff members of the Scates Family are the survivors and/or heirs of SSG Scates and are entitled to recover for the damages SSG Scates sustained.

**The August 30, 2007 IED Attack In Nineveh (Daniel E. Scheibner Family)**

1190.   On August 30, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "August 30, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the August 30, 2007 Attack.

1191.   The August 30, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1192.   **Sergeant First Class Daniel E. Scheibner** served in Iraq as a member of the U.S. Army.  SFC Scheibner was injured in the August 30, 2007 Attack.  SFC Scheibner died on August 30, 2007 as a result of injuries sustained during the August 30, 2007 Attack.

1193.   SFC Scheibner was a U.S. national at the time of the attack and his death.

1194.   Plaintiff Ann Scheibner is the widow of SFC Scheibner and a U.S. national.

1195.   Plaintiff Tyler Scheibner is the son of SFC Scheibner and a U.S. national.

1196.   Plaintiff Louise Scheibner is the mother of SFC Scheibner and a U.S. national.

1197.   Plaintiff Diane Cottrell is the sister of SFC Scheibner and a U.S. national.

1198.   Plaintiff David Scheibner is the brother of SFC Scheibner and a U.S. national.

1199.   As a result of the August 30, 2007 Attack and SFC Scheibner's injuries and death, each member of the Scheibner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Scheibner's society, companionship, and counsel.

1200.   As a result of the August 30, 2007 Attack, SFC Scheibner was injured in his person and/or property.  The Plaintiff members of the Scheibner Family are the survivors and/or heirs of SFC Scheibner and are entitled to recover for the damages SFC Scheibner sustained.

**The September 7, 2007 IED Attack In Nineveh (Jason J. Hernandez Family)**

1201.   On September 7, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "September 7, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 7, 2007 Attack.

1202.   The September 7, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1203.   **Corporal Jason J. Hernandez** served in Iraq as a member of the U.S. Army.  CPL Hernandez was injured in the September 7, 2007 Attack.  CPL Hernandez died on September 7, 2007 as a result of injuries sustained during the September 7, 2007 Attack.

1204.   CPL Hernandez was a U.S. national at the time of the attack and his death.

1205.   Plaintiff John Hernandez is the father of CPL Hernandez and a U.S. national.

1206.   Plaintiff Angela Hernandez is the sister of CPL Hernandez and a U.S. national.

1207.   As a result of the September 7, 2007 Attack and CPL Hernandez's injuries and death, each member of the Hernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Hernandez's society, companionship, and counsel.

1208.   As a result of the September 7, 2007 Attack, CPL Hernandez was injured in his person and/or property.  The Plaintiff members of the Hernandez Family are the survivors and/or heirs of CPL Hernandez and are entitled to recover for the damages CPL Hernandez sustained.

**The September 11, 2007 IED Attack In Kirkuk (Brett R. Wolf Family)**

1209.   On September 11, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Kirkuk, Iraq (the "September 11, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 11, 2007 Attack.

1210.   The September 11, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1211.   **Sergeant Brett R. Wolf** served in Iraq as a member of the U.S. Army. On September 11, 2007, SGT Wolf was injured in the September 11, 2007 Attack in Kirkuk.  The attack severely wounded SGT Wolf, who suffered a bilateral above the knee amputation with distal femur, complete paralysis of right ulnar nerve, broken elbow now fused at 90-degree angle, traumatic brain injury, multiple facial fractures, spleen removal, left ear hearing loss, posttraumatic osteoarthritis, joint dysfunction with limitation of motion, migraines, residual scarring throughout, bilateral left hip flexion contracture with left thigh retaining shrapnel, and bilateral right hip flexion contracture. As a result of the September 11, 2007 Attack and his injuries, SGT Wolf has experienced severe mental anguish and severe physical and emotional pain and suffering.

1212.   Plaintiff SGT Wolf was a U.S. national when attacked, and remains one today.

**The September 14, 2007 IED Attack In Baghdad (Christopher M. McCloud Family)**

1213.   On September 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "September 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 14, 2007 Attack.

1214.   The September 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1215.   **Private First Class Christopher M. McCloud** served in Iraq as a member of the U.S. Army.  PFC McCloud was injured in the September 14, 2007 Attack.  PFC McCloud died on September 14, 2007 as a result of injuries sustained during the September 14, 2007 Attack.

1216.   PFC McCloud was a U.S. national at the time of the attack and his death.

1217.   Plaintiff Sheena McCloud is the widow of PFC McCloud and a U.S. national.

1218.   Plaintiff Aidan McCloud is the son of PFC McCloud and a U.S. national.

1219.   Plaintiff L.M., by and through his next friend Sheena McCloud, is the minor son of PFC McCloud. He is a U.S. national.

1220.   As a result of the September 14, 2007 Attack and PFC McCloud's injuries and death, each member of the McCloud Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McCloud's society, companionship, and counsel.

1221.   As a result of the September 14, 2007 Attack, PFC McCloud was injured in his person and/or property.  The Plaintiff members of the McCloud Family are the survivors and/or heirs of PFC McCloud and are entitled to recover for the damages PFC McCloud sustained.

**The September 18, 2007 IED Attack In Diyala (Nicholas P. Olson Family)**

1222.   On September 18, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "September 18, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 18, 2007 Attack.

1223.   The September 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1224.   **Corporal Nicholas P. Olson** served in Iraq as a member of the U.S. Army.  CPL Olson was injured in the September 18, 2007 Attack.  CPL Olson died on September 18, 2007 as a result of injuries sustained during the September 18, 2007 Attack.

1225.   CPL Olson was a U.S. national at the time of the attack and his death.

1226.   Plaintiff M.O., by and through her next friend Kevin Harrington, is the minor daughter of CPL Olson. She is a U.S. national.

1227.   Plaintiff Raymond Olson is the father of CPL Olson and a U.S. national.

1228.   As a result of the September 18, 2007 Attack and CPL Olson's injuries and death, each member of the Olson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Olson's society, companionship, and counsel.

1229.   As a result of the September 18, 2007 Attack, CPL Olson was injured in his person and/or property.  The Plaintiff members of the Olson Family are the survivors and/or heirs of CPL Olson and are entitled to recover for the damages CPL Olson sustained.

**The October 14, 2007 IED Attack In Baghdad (Justin S. Monschke Family)**

1230.   On October 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "October 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the October 14, 2007 Attack.

1231.   The October 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1232.   **Sergeant First Class Justin S. Monschke** served in Iraq as a member of the U.S. Army.  SFC Monschke was injured in the October 14, 2007 Attack.  SFC Monschke died on October 14, 2007 as a result of injuries sustained during the October 14, 2007 Attack.

1233.   SFC Monschke was a U.S. national at the time of the attack and his death.

1234.   Plaintiff Ashley Monschke is the daughter of SFC Monschke and a U.S. national.

1235.   Plaintiff Patty Jett is the mother of SFC Monschke and a U.S. national.

1236.   As a result of the October 14, 2007 Attack and SFC Monschke's injuries and death, each member of the Monschke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Monschke's society, companionship, and counsel.

1237.   As a result of the October 14, 2007 Attack, SFC Monschke was injured in his person and/or property.  The Plaintiff members of the Monschke Family are the survivors and/or heirs of SFC Monschke and are entitled to recover for the damages SFC Monschke sustained.

**The October 24, 2007 IED Attack In Nineveh (Robin L. Towns Sr. Family)**

1238.   On October 24, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "October 24, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the October 24, 2007 Attack.

1239.   The October 24, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1240.   **Sergeant First Class Robin L. Towns Sr.** served in Iraq as a member of the U.S. Army National Guard.  SFC Towns was injured in the October 24, 2007 Attack.  SFC Towns died on October 24, 2007 as a result of injuries sustained during the October 24, 2007 Attack.

1241.   SFC Towns was a U.S. national at the time of the attack and his death.

1242.   Plaintiff Shelia Towns is the widow of SFC Towns Sr. and a U.S. national.

1243.   As a result of the October 24, 2007 Attack and SFC Towns's injuries and death, each member of the Towns Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Towns's society, companionship, and counsel.

1244.   As a result of the October 24, 2007 Attack, SFC Towns was injured in his person and/or property.  The Plaintiff members of the Towns Family are the survivors and/or heirs of SFC Towns and are entitled to recover for the damages SFC Towns sustained.

**The November 14, 2007 IED Attack In Diyala (Kenneth R. Booker Family)**

1245.   On November 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "November 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the November 14, 2007 Attack.

1246.   The November 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1247.   **Sergeant Kenneth R. Booker** served in Iraq as a member of the U.S. Army. SGT Booker was injured in the November 14, 2007 Attack.  SGT Booker died on November 14, 2007 as a result of injuries sustained during the November 14, 2007 Attack.

1248.   SGT Booker was a U.S. national at the time of the attack and his death.

1249.   Plaintiff Charles Booker is the father of SGT Booker and a U.S. national.

1250.   Plaintiff Brenda Booker is the stepmother of SGT Booker and a U.S. national. Ms. Booker lived in the same household as SGT Booker for a substantial period of time and considered SGT Booker the functional equivalent of a biological son.

1251.   As a result of the November 14, 2007 Attack and SGT Booker's injuries and death, each member of the Booker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Booker's society, companionship, and counsel.

1252.   As a result of the November 14, 2007 Attack, SGT Booker was injured in his person and/or property.  The Plaintiff members of the Booker Family are the survivors and/or heirs of SGT Booker and are entitled to recover for the damages SGT Booker sustained.

**The December 20, 2007 Suicide Attack In Diyala (Jeremy E. Ray Family)**

1253.   On December 20, 2007, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Diyala, Iraq (the "December 20, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the December 20, 2007 Attack.

1254.   The December 20, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1255.   **First Lieutenant Jeremy E. Ray** served in Iraq as a member of the U.S. Army. 1LT Ray was injured in the December 20, 2007 Attack.  1LT Ray died on December 20, 2007 as a result of injuries sustained during the December 20, 2007 Attack.

1256.   1LT Ray was a U.S. national at the time of the attack and his death.

1257.   Plaintiff Deborah Ray is the mother of 1LT Ray and a U.S. national.

1258.   Plaintiff Walter Ray is the father of 1LT Ray and a U.S. national.

1259.   As a result of the December 20, 2007 Attack and 1LT Ray's injuries and death, each member of the Ray Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Ray's society, companionship, and counsel.

1260.   As a result of the December 20, 2007 Attack, 1LT Ray was injured in his person and/or property.  The Plaintiff members of the Ray Family are the survivors and/or heirs of 1LT Ray and are entitled to recover for the damages 1LT Ray sustained.

**The January 5, 2008 IED Attack In Diyala (Jason F. Lemke Family)**

1261.   On January 5, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "January 5, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 5, 2008 Attack.

1262.   The January 5, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1263.   **Corporal Jason F. Lemke** served in Iraq as a member of the U.S. Army. CPL Lemke was injured in the January 5, 2008 Attack.  CPL Lemke died on January 5, 2008 as a result of injuries sustained during the January 5, 2008 Attack.

1264.   CPL Lemke was a U.S. national at the time of the attack and his death.

1265.   Plaintiff Jill Frederiksen is the sister of CPL Lemke and a U.S. national.

1266.   As a result of the January 5, 2008 Attack and CPL Lemke's injuries and death, each member of the Lemke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Lemke's society, companionship, and counsel.

1267.   As a result of the January 5, 2008 Attack, CPL Lemke was injured in his person and/or property.  The Plaintiff members of the Lemke Family are the survivors and/or heirs of CPL Lemke and are entitled to recover for the damages CPL Lemke sustained.

### The January 9, 2008 IED Attack In Diyala (Jonathan K. Dozier, Matthew I. Pionk, and Zachary W. McBride Families)

1268.   On January 9, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "January 9, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 9, 2008 Attack.

1269.   The January 9, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1270.   **Sergeant First Class Jonathan K. Dozier** served in Iraq as a member of the U.S. Army.  SFC Dozier was injured in the January 9, 2008 Attack.  SFC Dozier died on January 9, 2008 as a result of injuries sustained during the January 9, 2008 Attack.

1271.   SFC Dozier was a U.S. national at the time of the attack and his death.

1272.   Plaintiff Martha Cabe is the mother of SFC Dozier and a U.S. national.

1273.   As a result of the January 9, 2008 Attack and SFC Dozier's injuries and death, each member of the Dozier Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Dozier's society, companionship, and counsel.

1274.   As a result of the January 9, 2008 Attack, SFC Dozier was injured in his person and/or property.  The Plaintiff members of the Dozier Family are the survivors and/or heirs of SFC Dozier and are entitled to recover for the damages SFC Dozier sustained.

1275.   **Sergeant First Class Matthew I. Pionk** served in Iraq as a member of the U.S. Army.  SFC Pionk was injured in the January 9, 2008 Attack.  SFC Pionk died on January 9, 2008 as a result of injuries sustained during the January 9, 2008 Attack.

1276.   SFC Pionk was a U.S. national at the time of the attack and his death.

1277.   Plaintiff Melanie Pionk is the widow of SFC Pionk and a U.S. national.

1278.   Plaintiff Brandon Pionk is the son of SFC Pionk and a U.S. national.

1279.   Plaintiff Ashley Pionk is the daughter of SFC Pionk and a U.S. national.

1280.   Plaintiff Dillon Pionk is the son of SFC Pionk and a U.S. national.

1281.   Plaintiff Sandra Pionk is the mother of SFC Pionk and a U.S. national.

1282.   Plaintiff Duane Pionk is the father of SFC Pionk and a U.S. national.

1283.   Plaintiff Joshua Pionk is the brother of SFC Pionk and a U.S. national.

1284.   As a result of the January 9, 2008 Attack and SFC Pionk's injuries and death, each member of the Pionk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Pionk's society, companionship, and counsel.

1285.   As a result of the January 9, 2008 Attack, SFC Pionk was injured in his person and/or property.  The Plaintiff members of the Pionk Family are the survivors and/or heirs of SFC Pionk and are entitled to recover for the damages SFC Pionk sustained.

1286.   **Sergeant Zachary W. McBride** served in Iraq as a member of the U.S. Army. SGT McBride was injured in the January 9, 2008 Attack.  SGT McBride died on January 9, 2008 as a result of injuries sustained during the January 9, 2008 Attack.

1287.   SGT McBride was a U.S. national at the time of the attack and his death.

1288.   Plaintiff Laura McBride is the mother of SGT McBride and a U.S. national.

1289.   Plaintiff Marshall McBride is the father of SGT McBride and a U.S. national.

1290.   Plaintiff Sarah Lambert is the sister of SGT McBride and a U.S. national.

1291.   As a result of the January 9, 2008 Attack and SGT McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT McBride's society, companionship, and counsel.

1292.   As a result of the January 9, 2008 Attack, SGT McBride was injured in his person and/or property.  The Plaintiff members of the McBride Family are the survivors and/or heirs of SGT McBride and are entitled to recover for the damages SGT McBride sustained.

### The January 28, 2008 IED Attack In Nineveh (Evan A. Marshall, James E. Craig, and Joshua A.R. Young Families)

1293.   On January 28, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "January 28, 2008 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 28, 2008 Attack.

1294.   The January 28, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1295.   **Corporal Evan A. Marshall** served in Iraq as a member of the U.S. Army.  CPL Marshall was injured in the January 28, 2008 Attack.  CPL Marshall died on January 28, 2008 as a result of injuries sustained during the January 28, 2008 Attack.

1296.   CPL Marshall was a U.S. national at the time of the attack and his death.

1297.   Plaintiff Sheila Marshall is the mother of CPL Marshall and a U.S. national.

1298.   Plaintiff Andrew Marshall is the father of CPL Marshall and a U.S. national.

1299.   As a result of the January 28, 2008 Attack and CPL Marshall's injuries and death, each member of the Marshall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Marshall's society, companionship, and counsel.

1300.   As a result of the January 28, 2008 Attack, CPL Marshall was injured in his person and/or property.  The Plaintiff members of the Marshall Family are the survivors and/or heirs of CPL Marshall and are entitled to recover for the damages CPL Marshall sustained.

1301.   **Sergeant James E. Craig** served in Iraq as a member of the U.S. Army.  SGT Craig was injured in the January 28, 2008 Attack.  SGT Craig died on January 28, 2008 as a result of injuries sustained during the January 28, 2008 Attack.

1302.   SGT Craig was a U.S. national at the time of the attack and his death.

1303.   Plaintiff Natalie Jackson is the widow of SGT Craig and a U.S. national.

1304.   Plaintiff Phyllis Craig is the mother of SGT Craig and a U.S. national.

1305.   Plaintiff Joel Sexton-Craig is the father of SGT Craig and a U.S. national.

1306.   Plaintiff Rachael Putman is the sister of SGT Craig and a U.S. national.

1307.   Plaintiff Menesia Spade is the sister of SGT Craig and a U.S. national.

1308.   Plaintiff Kelly Inman is the sister of SGT Craig and a U.S. national.

1309.   As a result of the January 28, 2008 Attack and SGT Craig's injuries and death, each member of the Craig Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Craig's society, companionship, and counsel.

1310.   As a result of the January 28, 2008 Attack, SGT Craig was injured in his person and/or property.  The Plaintiff members of the Craig Family are the survivors and/or heirs of SGT Craig and are entitled to recover for the damages SGT Craig sustained.

1311.   **Private First Class Joshua A.R. Young** served in Iraq as a member of the U.S. Army.  PFC Young was injured in the January 28, 2008 Attack.  PFC Young died on January 28, 2008 as a result of injuries sustained during the January 28, 2008 Attack.

1312.   PFC Young was a U.S. national at the time of the attack and his death.

1313.   Plaintiff Brandi Yanez is the sister of PFC Young and a U.S. national.

1314.   As a result of the January 28, 2008 Attack and PFC Young's injuries and death, each member of the Young Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Young's society, companionship, and counsel.

1315.   As a result of the January 28, 2008 Attack, PFC Young was injured in his person and/or property.  The Plaintiff members of the Young Family are the survivors and/or heirs of PFC Young and are entitled to recover for the damages PFC Young sustained.

### The March 10, 2008 IED Attack In Diyala (Phillip R. Anderson and Torre R. Mallard Families)

1316.   On March 10, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "March 10, 2008 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 10, 2008 Attack.

1317.   The March 10, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1318.   **Sergeant Phillip R. Anderson** served in Iraq as a member of the U.S. Army.  SGT Anderson was injured in the March 10, 2008 Attack.  SGT Anderson died on March 10, 2008 as a result of injuries sustained during the March 10, 2008 Attack.

1319.   SGT Anderson was a U.S. national at the time of the attack and his death.

1320.   Plaintiff Kenneth Anderson is the father of SGT Anderson and a U.S. national.

1321.   As a result of the March 10, 2008 Attack and SGT Anderson's injuries and death, each member of the Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Anderson's society, companionship, and counsel.

1322.   As a result of the March 10, 2008 Attack, SGT Anderson was injured in his person and/or property.  The Plaintiff members of the Anderson Family are the survivors and/or heirs of SGT Anderson and are entitled to recover for the damages SGT Anderson sustained.

1323.   **Captain Torre R. Mallard** served in Iraq as a member of the U.S. Army.  CPT Mallard was injured in the March 10, 2008 Attack.  CPT Mallard died on March 10, 2008 as a result of injuries sustained during the March 10, 2008 Attack.

1324.   CPT Mallard was a U.S. national at the time of the attack and his death.

1325.   Plaintiff Robin Mallard is the mother of CPT Mallard and a U.S. national.

1326.   Plaintiff Mose Mallard III is the father of CPT Mallard and a U.S. national.

1327.   Plaintiff Terrence Mallard is the brother of CPT Mallard and a U.S. national.

1328.   As a result of the March 10, 2008 Attack and CPT Mallard's injuries and death, each member of the Mallard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Mallard's society, companionship, and counsel.

1329.   As a result of the March 10, 2008 Attack, CPT Mallard was injured in his person and/or property.  The Plaintiff members of the Mallard Family are the survivors and/or heirs of CPT Mallard and are entitled to recover for the damages CPT Mallard sustained.

**The March 30, 2008 IED Attack In Al Anbar (William G. Hall Family)**

1330.   On March 30, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "March 30, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 30, 2008 Attack.

1331.   The March 30, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1332.   **Lieutenant Colonel William G. Hall** served in Iraq as a member of the U.S. Marine Corps. LtCol Hall was injured in the March 30, 2008 Attack.  LtCol Hall died on March 30, 2008 as a result of injuries sustained during the March 30, 2008 Attack.

1333.   LtCol Hall was a U.S. national at the time of the attack and his death.

1334.   Plaintiff Xiomara Hall is the widow of LtCol Hall and a U.S. national.

1335.   Plaintiff G.H., by and through her next friend Xiomara Hall, is the minor daughter of LtCol Hall. She is a U.S. national.

1336.   Plaintiff Mildred Hall is the mother of LtCol Hall and a U.S. national.

1337.   Plaintiff Dolores Wilson is the sister of LtCol Hall and a U.S. national.

1338.   Plaintiff Margie Bell is the sister of LtCol Hall and a U.S. national.

1339.   Plaintiff Xavier Arias is the stepson of LtCol Hall and a U.S. national.  Mr. Arias lived in the same household as LtCol Hall for a substantial period of time and considered LtCol Hall the functional equivalent of a biological father.

1340.   Plaintiff Cristian Arias is the stepson of LtCol Hall and a U.S. national.  Mr. Arias lived in the same household as LtCol Hall for a substantial period of time and considered LtCol Hall the functional equivalent of a biological father.

1341.   As a result of the March 30, 2008 Attack and LtCol Hall's injuries and death, each member of the Hall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LtCol Hall's society, companionship, and counsel.

1342.   As a result of the March 30, 2008 Attack, LtCol Hall was injured in his person and/or property.  The Plaintiff members of the Hall Family are the survivors and/or heirs of LtCol Hall and are entitled to recover for the damages LtCol Hall sustained.

**The April 14, 2008 IED Attack In Al Anbar (Dean D. Opicka Family)**

1343.   On April 14, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 14, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 14, 2008 Attack.

1344.   The April 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1345.   **Lance Corporal Dean D. Opicka** served in Iraq as a member of the U.S. Marine Corps Reserve. LCpl Opicka was injured in the April 14, 2008 Attack.  LCpl Opicka died on April 14, 2008 as a result of injuries sustained during the April 14, 2008 Attack.

1346.   LCpl Opicka was a U.S. national at the time of the attack and his death.

1347.   Plaintiff Donna Opicka is the mother of LCpl Opicka and a U.S. national.

1348.   Plaintiff Daniel Opicka is the brother of LCpl Opicka and a U.S. national.

1349.   As a result of the April 14, 2008 Attack and LCpl Opicka's injuries and death, each member of the Opicka Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Opicka's society, companionship, and counsel.

1350.   As a result of the April 14, 2008 Attack, LCpl Opicka was injured in his person and/or property.  The Plaintiff members of the Opicka Family are the survivors and/or heirs of LCpl Opicka and are entitled to recover for the damages LCpl Opicka sustained.

**The June 25, 2008 IED Attack In Nineveh (Alejandro A. Dominguez Family)**

1351.   On June 25, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Nineveh, Iraq (the "June 25, 2008 Attack").   Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 25, 2008 Attack.

1352.   The June 25, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1353.   **Sergeant Alejandro A. Dominguez** served in Iraq as a member of the U.S. Army. SGT Dominguez was injured in the June 25, 2008 Attack.  SGT Dominguez died on June 25, 2008 as a result of injuries sustained during the June 25, 2008 Attack.

1354.   SGT Dominguez was a U.S. national at the time of the attack and his death.

1355.   Plaintiff I.O., by and through his next friend Julia Ward, is the minor son of SGT Dominguez. He is a U.S. national.

1356.   Plaintiff Elia Dominguez is the mother of SGT Dominguez and a U.S. national.

1357.   Plaintiff Antonio Dominguez is the father of SGT Dominguez and a U.S. national.

1358.   Plaintiff Elia Ortiz is the sister of SGT Dominguez and a U.S. national.

1359.   As a result of the June 25, 2008 Attack and SGT Dominguez's injuries and death, each member of the Dominguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dominguez's society, companionship, and counsel.

1360.   As a result of the June 25, 2008 Attack, SGT Dominguez was injured in his person and/or property.  The Plaintiff members of the Dominguez Family are the survivors and/or heirs of SGT Dominguez and are entitled to recover for the damages he sustained.

**The September 24, 2008 Suicide Attack In Diyala (Michael J. Medders Family)**

1361.   On September 24, 2008, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomber in Diyala, Iraq (the "September 24, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 24, 2008 Attack.

1362.   The September 24, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1363.   **Captain Michael J. Medders** served in Iraq as a member of the U.S. Army. CPT Medders was injured in the September 24, 2008 Attack.  CPT Medders died on September 24, 2008 as a result of injuries sustained during the September 24, 2008 Attack.

1364.   CPT Medders was a U.S. national at the time of the attack and his death.

1365.   Plaintiff Katherine Shrader is the sister of CPT Medders and a U.S. national.

1366.   As a result of the September 24, 2008 Attack and CPT Medders's injuries and death, each member of the Medders Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Medders's society, companionship, and counsel.

1367.   As a result of the September 24, 2008 Attack, CPT Medders was injured in his person and/or property.  The Plaintiff members of the Medders Family are the survivors and/or heirs of CPT Medders and are entitled to recover for the damages CPT Medders sustained.

**The November 14, 2008 IED Attack In Al Anbar (Aaron M. Allen Family)**

1368.   On November 14, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "November 14, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the November 14, 2008 Attack.

1369.   The November 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1370.   **Corporal Aaron M. Allen** served in Iraq as a member of the U.S. Marine Corps. Cpl Allen was injured in the November 14, 2008 Attack.  Cpl Allen died on November 14, 2008 as a result of injuries sustained during the November 14, 2008 Attack.

1371.   Cpl Allen was a U.S. national at the time of the attack and his death.

1372.   Plaintiff Mary Allen is the mother of Cpl Allen and a U.S. national.

1373.   As a result of the November 14, 2008 Attack and Cpl Allen's injuries and death, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Allen's society, companionship, and counsel.

1374.   As a result of the November 14, 2008 Attack, Cpl Allen was injured in his person and/or property.  The Plaintiff members of the Allen Family are the survivors and/or heirs of Cpl Allen and are entitled to recover for the damages Cpl Allen sustained.

**The December 4, 2008 Suicide Attack In Nineveh (John J. Savage Family)**

1375.   On December 4, 2008, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Nineveh, Iraq (the "December 4, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the December 4, 2008 Attack.

1376.   The December 4, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1377.  **Sergeant John J. Savage** served in Iraq as a member of the U.S. Army. SGT Savage was injured in the December 4, 2008 Attack.  SGT Savage died on December 4, 2008 as a result of injuries sustained during the December 4, 2008 Attack.

1378.  SGT Savage was a U.S. national at the time of the attack and his death.

1379.  Plaintiff John Savage is the father of SGT Savage and a U.S. national.

1380.  As a result of the December 4, 2008 Attack and SGT Savage's injuries and death, each member of the Savage Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Savage's society, companionship, and counsel.

1381.  As a result of the December 4, 2008 Attack, SGT Savage was injured in his person and/or property.  The Plaintiff members of the Savage Family are the survivors and/or heirs of SGT Savage and are entitled to recover for the damages SGT Savage sustained.

### The April 10, 2009 Suicide Attack In Nineveh (Bryan E. Hall, Edward W. Forrest Jr., Gary L. Woods Jr., and Jason G. Pautsch Families)

1382.  On April 10, 2009, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Nineveh, Iraq (the "April 10, 2009 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 10, 2009 Attack.

1383.  The April 10, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1384.  **Sergeant First Class Bryan E. Hall** served in Iraq as a member of the U.S. Army. SFC Hall was injured in the April 10, 2009 Attack.  SFC Hall died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

1385.  SFC Hall was a U.S. national at the time of the attack and his death.

1386.   Plaintiff Rachel Hall is the widow of SFC Hall and a U.S. national.

1387.   Plaintiff A.H., by and through her next friend Rachel Hall, is the minor daughter of SFC Hall. She is a U.S. national.

1388.   As a result of the April 10, 2009 Attack and SFC Hall's injuries and death, each member of the Hall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Hall's society, companionship, and counsel.

1389.   As a result of the April 10, 2009 Attack, SFC Hall was injured in his person and/or property.  The Plaintiff members of the Hall Family are the survivors and/or heirs of SFC Hall and are entitled to recover for the damages SFC Hall sustained.

1390.   **Sergeant Edward W. Forrest Jr.** served in Iraq as a member of the U.S. Army. SGT Forrest was injured in the April 10, 2009 Attack.  SGT Forrest died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

1391.   SGT Forrest was a U.S. national at the time of the attack and his death.

1392.   Plaintiff Stephanie Forrest is the widow of SGT Forrest Jr. and a U.S. national.

1393.   Plaintiff B.F., by and through his next friend Stephanie Forrest, is the minor son of SGT Forrest Jr. He is a U.S. national.

1394.   Plaintiff J.F., by and through his next friend Stephanie Forrest, is the minor son of SGT Forrest Jr. He is a U.S. national.

1395.   As a result of the April 10, 2009 Attack and SGT Forrest's injuries and death, each member of the Forrest Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Forrest's society, companionship, and counsel.

1396.   As a result of the April 10, 2009 Attack, SGT Forrest was injured in his person and/or property.  The Plaintiff members of the Forrest Family are the survivors and/or heirs of SGT Forrest and are entitled to recover for the damages SGT Forrest sustained.

1397.   **Staff Sergeant Gary L. Woods Jr.** served in Iraq as a member of the U.S. Army. SSG Woods was injured in the April 10, 2009 Attack.  SSG Woods died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

1398.   SSG Woods was a U.S. national at the time of the attack and his death.

1399.   Plaintiff Becky Johnson is the mother of SSG Woods Jr. and a U.S. national.

1400.   Plaintiff Britteny Woods is the sister of SSG Woods Jr. and a U.S. national.

1401.   As a result of the April 10, 2009 Attack and SSG Woods's injuries and death, each member of the Woods Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Woods's society, companionship, and counsel.

1402.   As a result of the April 10, 2009 Attack, SSG Woods was injured in his person and/or property.  The Plaintiff members of the Woods Family are the survivors and/or heirs of SSG Woods and are entitled to recover for the damages SSG Woods sustained.

1403.   **Corporal Jason G. Pautsch** served in Iraq as a member of the U.S. Army. CPL Pautsch was injured in the April 10, 2009 Attack.  CPL Pautsch died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

1404.   CPL Pautsch was a U.S. national at the time of the attack and his death.

1405.   Plaintiff Josef Pautsch is the brother of CPL Pautsch and a U.S. national.

1406.   As a result of the April 10, 2009 Attack and CPL Pautsch's injuries and death, each member of the Pautsch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Pautsch's society, companionship, and counsel.

1407.   As a result of the April 10, 2009 Attack, CPL Pautsch was injured in his person and/or property.  The Plaintiff members of the Pautsch Family are the survivors and/or heirs of CPL Pautsch and are entitled to recover for the damages CPL Pautsch sustained.

### The July 21, 2010 IED Attack In Diyala (Michael L. Runyan Family)

1408.   On July 21, 2010, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "July 21, 2010 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 21, 2010 Attack.

1409.   The July 21, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1410.   **First Lieutenant Michael L. Runyan** served in Iraq as a member of the U.S. Army. 1LT Runyan was injured in the July 21, 2010 Attack.  1LT Runyan died on July 21, 2010 as a result of injuries sustained during the July 21, 2010 Attack.

1411.   1LT Runyan was a U.S. national at the time of the attack and his death.

1412.   Plaintiff Alex Runyan is the brother of 1LT Runyan and a U.S. national.

1413.   As a result of the July 21, 2010 Attack and 1LT Runyan's injuries and death, each member of the Runyan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Runyan's society, companionship, and counsel.

1414.   As a result of the July 21, 2010 Attack, 1LT Runyan was injured in his person and/or property.  The Plaintiff members of the Runyan Family are the survivors and/or heirs of 1LT Runyan and are entitled to recover for the damages 1LT Runyan sustained.

**The December 31, 2012 Kidnapping Attack, And Subsequent Hostage Taking And Torture, In Aleppo, Syria (Matthew Schrier)**

1415.   Al-Qaeda-in-Iraq also acted through its (and al-Qaeda's) Syrian alias and affiliate, Jabhat al-Nusra, meaning the "Victory Front."  Jabhat al-Nusra was at all times an al-Qaeda branch and subsidiary and served as al-Qaeda's and al-Qaeda-in-Iraq's alias in Syria at all times in the case of al-Qaeda, and until 2014 in the case of al-Qaeda-in-Iraq.

1416.   As the Syrian branch, subsidiary, and alias for al-Qaeda and al-Qaeda-in-Iraq, Jabhat al-Nusra shared the same objective as al-Qaeda and al-Qaeda-in-Iraq:  killing Americans and others who opposed al-Qaeda's agenda of driving the United States out of Iraq so al-Qaeda could impose sharia law on the country.

1417.   Jabhat al-Nusra depended upon al-Qaeda-in-Iraq as a key source of funding for Jabhat al-Nusra from the latter's inception in 2010 until 2014.  During this period, payments to al-Qaeda-in-Iraq in Iraq also funded Jabhat al-Nusra in Syria.

1418.   From 2010 through 2014, al-Qaeda-in-Iraq relied upon al-Qaeda and al-Qaeda-in-Iraq funds, logistical networks, and operatives to establish and sustain Jabhat al-Nusra, which was itself an alias of both FTOs, and a percentage of the funds and operatives that benefited al-Qaeda or al-Qaeda-in-Iraq flowed through to facilitate the operations of Jabhat al-Nusra.

1419.   The U.S. State Department designated Jabhat al-Nusra as an FTO on December 11, 2012, and it has maintained that designation ever since. Notably, Jabhat al-Nusra was designated as an alias for al-Qaeda-in-Iraq (itself an FTO at the time).

1420.   At all times, the United Nations' al-Qaeda sanctions regime has identified Jabhat al-Nusra as an al-Qaeda affiliate.

1421.   In 2014, Jabhat al-Nusra split from al-Qaeda-in-Iraq after the latter's split from al-Qaeda.

1422.   From its formation through 2014, Jabhat al-Nusra remained an al-Qaeda-in-Iraq alias, branch, and subsidiary, and Jabhat al-Nusra terrorists swore allegiance to al-Qaeda-in-Iraq leadership.

1423.   From its formation through 2021, Jabhat al-Nusra remained an al-Qaeda alias, branch, and subsidiary, and Jabhat al-Nusra terrorists swore allegiance to al-Qaeda.

1424.   **Plaintiff Matthew Schrier** served in Syria as a journalist. On December 31, 2012, Mr. Schrier was taken hostage in a kidnapping attack in Aleppo, Syria.  Mr. Schrier was held hostage for 211 days before escaping to his freedom.[409]

1425.   The attack was committed by Jabhat al-Nusra, a designated FTO at the time, with material support and resources from al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.

1426.   The attack was planned and authorized by Jabhat al-Nusra and al-Qaeda, designated FTOs at the time.

1427.   Mr. Schrier's kidnapping, subsequent confinement, and torture would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists kidnapped a civilian who was not engaged in hostilities.

1428.   Mr. Schrier was a U.S. national at the time of the kidnapping and remains one today.

1429.   As a result of the December 31, 2012 kidnapping, and 211 days as a hostage during which he was tortured, Mr. Schrier has experienced severe mental anguish, emotional pain and suffering, and was injured in his person and/or property.

## XI.    THE AL-QAEDA ATTACKS IN AFGHANISTAN

---

[409] Mr. Schrier is, on information and belief, the only American hostage taken by an al-Qaeda-affiliated group to have escaped confinement.

### The July 23, 2007 IED Attack In Kabul (Adam J. Davis, Michael S. Curry Jr., and Travon T. Johnson Families)

1430.   On July 23, 2007, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "July 23, 2007 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda, an FTO, planned and authorized the July 23, 2007 Attack.

1431.   The July 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1432.   **Specialist Adam J. Davis** served in Afghanistan as a member of the U.S. Army. SPC Davis was injured in the July 23, 2007 Attack.  SPC Davis died on July 23, 2007 as a result of injuries sustained during the July 23, 2007 Attack.

1433.   SPC Davis was a U.S. national at the time of the attack and his death.

1434.   Plaintiff Tracy Carrico is the mother of SPC Davis and a U.S. national.

1435.   Plaintiff Timothy Davis is the father of SPC Davis and a U.S. national.

1436.   Plaintiff Stephanie Bova is the sister of SPC Davis and a U.S. national.

1437.   As a result of the July 23, 2007 Attack and SPC Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Davis's society, companionship, and counsel.

1438.   As a result of the July 23, 2007 Attack, SPC Davis was injured in his person and/or property.  The Plaintiff members of the Davis Family are the survivors and/or heirs of SPC Davis and are entitled to recover for the damages SPC Davis sustained.

1439.   **First Sergeant Michael S. Curry Jr.** served in Afghanistan as a member of the U.S. Army. 1SG Curry was injured in the July 23, 2007 Attack.  1SG Curry died on July 23, 2007 as a result of injuries sustained during the July 23, 2007 Attack.

1440.   1SG Curry was a U.S. national at the time of the attack and his death.

1441.   Plaintiff Lavette Curry is the sister of 1SG Curry Jr. and a U.S. national.

1442.   Plaintiff Niki Martin is the sister of 1SG Curry Jr. and a U.S. national.

1443.   As a result of the July 23, 2007 Attack and 1SG Curry's injuries and death, each member of the Curry Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1SG Curry's society, companionship, and counsel.

1444.   As a result of the July 23, 2007 Attack, 1SG Curry was injured in his person and/or property.  The Plaintiff members of the Curry Family are the survivors and/or heirs of 1SG Curry and are entitled to recover for the damages 1SG Curry sustained.

1445.   **Sergeant Travon T. Johnson** served in Afghanistan as a member of the U.S. Army. SGT Johnson was injured in the July 23, 2007 Attack.  SGT Johnson died on July 23, 2007 as a result of injuries sustained during the July 23, 2007 Attack.

1446.   SGT Johnson was a U.S. national at the time of the attack and his death.

1447.   Plaintiff Billie Shotlow is the mother of SGT Johnson and a U.S. national.

1448.   Plaintiff Michael Shotlow is the stepfather of SGT Johnson and a U.S. national. Mr. Shotlow lived in the same household as SGT Johnson for a substantial period of time and considered SGT Johnson the functional equivalent of a biological son.

1449.   As a result of the July 23, 2007 Attack and SGT Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Johnson's society, companionship, and counsel.

1450.   As a result of the July 23, 2007 Attack, SGT Johnson was injured in his person and/or property.  The Plaintiff members of the Johnson Family are the survivors and/or heirs of SGT Johnson and are entitled to recover for the damages SGT Johnson sustained.

**The January 7, 2008 IED Attack In Nangarhar (Ryan J. Newell Family)**

1451.   On January 7, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "January 7, 2008 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda, an FTO, planned and authorized the January 7, 2008 Attack.

1452.   The January 7, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1453.   **Sergeant Ryan J. Newell** served in Afghanistan as a member of the U.S. Army. On January 7, 2008, SGT Newell was injured in the January 7, 2008 Attack in Nangarhar Province. The attack severely wounded SGT Newell, who lost both legs, and now suffers from a traumatic brain injury, post-traumatic stress disorder, hearing loss, and tinnitus.  As a result of the January 7, 2008 Attack and his injuries, SGT Newell has experienced severe mental anguish and severe physical and emotional pain and suffering.

1454.   Plaintiff SGT Newell was a U.S. national when attacked, and remains one today.

**The January 14, 2008 Complex Attack In Kabul (Thor D. Hesla Family)**

1455.   On January 14, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving suicide bombing, small arms fire, and grenades in Kabul Province, Afghanistan (the "January 14, 2008 Attack"), which was facilitated by al-Qaeda-in-

Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda, an FTO, planned and authorized the January 14, 2008 Attack.

1456.   The January 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1457.   **Thor D. Hesla** worked in Afghanistan as a civilian contractor for BearingPoint Management & Technology Consultants, contracting with USAID. Mr. Hesla was injured in the January 14, 2008 Attack. Mr. Hesla died on January 14, 2008 as a result of injuries sustained during the January 14, 2008 Attack.

1458.   Mr. Hesla was a U.S. national at the time of the attack and his death.

1459.   Plaintiff Maren Hesla is the sister of Mr. Hesla, a U.S. national, and a resident of this District.

1460.   As a result of the January 14, 2008 Attack and Mr. Hesla's injuries and death, each member of the Hesla Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hesla's society, companionship, and counsel.

1461.   As a result of the January 14, 2008 Attack, Mr. Hesla was injured in his person and/or property. The Plaintiff members of the Hesla Family are the survivors and/or heirs of Mr. Hesla and are entitled to recover for the damages Mr. Hesla sustained.

**The May 20, 2008 IED Attack In Ghazni (Jeffrey F. DePrimo Family)**

1462.   On May 20, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "May 20, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda, an FTO, planned and authorized the May 20, 2008 Attack.

1463.  The May 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1464.  **First Lieutenant Jeffrey F. DePrimo** served in Afghanistan as a member of the U.S. Army National Guard.  1LT DePrimo was injured in the May 20, 2008 Attack.  1LT DePrimo died on May 20, 2008 as a result of injuries sustained during the May 20, 2008 Attack.

1465.  1LT DePrimo was a U.S. national at the time of the attack and his death.

1466.  Plaintiff Helen DePrimo is the mother of 1LT DePrimo and a U.S. national.

1467.  Plaintiff Joseph DePrimo is the father of 1LT DePrimo and a U.S. national.

1468.  Plaintiff Jodi Calabro is the sister of 1LT DePrimo and a U.S. national.

1469.  Plaintiff Danielle Fediw is the sister of 1LT DePrimo and a U.S. national.

1470.  As a result of the May 20, 2008 Attack and 1LT DePrimo's injuries and death, each member of the DePrimo Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT DePrimo's society, companionship, and counsel.

1471.  As a result of the May 20, 2008 Attack, 1LT DePrimo was injured in his person and/or property.  The Plaintiff members of the DePrimo Family are the survivors and/or heirs of 1LT DePrimo and are entitled to recover for the damages 1LT DePrimo sustained.

**The May 31, 2008 IED Attack In Nangarhar (James M. Finley Family)**

1472.  On May 31, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "May 31, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 31, 2008 Attack.

1473.   The May 31, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1474.   **Specialist James M. Finley** served in Afghanistan as a member of the U.S. Army. SPC Finley was injured in the May 31, 2008 Attack.  SPC Finley died on May 31, 2008 as a result of injuries sustained during the May 31, 2008 Attack.

1475.   SPC Finley was a U.S. national at the time of the attack and his death.

1476.   Plaintiff Gerald Finley is the father of SPC Finley and a U.S. national.

1477.   Plaintiff Jennifer Lefors is the sister of SPC Finley and a U.S. national.

1478.   Plaintiff John Finley is the brother of SPC Finley and a U.S. national.

1479.   Plaintiff Joshua Finley is the brother of SPC Finley and a U.S. national.

1480.   As a result of the May 31, 2008 Attack and SPC Finley's injuries and death, each member of the James Matthew Finley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Finley's society, companionship, and counsel.

1481.   As a result of the May 31, 2008 Attack, SPC Finley was injured in his person and/or property.  The Plaintiff members of the James Matthew Finley Family are the survivors and/or heirs of SPC Finley and are entitled to recover for the damages SPC Finley sustained.

### The July 13, 2008 Complex Attack In Nuristan (Gunnar W. Zwilling, Israel Garcia, Jason D. Hovater, Jason M. Bogar, Jonathan P. Brostrom, Pruitt A. Rainey, Jonathan R.C. Benton Families)

1482.   On July 13, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Nuristan Province, Afghanistan (the "July 13, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's

provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the July 13, 2008 Attack.

1483.   The July 13, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1484.   **Corporal Gunnar W. Zwilling** served in Afghanistan as a member of the U.S. Army. CPL Zwilling was injured in the July 13, 2008 Attack. CPL Zwilling died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

1485.   CPL Zwilling was a U.S. national at the time of the attack and his death.

1486.   Ms. Kathy Lay is the Personal Representative of Kurt Zwilling, who is the father of CPL Zwilling. She brings this claim in her representative capacity on behalf of Mr. Zwilling's estate. Ms. Lay is a U.S. national.

1487.   Plaintiff Alexander Zwilling is the brother of CPL Zwilling and a U.S. national.

1488.   As a result of the July 13, 2008 Attack and CPL Zwilling's injuries and death, each member of the Zwilling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Zwilling's society, companionship, and counsel.

1489.   As a result of the July 13, 2008 Attack, CPL Zwilling was injured in his person and/or property. The Plaintiff members of the Zwilling Family are the survivors and/or heirs of CPL Zwilling and are entitled to recover for the damages CPL Zwilling sustained.

1490.   **Sergeant Israel Garcia** served in Afghanistan as a member of the U.S. Army. SGT Garcia was injured in the July 13, 2008 Attack. SGT Garcia died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

1491.   SGT Garcia was a U.S. national at the time of the attack and his death.

1492.   Plaintiff Lesly Garcia is the widow of SGT Garcia and a U.S. national.

1493.   Plaintiff Maricruz Garcia Velasquez is the mother of SGT Garcia and a U.S. national.

1494.   Plaintiff Victor Garcia is the father of SGT Garcia and a U.S. national.

1495.   Plaintiff Ramsses Garcia is the brother of SGT Garcia and a U.S. national.

1496.   As a result of the July 13, 2008 Attack and SGT Garcia's injuries and death, each member of the Israel Garcia Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Garcia's society, companionship, and counsel.

1497.   As a result of the July 13, 2008 Attack, SGT Garcia was injured in his person and/or property.  The Plaintiff members of the Israel Garcia Family are the survivors and/or heirs of SGT Garcia and are entitled to recover for the damages SGT Garcia sustained.

1498.   **Specialist Jason D. Hovater** served in Afghanistan as a member of the U.S. Army. SPC Hovater was injured in the July 13, 2008 Attack.  SPC Hovater died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

1499.   SPC Hovater was a U.S. national at the time of the attack and his death.

1500.   Plaintiff Jenna Vanosdale is the widow of SPC Hovater and a U.S. national.

1501.   As a result of the July 13, 2008 Attack and SPC Hovater's injuries and death, each member of the Hovater Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hovater's society, companionship, and counsel.

1502.   As a result of the July 13, 2008 Attack, SPC Hovater was injured in his person and/or property.  The Plaintiff members of the Hovater Family are the survivors and/or heirs of SPC Hovater and are entitled to recover for the damages SPC Hovater sustained.

1503. **Corporal Jason M. Bogar** served in Afghanistan as a member of the U.S. Army. CPL Bogar was injured in the July 13, 2008 Attack. CPL Bogar died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

1504. CPL Bogar was a U.S. national at the time of the attack and his death.

1505. Plaintiff Carlene Cross is the mother of CPL Bogar and a U.S. national.

1506. Plaintiff Michael Bogar is the father of CPL Bogar and a U.S. national.

1507. Plaintiff Carise Martindale is the sister of CPL Bogar and a U.S. national.

1508. Plaintiff Micael Bogar is the sister of CPL Bogar and a U.S. national.

1509. As a result of the July 13, 2008 Attack and CPL Bogar's injuries and death, each member of the Jason Michael Bogar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Bogar's society, companionship, and counsel.

1510. As a result of the July 13, 2008 Attack, CPL Bogar was injured in his person and/or property. The Plaintiff members of the Jason Michael Bogar Family are the survivors and/or heirs of CPL Bogar and are entitled to recover for the damages CPL Bogar sustained.

1511. **First Lieutenant Jonathan P. Brostrom** served in Afghanistan as a member of the U.S. Army. 1LT Brostrom was injured in the July 13, 2008 Attack. 1LT Brostrom died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

1512. 1LT Brostrom was a U.S. national at the time of the attack and his death.

1513. Plaintiff Jase Brostrom is the son of 1LT Brostrom and a U.S. national.

1514. Plaintiff Mary Brostrom is the mother of 1LT Brostrom and a U.S. national.

1515. Plaintiff David Brostrom is the father of 1LT Brostrom and a U.S. national.

1516. Plaintiff Blake Brostrom is the brother of 1LT Brostrom and a U.S. national.

1517.   As a result of the July 13, 2008 Attack and 1LT Brostrom's injuries and death, each member of the Brostrom Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Brostrom's society, companionship, and counsel.

1518.   As a result of the July 13, 2008 Attack, 1LT Brostrom was injured in his person and/or property.  The Plaintiff members of the Brostrom Family are the survivors and/or heirs of 1LT Brostrom and are entitled to recover for the damages 1LT Brostrom sustained.

1519.   **Corporal Pruitt A. Rainey** served in Afghanistan as a member of the U.S. Army. CPL Rainey was injured in the July 13, 2008 Attack.  CPL Rainey died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

1520.   CPL Rainey was a U.S. national at the time of the attack and his death.

1521.   Plaintiff Renda Riggins is the mother of CPL Rainey and a U.S. national.

1522.   As a result of the July 13, 2008 Attack and CPL Rainey's injuries and death, each member of the Pruitt Allen Rainey Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Rainey's society, companionship, and counsel.

1523.   As a result of the July 13, 2008 Attack, CPL Rainey was injured in his person and/or property.  The Plaintiff members of the Pruitt Allen Rainey Family are the survivors and/or heirs of CPL Rainey and are entitled to recover for the damages CPL Rainey sustained.

1524.   **Staff Sergeant Jonathan R.C. Benton** served in Afghanistan as a member of the U.S. Army.  On July 13, 2008, SSG Benton was injured in the July 13, 2008 Attack.  The attack severely wounded SSG Benton, who now suffers from traumatic brain injury, spinal injury, and nerve damage, among other severe injuries.  As a result of the July 13, 2008 Attack and his injuries, SSG Benton has experienced severe physical and emotional pain and suffering.

1525.   SSG Benton was a U.S. national at the time of the attack, and remains one today.

1526.   Plaintiff Elizabeth Benton is the wife of SSG Benton and a U.S. national.

1527.   Plaintiff H.B., by and through her next friend Elizabeth Benton, is the minor daughter of SSG Benton. She is a U.S. national.

1528.   Plaintiff S.B., by and through her next friend Elizabeth Benton, is the minor daughter of SSG Benton. She is a U.S. national.

1529.   Plaintiff G.B., by and through her next friend Elizabeth Benton, is the minor daughter of SSG Benton. She is a U.S. national.

1530.   As a result of the July 13, 2008 Attack and SSG Benton's injuries, each member of the Benton Family has experienced severe mental anguish, emotional pain and suffering.

**The August 1, 2008 IED Attack In Kunar (Jair De Jesus Garcia Family)**

1531.   On August 1, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "August 1, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 1, 2008 Attack.

1532.   The August 1, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1533.   **Private E1 Jair De Jesus Garcia** served in Afghanistan as a member of the U.S. Army.  PV1 Garcia was injured in the August 1, 2008 Attack.  PV1 Garcia died on August 1, 2008 as a result of injuries sustained during the August 1, 2008 Attack.

1534.   PV1 Garcia was a U.S. national at the time of the attack and his death.

1535.   Plaintiff Maria Avneri is the mother of PV1 Garcia and a U.S. national.

1536.   Plaintiff Eduardo Garcia is the brother of PV1 Garcia and a U.S. national.

1537.   Plaintiff Jacob Avneri is the stepfather of PV1 Garcia and a U.S. national.  Mr. Avneri lived in the same household as PV1 Garcia for a substantial period of time and considered PV1 Garcia the functional equivalent of a biological son.

1538.   As a result of the August 1, 2008 Attack and PV1 Garcia's injuries and death, each member of the Garcia Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV1 Garcia's society, companionship, and counsel.

1539.   As a result of the August 1, 2008 Attack, PV1 Garcia was injured in his person and/or property.  The Plaintiff members of the Garcia Family are the survivors and/or heirs of PV1 Garcia and are entitled to recover for the damages PV1 Garcia sustained.

**The August 22, 2008 IED Attack In Ghazni (Brian E. Studer Family)**

1540.   On August 22, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "August 22, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 22, 2008 Attack.

1541.   The August 22, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1542.   **Staff Sergeant Brian E. Studer** served in Afghanistan as a member of the U.S. Army.  SSG Studer was injured in the August 22, 2008 Attack.  SSG Studer died on August 22, 2008 as a result of injuries sustained during the August 22, 2008 Attack.

1543.   SSG Studer was a U.S. national at the time of the attack and his death.

1544.   Plaintiff Crystal DeLeo is the sister of SSG Studer and a U.S. national.

1545.   As a result of the August 22, 2008 Attack and SSG Studer's injuries and death, each member of the Studer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Studer's society, companionship, and counsel.

1546.   As a result of the August 22, 2008 Attack, SSG Studer was injured in his person and/or property.  The Plaintiff members of the Studer Family are the survivors and/or heirs of SSG Studer and are entitled to recover for the damages SSG Studer sustained.

**The September 11, 2008 IED Attack In Nangarhar (Jacob R. Lerner Family)**

1547.   On September 11, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "September 11, 2008 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 11, 2008 Attack.

1548.   The September 11, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1549.   **Specialist Jacob R. Lerner** served in Afghanistan as a member of the U.S. Army.  On September 11, 2008, SPC Lerner was injured in the September 11, 2008 Attack.  The attack severely wounded SPC Lerner, who endured amputation of his left leg below the knee.  As a result of the September 11, 2008 Attack and his injuries, SPC Lerner has experienced severe mental anguish and severe physical and emotional pain and suffering.

1550.   SPC Lerner was a U.S. national at the time of the attack, and remains one today.

**The September 20, 2008 IED Attack In Kunar (Nathan M. Cox Family)**

1551.   On September 20, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "September 20, 2008

Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 20, 2008 Attack.

1552.  The September 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1553.  **Staff Sergeant Nathan M. Cox** served in Afghanistan as a member of the U.S. Army. SSG Cox was injured in the September 20, 2008 Attack.  SSG Cox died on September 20, 2008 as a result of injuries sustained during the September 20, 2008 Attack.

1554.  SSG Cox was a U.S. national at the time of the attack and his death.

1555.  Plaintiff Hannah Cox is the sister of SSG Cox and a U.S. national.

1556.  As a result of the September 20, 2008 Attack and SSG Cox's injuries and death, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cox's society, companionship, and counsel.

1557.  As a result of the September 20, 2008 Attack, SSG Cox was injured in his person and/or property.  The Plaintiff members of the Cox Family are the survivors and/or heirs of SSG Cox and are entitled to recover for the damages SSG Cox sustained.

**The October 14, 2008 IED Attack In Kunar (Cory J. Bertrand Family)**

1558.  On October 14, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "October 14, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 14, 2008 Attack.

1559.  The October 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1560.   **Specialist Cory J. Bertrand** served in Afghanistan as a member of the U.S. Army. SPC Bertrand was injured in the October 14, 2008 Attack.  SPC Bertrand died on October 14, 2008 as a result of injuries sustained during the October 14, 2008 Attack.

1561.   SPC Bertrand was a U.S. national at the time of the attack and his death.

1562.   Plaintiff Charlotte Allen is the mother of SPC Bertrand and a U.S. national.

1563.   Plaintiff Matthew Allen is the stepfather of SPC Bertrand and a U.S. national. Mr. Allen lived in the same household as SPC Bertrand for a substantial period of time and considered SPC Bertrand the functional equivalent of a biological son.

1564.   Plaintiff Austin Nelams is the brother of SPC Bertrand and a U.S. national.

1565.   As a result of the October 14, 2008 Attack and SPC Bertrand's injuries and death, each member of the Bertrand Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bertrand's society, companionship, and counsel.

1566.   As a result of the October 14, 2008 Attack, SPC Bertrand was injured in his person and/or property.  The Plaintiff members of the Bertrand Family are the survivors and/or heirs of SPC Bertrand and are entitled to recover for the damages SPC Bertrand sustained.

**The October 27, 2008 Suicide Attack In Baghlan (Kevin D. Grieco Family)**

1567.   On October 27, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Baghlan Province, Afghanistan (the "October 27, 2008 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 27, 2008 Attack.

1568.   The October 27, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

387

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1569.   **Staff Sergeant Kevin D. Grieco** served in Afghanistan as a member of the U.S. Army National Guard.  SSG Grieco was injured in the October 27, 2008 Attack.  SSG Grieco died on October 27, 2008 as a result of injuries sustained during the October 27, 2008 Attack.

1570.   SSG Grieco was a U.S. national at the time of the attack and his death.

1571.   Plaintiff Linda Grieco is the mother of SSG Grieco and a U.S. national.

1572.   Plaintiff Ralph Grieco is the father of SSG Grieco and a U.S. national.

1573.   Plaintiff Jennifer Burch is the sister of SSG Grieco and a U.S. national.

1574.   As a result of the October 27, 2008 Attack and SSG Grieco's injuries and death, each member of the Grieco Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Grieco's society, companionship, and counsel.

1575.   As a result of the October 27, 2008 Attack, SSG Grieco was injured in his person and/or property.  The Plaintiff members of the Grieco Family are the survivors and/or heirs of SSG Grieco and are entitled to recover for the damages SSG Grieco sustained.

**The January 17, 2009 IED Attack In Kabul (Simone A. Robinson Family)**

1576.   On January 17, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "January 17, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 17, 2009 Attack.

1577.   The January 17, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1578.   **Sergeant Simone A. Robinson** served in Afghanistan as a member of the U.S. Army National Guard.  SGT Robinson was injured in the January 17, 2009 Attack.  SGT Robinson died on March 1, 2009 as a result of injuries sustained during the January 17, 2009 Attack.

1579.   SGT Robinson was a U.S. national at the time of the attack and her death.

1580.   Plaintiff Regina Byther is the mother of SGT Robinson and a U.S. national.

1581.   Plaintiff N.W., by and through her next friend Regina Byther, is the minor daughter of SGT Robinson. She is a U.S. national.

1582.   As a result of the January 17, 2009 Attack and SGT Robinson's injuries and death, each member of the Robinson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Robinson's society, companionship, and counsel.

1583.   As a result of the January 17, 2009 Attack, SGT Robinson was injured in her person and/or property.  The Plaintiff members of the Robinson Family are the survivors and/or heirs of SGT Robinson and are entitled to recover for the damages SGT Robinson sustained.

**The January 18, 2009 IED Attack In Kabul (Jesse W. Watson Family)**

1584.   On January 18, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "January 18, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 18, 2009 Attack.

1585.   The January 18, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1586.   **Specialist Jesse W. Watson** served in Afghanistan as a member of the U.S. Army. On January 18, 2009, SPC Watson was injured in the January 18, 2009 Attack.  The attack severely

wounded SPC Watson, who now suffers from PTSD, depressive disorder, and traumatic brain injury.  As a result of the January 18, 2009 Attack and his injuries, SPC Watson has experienced severe mental anguish and severe physical and emotional pain and suffering.

1587.   SPC Watson was a U.S. national at the time of the attack, and remains one today.

1588.   As a result of the January 18, 2009 Attack and SPC Watson's injuries, each member of the Watson Family has experienced severe mental anguish, emotional pain and suffering.

**The May 20, 2009 IED Attack In Kabul (Roslyn L. Schulte Family)**

1589.   On May 20, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "May 20, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 20, 2009 Attack.

1590.   The May 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1591.   **First Lieutenant Roslyn L. Schulte** served in Afghanistan as a member of the U.S. military serving in the U.S. Air Force.  1stLt Schulte was injured in the May 20, 2009 Attack. 1stLt Schulte died on May 20, 2009 as a result of injuries sustained during the Attack.

1592.   1stLt Schulte was a U.S. national at the time of the attack and her death.

1593.   Plaintiff Susie Schulte is the mother of 1stLt Schulte and a U.S. national.

1594.   Plaintiff Robert Schulte is the father of 1stLt Schulte and a U.S. national.

1595.   Plaintiff Todd Schulte is the brother of 1stLt Schulte, a U.S. national, and a resident of this District.

1596.   As a result of the May 20, 2009 Attack and 1stLt Schulte's injuries and death, each member of the Schulte Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1stLt Schulte's society, companionship, and counsel.

1597.   As a result of the May 20, 2009 Attack, 1stLt Schulte was injured in her person and/or property.  The Plaintiff members of the Schulte Family are the survivors and/or heirs of 1stLt Schulte and are entitled to recover for the damages 1stLt Schulte sustained.

**The May 26, 2009 Suicide Attack In Kapisa (Mark E. Stratton II Family)**

1598.   On May 26, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kapisa Province, Afghanistan ("May 26, 2009 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 26, 2009 Attack.

1599.   The May 26, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1600.   **Lieutenant Colonel Mark E. Stratton II** served in Afghanistan as a member of the U.S. military serving in the U.S. Air Force.  Lt Col Stratton was injured in the May 26, 2009 Attack.  Lt Col Stratton died on May 26, 2009 as a result of injuries sustained during the Attack.

1601.   Lt Col Stratton was a U.S. national at the time of the attack and his death.

1602.   Plaintiff Janice York is the mother of Lt Col Stratton II and a U.S. national.

1603.   Plaintiff Michael Stratton is the brother of Lt Col Stratton II and a U.S. national.

1604.   Plaintiff Deborah Young is the stepmother of Lt Col Stratton II and a U.S. national.  Ms. Young lived in the same household as Lt Col Stratton II for a substantial period of time and considered Lt Col Stratton II the functional equivalent of a biological son.

1605.   Plaintiff Steven Stratton is the brother of Lt Col Stratton II and a U.S. national.

1606.   Plaintiff Franklin Little is the brother of Lt Col Stratton II and a U.S. national.

1607.   As a result of the May 26, 2009 Attack and Lt Col Stratton's injuries and death, each member of the Stratton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Lt Col Stratton's society, companionship, and counsel.

1608.   As a result of the May 26, 2009 Attack, Lt Col Stratton was injured in his person and/or property.  The Plaintiff members of the Stratton Family are the survivors and/or heirs of Lt Col Stratton and are entitled to recover for the damages Lt Col Stratton sustained.

**The July 24, 2009 Complex Attack In Nuristan (Justin D. Coleman Family)**

1609.   On July 24, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Nuristan Province, Afghanistan (the "July 24, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 24, 2009 Attack.

1610.   The July 24, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1611.   **Specialist Justin D. Coleman** served in Afghanistan as a member of the U.S. Army. SPC Coleman was injured in the July 24, 2009 Attack.  SPC Coleman died on July 24, 2009 as a result of injuries sustained during the July 24, 2009 Attack.

1612.   SPC Coleman was a U.S. national at the time of the attack and his death.

1613.   Plaintiff Dean Coleman is the father of SPC Coleman and a U.S. national.

392

1614.   As a result of the July 24, 2009 Attack and SPC Coleman's injuries and death, each member of the Justin Dean Coleman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Coleman's society, companionship, and counsel.

1615.   As a result of the July 24, 2009 Attack, SPC Coleman was injured in his person and/or property.  The Plaintiff members of the Justin Dean Coleman Family are the survivors and/or heirs of SPC Coleman and are entitled to recover for the damages SPC Coleman sustained.

**The August 21, 2009 Complex Attack In Kunar (Matthew L. Ingram Family)**

1616.   On August 21, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving an IED and small arms fire in Kunar Province, Afghanistan (the "August 21, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.   Al-Qaeda planned and authorized the August 21, 2009 Attack.

1617.   The August 21, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1618.   **Sergeant Matthew L. Ingram** served in Afghanistan as a member of the U.S. Army.  SGT Ingram was injured in the August 21, 2009 Attack.  SGT Ingram died on August 21, 2009 as a result of injuries sustained during the August 21, 2009 Attack.

1619.   SGT Ingram was a U.S. national at the time of the attack and his death.

1620.   Plaintiff Holly Ingram is the widow of SGT Ingram and a U.S. national.

1621.   Plaintiff C.A.I., by and through her next friend Holly Ingram, is the minor daughter of SGT Ingram. She is a U.S. national.

1622.   As a result of the August 21, 2009 Attack and SGT Ingram's injuries and death, each member of the Ingram Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ingram's society, companionship, and counsel.

1623.   As a result of the August 21, 2009 Attack, SGT Ingram was injured in his person and/or property.  The Plaintiff members of the Ingram Family are the survivors and/or heirs of SGT Ingram and are entitled to recover for the damages SGT Ingram sustained.

**The September 30, 2009 Suicide Attack In Khost (Alex French IV Family)**

1624.   On September 30, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Khost Province, Afghanistan (the "September 30, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 30, 2009 Attack.

1625.   The September 30, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1626.   **Staff Sergeant Alex French IV** served in Afghanistan as a member of the U.S. Army National Guard.  SSG French was injured in the September 30, 2009 Attack.  SSG French died on September 30, 2009 as a result of injuries sustained during the September 30, 2009 Attack.

1627.   SSG French was a U.S. national at the time of the attack and his death.

1628.   Plaintiff Gwendolyn French is the mother of SSG French IV and a U.S. national.

1629.   Plaintiff Laquitta French is the sister of SSG French IV and a U.S. national.

1630.   Plaintiff Latoya French is the sister of SSG French IV and a U.S. national.

1631.   As a result of the September 30, 2009 Attack and SSG French's injuries and death, each member of the French Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG French's society, companionship, and counsel.

1632.   As a result of the September 30, 2009 Attack, SSG French was injured in his person and/or property.  The Plaintiff members of the French Family are the survivors and/or heirs of SSG French and are entitled to recover for the damages SSG French sustained.

**The October 16, 2009 IED Attack In Ghazni (Anthony G. Green Family)**

1633.   On October 16, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "October 16, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 16, 2009 Attack.

1634.   The October 16, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1635.   **Sergeant Anthony G. Green** served in Afghanistan as a member of the U.S. Army National Guard.  SGT Green was injured in the October 16, 2009 Attack.  SGT Green died on October 16, 2009 as a result of injuries sustained during the October 16, 2009 Attack.

1636.   SGT Green was a U.S. national at the time of the attack and his death.

1637.   Plaintiff Patricia Green is the mother of SGT Green and a U.S. national.

1638.   Plaintiff Almuth Green Jr. is the father of SGT Green and a U.S. national.

1639.   Plaintiff Jesse Green is the brother of SGT Green and a U.S. national.

1640.   As a result of the October 16, 2009 Attack and SGT Green's injuries and death, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Green's society, companionship, and counsel.

1641.   As a result of the October 16, 2009 Attack, SGT Green was injured in his person and/or property.  The Plaintiff members of the Green Family are the survivors and/or heirs of SGT Green and are entitled to recover for the damages SGT Green sustained.

**The October 25, 2009 IED Attack In Laghman (Brandon K. Steffey Family)**

1642.   On October 25, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "October 25, 2009 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 25, 2009 Attack.

1643.   The October 25, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1644.   **Specialist Brandon K. Steffey** served in Afghanistan as a member of the U.S. Army.  SPC Steffey was injured in the October 25, 2009 Attack.  SPC Steffey died on October 25, 2009 as a result of injuries sustained during the October 25, 2009 Attack.

1645.   SPC Steffey was a U.S. national at the time of the attack and his death.

1646.   Plaintiff Andrea Steffey is the widow of SPC Steffey and a U.S. national.

1647.   Plaintiff A.G.S., by and through her next friend Andrea E. Steffey, is the minor daughter of SPC Steffey. She is a U.S. national.

1648.   Plaintiff Rachel Humpf is the mother of SPC Steffey and a U.S. national.

1649.   Plaintiff Dennis Steffey is the father of SPC Steffey and a U.S. national.

1650.   Plaintiff Heather Jackson is the sister of SPC Steffey and a U.S. national.

1651.   Plaintiff David Humpf is the stepfather of SPC Steffey and a U.S. national.  Mr. Humpf lived in the same household as SPC Steffey for a substantial period of time and considered SPC Steffey the functional equivalent of a biological son.

1652.   As a result of the October 25, 2009 Attack and SPC Steffey's injuries and death, each member of the Steffey Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Steffey's society, companionship, and counsel.

1653.   As a result of the October 25, 2009 Attack, SPC Steffey was injured in his person and/or property.  The Plaintiff members of the Steffey Family are the survivors and/or heirs of SPC Steffey and are entitled to recover for the damages SPC Steffey sustained.

### The November 19, 2009 Suicide Attack In Zabul (John J. Cleaver Family)

1654.   On November 19, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Zabul Province, Afghanistan (the "November 19, 2009 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 19, 2009 Attack.

1655.   The November 19, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1656.   **Staff Sergeant John J. Cleaver** served in Afghanistan as a member of the U.S. Army. SSG Cleaver was injured in the November 19, 2009 Attack.  SSG Cleaver died on November 19, 2009 as a result of injuries sustained during the November 19, 2009 Attack.

1657.   SSG Cleaver was a U.S. national at the time of the attack and his death.

1658.   Plaintiff Kim Sola is the widow of SSG Cleaver and a U.S. national.

397

1659.   Plaintiff Collin Cleaver is the son of SSG Cleaver and a U.S. national.

1660.   Plaintiff Aidan Cleaver is the son of SSG Cleaver and a U.S. national.

1661.   As a result of the November 19, 2009 Attack and SSG Cleaver's injuries and death, each member of the Cleaver Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cleaver's society, companionship, and counsel.

1662.   As a result of the November 19, 2009 Attack, SSG Cleaver was injured in his person and/or property.  The Plaintiff members of the Cleaver Family are the survivors and/or heirs of SSG Cleaver and are entitled to recover for the damages SSG Cleaver sustained.

**The December 30, 2009 Suicide Attack In Khost (Dane C. Paresi, Harold Brown Jr., and Jeremy J. Wise Families)**

1663.   On December 30, 2009, a joint cell comprised of al-Qaeda (an FTO), the Taliban (including its Haqqani Network), and the Pakistani Taliban committed a suicide bombing attack in Khost Province, Afghanistan (the "December 30, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 30, 2009 Attack.

1664.   The December 30, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1665.   **Dane C. Paresi** worked in Afghanistan as a civilian government contractor working for Xe Services. Mr. Paresi was injured in the December 30, 2009 Attack.  Mr. Paresi died on December 30, 2009 as a result of injuries sustained during the December 30, 2009 Attack.

1666.   Mr. Paresi was a U.S. national at the time of the attack and his death.

1667.   Plaintiff Mindylou Paresi is the widow of Mr. Paresi and a U.S. national.

1668.   Plaintiff Elizabeth Paresi is the daughter of Mr. Paresi and a U.S. national.

1669.   Plaintiff Janet Paresi is the mother of Mr. Paresi and a U.S. national.

1670.   Plaintiff Terry Paresi is the brother of Mr. Paresi and a U.S. national.

1671.   Plaintiff Santina Cartisser is the sister of Mr. Paresi and a U.S. national.

1672.   Plaintiff Alexandra VandenBroek is the stepdaughter of Mr. Paresi and a U.S. national. Ms. VandernBroek lived in the same household as Mr. Paresi for a substantial period of time and considered Mr. Paresi the functional equivalent of a biological father.

1673.   As a result of the December 30, 2009 Attack and Mr. Paresi's injuries and death, each member of the Paresi Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Paresi's society, companionship, and counsel.

1674.   As a result of the December 30, 2009 Attack, Mr. Paresi was injured in his person and/or property.  The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for the damages Mr. Paresi sustained.

1675.   **Harold Brown Jr.** worked in Afghanistan as a civilian government contractor working for the CIA.  Mr. Brown was injured in the December 30, 2009 Attack.  Mr. Brown died on December 30, 2009 as a result of injuries sustained during the December 30, 2009 Attack.

1676.   Mr. Brown was a U.S. national at the time of the attack and his death.

1677.   Plaintiff Barbara Brown is the mother of Mr. Brown Jr. and a U.S. national.

1678.   Plaintiff Harold Brown Sr. is the father of Mr. Brown Jr. and a U.S. national.

1679.   Plaintiff Paula Rich is the sister of Mr. Brown Jr. and a U.S. national.

1680.   Plaintiff Regina Brown is the sister of Mr. Brown Jr. and a U.S. national.

1681.   As a result of the December 30, 2009 Attack and Mr. Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brown's society, companionship, and counsel.

1682.   As a result of the December 30, 2009 Attack, Mr. Brown was injured in his person and/or property.  The Plaintiff members of the Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for the damages Mr. Brown sustained.

1683.   **Jeremy J. Wise** worked in Afghanistan as a civilian government contractor working for Xe Services.  Mr. Wise was injured in the December 30, 2009 Attack.  Mr. Wise died on December 30, 2009 as a result of injuries sustained during the December 30, 2009 Attack.

1684.   Mr. Wise was a U.S. national at the time of the attack and his death.

1685.   Plaintiff Dana Bernhardt is the widow of Mr. Wise and a U.S. national.

1686.   Plaintiff Mary L. Wise is the mother of Mr. Wise and a U.S. national.

1687.   Plaintiff Mary H. Wise is the sister of Mr. Wise and a U.S. national.

1688.   Plaintiff Ethan Prusinski is the stepson of Mr. Wise and a U.S. national.  Mr. Prusinski lived in the same household as Mr. Wise for a substantial period of time and considered Mr. Wise the functional equivalent of a biological father.

1689.   As a result of the December 30, 2009 Attack and Mr. Wise's injuries and death, each member of the Wise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Wise's society, companionship, and counsel.

1690.   As a result of the December 30, 2009 Attack, Mr. Wise was injured in his person and/or property.  The Plaintiff members of the Wise Family are the survivors and/or heirs of Mr. Wise and are entitled to recover for the damages Mr. Wise sustained.

**The March 16, 2010 Suicide Attack In Helmand (Allen R. Thomas Family)**

1691.   On March 16, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bomb attack in Helmand Province, Afghanistan (the "March 16, 2010 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the March 16, 2010 Attack.

1692.   The March 16, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1693.   **Staff Sergeant Allen R. Thomas** served in Afghanistan as a member of the U.S. Army.  On March 16, 2010, SSG Thomas was severely injured in the March 16, 2010 Attack, which, among other things, took out his left lung, collapsed his right, left him with burns down his back and chest tubes to help him breath, as well as traumatic brain injury and post-traumatic stress disorder. After years of rehabilitation, SSG Thomas died by suicide during a PTSD episode on September 29, 2013 as a result of injuries sustained during the March 16, 2010 Attack.

1694.   SSG Thomas was a U.S. national at the time of the attack and his death.

1695.   Plaintiff Danica Thomas is the widow of SSG Thomas and a U.S. national.

1696.   Plaintiff L.T., by and through her next friend Danica Thomas, is the minor daughter of SSG Thomas. She is a U.S. national.

1697.   As a result of the March 16, 2010 Attack and SSG Thomas's injuries and death, each member of the Thomas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Thomas's society, companionship, and counsel.

1698.   As a result of the March 16, 2010 Attack, SSG Thomas was injured in his person and/or property.  The Plaintiff members of the Thomas Family are the survivors and/or heirs of SSG Thomas and are entitled to recover for the damages SSG Thomas sustained.

**The June 7, 2010 IED Attack In Kunar (Blaine E. Redding Family)**

1699.   On June 7, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "June 7, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 7, 2010 Attack.

1700.   The June 7, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1701.   **Specialist Blaine E. Redding** served in Afghanistan as a member of the U.S. Army. SPC Redding was injured in the June 7, 2010 Attack.  SPC Redding died on June 7, 2010 as a result of injuries sustained during the June 7, 2010 Attack.

1702.   SPC Redding was a U.S. national at the time of the attack and his death.

1703.   Plaintiff Blaine Redding is the father of SPC Redding and a U.S. national.

1704.   As a result of the June 7, 2010 Attack and SPC Redding's injuries and death, each member of the Redding Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Redding's society, companionship, and counsel.

1705.   As a result of the June 7, 2010 Attack, SPC Redding was injured in his person and/or property.  The Plaintiff members of the Redding Family are the survivors and/or heirs of SPC Redding and are entitled to recover for the damages SPC Redding sustained.

**The June 21, 2010 Suicide Attack In Kunar (Andrew R. Looney Family)**

1706.   On June 21, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bomb attack in Kunar Province, Afghanistan (the "June 21, 2010 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 21, 2010 Attack.

1707.   The June 21, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1708.   **Sergeant Andrew R. Looney** served in Afghanistan as a member of the U.S. Army.  SGT Looney was injured in the June 21, 2010 Attack.  SGT Looney died on June 21, 2010 as a result of injuries sustained during the June 21, 2010 Attack.

1709.   SGT Looney was a U.S. national at the time of the attack and his death.

1710.   Plaintiff Martha Looney is the mother of SGT Looney and a U.S. national.

1711.   As a result of the June 21, 2010 Attack and SGT Looney's injuries and death, each member of the Looney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Looney's society, companionship, and counsel.

1712.   As a result of the June 21, 2010 Attack, SGT Looney was injured in his person and/or property.  The Plaintiff members of the Looney Family are the survivors and/or heirs of SGT Looney and are entitled to recover for the damages SGT Looney sustained.

**The June 25, 2010 Complex Attack In Kunar (Jared C. Plunk Family)**

1713.   On June 25, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan (the "June 25, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's

provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 25, 2010 Attack.

1714.   The June 25, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1715.   **Specialist Jared C. Plunk** served in Afghanistan as a member of the U.S. military serving in the U.S. Army. SPC Plunk was injured in the June 25, 2010 Attack.  SPC Plunk died on June 25, 2010 as a result of injuries sustained during the June 25, 2010 Attack.

1716.   SPC Plunk was a U.S. national at the time of the attack and his death.

1717.   Plaintiff Glenda Willard is the mother of SPC Plunk and a U.S. national.

1718.   Plaintiff Michelle Hock is the sister of SPC Plunk and a U.S. national.

1719.   Plaintiff Jordan Plunk is the brother of SPC Plunk and a U.S. national.

1720.   Plaintiff Ranee Massoni is the sister of SPC Plunk and a U.S. national.

1721.   Plaintiff Dr. Justin Plunk is the brother of SPC Plunk and a U.S. national.

1722.   As a result of the June 25, 2010 Attack and SPC Plunk's injuries and death, each member of the Plunk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plunk's society, companionship, and counsel.

1723.   As a result of the June 25, 2010 Attack, SPC Plunk was injured in his person and/or property.  The Plaintiff members of the Plunk Family are the survivors and/or heirs of SPC Plunk and are entitled to recover for the damages SPC Plunk sustained.

### The July 10, 2010 Complex Attack In Kunar (Carlos J. Negron Sr. and Shaun M. Mittler Families)

1724.   On July 10, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving a rocket propelled grenade and small arms fire in Kunar Province, Afghanistan (the "July 10, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 10, 2010 Attack.

1725.   The July 10, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1726.   **Specialist Carlos J. Negron Sr.** served in Afghanistan as a member of the U.S. Army.  SPC Negron was injured in the July 10, 2010 Attack.  SPC Negron died on July 10, 2010 as a result of injuries sustained during the July 10, 2010 Attack.

1727.   SPC Negron was a U.S. national at the time of the attack and his death.

1728.   Plaintiff Marta Torres is the mother of SPC Negron Sr. and a U.S. national.

1729.   Plaintiff Gabriel Negron is the father of SPC Negron Sr. and a U.S. national.

1730.   Plaintiff Marvin Negron is the brother of SPC Negron Sr. and a U.S. national.

1731.   Plaintiff Jose Negron is the brother of SPC Negron Sr. and a U.S. national.

1732.   Plaintiff Maribel Negron is the sister of SPC Negron Sr. and a U.S. national.

1733.   As a result of the July 10, 2010 Attack and SPC Negron's injuries and death, each member of the Negron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Negron's society, companionship, and counsel.

1734.   As a result of the July 10, 2010 Attack, SPC Negron was injured in his person and/or property.  The Plaintiff members of the Negron Family are the survivors and/or heirs of SPC Negron and are entitled to recover for the damages SPC Negron sustained.

1735.   **Staff Sergeant Shaun M. Mittler** served in Afghanistan as a member of the U.S. Army.  SSG Mittler was injured in the July 10, 2010 Attack.  SSG Mittler died on July 10, 2010 as a result of injuries sustained during the July 10, 2010 Attack.

1736.   SSG Mittler was a U.S. national at the time of the attack and his death.

1737.   Plaintiff Cristine Mittler is the daughter of SSG Mittler and a U.S. national.

1738.   Plaintiff Joyce Turner is the mother of SSG Mittler and a U.S. national.

1739.   Plaintiff Terry Mittler is the father of SSG Mittler and a U.S. national.

1740.   Plaintiff Alexander Mittler is the brother of SSG Mittler and a U.S. national.

1741.   Plaintiff Misty Barclay is the sister of SSG Mittler and a U.S. national.

1742.   As a result of the July 10, 2010 Attack and SSG Mittler's injuries and death, each member of the Mittler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mittler's society, companionship, and counsel.

1743.   As a result of the July 10, 2010 Attack, SSG Mittler was injured in his person and/or property.  The Plaintiff members of the Mittler Family are the survivors and/or heirs of SSG Mittler and are entitled to recover for the damages SSG Mittler sustained.

**The August 17, 2010 IED Attack In Kunar (Benjamen G. Chisholm Family)**

1744.   On August 17, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "August 17, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 17, 2010 Attack.

1745.   The August 17, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1746.   **Private First Class Benjamen G. Chisholm** served in Afghanistan as a member of the U.S. Army.  PFC Chisholm was injured in the August 17, 2010 Attack.  PFC Chisholm died on August 17, 2010 as a result of injuries sustained during the August 17, 2010 Attack.

1747.   PFC Chisholm was a U.S. national at the time of the attack and his death.

1748.   Plaintiff Linda Reynolds is the mother of PFC Chisholm and a U.S. national.

1749.   Plaintiff Glenn Chisholm is the father of PFC Chisholm and a U.S. national.

1750.   Plaintiff Karma Chisholm is the stepmother of PFC Chisholm and a U.S. national.  Ms. Chisholm lived in the same household as PFC Chisholm for a substantial period of time and considered PFC Chisholm the functional equivalent of a biological son.

1751.   As a result of the August 17, 2010 Attack and PFC Chisholm's injuries and death, each member of the Chisholm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Chisholm's society, companionship, and counsel.

1752.   As a result of the August 17, 2010 Attack, PFC Chisholm was injured in his person and/or property.  The Plaintiff members of the Chisholm Family are the survivors and/or heirs of PFC Chisholm and are entitled to recover for the damages PFC Chisholm sustained.

**The October 4, 2010 IED Attack In Kabul (Karl A. Campbell Family)**

1753.   On October 4, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "October 4, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 4, 2010 Attack.

1754.   The October 4, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1755.   **Sergeant Karl A. Campbell** served in Afghanistan as a member of the U.S. Army. SGT Campbell was injured in the October 4, 2010 Attack.  SGT Campbell died on October 4, 2010 as a result of injuries sustained during the October 4, 2010 Attack.

1756.   SGT Campbell was a U.S. national at the time of the attack and his death.

1757.   Plaintiff Audrey Campbell is the mother of SGT Campbell and a U.S. national.

1758.   Plaintiff Arthur Campbell is the father of SGT Campbell and a U.S. national.

1759.   Plaintiff Tina Campbell is the sister of SGT Campbell and a U.S. national.

1760.   As a result of the October 4, 2010 Attack and SGT Campbell's injuries and death, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Campbell's society, companionship, and counsel.

1761.   As a result of the October 4, 2010 Attack, SGT Campbell was injured in his person and/or property.  The Plaintiff members of the Campbell Family are the survivors and/or heirs of SGT Campbell and are entitled to recover for the damages SGT Campbell sustained.

**The November 5, 2010 IED Attack In Ghazni (Blake D. Whipple Family)**

1762.   On November 5, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "November 5, 2010 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 5, 2010 Attack.

1763.   The November 5, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1764.   **Specialist Blake D. Whipple** served in Afghanistan as a member of the U.S. Army. SPC Whipple was injured in the November 5, 2010 Attack.  SPC Whipple died on November 5, 2010 as a result of injuries sustained during the November 5, 2010 Attack.

1765.   SPC Whipple was a U.S. national at the time of the attack and his death.

1766.   Plaintiff Kimberley Whipple is the mother of SPC Whipple and a U.S. national.

1767.   Plaintiff David Whipple is the father of SPC Whipple and a U.S. national.

1768.   Plaintiff Sean Whipple is the brother of SPC Whipple and a U.S. national.

1769.   Plaintiff Brian Clyburn is the brother of SPC Whipple and a U.S. national.

1770.   As a result of the November 5, 2010 Attack and SPC Whipple's injuries and death, each member of the Whipple Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Whipple's society, companionship, and counsel.

1771.   As a result of the November 5, 2010 Attack, SPC Whipple was injured in his person and/or property.  The Plaintiff members of the Whipple Family are the survivors and/or heirs of SPC Whipple and are entitled to recover for the damages SPC Whipple sustained.

**The December 5, 2010 Suicide Attack In Paktia (Nicholas J. Aleman Family)**

1772.   On December 5, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing insider attack in Paktia Province, Afghanistan (the "December 5, 2010 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 5, 2010 Attack.

1773.   The December 5, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1774.   **Sergeant Nicholas J. Aleman** served in Afghanistan as a member of the U.S. Marine Corps.  Sgt Aleman was injured in the December 5, 2010 Attack.  Sgt Aleman died on December 5, 2010 as a result of injuries sustained during the December 5, 2010 Attack.

1775.   Sgt Aleman was a U.S. national at the time of the attack and his death.

1776.   Plaintiff Jose Aleman is the father of Sgt Aleman and a U.S. national.

1777.   Plaintiff Stephanie Hager is the sister of Sgt Aleman and a U.S. national.

1778.   As a result of the December 5, 2010 Attack and Sgt Aleman's injuries and death, each member of the Aleman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Aleman's society, companionship, and counsel.

1779.   As a result of the December 5, 2010 Attack, Sgt Aleman was injured in his person and/or property.  The Plaintiff members of the Aleman Family are the survivors and/or heirs of Sgt Aleman and are entitled to recover for the damages Sgt Aleman sustained.

**The February 27, 2011 IED Attack In Ghazni (Kristopher J. Gould Family)**

1780.   On February 27, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "February 27, 2011 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 27, 2011 Attack.

1781.   The February 27, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1782.  **Sergeant Kristopher J. Gould** served in Afghanistan as a member of the U.S. Army. SGT Gould was injured in the February 27, 2011 Attack.  SGT Gould died on February 27, 2011 as a result of injuries sustained during the February 27, 2011 Attack.

1783.  SGT Gould was a U.S. national at the time of the attack and his death.

1784.  Plaintiff Ann Gould is the mother of SGT Gould and a U.S. national.

1785.  Plaintiff James Gould is the father of SGT Gould and a U.S. national.

1786.  Plaintiff Julianna Symkowiak is the sister of SGT Gould and a U.S. national.

1787.  As a result of the February 27, 2011 Attack and SGT Gould's injuries and death, each member of the Gould Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gould's society, companionship, and counsel.

1788.  As a result of the February 27, 2011 Attack, SGT Gould was injured in his person and/or property.  The Plaintiff members of the Gould Family are the survivors and/or heirs of SGT Gould and are entitled to recover for the damages SGT Gould sustained.

**The April 13, 2011 IED Attack In Laghman (Donald L. Nichols Family)**

1789.  On April 13, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "April 13, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 13, 2011 Attack.

1790.  The April 13, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1791.   **Specialist Donald L. Nichols** served in Afghanistan as a member of the U.S. Army National Guard.  SPC Nichols was injured in the April 13, 2011 Attack.  SPC Nichols died on April 13, 2011 as a result of injuries sustained during the April 13, 2011 Attack.

1792.   SPC Nichols was a U.S. national at the time of the attack and his death.

1793.   Plaintiff Roger Poock is the stepfather of SPC Nichols and a U.S. national.  Mr. Poock lived in the same household as SPC Nichols for a substantial period of time and considered SPC Nichols the functional equivalent of a biological son.

1794.   Plaintiff Becky Poock is the mother of SPC Nichols and a U.S. national.

1795.   As a result of the April 13, 2011 Attack and SPC Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

1796.   As a result of the April 13, 2011 Attack, SPC Nichols was injured in his person and/or property.  The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

**The April 16, 2011 Suicide Attack In Laghman (Charles L. Adkins Family)**

1797.   On April 16, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Laghman Province, Afghanistan (the "April 16, 2011 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 16, 2011 Attack.

1798.   The April 16, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1799.   **Sergeant First Class Charles L. Adkins** served in Afghanistan as a member of the U.S. Army.  SFC Adkins was injured in the April 16, 2011 Attack.  SFC Adkins died on April 16, 2011 as a result of injuries sustained during the April 16, 2011 Attack.

1800.   SFC Adkins was a U.S. national at the time of the attack and his death.

1801.   Plaintiff Sheila Good is the mother of SFC Adkins and a U.S. national.

1802.   Plaintiff Charles Adkins is the father of SFC Adkins and a U.S. national.

1803.   Plaintiff Velvet Adkins is the stepmother of SFC Adkins and a U.S. national.  Ms. Adkins lived in the same household as SFC Adkins for a substantial period of time and considered SFC Adkins the functional equivalent of a biological son.

1804.   As a result of the April 16, 2011 Attack and SFC Adkins's injuries and death, each member of the Charles Lewis Adkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adkins's society, companionship, and counsel.

1805.   As a result of the April 16, 2011 Attack, SFC Adkins was injured in his person and/or property.  The Plaintiff members of the Charles Lewis Adkins Family are the survivors and/or heirs of SFC Adkins and are entitled to recover for the damages SFC Adkins sustained.

**The June 4, 2011 IED Attack In Laghman (Brett P. Benton and Devin A. Snyder Families)**

1806.   On June 4, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "June 4, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 4, 2011 Attack.

1807.   The June 4, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1808.   **Brett P. Benton** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone.  Mr. Benton was injured in the June 4, 2011 Attack.  Mr. Benton died on June 4, 2011 as a result of injuries sustained during the June 4, 2011 Attack.

1809.   Mr. Benton was a U.S. national at the time of the attack and his death.

1810.   Plaintiff Bethany Benton is the widow of Mr. Benton and a U.S. national.

1811.   As a result of the June 4, 2011 Attack and Mr. Benton's injuries and death, each member of the Benton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Benton's society, companionship, and counsel.

1812.   As a result of the June 4, 2011 Attack, Mr. Benton was injured in his person and/or property.  The Plaintiff members of the Benton Family are the survivors and/or heirs of Mr. Benton and are entitled to recover for the damages Mr. Benton sustained.

1813.   **Sergeant Devin A. Snyder** served in Afghanistan as a member of the U.S. Army. SGT Snyder was injured in the June 4, 2011 Attack.  SGT Snyder died on June 4, 2011 as a result of injuries sustained during the June 4, 2011 Attack.

1814.   SGT Snyder was a U.S. national at the time of the attack and her death.

1815.   Plaintiff Dineen Snyder is the mother of SGT Snyder and a U.S. national.

1816.   Plaintiff Edward Snyder is the father of SGT Snyder and a U.S. national.

1817.   Plaintiff Natasha Snyder is the sister of SGT Snyder and a U.S. national.

1818.   Plaintiff Damien Snyder is the brother of SGT Snyder and a U.S. national.

1819.   As a result of the June 4, 2011 Attack and SGT Snyder's injuries and death, each member of the Snyder Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Snyder's society, companionship, and counsel.

1820.   As a result of the June 4, 2011 Attack, SGT Snyder was injured in her person and/or property.  The Plaintiff members of the Snyder Family are the survivors and/or heirs of SGT Snyder and are entitled to recover for the damages SGT Snyder sustained.

**The July 31, 2011 IED Attack In Kunar (William B. Gross Paniagua Family)**

1821.   On July 31, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "July 31, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 31, 2011 Attack.

1822.   The July 31, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1823.   **Sergeant William B. Gross Paniagua** served in Afghanistan as a member of the U.S. Army.  SGT Gross Paniagua was injured in the July 31, 2011 Attack.  SGT Gross Paniagua died on July 31, 2011 as a result of injuries sustained during the July 31, 2011 Attack.

1824.   SGT Gross Paniagua was a U.S. national at the time of the attack and his death.

1825.   Plaintiff Felicia Gross Paniagua is the foster sister and cousin of SGT Gross Paniagua and a U.S. national.  Ms. Gross Paniagua lived in the same household as SGT Gross Paniagua for a substantial period of time and considered SGT Gross Paniagua the functional equivalent of a biological brother.

1826.   Plaintiff Socorro Gross Paniagua is the mother of SGT Gross Paniagua and a U.S. national.

1827.   Plaintiff Carlos Gross Rios Sr. is the father of SGT Gross Paniagua and a U.S. national.

1828.   Plaintiff Carlos Gross Paniagua is the brother of SGT Gross Paniagua and a U.S. national.

1829.   As a result of the July 31, 2011 Attack and SGT Gross Paniagua's injuries and death, each member of the Gross Paniagua Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

1830.   As a result of the July 31, 2011 Attack, SGT Gross Paniagua was injured in his person and/or property.  The Plaintiff members of the Gross Paniagua Family are the survivors and/or heirs of SGT Gross Paniagua and are entitled to recover for the damages he sustained.

### The September 25, 2011 IED Attack In Laghman (Francisco J. Briseño-Alvarez Jr. Family)

1831.   On September 25, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "September 25, 2011 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 25, 2011 Attack.

1832.   The September 25, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1833.   **Specialist Francisco J. Briseño-Alvarez Jr.** served in Afghanistan as a member of the U.S. Army National Guard. SPC Briseño-Alvarez was injured in the September 25, 2011

Attack.  SPC Briseño-Alvarez died on September 25, 2011 as a result of injuries sustained during the September 25, 2011 Attack.

1834.   SPC Briseño-Alvarez was a U.S. Permanent Resident and a member of the U.S. armed forces at the time of the attack and his death.

1835.   Plaintiff Francisco Briseño Gutierrez is the father of SPC Briseño-Alvarez Jr. and a U.S. national.

1836.   Plaintiff Luis Briseño Alvarez is the brother of SPC Briseño-Alvarez Jr. and a U.S. national.

1837.   As a result of the September 25, 2011 Attack and SPC Briseño-Alvarez's injuries and death, each member of the Briseño-Alvarez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

1838.   As a result of the September 25, 2011 Attack, SPC Briseño-Alvarez was injured in his person and/or property.  The Plaintiff members of the Briseño-Alvarez Family are the survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages he sustained.

### The October 29, 2011 Suicide Attack In Kabul (David E. Cabrera, James M. Darrough, and Christopher R. Newman Families)

1839.   On October 29, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul Province, Afghanistan (the "October 29, 2011 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 29, 2011 Attack.

1840.   The October 29, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1841.   **Lieutenant Colonel David E. Cabrera** served in Afghanistan as a member of the U.S. Army.  LTC Cabrera was injured in the October 29, 2011 Attack.  LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the October 29, 2011 Attack.

1842.   LTC Cabrera was a U.S. national at the time of the attack and his death.

1843.   Plaintiff August Wildman is the widow of LTC Cabrera and a U.S. national.

1844.   Plaintiff M.G.C., by and through his next friend August Wildman, is the minor son of LTC Cabrera. He is a U.S. national.

1845.   Plaintiff R.X.C., by and through his next friend August Wildman, is the minor son of LTC Cabrera. He is a U.S. national.

1846.   Plaintiff Corbin Cabrera is the son of LTC Cabrera and a U.S. national.

1847.   Plaintiff Gillian Cabrera is the daughter of LTC Cabrera and a U.S. national.

1848.   Plaintiff Ronald Hopkins is the brother of LTC Cabrera and a U.S. national.

1849.   Plaintiff Suzanne Martinez is the sister of LTC Cabrera and a U.S. national.

1850.   Plaintiff JD Prosser is the sister of LTC Cabrera and a U.S. national.

1851.   Plaintiff Robert Cabrera is the foster father of LTC Cabrera and a U.S. national. Mr. Cabrera lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological son.

1852.   Plaintiff Daniel Cabrera is the foster brother of LTC Cabrera and a U.S. national. Mr. Cabrera lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother.

1853.   Plaintiff Gloria Trelfa is the foster sister of LTC Cabrera and a U.S. national.  Ms. Trelfa lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother.

1854.   As a result of the October 29, 2011 Attack and LTC Cabrera's injuries and death, each member of the Cabrera Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Cabrera's society, companionship, and counsel.

1855.   As a result of the October 29, 2011 Attack, LTC Cabrera was injured in his person and/or property.  The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

1856.   **Sergeant James M. Darrough** served in Afghanistan as a member of the U.S. Army.  SGT Darrough was injured in the October 29, 2011 Attack.  SGT Darrough died on October 29, 2011 as a result of injuries sustained during the October 29, 2011 Attack.

1857.   SGT Darrough was a U.S. national at the time of the attack and his death.

1858.   Plaintiff Robert Darrough is the father of SGT Darrough and a U.S. national.

1859.   Plaintiff Judith Darrough is the stepmother of SGT Darrough and a U.S. national.  Ms. Darrough lived in the same household as SGT Darrough for a substantial period of time and considered SGT Darrough the functional equivalent of a biological son.

1860.   As a result of the October 29, 2011 Attack and SGT Darrough's injuries and death, each member of the Darrough Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Darrough's society, companionship, and counsel.

1861.   As a result of the October 29, 2011 Attack, SGT Darrough was injured in his person and/or property.  The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

1862.  **Staff Sergeant Christopher R. Newman** served in Afghanistan as a member of the U.S. Army.  SSG Newman was injured in the October 29, 2011 Attack.  SSG Newman died on October 29, 2011 as a result of injuries sustained during the October 29, 2011 Attack.

1863.  SSG Newman was a U.S. national at the time of the attack and his death.

1864.  Plaintiff Donald Newman Sr. is the grandfather of SSG Newman and a U.S. national.  Mr. Newman lived in the same household as SSG Newman for a substantial period of time and considered SSG Newman the functional equivalent of a biological son.

1865.  Plaintiff Amanda Newman is the widow of SSG Newman and a U.S. national.

1866.  As a result of the October 29, 2011 Attack and SSG Newman's injuries and death, each member of the Newman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Newman's society, companionship, and counsel.

1867.  As a result of the October 29, 2011 Attack, SSG Newman was injured in his person and/or property.  The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

**The December 11, 2011 IED Attack In Kunar (Charles S. Ligon Family)**

1868.  On December 11, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "December 11, 2011 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 11, 2011 Attack.

1869.  The December 11, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1870.   **Specialist Charles S. Ligon** served in Afghanistan as a member of the U.S. Army. On December 11, 2011, SPC Ligon was injured in the December 11, 2011 Attack.  The attack severely wounded SPC Ligon, who lost his left leg above the knee, sustained shrapnel to the right leg with open tibia and fibula fractures, a left open eye globe rupture, left tympanic membrane rupture with traumatic brain injury, and peppering and burns to the left hand.  As a result of the December 11, 2011 Attack and his injuries, SPC Ligon has experienced severe mental anguish and severe physical and emotional pain and suffering.

1871.   SPC Ligon was a U.S. national at the time of the attack, and remains one today.

1872.   As a result of the December 11, 2011 Attack and SPC Ligon's injuries, each member of the Ligon Family has experienced severe mental anguish, emotional pain and suffering.

**The April 3, 2012 IED Attack In Kunar (Christopher L. Brown Family)**

1873.   On April 3, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "April 3, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 3, 2012 Attack.

1874.   The April 3, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1875.   **Staff Sergeant Christopher L. Brown** served in Afghanistan as a member of the U.S. Army.  SSG Brown was injured in the April 3, 2012 Attack.  SSG Brown died on April 3, 2012 as a result of injuries sustained during the April 3, 2012 Attack.

1876.   SSG Brown was a U.S. national at the time of the attack and his death.

1877.   Plaintiff Ariell Taylor is the widow of SSG Brown.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Brown's estate. She is a U.S. national.

1878.   As a result of the April 3, 2012 Attack and SSG Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Brown's society, companionship, and counsel.

1879.   As a result of the April 3, 2012 Attack, SSG Brown was injured in his person and/or property.  The Plaintiff members of the Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

### The April 4, 2012 Suicide Bombing Attack In Faryab (Nicholas J. Rozanski, Christopher J. Rosebrock, and David W.H. Lau Families)

1880.   On April 4, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bomb attack in Faryab Province, Afghanistan (the "April 4, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 4, 2012 Attack.

1881.   The April 4, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1882.   **Captain Nicholas J. Rozanski** served in Afghanistan as a member of the U.S. Army National Guard.  CPT Rozanski was injured in the April 4, 2012 Attack.  CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the April 4, 2012 Attack.

1883.   CPT Rozanski was a U.S. national at the time of the attack and his death.

1884.   Plaintiff Alex Rozanski is the brother of CPT Rozanski and a U.S. national.

1885.   As a result of the April 4, 2012 Attack and CPT Rozanski's injuries and death, each member of the Rozanski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Rozanski's society, companionship, and counsel.

1886.   As a result of the April 4, 2012 Attack, CPT Rozanski was injured in his person and/or property.  The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

1887.   **Captain Christopher J. Rosebrock** served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rosebrock was injured in the April 4, 2012 Attack. The attack severely wounded CPT Rosebrock, who suffered a shattered radius of the left arm, a concussion, blown eardrums, disfiguring shrapnel wounds, and traumatic brain injury.  As a result of the April 4, 2012 Attack and his injuries, CPT Rosebrock has experienced severe mental anguish and severe physical and emotional pain and suffering.

1888.   CPT Rosebrock was a U.S. national when attacked, and remains one today.

1889.   As a result of the April 4, 2012 Attack and CPT Rosebrock's injuries, each member of the Rosebrock Family has experienced severe mental anguish, emotional pain and suffering.

1890.   **Sergeant First Class David W.H. Lau** served in Afghanistan as a member of the U.S. Army National Guard.  On April 4, 2012, SFC Lau was injured in the April 4, 2012 Attack, which severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings.  As a result of the Attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

1891.   Plaintiff SFC Lau was a U.S. national when attacked, and remains one today.

1892.   Plaintiff Hamide Lau is the wife of SFC Lau and a U.S. national.

1893.   Plaintiff M.L., by and through her next friend David Lau, is the minor daughter of SFC Lau. She is a U.S. national.

1894.   Plaintiff K.L., by and through his next friend David Lau, is the minor son of SFC Lau. He is a U.S. national.

1895.   Plaintiff Alexander Lau is the son of SFC Lau and a U.S. national.

1896.   Plaintiff Vivian Perry is the mother of SFC Lau and a U.S. national.

1897.   Plaintiff Jammie Smith is the sister of SFC Lau and a U.S. national.

1898.   Plaintiff Michelle Rauschenberger is the sister of SFC Lau and a U.S. national.

1899.   Plaintiff Leroy Lau Jr. is the brother of SFC Lau and a U.S. national.

1900.   Plaintiff Holly Abraham is the sister of SFC Lau and a U.S. national.

1901.   As a result of the April 4, 2012 Attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

**The April 22, 2012 IED Attack In Ghazni (Michael J. Metcalf Family)**

1902.   On April 22, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "April 22, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 22, 2012 Attack.

1903.   The April 22, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1904.   **Private First Class Michael J. Metcalf** served in Afghanistan as a member of the U.S. Army.  PFC Metcalf was injured in the April 22, 2012 Attack.  PFC Metcalf died on April 22, 2012 as a result of injuries sustained during the April 22, 2012 Attack.

1905.   PFC Metcalf was a U.S. national at the time of the attack and his death.

1906.   Plaintiff Kimberly Metcalf is the mother of PFC Metcalf and a U.S. national.

1907.   Plaintiff Clarence Metcalf is the father of PFC Metcalf and a U.S. national.

1908.   As a result of the April 22, 2012 Attack and PFC Metcalf's injuries and death, each member of the Metcalf Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Metcalf's society, companionship, and counsel.

1909.   As a result of the April 22, 2012 Attack, PFC Metcalf was injured in his person and/or property.  The Plaintiff members of the Metcalf Family are the survivors and/or heirs of PFC Metcalf and are entitled to recover for the damages PFC Metcalf sustained.

**The May 7, 2012 IED Attack In Ghazni (Chase S. Marta and Jacob M. Schwallie Families)**

1910.   On May 7, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "May 7, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 7, 2012 Attack.

1911.   The May 7, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1912.   **Specialist Chase S. Marta** served in Afghanistan as a member of the U.S. Army. SPC Marta was injured in the May 7, 2012 Attack.  SPC Marta died on May 7, 2012 as a result of injuries sustained during the May 7, 2012 Attack.

1913.   SPC Marta was a U.S. national at the time of the attack and his death.

1914.   Plaintiff Karyn Stone is the mother of SPC Marta and a U.S. national.

1915.   Plaintiff Lawrence Marta is the father of SPC Marta and a U.S. national.

1916.   Plaintiff Taylor Marta is the sister of SPC Marta and a U.S. national.

1917.   As a result of the May 7, 2012 Attack and SPC Marta's injuries and death, each member of the Marta Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Marta's society, companionship, and counsel.

1918.   As a result of the May 7, 2012 Attack, SPC Marta was injured in his person and/or property.  The Plaintiff members of the Marta Family are the survivors and/or heirs of SPC Marta and are entitled to recover for the damages SPC Marta sustained.

1919.   **Sergeant Jacob M. Schwallie** served in Afghanistan as a member of the U.S. Army. SGT Schwallie was injured in the May 7, 2012 Attack.  SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the May 7, 2012 Attack.

1920.   SGT Schwallie was a U.S. national at the time of the attack and his death.

1921.   Plaintiff Sarah Schwallie is the mother of SGT Schwallie and a U.S. national.

1922.   Plaintiff Thomas Schwallie is the father of SGT Schwallie and a U.S. national.

1923.   As a result of the May 7, 2012 Attack and SGT Schwallie's injuries and death, each member of the Schwallie Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schwallie's society, companionship, and counsel.

1924.   As a result of the May 7, 2012 Attack, SGT Schwallie was injured in his person and/or property.  The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

**The May 20, 2012 Suicide Attack In Uruzgan (Ryan G. Timoney Family)**

1925.   On May 20, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Uruzgan Province, Afghanistan (the "May 20, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 20, 2012 Attack.

1926.   The May 20, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1927.   **Captain Ryan G. Timoney** served in Afghanistan as a member of the U.S. Army. On May 20, 2012, CPT Timoney was injured in the May 20, 2012 Attack.  The attack severely wounded CPT Timoney, who lost his left leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty.  As a result of the May 20, 2012 Attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

1928.   CPT Timoney was a U.S. national when attacked, and remains one today.

1929.   Plaintiff Diane Timoney is the mother of CPT Timoney and a U.S. national.

1930.   Plaintiff Gregory Timoney is the father of CPT Timoney and a U.S. national.

1931.   As a result of the May 20, 2012 Attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**The June 1, 2012 Complex Attack In Khost (Vincent J. Ellis Family)**

1932.   On June 1, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost Province, Afghanistan (the "June 1, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 1, 2012 Attack.

1933.   The June 1, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1934.   **Private First Class Vincent J. Ellis** served in Afghanistan as a member of the U.S. Army.  PFC Ellis was injured in the June 1, 2012 Attack.  PFC Ellis died on June 4, 2012 as a result of injuries sustained during the June 1, 2012 Attack.

1935.   PFC Ellis was a U.S. national at the time of the attack and his death.

1936.   Plaintiff Julie Ellis is the mother of PFC Ellis and a U.S. national.

1937.   Plaintiff Brian Ellis is the father of PFC Ellis and a U.S. national.

1938.   Plaintiff Vanessa Anzures is the sister of PFC Ellis and a U.S. national.

1939.   Plaintiff Victor Ellis is the brother of PFC Ellis and a U.S. national.

1940.   As a result of the June 1, 2012 Attack and PFC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Ellis's society, companionship, and counsel.

1941.   As a result of the June 1, 2012 Attack, PFC Ellis was injured in his person and/or property.  The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

428

**The July 8, 2012 IED Attack In Ghazni (Nathan J. Rimpf Family)**

1942.   On July 8, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "July 8, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 8, 2012 Attack.

1943.   The July 8, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1944.   **First Lieutenant Nathan J. Rimpf** served in Afghanistan as a member of the U.S. Army. On July 8, 2012, 1LT Rimpf was injured in the July 8, 2012 Attack, which severely wounded 1LT Rimpf, including loss of left leg below the knee and right leg above the knee, and partial paralysis of right scapula.  As a result of the July 8, 2012 Attack and his injuries, 1LT Rimpf has experienced severe mental anguish and severe physical and emotional pain and suffering.

1945.   1LT Rimpf was a U.S. national at the time of the attack, and remains one today.

**The August 8, 2012 Suicide Attack In Kunar (Kevin J. Griffin Family)**

1946.   On August 8, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kunar Province, Afghanistan (the "August 8, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 8, 2012 Attack.

1947.   The August 8, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1948.  **Command Sergeant Major Kevin J. Griffin** served in Afghanistan as a member of the U.S. Army.  CSM Griffin was injured in the August 8, 2012 Attack.  CSM Griffin died on August 8, 2012 as a result of injuries sustained during the August 8, 2012 Attack.

1949.  CSM Griffin was a U.S. national at the time of the attack and his death.

1950.  Plaintiff Sheila Ristaino is the sister of CSM Griffin and a U.S. national.

1951.  Plaintiff Shawn Griffin is the brother of CSM Griffin and a U.S. national.

1952.  Plaintiff Carol Griffin is the stepmother of CSM Griffin and a U.S. national. Ms. Griffin lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological son.

1953.  Plaintiff Daniel Griffin is the stepbrother of CSM Griffin and a U.S. national.  Mr. Griffin lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological brother.

1954.  Plaintiff Matt Griffin is the brother of CSM Griffin and a U.S. national.

1955.  As a result of the August 8, 2012 Attack and CSM Griffin's injuries and death, each member of the Griffin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CSM Griffin's society, companionship, and counsel.

1956.  As a result of the August 8, 2012 Attack, CSM Griffin was injured in his person and/or property.  The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

### The August 11, 2012 IED Attack in Helmand Province (Mark G. Worley Family)

1957.  On August 11, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Helmand Province, Afghanistan (the "August 11, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 11, 2012 Attack.

430

1958.   The August 11, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1959.   **Sergeant Mark G. Worley** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On August 11, 2012, SGT Worley was injured in an IED attack in Helmand Province.  The attack severely wounded SGT Worley, who Right BTK amputation, Nerve damage in left leg w/dropfoot, deep laceration to right forearm..  As a result of the August 11, 2012 Attack and his injuries, SGT Worley has experienced severe physical and emotional pain and suffering.

1960.   Plaintiff SGT Worley was a U.S. national at the time of the attack, and remains one to this day.

1961.   Plaintiff Mona Betzen is the mother of SGT Worley and a U.S. national.

1962.   Plaintiff Gregory Worley is the father of SGT Worley and a U.S. national.

1963.   Plaintiff James Worley is the brother of SGT Worley and a U.S. national.

1964.   Plaintiff Cody Worley is the brother of SGT Worley and a U.S. national.

1965.   As a result of the August 11, 2012 Attack and SGT Worley's injuries, each member of the Mark G. Worley Family has experienced severe mental anguish, emotional pain and suffering.

### The September 1, 2012 Complex Attack In Ghazni (Jeremie S. Border and Jonathan P. Schmidt Families)

1966.   On September 1, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan (the "September 1, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's

provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 1, 2012 Attack.

1967.   The September 1, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1968.   **Staff Sergeant Jeremie S. Border** served in Afghanistan as a member of the U.S. Army. SSG Border was injured in the September 1, 2012 Attack.  SSG Border died on September 1, 2012 as a result of injuries sustained during the September 1, 2012 Attack.

1969.   SSG Border was a U.S. national at the time of the attack and his death.

1970.   Plaintiff Mary Border is the mother of SSG Border and a U.S. national.

1971.   Plaintiff Katherine Abreu-Border is the sister of SSG Border and a U.S. national.

1972.   Plaintiff DeLaynie Peek is the sister of SSG Border and a U.S. national.

1973.   As a result of the September 1, 2012 Attack and SSG Border's injuries and death, each member of the Border Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Border's society, companionship, and counsel.

1974.   As a result of the September 1, 2012 Attack, SSG Border was injured in his person and/or property.  The Plaintiff members of the Border Family are the survivors and/or heirs of SSG Border and are entitled to recover for the damages SSG Border sustained.

1975.   **Staff Sergeant Jonathan P. Schmidt** served in Afghanistan as a member of the U.S. Army. SSG Schmidt was injured in the September 1, 2012 Attack.  SSG Schmidt died on September 1, 2012 as a result of injuries sustained during the September 1, 2012 Attack.

1976.   SSG Schmidt was a U.S. national at the time of the attack and his death.

1977.   Plaintiff Natalie Schmidt is the widow of SSG Schmidt and a U.S. national.

1978.   Plaintiff A.L.S., by and through his next friend Natalie Schmidt, is the minor son of SSG Schmidt. He is a U.S. national.

1979.   Plaintiff LeeAnn Schmidt is the mother of SSG Schmidt and a U.S. national.

1980.   Plaintiff Phillip Schmidt is the father of SSG Schmidt and a U.S. national.

1981.   Plaintiff Brandon Schmidt is the brother of SSG Schmidt and a U.S. national.

1982.   As a result of the September 1, 2012 attack and SSG Schmidt's injuries and death, each member of the Schmidt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schmidt's society, companionship, and counsel.

1983.   As a result of the September 1, 2012 attack, SSG Schmidt was injured in his person and/or property.  The Plaintiff members of the Schmidt Family are the survivors and/or heirs of SSG Schmidt and are entitled to recover for the damages SSG Schmidt sustained.

### The September 15, 2012 Complex Attack in Helmand Province (Bradley W. Atwell and Christopher K. Raible Families)

1984.   On September 15, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan (the "September 15, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 15, 2012 Attack.

1985.   The September 15, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1986.   **Sergeant Bradley W. Atwell** served in Afghanistan as a member of the U.S. military serving in the U.S. Marine Corps. Sgt Atwell was injured in the September 15, 2012 Attack. Sgt Atwell died on September 15, 2012 as a result of injuries sustained during the September 15, 2012 Attack.

1987.   Sgt Atwell was a U.S. national at the time of the attack and his death.

1988.   Plaintiff Cheryl Atwell is the mother of Sgt Atwell and a U.S. national.

1989.   Plaintiff Erin Riedel is the sister of Sgt Atwell and a U.S. national.

1990.   As a result of the September 15, 2012 attack and Sgt Atwell's injuries and death, each member of the Atwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Atwell's society, companionship, and counsel.

1991.   As a result of the September 15, 2012 attack, Sgt Atwell was injured in his person and/or property.  The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

1992.   **Lieutenant Colonel Christopher K. Raible** served in Afghanistan as a member of the U.S. military serving in the U.S. Marine Corps.  LtCol Raible was injured in the September 15, 2012 Attack.  LtCol Raible died on September 15, 2012 as a result of injuries sustained during the September 15, 2012 Attack.

1993.   LtCol Raible was a U.S. national at the time of the attack and his death.

1994.   Plaintiff Lona Gambone is the sister of LtCol Raible and a U.S. national.

1995.   As a result of the September 15, 2012 attack and LtCol Raible's injuries and death, each member of the Raible Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LtCol Raible's society, companionship, and counsel.

1996.   As a result of the September 15, 2012 attack, LtCol Raible was injured in his person and/or property.  The Plaintiff members of the Raible Family are the survivors and/or heirs of LtCol Raible and are entitled to recover for the damages LtCol Raible sustained.

1997.

**The September 26, 2012 Suicide Attack In Logar (Jonathan A. Gollnitz and Orion N. Sparks Families)**

1998.   On September 26, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Logar Province, Afghanistan (the "September 26, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 26, 2012 Attack.

1999.   The September 26, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2000.   **Sergeant Jonathan A. Gollnitz** served in Afghanistan as a member of the U.S. Army. SGT Gollnitz was injured in the September 26, 2012 Attack.  SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the September 26, 2012 Attack.

2001.   SGT Gollnitz was a U.S. national at the time of the attack and his death.

2002.   Plaintiff L.D., by and through his next friend Bridgett DeHoff, is the minor son of SGT Gollnitz. He is a U.S. national.

2003.   Plaintiff Kirk Gollnitz is the brother of SGT Gollnitz and a U.S. national.

2004.   Plaintiff Tyler Gollnitz is the brother of SGT Gollnitz and a U.S. national.

2005.   As a result of the September 26, 2012 Attack and SGT Gollnitz's injuries and death, each member of the Gollnitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gollnitz's society, companionship, and counsel.

2006.   As a result of the September 26, 2012 Attack, SGT Gollnitz was injured in his person and/or property.  The Plaintiff members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

2007.   **Staff Sergeant Orion N. Sparks** served in Afghanistan as a member of the U.S. Army.  SSG Sparks was injured in the September 26, 2012 Attack.  SSG Sparks died on September 26, 2012 as a result of injuries sustained during the September 26, 2012 Attack.

2008.   SSG Sparks was a U.S. national at the time of the attack and his death.

2009.   Plaintiff Jan Hurnblad Sparks is the mother of SSG Sparks and a U.S. national.

2010.   Plaintiff Garry Sparks is the father of SSG Sparks and a U.S. national.

2011.   Plaintiff Erik Sparks is the brother of SSG Sparks and a U.S. national.

2012.   Plaintiff Zachary Sparks is the brother of SSG Sparks and a U.S. national.

2013.   Plaintiff Jane Sparks is the stepmother of SSG Sparks and a U.S. national.  Ms. Sparks lived in the same household as SSG Sparks for a substantial period of time and considered SSG Sparks the functional equivalent of a biological son.

2014.   As a result of the September 26, 2012 Attack and SSG Sparks's injuries and death, each member of the Sparks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Sparks's society, companionship, and counsel.

2015.   As a result of the September 26, 2012 Attack, SSG Sparks was injured in his person and/or property.  The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

### The September 30, 2012 IED Attack in Kandahar Province (Cameron J. Stuart Family)

2016.   On September 30, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "September 30, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 30, 2012 Attack.

2017.   The September 30, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2018.   **Sergeant Cameron J. Stuart** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On September 30, 2012, SGT Stuart was injured in an IED attack in Kandahar Province.  The attack severely wounded SGT Stuart, who severe damage to his left leg, which required several reconstructive surgeries.  As a result of the September 30, 2012 Attack and his injuries, SGT Stuart has experienced severe physical and emotional pain and suffering.

2019.   Plaintiff SGT Stuart was a U.S. national at the time of the attack, and remains one to this day.

2020.   Plaintiff Katy Stuart is the wife of SGT Stuart and a U.S. national.

2021.   As a result of the September 30, 2012 Attack and SGT Stuart's injuries, each member of the Cameron J. Stuart Family has experienced severe mental anguish, emotional pain and suffering.

**The October 1, 2012 Suicide Attack In Khost (Jeremy F. Hardison Family)**

2022.   On October 1, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack by an individual wearing an Afghan police uniform in Khost Province, Afghanistan (the "October 1, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 1, 2012 Attack.

2023.   The October 1, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2024.   **Sergeant Jeremy F. Hardison** served in Afghanistan as a member of the U.S. Army National Guard. SGT Hardison was injured in the October 1, 2012 Attack.  SGT Hardison died on October 1, 2012 as a result of injuries sustained during the October 1, 2012 Attack.

2025.   SGT Hardison was a U.S. national at the time of the attack and his death.

2026.   Plaintiff Jerry Hardison is the father of SGT Hardison and a U.S. national.

2027.   Plaintiff Justina Hardison is the sister of SGT Hardison and a U.S. national.

2028.   As a result of the October 1, 2012 Attack and SGT Hardison's injuries and death, each member of the Hardison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hardison's society, companionship, and counsel.

2029.   As a result of the October 1, 2012 Attack, SGT Hardison was injured in his person and/or property.  The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

**The October 13, 2012 IED Attack in Zabul Province (Brittany B. Gordon Family)**

2030.   On October 13, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Zabul Province, Afghanistan (the "October 13, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 13, 2012 Attack.

2031.   The October 13, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2032.   **Specialist Brittany B. Gordon** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Gordon was injured in the October 13, 2012 Attack.  SPC Gordon died on October 13, 2012 as a result of injuries sustained during the October 13, 2012 Attack.

2033.   SPC Gordon was a U.S. national at the time of the attack and his death.

2034.   Plaintiff Cedric Gordon is the father of SPC Gordon and a U.S. national.

2035.   Plaintiff Adrian Sherrod is the brother of SPC Gordon and a U.S. national.

2036.   Plaintiff Conchetta Diaz is the sister of SPC Gordon and a U.S. national.

2037.   Plaintiff Cedric Gordon Sr. is the brother of SPC Gordon and a U.S. national.

2038.   As a result of the October 13, 2012 attack and SPC Gordon's injuries and death, each member of the Gordon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gordon's society, companionship, and counsel.

2039.   As a result of the October 13, 2012 attack, SPC Gordon was injured in his person and/or property.  The Plaintiff members of the Gordon Family are the survivors and/or heirs of SPC Gordon and are entitled to recover for the damages SPC Gordon sustained.

**The October 22, 2012 IED Attack in Kandahar Province (Edward W. Klein Family)**

2040.  On October 22, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 22, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 22, 2012 Attack.

2041.  The October 22, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2042.  **Major Edward W. Klein** served in Afghanistan as a member of the U.S. military serving in the U.S. Army. On October 22, 2012, MAJ Klein was injured in an IED attack in Kandahar Province.  The attack severely wounded MAJ Klein, who lost both legs above the knee, his right arm, and three fingers on his left hand.  As a result of the October 22, 2012 Attack and his injuries, MAJ Klein has experienced severe physical and emotional pain and suffering.

2043.  Plaintiff MAJ Klein was a U.S. national at the time of the attack, and remains one to this day.

**The November 3, 2012 IED Attack in Paktia Province (Ryan P. Jayne Family)**

2044.  On November 3, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Paktia Province, Afghanistan (the "November 3, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 3, 2012 Attack.

2045.  The November 3, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

440

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2046.   **Specialist Ryan P. Jayne** served in Afghanistan as a member of the U.S. military serving in the U.S. Army Reserve.  SPC Jayne was injured in the November 3, 2012 Attack.  SPC Jayne died on November 3, 2012 as a result of injuries sustained during the Attack.

2047.   SPC Jayne was a U.S. national at the time of the attack and his death.

2048.   Plaintiff Sherry Skeens is the mother of SPC Jayne and a U.S. national.

2049.   Plaintiff Paul Jayne is the father of SPC Jayne and a U.S. national.

2050.   Plaintiff Adam Jayne is the brother of SPC Jayne and a U.S. national.

2051.   Plaintiff Garrett Skeens is the brother of SPC Jayne and a U.S. national.

2052.   Plaintiff Ayzia Jayne is the sister of SPC Jayne and a U.S. national.

2053.   Plaintiff Z.R.S., by and through her next friend Kent Skeens, is the minor sister of SPC Jayne. She is a U.S. national.

2054.   Plaintiff Trent Skeens is the brother of SPC Jayne and a U.S. national.

2055.   Plaintiff Kent Skeens is the stepfather of SPC Jayne and a U.S. national. Mr. Skeens lived in the same household as SPC Jayne for a substantial period of time and considered SPC Jayne the functional equivalent of a biological son.

2056.   As a result of the November 3, 2012 attack and SPC Jayne's injuries and death, each member of the Jayne Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Jayne's society, companionship, and counsel.

2057.   As a result of the November 3, 2012 attack, SPC Jayne was injured in his person and/or property.  The Plaintiff members of the Jayne Family are the survivors and/or heirs of SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

### The November 16, 2012 Complex Attack in Paktika Province (Joseph A. Richardson Family)

2058.    On November 16, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving an IED and small arms fire in Paktika Province, Afghanistan (the "November 16, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 16, 2012 Attack.

2059.    The November 16, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2060.    **Sergeant Joseph A. Richardson** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SGT Richardson was injured in the November 16, 2012 Attack. SGT Richardson died on November 16, 2012 as a result of injuries sustained during the Attack.

2061.    SGT Richardson was a U.S. national at the time of the attack and his death.

2062.    Plaintiff Cassie Richardson is the sister of SGT Richardson and a U.S. national.

2063.    As a result of the November 16, 2012 attack and SGT Richardson's injuries and death, each member of the Richardson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Richardson's society, companionship, and counsel.

2064.    As a result of the November 16, 2012 attack, SGT Richardson was injured in his person and/or property.  The Plaintiff members of the Richardson Family are the survivors and/or heirs of SGT Richardson and are entitled to recover for the damages he sustained.

### The November 18, 2012 IED Attack in Helmand Province (Dale W. Means Family)

2065.   On November 18, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Helmand Province, Afghanistan (the "November 18, 2012 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 18, 2012 Attack.

2066.   The November 18, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2067.   **Lance Corporal Dale W. Means** served in Afghanistan as a member of the U.S. military serving in the U.S. Marine Corps.  LCpl Means was injured in the November 18, 2012 Attack.  LCpl Means died on November 18, 2012 as a result of injuries sustained during the November 18, 2012 Attack.

2068.   LCpl Means was a U.S. national at the time of the attack and his death.

2069.   Plaintiff John Means is the father of LCpl Means and a U.S. national.

2070.   As a result of the November 18, 2012 attack and LCpl Means's injuries and death, each member of the Means Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Means's society, companionship, and counsel.

2071.   As a result of the November 18, 2012 attack, LCpl Means was injured in his person and/or property.  The Plaintiff members of the Means Family are the survivors and/or heirs of LCpl Means and are entitled to recover for the damages LCpl Means sustained.

**The December 15, 2012 IED Attack In Kabul (Mark H. Schoonhoven Family)**

2072.   On December 15, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "December 15, 2012 Attack"),

which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 15, 2012 Attack.

2073.   The December 15, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2074.   **Staff Sergeant Mark H. Schoonhoven** served in Afghanistan as a member of the U.S. Army. SSG Schoonhoven was injured in the December 15, 2012 Attack.  SSG Schoonhoven died on January 20, 2013 as a result of injuries sustained during the December 15, 2012 Attack.

2075.   SSG Schoonhoven was a U.S. national at the time of the attack and his death.

2076.   Plaintiff Tammie Schoonhoven is the widow of SSG Schoonhoven and a U.S. national.

2077.   Plaintiff A.R.S., by and through her next friend Tammie Schoonhoven, is the minor daughter of SSG Schoonhoven. She is a U.S. national.

2078.   Plaintiff A.M.S., by and through her next friend Tammie Schoonhoven, is the minor daughter of SSG Schoonhoven. She is a U.S. national.

2079.   Plaintiff Deborah Schoonhoven is the mother of SSG Schoonhoven and a U.S. national.

2080.   Plaintiff Christopher Schoonhoven is the brother of SSG Schoonhoven and a U.S. national.

2081.   Plaintiff Sheeshta Perry is the stepdaughter of SSG Schoonhoven and a U.S. national.  Ms. Perry lived in the same household as SSG Schoonhoven for a substantial period of time and considered SSG Schoonhoven the functional equivalent of a biological father.

2082.   As a result of the December 15, 2012 Attack and SSG Schoonhoven's injuries and death, each member of the Schoonhoven Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

2083.   As a result of the December 15, 2012 Attack, SSG Schoonhoven was injured in his person and/or property.  The Plaintiff members of the Schoonhoven Family are the survivors and/or heirs of SSG Schoonhoven and are entitled to recover for the damages he sustained.

### The February 22, 2013 IED Attack in Helmand Province (Jonathan D. Davis Family)

2084.   On February 22, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Helmand Province, Afghanistan (the "February 22, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 22, 2013 Attack.

2085.   The February 22, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2086.   **Staff Sergeant Jonathan D. Davis** served in Afghanistan as a member of the U.S. military serving in the U.S. Marine Corps.  SSgt Davis was injured in the February 22, 2013 Attack. SSgt Davis died on February 22, 2013 as a result of injuries sustained during the Attack.

2087.   SSgt Davis was a U.S. national at the time of the attack and his death.

2088.   Plaintiff Helena Davis is the widow of SSgt Davis and a U.S. national.

2089.   Plaintiff C.D., by and through his next friend Helena Davis, is the minor son of SSgt Davis. He is a U.S. national.

2090.   As a result of the February 22, 2013 attack and SSgt Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Davis's society, companionship, and counsel.

2091.   As a result of the February 22, 2013 attack, SSgt Davis was injured in his person and/or property.  The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

**The April 6, 2013 Suicide Attack In Zabul (Anne T. Smedinghoff Family)**

2092.   On April 6, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Zabul Province, Afghanistan (the "April 6, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 6, 2013 Attack.

2093.   The April 6, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2094.   **Anne T. Smedinghoff** served in Afghanistan as a U.S. Foreign Service Officer working for the U.S. Department of State.

2095.   Ms. Smedinghoff was injured in the April 6, 2013 Attack.  Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the April 6, 2013 Attack.

2096.   Ms. Smedinghoff was a U.S. national at the time of the attack and her death.

2097.   Plaintiff Mary Smedinghoff is the mother of Ms. Smedinghoff and a U.S. national.

2098.   Plaintiff Thomas Smedinghoff is the father of Ms. Smedinghoff and a U.S. national.

2099.   Plaintiff Regina Smedinghoff is the sister of Ms. Smedinghoff and a U.S. national.

2100.   Plaintiff Joan Smedinghoff is the sister of Ms. Smedinghoff and a U.S. national.

2101.   Plaintiff Mark Smedinghoff is the brother of Ms. Smedinghoff and a U.S. national.

2102.   As a result of the April 6, 2013 Attack and Ms. Smedinghoff's injuries and death, each member of the Smedinghoff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Smedinghoff's society, companionship, and counsel.

2103.   As a result of the April 6, 2013 Attack, Ms. Smedinghoff was injured in her person and/or property.  The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages she sustained.

**The March 17, 2013 IED attack in Kandahar Province (Samuel R. Shockley Family)**

2104.   On March 17, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "March 17, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the March 17, 2013 Attack.

2105.   The March 17, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2106.   **Staff Sergeant Samuel R. Shockley** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On March 17, 2013, SSG Shockley was injured in an IED attack in Kandahar Province. The attack severely wounded SSG Shockley, who lost both legs above the knee, lost his middle finger and lost his index finger on his right hand, required a skin

graph on his right arm from his elbow to his wrist, and missing a testicle.  As a result of the March 17, 2013 Attack and his injuries, SSG Shockley has experienced severe physical and emotional pain and suffering.

2107.   Plaintiff SSG Shockley was a U.S. national when attacked, and remains so today.

2108.   As a result of the March 17, 2013 Attack and SSG Shockley's injuries, each Shockley Family member has experienced severe mental anguish, emotional pain and suffering.

### The May 4, 2013 IED Attack in Kandahar (Brandon J. Landrum, Brandon J. Prescott, Francis G. Phillips IV, Kevin Cardoza, and Thomas P. Murach Families)

2109.   On May 4, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 4, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 4, 2013 Attack.

2110.   The May 4, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2111.   **First Lieutenant Brandon J. Landrum** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  1LT Landrum was injured in the May 4, 2013 Attack. 1LT Landrum died on May 4, 2013 as a result of injuries sustained during the Attack.

2112.   1LT Landrum was a U.S. national at the time of the attack and his death.

2113.   Plaintiff Miranda Landrum is the widow of 1LT Landrum and a U.S. national.

2114.   Plaintiff G.B.L., by and through his next friend Miranda Landrum, is the minor son of 1LT Landrum. He is a U.S. national.

2115.   Plaintiff B.R.L., by and through her next friend Miranda Landrum, is the minor daughter of 1LT Landrum. She is a U.S. national.

2116.   Plaintiff Janet Landrum is the mother of 1LT Landrum and a U.S. national.

2117.   Plaintiff James Landrum is the father of 1LT Landrum and a U.S. national.

2118.   As a result of the May 4, 2013 attack and 1LT Landrum's injuries and death, each member of the Landrum Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Landrum's society, companionship, and counsel.

2119.   As a result of the May 4, 2013 attack, 1LT Landrum was injured in his person and/or property.  The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages he sustained.

2120.   **Specialist Brandon J. Prescott** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Prescott was injured in the May 4, 2013 Attack.  SPC Prescott died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack.

2121.   SPC Prescott was a U.S. national at the time of the attack and his death.

2122.   Plaintiff Tracey Prescott is the mother of SPC Prescott and a Canadian citizen residing in California.

2123.   Plaintiff Jacob Prescott is the brother of SPC Prescott and a U.S. national.

2124.   Plaintiff Aaron Prescott is the brother of SPC Prescott and a U.S. national.

2125.   Plaintiff Joshua Prescott is the brother of SPC Prescott and a U.S. national.

2126.   As a result of the May 4, 2013 attack and SPC Prescott's injuries and death, each member of the Prescott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Prescott's society, companionship, and counsel.

2127.   As a result of the May 4, 2013 attack, SPC Prescott was injured in his person and/or property.  The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

2128.   **Staff Sergeant Francis G. Phillips IV** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SSG Phillips was injured in the May 4, 2013 Attack.  SSG Phillips died on May 4, 2013 as a result of injuries sustained during the Attack.

2129.   SSG Phillips was a U.S. national at the time of the attack and his death.

2130.   Plaintiff Christine Phillips is the widow of SSG Phillips IV and a U.S. national.

2131.   Plaintiff S.N.P., by and through her next friend Christine Phillips, is the minor daughter of SSG Phillips IV. She is a U.S. national.

2132.   As a result of the May 4, 2013 attack and SSG Phillips's injuries and death, each member of the Phillips Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Phillips's society, companionship, and counsel.

2133.   As a result of the May 4, 2013 attack, SSG Phillips was injured in his person and/or property.  The Plaintiff members of the Phillips Family are the survivors and/or heirs of SSG Phillips and are entitled to recover for the damages SSG Phillips sustained.

2134.   **Specialist Kevin Cardoza** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Cardoza was injured in the May 4, 2013 Attack.  SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack.

2135.   SPC Cardoza was a U.S. national at the time of the attack and his death.

2136.   Plaintiff Maria Cardoza is the mother of SPC Cardoza and a U.S. national.

2137.   Plaintiff Ramiro Cardoza Sr. is the father of SPC Cardoza and a U.S. national.

2138.   Plaintiff Ramiro Cardoza Jr. is the brother of SPC Cardoza and a U.S. national.

2139.   As a result of the May 4, 2013 attack and SPC Cardoza's injuries and death, each member of the Cardoza Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Cardoza's society, companionship, and counsel.

2140.   As a result of the May 4, 2013 attack, SPC Cardoza was injured in his person and/or property.  The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and are entitled to recover for the damages SPC Cardoza sustained.

2141.   **Specialist Thomas P. Murach** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Murach was injured in the May 4, 2013 Attack.  SPC Murach died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack.

2142.   SPC Murach was a U.S. national at the time of the attack and his death.

2143.   Plaintiff Chet Murach is the father of SPC Murach and a U.S. national.

2144.   Plaintiff William Murach is the brother of SPC Murach and a U.S. national.

2145.   As a result of the May 4, 2013 attack and SPC Murach's injuries and death, each member of the Murach Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Murach's society, companionship, and counsel.

2146.   As a result of the May 4, 2013 attack, SPC Murach was injured in his person and/or property.  The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

### The May 14, 2013 IED Attack in Kandahar (Mitchell K. Daehling, William J. Gilbert, and Adam S. Hartswick Families)

2147.   On May 14, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 14, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 14, 2013 Attack.

2148.   The May 14, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2149.   **Specialist Mitchell K. Daehling** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Daehling was injured in the May 14, 2013 Attack.  SPC Daehling died on May 14, 2013 as a result of injuries sustained during the May 14, 2013 Attack.

2150.   SPC Daehling was a U.S. national at the time of the attack and his death.

2151.   Plaintiff Samantha McNamara is the widow of SPC Daehling and a U.S. national.

2152.   Plaintiff Brenda Daehling is the mother of SPC Daehling and a U.S. national.

2153.   Plaintiff Kirk Daehling is the father of SPC Daehling and a U.S. national.

2154.   Plaintiff Adam Daehling is the brother of SPC Daehling and a U.S. national.

2155.   Plaintiff Kayla Daehling is the sister of SPC Daehling and a U.S. national.

2156.   As a result of the May 14, 2013 attack and SPC Daehling's injuries and death, each member of the Daehling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Daehling's society, companionship, and counsel.

2157.   As a result of the May 14, 2013 attack, SPC Daehling was injured in his person and/or property.  The Plaintiff members of the Daehling Family are the survivors and/or heirs of SPC Daehling and are entitled to recover for the damages SPC Daehling sustained.

2158.   **Specialist William J. Gilbert** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Gilbert was injured in the May 14, 2013 Attack.  SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the May 14, 2013 Attack.

2159.   SPC Gilbert was a U.S. national at the time of the attack and his death.

2160.   Plaintiff Joanna Gilbert is the mother of SPC Gilbert and a U.S. national.

2161.   Plaintiff Jessica Benson is the sister of SPC Gilbert and a U.S. national.

2162.   As a result of the May 14, 2013 attack and SPC Gilbert's injuries and death, each member of the Gilbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilbert's society, companionship, and counsel.

2163.   As a result of the May 14, 2013 attack, SPC Gilbert was injured in his person and/or property.  The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

2164.   **Sergeant Adam S. Hartswick** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On May 14, 2013, SGT Hartswick was injured in an IED attack in Kandahar Province.  The attack severely wounded SGT Hartswick, who Double above-knee amputations, traumatic brain injury, Bilateral perforated eardrums, broken hip, amputation of right index finger, partial amputation right thumb, muscle avulsion right forearm.  As a result of the May 14, 2013 Attack and his injuries, SGT Hartswick has experienced severe physical and emotional pain and suffering.

2165.   Plaintiff SGT Hartswick was a U.S. national when attacked, and remains so today.

2166.   As a result of the May 14, 2013 Attack and SGT Hartswick's injuries, each Hartswick Family member has experienced severe mental anguish, emotional pain and suffering.

### The May 16, 2013 Suicide Attack In Kabul (Angel Roldan Jr. Family)

2167.   On May 16, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul, Afghanistan (the "May 16, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 16, 2013 Attack.

2168.   The May 16, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2169.   **Angel Roldan Jr.** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Roldan was injured in the May 16, 2013 Attack.  Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the May 16, 2013 Attack.

2170.   Mr. Roldan was a U.S. national at the time of the attack and his death.

2171.   Plaintiff Lieselotte Roldan is the widow of Mr. Roldan Jr. and a U.S. national.

2172.   Plaintiff Matthias Roldan is the son of Mr. Roldan Jr. and a U.S. national.

2173.   Plaintiff Angel Roldan is the son of Mr. Roldan Jr. and a U.S. national.

2174.   Plaintiff Samantha Roldan is the daughter of Mr. Roldan Jr. and a U.S. national.

2175.   As a result of the May 16, 2013 Attack and Mr. Roldan's injuries and death, each member of the Roldan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Roldan's society, companionship, and counsel.

2176.   As a result of the May 16, 2013 Attack, Mr. Roldan was injured in his person and/or property.  The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

### The June 2, 2013 an IED attack in Nimruz Province (Sean W. Mullen Family)

2177.   On June 2, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nimruz Province, Afghanistan (the "June 2, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 2, 2013 Attack.

2178.   The June 2, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2179.   **Warrant Officer Sean W. Mullen** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  WO1 Mullen was injured in the June 2, 2013 Attack.  WO1 Mullen died on June 2, 2013 as a result of injuries sustained during the Attack.

2180.   WO1 Mullen was a U.S. national at the time of the attack and his death.

2181.   Plaintiff Nancy Mullen is the widow of WO1 Mullen and a U.S. national.

2182.   Plaintiff Miriam Mullen is the mother of WO1 Mullen and a U.S. national.

2183.   Plaintiff William Mullen is the father of WO1 Mullen and a U.S. national.

2184.   As a result of the June 2, 2013 attack and WO1 Mullen's injuries and death, each member of the Mullen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of WO1 Mullen's society, companionship, and counsel.

2185.   As a result of the June 2, 2013 attack, WO1 Mullen was injured in his person and/or property.  The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.

**The June 23, 2013 IED Attack in Paktika (Brandon Korona Family)**

2186.   On June 23, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Paktika Province, Afghanistan (the "June 23, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 23, 2013 Attack.

2187.   The June 23, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2188.   **Sergeant Brandon Korona** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On June 23, 2013, SGT Korona was injured in an IED attack in Paktika Province.  The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below knee amputation in 2017, a fractured right ankle, and a traumatic brain injury.  As a result of the June 23, 2013 Attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

2189.   Plaintiff SGT Korona was a U.S. national when attacked, and remains one today.

2190.   As a result of the June 23, 2013 Attack and SGT Korona's injuries, each member of the Korona Family has experienced severe mental anguish, emotional pain and suffering.

### The July 23, 2013 IED Attack in Wardak (Nickolas S. Welch and Rob L. Nichols Families)

2191.   On July 23, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Wardak Province, Afghanistan (the "July 23, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 23, 2013 Attack.

2192.   The July 23, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2193.   **Specialist Nickolas S. Welch** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Welch was injured in the July 23, 2013 Attack.  SPC Welch died on August 6, 2013 as a result of injuries sustained during the July 23, 2013 Attack.

2194.   SPC Welch was a U.S. national at the time of the attack and his death.

2195.   Plaintiff Lorria Welch is the mother of SPC Welch and a U.S national.

2196.   Plaintiff Barry Welch is the father of SPC Welch and a U.S national

2197.   Plaintiff Zackary Welch is the brother of SPC Welch and a U.S national.

2198.   As a result of the July 23, 2013 attack and SPC Welch's injuries and death, each member of the Welch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Welch's society, companionship, and counsel.

2199.   As a result of the July 23, 2013 attack, SPC Welch was injured in his person and/or property.  The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

2200.   **Specialist Rob L. Nichols** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Nichols was injured in the July 23, 2013 Attack.  SPC Nichols died on July 23, 2013 as a result of injuries sustained during the July 23, 2013 Attack.

2201.   SPC Nichols was a U.S. national at the time of the attack and his death.

2202.   Plaintiff Bruce Nichols is the father of SPC Nichols and a U.S. national.

2203.   Plaintiff Jeanne Nichols is the stepmother of SPC Nichols and a U.S. national. Ms. Nichols lived in the same household as SPC Nichols for a substantial period of time and considered SPC Nichols the functional equivalent of a biological son.

2204.   Plaintiff M.N., by and through her next friend Bruce Nichols, is the minor sister of SPC Nichols. She is a U.S. national.

2205.   As a result of the July 23, 2013 attack and SPC Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

2206.   As a result of the July 23, 2013 attack, SPC Nichols was injured in his person and/or property.  The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

### The August 12, 2013 IED Attack in Logar (James T. Wickliff Chacin Family)

2207.   On August 12, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Logar Province, Afghanistan (the "August 12, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 12, 2013 Attack.

2208.   The August 12, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2209.   **Specialist James T. Wickliff Chacin** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Wickliff Chacin was injured in the August 12, 2013 Attack.  SPC Wickliff Chacin died on September 20, 2013 as a result of injuries sustained during the August 12, 2013 Attack.

2210.   SPC Wickliff Chacin was a U.S. national at the time of the attack and his death.

2211.   Plaintiff Martha Smith is the mother of SPC Wickliff Chacin and a U.S. national.

2212.   Plaintiff Thomas Wickliff is the father of SPC Wickliff Chacin and a U.S. national.

2213.   Plaintiff Michelle Rotelli is the sister of SPC Wickliff Chacin and a U.S. national.

2214.   As a result of the August 12, 2013 attack and SPC Wickliff Chacin's injuries and death, each Wickliff Chacin Family member has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Wickliff Chacin's society, companionship, and counsel.

2215.   As a result of the August 12, 2013 attack, SPC Wickliff Chacin was injured in his person and/or property.  The Plaintiff members of the Wickliff Chacin Family are the survivors and/or heirs of SPC Wickliff Chacin and are entitled to recover for the damages he sustained.

**The September 26, 2013 IED Attack in Wardak (Seth T. Wakeling Family)**

2216.   On September 26, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Wardak Province, Afghanistan (the "September 26, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.   Al-Qaeda planned and authorized the September 26, 2013 Attack.

2217.   The September 26, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2218.   **Specialist Seth T. Wakeling** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On September 26, 2013, SPC Wakeling was injured in the September 26, 2013 Attack, which severely wounded SPC Wakeling, including by causing the amputation of his left leg below the knee, and other severe injuries.  As a result of the Attack and his injuries, SPC Wakeling has experienced severe physical and emotional pain and suffering.

2219.   Plaintiff SPC Wakeling was a U.S. national when attacked, and remains so today.

2220.   Plaintiff Adriana Wakeling is the wife of SPC Wakeling and a U.S. national.

2221.  As a result of the September 26, 2013 Attack and SPC Wakeling's injuries, each Wakeling Family member has experienced severe mental anguish, emotional pain and suffering.

### The October 6, 2013 IED Attack in Kandahar (Cody J. Patterson and Joseph M. Peters Families)

2222.  On October 6, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 6, 2013 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 6, 2013 Attack.

2223.  The October 6, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2224.  **Specialist Cody J. Patterson** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Patterson was injured in the October 6, 2013 Attack.  SPC Patterson died on October 6, 2013 as a result of injuries sustained during the Attack.

2225.  SPC Patterson was a U.S. national at the time of the attack and his death.

2226.  Plaintiff Nancy Wilson is the mother of SPC Patterson and a U.S. national.

2227.  As a result of the October 6, 2013 attack and SPC Patterson's injuries and death, each member of the Patterson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Patterson's society, companionship, and counsel.

2228.  As a result of the October 6, 2013 attack, SPC Patterson was injured in his person and/or property.  The Plaintiff members of the Patterson Family are the survivors and/or heirs of SPC Patterson and are entitled to recover for the damages SPC Patterson sustained.

2229.   **Sergeant Joseph M. Peters** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SGT Peters was injured in the October 6, 2013 Attack.  SGT Peters died on October 6, 2013 as a result of injuries sustained during the Attack.

2230.   SGT Peters was a U.S. national at the time of the attack and his death.

2231.   Plaintiff Ashley Peters is the widow of SGT Peters and a U.S. national.

2232.   Plaintiff G.R.P., by and through his next friend Ashley Peters, is the minor son of SGT Peters. He is a U.S. national.

2233.   Plaintiff Deborah Peters is the mother of SGT Peters and a U.S. national.

2234.   Plaintiff Dennis Peters is the father of SGT Peters and a U.S. national.

2235.   As a result of the October 6, 2013 attack and SGT Peters's injuries and death, each member of the Peters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Peters's society, companionship, and counsel.

2236.   As a result of the October 6, 2013 attack, SGT Peters was injured in his person and/or property.  The Plaintiff members of the Peters Family are the survivors and/or heirs of SGT Peters and are entitled to recover for the damages SGT Peters sustained.

**The January 17, 2014 Complex Attack In Kabul (Alexis L. Kamerman Family)**

2237.   On January 17, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving a suicide bomber and gunmen in Kabul Province, Afghanistan (the "January 17, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 17, 2014 Attack.

2238.   The January 17, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2239.  **Alexis L. Kamerman** worked in Afghanistan as a civilian educator with American University of Afghanistan. Ms. Kamerman was injured in the January 17, 2014 Attack.  Ms. Kamerman died on January 17, 2014 as a result of injuries sustained during the Attack.

2240.  Ms. Kamerman was a U.S. national at the time of the attack and her death.

2241.  Plaintiff Alison Pohn is the mother of Ms. Kamerman and a U.S. national.

2242.  Plaintiff John McCarthy is the stepfather of Ms. Kamerman and a U.S. national. Mr. McCarthy lived in the same household as Ms. Kamerman for a substantial period of time and considered Ms. Kamerman the functional equivalent of a biological daughter.

2243.  As a result of the January 17, 2014 Attack and Ms. Kamerman's injuries and death, each member of the Kamerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Kamerman's society, companionship, and counsel.

2244.  As a result of the January 17, 2014 Attack, Ms. Kamerman was injured in her person and/or property.  The Plaintiff members of the Kamerman Family are the survivors and/or heirs of Ms. Kamerman and are entitled to recover for the damages Ms. Kamerman sustained.

### The February 10, 2014 IED Attack In Kabul (Michael A. Hughes and Paul E. Goins Jr. Families)

2245.  On February 10, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "February 10, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 10, 2014 Attack.

2246.  The February 10, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2247.  **Mr. Michael A. Hughes** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Hughes was injured in the February 10, 2014 Attack. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the Attack.

2248.  Mr. Hughes was a U.S. national at the time of the attack and his death.

2249.  Plaintiff Daniel Hughes is the brother of Mr. Hughes and a U.S. national.

2250.  Plaintiff Kristine Zitny is the sister of Mr. Hughes and a U.S. national.

2251.  Plaintiff Kathleen Alexander is the sister of Mr. Hughes and a U.S. national.

2252.  Plaintiff Patricia Hughes is the sister of Mr. Hughes and a U.S. national.

2253.  As a result of the February 10, 2014 Attack and Mr. Hughes's injuries and death, each member of the Michael Anthony Hughes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hughes's society, companionship, and counsel.

2254.  As a result of the February 10, 2014 Attack, Mr. Hughes was injured in his person and/or property.  The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

2255.  **Paul E. Goins Jr.** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Goins was injured in the February 10, 2014 Attack.  Mr. Goins died on February 10, 2014 as a result of injuries sustained during the February 10, 2014 Attack.

2256.  Mr. Goins was a U.S. national at the time of the attack and his death.

2257.  Plaintiff Patricia Goins is the widow of Mr. Goins Jr. and a U.S. national.

2258.  Plaintiff Paul Goins III is the son of Mr. Goins Jr. and a U.S. national.

2259.   Plaintiff Janice Caruso is the stepdaughter of Mr. Goins Jr. and a U.S. national. Ms. Caruso lived in the same household as Mr. Goins Jr. for a substantial period of time and considered Mr. Goins Jr. the functional equivalent of a biological father.

2260.   Plaintiff Dana Rainey is the stepdaughter of Mr. Goins Jr. and a U.S. national. Ms. Rainey lived in the same household as Mr. Goins Jr. for a substantial period of time and considered Mr. Goins Jr. the functional equivalent of a biological father.

2261.   Plaintiff Emmitt Burns is the stepson of Mr. Goins Jr. and a U.S. national. Mr. Burns lived in the same household as Mr. Goins Jr. for a substantial period of time and considered Mr. Goins Jr. the functional equivalent of a biological father.

2262.   As a result of the February 10, 2014 Attack and Mr. Goins's injuries and death, each member of the Goins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Goins's society, companionship, and counsel.

2263.   As a result of the February 10, 2014 Attack, Mr. Goins was injured in his person and/or property.  The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

### The February 15, 2014 Complex Attack in Helmand Province (Aaron C. Torian Family)

2264.   On February 15, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving an IED and small arms fire in Helmand Province, Afghanistan (the "February 15, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 15, 2014 Attack.

2265.   The February 15, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2266.   **Master Sergeant Aaron C. Torian** served in Afghanistan as a member of the U.S. military serving in the U.S. Marine Corps.  MSgt Torian was injured in the February 15, 2014 Attack.  MSgt Torian died on February 15, 2014 as a result of his injuries from the Attack.

2267.   MSgt Torian was a U.S. national at the time of the attack and his death.

2268.   Plaintiff Esta Smith is the mother of MSgt Torian and a U.S. national.

2269.   Plaintiff Joe Torian is the father of MSgt Torian and a U.S. national.

2270.   Plaintiff Nathan Torian is the brother of MSgt Torian and a U.S. national.

2271.   Plaintiff Jimmy Smith is the stepfather of MSgt Torian and a U.S. national. Mr. Smith lived in the same household as MSgt Torian for a substantial period of time and considered MSgt Torian the functional equivalent of a biological son.

2272.   Plaintiff Emily Torian is the sister of MSgt Torian and a U.S. national.

2273.   As a result of the February 15, 2014 attack and MSgt Torian's injuries and death, each member of the Torian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Torian's society, companionship, and counsel.

2274.   As a result of the February 15, 2014 attack, MSgt Torian was injured in his person and/or property.  The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

**The August 12, 2014 IED Attack in Kandahar (Alberto D. Diaz Family)**

2275.   On August 12, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 12, 2014 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 12, 2014 Attack.

2276.   The August 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2277.   **Specialist Alberto D. Diaz** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  On August 12, 2014, SPC Diaz was injured in an IED attack in Kandahar Province.  The attack severely wounded SPC Diaz, who suffered severe brain injuries and facial damage requiring complete right side facial reconstruction, and also suffers from PTSD, chronic fatigue syndrome, chronic pain, social anxiety, panic attacks, hearing loss and tremors.  As a result of the August 12, 2014 Attack and his injuries, SPC Diaz has experienced severe physical and emotional pain and suffering.

2278.   Plaintiff SPC Diaz was a U.S. national when attack, and remains one today.

2279.   Plaintiff Kayla Diaz is the wife of SPC Diaz and a U.S. national.

2280.   Plaintiff N.J.D., by and through his next friend Kayla Diaz, is the minor son of SPC Diaz. He is a U.S. national.

2281.   Plaintiff N.J.D., by and through her next friend Kayla Diaz, is the minor daughter of SPC Diaz. She is a U.S. national.

2282.   Plaintiff Frances Diaz is the mother of SPC Diaz and a U.S. national.

2283.   Plaintiff Maximo Diaz is the father of SPC Diaz and a U.S. national.

2284.   Plaintiff Anthony Diaz is the brother of SPC Diaz and a U.S. national.

2285.   Plaintiff Matthew Diaz is the brother of SPC Diaz and a U.S. national.

2286.   As a result of the August 12, 2014 Attack and SPC Diaz's injuries, each member of the Diaz Family has experienced severe mental anguish, emotional pain and suffering.

**The August 24, 2014 Suicide Attack In Nangarhar (Carey G. Duval Family)**

2287.   On August 24, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Nangarhar Province, Afghanistan (the "August 24, 2014 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 24, 2014 Attack.

2288.   The August 24, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2289.   **Captain Carey G. DuVal** served in Afghanistan as a member of the U.S. Army. On August 24, 2014, CPT DuVal was injured in the August 24, 2014 Attack.  The attack severely wounded CPT DuVal, who suffered an amputation of his right hand, broken right ulna, elbow, humerus, broken right femur, and a loss of 20% of his right quadricep.  As a result of the August 24, 2014 Attack and his injuries, CPT DuVal has experienced severe mental anguish and severe physical and emotional pain and suffering.

2290.   Plaintiff CPT DuVal was a U.S. national when attacked, and remains one today.

**The November 24, 2014 IED Attack In Kabul (Joseph W. Riley Family)**

2291.   On November 24, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a vehicle-borne IED attack in Kabul Province, Afghanistan (the "November 24, 2014 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 24, 2014 Attack.

2292.   The November 24, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2293.   **Specialist Joseph W. Riley** served in Afghanistan as a member of the U.S. Army. SPC Riley was injured in the November 24, 2014 Attack.  SPC Riley died on November 24, 2014 as a result of injuries sustained during the November 24, 2014 Attack.

2294.   SPC Riley was a U.S. national at the time of the attack and his death.

2295.   Plaintiff Michelle Riley is the mother of SPC Riley and a U.S. national.

2296.   Plaintiff Rodney Riley is the father of SPC Riley and a U.S. national.

2297.   As a result of the November 24, 2014 Attack and SPC Riley's injuries and death, each member of the Riley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Riley's society, companionship, and counsel.

2298.   As a result of the November 24, 2014 Attack, SPC Riley was injured in his person and/or property.  The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

**The December 12, 2014 IED Attack in Parwan (Wyatt J. Martin Family)**

2299.   On December 12, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a command wire-detonated IED attack in Parwan Province, Afghanistan (the "December 12, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 12, 2014 Attack.

2300.   The December 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2301.   **Specialist Wyatt J. Martin** served in Afghanistan as a member of the U.S. military serving in the U.S. Army.  SPC Martin was injured in the December 12, 2014 Attack.  SPC Martin died on December 12, 2014 as a result of injuries sustained during the Attack.

2302.   SPC Martin was a U.S. national at the time of the attack and his death.

2303.   Plaintiff Julie Martin is the mother of SPC Martin and a U.S. national.

2304.   Plaintiff Brian Martin is the father of SPC Martin and a U.S. national.

2305.   Plaintiff Catherine Martin is the sister of SPC Martin and a U.S. national.

2306.   Plaintiff Elizabeth Martin is the sister of SPC Martin and a U.S. national.

2307.   As a result of the December 12, 2014 Attack and SPC Martin's injuries and death, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Martin's society, companionship, and counsel.

2308.   As a result of the December 12, 2014 Attack, SPC Martin was injured in his person and/or property.  The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

### The August 22, 2015 Suicide Attack In Kabul (Corey J. Dodge, Richard P. McEvoy, and Barry D. Sutton Families)

2309.   On August 22, 2015, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul Province, Afghanistan (the "August 22, 2015 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 22, 2015 Attack.

2310.   The August 22, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2311.  **Corey J. Dodge** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone. Mr. Dodge was injured in the August 22, 2015 Attack.  Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

2312.  Mr. Dodge was a U.S. national at the time of the attack and his death.

2313.  Plaintiff Kelli Dodge is the widow of Mr. Dodge and a U.S. national.

2314.  Plaintiff B.C.D., by and through his next friend Kelli Dodge, is the minor son of Mr. Dodge. He is a U.S. national.

2315.  Plaintiff P.A.D., by and through her next friend Kelli Dodge, is the minor daughter of Mr. Dodge. She is a U.S. national.

2316.  As a result of the August 22, 2015 Attack and Mr. Dodge's injuries and death, each member of the Dodge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Dodge's society, companionship, and counsel.

2317.  As a result of the August 22, 2015 Attack, Mr. Dodge was injured in his person and/or property.  The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

2318.  **Richard P. McEvoy** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  Mr. McEvoy was injured in the August 22, 2015 Attack.  Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

2319.  Mr. McEvoy was a U.S. national at the time of the attack and his death.

2320.  Plaintiff Kathleen McEvoy is the widow of Mr. McEvoy and a U.S. national.

2321.  Plaintiff Patrick McEvoy is the son of Mr. McEvoy and a U.S. national.

2322.  Plaintiff Michelle McEvoy is the daughter of Mr. McEvoy and a U.S. national.

2323.  Plaintiff Janice Proctor is the mother of Mr. McEvoy and a U.S. national.

2324.   Plaintiff Luann Varney is the sister of Mr. McEvoy and a U.S. national.

2325.   As a result of the August 22, 2015 Attack and Mr. McEvoy's injuries and death, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. McEvoy's society, companionship, and counsel.

2326.   As a result of the August 22, 2015 Attack, Mr. McEvoy was injured in his person and/or property.  The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

2327.   **Barry D. Sutton** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone. Mr. Sutton was injured in the August 22, 2015 Attack.  Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

2328.   Mr. Sutton was a U.S. national at the time of the attack and his death.

2329.   Plaintiff Summer Sutton is the daughter of Mr. Sutton and a U.S. national.

2330.   Plaintiff Erin Goss is the daughter of Mr. Sutton and a U.S. national.

2331.   Plaintiff Harriet Sutton is the mother of Mr. Sutton and a U.S. national.

2332.   Plaintiff Wendy Shedd is the sister of Mr. Sutton and a U.S. national.

2333.   Plaintiff Trecia Hood is the sister of Mr. Sutton and a U.S. national.

2334.   Plaintiff Freddie Sutton is the brother of Mr. Sutton and a U.S. national.

2335.   As a result of the August 22, 2015 Attack and Mr. Sutton's injuries and death, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sutton's society, companionship, and counsel.

2336.   As a result of the August 22, 2015 Attack, Mr. Sutton was injured in his person and/or property.  The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

**The December 21, 2015 Suicide Attack In Parwan (Chester J. McBride III Family)**

2337.   On December 21, 2015, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Parwan Province, Afghanistan (the "December 21, 2015 Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 21, 2015 Attack.

2338.   The December 21, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2339.   **Staff Sergeant Chester J. McBride III** served in Afghanistan as a member of the U.S. military serving in the U.S. Air Force.  SSgt McBride was injured in the December 21, 2015 Attack.  SSgt McBride died on December 21, 2015 as a result of injuries sustained during the December 21, 2015 Attack.

2340.   SSgt McBride was a U.S. national at the time of the attack and his death.

2341.   Plaintiff Annie McBride is the mother of SSgt McBride III and a U.S. national.

2342.   Plaintiff Chester McBride Sr. is the father of SSgt McBride III and a U.S. national.

2343.   As a result of the December 21, 2015 Attack and SSgt McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt McBride's society, companionship, and counsel.

2344.   As a result of the December 21, 2015 Attack, SSgt McBride was injured in his person and/or property.  The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

**The January 5, 2016 Complex Attack in Helmand (Matthew Q. McClintock Family)**

2345.   On January 5, 2016, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire in Helmand Province, Afghanistan (the "January 5, 2016 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 5, 2016 Attack.

2346.   The January 5, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2347.   **Sergeant First Class Matthew Q. McClintock** served in Afghanistan as a member of the U.S. military serving in the U.S. Army National Guard.  SFC McClintock was injured in the January 5, 2016 Attack.  SFC McClintock died on January 5, 2016 as a result of injuries sustained during the January 5, 2016 Attack.

2348.   SFC McClintock was a U.S. national at the time of the attack and his death.

2349.   Plaintiff Alexandra McClintock is the widow of SFC McClintock and a U.S. national.

2350.   Plaintiff D.C.M., by and through his next friend Alexandra McClintock, is the minor son of SFC McClintock. He is a U.S. national.

2351.   Plaintiff Joyce Paulsen is the mother of SFC McClintock and a U.S. national.

2352.   Plaintiff George McClintock III is the father of SFC McClintock and a U.S. national.

2353.   As a result of the January 5, 2016 Attack and SFC McClintock's injuries and death, each member of the McClintock Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC McClintock's society, companionship, and counsel.

2354.   As a result of the January 5, 2016 Attack, SFC McClintock was injured in his person and/or property.  The Plaintiff members of the McClintock Family are the survivors and/or heirs of SFC McClintock and are entitled to recover for the damages he sustained.

### The August 7, 2016 Kidnapping, Subsequent Hostage Taking, And Torture in Kabul Province and Pakistan (Kevin King Family)

2355.   On August 7, 2016, a joint cell comprised of FTOs, al-Qaeda and the Haqqani Network, acting together as the Kabul Attack Network, committed a kidnapping at gunpoint in Kabul Province, Afghanistan (the "King Kidnapping Attack"), which was facilitated by AQI's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the King Kidnapping Attack.

2356.   The King Kidnapping Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2357.   **Kevin King** served in Afghanistan as a civilian professor teaching at American University of Afghanistan.  On August 7, 2016, Mr. King was injured in a kidnapping at gunpoint attack in Kabul Province, and he was held hostage for years thereafter. The King Kidnapping Attack severely wounded Mr. King, who was tortured, beaten, malnourished, and experienced a broad range of life-altering ailments thereafter, which injuries were caused by the repeated torture and beatings Mr. King sustained at the hands of Sirajuddin Haqqani's personal terrorist henchmen

from the Haqqani Network. As a result of the King Kidnapping Attack and his injuries, Mr. King

has experienced severe physical and emotional pain and suffering.

2358.   Plaintiff King was a U.S. national when attacked, and remains one to this day.

2359.   Plaintiff Stephanie Miller is the sister of Mr. King and a U.S. national.

2360.   As a result of the King Kidnapping Attack and Mr. King's injuries, each member

of the King Family has experienced severe mental anguish, emotional pain and suffering.

## CLAIMS FOR RELIEF

### COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
[All Defendants:  Aiding-And-Abetting Liability, Attack Predicate]

2361.   Plaintiffs incorporate their factual allegations above.

2362.   The terrorist attacks that killed or injured Plaintiffs or their family members were

acts of international terrorism committed by al-Qaeda and al-Qaeda-in-Iraq or Islamic State.

2363.   The terrorist attacks committed by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State,

which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous

to human life that violated the criminal laws of the United States and many States, or would have

violated those laws had they been committed within the jurisdiction of the United States or of the

States.  In particular, each attack constituted one or more of murder, attempted murder,

conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of

U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and

attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S.

government property, killing U.S. nationals abroad, use of weapons of mass destruction,

commission of acts of terrorism transcending national boundaries, and bombing places of public

use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a,

2332b, and 2332f, respectively.

2364.   Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq, Afghanistan, and Syria, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraqi, then-existing Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, then-existing Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2365.   Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

2366.   Defendants aided and abetted and knowingly provided substantial assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – and aided and abetted and knowingly provided substantial assistance to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's attacks on Plaintiffs – by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed those attacks, and, by obstructing United States counterterrorism policy by fraudulently concealing their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for fifteen years.

2367.   The terrorist attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by al-Qaeda, al-Qaeda-in-Iraq, and/or Islamic State which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, 2004, and 2004, respectively.

2368.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by al-Qaeda, al-Qaeda-in-Iraq, and/or Islamic State.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2369.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are

entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

2370.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a

trial by jury on all issues so triable.

## PRAYER FOR RELIEF

2371.   Plaintiffs request that the Court:

(a)   Enter judgment against Defendants finding them jointly and severally liable under

the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)   Award Plaintiffs compensatory and punitive damages to the maximum extent

permitted by law, and treble any compensatory damages awarded under the Anti-

Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to

18 U.S.C. § 2333(a);

(d)   Award Plaintiffs prejudgment interest; and

(e)   Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  August 4, 2022

                                                 Respectfully submitted,

                                                 */s/ Ryan R. Sparacino*

                                                 Ryan R. Sparacino (D.C. Bar No. 493700)
                                                 Geoffrey P. Eaton (D.C. Bar No. 473927)
                                                 Eli J. Kay-Oliphant (D.C. Bar No. 503235)
                                                 Tejinder Singh (D.C. Bar No. 1012396)
                                                 Shuman Sohrn (*Pro Hac Vice* Pending)
                                                 SPARACINO PLLC
                                                 1920 L Street, NW, Suite 835
                                                 Washington, D.C. 20036
                                                 Tel: (202) 629-3530
                                                 ryan.sparacino@sparacinopllc.com
                                                 geoff.eaton@sparacinopllc.com
                                                 eli.kay-oliphant@sparacinopllc.com
                                                 tejinder.singh@sparacinopllc.com
                                                 shuman.sohrn@sparacinopllc.com

                                                 *Counsel for Plaintiffs*