Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK SCHMITZ, SUZANNE SCHMITZ, CAMERON SCHMITZ, E.S. by and through her next friend Mark Schmitz, A.S. by and through her next friend Mark Schmitz, JACLYN SCHMITZ, TRAVIS AVENVILI-FRKOVIC, RICHARD HERRERA, DIANE FOLEY, individually, and for the estate of JAMES FOLEY, JOHN W. FOLEY, JOHN E. FOLEY, MARK FOLEY, KATHRYN SIMPSON, MICHAEL FOLEY, RICHARD MUELLER II, individually, and for the estate of KAYLA MUELLER, MARSHA MUELLER, ERIC MUELLER, ARTHUR SOTLOFF, individually, and for the estate of STEVEN SOTLOFF, SHIRLEY SOTLOFF, LAUREN SOTLOFF, WILLIAM RAAK, ALDENE LEE, individually, and for the estate of WESTON LEE, AMINA SHAHEEN, individually, and for the estate of GHADIR TAHER, KAWA MAHMOUD AZIZ TALABANI, LISA MACK, ASHLEY MACK, ROBIN FERON, DARRELL BOWLING, BROOKE WEXLER, ASHLEY NOGUEIRA, ELFRIEDE PLUMONDORE, DANIEL PLUMONDORE, MARY HERNANDEZ, FRANK HERNANDEZ SR., JESSICA HERNANDEZ, MARY SUSAN HERNANDEZ, DEBRA MALSON, BEN MALSON JR., DAVID MALSON, AMY FLY, ARIEL GERMAN, JULIE GRESHAM, ELIZABETH START, DEBBEE WAY, RICHARD GIENAU, BOBBIE MCGOWAN, MICHAEL GREEN, MELANIE GREEN, STEVEN GREEN, JEANIE KINCHEN, JAMES KINCHEN JR., AMIE MEREDITH, JOLENE MORRIS, SHERRY ROCKHOLT, JASON ROCKHOLT, CHRISTINA LINDEN, RONALD LUTTERS, JIMMY CASTLE, PEARL SAYLES, JOSEPH SAYLES, WESLEY SAYLES, ANNIE EDMUNDSON, ROBERT EDMUNDSON, BRUCE SQUIRES, CHERYL KILPELA, MICHAEL KILPELA, JOANN ARNOLD, JANET BRANDES, BEVERLY HICKS, GENE MAYNARD, OCTAVIO SANCHEZ, JACOB SANCHEZ, ESTEFANI VALDEZ, GAIL WILLIAMS, ALLISON MURPHY, PATRICIA JAMESON, ROBERT JAMESON, IMOJEAN | Case No. 1:22-cv-02317 (CKK)<br><br>JURY TRIAL DEMANDED |

MYERS, REBEKAH MYERS, CHARLOTTE
MYERS-DICK, THOMAS DICK, KATRINA
GRAHAM, JAMES GRAHAM II, SARA DUVALL,
MATTHEW REED, JILL PARMETER, LARRY
DUVALL, ALCIDES BLOEM JR., RYAN
STILWELL, RACHEL VERA, JIMMY STILWELL,
DEBRA GROVE, CAMERON MANN, DALE
GROVE, JOHN BOUCHARD, MONICA
SEAMANS, DAVID SEAMANS, ASHLEY
KNAPP, ADAM KISIELEWSKI, JUAN ROMERO,
MARIA ROMERO, YAJAIRA ROMERO,
BERNARDO ROMERO, PENNY LIEURANCE,
CHASE LIEURANCE, DAMIEN LIEURANCE,
JONETTE LIEURANCE, LORI DIESING,
HYESUK JERAK, MARK BEYERS, DENISE
BEYERS, DAVID W. BRONSON, MARIA EGAN,
SAMANTHA EGAN, KAREN GRENNER-CASE,
TROY GRENNER-CASE, MYRA BARDO, KYLIE
FOGLE, LARRY LARGE, MICHELLE LEVER,
DEVAN EUTIN, MARK MCVICKER, CAREY
MEISSNER, MOLLIE HANDY, IRMA
MCVICKER, EDWARD RICCI, KADE
HINKHOUSE, RICHARD HINKHOUSE, SUSAN
HINKHOUSE, SHALONDA JOHNSON, DEIONNE
JOHNSON, LEON JOHNSON JR., JULIA BYRD,
DORIS HARDY, NAKIA HOWE, GARY-DEAN
HOWE, SHAYE-MALEIGH HOWE, ALEXANDER
KLAUS, WALLACE SZWYDEK, NANCY
SZWYDEK, JILL COCKERHAM, BENNY
COCKERHAM JR., BRANDON DALE,
KIMBERLY BOYD,  ALVIN ESPIRITU, NITA
CROSS, PATRICK MYERS, MINDY MYERS,
ALEK LE, LANDON LE, REBECCA SWAIM,
MICHAEL SWAIM, STEPHANY KERN, DAVID
SCHIAVONI, DANIEL L. GUBLER, CHRISTINE
LEBRON, BARBARA BENARD, JOHN BENARD
JR., MARK COMFORT, THOMAS MCELVEEN,
TRAVIS GREENE, NOE OROSCO SR., MEGAN
CASH, G.S. by and through his next friend Megan
Cash, DANIEL M. JACOBS, PAULETTE
MARTONE, AGOSTINE MARTONE JR., APRIL
BACA-SALAS, JORDAN SALAS, J.S. by and
through his next friend April Baca-Salas, BRENDA
ROBERTSON, ROGER SALAS, DANIEL SALAS,
MELISSA GUTIERREZ,  PAMELA BEERY,
ROGER BEERY, TOBEY BEERY, JOEL BEERY,

APRIL HESS, KATHERINE MEEKS, PREINA
DAVIS, ALYSSA DAVIS, EDWARD DAVIS IV,
PRISCILLA SANDOVAL SMITH, KEESHA
MILLS, DELORES MILLS, ROBERT MILLS,
PARKER MILLS, DANNA PALMER, DALE
DERAPS, REGINA BAEPLER, DAWN CASSIL,
CEDAR DERAPS, SHANTI JOHNSON, PAUL E.
HAINES, RONDA HAINES, KAREN HAINES,
SUSAN JAENKE, RITA ZOUCHA, SHERRI
LASKA, CHRISTINA MENCHACA, individually,
and as co-representative for the estate of KRISTIAN
MENCHACA, PEDRO MENCHACA, MARIA
GUADALUPE VASQUEZ, JULIO MENCHACA,
individually, and as co-representative for the estate of
KRISTIAN MENCHACA, MARJORIE BENSON,
STEVEN BENSON, ANTHONY JONES, DIANE
JONES, ABBI CARRETO, JACQUE J. KEESLAR,
VANESSA KEESLAR, CATHERINE LUCKEY,
STACY BRIDGES, MARK NOYES, GAYLE
THARP, DONNA THARP, KAREN THARP, JOHN
DARGA, KATHLEEN HANSON, ROBERT
HANSON, CHRISTINE STANTON, MAUREEN
WALSH, MEGHAN TURNER, JOSEPH WALSH,
PATRICK WALSH, ERIN WATSON, LEROY
CAIN JR., MELISSA ADAMS, ADDRIN ADAMS,
ROBERT RODDY JR., PHILLIP HALE, ELIZA
BACOT, JILL PUCKETT, ASHLEY BELLOT,
RICHARD FENIELLO, ERICA BOOTH, G.B. by
and through her next friend Erica Booth, T.B. by and
through his next friend Erica Booth, DEBRA
BOOTH, MARY BROZOVICH, RYAN
BROZOVICH, TERESA ELROD, TIMOTHY
ELROD, SHANNON EURY, DANIEL J.
ALDERMAN, A.A. by and through her next friend
Daniel Alderman, A.A. by and through her next
friend Daniel Alderman, RUTH HOLLER, JOHN
HOLLER JR., JOSEPH HOLLER, LETICIA ROMO,
JESSE VEGA, JACE BADIA, K.B. by and through
her next friend Jace Badia, MELISSA WARNER,
SCOTT WARNER, ASHTON WARNER, VIOLET
KAYLOR, JIM KAYLOR, CHAD WATSON,
ROBERT LOVE SR., EVELYN FORD, KERBY
MILLER, KIM MILLER, LLOYD MORRIS JR.,
PATRICK RUSSELL, ELIZABETH RUSSELL, J.R.
by and through her next friend Patrick Russell, KAIE
KINMON-RUSSELL, SUSAN WEST, SHERRI

SPRINGATE, CHRISTOPHER BOREA, KIM
BOREA, ANDREW BISSON, LAURALEE
BISSON, RICHARD BISSON, CHRISTOPHER
BISSON, VICTORIA JOHNSON, BRANDON
CLEVENGER, NANCY CLEVENGER, ROGER
KURTZ, STEPHANIE KURTZ, DARLENE
SEIGART, CONNIE MADORE, RONNIE
MADORE, RICHARD WITTEVEEN, TRENT
WITTEVEEN, HEATHER KAUFMAN, KRIS
HAGER, DIANE SALYERS, KELLI WINKLER,
NORMA ESTES, DANIEL SEBBAN, JANICE
RIEWER, RICHARD RIEWER, SONDRA
ADKINS, JOSEPH CANTRELL III, PATRICIA
GRASSBAUGH, BELINDA BREWSTER,
CHASSITY MCCANDLESS, RONALD SUMNER,
ROBIN WALLACE, RICKEY WALLACE, SARAH
WALLACE, RACHEL TUCKER, KIMBERLY
SCHMIT, LESLIE WHITE, JEREMY PEARSON,
KENNETH LOCKER SR., CARMON PETTERS,
LORIE SOUTHERLAND, CRAIG HALL, DANIEL
HALL, GUILLERMO CASTILLO-RIVERA,
THEODORE COTHRAN JR., ELENA COTHRAN,
THEODORE COTHRAN SR., ANTOINETTE
COTHRAN HEBERT, RONNY PORTA, NATALI
PORTA, APRIL HARKINS, ROBERT HARKINS
JR., YADERLIN JIMENEZ, individually, and as co-
representative for the estate of ALEX JIMENEZ,
RAMON D. JIMENEZ, MARIA DURAN, ANDY J.
JIMENEZ, IRVING JIMENEZ, ANDY D.
JIMENEZ, individually, and as co-representative for
the estate of ALEX JIMENEZ, BRYANT JIMENEZ,
ALEXANDER VARGAS, SARAH HAVERLOCK,
RONALD FOUTY for the estate of MICKEY
FOUTY, HILARY NORTH, GORDON DIBLER
JR., individually, and for the estate of BYRON
FOUTY, TINA HOUCHINS, DANIEL GAUTIER,
ANSELMO MARTINEZ JR., GALDINA IBARRA,
MICAH MONTGOMERY, MICHAEL SUMMERS,
NANETTE WEST, CLARK WEST, KARA WEST,
KELLI ANDERSON, CARTER WEST,
CHRISTINA BAKER, DAVID DEHN JR., LILLIAN
COSTELLO, DEBRA SPRINGMAN, DAVID
LIND, CATHERINE JACKMAN, BRADLEY
LIND, SIGIFREDO APODACA, VANITA
APODACA, MANUEL APODACA, SAUL
APODACA, DEBRA APODACA, ALEXIA FELIX,

DARRYL LINDER, SHIRLEY WADE, GARY
WADE, LYNN ZINDARS, KENNETH ZINDARS,
MICHAEL LYNCH III, LINDA BALOGA, AMBER
BACHMAN WILSON, TYLER BACHMAN, K.B.
by and through her next friend Amber Bachman
Wilson, SHANNON OWENS, ANN SCHEIBNER,
TYLER SCHEIBNER, LOUISE SCHEIBNER,
DIANE COTTRELL, DAVID SCHEIBNER, JOHN
HERNANDEZ, ANGELA HERNANDEZ, BRETT
R. WOLF, SHEENA MCCLOUD, AIDAN
MCCLOUD, L.M. by and through his next friend
Sheena McCloud, M.O. by and through her next
friend Kevin Harrington, RAYMOND  OLSON,
ASHLEY MONSCHKE, PATTY JETT, SHELIA
TOWNS, CHARLES BOOKER, BRENDA
BOOKER, DEBORAH RAY, WALTER  RAY, JILL
FREDERIKSEN, MARTHA CABE, MELANIE
PIONK, BRANDON PIONK, ASHLEY PIONK,
DILLON PIONK, SANDRA PIONK, DUANE
PIONK, JOSHUA PIONK, LAURA MCBRIDE,
MARSHALL MCBRIDE, SARAH LAMBERT,
SHEILA MARSHALL, ANDREW MARSHALL,
NATALIE JACKSON, PHYLLIS CRAIG, JOEL
SEXTON-CRAIG, RACHAEL PUTMAN,
MENESIA SPADE, KELLY INMAN, BRANDI
YANEZ, EUGENIA MEYER, TERRY MEYER,
ALEXANDER MCINTOSH, KENNETH
ANDERSON, ROBIN MALLARD, MOSE
MALLARD III, TERRENCE MALLARD,
XIOMARA HALL, G.H. by and through her next
friend Xiomara Hall, MILDRED HALL, DOLORES
WILSON, MARGIE BELL, XAVIER ARIAS,
CRISTIAN ARIAS, DONNA OPICKA, DANIEL
OPICKA, HENRY KOHLHAAS, ISAIJAH ORTIZ,
ELIA DOMINGUEZ,  ANTONIO DOMINGUEZ,
ELIA ORTIZ, KATHERINE SHRADER, MARY
ALLEN, JOHN SAVAGE, MATTHEW JORDAN,
KATELYNN JORDAN, O.J. by and through her next
friend Katelynn Jordan, RACHEL HALL, A.H. by
and through her next friend Rachel Hall,
STEPHANIE FORREST, B.F. by and through his
next friend Stephanie Forrest, J.F. by and through his
next friend Stephanie Forrest, BECKY JOHNSON,
BRITTENY WOODS, JOSEF PAUTSCH, ALEX
RUNYAN, MATTHEW SCHRIER, JAMES WHITE
SR., SHELDON PAUL, WENDY SLOAN, EMORY

SLOAN, JAMES SLOAN, TRACY CARRICO,
TIMOTHY DAVIS, STEPHANIE BOVA,
LAVETTE CURRY, NIKI MARTIN, BILLIE
SHOTLOW, MICHAEL SHOTLOW, RYAN
NEWELL, MAREN HESLA, HELEN DEPRIMO,
JOSEPH DEPRIMO, JODI CALABRO, DANIELLE
FEDIW, GERALD FINLEY, JENNIFER LEFORS,
JOHN FINLEY, JOSHUA FINLEY, KATHY LAY
for the estate of KURT ZWILLING, ALEXANDER
ZWILLING, LESLY GARCIA, MARICRUZ
GARCIA VELASQUEZ, VICTOR GARCIA,
RAMSSES GARCIA, JENNA VANOSDALE,
CARLENE CROSS, MICHAEL BOGAR, CARISE
MARTINDALE, MICAEL GAUGER, JASE
BROSTROM, MARY BROSTROM, DAVID
BROSTROM, BLAKE BROSTROM, RENDA
RIGGINS, JONATHAN BENTON, ELIZABETH
BENTON, H.B. by and through her next friend
Elizabeth Benton, S.B. by and through her next friend
Elizabeth Benton, G.B. by and through her next
friend Elizabeth Benton, MARIA AVNERI,
EDUARDO GARCIA, JACOB AVNERI, CRYSTAL
DELEO, JACOB LERNER, HANNAH COX,
CHARLOTTE ALLEN, MATTHEW ALLEN,
AUSTIN NELAMS, LINDA GRIECO, RALPH
GRIECO, JENNIFER BURCH, REGINA BYTHER,
N.W. by and through her next friend Regina Byther,
JESSE W. WATSON, SUSIE SCHULTE, ROBERT
SCHULTE, TODD SCHULTE, JANICE YORK,
MICHAEL STRATTON, DEBORAH YOUNG,
STEVEN STRATTON, FRANKLIN LITTLE,
DEAN COLEMAN, HOLLY INGRAM, C.A.I. by
and through her next friend Holly Ingram,
GWENDOLYN FRENCH, LAQUITTA FRENCH,
PATRICIA GREEN, ALMUTH GREEN JR., JESSE
GREEN, ANDREA STEFFEY, A.G.S. by and
through her next friend Andrea Steffey, RACHEL
HUMPF, DENNIS STEFFEY, HEATHER
JACKSON, DAVID HUMPF, KIM SOLA, COLLIN
CLEAVER, AIDAN CLEAVER, MINDYLOU
PARESI, ELIZABETH PARESI, JANET PARESI,
TERRY PARESI, SANTINA CARTISSER,
ALEXANDRA VANDENBROEK, BARBARA
BROWN, HAROLD BROWN SR., PAULA RICH,
REGINA BROWN, DANA BERNHARDT, MARY
L. WISE, MARY H. WISE, ETHAN PRUSINSKI,

DANICA THOMAS, L.T. by and through her next
friend Danica Thomas, BLAINE REDDING,
MARTHA LOONEY, GLENDA WILLARD,
MICHELLE HOCK, JORDAN PLUNK, RANEE
MASSONI, JUSTIN PLUNK, MARTA TORRES,
GABRIEL NEGRON, MARVIN NEGRON, JOSE
NEGRON, MARIBEL NEGRON, CRISTINE
MITTLER, JOYCE TURNER, TERRY MITTLER,
ALEXANDER MITTLER, MISTY BARCLAY,
LINDA REYNOLDS, GLENN CHISHOLM,
KARMA CHISHOLM, AUDREY CAMPBELL,
ARTHUR CAMPBELL, TINA CAMPBELL,
KIMBERLEY WHIPPLE, DAVID WHIPPLE,
SEAN WHIPPLE, BRIAN CLYBURN, JOSE
ALEMAN, STEPHANIE HAGER, ANN GOULD,
JAMES GOULD, JULIANNA SYMKOWIAK,
ROGER POOCK, BECKY POOCK, SHEILA
GOOD, CHARLES ADKINS, VELVET ADKINS,
BETHANY BENTON, DINEEN SNYDER,
EDWARD SNYDER, NATASHA SNYDER,
DAMIEN SNYDER, FELICIA GROSS
PANIAGUA, SOCORRO GROSS PANIAGUA,
CARLOS GROSS RIOS SR., CARLOS GROSS
PANIAGUA, FRANCISCO BRISEÑO
GUTIERREZ, LUIS BRISEÑO ALVAREZ,
AUGUST WILDMAN, MAXWELL CABRERA,
R.X.C. by and through his next friend August
Wildman, CORBIN CABRERA, GILLIAN
CABRERA, RONALD HOPKINS, SUZANNE
MARTINEZ, JD PROSSER, ROBERT CABRERA,
DANIEL CABRERA, GLORIA TRELFA, ROBERT
RIVERA, DAVID BEAN, ROBERT DARROUGH,
JUDITH DARROUGH, DONALD NEWMAN SR.,
AMANDA NEWMAN, CHARLES LIGON,
ARIELL TAYLOR, individually, and for the estate of
CHRISTOPHER BROWN, ALEX ROZANSKI,
CHRISTOPHER ROSEBROCK, DAVID LAU,
HAMIDE LAU, M.L. by and through her next friend
David Lau, K.L. by and through his next friend David
Lau, ALEXANDER LAU, VIVIAN PERRY,
JAMMIE SMITH, MICHELLE
RAUSCHENBERGER, LEROY LAU JR., HOLLY
ABRAHAM, KIMBERLY METCALF, CLARENCE
METCALF, KARYN STONE, LAWRENCE
MARTA, TAYLOR MARTA, SARAH
SCHWALLIE, THOMAS SCHWALLIE, RYAN

TIMONEY, DIANE TIMONEY, GREGORY
TIMONEY, JULIE ELLIS, BRIAN ELLIS,
VANESSA ANZURES, VICTOR ELLIS, NATHAN
J. RIMPF, SHEILA RISTAINO, SHAWN GRIFFIN,
CAROL GRIFFIN, DANIEL GRIFFIN, MATT
GRIFFIN, MARK WORLEY, MONA BETZEN,
GREGORY WORLEY, JAMES WORLEY, CODY
WORLEY, MARY BORDER, KATHERINE
ABREU-BORDER, DELAYNIE PEEK, NATALIE
SCHMIDT, A.L.S. by and through his next friend
Natalie Schmidt, LEE ANN SCHMIDT, PHILLIP
SCHMIDT, BRANDON SCHMIDT, CHERYL
ATWELL, ERIN RIEDEL, LONA GAMBONE, L.D.
by and through his next friend Bridgett DeHoff,
KIRK GOLLNITZ, TYLER GOLLNITZ, JAN
HURNBLAD SPARKS, GARRY SPARKS, ERIK
SPARKS, ZACHARY SPARKS, JANE SPARKS,
CAMERON STUART, KATY STUART, JERRY
HARDISON, JUSTINA HARDISON, CEDRIC
GORDON, ADRIAN SHERROD, CONCHETTA
DIAZ, CEDRIC GORDON SR., EDWARD W.
KLEIN, SHERRY SKEENS, PAUL JAYNE, ADAM
JAYNE, GARRETT SKEENS, AYZIA JAYNE,
Z.S., by and through her next friend Kent Skeens,
TRENT SKEENS, KENT SKEENS, CASSIE
RICHARDSON, JOHN MEANS, TAMMIE
SCHOONHOVEN, A.R.S. by and through her next
friend Tammie Schoonhoven, A.M.S. by and through
her next friend Tammie Schoonhoven, DEBORAH
SCHOONHOVEN, CHRISTOPHER
SCHOONHOVEN, SHEESHTA PERRY, HELENA
DAVIS, C.D., by and through his next friend Helena
Davis, COLLEEN WHIPPLE, SAMUEL
SHOCKLEY, MARY SMEDINGHOFF, THOMAS
SMEDINGHOFF, REGINA SMEDINGHOFF,
JOAN SMEDINGHOFF, MARK SMEDINGHOFF,
MIRANDA LANDRUM, G.L., by and through his
next friend Miranda Landrum, B.L., by and through
her next friend Miranda Landrum, JANET
LANDRUM, JAMES LANDRUM, TRACEY
PRESCOTT, JACOB PRESCOTT, AARON
PRESCOTT, JOSHUA PRESCOTT, JOSEPH
PRESCOTT, CHRISTINE PHILLIPS, S.P., by and
through her next friend Christine Phillips, MARIA
CARDOZA, RAMIRO CARDOZA SR., RAMIRO
CARDOZA JR., CHET MURACH, WILLIAM

MURACH, SAMANTHA MCNAMARA, BRENDA
DAEHLING, KIRK DAEHLING, ADAM
DAEHLING, KAYLA DAEHLING, JOANNA
GILBERT, JESSICA BENSON, ADAM S.
HARTSWICK, LIESELOTTE ROLDAN,
MATTHIAS ROLDAN, ANGEL ROLDAN,
SAMANTHA ROLDAN, NANCY MULLEN,
MIRIAM MULLEN, WILLIAM MULLEN, JOELLE
ELLIS, JOHN ELLIS, JAMES ELLIS, BRANDON
KORONA, MICHELLE ZIMMERMAN, CHRIS
ZIMMERMAN, BAILY ZIMMERMAN, LORRIA
WELCH, BARRY WELCH, ZACKARY WELCH,
BRUCE NICHOLS, JEANNE NICHOLS, MOLLY
NICHOLS, TAMMY OLMSTEAD, WILLIAM
BURLEY, DAN OLMSTEAD, MICHAEL
COLLINS, MARTHA SMITH, THOMAS
WICKLIFF, MICHELLE ROTELLI, GARRETT
FUNK, WILLIAM NEVINS, SETH WAKELING,
ADRIANA WAKELING, ANGELA KAHLER,
NANCY WILSON, ASHLEY PETERS, G.P., by and
through his next friend Ashley Peters, DEBORAH
PETERS, DENNIS PETERS, ALISON POHN,
JOHN MCCARTHY, DANIEL HUGHES,
KRISTINE ZITNY, KATHLEEN ALEXANDER,
PATRICIA HUGHES, PATRICIA GOINS, PAUL
GOINS III, JANICE CARUSO, DANA RAINEY,
EMMITT BURNS, ESTA SMITH, JOE TORIAN,
NATHAN TORIAN, JIMMY SMITH, EMILY
TORIAN, JOSEPH JONES JR., ALBERTO DIAZ,
KAYLA DIAZ, N.J.D., by and through his next
friend Kayla Diaz, N.J.D., by and through her next
friend Kayla Diaz, FRANCES DIAZ, MAXIMO
DIAZ, ANTHONY DIAZ, MATTHEW DIAZ,
CAREY G. DUVAL, MICHELLE RILEY,
RODNEY RILEY, JULIE MARTIN, BRIAN
MARTIN, CATHERINE MARTIN, ELIZABETH
MARTIN, KELLI-JO DODGE, B.C.D. by and
through his next friend Kelli-Jo Dodge, P.A.D. by and
through her next friend Kelli-Jo Dodge, KATHLEEN
MCEVOY, PATRICK MCEVOY, MICHELLE
MCEVOY, JANICE PROCTOR, LUANN
VARNEY, SUMMER SUTTON, ERIN GOSS,
HARRIET SUTTON, WENDY SHEDD, TRECIA
HOOD, FREDDIE SUTTON, ANNIE MCBRIDE,
CHESTER MCBRIDE SR.,  ALEXANDRA
MCCLINTOCK, D.M., by and through his next

friend Alexandra McClintock, JOYCE PAULSEN,
GEORGE MCCLINTOCK III,
KEVIN KING, STEPHANIE MILLER,
CHRISTOPHER BALDRIDGE, E.B., by and
through his next friend Christopher Baldridge, L.B.,
by and through his next friend Christopher
Baldridge, S.B., by and through her next friend
Christopher Baldridge, JESSIE BALDRIDGE,
JASMIN BAYS, APRIL BAYS, TIMOTHY BAYS,
BRENDA GRINER, LINDSAY REDOUTEY,
JULIA STEINER, L.S., by and through her next
friend Jasmin Bays, M.S., by and through her next
friend Jasmin Bays, ANNGEL NORKIST,
WILLIAM NEWNHAM, HART NORKIST,
AUJZA NORKIST, SUSAN KOLEAN,
BRITTANY HARRIS, KARIM HAKIMYAR,
ZARA KARIM, S.K., by and through his next friend
Karim Hakimyar, NICOLE KAMALESON,
CEDRIC KAMALESON, BARCLAY
KAMALESON, CADE KAMALESON,
SUNDERRAJ KAMALESON, MARY PRYOR-
PATTERSON, CRISTA BROONER, GRACE
KREISCHER, C.K. by and through his next friend
Grace Kreischer, BRIANNE BARLOW, JASON
BARLOW, SAGE SALADIN, SHUSHAWNDRA
GREGOIRE, J.G. by and through his next friend
ShuShawndra Gregoire, JOHN GREGOIRE SR.,
and L.G. by and through her next friend John
Gregoire Sr.,

> Plaintiffs,

> v.

ERICSSON INC., ERICSSON AB,
TELEFONAKTIEBOLAGET LM ERICSSON,
RAFIAH IBRAHIM, and BÖRJE EKHOLM,

> Defendants.

## FIRST AMENDED COMPLAINT FOR
## VIOLATION OF THE ANTI-TERRORISM ACT

Ryan R. Sparacino
Geoffrey P. Eaton
Eli J. Kay-Oliphant
Tejinder Singh
Shuman Sohrn
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
tejinder.singh@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

THE DEFENDANTS......................................................................................... 10

JURISDICTION AND VENUE ........................................................................ 15

SOURCING ...................................................................................................... 16

FACTUAL ALLEGATIONS ............................................................................ 18

I.    AL-QAEDA AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF
      INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ,
      SYRIA, AND AFGHANISTAN AS PART OF AL-QAEDA'S
      TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED
      STATES FROM THE MIDDLE EAST .................................................... 18

      A.    Al-Qaeda Waged A Global Terrorist Campaign To Expel The United
            States From Iraq, Afghanistan, And The Rest Of The Middle East ................... 20

      B.    Al-Qaeda Comprised A Globally Integrated Terror Network That Relied
            Upon A Cooperative, Corporate Model Internally And With Other Allied
            Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign
            Against The United States ..................................................................... 43

            1.    Al-Qaeda's Integrated Global Network ............................................ 44

            2.    Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists................... 48

            3.    Al-Qaeda's Multi-National Corporate Model................................. 48

            4.    In Collaboration With Iran's Islamic Revolutionary Guard Corps, Al-
                  Qaeda Used Iranian Territory To Securely Move Money, Fighters,
                  Weapons, and Communications Between Afghanistan And Iraq In
                  Order To Facilitate Attacks Against Americans In Both Places.................... 55

II.   DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL
      TERRORISM BY PROVIDING FINANCIAL ASSISTANCE TO AL-
      QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE BY MAKING
      PROTECTION PAYMENTS TO THEM .................................................. 57

      A.    Defendants Operated In Insecure And Corrupt Iraqi And Afghan
            Contracting Environments That Encouraged Protection Payments To Al-
            Qaeda, Al-Qaeda-In-Iraq, And Islamic State........................................ 57

i

1.     Al-Qaeda, Islamic State, And Their Allies Operated Sophisticated Protection Money Networks In Iraq And Afghanistan .................................. 58

a.     Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money Operation in Iraq from 2004 through 2014 .................................................... 62

b.     Islamic State Ran a Sophisticated Protection Money Operation in Iraq from 2014 through at least 2022 ........................................................ 65

2.     Multinational Corporations Commonly Structured Their Operations In Iraq And Afghanistan To Funnel Protection Money Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State ................................................... 67

B.     Defendants Made Protection Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State In Iraq And Afghanistan ............................................................ 80

1.     Defendants Pursued An Enterprise-Wide Corruption Scheme, Which Defendants Applied In A Substantially Similar Manner In Iraq And Afghanistan ................................................................................................ 80

a.     Defendants Pursued an Enterprise-Wide Corruption Scheme ....................... 80

b.     Defendants Deployed The Same Manner And Means To Operationalize Their Enterprise-Wide Scheme in Iraq and Afghanistan ....... 88

2.     Defendants Made Protection Payments To Terrorists In Iraq ........................ 90

a.     Leaked Ericsson Documents and Subsequent Public Statements Confirm Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Iraq. ................................................................................ 94

b.     Defendants Used Strategic Partners, Consultants, Subcontractors, and Slush Funds to Funnel Protection Payments to Terrorists in Iraq ................. 96

c.     Defendants Admitted That Ericsson Likely Purchased Security From Al-Qaeda And Islamic State In Iraq ............................................................ 116

d.     Independent Media Reports Corroborate Plaintiffs' Interpretation of Ericsson's Conduct in Iraq ........................................................................ 117

e.     The Terms and Rates That Governed Lafarge S.A.'s Participation in Islamic State's Protection Networks In Iraq Confirmed That Defendants Also Participated In The Same Protection Networks as Lafarge ....................................................................................................... 122

3.     Defendants Made Protection Payments To Terrorists In Afghanistan ......... 126

a.      Leaked Ericsson Documents and Subsequent Public Statements
        Corroborate Ericsson's Knowing Participation In Terrorist Protection-
        Money Networks In Afghanistan ................................................................. 131

b.      Ericsson Inc. Made Direct Free Goods Payments Of Sensitive U.S.
        Origin Communications Technologies To Al-Qaeda .................................... 133

5.      Attack Disparity Data Independently Provides Sufficient Basis To
        Conclude Defendants Made Protection Payments To Terrorists In Iraq
        And Afghanistan ........................................................................................... 144

C.      Each Defendant Facilitated Ericsson's Protection Payments To Al-Qaeda,
        Al-Qaeda-In-Iraq, And Islamic State ................................................................. 146

1.      LM Ericsson ................................................................................................. 147

a.      LM Ericsson Created And Led Ericsson's Enterprise-Wide Illicit
        Payments Scheme From The Late 1990s Through 2022 ............................. 147

b.      LM Ericsson Secured Ericsson AB's Ability To Win The Iraq Work,
        And Ericsson Inc's Ability To Profit From The Iraq Work .......................... 150

c.      LM Ericsson Approved Ericsson AB's Initial Choice To Participate In
        Al-Qaeda's, Al-Qaeda-in-Iraq's, And Islamic State's Protection
        Networks. ...................................................................................................... 151

d.      LM Ericsson Supervised Ericsson AB's Subsequent Conduct While
        Participating in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's
        Protection Networks ...................................................................................... 153

e.      LM Ericsson Authorized Ericsson AB's Associated Protection
        Payments. ...................................................................................................... 154

f.      LM Ericsson Operationalized Ericsson AB's Protection Payment
        Scheme In Iraq .............................................................................................. 154

g.      LM Ericsson's CEO Personally Directed Aspects of Defendants'
        Protection Money Scheme In Iraq ................................................................ 155

h.      LM Ericsson Embraced Defendant Ibrahim, When It Should Have
        Fired Her, In Order To Enable The Continued Operation Of
        Defendants' Protection Money Scheme In Iraq ............................................ 155

2.      Ericsson AB ................................................................................................. 160

3.      Ericsson Inc. ................................................................................................ 164

4.      Börje Ekholm ............................................................................................... 169

     5.      Rafiah Ibrahim ........................................................................... 169

D.     Defendants' Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States .......................... 170

     a.      Defendants' Conduct Relied On American Contacts ................................. 170

     b.      Defendants' Conduct Targeted The United States....................................... 185

E.     Defendants' Protection Payments To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda And Al-Qaeda-In-Iraq Acts of International Terrorism Against Americans In Iraq, Syria, And Afghanistan ....................... 186

     1.      Al-Qaeda Relied Upon Protection Money And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, And Afghanistan ........ 186

     a.      Defendants' Cash-Based Protection Payments To Al-Qaeda Aided and Abetted Al-Qaeda's Acts of Terrorism......................................................... 188

     b.      Defendants' Free Goods-Based Protection Payments, Including High-Tech, U.S.-Origin Cell Phones and Laptops, Aided and Abetted Al-Qaeda's Acts of Terrorism................................................................................. 189

     2.      Defendants' Value Flow To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda's And Al-Qaeda-In-Iraq's Attacks Against Americans In Iraq, Syria, And Afghanistan From At Least 2005 Through At Least 2017 ................................................................................ 194

     a.      Funds Raised In Iraq And Syria By Al-Qaeda And Al-Qaeda-In-Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan................................................................................................. 196

     b.      Al-Qaeda Redeployed Al-Qaeda-In-Iraq Terrorists To Afghanistan And Pakistan To Facilitate Al-Qaeda's Attacks Against Americans In Afghanistan................................................................................................. 198

     c.      Al-Qaeda Facilitated Al-Qaeda-In-Iraq's Provision Of Key Training And Expertise To Terrorists Targeting Americans In Afghanistan.............. 201

     d.      Al-Qaeda-In-Iraq Provided Logistical Aid To Al-Qaeda Core ................... 203

F.     Defendants' Protection Payments To Islamic State Aided And Abetted Islamic State Acts of International Terrorism Against Americans In Iraq, Syria, Turkey, And Afghanistan ........................................................................ 204

     1.      Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, Turkey, And Afghanistan.................................................................................. 204

2.      Defendants' Value Flow To Islamic State Aided And Abetted Islamic State's Attacks Against Americans In Iraq, Syria, Turkey, And Afghanistan From 2014 Through 2022.........................................................205

a.      Islamic State Funds Raised In Iraq And Syria Funded Islamic State Attacks In Iraq, Syria, And Afghanistan.......................................................206

b.      Islamic State Redeployed Its Iraq And Syria Based Terrorists To Afghanistan And Pakistan To Establish And Lead Islamic State's Branch There...............................................................................................207

c.      Islamic State's Terrorists in Iraq And Syria Provided Key Training And Expertise to Islamic State's Terrorists In Afghanistan And Pakistan Targeting Americans in Afghanistan ...............................................209

d.      Islamic State Terrorists In Iraq Provided Key Logistical Aid To Islamic State's Branch In Afghanistan And Pakistan ..................................210

III.    DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING COMMUNICATIONS, LOGISTICS, AND TECHNICAL ASSISTANCE TO AL-QAEDA AND THE TALIBAN THROUGH DEFENDANTS' FACILITATION OF THE TERRORISTS' MANIPULATION OF COMMUNICATIONS NETWORKS TO ATTACK AMERICANS IN AFGHANISTAN ........................................................................211

A.      Al-Qaeda And The Taliban Attacked Americans In Afghanistan By Manipulating MTN Cellular Networks In Afghanistan That Were Managed By Defendants.......................................................................................211

B.      Defendants Provided Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban By Facilitating The Terrorists' Manipulation Of Communications Networks In Afghanistan To Target Americans There.............................................................................................214

C.      Each Defendant Facilitated Defendants' Provision Of Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban...............219

1.      LM Ericsson.............................................................................................219

2.      Ericsson AB .............................................................................................220

3.      Ericsson Inc..............................................................................................221

D.      Defendants' Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban Had A Substantial Nexus To The United States ...........................................................................................................222

1.      Defendants' Conduct Relied On American Contacts ..................................222

2.      Defendants' Conduct Targeted The United States.......................227

E.      Defendants' Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban Aided And Abetted Acts Of International Terrorism Against Americans In Afghanistan .....................................228

IV.     DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING OPERATIONAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE THROUGH DEFENDANTS' OBSTRUCTION OF UNITED STATES COUNTERTERRORISM OPERATIONS TARGETING AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE .........................................232

A.      The U.S. Government Prevented Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, And Afghanistan By Conducting Counterterrorism Operations In The United States And The Middle East That Targeted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State.......................233

1.      U.S. Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Relied Upon A Whole-Of-Government Approach In Which The Department Of Justice And Other Agencies Shared Information In Order To Prevent Terrorist Attacks.........................233

2.      U.S. Counterterrorism Operations Designed To Protect Americans From Attack By Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State In Iraq, Syria, Turkey, And Afghanistan Relied Upon The Effectiveness Of The U.S. Government's Anti-Corruption And Anti-Money Laundering Efforts .........................................................................244

B.      Defendants Provided Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State By Obstructing United States Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ...............253

C.      Each Defendant Facilitated Ericsson's Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State .....................................................258

1.      LM Ericsson........................................................................258

2.      Ericsson AB ........................................................................259

3.      Ericsson Inc.........................................................................260

4.      Börje Ekholm .....................................................................266

5.      Rafiah Ibrahim ...................................................................268

D.  Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States.......................................................... 270

E.  Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Aided And Abetted The Terrorists' Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, And Afghanistan............................ 274

V.  DEFENDANTS FRAUDULENTLY CONCEALED THEIR ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, THE TALIBAN, AND ISLAMIC STATE ................................................................................................. 275

VI.  DEFENDANTS KNEW THEY WERE AIDING AND ABETTING ATTACKS ON AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE ................................................................................. 287

A.  Defendants' Conduct Suggests That They Were Aware Their Protection Payments And Obstruction Of United States Counterterrorism Operations Aided And Abetted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Attacks Against Americans.................................................................................... 287

B.  Defendants Knew They Operated In A Hyper-Corrupt Environment In Which Corporations Commonly Made Protection Payments To Terrorists....... 290

1.  Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt ............ 291

2.  Defendants Knew Corruption In Iraq Was Inextricably Connected To Terrorism.................................................................................................... 295

3.  Defendants Knew They Did Business In Geographies That Were Insecure And Targeted By Terrorists............................................................. 298

4.  Defendants Knew Multinational Corporations' Illicit Transactions In, Or Relating To, Iraq, Afghanistan, Syria, And Turkey Were Routinely Designed To Route Protection Payments To Al-Qaeda And Islamic State Branches Operating In The Middle East.............................................. 301

5.  Defendants Knew Al-Qaeda's And Islamic State's Terrorist Campaigns In Iraq And Afghanistan Were Inextricably Linked ................. 308

C.  Defendants Knew Their Illicit Transactions Aided Terrorist Attacks By Causing Financial Assistance To Flow To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Protection Payments To Them........... 311

1.    Defendants Knew Their Illicit Transactions With Iraq-Related Intermediaries Caused Protection Payments To Flow To Terrorists ............ 316

a.    Defendants Knew Their Illicit Transactions With Iraqi Partners Caused Protection Payments To Flow To Terrorists ................................................. 333

b.    Defendants Knew Their Illicit Transactions In Iraq With Local Consultants Caused Protection Payments To Flow To Terrorists ................ 335

c.    Defendants Knew Their Illicit Transactions with Security, Transportation, and Logistics Contractors in Iraq, Syria, Jordan, Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to Flow to Terrorists ........................................................................................ 337

2.    Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-Based Protection Payments To Flow To Terrorists, And Intended For Their Officers, Employees, Agents, Partners, Consultants, And Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists ........................................................................................ 340

a.    Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists ............. 340

b.    Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit Iraqi Transactions Would Facilitate Covert Protection Payments To Terrorists ........................................................................................ 343

3.    Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Help Conceal Their Protection Payments To Terrorists ........................................................................................ 344

D.    Defendants Knew Their Obstruction Of United States Counterterrorism Operations Provided Operational Assistance To Al-Qaeda And The Taliban ........................................................................................ 346

1.    Defendants Knew Their Conduct Obstructed U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State .......................................................................... 346

2.    Defendants Knew Their Obstruction Of U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Aided Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State Aided Attacks Against Americans ...................................................... 349

E.    Defendants Knew Their Facilitation Of Al-Qaeda's And The Taliban's Attacks On Communications Networks Provided Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban in Afghanistan ........................................................................................ 355

1.  Defendants Knew Their Conduct Facilitated Al-Qaeda's And The Taliban's Manipulation Of Networks In Afghanistan ................................... 355

2.  Defendants Knew Their Facilitation Of Al-Qaeda's And The Taliban's Manipulation Of Communications Networks In Afghanistan Aided Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State Aided Attacks Against Americans ...................................................................................................... 356

F.  Defendants Knew Al-Qaeda's Role ................................................................. 357

1.  Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States ............................................................................. 357

2.  Defendants Knew Protection Payments Aided Al-Qaeda ........................... 365

a.  Defendants Knew Their Cash-Based Protection Payments Aided Al-Qaeda ...................................................................................................... 365

b.  Defendants Knew "Free Goods"-Based Protection Payments Aided Al-Qaeda ................................................................................................ 371

3.  Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq ............... 372

4.  Defendants Knew Al-Qaeda-In-Iraq Aided Al-Qaeda ................................ 376

a.  Defendants Knew Al-Qaeda-In-Iraq Funded Al-Qaeda .............................. 379

b.  Defendants Knew Al-Qaeda-In-Iraq Terrorists Served Al-Qaeda In Afghanistan, Pakistan, And The Persian Gulf ................................. 381

c.  Defendants Knew al-Qaeda-In-Iraq Provided Key Training to Al-Qaeda and the Taliban .............................................................................. 386

d.  Defendants Knew Al-Qaeda-In-Iraq Provided Key Logistical Aid To Al-Qaeda ............................................................................................... 390

G.  Defendants Knew Islamic State's Role ............................................................. 391

1.  Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States ......................................................................... 391

2.  Defendants Knew Protection Payments Aided Islamic State ...................... 395

3.  Defendants Knew Islamic State's Core In Iraq And Syria Facilitated Attacks By Islamic State's Branch In Afghanistan ...................................... 403

a.  Defendants Knew Islamic State's "Core" Funded Islamic State's Branch In Afghanistan ................................................................................. 403

|  | b. | Defendants Knew Fighters from Islamic State's "Core" Served Islamic State's Branch In Afghanistan ........................................................ 406 |

| VII. | | DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL ........................................ 407 |

| | A. | Defendants Provided Support Tailored To The Violence At Issue Here ............ 407 |

| | B. | The Amount Of Protection Money, Fraudulent Concealment Of Defendants' Relationship With Terrorists, And Obstruction Of United States Counterterrorism Operations, Were All Significant ................................ 414 |

| | C. | Defendants Had Culpable Mental States ............................................. 416 |

| | D. | Defendants Had A Close Relationship To The Tortfeasors ................................ 418 |

| | E. | The Duration Of Support Was Long .................................................... 419 |

| VIII. | | ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ USED DEFENDANTS' ASSISTANCE TO COMMIT ACTS OF INTERNATIONAL TERRORISM THAT KILLED AND INJURED PLAINTIFFS IN IRAQ, SYRIA, TURKEY, AND AFGHANISTAN ................... 419 |

| | A. | Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In Iraq, Syria, Turkey, And Afghanistan From At Least 2014 Through At Least 2021 ......................................................... 419 |

| | B. | Al-Qaeda Polyterrorists Facilitated Al-Qaeda's Acts Of International Terrorism In Iraq, Afghanistan, Pakistan, Syria, and Turkey And Helped Commit The Acts Of International Terrorism That Injured Plaintiffs ............... 420 |

| | 1. | Abu Musab al-Zarqawi ................................................................. 421 |

| | 2. | Sulayman Khalid Darwish ............................................................ 423 |

| | 3. | Muhsin al-Fadhli ..................................................................... 425 |

| | 4. | Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri) .................................... 427 |

| | 5. | Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani .......................... 428 |

| | 6. | Sirajuddin Haqqani ................................................................... 429 |

| | 7. | Shaykh Aminullah (Fazeel-A-Tul Shaykh Abu Mohammed Ameen Al-Peshawari) .................................................................... 433 |

| | 8. | Khalil Haqqani ....................................................................... 434 |

| | 9. | Ahmed Jan Wazir ..................................................................... 436 |

10.    Ezedin Abdel Aziz Khalil (aka Yasin al-Suri)...............................................437

11.    Umid Muhammadi ..........................................................................................438

12.    Sangeen Zadran................................................................................................438

13.    Mustafa Hajji Muhammad Khan ....................................................................439

14.    Adel Radi Saqr al-Wahabi al-Harbi.................................................................440

15.    Abdul Rauf Zakir ............................................................................................441

16.    Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni ...............................442

17.    Abd al-Rahman Mustafa al-Qaduli.................................................................443

18.    Abu Afghan al-Masri ......................................................................................443

IX.    ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ
COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST
AMERICANS IN IRAQ, SYRIA, TURKEY, AND AFGHANISTAN AS
PART OF ISLAMIC STATE'S AND AL-QAEDA'S TRANSNATIONAL
TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM
THE MIDDLE EAST .................................................................................445

A.    Islamic State Waged A Global Terrorist Campaign To Expel The United
States From Iraq, Afghanistan, And The Rest Of The Middle East .................445

B.    Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks,
Infrastructure, Ideology, Tactics, Techniques, And Procedures, And
Followed Al-Qaeda's Model As A Globally Integrated Terror Network
That Facilitated Cooperation Between Islamic State Branches.........................448

1.    Islamic State Emulated Al-Qaeda ..................................................................449

2.    Islamic State Operated As An Integrated Global Network...........................450

3.    Islamic State Followed A Multi-National Corporate Model .......................450

C.    Al-Qaeda And Al-Qaeda-in-Iraq Committed, Planned, And Authorized the
Attacks That Injured Plaintiffs In Iraq And Syria From 2005 Through
2013..................................................................................................................452

D.    Al-Qaeda Committed, Planned, and Authorized the Attacks that Injured
Plaintiffs in Afghanistan From at Least 2006 through at Least 2017,
Which Were Facilitated By Al-Qaeda-In-Iraq..................................................454

X.    THE ISLAMIC STATE ATTACKS .......................................................461

The August 26, 2021 Suicide Attack In Afghanistan (Jared Schmitz and Nicole Gee Families) ................................................................................. 461

The November 22, 2012 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Syria (James Foley Family) ......................... 466

The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Syria (Kayla Mueller Family) ...................... 468

The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Syria (Steven Sotloff Family) ...................... 469

The January 1, 2017 Mass Shooting Attack In Turkey (William J. Raak) .................... 471

The April 29, 2017 IED Attack In Iraq (Weston Lee Family) ........................................ 472

The January 16, 2019 Suicide Attack In Syria (Ghadir Taher Family) ......................... 473

XI.     THE AL-QAEDA AND AL-QAEDA-IN-IRAQ ATTACKS IN IRAQ AND SYRIA .................................................................................................... 474

The January 13, 2005 IED Attack In Ninewa (Brian A. Mack Family) ........................ 474

The January 26, 2005 Complex Attack In Al Anbar (Jonathan Bowling Family) ......... 475

The February 16, 2005 Car Bomb Attack In Ninewa (Adam Plumondore Family) ....... 476

The February 17, 2005 IED Attack In Ninewa (Frank Bustamante Hernandez Jr. Family) ............................................................................................... 477

The February 19, 2005 Suicide Attack In Baghdad (Adam M. Malson Family) ........... 478

The February 22, 2005 IED Attack In Al Anbar (Merlin German Family) ................... 479

The February 24, 2005 IED Attack In Saladin (Daniel G. Gresham Family) ............... 480

The February 27, 2005 IED Attack In Al Anbar (Richard B. Gienau Family) .............. 481

The March 4, 2005 IED Attack In Al Anbar (Stephen M. McGowan Family) .............. 481

The March 28, 2005 IED Attack In Salah Ad Din (Michael E. Green Family) ............. 482

The April 4, 2005 Bomb Attack In Al Anbar (Jeremiah C. Kinchen Family) .............. 483

The April 28, 2005 IED Attack In Ninewa (Eric W. Morris, Ricky W. Rockholt, Jr., and William A. Edens Families) ................................................. 484

The May 1, 2005 Suicide Attack In Baghdad (Derrick J. Lutters Family) .................... 486

The May 10, 2005 IED Attack In Al Anbar (Samuel T. Castle Family) ........................ 487

The May 28, 2005 IED Attack In Ninewa (Phillip N. Sayles Family) ........................... 488

The June 1, 2005 IED Attack In Al Anbar (Phillip C. Edmundson Family) .................. 489

The June 9, 2005 IED Attack in Al Anbar (Brad D. Squires Family) ........................... 489

The June 10, 2005 IED Attack In Al Anbar (Andrew J. Kilpela Family) ...................... 490

The June 11, 2005 IED Attack In Al Anbar (Larry R. Arnold Sr. Family) ................... 491

The June 15, 2005 IED Attack In Al Anbar (Chad B. Maynard Family) ....................... 492

The June 16, 2005 Complex Attack Involving IED In Al Anbar (Octavio Sanchez
        Family) ................................................................................................................ 493

The June 23, 2005 Suicide Attack In Al Anbar (Ramona M. Valdez Family) ............... 494

The July 14, 2005 IED Attack In Al Anbar (Christopher D. Winchester Family) ......... 495

The July 14, 2005 IED Attack In Al Anbar (Tricia L. Jameson Family) ...................... 495

The July 27, 2005 IED Attack In Saladin (Edward L. Myers Family) .......................... 496

The August 1, 2005 Suicide Attack In Al Anbar (James R. Graham III Family) .......... 497

The August 3, 2005 IED Attack In Al Anbar (Aaron H. Reed and Nicholas W. B.
        Bloem Families) .................................................................................................. 498

The August 12, 2005 Complex Attack Involving An IED In Al Taqqadum (Larry
        A. Stilwell Family) .............................................................................................. 500

The August 18, 2005 IED Attack In Saladin (Jeremy W. Doyle, Nathan K.
        Bouchard, Timothy J. Seamans Families) ........................................................... 501

The August 21, 2005 IED In Al Anbar (Adam Kisielewski Family) ............................ 503

The August 22, 2005 IED Attack In Al Anbar (Ramon Romero Family) ..................... 504

The August 22, 2005 IED Attack In Saladin (Victoir P. Lieurance Family) ................. 505

The August 25, 2005 IED Attack In Al Anbar (Trevor J. Diesing Family) .................. 506

The August 26, 2005 IED Attack In Al Anbar (Ivica Jerak Family) ............................ 507

The August 26, 2005 Complex Attack Involving An IED In Al Anbar (Mark H.
        Beyers Family) .................................................................................................... 507

The September 9, 2005 IED Attack In Salah Ad Din (David W. Bronson Family)....... 508

The September 19, 2005 Complex Attack Involving IED In Al Anbar (Michael Egan Family).................................................................................................... 509

The September 20, 2005 Complex Attack Involving An IED In Salah Ad Din (Sascha Grenner-Case Family) .......................................................................... 510

The October 3, 2005 IED Attack In Al Anbar (Bryan W. Large Family)..................... 511

The October 6, 2005 IED Attack In Al Anbar (Daniel M. McVicker Family) ............. 512

The October 8, 2005 Complex Attack Involving An IED In Al Anbar (Kade L. Hinkhouse Family)........................................................................................... 514

The October 10, 2005 IED Attack In Al Anbar (Leon M. Johnson Family)................. 515

The October 15, 2005 IED Attack In Al Anbar (Thomas H. Byrd and Richard A. Hardy Families) ............................................................................................... 516

The October 17, 2005 IED Attack In Salah Ad Din (Darren D. Howe Family) ........... 517

The October 20, 2005 IED Attack In Al Anbar (Steven W. Szwydek Family) ............. 518

The October 21, 2005 IED Attack In Al Anbar (Benny G. Cockerham III Family)...... 519

The October 29, 2005 IED Attack In Ninewa (Brandon L. Dale Family)..................... 520

The October 29, 2005 IED Attack In Al Anbar (Michael P. Hodshire Family)............. 520

The November 1, 2005 IED Attack In Al Anbar (Allan M. C. Espiritu Family)........... 521

The November 3, 2005 IED Attack In Diyala (Kyle B. Wehrly Family)....................... 522

The November 9, 2005 IED Attack In Al Anbar (Patrick J. Myers Family)................. 523

The November 10, 2005 IED Attack In Al Anbar (Daniel F. Swaim Family)............... 524

The November 15, 2005 Suicide Attack In Al Anbar (Nickolas D. Schiavoni Family)............................................................................................................... 525

The November 16, 2005 IED Attack In Al Anbar (Daniel L. Gubler Family)............... 525

The November 24, 2005 IED Attack In Al Anbar (Javier A. Villanueva Family)......... 526

The December 1, 2005 IED Attack In Al Anbar (Brent A. Adams, John M. Homason, and Anthony T. McElveen Families) ................................................. 527

The December 7, 2005 IED Attack In Al Anbar (Travis Greene Family) .................... 529

The December 9, 2005 Suicide Attack In Baghdad (Adrian N. Orosco Family) ........... 530

The February 6, 2006 IED Attack In Al Anbar (Brandon S. Schuck Family) .............. 531

The February 25, 2006 Complex Attack Involving An IED In Al Anbar (Daniel
    M. Jacobs Family) ............................................................................................. 532

The March 7, 2006 IED Attack In Al Anbar (Justin R. Martone Family) .................... 533

The March 7, 2006 IED Attack In Ninewa (Ricky Salas Jr. Family) ........................... 534

The March 23, 2006 IED Attack In Al Anbar (Brock A. Beery Family) ...................... 535

The April 11, 2006 Suicide Attack In Al Anbar (Kenneth D. Hess Family) ................ 536

The April 28, 2006 IED Attack In Al Anbar (Edward G. Davis III Family) ................ 537

The April 28, 2006 IED Attack In Al Anbar (Lea R. Mills Family) ............................ 538

The May 1, 2006 IED Attack In Al Anbar (Cory L. Palmer Family) ........................... 539

The May 6, 2006 IED Attack In Al Anbar (Leon B. Deraps Family) ........................... 539

The June 4, 2006 IED Attack In Baghdad (Paul E. Haines Family) ............................ 540

The June 5, 2006 IED Attack In Al Anbar (Jaime S. Jaenke Family) .......................... 541

The June 9, 2006 IED Attack In Al Anbar (Brent B. Zoucha Family) ......................... 542

The June 16, 2006 Kidnapping Attack, And Subsequent Hostage Taking, Torture,
    And Murder In Baghdad Province (Kristian Menchaca Family) ........................ 543

The June 17, 2006 IED Attack In Al Anbar (Johnathan L. Benson Family) ................ 544

The June 27, 2006 IED Attack In Baghdad (Jeremy S. Jones Family) ......................... 545

The June 27, 2006 IED Attack In Al Anbar (Jacque J. Keeslar Family) ...................... 546

The June 29, 2006 Small Arms Fire Attack In Ninewa (Bryan C. Luckey Family) ...... 547

The July 2, 2006 IED Attack In Al Anbar (Justin L. Noyes Family) ........................... 548

The July 12, 2006 IED Attack In Al Anbar (Jerry A. Tharp Family) ........................... 549

The August 22, 2006 IED Attack In Al Anbar (Paul J. Darga Family) ......................... 550

The August 30, 2006 IED Attack In Al Anbar (Joshua R. Hanson Family) ................. 550

The September 3, 2006 IED Attack In Ninewa (Richard J. Henkes II Family) ............. 551

The September 4, 2006 IED Attack In Al Anbar (Christopher Walsh Family) ............. 552

The September 13, 2006 Suicide Attack In Baghdad (Marcus A. Cain Family)........... 553

The September 13, 2006 IED Attack In Al Anbar (Jeffrey P. Shaffer Family) ............. 554

The September 16, 2006 IED Attack In Al Anbar (David S. Roddy Family)................ 555

The October 6, 2006 IED Attack In Al Anbar (John E. Hale Family) ........................... 556

The October 6, 2006 IED Attack In Al Anbar (Stephen F. Johnson Family)................ 556

The October 9, 2006 IED Attack In Al Anbar (Jon E. Bowman and Shelby J.
    Feniello Families) ................................................................................................. 557

The October 17, 2006 Sniper Attack In Al Anbar (Joshua L. Booth Family)............... 559

The October 18, 2006 IED Attack In Diyala (Daniel A. Brozovich Family)................ 560

The October 21, 2006 IED Attack in Al Anbar (Nathan R. Elrod Family)................... 560

The November 1, 2006 IED Attack In Kirkuk (Daniel J. Alderman Family) ............... 561

The November 2, 2006 IED Attack in Al Anbar (Luke B. Holler Family)................... 562

The November 5, 2006 IED Attack In Al Anbar (Jose A. Galvan Family) .................. 563

The November 11, 2006 Complex Attack Involving An IED In Al Anbar (Jace A.
    Badia Family)....................................................................................................... 564

The November 22, 2006 IED Attack In Al Anbar (Heath D. Warner Family) ............. 565

The November 28, 2006 IED Attack In Al Anbar (Jon-Erik Loney Family)................ 566

The November 29, 2006 IED Attack In Al Anbar (Chad Watson Family) ................... 567

The December 1, 2006 IED Attack In Al Anbar (Robert L. Love Jr. Family).............. 568

The December 11, 2006 IED Attack In Al Anbar (Clinton J. Miller Family)............... 569

The December 24, 2006 IED Attack In Al Anbar (Stephen L. Morris Family)............. 570

The January 5, 2007 IED Attack In Al Anbar (Patrick R. Russell Family) .................. 570

The January 15, 2007 IED Attack In Ninewa (John E. Cooper Family)....................... 571

The January 19, 2007 IED Attack In Ninewa (Russell P. Borea Family) ..................... 572

The January 20, 2007 IED Attack In Al Anbar (Jeffrey D. Bisson Family) ................. 573

The January 26, 2007 IED Attack In Diyala (Alan R. Johnson Family) ....................... 574

The February 8, 2007 IED Attack In Al Anbar (Ross A. Clevenger Family) ............... 575

The February 11, 2007 IED Attack In Al Anbar (Russell A. Kurtz Family) ................ 576

The February 14, 2007 IED Attack In Diyala (Carl L. Seigart and Ronnie G. Madore Jr. Families) ................................................................................ 577

The February 18, 2007 IED Attack In Al Anbar (Brett A. Witteveen Family) ............. 578

The February 22, 2007 IED Attack In Al Anbar (Joshua R. Hager Family) ................ 579

The March 5, 2007 IED Attack In Saladin (Justin M. Estes Family) ........................... 580

The March 17, 2007 IED Attack In Diyala (Benjamin L. Sebban Family) ................... 581

The March 23, 2007 IED Attack In Al Anbar (Greg N. Riewer Family) ...................... 581

The April 4, 2007 IED Attack In Baghdad (Joseph H. Cantrell IV Family) ................ 582

The April 7, 2007 IED Attack In Diyala (Jonathan D. Grassbaugh, Levi K. Hoover, and Rodney L. McCandless Families) ................................................... 583

The April 14, 2007 IED Attack In Al Anbar (Brandon L. Wallace and Joshua A. Schmit Families) ................................................................................ 585

The April 23, 2007 IED Attack In Al Anbar (Brice A. Pearson, Kenneth E. Locker Jr., and Michael J. Rodriguez Families) ................................................. 587

The April 27, 2007 IED Attack In Salah Ad Din (Craig S. Hall Family) ..................... 588

The April 27, 2007 Complex Attack Involving An IED In Al Anbar (Guillermo Castillo-Rivera Family) .................................................................. 589

The April 28, 2007 IED Attack In Al Anbar (Theodore M. Cothran Jr. Family) ........... 590

The May 5, 2007 IED Attack In Al Anbar (Ronny Porta Family) ................................ 591

The May 6, 2007 IED Attack In Diyala (Jason R. Harkins Family) ............................. 592

The May 12, 2007 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Baghdad Province (Alex Jimenez and Byron Fouty Families) .................................................................................................... 593

The May 17, 2007 Complex Attack Involving An IED In Baghdad (Aaron D. Gautier Family) .................................................................................... 595

The May 18, 2007 IED Attack In Baghdad (Anselmo Martinez III Family) ................ 596

The May 22, 2007 IED Attack In Baghdad (Robert J. Montgomery Jr. Family) ........... 597

The May 28, 2007 IED Attack In Diyala (James E. Summers III, Kile G. West, and Zachary D. Baker Families) ....................................................... 598

The June 2, 2007 IED Attack In Saladin (Dariek E. Dehn Family) ............................. 600

The June 2, 2007 IED Attack In Ninewa (Jeremiah D. Costello Family) ..................... 601

The June 14, 2007 IED Attack In Al Anbar (David K. Lind Family) ........................... 602

The June 14, 2007 IED Attack In Al Anbar (Sigifredo Apodaca Family) .................... 602

The June 19, 2007 IED Attack In Diyala (Darryl W. Linder Family) ........................... 603

The July 17, 2007 IED Attack In Saladin (Patrick L. Wade Family) ............................ 604

The July 24, 2007 IED Attack In Diyala (Matthew R. Zindars and Robert A. Lynch Families) ............................................................................ 605

The July 26, 2007 IED Attack In Diyala (Michael A. Baloga Family) ......................... 606

The August 1, 2007 IED Attack In Ninewa (Travis S. Bachman Family) .................... 607

The August 11, 2007 IED Attack In Baghdad (William D. Scates Family) .................. 608

The August 30, 2007 IED Attack In Ninewa (Daniel E. Scheibner Family) ................. 609

The September 7, 2007 IED Attack In Ninewa (Jason J. Hernandez Family) .............. 610

The September 11, 2007 IED Attack In Kirkuk (Brett R. Wolf Family) ...................... 611

The September 14, 2007 IED Attack In Baghdad (Christopher M. McCloud Family) ............................................................................... 612

The September 18, 2007 IED Attack In Diyala (Nicholas P. Olson Family) ................ 613

The October 14, 2007 IED Attack In Baghdad (Justin S. Monschke Family) .............. 614

The October 24, 2007 IED Attack In Ninewa (Robin L. Towns Sr. Family) ................ 614

The November 14, 2007 IED Attack In Diyala (Kenneth R. Booker Family) .............. 615

The December 20, 2007 Suicide Attack In Diyala (Jeremy E. Ray Family) ................. 616

The January 5, 2008 IED Attack In Diyala (Jason F. Lemke Family) .......................... 617

The January 9, 2008 IED Attack In Diyala (Jonathan K. Dozier, Matthew I. Pionk, and Zachary W. McBride Families) ...................................... 618

xviii

The January 28, 2008 IED Attack In Ninewa (Evan A. Marshall, James E. Craig, and Joshua A.R. Young Families) ...................................................................... 620

The January 28, 2008 Complex Attack Involving An IED In Ninewa (Brandon A. Meyer Family) ............................................................................................. 622

The March 10, 2008 Suicide Bomb Attack In Baghdad (Scott A. McIntosh Family)................................................................................................................. 623

The March 10, 2008 IED Attack In Diyala (Phillip R. Anderson and Torre R. Mallard Families)............................................................................................. 624

The March 30, 2008 IED Attack In Al Anbar (William G. Hall Family) ..................... 625

The April 14, 2008 IED Attack In Al Anbar (Dean D. Opicka Family) ........................ 626

The April 21, 2008 IED Attack In Salah Ad Din (Adam J. Kohlhaas Family).............. 627

The June 25, 2008 IED Attack In Ninewa (Alejandro A. Dominguez Family) ............. 628

The September 24, 2008 Suicide Attack In Diyala (Michael J. Medders Family)......... 629

The November 14, 2008 IED Attack In Al Anbar (Aaron M. Allen Family) ................ 630

The December 4, 2008 Suicide Attack In Ninewa (John J. Savage Family).................. 631

The March 14, 2009 IED Attack In Ninewa (Matthew A. Jordan Family).................... 632

The April 10, 2009 Suicide Attack In Ninewa (Bryan E. Hall, Edward W. Forrest Jr., Gary L. Woods Jr., and Jason G. Pautsch Families)..................................... 633

The July 21, 2010 IED Attack In Diyala (Michael L. Runyan Family) ........................ 635

The December 31, 2012 Kidnapping Attack, And Subsequent Hostage Taking And Torture, In Aleppo, Syria (Matthew Schrier)............................................. 636

XII.     THE AL-QAEDA ATTACKS IN AFGHANISTAN ............................................... 638

The August 11, 2006 Complex Attack In Nuristan (James P. White Jr. Family)........... 638

The September 8, 2006 Suicide Attack In Kabul (Robert J. Paul Family).................... 639

The October 31, 2006 IED Attack In Nuristan (Douglas E. Sloan Family) .................. 640

The July 23, 2007 IED Attack In Kabul (Adam J. Davis, Michael S. Curry Jr., and Travon T. Johnson Families) .............................................................................. 641

The January 7, 2008 IED Attack In Nangarhar (Ryan J. Newell Family)...................... 643

The January 14, 2008 Complex Attack In Kabul (Thor D. Hesla Family)....................... 644

The May 20, 2008 IED Attack In Ghazni (Jeffrey F. DePrimo Family) ........................ 645

The May 31, 2008 IED Attack In Nangarhar (James M. Finley Family)....................... 646

The July 13, 2008 Complex Attack In Nuristan (Gunnar W. Zwilling, Israel Garcia, Jason D. Hovater, Jason M. Bogar, Jonathan P. Brostrom, Pruitt A. Rainey, Jonathan R.C. Benton Families) ............................................................ 647

The August 1, 2008 IED Attack In Kunar (Jair De Jesus Garcia Family)...................... 652

The August 22, 2008 IED Attack In Ghazni (Brian E. Studer Family).......................... 653

The September 11, 2008 IED Attack In Nangarhar (Jacob R. Lerner Family) .............. 653

The September 20, 2008 IED Attack In Kunar (Nathan M. Cox Family)...................... 654

The October 14, 2008 IED Attack In Kunar (Cory J. Bertrand Family) ....................... 655

The October 27, 2008 Suicide Attack In Baghlan (Kevin D. Grieco Family)............... 656

The January 17, 2009 IED Attack In Kabul (Simone A. Robinson Family)................. 657

The January 18, 2009 IED Attack In Kabul (Jesse W. Watson Family) ....................... 658

The May 20, 2009 IED Attack In Kabul (Roslyn L. Schulte Family)........................... 659

The May 26, 2009 Suicide Attack In Kapisa (Mark E. Stratton II Family) ................. 660

The July 24, 2009 Complex Attack In Nuristan (Justin D. Coleman Family)............... 661

The August 21, 2009 Complex Attack In Kunar (Matthew L. Ingram Family)............. 662

The September 30, 2009 Suicide Attack In Khost (Alex French IV Family)................. 663

The October 16, 2009 IED Attack In Ghazni (Anthony G. Green Family)................... 664

The October 25, 2009 IED Attack In Laghman (Brandon K. Steffey Family) .............. 665

The November 19, 2009 Suicide Attack In Zabul (John J. Cleaver Family)................. 666

The December 30, 2009 Suicide Attack In Khost (Dane C. Paresi, Harold Brown Jr., and Jeremy J. Wise Families) .................................................................... 667

The March 16, 2010 Suicide Attack In Helmand (Allen R. Thomas Family)............... 670

The June 7, 2010 IED Attack In Kunar (Blaine E. Redding Family)............................ 671

The June 21, 2010 Suicide Attack In Kunar (Andrew R. Looney Family) .................... 672

The June 25, 2010 Complex Attack In Kunar (Jared C. Plunk Family) ........................ 672

The July 10, 2010 Complex Attack In Kunar (Carlos J. Negron Sr. and Shaun M.
        Mittler Families) ................................................................................. 674

The August 17, 2010 IED Attack In Kunar (Benjamen G. Chisholm Family) ............. 675

The October 4, 2010 IED Attack In Kabul (Karl A. Campbell Family) ....................... 676

The November 5, 2010 IED Attack In Ghazni (Blake D. Whipple Family) ................. 677

The December 5, 2010 Suicide Attack In Paktia (Nicholas J. Aleman Family) ............ 678

The February 27, 2011 IED Attack In Ghazni (Kristopher J. Gould Family) ............... 679

The April 13, 2011 IED Attack In Laghman (Donald L. Nichols Family) ................... 680

The April 16, 2011 Suicide Attack In Laghman (Charles L. Adkins Family) ............... 681

The June 4, 2011 IED Attack In Laghman (Brett P. Benton and Devin A. Snyder
        Families) .............................................................................................. 682

The July 31, 2011 IED Attack In Kunar (William B. Gross Paniagua Family) ............. 684

The September 25, 2011 IED Attack In Laghman (Francisco J. Briseño-Alvarez
        Jr. Family) ............................................................................................ 685

The October 29, 2011 Suicide Attack In Kabul (David E. Cabrera, James M.
        Darrough, and Christopher R. Newman Families) ............................................. 686

The December 11, 2011 IED Attack In Kunar (Charles S. Ligon Family) ................... 689

The April 3, 2012 IED Attack In Kunar (Christopher L. Brown Family) ..................... 690

The April 4, 2012 Suicide Bombing Attack In Faryab (Nicholas J. Rozanski,
        Christopher J. Rosebrock, and David W.H. Lau Families) ................................. 691

The April 22, 2012 IED Attack In Ghazni (Michael J. Metcalf Family) ....................... 693

The May 7, 2012 IED Attack In Ghazni (Chase S. Marta and Jacob M. Schwallie
        Families) .............................................................................................. 694

The May 20, 2012 Suicide Attack In Uruzgan (Ryan G. Timoney Family) ................. 696

The June 1, 2012 Complex Attack In Khost (Vincent J. Ellis Family) ........................ 697

The July 8, 2012 IED Attack In Ghazni (Nathan J. Rimpf Family) ............................. 698

The August 8, 2012 Suicide Attack In Kunar (Kevin J. Griffin Family) ...................... 699

The August 11, 2012 IED Attack In Helmand Province (Mark G. Worley Family)...... 700

The September 1, 2012 Complex Attack In Ghazni (Jeremie S. Border and
    Jonathan P. Schmidt Families)............................................................. 701

The September 15, 2012 Complex Attack In Helmand Province (Bradley W.
    Atwell And Christopher K. Raible Families) ...................................... 703

The September 26, 2012 Suicide Attack In Logar (Jonathan A. Gollnitz and Orion
    N. Sparks Families)............................................................................. 704

The September 30, 2012 IED Attack In Kandahar Province (Cameron J. Stuart
    Family)................................................................................................ 706

The October 1, 2012 Suicide Attack In Khost (Jeremy F. Hardison Family) ............... 707

The October 13, 2012 IED Attack In Zabul Province (Brittany B. Gordon Family) ..... 708

The October 22, 2012 IED Attack In Kandahar Province (Edward W. Klein
    Family)................................................................................................ 709

The November 3, 2012 IED Attack In Paktia Province (Ryan P. Jayne Family)........... 710

The November 16, 2012 Complex Attack In Paktika Province (Joseph A.
    Richardson Family)............................................................................. 711

The November 18, 2012 IED Attack In Helmand Province (Dale W. Means
    Family)................................................................................................ 712

The December 15, 2012 IED Attack In Kabul (Mark H. Schoonhoven Family) ........... 713

The February 22, 2013 IED Attack In Helmand Province (Jonathan D. Davis
    Family)................................................................................................ 714

The March 11, 2013 Insider Attack In Wardak (Rex L. Schad Family) ....................... 715

The March 17, 2013 IED Attack In Kandahar Province (Samuel R. Shockley
    Family)................................................................................................ 716

The April 6, 2013 Suicide Attack In Zabul (Anne T. Smedinghoff Family)................. 717

The May 4, 2013 IED Attack In Kandahar (Brandon J. Landrum, Brandon J.
    Prescott, Francis G. Phillips IV, Kevin Cardoza, and Thomas P. Murach
    Families) .............................................................................................. 718

The May 14, 2013 IED Attack In Kandahar (Mitchell K. Daehling, William J.
    Gilbert, and Adam S. Hartswick Families)........................................ 722

The May 16, 2013 Suicide Attack In Kabul (Angel Roldan Jr. Family) ........................ 724

The June 2, 2013 IED Attack In Nimruz Province (Sean W. Mullen Family).............. 725

The June 18, 2013 Rocket Attack In Parwan (Robert W. Ellis Family)........................ 726

The June 23, 2013 IED Attack In Paktika (Brandon Korona Family)........................... 727

The July 15, 2013 Attack Involving A Recoilless Rifle In Paktia (Sonny C.
        Zimmerman Family) ........................................................................... 727

The July 23, 2013 IED Attack In Wardak (Nickolas S. Welch and Rob L. Nichols
        Families) ........................................................................................ 729

The July 30, 2013 Indirect Fire Attack In Logar (Nicholas B. Burley Family) ............. 730

The August 12, 2013 IED Attack In Logar (James T. Wickliff Chacin Family) ........... 731

The September 21, 2013 Insider Attack In Paktia (Joshua J. Strickland and Liam
        J. Nevins Families)............................................................................. 732

The September 26, 2013 IED Attack In Wardak (Seth T. Wakeling Family)............... 734

The September 26, 2013 Insider Attack In Paktia (Thomas A. Baysore Jr. Family) ..... 735

The October 6, 2013 IED Attack In Kandahar (Cody J. Patterson and Joseph M.
        Peters Families).................................................................................. 735

The January 17, 2014 Complex Attack In Kabul (Alexis L. Kamerman Family).......... 737

The February 10, 2014 IED Attack In Kabul (Michael A. Hughes and Paul E.
        Goins Jr. Families) ............................................................................. 738

The February 15, 2014 Complex Attack In Helmand Province (Aaron C. Torian
        Family) ........................................................................................... 740

The June 2, 2014 Small Arms Fire Attack In Nangarhar (Jason B. Jones Family)........ 741

The August 12, 2014 IED Attack In Kandahar (Alberto D. Diaz Family).................... 742

The August 24, 2014 Suicide Attack In Nangarhar (Carey G. Duval Family).............. 743

The November 24, 2014 IED Attack In Kabul (Joseph W. Riley Family).................... 744

The December 12, 2014 IED Attack In Parwan (Wyatt J. Martin Family)................... 745

The August 22, 2015 Suicide Attack In Kabul (Corey J. Dodge, Richard P.
        McEvoy, and Barry D. Sutton Families) ............................................... 746

The December 21, 2015 Suicide Attack In Parwan (Chester J. McBride III Family) ................................................................................................ 748

The January 5, 2016 Complex Attack In Helmand (Matthew Q. McClintock Family) ................................................................................................ 749

The August 7, 2016 Kidnapping, Subsequent Hostage Taking, And Torture In Kabul Province And Pakistan (Kevin King Family) .......................................... 750

The June 10, 2017 Insider Attack In Nangarhar (Dillon C. Baldridge and William M. Bays Families) .......................................................................... 751

The July 3, 2017 Indirect Fire Attack In Helmand (Hansen B. Kirkpatrick Family) ..... 754

The August 2, 2017 Suicide Attack In Kandahar (Christopher Harris and Karim Hakimyar Families) .................................................................... 755

The January 14, 2019 Suicide Attack In Kabul (Manoharan P. Kamaleson Family)..... 756

The July 13, 2019 Small Arms Fire Attack In Faryab (James G. Sartor Family) .......... 757

The July 29, 2019 Insider Attack In Kandahar (Brandon Kreischer Family)................ 759

The July 29, 2019 Insider Attack In Kandahar (Michael I. Nance Family) .................. 760

CLAIMS FOR RELIEF ............................................................................... 763

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants: Aiding and Abetting Liability, Attack Predicate] ............................ 763

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]............................ 765

COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)    [All Defendants:  Aiding-and-Abetting Liability, RICO predicate] ...................... 768

COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]............................ 771

COUNT FIVE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate] ......................... 774

COUNT SIX:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339B Predicate] ......................... 776

COUNT SEVEN:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate]........................ 778

JURY DEMAND ....................................................................................... 780

PRAYER FOR RELIEF ........................................................................................................... 780

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18

U.S.C. § 2333, on behalf of American service members and civilians who were killed or

wounded while serving their country in Iraq, Syria, Afghanistan, and Turkey between 2005 and

2021, as well as their families.  While these men and women worked to support humanitarian

efforts in the Middle East, they were attacked by Foreign Terrorist Organizations ("FTOs") al-

Qaeda, al-Qaeda-in-Iraq, and Islamic State, which Ericsson Inc. ("Ericsson Inc."), Ericsson

Aktiebolag ("Ericsson AB"), Telefonaktiebolaget LM Ericsson (individually, "LM Ericsson" and

collectively with Ericsson Inc. and Ericsson AB, "Ericsson" or "Corporate Defendants"), Rafiah

Ibrahim, and Borje Ekholm ("Ibrahim" and "Ekholm," respectively, and together "Individual

Defendants") (the Corporate Defendants and Individual Defendants collectively being

"Defendants") helped finance and logistically aid.

2.      Specifically, from at least 2004 until at least February 15, 2022, Defendants –

themselves and through their strategic partners, consultants, and subcontractors – made

substantial protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in both

America-sourced U.S. dollars and in free state-of-the-art U.S. communications devices and

technologies like cell phones and tablets, which provided encryption while doubling as cash

equivalents.  Starting no later than 2013, Ericsson also intentionally obstructed vital U.S.

government counterterrorism operations, including by lying to the U.S. government repeatedly

about the terrorists' operations and Ericsson's related conduct.  In doing so, Ericsson provided

key "cover" and "concealment" to – and thereby logistical aid and support for – al-Qaeda's and

Islamic State's fundraising rackets while these FTOs were killing and kidnapping Americans.

3.      After the U.S. military's post-9/11 invasions of Afghanistan and Iraq, al-Qaeda

and its regional branches, led by al-Qaeda-in-Iraq (which evolved into Islamic State, aka ISIS

1

and ISIL, in 2014), collaborated to expel the United States from the Middle East by sponsoring waves of terrorist attacks against Americans throughout the region.  To date, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State have collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded roughly 30,000 more, primarily in Iraq and Afghanistan, but also in Syria and other countries in the Middle East, Europe, Asia, and Africa.

4.      Reliable funding was vital to the terrorists' campaigns.  By 2005, al-Qaeda's branches in Iraq and Syria – most notoriously, al-Qaeda-in-Iraq under the leadership of notorious terrorist Abu Musab al-Zarqawi – began systematically extracting protection payments from international businesses operating in the Iraqi and Syrian geographies in which al-Qaeda-in-Iraq posed a threat.  The terrorists motivated companies to pay by presenting them with a choice: either meet the terrorists' demands and help fund terrorist attacks, or else spend even more money on expensive security measures.

5.      LM Ericsson, Ericsson AB, and Ericsson Inc. agreed to the terrorists' demands. Under Ericsson's business model, LM Ericsson's and Ericsson AB's primary goal in Iraq between 2003 and 2022 was to sell goods, technologies, and services manufactured, provided, or serviced by Ericsson Inc. because Ericsson AB's large-scale infrastructure projects in Iraq required Ericsson Inc.'s goods, technologies, and services. To maximize their profits, Defendants funded the terrorists to leave them alone.  The payments saved Ericsson money: it was cheaper to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State than to invest in the security necessary to mitigate the terrorists' threats.  And the payments generally worked as intended.  Paying the terrorists reduced the frequency with which Defendants faced the threat of terrorists attacking their assets in the region, and it allowed them to cut corners on security, too.

6.      LM Ericsson, Ericsson AB, and Ericsson Inc. financed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through such protection payments from at least 2004 until at least 2019. Below, Plaintiffs identify: contracts on which Defendants made payments; identities of subcontractors they used to facilitate the flow of money; indications of how they concealed payments on their books; and examples of specific payments made by each.  Some details varied over time (*e.g.*, different subcontractor buffers) while others endured (*e.g.*, the use of a corrupt consultant as a buffer for more than a decade). Throughout, however, Ericsson's objective was the same – to ensure that Defendants' funds reached the terrorists so that Ericsson's lucrative Iraq-based projects, and attendant profits, continued flowing.

7.      On behalf of Ericsson Inc., LM Ericsson and Ericsson AB often (but not always) paid these designated FTOs through Ericsson's local strategic partners, consultants, and subcontractors, in an effort to reduce the risk those illegal payments would be traced back to Ericsson.  Many projects in Iraq involved chains of subcontractors – in which a prime contractor funneled both the work and the money through layers of additional corporate entities – and Ericsson exploited that structure to facilitate payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Indeed, Ericsson often hired local subcontractors intending for those companies to deliver "security" for Defendants' projects by paying off al-Qaeda-in-Iraq and Islamic State using either transfers through intermediaries or payments from uncontrolled slush funds.

8.      Protection payments like the ones Ericsson made have been closely studied by U.S. military intelligence agencies, and Congress, which have confirmed that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State depended on Western companies making such payments, and that the amounts paid in Iraq typically were worth at least 10 percent to 20 percent – and often much more – of the thing being "protected" or the income being earned.

9.      Defendants also likely facilitated Ericsson Inc.'s direct transfer of high-tech, U.S. military-grade, U.S. origin communications technologies to al-Qaeda in its Afghanistan stronghold from 2008 through 2017. One Confidential Witness, a retired U.S. Army Colonel, stated:

> Ericsson in Iraq and Afghanistan would consciously leave free communications equipment, including trucks, trailers, signal communications equipment, operation based sustainment equipment, phones, radios, computers, laptops, desktops, signals pieces, satellite nodes and capabilities.

According to the same Confidential Witness, who directly observed Ericsson Inc. in Iraq and Afghanistan, Ericsson Inc. "likely" made protection payments directly to al-Qaeda in Afghanistan through a "free goods" scheme in which Ericsson Inc. personnel consciously purchased protection directly from al-Qaeda in Afghanistan by transferring Ericsson Inc.'s high-tech, U.S.-origin communications devices – including cellular phones, satellite phones, laptop computers, and more sophisticated technology used by Americans in Afghanistan – to al-Qaeda. Notably, according to this Confidential Witness, Ericsson Inc.'s "likely" transfers of U.S.-origin cell phones, laptops, and other devices to al-Qaeda were transmitted ***directly from Ericsson Inc. to al-Qaeda*** in Afghanistan because, this Confidential Witness assessed, Ericsson Inc. and al-Qaeda used a coordinated "dead drop" approach to accomplish the "free goods" transfers without anyone between Ericsson Inc. and al-Qaeda.

10.     Defendants bribed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State so that the FTOs would allow LM Ericsson and Ericsson AB to sell Ericsson Inc.'s U.S.-sourced technology, goods, and services in Iraq.  By doing so, Ericsson participated in one of the FTOs' longest running and most effective terrorist finance schemes: the collection of protection money from corrupt multinational corporations that were willing to place their own business interests above the national security interests of the United States and the safety of American lives in the Middle

East. By offering a percentage of their profits as well as free U.S.-manufactured technology and goods to the terrorists as tribute, Ericsson redirected terrorist violence away from Defendants' Middle Eastern operations – and toward honest businesses and people, including Plaintiffs.

11. It is impossible to overstate the culpability of Ericsson's conduct, as illustrated by a few examples: after Islamic State seized Mosul, Defendants rejected the "the strong recommendation" of their top lawyer in the Middle East to invoke force majeure and exit the area "because," Ericsson calculated, "it would be 'premature' and 'destroy [Ericsson's] business.'" Instead, LM Ericsson, Ericsson AB, and Ericsson Inc. paid off Islamic State, literally using the word "please" and "thank[ing]" ISIS for its "cooperation" with Ericsson.

12. As another example, in 2017, Defendants chose to move their goods in Iraq using the "Speedway" as opposed to the "legal way" – the former involved payoffs to terrorists and greater profits for Defendants, while the latter avoided enriching terrorists but burdened Ericsson with lower profit margins from its Iraq business.  LM Ericsson, Ericsson AB, and Ericsson Inc. rejected following what their own employees called the "legal way."

13. As yet another example, in 2014, Defendants and Asiacell (one of their "strategic partners" in Iraq) effectively offered up one of their Iraqi subcontractors as a human sacrifice to Islamic State. As that subcontractor explained: "Ericsson put pressure on my company, and my company put pressure on me," resulting in his capture and detention by Islamic State.  In the victim's own words, Defendants "destroyed" him when they effectively "sold" him to Islamic State. Transacting business with terrorists at the cost of innocent human lives, while repugnant to most, was business as usual for Ericsson in Iraq.

14. Confidential Witnesses also confirm key aspects of Plaintiffs' allegations.

15.     Ericsson's protection payments aided and abetted terrorism by funding al-Qaeda's and Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, and Turkey. Although Defendants made their payments in Iraq, those payments aided al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State in Iraq, Afghanistan, Syria, and Turkey, facilitating attacks on Americans in all those places. That is because these FTOs maintained global operations, under which financial, technical, and logistical resources raised in one area flowed through to the others to support their transnational campaign against Americans.

16.     Ericsson's conduct supported al-Qaeda's and Islamic State's global terrorist campaign against Americans in Iraq, Syria, Afghanistan, and Turkey.  When Ericsson paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State not to attack them, they were not reducing the overall threat of terrorist violence; they were redirecting the attacks to other targets – including Plaintiffs and their family members.  At the same time, Ericsson's financing intensified the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State against those very targets. Protection money was quantitatively significant – by most accounts, al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's largest (or second largest) funding source overall – and such FTOs' substantially similar and highly disciplined process for extracting it made for an especially potent form of terrorist finance.  Even relatively low-dollar protection payments had an outsized effect on al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist capabilities by subsidizing salaries and weapons for multiple terrorists.  Ericsson's decision to make larger, regular, six- and seven-figure payments had an even greater effect:  it translated directly into substantial numbers of terrorists, weapons, and bombs that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to kill and injure Americans in Iraq, Afghanistan, Syria, and Turkey.

17.     Defendants necessarily knew that by making protection payments to terrorists, they were playing a role in violent terrorism. As practiced by criminal foreign telecom companies like Ericsson, the entire point of corporate protection payments is to appease violent actors so that they will not direct violence at the corporation's valuable physical assets (such as infrastructure sites) and goods (such as product shipments).  Thus, any corporation that makes protection payments necessarily intends that the money will reach the violent actor. More specifically, robust public information explained to contractors that terrorist organizations in Iraq were soliciting protection payments from corporations to fund their ongoing campaigns of terrorist violence against Americans. And the specific FTOs at issue here – al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – were globally notorious for putting their resources, including protection money funds, to violent ends. That is why the U.S. government publicly designated them as FTOs in the first place.

18.     Consistent with that understanding, the U.S. government has long opposed the payment of protection money to terrorist organizations. An Assistant Attorney General said it plainly in a 2007 criminal resolution concerning similar conduct: "corporations are on notice that they cannot make protection payments to terrorists." A Deputy Attorney General similarly noted in 2022 that "business with terrorists cannot be business as usual." Multiple agencies set up task forces designed to interrupt the flow of protection money to terrorists in Iraq and Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive. Applicable regulations and financial rules also required companies to ensure that their contracting practices – including the money spent by their subcontractors – did not finance terrorism.  Defendants violated those requirements and concealed their payments in part because they knew the U.S. government considered such payments to be illegal.  Thus, Ericsson paid off

7

terrorists even while knowing that the U.S. government publicly opposed protection payments and tried to stop them.

19.    Ericsson's aid to terrorists did not end at money, although that was plenty. Defendants provided key logistical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2004 through at least February 15, 2022 by providing critical cover and concealment for their protection rackets.  LM Ericsson and Ericsson AB did so by paying off the terrorists while simultaneously keeping secret their knowledge of the protection rackets that were instrumental in financing attacks on Americans in Iraq, Afghanistan, Syria, and Turkey.  Defendants did so even when they had affirmative legal obligations requiring disclosure to the U.S. government and Defendants' shareholders, among others.

20.    By fraudulently concealing the FTOs' protection rackets when they had a duty to share what they knew, LM Ericsson, Ericsson AB, and Ericsson Inc. also provided vital operational aid to the functioning of al-Qaeda's, al-Qaeda-in-Iraq's and Islamic State's protection rackets – independent of the U.S. dollars that Defendants paid such FTOs – by depriving the U.S. government, LM Ericsson's shareholders, and Plaintiffs of actionable intelligence and accurate information, which prevented U.S. military, intelligence, law enforcement, shareholder, and litigation pressure that would otherwise have made it harder for the terrorists to extract comparable value from their protection rackets in Iraq.  Specifically, Ericsson knew who was soliciting money on behalf of terrorists; knew which subcontractors were funneling corrupt payments to the terrorists; and knew which geographies were focal points for terrorists – but instead of disclosing that information, Ericsson held it close for its own benefit.  This conduct was in direct conflict with the position of the U.S. government and terrorism scholars, who have long emphasized that public-private cooperation is a key tool in the

U.S. government's counterterrorism strategy to protect American lives. The corollary is equally true: corporate obstruction aids the FTOs' terrorist attacks against Americans.

21.     Ericsson's misconduct is now coming to light.  The first domino fell in 2019, when LM Ericsson pleaded guilty to violating the Foreign Corrupt Practices Act ("FCPA"), paying more than $1 billion in combined penalties to the DOJ and SEC as part of a Deferred Prosecution Agreement ("DPA") relating to its decades-long, enterprise-wide pattern of bribery and corruption throughout the world.

22.     In February 2022, Defendants admitted that their money may have flowed to anti-American terrorists from at least 2011 through at least 2019.  Defendants announced that they had "identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes" and admitted that their "[i]nvestigators could not determine the ultimate recipients of these payments."  Indeed, Ericsson itself concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that [an Ericsson subcontractor] engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

23.     After Ericsson's recent admission regarding funding the terrorists, the U.S. government has concluded that LM Ericsson breached its DPA, and is now actively investigating LM Ericsson a second time, because Ericsson's conduct made a mockery of U.S. law and regulators, including the DOJ and SEC. Other governments are also investigating.  For example, in April 2022 the Swedish judiciary announced the opening of an investigation into "possible corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of

bribes to ISIS." It is highly likely that these investigations will reveal additional evidence of Ericsson's longstanding support for terrorists and terrorist groups.

24.     Plaintiffs are U.S. citizens, and their family members, who served in Iraq, Syria, and Afghanistan between 2005 and 202,1 and who were killed or wounded in terrorist attacks committed by al-Qaeda, al-Qaeda-in-Iraq, and/or Islamic State, often working together with other groups as part of global anti-American terrorist coalitions. Plaintiffs are entitled to recover for their injuries under the ATA because Defendants engaged in acts of international terrorism and also aided and abetted al-Qaeda's, al-Qaeda-in-Iraq's, the Taliban's, and Islamic State's terrorist attacks and campaigns in Iraq, Syria, Afghanistan, and Turkey. 18 U.S.C. § 2333(a), (d)(2). With this statute, Congress sought "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016).  This case falls within the heartland of the ATA's prohibitions.

## THE DEFENDANTS

25.     Defendant LM Ericsson is publicly traded on the NASDAQ under the ticker ERIC.  LM Ericsson is incorporated in the Kingdom of Sweden ("Sweden"), and its principal place of business is in Stockholm, Sweden.

26.     Defendant Ericsson Inc. is a wholly owned subsidiary of Ericsson Holding II, Inc., which is a wholly owned subsidiary of LM Ericsson.  It is incorporated in Delaware, and its principal place of business is in Plano, Texas.  Ericsson Inc. has an agent and maintains an office in this District.

27.     Defendant Ericsson AB is a wholly owned subsidiary of LM Ericsson.  It is incorporated in the Kingdom of Sweden, and its principal place of business is in Stockholm, Sweden.  Ericsson AB has appointed Ericsson Inc. as its agent for service of process in the United States.

28.     Defendant Rafiah Ibrahim ("Ibrahim") is a purported "advisor" to LM Ericsson CEO (and co-defendant) Börje Ekholm, a role that Ericsson claims she has served since August 31, 2019.  Ibrahim is a foreign national and is known to have recently resided in the United Arab Emirates.  Ibrahim first joined Ericsson in 1996 and held several high-profile positions during her tenure.  Immediately before becoming an advisor to Ekholm, Ibrahim was a Senior Vice President and Ericsson's Head of Market Area Middle East and Africa, as well a member of LM Ericsson's Executive Team—positions she assumed on July 1, 2014.

29.     Defendant Börje Ekholm ("Ekholm") is the President and CEO of LM Ericsson and has served in that role since January 16, 2017.  Ekholm has been a member of LM Ericsson's board of directors since 2006.  Ekholm is a United States citizen who has led LM Ericsson from the United States while a resident of Connecticut from 2017 until at least 2022 and of Colorado thereafter.  On March 29, 2022, LM Ericsson's shareholders voted not to discharge Ekholm (and the other members of LM Ericsson's board) from liability arising from Ericsson's alleged conduct in Iraq.

30.     Ericsson AB and Ericsson Inc. are LM Ericsson's two largest operating subsidiaries.

31.     Ericsson AB manufactures communications equipment, including mobile broadband, routers, switches, software, and network equipment for microwave, transport, and

internet protocol.  Ericsson AB also sells Ericsson products and services all over the world, including directly to Ericsson's customers and to certain of LM Ericsson's other subsidiaries.

32.     In addition to acting in their capacities as employees of Ericsson AB, several executives and other employees of Ericsson AB acted as agents of LM Ericsson in conducting Ericsson business in Iraq. From 2000 through 2022, LM Ericsson was a multinational telecommunications equipment and service company headquartered in Stockholm, Sweden. From 2000 through 2022, LM Ericsson functioned as the holding company for a multinational telecommunications equipment and service behemoth that operated all over the world through its many subsidiaries and affiliated entities.  Although LM Ericsson purports not to conduct operating activities, LM Ericsson employees have been implicated in widespread unlawful activity relating to its operating companies' operations.

33.     LM Ericsson admitted in its DPA that its "subsidiaries," including Ericsson AB and Ericsson Inc., "acted as divisions of the parent, rather than separate and independent entities."  Deferred Prosecution Agreement at A1-A2, *United States v. Telefonaktiebolaget LM Ericsson,* No. 1:19-cr-00884 (S.D.N.Y. Dec. 6, 2019), ECF No. 6.

34.     Consistent with that admission, LM Ericsson's global business operated as a singular "One Ericsson" organization, combining Ericsson's manufacturing, R&D, and other arms under the control of LM Ericsson headquarters in Stockholm to deliver complete products and services to its global customers.  In 2007, for example, an LM Ericsson employee publicly explained that LM Ericsson's business strategy was to achieve long-term growth based on the interrelationships of the various technological products offered by LM Ericsson's subsidiaries to operators of mobile networks and fixed communication systems throughout the world, which LM Ericsson marketed through "portfolio" and "bundled" offerings.

35.     In 2012, similarly, LM Ericsson's CEO at the time publicly observed that

**Ericsson's globally integrated "One Ericsson" business model** drew on Ericsson's global

employees, technologies, and services – including those in the U.S. – to optimize value for

Ericsson's operations and LM Ericsson's shareholders.  In the same speech, LM Ericsson's CEO

in 2012 explained that "[a]ny strategic decision" that Defendants adopted was "buil[t] on"

Ericsson's "three" "competitive advantages":

a.     **Ericsson's "technology leadership"** which was "the foundation for our Company";

b.     **Ericsson's "service leadership,"** through which Defendants leverage Ericsson's "global
       scale[,] which [was] unique" because Defendants offered their potential telecom
       customers worldwide the "unique possibility to" drive value by "working in an efficient
       way globally, using IT support," and benefiting from Defendants' "use [of] the [O]ne
       Ericsson [business model] across the globe"; and

c.     **Ericsson's "commercial management,"** which was "a key" for Defendants given that
       they "work[ed] as [O]ne Ericsson" "globally to keep control [of] where the commercials"
       – i.e., the contractual bids, relationships, and projects worldwide in which LM Ericsson
       and Ericsson Inc. collaborated with other Ericsson entities as "One Ericsson," – are
       going."

36.     Ericsson Inc. was a wholly owned subsidiary of LM Ericsson that operated in the

United States, served as Ericsson's vital technology hub in the United States, and regularly sold

goods (through LM Ericsson) to customers in the Middle East. Throughout this period, Ericsson

Inc. manufactured and serviced core communications network products including, but not

limited to, antennas, transmitters, switching systems, and other gear used to build wireless

telecommunications networks. Ericsson Inc. primarily served network operators, transportation

companies, utilities, and broadcasters, and specialized in offering full-spectrum consulting,

network build-out, network optimization, and network management and maintenance services.

37.     Under its "One Ericsson" approach, to which Defendants always adhered, LM

Ericsson, Ericsson AB, and Ericsson Inc. routinely collaborated with one another through cross-

functional teams based and led in the United States by U.S. personnel who reported to LM

Ericsson, Ericsson AB, and Ericsson Inc. management.  Ericsson's U.S.-based cross-functional

teams developed products for Ericsson Inc., helped LM Ericsson win and execute bids on behalf

of Ericsson Inc. and Ericsson AB, and enabled Ericsson Inc.'s services and technologies to

benefit Ericsson AB and LM Ericsson.  LM Ericsson and Ericsson AB sold bundles of goods and

services across the world, including in Iraq and Syria, and the services portion of those bundles

was provided, in whole or in part, by Ericsson Inc. in the United States.

38.     Ericsson's cross-functional teams were also responsible for assessing Ericsson's

legal and compliance risks worldwide flowing out of extreme risk geographies like Iraq,

including Defendants' anti-corruption and associated terrorist finance risks, technology- and

diversion-related anti-terrorism risks, and overlapping corporate social responsibility portfolios,

*e.g.*, sustainable development and corporate responsibility, in which these concerns were core

considerations. On May 13, 2014, for example, LM Ericsson's Group Vice President of

Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald, explained how

Ericsson Inc. in the United States and LM Ericsson in Sweden partnered closely with their

respective divisions around the world through Ericsson's reliance upon cross-functional teams:

> When I set up [LM Ericsson's Sustainability and Corporate Responsibility
> Program], it was really important to me that key functions in the [C]ompany were
> part of it. So I didn't run it just as part of the corporate responsibility program. I
> really made sure over this two-year period that we had, for example, executives
> from our sourcing department, security, our government affairs, our different
> business units, sales and marketing, so we had cross-functional representation on
> the team. That was part of the business learning program. The whole idea … to
> running a sustainability function within a company is you have to integrate across
> the organization and into the relevant functions. I see my role as guiding that, but
> if sourcing doesn't run the responsible sourcing program or if the product lines
> don't run with the design from [the beginning], it won't really work. You can
> never get the scale or the impact having just a separate sustainability organization.
> That's not my goal. It's really about integration into the business.

39.     Ericsson Inc. was essential to LM Ericsson's and Ericsson AB's ability to market their full-spectrum, turnkey network communications systems in the Middle East. Among other reasons, Ericsson Inc.'s personnel, expertise, products, and intellectual property holdings meant that it was impossible for LM Ericsson and Ericsson AB to service their customers in the Middle East without Ericsson Inc. For example, LM Ericsson's ability to market its radio base stations, including the RBS 6000, to customers in the Middle East depended upon LM Ericsson's access to Ericsson Inc.'s American technologies and services.  Similarly, one of its contracts with Iraqi mobile provider Korek required ASR 9000 routers supplied by American manufacturer Cisco.

40.     Ericsson Inc. was also essential to providing the bundled services that Ericsson AB marketed to its customers in the Middle East, including those in Iraq.  On information and belief, given how LM Ericsson and Ericsson AB structured their service offerings to rely on Ericsson Inc. personnel in the United States as a core component of Defendants' "One Ericsson" strategy, LM Ericsson and Ericsson AB would not have been able to provide the turnkey offerings they provided to their Iraqi customers, as alleged in this complaint, without the services provided to LM Ericsson and Ericsson AB – and their end-point customers in Iraq – by Ericsson Inc.'s services personnel.

41.     In light of LM Ericsson's written admission that all its subsidiaries operated as mere divisions of LM Ericsson, and not as independent entities, all the conduct here attributed to Ericsson AB, Ericsson Inc., or any other LM Ericsson subsidiary, was performed at the direction and for the benefit of, and is ultimately attributable to, LM Ericsson.  All profits from LM Ericsson's subsidiaries ultimately flow to LM Ericsson.

## JURISDICTION AND VENUE

42.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

43.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

44.     Venue is proper in this District under 18 U.S.C. § 2334(a) because Plaintiffs Todd Schulte and Maren Hesla reside in the District of Columbia.  Venue is also proper in this District under 18 U.S.C. § 2334(a) because Defendant Ericsson Inc. has an agent in this District.  Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## <u>SOURCING</u>

45.     The factual allegations that follow are based on an extensive investigation drawing on a broad array of public and non-public information, including, but not limited to:

a.      evidence obtained from witnesses with direct and indirect knowledge of the alleged facts, including five (5) Confidential Witnesses;

b.      LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, Ibrahim's and Ekholm's admissions, including, but not limited to, such admissions made in the DPA;

c.      leaked internal LM Ericsson, Ericsson AB, and Ericsson Inc. company data;

d.      LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, Ibrahim's and Ekholm's public and private statements, including emails and quotes memorialized by Ericsson investigators;

e.      reports and recommendations by LM Ericsson's and Ericsson AB's compliance personnel;

f.      declassified military and intelligence agency reporting;

g.      U.S. diplomatic and military cables (as published online);

h.      Congressional factfinding;

i.      Executive branch public statements and reports to Congress;

j.      United Nations and Financial Action Task Force ("FATF")[1] reports;

---

[1] The FATF is an inter-governmental global money laundering and terrorist financing watchdog. It develops standards to ensure a coordinated global response to prevent organized crime, corruption and terrorism. *See* https://www.fatf-gafi.org/about/.

**k.**     media accounts; and

**l.**     Plaintiffs' recollections.

46.     Plaintiffs' Confidential Witnesses have offered an array of first-hand perspectives on various aspects of the terrorist-financing scheme alleged below. Those witnesses include a former senior official employed by LM Ericsson and Ericsson AB with direct experience regarding Ericsson's enterprise-wide strategy to boost profits through illicit payments in high-risk jurisdictions; a former Ericsson Inc. employee with direct knowledge of Ericsson Inc.'s provision of essential support from the United States to LM Ericsson and Ericsson AB in the Middle East, including Iraq; a former U.S. official stationed in Iraq with direct knowledge of the smuggling routes and strategies relevant to Iraqi transportation routes in the post-Saddam era; a former security contractor who deployed to Iraq in 2003-2004 with the U.S. military and returned in 2006-2007 as a contractor; and a retired U.S. Army Colonel who deployed to Iraq in 2003-2004 and to Afghanistan in 2008 and concluded that Ericsson Inc. likely purchased protection from al-Qaeda in Afghanistan by directly transferring U.S.-origin communications technologies directly to al-Qaeda through a "dead drop" approach that eschewed the usual buffers that Defendants seek to interpose between Ericsson and the terrorists with whom they did business.

47.     The following allegations are based in part on those witnesses' observations and recollections, corroborated by public and non-public documents and press reports.

17

## FACTUAL ALLEGATIONS

**I.     AL-QAEDA AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, AND AFGHANISTAN AS PART OF AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST**

48.     Ericsson's conduct occurred against the backdrop of three decades of al-Qaeda history, during which al-Qaeda and its branches in Afghanistan, Iraq, Syria, and elsewhere perpetrated a globalized terrorist campaign in which such FTOs needed Defendants' money to kill and injure Americans.  In this section, Plaintiffs describe that background, which is broken out into four eras:  (1) 1992 through 2002, when al-Qaeda emerged as a threat and executed a series of attacks targeting Americans overseas and in the United States, culminating in 9/11 and the immediate American campaign in Afghanistan thereafter; (2) 2003 through 2007, when al-Qaeda focused its terrorist campaign on Iraq as the top theater in which to attack and kill Americans; (3) 2008 through 2013, when al-Qaeda greatly accelerated its terrorist campaign in Afghanistan; and (4) 2014 through 2022, when Islamic State emerged as an al-Qaeda splinter group and conducted its own globalized terrorist campaign targeting Americans in Iraq, Afghanistan, Syria, Europe, and Africa.

49.     Defendants' payments supported acts of international terrorism that killed and injured Plaintiffs.  In this section, Plaintiffs identify the terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them.  Each worked in concert and shared resources, personnel, and operational plans.

50.     In Iraq, due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, support for the one benefited the other.  Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects:  they enabled wide-ranging terrorist attacks

against Americans in Iraq and Syria, executed mostly by al-Qaeda-in-Iraq in Iraq and Syria, but supported by (and sometimes jointly committed with) al-Qaeda.

51.     In Afghanistan, al-Qaeda and its allies also coordinated, causing the U.S. government to conclude that the resulting terrorist superstructure was a "Syndicate" composed of al-Qaeda, the Taliban (including its Haqqani Network),[2] and other allied FTOs.  Osama bin Laden himself conceived of al-Qaeda as the leader of a terrorist coalition, including the Taliban, across Pakistan and Afghanistan.  Due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, on the one hand, and the Taliban, on the other, support for the one benefited the other.  Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects:  they enabled wide-ranging terrorist attacks against Americans in Iraq, Afghanistan, Syria, and Turkey that were committed, planned, and/or authorized by al-Qaeda.  (Islamic State followed this approach, as well, so Defendants' payments to Islamic State produced similar crosscutting effects on ISIS's capabilities in all three countries.)

52.     Each of the terrorist entities identified below used indiscriminate violence against American armed forces members serving as part of Operation Iraqi Freedom (in Iraq) and Operation Enduring Freedom (in Afghanistan), as well as American civilians in both countries, to achieve political ends.  Their primary goal was to intimidate and coerce—using mass destruction, assassinations, and kidnapping—the U.S. government to withdraw its personnel from Iraq and Afghanistan.  The terrorists also sought to intimidate the newly elected (and U.S.-backed and recognized) governments of Iraq and Afghanistan to, among other things, expel the United States from Iraq and Afghanistan.

---

[2] The Haqqani Network has always been, and remains, a part of the Taliban.  In this Complaint, all references to the "Taliban" include the Haqqani Network.

53.     None of the terrorist entities involved in the attacks detailed herein adhered to the Geneva Conventions or the laws of war.  Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.  None was associated with a recognized government.  None was waging a civil war, and none had a legitimate claim to sovereignty over Iraq or Afghanistan.

**A.      Al-Qaeda Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East**

54.     Osama bin Laden established and operationalized al-Qaeda in the late 1980s. Ever since, al-Qaeda has been a global terrorist organization notoriously targeting Americans.[3]

55.     From the early 1990s through approximately 1998, al-Qaeda was based primarily in Africa, where it developed its various economic theories and associated terrorist tradecraft, including operationalization of protection rackets and the leveraging of intermediaries to move money so as to evade detection and obfuscate the true parties-in-interest.

56.     In 1996, bin Laden issued a *fatwa* authorizing attacks against Americans worldwide.  In 1998, bin Laden issued another *fatwa*, in which he instructed al-Qaeda operatives "to kill the Americans and their allies – civilians and military," while commanding that this was "an individual duty for every Muslim who can do it in any country in which it is possible to do it."  That same year, al-Qaeda committed simultaneous attacks targeting U.S. embassies in Kenya and Tanzania, which it facilitated through an array of cells around the world.  Thereafter, al-Qaeda relocated the bulk of its terrorists from Africa to camps in Afghanistan that al-Qaeda had established in 1996.

---

[3] Al-Qaeda translates as "the base" in Arabic.  This name is a reference to bin Laden's vision of al-Qaeda serving as a consortium of allied jihadist groups under his leadership.

57.     On October 8, 1999, the United States designated al-Qaeda as an FTO, and it has maintained that designation ever since.

58.     In 2000, al-Qaeda committed an attack against the USS Cole, a U.S. Navy destroyer, while it was docked in Yemen, which attack al-Qaeda executed from its base in Afghanistan.

59.     From its headquarters in Afghanistan, al-Qaeda planned and executed the September 11, 2001 terrorist attacks against the United States.

60.     In the wake of the 9/11 attacks, the United States demanded that the Taliban stop harboring al-Qaeda and turn Osama bin Laden over to U.S. custody.  The Taliban refused. Instead, eight days after 9/11, Taliban leader Mullah Omar issued an "Order" decreeing that "[a]ll the infidel powers of the world have united against the [Taliban]" and instructing Taliban mujahedin to be "ready" to "mak[e] sacrifices" to "defeat" the "infidel powers."

61.     On October 7, 2001, the United States initiated Operation Enduring Freedom and invaded Afghanistan.  The operation's purpose was to destroy the Taliban regime and degrade Afghanistan's utility as a base of operations for anti-American terrorists, including al-Qaeda.

62.     U.S. forces quickly defeated the Taliban contingent in Kabul.  By November 2001, the Taliban fled Kabul, and it abandoned Kandahar, its historical stronghold in southern Afghanistan, the following month.  Rank-and-file Taliban fighters dispersed back into the countryside, while the Taliban leadership – including Mullah Omar – scattered with most taking refuge in Pakistan but some decamping to Iran and Iraq.  One such al-Qaeda terrorist was Abu Musab al-Zarqawi, who had joined al-Qaeda in Afghanistan in the late 1990s.

63.     In the decades after 9/11, al-Qaeda continued to wage its campaign of anti-U.S. terrorism, attacking Americans in Afghanistan, Iraq, and Syria, in an effort to intimidate the United States into withdrawing from the Middle East.[4]

64.     From the mid-2000s throughout the 2010s, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda's leadership in Afghanistan and Pakistan – which many people dubbed "al-Qaeda core" or "AQC"[5] – remained key to the funding, training, and logistics of its branches (like al-Qaeda-in-Iraq) and affiliates (like the Taliban).[6]  Plaintiffs outline al-Qaeda's relevant history in this section.

65.     Afghanistan and Iraq were the first two primary theaters of mass anti-American terror by al-Qaeda and its branches during the first decade after 9/11.  In the second decade after 9/11, however, al-Qaeda and its branches expanded from Afghanistan and Iraq into Syria, among other places, following the same al-Qaeda playbook, using al-Qaeda's resources, and deploying al-Qaeda's personnel.  Terrorists recruited into al-Qaeda's expanding branch network, including

---

[4] Bin Laden claimed, inter alia, that "[t]he American people [were] the ones who pa[id] the taxes which fund[ed] the planes that bomb [al-Qaeda] in Afghanistan, … and … Iraq."

[5] At all times, al-Qaeda comprised far more than simply al-Qaeda core. In this Complaint, references to "al-Qaeda" mean—consistent with the scope of the U.S.'s FTO designation—the entire network, while references to "al-Qaeda core" mean al-Qaeda's Afghanistan, Pakistan, and Iran-based senior leadership.

[6] Al-Qaeda's web of relationships are commonly described as "branches," "franchises," "affiliates," "alliances," and the like.  As used in this Complaint, an al-Qaeda "branch" comprises another designated terrorist organization for which the leadership and members are formally part of al-Qaeda through, *inter alia*, their oath of loyalty to al-Qaeda and Osama bin Laden, and later, Ayman al-Zawahiri, and an al-Qaeda "affiliate" comprises another designated terrorist organization for which the leaders and members have closely integrated with al-Qaeda to the point of being fused, but have not formally pledged an oath of allegiance.  Al-Qaeda-in-Iraq and Jabhat al-Nusra were al-Qaeda branches, while the Taliban (including its Haqqani Network) were al-Qaeda affiliates.  Even then, however, al-Qaeda's intricate terrorist superstructure included additional overlap points.  For example, it was not uncommon for terrorists who served an al-Qaeda affiliate to be members of al-Qaeda itself, even if the broader organization had not sworn an oath to al-Qaeda.  For example, Sirajuddin Haqqani was both a sworn member of al-Qaeda and a leader of an al-Qaeda affiliate (the Taliban).

in Syria, ultimately became part of al-Qaeda, taking an oath of allegiance to it, which al-Qaeda accepted. Although there is substantial temporal overlap, Plaintiffs address Afghanistan, Iraq, and Syria in that order, roughly tracing the explosion of protection money strategies across all al-Qaeda-affiliated terrorist groups, which began in the mid-2000s.

66.     In Afghanistan and Pakistan, al-Qaeda and the Taliban, including its Haqqani Network, operated as part of an al-Qaeda-led "Syndicate" of terrorists, working in Afghanistan and Pakistan as joint venture partners sharing the common purpose of conducting terrorist attacks against Americans to expel the United States from Afghanistan.

67.     In December 2001, the United Nations passed Resolution 1386, authorizing the International Security Assistance Force ("ISAF," often called the "Coalition"), whose mandate was to assist the newly formed Afghan government in rebuilding the country.

68.     From late 2001 through late 2002, al-Qaeda relocated most of its leadership to Pakistan, Iran, and Iraq, and was busy planning long-term terrorist campaigns against America in Afghanistan and Iraq, which al-Qaeda correctly anticipated the United States would invade.

69.     As 2003 began, al-Qaeda viewed its campaigns in Iraq and Afghanistan as linked in the following two primary objectives. *First*, reconstitute al-Qaeda's leadership outside of the areas within Afghanistan that were vulnerable to immediate attack by America, and help the Taliban regenerate itself as an anti-American terrorist group based in Pakistan, so that al-Qaeda would have a reliable haven from which to plan and facilitate terrorist attacks against Americans throughout the Middle East. *Second*, prepare for, and eventually launch, a new terrorist campaign against Americans in Iraq. Both goals dominated al-Qaeda strategy from 2003 through 2007.

70.     With respect to Afghanistan, in 2003, Mullah Omar formed the Quetta Shura, a leadership council that functioned as the Taliban's governing body.  Thereafter, the Taliban regenerated as a deadly terrorist group intent on expelling the United States from Afghanistan, overthrowing the U.S.-backed and recognized government of Afghanistan, and re-establishing Islamist rule.

71.     With respect to Iraq, in early 2003, al-Qaeda anticipated the U.S. invasion of Iraq and prepared for Iraq's emergence as a primary theater for al-Qaeda's anti-American jihad. Even though al-Qaeda and its ally the Taliban would successfully rebuild themselves by 2005-2006 into a formidable terrorist threat to Americans in Afghanistan, al-Qaeda core's attention was also substantially focused on Iraq in 2003 because it believed—by virtue of the rapid growth in American troop presence there—Iraq was the theater that offered al-Qaeda the best opportunity to attack and kill Americans *en masse* from 2003 through 2007.

72.     On March 19, 2003, the United States invaded Iraq. U.S. troops seized control of Baghdad within weeks, and on April 9, 2003, Saddam Hussein's government fell. Shortly thereafter, the Coalition Provisional Authority ("CPA") began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

73.     Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy.

74.     As it did in Afghanistan, al-Qaeda responded to America's involvement in Iraq with a campaign of terror that leveraged al-Qaeda core's expertise, funds, logistics, and financial management skills with local al-Qaeda branches' fighters and funding streams, through a

continuous two-way carousel of terrorist value flow between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda's branches in Afghanistan, Iraq, and Syria.

75.    Al-Qaeda built its campaign of anti-American terror in Iraq in three primary ways.  First, al-Qaeda unleashed a flood of propaganda and *fatwas* calling for violent attacks on Americans in Iraq. Second, al-Qaeda relied upon a secret agreement it had with the Islamic Revolutionary Guard Corps ("IRGC") to secure a direct land corridor, through Iran, that connected Iraq and al-Qaeda's sanctuaries in Afghanistan and Pakistan. Third, al-Qaeda intensified its support for its eventual Iraqi branch led by Zarqawi.

76.    Al-Qaeda spent most of 2003 building up its presence inside Iraq, with a focus on indoctrination, propaganda, recruiting, operationalizing the Sunni insurgency, and the development of the illicit networks necessary to smuggle terrorists, money, and weapons into Iraq to attack Americans there. On April 25, 2003, al-Qaeda issued a *fatwa* that declared jihad in Iraq and called on all pious Muslims to help attack and kill Americans there. In the summer of 2003, Zarqawi directly communicated to Osama bin Laden and Ayman al-Zawahiri in writing that Zarqawi's group in Iraq wished to be officially designated as "al-Qaeda-in-Iraq." In that message, Zarqawi described a new terrorist force to attack the United States under al-Qaeda's banner and led in-country by Zarqawi.  Zarqawi asserted that his terrorist campaign against the U.S. in Iraq was the real "field of jihad" and sought bin Laden's blessing for an expanded terrorist campaign against Americans in Iraq and throughout the Middle East.  Zarqawi therefore requested al-Qaeda core's strategic aid in Iraq. By late 2003, Sunni jihadist networks throughout Iraq were nesting their operational-level activities under the ideological, strategic, and financial umbrella of al-Qaeda, which flowed a river of aid to the nascent Sunni insurgency.

77.     On or about November 2003, Osama bin Laden personally approved al-Qaeda's direct role in funding Sunni terrorists in Iraq, when he authorized regular monthly payments of $1.5 million, ordinarily denominated in U.S. dollars, to finance the leadership cells and "start-up" costs of al-Qaeda affiliated terrorists in Iraq.  Al-Qaeda continued making such payments to al-Qaeda's terrorist allies in Iraq throughout bin Laden's tenure, and on information and belief, al-Qaeda continued making regular payments of a similar amount to al-Qaeda-in-Iraq until the latter split from al-Qaeda in 2014, which payments were at all relevant times supervised by senior personnel from al-Qaeda "core" in Afghanistan and Pakistan.

78.     By late 2003, al-Qaeda had established a deadly Sunni terrorist insurgency against Americans in Iraq, every member organization of which was an al-Qaeda-affiliated U.S.-government-designated FTO, which al-Qaeda led alongside Zarqawi.

79.     From 2004 onward, al-Qaeda remained a persistent threat in Iraq while vastly expanding its activities in Afghanistan and Syria. By then, Zarqawi had more than 1,000 well-trained terrorists under his command throughout Iraq.  While his coalition of Sunni terrorists conducted attacks throughout Iraq, their primary area of operations were: (a) the Sunni Triangle, a central Iraqi region traced by Tikrit in the north, Ramadi in the southwest, and Baghdad in the southeast; (b) northern Iraq, including Mosul and Kirkuk, which sat astride key facilitation routes used by al-Qaeda and al-Qaeda-in-Iraq; and (c) the Iraqi/Syrian border, which al-Qaeda and al-Qaeda-in-Iraq cultivated as part of their network to move foreign fighters from dozens of countries into Iraq, who often entered Iraq via Syria.

80.     In a January 2004 letter to al-Qaeda attributed to Zarqawi by the U.S. government, Zarqawi asked for al-Qaeda's expanded aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> We need to create armies of mujahidin … to fight the enemy—the Americans …
> We are continuing to train ourselves and strengthen our ranks.  We will strike at
> them with suicide operations and car bombs. … If you are of the same opinion, if
> you adopt it as your program, … and you are convinced by the idea of fighting the
> infidels, we will be your soldiers, under your banner, obeying your orders …

81.     Powered in substantial part by the reliable, potent, and hard-to-trace U.S. dollars afforded to al-Qaeda by its protection rackets in Iraq, al-Qaeda launched a devastating terrorist campaign in Iraq in 2004 that was designed to expel America from Iraq and the Middle East, which al-Qaeda and its branches have pursued ever since.

82.     In the spring of 2004, al-Qaeda further escalated its support for the Sunni terrorist insurgency in Iraq from its safe havens in Iran, Afghanistan, and Pakistan.  On March 24, 2004, al-Qaeda called for Muslims "to take part in jihad against the United States in Iraq."

83.     In April 2004, Zarqawi led a large group of terrorists against American forces in Fallujah, Iraq.  In so doing, he quickly became the face of the Sunni insurgency in Iraq, which enabled him to rapidly scale up al-Qaeda's enterprise there. Boasting about his ability to transit between Iran, Iraq, and Syria in support of his attacks against Americans there, on May 25, 2004, Zarqawi declared: "I am global, and no land is my country."

84.     By late 2004, al-Qaeda-in-Iraq had effectively seized Ninewa and Anbar provinces and was conducting attacks throughout Iraq.  Even when Coalition forces experienced success in one area, *e.g.*, Fallujah, al-Qaeda-in-Iraq's resources allowed the group to seamlessly reconstitute its headquarters elsewhere.  In late 2004, for example, al-Qaeda surged in Mosul in response to U.S. pressure on the terrorists in Fallujah.

85.     In October 2004, the United States launched a concerted campaign against al-Qaeda's presence in Iraq that focused on Zarqawi and his network.

86.     On October 15, 2004, the United States designated al-Qaeda-in-Iraq as a Specially Designated Global Terrorist ("SDGT"), and it has maintained that designation ever since. The next day, the U.S. military launched a major counterterrorism campaign against al-Qaeda in its Fallujah stronghold in Anbar Province.

87.     On October 17, 2004 – the day after the start of the comprehensive American campaign to oust al-Qaeda from Fallujah – Zarqawi's group, Tawhid wal Jihad, publicly declared that it was joining al-Qaeda in order to coordinate the Sunni terrorist campaign against Americans in Iraq under one in-theater leader, a "prince," (i.e., Zarqawi) who was acting on behalf of, and supported by, al-Qaeda's *emir* (i.e., bin Laden), to whom al-Qaeda-in-Iraq and each al-Qaeda-in-Iraq operative swore an oath of loyalty (the *bayat*).  Zarqawi did so in a boldly titled public oath, entitled "The Tawhid wal Jihad Movement, its Emir [Zarqawi], and its Fighters Have Joined the Cause of al-Qaeda and Sworn Allegiance to Sheikh Osama bin Laden," in which Zarqawi declared, "We announce that Tawhid and Jihad, its princes and soldiers, have pledged allegiance to the leader of the mujahedin, Osama bin Laden," and he signed "Abu Musab Al-Zarqawi, commander of the Tawhid wal Jihad movement."  Unambiguously and publicly confirming Tawhid wal Jihad's status as an al-Qaeda affiliate, Zarqawi announced that Tawhid wal Jihad would now be known as "al-Qaeda in the Land of Two Rivers," i.e., al-Qaeda-in-Iraq.[7]  Zarqawi's declaration recognized bin Laden's authority, publicly embraced al-Qaeda's

---

[7] This was Zarqawi's second loyalty oath to al-Qaeda, because he was already a long-standing member of al-Qaeda who had sworn fealty to bin Laden, and Tawhid wal Jihad was already al-Qaeda's widely recognized affiliate in Iraq.  The date chosen for the announcement, however, demonstrated the tight nexus between al-Qaeda and al-Qaeda-in-Iraq with respect to Sunni extremists' efforts to rally against the U.S. presence in Iraq.

terrorist campaign against Americans in Iraq, and urged all others to do so.[8]  That same day, bin

Laden formally accepted Zarqawi's and al-Qaeda-in-Iraq's public declaration of fealty and

commitment to al-Qaeda's global organization.  In his acceptance announcement, bin Laden's

first directive to his new branch in Iraq was to grow al-Qaeda's presence in Iraq while partnering

with local Iraqis: "My greatest wish is for you to keep the resistance alive and growing, to

increase the number of local Insurgents and give the Iraqis more decision-making powers."

88.     Zarqawi's and bin Laden's public proclamations on October 17, 2004 formally

merged al-Qaeda with al-Qaeda-in-Iraq, through a relationship in which the latter was a branch

of the former. Such status endured until al-Qaeda-in-Iraq's departure from al-Qaeda in February

2014. Though al-Qaeda-in-Iraq had many brandings over time,[9] it was one organization – Iraq's

al-Qaeda branch – and pursued a consistent mission at all times between October 2004 and

February 2014: support the terrorist campaign against America led by al-Qaeda, including its

emir, by targeting Americans in Iraq and Syria and facilitating al-Qaeda operations in

Afghanistan and Pakistan for the purpose of permitting al-Qaeda to create a "jihad wave"

---

[8] Zarqawi's declaration provided: "O Sheikh of the mujahidin, if you cross the sea, we shall cross
it with you.  If you give orders, we shall listen; if you forbid, we shall obey.  You are the
designated leader for the armies of Islam against all infidels, Crusaders, and apostates."
[9] Zarqawi's al-Qaeda branch has had various names since its creation, including Tawhid wal
Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two
Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura
Council (from January 2006 through October 2006), the Islamic State of Iraq (from October
2006 through April 2013), Islamic State in Iraq and Syria, aka ISIS, aka Islamic State in Iraq and
the Levant, aka ISIL (from April 2013 through June 2014) and finally the Islamic State (from
June 2014 through present).  While the names changed, at all relevant times, the organization
built by Zarqawi with Iran's backing pursued attacks against Americans in Iraq.  In this
Complaint, Plaintiffs collectively refer to all such groups, prior to al-Qaeda's split from ISIS in
February 2014, as "al-Qaeda-in-Iraq" or "AQI" and Plaintiffs refer to the group post-February
2014 split as "Islamic State," "ISIS," or "ISIL."

stretching from Afghanistan to Iraq that would support an al-Qaeda-led caliphate that would

grow throughout the Middle East, including Afghanistan, Iraq, and Syria.

89.     Al-Qaeda's merger with al-Qaeda-in-Iraq was mutually beneficial.  For al-Qaeda

core and its leader bin Laden, al-Qaeda-in-Iraq was immediately the most active and violent

branch of al-Qaeda's global franchise, and by late 2004, bin Laden had determined that Iraq

should be a central front of al-Qaeda's terrorist campaign against Americans in the Middle East.

Zarqawi concurred regarding the centrality of Iraq to al-Qaeda's terrorist campaign against

Americans in the Middle East and declared, in the fall of 2004: "The spark has been lit here in

Iraq and its heat will continue to intensify—by Allah's permission—until it burns the Crusader

Armies in Dabiq."  By referencing Dabiq, Zarqawi explicitly connected al-Qaeda's terrorist

campaign against the United States in Iraq with a global conflict against America through which

Islam would triumph over the West in Armageddon.

90.     From late 2004 through 2014, al-Qaeda-in-Iraq deployed a vast network of

terrorists throughout Iraq, which was estimated at approximately 15,000 members.  A substantial

percentage of its members were foreign fighters who came from outside Iraq and often had prior

relationships, experience, training, or indoctrination with or from al-Qaeda core, which always

sourced terrorist talent for al-Qaeda-in-Iraq until their split in 2014.

91.     Al-Qaeda-in-Iraq maintained notorious strongholds in Anbar province in Western

Iraq and Ninewa Province in northern Iraq, including their respective capitals, Ramadi and

Mosul.  For example, the U.S. government described Mosul as the "strategic center of gravity"

for al-Qaeda-in-Iraq, and one senior commander of U.S. forces observed that "If AQI had a

Pentagon, it would be in Mosul."

92.     Al-Qaeda-in-Iraq also maintained large cells throughout Iraq, which were in each instance commanded by hand-selected Zarqawi lieutenants, including in Baghdad (Umar Bazyani), northern Iraq (Husain Salim), and Anbar (Abu Azzam Abdallah).  Zarqawi also prioritized building cells at key transport and smuggling nodes for al-Qaeda and al-Qaeda-in-Iraq and stood up al-Qaeda-in-Iraq cells in an array of other Iraqi cities and provinces including Samarra (on the approach to Baghdad), Diyala (near the border with Iran, and a critical waypoint on the road to Lebanon), and al-Qaim (on the border of Syria).

93.     Like other al-Qaeda branches, al-Qaeda-in-Iraq relied upon a hierarchical organization in which there was both top-down leadership as well as local initiative headed by provincial leaders in order to conduct terrorist operations throughout Iraq.

94.     Al-Qaeda-in-Iraq modeled al-Qaeda's corporate approach, including al-Qaeda's reliance upon top-down bureaucracies to manage the terrorist finances, logistics, recruiting, and communications of al-Qaeda and al-Qaeda-in-Iraq terrorists as a precursor to al-Qaeda's desired global caliphate.  Like its parent al-Qaeda, al-Qaeda-in-Iraq also maintained detailed corporate structures, bylaws, committees, and the like, who, in turn, used al-Qaeda-in-Iraq letterhead, forms, receipts, and permission slips.

95.     Al-Qaeda-in-Iraq operated provincial shadow governments that roughly tracked the provincial structure of the Iraqi government.  Al-Qaeda-in-Iraq divided each province into geographic sectors, each of which had an administrator who oversaw smaller highly bureaucratized operational units, such as "brigades," "battalions," or "groups."

96.     Al-Qaeda-in-Iraq organized its bureaucracy similarly at the province and sector levels, both of which relied upon administrative emirs who operationalized its cross-cutting

31

terrorist logistics, finance, and attack planning needs, including bureaucracies governing

"movement and maintenance," "legal," "military," "security," "medical," "spoils," and "media."

97.      At all times, al-Qaeda-in-Iraq relied upon the same al-Qaeda-designed corporate

structures, including an array of committees governing the group's media, terrorist attack

planning, and financial affairs. Through its emulation of al-Qaeda's model, al-Qaeda-in-Iraq

also, among other things, paid salaries to its members, provided comprehensive training to its

recruits, had detailed expense reimbursement processes, and required prospective members or

guests to fill out a detailed application form before joining.

98.      Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al-

Qaeda-in-Iraq ensured that funds raised in one part of Iraq could be redeployed both to other

parts of Iraq as well as to fund al-Qaeda "core" in Afghanistan and Pakistan, or facilitate the flow

of al-Qaeda and al-Qaeda-in-Iraq terrorists between Iraq, Syria, Iran, other Persian Gulf

countries, Afghanistan, and Pakistan from 2004 through 2014.

99.      Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al-

Qaeda-in-Iraq relied upon local fundraising schemes, including protection rackets, as a key

source of funding for operations in Iraq and Syria, and flowing money, fighters, and logistical aid

to al-Qaeda in Afghanistan, Pakistan, Iran, and the Persian Gulf from 2004 through 2014.

100.      On December 17, 2004, the U.S. State Department designated al-Qaeda-in-Iraq as

an FTO, and it has maintained that designation ever since.

101.      By the start of 2005, al-Qaeda-in-Iraq had cemented al-Qaeda's control over the

Sunni insurgency targeting Americans in Iraq.  This represented a tectonic shift in the Sunni

insurgency, which was dominated thereafter by al-Qaeda-linked terrorists, often non-Iraqi Arabs

who served as polyterrorists for al-Qaeda core and al-Qaeda-in-Iraq under bin Laden's franchise model.

102.    In June 2005, al-Qaeda core transmitted instructions to Zarqawi concerning the overall goals of the Iraqi campaign and means to achieve them.  Al-Qaeda emphasized two points above all.  *First*, Iraq remained central to al-Qaeda's global strategy, and al-Qaeda core's instruction to al-Qaeda-in-Iraq was to continue to focus on reestablishing the caliphate in Iraq; as al-Qaeda core put it: "The victory of Islam will never take place until a Muslim state is established in the manner of the Prophet in the heart of the Islamic world, specifically in the Levant, Egypt, and the neighboring states of the Peninsula and Iraq."  *Second*, al-Qaeda-in-Iraq's primary goal was to expel the United States from Iraq and the Middle East.

103.    In July 2005, Zarqawi transmitted a detailed four-phase plan to al-Qaeda core in Afghanistan and Pakistan. Phase One was to expel the United States from Iraq. Phase Two was to develop an Islamic Emirate of Iraq to the point that al-Qaeda could declare a caliphate. Phase Three was to extend al-Qaeda's "jihad wave" to the other countries of the Middle East, including Afghanistan. And Phase Four was to initiate a direct clash with Israel.

104.    Throughout 2005, al-Qaeda-in-Iraq expanded its suicide bombing networks in Iraq (and the broader Middle East, which supported it) side-by-side with the growth of its protection rackets in Iraq.  Most of al-Qaeda-in-Iraq's suicide bombers were foreigners, usually Arabs, who were often personally selected by Zarqawi for their dedication to al-Qaeda's mission. Al-Qaeda-in-Iraq followed al-Qaeda's suicide bombing playbook, including al-Qaeda's tactic of having suicide bombers officially join the organization prior to the attack as a means of cementing their psychological commitment to what al-Qaeda terms its "martyrdom operations."

105.     Ascendant throughout Iraq, al-Qaeda-in-Iraq leaders met in May 2006 to finalize their plans to establish a caliphate over several provinces in Iraq, including Anbar, Salahuddin, Diyala, and Ninewa provinces.  At this meeting, Zarqawi instructed his al-Qaeda-in-Iraq subordinates to communicate to their cells that all agents of the United States were to be killed immediately without prior approval from their superiors. The meeting ended with Zarqawi distributing cash payments, denominated in U.S. dollars, ranging from $500 to $10,000 to selected lieutenants, to finance their attacks.

106.     Zarqawi did not live to see his caliphate. On June 7, 2006, American forces killed Zarqawi in an airstrike on an al-Qaeda-in-Iraq safehouse in Diyala Province.

107.     Al-Qaeda quickly designated al-Qaeda polyterrorist (and Zawahiri lieutenant) Abu Ayyub al-Masri as Zarqawi's successor and leader of al-Qaeda-in-Iraq. Masri's rapid succession permitted al-Qaeda-in-Iraq to continue its advance across Iraq without skipping a beat (despite Zarqawi's righteous demise).

108.     Indeed, by late 2006, al-Qaeda-in-Iraq was more powerful than ever and committing more – and more lethal – attacks against Americans throughout Iraq.

109.     On October 12, 2006, al-Qaeda rebranded al-Qaeda-in-Iraq as the Islamic State of Iraq (or "ISI"), for which it announced a purported cabinet and governance structure, and claimed authority over the provinces of Anbar, Baghdad, Diyala, Kirkuk, Salah al-Din, and Ninewa, as well as parts of Babil and Wasit provinces.  This announcement, fully supported by al-Qaeda core, was the first time any al-Qaeda affiliate had openly declared territorial control, and the elevation of Abu Omar al-Baghdadi to its leadership gave al-Qaeda-in-Iraq's leadership a partial Iraqi face (while al-Qaeda-in-Iraq's leader, Masri, was Egyptian, Abu Omar al-Baghdadi was Iraqi).

110.    By the end of 2006, al-Qaeda-in-Iraq so dominated the Sunni insurgency that most of the remaining Sunni groups were assimilated into al-Qaeda-in-Iraq or, at a minimum, compelled to facilitate al-Qaeda-in-Iraq attacks against Americans even if they remained nominally outside of the group.

111.    Al-Qaeda's resurgence in Iraq also coincided with its renewal in Afghanistan and Pakistan.  By early 2006, al-Qaeda and a rebuilt Taliban began staging terrorist attacks on American forces there with increasing frequency.  These two developments created a vicious feedback loop, in which al-Qaeda-affiliated terrorists could fund, staff, and supply one another's attacks from their respective havens in Iraq, Iran, Afghanistan, and Pakistan.

112.    By the start of 2007, the U.S. government recognized that al-Qaeda's presence in Iraq had grown so extensive as to threaten the viability of the reconstructed Iraqi state.

113.    In February 2007, the U.S. "surged" tens of thousands of additional American personnel into Iraq to halt the explosive growth of al-Qaeda-in-Iraq.  This was accompanied by a string of statements in which senior U.S. officials repeatedly identified al-Qaeda-in-Iraq as the driving force of the anti-American insurgency there.  On February 27, 2007, the Director of the Defense Intelligence Agency, Lieutenant General Michael Maples, publicly characterized al-Qaeda-in-Iraq as "the largest and most active of the Iraq-based terrorist groups."  On April 26, 2007, the top American commander in Iraq, General David Petraeus, called al-Qaeda-in-Iraq "probably public enemy number one."  On July 12, 2007, the U.S. military spokesman in Iraq, Brigadier General Kevin Bergner, observed that AQI was responsible for 80% to 90% of suicide attacks, and stated that defeating AQI was a focus of U.S. operations.

114.    From the start of the surge in early 2007, al-Qaeda-in-Iraq experienced meaningful pressure across multiple fronts in Iraq for the first time in its existence.  As such, al-

Qaeda and al-Qaeda-in-Iraq terrorists operated along two tracks in which some continued the assault in Iraq, while others redeployed from Iraq to al-Qaeda's havens along the Afghanistan/Pakistan border.

115.    At the same time, al-Qaeda core in Afghanistan had spent years patiently rebuilding itself, and its Taliban proxy, and stood poised to dramatically intensify its terrorist campaign in Afghanistan and Pakistan in 2007.  These parallel dynamics meant that al-Qaeda had a ready-made safety valve for its al-Qaeda-in-Iraq terrorists if they needed to flee American forces in Iraq – the haven afforded to al-Qaeda "core" by the Taliban in Afghanistan and Pakistan. Indeed, starting in 2007 and continuing until 2014, al-Qaeda-in-Iraq terrorists flowed back to al-Qaeda's traditional havens in Afghanistan and Pakistan, where they joined al-Qaeda's pre-existing joint cells in Afghanistan or its training and bomb-making camps in Pakistan.  Such al-Qaeda-in-Iraq turned al-Qaeda in Afghanistan operatives helped power al-Qaeda's resurgence in Afghanistan and Pakistan when Plaintiffs and their loved ones were injured there between 2007 and 2016.

116.    But in Iraq, throughout 2007, al-Qaeda-in-Iraq focused on accelerating its wave of terror across Iraq even while many of its terrorists also melted back to Afghanistan and Pakistan, and prioritized attacks against Americans in Ninewa Province (where al-Qaeda-in-Iraq sought to secure Mosul as its long-term base of operations), Anbar and Salah al-Din Provinces (which served as al-Qaeda-in-Iraq strongholds and key transit points), Diyala Province (which was an al-Qaeda-in-Iraq stronghold that keyed its national logistics chain as well as its ability to attack Baghdad), and Baghdad Province (which was a focal point of al-Qaeda-in-Iraq's "spectacular" attacks).

117.    By fall 2007, the U.S. military's surge had begun to show success against al-Qaeda-in-Iraq, putting pressure on al-Qaeda-in-Iraq in Anbar Province and the belts around Baghdad upon which al-Qaeda-in-Iraq relied to attack Americans in Iraq's capital.  These developments alarmed al-Qaeda "core" in Afghanistan and Pakistan, which viewed the attacks in Iraq as one of the centerpieces of their global campaign against America.  As al-Qaeda-in-Iraq's fighters began coming under pressure from both American forces and their allied Iraqi counterparts during the period known as the "Awakening," al-Qaeda core began plotting to secure the services of as many al-Qaeda fighters whom the core had "seconded" to al-Qaeda-in-Iraq as possible while simultaneously redoubling their support for al-Qaeda-in-Iraq.

118.    Al-Qaeda and al-Qaeda-in-Iraq continued al-Qaeda's terrorist campaign against Americans in Iraq and Syria from 2008 through al-Qaeda-in-Iraq's split with al-Qaeda in February 2014, and continued to always support al-Qaeda's campaign against Americans in Afghanistan.

119.    In 2009, al-Qaeda-in-Iraq leader Masri declared that "large, courageous, and targeted operations are necessary to break the bones of the infidels" (i.e., Americans) in Iraq. On June 30, 2009, Multi-National Force-Iraq withdrew from Iraqi cities as part of the plan for the eventual departure of most U.S. forces from Iraq.  In response, al-Qaeda-in-Iraq launched a new wave of spectacular attacks throughout the rest of 2009 designed to show continued nationwide threat posed by al-Qaeda-in-Iraq while simultaneously advancing al-Qaeda's strategic narrative (for fundraisers and recruits) that al-Qaeda and al-Qaeda-in-Iraq were victoriously forcing America out of Iraq. Al-Qaeda's and al-Qaeda-in-Iraq's nationwide bombing campaign throughout 2009 showed to all that both FTOs remained potent threats to Western interests and businesses in Iraq, including the Iraqi companies they subcontracted. During this time, al-Qaeda

and al-Qaeda-in-Iraq continued to boast thousands of terrorist operatives inside Iraq, who continued their terrorist campaign throughout the country.

120.    The pace of al-Qaeda-in-Iraq's terrorist campaign increased throughout 2010.

121.    Indeed, by 2010, every metric confirmed that al-Qaeda was far stronger than it had been when it executed its attacks on 9/11, principally because of the financial, operational, logistical, training, and safe havens it derived from the interplay between al-Qaeda core in Afghanistan and Pakistan and al-Qaeda's key branches like al-Qaeda-in-Iraq, which facilitated a regular flow of fighters, logistical aid, funds, training, and other key aid to al-Qaeda core and, through al-Qaeda core, to other al-Qaeda affiliates, like the Taliban.

122.    On April 19, 2010, Coalition forces killed al-Qaeda's and al-Qaeda-in-Iraq's top two leaders in Iraq, the polyterrorists Masri and Abu Omar al-Baghdadi. Then-Vice President Joe Biden observed at the time that "[t]heir deaths [were] potentially devastating blows to al Qaeda Iraq." After Masri was killed, he was succeeded by al-Qaeda and al-Qaeda-in-Iraq operative Abu Bakr al-Baghdadi al-Husseini al-Qurashi (commonly known as Abu Bakr al-Baghdadi), who led al-Qaeda-in-Iraq thereafter.

123.    Al-Qaeda continued its dominance of al-Qaeda-in-Iraq's leadership after Masri and Abu Omar al-Baghdadi were taken out on April 9, 2010, when al-Qaeda installed another senior al-Qaeda core terrorist into al-Qaeda-in-Iraq's command structure by appointing longstanding bin Laden lieutenant Nu'man Salman Mansur al-Zaydi as al-Qaeda-in-Iraq's "Minister of War" for Iraq.  In this role, Zaydi was effectively the number 2 al-Qaeda-in-Iraq terrorist, behind only Abu Bakr al-Baghdadi.

124.    As of late 2010, al-Qaeda and al-Qaeda-in-Iraq endured in Iraq through their strongholds in Ninewa Province, from which the terrorists continued to successfully threaten and attack Americans throughout much of Iraq, including Ninewa, Anbar, Baghdad, and Diyala.

125.    Al-Qaeda's fortunes in Iraq, and those of its affiliate there, further improved in 2011.  In the spring of 2011, civil war erupted in Syria.  This afforded al-Qaeda and al-Qaeda-in-Iraq an expanded chessboard.  While Syria had long been a haven for al-Qaeda and al-Qaeda-in-Iraq (owing to the Assad regime's calculated embrace of both groups in an effort to help kill Americans in Iraq), the Syrian geographies available to them were somewhat limited.  From 2011 onward, however, the map expanded greatly for al-Qaeda and al-Qaeda-in-Iraq, which sought to rapidly grow into the void created by the violence.

126.    In mid-2011, al-Qaeda instructed al-Qaeda-in-Iraq to establish an al-Qaeda/al-Qaeda-in-Iraq affiliate in Syria.  Following al-Qaeda's instruction, al-Qaeda-in-Iraq supplied its resources, terrorists, and logistical networks in support of the creation of a new al-Qaeda affiliate in Syria, which the terrorists named Jabhat al-Nusra, meaning the "Victory Front."  Among other things, al-Qaeda-in-Iraq leader Abu Bakr al-Baghdadi personally appointed al-Qaeda-in-Iraq terrorist, Abu Mohammad al-Jolani, as head of Jabhat al-Nusra.

127.    In so doing, al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra relied upon the same al-Qaeda-crafted protection money playbook and strategies, al-Qaeda-designed organizational and management practices, and often even the same "polyterrorist" operatives who were simultaneously members of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra.

128.    From 2011 through 2013, al-Qaeda-in-Iraq resumed its expansion across Iraq and Syria and boasted thousands of terrorist operatives dedicated to facilitating al-Qaeda's and al-Qaeda-in-Iraq's terrorist campaign against Americans in the Middle East.

129.     In 2013, al-Qaeda and al-Qaeda-in-Iraq rebranded al-Qaeda-in-Iraq (which they began interchangeably calling "Islamic State of Iraq" in 2006) as Islamic State in Iraq and Syria (or "ISIS") or Islamic State in Iraq and the Levant (or "ISIL"). Specifically, on April 8, 2013, al-Qaeda and al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi announced that Islamic State in Iraq (i.e., al-Qaeda-in-Iraq) had merged with al-Qaeda's and al-Qaeda-in-Iraq's Syrian affiliate, Jabhat al-Nusra, and formed Islamic State of Iraq and Syria.

130.     Even after being rebranded as ISIS (and publicly referring to itself as both ISIS and ISIL interchangeably), al-Qaeda-in-Iraq continued to be al-Qaeda's branch in Iraq until on or about February 2014, when al-Qaeda and ISIS formally separated.  The following day, Abu Mohammed al-Jolani, the leader of Jabhat al-Nusra, rejected Baghdadi's announcement as premature, while professing Jabhat al-Nusra's continued fealty to al-Qaeda, which Jolani invited to mediate the dispute.

131.     For the remainder of 2013, al-Qaeda core, led by Zawahiri and his lieutenants, attempted to mediate the disagreement between Baghdadi and Jolani.  While al-Qaeda core was doing so, a substantial number of Jabhat al-Nusra terrorists joined al-Qaeda-in-Iraq.

132.     Despite their disagreements, al-Qaeda-in-Iraq and Jabhat al-Nusra continued to closely cooperate on tactical matters in Iraq and Syria throughout 2013.

133.     By the end of 2013, Western and Iraqi analysts were publicly and privately observing how al-Qaeda-in-Iraq had successfully regrouped into a terrorist force that was larger, more capable, and more threatening to the United States than it had been between 2003 and 2007.  Among other concerns, such analysts often warned that:  (1) al-Qaeda-in-Iraq's renewed strength could spill over beyond Iraq and further aid al-Qaeda attacks against Americans throughout the region, including in Syria and Afghanistan, based upon al-Qaeda's cross-

pollination model; (2) al-Qaeda-in-Iraq's terrorist campaign could threaten Americans throughout Iraq with attacks that were more lethal and sophisticated than before; and (3) stakeholders should assume al-Qaeda-in-Iraq would continue growing, and that such growth would continue to fuel violence by other al-Qaeda branches (like al-Qaeda core) and affiliates (like the Taliban) around the world.  All three warnings were correct on the merits and widely shared views amongst Western and Iraqi businesses, officials, media, and NGOs in Iraq.

134.   By the end of 2013, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda core provided key funding, training, and logistical aid to its branches and affiliates. Indeed, its branch in Iraq, al-Qaeda-in-Iraq, ended the year by seizing Fallujah.

135.   As 2014 began, al-Qaeda-in-Iraq was on the march in Iraq and Syria, having freshly seized most of Anbar Province, while moving forward to attempting a complete takeover of Ninewa Province (already an al-Qaeda-in-Iraq stronghold at the time). In January 2014, al-Qaeda-in-Iraq complemented its December 2013 seizure of Fallujah by seizing a comparable target in Syria, the city of Raqqa, which al-Qaeda-in-Iraq declared to be its capital upon seizure. In February 2014, al-Qaeda-in-Iraq split with al-Qaeda and rebranded itself as the "Islamic State."

136.   With respect to Afghanistan, from 2003 through 2004, under the Quetta Shura's leadership, guided by al-Qaeda's experts, the Taliban regenerated as a deadly terrorist group intent on expelling America from Afghanistan, overthrowing the recognized government of Afghanistan, and re-establishing Islamist rule.  To that end, in 2005 and early 2006, al-Qaeda and a rebuilt Taliban began staging increasingly frequent terrorist attacks on U.S. forces, Afghan government personnel, and civilians.

137.    Al-Qaeda's posture in Afghanistan from 2007 to 2015 was closely linked to the developments described above.  While al-Qaeda and al-Qaeda-in-Iraq renewed and expanded their terrorist campaigns in Iraq and Syria, their primary focus from 2008 through 2013 shifted to Afghanistan – because that was where they could kill the most Americans.[10]

138.    Al-Qaeda's resurgence continued largely unabated between 2007 and 2016, as al-Qaeda-in-Iraq terrorists, funds, and materiel melted back into al-Qaeda via al-Qaeda's havens in Afghanistan and Pakistan.  During this period, al-Qaeda led a Syndicate of affiliated terrorists that supported al-Qaeda's efforts against the United States and the overthrow of the lawfully elected government of Afghanistan by the Taliban, including its Haqqani Network.  From 2007 through 2016, al-Qaeda and its Syndicate partners focused on suicide bomb attacks against Americans throughout Afghanistan, as well as attacks against Americans in Kabul, and in geographies in Afghanistan and Pakistan where joint al-Qaeda/Taliban cells operated, including, but not limited to, Nuristan, Nangarhar, Kunar, Laghman, Ghazni, and the Haqqani-controlled areas in both countries.

139.    Al-Qaeda's activities in Afghanistan and Pakistan dramatically escalated in 2007.  At around that time, al-Qaeda's Syndicate of affiliated FTOs and SDGTs was fully built, and the Syndicate was actively sponsoring attacks against Americans throughout the Middle East, principally by committing attacks against Americans in Afghanistan and by facilitating attacks against Americans in Iraq through al-Qaeda's provision of training, logistical aid, recruiting, and fundraising networks in Afghanistan, Pakistan, and elsewhere in the Middle East.

---

[10] Al-Qaeda's rationale for its strategic escalation in Afghanistan from 2008 through 2013 mirrored the group's earlier basis for focusing on Iraq from 2003 through 2007:  in both instances, the geography in question represented the location in the Middle East in which al-Qaeda could attack and kill the most Americans possible.

140.     Collectively, al-Qaeda and al-Qaeda-in-Iraq committed many of the attacks in furtherance of al-Qaeda's campaigns in Iraq, Syria, and Afghanistan that killed and injured Plaintiffs in Iraq and/or Afghanistan.  *See infra* Part XI (Iraq and Syria); XII (Afghanistan).

141.     Islamic State had a sophisticated, well-developed, and complex financial structure.  Islamic State's Finance Council was a cabinet-level entity that managed Islamic State's expenditures and revenue derived from illicit proceeds from occupation of territory, including from its protection rackets and illicit taxation of goods and cash that transited through territory where Islamic State operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and even had a "Chief Financial Officer" to manage it all.  Islamic State's Finance Council oversaw the financial infrastructure of the organization and managed Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated multiple "taxation offices" replete with financial auditors.

### B.     Al-Qaeda Comprised A Globally Integrated Terror Network That Relied Upon A Cooperative, Corporate Model Internally And With Other Allied Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign Against The United States

142.     Al-Qaeda's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, al-Qaeda's:  (1) integrated global network, which disregarded national boundaries; (2) doctrinal emphasis on unity amongst Islamist groups, and cooperation with otherwise-hostile groups that were also targeting the United States, which comprised a "joint operations" model of terrorist campaigns that revolutionized terrorism; (3) multinational corporate model, which emphasized partnership between al-Qaeda branches and affiliates; (4) reliance upon protection money

payments extracted from companies to finance terrorist operations; (5) use of Iranian territory as a safe haven and logistical pipeline through a secret deal with the Iranian regime to connect al-Qaeda operatives in Iraq, Iran, and Afghanistan; and (6) practice of flowing value from al-Qaeda-in-Iraq to al-Qaeda "core" and its partners in Afghanistan and Pakistan.

### 1.    Al-Qaeda's Integrated Global Network

143.    Al-Qaeda served as a global network and umbrella group that organized the anti-American terrorist campaigns of its branches (like al-Qaeda-in-Iraq, inclusive of Jabhat al-Nusra) and affiliates or allies (like the Taliban, including its Haqqani Network).

144.    Al-Qaeda operated in both a centralized and decentralized manner, extracting advantage from what each approach offered.  While al-Qaeda's core set the strategy, facilitated attacks, provided fighters and funding, and led the overall campaign, al-Qaeda's branches around the world had autonomy to conduct operations on a cellular level.  This balanced approach modeled that of the U.S. military (which also relied upon a chain-of-command that facilitated local innovation) and made al-Qaeda far more formidable.

145.    Throughout al-Qaeda's more than 25-year history, al-Qaeda has operated as a highly structured organization, rather than a loose network.

146.    At all times, thousands of al-Qaeda operatives served al-Qaeda's global terrorist network.

147.    After 9/11, the United States government launched a globalized war against al-Qaeda and its branches and affiliates, to which al-Qaeda replied with an equally globalized response.  In the twenty years following 9/11, al-Qaeda and its branches and affiliates used shared strategies, training sites, terrorist operatives (who wore multiple organizations' hats and were known as "polyterrorists"), financiers, and the like, under al-Qaeda's multinational corporate approach.  As a result, while al-Qaeda's footprint grew over time to encompass Syria

and other countries in the Middle East, Africa, and Europe, al-Qaeda and its allies pursued consistent approaches that drew resources, personnel, and expertise, from a global latticework of cells in Afghanistan, Pakistan, Iraq, Syria, Lebanon, Jordan, and dozens of other nations on every continent but Antarctica.  This was made possible by al-Qaeda's long-term role as a terrorist innovation hub in which transnational al-Qaeda terrorists trained al-Qaeda branches and affiliates regarding terrorist practices, including terrorist fundraising tactics, techniques, and procedures.

148.    Al-Qaeda's post-9/11 strategy reflected bin Laden's long-standing vision of al-Qaeda (and himself, specifically) as the leader of a grand terrorist coalition across Iraq, Afghanistan, and Pakistan. Due to the mutually reinforcing ties between al-Qaeda and its Sunni allies – including their practice of cross-donations to each other – support for one benefited all.

149.    Under al-Qaeda's global network approach, al-Qaeda, al-Qaeda-in-Iraq, and their allies collaborated in Iraq, Syria, Afghanistan, Pakistan, the U.A.E., Europe, Africa, and elsewhere to carry out terrorist attacks against Americans worldwide from 9/11 through today.

150.    Al-Qaeda exemplified how terrorist networks could harness the benefits of an increasingly interconnected, globalized environment to serve their agenda by operating as a multinational enterprise with operations in more than 60 countries.  Al-Qaeda's global activities were coordinated using personal couriers and communication technologies emblematic of the era—cellular phones, encrypted e-mail, internet chat rooms, and online videos. Members of al-Qaeda traveled from continent to continent with the ease of a recreational or business traveler in an age marked by unprecedented mobility and migration, paid for with the funds al-Qaeda raised through, among other things, protection rackets, front businesses, and donations.

151.    Indeed, al-Qaeda experts have long warned against attempts to treat al-Qaeda core in Afghanistan and Pakistan as a separate operational, financial, logistical, and doctrinal

organization from al-Qaeda branches and affiliates like al-Qaeda-in-Iraq and Jabhat al-Nusra. Instead, to properly understand how al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra plan and execute attacks, one must consider al-Qaeda's relationships with its subsidiaries like al-Qaeda-in-Iraq and Jabhat al-Nusra, which operated from 2001 through 2014 as part of a single structure in which al-Qaeda facilitated attacks by al-Qaeda-in-Iraq and Jabhat al-Nusra in their capacity as al-Qaeda subsidiaries serving as part of al-Qaeda's integrated global terrorist organization.

152.    Al-Qaeda's global network approach also comported with its multinational corporate model.  As a result, al-Qaeda, al-Qaeda-in-Iraq, and their allies regularly pursued fused terrorist finance and logistics strategies—*e.g.*, joint al-Qaeda and Haqqani Network cells in Europe, Afghanistan, or Pakistan, and/or allied terrorist finance and logistics strategies, such as when al-Qaeda and al-Qaeda-in-Iraq collaborated to distribute ransoms paid to either group to al-Qaeda's other global franchises and partners, or between their respective global cells and financiers for the shared purpose of routing funds, arms, and fighters to terrorist cells targeting Americans in the Middle East.

153.    After 9/11, the al-Qaeda network demonstrated how terrorists could harness technology to disperse leadership, training, and logistics not just regionally but globally because establishing and moving cells in virtually any country was relatively easy in a world where more than 140 million people lived outside of their country of origin and millions of people crossed international borders every day.

154.    Thus, al-Qaeda benefited from a flexible, transnational network structure, enabled by modern technology, in which terrorists worked together in fundraising, intelligence collection, training, logistics, planning, and in executing attacks. Under this approach, al-Qaeda terrorists

with objectives in one country or region drew strength and support from branches in other countries or regions, producing a mutually reinforcing, dynamic al-Qaeda network structure.

155.    Al-Qaeda's global network created a force multiplier effect for al-Qaeda terrorists by establishing links with other like-minded organizations around the globe.  The resultant terrorist interconnectivity changed the nature of terrorism.

156.    Al-Qaeda-in-Iraq, which was al-Qaeda's most important branch outside of Afghanistan/Pakistan, served as an indispensable component of al-Qaeda's global terrorist finance, logistics, operational, and communications infrastructure, and vice versa.  Through their shared networks, al-Qaeda and al-Qaeda-in-Iraq greatly facilitated, and greatly enhanced the lethality of, both groups' attacks in Afghanistan, Iraq, Syria, and elsewhere.  This outcome was the entire point of al-Qaeda's and al-Qaeda-in-Iraq's respective terrorism "business models." With respect to al-Qaeda, al-Qaeda core's terrorism "business model" sought to facilitate attacks against Americans around the world through al-Qaeda core's ability to leverage the resources of al-Qaeda-in-Iraq to facilitate attacks by al-Qaeda core (and other al-Qaeda branches and affiliates) around the world, which was a prime motivation for al-Qaeda core's support for al-Qaeda-in-Iraq in the first instance, and was also the direct result of bin Laden's transactional and franchise-based approach to transnational terrorism.  Likewise, al-Qaeda-in-Iraq's terrorism "business model" also sought to facilitate attacks against Americans around the world through al-Qaeda-in-Iraq's ability to leverage both its own financial and logistical resources from its protection rackets in Iraq, and also the network of resources provided by al-Qaeda core in Afghanistan and Pakistan and elsewhere in the Middle East.

157.    With respect to its operations outside of Iraq, al-Qaeda-in-Iraq prioritized the Afghanistan/Pakistan region as a key theater in which it would facilitate attacks against

Americans.  This reflected al-Qaeda-in-Iraq's institutional viewpoint that its Iraqi strongholds, like Mosul, represented the best location for the capital of a global caliphate that would expand westward to Syria and eastward into Afghanistan.

### 2. Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists

158.    At all times, al-Qaeda emphasized unity with other Islamists – as long as they sought to attack America.  Under this approach, al-Qaeda's strategy, under bin Laden and his successors, was to use its money, polyterrorists, and good offices to build bridges between and otherwise unite Islamists who targeted American in order to expel the U.S. from the Middle East.

159.    Al-Qaeda's doctrinal emphasis on unity, and the cooperation with other terrorists demanded by it, served al-Qaeda's programmatic interests by positioning al-Qaeda as the leader of an anti-American vanguard, facilitating cooperation with potential Islamist allies who might otherwise be enemies (like the IRGC), and promoting an ethos consistent with al-Qaeda's "joint cell" model (in which al-Qaeda terrorists ordinarily co-located with their branch or affiliate/ally, such as a joint al-Qaeda/Taliban cell in Afghanistan), through which al-Qaeda further expanded its reach.

### 3. Al-Qaeda's Multi-National Corporate Model

160.    Al-Qaeda followed a corporate model in which it operated as a devolved network hierarchy where al-Qaeda core facilitated attacks, approved campaigns and geographies targeting Americans, provided training and technical expertise, supported logistics and smuggling, operated a transnational travel network of safe havens for operatives to move between Iraq/Syria and Afghanistan/Pakistan (often through Iran via al-Qaeda's deal with the IRGC), and enabled cross-pollination between al-Qaeda's branches and/or affiliates (*e.g.*, within and between al-Qaeda-in-Iraq, and the Taliban [including the Haqqanis] or Jabhat al-Nusra, for example).

161.     After 9/11, al-Qaeda leaned heavily into its strategic doctrinal emphasis on corporate and cooperative game-theoretic principles, including concepts such as cooperation theory, franchising, and joint ventures.  This reflected al-Qaeda's tactical and operational fusion with its affiliates in Afghanistan and Pakistan.

162.     Under al-Qaeda's corporate model, al-Qaeda core leaned heavily into al-Qaeda's subsidiary branches (like al-Qaeda-in-Iraq) when the former was under pressure and the latter were not (as was the case from 2003 through 2008), and al-Qaeda core also served as a haven for those same subsidiaries when the tables were turned and the subsidiaries were under pressure while the core was stronger (as was the case from 2008 through 2014). Al-Qaeda's interdependence and joint ventures with its allies in Iraq, Syria, Afghanistan, and Pakistan continued throughout the period in which Plaintiffs were killed and injured.

163.     **Oath of Allegiance.** Al-Qaeda required every al-Qaeda branch, like al-Qaeda-in-Iraq or al-Qaeda in the Arabian Peninsula ("AQAP"), to swear an oath of allegiance to al-Qaeda (which often swore a reciprocal oath to its counterpart), and al-Qaeda required both its branches and its allies or affiliates (like the Taliban, including its Haqqani Network) to follow al-Qaeda's playbook concerning terrorist operations, finance, logistics, doctrine, and communication.

164.     **Structure.** Al-Qaeda's corporate approach was also reflected in its goal of establishing and maintaining a top-down global bureaucracy through which al-Qaeda "core" managed the terrorist finances, logistics, recruiting, and communications of al-Qaeda branches as a precursor to al-Qaeda's desired global caliphate.  Accordingly, al-Qaeda created and maintained detailed bylaws and established formal governing committees and a chain of command among its leaders — who corresponded on al-Qaeda letterhead and used al-Qaeda-branded forms, receipts, and permission slips to conduct al-Qaeda's affairs.

165.    At all times, al-Qaeda relied upon a substantial corporate structure with an array of committees governing the group's media, terrorist attack planning, and financial affairs. Through these structures, al-Qaeda implemented a corporate-style chain of command complete with a CEO, paid salaries to its members, offered vacation (when requested at least ten weeks in advance), provided comprehensive and organized training to its recruits, and required every prospective al-Qaeda member or guest to fill out a detailed application form or attend an al-Qaeda-sponsored camp.

166.    Al-Qaeda's official organizational structure included a formalized hierarchy and official positions. Al-Qaeda was led worldwide by an emir, to whom all branches (and their members) pledged allegiance.  Al-Qaeda's emir was advised by the Shura Council.  Al-Qaeda also maintained a Military Committee, Political Committee, Media Committee, Administrative and Financial Committee, Religious Committee, and Foreign Affairs Committee, each of which had a formal structure, objectives, and authorities.

167.    Al-Qaeda's formal organizational structure ran from al-Qaeda "core" in Afghanistan and Pakistan to al-Qaeda's branches, including al-Qaeda-in-Iraq.  Among other things, al-Qaeda's emir appointed a representative co-located with the leadership of each affiliate to act as a direct channel to al-Qaeda core in Afghanistan and Pakistan.  Through its direct chain of command that emanated from al-Qaeda "core" to al-Qaeda's branches, including al-Qaeda-in-Iraq, al-Qaeda's branches reinforced their subordination to al Qaeda "core."

168.    Al-Qaeda also ensured that its branches, including al-Qaeda-in-Iraq, followed an organizational structure similar to that of al-Qaeda core.

169.   **Franchises**.   After 9/11, al-Qaeda often conducted its attacks against the United States through al-Qaeda branches, like al-Qaeda-in-Iraq.  In such cases, the attack in question was committed by al-Qaeda and its local branch.

170.   Consistent with its adherence to a corporate-style structure, al-Qaeda also followed a "franchise" model around the world after 9/11, under which al-Qaeda "branches" (like al-Qaeda-In-Iraq and Jabhat al-Nusra) and "affiliates" or "allies" (like the Taliban, including its Haqqani Network), operated as part of al-Qaeda's network and cross-pollinated with all the other above-referenced FTOs.

171.   Al-Qaeda "core" in Afghanistan/Pakistan established al-Qaeda branches (also known as "franchises") in Iraq (i.e., al-Qaeda-in-Iraq), Syria (i.e., al-Qaeda-in-Iraq and later Jabhat al-Nusra), and elsewhere, through which al-Qaeda raised funds and resources, which flowed from the affiliates in Iraq, Syria, and elsewhere, back to al-Qaeda "core" in Afghanistan to facilitate al-Qaeda attacks against Americans worldwide.

172.   The value flowed both directions.  For example, after al-Qaeda-in-Iraq's official accession to al-Qaeda's global organization, al-Qaeda core escalated the flow of funds, fighters, and logistical aid to al-Qaeda-in-Iraq, and al-Qaeda provided at least $1,000,000 per month in total value to al-Qaeda-in-Iraq thereafter.

173.   Simultaneously, from 2004 through 2014, al-Qaeda-in-Iraq was al-Qaeda's top wholly owned subsidiary, and responsible for more support to al-Qaeda "core" than any other al-Qaeda branch or affiliate.  Because of the parent/subsidiary and franchisor/franchisee relationship between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda-in-Iraq in Iraq and Syria, aid to one necessarily benefited the other.  Indeed, this was the goal of bin Laden's corporate model in the first place:  to maximize the potency of al-Qaeda's campaign against

America by leveraging the financial, logistical, and operational capabilities of al-Qaeda's branches, and vice versa.

174.     At all times, such two-way value flows – in which al-Qaeda core provided funds, logistical aid, and fighters to al-Qaeda-in-Iraq in Iraq and Syria, while al-Qaeda-in-Iraq also provided funds, logistical aid, and fighters to al-Qaeda core in Afghanistan and Pakistan – were a hallmark of al-Qaeda's relationships with its branches, including al-Qaeda-in-Iraq.

175.     **Command and Control.**  Under al-Qaeda's corporate model, when any al-Qaeda branch, like al-Qaeda-in-Iraq, facilitates attacks against Americans or the growth of al-Qaeda outside of such branch's al-Qaeda-assigned territory, the subsidiary must communicate directly with al-Qaeda core, receive al-Qaeda's authorization, follow al-Qaeda's plan, and strictly adhere to al-Qaeda doctrine.

176.     These al-Qaeda rules applied, for example, when al-Qaeda-in-Iraq worked with Sirajuddin Haqqani to establish a two-way training pipeline between Iraq/Syria and Afghanistan/Pakistan from 2005 through 2014 in which al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, the Taliban (including its Haqqani Network), and other al-Qaeda affiliates and "Syndicate" members, like Lashkar-e-Taiba, all jointly trained in cross-pollinating terrorist networking sessions that epitomized bin Laden's "first principles" view of al-Qaeda's terrorist business model.

177.     Al-Qaeda's core also maintained a designated representative co-located with each al-Qaeda affiliate, including al-Qaeda-in-Iraq, who interacted with affiliate leadership and ensured that the relationship ran directly through the affiliate's leadership in Iraq and Syria to al-Qaeda core's leadership in Afghanistan and Pakistan.

178.   **Cross-Pollination.**  Al-Qaeda core's emphasis on command-and-control did not stifle innovation amongst its branches and affiliates.  To the contrary, al-Qaeda also encouraged horizontal relationships amongst its branches and affiliates as long as it was mediated by al-Qaeda, *e.g.*, al-Qaeda-brokered cooperation between the Taliban and al-Qaeda-in-Iraq for the mutual benefit of both.

179.   Al-Qaeda core's desire to serve as a hub for cross-pollination amongst al-Qaeda's various branches like al-Qaeda-in-Iraq reflected its "franchise" approach to anti-American terrorism.  For example, from 2003 through 2014, al-Qaeda core facilitated substantial training programs conducted by al-Qaeda-in-Iraq terrorists at al-Qaeda camps in Afghanistan and Pakistan, which were for the mutual benefit of the al-Qaeda-in-Iraq terrorists providing the training (who used the opportunity to network, improve their own skills, and develop new fundraising relationships) as well as al-Qaeda-affiliated terrorists in the camps (*e.g.*, the Taliban, who learned from al-Qaeda-in-Iraq how to more effectively attack U.S. armor).

180.   While Iraq was al-Qaeda's top focus from 2003 through 2006, Afghanistan was always at least a close second, which eventually surpassed Iraq as al-Qaeda's top priority after 2009.  Afghanistan remained al-Qaeda's top focus until the United States fully withdrew from the country in 2021 (with Syria assuming co-equal importance once the violence there began).

181.   Given that Iraq (inclusive of parts of Syria) and Afghanistan were at all relevant times al-Qaeda's top two priorities, al-Qaeda aggressively pursued cross-pollination of strategies, personnel, fundraisers, and the like between these geographies.  In such a dynamic learning environment for the terrorists, successful strategies were quickly "ported" from one geography to another (the boundaries between which al-Qaeda and its branches generally rejected on principle

and ignored in practice).[11] As a result, al-Qaeda's living/learning approach to cross-pollinating knowledge and practices amongst its branches had a devastating effect on Americans in Iraq, Syria, and Afghanistan.

182.    **Finance.**  Throughout its existence, and in keeping with its corporate model, al-Qaeda developed a comprehensive infrastructure designed to route money anywhere in the world that al-Qaeda and its franchises and partners needed resources.

183.    True to its multinational corporate structure, al-Qaeda (the parent) devised and oversaw the financial bureaucracy of al-Qaeda-in-Iraq (the subsidiary) throughout Iraq, which al-Qaeda-in-Iraq operationalized and executed at the national, provincial, and local levels throughout Iraq.  The resulting al-Qaeda and al-Qaeda-in-Iraq financial infrastructure was purpose-built to ensure that the protection money both received through any level of their Iraq- and Syria-related protection rackets was optimized to maximize the lethality of their terrorist campaign in Iraq, Syria, Afghanistan, and Pakistan, for example, by ensuring that al-Qaeda and al-Qaeda-in-Iraq senior leadership could redirect payments from one geography to another, as necessary, to maximize the tempo of their terrorist campaigns and ensure that protection payments to local or provincial terrorists were passed up both groups' chains, ultimately reaching al-Qaeda core in Afghanistan and Pakistan and al-Qaeda-in-Iraq's national finance emir.

184.    **Safe Haven.** Al-Qaeda core's sanctuary in Afghanistan and Pakistan also served as a permanent safe haven for al-Qaeda branch and affiliate terrorists who needed to flee their own geographies whenever pressure from the United States grew too intense.

---

[11] Al-Qaeda and its affiliates rejected nearly every major border and geographic concept relevant to today's Middle East as having been created by the infidels.  Al-Qaeda and its allies, as a result, often organized themselves along transnational lines that crossed several countries' borders.

185.   **Learning Organizations.**   Al-Qaeda and its branches, including al-Qaeda-in-Iraq, were "learning organizations" in which operatives were allowed to criticize leaders and were encouraged to evaluate operations afterwards to learn from them and port their experiential wisdom (aka "lessons learned") throughout the broader al-Qaeda network.

> **4.      In Collaboration With Iran's Islamic Revolutionary Guard Corps, Al-Qaeda Used Iranian Territory To Securely Move Money, Fighters, Weapons, and Communications Between Afghanistan And Iraq In Order To Facilitate Attacks Against Americans In Both Places**

186.   Al-Qaeda made a secret deal with the Islamic Revolutionary Guard Corps that allowed al-Qaeda to seamlessly transfer terrorists, funds, weapons, communications, and expertise between Iraq and Afghanistan from 2005 through 2022. Al-Qaeda's ability to transit Iran was vitally important for its ability to facilitate attacks in Iraq and Afghanistan by creating a land bridge connecting those two countries (extended by their borders with Syria and Pakistan, respectively).   Moreover, the Iranian havens provided as part of the secret deal protected key al-Qaeda leaders from U.S. strikes.

187.   Following 9/11 and the United States' subsequent rout of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, the IRGC met in Iran with senior al-Qaeda leaders who had fled Afghanistan to offer military aid to support al-Qaeda's fight against America.   The IRGC hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002.

188.   Under their secret deal, the IRGC intensified its material support for al-Qaeda's terrorist campaign against Americans around the world and was responsible for—as bin Laden himself concluded—al-Qaeda's survival as a terrorist organization after 9/11 and, consequently, the al-Qaeda-linked terrorist attacks against Americans in Iraq, Syria, and Afghanistan, including Plaintiffs, that inevitably followed.

189.    Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by the IRGC.  For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving aid that the IRGC had been providing to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "main artery for funds, personnel, and communication."

190.    The U.S. government has also recognized the significance of the close partnership between the IRGC and al-Qaeda after the secret deal between the two.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between the IRGC and al-Qaeda.  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities."  The Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serve[d] as the core pipeline through which al-Qa'ida move[d] money, facilitators and operatives from across the Middle East to South Asia."  Indeed, al-Qaeda has honored its commitment to the IRGC despite its attacks on Shiite Muslims elsewhere in the Middle East.

II.   **DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING FINANCIAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE BY MAKING PROTECTION PAYMENTS TO THEM**

A.   **Defendants Operated In Insecure And Corrupt Iraqi And Afghan Contracting Environments That Encouraged Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**

191.   LM Ericsson, Ericsson AB, and Ericsson Inc. operated lucrative businesses in which their profits depended upon transactions in, and transporting lucrative goods through, Iraq, Syria, and Turkey. LM Ericsson and Ericsson AB operated as one of the largest telecom companies in Iraq, which required regular transportation of goods throughout Iraq as well as Syria and Turkey.  LM Ericsson, Ericsson AB, and Ericsson Inc. earned at least $1.9 billion combined in net profits in Iraq alone from 2003 through 2019 through large-scale U.S.-government and U.S.-funded Iraqi government contracts and by providing logistical support to other companies in Iraq and Syria.

192.   To increase their profit margins by redirecting terrorist attacks away from their business interests, LM Ericsson, Ericsson AB, and Ericsson Inc. knowingly facilitated protection money or "tax" payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists in Iraq and Syria between at least 2004 and at least 2019, and thereby provided millions in U.S. dollars to these FTOs each year.

193.   The specifics of Ericsson's protection payments and obstruction of American counterterrorism efforts in the United States and the Middle East are discussed in Parts II, IV, V, VI, and VII.  To lay the groundwork for those allegations, the next two sections describe the contracting environment in geographies that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State between 2003 and 2022 and survey the evidence that illicit Iraq-related

transactions by multinational corporations, including Defendants, commonly served as vehicles to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq and Syria.

> **1.** **Al-Qaeda, Islamic State, And Their Allies Operated Sophisticated Protection Money Networks In Iraq And Afghanistan**

194.    LM Ericsson's and Ericsson AB's and Ericsson Inc.'s protection payments and obstruction of American counterterrorism activities against al-Qaeda and Islamic State occurred in contracting environments in Iraq marked by widespread insecurity and endemic corruption.

195.    From 2004 through 2022, al-Qaeda and al-Qaeda-in-Iraq (2004-2014) and Islamic State (2014-2022) successfully extracted protection payments throughout Iraq because they controlled or contested key transportation nodes relevant to shipping nearly anything nearly anywhere in the country including, but not limited to, key geographies astride transportation routes linking Iraq with Jordan and Syria (through Qaim, in western Iraq), Turkey (through Mosul and Erbil, in northern Iraq), the Persian Gulf (through the western and southern approaches to Baghdad, in central Iraq), and Iran (through Diyala, in eastern Iraq).

196.    Throughout this period, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operationalized their protection rackets vis-à-vis commerce conducted throughout Iraq, not just the areas these terrorists controlled or contested.  This was a function of geography and then-existing transportation routes. In short, most companies shipped their products and other materials overland from northern or western Iraq, rather than using the port at Umm Qasr in Southern Iraq.  The terrorists controlled or contested key chokepoints relevant to all transportation routes, and thus financially benefitted from protection money payments for all types of commercial activity, ranging from shipments of lucrative goods (*e.g.* consumer electronics) to shipments of building supplies used for infrastructure projects (*e.g.* cell towers)—

even when the projects in question were built in areas of Iraq far outside the terrorists'

strongholds in Anbar, Baghdad, Ninewa, Kirkuk, and Diyala.

197.     In the decade prior to the U.S. invasion of Iraq in 2003, the rule of law broadly

collapsed in Iraqi society, as nearly all Iraqi elites engaged in corruption.

198.     Following the 2003 invasion, al-Qaeda-affiliated clerics explicitly blessed

corruption and criminality as long as it related to financing attacks against Americans in Iraq

through a series of *fatwas* that turbocharged the willingness of Iraqis to engage in corruption.

199.     These messages were favorably received throughout Iraq, as the security climate

worsened after 2003 and corruption became entrenched to a level it had not achieved even under

Saddam.  From 2003-2020, Iraq was one of the most corrupt countries in the world – falling into

a category some refer to as "hyper-corruption." In Transparency International's Corruption

Perceptions Index – widely considered the most authoritative measure of country-level

corruption – Iraq ranked near the very bottom each year.  In 2007, for example, Transparency

International ranked Iraq 161st out of 163 countries.  Such rankings reflected longstanding

traditions of corruption that affected virtually every aspect of Iraqi civil society.

200.     The U.S. government concurred.  In a since-declassified study of al-Qaeda

finance in Iraq in the mid-2000s, the U.S. military's Central Command ("CENTCOM"), which is

responsible for U.S. operations throughout the Middle East, including Iraq, Afghanistan, Syria,

and Turkey, observed that the "rampant corruption" that Saddam Hussein's regime

programmatically pursued from the late 1990s until 2003 set the conditions for terrorists to later

leverage corruption as a key source of terrorist finance and logistics flow.

201.     When LM Ericsson, Ericsson AB, and Ericsson Inc. sought to profit off the Iraqi

market, Defendants faced an equally corrupt business environment.  When they sought to profit

from economic transactions in Iraq's corruption-based economy – including those linked to U.S. government dollars directly through U.S. government contracts or indirectly through Iraqi government contracts funded by the U.S. government – they therefore faced unusually high corruption and money laundering risks, including the associated terrorism risks.

202.    Western corporations operating in Iraq used the same corruption manners and means to route payoffs to corrupt government officials who could influence their business as they used to pay off terrorists who could also influence their business, and knowingly structured their transactions to exploit their corrupt business environments as the cost of doing business. They did so by laundering money through a latticework of local partners including, but not limited to, their local customers (for whom elite Western bribe-paying companies, not the customer, held the real power), and their subcontractors – hired for ostensible tasks such as security, transportation, logistics, sales, government relations, and business intelligence, among others – that could make corrupt payoffs downstream while (in theory) maintaining plausible deniability for the corporations, like LM Ericsson, Ericsson AB, and Ericsson Inc., whose money they were diverting to terrorists.

203.    Some protection payments passed through a single intermediary, but other projects had as many as five different companies in the contracting chain:  a prime contractor, acting in a supplier and agent role (*e.g.*, Ericsson AB), would interface with the customer, usually the U.S. or Iraqi government, as well as any key stakeholders like the World Bank, to facilitate large-scale contracts involving the sale of goods or services manufactured by the supplier's affiliated manufacturer (*e.g.*, Ericsson Inc.); the prime contractor would then outsource performance or implementation of key aspects of the contract to a partner (including its customer) or a subcontractor; the partner or subcontractor would hire another partner or

subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf.  This structure was commonplace for protection payments made by Western companies in terrorist-contested areas in the Middle East, who (for obvious reasons) preferred to funnel their payments to terrorists through intermediaries.  This structure allowed the final subcontractor to make corrupt payments while the companies higher up in the chain denied involvement; it also ensured that there was always a demand for more work, as the jobs in question were rarely completed on time (if ever).

204.    Ericsson was no stranger to such multi-layered illicit payment schemes.  In its Deferred Prosecution Agreement, LM Ericsson admitted to making illegal payments in China that flowed from multiple Ericsson entities via sham contracts to consulting companies; from the consulting companies to individual "sales agents"; and from the sales agents to Ericsson's Chinese state-owned customers.

205.    These same contracting practices typically led to poor-quality work that undermined U.S. reconstruction objectives in Iraq.

206.    Enormous amounts of American taxpayer dollars disappeared into this web of corrupt contractors and subcontractors.  With prime contractors abdicating their oversight role, in part to maintain plausible deniability over the protection payments they were encouraging, subcontractors rarely spent the U.S. dollars provided by their U.S. government, Iraqi government, and/or World Bank-funded customers on the intended projects.

207.    Western contractors' exploitation of chains of unethical subcontractors in Iraq and Afghanistan was widely understood to be corrupt.  A 2009 study for the U.S. Agency for International Development ("USAID") detailed that "perceptions of rampant corruption include corruption in the donor community, due to the high costs, bureaucratic procedures, and layers of

contracting and subcontracting in many projects." A 2011 report by the U.S. Senate Committee

on Foreign Relations likewise criticized the widespread "use of large numbers of contractors" as

inviting "corruption through multiple subcontractors." The prevailing criticism of such practices

led General Petraeus to issue formal contracting guidance in 2010 that emphasized the

importance of "contract[ing] with vendors that have fewer sub-contractors. Excessive sub-

contracting tiers provide opportunities for … insurgents to divert contract money from its

intended purpose." Although not the only cause, Defendants' use of multiple contracting tiers

enabled them to make enormous profits while delivering substandard work. It also, as alleged

below, helped them fund al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for nearly two decades.

### a.    Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money Operation in Iraq from 2004 through 2014

208.    From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq jointly managed and

profited from a sophisticated, nationwide protection money operation in Iraq, through which al-

Qaeda and al-Qaeda-in-Iraq successfully extracted payments using their ability to control or

contest vital transport nodes relevant to transporting nearly anything nearly anywhere in Iraq.

209.    In 2003 and 2004, al-Qaeda, including its polyterrorist leader Abu Musab al-

Zarqawi, spearheaded the development of al-Qaeda's and al-Qaeda-in-Iraq's protection rackets

in Iraq and Syria, which Zarqawi and his allies operated to profit from protection "taxes" applied

to commercial activities in any Iraqi territories that al-Qaeda and al-Qaeda-in-Iraq could contest

– i.e., most of the country. To do so, Zarqawi did not have to build these protection rackets from

scratch. Instead, al-Qaeda just took them over from the incumbent owners (usually, middlemen

affiliated with Saddam), declared that al-Qaeda was now in charge, and followed al-Qaeda's

protection money playbook thereafter.

210.    Al-Qaeda-in-Iraq's surge throughout Iraq in 2004 was powered by its wholesale adoption of al-Qaeda's protection money playbook, which bin Laden and his lieutenants pioneered in Africa and on which al-Qaeda trained its branches and affiliates in Afghanistan. For al-Qaeda, al-Qaeda-in-Iraq offered the first-ever test case of al-Qaeda's protection money tactics in an environment rich in Western firms, as opposed to prior rackets based in Sudan and Somalia, which tended to target Middle Eastern firms because no one else did business there.

211.    By the summer of 2004, al-Qaeda (through Zarqawi and others) had fully operationalized al-Qaeda's protection rackets in Iraq and parts of Syria.  To do so, al-Qaeda and its local branches communicated to companies doing business in these geographies that companies could absorb the expense of guards or take the easier and more profitable route of simply paying protection money to al-Qaeda and its branches, like al-Qaeda-in-Iraq.

212.    Zarqawi and al-Qaeda-in-Iraq took to al-Qaeda's protection money scheme with a zeal that matched the intensity of the al-Qaeda terrorist campaign that it financed.  Al-Qaeda and al-Qaeda-in-Iraq collected "taxes" and "fees" throughout the life cycle of significant economic transactions in Iraq that involved transportation of valuable products (as Ericsson's business interests in Iraq ordinarily did). Those payments included, but were not limited to, "tolls" of $400-$500 per vehicle that were assessed at or near border crossings in Qaim, Erbil, Mosul, Diyala; similar "tolls" at key chokepoint geographies in and near Baghdad; "fees" assessed on a project basis; and/or "taxes" assessed based on targets' estimated income.

213.    Al-Qaeda-in-Iraq followed the bin Laden protection money playbook by having a specific bureaucracy dedicated to collecting and redistributing protection money payments from companies with business interests in geographies that were controlled or contested by al-Qaeda or an al-Qaeda subsidiary.  For example, al-Qaeda-in-Iraq operated what it euphemistically

referred to as "Spoils Groups," which were terrorist finance and logistics cells that al-Qaeda-in-Iraq had specifically designated to facilitate al-Qaeda and al-Qaeda-in-Iraq operations through the collection and redistribution of protection money at an industrial scale.[12]

214.    By April 2005, al-Qaeda-in-Iraq's protection rackets had been running for more than a year, and Zarqawi was using them to rapidly expand al-Qaeda's terrorist campaign, opening up new fronts in Baghdad and Diyala Provinces. Protection rackets in Anbar Province alone, for example, yielded several million U.S. dollars per month, which flowed back to al-Qaeda-in-Iraq and, through it, al-Qaeda core as well.

215.    Al-Qaeda's continued expansion throughout Iraq in 2006, through al-Qaeda-in-Iraq, was powered by the latter's protection rackets, which were in full bloom throughout the country.  According to confidential U.S. government assessments at the time, al-Qaeda-in-Iraq was raising US$70 million to US$200 million a year from its criminal activities, including its protection rackets.  Indeed, U.S. assessments also concluded that the income stream generated by al-Qaeda-in-Iraq's criminal rackets was so pronounced that al-Qaeda-in-Iraq ran a surplus, which

---

[12] An Al-Qaeda affiliate, the Taliban, including its Haqqani Network, followed a similar playbook, calling their protection money bureaucracy the "Contractors and Organisations Commission." Given that the Taliban's protection rackets, like those of al-Qaeda-in-Iraq, were inspired by al-Qaeda's teaching and derived from a literal al-Qaeda playbook, the terrorists' tactics, techniques, and procedures for their protection rackets in Iraq and Afghanistan were remarkably similar.  They were different in at least two respects, however.  First, the different groups sometimes used differing nomenclature.  Second, al-Qaeda's terrorists in Iraq (*i.e.*, al-Qaeda-in-Iraq) charged a somewhat lower rate than al-Qaeda's terrorists in Afghanistan (*i.e.*, the Syndicate), with the former often charging 10%-20% (sometimes more) while the latter often charged 30%-40% (sometimes more). This was a simple reflection of the different terrorist market economic contexts in Iraq and Afghanistan.  In Iraq, al-Qaeda-in-Iraq had to compete for the security dollar with Shiite terrorists, like Jaysh al-Mahdi, who had competing rackets. Al-Qaeda-in-Iraq (and later, Islamic State) chose to compete on price, and companies like Ericsson chose to pay al-Qaeda-in-Iraq and ISIS rather than invest in legitimate security. In Afghanistan, in contrast, there was no indigenous Shiite terrorist analogue to Jaysh al-Mahdi's role in Iraq, and al-Qaeda's Syndicate exercised a functional monopoly on the protection economy, which permitted the Taliban, as most monopolists do, to charge more.

al-Qaeda-in-Iraq used to fund al-Qaeda core in Afghanistan and Pakistan in keeping with its status as an al-Qaeda branch under the latter's corporatist model.

216.     By the spring of 2006, and continuing through 2014, al-Qaeda-in-Iraq's terrorist finance network had grown so much that al-Qaeda-in-Iraq required additional bureaucracies in key provinces in order to adequately manage its money. These bureaucracies flowed money, including *khums* donations mandated as kickbacks to superiors, and created direct links between al-Qaeda-in-Iraq cell leaders and their operatives and agents who extracted, as one CENTCOM document put it, "money from the government contracting process," including from Western companies like Defendants.

          **b.**     **Islamic State Ran a Sophisticated Protection Money Operation in Iraq from 2014 through at least 2022**

217.     Islamic State continuously ran a sophisticated protection money operation in Iraq and Syria from 2014 through at least 2022. Throughout, Islamic State's terrorist campaign in Iraq, Syria, Turkey, and Afghanistan was powered by its protection rackets in Iraq and Syria. According to one confidential U.S. government report published in 2015, Islamic State raised hundreds of millions of U.S. dollars by extracting protection money from businesses in Iraq.

218.     As Islamic State seized territory in Iraq, it intensified al-Qaeda-in-Iraq's longstanding protection rackets and formalized them into a purported system of universal taxation of goods and cash that transited territory where Islamic State operated, overseen by its Finance Council, that applied to all territory controlled or contested by Islamic State.[13]

---

[13] Islamic State intensified such rackets along at least two axes.  *First*, Islamic State expanded the outreach efforts to communicate to all businesses in ISIS-impacted geographies that Islamic State had a bureaucracy with which such businesses could engage.  *Second*, Islamic State increased the rates previously charged by al-Qaeda-in-Iraq.  While Islamic State did not deviate from the long-standing al-Qaeda strategy of competing against Shiite protection rackets in Iraq based upon price, Islamic State's tax increases did somewhat narrow the value gap between itself and Jaysh al-Mahdi (with ISIS remaining the lowest priced security solution).

219.    Under Islamic State's taxation system, Islamic State established a series of "taxes" and "fees," which it collected from businesses with interests in geographies controlled or contested by Islamic State, as well as companies transporting goods through the same places via Islamic State checkpoints, all under the pretense of such payments serving as *zakat* (donations or taxes that the terrorists claimed were mandated under applicable Islamic principles).

220.    Islamic State also expanded al-Qaeda-in-Iraq's prior taxation system on trucks, and eventually increased the rate to $1,000 per truck, which was ordinarily paid in U.S. Dollar-denominated transactions.

221.    In late 2014, Islamic State reached what amounted to a global protection money agreement with every major Kurdish party in Iraq, which the two sides reached even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria. Simply put, the leading Kurdish groups in Iraq prioritized their own local interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today. Under this accord, Kurdish agents collected protection money for Islamic State.

222.    As the Coalition expanded its airstrikes against Islamic State's oil and gas fields, Islamic State's protection rackets assumed even greater importance to its ability to launch attacks against Americans around the world.  In September 2016, for example, Islamic State intensified its protection money-related collections to offset funding losses from elsewhere.  Through these rackets, Islamic State generated millions in monthly cash flow – mostly denominated in U.S. dollars – from businesses in Iraq, which Islamic State styled as *zakat*, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.

223.     Throughout 2017, Islamic State increasingly relied upon its protection rackets as Coalition pressure shrunk the geographic footprint of territory the terrorists controlled.

224.     Islamic State's loss of its caliphate in late 2017 did not end its protection rackets, which continued largely unabated.  Islamic State's control of, or ability to contest, the territories it seized in Iraq and Syria endured from 2014 through at least 2022 because Islamic State maintained control of key chokepoints throughout Iraq and Syria from which it exerted power over companies with business interests there.

> **2.     Multinational Corporations Commonly Structured Their Operations In Iraq And Afghanistan To Funnel Protection Money Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State**

225.     Al-Qaeda and Islamic State used threats of terrorist violence to extract protection money from corrupt international companies doing business in the parts of Iraq, Syria, and Turkey in which LM Ericsson, Ericsson AB, and Ericsson Inc. did business.  Such threats were especially frequent in (though not limited to) geographic areas that al-Qaeda-in-Iraq and ISIS controlled.  By 2004, al-Qaeda-in-Iraq had achieved control of wide swaths of central, western, and northern Iraq, and had havens in Syria, Iran, Afghanistan, and Pakistan.  By 2005, al-Qaeda and al-Qaeda-in-Iraq had consolidated Sunni anti-American terror in Iraq and Syria under al-Qaeda's organization, which control (or ability to contest) al-Qaeda, through al-Qaeda-in-Iraq (until 2014), and Islamic State (from 2014 through present) leveraged on the ground in Iraq into protection payments.  "In Iraq and Afghanistan," concluded a Congressional study in 2011, "U.S. funds have been diverted to insurgents … as a cost of doing business" and "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects."  Al-Qaeda and al-Qaeda-in-Iraq perfected that practice by threatening businesses until (and sometimes even after) they met the FTOs' financial demands.

226.    The FTOs' threats presented companies with a choice:  alert the government and

seek the U.S. military's aid while investing in legitimate security to protect their companies'

projects, shipments, and facilities in Iraq, or instead save time and money by regularly paying al-

Qaeda-in-Iraq (from at least 2004 through at least 2014) and Islamic State (thereafter)—usually

monthly—to direct their attacks elsewhere.  Contractors, including Defendants and Defendants'

agents, typically chose the latter option.  Simply put, many with business interests in Iraq paid

off terrorists knowing full well the money would be used for bombs and weapons to take the

lives of others.[14]

227.    Al-Qaeda and al-Qaeda-in-Iraq consistently extracted protection money payments

from Western companies with business interests in Iraq, like Defendants, and the subcontractors

who served as their agents, throughout the period from 2004 through 2014, usually doing so

monthly.  The case of one long-standing business owner in Mosul named Abdali was typical:  his

business made regular monthly protection payments to al-Qaeda-in-Iraq, and later Islamic State,

consistently from 2004 through 2017, which he justified as a cost of doing business.

228.    Companies, including Defendants, rationalized their payments to al-Qaeda-in-Iraq

and Islamic State by framing them as a necessary cost of business.  But the payments were

unnecessary – even from the standpoint of Defendants' own security needs – and

counterproductive.  In reality, Western businesses chose to pay not because of any reconstruction

imperative in Iraq, but because it served their financial interests.  By diverting money to al-

Qaeda-in-Iraq and Islamic State, the payments lowered the projects' quality and undermined

whatever alleged counterinsurgency benefits they might have otherwise delivered.

---

[14] The same outcome was true in Afghanistan, which was a feature, not a bug, of al-Qaeda-
designed protection rackets:  the point was to induce a similar response from Western companies
facing similar incentives, performing similar work, in a similar threat environment.

229.    Confidential Witnesses confirmed the accuracy of this conclusion based on their own experiences in Iraq.  According to one Confidential Witness, for example, it would have been extraordinarily tempting financially for any contractor or subcontractor to pay off terrorists in Iraq because "at least 70 percent" of every U.S. dollar allocated to a project "went to overhead and armed protection," with armed protection likely being the single largest expense within that 70 percent and much larger than the minimum amount of 10-20 percent – and often much more – always charged by al-Qaeda's, al-Qaeda-in-Iraq's, and ISIS's protection networks in Iraq.

230.    According to another Confidential Witness, who also had extensive security-related experience in post-Saddam Iraq, no Western corporation could have had people on the ground in Iraq during the early years of Iraqi reconstruction without either using a "Western security firm" or paying protection money to terrorists, and any Western corporation with business in Iraq would have known that those were their only two options.  The same Confidential Witness further explained one of the prevailing, and widely known, strategies that Western contractors, like Ericsson, deployed to route protection money to terrorists in Iraq:

> The local militia, al-Qaeda, whomever, they all know you're there, you're not in their country without them knowing you're there, so eventually you're going to get approached, or if you have a savvy security team that has a local national with them, they'll use that local national to find out who the payoff guys are . . . If you were in Baghdad and you did not have western security you would have to pay, find someone to get your money to al-Qaeda or [Jaysh-al-Mahdi].

231.    Although some contracts required the U.S. government to reimburse the prime contractor for local security costs, that did not eliminate the profit motive for Defendants to orchestrate protection payments.  Even on "cost plus" contracts, where profits were pegged to a fixed percentage of the government's costs, such payments benefited the prime contractor in two significant ways.  *First*, had Defendants implemented legitimate, more expensive security measures, that would have raised the cost of their proposals on the front end and jeopardized

their ability to win as many contracts.  By purchasing their security from the terrorists, Defendants artificially lowered the price of their bids, thereby helping them obtain the contracts in the first place.  *Second*, protection payments offered a simpler and less time-consuming way of purchasing project security, which freed up internal resources and bandwidth for companies, like Defendants, to undertake more projects overall.  Had they spent the time and effort – even apart from the expense – needed to implement legitimate security, they would have been able to perform fewer projects, and thus would have made less money on an aggregate basis.

232.    As a negotiating ploy, al-Qaeda-in-Iraq and Islamic State terrorists occasionally threatened or even attacked employees or agents affiliated with corporations that were paying protection money, albeit less frequently than those that elected not to pay.  For that reason, a corporation's experience facing actual or threatened attacks was not inconsistent with it having made protection payments.  Often, such threats were merely an indication of ongoing negotiations over price.  On balance, though, corporations who paid al-Qaeda-in-Iraq and Islamic State bought themselves relative security (in the related geographies in Iraq and Syria) at an attractive price.

233.    Multinational corporations, including Defendants, often routed money to al-Qaeda and Islamic State through their contractor networks, using contractors as their agents to guide the money home to the FTOs as intended.  Just as delegating contract performance to corrupt subcontractors worsened the quality of the services provided, *see supra* II.A.1, so too did it create opaque pools of money from which to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

234.    Multinational corporations, including Defendants, used their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them

by paying off Iraqi insurgents with protection money, resulting in American money sustaining al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. As explained below, Defendants both actively facilitated and benefited from such payments that their agents and subcontractors delivered on their behalf. *See infra* Part II.B.

235.    Cargo Iraq, a now-infamous Iraqi security subcontractor, offers an example. Cargo Iraq was one of the largest private-security companies in Iraq, and it made its money on subcontracts to protect convoys ferrying goods and fuel between Iraq, Jordan, and Syria.  In that capacity, Cargo Iraq worked for Ericsson in Iraq.

236.    Cargo Iraq was profitable because it paid al-Qaeda-in-Iraq and Islamic State. Companies that outsourced security to Cargo Iraq were, in effect, knowingly hiring al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to provide security for company resources and shipments in terrorist-influenced geographies in Iraq and Syria.  Decisions to hire Cargo Iraq for security supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with money and intelligence that undermined American interests.

237.    Middle East Shipping Services ("MESS") is another example.  MESS was a Middle East shipping subcontractor based in Amman, Jordan, and used by numerous large U.S. and European corporations operating in Iraq.  MESS's specialty was shipping product overland from Jordan, Turkey, and/or Syria into Iraq.  In discussions with the State Department, MESS's CEO admitted that MESS paid U.S. Dollar-denominated protection money to anti-American terrorists in Iraq.  For example, according to a 2004 State Department cable, as published online,

> Amman-based Middle East Shipping Services (MESS) … maintains offices in Baghdad, Basra and Umm Qasr inside Iraq … MESS provides transportation and shipping services for contractors within Iraq, most notably Bechtel Corporation. … [A]fter renting a warehouse in Baghdad, … MESS eventually had to pay 'protection money' to a group of Iraqis who accused the company of collaborating with coalition forces. Despite [MESS's] providing cash for 'protection,' the

MESS warehouse was burned to the ground … [MESS never] approached the CPA for security assistance [because MES did not want to] confirm[] … that [MESS] was directly in league with U.S. troops.

238.   Cargo Iraq and MESS illustrate a broader pattern in which companies, including Defendants, knowingly (or recklessly) paid protection money to al-Qaeda-in-Iraq and Islamic State.  The widespread existence of such protection-money payments has been confirmed by congressional investigators, U.S. and Iraqi officials, industry participants, and journalists.

239.   For starters, Congress's Commission on Wartime Contracting documented the pattern of how "[i]n Iraq and Afghanistan, U.S. funds" were "diverted to insurgents" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects."[15]

240.   U.S. military officials also documented the pattern.  A since-declassified 2007 study by CENTCOM concluded that the number one aspect of al-Qaeda-in-Iraq's "funding strategy" was to "[e]xploit the Coalition's civil-military reconstruction contracts by gathering information on reconstruction or economic development initiatives to gauge which Iraqi contractors [were] most likely to win Coalition contracts"; "[t]he contractors were then targeted for … extortion[] or co-opting to force them to contribute a part of their profits to AQI."  As Major General Rick Lynch, commander of U.S. forces in central Iraq in 2007, explained: "I tell a lot of my soldiers: A good way to prepare for operations in Iraq is to watch the sixth season of '*The Sopranos*.' … You're seeing a lot of Mafioso kind of activity."

241.   The Iraq Threat Finance Cell, an interagency group that drew on law-enforcement and intelligence assets to interdict insurgent funding sources, performed a series of sophisticated

---

[15] Notably, Congress made the same finding concerning both Iraq and Afghanistan, reflecting the common influence of al-Qaeda's protection money playbook, and the similar response of Western corporations and contractors to such playbook in both countries.

audits of Sunni insurgent financing, and reached the same conclusion.  As former senior Treasury official Juan Zarate summarized in 2015, "the Iraq threat finance cell" was "created in 2006 to look at how Al Qaida in Iraq and the insurgents were funding themselves" and concluded that the terrorists "were engaged in" criminal activities which were "[a]ll the things we're talking about now" (in 2015 with respect to ISIS) "they were doing … then" (i.e., during al-Qaeda-in-Iraq's heyday in the mid-2000s).

242.    Iraqi officials also confirmed the practice.  For example, Fawzi Hariri, an Iraqi cabinet member who headed its Anbar Reconstruction Committee, publicly stated in 2007 that U.S. rebuilding funds certainly had gone into terrorists' pockets.

243.    Those protection payments continued despite mounting concerns raised by U.S., British, and Iraqi leaders that multinational corporations who made protection payments financed terrorist attacks by al-Qaeda-in-Iraq, Islamic State, and their allies.

244.    From 2004 (at the latest) through at least 2019, multinational corporations, including Ericsson, that cut corners in Iraq, Syria, and Afghanistan by paying off terrorists, routed their value transfers to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through two primary channels:  (i) direct transactions with the FTOs, through which corporations, including Defendants, knowingly (and illegally) provided them with communications, economic, and technical aid; and (ii) payments to the FTOs routed through intermediaries that corporations, including Defendants, controlled and intentionally used, mafia-style, as a "buffer" between Defendants and these FTOs to which Defendants specifically intended to pay – and did pay – millions of U.S. dollars for "protection" from at least 2004 through at least 2019.

245.    As to both of those channels, Defendants deliberately facilitated protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through illegal terrorist

finance transactions that included: (1) cash payments to the FTOs, which were often U.S. Dollar-denominated and infamously called "commissions" as a euphemism for payoffs in Iraq and Syria since the 1990s; (2) "free goods" payments to the FTOs in the form of highly lucrative U.S.-manufactured goods that functioned as cash equivalents and were supplied "free of charge" through a notorious decades-long Iraqi and Syrian corruption scheme specifically intended to covertly route substantial value flow from corporations to violent actors; and (3) financial and technical aid to the FTOs through their facilitation of the FTOs' protection rackets, corrupt black market transactions, and illicit communications technologies acquisitions, all of which facilitated al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, and Turkey from 2004 through at least 2019.

246.    In every instance, each Defendant intended al-Qaeda, al-Qaeda-in-Iraq and Islamic State to receive the value from Defendants, which flowed substantial U.S. Dollar cash payments, and free goods payments in valuable U.S. manufactured and/or U.S.-sourced, and terrorism embargo-restricted, communications technologies and other cash equivalents that the FTOs used as weapons of terror or resold on black markets in Iraq and Syria (for $2,000 per American smartphone) to al-Qaeda-in-Iraq and Islamic State agents, in payments that Defendants intended to serve as protection payments or "taxes" with the specific intent, by Defendants, to cause the above cash flow to reach these FTOs in order to maximize Defendants' profits from the payoffs to the FTOs.

247.    When using intermediaries, Defendants employed similar processes to funnel money to al-Qaeda-in-Iraq and Islamic State in Iraq.  Defendants paid the money as protection: they decided that the cheapest way to shield their projects from attack was to pay al-Qaeda-in-Iraq and Islamic State to leave them alone and instead attack other targets – like Plaintiffs and

their family members.  As detailed in this section, similar payments were pervasive throughout the Iraqi and Syrian geographies that were contested by al-Qaeda-in-Iraq and Islamic State and supplied the FTOs – directly when they were the recipient, and indirectly when another of the two was the recipient through their mutual sharing – with a key stream of financing to fund their terrorist attacks across the parts of Iraq, Afghanistan, Syria, and Turkey controlled or contested by al-Qaeda-in-Iraq and/or Islamic State (and their local branches) from 2000 through 2022.

248.   Defendants followed several shared strategies to operationalize their protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

249.   *First*, Defendants negotiated payments with senior terrorists from these FTOs (*e.g.*, a regional representative of al-Qaeda-in-Iraq).  Al-Qaeda emphasized a rigorous process for negotiating an appropriate level of protection money or "tax" paid by a multinational corporation.  In 2007, for example, CENTCOM concluded in a since-declassified study of terrorist finance in Iraq, among other things, that:

a.   "AQI was able to stop vehicles, including tractor trailers, from entering or exiting the Waleed and Trebil border crossing in order to extort payments of up to $200."

b.   "AQI collected intelligence on … the contracting process through a former contractor" and had sources who "reported the names of any individual awarded a major contract to local AQI leaders along with the cash value so that AQI extortion cells could determine the appropriate amount of money to demand from a given contractor without derailing the project."

c.   "[T]he AQI amir for the Tamim and 5 Kilo districts of [Ramadi] was considered powerful enough by local contractors that no work could take place in the area without his approval, which usually came with the condition that he would receive up to 50% of the profit. Qutayba's situation was the norm and AQI extortion of Iraqi contracts was the standard practice in Ramadi and throughout much of Anbar. Under the new policies set down since the rise of [AQ/AQI polyterrorist Masri] AQI operatives refined their method of extortion to demanding protection money in return for 'guaranteeing' that new contracts were allowed to occur free of insurgent attacks."

250.   The same CENTCOM study noted how "one of the primary financiers of AQI in Fallujah" "received $90,000 payments from tribal and religious figures who worked for Islamic

NGOs" and "then had this money returned to various AQI cells in Fallujah to cover the purchase of vehicles and weapons." Other U.S. Army publications also confirmed how al-Qaeda-in-Iraq/Islamic State leaders "financed" cells through protection "money from contractors working for the coalition."

251.    Following the bin Laden protection money playbook, the procedure through which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State extracted those payments in Iraq and Syria – like that of the Syndicate in Afghanistan – was straightforward. At in-person meetings conducted either directly with the corporation (inclusive of the corporation's agents) or through an intermediary, al-Qaeda, AQI, and Islamic State operatives negotiated the rate. Defendants usually agreed to pay.

252.    Al-Qaeda practices confirm its branches' systematic tactic of extracting protection payments from large firms doing business in the geographies they contested in Iraq, such as Defendants. In general, al-Qaeda terrorists kicked back a fixed percentage of any money seized in terrorist attacks as "*khums*" (an Islamic tax) to al-Qaeda's leadership; the remaining four-fifths was given to those on the frontline in Iraq. However, any money or property seized without fighting from Western projects or businesses – such as the fruits of successful negotiations with a European telecommunications company – was sent to the leadership to be spent on attacks against Americans by al-Qaeda and its regional branches in the Middle East.

253.    Al-Qaeda created these rules and norms to ensure that protection money would benefit the broader al-Qaeda organization—both worldwide (*i.e.*, al-Qaeda core) and in Iraq, Afghanistan, Syria, and Turkey as the four most important terror zones to al-Qaeda core, al-Qaeda-in-Iraq, and Jabhat al-Nusra, rather than individual terrorists outside of senior leadership ranks. (Islamic State later followed the same al-Qaeda approach.)

254.    *Second*, in addition to high-level negotiations with senior al-Qaeda-in-Iraq and Islamic State terrorists, Defendants also paid protection money to local al-Qaeda-in-Iraq and Islamic State cell leaders in the areas where they were operating.

255.    Defendants sometimes made these more localized payments directly and sometimes routed such payments through Defendants' agents or subcontractors.  Most often under this second approach, corporations routed their payments through "middlemen" known as "consultants" and/or subcontractors that arranged payment on their clients' behalf, through U.S. dollars routed through the corporation and usually falsely described as being for purported services (which were not provided) such as transportation, logistics, security, research, government relations, and legal counsel.[16]  The consultants and subcontractors paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by making cash payments through the intermediaries, or corruptly routing value through illicit "free goods" deals designed to be monetized on the black market, or by providing embargoed U.S. technical and financial aid and communications technology to the FTOs.  Under all three strategies, the logic of the payments was simple:  they reduced the threat of attacks on the corporations' own projects at the least possible cost to those corporations.

256.    Companies paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection money in relatively predictable percentages on each project they undertook in Iraq and Syria.  The percentages could vary based on several factors, including contract size, location, and the

---

[16] In Iraq, as in many hyper-corrupt jurisdictions, multinational corporations often rely upon in-country external legal counsel, often local litigation firms, who facilitate protection payments styled as "settlements" and the like.  This has always been a notorious aspect of the corruption economy in Iraq, which Defendants knew because they employed (or were served by) local Iraqi agents who had a sophisticated understanding of the Iraqi economy, including how bribes were commonly paid, and it was commonly known in Iraq that Middle Eastern law firms were a popular vehicle to route large-dollar payoffs.

particular al-Qaeda-in-Iraq and Islamic State terrorists involved.  But overall, many analysts

estimated that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State consistently levied a "tax" of *at*

*least* 10 percent to 20 percent on every economically significant project.  Often, the percentage

was much higher.

257.    Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State always maintained potent

protection rackets from 2004 through 2022.  From the early 2000s through 2014, under the same

scheme, protection payments to al-Qaeda-in-Iraq delivered protection payment-related value

(*e.g.*, cash flow, illicit technologies flow) to al-Qaeda core and Jabhat al-Nusra because all three

FTOs followed the bin Laden playbook on cross-pollination, which they applied to the protection

rackets for a host of reasons, including ensuring the continued facilitation of all such groups'

relationships with one another.  From 2014 through 2021, Islamic State continued these same

protection money operations in Iraq and Syria, such that protection money payments to Islamic

State in either country also benefited Islamic State's branch in Afghanistan.

258.    Corporations, including Defendants, usually concealed their protection payments

from their own shareholders, the U.S. government, and others, by inflating their costs and

fraudulently describing their payments as legitimate security, transportation, consulting, and/or

humanitarian expenses.  For example, as one Iraqi company officer publicly explained in 2007,

contractors often set their prices up to four times the going rate because they budgeted fifty

percent (50%) for payoffs to terrorists in exchange for the safe passage of their supply convoys,

so that of every $1 million he received, $500,000 flowed through to al-Qaeda and al-Qaeda-in-

Iraq.  Similar ratios continued after Islamic State assumed control of al-Qaeda-in-Iraq's

protection money operation in Iraq in 2014 and continued through 2022.

259.    As explained below, LM Ericsson, Ericsson AB, and Ericsson Inc. followed that practice and paid protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State including through their agents and subcontractors, using one or more of the methods described above.  *See infra* II.B.  In doing so, they knowingly both orchestrated and benefited from their agents' and subcontractors' protection payments on their behalf.  Defendants actively orchestrated the payments by obtaining the underlying contracts to pay for the work (or licenses to conduct it) that needed "protection" from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; by retaining and outsourcing security to the corrupt strategic partners, consultants, and subcontractors they knew would pay money to terrorists; by encouraging their strategic partners, consultants, and subcontractors to make the payments, either explicitly or implicitly; by supplying the financing that the strategic partners, consultants, and subcontractors used to make the payments; and then by knowingly approving reimbursement of the payments.  Such intermediaries' contracts with Defendants typically required Defendants to review and approve their expenses, and Defendants knowingly accepted expense reports that hid or mischaracterized the payoffs.  Throughout, Defendants had the right to control their consultants' and subcontractors' security activities and knew that their consultants and subcontractors were acting on their behalf.  Similarly, through Defendants' offloading scheme, *infra* IIB.2.b, Defendants intentionally structured their relationships with their strategic partners to facilitate the latters' protection payments on Ericsson's behalf.

260.    When Defendants' strategic partners, consultants, and subcontractors paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, they did so as part of their performance under their contracts with Defendants.  The strategic partners, consultants, and subcontractors would have been unable to make protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State

without Defendants' money and approval.  Defendants supplied the funds for the protection

payments because they, even more than their strategic partners, consultants, and subcontractors,

financially benefited from them.  Indeed, the core purpose of the payments was to benefit

Defendants by shielding their projects from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attack

at an affordable price.  To obtain that benefit, Defendants needed and intended for their money

and other value provided to reach al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

> **B.** **Defendants Made Protection Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State In Iraq And Afghanistan**

261.    LM Ericsson, Ericsson AB, and Ericsson Inc. made protection payments to al-

Qaeda and al-Qaeda-in-Iraq agents in Iraq from 2004 through at least 2014, and to Islamic State

agents in Iraq from 2014 through at least 2019.  And to conceal what they did, LM Ericsson,

Ericsson AB, and Ericsson Inc. intentionally obstructed United States counterterrorism efforts

targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2013 until at least 2022, and

Ekholm did so from 2017 until at least 2022 while serving as CEO. *See infra* Part IV.[17]

> **1.** **Defendants Pursued An Enterprise-Wide Corruption Scheme, Which Defendants Applied In A Substantially Similar Manner In Iraq And Afghanistan**

> > **a.** **Defendants Pursued an Enterprise-Wide Corruption Scheme**

262.    LM Ericsson oversaw Ericsson's transactions in Iraq, through LM Ericsson's own

officers, directors, employees and agents (including LM Ericsson's C-Suite, including Defendant

Ekholm) as well as LM Ericsson's wholly owned subsidiary, Ericsson AB, and its branch in Iraq,

known as Ericsson Iraq, which served as the in-country representatives for LM Ericsson and its

---

[17] Even now, it remains to be seen whether LM Ericsson, Ericsson AB, and Ericsson Inc. will continue obstructing U.S. counterterrorism efforts through their unprecedented misconduct.  For that reason, Plaintiffs do not wish to imply that Defendants' obstruction is over as of the date of this Complaint.  Discovery will determine when, if at all, Ericsson ever changed course.

subsidiaries around the world, including Ericsson Inc., under Ericsson's global "One Ericsson"

business model.  Employees of Ericsson AB frequently acted as agents for LM Ericsson.

263.    At all times, Ericsson AB (on its own, and through its local branch, Ericsson Iraq)

acted as Ericsson Inc.'s sales agent in Iraq and was responsible for securing lucrative contracts in

Iraq that typically involved all Defendants.

264.    Ericsson AB (on its own and via its local branch, Ericsson Iraq) ordinarily served

in a *supplier* and *agent* role, as the Ericsson entity that negotiated with counterparts in Iraq and

facilitated payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents.

265.    Ericsson Inc. ordinarily served in a *manufacturer* and *principal* role, as the

Ericsson entity that provided the goods and services that Ericsson AB (on its own and through

Ericsson Iraq) sold to its customers in Iraq, including (for example) RBS 6000 base stations

featuring software written in the U.S. and the Charging and Billing in One ("CBiO") system

developed by Telcordia, a California company acquired by Ericsson in 2011.  Those and other

U.S.-related goods and services were the object of Ericsson's protection money payments to al-

Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through at least 2019.

266.    LM Ericsson, Ericsson AB, and Ericsson Inc. sought to profit from the Iraqi

marketplace and were willing to pay anyone to do so, including terrorists. While operating in

Iraq, Ericsson AB understood the economic threat that insurgents posed to Ericsson's

profitability and went to extreme lengths to assess how Ericsson employees would perform under

terrorist threat.[18]

---

[18] For example, in 2000, LM Ericsson employees coordinated "mock hijackings" of other
unwitting LM Ericsson employees, which at least once resulted in others calling law enforcement
during an exercise.

267.     From at least 2000 through at least 2019, Ericsson relied upon a business model built upon illegal payments to third parties who could positively or negatively influence Ericsson's bottom line.  Simply put, throughout this period, LM Ericsson, Ericsson AB, and Ericsson Inc. were corporate criminals engaged on a decades-long, international corporate crime spree that spanned the United States, Europe, the Middle East, Africa, and Asia.

268.     According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments to increase Ericsson profits in high-risk jurisdictions:

a.     With respect to LM Ericsson and Ericsson AB, "the 'Tone-of-the-Top' management style at the Corporate level" sustained an "unofficial policy for, and willingness to, issu[e] and authoriz[e] payment orders" documenting Ericsson's bribes "in writing for most confidential [and] obscure payments to so called 'commercial agents'" in order to obscure illegal bribes through a web of obscure commercial intermediaries.

b.     Under the global bribery strategy practiced by LM Ericsson and Ericsson AB, "payment orders" relating to Ericsson's "commercial agents," whom Ericsson relied upon to untraceably route illicit payments to intended recipients on Ericsson's behalf, "were archived in hiding, often in anonymous bank safes in Switzerland, thereafter subsequently to be destroyed."

c.     LM Ericsson and Ericsson AB leadership ensured that LM Ericsson and Ericsson AB's management led the effort to ensure that "all" the features of Ericsson's global bribery strategy as described above were deployed "on a worldwide basis covering most so called emerging markets in the world."

d.     "The system" that LM Ericsson and Ericsson AB operationalized to carry out Defendants' global bribery scheme "was called WCS, Worldwide Commission Scheme."

269.     From 2000 through at least 2019, LM Ericsson and Ericsson AB engaged in a global bribery scheme, which relied on a litany of criminal tactics, including but not limited to:

a.     fraudulent due diligence reports that concealed corrupt relationships;

b.     sham contracts used to corruptly route value to illicit recipients;

c.     fake invoices used to further conceal corrupt payments;

**d.**     explicit contemporaneous written admissions as to LM Ericsson's and Ericsson AB's corrupt conduct;

**e.**     the creation, maintenance, and use of off-the-books slush funds so that LM Ericsson, its subsidiaries and their respective agents could make corrupt payments;

**f.**     deliberate mischaracterization of corruption-related expenses as being related to "travel," "consulting," "supply costs," "material consumption," "customer service," "cost of sales," "entitlements," "settlements," "fridge," and "marketing and sales support";[19]

**g.**     willful failure to implement internal controls necessary to prevent corrupt payments; and

**h.**     improper recording of LM Ericsson's, and its subsidiaries', corrupt payments on LM Ericsson's books and records, which were sent to shareholders and regulators in the U.S.

270.     LM Ericsson's and Ericsson AB's global bribery scheme also routinely relied upon U.S.-based personnel, emails, bank accounts, and products.

271.     Geoffrey S. Berman, former United States Attorney for the Southern District of New York, summarized Ericsson's global business model from 2000 through at least 2016: "Through slush funds, bribes, gifts, and graft, Ericsson conducted telecom business with the guiding principle that 'money talks.'"

272.     When describing Ericsson's global business model from 2000 through at least 2016, former Assistant Attorney General, Brian A. Benczkowski, stated as follows:  "Ericsson's corrupt conduct involved high-level executives and spanned 17 years and at least five countries, all in a misguided effort to increase profits.  Such wrongdoing called for a strong response from law enforcement."

273.     Steve Peikin, Co-Director of the SEC Enforcement Division, also summarized Ericsson's global business model from at least 2011 through at least 2017: "Ericsson engaged in

---

[19] Ericsson subsidiaries' characterization of certain payoffs as being related to a "fridge" demonstrates the pervasiveness of the misconduct through LM Ericsson and its subsidiaries, as well as the obvious nature of the fraud (within Ericsson), given absurd "expenses" like "fridge."

an egregious bribery scheme for years, spanning multiple continents, by surreptitiously using slush funds and funneling money through sham intermediaries."  The SEC found that "LM Ericsson … engag[ed] in a large-scale bribery scheme involving the use of sham consultants to secretly funnel money to government officials in multiple countries" and "Ericsson's subsidiaries … in Vietnam, Indonesia and Kuwait … maintain[ed] slush funds, us[ed] code names, and create[ed] sham transactions and invoices."  According to the SEC, "[f]rom 2011 through early 2017, Ericsson subsidiaries paid approximately $62 million in bribes to [recipients] through third parties … to obtain or retain business" and, as a result, "Ericsson realized approximately $427 million in profits from business obtained through the use of these illicit payments."[20]

274.    LM Ericsson's ability to operationalize – and later sustain – an enterprise-wide, decades-long, scheme to make illicit payments around the world depended upon the close collaboration of LM Ericsson, Ericsson AB, and Ericsson Inc. as "One Ericsson."

275.    LM Ericsson relied upon Ericsson AB's ability to identify and promote openly **corrupt and criminal Ericsson AB regional managers** who were willing to engage in shocking acts of terrorist finance and corruption, which Ericsson viewed as the cost of doing business in Iraq and Afghanistan. Unsurprisingly, Ericsson AB entrusted Defendants' operations in Iraq and Afghanistan—the ***greatest anti-terrorism*** and ***anti-corruption*** risks worldwide from 2001 through 2022—to the head of Ericsson AB's Middle East branch.

276.    The head of Ericsson AB's Middle East branch was a hardened white collar criminal who openly discussed Ericsson's criminal schemes with coworkers.  For Ericsson, however, the presence of such a committed criminal at the very top of its Middle East

---

[20] Compl., ¶ 2, *SEC v. Telefonaktiebolaget LM Ericsson*, No. 1:19-cv-11214 (D.D.C. Compl. filed Dec. 6, 2019), ECF No. 1 ("Ericsson FCPA Compl.").

organization was a feature, not a bug.  Ericsson was bribing its way to greater profitability one despot, terrorist, or communist apparatchik at a time during this period.  Moreover, Ericsson perceived the Middle East as the most exciting growth market in the world given the abundance of so-called "virgin" telecom markets throughout the region.  After observing the success of its deep-seated commitment to bribery as a corporate strategy, and sizing up the gigantic opportunity before Ericsson thanks to the Middle East's nascent telecoms markets at the time, Ericsson made the predictable, and criminal, choice: go all-in on corruption as Ericsson's core strategy in the Middle East by empowering the least ethical, most criminal, greediest, regional leader Ericsson could find and commit the necessary resources to pay off everyone who needs it, while knowing, but not caring, about the inevitable acts of international terrorism that Ericsson's conduct would surely enable. Plaintiffs' allegation is plausible:  Ericsson was on its crime spree when it chose terrorist finance as an acceptable business strategy in the Middle East, and thus Ericsson's conduct reflected the necessary criminal intent.

277.    Ericsson also relied upon widespread use of **sham consulting agreements** it routinely created to facilitate its corrupt payments in the Middle East.  From 2011 through 2017, per the SEC, "Ericsson's practice involved either entering into agreements with third party consultants who had connections with or access to [the person who could help or hurt Ericsson's business], and/or paying for travel and entertainment expenses for [such persons] … to influence their decision-making"—and Ericsson's Djibouti, Saudi Arabia, Qatar, and Kuwait branches – all managed by the same Ericsson Middle East organizations that supervised Defendants' work

in Iraq and Afghanistan—each of which adhered to "Ericsson's practice" of using "third party consultants" to route illicit payments to intended recipients from 2011 until 2017.[21]

278.    Ericsson also deliberately operated a **built-to-fail compliance program,** which Defendants specifically intended to enable corrupt payments instead of preventing them so that Ericsson could continue to realize additional profits through its enterprise-wide corruption strategy. The SEC, for example, found that "Ericsson knowingly and willfully failed to implement adequate internal accounting controls with respect to retention of consultants and agents, payment of bribes, and making improper payments."[22]

279.    Ericsson also routinely created **deliberately falsified books and records**, which Defendants specifically intended to conceal, rather than reveal, corrupt payments so that Ericsson could continue to realize additional profits through its enterprise-wide corruption strategy. The

---

[21] *See*, *e.g.*, *id*. ¶ 2 ("Ericsson's practice"); *id*. ¶ 5 (Ericsson AB's Qatar branch "created a sham consultancy agreement to disguise [an illegal] payment to [an Ericsson] consultant"); *id*. ¶ 14 ("Egypt"); *id*. ¶ 66 ("Kuwait"); *id.* ¶¶ 19-33 (SEC found, *inter alia*, that: (1) "the head of Ericsson's Middle East region … devised a plan to bribe the government officials"; (2) "[t]he head of Ericsson's Middle East region … falsely booked [] payments to the … Consultant in the books … under a cost of sales account, when they were, in fact, bribes"; and (3) Ericsson AB's Middle East Regional Branch in Dubai, U.A.E. used a sham consulting agreement to route a series of corrupt payments to a decisionmaker, which flowed through U.S. banks, in furtherance of Ericsson's "Djibouti Bribery Scheme"); *id.* ¶¶ 34-44 (SEC found, *inter alia*, that: (1) "the head of Ericsson's Middle East region signed [] consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a portion of these commissions were intended for, or would be passed to, [unlawful recipients]"; (2) Ericsson AB's branch in Saudi Arabia used bogus "consulting" agreements to route a series of corrupt payments to a decisionmaker, which flowed through U.S. banks in furtherance of Ericsson's "Saudi Arabia Bribery Scheme"); *id.* ¶¶ 72-74 (SEC found that "the head of Ericsson's Middle East region," *inter alia*: (1) "agreed to make a payment to [a] Kuwait Consultant in the amount of $450,000 through a sham agreement"; (2) "asked the Kuwait Consultant to create a sham invoice to support the [corrupt transfer disguised as a] settlement payment"; and (3) "[Ericsson AB] employees, at the direction of the head of Ericsson's Middle East region, created a sham contract to disguise the [corrupt] payment to the consultant and approved a fake invoice for services in order to conceal the transaction").

[22] *Id.* ¶ 83.

SEC, for example, found that "Due to Ericsson's failure to implement and enforce effective internal accounting controls, employees were able to disguise the true nature and purpose of certain transactions in Ericsson's books and records."[23]  With respect to this conduct:

a.     "[LM] Ericsson, through its employees and agents, including senior-level employees, paid millions of dollars to various agents, consultants, and service providers who were not approved or paid in compliance with [LM] Ericsson's internal procedures. Some of the payments were made in cash and were used to create slush funds, the purpose and recipients of which are unknown. Other payments were made pursuant to sham service provider agreements under which no legitimate services were provided to Ericsson, so as to continue to use and pay agents in contravention of [Ericsson]'s policies and procedures."

b.     "In connection with these payments, Ericsson, through its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered; used secret codenames for certain expenditures; and bypassed Ericsson's standard vendor sourcing process, including by using hard copy, rather than electronic, documentation to evade detection. The payments were falsely or misleadingly characterized in Ericsson's books and records, including as consulting expenses, cost of sales 'corporate marketing fees,' 'other external services' or 'service fulfillment of contract.'"[24]

280.    LM Ericsson and Ericsson AB collaborated with Ericsson Inc. to execute a **whistleblower retaliation strategy** in order designed to prevent evidence of Ericsson's crimes, *e.g.*, its payments to ISIS, from emerging via whistleblower.  LM Ericsson and Ericsson AB regularly used Ericsson Inc. to prevent discovery of their crimes through by intimidating the newly fired former Ericsson Inc. employees who serviced Ericsson AB customers in Ericsson AB's North Middle East Group, which included Afghanistan and Iraq, on behalf of Ericsson Inc., *as well as* LM Ericsson, Ericsson AB, and other Ericsson entities.   They did so to enhance LM Ericsson and Ericson AB value by reducing the risk that their terrorist finance schemes in the

---

[23] *Id.* ¶ 90.

[24] *Id.* ¶¶ 91-92.

Middle East would be detected, and Ericsson's outsized terrorist-finance-fueled profits would decline.

> **b.      Defendants Deployed The Same Manner And Means To Operationalize Their Enterprise-Wide Scheme in Iraq and Afghanistan**

281.    From 2003 through at least 2019, LM Ericsson and Ericsson AB and Ericsson Inc. relied upon the same entities – *e.g.*, Ericsson's offices in the Middle East – and used the same schemes – *e.g.*, slush funds – at issue in Ericsson's Deferred Prosecution Agreement to route value to the necessary recipients, whether a corrupt government official in Djibouti, Islamic State in Iraq, or al-Qaeda in Afghanistan.

282.    Ericsson AB divided its business units into geographies, which typically share leadership, personnel, processes, procedures, networks, customer relationships, and information consistent with Defendants' "One Ericsson" approach, to which Ericsson AB faithfully adhered in the Middle East.

283.    From 2000 until at least 2017, Ericsson's Middle East region has been, by nearly every metric, shown to be the most corrupt Ericsson business region in the world.  For much of the relevant period, the head of Ericsson Middle East served as the ***ringleader*** for Defendants' corrupt payments throughout the region.

284.    Ericsson's Middle East leadership openly embraced a comprehensive commitment to corruption as a strategy to boost Ericsson's profits from the Middle East. According to the SEC, for example, from 2011 through 2017:

a.      "the head of Ericsson's Middle East region … devised a plan to bribe the government officials";

b.      "[t]he head of Ericsson's Middle East region … falsely booked [] payments to the … Consultant in the books … under a cost of sales account, when they were, in fact, bribes";

c.      "the head of Ericsson's Middle East region signed [sham] consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a portion of these commissions were intended for, or would be passed to, [unlawful recipients]";

d.      "the head of Ericsson's Middle East region … agreed to make a payment to [a] Kuwait Consultant in the amount of $450,000 through a sham agreement";

e.      "the head of Ericsson's Middle East region … asked the Kuwait Consultant to create a sham invoice to support the [corrupt transfer disguised as a] settlement payment"; and

f.      "the head of Ericsson's Middle East region" "direct[ed]" "[Ericsson AB] employees" to "create[] a sham contract to disguise the [corrupt] payment to the consultant and approved a fake invoice for services in order to conceal the transaction."[25]

285.    LM Ericsson, Ericsson AB, Ericsson Inc, Ibrahim, and Ekholm facilitated Defendants' protection payments to al-Qaeda and its progeny in Iraq and Afghanistan in a manner that was often virtually identical to the features of Defendants' related scheme in Iraq: pursue the same illicit goal (purchase security from al-Qaeda and its allies), using the same corrupt means as in Iraq (route protection payments to al-Qaeda through purpose-built buffers), for a similar business purpose (help Ericsson dominate a similarly-sized "virgin" telecoms market), subject to nearly identical anti-corruption and anti-terrorism risks (Iraq and Afghanistan were always, essentially, numbers 1 and 2 in both categories), to sell Ericsson's same U.S.-origin technologies, networks, and managed services solutions (*e.g.*, Ericsson AB's and Ericsson Inc.'s "global" "end-to-end" "managed services" solutions, which Defendants sold to customers in both Iraq, *e.g.*, Asiacell, and Afghanistan, *e.g.*, MTN).

286.    In early 2009, Ericsson revised its Middle East organization structure by creating a North Middle East Account Unit, which combined the following five countries:  Jordan, Iraq, Syria, Lebanon, and Afghanistan.  Tarek Saadi—who later became one of Ibrahim's key deputies and whom the ICIJ reported acted as Ibrahim's bagman on a number of illicit payments in Iraq—

---

[25] *Id.* ¶¶ 2, 5, 19-33, 34-44, ¶¶ 72-74.

was simultaneously appointed as the Account Unit Head for this region, which made sense given

his prior experience as Ericsson's country-level manager for Jordan and Iraq for three years each.

287.    Shortly after Ibrahim was promoted in mid-2014 to become Ericsson's Head of

Market Area Middle East and Africa (which encompassed the North Middle East region,

including Afghanistan), Saadi declared that he and Ericsson were "bullish on Afghanistan" —

despite the political instability — because of the rapid growth of mobile call and data traffic in

the country.  Ibrahim echoed those sentiments in December 2015 when she announced to the

market Ericsson's new long-term managed services deal with a second major Afghan mobile

operator (the first being MTN Afghanistan), stating that: "As an emerging market, Afghanistan

has immense potential for growth in terms of [information and communications technology]."

### 2.    Defendants Made Protection Payments To Terrorists In Iraq

288.    From 2003 through 2022, Ericsson pursued growth in the Middle East market in

general and in Iraq in particular.

289.    After Baghdad fell in April 2003, LM Ericsson and Ericsson AB quickly went to

work lobbying U.S. government representatives in Washington, D.C. to facilitate Ericsson's

retention by the U.S.-controlled Coalition Provisional Authority, and later the U.S.-influenced

Iraqi government, to build and sustain Iraq's post-war telecommunications infrastructure.

290.    Iraq was a key market for Ericsson, which viewed Iraq as a "virgin" market, *i.e.*, a

new market that required a complete rebuild from top to bottom, and therefore promised

unusually robust profits for Ericsson. In 2009, for example, Bo-Erik Dahlström, LM Ericsson's

Head of Market Unit Middle East, publicly stated that "we regard [Iraq] as [] one of the most

strategic markets for growth for Ericsson."

291.    About their own profits, at least, Defendants were correct: collectively, Ericsson

AB (or another LM Ericsson subsidiary acting at the direction and for the benefit of LM

Ericsson) executed billions of dollars in contracts in Iraq and Syria from 2004 through 2022.  For each such contract, Ericsson maintained a general policy of engaging in fraudulent transactions to aid al-Qaeda, al-Qaeda-in-Iraq, Islamic State, and other terrorists in Iraq and Syria by:  (1) facilitating regular U.S. dollar-denominated protection payments to such FTOs to protect projects they implemented in terrorist-controlled or -influenced regions; and (2) obstructing U.S. counterterrorism policy by fraudulently concealing their protection money relationships with such FTOs in Iraq from U.S. government personnel whom Defendants knew served in key counterterrorism roles.

292.    From 2004 through at least February 15, 2022, Ericsson maintained its general policy as described because doing so was vital to Ericsson's bottom line during a period when it was under tremendous competitive pressure and financial stress, and Iraq was a rare, consistent, financial bright spot for Defendants.  That policy applied to each of the contracts Ericsson implemented in Iraq and Syria, including the contracts in either country that required transportation of goods or materials across or through either, as well as each of the fraudulent communications Ericsson caused to be published inside the United States concerning transactions, services, communications, and other conduct in furtherance of the illicit payments Ericsson made on Iraq-related contracts.  Among those contracts were the following:

a.    <u>2004 Asiacell Network Contract</u>: On or about 2004, Wataniya Telecom, on behalf of Asiacell, contracted with LM Ericsson and Ericsson AB under a global frame agreement to expand Asiacell's network in central Iraq, including Baghdad and the surrounding areas, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.[26]

b.    <u>2004 Korek Network Expansion Contract</u>: On or about 2004, Korek Telecom ("Korek") contracted with LM Ericsson and Ericsson AB to expand Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work

---

[26] On information and belief, while Wataniya Telecom exited Asiacell on or about 2007, Ericsson's services under this agreement continued thereafter until its work was completed.

Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

c.   2006 Korek Base Stations Contract:  On or about 2006, Korek contracted with LM Ericsson and Ericsson AB to build RBS 6000 base stations throughout Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

d.   2008 ITPC Network Deployment Contract:  On or about 2008, the Iraqi Telecommunications and Post Company ("ITPC"), a state-owned company responsible for Iraq's fixed-line infrastructure, contracted with LM Ericsson and Ericsson AB to execute the initial deployment of ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

e.   2009 Asiacell Network Expansion Contract:  On or about 2009, Asiacell contracted with LM Ericsson and Ericsson AB to expand Asiacell's network throughout certain geographies in Iraq, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

f.   2009 Korek Billing System Contract:  On or about 2009, Korek contracted with LM Ericsson and Ericsson AB to modernize Korek's billing systems throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

g.   2011 Korek Network Expansion Contract:  On or about 2011, Korek contracted with LM Ericsson and Ericsson AB to expand Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

h.   2011 Zain Iraq Network Management Contract:  On or about 2011, Atheer Telecom Iraq Limited ("Zain Iraq") entered into a five-year, $900 million, managed services contract with LM Ericsson and Ericsson AB to optimize, modernize, and manage Zain Iraq's IT operations and its entire mobile network spanning 3,700 sites located throughout Iraq, including in several areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and beginning in 2014, Islamic State. Notably, this contract gave Ericsson management responsibility over subcontractors deemed necessary for Zain Iraq's network operations.

i.   2012 Asiacell Business Transformation Partnership Contract:  On or about 2012, Asiacell contracted with LM Ericsson and Ericsson AB to provide consultancy services covering Asiacell's "business transformation" under a three-year "partnership" agreement between Asiacell and Defendants, which work Defendants performed in Iraqi areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and beginning in 2014, Islamic State.

j.   2012 Korek Field Maintenance Contract:  On or about 2012, Korek contracted with LM Ericsson and Ericsson AB to provide field maintenance services to Korek's entire

network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**k.** <u>2013 ITPC Network Upgrade Contract</u>:  On or about 2013, the ITPC contracted with LM Ericsson and Ericsson AB to upgrade the ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**l.** <u>2013 Korek Billing Contract</u>:  On or about 2013, Korek contracted with LM Ericsson and Ericsson AB to provide Ericsson's comprehensive suite of billing services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**m.** <u>2014 Asiacell Base Stations Contract</u>:  On or about 2014, Asiacell contracted with LM Ericsson and Ericsson AB to support Asiacell's "Golden Province" initiative by upgrading Asiacell's core network infrastructure with new RBS 6000 base stations to prepare for LTE adoption, which work Defendants performed in Iraqi areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

**n.** <u>2015 Korek Spare Parts Services Management Contract</u>:  On or about 2015, Korek contracted with LM Ericsson and Ericsson AB to manage the inventory of spare parts necessary to the maintenance of Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

**o.** <u>2016 Asiacell Network Upgrade Contract</u>:  On or about 2016, Asiacell contracted with LM Ericsson and Ericsson AB to upgrade Asiacell's "backbone" network to facilitate Asiacell's value-added services, including, but not limited to, Asiacell's proprietary mobile payment system, "AsiaHawala," which work Defendants performed in Iraqi areas that were controlled by Islamic State.

**p.** <u>2016 Korek LTE Upgrade Contract</u>:  On or about 2016, Korek contracted with LM Ericsson and Ericsson AB to provide core network updates in preparation for Korek's adoption of LTE services throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

**q.** <u>2017 Korek IP Network Contract</u>:  On or about 2017, Korek contracted with LM Ericsson and Ericsson AB to assist with IP network updates to Korek's network computing infrastructure through the provision of Ericsson services that depended upon Ericsson's ability to procure technology from another U.S. company, which was installed throughout Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by Islamic State.

**r.** <u>2019 Asiacell Network Optimization Contract</u>:  On or about 2019, Asiacell contracted with LM Ericsson and Ericsson AB to provide a suite of network expansion, network design, and optimization services under a managed services agreement, which work Defendants performed in Iraqi areas that Islamic State controlled or contested.

293.     On information and belief, LM Ericsson, Ericsson AB, and Ericsson Inc. were parties to, or otherwise provided goods or services pursuant to, every major Ericsson contract in Iraq from 2004 through 2022, including, but not limited to, each contract set forth above, and made protection payments to al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State in connection with all such contracts.

294.     According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments in high-risk jurisdictions, she/he felt "ashamed having worked for" LM Ericsson and Ericsson AB because she/he believed that the following conclusions were "obviously" correct:

a.     LM Ericsson and Ericsson AB "seemed to have bribed such terrorist organizations," i.e., al-Qaeda, al-Qaeda-in-Iraq, and Islamic State;

b.     LM Ericsson and Ericsson AB paid such "bribe[s]" "for the purposes of being permitted to do businesses in territories controlled and administrated by them," i.e., al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; and

c.     LM Ericsson's and Ericsson AB's "top management had … approved" protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

**a.     Leaked Ericsson Documents and Subsequent Public Statements Confirm Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Iraq.**

295.     Ericsson's public statements after its latest criminal scandal emerged in February 2022, and the revelations contained in Defendants' internal documents—first leaked and reported by the media on February 15, 2022—offer some indications of Ericsson's general policy of protection payments in Iraq and obstruction of U.S. government counterterrorism operations, including, but not limited to:

a.     Ericsson Admitted Its Conduct After the Ericsson Leak in 2022:  After the leak went public in February 2022 and exposed their aid to FTOs, Ericsson has admitted, in sum and substance, that it facilitated the flow of protection payments in Iraq from at least 2011 through at least 2019, and that DOJ had concluded that LM Ericsson's conduct in Iraq constituted a "breach" of Ericsson's DPA.

b.    The Ericsson Leak in 2022 Revealed Ericsson's Contemporaneous Office Discussions about Protection Payments to Terrorists:  Prior to at least February 15, 2022, Ericsson concealed the fact that beginning in at least 2014, Ericsson's officers, employees, and agents frequently discussed Ericsson's protection payments, and the general consensus among them was that Ericsson paid Islamic State – either directly or through its Iraqi partners, consultants, subcontractors, or slush funds – to secure its projects in Iraq, including its transportation needs.  Those discussions typically occurred in private, without official documentation.  But the typical view of multiple Ericsson officers, employees, and agents—like that of other companies operating in Iraq—was that Ericsson had to pay terrorists to proceed with its work in unstable areas in Iraq.

c.    The Ericsson Leak in 2022 Revealed Ericsson's Permission Letters to Terrorists in Iraq:  Prior to at least February 15, 2022, Ericsson concealed the fact that it requested "permission letters" from terrorists in Iraq granting them formal authority to work in Iraq, similar to a request Ericsson submitted to Islamic State in 2014 via its strategic partners, like Asiacell, and subcontractors, like Orbitel.  Al-Qaeda, al-Qaeda-in-Iraq, and ISIS issued such letters only to contractors that had made the necessary protection payments.

d.    The Ericsson Leak in 2022 Revealed Ericsson's Indifference to Funding Consequences in Iraq:  Prior to at least February 15, 2022, Ericsson concealed the fact that it had a documented track record of expressed indifference to where their money went in Iraq. For example, Ericsson admitted that, at best, it did not know, and until 2022 did not care, where its money went, as long as its profitable work remained unimpacted. That philosophy, prevalent throughout Defendants' operations, led Ericsson to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to maximize Ericsson's profits from customers in the Iraqi and Syrian geographies in which such groups operated.

e.    The Ericsson Leak in 2022 Revealed Ericsson's Uncontrolled Iraqi Slush Funds:  Prior to at least February 15, 2022, Ericsson concealed the fact that it operated, and benefited from, an uncontrolled slush fund in Iraq—which Defendants intentionally created and sustained by deliberately avoiding placing rigorous controls on what their partners, consultants, and contractors could do with Ericsson's money inside Iraq even though Iraq posed extraordinarily unique terrorist finance risk—as a strategy designed to create purpose-built buffers between Defendants and the terrorists they intentionally paid. Defendants did so to permit Ericsson to route payments to terrorists through Defendants' partners, consultants, contractors, and slush funds, which Ericsson encouraged while often avoiding the details.

f.    The Ericsson Leak in 2022 Revealed Ericsson's Use of Incentives to Encourage Personnel to Make Protection Payments to Terrorists:  Prior to at least February 15, 2022, Ericsson concealed the fact that it rewarded its officers, employees and agents who facilitated protection payments to terrorists, while simultaneously punishing persons who questioned their conduct.

296.    Ericsson's payments were consistent with foreign-headquartered

telecommunications companies' standard operating practice on projects with comparable funding

profiles, security risks, and geographical coverage. *See supra* II.A.2. In following that standard practice, Ericsson caused protection payments to flow to terrorists that were, on information and belief, worth at least 10 percent to 20 percent of the value of Ericsson's Iraqi contracts—a common rate for protection payments to al-Qaeda-sponsored Sunni terrorists in Iraq and Syria. As a result, across its contracts, Ericsson made payments to al-Qaeda and al-Qaeda-in-Iraq worth at least several million dollars per year from 2004 through 2014, and made payments to Islamic State worth at least several million dollars per year from 2014 through at least 2019.

297.     From 2014 through at least 2019, Ericsson likely routed more than $15 million to Islamic State and Jabhat al-Nusra pursuant to LM Ericsson's approval of Ericsson AB's agreement to purchase security from Islamic State and Jabhat al-Nusra in Iraq.

298.     On information and belief, the sum and substance of Ericsson's protection agreements with al-Qaeda-in-Iraq and Islamic State from 2004 through at least 2019 were substantially like Lafarge's protection agreement with Islamic State in Syria with respect to, *inter alia*, the "rate(s)" that Ericsson agreed to pay Islamic State to purchase security in Iraq from ISIS, "tolls" assessed on Ericsson's convoys, "taxes" assessed on Ericsson's income, and other assorted fees and penalties.

> **b.    Defendants Used Strategic Partners, Consultants, Subcontractors, and Slush Funds to Funnel Protection Payments to Terrorists in Iraq**

299.     From 2004 through at least 2019, Ericsson used a broad array of strategies to route protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State on Ericsson's behalf, including, but not limited to, protection payments to such FTOs that Ericsson routed through: (1) Ericsson's strategic "partners" in Iraq; (2) Ericsson's consultants; (3) Ericsson's security, logistics, and transportation subcontractors; and (4) Ericsson's slush funds, upon which Ericsson's employees and contractors relied. At all times, such conduct by Ericsson and its

agents and allies was understood and intended by all concerned to purchase security from the FTOs to aid Ericsson's Iraq business.

300.    **Ericsson's Strategic Partners.**  Close cooperation between LM Ericsson, Ericsson AB, and Ericsson Inc. and their strategic partners in Iraq, like Asiacell and Korek, was a hallmark of Ericsson's protection money strategy in Iraq from 2004 through at least 2019.

301.    From 2004 through 2022, Ericsson viewed Asiacell as one of its key strategic partners in Iraq, and Asiacell likewise viewed Ericsson as a key strategic partner of Asiacell.

302.    Even though Ericsson AB and Ericsson Inc. were nominally the supplier and manufacturer, respectively, while Asiacell was the customer, their mutual agreement that the Ericsson-Asiacell relationship was between two partners was apt—particularly with respect to protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

303.    From 2004 through at least February 15, 2022, while Ericsson and Asiacell served as partners to one another, Ericsson (through LM Ericsson and Ericsson AB) coordinated closely with Asiacell regarding any protection payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS.

304.    When Asiacell made its protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Asiacell often did so through LM Ericsson, Ericsson AB, and/or Ericsson's subcontractors.  For example, according to leaked Ericsson internal documents, "[e]vidence suggests that Asiacell [] engaged in smuggling and potential illegitimate payments directly and through Ericsson."

305.    True to their partnership, LM Ericsson and Ericsson AB were likewise willing to pay off terrorists on Asiacell's behalf.  Indeed, more than one review published by, or funded by, the U.S. government determined that Asiacell paid al-Qaeda-in-Iraq hundreds of thousands of

U.S. dollars per month in Ninewa province alone during a substantial part of the 2000s while it served as Ericsson's strategic partner there.

306.    As a result, from 2004 through at least 2019, Ericsson and Asiacell were generally both involved, directly or indirectly, whenever protection money payments were made to terrorists in connection with Ericsson's projects for Asiacell.

307.    According to leaked Ericsson internal documents, Defendants also relied upon U.S.-manufactured "free goods," including sophisticated free American consumer communications technologies like Apple iPads,[27] as cash equivalents to make corrupt payments to support Ericsson's ability to make protection payments in Iraq.  The terrorists who received those high-tech, embargoed, free goods used them for vital communications support and as a fungible cash-equivalent that they could, and often did, monetize through the black markets that were endemic throughout the Middle East from 2003 through 2022.  Ericsson also gave such free goods as alternative payments and gratuities to the Kurdish intermediaries upon whom Ericsson partially relied to route protection money to Islamic State, which furthered Ericsson's ability to make protection payments by helping lubricate Ericsson's relations with its local allies—the entire point of the iPad gifts in the first instance.

308.    On information and belief, Ericsson AB and Ericsson Inc. also each provided "free goods" payments to al-Qaeda-in-Iraq terrorists in Iraq in the form of Ericsson cell phones, which were valuable both as cash equivalents and for their utility as communications devices. They were particularly valuable as cash equivalents given their ubiquity in Iraq between 2005 and 2007.  According to one Confidential Witness who had counterterrorism-facing

---

[27] Although iPads are generally manufactured in China, they contain significant U.S.-manufactured parts (including chips and glass screens) and are typically shipped or sold from the United States.

responsibilities in Iraq, Ericsson mobile phones were the "only phones [he] ever saw" while there (other than the occasional satellite phone) and were used by U.S. government contractors, government personnel, and Iraqi nationals.

309.    The Middle East, including Iraq, also featured a robust black market in Ericsson cell phones.  The same Confidential Witness, for example, recalled seizing "multiple boxes of Ericsson phones" while stationed at a checkpoint on a major supply route.  And as with everyone else in Iraq, Ericsson's cell phones were popular among and used by terrorists.  According to this Confidential Witness, "[t]he terrorists always had a phone, and it was Ericsson 100 percent of the time."  After any terrorist attack, it was protocol to search terrorists' bodies for the phone (among other items) because it could contain actionable intelligence.  The same Confidential Witness even recounted how his/her team found the Ericsson cell phone that belonged to the terrorist/security guard who "blew himself up in the Iraqi Parliament" in 2007.  That terrorist kept his Ericsson cell phone in his boot, which – after the explosion – was no longer attached to his body, and the Confidential Witness personally observed the Ericsson phone "wedged up [in the boot] against the severed foot."

310.    The Ericsson leaks in 2022 also revealed that LM Ericsson and Ericsson AB—in their role as supplier, on behalf of themselves and key Ericsson divisions and manufacturers, like Ericsson Inc., that Ericsson promoted in Iraq—also used its strategic partners to deploy another popular tactic in the corporate corruption and illicit finance toolkit from 2003 through 2022 known by some as **"offloading."**

311.    Offloading is a notorious corruption strategy that was always (and remains) especially popular with corrupt European and American multinational corporations that desire to make large streams of regular and predictable illicit payments to known recipients.  In a typical

version of an "offloading" transaction, criminal corporations, including Ericsson, negotiate with a trusted ally, like a strategic partner or captive subcontractor, to serve as an intermediary upon which the corporation can "offload" some aspect of that illicit payment stream.  The offloading corporation is thus able to theoretically offload the legal exposure it would otherwise risk incurring onto its ally, which typically has significantly less (or even zero) legal exposure even it its conduct were detected by relevant local governing authorities.  In exchange for taking on a role in the illicit payment stream, the offloading corporation typically provides a benefit to make it worth the ally's while, such as off-books cash payoffs, commercially unreasonable terms (in the ally's favor) on another aspect of their business relationships, free goods, and so on.  As a result, when Western corporations and local partners engage in a pattern of transactions reflecting offloading tactics to facilitate corrupt payments by the Western company (usually the offloader) through a local partner (usually the intermediary), the local partner typically can expect to charge a fee of some sort, and yield a substantial profit from the offloading relationship (a win/win for both sides of this criminal coin).

312.    Offloading was popular among multinational corporations during the United Nation's Oil-for-Food program from 1998 through 2003, several of whom used local businesses as intermediaries to make off-books payments to Saddam Hussein's regime, which funds were used to finance terrorism.  Not surprisingly, Ericsson ordinarily hired consultants and subcontractors who had gained substantial illicit economy experience during the Oil-for-Food era that could help Ericsson operationalize and sustain an offloading scheme for terrorist finance, like what Ericsson pursued with Ericsson's Iraqi partners, Asiacell and Korek.

313.    The history of Ericsson's behavior in Iraq, as first revealed during the 2022 Ericsson leaks, is consistent with Defendants' widespread implementation of an offloading

strategy in Iraq.  Ericsson relied on an offloading strategy to route some of their protection money value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Defendants did so by, among other things, routing cash payments through intermediaries.  Moreover, on information and belief, Defendants also negotiated discounted pricing on certain commercial aspects of their deals with Asiacell and Korek to provide these customers with excess value for the purpose of, and with the specific intent to, facilitate Asiacell's and Korek's respective protection payments to terrorists on each of their own behalves and on behalf of their partner, Ericsson (while also permitting Asiacell and Korek to each keep some of that excess value for themselves as a fee for participating in Ericsson's offloading strategy).

314.    When corporations, like Ericsson, embrace offloading as a corruption scheme, the criminal rot tends to spread far and wide throughout the organization, as it requires a team effort to sustain an offloading scheme at a large multinational corporation.  Thus, offloading schemes tend to be practiced by only the most brazen of corporate criminals, as they are one of the maximalist ways (from an organizational perspective) a corporation can route illicit payments to third parties.  Simply put, one-off dirty consultants are far easier.  But for large scale payments, offloading offers superior efficiency advantages for the criminal enterprise.  Defendants practiced an all-of-the-above approach, in which they used more common illicit transfer strategies (*e.g.*, slush funds and corrupt consultants) while also embracing an offloading approach through their relationships with strategic partners and subcontractors.

315.    Given LM Ericsson's "One Ericsson" model, which places tremendous scrutiny on the commercial terms at issue, Ericsson's offloading practices necessarily involved both LM Ericsson's C-Suite (which had to approve the egregious deals) and its cross-functional

commercial, legal, compliance, and technical teams in the United States (which had to approve and operationalize those deals).

316.    As a result of Defendants' adherence to such offloading practices, even corrupt value transfers to Asiacell and Korek that did not directly go to the terrorists – *e.g.*, a large off-books cash payment to officers, employees, or agents of Asiacell or Korek – still often flowed significant value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because LM Ericsson, Ericsson AB, and Ericsson Inc. (via Ericsson AB's role as Ericsson Inc.'s agent in Iraq) agreed with its Iraqi partners like Asiacell and Korek that everyone involved would help everyone else with their protection money needs.  On information and belief, Ericsson regularly routed large-value protection payments through its partners via such an "offloading" strategy.[28]

317.    **Ericsson's Consultants.**  Ericsson leveraged its long-standing consultants in Iraq to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

318.    According to leaked Ericsson internal documents, Defendants paid **al-Awsat Telecommunications Service Company ("al-Awsat")** to serve as a conduit in order to route tens of millions of dollars to others, through consulting work where: (a) the ultimate beneficiary could not be identified; (b) there was "deficient proof of work"; and (c) "the money ultimately ended up in a Jordanian bank account."[29]  These were three classic indicia of a company routing value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq.  According to leaked Ericsson internal documents,

---

[28] Given that offloading is the most effective way to conceal illicit payments (that's why it exists, after all), Plaintiffs have only scratched the surface, and discovery is likely to reveal additional instances of Defendants' offloading relationships.

[29] Notably, al-Awsat means "the middle" in Arabic, thus expressly and without irony referencing Ericsson's use of al-Awsat as a "buffer" between Ericsson and those whom Ericsson needed to pay off as the price of doing business in Iraq.

> In interviews, [at least two witnesses] stated that Al-Awsat were paid 500k USD
> under the label "Security Service" without a clear scope of delivery. … In [an]
> interview [with Ericsson, a witness] stated that the amount was requested to be
> added by [chief of LM Ericsson's Iraq Country Unit] Tarek Saadi … In
> interviews with [Ericsson, one or more witnesses] has confirmed that no security
> services from Al-Awsat have been rendered, and in reference to the 500k USD …
> [i]t has not been possible to trace the ultimate beneficiary of this money.

319.    According to leaked Ericsson internal documents, Defendants authorized al-Awsat and its proprietor, Jawhar Surchi, to execute agreements on Defendants' behalf.  Indeed, according to those leaked documents, Surchi and al-Awsat were internally viewed as indistinct from Ericsson to such an extent over time that al-Awsat was no longer referred to by its name "al Awsat" but instead simply as "Ericsson."

320.    According to leaked internal Ericsson documents, one or more Ericsson employees told LM Ericsson's investigators that Ericsson directed large U.S. Dollar-denominated "commission" and "security services" payments to al-Awsat "regardless of whether there were deliveries ongoing or not," which were classic indicia of a company routing value to al-Qaeda, AQI, and Islamic State through an intermediary.

321.    From at least 2005 through at least 2017, Ericsson relied upon the services of al-Awsat and its sister company, Alawsatiya, to route illicit funds through suppliers.[30]  During this period, Defendants caused al-Awsat and Alawsatiya to be paid at least $10.5 million.  According to Ericsson, "[t]he 10.5M USD paid to Alawsatiya into Al-Awsat's accounts was not reflected in their accounts at all, and therefore we are unable to ascertain who the ultimate beneficiary owner was for this money." On information and belief, al-Awsat and Alawsatiya diverted a substantial percentage of this money to al-Qaeda, al-Qaeda-in-Iraq, and ISIS from 2005 until at least 2017.

---

[30] According to al-Awsat's owner, Jawhar Surchi, Alawsatiya was a "secondary contractor" that served as an extension of al-Awsat.

322.    On information and belief, Ericsson retained other consultants from 2005 through at least 2019, which Defendants used to route protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, through these FTOs' agents in Iraq.

323.    **Ericsson's Security, Logistics, and Transportation Subcontractors.** LM Ericsson, Ericsson AB, and Ericsson Inc. also relied upon LM Ericsson's security, logistics, and transportation suppliers, with whom Defendants contracted, to route Ericsson's protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2019.

324.    During this period, Ericsson relied upon, among others, **Security and Logistic Services ("SLS")**, which was a supplier to Ericsson, and **Cargo Iraq**, which was also an Ericsson contractor, albeit one that Defendants tried to conceal on their books.

325.    Ericsson intended for its security, logistics, and transportation suppliers to divert a substantial amount of the sums they were paid by Ericsson to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because the suppliers understood that Ericsson affirmatively desired that they pass on such money to the terrorists in order to secure a more favorable business environment in Iraq for Ericsson.  And those suppliers did what Ericsson intended them to do.

326.    **Ericsson's Slush Funds.**  According to leaked Ericsson documents, Defendants maintained an **"uncontrolled slush fund"** that they operationalized through their employees and subcontractors.  Ericsson "used" its longtime subcontractor SLS "to provide cash for transportation services."  SLS did not provide legitimate transportation security services but chose to simply pay the terrorists.  According to leaked Ericsson internal documents, Ericsson's "suppliers were used as an uncontrolled slush fund between 2016-2018" and Ericsson "cannot rule out that other suppliers [had] been used in [a] similar manner until today."

327.    Ericsson's personnel in Iraq went to great lengths to create slush funds in every manner possible.  For example, Ericsson's personnel working on Defendants' Asiacell contracts developed a scrapping scheme in which Ericsson employees used unrecorded cash from the sale of decommissioned equipment to pay for illicit off-books expenses.

328.    Ericsson operated its scrapping scheme as a slush fund generation tactic from at least 2014 through at least 2017.  According to Ericsson:

> A scrapping scheme was established, which involved selling decommissioned equipment owned by Asiacell on a swap project for 2000 sites, including Nokia and Huawei sites.  Ericsson's Asiacell KAM [i.e., Key Account Manager] and Operations teams have been using the unrecorded cash as a 'slush fund' for other expenses. … Over 188K USD between 2014-2017 has been identified by the investigation.  The spent included hotels, dinners, bonuses for contractors, parties, personal expenses, taxis and miscellaneous purchases.  This process does not follow any of the four Ericsson routines for handling cash.

329.    On information and belief, some of the sums described above, including but not limited to "bonuses for contractors" and "personal expenses" were euphemisms for payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and Defendants' scrapping scheme was another mechanism through which Ericsson created the purpose-built slush funds it needed for its payoffs, including to al-Qaeda and al-Qaeda-in-Iraq (in at least 2014) and to Islamic State (from at least 2014 through 2017).

330.    The **2014 Asiacell Base Stations Contract**, *supra* ¶ 292(m), offers a good illustration of Defendants' general practice of making protection payments to terrorists in Iraq. Throughout the spring and summer of 2014, LM Ericsson faced an imminent financial crisis, causing it to announce major restructuring, impairments, and the need to substantially increase revenue. Against this backdrop of intense corporate pressure, in the summer of 2014, while Ericsson began working under the 2014 Asiacell Base Stations Contract, ISIS was rampaging across Iraq, including the northern Iraqi geographies in which Ericsson's work was being

performed.  Given ISIS's universal taxation practices, and use of such tax revenue to finance terrorism, every responsible company exited the areas seized by ISIS. Ericsson, however, stayed.

331.    On June 10, 2014, Islamic State seized Mosul. The next day, instead of planning their departure, Ericsson was looking for contractors to work on a network upgrade project under the 2014 Asiacell Base Stations Contract. One or more of Ericsson's employees and/or agents expressed concern about the security environment in Iraq and encouraged Ericsson to invoke its "force majeure" clause in the Asiacell contract so that Ericsson would not have to work in or near Islamic State-held territory, and the issue was escalated to Ericsson's regional management.

332.    According to leaked Ericsson internal documents, an "email review" of Defendants' emails showed that Ericsson "persever[ed] to maintain business continuity" in northern Iraq "[i]n the weeks following the capture of Mosul by ISIS on 10 June 2014." For example, during this period, an LM Ericsson manager emailed one of Ericsson's subcontractors operating in Islamic State-controlled territory and instructed him as follows:  "Kindly let's keep each other updated daily so that whenever there's any window to perform activity if the security situation allows, so that we grab any chance available."

333.    Between on or about June 11, 2014 and on or about June 17, 2014, Tom Nygren, LM Ericsson's Vice President and General Counsel for the Middle East Region, strongly recommended that Defendants invoke force majeure and withdraw from the Iraqi geographies controlled by Islamic State.

334.    But on June 18, 2014, Rafiah Ibrahim, Head of Ericsson's Middle East & Africa Region, and Tarek Saadi, then-head of Ericsson's Iraq Country Unit, rejected Mr. Nygren's recommendation.  According to Ericsson, "[d]espite the strong recommendation from Tom

Nygren," "Rafiah Ibrahim" "and Tarek Saadi" "decide[d] not to invoke force majeure because it would be 'premature' and 'destroy [Ericsson's] business.'"

335.    According to Ericsson, Roger Antoun, an Ericsson manager who worked on the 2014 Asiacell Base Station Contract, said the proposal by Ericsson's employees to invoke force majeure was "escalated" to LM Ericsson's global headquarters and Mr. Antoun "raised it verbally as well."  On information and belief, LM Ericsson's senior global leadership sided with Ms. Ibrahim and Mr. Saadi, and approved Defendants' continued business in Islamic State-controlled territory.

336.    On July 13, 2014, LM Ericsson conducted a meeting of its regional leadership for the Middle East, during which meeting the participants openly discussed continuing to do business in Islamic State-controlled territory.  At this meeting, Ericsson AB's senior executive for the Middle East and Africa, Ms. Ibrahim, shared information with the group that Islamic State's abductions in Iraq were "impacting business."  Ms. Ibrahim and Ericsson AB's senior Middle East management team, however, concluded that "for now," there would be "no changes," meaning that Ericsson would continue to do business in Iraqi territory controlled by Islamic State even though Defendants understood the risks in doing so.

337.    The day after Ericsson AB's meeting, on July 14, 2014, according to leaked Ericsson documents, Ericsson asked Asiacell, which Ericsson viewed as one of its Iraqi "partners," to request "permission from 'local authority ISIS'" to permit Ericsson to continue to work in Mosul even after Islamic State fully seized the city in Summer 2014.

338.    Later that summer, LM Ericsson, Ericsson AB, and Asiacell prepared a letter to Islamic State requesting the terrorist group's permission to continue working in northern Iraq. Among other things, Ericsson and its "partners" at Asiacell asked Islamic State to "[p]lease

facilitate the mission of the technical team … of Ericsson which is contracted by Asiacell for the maintenance and setting up of the towers" and "thank[ed]" Islamic State for its "cooperation." According to a leaked Ericsson report, Ericsson could not rule out the possibility that this "facilitation" involved Ericsson's financing of terrorism in Iraq.

339.    LM Ericsson, Ericsson AB, and Asiacell then caused an engineer named Affan – who had been working for Ericsson's subcontractor, Orbitel, on tower tests in Mosul – to personally deliver Ericsson's and Asiacell's permission letter to the terrorists at Islamic State's office in Mosul.

340.    LM Ericsson, Ericsson AB, and Asiacell insisted that the work continue and sent Affan to deliver their letter to Islamic State even though LM Ericsson, Ericsson AB, and Asiacell understood that Islamic State terrorists had previously detained several other workers performing services under Defendants' 2014 Asiacell Base Stations Contract.

341.    LM Ericsson and Ericsson AB communicated directly with Affan prior to his interaction with Islamic State to instruct him to hand-deliver Ericsson's and Asiacell's permission letter to ISIS.

342.    LM Ericsson and Ericsson AB also communicated with their Iraqi subcontractor, Orbitel, which employed Affan on Ericsson's behalf, in order to pressure Orbitel to deliver Ericsson's and Asiacell's letter to Islamic State.  As Affan put it, "Ericsson put pressure on my company, and my company put pressure on me."

343.    After Affan hand-delivered the joint Ericsson/Asiacell letter to Islamic State, he was contacted by Islamic State terrorists and instructed to appear at a meeting point. When Affan did so, he was detained by a sheikh, Haji Saleh, who was an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecommunications businesses in northern Iraq. Haji

Saleh told Ericsson's senior manager in Iraq that Ericsson must pay millions of U.S. dollars to Islamic State in order to continue its work in Northern Iraq.

344.    According to leaked Ericsson internal documents, an Islamic State "sheikh" – on information and belief, Haji Saleh – called Rabbah Dannawi, an Ericsson project manager in Iraq, and told Mr. Dannawi that Ericsson and its employees were "infidels," Islamic State was demanding that Ericsson pay a religious tax of millions of U.S. dollars, and Mr. Dannawi was "reachable" even in Oman or Lebanon.  After Mr. Dannawi "hung up the phone," Affan frantically called back but no one from Ericsson returned his calls.

345.    Ericsson, Asiacell, and Orbitel abandoned Affan for several weeks, while he was placed under house arrest by Islamic State.  Describing how Ericsson treated him, Affan put it simply: "They sold me."  Referring to Ericsson, Affan said: "They destroyed me."

346.    After a few weeks, Islamic State terrorists told Affan that he was free to leave. Islamic State did so because Ericsson facilitated the payment of millions of U.S. dollars to Islamic State as a "business tax," which Islamic State had previously communicated to Ericsson must be paid for Defendants to do business in parts of northern Iraq that were controlled or contested by Islamic State. According to leaked Ericsson documents, an Ericsson manager admitted that Ericsson worked through Asiacell to make "arrangements to obtain the release of the hostage and to let Ericsson continue the work in Mosul."  Based on his personal observations, Affan also concluded that Ericsson purchased security from Islamic State by paying protection money to it.  On information and belief, Ericsson routed some of these payments to Islamic State through, among other terrorists, Haji Saleh, an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecom firms in northern Iraq.

347.     Defendants did not merely pay "business taxes" to Islamic State. From at least 2014 through at least 2017, Ericsson also facilitated the payment of "customs taxes" to Islamic State, which Islamic State assessed on trucks traveling through or near territory controlled by Islamic State.

348.     As part of the 2014 Asiacell Base Stations Contract, for example, Ericsson and its partner Asiacell had to transport expensive cell towers and equipment from Erbil in northern Iraq to Ramadi in western Iraq.  According to leaked Ericsson documents, Defendants' transportation contractor, Cargo Iraq, had two options: the "legal way" and the "Speedway."  While the "Speedway" was both longer (in terms of distance) and more expensive (in terms of illicit protection payments, styled as "customs taxes," required to be made to Islamic State), it was actually much faster than the "legal way" because it avoided the lawful Iraqi checkpoints that the Iraqi government established throughout the country in an attempt to halt Islamic State's rapid advance at the time. The International Consortium of Investigative Journalists published a graphic, *see* Figure 1, depicting Ericsson's choice.[31]

---

[31] Sydney P. Freedberg, Maggie Michael and Amir Musawy, *The Ericsson List: Leak Exposes Ericsson's Secret Dealings With ISIS Amid Iraq Corruption Spree*, Int'l Consortium of Investigative Journalists (Feb. 27, 2022), https://tinyurl.com/5yjnnjyr ("ICIJ, *Ericsson List*").



**Figure 1**

349.    Ericsson instructed Cargo Iraq to take the "Speedway" because Ericsson calculated that doing so was better for its bottom line (notwithstanding the cost of payoffs to Islamic State).  On information and belief, this was because, among other reasons, Defendants' contracts with Asiacell and Korek harshly penalized project delays.  In short: Defendants bribed

Islamic State so that Ericsson could avoid paying substantial late fees to its Iraqi customers—which fees would have exceeded the amounts Ericsson had to pay Islamic State to take the "Speedway."  Moreover, even without the prospect of costly project delays, taking the "Speedway" allowed Ericsson to avoid paying official customs taxes that the Iraqi government assessed at various checkpoints along the "legal way."

350.    According to leaked Ericsson documents, Defendants regularly paid thousands of dollars per truck to transport their equipment on the "Speedway" through Islamic State's territory while providing services under the 2014 Asiacell Base Stations Contract.  For example, in March 2017, according to such Ericsson documents, Ericsson paid $22,000 per truck for three loads on a single day. According to such leaked Ericsson data,

> Roger Antoun stated in an interview that Ericsson had paid an illegal 'Speedway' option to the transporter Cargo Iraq [] for faster transportation of equipment in Iraq.  According to Roger Antoun, Cargo Iraq were engaged by Ericsson, on instruction by non-government customer Asiacell, for transportation during 2016 and 2017. With the specific purpose to circumvent the official customs.  That had been increased to 25% from 10%-15% by the government since the ISIS invasion [in 2014]. Cargo Iraq were not registered as an Ericsson supplier and were paid in cash through Security and Logistic Services (SLS), a supplier to Ericsson.  The timeframe and geographic areas covered by these transportations indicate that areas controlled by local militias, including ISIS, has been passed.

351.    Collectively, LM Ericsson, Ericsson AB, and Ericsson Inc. facilitated at least several million U.S. dollars' worth of such "customs tax" payments to Islamic State terrorists to transport goods on the "Speedway" from at least 2014 through at least 2019.  Indeed, the transactions above, which describe only one day in March 2017, resulted in at least $16,500 flowing from Defendants to Islamic State on a single route in a single day. Indeed, in a leaked report, Ericsson itself concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that Cargo Iraq engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

352.     The **2004 Asiacell Networks Contract**, *supra* ¶ 292(a), offers another good illustration of Defendants' general practice of making protection money payments to terrorists in Iraq from at least 2004 through at least 2019. From 2004 through approximately 2008, Ericsson expanded Asiacell's network throughout central and northern Iraq, including in Baghdad and Mosul. Throughout, Defendants and Asiacell viewed one another as strategic "partners," in the same way they were a decade later.

353.     While Defendants built out Asiacell's network in central Iraq from 2004 through 2008, al-Qaeda and al-Qaeda-in-Iraq ran sophisticated protection money operations that specifically focused on extracting business taxes and customs taxes from telecommunications companies that were doing business in central Iraq and/or shipping equipment through northern Iraq, both of which described Defendants' services to, and partnership with, Asiacell.

354.     From 2004 through at least 2008, al-Qaeda and al-Qaeda-in-Iraq collectively extracted millions of U.S. dollars each year from persons affiliated with the 2004 Asiacell Network Contract. The U.S. government has determined that al-Qaeda-in-Iraq extracted large amounts of protection money from persons associated with the 2004 Asiacell Network Contract between about 2005 through about 2008 (at least), which included monthly six-figure payments of "business taxes" in al-Qaeda-in-Iraq-contested provinces, including Ninewa and Baghdad, where Ericsson performed under the 2004 Asiacell Network Contract.

355.     Ericsson played a key role in the Asiacell-related protection money payments to al-Qaeda and al-Qaeda-in-Iraq from 2004 through at least 2008.

356.     Defendants did not limit their protection money payments in Iraq to Asiacell-related work.  Ericsson's corruption was programmatic throughout Iraq and extended specifically to Ericsson's work for Korek in Iraq.  According to leaked Ericsson internal documents, Elie

Moubarak, Ericsson's account manager for Korek, engaged in "corruption and financial irregularities" in order to facilitate Ericsson's business in Iraq. On information and belief, LM Ericsson and Ericsson Inc. routed protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2019 in connection with Ericsson's Korek-related work as described above.

357.    In each instance above, LM Ericsson and Ericsson AB authorized and coordinated the payment(s) to the terrorists.  Although LM Ericsson and Ericsson AB could have vetoed any such payment, they chose not to—just as Ericsson opted not to hire sufficient private security to protect its projects and equipment from terrorist attacks—because Ericsson prioritized profits over all else, including any risks that its substantial payments to violent terrorists would facilitate violent terrorism.

358.    Indeed, the events alleged above are merely examples and reflect the tip of what is likely an historically large legal iceberg, as Ericsson went to unusual lengths to conceal its protection payments to terrorists. *See infra* Part IV.  Discovery is therefore likely to reveal additional culpable (and illegal) relationships, strategies, and payments.

359.    Ericsson's protection payments delivered substantial monetary value, usually in U.S. dollars, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through 2022.  Given the size of Defendants' business in Iraq during that time frame, the frequency of its contracts, the nature of the Iraqi projects for which Defendants were contracted, and LM Ericsson's admissions about Defendants' conduct in Iraq, Ericsson's total protection payments – including cash payments through Ericsson's uncontrolled slush funds and value transfers through Defendants' agents, partners, consultants, and contractors – delivered at least several million U.S. dollars per

year in total value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2004 through at least 2019.

360.    From 2004 through 2014, the total value of the protection payments that Ericsson caused to flow through to al-Qaeda and al-Qaeda-in-Iraq likely exceeded $50 million—and may be far in excess of that number.  Among other reasons, the U.S. military and media both confirmed in numerous reports that al-Qaeda-in-Iraq charged telecommunications companies in Iraq a "going rate" of $200,000 per month per province in order to receive al-Qaeda-in-Iraq's protection.  At all times, al-Qaeda-in-Iraq claimed dominion over at least five provinces in Iraq, and thus it is extremely unlikely that Ericsson only paid a single $200,000 monthly fee to purchase security from AQI for all of Ericsson's projects nationwide.

361.    Even applying that unrealistic assumption, however, Ericsson likely paid al-Qaeda-in-Iraq around $25 million, which is the result if one assumes that Ericsson merely paid the bare minimum $200,000 fee during each of the approximately 130 months when al-Qaeda-in-Iraq operated al-Qaeda's protection networks in Iraq from spring 2003 through spring 2014. Considering the publicly confirmed rates that AQI charged telecommunications companies like Ericsson in Iraq from 2004 through 2014, Plaintiffs' estimates regarding Ericsson's protection payments to al-Qaeda and al-Qaeda-in-Iraq are conservative.

362.    Moreover, the vast sums Ericsson paid throughout from at least 2004 through at least 2019 facilitated the terrorists' financial reserves for at least several years thereafter. As a result, Islamic State was still likely benefitting from Ericsson's 2019 largesse, for example, in February 2022 when leaked Ericsson internal documents revealed Defendants' past aid to terrorists.

### c.   Defendants Admitted That Ericsson Likely Purchased Security From Al-Qaeda And Islamic State In Iraq

363.   Ericsson has, in sum and substance, admitted that it purchased protection from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2011 through at least 2019 and that it obstructed U.S. counterterrorism operations until at least February 15, 2022.  In addition to the statements alleged above, *e.g.*, *supra* II.B, other examples of LM Ericsson's admissions (on behalf of itself and Ericsson AB and as Ericsson Inc.'s agent) include, but are not limited to:[32]

a.   Via its CEO, Mr. Ekholm: "We . . . received communication from the DOJ about a breach notice related to our DPA, … it's our assessment that the resolution will likely result in monetary and other measures"[33]

b.   "Ericsson has been active in Iraq since the lifting of a UN embargo led to the reopening of the telecoms equipment market. Since then, Ericsson has continued its work in the country, including during periods of civil unrest.  Iraq is one of a number of countries where increased concerns about security and risk to colleagues' well-being is closely monitored. The company has processes in place to manage security risks, covering both employees and subcontractors."[34]

c.   "[Ericsson's] investigating team [] identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. Investigators could not determine the ultimate recipients of these payments. Payment schemes and cash transactions that potentially created the risk of money laundering were also identified."[35]

d.   "[An] investigation [by Ericsson relating to unusual expenses] included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. It found serious breaches of compliance rules and the Code of Business Ethics. It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found

---

[32] Consistent with its typical practice and its "One Ericsson" structure, LM Ericsson's public statements about misconduct in Iraq refer only to "Ericsson," and do not specify any other entity. *See* LM Ericsson, *Press Release: Update: Iraq Media Inquiries* (Feb. 15, 2022).

[33] Telefonaktiebolaget LM Ericsson (ERIC) CEO Börje Ekholm on Q1 2022 Results - Earnings Call Transcript (Apr. 14, 2022), https://tinyurl.com/mw2yzrv9.

[34] LM Ericsson, *Press Release: Update: Iraq Media Inquiries* (Feb. 15, 2022).

[35] *Id.*

violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation."[36]

**e.** "Ericsson terminated a number of third-party relationships and prioritized the Iraq country business for enhanced training and awareness activities, policies and procedures, and third-party management processes."[37]

**f.** Via its CEO, Börje Ekholm: LM Ericsson and its subsidiaries had identified "unusual expenses" relating to Iraq "dating back to 2018."[38]

**g.** Via its CEO, Mr. Ekholm: in sum and substance, LM Ericsson and its subsidiaries (as paraphrased by a reporter, with Mr. Ekholm's quote) "may have made illicit payments, but that the company had often struggled to identify the final beneficiary … [because] '[w]e [i.e., LM Ericsson and its subsidiaries] can't determine where money sometimes really goes, but we can see that it has disappeared.'"[39]

**h.** Via its CEO, Mr. Ekholm: "What we [i.e., LM Ericsson and its subsidiaries] are seeing is that transport routes have been purchased [by LM Ericsson and its agents] through areas that have been controlled by terrorist organisations, including ISIS."[40]

**i.** Via its CEO, Mr. Ekholm: LM Ericsson could not disprove that its money flowed to Islamic State: "The question on financing armed factions cannot be substantiated" one way or another.[41]

**j.** "[M]edia will focus on the conduct of business in unstable regions where terrorist organizations and corruption are present."[42]

### d. Independent Media Reports Corroborate Plaintiffs' Interpretation of Ericsson's Conduct in Iraq

364.   Widespread media coverage confirms that Ericsson tried to pull a fast one on the

U.S. government, Ericsson's shareholders, and American victims of terrorism, including

Plaintiffs and their family members, and only came clean once a heroic whistleblower leaked the

---

[36] *Id.*

[37] *Id.*

[38] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq, Report Says; A Leaked Internal Report by the Swedish Business Shows Corruption and Terrorist-Linked Transactions Between 2011 and 2019* (Feb. 28, 2022), https://tinyurl.com/v93j5szx.

[39] ICIJ, *Ericsson List.*

[40] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq.*

[41] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS*, Washington Post (Mar. 2, 2022).

[42] LM Ericsson, *Press Release: Comment Regarding Recent Media Inquiries* (Feb. 8, 2022).

evidence of Ericsson's continued corporate crime spree and deception.  Only then, once caught,

did Ericsson admit its culpability.  As the BBC's headline reported: "*Ericsson says it may have*

*paid bribes to Islamic State terrorists*."[43] Other such reports include, but are not limited to:

a.    *Voice & Data*, February 2022:  "Ericsson [] said that its employees may have funded
      terrorism in Iraq and the Middle East. While it remains under investigation, the
      statements issued by [LM Ericsson] have all but confirmed it … Ericsson itself reported
      that the illicit payments might not have stopped until 2019 …. Notably, [LM Ericsson]
      has noted that during a period that lasted the entire 2010s, it found 'serious breaches' of
      compliance rules and the Code of Business Ethics. … A media statement [by LM
      Ericsson]… read, 'It identified evidence of corruption-related misconduct, including:
      Making a monetary donation without a clear beneficiary; paying a supplier for work
      without a defined scope and documentation; using suppliers to make cash payments;
      funding inappropriate travel and expenses; improper use of sales agents and consultants'.
      Let us break this down. 1. Making a monetary donation without a clear beneficiary:
      means that company funds … potentially … fund[ed] terrorist activities in Iraq and the
      Middle East. 2. Paying a supplier for work without a defined scope and documentation: a
      way to cover up the transfer of funds. 3. Funding inappropriate travel and expenses: using
      money to bribe ISIS for access to certain roads. This could also be used as a method to
      cover up fund transfers to terrorist beneficiaries. 4. Improper use of sales agents and
      consultants: this can mean a lot of things, such as sales agents being used as middlemen,
      to begin with. Furthermore, the investigating team also identified payments to
      intermediaries and the use of alternative transport routes in connection with
      circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS,
      controlled some transport routes. This means that Ericsson intended to avoid Iraqi
      authorities, and as such, paid money to ISIS and other terrorist organizations controlling
      some routes at that time. Of course, the investigators could not determine the ultimate
      recipients of these payments. However, Ericsson did note that that did create a risk of
      money laundering. All of this points to a serious implication; Ericsson … funded terrorist
      activities during the time. However, Ericsson has said that none of its employees were
      'directly involved' in funding any terrorist organization. Which really is not a great
      defense, to be honest." [44]

b.    *Guardian*, February 2022:  "Confidential documents have revealed how … [LM
      Ericsson] is alleged to have helped pay bribes to [] Islamic State … in order to continue

---

[43] BBC, *Ericsson Says It May Have Paid Bribes To Islamic State Terrorists* (Feb. 16, 2022)
("Ericsson['s] … boss said it may have paid off Islamic State (IS) in Iraq to access key transport
routes. … Chief executive Börje Ekholm [said that] … an internal probe started in 2019 had
found …. [that] [m]oney was paid to access areas in Iraq that were controlled by [Islamic
State]").
[44] Voice & Data, *Ericsson Has to Sleep in the Bed it Made in Iraq* (Feb. 17, 2022), 2022 WLNR
4973266.

selling its services after the militants seized control of large parts of Iraq. … The leak of internal investigations at Ericsson, [] also found that the firm had put its contractors at risk and allowed them to be kidnapped by the militants …."[45] "In addition to the findings about the alleged payments to [Islamic State], the investigations uncovered allegations [LM Ericsson] was involved in corruption in at least 10 countries across four continents. That would suggest a pattern of wrongdoing by Ericsson that is far wider than what the telecoms giant publicly admitted to in 2019, when it entered into a $1bn [] settlement with the [DOJ]."[46] "[Ericsson's] [i]nvestigators concluded that the multinational firm was likely to have been involved in channelling bribes to [Islamic State] to allow its products to be transported across parts of Iraq that were held by the terrorists."[47] "[Ericsson's] payments [to Islamic State] … were [also] made through a slush fund run by contractors working for the Swedish multinational, according to [Ericsson's] investigators."[48] "The leaked documents also show how Ericsson jeopardised their contractors in Iraq in the pursuit of profits, as managers strove to continue the firm's commercial operations even after [Islamic State] took control of Mosul. According to investigators, emails showed 'this persistence resulted in the kidnapping of [contractors] while doing fieldwork for Ericsson'. The investigators added that even after the kidnapping, Ericsson sought to carry on doing business in the area."[49]

c.   *The National*, February 2022:  "[LM Ericsson] has been accused of spending 'millions of dollars' to smuggle equipment into ISIS-controlled territory in Iraq … in a leaked internal report by the company … The ICIJ said that between 2011 and 2019, Ericsson made payments 'to sustain its business in Iraq, financing slush funds, trips abroad for defence officials and payoffs through middlemen to corporate executives and possibly terrorists'. 'The internal investigation describes a pattern of bribery and corruption so widespread, and company oversight so weak, that millions of dollars in payments couldn't be accounted for — all while Ericsson worked to maintain and expand vital cellular networks in one of the most corrupt countries in the world.'"[50]

d.   *Agence France Presse*, April 2022:  "[LM Ericsson's CEO] Börje Ekholm conceded in a newspaper interview … that some Ericsson employees may have bribed [Islamic State] members for road transport through areas controlled by [ISIS] in Iraq. The admission was made before the publication of a report by the [ICIJ] revealing that an internal Ericsson investigation from 2019 was never made public. The internal probe had identified possible corruption between 2011 and 2019 in the group's Iraqi operations."[51]

---

[45] Rob Evans and Michael Safi, *Revealed: Leaked Files Show How Ericsson Allegedly Helped Bribe Islamic State*, Guardian (Feb. 27, 2022).
[46] *Id*.
[47] *Id*.
[48] *Id*.
[49] *Id*.
[50] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq*.
[51] Agence France Presse English Wire, *Sweden Opens Criminal Probe Into Ericsson Iraq Graft* (Apr. 20, 2022).

e.    *National Iraqi News Agency*, April 2022:  "The Swedish judiciary announced … the opening of an investigation into possible corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of bribes to ISIS elements in Iraq. According to [Swedish] Attorney General Lev Gortz, the investigation covers the period from 2011 to 2019. …. 'We have good reasons to believe that corruption may have been committed in Iraq during this period, …,' Gortz [said].  … [LM Ericsson's] CEO, Börje Ekholm, admitted in a newspaper interview [] that some Ericsson employees may have bribed ISIS elements to move overland through ISIS-controlled areas in Iraq."[52]

f.    ICIJ, June 2022:  "The [SEC] is probing … Ericsson over its conduct in Iraq following company admissions that it may have made payments to [] Islamic State … The announcement comes nearly five months after the [ICIJ] and 30 media partners … detail[ed] a widespread pattern of alleged corruption and graft, [and] revealed that [LM Ericsson] had paid tens of millions in suspicious payments from 2011-2019 to sustain its business in Iraq. … Days after the Ericsson List was published, U.S. prosecutors told [Ericsson] that it had breached [the DPA] by failing to fully disclose the misconduct in Iraq and that the department was weighing whether Ericsson or its executives would face new fines or prosecution for breaking terms of the deal."[53]

365.    White collar crime scholars also confirmed that Ericsson's conduct comprised an admission of wrongdoing.  As former federal prosecutor Michael Volkov, author of the widely-read *Corruption, Crime, and Compliance* blog, summarized on June 15, 2022:

> Ericsson is having a tough time. First, in 2019, Ericsson settled FCPA charges with [DOJ] and the SEC for … $1 billion … Second, Ericsson had an independent compliance monitor appointed for a three-year term under its deferred prosecution agreement. And then — last year, Ericsson was notified by DOJ that it failed to conduct a proper internal investigation in Iraq because it failed to disclose additional misconduct to DOJ, most of which centered on bribery payments made to ISIS terrorists … DOJ has another opportunity to resolve the Ericsson matter to confirm prior policy statements highlighting a tough stance on recidivists — those defendants that have multiple violations of the FCPA or violated deferred or non-prosecution agreements. … DOJ is lining up against Ericsson to bring a major enforcement action for violating their 2019 [DPA] by failing to disclose bribery conduct in Iraq involving illegal payments to ISIS. Last year, DOJ announced that Ericsson violated its [DPA] by failing to disclose deficiencies in its prior internal investigation. Specifically, DOJ claimed that Ericsson failed to provide certain documents and factual information about bribery conduct. The alleged violations focus on Ericsson's conduct in Iraq. … In March 2021, DOJ alerted Ericsson of

---

[52] National Iraqi News Agency, *Sweden Opens an Investigation Into Possible Corruption Crimes for Ericsson in Iraq* (Apr. 21, 2022).
[53] Maggie Michael, *US Securities Regulator Opens Probe into Ericsson's Conduct in Iraq*, Int'l Consortium of Investigative Journalists (June 9, 2022), https://tinyurl.com/cce5atpr.

its multiple breaches of its settlement agreements for failing to disclose to the government that it paid bribes to ISIS to gain access to transport routes in Iraq.[54]

366.    Similarly, Hogan Lovells LLP also concluded that Ericsson's Iraq-related conduct plausibly constituted an admission of Ericsson's payments to anti-American terrorists:

> An often-cited example of an entity engaging in illegal practices to rapidly expand their business is Telefonaktiebolaget LM Ericsson (Ericsson). Following investigations, Ericsson entered into a $1 billion criminal settlement with U.S. authorities in 2019. Ericsson admitted to a campaign of corruption through, amongst other material failures, improper payments to secure lucrative government contracts, and collusion to falsify its account books. There are perhaps further issues arising for Ericsson through its involvement in high-risk jurisdictions. In February 2022 it disclosed that an internal investigation had found that it may have been making payments to the Islamic State militia in Iraq since 2011. As part of a project to modernise LTE services in the region, Ericsson allegedly made payments to facilitate the transport of its goods through ISIS controlled areas, as well as for the 'protection' of its offices. …[55]

367.    Despite Ericsson's use of careful phrasing in their public statements that merely appeared to imply a remote possibility that their illicit and corrupt payments might have ended up in terrorists' hands, even Defendants' admissions did not go nearly as far enough:  Defendants

---

[54] Michael Volkov, *SEC Joins DOJ in Probe of Ericsson ISIS Bribery Payments*, Corruption, Crime & Compliance (June 15, 2022), 2022 WLNR 18715111.

[55] Crispin Rapinet, Liam Naidoo, Reuben Vandercruyssen, Nick Roper, *Corruption In The Telecoms Sector: Beware The Elephant In The Room*, Hogan Lovells LLP, Engage: Legal Insight and Analysis (Oct. 11, 2022), https://tinyurl.com/59tfb2yf.  Hogan Lovells's legal analysis also confirms the plausibility of Plaintiffs' allegations concerning endemic corruption in the Middle Eastern telecoms sector more generally.  *See id*. ("Corruption risks are significant within the telecommunications sector, and at least four of the top ten enforcement penalties under the FCPA have been imposed on telecommunications companies. Risks that have plagued the sector for decades are being investigated and penalised with increasing frequency … The sector risk, amongst other factors, requires relevant entities and compliance functions to frequently re-evaluate their processes to ensure effective internal compliance measures. … The telecommunications sector operates in a fast paced, competitive and global sphere …. To counter the risks of enhanced scrutiny, the shortcomings of Ericsson … serve as useful case studies of practices to avoid.  We observe that there are particularly high risks when seeking to obtain licences and concessions for new contracts, especially for those with official counterparties, in developing jurisdictions. Ericsson serves as a reminder to prioritise compliance over the desire to obtain first mover advantage by engaging in corrupt practices.").

fatuously implied that it was some mystery where their illicit payments went, when Defendants

were well aware that the only plausible conclusion is that Defendants' intermediaries paid al-

Qaeda, al-Qaeda-in-Iraq, and Islamic State on Defendants' behalf.

> **e.      The Terms and Rates That Governed Lafarge S.A.'s
>          Participation in Islamic State's Protection Networks In Iraq
>          Confirmed That Defendants Also Participated In The Same
>          Protection Networks as Lafarge**

368.     Islamic State's protection agreement with Lafarge, S.A. of France, and its Syrian

subsidiary (collectively, "Lafarge") strongly supports Plaintiffs' conclusion that Defendants

routed at least several million U.S. dollars to al-Qaeda and al-Qaeda-in-Iraq from 2004 through

2014, and at least several million dollars to ISIS from 2014 through at least 2019.

369.     On October 18, 2022, Lafarge admitted as to the terms of its protection deal with

Islamic State and al-Qaeda's branch in Syria, Jabhat al-Nusra when Lafarge pleaded guilty to

providing material support to foreign terrorist organizations by, among other things, "schem[ing]

to pay ISIS and [al-Nusra Front] in exchange for permission to operate a cement plant in Syria

from 2013-to 2014."[56]  As Lafarge has admitted, and DOJ has confirmed, Lafarge "paid monthly

'donations' to armed groups, including ISIS and [al-Nusra Front], so that employees, customers

and suppliers could traverse checkpoints controlled by the armed groups …; and eventually

agreed to make payments to ISIS based on the volume of cement that LCS [LaFarge's Syrian

subsidiary] sold to its customers, which Lafarge and LCS executives likened to paying "taxes." [57]

370.     The evidence set forth in Lafarge's guilty plea – without anything more – would

permit a reasonable fact finder to conclude that Defendants purchased security from Islamic

---

[56] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022), https://tinyurl.com/bdf3zrew.
[57] *Id*.

State and Jabhat al-Nusra just like Lafarge.  Indeed, to conclude anything otherwise requires one

to ignore nearly every relevant data point to how Islamic State, al-Qaeda, and al-Qaeda-in-Iraq

(inclusive of Jabhat al-Nusra, which was an al-Qaeda-in-Iraq alias) operationalized their

respective protection money networks in Iraq and Syria from 2004 through at least 2019.

371.   *First*, Lafarge and Ericsson were the only two large multinational corporations on

earth that made the depraved choice to continue conducting business as usual on the ground

inside Islamic State's caliphate from 2014 through 2017.  ***For that reason alone***, it is more likely

than not that Ericsson purchased its security in Iraq from Islamic State pursuant to terms that

were substantially like those between was purchase could have negotiated terms with Islamic

State that were better than those to which Lafarge agreed.

372.   *Second*, Islamic State's ranks were heavily populated with former al-Qaeda-in-

Iraq members, who knew that Ericsson purchased security from al-Qaeda-in-Iraq for at least a

decade prior to 2014. Given Ericsson's likely status as one of the largest overall corporate

financiers of al-Qaeda-in-Iraq from 2003 through 2014, it is not plausible that the full universe of

Islamic State's thousands of terrorists in Iraq and Syria would tolerate an outcome where

Ericsson paid al-Qaeda-in-Iraq for a decade but refused to pay ISIS thereafter.

373.   *Third*, Ericsson presented greater upside to Islamic State as a potential participant

in ISIS's protection networks than did Lafarge from 2014 through 2017.  Ericsson had far more

money, more project sites that needed protecting, valuable goods, technology, and cell phones—

for which FTOs like ISIS had an insatiable appetite—that ISIS could accept in lieu of cash.

Moreover, Ericsson presented ISIS with a scalable protection market opportunity that far

exceeded the potential global upside associated with Lafarge.  Considering Ericsson's status as

the number one overall potential business partner for Islamic State during its caliphate era from

2014 through 2017, the terms of Islamic State's protection agreement with Lafarge likely represented the floor of what Defendants had to pay.

374.    Lafarge's deal with Islamic State proves Islamic State's "going rate" for guaranteeing protection to a multinational corporation operating within ISIS's Caliphate was approximately $400,000 per month:  according to DOJ and Lafarge, "[f]rom August 2013 through October 2014, Lafarge and LCS paid ISIS and ANF, through intermediaries, the equivalent of approximately $5.92 million, consisting of fixed monthly 'donation' payments to ISIS and ANF, payments to ISIS-controlled suppliers to purchase raw materials, and variable payments based on the amount of cement LCS sold."[58]

375.    Moreover, in 2017, the European Parliament published an official analysis of Islamic State's protection networks in the Middle East that strongly supports the conclusions above:  in its analysis concerning the protection money networks created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, the European Parliament concluded that "*[t]he case of the Swiss … conglomerate LafargeHolcim*" was "*typical of*" the al-Qaeda-in-Iraq/Islamic State protection money "*modus operandi*" in geographies the terrorists controlled."[59] Lafarge's "management wanted to remain operational despite the seizure of territory by [Islamic State]" and therefore "obtained" Islamic State's "permission to pass through

---

[58] *See id*. ($5,920,000 divided by 14 months comes out to $422,857.14).  For the avoidance of all doubt, Plaintiffs believe that Lafarge's payments to al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, and Islamic State began well before August 2013, and, accordingly, that Lafarge likely routed substantially more money to FTOs than was depicted by the dollar amount set forth in the plea.
[59] European Parliament, Directorate-General for External Policies, Policy Department, *The Financing of the 'Islamic State' in Iraq and Syria (ISIS)*, at 11 (Sept. 2017), https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as did the European Parliament, that Islamic State followed the same protection money-related tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.

checkpoints in exchange for paying taxes."[60]  Referring to Islamic State, Lafarge "admit[ted] that 'unacceptable' arrangements had been made to protect its cement factory" and "recognised that its local branch belonging to Lafarge 'handed funds over to third parties in order to come to an arrangement with a certain number of armed groups," "targeted by sanctions', without being able to identify their ultimate recipient."[61]

376.    From 2014 through at least 2017, Ericsson operated under nearly identical circumstances as Lafarge.  Considering the European Parliament's conclusion that the Islamic State-Lafarge protection arrangement revealed by the Lafarge scandal was Islamic State's "modus operandi" for ISIS protection rackets throughout Islamic State's caliphate on both sides of the Iraqi-Syrian border. As a result, considering the European Parliament's analysis, Lafarge's and Ericsson's obvious similarities strongly supports Plaintiffs' allegations that:  (i) Ericsson likely began making protection payments to Islamic State in 2014, and continued paying ISIS thereafter, until at least 2019 by making regular payments to ISIS throughout that five-year period; and (ii) Ericsson did so through Ericsson's use of illicit transactions with, or through, intermediaries, which were designed to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS.

377.    On balance, given that Ericsson was far larger and wealthier than Lafarge, it is more likely than not that the rates that Islamic State and Jabhat al-Nusra charged Defendants to purchase their respective FTOs' protection in Iraq and Syria were equal to or greater than the rates ISIS charged Lafarge.  Even if one merely assumes, however, that Islamic State and Jabhat al-Nusra only charged Ericsson the same per month rate that ISIS charged Lafarge, Defendants'

---

[60] *Id*.
[61] *Id*.

participation in Islamic State's protection network in Iraq necessarily caused a torrent of cash and free goods to flow from Defendants to ISIS and Jabhat al-Nusra.

378.    For example, assume that Islamic State agreed to sell its protection to Ericsson for a monthly purchase price equal to the monthly rate that ISIS charged Lafarge during Islamic State's 42-month-long "caliphate" era from June 2014 until December 2017.  Even such a conservative assumption, however, suggests that Ericsson likely paid Islamic State, at least, more than $17 million to buy security from ISIS monthly from June 2014 and December 2017.

### 3.    Defendants Made Protection Payments To Terrorists In Afghanistan

379.    Like post-Saddam Iraq, post-9/11 Afghanistan was an extreme rarity in the international telecoms marketplace:  a "virgin" geography that required a total, end-to-end reconstruction (in the case of Iraq) or construction (in the case of Afghanistan) and the attendant possibility of the outsized profits associated with being a first mover in any new market.

380.    Just as Defendants did in Iraq from 2003 until 2022, Defendants also sought to capture as much of Afghanistan's "virgin" telecoms market as possible.  To do so, Defendants followed the same "One Ericsson" approach they deployed in Iraq.  Ericsson's strategy to compete in Afghanistan relied upon the close collaboration of LM Ericsson, Ericsson AB, and Ericsson Inc. Ericsson AB supported the strategy through its European office as well as its office in Pakistan ("Ericsson Pakistan") and its office in Afghanistan ("Ericsson Afghanistan").[62]

---

[62] For much of the two decades since 9/11, Defendants collaborated to serve customers in Afghanistan through a host of Ericsson entities and personnel inside and outside of Afghanistan, including, but not limited to, LM Ericsson and Ericsson AB in Sweden, and Ericsson AB's branch in the United States, Ericsson Inc.

381.    After Kabul fell in April 2001, LM Ericsson and Ericsson AB quickly went to work lobbying U.S. and United Nations officials to award what they expected to be highly lucrative projects helping build a modern telecommunication system in Afghanistan.

382.    Defendants' Afghanistan-related contracts were negotiated by, supervised by, and implemented by, LM Ericsson, Ericsson AB, and Ericsson Inc., including many of the same LM Ericsson and Ericsson AB officers, employees, or agents who operationalized Defendants' scheme to participate in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection money networks in Iraq – and to make the associated protection payments to the FTOs that such groups required in order to provide their "protection" to LM Ericsson, Ericsson AB, and Ericsson Inc. facilities, convoys, goods, and personnel in Afghanistan and Pakistan.

383.    Ericsson Pakistan served as Ericsson's operational, logistics, and transportation artery into Afghanistan and therefore played an essential role in Ericsson's supply of goods and services to its Afghan customers, including MTN.  From 2002 through at least 2021, most of the expensive communications equipment packages that Defendants supplied to customers in Afghanistan, *e.g.*, an RBS-6000 for MTN Afghanistan, were first manufactured and/or designed by Ericsson Inc. in the United States, then transferred to Ericsson AB for shipment to Pakistan, where Ericsson AB's local branch, Ericsson Pakistan, took custody of such equipment.  Once Ericsson Pakistan received Defendants' Afghan-bound goods, Ericsson Pakistan would transport Defendants' goods overland through truck convoys that traveled through al-Qaeda and Haqqani Network-dominated areas in Pakistan (*e.g*, Pakistan's FATA region) before crossing into Afghanistan, where Defendants' convoys then traveled through Syndicate-dominated territory throughout Afghanistan, before reaching their destination in northern, southern, eastern, or

western Afghanistan.[63]  On information and belief, Ericsson Pakistan continued to play such a

role even after Ericsson AB opened its Afghan branch, Ericsson Afghanistan, on or about 2012.

384.    On November 8, 2001, pursuant to Contract No. DAAB0798CD010, the U.S.

Army contracted with Ericsson Inc. to provide communications equipment and network services

support to the Army's Global War on Terrorism-related operations after 9/11 (the "2001 U.S.

Army Counterterrorism Contract" or "2001 Contract"), which was initially valued at

$4,411,243.[64]  From November 8, 2001 through January 26, 2020, Ericsson Inc. continuously

contracted with the Army pursuant to a series of amendments to the 2001 U.S. Army

Counterterrorism Contract, under which Ericsson Inc. continuously provided communications

and network services to the U.S. Army's counterterrorism forces in Afghanistan, and later Iraq,

doing so from 2001 (in the case Afghanistan) and 2003 (in the case of Iraq) until, on information

and belief, January 26, 2020 (in the case of both Iraq and Afghanistan), when the Army closed

the contract.[65]  The Army paid Ericsson Inc. at least $28,224,016 pursuant to the 2001 U.S.

Army Counterterrorism Contract.

---

[63] At all times, al-Qaeda and the Taliban controlled or contested the key geographies through which Ericsson Pakistan's convoys were required to travel.  This was a function of the disposition of the Afghan government (which was concentrated in Afghanistan's urban areas, like Kabul) as compared to that of al-Qaeda and the Taliban (which dominated the rural and mountainous areas that comprised Afghanistan's border with Pakistan).  Thus, there was no functional way for Defendants' convoys to travel from Pakistan into Afghanistan without such convoys having to travel through hundreds of miles of terrorist-controlled or contested territory, e.g., Haqqani-controlled territory on both sides of the Afghan/Pakistan border.

[64] For the avoidance of all doubt, Plaintiffs' invocation of the "Global War on Terrorism" is a reference to the various foreseeable locations under which Ericsson Inc. intended to perform under this contract, meaning, Ericsson Inc. would support the U.S. Army's counterterrorism-facing forces in the various countries to which they deployed in response to al-Qaeda-sponsored terrorism around the world after 9/11.

[65] *See*, *e.g.*, 2001 U.S. Army Counterterrorism Contract, Apr. 15, 2002 Amendment (Supplemental Agreement For Work Within Scope between U.S. Army and Ericsson Inc. for which the Army paid Ericsson Inc. an additional $425,739 to Contract No. DAAB0798CD010);

385.    In the two decades thereafter, Defendants always viewed Afghanistan as a key "virgin" market opportunity, *i.e.*, a new market that required a complete rebuild from top to bottom, which promised unusually robust profits for Ericsson's globally integrated, end-to-end offerings. On May 29, 2012, for example, Anders Lindblad, president of LM Ericsson's Middle East Region publicly stated, *inter alia*, that: (i) Ericsson believed "Afghanistan has seen a tremendous amount of growth in the country's communications market over past few years"; (ii) Ericsson was "seeing significant investments" and "demand for advanced services" in Afghanistan's booming telecoms sector; and (iii) Ericsson's "Managed Services agreement" with MTN for MTN Afghanistan was "a clear sign of the Afghan telecom market's maturity and [Ericsson was] confident that MTN Afghanistan [would] begin to see immediate benefits, as a result of this partnership."

386.    On information and belief, LM Ericsson, Ericsson AB, and Ericsson Inc. were parties to, or otherwise provided goods or services pursuant to, every major Ericsson contract, in or relating to, Afghanistan from 2001 through 2022, including, but not limited to, each contract set forth above, and made protection payments to al-Qaeda and the Taliban, including its Haqqani Network, in connection with all such contracts.

387.    Ericsson's payments in Afghanistan were consistent with foreign-headquartered telecommunications companies' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage in Afghanistan and Iraq.  *See supra* II.A.2.  In following that standard practice, Ericsson caused protection payments to flow to terrorists that

---

*id.*, Aug. 29, 2002 Amendment (Army's exercise of an option pursuant to Contract No. DAAB0798CD010, for which the Army paid Ericsson Inc. an additional $599,999); *id.*, Sept. 30, 2002 Amendment (additional Army funding for Ericsson Inc.'s services pursuant to Contract No. DAAB0798CD010, for which the Army paid Ericsson Inc. $1,848,839).

were, on information and belief, worth at least 20 to 40 percent of the value of Ericsson's

Afghanistan contracts—a common rate for protection payments to Syndicate terrorists in

Afghanistan.  As a result, across its contracts, Ericsson made payments to al-Qaeda and the

Taliban, including its Haqqani Network, worth at least several million dollars per year from at

least 2007 through at least 2020, the period when Ericsson and its strategic partner in

Afghanistan, MTN Group and its local subsidiary, MTN Afghanistan (collectively, "MTN"),

collaborated hand-in-hand to rapidly construct MTN's communications and cellular networks

throughout Afghanistan from 2007 through at least 2012, and then augment MTN's networks

under an end-to-end managed services agreement from 2012 through at least 2020.

388.    From 2008 until, on information and belief, 2017, Ericsson Inc. routed protection

payments to al-Qaeda in Afghanistan to purchase protection on Ericsson's behalf by paying al-

Qaeda in lucrative, military-grade vehicles and equipment—including, according to Confidential

Witness Colonel Tango, "free communications equipment, including trucks, trailers, signal

communications equipment, operation based sustainment equipment, phones, radios, computers,

laptops, desktops, signals pieces, satellite nodes and capabilities," which "Ericsson in Iraq and

Afghanistan would consciously" transfer to al-Qaeda by "leav[ing]" such goods in a mutually

agreed upon area, where al-Qaeda would assume possession of them, completing the direct value

transfer from Ericsson Inc. to al-Qaeda.

389.    From 2008 until 2021, Ericsson also fueled the profits that al-Qaeda and the

Taliban derived from the Syndicate's protection networks in Afghanistan.  Defendants did so by

directly enabling, and participating in, the Taliban's manipulation of Afghanistan's cellular

networks to attack Americans there.  *See infra* at Part III.  In so doing, Ericsson facilitated the

rapid expansion of the Taliban's nationwide protection rackets in Afghanistan, because

Ericsson's assistance enabled the key tower shutdowns upon which the Taliban protection networks relied to evade U.S. forces at night.   Ericsson AB and Ericsson Inc. worked together to facilitate the Taliban's ability to sponsor acts of terrorism targeting Americans in Afghanistan. Ericsson AB and Ericsson Inc. also directly joined—alongside their partner, MTN—in the Taliban's attack on Americans in Afghanistan by directly enabling the functionality necessary for MTN to make the Taliban's scheme maximally effective.

390.    At all times, such conduct by Ericsson and its agents and allies was understood and intended by all concerned to purchase security from al-Qaeda and the Taliban, including its Haqqani Network, in Afghanistan and Pakistan to aid Ericsson's Afghanistan business.[66]

> a.    **Leaked Ericsson Documents and Subsequent Public Statements Corroborate Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Afghanistan**

391.    Ericsson's public statements after its latest criminal scandal emerged in February 2022, and the revelations contained in Defendants' internal documents—first leaked and reported by the media on February 15, 2022—offer some indications of Ericsson's general policy of purchasing security from al-Qaeda-affiliated terrorists and their progeny in Afghanistan through financial assistance (e.g., protection payments to such FTOs), operational assistance to such FTOs (e.g., obstruction of U.S. counterterrorism operations to such FTOs), and logistical

---

[66] Plaintiffs believe discovery is likely to reveal that Defendants also deployed consultants in Afghanistan and Pakistan as they did in Iraq, *see supra* II.B.2.b, but Defendants have managed, to date, to conceal the identities of any and all consultants whom they may have hired to support their business efforts in Iraq and Afghanistan.  Given the nature of Ericsson's business, the consultant-heavy nature of the global telecoms industry in high-risk jurisdictions, and Defendants' own use of consultants to route protection payments to terrorists in Iraq, *see supra* II.B.2.b, and bribes to others who could impact their business throughout the world, it is highly likely that Defendants followed the same playbook in Afghanistan, and also used consultants to route illicit payments there like in Iraq.

assistance to such FTOs (e.g., the provision of high-tech U.S. cell phones as "free goods" bribes

to such FTOs), including, but not limited to:

a.   <u>The Ericsson Leak in 2022 Revealed Ericsson's Afghanistan-Facing Corporate Leadership Sponsored Protection Payments to Terrorists</u>:  Prior to at least February 15, 2022, Ericsson concealed the fact that beginning in at least 2014, senior Ericsson officers and employees who were responsible for Ericsson's business in both Iraq and Afghanistan frequently discussed Ericsson's protection payments to Sunni terrorists as the cost of doing business in the Middle East.

b.   <u>The Ericsson Leak in 2022 Revealed Ericsson's Willingness To Use "Permission Letters" To Participate in an al-Qaeda-Derived Protection Network</u>:  Prior to at least February 15, 2022, Ericsson concealed the fact that it requested "permission letters" from Islamic State terrorists in Iraq who followed the long-standing al-Qaeda protection money playbook by granting them formal authority to work in Iraq.  Ericsson's willingness to participate in an al-Qaeda-derived protection money racket in Iraq that featured permission letters between corporate participant and FTO offers further indication of similar conduct in Afghanistan, where al-Qaeda's and the Taliban's protection rackets deployed the same "permission letter" tactics that proved persuasive to Defendants in Iraq.

c.   <u>The Ericsson Leak in 2022 Revealed Ericsson's Indifference to Funding Consequences in Extreme Terrorist Finance Environments Similar to Afghanistan</u>:  Prior to at least February 15, 2022, Ericsson concealed the fact that it had a documented track record of expressed indifference to where their money went in geographies that posed an extreme risk for terrorist finance, including, but not limited to, Iraq, Afghanistan, and Pakistan. For example, Ericsson admitted that, at best, it did not know, and until 2022 did not care, where its money went, as long as its profitable work remained unimpacted in Iraq even at the moment of arguably the greatest terrorist finance risk in Western corporate history: when Islamic State operated its own geographically contiguous caliphate in Iraq and Syria from 2014 through 2017. Given Islamic State's reputation as the only Salafist terrorist organization that was even more brutal than al-Qaeda and the Taliban, if Defendants were willing to be indifferent to the funding consequences of its business in, and near, Islamic State-controlled or contested territory from at least 2014 through at least 2019, as shown by Ericsson's leaked data, the February 2022 leak revealed that Defendants likely took a substantially similar approach to facilitate Defendants' protection payments to al-Qaeda and the Taliban in Afghanistan.

d.   <u>The Ericsson Leak in 2022 Revealed Ericsson's Deployment of Slush Funds In Extreme Terrorist Finance Risk Environments</u>:  Prior to at least February 15, 2022, Ericsson concealed the fact that Ericsson AB's Middle East branches sponsored the operation of an uncontrolled slush fund in Iraq to permit Ericsson to route payments to FTOs in Iraq through Defendants' partners, consultants, contractors, and slush funds, which Ericsson encouraged while often avoiding the details. Given the nature of Defendants' "One Ericsson" approach, in which Ericsson AB's Middle East headquarters in the U.A.E. had full visibility into the books of Ericsson AB's branches in Iraq, Jordan, Lebanon, the U.A.E., Afghanistan, and Pakistan. A slush fund of the scale practiced by Ericsson in Iraq

as revealed in February 2022 would not have been possible without Defendants' enterprise-wide corruption scheme because of the integrated nature of Ericsson's Middle Eastern business and associated controls, which enabled their Iraqi slush fund.  Given that Defendants pursued their business in Afghanistan using the same regional internal controls and personnel, the February 2022 leak revealed that Defendants likely deployed a similar slush fund approach to facilitate Defendants' protection payments to al-Qaeda and the Taliban in Afghanistan.

   **b.**  **Ericsson Inc. Made Direct Free Goods Payments Of Sensitive U.S. Origin Communications Technologies To Al-Qaeda**

392. From at least 2008 until at least 2019, and on information and belief from on or about 2002 until 2022, Ericsson worked on numerous large contracts throughout Afghanistan, including several in or near Jalalabad, Nangarhar Province, Afghanistan, where Ericsson derived profits from several substantial relationships with customers there, including the U.S. Army and MTN, among others.  Before detailing Ericsson's protection payments to al-Qaeda operatives in N2KL below, Plaintiffs first describe the local business and security environment in N2KL while Ericsson was contracted to work there.

393. From 2001 through 2020, Ericsson Inc. provided contracted-for services to the U.S. Army in Afghanistan, including N2KL generally and Jalalabad in particular, and the U.S. government compensated Ericsson Inc. for such contractual performance, pursuant to the **2001 U.S. Army Counterterrorism Contract**. *Supra* at II.B.3.

394. Most American counterterrorism professionals viewed Afghanistan's contiguous Nangarhar, Nuristan, Kunar, and Laghman Provinces, which sat astride the border with Pakistan (or near it), as a single Afghan region collectively called "N2KL."  Throughout this time, N2KL was the most important, and notorious, al-Qaeda stronghold in Afghanistan. And Jalalabad, in Nangarhar Province, was al-Qaeda's key to N2KL. As such, counterterrorism practitioners widely viewed Jalalabad as the worst, and most notorious, al-Qaeda stronghold in Afghanistan from 2001 through 2022.  For example, when al-Qaeda redeployed its al-Qaeda-in-Iraq members

from Iraq back to Afghanistan to support al-Qaeda's violence alongside the Taliban there, Jalalabad was among the locations chosen by al-Qaeda where its returning members from Iraq could effectively integrate into the already-existing joint al-Qaeda-Taliban cells in Nangarhar Province and the rest of N2KL.  This was the business and security environment in which Ericsson made its decisions.

395.    In 2008, Ericsson Inc. made direct free goods payments of in which it transferred sensitive U.S. origin items to al-Qaeda operatives in Nangarhar Province, Afghanistan.  Given the totality of the circumstances, Ericsson Inc. also likely continued making similar "free goods" protection payments of sensitive U.S.-origin goods to al-Qaeda throughout the period from at least 2009 through at least 2017. Simply put, Ericsson Inc. faced far greater incentives to make such payments from 2009 through 2017 than it did in 2008, because al-Qaeda and its fused-at-the-hip Taliban allies in Nangarhar were as great a threat – if not greater – to Ericsson Inc. from 2009 through 2017 as they were in 2008.  As a result, Ericsson Inc.'s motivation for making such payments to al-Qaeda was as great or greater from 2009 through 2017 as it was in 2008.

396.    Ericsson Inc. facilitated the flow of U.S. origin cell phones, laptops, and other communications devices to al-Qaeda as protection:  Ericsson Inc. decided that the cheapest way to secure Ericsson Inc.'s work in the areas of Afghanistan in which al-Qaeda was a dominant threat from attack was to pay al-Qaeda to leave them alone and instead attack other targets – like Plaintiffs and their family members.

397.    **Confidential Witness Colonel Tango** observed Ericsson Inc. personnel in Iraq in 2003-2004 and Afghanistan in 2008 and corroborated substantial aspects of Plaintiffs' allegations that Defendants routed technology-based "free goods" to al-Qaeda as a means of purchasing protection from it.  Based on Colonel Tango's personal observations in Iraq and

Afghanistan, knowledge of attack data patterns, training, and counterterrorism expertise, Colonel

Tango concluded, in sum and substance, that it is "likely" that Ericsson agreed to purchase

security from al-Qaeda in Afghanistan by, at least, making protection payments to al-Qaeda

operatives in the al-Qaeda's stronghold in the N2KL region of eastern Afghanistan near al-

Qaeda's and the Haqqani Network's historic sanctuaries in Pakistan while Colonel Tango served

in Afghanistan in 2008.

398.    According to Colonel Tango, Ericsson Inc. likely operated in Afghanistan

pursuant to a conscious agreement with al-Qaeda in which Ericsson Inc. directly transferred

valuable U.S. origin goods to al-Qaeda as payment for the latter's provision of security to

Ericsson in Afghanistan. Ericsson Inc. intentionally transferred, according to Tango, lucrative

goods specifically intended for al-Qaeda's receipt:

> Ericsson in Iraq and Afghanistan would consciously leave free communications
> equipment, including trucks, trailers, signal communications equipment, operation
> based sustainment equipment, phones, radios, computers, laptops, desktops,
> signals pieces, satellite nodes and capabilities.

399.    Colonel Tango's views as described above were based upon Colonel Tango's

direct observations and the resulting conclusions that Colonel Tango drew based upon Colonel

Tango's training and on-the-ground experiences and observations while deployed in Afghanistan

in 2008 and Iraq in 2003-2004, including, but not limited to, Colonel Tango's knowledge

concerning:

a.    Ericsson Inc. in Afghanistan and Iraq;

b.    al-Qaeda's attack-related tactics, techniques, and procedures in Afghanistan and Iraq;

c.    U.S. contractors' willingness to make extreme "compromises" in eastern Afghanistan that
stand out even by Afghan standards, which included substantial "free goods" transfers to
al-Qaeda;

d.    al-Qaeda's village-based protection money strategies and tactics in eastern Afghanistan,
including al-Qaeda's Jalalabad stronghold in the N2KL; and

e.  observations regarding the dramatic change in the nature of the threat from al-Qaeda to U.S. personnel in the Middle East between 2003-2004 and 2008, which corroborated COL Tango's the view that al-Qaeda-inspired protection rackets targeting Americans in the Middle East had completely changed the security equation confronting U.S. servicemembers in the region by the time COL Tango deployed to Afghanistan in 2008.

400.  Ericsson Inc.'s likely scheme to route high-tech U.S. communications equipment to al-Qaeda in Afghanistan offered significant benefits to both Ericsson Inc. and al-Qaeda.

401.  *First*, Ericsson Inc.'s technology-based "free goods" payments saved Ericsson Inc., on information and belief, millions of U.S. Dollars over the life of the scheme because every piece of U.S. technology that Ericsson Inc. transferred to al-Qaeda to purchase security from the FTO represented less cash that Ericsson Inc. needed to pay to buy their protection.

402.  *Second*, the unique facts attendant to the transportation routes in eastern Afghanistan meant that Ericsson derived greater profit by transferring such technologies to al-Qaeda.  In eastern Afghanistan, such as the N2KL region, many U.S. installations were only accessible via air because al-Qaeda operatives and their Taliban allies serving together in joint cells there controlled every major ground-based chokepoint.  As a result, whenever any U.S. military unit, or government contractor, operated in N2KL, they did so pursuant to strict rules designed to ensure that sensitive U.S. technology was not transferred to terrorists.  To do so, the U.S. government imposed a simple rule for which there were only two lawful choices: (1) take the sensitive tech with you when you leave; or (2) destroy or disable the sensitive U.S. tech before you leave.[67]

---

[67] This principle reflected the U.S. government's universal approach for protecting sensitive technologies and data in a high-terrorist-risk environment like Iraq, Afghanistan, and Pakistan. Thus, for example, if a U.S. Army Blackhawk helicopter is shot down, Army training instructs that soldiers must protect the Army's sensitive communications technologies inside by destroying as much of the helicopter as possible (most of all its communications equipment) with an incendiary charge before leaving the area.

403.    According to Colonel Tango, every U.S. Army contractor operating in eastern Afghanistan, including Ericsson Inc., knew that was no legal "Option 3" under which Defendants could cause the transfer such U.S. technologies to al-Qaeda in Afghanistan (like Defendants knew in Iraq, where they knew there was no "Legal Way" Defendants could send their convoys through Islamic State territory in Iraq).  According to Colonel Tango, Ericsson Inc. rejected the legal way (Options 1 and 2) in favor of a highly illegal, but far more profitable, Option 3 (also like it did in Iraq)—monetize the technology as a cash equivalent with which to purchase protection from al-Qaeda in Afghanistan.

404.    Ericsson Inc. did so, according to Colonel Tango, by consciously coordinating directly with al-Qaeda operatives in eastern Afghanistan in order to transfer to al-Qaeda some of the same U.S.-origin technologies that Ericsson Inc. supplied to the U.S. Army in Afghanistan pursuant to the 2001 U.S. Army Counterterrorism Contract.  *Supra* at II.B.3.  According to Colonel Tango, Ericsson Inc. and al-Qaeda in Afghanistan accomplished such value transfers through covert tactics including the use of one or more mutually agreed upon "dead drop" locations in the vicinity of al-Qaeda's Jalalabad stronghold in Nangarhar Province.  According to Colonel Tango, at such location, Ericsson Inc. personnel intentionally deposited Ericsson Inc.'s sensitive U.S.-origin communications technologies with the specific intent that al-Qaeda operatives retrieve such free goods as a bribe in exchange for al-Qaeda's protection to Ericsson Inc. in Afghanistan.

405.    According to Colonel Tango, Ericsson Inc.'s corrupt high-tech U.S.-origin transfers to al-Qaeda in Afghanistan in 2008 "likely" included, but may not have been limited to, free goods comprised of Ericsson's:

a.    "communications equipment";

b.    "trucks";

**c.** "trailers";

**d.** "signal communications equipment";

**e.** "operation based sustainment equipment";

**f.** "[cellular] phones";

**g.** "radios";

**h.** "computers";

**i.** "laptops";

**j.** "desktops";

**k.** "signals pieces"; and

**l.** "satellite nodes and capabilities."

406.    According to Colonel Tango, when Ericsson Inc. arranged to transfer valuable, high-tech U.S. communications technologies to al-Qaeda in Afghanistan, Ericsson Inc. did so in direct defiance of long-settled practices in the U.S. Army – and every other national-security-facing component of the U.S. government in Afghanistan – to either take the sensitive U.S. communications technologies with you when you leave a high-terrorist-risk area of Afghanistan or, if you cannot do so, destroy such items to prevent al-Qaeda and the Taliban from re-deploying them in the Syndicate's terrorist campaign targeting Americans in Afghanistan.

407.    Ericsson Inc.'s direct transfers of U.S.-origin communications technologies to al-Qaeda in 2008, as described above, likely caused Defendants to flow significant value in U.S. communications technologies to al-Qaeda in Afghanistan equivalent to more than $1 million in 2008 alone. Plaintiffs' belief is based upon, *inter alia*:

**a.**    the nature of Ericsson Inc.'s U.S.-origin technology in Afghanistan, which comprised expensive, state-of-the-art, military-grade communications gear that Ericsson Inc. supplied to, and maintained for, the U.S. Army's use in its counterterrorism missions targeting al-Qaeda after 9/11 pursuant to Ericsson Inc.'s 2001 U.S. Army Counterterrorism Contract;

138

**b.**   the volume of Ericsson Inc.'s equipment in question, which necessarily was substantial given the fact that such equipment was supposed to have been destroyed, which necessarily meant there was a large amount of it;

**c.**   the near-universal black market economics attendant to the re-sale of Ericsson Inc.'s goods, *e.g.*, Ericsson's U.S.-origin cell phones, laptops, and similar devices, the cash equivalent value of which increased about 10-fold the moment al-Qaeda assumed possession of such goods from Ericsson Inc.; and

**d.**   the then-prevailing rates that al-Qaeda-affiliated terrorists charged large multinational telecommunications companies, like Ericsson Inc., in exchange for al-Qaeda's agreement to provide protection.

408.   A wide range of additional conduct pursued by Ericsson, its allies, and its competitors substantially corroborates Plaintiffs' allegations.

409.   For starters, Defendants had already crossed the largest hurdle – by far –  to paying off al-Qaeda:  a possible reluctance to do business with an FTO.  Through their payments to Islamic State, Defendants demonstrated their explicit willingness to approve direct transactions with FTOs like al-Qaeda when Defendants approved, and operationalized, Ericsson's participation in Islamic State's protection networks in Iraq through, inter alia, Defendants' request for, and use of, a "permission letter" from Islamic State, for which Ericsson told ISIS "please" and "thank[s]."  Ericsson Inc.'s choice to participate in al-Qaeda's protection network in eastern Afghanistan by paying al-Qaeda in high-end U.S. communications technologies from 2008 through 2017 was of a piece with Defendants' choice to participate in Islamic State's protection networks by paying ISIS money to purchase protection from 2014 until at least 2019.  Ericsson's willingness to partner with ISIS in such a way, on its own, strongly suggests Plaintiffs' allegations concerning al-Qaeda are likely true.

410.   Plaintiffs' allegations that Ericsson Inc. directly assisted al-Qaeda and the Taliban through Ericsson Inc.'s routine free goods protection payments to al-Qaeda are also plausible because Ericsson Inc. confronted a similar counterterrorism choice when it helped Ericsson AB

support the terrorists' manipulation of MTN's network in Afghanistan, which Ericsson Inc. did during this period (2008-2017), and in the same place (N2KL and Jalalabad), while Ericsson Inc. also worked for the U.S. Army in Afghanistan under its 2001 Contract.  When al-Qaeda and the Taliban needed Ericsson's help to attack Americans through their shared manipulation of MTN's cellular networks, Ericsson Inc. participated in their violence by knowingly providing significant technical assistance that provided valuable communications and logistics support to these terrorists' attacks against Americans in Afghanistan.

411.     Similarly, when Ericsson Inc. agreed to purchase security from al-Qaeda by paying al-Qaeda through direct free goods transfers that also bolstered the Syndicate's communications and logistics abilities—including Ericson's cell phones, satellite phones, and trucks—to al-Qaeda operatives who served the joint al-Qaeda-Taliban cells that targeted Americans throughout N2KL, it made a similarly unlawful choice to directly aid these terrorists in a manner that that would enable their attacks against Americans in Afghanistan by bolstering their communications networks and logistics chains.

412.     Plaintiffs' allegations that Ericsson Inc. provided direct, and lethal, communications- and attack-related aid to al-Qaeda through Ericsson Inc.'s "free goods" bribes to that FTO are also plausible because Ericsson Inc. also likely partnered with Ericsson AB to deliver other similarly valuable aid to the same terrorists (al-Qaeda and the Taliban), while being aware of the same inextricable connection between Ericsson's aid and al-Qaeda's resulting violence against Americans in Afghanistan (by granting al-Qaeda and the Taliban the ability to leverage MTN's and Ericsson's communications technologies to attack Americans in Afghanistan) in the same area (N2KL and Jalalabad) during the same time (2009 through 2017).

413.    Ericsson AB's deliberate choice to aid the joint al-Qaeda-Taliban cells that was responsible for all, or nearly all, the violence in N2KL from 2008 through 2021 strongly supports Plaintiffs' allegations that Ericsson Inc. purchased protection from al-Qaeda – and by extension, their joint cell members from the Taliban – by making substantial "free goods"-based protection payments to al-Qaeda in N2KL, including Jalalabad, from at least 2008 through 2017.

414.    Defendants also operated in an Afghanistan contracting environment in which the U.S. military's contractors, like Ericsson Inc., commonly purchased protection from terrorists as the cost of doing business.  *Supra* II.A.  Ericsson Inc.'s payments to al-Qaeda while under the 2001 U.S. Army Counterterrorism Contract was consistent with this approach.

415.    Defendants' history of using iPads and other high-end communications devices as "free goods" bribe payments to actors in Ericsson's business environment who could help or harm Ericsson further supports the plausibility of Plaintiffs' allegations.

416.    In addition, Ericsson's decades-long strategic partner in Afghanistan, MTN, was also a rapacious payor of protection money to the Syndicate.  From 2008 through today, MTN has likely paid more than $2 million per month to the Syndicate, through MTN's payments to the Taliban, including those payments that MTN routed to operatives acting for dual-hatted al-Qaeda/Taliban polyterrorist Sirajuddin Haqqani. MTN's enormous monthly payments to the Taliban substantially heighten the plausibility of Plaintiffs' allegations because it is more plausible that Ericsson Inc.'s in-country personnel would act in a manner like Defendants' strategic partner there than the alternative:  that they would stand firm against the terrorists while their key business ally in the country funded them so much.

417.    Ericsson competitors' conduct in the Afghan telecoms marketplaces further corroborates the plausibility of Plaintiffs' allegations by showing the willingness of terrorists in

Afghanistan to accept donated high-tech "free goods" as a form of payment.  For example, U.S. government officials have concluded that it is likely that two of Ericsson Inc.'s largest competitors in the telecoms manufacturing space, Chinese telecoms giants Huawei Co. and ZTE Corporation, are likely to have made similar transfers of high-tech communications equipment to Syndicate terrorists in Afghanistan.  For example, on June 8, 2012, *Business Insider* confirmed – citing American "military sources" and "former and current intelligence sources" – that that "China [was] likely to remain an aggressive and capable collector of sensitive U.S. economic information and technologies."[68]  Thus, "[a]nother concern raised by [U.S. military] sources [was] that Huawei and the other Chinese telecommunications companies [i.e., ZTE] also provide[d] technology to Iran and the Taliban."[69]

418.    On information and belief, Ericsson Inc. continued making similar free goods bribes to al-Qaeda from at least 2009 through at least 2017, while Ericsson Inc. continued to provide substantially similar services to the U.S. Army in the same context and N2KL geographies that, collectively, caused Colonel Tango to conclude it was "likely" that Ericsson Inc. had agreed to provide such aid to al-Qaeda in 2008.  On information and belief, Ericsson Inc.'s direct transfers of U.S.-origin communications technologies to al-Qaeda through the scheme described by Colonel Tango above caused Ericsson Inc. to flow value in U.S. communications technologies to al-Qaeda each year from 2009 through 2017 that was equal to, or greater than, the value that Ericsson flowed to al-Qaeda in 2008.  Simply put, if Colonel Tango's conclusion is correct, then it necessarily follows that it is likely that Ericsson Inc. continued sponsoring such payments after 2008 because (a) the incentives for Ericsson Inc. to

---

[68] Business Insider, *Military Sources: China Could Shut Down All The Telecommunications Technology It Sold To America* (June 8, 2012).
[69] *Id.*

continue engaging in such conduct remained; and (b) Defendants continued pursuing their broader globally integrated corruption enterprise, of which payoffs to terrorists like al-Qaeda and Islamic State were a part until at least 2019.

419.    Simply put, al-Qaeda-affiliated terrorists' typically charged telecommunications-adjacent companies that sought to buy protection from al-Qaeda regular, large, six- and seven-figure amounts, which were paid by these companies to al-Qaeda, its allies like the Taliban, or its progeny like ISIS.  Given al-Qaeda's past practices when extracting protection payments from telecommunications companies in Iraq and Afghanistan, the cash equivalent value of the free goods payments from Ericsson Inc. to al-Qaeda in Afghanistan as alleged herein were highly likely to be similarly sized as other free goods payments made to al-Qaeda and similar FTOs by other large international telecoms companies in the Middle East, and was likely worth more than $1 million as a result.[70]

420.    Independent of Defendants' free goods payments to the Syndicate, Ericsson also directly assisted the Taliban's protection networks through its manipulation of the Afghanistan cellular infrastructure on their behalf and its provision of the associated ability to manage such technologies.  *See infra* Part III.  Through such conduct, Ericsson optimized the Taliban's protection networks anywhere in Afghanistan that featured an MTN cell tower – which was nearly everywhere in Afghanistan that the Syndicate operated by the time most Plaintiffs were attacked there.  Through such technical assistance to the Taliban, Ericsson directly increased the profitability of the Syndicate's protection rackets—and the al-Qaeda and Taliban acts of

---

[70] The devices themselves were also weapons in the hands of al-Qaeda, which used cell phones and laptops, and other communications systems, to *inter alia*, detonate bombs, gather intelligence, coordinate attacks, and barter for other black market goods given such goods' status as valuable cash equivalents on the black market.

terrorism to which such networks were inextricably intertwined—by giving the terrorists the ability to operate their protection networks during at times and places that eluded U.S. counterterrorism operations, resulting in more Syndicate acts of terrorism that killed and maimed Americans in Afghanistan, including Plaintiffs.

### 5. Attack Disparity Data Independently Provides Sufficient Basis To Conclude Defendants Made Protection Payments To Terrorists In Iraq And Afghanistan

421.    As one of the largest multinational corporate targets for any protection money network operating in Iraq and Afghanistan since 2001, Ericsson avoided attacks at an astonishing rate. As shown by the substantial disparities between attacks targeting Ericsson and attacks targeting others similarly situated, that this disparity-related evidence is so powerful that such data, alone, supports the factual conclusion that Ericsson "likely" operated in Iraq and Afghanistan pursuant to an agreement with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in which Defendants purchased security from these FTOs by routing protection payments to them.

422.    Plaintiffs have analyzed the attack patterns associated with Ericsson's work in Iraq and Afghanistan since from 2002 through 2022.

423.    Attack data from both countries reveals a substantial disparity between the frequency with which Ericsson and non-Ericsson convoys were attacked while traveling on transportation routes known to be targeted by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq from 2004 through 2021.

424.    The attack disparity between Ericsson's convoys and other similarly situated convoys that traveled in Iraq and Afghanistan during this period is substantial, obvious, and measurable.

425.    From 2004 through 2014, the substantial disparity between the volume of attacks targeting Ericsson convoys in Iraq cannot be explained by any factor other than the existence of a

protection agreement between Ericsson and al-Qaeda-in-Iraq, pursuant to which AQI redirected its violence away from Ericsson and towards other targets in Iraq and Syria, including Plaintiffs.

426.    From 2014 through at least 2017, the substantial disparity between the volume of attacks targeting Ericsson convoys in Iraq cannot be explained by any factor other than the existence of a protection agreement between Ericsson and Islamic State, pursuant to which ISIS redirected its violence away from Ericsson and towards other targets in Iraq and Syria, including Plaintiffs.

427.    Several Confidential Witnesses confirm that if a substantial disparity in the rate of attacks targeting two Western target sets in Iraq or Afghanistan exists after the counterterrorism practitioner normalizes the data between the two target sets to enable an apples-to-apples comparison – *e.g.*, the rate of attacks targeting U.S. military convoys and Ericsson convoys traveling in the same area – the only plausible explanation is that the target set for which there was a substantially reduced likelihood of attack was likely operating in-country pursuant to an agreement to purchase security from the al-Qaeda-affiliated terrorists in the area by making protection payments to them.

428.    One Confidential Witness, for example, corroborated that a substantial attack disparity as described above could, on its own, permit the conclusion of a protection relationship between al-Qaeda and Defendants, based upon his/her experience while serving in Iraq first with the U.S. military in Iraq in 2003-2004 and later with one of the largest private security contractors that operated in Iraq in 2006-2007.  While serving in Iraq, this Confidential Witness had specific responsibilities for, *inter alia*, security, transportation, and force protection.  The same Confidential Witness also learned about well-known strategies used by terrorists and Western companies alike to illicitly transfer money and goods into, and out of, Iraq.  Based on

the Confidential Witness's personal observations in Iraq, familiarity with al-Qaeda-in-Iraq insurgent strategy and tactics, government training, and specific experience in connection with protecting Western officials and contractors from attack in Iraq, the Confidential Witness concluded, in sum and substance, that a substantial disparity in the attack patterns could offer strong support that the company in question likely had an arrangement with the terrorists.

429.    On information and belief, insurance records in the custody and control of Ericsson would further confirm the substantial attack disparity between Ericsson and other similarly situated persons in Iraq.

### C.    Each Defendant Facilitated Ericsson's Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

430.    Each Defendant – LM Ericsson, Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm – was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; the first three for the entirety of the period alleged herein, Ibrahim from at least 2014 through 2019, and Ekholm from 2017 through present.

431.    In addition to the allegations set forth in the rest of this Complaint, Plaintiffs set forth additional allegations below as to why each Defendant's conduct act facilitated Ericsson's protection payments alleged herein, and such payments would not have been possible without each Defendant's specific wrongful choices.[71]

432.    The synchronicity required for the scheme's success was consistent with Defendants' broader adherence to their "One Ericsson" business mantra. Had any Defendant chosen to resist, Ericsson's protection payments scheme would have collapsed, al-Qaeda, al-

---

[71] For the avoidance of all doubt, Plaintiffs are not limiting their Defendant-specific allegations to this subsection.  This subsection provides representative examples of the roles each Defendant played in the various key details attendant to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

Qaeda-in-Iraq, and Islamic State would not have received vast sums of money Defendants funneled to them, and the acts of international terrorism that injured Plaintiffs may not have occurred.  For that, each Defendant is liable.

### 1.    LM Ericsson

433.    LM Ericsson was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. LM Ericsson's conduct actively facilitated Defendants' protection payments alleged herein, and such payments would not have been possible without LM Ericsson's specific wrongful choices.

434.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to ISIS by administering Ericsson's enterprise-wide corruption scheme, in which Defendants' willingness to pay FTOs played a key role.

435.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to flow to ISIS by deliberately constructing Ericsson's global compliance program to aid, rather than stop, illicit payments, including those to terrorists.

436.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to flow to ISIS by deliberately constructing Ericsson's global compliance program to aid, rather than stop, illicit payments, including those to terrorists.

### a.    LM Ericsson Created And Led Ericsson's Enterprise-Wide Illicit Payments Scheme From The Late 1990s Through 2022

437.    In the late 1990s, LM Ericsson devised and perfected Ericsson's enterprise-wide corruption scheme, which LM Ericsson, Ericsson AB, and Ericsson Inc. thereafter jointly pursued from at least the late 1990s through at least 2019.  At all times throughout this period, LM Ericsson instructed, or otherwise encouraged, Ericsson's divisions and associated leadership,

including Ericsson AB, Ericsson Inc., Defendant Ekholm, and/or Defendant Ibrahim, to

participate in various facets of Ericsson's company-wide scheme.

438.    LM Ericsson's deliberate refusal to implement meaningful internal controls was

the essential ingredient that made Defendants' enterprise-wide corruption scheme possible in the

first instance.  The SEC found, for example, that "Ericsson knowingly and willfully failed to

implement adequate internal accounting controls with respect to retention of consultants and

agents, payment of bribes, and making improper payments."[72]

439.    "In particular," the SEC found, "Ericsson failed to implement controls to ensure

the effective enforcement of its policies and procedures that, among other things, (a) required

employees properly to document and account for payments to agents and consultants, including

the ultimate recipients of the payments and the reasons for the payments; (b) required adequate

due diligence for the retention of third-party agents and consultants; (c) required completed due

diligence and a fully executed contract with a third party before the third party could begin

providing services; (d) required that agreed-upon payments be commensurate with the services to

be performed and that the services paid for were performed; (e) prohibited certain compensation

arrangements with third parties, such as advance payments; and (f) established oversight

procedures, by personnel at Ericsson's headquarters and others, to ensure that third parties were

retained and paid pursuant to appropriate controls."[73]

440.    LM Ericsson encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and

Defendant Ibrahim to make and/or facilitate illicit payments to unlawful recipients in order to

---

[72] *Id.* ¶ 83.

[73] *Id.* ¶ 84.

drive greater profits for Ericsson as a matter of unofficial Ericsson corporate policy, including to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

441.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to create purpose-built intermediary relationships designed to obscure Ericsson's illicit payments, including to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

442.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to design and distribute built-to-fail anti-corruption- and counterterrorism-related policies and procedures that were reverse-engineered to ensure the business unit's desired illicit payment outcomes were always possible, by authorizing Ericsson AB to make them, and also by deliberately failing to prohibit payments to terrorists in the first instance, as a reflection of LM Ericsson's see no evil, hear no evil, speak no evil posture, which enabled Ericsson AB's decision to continue doing business inside Islamic State's caliphate from 2014 through 2017.

443.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to create and oversee a built-to-fail compliance program that was designed to facilitate illicit payments by concealing their existence rather interdicting illicit payments by exposing them.

444.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to persistently lie about such conduct thereafter, including about Defendants' facilitation of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

445.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to coordinate a comprehensive disinformation campaign to further amplify Ericsson's enterprise-wide corruption scheme by open letters, and press releases that were designed to attempt to conceal Ericsson's misconduct through Defendants' comprehensive,

whole-of-Ericsson, strategic communications scheme, which was designed to make it easier for Defendants to make illicit payments, including their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by "reputation washing" Ericsson's *bona fides* on anti-corruption, anti-terrorism, and national security issues.

446.   LM Ericsson's creation and perfection of Ericsson's enterprise-wide corruption scheme from the late 1990s through the early 2000s was a but-for cause of Defendants' vast, nearly two-decades-long scheme of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

447.   From the early 2000s through at least 2019, Ericsson's enterprise-wide corruption scheme consistently grew in volume, legal risk for Ericsson, and the predictably devastating outcomes for the United States in the Middle East, including Plaintiffs.  The growth of all three axes – and their intersections with one another, *e.g.*, more bribes meant more DOJ risk – only heightened LM Ericsson's importance to Defendants' ability to sustain Ericsson's company-wide corruption scheme.

448.   It would have been impossible for Ericsson AB to route the totality of the protection payments alleged herein to these FTOs without LM Ericsson's creation of the broader illicit payments scheme upon which Defendants relied to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, *e.g.*, the key Ericsson personnel, intermediaries, tactics and techniques, templates, and so on.

　　　　b.　　**LM Ericsson Secured Ericsson AB's Ability To Win The Iraq Work, And Ericsson Inc's Ability To Profit From The Iraq Work.**

449.   LM Ericsson was the but-for cause of Ericsson's decision to seek business in Iraq through the application of Ericsson's enterprise-wide corruption model.  This is so because LM Ericsson perfected the model by no later than the late 1990s, administered the application of the

model throughout, and protected the model from challenge by, *inter alia*, retaliating against whistleblowers, engaging in reputation-washing on a large-scale for the specific purpose of developing the political capital and media image necessary to deflect criticism though the false narrative that Ericsson was a responsible corporate citizen rather than what it was:  a criminal.

450.    LM Ericsson played a key role in securing Ericsson AB's Iraq-related contracts, and associated financing, from sources funded or operated by the United States government, Iraqi government, and the World Bank, including each of those identified in this Complaint.  LM Ericsson's role was essential, as the underlying contracts upon which Ericsson worked in Iraq would have been impossible without the support of the United States government and the U.S. dollars flowing out of the U.S. government, World Bank, Iraqi government (supplied by the U.S. or the World Bank in Washington, D.C.), or Iraqi customers like Zain Iraq (from the International Finance Corporation ["IFC"] in Washington, D.C.)

> **c.    LM Ericsson Approved Ericsson AB's Initial Choice To Participate In Al-Qaeda's, Al-Qaeda-in-Iraq's, And Islamic State's Protection Networks.**

451.    Whenever the senior leadership of a multinational corporation operates a decades-long, enterprise-wide corruption scheme, one of the first hurdles the scheme must surmount to get off the ground is the simple gating issue of headquarters-level approval, because enterprise-wide schemes of the nature at issue here are impossible without the participation of at least some key leaders at the headquarters level.  Such was the case here:  LM Ericsson approved Ericsson AB's decision to continue operating inside of Islamic State's caliphate from 2014 through 2017.

452.    On information and belief, LM Ericsson also approved Ericsson AB's earlier decision to enter the al-Qaeda-in-Iraq protection marketplace—which Ericsson AB made, and LM Ericsson approved, on or about late 2003 or early 2004.  Plaintiffs' belief is based upon at least three factors that, when considered together, strongly support Plaintiffs' conclusion.

453.     *First*, LM Ericsson confronted the **identical illicit relationship question** in 2004 that it faced a decade later in 2014:  should LM Ericsson purchase security from violent actors in the Iraqi marketplace by making unlawful protection payments to them?  In 2014, LM Ericsson not only chose to do so, but also supported Ericsson AB's, and Defendant Ibrahim's, steamrolling of Ericsson's in-house counsel's legal opposition to Defendants' decision to participate in Islamic State's protection rackets, which cleared the way for Ericsson AB's subsequent payments to flow through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  The same motivations governed in 2004.

454.     *Second*, LM Ericsson faced the **identical positive economic opportunity** in 2004 that it faced in 2014:  should LM Ericsson purchase security from terrorists to inflate LM Ericsson's profits from Iraq?  In 2014, Islamic State's ascendance throughout much of Iraq motivated LM Ericsson to authorize Ericsson AB's participation in ISIS's growing protection networks and associated protection payments because LM Ericsson and Ericsson AB determined that Defendants could leverage Islamic State's protection networks to substantially increase Ericsson's profits by purchasing security through ISIS, rather than through lawful – and costlier – means.  In late 2003 and early 2004, al-Qaeda-in-Iraq's ascendance throughout much of Iraq presented LM Ericsson with an identical value proposition: make more money by paying bribes to terrorists rather than following the law.

455.     *Third*, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State confronted Western corporations, including Defendants, with **substantially similar protection racket-related tactics, techniques, and procedures**, which all three FTOs practiced in the same country (Iraq) and focusing on the same customers (*e.g.*, Asiacell), administrated using the same violent tactics (threats of harm to Western corporations' property and goods to maximize collections), pursued

for the same purpose (raising money to fund terrorist attacks), and used to target the same

victims (Americans in the Middle East).  Moreover, LM Ericsson benefited from substantial

continuity in with respect to its key Iraq-facing bad actors, most of all, the ability to use the same

proven cutouts whom Ericsson (and others in the Middle East) had long used to pay bribes to

terrorists, and whom Ericsson itself concluded likely did so in 2014.  As a result, LM Ericsson

faced the same incentives and threats in 2014 as it did in late 2003 or early 2004 when deciding

whether to authorize Ericsson AB to participate in al-Qaeda-in-Iraq's protection network and

make the associated protection payments.

456.    When Ericsson AB necessarily chose to participate in al-Qaeda-in-Iraq's nascent

protection rackets on or about late 2003 or early 2004, LM Ericsson confronted all the same

incentives that persuaded LM Ericsson to approve Ericsson AB's assistance to Islamic State a

decade later.  On information and belief, LM Ericsson made the same choice in late 2003 or

early 2004 concerning al-Qaeda-in-Iraq as it made a decade later regarding Islamic State: pay.

> **d.    LM Ericsson Supervised Ericsson AB's Subsequent Conduct While Participating in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's Protection Networks.**

457.    As part of its supervision of Ericsson AB's participation in the FTOs' protection

networks in the first instance, LM Ericsson also oversaw Ericsson AB's subsequent decision-

making regarding protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

458.    LM Ericsson's supervision was important.  Defendants' protection payments to

al-Qaeda, al-Qaeda-in-Iraq, and Islamic State required Defendants to navigate an unusually risky

context to sustain their scheme to pay these FTOS.  Among the other challenges they faced,

Defendants had to account for: (i) the extreme nature of the transaction, *e.g.*, bribes to terrorists;

(ii) the extreme volume of illicit payments, *e.g.*, millions of dollars per year; (iii) the extreme

media microscope that was trained on Iraq while Defendants were making their protection

payments there; (iv) the extreme terrorism risk presented by Iraq while Defendants were making their protection payments there, which was always – by wide consensus – one of the two greatest counterterrorism threat environments globally for Americans (Afghanistan was the other), and was known as such; and (v) the extreme anti-corruption risk presented by Iraq, which always ranked, alongside Afghanistan, as among the two or three most corrupt countries on earth.

> **e.    LM Ericsson Authorized Ericsson AB's Associated Protection Payments.**

459.    LM Ericsson always approved Ericsson AB's protection payments to terrorists, each time doing so in violation of U.S. law and LM Ericsson's obligations to Ericsson's shareholders.  Had LM Ericsson made the legal choice, and rejected such payments, Ericsson AB would not have facilitated them, and al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would not have received their money.  LM Ericsson's authorization of Ericsson AB's protection payments was thus a but-for cause of the payments being made, and LM Ericsson authorized such payments with the specific intent that Ericsson AB's money flow through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because doing so would allow LM Ericsson and its divisions to generate greater profits.

> **f.    LM Ericsson Operationalized Ericsson AB's Protection Payment Scheme In Iraq**

460.    In addition to supervising Ericsson AB's participation in al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection networks, and associated protection payments to such FTOs, LM Ericsson also played a key role in operationalizing key facets of the scheme, which both enabled the scheme in the first instance and, once underway, made the scheme more effective— which results were exactly as LM Ericsson intended, since LM Ericsson intended to facilitate Ericsson AB's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

461.    LM Ericsson also played a key role in Defendants' ability to continue making protection payments by implementing the rewards and punishments wielded by Ericsson as carrots and sticks in defense of Ericsson's continued ability to generate outsized profits from Iraq-related customers by participating in al-Qaeda's, al-Qaeda-in-Iraq, and Islamic State's protection money networks.  With respect to rewards, LM Ericsson approved of Ericsson AB's decisions to elevate protection-money-related-wrongdoers, like Ms. Ibrahim, to global C-Suite roles at LM Ericsson.  With respect to punishments, LM Ericsson operationalized Defendants' internal punishments (*e.g.*, sacking whistleblowers under absurd pretextual concerns about Ericsson's purported committed to business integrity) and external punishments (*e.g.*, waging a smear campaign in the media against a whistleblower who correctly identified bribes facilitated by LM Ericsson).  LM Ericsson's authorization of such incentives and disincentives was key to Defendants' ability to continue making protection payments for as long as they did.

> **g.    LM Ericsson's CEO Personally Directed Aspects of Defendants' Protection Money Scheme In Iraq**

462.    LM Ericsson's CEO, Defendant Ekholm, personally facilitated Defendants' protection payments. *Infra* at II.C.4. LM Ericsson's choice to retain Ekholm in spite of his role in their protection scheme was a ratification by LM Ericsson of Ekholm's conduct.

> **h.    LM Ericsson Embraced Defendant Ibrahim, When It Should Have Fired Her, In Order To Enable The Continued Operation Of Defendants' Protection Money Scheme In Iraq**

463.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to ISIS by empowering the openly criminal leadership of Ericsson Middle East, which promoted Ericsson's protection payments in Iraq, and Ericsson's co-participation, alongside MTN, in the Taliban's use of MTN's cellular networks to attack Americans there.

464.     In so doing, LM Ericsson was also vital to Defendants' protection payments to Islamic State from 2014 through at least 2019 because of how LM Ericsson responded to Ms. Ibrahim's conduct and decision-making. By no later than 2014, LM Ericsson had actual knowledge – through its directors, employees, and agents, including Simpson Thacher – that Defendant Ibrahim:  (i) was involved in prior corruption at Ericsson in Malaysia; (ii) supported Ericsson's participation in Islamic State's protection money networks and Ericsson's associated protection payments to ISIS; and (iii) rejected the emphatic counsel of Ericsson AB's top in-house counsel for the Middle East, Tom Nygren, who urged as strongly as possible that Ericsson refrain from doing business with Islamic State and exit ISIS-controlled geographies in light of the certain terrorist finance implications that would follow from Ericsson's decision to remain inside of Islamic State's caliphate even while every other Western corporation on the ground in Iraq and Syria, other than Lafarge SA, did the opposite.

465.     In response, LM Ericsson protected, promoted, and paid Defendant Ibrahim for eight (8) years – and counting – when LM Ericsson should have fired Defendant Ibrahim, at the latest, by the summer of 2014, when LM Ericsson should have also disclosed the details of her (and Defendants') conduct to, *inter alia*, DOJ, FBI, and the SEC.

466.     Defendant Ibrahim committed shocking crimes in plain view. Regardless of her obvious criminal exposure at the time, and ever since (which is vast), Ibrahim also demonstrated, in as clear a manner as a senior executive ever could, her shocking willingness to, *inter alia*:  (i) cooperate with Islamic State; (ii) defy basic counterterrorism demands by the United States and the civilized world, *e.g.*, "Western corporations, please exit Islamic State's caliphate"; (iii) violate core and universally adopted anti-corruption principles and practices; and (iv) facilitate extreme human rights violations, including human trafficking, by ISIS.

467.    On all four of the preceding points, LM Ericsson knew that Defendant Ibrahim's leadership and conduct – if allowed to continue at Ericsson – effectively guaranteed that Defendants' protection payments would continue flowing to Islamic State on and after 2014.

468.    LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014 and again in 2017, and to continue paying and protecting Ibrahim ever since, ensured that Ericsson AB would remain substantially influenced by Ibrahim and would continue participating in Islamic State's protection networks and paying ISIS for to secure Defendants' ability to do so.

469.    LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014 and again 2017, and continue paying and protecting Ibrahim ever since, ensured that LM Ericsson would also remain substantially influenced by Ibrahim (through Ibrahim's role as a member of LM Ericsson's executive team), and LM Ericsson (including through Defendant Ekholm) would continue sponsoring Ericsson AB's and Defendant Ibrahim's participation in Islamic State's protection networks and associated payments to ISIS for the right to do so.

470.    LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Defendant Ekholm would continue to be personally influenced by Defendant Ibrahim in her capacity as a member of LM Ericsson's Executive Leadership Team as well as, starting in 2019, her role as personal advisor to Defendant Ekholm.

471.    LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Ericsson Inc. would continue to serve as both the object of the sales to Iraqi customers (owing to Ericsson Inc.'s centrality on the services side), and would necessarily continue to facilitate the flow of protection payments to Islamic State as a result because Ericsson Inc.'s refusal to provide services to Iraqi

customers would have destroyed Ericsson's ability to make the payments since Ericsson Inc. was key to the entire "turnkey" approach offered by Ericsson AB in the Middle East, including Iraq.

472.    LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Simpson Thacher, as agent for LM Ericsson – and, on information and belief, Ericsson AB and Ericsson Inc. – would continue to serve in a compromised posture, as Simpson Thacher's reporting chain was hopelessly compromised by Defendant Ibrahim's presence in, or ability to influence, any meaningful compliance counsel that Simpson Thacher could have provided to LM Ericsson, Ericsson AB, or Ericsson Inc. in a hypothetical world where Simpson Thacher chose to honor its legal and ethical commitments, as well as its fiduciary obligations to LM Ericsson, to interdict the ongoing crime spree perpetrated by Defendants, including Defendant Ibrahim.

473.    LM Ericsson also always knew that Defendant Ibrahim's conduct from at least 2014 through at least 2019, if revealed to the world, would vividly expose the fraudulent nature of the Ericsson Group's, including Ericsson AB's constant public and private representations regarding its opposition to terrorist groups, support for U.S. counterterrorism operations, adherence to anti-corruption laws, and promotion of human rights causes from at least 2001 through at least 2022.  These four issues were not just aspirational goals – they were concrete expressions of Defendants' purported business values, which Defendants devoted enormous time and resources to amplifying for the simple reason that Defendants believed (correctly) that such branding helped Ericsson make more money.  Examples of LM Ericsson's knowledge that Defendant Ibrahim's conduct, if exposed, would reveal Defendants' serial frauds concerning these four points included, but were not limited to:

a.    **Ericsson's Purported Opposition to Terrorist Groups.**  LM Ericsson publicly claimed that it staunchly opposed terrorists like Islamic State.  LM Ericsson knew, however, that

Ericsson actually paid ISIS, coordinated with ISIS, and even said "please" and "thank you" to ISIS, all which Defendant Ibrahim sponsored and operationalized with LM Ericsson's full knowledge and approval (in real-time, or after-the-fact).

b.   **Ericsson's Purported Support for U.S. Counterterrorism Operations**.  LM Ericsson publicly claimed that the Ericsson Group was a trustworthy counterterrorism and national security partner for the United States, and that it would support America's counterterrorism efforts.  LM Ericsson knew, however, that Defendant Ibrahim, among others, had directly and shockingly sponsored Defendants' direct violation of two of the most fundamental counterterrorism demands that the United States ever asks of any multinational corporation:  don't pay terrorists, and don't do business in geographies controlled by terrorists.

c.   **Ericsson's Purported Adherence to Universal Anti-Corruption Rules**.  LM Ericsson publicly claimed that the Ericsson Group adhered to widely practiced anti-corruption laws and rules, and more generally, that Ericsson was committed to anti-corruption principles as part of its commitment to social good.  LM Ericsson knew, however, that Defendant Ibrahim, among others, had sponsored a wide range of anti-corruption violations of almost every imaginable stripe: bribery and protection payments, built-to-fail internal controls, the business unit overriding in-house lawyers' extreme compliance concerns, (and the list goes on).

d.   **Ericsson's Purported Promotion of Human Rights, Including Education for Women and Girls**.  LM Ericsson publicly claimed that the Ericsson Group was a strong supporter of human rights generally, with a strong focus on supporting education for women and girls.  LM Ericsson knew, however, that Defendant Ibrahim, among others, had sponsored millions in U.S. dollar payments to a terrorist group, Islamic State, that was universally recognized in the United States, Europe, and the Middle East, as the worst human rights violator and enemy of education for women and girls on earth.  Remarkably, LM Ericsson (and Ericsson AB) chose to *highlight* Defendant Ibrahim's purported support for human rights and education for women and girls.  LM Ericsson did so because Defendants spent years – and, on information and belief, millions of U.S. dollars – cultivating the Ericsson Group's public image on these issues, which LM Ericsson (and Ericsson AB) believed (correctly) played a material role in helping Ericsson win more business around the world.

474.   Even simpler, though, LM Ericsson knew that Defendant Ibrahim demonstrated not just a lack of business ethics but an affirmative willingness to engage in conduct that was obviously shocking and appalling to all who were aware of it—as demonstrated by, *inter alia*, the universal scorn Ericsson received from the media and knowledgeable commentators after its secrets leaked in February 2022.

475.     In 2014, LM Ericsson knew or was willfully blind to the fact that any responsible multinational corporation in its position would promptly fire (or cause the firing of) Defendant Ibrahim.  Instead, LM Ericsson *promoted* Ms. Ibrahim, and in 2017 elevated her to a new title at both Ericsson AB and LM Ericsson by virtue of her roles on the Executive Leadership Team for the Ericsson Group and then later her elevation to personal advisor to LM Ericsson's CEO.

476.     As a result of LM Ericsson's conscious decision – starting in 2014 and continuing ever since, including through the date of this Complaint – to keep Defendant Ibrahim inside the Ericsson tent even after she did all that she did, Defendant Ibrahim continued to facilitate Defendants' participation in Islamic State's protection networks and associated protection payments to ISIS while wearing two hats: a senior executive of Ericsson AB, and a member of LM Ericsson's Executive Leadership Team.

## 2.      Ericsson AB

477.     Ericsson AB was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Ericsson AB's conduct actively facilitated Defendants' protection payments alleged herein, and such payments would not have been possible without Ericsson AB's specific wrongful choices.

478.     Ericsson AB operationalized the global corruption scheme devised by LM Ericsson, including through Ericsson AB's:  (a) illicit payments to unlawful recipients in order to drive greater profits for Defendants as a matter of unofficial Ericsson corporate policy; (b) operation of purpose-built intermediary relationships designed to obscure Ericsson's illicit payments; (c) adherence to LM Ericsson's decades-long deception about such conduct thereafter; and (d) deliberately sustaining a built-to-fail compliance culture where Ericsson AB consciously avoided doing having any credible compliance function relating to Iraq so that Defendants'

ability to pay bribes to Iraqi recipients, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, would remain unfettered.

479.    Ericsson AB was necessary to operationalize LM Ericsson's decision to seek business in Iraq through the application of Ericsson's enterprise-wide corruption model.  This is so because Ericsson AB served as LM Ericsson's face, on the ground, around the world, and was responsible for conducting day-to-day operations while LM Ericsson focused on strategic matters such as communications, lobbying, legal, compliance, and crisis management.

480.    Ericsson AB, inclusive of its Iraqi branch, were the counterparties to most, if not all, the contracts in Iraq for which Defendants paid protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Such payments would have been impossible had Ericsson AB not agreed to make such payments in order to maximize Defendants' profits associated with Ericsson AB's contracts in Iraq.

481.    Ericsson AB was a link in the decision-making chain that authorized Ericsson's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Ericsson AB's management always approved such payments, each time doing so in violation of, *inter alia*, United States law.  Had Ericsson AB made the legal choice, and rejected such payments, LM Ericsson could have not otherwise forced the issue because Ericsson AB could have just refused to do the work, as such work was procured with bribery in violation of U.S. law.  Instead, Ericsson AB chose to facilitate illicit payments with the specific intent that Ericsson AB's money flow through Ericsson AB's intermediaries to reach al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because Ericsson AB consciously sought a competitive advantage in the Iraqi marketplace by obtaining below-cost security through their protection payments to al-Qaeda, al-Qaeda-in-

Iraq, and Islamic State, rather than investing in real security or pulling out of the terrorist-controlled geographies as nearly every other responsible company did at the time.

482.    Aside from directly causing Defendants' protection payments to be routed to the terrorists through Defendants' purpose-built cutouts, Ericsson AB also played an essential role in Defendants' ability to continue making protection payments by operationalizing the rewards and punishments wielded by Ericsson as carrots and sticks in defense of Ericsson's continued ability to generate outsized profits by participating in the terrorists' protection money networks. For example, Ericsson AB elevated protection-money-related-wrongdoers, like Ms. Ibrahim, to global C-Suite roles at LM Ericsson. Ericsson AB's participation in LM Ericsson's broader carrot/stick scheme against whistleblowers was essential to Defendants' ability to continue making protection payments for as long as they did.

483.    On information and belief, Ericsson AB also directly retained Simpson Thacher and/or Ericsson AB assented to the retention of Simpson Thacher on Ericsson AB's behalf by LM Ericsson. When Ericsson AB did so, Ericsson AB had the specific intent that Simpson Thacher deflect any United States government scrutiny concerning Ericsson's illicit payments in Iraq, including those relating to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. *Infra* at Part V. Ericsson AB and Simpson Thacher agreed as to that course of conduct, and thereafter successfully obstructed the United States government's counterterrorism operations.  This conduct was a but-for cause of Defendants' protection payments in Iraq by no later than 2014, when Ericsson AB, on information and belief, retained Simpson Thacher alongside LM Ericsson or, alternatively, assented to LM Ericsson's retention of Simpson Thacher on behalf of Ericsson AB.  Ericsson AB and Simpson Thacher were aware of Defendants' payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and Ericsson AB and Simpson Thacher both knew such

payments were illegal and foreseeably aided acts of terrorism against Americans, and both

Ericsson AB and Simpson Thacher both affirmatively chose to conceal such information from

the United States government even though Ericsson AB and Simpson Thacher both had an

affirmative duty of disclosure given Ericsson AB's assertion that Ericsson was fully cooperating

with the then-existing U.S. government investigation of Ericsson.

484.    Ericsson AB coordinated with LM Ericsson and Defendant Ibrahim to continue

Ericsson operations in Islamic State-controlled territory during its "caliphate" era from at least

2014 through at least late 2017, and Ericsson AB similarly coordinated (alongside LM Ericsson

and Defendant Ibrahim) with Defendant Ekholm to continue Ericsson operations in ISIS-

controlled territory throughout at least 2017, when Defendant Ekholm served as CEO of LM

Ericsson, which service began on January 16, 2017.  Ericsson AB did so even though Ericsson

AB knew that such continued Ericsson AB operations in ISIS-governed geographies would

inevitably cause millions of dollars in additional "tax" payments by Ericsson AB, including

Defendants' intermediaries, to flow through to Islamic State.  Had LM Ericsson made the lawful

choice, and instructed Ericsson AB to cease operations from inside of Islamic State's caliphate,

most of Defendants' protection payments to Islamic State would not have occurred.[74]

485.    As a result of the foregoing, Ericsson AB's conduct caused millions of U.S.

dollars in protection payments to flow to al-Qaeda and al-Qaeda-in-Iraq from at least 2004

---

[74] True, Ericsson AB would have paid the terrorists some money even had LM Ericsson told
Ericsson AB to avoid ISIS's caliphate from 2014-2017 since Islamic State also extracted
protection payments from businesses operating near their territory.  While Islamic State extracted
substantial revenue from companies that conducted operations near to its caliphate (but not
inside of it), ISIS extracted far more revenue from the companies that **both** remained inside their
caliphate **and also** continued operating outside of it.  Had LM Ericsson made the responsible
choice, Ericsson AB likely would have still made some payments to ISIS, but the volume of such
payments would have been lower.

through at least 2014, and Ericsson AB's conduct caused millions of U.S. dollars in protection payments to flow to Islamic State each year from at least 2014 through at least 2019.

486.    On information and belief, from 2014 through at least 2019, Ericsson AB caused more than $15 million in financial transactions related to the protection payments that Ericsson AB was routing to Islamic State on behalf of itself, as well as LM Ericsson, and Ericsson Inc.

### 3.    Ericsson Inc.

487.    Ericsson Inc. also actively participated in the protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through numerous channels of support that included, but were not limited to, the examples offered below.

488.    *First*, Ericsson Inc. directly transferred sophisticated, U.S.-origin, military grade communications technologies to al-Qaeda in Afghanistan from at least 2008 through, on information and belief, at least 2017.  *Supra* II.B.3.b.

489.    *Second*, Ericsson Inc. manufactured and/or procured devices for LM Ericsson and Ericsson AB – for which Ericsson Inc. served as the U.S. division, rather than a traditional subsidiary – that Ericsson Inc. knew or recklessly disregarded were being used by LM Ericsson and Ericsson AB as currency for at protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State or, alternatively, to compensate the Ericsson intermediaries that made such payments.  Had Ericsson Inc. declined to perform this role, Defendants' ability to participate in, and financially benefit from, al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets would have been substantially degraded.

490.    *Third*, under Defendants' "One Ericsson" organizational framework, Ericsson Inc.'s involvement in Ericsson AB's Iraq work was necessary to sustain Defendant' flow of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Under Defendants' "One Ericsson" model, Ericsson organized itself as a single entity with a headquarters in Sweden and

divisions, rather than subsidiaries, in key geographies.  Consistent with its "One Ericsson" approach, LM Ericsson structured Defendants' operations to minimize redundancies between "divisions" of Ericsson, e.g., Ericsson Inc., and foster interdependence amongst Ericsson's corporate family to foster seamless collaboration between geographies, divisions, and personnel.

491.    Under the resulting organizational chart, Ericsson Inc. was therefore a necessary participant in essentially all Ericsson AB work worldwide.  This outcome obtained regardless of whether Ericsson Inc. was a party to the contract between Ericsson and the customer in question. As a result, Ericsson Inc.'s participation in the Iraq work was a but-for cause of such work continuing:  had Ericsson Inc. refused to continue servicing Iraq-related customers, Ericsson AB's ability to sustain the protection racket would have collapsed because Ericsson AB would not have been able to offer the "turnkey" engineering, network, and technical services that served as Ericsson's calling card with customers worldwide, including those in Iraq.

492.    Indeed, according to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, because of Ericsson Inc.'s support to Ericsson AB, Ericsson's customers in the Middle East experienced seamless "turnkey" services support, which was one of the key value propositions Ericsson offered to its Middle Eastern customers.

493.    *Fourth*, Ericsson Inc. affirmatively chose to continue supporting LM Ericsson's and Ericsson AB's work in Iraq well after Ericsson Inc. knew, or recklessly disregarded, that LM Ericsson operated an enterprise-wide corruption program that, at a minimum, alerted Ericsson Inc. to the foreseeable risk that its LM Ericsson, which Ericsson Inc. understood to effectively be on a decades-long global white collar illicit payments crime spree lasting from at least the late 1990s through at least 2022.  Ericsson Inc.'s knowledge of this fact alone, coupled with Ericsson

Inc.'s continued facilitation of Defendants' work in Iraq thereafter, represented an affirmative choice by Ericsson Inc. to look the other way while its corporate affiliate applied the Ericsson playbook to Iraq, with the predictably foreseeable result that bribes would be paid to terrorists and anti-American violence would follow.

494.    From 2004 through 2022, Ericsson Inc provided its unfettered support for Defendants' business operations in Iraq while knowing that LM Ericsson and Ericsson AB operated an enterprise-wide corruption scheme.  In so doing, Ericsson Inc. consciously avoided reaching the foreseeable – if not inescapable – conclusion:  a company with a commitment to corruption that starts in its C-Suite (like LM Ericsson) with billions in potential profits on the line  in one of the most violent places in the world (given Iraq's distinction of being one of the few "virgin" telecoms markets in the world), in which bribing terrorists is the more economically profitable choice (also Iraq) is likely to decide that it could bribe its way to security and greater profit, and therefore bribe terrorists while doing business in what was widely perceived to be the most corrupt and most violent country on earth.

495.    *Fifth*, Ericsson Inc. provided essential support to the cross-functional Ericsson Group teams that were indispensable to Defendants' ability to regularly, and reliably, leverage Ericsson's U.S. contacts to support LM Ericsson's and Ericsson AB's Iraq-related business development efforts.  Defendants' cross-functional teams were a vital cog in their Iraq machinery because of the central role played by the United States in post-Saddam Iraq and, most of all, the leadership role played by Washington, D.C.-based political, diplomatic, national security, media, and finance stakeholders.  Ericsson Inc. maintained an office in Washington, D.C. to enable the activities of Ericsson's cross-functional teams so that they could seamlessly collaborate in the most important city in the world to their business: the District of Columbia.

496.    Moreover, between the U.S. government and the World Bank, Washington, D.C. provided outsized support for Iraq's telecommunications sector, including money and technical support, related to supporting Iraq's telecoms-related procurement budgets throughout the post-Saddam era.  As a result, Ericsson Inc.'s support for Defendants' Washington, D.C.-based cross-functional team operations was a but-for cause of such teams' ability to help Ericsson land the Iraq work for which Defendants paid protection money. Had Ericsson Inc. declined to share its personnel and office in Washington, D.C., Defendants' ability to effectively compete for Iraq-related work would have evaporated because the U.S. government generally refused to provide robust financial support to companies involved in Iraqi reconstruction that did not have a meaningful presence in the United States.  Ericsson Inc.'s status as a U.S. company therefore helped Defendants seize Iraq-related opportunities because Defendants could invoke their U.S. presence to bolster their credibility as a potentially trustworthy partner for the U.S. government in a conflict zone like Iraq.

497.    *Sixth*, on information and belief, Ericsson Inc. directly supported all or nearly all of Ericsson AB's contracts with its Iraqi and Afghanistan customers related to networks and managed services.  Ericsson Inc. accomplished such support through Ericson Inc.'s direct participation in Ericsson AB's performance of all or nearly all of Ericsson's contracts with customers in Iraq and Afghanistan alleged in this Complaint.

498.    From 2001 through 2022, multinational corporations operating in the United States, Europe, and the Middle East almost universally relied upon transaction structures known as "inter-company transfers" or "inter-company transactions" to maximize corporate efficiencies while simultaneously integrating all the corporation's subsidiaries or divisions into a single "One

Company" operational structure.[75]  On information and belief, when Ericsson AB employed

Ericsson Inc. to help Ericsson AB provide Ericsson's contracted-for technologies and services to

Ericsson AB customers in Iraq and Afghanistan—including all such customers and contracts

alleged in this Complaint, —Ericsson AB compensated Ericsson Inc. through such inter-

company transactions between Ericsson AB and Ericsson Inc.  On information and belief,

Ericsson AB transmitted instructions to Ericsson Inc. detailing how Ericsson Inc. was to account

for the various services, goods, and personnel that Ericsson Inc. provided to Ericsson AB while

participating in Ericsson AB's provision of services to Ericsson AB's customers and contracts in

Iraq and Afghanistan, including every such customer and contract alleged in this Complaint.

Plaintiffs' allegation is plausible based upon Ericsson's prior statements, corporate structure, and

the practices of other companies like Ericsson.

499.    Ericsson Inc. knew that it and the other Defendants aided and abetted al-Qaeda,

al-Qaeda-in-Iraq, and Islamic State as alleged in this Complaint because, on information and

belief, Ericsson Inc. earned substantial compensation through its provision of goods, services,

personnel, and technologies to Ericsson AB related to Ericsson AB's contracts with Ericsson

customers in Iraq and Afghanistan.  Simply put, Ericsson Inc. always knew that Ericsson AB's

unethical and criminal overseas sales practices were an integral part of Ericsson's operations

globally, and it is not plausible – nor would it have been credible at the time, or now – for

Ericsson Inc. to have concluded that Ericsson Inc. could lawfully earn money through its

---

[75] Given Ericsson's unique "divisions, not subsidiaries" corporate structure, Plaintiffs' use of this nomenclature does not mean to suggest that Plaintiffs concede the separateness between LM Ericsson, Ericsson AB, and Ericsson Inc.  For the avoidance of all doubt, Plaintiffs allege—consistent with Ericsson's admission in its guilty plea in 2019—that LM Ericsson, Ericsson AB, and Ericsson Inc. collaborated seamlessly as "One Ericsson" under a corporate model that eschewed boundaries between entities in recognition of their division relationships.

participation in Ericsson AB's provision of goods and services to Ericsson's customers in Iraq

and Afghanistan once Ericsson Inc. knew – as it did all along – that Ericsson AB was committed

to an enterprise-wide corruption scheme.

500.     Accordingly, when Ericsson Inc. facilitated Ericsson's protection payments, or

Ericsson's other unlawful conduct in Iraq or Afghanistan alleged in this Complaint, Ericsson Inc.

did so while sharing the same bases as every other Defendant for knowing that Ericsson's

conduct (including Ericsson Inc.'s own conduct), aided and abetted the acts of terror committed

by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State against Americans in the Middle East, including

Plaintiffs.

501.     As a result of the foregoing, Ericsson Inc.'s conduct caused millions of U.S.

dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from

at least 2004 through at least 2014, and Ericsson Inc.'s conduct caused millions of U.S. dollars in

protection payments to flow to Islamic State from at least 2014 through at least 2019.

### 4.     Börje Ekholm

502.     Ekholm facilitated the payments alleged herein through his conduct as described

in this Complaint, including, but not limited to, Ekholm's approval of such payments in 2017.

### 5.     Rafiah Ibrahim

503.     Ibrahim knew about and, on information and belief, personally approved of

Ericsson's protection payments to al-Qaeda-in-Iraq and Islamic State beginning no later than

June 2014.  From the moment her 2014 promotion to Head of the Middle East and North Africa

Market Area was announced in June, Islamic State terrorists' emergence in Iraq, including

Islamic State's taking of Mosul, was top-of-mind for Ibrahim and other Ericsson employees in

Iraq.  Ericsson's regional leadership, including—and beginning in July, led by—Ibrahim,

rejected suggestions of suspending work on Asiacell's network and instead opted to formally ask

Islamic State for permission to continue that work via hand-delivered letter.  Ericsson's leadership, including Ibrahim, and Ericsson's strategic partner Asiacell were undoubtedly aware that "permission" for Western corporations to conduct business in its territory was not freely given by Islamic State (or its predecessor al-Qaeda-in-Iraq) but would come at a price.  Given that Ericsson's work continued mostly unabated, it is reasonable to infer that Ericsson met Islamic State's price.

504.    Ibrahim's long and varied tenure with Ericsson suggests her familiarity with its long-documented history of surreptitiously making corrupt (and illegal) payments to third parties.  For example, between 2008 and 2010, Ibrahim was Ericsson's head of the North Africa region, which spanned 11 countries, including Egypt (where she was based at the time).  In 2019, when LM Ericsson entered into the DPA with DOJ and Ericsson's Egyptian subsidiary, Ericsson Egypt Ltd., pled guilty to criminal FCPA charges, both entities admitted that from 2000 to 2016, they "through various executives, employees, and affiliated entities, used third-party agents and consultants to bribe foreign government officials and/or manage off-the-books slush funds in countries where it pursued contracts to conduct telecommunications business [and that] [t]he agents were often engaged through sham contracts and paid pursuant to false invoices."

**D.    Defendants' Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States**

**a.    Defendants' Conduct Relied On American Contacts**

505.    Ericsson's protection payments were closely tied to the United States.  Ericsson Inc. made payments through Ericsson AB or another LM Ericsson subsidiary acting as its sales agent in Iraq.  Ericsson AB obtained—for the immediate benefit of Ericsson Inc. and the ultimate benefit of LM Ericsson—contracts with the U.S. government, Iraqi government, Korek, and Asiacell, or subcontracts with other prime contractors for those same entities.

506.     As an initial matter, the claims asserted in this amended complaint arise from Ericsson's illegal conduct in conducting business in post-Saddam Iraq beginning no later than 2004.  That business—building telecommunications infrastructure in post-Saddam Iraq—might never have happened without U.S. Government funding and a U.S.-based company with whom Ericsson could partner.  In May 2003, shortly after the end of major combat operations in Iraq, the U.S. Department of Defense awarded a $35 million contract to U.S.-based WorldCom, Inc. (aka MCI) to build a small wireless phone network in Baghdad for U.S. civilian and military personnel in Iraq, for which Ericsson agreed to provide 2,000 mobile phones.  WorldCom and Ericsson also contracted to have LM Ericsson (likely through Ericsson AB) supply the equipment that WorldCom needed to build a network based on the Global System for Mobile Communication (GSM) standard, including 17 cell towers.  After the U.S. Government decided to bar WorldCom/MCI from being awarded new government contracts in August 2003, Ericsson was quickly able to capitalize on its prior work to win new contracts from Iraqi network operators Korek (on or about November 2003) and ITPC (on or about November 2004)—both of whom invariably relied upon at least some U.S. Government funds to pay Ericsson for its work.

507.     Moreover, Ericsson's protection payments in Iraq required extensive involvement of U.S. personnel and facilities in the global Ericsson mobile business unit, Ericsson Inc., which operated in practice as a division of LM Ericsson's integrated structure rather than an independent subsidiary.

508.     From 2003 through 2022, LM Ericsson – the parent of both Ericsson AB and Ericsson Inc., the latter of which was its crown jewel and a wholly owned subsidiary – maintained a substantial Iraq-focused presence in the United States, including in Washington, D.C. (*i.e.*, inside this District) and the broader Washington, D.C. metropolitan area, through the

Iraq-related activities, travels, transactions, and communications of LM Ericsson's officers, employees, and agents in the United States, including in this District. For example, LM Ericsson and Ericsson Inc. always deployed cross-functional Ericsson teams who worked in Ericsson Inc.'s Washington, D.C. office on behalf of Ericsson Inc. and LM Ericsson, in order to advance Ericsson's critical global requirements, which often hinged upon access relationships with key Washington, D.C. stakeholders, government and non-government alike. According to one former leader of such LM Ericsson and Ericsson Inc. office in Washington D.C., as she/he published online, Ericsson's D.C. office aided LM Ericsson's and Ericsson Inc.'s "influencing plan[s]" in North American as well as Ericsson's "global" "plans", and coordinated directly with LM Ericsson's executives.

509.     As LM Ericsson's wholly owned subsidiary in the United States, and the entity responsible for technical innovation, mobile telephony, customer billing, and enterprise management, Ericsson Inc. was the indispensable ingredient to, and partner in, LM Ericsson's next generation network offering worldwide from 2000 through 2022, as sold by its many divisions throughout the world. Through Ericsson Inc. and other U.S. subsidiaries, LM Ericsson also acquired U.S.-technology from, and collaborated with, other U.S.-based technology companies to design, develop, and support Ericsson products and services that were sold or provided for Ericsson's Iraqi projects and contracts during that period. Simply put, Ericsson Inc. provided the U.S. technology (including software and intellectual property), provided the U.S. services, and facilitated other key U.S. commercial relationships that were indispensable to the integrated networks that LM Ericsson sold to customers worldwide through Ericsson AB or other subsidiaries, including Iraq. As such, like many other multinational companies (*e.g.*, medical supply firms) that leveraged U.S. economic prowess, technical expertise, manufacturing strength,

and favorable legal regime for their sales in Iraq, LM Ericsson structured its sales in Iraq to operate (through Ericsson AB or another subsidiary) as Ericsson Inc.'s exclusive representative in Iraq, consistent with decades-long Iraqi practice.

510.    Ericsson purposely availed itself of the United States, including its patent system, to position itself as the technological and service leader in several important sectors of the global telecommunications industry. *See infra* at III.D.1.  Ericsson used that position, as well as a variety of products and services benefitting from Ericsson's U.S. patents, to win the lucrative contracts in Iraq and Afghanistan that gave rise to the illegal protection payments at the very heart of this action.  Ericsson also acquired U.S.-based companies to fuel its growth in key business segments for which global demand, particularly in the Middle East, was expected to increase.

511.    Ericsson could not have obtained or implemented telecommunications contracts in Iraq without maintaining a substantial U.S. presence through its regular deployment of LM Ericsson and Ericsson AB officers, employees, and agents into the United States in order to, *inter alia*, coordinate with Ericsson Inc. for purposes of designing the bid strategy, executing the bid, performing the subsequent work, and managing finances, for the Iraqi contracts alleged herein, and also to fraudulently conceal Ericsson's facilitation of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through false statements to LM Ericsson shareholders that LM Ericsson reached into the United States to issue, often jointly with Ericsson Inc., and sometimes through Ericsson Inc. (*i.e.*, Ericsson Inc. is the primary author of a media statement formally on behalf of LM Ericsson). Such close cooperation was consistent with LM Ericsson's admission that its subsidiaries operate as divisions of LM Ericsson, rather than independent entities, and a hallmark of their "One Ericsson" model, which was a popular business model for trans-Atlantic

multinational corporate collaboration within one family, as demonstrated by its widespread deployment by other Western industries, *e.g.*, medical supply, during Oil-for-Food and reconstruction-era Iraq.

512.    Indeed, LM Ericsson's leadership regularly acted in furtherance of Ericsson's illicit protection money scheme while physically present in the United States.  Such contacts were not fortuitous:  LM Ericsson promoted the cross-pollination of its European and American workforces.  Such practices started at the very top:  LM Ericsson's CEO, Börje Ekholm, has lived and worked in the United States while leading LM Ericsson since 2017, including, on information and belief, during the period when Mr. Ekholm approved protection payments from 2017 through at least 2019.  LM Ericsson authorized Mr. Ekholm to lead them from the United States so that LM Ericsson, through Mr. Ekholm's presence in America, could leverage the unique economic, cultural, technological, and financial networks of the United States. While he led LM Ericsson as its CEO from 2017 through 2022 – including while he helped obstruct U.S. counterterror efforts – Mr. Ekholm was a Connecticut resident often working out of New York City.  In February 2022, near in time to when Ericsson's Iraq scandal broke, Mr. Ekholm sold his Connecticut home and, on information and belief, relocated to Colorado, where he now resides and has a P.O. Box.

513.    Ericsson Inc. personnel in the United States routinely supported Ericsson AB's implementation of Defendants' contracts in Iraq, just as Ericsson Inc. personnel in the U.S. did with respect to the rest of Defendants' North Middle East region, which was comprised of Iraq, Afghanistan, Jordan, Lebanon, and Syria.  Ericsson Inc.'s provision of such services to Ericsson AB's ability to perform under its Iraqi contracts and thereby enable Defendants' Iraq-derived profits, which Defendants' protection payments were designed to inflate.

174

514.    Ericsson's protection payments in Iraq (alleged above) involved sales of telecommunications technologies and services sourced from and/or provided largely in the United States, and Ericsson's protection payments were intended to maximize the profits that Ericsson Inc., and, by extension, LM Ericsson, derived from contracts in Iraq for the sale of Ericsson Inc.'s specialized goods and services (like, for example, the Charging and Billing in One, or CBiO system).  Moreover, on information and belief, Ericsson procured many of the core radio network components for the systems they installed all over the globe, including in Iraq, from U.S.-based companies.  At a minimum, Ericsson used those U.S. companies' technology in the mobile network and broadband systems Ericsson built and installed for its global customer base.  For example, Ericsson bundled Ericsson Inc. services with Cisco ASR 9000 routers for its Iraqi client Korek.

515.    The object of Ericsson's network and radio contracts in Iraq, including on information and belief every contract with Asiacell and Korek, was to provide U.S.-origin technology and services, including but not limited to the RBS 6000, the Cisco ASR 9000, and the CBiO system, that were sourced in whole or in part by Ericsson Inc. or another LM Ericsson subsidiary in the United States.  Each such contract was negotiated, executed, and/or serviced in whole or in part in the United States; each required extensive communications with Ericsson Inc. personnel located in the United States; and each required Ericsson to pay protection money to terrorists as a cost of doing business in terrorist-contested areas, such that all revenue and profit flowing to Ericsson Inc. from Ericsson's Iraq business was a result in part of payments to terrorists.   Those revenues and profits were then used in turn to fund future payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and to secure work on new projects in Iraq.

516.     Many of the projects to which Ericsson contributed protection payments were managed by and for the benefit of counterparties who were funded by one or more U.S. government components based in Washington, D.C., including, but not limited to, through USAID and the Department of Commerce. For example, in 2003, USAID began awarding contracts for the reconstruction of Iraq's telecommunications networks.  By making protection payments in connection with such projects, Ericsson breached U.S. government-based, Washington, D.C.-negotiated contractual requirements prohibiting material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

517.     Many of the projects to which Ericsson contributed protection payments were also managed by and for the benefit of counterparties who were funded by the World Bank, through its members the IFC and the Multilateral Investment Guarantee Agency ("MIGA"), both of which were based in Washington, D.C.  For example, Zain Iraq entered into a $650 million managed services contract with Ericsson in November 2011 after securing a $400 million debt facility from IFC earlier that year. By making protection payments in connection with such projects, Ericsson breached MIGA- and IFC-based, Washington, D.C.-negotiated contractual requirements prohibiting material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

518.     Many—and on information and belief all—Ericsson contracts in Iraq alleged herein relied on Ericsson's contacts with the United States, and were for the purpose (in whole or in part) of generating business for Ericsson Inc.  Given the managerial role played by LM Ericsson and Ericsson AB overseeing Ericsson's Iraq business, including on behalf of Ericsson Inc., LM Ericsson and Ericsson AB personnel often worked with and relied on Ericsson Inc.'s U.S. assets to implement Ericsson's Iraqi projects.

519.     LM Ericsson's and Ericsson AB's U.S.-based contacts were important.  The United States led Coalition forces in Iraq and spearheaded the civilian reconstruction effort. When other entities like the World Bank funded telecommunications projects in Iraq, they did so in close consultation with the U.S. government and in service of U.S. objectives.[76]  LM Ericsson's and Ericsson AB's cooperation with their U.S. affiliates, including Ericsson Inc., was thus material in Ericsson obtaining work from its Iraqi customers, including Korek and Asiacell. Ericsson would not have obtained the Korek and Asiacell contracts alleged herein without promising close coordination with Ericsson Inc. and LM Ericsson's other subsidiaries in the United States.  That was particularly true because the subject matters of the Iraqi contracts under which Ericsson was paid from 2004 through 2022 focused heavily on the development of Iraq's mobile network and associated business services solutions – the two signature roles played by Ericsson Inc. in LM Ericsson's globally integrated corporate network.  LM Ericsson's work in Iraq depended on its relationship with Ericsson Inc.

520.     From 2004 until 2022, LM Ericsson – for which Ericsson Inc. served as a U.S. division – and Ericsson AB maintained a substantial presence in the United States, including Washington, D.C., through the travel, communications, transactions, and services that LM Ericsson's officers, employees, and agents obtained in, or routed via, Washington, D.C. LM Ericsson's Washington, D.C.-based agents' conduct.  As *Reuters* observed a few days after LM

---

[76] Many, and on information and belief most, of Defendants' contracts were awarded by Iraqi customers who received World Bank funding, and as such, Defendants' Iraq-related contracts were often governed by the World Bank's standard contractual provisions, which typically required both the funding recipient (*e.g.*, Asiacell) and the prime contractor who would receive the money downstream (*e.g.*, LM Ericsson) to adhere to strict counterterrorism standards that usually included certifications and reporting requirements applicable to both funding recipient and prime contractor who deploys the World Bank's money.

Ericsson's Iraq scandal broke, through "[Mr.] Ekholm," LM Ericsson strategized to, and did, financially "benefit[] from Washington's diplomatic pressure against Huawei [concerning, in part, anti-terrorism issues], which drove [Huawei] out of the U.S. and most of Europe" causing Ericsson's "sales" to "soar[]."[77]

521.    LM Ericsson's presence in Washington, D.C. from 2004 until 2022 was accomplished, in part, by LM Ericsson's Washington, D.C.-based compliance and legal agents, public relations agents, lobbyists, and consulting and/or accounting firms. Some of those agents may have been retained by Ericsson Inc. via its office in Washington, D.C., acting as a division of and agent for LM Ericsson.  LM Ericsson's Washington, D.C. actions furthered both LM Ericsson's receipt of U.S. dollars from U.S.-based customers or lenders, which LM Ericsson diverted to terrorists in Iraq in the first instance, and LM Ericsson's successful concealment of its aid to terrorists and obstruction of U.S. policy thereafter. Examples of LM Ericsson's routine and direct presence in Washington, D.C. to further its Iraq-related protection payments and obstruct U.S. counterterrorism efforts include, but are not limited to:

a.    <u>LM Ericsson's DOJ and SEC-Facing Presence in Washington, D.C.</u>:  LM Ericsson routinely interacted with, and facilitated ongoing protection payments by making fraudulent Iraq-related representations, while present in Washington, D.C., to DOJ's and SEC's FCPA Units (which both received the information, and are based in, Washington, D.C.), while LM Ericsson knew of the key role played by DOJ and SEC in protecting Americans from terrorist threats as recognized by longstanding, widely publicized, official joint DOJ/SEC pronouncements, and also knew that LM Ericsson's nearly decade-long concealment of vital al-Qaeda and Islamic State-related information from the U.S. government foreseeably aided such terrorists attacks targeting America and its citizens.

---

[77] Reuters, *The Effect of ISIS Case for Ericsson May Go Far Beyond The Fine*, *republished by* NoticiasFinancieras – English (Feb. 18, 2022), 2022 WLNR 5092252. Among the U.S. government's stated Huawei-related national security concerns, Huawei was, and remains, subject to significant U.S. terrorism-related allegations concerning Huawei's alleged sanctions evasion and money laundering relating to Huawei's provision of services to notorious IRGC fronts in Iran.

**b.**   <u>LM Ericsson's Customer- and Lender-Facing Presence in Washington, D.C.</u>:  LM
Ericsson routinely deployed its officers, directors, and agents to meet with key
Washington, D.C.-based customers and lenders, including U.S. government military, aid,
and commercial agencies in Washington, D.C., and World Bank stakeholders who
facilitated billions in Iraq-related revenue for LM Ericsson and Ericsson Inc. which LM
Ericsson secured through the artificial commercial benefits it derived from its protection
payments, which themselves violated LM Ericsson's counterterrorism obligations under
standard U.S. government and World Bank contracts that were ordinarily negotiated in
Washington, D.C. and governed by Washington, D.C. law.

**c.**   <u>LM Ericsson's Media-Facing Presence in Washington, D.C.</u>:  Through LM Ericsson's
Washington, D.C.-oriented press releases, and Washington, D.C. located officers,
employees, and agents—with whom LM Ericsson and Ericsson Inc. routinely cross-
pollinated under LM Ericsson's unusual "division"-based integrated corporate approach
(in which Ericsson Inc. and other LM Ericsson subsidiaries serve as divisions of LM
Ericsson rather than in  traditional parent/subsidiary roles)—LM Ericsson routinely
published joint statements with its division, Ericsson Inc (which has an agent and office
in this District) statements inside Washington, D.C. that LM Ericsson specifically
intended to use to influence key Iraq-, terrorism-, and corruption-focused Washington,
D.C. media outlets, Washington, D.C.-based journalists, Washington, D.C.-based
opinion-makers, and Washington, D.C.-based think tanks, in order to protect LM
Ericsson's associated branding, which was vital to keep LM Ericsson's Iraq-related U.S.
dollar pipeline—and Defendants' attendant protection payments to terrorists—flowing
undetected until 2022. Simply put, LM Ericsson knew that its heavily U.S.-centric
business would come under severe pressure in Washington, D.C. if the U.S. government
learned it had been bribing anti-American terrorists responsible for beheading and
blowing up Americans on camera for more than a decade.

522.   Ericsson consummated its transactions through the United States banking system,

by relying upon U.S.-based accounts to obtain the cash necessary to make Ericsson's slush fund-

based protection payments, and wiring the funds necessary to make Ericsson's intermediary-

based protection payments. On information and belief, Ericsson relied upon the U.S. dollar (or

"USD") as its currency of choice for illicit Iraq-related payments in the Middle East. Plaintiffs'

belief is based upon, among other things:

**a.**   the universal preference by terrorists in the Middle East for USD-denominated payments,
which usually required a U.S.-based correspondent bank when the original transaction
occurred in Iraq;

**b.**   LM Ericsson's and Ericsson AB's historical reliance (as documented in LM Ericsson's
Deferred Prosecution Agreement) on U.S. dollars routed via U.S. banks when making
other corrupt payments to Middle Eastern intermediaries, including consultants and

vendors, in violation of U.S. law, as reported in the press and admitted by LM Ericsson in its Deferred Prosecution Agreement;

c.   LM Ericsson's use of USD as the controlling currency in many (if not most) of its commercial agreements, including with European counterparties;

d.   Ericsson's profile as a multinational enterprise that worked continuously in Iraq since the fall of Saddam, which ordinarily entailed heavy reliance upon U.S. dollars routed through the U.S. financial system given the interlocking nature of the U.S. and Iraqi systems (by design) after Saddam; and

e.   Ericsson's recognition that the U.S. dollar was a better currency both for tactical reasons (the currency of choice for illicit cash transactions worldwide) and financial reasons (as the world's reserve currency).

523.   Confidential Witnesses confirm the centrality of U.S. banks and the U.S. financial system to transactions in Iraq during the post-Saddam era.  According to one Confidential Witness, for example, after the U.S. invasion of Iraq, "U.S. banks were the primary operators in Iraq . . . and the U.S. dollar was the currency that was used for everything."  Based on his/her experience, the same Confidential Witness concluded that, "the U.S. financial system was the only way any Western [multinational] company could move [significant] funds into Iraq without paying an exorbitant transaction fee like 30 percent" or using all cash, which would have been "very risky" because the company could easily get robbed.

524.   On information and belief, payments made by Ericsson AB to various Middle Eastern intermediaries, including consultants and vendors, were wired through correspondent bank accounts in America—likely in New York, New York.  For example, between 2011 and 2013, Ericsson AB made several payments from one of its Middle Eastern branch offices in Dubai to consultants with bank accounts located in the Middle East and Africa region (including in Djibouti and Qatar) for which the funds were wired through correspondent bank accounts in New York. *See* Information, *U.S. v. Telefonaktiebolaget LM Ericsson,* No. 19-CRIM-884

(S.D.N.Y. Dec. 6, 2019), at ¶¶ 42, 59, 61, 63, 105.  On information and belief, some of Ericsson AB's work in Iraq was carried out from that same Dubai branch office.

525.    Ericsson's ability to leverage U.S. markets, relationships, legal protections, technologies, and intellectual property enhanced the potency of the resulting terrorist finance and logistical aid that Defendants provided to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

526.    With respect to Ericsson's cash-based protection money payments, Ericsson's ability to reliably and regularly access U.S. dollar-related bank accounts in the United States was essential to Defendants' ability to consistently make the high-dollar, U.S. dollar-denominated bulk cash protection payments demanded by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Such ability, in turn, amplified the lethality of the resulting terrorist finance that flowed through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because the U.S. dollar was the currency of choice for all such FTOs at all times in Iraq, Afghanistan, and Syria because their ability to transact in U.S. dollars allowed them to, on net, purchase more weapons, pay more fighters, and conduct more operations, owing to the economic advantages presented by the USD over every other currency in Iraq, Afghanistan, Pakistan, Syria, Jordan, Iran, and the Persian Gulf – the jurisdictions that mattered most to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's ability to commit attacks against Americans in Iraq, Afghanistan, and Syria from 2005 through 2022.

527.    With respect to Ericsson's free goods-based protection payments, Ericsson's ability to reliably and regularly purchase brand-name American communications devices, including Apple iPads, iPhones, and similarly iconic American consumer technologies, provided a potent stream of hard-to-trace off-books cash equivalents that Ericsson—on its own, or through its intermediary partners, consultants, and subcontractors—passed along to terrorists as an alternative to cash payoffs on behalf of Ericsson in order to "protect" their business interests in

high-risk markets like Iraq. For example, ever since the late 2000s, iPhones and iPads purchased

from the United States have been the gold standard mobile phone of choice for illicit "free

goods" donations by corporations to a recipient who can harm or hurt their business outlook. The

reason is simple: iPhones and iPads were (and remain) imbued with powerful, iconic brand (and

cash) value because of their association with the United States.[78] As one commentator explained

in 2019, "[a] civil servant friend of mine was still offered a brand-new iPhone as a "gift" in

2016; I've yet to hear of anyone who was bribed with a Huawei."[79]

528.    LM Ericsson also depended upon access to the United States to maximize its

ability to conceal its decades-long protection payment scheme from U.S. counterterrorist

practitioners, because LM Ericsson depended upon U.S. relationships and service providers to

operate Ericsson's entire virtual private network (or "VPN") system at Ericsson's offices in the

Middle East, including Iraq, Qatar, Lebanon, and the United Arab Emirates.  The

communications security afforded by the state-of-the-art, U.S.-sourced VPN enhanced Ericsson's

ability to avoid detection of its unlawful payment schemes by the authorities, including the U.S.

government.

529.    LM Ericsson also depended upon access to America to enable it to continue

making protection payments after Ericsson started doing so.  LM Ericsson also purposefully

---

[78] The foregoing is not a criticism of Apple, the U.S. consumer, or telecoms companies that sell
Apple products.  Ordinarily, criminals who use free iPhones and iPads obtained in the United
States as a cash equivalent alternative to facilitate corrupt payoffs in the Middle East, like
Ericsson, do not openly disclose to their seller their intentions to use the devices purchased in the
U.S. for illicit reasons overseas.  (Instead, they often cheat the sellers in the U.S. by doing things
like breaking the cell phone contracts that the sellers need to earn a profit.) Ericsson, however,
harbored an illicit intent, distinguishing Ericsson to facilitate from manufacturers (like Apple) or consumer
brands (like Best Buy) that did not double as a decades-long global corruption factory, terrorist
financier, and obstructor of U.S. counterterror efforts (like Ericsson).

[79] Yuan Ren, *Opinion: Why My Chinese Dad Switched From an iPhone to a Huawei*, N.Y.
Times (Jan. 5, 2019).

availed itself of the United States by reaching into the U.S. in or about 2013 or 2014 for the specific purpose of retaining a captive American law firm that LM Ericsson could, in turn, wield as a sword and shield, through the imprimatur of United States legal compliance afforded to LM Ericsson by its retention of American lawyers operating out of the nation's capital in Washington, D.C.  LM Ericsson retained Simpson Thacher for this purpose.

530.    LM Ericsson retained Simpson Thacher on or about 2013 or 2014 in order to leverage Simpson Thacher's presence in America as its agent in order to obtain numerous U.S.-only benefits, which enabled LM Ericsson to continue to sponsor Ericsson AB's assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2014 through 2022.  For example, from 2013 or 2014 through 2022, LM Ericsson leveraged its relationship with, and benefits resulting from brand association with, Simpson Thacher, and it instrumentalized Simpson Thacher's services as a form of cover and concealment for Defendants' continuing corruption scheme, including Defendants' associated protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2013 or 2014 through 2022.

531.    LM Ericsson converted its U.S. contacts with Simpson Thacher into continued cover for Defendants' scheme to route protection payments to FTOs.  LM Ericsson's ability to launder Ericson's compliance-related reputation by leveraging Simpson Thacher's involvement as a "reputation launderer" was important to Defendants' continued ability to route assistance to al-Qaeda and Islamic State in Iraq and Afghanistan from 2013 or 2014 through 2022.  For example, LM Ericsson was able to conceal its protection payments for at least eight (8) years while benefiting from the imprimatur of Simpson Thacher's captive-by-design representation of Ericsson.  Thus, LM Ericsson's Simpson Thacher-related contacts with the United States,

including Washington, D.C., helped Defendants continue to flow valuable assistance to the FTOs that killed and injured Plaintiffs from 2013/2014 through 2021.

532.    LM Ericsson extracted its desired-for cover-and-concealment value from its deployment of Simpson Thacher from 2013 or 2014 through 2022 entirely because of LM Ericsson's ability to reach into America—including inside this District—to extract substantial value for LM Ericsson—and for Ericsson AB and, on information and belief, Ericsson Inc., Ekholm, and Ibrahim—by leveraging the firm's American contacts, including those of its individual partners.  LM Ericsson's ability to extract value through its Simpson Thacher-related American contacts benefited from numerous channels of U.S.-located value flowing from the firm to LM Ericsson that included, but were not limited to:

a.      Simpson Thacher's attorneys located and licensed in the U.S., including one or more of the firm's attorneys in this District;

b.      Simpson Thacher's offices in the U.S., including the firm's office in this District;

c.      Simpson Thacher's brand in the U.S., including its reputation with important government, media, and non-profit stakeholders in this District; and

d.      Simpson Thacher's networks in the U.S., including those in this District.

533.    LM Ericsson could not have leveraged Simpson Thacher's eight-year-long reputation washing exercise on Ericsson's behalf into the potent, terrorist-enabling assistance such conduct enabled without the cover provided to LM Ericsson by its ability to represent to its business partners and investors, among others, that Ericsson was represented by a United States law firm with offices in Washington, D.C., from and through which LM Ericsson could—on its own behalf, and on behalf of Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm—continue to manage any of the predictably foreseeable Washington, D.C.-related fallout from LM Ericsson's long-standing, enterprise-wide, corruption scheme, including Ericsson's associated protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

534.    LM Ericsson's conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from at least 2004 through at least 2014, and LM Ericsson's conduct caused millions of U.S. dollars in protection payments to flow to Islamic State from at least 2014 through at least 2019.

### b.    Defendants' Conduct Targeted The United States

535.    At all relevant times, Defendants knew that the Taliban was targeting the United States.  The Taliban did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, the Taliban directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that it could inflict pain in the United States and influence U.S. policy.  As the U.S. Attorney for the Southern District of New York stated, the "Haqqani Network and the Taliban have been and are engaged in highly public acts of terrorism against U.S. interests, including U.S. and coalition forces in Afghanistan."[80]  And the Taliban's ultimate, publicly stated goal was to effect a withdrawal of U.S. forces from Afghanistan.  Each terrorist attack that killed and injured Plaintiffs in Afghanistan was part of that campaign of anti-American terrorism.

536.    Ericsson also made direct payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State knowing that each FTO would use Ericsson's payments to target U.S. citizens in terrorist attacks.  Those payments were no accident.  Ericsson intentionally directed its money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and intentionally aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist campaigns, in exchange for each FTO's agreement to route its attacks away from Ericsson's business interests and toward U.S. forces instead.

---

[80] Press Release, U.S. Dep't of Justice, *Manhattan U.S. Attorney Announces Extradition Of OFAC-Sanctioned Afghan Man For Narco-Terrorism Offenses* (Feb. 6, 2019).

537.     Ericsson's decision to pay protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was also expressly aimed at the United States, because when making those payments, LM Ericsson, Ericsson AB, and Ericsson Inc. knew they were aiding al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks that were designed specifically to influence U.S. policy by killing and injuring American personnel.

E.     **Defendants' Protection Payments To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda And Al-Qaeda-In-Iraq Acts of International Terrorism Against Americans In Iraq, Syria, And Afghanistan**

1.     **Al-Qaeda Relied Upon Protection Money And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, And Afghanistan**

538.     From 2004 through 2014, al-Qaeda's protection rackets in Iraq and Syria provided substantial cash flow to both al-Qaeda's local branches in Iraq and Syria, but also al-Qaeda's "core" leadership in Afghanistan and Pakistan.  Al-Qaeda continuously operated, and profited from, al-Qaeda-in-Iraq's protection rackets until al-Qaeda-in-Iraq split with al-Qaeda in 2014 to become Islamic State. In so doing, al-Qaeda's network, like a multinational enterprise with operations in more than 60 countries, seamlessly moved its protection money profits between branches, like al-Qaeda-in-Iraq, and al-Qaeda core.

539.     For decades, al-Qaeda has relied upon protection money payments and donations as key sources of revenues to finance its terrorist operations. In so doing, al-Qaeda doctrine emphasized taking advantage of the protection money opportunities afforded by environments in which the central state was weak, corruption was endemic, and al-Qaeda had (or could quickly manufacture) a strong presence.

540.     Throughout the 1990s, al-Qaeda funded its operations through two primary income streams: protection rackets and donations.  Al-Qaeda extracted protection payments and

large contributions from businesses in the Persian Gulf, which al-Qaeda used to fund operations that targeted Americans and its allies in the Middle East.

541.    Al-Qaeda's decades-long doctrinal emphasis on fundraising through the collection of protection money – which al-Qaeda sometimes referred to as "taxes," "donations," "fees," or *zakat* – was also a reflection of bin Laden's and al-Qaeda's organizational, obsession with securing regular, predictable, income streams that were less susceptible to interdiction by al-Qaeda's Western enemies.

542.    Al-Qaeda's reliance on protection money as a foundation of its global network intensified after 9/11.  Al-Qaeda recognized, as deceased al-Qaeda financial chief Sa'id al-Masri stated, "without money, jihad stops."  Accordingly, al-Qaeda and its branches generated significant "tax" revenue by exploiting the business communities in Iraq and Syria through sophisticated protection rackets throughout those countries, even extracting payments for the use of public highways.

543.    Al-Qaeda core directly oversaw – and profited from – the protection rackets operated by al-Qaeda branches, including al-Qaeda-in-Iraq by installing at least one trusted al-Qaeda core terrorist into the protection money operation of each al-Qaeda branch.  In Iraq, for example, al-Qaeda core's protection money designee was a personal representative of bin Laden who reported to him directly.

544.    Al-Qaeda's strategy in Iraq and other geographies key to its ability to launch attacks in Iraq (*e.g.*, Syria, Jordan, and Afghanistan) also included wiping out any opposition within the protection rackets from anyone not belonging to an al-Qaeda-affiliated (and al-Qaeda-dues-paying) group so that al-Qaeda (including its branches) could exercise a monopoly on the best protection rackets in Iraq and other al-Qaeda-contested geographies.

a.      **Defendants' Cash-Based Protection Payments To Al-Qaeda
Aided and Abetted Al-Qaeda's Acts of Terrorism**

545.    By 2011, al-Qaeda and its branches had targeted Iraq, Afghanistan, Syria, and

Turkey as the best places to kill Americans, and al-Qaeda and its branches had developed and

fully operationalized industrial-scale protection rackets designed to finance operations by both

al-Qaeda core and its regional allies in all four countries, having built its rackets in Iraq and parts

of Syria by 2004, in Afghanistan by 2005-2006, and in most of the rest of Syria, by 2011.

546.    Al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra also cross-pollinated the funds

they raised from protection rackets in Iraq and Syria because all three FTOs relied upon the same

networks of financiers in Iraq and Syria.

547.    While al-Qaeda's branches in Iraq and Syria were the first al-Qaeda allies after

9/11 to pursue industrial-scale protection rackets to fund attacks, they were not the last.

548.    While al-Qaeda was pursuing its full-scale terrorist campaign in Iraq from 2003

through 2005, al-Qaeda and its allies in Afghanistan, including the Taliban and the Taliban's

Haqqani Network, were carefully studying al-Qaeda's terrorist campaign in Iraq to optimize their

ability to attack and kill Americans in Afghanistan (and Iraq).

549.    Under al-Qaeda's tutelage – and following more than two years of "proof of

concept" in Iraq courtesy of al-Qaeda's Iraqi branch – the Taliban imported al-Qaeda's and al-

Qaeda-in-Iraq's protection money playbook and strategy into Afghanistan, just as the Taliban

imported al-Qaeda-derived attack tactics.  For example, the Taliban (including its Haqqani

Network) imported al-Qaeda's calcium ammonium nitrate fertilizer-based bomb strategy from

al-Qaeda-in-Iraq.

550.    From 2004 through at least 2014, al-Qaeda and al-Qaeda-in-Iraq jointly ran their

sophisticated protection money operation in Iraq and Syria to finance their operations in, among

other places, Iraq, Syria, Afghanistan, and Pakistan.  The proceeds from that protection money operation funded their terrorist attacks against Americans in Afghanistan, Iraq, and Syria, from at least 2004 through at least 2019.

> **b.**   **Defendants' Free Goods-Based Protection Payments, Including High-Tech, U.S.-Origin Cell Phones and Laptops, Aided and Abetted Al-Qaeda's Acts of Terrorism**

551.   Defendants' choice to transfer U.S.-origin cell phones was inextricably connected to the acts of terrorism committed by Al-Qaeda and the Taliban in Afghanistan because the Syndicate could use nearly every feature of Defendants' cell phones as a weapon with which to attack Americans.  Defendants' direct transfer of military-grade, U.S.-origin communications technologies to al-Qaeda as a form of "free goods" protection payments assisted al-Qaeda to devastating effect by causing more frequent, effective, and lethal al-Qaeda and Taliban suicide attacks, IED strikes, and complex attacks. In the hands of al-Qaeda, sophisticated communications technologies were a weapon that targeted the United States and its citizens in Afghanistan and Iraq, and were vital to al-Qaeda's ability to enable attacks against Americans.

552.   In 2010, Eric Schmidt, then Google's Chair and CEO, and Jared Cohen, then the Director of Google Ideas, noted, among other things:

a.   "[F]or all the inspiring stories and moments of hope abetted by the use of connection technologies, the potential of such technologies to be manipulated or used in dangerous ways should not be underestimated. The world's most … violent transnational groups— from al Qaeda … to the … Taliban—are effectively using technology to bring on new recruits, terrify local populations, and threaten democratic institutions. …"

b.   "The same encryption technologies used by dissidents and activists to hide their private communications and personal data from the state are used by would-be terrorists…"

c.   "Afghanistan's telecommunications networks provide a useful case study … Since U.S. and NATO forces first launched military operations there in 2001, cell-phone access in Afghanistan has grown from zero to 30 percent. … At the same time, the Taliban have become increasingly savvy about using mobile technology to malicious and deadly effect. Taliban militants have used cell phones to coordinate attacks, threaten local populations, and hold local businesses hostage …"

<div align="center">189</div>

**d.**     "In February 2009, Taliban inmates in Kabul's Policharki prison used cell phones to orchestrate a number of coordinated attacks on Afghan government ministries.

**e.**     In Afghanistan—and Iraq, too—it is not uncommon for insurgents to use cell phones to detonate roadside bombs remotely."[81]

553.    Defendants' assistance was inextricably intertwined with al-Qaeda violence in Afghanistan for at least five reasons.

554.    **Weapons.**  Defendants' "free goods" payments of free cell phones also armed al-Qaeda because Defendants' free phones were, themselves, weapons when wielded by Syndicate terrorists.  By 2008, while "cell phone[s]" were "[n]othing special in America," cell phones were "having a profound effect in Afghanistan[,]" where "[m]any Afghans now rel[ied] on cell phones, as [did] Taliban militants."[82] As the *Associated Press* reported at the time, "Taliban" "militant fighters rely on mobile phones to communicate and coordinate their operations."[83]

555.    Al-Qaeda and the Taliban also used deployed some of Defendants' "free goods" donations of cell phones as part of their IEDs, using the phones to detonate the bombs that killed Americans in Afghanistan, including on information and belief many Plaintiffs.[84]  By 2005, "[i]t [was] an irony of the digital age that technology ha[d] aided the security forces in detecting and

---

[81] Eric Schmidt and Jared Cohen, *The Digital Disruption: Connectivity and the Diffusion of Power*, Foreign Affairs, Vol. 89, Issue 6 (Nov. 1, 2010), 2010 WLNR 28476557.

[82] NPR Morning Edition, *Cell Phones Connect Afghans to Rest of World* (Feb. 26, 2008), 2008 WLNR 3764701.

[83] Noor Khan, *Taliban Destroy 2 Phone Towers in Southern Afghanistan*, AP DataStream (Mar. 2, 2008).

[84] *See*, *e.g.*, AllAfrica.com English, *Terrorists Drew World's Attention in Madrid* (Apr. 2, 2004) ("Technology has also linked al-Qaeda to the Madrid bombings. Al-Hayat claims that an Islamist source revealed to the newspaper that al-Qaeda trained its fighters in Afghanistan to use mobile phones for setting off explosive devices. The source told al-Hayat that the explosions on the trains were triggered by mobile phones with alarm clocks set to go off at a specific time.").

thwarting terrorist operations … helped terrorists do their evil."[85] "High-tech communication" technologies, including "[c]ell phones," in the hands of an al-Qaeda operative after 9/11, constituted a "weapon at the disposal of" the al-Qaeda "terrorist" because "[c]ell phones" "were a key in" Al-Qaeda's ability to execute "coordinated attack[s]," including "suicide terrorist attack[s]," which attacks were "facilitated by" al-Qaeda's access to "hi-tech communications" technologies, including "[c]ell phones."[86]   Moreover, when the Syndicate's IED campaign intensified in 2009-2010, so did its reliance on cell phones, which remained a key detonator.[87]

556.   **Funding.**   Moreover, when Ericsson Inc. provided free communications technologies to al-Qaeda, Ericsson Inc. provided the terrorists a cash equivalent that sponsored tremendous violence given the going rate of $2,000 per black market cell phone.[88]   Defendants' "free goods" deliveries of U.S.-origin cell phones to al-Qaeda carried outsized value as a "free goods" protection payment to such terrorists because the centrality of cellular phones in Afghanistan ensured their status as one of the single most valuable items any person, including any terrorist, could possess.   As the *Sydney Morning Herald* explained, from 2004 onward,

---

[85] James D. Zirin (Member, Council on Foreign Relations), *Terrorism in the Digital Age*, Wash. Times (Dec. 6, 2005), 2005 WLNR 19631068; United News of Bangladesh, *Bomb at Pakistan Shiite Procession Kills 7* (Nov. 24, 2012) ("Officials say Taliban frequently use cellular phones as remote detonators for bomb attacks.").

[86] *Id.*

[87] *See*, *e.g.*, CNN Newsroom, *Goes Green; Updates on Major Accident on Missouri's I-44 Crash - Part 1*, AP Alert – Environment (Aug. 6, 2010) (CNN reporting that "the Taliban us[ed] IEDs in a deadly campaign of intimidation against Afghan villagers," the Taliban's "IEDs" were "the top killers of American and coalition forces," "often made of cheap materials like fertilizer" and "detonated by" "something as simple as a cell phone").

[88] The going rate for a "clean" American cell phone on the black market is a 10-fold markup. The phones that get busted out into this market are ordinarily priced at around $200 per phone (because the annual contract heavily subsidizes the device itself).  Thus, when black market sellers flip an ordinary American cell phone, they can expect to earn about $2,000 per black market cell phone.

"[c]ommunications [were] vastly better" in Afghanistan and, as a result, "Afghans who [could] afford a mobile phone *clutch[ed] them like talismans*; even the Taliban spokesman avail[ed] himself of the best technology: a satellite phone with an automatic message bank that respond[ed] in 10 languages."[89]

557.    Defendants' "free goods" deliveries of U.S. origin communications technologies to al-Qaeda also aided the terrorists' fundraising campaigns because it gave the Syndicate the technical tools they required to send communications to others requesting (or demanding) payments, including, but not limited to, sending text messages to Afghans soliciting *zakat* contributions and sending messages to companies, including Defendants, soliciting protection payments or, if such terms were already agreed upon, reminding that a payment was due.[90]

558.    Defendants' "free goods" payments of U.S.-origin communications technologies, including cell phones, to al-Qaeda also allowed al-Qaeda to maintain its cell phone stockpile without spending as many precious U.S. Dollars to do so, providing the FTO a substantial logistical and financial windfall.  In 2006 the *Independent* reported on the common experience,

---

[89] Paul McGeough, *In the Shadow of the Guns*, Sydney Morning Herald (Aug. 27, 2005), 2005 WLNR 28183961.

[90] *See*, *e.g.*, Rachel Ehrenfeld and John Wood, *Funding Terror; New Technology Terrorists Can Use*, Wash. Times (Mar. 15, 2007) ("We are on the cusp of a new era of terror financing, that of mobile payments or 'm-payments.' … Are Hamas, al Qaeda, Hezbollah and their likes far behind? Soon, every mobile-phone owner will be able to send money, pay bills and make purchases anywhere, anytime. … Without the implementation of a real-time digital anti-money-laundering compliance framework, the m-payment system is well suited to become the 'killer application' for money laundering and terror financing. All you need is a stored value card and m-payments enabled mobile phone and carrier …[for] members of Hamas and Hezbollah in the United States to send money back to the Middle East, or to each other all over the world … [including in areas like] Dubai[,] … a well-known conduit for al Qaeda, Hamas and Hezbollah funding."), 2007 WLNR 4912741.

reflected by the example of an Afghan's experience in the Taliban's stronghold of Kandahar, that "the Taliban in his district [had] little money but they ha[d] mobile phones."[91]

559.  **Communications.**  Al-Qaeda depended upon a vast stockpile of cell phones in order to conduct its global terrorist enterprise in Afghanistan, Pakistan, the U.A.E., Iran, and the other key geographies worldwide from which al-Qaeda facilitated terrorist attacks against Americans in Afghanistan and Iraq.  When Defendants provided "free" U.S.-origin cell phones to al-Qaeda, they furnished a key supply of untraceable phones to the terrorists that aided their communications, attack planning, attack operations, logistics, propaganda, smuggling, and travels – every facet of the terrorists' enterprise targeting Americans in Afghanistan and Iraq.

560.  Al-Qaeda alone, for example, required tens of thousands of untraceable mobile phones each year for the thousands of operatives it deployed in Afghanistan and Pakistan in support of the attacks.  For example, in 2002, media accounts noted that "[t]housands of al Qaeda members hiding in Pakistan use[d] cell phones,"[92] while, "[i]n Afghanistan, al Qaida were using top-of-the-range cellular phones,"[93] both of which trends always endured.

561.  Defendants' transfer of U.S.-origin communications technologies to al-Qaeda also directly facilitated communications between forward deployed al-Qaeda and Taliban, including Haqqani Network, terrorists in Afghanistan and their leadership in Pakistan, which accelerated the pace of the Syndicate's attack planning and logistics-related communications, causing more al-Qaeda and Taliban attacks against Americans in Afghanistan.  Defendants' free

---

[91] Nelofer Pazira, *Taliban's Terror Tactics Reconquer Afghanistan*, Independent on Sunday (UK) (August 20, 2006), 2006 WLNR 17604097.

[92] Ralph Joseph, *Chemical Labs Show Al Qaeda Still Active*, Wash. Times (Oct. 6, 2002), 2002 WLNR 383410.

[93] Phil Hazlewood and Tom Whitehead, *Role of Aircraft Patrolling Skies*, PA News (Feb. 13, 2003).

cell phones were vital because, given the nature of communications between Afghanistan and Pakistan, "telecommunication" technologies were "[t]he only way" that "Taliban commanders" at "Taliban headquarters in Pakistan" could communicate with "Taliban" "field commanders in Afghanistan and outside actors in" other countries,[94] *e.g.*, al-Qaeda.

562.   **Tradecraft.**  Defendants' technology-based free goods bribes were also easier to conceal given how Defendants leveraged black markets to cover their tracks.  On information and belief, Ericsson Inc. supplied free U.S. origin communications technologies to al-Qaeda because Ericsson Inc. understood that al-Qaeda and its allies, like other terrorist groups, long emphasized exploiting black markets to derive untraceable terrorist cash flow, which Ericsson Inc. leveraged to further conceal Defendants' assistance.

563.   **Logistics.**  Defendants' "free goods" deliveries of U.S.-origin communications technologies, including cell phones, also provided direct logistical support to al-Qaeda by furnishing untraceable, valuable, cell phones, which the Syndicate could use to communicate with one another to securely coordinate smuggling, transportation, attack plans, and the like.

> **2.**   **Defendants' Value Flow To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda's And Al-Qaeda-In-Iraq's Attacks Against Americans In Iraq, Syria, And Afghanistan From At Least 2005 Through At Least 2017**

564.   From 2004 through 2014, al-Qaeda's protection rackets in Iraq and Syria provided substantial cash flow to both al-Qaeda's local branches in Iraq and Syria and to al-Qaeda's "core" leadership in Afghanistan and Pakistan.  Al-Qaeda core continuously operated, and profited from, al-Qaeda-in-Iraq's protection rackets until al-Qaeda-in-Iraq split with al-Qaeda in 2014 to become Islamic State. In so doing, al-Qaeda's network, like a multinational enterprise

---

[94] Stewart Bell, *Canada Listening In On Taliban Exchanges*, National Post (May 1, 2007), 2007 WLNR 28591271.

with operations in more than 60 countries, seamlessly moved its protection money profits between branches, like al-Qaeda-in-Iraq, and al-Qaeda core.

565. Al-Qaeda and al-Qaeda-in-Iraq viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign with the singular purpose of expelling the United States from the entire region to facilitate an al-Qaeda-led caliphate there.

566. Osama bin Laden repeatedly called for al-Qaeda supporters from around the world, including Iraq, to facilitate al-Qaeda's attacks against Americans in Iraq and Afghanistan through public statements between 2001 through 2011.

567. Under al-Qaeda's organizational structure, a substantial portion of the value that flowed to al-Qaeda-in-Iraq while it operated as an al-Qaeda branch from October 2004 through February 2014 flowed through to al-Qaeda's "core" in Afghanistan and Pakistan. This occurred because al-Qaeda and al-Qaeda-in-Iraq conducted an integrated campaign against the United States in Iraq and Afghanistan, through which al-Qaeda-in-Iraq flowed funds, fighters, training and expertise, and logistical aid to al-Qaeda in Afghanistan and Pakistan, facilitating al-Qaeda's and its Syndicate allies' attacks against Americans in Afghanistan from at least 2006 through at least 2017.

568. The U.S. government agreed. For example, in June and July 2006, the U.S. government publicly emphasized the intimate relationship between al-Qaeda core in Afghanistan/Pakistan and al-Qaeda-in-Iraq in public statements or publications:

a. U.S. officials published an authenticated bin Laden audiotape in which bin Laden called for holy war in Iraq and stated that al-Qaeda's "banner of jihad ha[d] not fallen" and al-Qaeda vowed to "keep up [al-Qaeda's and its branches'] fight to bleed [the United States'] money dry, kill [America's] men so that ([U.S.] forces) go home defeated" and al-Qaeda and its branches would "continue [their] fight against [America and Americans] everywhere, in Iraq, in Afghanistan, in Somalia and in Sudan";

b. U.S. officials publicly stated that bin Laden had publicly mourned Zarqawi and urged his and Zarqawi's supporters to continue to attack Americans in Iraq;

195

c.    U.S. officials publicly stated that bin Laden's public statements reflected "a recognition on [bin Laden's] part how important Al-Qaeda in Iraq [was] in pursuing Al-Qaeda's central strategy"; and

d.    U.S. officials publicly stated that "Ayyub al-Masri [was] an Egyptian national and a senior Al-Qaeda leader in Iraq" who was '[t]rained in Afghanistan and Pakistan," and served as "an explosives expert specializing in the construction of Vehicle-Borne [IEDs], the same bombs responsible for large numbers of US troop casualties."

a.    **Funds Raised In Iraq And Syria By Al-Qaeda And Al-Qaeda-In-Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan**

569.    From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq relied upon the same parent/subsidiary-inspired, al-Qaeda-designed, al-Qaeda-in-Iraq-executed protection rackets to optimize al-Qaeda's global terrorist capabilities by ensuring that al-Qaeda core leveraged al-Qaeda-in-Iraq's network through al-Qaeda core's receipt of a percentage of all income from al-Qaeda-in-Iraq's protection money racket, all of which was in accordance with the al-Qaeda core protection money playbook used by bin Laden and his lieutenants.

570.    Al-Qaeda directly and substantially participated in al-Qaeda-in-Iraq's protection rackets through al-Qaeda's personnel and practice.  Al-Qaeda installed al-Qaeda "core" lieutenants into the al-Qaeda-in-Iraq's protection money bureaucracy inside Iraq to ensure that al-Qaeda core received its proper share.  Al-Qaeda core also ensured that al-Qaeda-in-Iraq also operated purpose-built bureaucracies designed to route a percentage of all al-Qaeda-in-Iraq back to al-Qaeda "core" in Afghanistan and Pakistan to facilitate al-Qaeda's global jihad against Americans.  Among other things, al-Qaeda-in-Iraq maintained an internal account known as the "General Treasury," which al-Qaeda-in-Iraq used to flow a percentage of all its Iraq-based income back to al-Qaeda "core" in Afghanistan and Pakistan.

571.    Senior al-Qaeda core terrorists documented their need for funds from al-Qaeda-in-Iraq in order to conduct attacks against Americans in Afghanistan.  In July 2005, for example,

Zawahiri instructed Zarqawi to transmit $100,000 to al-Qaeda in Afghanistan.  Similarly, in May

2007, Shaykh Mustafa Abu al-Yazid, a senior al-Qaeda leader in Afghanistan, highlighted al-

Qaeda core's desperate need for funds from al-Qaeda's Iraqi branch:

> As for the needs of the Jihad in Afghanistan, the first of them is financial. The
> Mujahideen of the Taliban … lack funds. And there are hundreds wishing to carry
> out martyrdom-seeking operations, but they can't find the funds to equip
> themselves. So funding is the mainstay of Jihad. They also need personnel from
> their Arab brothers and their brothers from other countries in all spheres: military,
> scientific, informational and otherwise.... And here we would like to point out that
> those who perform Jihad with their wealth should be certain to only send the
> funds to those responsible for finances and no other party, as to do otherwise
> leads to disunity and differences in the ranks of the Mujahideen.

572.    While al-Qaeda and its branches' names evolved over time, this core relationship

between protection money and two-way positive cash flow for al-Qaeda and its allies in Iraq,

Syria, Afghanistan, and Pakistan remained constant at all relevant times.[95]

573.    Al-Qaeda-in-Iraq directly funded al-Qaeda "core" from 2004 through 2014

through at least four channels, usually through U.S. dollar-denominated payments.  *First*, al-

Qaeda-in-Iraq made large U.S. dollar-denominated cash payments to al-Qaeda core upon the

latter's request, which were smuggled by al-Qaeda and/or al-Qaeda-in-Iraq operatives from Iraq,

Syria, and the Persian Gulf (where they raised money) to al-Qaeda core in Afghanistan and

Pakistan. *Second*, al-Qaeda-in-Iraq paid al-Qaeda core a percentage of its net income (or "excess

funding") befitting its status as a branch of al-Qaeda. *Third*, al-Qaeda-in-Iraq provided vital

logistical aid that enabled al-Qaeda core's other money-making rackets to generate more cash

flow.  For example, al-Qaeda-in-Iraq helped al-Qaeda core move narcotics through Iraq and into

the Middle East for distribution, which generated cash flow for al-Qaeda core and its ally, the

---

[95] Even after al-Qaeda and ISIS split in 2014, the same protection rackets continued to fund the
global operations of both FTOs and their respective regional affiliates worldwide.

Taliban, in Afghanistan and Pakistan. *Fourth*, al-Qaeda-in-Iraq's successful attacks also directly strengthened al-Qaeda core's ability to raise funds and sign new recruits (who ordinarily contributed to both al-Qaeda and al-Qaeda-in-Iraq) in order to facilitate attacks against Americans in Afghanistan by materially strengthening al-Qaeda's ability to successfully present bin Laden's strategic narrative to the broader pool of global terrorist-curious followers and potential financiers whom were choosing between al-Qaeda and another organization by giving al-Qaeda the ability to present itself as both the senior leader of the global jihadist cause and the terrorist organization with the greatest capabilities and track record of killing Americans after 9/11, which helped it raise more money.

574.     Between 2004 and 2014, Al-Qaeda-in-Iraq collectively routed more than one million U.S. dollars per year, in cash, goods, labor, and other value, to al-Qaeda core in Afghanistan and Pakistan. Al-Qaeda core used that cash to facilitate attacks against Americans in Afghanistan from at least 2006 through at least 2017.

> **b.     Al-Qaeda Redeployed Al-Qaeda-In-Iraq Terrorists To Afghanistan And Pakistan To Facilitate Al-Qaeda's Attacks Against Americans In Afghanistan**

575.     Zarqawi himself recognized that Iraq was but one front in al-Qaeda's larger transnational campaign against the United States. As Zarqawi promised (in writing), if al-Qaeda failed in Iraq, al-Qaeda's al-Qaeda-in-Iraq operatives would, as Zarqawi put it, "pack out [their] bags and search for another land, as is the sad, recurrent story in the arenas of jihad."

576.     From the 1990s through 2021, the mountainous areas in the Afghanistan/Pakistan border were always the world's most iconic safe haven for al-Qaeda and its members.

577.     Consistent with this ethos, al-Qaeda regularly redeployed al-Qaeda-in-Iraq terrorists to Afghanistan and Pakistan in order to facilitate al-Qaeda's attacks against Americans in Afghanistan and Pakistan (where the al-Qaeda-in-Iraq terrorists were folded into pre-existing

joint al-Qaeda/Taliban cells) and Iraq (through the relationships that al-Qaeda-in-Iraq terrorists developed while deployed in Afghanistan and Pakistan).

578.    In so doing, al-Qaeda core and al-Qaeda-in-Iraq were simply following the time-honored al-Qaeda playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed, or cross-pollinated, with al-Qaeda terrorists in other theaters. Al-Qaeda did this time and again from the 1990s through 2021, including with respect to the movement of its terrorists into, and out of, Afghanistan, Somalia, Sudan, Bosnia, Chechnya, Iraq, and Syria.

579.    Al-Qaeda's use of al-Qaeda-in-Iraq terrorists in Afghanistan and Pakistan began under Zarqawi, who deployed elite al-Qaeda-in-Iraq terrorist operatives to Afghanistan to demonstrate his (and al-Qaeda-in-Iraq's) subordinate status and as tribute to bin Laden. This approach was consistent with Zarqawi's, and bin Laden's desire for al-Qaeda-in-Iraq to support terrorist operations by al-Qaeda's other branches worldwide.

580.    Al-Qaeda's use of al-Qaeda-in-Iraq terrorists in Afghanistan and Pakistan intensified dramatically from 2006 through 2010, when a substantial portion of al-Qaeda-in-Iraq's terrorists in Iraq, including hundreds of fighters in the leadership and senior ranks, fled Iraq for al-Qaeda's historic mountainous safe havens in Afghanistan and Pakistan.  Al-Qaeda-in-Iraq terrorists continued redeploying from Iraq to Afghanistan until at least 2014.

581.    Al-Qaeda's strategy of having al-Qaeda-in-Iraq terrorists melt back to Afghanistan and Pakistan to augment the joint al-Qaeda/Taliban cells there from 2006 through 2014 reflected al-Qaeda's view, shared amongst jihadists around the world at the time, that Afghanistan offered strong prospects of victory over the Americans.

582.    Al-Qaeda facilitated these redeployments, which were like prior al-Qaeda redeployments out of parts of Afghanistan in the months following 9/11.  Most non-Iraqi or non-

Syrian Arabs who joined al-Qaeda-in-Iraq and later departed Iraq or Syria joined al-Qaeda in Afghanistan and Pakistan, where such terrorists often had pre-existing relationships through their training, travel, finance, or indoctrination; most of the Iraqi and Syrian members of al-Qaeda-in-Iraq melted away to Syria, where they benefited from centuries-old tribal and smuggling networks. Indeed, it was not uncommon for an al-Qaeda-in-Iraq terrorist to retreat first to Syria (from Iraq) and then to Afghanistan or Pakistan (from Syria).

583.    Al-Qaeda-in-Iraq terrorists whom al-Qaeda redeployed to Afghanistan and Pakistan were amongst the most elite of al-Qaeda's operatives worldwide, having survived the Darwinian process in Iraq in which U.S. forces eliminated the less capable operatives. As a result, these al-Qaeda-in-Iraq terrorists greatly augmented the capabilities and experience of the joint al-Qaeda/Taliban cells they served in Afghanistan and Pakistan, including the effectiveness of al-Qaeda's suicide bomb, IED, and complex attacks.

584.    Given their extraordinary capabilities, al-Qaeda strategically marbled its al-Qaeda-in-Iraq operatives throughout al-Qaeda's organization in Afghanistan and Pakistan, with a particular emphasis on reinforcing the existing al-Qaeda strongholds in Nangarhar, Nuristan, Kunar, and Laghman Provinces (N2KL, al-Qaeda's historic headquarters in Afghanistan), Ghazni Province (where al-Qaeda terrorist Ahemed Jan Wazir led a joint al-Qaeda/Taliban cell that attacked Americans in Ghazni while also functioning as part of the Kabul Attack Network), and the Haqqani-controlled territories in Afghanistan and Pakistan (where a new generation of al-Qaeda terrorists, like Sirajuddin Haqqani, led al-Qaeda's campaign in Afghanistan and Pakistan after 9/11, including its attacks targeting Americans in Kabul).

585.    Al-Qaeda-in-Iraq collectively routed at least hundreds of terrorists to al-Qaeda core in Afghanistan and Pakistan each year from 2004 through 2014, whom al-Qaeda core used to facilitate attacks against Americans in Afghanistan from 2004 through at least 2017.

> **c.    Al-Qaeda Facilitated Al-Qaeda-In-Iraq's Provision Of Key Training And Expertise To Terrorists Targeting Americans In Afghanistan**

586.    Al-Qaeda organized al-Qaeda-in-Iraq so that the latter could provide training and expertise to the former – and its allies.  Al-Qaeda and al-Qaeda-in-Iraq, along with most Islamists, viewed Iraq as the central front against America from 2003 through at least 2007. Al-Qaeda and al-Qaeda-in-Iraq worked to make the insurgency in Iraq what Afghanistan was to the earlier generation of jihadists — a melting pot for jihadists from around the world, a training ground, and an indoctrination center.  In so doing, al-Qaeda and al-Qaeda-in-Iraq ensured that a substantial number of fighters who had traveled to Iraq could return to their home countries, with new skills and experience to augment the existing extremist networks in the communities to which they returned.

587.    Al-Qaeda-in-Iraq terrorists publicly confirmed their status as teachers of terror to allied Islamists around the world.  For example, in 2007, senior al-Qaeda-in-Iraq terrorist Abu Omar al-Baghdadi publicly boasted, "one of the (enemy) devils was right in saying that if Afghanistan was a school of terror, then Iraq is a university of terrorism. … The fear of the American [M]arines has disappeared from the hearts of the people of the world, as the mujahideen have become thousands from the few … after the fall of the infidel Baath regime."

588.    Al-Qaeda's use of al-Qaeda-in-Iraq trainers provided another key mechanism through which al-Qaeda facilitated attacks against Americans in Afghanistan.  Before 9/11, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request.  By 2005, al-Qaeda began bringing AQI instructors from Iraq to train the Taliban how to fight Americans.

589.    Al-Qaeda depended upon al-Qaeda-in-Iraq for Iraq-experienced operatives, who furnished training and expertise to al-Qaeda core and al-Qaeda's allies in Afghanistan, including the Taliban and its Haqqani Network.  This allowed al-Qaeda-in-Iraq to export tactical innovations developed in Iraq to al-Qaeda's terrorists and their partners operating in Afghanistan and Pakistan. As Mullah Dadullah, a key Taliban commander, publicly stated in 2006, "we have 'give and take' relations with the mujahidin in Iraq."

590.    Such cross-pollination benefits extended to the Haqqani Network as well.  For example, al-Qaeda leveraged al-Qaeda-in-Iraq trainers to teach the Haqqanis how to conduct suicide bomb attacks against Americans based upon innovations and lessons learned from Iraq.

591.    The training continued throughout the relevant timeframe of this case.  In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly hosted by the Taliban.  One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

592.    Al-Qaeda also facilitated relationships between al-Qaeda-in-Iraq and al-Qaeda and Taliban (including Haqqani Network) terrorists based in Afghanistan and Pakistan, through which such groups' Afghanistan and Pakistan-based terrorists traveled to Iraq and embedded with al-Qaeda-in-Iraq to attack Americans as part of what al-Qaeda euphemistically termed "live fire training exercises," before returning to Afghanistan and Pakistan with their new skills. Through these al-Qaeda-facilitated, al-Qaeda-in-Iraq-furnished, "live-fire training exercises" in Iraq, al-Qaeda and the Taliban, including its Haqqani Network, enhanced the lethality of their suicide bomb, IED, and complex attacks against Americans in Afghanistan.

593.    Al-Qaeda's use of al-Qaeda/al-Qaeda-in-Iraq polyterrorist trainers revolutionized al-Qaeda's use of suicide bombings, IEDs, and complex attacks in Afghanistan, and directly

enhanced the lethality of the joint al-Qaeda/Taliban cells that committed the attacks that killed and injured Plaintiffs in Afghanistan from at least 2006 through at least 2017.  Through its al-Qaeda-in-Iraq trainers, al-Qaeda was able to train more terrorists, build more bombs, plan more attacks, and execute more operations during that period.

594.    Al-Qaeda-in-Iraq's training of al-Qaeda's and the Taliban's Afghanistan and Pakistan operatives occurred in a range of training camps around the world including, but not limited to, camps in Afghanistan, Pakistan, Iraq, Iran, Syria, and Somalia.

595.    Al-Qaeda-in-Iraq trainers provided al-Qaeda terrorists and their allies in Afghanistan and Pakistan with lessons learned from Iraq that offered cross-cutting efficiencies for al-Qaeda's terrorist enterprise in Afghanistan and Pakistan.  For example, al-Qaeda-in-Iraq terrorists helped al-Qaeda import sophisticated bomb triggers, design concepts, and proven strategies to defeat American countermeasures, all of which enhanced al-Qaeda's and its partners' IED and suicide bomb attacks against Americans in Afghanistan.

### d.    Al-Qaeda-In-Iraq Provided Logistical Aid To Al-Qaeda Core

596.    Al-Qaeda doctrine emphasized leveraging the logistical strengths of al-Qaeda's branches to facilitate operations by al-Qaeda core. Al-Qaeda and al-Qaeda-in-Iraq recognized that al-Qaeda's operations against the United States in Iraq, Syria, Afghanistan, and Pakistan were part of a single al-Qaeda campaign that was linked by common financial, human recourses, travel, and communications needs.

597.    As a legacy of the extensive network that Zarqawi and his lieutenants built from the late 1990s through 2006, al-Qaeda-in-Iraq at all times until 2014 operated extensive and sophisticated logistics networks inside Iraq, which were supported by al-Qaeda-in-Iraq's extensive logistics network throughout the Middle East, North Africa, and Europe, including, but not limited to, Iran, Afghanistan, and Pakistan. Within Iraq, al-Qaeda-in-Iraq had dedicated

logistics officers for each province, who coordinated with al-Qaeda-in-Iraq's Finance Council to ensure that money, terrorists, and material flowed where necessary to maximize the lethality of al-Qaeda-in-Iraq's campaign against the United States in the Middle East.

598.    Al-Qaeda leveraged al-Qaeda-in-Iraq's extensive global logistics networks to fund, arm, equip, and manage al-Qaeda's terrorist campaign in Afghanistan and Pakistan.

599.    Al-Qaeda's strategy of leveraging the logistics networks of its branches, like al-Qaeda-in-Iraq, was one of the core mechanisms through which al-Qaeda facilitated al-Qaeda core's own operations in Afghanistan and Pakistan.

600.    Through al-Qaeda-in-Iraq's global logistics network, al-Qaeda raised funds, recruited new terrorists, and facilitated transactions on the Taliban's behalf, all of which facilitated attacks against Americans in Afghanistan by joint al-Qaeda/Taliban cells there.

**F.    Defendants' Protection Payments To Islamic State Aided And Abetted Islamic State Acts of International Terrorism Against Americans In Iraq, Syria, Turkey, And Afghanistan**

**1.    Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, Turkey, And Afghanistan**

601.    Islamic State also modeled al-Qaeda's and al-Qaeda-in-Iraq's doctrinal emphasis on the use of protection rackets and donations as two cornerstones of its terrorist finance strategy. In so doing, Islamic State adopted the same tactics, techniques and procedures as practiced by al-Qaeda and al-Qaeda-in-Iraq.

602.    From 2014 through 2021, Islamic State relied upon sophisticated protection rackets in Iraq and Syria to finance Islamic State's operations in Iraq and Syria, as well as Islamic State's operations through key Islamic State branches, including its branch in Afghanistan.

2.      **Defendants' Value Flow To Islamic State Aided And Abetted Islamic State's Attacks Against Americans In Iraq, Syria, Turkey, And Afghanistan From 2014 Through 2022**

603.     Islamic State viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate Islamic State's caliphate there.

604.     Abu Bakr al-Baghdadi, the leader of Islamic State until his death in 2019, repeatedly called for Islamic State supporters worldwide to facilitate Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, and Turkey through his public statements from 2014 through 2019.

605.     Having himself taken refuge with Zarqawi's former allies in the Datta Khel region of North Waziristan, Pakistan between 2012 and 2013, Baghdadi's history confirms the interconnections between Islamic State's activities in Iraq/Syria and Afghanistan/Pakistan.

606.     Under Islamic State's organizational structure, copycatted from al-Qaeda, a substantial portion of the value that flowed to Islamic State in Iraq and Syria from 2014 thought at least 2022 flowed through Islamic State's "core" there and benefited Islamic State's "Khorasan" branch in Afghanistan and Pakistan.  This occurred because Islamic State conducted an integrated campaign against the United States in Iraq, Syria, Afghanistan, and Pakistan through which Islamic State's "core" in Iraq and Syria flowed funds, fighters, training and expertise, and logistical aid to Islamic State's branch in Afghanistan and Pakistan, facilitating Islamic State's attacks against Americans in Afghanistan from 2014 through 2021, including the August 2021 suicide bomber attack at Kabul International Airport, which killed 13 Americans, including Lance Corporal Jared M. Schmitz and Sergeant Nicole Gee, whose family are among the Plaintiffs.

a.   **Islamic State Funds Raised In Iraq And Syria Funded Islamic State Attacks In Iraq, Syria, And Afghanistan**

607.    Islamic State generally copied or absorbed al-Qaeda's and al-Qaeda-in-Iraq's approach to sharing funds between geographies, as well as al-Qaeda's and al-Qaeda-in-Iraq's universal preference for U.S. dollars.

608.    From 2014 through 2021, Islamic State's fundraising activities in Iraq and Syria directly funded Islamic State's branch in Afghanistan and followed at least five practices that were clearly inspired by al-Qaeda.

609.    *First*, from 2014 through 2017, Islamic State's "core" in Iraq and Syria provided the essential "start-up capital" that Islamic State's branch in Afghanistan and Pakistan relied on to establish itself.

610.    *Second*, Islamic State's "core" in Iraq and Syria made regular cash payments to Islamic State's branch in Afghanistan and Pakistan for the specific purpose of facilitating the latter's attacks against Americans.

611.    *Third*, Islamic State's "core" in Iraq and Syria provided key logistical aid that enabled Islamic State's branch in Afghanistan and Pakistan to derive more cash from Islamic State's money-making rackets in South Asia.  For example, Islamic State's "core" helped Islamic State's branch in Afghanistan and Pakistan move fundraisers through the key Middle Eastern geographies in which Islamic State solicited donations.

612.    *Fourth*, Islamic State's successful attacks in Iraq also directly strengthened the ability of Islamic State's branch in Afghanistan and Pakistan ability to raise funds and sign new recruits (who ordinarily financially contributed to Islamic State) in order to facilitate attacks against Americans in Afghanistan. Successful attacks in Iraq materially strengthened Islamic State's sales pitch to the broader pool of global terrorist-curious followers and potential

financiers whom were choosing between Islamic State and another organization (like al-Qaeda) by giving Islamic State the ability to present Baghdadi's strategic narrative in which Islamic State was both the senior leader of the global jihadist cause, and also the group with the greatest capabilities and track record of success killing Americans after 9/11.

613.    *Fifth*, Islamic State's "core" in Iraq and Syria stockpiled its cash haul from Iraqi and Syrian protection rackets throughout Iraq from 2014 through 2017 in anticipation of a global insurgency thereafter.  Such cash stockpiles totaled hundreds of millions of U.S. dollars and continued to facilitate attacks by Islamic State and its branches thought at least 2022.

614.    From 2014 through 2021, Islamic State's "core" in Iraq and Syria collectively routed millions of U.S. dollars' worth of cash, goods, and other value to Islamic State's branch in Afghanistan and Pakistan, including at least several hundred thousand U.S. dollars per year derived from its protection rackets in Iraq, which Islamic State used to facilitate attacks against Americans in Afghanistan during that same period.

> **b.    Islamic State Redeployed Its Iraq And Syria Based Terrorists To Afghanistan And Pakistan To Establish And Lead Islamic State's Branch There**

615.    Islamic State continued al-Qaeda's and al-Qaeda-in-Iraq's practice of redeploying terrorists from Iraq and Syria to Afghanistan and Pakistan in order to facilitate terrorist attacks against Americans in Afghanistan and Pakistan (where the arriving Islamic State terrorists were folded into pre-existing Islamic State cells in the border region) and Iraq and Syria (by leveraging the relationships that Islamic State terrorists developed while in Afghanistan and Pakistan).

616.    In so doing, Islamic State followed al-Qaeda's time-honored playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed to, or cross-pollinated with,

terrorists in other theaters. Al-Qaeda and al-Qaeda-in-Iraq, from whose ranks Islamic State initially drew its fighters, routinely did the same from the 1990s thought at least 2022.

617.    Islamic State's strategy of having Islamic State "core" terrorists in Iraq and Syria melt back into Afghanistan and Pakistan to augment the Islamic State branch there from 2014 thought at least 2022 followed the al-Qaeda playbook and reflected Islamic State's view, shared amongst jihadists around the world at the time, that its loss of a caliphate in Iraq and Syria was merely a setback, and Afghanistan offered the strongest prospect of victory over the Americans.

618.    Islamic State "core" terrorists from Iraq and Syria whom Islamic State redeployed to its branch in Afghanistan and Pakistan were among the most elite of Islamic State's operatives worldwide, having survived the Darwinian process in Iraq in which U.S. forces eliminated the less capable operatives. As a result, these experienced Islamic State terrorists greatly augmented the capabilities of Islamic State cells they served in Afghanistan and Pakistan, including the effectiveness of Islamic State's suicide bomb attacks.

619.    Islamic State's use of Islamic State "core" terrorists in Iraq and Syria to facilitate the operations of Islamic State's branch in Afghanistan and Pakistan began with the formation of the Afghanistan/Pakistan branch, which was accomplished by the flow of at least hundreds of hardened Islamic State veterans from Iraq in 2014 and 2015 and the continued flow of such Islamic State "core" terrorists thought at least 2022.

620.    On December 27, 2016, Russia, China, and Pakistan publicly warned that Islamic State activity in Iraq and Syria was generating a new Islamic State threat in Afghanistan and Pakistan.  Their warnings were validated only weeks later when Islamic State executed a massive suicide bomb attack in Kabul, Afghanistan on February 7, 2017, followed by another spectacular attack in Pakistan on February 16, 2016, and then a third in Kabul on March 8, 2017.

621.     On February 4, 2018, a senior U.S. official publicly stated that Islamic State terrorists in Iraq were "going underground" and "dispersing to other safe havens."  Afghanistan was a top safe haven for Islamic State, as it had recently secured a significant expanse of geography, including the infamous Islamist terrorist safe haven of Tora Bora.

622.     On March 7, 2019, General Joseph Votel, commander of CENTCOM, testified before Congress, warning that Islamic State was laying in wait in anticipation of its resurgence, and explaining that Islamic State made a "calculated decision to preserve the safety of their families and preservation of their capabilities by" (among other things) "going to ground in remote areas and waiting for the right time to resurge."  Afghanistan was one such area.

623.     Collectively, Islamic State routed more than 1,000 terrorists from Iraq to its branch in Afghanistan and Pakistan, including at least hundreds of terrorists from Islamic State's "core" in Iraq and Syria each year from 2014 through 2021, whom Islamic State's branch in Afghanistan and Pakistan used to facilitate attacks against Americans in Afghanistan from at least 2017 through at least 2021.

c.     **Islamic State's Terrorists in Iraq And Syria Provided Key Training And Expertise to Islamic State's Terrorists In Afghanistan And Pakistan Targeting Americans in Afghanistan**

624.     Islamic State, along with most Islamist terrorists globally, viewed Iraq as one of the central fronts against America from 2014 through at least 2022.

625.     Given Iraq's status both with respect to Islamic State's "caliphate" (from 2014-2017) and its terrorist campaign against the United States (at all times), Islamic State organized the relationships between its "core" in Iraq and Syria and its key branch in Afghanistan/Pakistan so that the former could provide training and expertise to the latter.

626.    Islamic State depended upon Islamic State's "core" in Iraq and Syria for Iraq- and Syria-experienced operatives, who furnished training and expertise to Islamic State's branch in Afghanistan.  Just as al-Qaeda leveraged al-Qaeda-in-Iraq to enhance the lethality of al-Qaeda's bombing campaign in Afghanistan, Islamic State's relationship between its "core" and its Afghanistan/Pakistan branch permitted the former the ability to export suicide bombing-related innovations developed in Iraq to the latter's operatives in Afghanistan and Pakistan.

627.    Islamic State core's provision of key training to Islamic State's branch in Afghanistan and Pakistan occurred in a range of training camps around the world including, but not limited to, camps in Afghanistan, Pakistan, Iraq, and Syria.

### d.    Islamic State Terrorists In Iraq Provided Key Logistical Aid To Islamic State's Branch In Afghanistan And Pakistan

628.    Islamic State recognized that Islamic State's operations against the United States in Iraq, Syria, Turkey, Afghanistan, and Pakistan were part of a single Islamic State campaign that was linked by common financial, human resources, travel, and communications needs.

629.    Islamic State's branch in Afghanistan and Pakistan leveraged Islamic State core's extensive global logistics networks to fund, arm, equip, and manage Islamic State's terrorist campaign in Afghanistan and Pakistan.

630.    Like al-Qaeda, Islamic State's strategy of leveraging the logistics networks of its branches was one of the core mechanisms through which Islamic State "core" facilitated its Afghanistan/Pakistan branch's attacks against Americans from 2014 through at least 2022.

631.    Through Islamic State core's global logistics network, Islamic State raised funds, recruited new terrorists, and facilitated transactions on behalf of Islamic State's branch in Afghanistan and Pakistan, all of which facilitated attacks against Americans in Afghanistan by Islamic State cells there.

III.   **DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING COMMUNICATIONS, LOGISTICS, AND TECHNICAL ASSISTANCE TO AL-QAEDA AND THE TALIBAN THROUGH DEFENDANTS' FACILITATION OF THE TERRORISTS' MANIPULATION OF COMMUNICATIONS NETWORKS TO ATTACK AMERICANS IN AFGHANISTAN**

632.    Independently, and in addition to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq and Islamic State, as well as Defendants' obstruction of U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, LM Ericsson, Ericsson AB, Ericsson Inc., Ekholm, and Ibrahim also aided and abetted acts of international terrorism by al-Qaeda and the Taliban against Americans in Afghanistan by enabling the Syndicate's manipulation of communication networks in Afghanistan to attack and kill Americans there. Through their management of MTN's network in Afghanistan, LM Ericsson, Ericsson AB, and Ericsson Inc. enabled the Syndicate's use of Afghanistan's communications networks as a terrorist weapon against Americans in Afghanistan from at least 2008 through at least 2021.[96]

A.    **Al-Qaeda And The Taliban Attacked Americans In Afghanistan By Manipulating MTN Cellular Networks In Afghanistan That Were Managed By Defendants**

633.    MTN provided material support to the Taliban by deactivating its cell towers at the Taliban's request.  In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night.  The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout

---

[96] While the allegations in this Section concern LM Ericsson, Ericsson AB, and Ericsson Inc., Plaintiffs believe discovery is likely to show that Ekholm and Ibrahim were also involved in the decision-making attendant to Defendants' conduct at issue in this Section, and nothing in this Section should be interpreted to suggest that Plaintiffs disclaim the involvement of Ekholm and/or Ibrahim in the conduct that aided and abetted the acts of international terrorism described in this Complaint.

the war-torn country."[97]  Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[98]  Because the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their transmission masts from 5 p.m. until 3 a.m.  Later, the Taliban insisted that the companies keep their masts deactivated until 6:30 a.m.

634.    MTN granted the Taliban's requests.  In early 2008, MTN Group issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas.  We are evaluating the situation and liaising with our executives and the relevant authorities in Afghanistan."[99]  The "executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's transmission masts at night.  MTN and others, the *Wall Street Journal* reported in 2010, "strictly abide[d] by Taliban hours in several provinces, going off air precisely at 5 p.m. and going back on at 6:30 a.m."[100]  And when the Taliban ordered cellular-phone companies in Helmand to "switch off the signal," MTN Afghanistan's head of legal and government affairs told the media: "We decided to obey the orders and we have been shut down since yesterday."[101]  Since 2008, MTN's policy has remained consistent:  it has followed the Taliban's directives and switched off its transmission masts for the Taliban's benefit – typically at night.

---

[97] Paul Vecchiatto, *MTN Concerned By Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned By Afghanistan Threats*"), https://tinyurl.com/2yxceprh.

[98] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

[99] *MTN Concerned By Afghanistan Threats*.

[100] Yaroslav Trofimov, *Cell Carriers Bow To Taliban Threat*, Wall St. J. (Mar. 22, 2010) ("Wall St. J., *Cell Carriers Bow To Taliban Threat*").

[101] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).

635.     MTN shut down its towers to maintain good relations with the Taliban.  MTN made no effort to hide its motivation in that regard.  When asked about shutting down its network, MTN Afghanistan's head of legal and government affairs explained that the company could not "afford to be seen as siding with the Afghan government against the Taliban . . . 'You should not give a justification to the others that you are favoring the government – and you have to prove in words and in deeds that you are neutral.'"[102]

636.     MTN went to great lengths to maintain its "neutrality" and do what the Taliban asked of it.  Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's directive and continued to follow the Taliban's requests.  One executive summed up MTN's (and others') refusal to follow President Karzai's directive:  "We're not going to turn on our masts and become part of the army of the Afghan government."[103]  By shutting down its towers, MTN decided, it could reduce the risk that the Taliban would threaten MTN's commercial interests.

637.     The Afghanistan Threat Finance Cell ("ATFC") gathered evidence confirming that MTN was switching off its transmission masts at night to comply with Taliban demands. Based on intelligence reporting, wire intercepts, and interviews with MTN sources, the ATFC concluded that MTN Afghanistan was deactivating its cell towers in coordination with the Taliban.  The justification offered by MTN Afghanistan employees was, again, financial: turning off the towers helped MTN save money by avoiding the need for MTN to invest in expensive security or to rebuild its towers.  The ATFC observed that the security threat MTN

---

[102] Wall St. J., *Cell Carriers Bow To Taliban Threat*.

[103] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild.

638.    MTN Afghanistan implemented tower shutdowns through a secretive process that originated with its security team.  The head of MTN Afghanistan's security division would negotiate with the Taliban to determine which towers (called "Base Transceiver Stations" by MTN's technical team) to shut down, and at which times.  Then, based on information received from the Taliban, MTN's security team relayed instructions to MTN Afghanistan's technical team directing them to implement the shutdowns.  The instructions pinpointed the particular quadrant(s) within particular MTN towers' coverage areas in which Taliban operatives were located, specifying that MTN should turn off the signal within those quadrants.  That enabled MTN to satisfy the Taliban's demands while also allowing MTN to continue earning revenue from customers in the other quadrants – and also to deceive the government about the extent of its shutdown.  MTN employees further avoided memorializing these instructions over company email or in memos; they instead used phone calls or text messages with the purpose of avoiding a paper trail that would document their cooperation with the Taliban.

639.    At all relevant times, MTN Group was aware of, and approved, MTN Afghanistan's practice of shutting down its towers to comply with the Taliban's requests.  MTN Afghanistan would not have maintained that policy without specific buy-in from MTN Group's senior management in South Africa.

**B.    Defendants Provided Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban By Facilitating The Terrorists' Manipulation Of Communications Networks In Afghanistan To Target Americans There**

640.    From at least 2008 until at least 2022, Ericsson AB – and, on information and belief, Ericsson Inc. as Ericsson AB's internally-contracted-for-services provider – also provided

direct technical assistance to the Syndicate through its support for their acts of terrorism targeting Americans through the terrorists' manipulation of Afghanistan's cellular networks.

641.    Ericsson and MTN worked together as strategic partners in Afghanistan and pursued an aggressive growth strategy from 2006 through at least 2021.  For all but the first two of these years, their collaboration directly enabled the Syndicate's tower shutdown attacks.

642.    Ericsson AB and, on information and belief, Ericsson Inc., provided such technical and communications assistance to the joint al-Qaeda-Taliban cells in Jalalabad, and the rest of N2KL, in the same way it aided the terrorists' similar efforts throughout Afghanistan:  by facilitating the Taliban's attacks on Americans through manipulation of Afghan civilian cellular phone networks in Jalalabad, including those operated by MTN and served by Ericsson AB, and on information and belief, Ericsson Inc.  In so doing, Ericsson AB and, on information and belief, Ericsson Inc., participated in the attacks on Americans in Afghanistan that were committed by the joint al-Qaeda-Taliban cells that controlled all anti-American violence throughout N2KL.

643.    Defendants consistently operated MTN's networks in Afghanistan from 2006 through at least 2017 and, on information and belief, until at least 2021.  Defendants did so pursuant to two agreements between Ericsson and MTN that effectively cemented the strategic partnership between them in Afghanistan through their: (1) 2006 Network Contract; and (2) 2012 Managed Services Contract.

644.

645.    **The 2006 Network Contract.**  On March 3, 2006, Investcom, a Lebanese-owned, U.A.E.-incorporated telecoms company, contracted with Ericsson AB to serve as Investcom's principal supplier of GSM900/1800 network equipment for Investcom's Afghani licensee,

Areeba.  Two months later, on May 3, 2006, the South African telecoms giant, MTN Group Ltd. ("MTN Group"), the largest telecoms company in Africa, purchased Investcom, including Investcom's Afghanistan subsidiary, Areeba. which MTN Group quickly rebranded as MTN Afghanistan. Thereafter, Ericsson AB served as MTN Afghanistan's principal supplier of network equipment while MTN Afghanistan built out its new cellular phone network throughout Afghanistan (the "2006 MTN Afghanistan Network Development Contract" or "2006 MTN Contract").  Ericsson AB provided network development services to MTN Afghanistan pursuant to Ericsson AB's agreement with MTN Group (which assumed Ericsson AB's agreement with Investcom) from 2006 until, on information and belief, 2012.

646.    **The 2012 Managed Services Contract.** On May 29, 2012, MTN Afghanistan and MTN Group contracted with Ericsson AB and, on information and belief, Ericsson Inc., to operate and optimize MTN's mobile network as well as its charging systems and value-added services such as mobile applications through an end-to-end managed services agreement (the "2012 MTN Afghanistan Managed Services Contract" or "2012 MTN Contract").  Under the 2012 MTN Contract, Ericsson AB and, on information and belief, Ericsson Inc., deployed Defendants' end-to-end solutions and systems to provide 24/7 network monitoring to enhance MTN Afghanistan's network efficiency and simplify MTN Afghanistan's operations.

647.    Ericsson was the necessary, but-for ingredient to MTN's ability to collaborate with the Syndicate and convert MTN's network in Afghanistan into a weapon for al-Qaeda and the Taliban.  Ericsson AB's and, Ericsson Inc.'s, management of MTN Afghanistan's network services were the initial but-for cause, and turbocharger thereafter, of al-Qaeda's and the Taliban's ability to successfully attack Americans in Afghanistan by manipulating MTN Afghanistan's cellular networks.

648.   Ericsson AB and, on information and belief, Ericsson Inc., supplied MTN Afghanistan with something that MTN Group could not: a state-of-the art managed services solution for cellular phone networks.  While MTN Group was a large global telecoms company, it did not – like Ericsson – have managed services expertise. In 2011 alone, for example, Ericsson signed more than 70 managed services contracts, and managed networks that collectively served nearly 1 billion subscribers worldwide.

649.   MTN publicly confirmed Ericsson's vital role in every aspect of MTN Afghanistan's cellular networks and services.  On May 29, 2012, for example, Hassan Jaber, CEO of MTN Afghanistan, publicly stated, *inter alia*, that: (i) MTN had "chosen Ericsson" to "leverage[] [] the company's global experience and competence in managing such complex projects"; and (ii) "Ericsson [would] ensure that [MTN Afghanistan's] network and IT operations [were] managed effectively, [MTN Afghanistan would] focus on tailoring our services to better cater to our customers' needs."

650.   Ericsson's work for MTN Group and MTN Afghanistan pursuant to the 2006 MTN Afghanistan Network Development Contract, and the 2012 MTN Afghanistan Managed Services Contract, supplied Ericsson AB and, on information and belief, Ericsson Inc., with complete God's-eye-like visibility into MTN Afghanistan's network.  Under these contracts, Ericsson was MTN's indispensable partner in Afghanistan since Day 1:  Ericsson built MTN Afghanistan's network from 2006 through 2012, and Ericsson managed MTN Afghanistan's network from at least 2012 through at least, on information and belief, 2020.

651.   Defendants could have pulled the plug on their support for the Syndicate's attacks on Afghanistan's communications networks, and the American servicemembers and counterterrorism professionals who relied upon such networks to prevent attacks by al-Qaeda

and the Taliban in Afghanistan.  Had Defendants terminated Ericsson AB's and Ericsson Inc.'s, management of MTN's network in Afghanistan, the Syndicate's scheme to attack Americans in Afghanistan would have collapsed overnight.  That is because the scheme depended upon MTN's ability to engage in pinpoint management of its entire network, so that it could shut down the towers demanded by the Syndicate at the exact time indicated by the terrorists, without alerting U.S. counterterrorism forces that were targeting them.

652.    Ericsson AB's and Ericsson Inc.'s technology and services provided MTN with the capabilities necessary to operationalize the tower shutdowns in such a manner as to maximize the lethality of the campaign because Defendants' services provided MTN the necessary technical and engineering tools, which MTN borrowed from Ericsson Inc.'s intellectual property toolkit and, on information and belief, subject to license agreement with Ericsson AB and/or Ericsson Inc.  When terrorists following the command of Sirajuddin Haqqani ordered MTN to disable specific towers to facilitate attacks against Americans, the Taliban's ability to turn MTN's network into a gun depended entirely on the MTN's ability, in turn, to pull the technical "trigger" that Ericsson AB and Ericsson Inc. loaned to MTN from Ericsson Inc.'s.

653.    When Defendants maintained MTN's network starting in 2008, Defendants played a direct, and active, role in the Syndicate's terrorist attacks against Americans because it was Defendants' technology, personnel, and managed services that constituted the trigger MTN so gladly pulled whenever the Taliban wanted to initiate its cellular tower shutdown attack against Americans in Afghanistan.  By supplying the technical trigger that made the attack possible, and then maintaining that trigger, Defendants were the essential, but-for, cause of al-Qaeda's and the Taliban's ability to manipulate MTN's networks in Afghanistan to attack Americans there.

654.     Ericsson's assistance gave the joint al-Qaeda-Taliban cells operating in N2KL the ability to exercise pinpoint control over the cellular networks throughout N2KL, including Jalalabad.  In so doing, Ericsson AB and, on information and belief, Ericsson Inc., allowed al-Qaeda and the Taliban to wield MTN's cellular networks as a weapon to attack Americans in throughout Afghanistan, including N2KL, from 2008 through 2021.

655.     Ericsson AB also assisted Islamic State terrorists in N2KL, including Jalalabad, when they sought to wield Afghanistan's cellular networks as a terrorist weapon against Americans serving there.  For example, Ericsson AB (and, by implication, Ericsson Inc.) was one of the telecommunications companies that is publicly reported to have complied with Islamic State's own tower shutdown demands in Nangahar Province in 2019.  Ericsson's willingness to assist Islamic State's own terrorist campaign in 2019 that targeted Americans further confirms the plausibility of Plaintiffs' allegations about Ericsson's earlier similar aid to the Taliban. Ericsson's willingness to directly assist Islamic State's similar terrorist attacks further confirms Plaintiffs' allegations.

C.     **Each Defendant Facilitated Defendants' Provision Of Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban**

1.     **LM Ericsson**

656.     LM Ericsson led Defendants' overall strategy in Afghanistan, including Ericsson's provision of technology and managed services to MTN in Afghanistan.

657.     By no later than 2010, LM Ericsson knew that its facilitation of MTN's tower shutdowns through its continued support for Ericsson AB's provision of Ericsson Inc.'s technology and managed services to MTN in Afghanistan was inextricably connected to al-Qaeda and Taliban violence.  LM Ericsson's affirmative choice to continue serving MTN in Afghanistan, therefore aided al-Qaeda and Taliban acts of terrorism targeting Americans in

Afghanistan by supporting the continuation of the relationship even after knowing that Ericsson's services for MTN were directly causing al-Qaeda and Taliban attacks against Americans in Afghanistan by weaponizing the key Afghan civilian cellular networks upon which U.S. counterterrorism policy in Afghanistan so heavily relied from 2008 through 2021.

## 2.   Ericsson AB

658.   Ericsson AB operationalized Defendants' on-the-ground strategy in Afghanistan, including Ericsson's provision of technology and managed services to MTN in Afghanistan pursuant to the 2006 Network Contract and the 2012 Managed Services Contract.

659.   Ericsson AB served as the bridge that connected Ericsson Inc.'s intellectual property, innovation, researchers, network engineers, and managed services specialists in the United States into Defendants' "global" technology and services model under their "One Ericsson" approach that MTN specifically identified as the strongest value proposition in MTN's decision to choose Defendants to manage MTN's network in Afghanistan.

660.   By no later than 2010, Ericsson AB knew that its facilitation of MTN's tower shutdowns through Ericsson AB's provision of Ericsson Inc's. technology, engineering, and managed services was inextricably connected to al-Qaeda and Taliban violence.  Ericsson AB's affirmative choice to continue serving MTN in Afghanistan, therefore aided al-Qaeda and Taliban acts of terrorism targeting Americans in Afghanistan by supporting the continuation of the relationship even after knowing that Ericsson Inc.'s services for MTN were directly causing al-Qaeda and Taliban attacks against Americans in Afghanistan by attacking the key Afghan civilian cellular networks upon which U.S. counterterrorism policy in Afghanistan so heavily relied from 2008 through 2021.

### 3.    Ericsson Inc.

661.    Ericsson Inc. played the critical, but-for, causal role that enabled Defendants to provide integrated "global" "end-to-end" network operations and managed services offerings to MTN in Afghanistan under the 2006 Network Contract and 2012 Managed Services Contract.

662.    On information and belief, Ericsson Inc. chose to continue supporting Defendants' provision of services to MTN in Afghanistan even while Ericsson Inc. knew, by no later than 2010 that Defendants' provision of Ericsson Inc.'s technologies, engineering know-how, and managed services to MTN in Afghanistan directly enabled terrorist attacks targeting Americans in Afghanistan no later than 2010, after a stream of media reports garnered widespread global attention and alerted Ericsson Inc. to the inextricable role that its services to MTN played in causing Taliban attacks in Afghanistan.

663.    At any time, Ericsson Inc. could have declined to provide managed services to MTN in Afghanistan, or permit MTN to license the essential Ericsson Inc. intellectual property upon which Defendants' entire "global" "integrated" "end-to-end" "managed services" offering depended.  Ericsson Inc.'s affirmative choice to continue performing services relating to MTN in Afghanistan therefore aided al-Qaeda and Taliban acts of terrorism targeting Americans in Afghanistan by supporting the continuation of the relationship even after knowing that Ericsson Inc.'s services for MTN were directly causing al-Qaeda and Taliban attacks against Americans in Afghanistan by attacking the key Afghan civilian cellular networks upon which U.S. counterterrorism policy in Afghanistan so heavily relied from 2008 through 2021.

### D. Defendants' Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban Had A Substantial Nexus To The United States

#### 1. Defendants' Conduct Relied On American Contacts

664. Ericsson's decision to participate alongside MTN in the Taliban's manipulation of cellular networks in Afghanistan to attack Americans in Afghanistan through Defendants' decision to provide the technology, engineering, and managed services that enabled al-Qaeda's and the Taliban's manipulation of MTN's cellular networks in Afghanistan had a substantial nexus to the United States. Ericsson Inc. was essential to Defendants' ability to compete for, and win, the 2006 Network Contract and 2012 Managed Services Contract. At all times, Defendants touted Ericsson's "global" and "integrated" "One Ericsson" model as a key differentiator because, among other things, Defendants claimed that such model fueled Ericsson's innovation, provided superior customer service, and promoted 24/7 connectivity for Ericsson's customers.

665. MTN, in turn, told Defendants that it sought to leverage Defendants' "global" "end-to-end" "managed services" offering. Enter, Ericsson Inc., which was the branding glue that held Defendants' entire offering to MTN together. Ericsson Inc.'s participation in Ericsson's integrated "end-to-end" "managed services" organization was necessary for Ericsson to satisfy MTN's stated commercial objective – to leverage Ericsson's "global" managed services offerings. Defendants could not have credibly made their "global" "end-to-end" "One Ericsson" pitch without Ericsson Inc.'s involvement in the services provided to MTN, including Ericsson Inc.'s intellectual property, researchers, network engineers, and managed services specialists in the United States. Such Ericsson Inc. offerings were the only thing that made Ericsson's product offering to MTN Defendants' a "global" (not European or regional), and "integrated" (not siloed) managed services product consistent with MTN's stated need.

666.     As a result, Defendants could not have satisfied MTN's stated desire for a "global" solution without Ericsson Inc., and would not have won the 2006 Network Contract or the 2012 Managed Services Contract without the "global" branding that Ericsson Inc. conferred, and therefore would not have aided and abetted al-Qaeda's and the Taliban's acts of terror that targeted Americans through attacks on Afghanistan's cellular networks from 2008 through 2021.

667.     Ericsson Inc.'s dynamic, and ever growing, engineering, software, and intellectual property pipeline was essential to Defendants' ability to continually improve MTN's – and therefore al-Qaeda's and the Taliban's – manipulation of MTN's cellular networks in Afghanistan with greater and greater precision between 2006 and 2021.

668.     Given the Taliban's effective control of MTN's cellular networks in Afghanistan through MTN's obedience to the Syndicate's demands, each time Ericsson Inc. improved the efficiency of the managed services that Defendants supplied to MTN, Ericsson Inc. also aided al-Qaeda's and the Taliban's attacks through MTN's cellular networks because Ericsson's services under the 2006 Network Contract and 2012 Managed Services Contract substantially improved MTN's ability to control its network services and towers in Afghanistan—and, by implication, the Taliban's ability to use MTN's cellular networks to attack Americans in Afghanistan because of MTN's obedience to the Taliban from 2008 through today.  As a result, Defendants' provision of Ericsson Inc.'s technologies and services to MTN directly augmented al-Qaeda's and the Taliban's ability to leverage Ericsson Inc.'s intellectual property, engineering, and managed services to enhance the effectiveness of the Syndicate's use of MTN's cellular towers as a terrorist weapon against Americans in Afghanistan from 2006 through 2021.

669.     Ericsson Inc. personnel in the United States routinely supported Ericsson AB's implementation of Defendants' contracts in Afghanistan, just as Ericsson Inc. personnel in the

U.S. did with respect to the rest of Defendants' North Middle East region, which was comprised of Iraq, Afghanistan, Jordan, Lebanon, and Syria.  Ericsson Inc.'s provision of such services to Ericsson AB's customers in the Middle East, including Afghanistan, were essential to Ericsson AB's ability to enable the Syndicate's manipulation of cellular networks in Afghanistan to attack Americans there.

670.    According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, Ericsson Inc. personnel in the United States regularly supported Ericsson AB's implementation of contracts in the Middle East region, which included Iraq.  For example, Ericsson Inc.'s technical personnel in the United States provided key technical, network, and engineering support for Ericsson AB customers in the Middle East region, which included Iraq.

671.    Ericsson purposely availed itself of the United States, including its patent system, to position itself as the technological and service leader in several important sectors of the global telecommunications industry.  Ericsson used that position, as well as a variety of products and services benefitting from Ericsson's U.S. patents, to win the lucrative contracts in Iraq and other Middle Eastern countries that gave rise to the illegal protection payments at the very heart of this action.  Ericsson also acquired U.S.-based companies to facilitate its growth in key business segments for which global demand, particularly in the Middle East, was expected to increase.

672.    Indeed, Ericsson has long occupied a spot in the U.S. Patent 100 – a list of 100 companies with the largest active portfolios of patents issued by the U.S. Patent and Trademark Office – and as one of the few companies in that group with a "'Standout' portfolio, one of the largest, fastest growing and most industry-recognized in the United States.  Ericsson Inc. is also one of the nearly 40 members of the Coalition for 21st Century Patent Reform, whose senior

leader—while speaking to Congress on the coalition's behalf, described the United States patent system as the "gold standard."  In contrast, Ericsson did not hold Europe's patent system in the same favorable light.  Ericsson's increasing focus on becoming more of a software company further elevated the importance of the U.S. patent system to Ericsson's business, as the European Patents Office is less inclined to grant patents on software innovations.

673.    Recognizing the importance of its U.S. patent portfolio (and of the U.S. IP regime generally) to LM Ericsson's global business, LM Ericsson moved one of its most important executives with IP-related responsibilities to Ericsson offices in the U.S.  In August 2012, LM Ericsson moved Kasim Alfalahi, its Chief Intellectual Property Officer, to Dallas, Texas.  As Ericsson's CIPO, Alfalahi at all relevant times had a direct reporting line to LM Ericsson's CEO. LM Ericsson also entered into a first-of-its-kind transaction in 2013 with a U.S.-based company called Unwired Planet, Inc. ("UP"), whereby Ericsson transferred thousands of patents to UP, including 753 U.S. issued patents related to 2G, 3G, LTE and other global telecommunication technologies, such as GSM, GPRS, EDGE, and WCDMA.  And LM Ericsson and Ericsson Inc. have also frequently availed themselves of U.S. courts to protect their patent portfolio.  Although Ericsson AB owns several U.S.-issued patents in its own right, Ericsson's patents are predominantly owned by LM Ericsson and/or Ericsson Inc., which have, in turn, assigned to Ericsson AB the rights to collect all royalties and other income from licensing those patents to third parties.  LM Ericsson manages Ericsson's patent portfolio, patent applications, and patent licensing agreements with third parties, and is responsible for defending Ericsson's patents in litigation worldwide.

674.    All of these moves were motivated by LM Ericsson's "focus[] on protecting our technology leadership," which was viewed as inextricably linked to the strength of its intellectual

property portfolio.  As LM Ericsson's CIPO stated: "At Ericsson, we don't see intellectual property as a purely legal function; we see it as part of the business – that is the real difference between us and many other companies."  LM Ericsson's former CEO, Hans Vestberg, attributed Ericsson's market positioning as the global "No. 1" in its three primary business areas—mobile infrastructure, services (*i.e.* installation and management of networks for large telcos), and operating, charging, and billing systems for telecom operators (*e.g.* Operations Support Systems (or OSS) and Business Support Systems (or BSS))—to its commitment to innovation and patent portfolio strength.  Ericsson viewed its patent strategy as a key driver towards its goal of globally expanding its market-leading services and systems business segments by bundling those offerings with its infrastructure products.  In describing Ericsson's strategy of leveraging its "global presence and scale, as well as technology and services leadership" to grow its business in the Middle East, Ericsson Saudi Arabis ("KSA")'s former president, Ali Eid, highlighted the company's (then) 27,000 patents.  To further bolster its offerings and market share in OSS/BSS, which Ericsson viewed as a key area for future growth, Ericsson completed its $1.15 billion acquisition of U.S.-based Telcordia Technologies Inc. in January 2012.

675.    Ericsson has publicly touted the linkages between, on the one hand, its technological leadership—driven by its patent strategy and IP portfolio—and its acquisition (through Ericsson AB, according to press reports) of U.S.-based Telcordia, and, on the other hand, its growth in sales and contracts in the Middle East.  In particular, Iraqi mobile operators, including Asiacell and Korek, became some of Ericsson's biggest OSS and BSS clients in the entire Middle East & North Africa region.  But Ericsson's technology and services leadership also positioned the company to win larger managed services contracts with *all* of the major network operators in Iraq, including those same mobile operators, as well as fixed-line telecom

provider ITPC, which contracted with Ericsson "to expand its wireline network and roll out [internet protocol] technology as part of a next generation transition process."  Ericsson's internet protocol technology originated with California-based Redback Networks, which Ericsson acquired in 2006.  Ericsson's U.S.-based internet protocol business is so important to Ericsson's worldwide operations that in 2010, LM Ericsson's Chief Technology Officer, Hakkan Eriksson, moved to "Silicon Valley, the center of the company's important IP business," to take control of it. [104]

676.    Moreover, Ericsson's use of its revolutionary radio base hardware system, the RBS 6000, was critical to its penetration of all key markets, including in Iraq.  The product was a software-enabled system that was compatible with multiple network types, allowing it to be used with "all [of Ericsson's] customers' networks, more or less."  In Iraq specifically, the RBS 6000 was a key component of Ericsson's 2014 contract with Asiacell to implement its "Golden Province" network infrastructure improvement program.  Other Ericsson products that, on information and belief, enjoy U.S. patent protection and were used in Ericsson's Iraq business include Ericsson's Blade Cluster system.

## 2.    Defendants' Conduct Targeted The United States

677.    Defendants' decision to directly play a role, alongside MTN, in shutting down MTN's transmission masts at al-Qaeda's and the Taliban's request was also expressly aimed at the United States.  Defendants knew, based on their sophisticated understanding of the security environment in Afghanistan, as well as conversations with U.S. officials, that active cellular networks provided the United States with a vital flow of intelligence and supported U.S.

---

[104] Despite the move to the U.S., Hakkan Eriksson remained LM Ericsson's global CTO and a member of its Group Management Team.

operations against the Taliban, including joint al-Qaeda/Taliban cells in places like eastern Afghanistan.

678.    When Defendants helped MTN turn the towers off, Defendants intentionally deprived the United States of that critical intelligence.  Indeed, the Taliban's publicly stated reason for demanding tower shutdowns was to interfere with U.S. operations.  When Defendants enabled MTN's compliance with those demands, they targeted the United States by robbing U.S. forces of intelligence that Ericsson knew they needed.

### E.    Defendants' Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban Aided And Abetted Acts Of International Terrorism Against Americans In Afghanistan

679.    Defendants' conduct strengthened al-Qaeda and the Taliban, including its Haqqani Network, and undermined U.S. counterterrorism efforts.  By 2010, the Syndicate was "using the cellphone system as an instrument of war against the Afghan government and the U.S.-led coalition."[105]  The terrorists, one Army officer told the *New York Times*, used MTN's cell towers "as a weapons system" against U.S. forces.[106]  Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides.  *First*, U.S. intelligence tracked the Taliban's phone signals and used them to locate high-level targets for capture-or-kill missions.  *Second*, cell phones provided Afghan civilians with the ability to call Coalition tip lines and provide valuable human intelligence.

680.    Nighttime deactivation was the Taliban's solution to both problems.  U.S. Special Forces typically execute high-value raids at night, and deactivated cell signals impeded those

---

[105] Wall St. J., *Cell Carriers Bow To Taliban Threat*.

[106] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

missions by making the insurgent targets harder to track.  That was the Taliban's stated rationale

for demanding nighttime signal deactivation:  its spokesman argued that Taliban fighters had

"been increasingly targeted by foreigners recently and we know they are using the services of

these phone companies against us.'"[107]  As another Taliban spokesman explained publicly, the

Taliban viewed the "cutoffs as a line of defense," in which its "'main goal is to degrade the

enemy's capability in tracking down our mujahedeen.'"[108]  Consistent with that statement, *AFP*

reported that "Taliban militants regularly demand that mobile phone companies switch off their

networks at night, fearing that NATO-led forces can track them through phone signals."[109]

681.    Similarly, nighttime deactivation obstructed U.S. efforts to gather human

intelligence.  Cell phones provided a key conduit for Afghan civilians to pass intelligence to U.S.

personnel.  But as the U.S. military director of the Telecommunication Advisory Team

explained, "[i]f the masts are off Afghans can't report anything . . . If you see an insurgent you

can't call the police to say check this out."[110]  And Afghan informants were "usually reluctant to

call in tips during daytime, when they can be spotted by Taliban sympathizers."[111]  Human

intelligence thus typically flowed to the Coalition at night.  By agreeing to shut down its

transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

682.    In 2010, *CBS News* reported on this so-called "détente" between the Taliban and

large mobile-phone companies, including MTN.  "The phone companies shut down their cell

---

[107] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011) ("*Taliban Shut Down Cell Phones*").

[108] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).

[109] Agence France Presse, *Taliban Shut Down Cell Phones*.

[110] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

[111] Wall St. J., *Cell Carriers Bow To Taliban Threat*.

towers at night, preventing local residents from discreetly calling coalition military tip lines.  In exchange, Taliban militants don't target the costly cell towers with explosives."[112]  The trade was a major strategic victory for the Taliban.  As Roshan's COO explained in trying to justify a similar decision:  "We play by their rules; we don't like to play around when people's lives are at stake. . . .  From a political perspective, it's quite a coup for them."[113]

683.    Ericsson's facilitation of MTN's tower shutdowns substantially contributed to al-Qaeda's and the Taliban's ability to commit the attacks that killed and injured Plaintiffs.  Al-Qaeda and the Taliban targeted the Syndicate's shutdown orders at key districts and provinces with tactical importance for ongoing terrorist operations.  As Ericsson and MTN knew, tower deactivation in those areas impeded U.S. forces from locating Syndicate operatives and degraded the Coalition's ability to interdict the Syndicate's ongoing attacks.  Indeed, the U.S. intelligence benefits gleaned from active cell towers were so potent that ISAF often executed operations designed specifically to induce Taliban operatives to use their phones.  By the same token, the operational impact of MTN's tower-shutdown policy was so extreme that ISAF, U.S. Embassy, and Afghan government personnel repeatedly pressured MTN to stop.  ISAF command considered such shutdowns to be a significant threat to U.S. counterinsurgency efforts.  And those shutdowns occurred in the key provinces and districts in which Plaintiffs (or their family members) were operating when they were killed and injured.  By providing the essential technology and managed services that were the but-for cause of MTN's ability to defy the U.S. government and obeying the Taliban in the contested areas in which the insurgents were fighting

---

[112] Alex Sundby, *Afghan Cell Carriers Follow Taliban Rules*, CBS News (Mar. 24, 2010).
[113] *Id.*

Americans, Defendants materially supported the Taliban attacks that killed and injured Plaintiffs, including the attacks that were committed by joint al-Qaeda-Taliban cells.

684.    The U.S. government tried to address those problems by encouraging Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases. As the U.S. government explained in proposing the idea, securely located transmission masts would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN was deactivating its cell towers when the Taliban told it to.  Roshan, according to a purported 2009 U.S. State Department cable (as published online), was "keen to develop this partnership with the USG and sees it as a way to promote mutual security, communications, and commercial strategies for Afghanistan."[114]  MTN, by contrast, refused to participate and declined even to join Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

685.    Neither the U.S. government nor the Afghan government ever condoned or conveyed approval of MTN's tower-shutdown policy, or Defendants' deliberate facilitation thereof.  Although news reports on occasion quoted individual Afghan government officials suggesting a resignation to the reality of MTN's shutdown policy, the official Afghan government position – conveyed at in-person meetings held with MTN, including at least one with President Karzai himself – was that cell-phone companies must keep their towers active at night.  The U.S. government was even more strongly committed to that position.  ISAF leadership especially rejected the suggestion that MTN's conduct represented an acceptable way of protecting its network.  ISAF expected MTN to keep its towers on, invest in security to protect them itself rather than paying the Taliban, and ultimately rebuild them if necessary.  ISAF

---

[114] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

231

considered that course of action not only feasible, but mandatory for a company like MTN reaping profits in an insurgency-afflicted country like Afghanistan.

686.    Defendants' direct facilitation of the Taliban's tower shutdowns also directly aided al-Qaeda.  Dual-hatted al-Qaeda/Taliban polyterrorists, like Sirajuddin Haqqani, played a central role in the Syndicate's tower scheme.  Dual-hatted al-Qaeda/Taliban polyterrorists like Sirajuddin also attacked Americans in Afghanistan through the use of MTN's cell tower shutdowns as weapons against the United States. Thus, when Defendants facilitated MTN's tower shutdowns, Defendants provided direct operational assistance to al-Qaeda in Afghanistan in addition to Defendants' assistance to the Taliban.

**IV.    DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING OPERATIONAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE THROUGH DEFENDANTS' OBSTRUCTION OF UNITED STATES COUNTERTERRORISM OPERATIONS TARGETING AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE**

687.    Independently, and in addition to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq and Islamic State, *supra* part II, LM Ericsson, Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm also aided and abetted acts of international terrorism by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State against Americans in Iraq, Syria, Turkey, and Afghanistan by obstructing United States counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in the Middle East.

688.    LM Ericsson, Ericsson AB, and Ericsson Inc. obstructed U.S. government counterterrorism operations targeting al-Qaeda and al-Qaeda-in-Iraq from at least 2003 through at least 2022, Ibrahim did so from at least 2014 through at least 2022 while acting in her capacity as an Ericsson AB employee and while acting in her capacity as an LM Ericsson employee and

personal counselor to Ekholm, and Ekholm did so from at least 2017 until at least 2022 while serving as CEO.[115]

689.     Defendants obstructed U.S. government counterterrorism operations targeting Islamic State from 2014 through at least 2022, and Ekholm did so from 2017 until at least 2022 while serving as CEO.

> **A.     The U.S. Government Prevented Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, And Afghanistan By Conducting Counterterrorism Operations In The United States And The Middle East That Targeted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**
>
> > **1.     U.S. Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Relied Upon A Whole-Of-Government Approach In Which The Department Of Justice And Other Agencies Shared Information In Order To Prevent Terrorist Attacks**

690.     From at least 2004 through at least 2022, the United States counterterrorism operations that targeted the transnational terrorist finance, logistics, and personnel networks upon which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied depended upon a whole-of-U.S.-government effort in which the Department of Justice played a key role in developing, vetting, and sharing actionable information concerning al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorist finance, logistics, and networks worldwide, which helped protect Americans from attack in Iraq, Syria, Turkey, and Afghanistan.

691.     This approach reflected America's broad post-9/11 counterterrorism emphasis on cross-pollination of data, intelligence, and investigative leads between various departments of the

---

[115] Ekholm served on LM Ericsson's Board of Directors prior to when Ericsson installed him as CEO in 2017.  Plaintiffs believe discovery is likely to show that Ekholm knew of Defendants' protection money payments prior to when he became CEO in 2017, and likely enabled such scheme to continue by violating his own fiduciary obligations to as the Board member of a publicly traded company with actual knowledge of Ericsson's payments to FTOs, and nothing in this Complaint should be interpreted to suggest otherwise.

U.S. government in order to prevent future attacks by al-Qaeda and its progeny, including al-Qaeda-in-Iraq and Islamic State, against Americans.

692.     United States counterterrorism strategy from 9/11 through 2022 always depended upon the key role that the National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial Intelligence, and State Department Bureau of Counterterrorism each played – individually, and as part of the post-9/11 "whole-of-government" counterterrorism strategy in response to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – with respect to developing actionable intelligence that enabled whole-of-U.S.-government efforts to more effectively interdict terrorist finance, disrupt terrorist networks, and impair terrorist logistics and thus prevent acts of international terrorism.

693.     From 2003 through 2022, the U.S. government published other reports and made multiple public statements that similarly alerted Defendants that their provision of cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs' ability to attack Americans in Iraq, Syria, Turkey, and Afghanistan.

694.     In November 2004, Assistant Treasury Secretary Juan Zarate testified before Congress that focusing on the sources and movement of monies used to fund terrorist groups in Iraq was absolutely critical to effective counter-terrorism policy in Iraq.  Zarate further testified that the U.S. government has taken a coordinated interagency approach to that very issue, which employs robust information sharing across various components of the Treasury Department, DOJ (from whom Defendants were concealing material information that they were duty-bound to

share), the State Department, the Department of Defense, the Department of Homeland Security, the Intelligence Community, and the National Security Council.[116]

695.    In February 2005, Assistant Secretary Zarate gave a keynote address at an anti-counterfeiting summit in which he emphasized the importance of collaboration and information sharing between major players from the international private sector (*e.g.*, Ericsson, among others) and the U.S. government in gathering the information required to "triumph over a wide array of terrorist financing" in Iraq and other countries.  Mr. Zarate further stated that "Every day it becomes more apparent that following dirty money and attacking its illicit sources is an essential part of winning the financial war on terrorism."[117]

696.    In April 2006, Henry Crumpton, the Ambassador-at-Large for Counterterrorism at the U.S. Department of State, further emphasized the importance of "unified statecraft" – built upon cooperation between non-state actors from the private sector and the U.S. government (and other nations) – to "counter th[e] multi-layered threat" posed by "al-Qaida and its affiliates."  At

---

[116] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* Dep't of the Treasury, Testimony of Juan Carlos Zarate, Assistant Secretary, *Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, Before the Senate Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs* (Nov. 15, 2004), https://tinyurl.com/bdd6ykzw. The Treasury Department and State Department both amplified Assistant Secretary Zarate's comments in the national media.  *See, e.g.*, CQ Congressional Testimony, *Hussein's Abuse of the U.N. Oil Free Food Program* (Nov. 15, 2004) (quoting Zarate testimony).

[117] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e. The Treasury Department and State Department both amplified Assistant Secretary Zarate's comments in the national media.  *See, e.g.*, U.S. Dep't of State, Release, *Zarate Cites Need For Public-Private Cooperation, Flexibility*, States News Serv. (Feb. 1, 2005) ("Continued success against terrorist financing will require 'strong and flexible plans' and better ways of collecting and sharing financial data without overburdening the financial sector, he said.
'Effective mechanisms depend on greater collaboration and information sharing within the government and with the private sector,' Zarate said.").

one point, he bluntly stated, "The government needs the private sector" in the counterterrorism effort.  He further explained that he was hopeful that private sector actors would buy into the concept of public-private partnerships in this area because of the private sector's exposure as a terrorist target "for exploitation or destruction."[118]

697.    In April 2008, the Treasury's Under Secretary for Terrorism and Financial Intelligence observed how terrorists "rely on financial support networks," which "are not only a rich source of intelligence [for U.S. counterterrorism efforts] but also . . . a vulnerability we can exploit . . . against al-Qaeda" and "the Iraqi insurgency" (*i.e.*, al-Qaeda-in-Iraq).  He explained how receiving real-time information, particularly from private sector actors, about terrorists' fast-evolving financial networks is critical to "better understand the relationship among [terrorists' financing nodes] and identify potential vulnerabilities . . . [and] sources and conduits of illicit finance."[119]

698.    In March 2009, Lieutenant General David P. Fridovich, commander of Special Operations Command, reiterated the importance of taking "a whole-of-government, or interagency, approach to this challenge [of eliminating the networks of terrorist facilitators]."

---

[118] Ambassador Henry A. Crumpton, Coordinator for Counterterrorism, U.S. Dep't of State, *The Role of Public and Private Partnerships in the Global War on Terrorism; Remarks to the 5th Annual International Counterterrorism Conference: Public and Private Partnerships; Washington, D.C.* (Apr. 20, 2006), https://2001-2009.state.gov/s/ct/rls/rm/2006/64977.htm. The State Department amplified Ambassador Crumpton's comments in the national media.  *See, e.g.*, State Dep't Documents and Publications, *Government-Private Partnership Key to Defeating Terrorism; Careful Investment Can Replace Ideology Of Hatred With Hope, Says Official* (Apr. 20, 2006) (quoting Ambassador Crumpton's speech).

[119] Under Secretary for Terrorism and Financial Intelligence Stuart Levey, U.S. Dep't of the Treasury, Press Release, *Under Secretary for Terrorism and Financial Intelligence Stuart Levey Testimony* (Apr. 1, 2008), https://home.treasury.gov/news/press-releases/hp898. Treasury amplified Under Secretary Levey's comments in the national media.  *See, e.g.*, Stuart Levey, *Anti-Terrorism Financing*, CQ Congressional Testimony (Apr. 1, 2008) (quoting Under Secretary Levey's speech).

LTG Fridovich explained the importance of the government's existing and planned collaboration with partner nations and the private sector, noting that DOD's exchange with "the private sector has been especially informative as we learn how better to deal with the rapidly developing cutting edge financial technologies like internet and cellphone money transfers."  He further elaborated on the focus of recent collaborative efforts and exchanges as al-Qaeda's facilitation networks, noting that "[a]ny tracking of money flows in support of the insurgents and terrorists operating in Iraq and Afghanistan links almost immediately to transregional and global facilitation networks that pose very real threats to the United States and our interests."  Finally, in highlighting the success to date and future promise of the government's Iraq Threat Finance Cell, he expressed how DOD was "eagerly participating in the establishment of" a similar program focused on Afghanistan-based terrorism threats.[120]

699.    In September 2011, Assistant Treasury Secretary of Counter-Terrorist Finance Daniel Glaser testified before a House Subcommittee about how substantial sums of money are critical to terrorist groups—not just to carry out attacks, but to also recruit and train operatives, procure weapons, make 'martyr' payments to terrorists' families, and to gain support from local populations.  According to Glaser, terrorists' constant need for funding underscored the importance to counterterrorism efforts of receiving information and intelligence "to identify sources of illicit finance [for terrorists] and those individuals and entities that comprise [their] illicit finance networks."  This financial intelligence allows counterterrorist efforts to identify vulnerable points in terrorist finance networks that are susceptible to disruption, including those

---

[120] LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* U.S. House of Representatives, *Tracking And Disrupting Terrorist Financial Networks: A Potential Model For Interagency Success?*, Hearing, House Committee on Armed Services, Terrorism, Unconventional Threats and Capabilities Subcommittee (Mar. 11, 2009).

related to terrorist groups' increasing use of criminal activity to raise money.  Secretary Glaser also explained how "[f]ollowing the money can often yield valuable insights into a terrorist organization and help discover previously unidentified leadership and support nodes."  He then touted the Treasury's Office of Financial Intelligence's successful efforts against core al-Qaeda achieved by being able to "undermine[] terrorist financial networks across the globe."[121]

700.    In a November 2013 statement before a Senate Committee, FBI Director James Comey described how the FBI works with its law enforcement and intelligence community partners to advance the Bureau's top priority of counterterrorism, particularly as to "Al-Qaeda and its affiliates."  Notably, Director Comey emphasized that "there must be cooperation with the private sector" for the government's counterterrorism efforts to succeed, drawing on his assessment of the effectiveness of another public-private partnership in the cybersecurity space where "[t]he private sector is the key player" and provides to its federal and international partners "real-time threat intelligence, every day."[122]

701.    Following the emergence of the Islamic State as a prime terrorist threat, Samantha Power, U.S. Permanent Representative to the United Nations, wrote that all countries must rely on and support private sector actors to help them "identify and block financial transactions benefiting ISIL and other terrorist groups" and identify terrorist financiers and other facilitators.

---

[121] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations* (Sept. 6, 2011), https://home.treasury.gov/news/press-releases/tg1287. Treasury amplified Assistant Secretary Glaser's comments in the national media.  *See, e.g.*, States News Service, *Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations* (Sept. 6, 2011).
[122] FBI Director James B. Comey, *quoted in* FBI, *Homeland Threats And The FBI's Response; Statement For The Record Befor*e *The Senate Committee On Homeland Security And Governmental Affairs* (Nov. 14, 2013), https://tinyurl.com/2s4z78t8.

As an example of some of those key transactions, Ms. Power specifically highlighted the "crude tax and protection rackets" that ISIL employs to raise "hundreds of millions of dollars . . . [and] pay its followers and fund attacks around the world." [123]

702.    And in May 2017, Marshall Billingslea, as the nominee for Assistant Treasury Secretary for Terrorist Financing, did not mince words in his opening statement before the Senate Committee considering his nomination when saying that "disrupting terrorist finance and illicit trade requires working closely with the private sector."[124]

703.    Moreover, Ericsson personnel have attended in-person U.S. government presentations emphasizing the U.S. government's reliance on actionable information from private sector actors to protect America from asymmetrical threats like terrorism.

704.    On July 31, 2019, for example, at least one senior executive acting on behalf of Ericsson attended a presentation at the Washington, D.C. office of the Center for Strategic and International Studies ("CSIS"), a think tank that focuses on, *inter alia*, counterterrorism (the "CSIS Meeting").  During this presentation at the CSIS Meeting, Christopher Krebs, a senior U.S. cybersecurity official, while addressing the importance of "private public partnership," told those in the room, including Defendants:

> We have to continue working together between government and industry to understand what the challenges are and employee mitigations that are collaborative, coordinated and effective. … So, it's going to take all of us working together. … You will hear the perspectives later today from the government players, but it also requires very close coordination with government and industry. … it requires trusted and confidential working relationship. … So again, the call to action here, is government, industry continuing to work together.

---

[123] Ambassador Samantha Power (U.S. Permanent Representative to the U.N.), *Samantha Power: Putting ISIS Out Of Business*, CNN Wire (Dec. 17, 2015), https://tinyurl.com/46tswhph.

[124] Marshall Billingslea, *Opening Statement Of The Nominee For Assistant Secretary Of The Treasury For Terrorist Financing*, U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 16, 2017), https://tinyurl.com/4brujnkv.

705.    As the DOJ FCPA Unit and the SEC FCPA Unit publicly observed in 2012, for example, "DOJ's and SEC's FCPA enforcement actions" regularly successfully interdicted illicit schemes by "third parties, including agents, consultants, and distributors," who were "commonly used to conceal [] [corrupt] payment[s]" "in [] business transactions,"[125] and therefore supported America's post-9/11 counterterrorism efforts because "corruption" "impede[d] U.S. efforts to" "combat … terrorism."[126]

706.    With respect to interdicting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State transnational terrorist networks, financiers, logisticians, and tactics operationalizing protection money, "taxation," and the use of cash equivalents like "free goods," the effectiveness of the U.S. government's whole-of-government counterterrorism strategy substantially depended upon DOJ's and SEC's illicit payments-related law enforcement efforts, including those of the National Security Division, USAO-DC, FBI-WFO, DOJ FCPA Unit, and SEC FCPA Unit.  This was because such above-described al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists often depended upon modes of value transfer that sounded in corruption, money laundering, and other illicit transnational activity for which DOJ and SEC had substantial expertise.

707.    The DOJ's National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial Intelligence, and State Department Bureau of Counterterrorism's contributions to the U.S. government's whole-of-government counterterrorism operations regularly protected Americans from terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in, *inter alia*, Iraq, Syria, Turkey, and Afghanistan from 2002 through 2022 in at least four ways.

---

[125] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 60.
[126] *Id*. at 2-3.

708.     *First*, whole-of-U.S.-government efforts routinely secured U.S. federal criminal indictments and convictions of key transnational al-Qaeda, al-Qaeda-in-Iraq, and Islamic terrorist operatives, financiers, and logisticians who directly funded, armed, and staffed such FTOs' terrorist attacks against Americans in Iraq, Syria, Turkey, and Afghanistan.

709.     *Second*, whole-of-U.S.-government efforts regularly developed actionable information for on-the-ground U.S. government counterterrorism operations in Iraq, Syria, Turkey, and Afghanistan designed to protect Americans from terrorist attack (and rescue American hostages) by targeting key al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorist operatives, financiers, logisticians, supply cashes, funding sites, safe houses, and other key targets that directly funded, armed, and staffed such FTOs' terrorist attacks against Americans in Iraq, Syria, Turkey, and Afghanistan.

710.     *Third*, whole-of-U.S.-government efforts routinely reduced the overall funds, weapons, and equipment available to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for use against Americans in Iraq, Syria, Turkey, and Afghanistan by interdicting the corruption, money laundering, narcotics, sanctions evasion, and fraud schemes upon which the terrorists relied, even short of an indictment or conviction.

711.     *Fourth*, whole-of-U.S.-government efforts regularly facilitated intelligence sharing between the U.S. government and key counterterrorism allies (e.g., many European or Middle Eastern governments) or participants in the terrorist finance scheme in question (e.g., the universe of companies that chose to pay Islamic State) by developing vetted information that American officials could deploy in the Middle East in order to protect Americans from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks in Iraq, Syria, Turkey, and Afghanistan.

712. United States counterterrorism operations always targeted al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection networks – literally every day at issue in this case. In fact, given the central role that such networks played in financing and arming these FTOs in Iraq and Afghanistan, there were usually multiple, large-scale, U.S. counterterrorism operations targeting the protection networks, often dozens of separate ones at the same time.

713. In 2010, for example, U.S. Army Brigadier General Jeffrey Buchanan publicly stated explained how the U.S. government and its Coalition partners were continuing to prioritize counterterrorism operations targeting al-Qaeda-in-Iraq's extortion networks because the United States recognized that, with respect to "al Qaeda," "al Qaeda in Iraq" "remain a threat," "remain dangerous[,]" "[a]nd [al-Qaeda-in-Iraq is a] part of the [al-Qaeda] network" and thus "includes al Qaeda's ability to recruit Iraqi fighters, al Qaeda's ability to bring foreign fighters across the border into Iraq, their ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money."[127] In that context, BG Buchanan observed that "al Qaeda continues to change its tactics and how it adapts" and "[b]ecause [al-Qaeda's and al-Qaeda-in-Iraq's] financial networks have been so degraded, they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of the country."[128]

714. From 2004 through 2014 (in the case of al-Qaeda and al-Qaeda-in-Iraq), and from 2014 through at least 2019 (in the case of Islamic State), the operative FTOs' protection rackets generally shared the same features described by BG Buchanan above: they were multi-faceted,

---

[127] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.
[128] *Id*.

dynamic, and constantly evolving in response to non-stop 24/7 pressure from the United States,

directly through U.S. forces or through Coalition partners like the Iraqi government. In addition

to BG Buchanan's public statement in 2010, a constant stream of additional U.S. government

announcements and associated media reports regularly highlighted how the U.S. government

believed that the effectiveness of American counterterrorism operations in Iraq that specifically

targeted al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks were

inextricably connected to reducing such FTOs' ability to kill Americans in the Middle East.

Examples of such reports included, but were not limited to:

a.  *Defense Department Documents*, January 2007:  "[S]uspected terrorists were captured []
    during a raid conducted north of Baghdad that targeted an individual with ties to a senior
    al Qaeda leader who has … conducted extortion operations …"[129]

b.  *Associated Press*, July 2007:  "On July 9, [2007] Iraqi security forces detained four
    suspects allegedly responsible for running an extortion network and two individuals
    suspected of planning attacks against coalition forces. … Iraqi police detained four
    suspects allegedly engaged in extorting protection money from local contractors and
    using the funds to finance al Qaeda in Iraq activities."[130]

c.  *Washington Post*, November 2007:  "A good way to prepare for operations in Iraq is to
    watch … 'The Sopranos,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in
    central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of
    Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the
    group 'gets a lot of money through extortion….' … The racketeering operations extended
    to nearly every type of business in [Mosul], including … a cellphone company, which
    paid the insurgents $200,000 a month."[131]

d.  *American Forces Press Service*, April 2010:  "In … Mosul, Iraqi soldiers and U.S.
    advisors searched … for a suspected AQI member believed to extort money from []
    transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in
    the deaths or arrests of at least six suspected senior AQI leaders believed to greatly
    contribute to funding the terrorist group by their involvement in a highly-organized

---

[129] Def. Dep't Documents, *American Forces Information Service News Articles, Combined Operation Nets Insurgents, Weapons in Baghdad* (Jan. 24, 2007), 2007 WLNR 1420339.
[130] Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007).
[131] Amit R. Paley, *Iraqis Joining Insurgency Less for Cause Than Cash*, Wash. Post (Nov. 20, 2007).

extortion … ring based in Mosul. … The six … include the overall AQI commander of northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion … network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"[132]

e.    *Associated Press*, October 2009:  "[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based in … Mosul. … targeted … those who own or work at construction sites and local businesses … Extortionists then use the [] money to fund terrorist attacks …"[133]

f.    *Associated Press*, September 2010:  "Iraqi forces … searched … for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money from … contractors and … transportation workers in order to fund terrorist operations …"[134]

g.    *New York Times*, December 2013:  "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely self-financing. … In Mosul, most of the security force members who are not from the area have left the city, and Al Qaeda controls whole sections of territory."[135]

2.    **U.S. Counterterrorism Operations Designed To Protect Americans From Attack By Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State In Iraq, Syria, Turkey, And Afghanistan Relied Upon The Effectiveness Of The U.S. Government's Anti-Corruption And Anti-Money Laundering Efforts**

715.    From at least 2004 through at least 2022, the United States' counterterrorism operations that targeted the transnational terrorist finance, logistics, and personnel networks upon which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied depended upon a whole-of-U.S.-government effort in which the Department of Justice played a key role in developing, vetting, and sharing actionable information concerning al-Qaeda, al-Qaeda-in-Iraq, and Islamic State

---

[132] American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010), 2010 WLNR 6913562.
[133] AP Alert - Business, *Iraqis Arrest Numerous Terrorism Suspects* (Oct. 14, 2009).
[134] Assoc. Press, *Iraqi Forces Arrest 2 Al-Qaida Suspects*, AP Alert – Terrorism (Sept. 2, 2010).
[135] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

terrorist finance, logistics, and networks worldwide, which helped protect Americans from attack in Iraq, Syria, Turkey, and Afghanistan.

716.    The United States government did not approve, publicly or privately, of Defendants' protection payments.  The U.S. government relied on its chosen Western contractors – including Defendants – to take responsibility for ensuring the financial integrity of their contracting practices in Iraq.  At all times, the U.S. government conveyed the message that protection payments violated U.S. law and undermined U.S. foreign-policy objectives in Iraq.

717.    The U.S. government has long been on record that protection payments to terrorists are unlawful – no matter their motivation.  In 2007, for example, an Assistant Attorney General emphasized at a public press conference that "corporations are on notice that they cannot make protection payments to terrorists."[136] In 2022, similarly, the Deputy Attorney General emphasized that "business with terrorists cannot be business as usual."[137]

718.    The U.S. government viewed protection payments to terrorists in Iraq and Afghanistan the same way.  Government officials stated that, as with Chiquita's payments to terrorists in Colombia, protection payments to al-Qaeda-affiliated terrorists undermined U.S. reconstruction objectives in Iraq and Afghanistan.  For example, at a House Subcommittee hearing, an Assistant Deputy Undersecretary of Defense for Program Support was asked whether "facilitation payments . . . to ensure that trucks aren't bothered [are] legal under United States law?"[138]  He responded:  "Clearly, it's not . . . and it's counterproductive to what we're trying to

---

[136] U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty*.

[137] Deputy Attorney General Lisa O. Monaco, *quoted in* U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022), https://tinyurl.com/yzb9sb8m ("DAG Statement").

[138] *Hearing on Corruption in Afghanistan Defense Contracting* (statement by Rep. John F. Tierney (D. Mass.)).

do."[139]  The U.S. Special Inspector General for Afghanistan Reconstruction ("SIGAR") similarly opined that "I don't think that there should ever be or ever condone paying off a [terrorist] entity for anything . . . Obviously that's wrong; it's against the law and counter to any counterinsurgency or reconstruction initiative that we would like to see put in place."[140]

719.    The Congressional Commission on Wartime Contracting found it "particularly alarming" that "subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[141]  Based on such statements, Defendants knew that the U.S. government was institutionally opposed to protection-money payments.

720.    The United States' recent charges against Lafarge S.A. highlights Defendants' deliberate choice to contradict U.S. counterterrorism policy to suit their own selfish interests. According to Deputy Attorney General Monaco, speaking for the United States, "[m]any companies made the right choice — the ***only lawful choice: to leave the region rather than join hands*** with [al-Qaeda- and Islamic State-linked] terrorists" in Iraq and Syria.[142] "Lafarge" – like Ericsson – "made a different decision: to go into business with ISIS and al-Nusrah — two of the world's most notorious and brutal terrorist organizations."[143]

721.    Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directly undermined the United States desire to combat extortion-related terrorist finance—a cornerstone of United States policy specifically designed to protect Americans overseas. U.S. government reports and statements alerted Defendants that resisting terrorists' demands for

---

[139] *Id.* (Statement of Assistant Deputy Undersecretary Gary Motsek).
[140] *Funding The Enemy* at 196.
[141] *CWC Report* at 73.
[142] DAG Statement (emphasis added).
[143] *Id.*

protection payments was a cornerstone of American counterterrorism policy in Iraq, Syria, and

Afghanistan.[144]

---

[144] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 6, 2 (Jan. 30, 2006) ("During the past quarter, [SIGIR] continued to advance aggressive oversight of the use of U.S. funds in Iraq's reconstruction. … SIGIR's role in Iraq's reconstruction aims to help secure the overall success of the U.S. effort and thereby honor the sacrifices of the soldiers and contractors killed or wounded. SIGIR's most notable achievements during the past quarter were the arrests of four U.S. citizens for bribery, fraud, and theft involving Iraq reconstruction funds on contracts valued at more than $13 million. These arrests signal that the United States is unequivocally committed to fighting corruption and promoting accountability on all fronts in Iraq. SIGIR's Audit and Inspections divisions continued to focus oversight on [inter alia] ... the effort to fight corruption in Iraq … SIGIR remains committed to intensifying U.S. efforts to promote an effective anticorruption system … [and] to support anticorruption institutions in Iraq."); U.S. Dep't of Defense, Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with Department of Defense Appropriations Act 2006 (Section 9010), at 3 (May 26, 2006) ("The United States remains committed to … helping Iraqis … establishing … rule of law …, and fighting corruption."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 119 (July 31, 2006) ("[In] the Corruption Perception Index, compiled by Transparency International[,] Iraq ranks 21st in countries perceived as most corrupt in the world. The U.S. Embassy-Iraq has identified assisting the Iraqi government in its efforts to reduce corruption as one of its highest priorities."); The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Our goal is … to degrade and ultimately destroy ISIL through a comprehensive and sustained counterterrorism strategy so that it's no longer a threat to Iraq, the region, the United States, and our partners. … [T]he United States will carry out a comprehensive strategy to defeat ISIL … [for which] the [] core elements [included] … Disrupting ISIL's Finances … The U.N. Security Council resolution that passed unanimously … demonstrated the broad international consensus to disrupt ISIL's finances. We are [] working aggressively … on a coordinated approach that includes: … limiting ISIL's ability to extort local populations;… and disrupting the flow of external donations to the group.  Our domestic laws also provide additional tools in this effort, enabling us to sanction or prosecute those who fund ISIL's activities."), http://tinyurl.com/6yce8e3z; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, December 17, 2014−March 31, 2015*, at 31-32 (Apr. 30, 2015) ("Several U.S. agencies play a role in disrupting ISIL's ability to fund operations. A broad U.S. government team is arrayed against this problem, including DoS, Treasury, DoD, and the intelligence community … work to accomplish the following strategic goals: … [*inter alia*] • Limit ISIL's ability to extort local populations. • … disrupt[] the flow of external donations to the group. • Prevent ISIL from accessing the financial system. … Some of the ongoing activities to disrupt ISIL's financing include: … Limiting ISIL's ability to extort local populations. ... ISIL [] extorts money in connection with daily transactions ranging from fuel and vehicle movement in ISIL-held territories to school fees for children. The U.S. government is working to limit

722.    Given the centrality of anti-corruption to U.S. counterterrorism policy in Iraq and Afghanistan after 9/11, protection payments also violated express U.S. government contracting requirements and regulations.  Under the terms of their contracts, prime contractors bore responsibility for ensuring the integrity of U.S. spending in Iraq.  The government imposed requirements designed to ensure that private contractors lived up to that responsibility.  For example, USAID's contracts contained a "standard clause" reminding its contractors that "U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism.  It is the legal responsibility of the contractor/recipient to ensure compliance with these Executive Orders and laws."[145]  CENTCOM contracts followed DOD guidelines that similarly mandated that defense contracts—and DOD's Contracting Officers who negotiated and enforced them—must include a standard clause in every contract requiring government contractors to comply with all U.S. and Iraqi laws, including laws prohibiting the provision of material support to terrorists.[146]

---

ISIL's ability to transact extorted monies …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015*, at 59 (Nov. 25, 2015) ("[T]he U.S. government is pursuing a four-part strategy to disrupt ISIL's ability to finance operations: 1. Disrupt ISIL's sources of revenue. Cut off ISIL's ability to generate revenue from … extortion in ISIL-controlled territories … and external donations. 2. Cut off ISIL's access to the regional and international financial systems. Restrict ISIL's ability to move and use its funds by accessing financial systems … and [] limit ISIL's ability to … move funds. 3. Target ISIL's financial leadership and facilitators. Identify and target key financiers within the ISIL structure. 4. Disrupt ISIL's external networks. Deny ISIL access to the international financial network that could support it in resupplying its war effort.").

[145] Memo. from Bruce N. Bower, USAID Regional Inspector General to Earl W. Gast, USAID Afghanistan Director, *Review Of Security Costs Charged To USAID's Projects In Afghanistan* (Review Report No. 5-306-10-002-S) at 11 (Sept. 29, 2010), https://tinyurl.com/2p82chxz.

[146] *See* Office of Under Secretary of Defense, *Class Deviation – Implementation Of The Synchronized Predeployment & Operational Tracker (SPOT) To Account For Contractor Personnel Performing In The United States Central Command Area Of Responsibility*, Memorandum for Directors Of Defense Agencies (Oct. 17, 2007).

723.    Prime contractors were required to include those same clauses in their contracts with their subcontractors and to ensure that their subcontractors complied with them.[147]  The "vetting" requirements were especially strict for any subcontractors that were to be armed under the contracts. Most Defendants' protection payments – whether made directly, or through subcontractors – violated those requirements and reflected a failure to live up to their responsibility to ensure the legality of their contract spending in Iraq.

724.    Contractors typically concealed their protection payments from the U.S. government (and the Iraqi government) by funneling the money through networks of subcontractors and mischaracterizing the payments in their books and records as "security," "transportation," "logistics" or other similar costs.  For that reason, the U.S. government (and the Iraqi government) was unaware of the specific illegal payments that Defendants made.

725.    As the U.S. government became aware of broader patterns of corruption in Iraq, it implemented a number of programs to curtail illicit payments.  For example, Congress created SIGIR, which scrutinized and audited government contracting as part of a broader anti-corruption mandate.  The U.S. Embassy in Baghdad also aggressively pushed anti-corruption efforts.  The net effect of these various efforts was to elevate anti-corruption to a distinct line of effort in the U.S. strategy in Iraq, and to convey unmistakably to industry participants that protection payments were unacceptable.

726.    The U.S. government also implemented a wider array of programs designed to combat corruption in Iraq more broadly.  Defendants' protection payments also stymied those programs by fueling the type of corruption that U.S. agencies were attempting to eradicate.

---

[147] *See*, *e.g.*, USAID Contract No. DFD-I-00-05-00250, § H.15 (Sept. 27, 2005) ("[t]his provision must be included in all subcontracts/subawards"); USAID Contract No. 306-C-00-11-00506, § H.17 (Oct. 29, 2010) (same).

727.    The U.S. government on occasion encouraged companies to hire local Iraqis or employ local Iraqi businesses in connection with some projects.  However, this was not a license for Western companies, including Defendants, to allow (much less instruct) their partners, consultants, and contractors to pay terrorists.  On the contrary, the U.S. government at all times communicated its expectation that Defendants should vet their local partners and take affirmative steps to ensure that the money they paid to those partners did not flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  And the U.S. government repeatedly made clear that the payment of protection money – or the payment of terrorist "taxes" – in exchange for permission to proceed with U.S.-funded projects was illegal and counterproductive.  Neither USAID nor Multinational Forces-Iraq ever suggested that such payments were either an inevitable consequence or an acceptable cost of implementing U.S.-funded projects in areas controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, or Islamic State.

728.    In September 2010, General Petraeus issued formal contracting guidance designed to further discourage protection payments to terrorists.  In the guidance document, General Petraeus emphasized that "[w]here our money goes is as important as the service provided or the product delivered."[148]  He thus instructed contracting officers to "[h]old prime contractors responsible for the behavior and performance of their sub-contractors," with an understanding that "[e]xcessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[149]  At bottom, the U.S. government's goal was to improve its systems and ensure that its "vendors and contractors" did not "empower the wrong people or allow the diversion of funds" to insurgents.[150]  The government took a number

---

[148] *COMISAF's Contracting Guidance* at 1.
[149] *Id.*
[150] *Id.*

of steps to implement that guidance, including by ramping up its own vetting efforts and affirmatively suspending or debarring certain contractors with suspected links to insurgents.

729.    For several reasons, Defendants nonetheless remained able to execute their payments to insurgents despite the U.S. government's efforts to discourage and stop them.  *First*, in Iraq and Afghanistan, the government often lacked visibility into the subcontracting networks through which the payments flowed and thus had to "rely exclusively on prime contractors" to vet and supervise the subcontractors.[151]  When Defendants knowingly funneled protection money through those subcontractors, the structure of the transactions made it difficult for the government to trace the money with sufficient precision to take corrective action.  Such payments frustrated the U.S. military's policy of identifying and terminating "contracts with supporters of the insurgency."[152]

730.    *Second*, the U.S. government faced staffing shortages that impeded its efforts to fully monitor the large number of contractors and subcontractors operating in Iraq and Afghanistan.  With a limited number of qualified contracting officers available – and a vast network of contracts to supervise – the government lacked the resources to investigate every payment made by Defendants or their subcontractors.  Defendants were able to exploit those resource constraints to conceal their protection payments from U.S. government personnel. Defendants did so even though they were duty bound to affirmatively flag such issues for the U.S. agencies funding their projects with U.S. taxpayer money.

731.    *Third*, because the U.S. government's contractors often had better access to on-the-ground information than it had, the U.S. government relied on the good faith of its

---

[151] U.S. Special Inspector General for Afghanistan Reconstruction, *Contracting With The Enemy*, at 8, Audit No. 13-6 (Apr. 2013).
[152] *Id*.

contractors to prevent payments to terrorists.  Due to Defendants' business ties – and the long in-country tenures of many of their personnel, as compared to the typically short rotations of U.S. government deployments – Defendants had unique real-time visibility into where their money was going.  The government's need to rely on Defendants to use that unique visibility to do the right thing made it even easier for Defendants to conceal their payments from U.S. regulators.

732.    Given those constraints, it was Defendants (not the U.S. or Iraqi governments) that had the resources, expertise, and obligation to ensure that their practices did not materially support al-Qaeda, al-Qaeda-in-Iraq, or Islamic State. As the U.S. Senate Finance Committee's Oversight and Investigations Unit reported in 2020, when a Western company's "work [in] some of the most" "dangerous," "active hotspots for terrorist activity" "generates more than $1 billion in revenue" directly or indirectly through U.S. federal government "grants," "both USAID's and OFAC's processes clearly state that it was the responsibility of the [company] to vet all sub-grantees" and the Western company plainly "has a duty to ensure that funds acquired from the U.S. government … do not end up supporting terrorist activity."[153]

733.    In such circumstances, if a Western company had "access to the appropriate public information and should have known how, but failed to, properly vet [a contractor] as a sub-grantee, resulting in the transfer of U.S. taxpayer dollars to an organization with an extensive history of supporting … terrorists," it is the company that "bears the sole responsibility for their failure to properly vet [the contractor]" because "[h]ad [the company] employed [reasonable] due diligence … methods …, taxpayer dollars would not have exchanged hands with an organization

---

[153] U.S. Senate Finance Committee Oversight and Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, at 5-8, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

that is known to fund terrorist organizations."[154] "Particularly concerning," according to the U.S. Senate Finance Committee's Oversight and Investigations Unit, "is [when a Western company] attempt[s] to shift the blame to the federal government for [its] own inability to properly vet a subcontractor" for terrorist finance.[155]

734.    In sum, the U.S. government clearly stated its opposition to protection payments and attempted to curtail them.  But those efforts were imperfect, and, at all times, Western contractors, including Defendants, functioned as the U.S. government's principal tool against terrorist financing.  But Defendants abused that trust to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State and thereby increase their profit margins.  Ericsson's conduct forms the basis of this lawsuit; Plaintiffs expressly disclaim any challenge to the U.S. government's policy decisions.

**B.     Defendants Provided Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State By Obstructing United States Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**

735.    Ericsson's participation in the FTOs' protection-money rackets gave it firsthand access to important information about how terrorists were raising money in Iraq.  No later than 2013 (when it was under investigation by the U.S. government for foreign bribery), Ericsson was required to disclose this information to the U.S. government and others, but it chose instead to conceal it to prevent Ericsson's own complicity with terrorists from coming to light.  Thus, at various points thereafter, Ericsson hid information about the protection-money rackets, including the identities of terrorist actors (*e.g.*, Haji Saleh), corrupt contractors and subcontractors (*e.g.*, al Awsat), and details regarding how money was solicited and collected that allowed the FTOs'

---

[154] *Id*. at 10-11.
[155] *Id*.

253

finance mechanism to flourish.  This concealment independently aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's violence.

736.    From at least 2013 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely and substantially obstructed United States counterterrorism operations designed to protect Americans from terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by lying to multiple key members of the U.S. government's whole-of-government counterterrorism team, including, but not limited to, the DOJ National Security Division, DOJ FCPA Unit, and SEC FCPA Unit.

737.    Eventually, Defendants' global bribery scheme – but not the terrorist finance aspects of such scheme – was detected, in part.  In 2013, the SEC launched an FCPA investigation of LM Ericsson's and its subsidiaries' corrupt practices worldwide, and DOJ launched its own investigation in 2015 (but neither learned that Ericsson obstructed U.S. counterterrorism efforts until at least 2022).

738.    Even then, however, Defendants' obstruction of U.S. counterterrorism efforts endured:  from 2013 through 2022, LM Ericsson, Ericsson AB, Ericsson Inc., and Ekholm represented to DOJ, as well as LM Ericsson's shareholders, that Defendants were fully cooperating with the United States' then-ongoing criminal and civil anti-corruption investigations.

739.    Ericsson brazenly obstructed U.S. counterterrorism efforts by concealing Defendants' payoffs to terrorists throughout the course of DOJ's and SEC's respective investigations.  During the early phase (from 2013 through 2015), while Defendants were promising cooperation and good corporate citizenship to DOJ and SEC, they plotted to pay off terrorists.  During the middle phase (from 2016 through 2018), Defendants continued their

payoffs to Islamic State – while still lying to everyone else.  Amazingly, while LM Ericsson was finalizing its parallel resolutions with DOJ and SEC in 2019, it was simultaneously making the deliberate – and obviously wrongful – choice to conceal its protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State under the pretense that corrupt payments to the world's most notorious anti-American terrorist group were not "material."

740.     To obstruct U.S. government counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants routinely structured illicit transactions to conceal their protection payments on  books-and-records, including, but not limited to, through Defendants': (i) illicit transactions with and through intermediaries, including their Iraqi partners, consultants, and contractors; (ii) use of slush funds and cash payoffs; and (iii) creation and maintenance of deliberately deficient internal controls.

741.     To obstruct U.S. government counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants routinely made materially false representations to, *inter alia*, the DOJ National Security Division, DOJ FCPA Unit, SEC FCPA Unit, and FBI, that obstructed such U.S. counterterrorism authorities' investigations and intelligence concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria.  LM Ericsson, Ericsson AB, and Ericsson Inc. routinely caused such obstructive communications to be made to U.S. government officials from at least 2013 through at least 2022, and Ekholm did so from at least 2017 through at least 2022.

742.     On December 6, 2019, LM Ericsson and its subsidiaries—which LM Ericsson admitted "operated as divisions of the parent, rather than separate and independent entities"—(1) admitted to a years-long campaign of corruption undertaken to solidify its grip on telecommunications business in six countries; and (2) entered into a Deferred Prosecution

Agreement with DOJ, under which LM Ericsson agreed to pay total criminal and regulatory penalties to the United States government in the amount of $1,060,570,432, one of the largest corruption fines ever imposed.

743. As *Reuters* observed, Ericsson's subsequent "excuse for not fessing up earlier" – i.e., "that the [Iraq] transactions … didn't meet Ericsson's 'materiality' threshold" – was "unlikely to sit well with the Department of Justice, which takes a dim view of anything less than full disclosure in anti-corruption probes."[156] According to *Reuters*, Ericsson's "[k]eeping [Ericsson's] Iraqi skullduggery under wraps while in negotiations with the Feds is a distinctly bad look" considering "[LM Ericsson]'s 2019 [FCPA] settlement over graft in China, Vietnam, Indonesia, Kuwait and Djibouti made clear that the hefty size of the fine was partly due to Ericsson's foot-dragging."[157]

744. DOJ agreed. On March 2, 2022, LM Ericsson publicly admitted: "On March 1, 2022, the DOJ informed Ericsson that the disclosure made by the company prior to the DPA about its internal investigation into conduct in Iraq in the period 2011 until 2019 was insufficient. Furthermore, it determined that the company breached the DPA by failing to make subsequent disclosure related to the investigation post-DPA." As the *Washington Post* reported, DOJ "accused … Ericsson of violating a billion-dollar legal settlement by failing to fully disclose evidence of alleged corruption and possible payments to terrorists in Iraq."[158]

---

[156] Ed Cropley, *Ericsson's ISIS Fallout Could Go Beyond Big Fines*, Reuters (Feb. 16, 2022).
[157] *Id.*
[158] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS*, Washington Post (Mar. 2, 2022).

745.     The SEC concurred.  On June 9, 2022, LM Ericsson reported that the SEC "has

notified the Company that it has opened an investigation concerning the matters described in the

Company's 2019 Iraq investigation report."[159]

746.     According to a Confidential Witness with direct, first-hand knowledge of LM

Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments to increase

Ericsson profits in high-risk jurisdictions, the following conclusions are "obviously" correct:

a.     LM Ericsson's and Ericsson AB's "top management" both "approved" Ericsson's
        decision to "bribe[]such terrorist organizations" – i.e., al-Qaeda, al-Qaeda-in-Iraq, and
        Islamic State – "but also wanted to hide it from DOJ+SEC+IRS during their penalty
        negotiations up to the signing of the DPA in December 6, 2019."

b.     When LM Ericsson's and Ericsson AB's "top management" concealed information
        concerning Ericsson's decision to "bribe[] such terrorist organizations," Defendants' "top
        management" did so "in spite of the existence" – by no later than "2018" – of
        Defendants' "revealing Internal Compliance Report" "concerning their payments in
        Iraq."

c.     "[LM Ericsson's] CEO [i.e., Börje Ekholm] should have presented [Defendants' "Internal
        Compliance Report" regarding Iraq] to those US Authorities," including "DOJ," "without
        delay, before the signing of the DPA."

747.     The suspicious timing of Simpson Thacher's final report (and the fact that

Simpson Thacher was simultaneously advising LM Ericsson on the DOJ investigation) also

suggests that the report was intentionally delayed until just after the ink on LM Ericsson's DPA

had dried so that Ericsson could get away with not disclosing it to the DOJ—and, if necessary, to

give Ericsson the ability to say it could not have disclosed Simpson Thacher's findings to the

DOJ before finalizing their settlement.  LM Ericsson and the DOJ executed the DPA on

November 26, 2019.  The DOJ filed the related criminal charges and put out a press release

---

[159] LM Ericsson, *Press Release: Update on Ericsson Engagement with U.S. Authorities* (June 9,
2022).

announcing the DPA on December 6, 2019.  And Simpson Thacher "finished" its report on

December 11, 2019.

    C.    **Each Defendant Facilitated Ericsson's Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**

        1.    **LM Ericsson**

748.    Defendants' corporate culture of obstruction, like their corporate culture of

corruption, started at the top:  LM Ericsson directed Defendants' obstruction of U.S.

counterterrorism operations.

749.    From the start of the DOJ's and SEC's respective investigations, LM Ericsson

specifically intended to impede the U.S. government's ability to uncover LM Ericsson's bribes to

al-Qaeda and Islamic State in Iraq and Afghanistan.  LM Ericsson's agent, Simpson Thacher, has

boasted in marketing materials how "the Firm convinced the SEC to drop certain issues from its

ongoing investigation" of a "global telecommunications company . . . regarding alleged

payments to government officials in various countries in violation of the FCPA."

750.    LM Ericsson hired Simpson Thacher with the specific intent that Simpson

Thacher deflect any United States government scrutiny concerning Ericsson's illicit payments in

Iraq, including those relating to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. *See infra* Parts IV,

V.  LM Ericsson and Simpson Thacher agreed as to that course of conduct, and thereafter

successfully obstructed the United States government's counterterrorism operations.  *Id.*  This

conduct was a but-for cause of Defendants' protection payments in Iraq by no later than 2014;

when LM Ericsson had already retained Simpson Thacher; both LM Ericsson and Simpson

Thacher were aware of Defendants' payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State;

both LM Ericsson and Simpson Thacher knew such payments were illegal and foreseeably aided

acts of terrorism against Americans; and LM Ericsson and Simpson Thacher both affirmatively chose to conceal such information from the United States government even though both had an affirmative duty of disclosure given LM Ericsson's assertion that it was fully cooperating with the then-existing U.S. government investigation of Ericsson.

751.    On information and belief, LM Ericsson represented to DOJ – directly, or through its agent, Simpson Thacher – that LM Ericsson was fully cooperating with DOJ's investigation.

### 2.    Ericsson AB

752.    Consistent with the "One Ericsson" model, Ericsson AB had control of most Ericsson employees and other personnel (from Ericsson's customers, strategic partners, consultants, and other vendors, suppliers, and subcontractors with whom Ericsson AB contracted) relevant to the Corporate Defendants' obstructive conduct.  By exercising direct control over those individuals, Ericsson AB helped LM Ericsson operationalize its obstruction.

753.    Moreover, on information and belief, Simpson Thacher also represented Ericsson AB (in addition to LM Ericsson) in connection with the SEC and DOJ probes of Ericsson's corrupt payments and other potential FCPA violations.[160]  Because Ericsson AB was jointly represented by Simpson Thacher, it was jointly aware of LM Ericsson's obstructive conduct and facilitated it through its ongoing concealment

---

[160] Ordinarily, in a government investigation, a firm in Simpson Thacher's position that represents the parent corporation would represent its various divisions and encompassed subsidiaries.  In particular, the Statement of Facts attached to and incorporated by reference in, LM Ericsson's DPA stipulated that "LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated entities," and that its "subsidiaries acted as divisions of the parent, rather than separate and independent entities."

### 3.    Ericsson Inc.

754.    On information and belief, Ericsson Inc. was aware of Ericsson's transfers of

U.S.-origin communications technologies to al-Qaeda in Afghanistan and thus obstructed U.S.

counterterrorism operations—thereby providing operational assistance to al-Qaeda—by

concealing information regarding those transfers (just as it concealed information regarding

Defendants' illicit payments to Islamic State).

755.    Moreover, Ericsson Inc. concealed its own likely direct payments to terrorists in

Iraq and Afghanistan.  Given that, according to one Confidential Witness, "[t]he Ericsson people

in Iraq between [March 2003 and February 2004] were generally Americans"—combined with

his/her observations about stark attack disparities in military-led convoys that included (versus

those that did not include) Ericsson personnel—it is reasonable to infer that the Ericsson

personnel on the ground either made or were directly involved in the making of protection

payments to al-Qaeda-in-Iraq and al-Qaeda "core" in Afghanistan.

756.    Ericsson Inc. also participated in the Corporate Defendants' obstruction scheme

by operationalizing Ericsson's whistleblower intimidation machinery, particularly by leveraging

the U.S. legal system to maximize Ericsson's ability to threaten former Ericsson Inc. employees.

This was designed to intimidate those employees from communicating with the U.S. government

about Defendants' conduct, including (on information and belief), the conduct alleged herein.

757.    According to a Confidential Witness with direct, first-hand knowledge of LM

Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the

Middle East, Ericsson caused a draft letter agreement to be transmitted to one or more former

employees of Ericsson Inc. in the United States that contained, inter alia, the following:

| ERICSSON ⟋ | | Ericsson Internal<br>POLICY | | |
|---|---|---|---|---|
| Prepared (also subject responsible if other) | | No.<br>EUS-08:008075 Uen | | |
| Approved | Checked | Date<br>2020-04-06 | Rev<br>AM | Reference |

## 11     Proprietary Information
### Please read, sign and return to your HR Generalist

FROM:      Legal Department

RE:         PROPRIETARY INFORMATION

This letter is to remind you of your continuing obligations regarding proprietary information of Ericsson Inc., Ericsson Canada Inc. and their parent companies, subsidiaries and affiliates (collectively, the "Company"). Company proprietary information includes (but is not limited to) proprietary information concerning Company products, technology and all non-public aspects of Company business.

Under the terms of agreement(s) signed pursuant to your employment with the Company, it is a violation to disclose or use for your own benefit or the benefit of any other individual or entity the confidential or proprietary information of the Company. Federal, provincial, and state laws establish similar post-employment obligations under the law, including a duty not to disclose or use information that may be classified as a trade secret or proprietary information of your prior employer.

While we understand your loyalties will be with your future employers, we expect you to observe and comply with your responsibilities to the Company, just as your future employers will expect with regard to their proprietary information.

We wish you the best of luck in the future.

Sincerely,

Ericsson Legal Department

_____    Employee's Name

_____    Employee's Signature

_____    Date

758.     Plaintiffs refer to this letter, and substantially similar communications demanding confidentiality from former employees of Ericsson Inc., as the "Ericsson Legal Threat Letter."

759.    Although phrased as a "reminder," the Ericsson Legal Threat Letter is clearly a threat, as it threatens legal consequences under both contracts as well as federal, state, and local laws for any person who discloses Ericsson's confidential or proprietary information.  The demand for secrecy is sweeping:  the letter refers to confidential or proprietary information without specifying what that is, and makes it clear that it applies to information relating not only to Ericsson Inc., but also to the company's parent, subsidiaries, and affiliates.  It is also unqualified:  it does not exclude, for example, reports of information to law enforcement authorities.  And it purports to be binding, as it requires the employee's signature.

760.    It is well-known across industries that such broad and unqualified demands for secrecy chill whistleblowing activity by intimidating putative whistleblowers.  Employees will err on the side of self-preservation by staying silent if they are concerned that disclosing information about their employer's illegal activities will result in adverse consequences—and doubly so if they have recently signed a document promising not to disclose that information.

761.    Precisely for this reason, such demands are illegal.  For example, Securities and Exchange Commission Rule 21F-17 prohibits any person from taking action to impede an individual from communicating information to the Commission, including by "enforcing, or threatening to enforce, a confidentiality agreement" with respect to that communication.  Pursuant to this rule, the Commission has repeatedly brought enforcement actions against companies that adopt broad confidentiality policies or agreements that do not inform employees of their right to disclose information to law enforcement authorities.

762.    Suppressing potential whistleblowers was important to Ericsson because, for years, LM Ericsson was systematically breaking the law around the world. Indeed, for engaging in widespread bribery, record-keeping violations, and internal controls violations, Ericsson

admitted to one of the largest Foreign Corrupt Practices Act sanctions in U.S. history in 2019. The government explained that Ericsson did not receive full credit for cooperation in connection with that investigation because Ericsson failed to voluntarily disclose all of its serious misconduct, produced materials in an untimely manner, and did not fully remediate the violations. Indeed, years after Ericsson's 2019 settlement, it emerged that Ericsson had withheld information about payments to Islamic State.

763.    Consistent with Ericsson's policy of covering up its wrongdoing, LM Ericsson and Ericsson AB depended upon Ericsson Inc. to ensure that Ericsson's whistleblower intimidation machinery functioned as Defendants corruptly intended—to intimidate any whistleblowers who challenged any aspect of Ericsson's criminal schemes.

764.    Thus, LM Ericsson and Ericsson AB relied upon Ericsson Inc. to transmit the Ericsson Legal Threat Letter to one or more former Ericsson Inc. employees who directly serviced Ericsson AB's customers in the North Middle East Group – which covers Afghanistan, Iraq, Jordan, Lebanon, and Syria – from an Ericsson Inc. office in America.  This letter was transmitted even after Ericsson's December 2019 resolution with the U.S. government, indicating specific intent to cover up wrongdoing.

765.    The Ericsson Legal Threat Letter appears to be a form letter that was sent not only to one Ericsson Inc. employee, but on information and belief to every exiting Ericsson Inc. employee.  Each time, the letter was transmitted not only for the benefit of Ericsson Inc., but also for all of that company's parents, subsidiaries, and affiliates, including LM Ericsson and Ericsson AB.  Each time, the letter was transmitted from an Ericsson Inc. office in the United States, to an employee in the United States, referencing U.S. laws, and requesting a signature in the United States.

766.    LM Ericsson and Ericsson AB caused Ericsson Inc. to transmit the Ericsson Legal Threat Letter with the shared specific intent for LM Ericsson and Ericsson AB to each reach into the United States to use Ericsson Inc. to intimidate every former Ericsson Inc. employee who could potentially expose LM Ericsson's and Ericsson's enterprise-wide corruption scheme from 2001 through at least February 15, 2022,  of which Defendants' terrorist finance was an inextricable part, including the foreseeable risk that evidence of LM Ericsson's and/or Ericsson AB's payments to terrorists throughout the Middle East, including al-Qaeda, al-Qaeda-in-Iraq, the Taliban, and Islamic State.

767.    When LM Ericsson and Ericsson AB reached into America through Ericsson Inc. to transmit Ericsson's Legal Threat Letter to former Ericsson Inc. employees in the U.S. who could expose Ericsson AB's unlawful conduct while working for high-risk Middle Eastern customers, LM Ericsson and Ericsson AB sought to secure significant business benefits derived from LM Ericsson's and Ericsson AB's desired consequential actions inside America:

a.    Ericsson Inc. acted on behalf of LM Ericsson and Ericsson AB, and attempted to procure a signed admission from each newly fired Ericsson Inc. employee residing in America, which LM Ericsson and Ericsson AB valued specifically because of their need to deter whistleblowing given Ericsson's admitted, extensively documented, criminal conduct.

b.    Acting through Ericsson Inc. in the U.S., LM Ericsson and Ericsson AB asked each Ericsson Inc. employee in America to "[p]lease read, sign and return to your HR Generalist" in Ericsson Inc.'s office in the United States.  When LM Ericsson and Ericsson AB used Ericsson Inc. to send this request to the U.S.-based newly fired employees of the latter, LM Ericsson and Ericsson AB intended to secure a strong piece of evidence against former Ericsson Inc. employee, which LM Ericsson and Ericsson Inc. specifically intended to use in an American court.

c.    Each time Ericsson Inc. secured a signature on behalf of LM Ericsson and Ericsson AB from a newly fired Ericsson Inc. employee in the United States, LM Ericsson and Ericsson AB obtained a valuable business asset – *i.e.*, the signed document – that LM Ericsson and Ericsson AB could (and, on information and belief, often did) later use to extract further advantages from Ericsson Inc. and the American legal system.

d.    Acting through Ericsson Inc. in the U.S., LM Ericsson and Ericsson AB reached into America to threaten potential whistleblowers and witnesses.

768.    At all times, LM Ericsson and Ericsson AB knew that Ericsson faced substantial criminal risk under United States law, given LM Ericsson's and Ericsson AB's operation of an enterprise-wide corruption scheme in which LM Ericsson and Ericsson AB violated numerous laws of the United States prohibiting, *inter alia*, the provision of material support to terrorists.

769.    LM Ericsson and Ericsson AB reached into the United States to wield Ericsson Inc. as both sword and shield.  LM Ericsson and Ericsson AB leveraged unique advantages offered by America's legal system, including the rule of law, reliable courts, discovery, and so on, to attempt, through Ericsson Inc., to proactively compel former Ericsson Inc. employees to remain silent about whatever they knew given the explicit legal threat for which LM Ericsson and Ericsson AB relied upon Ericsson Inc.'s presence in America.

770.    LM Ericsson and Ericsson AB also knew that Ericsson AB's most profitable network development and managed services contracts outside of America and Europe tended to be in the so-called "virgin" telecoms markets that offered the potential for Ericsson to build an entire network from scratch—with the attendant chance for LM Ericsson and Ericsson AB to realize outsized profits.  In every "virgin" telecom market that existed from 2001 through 2022, however, the reason for the market opportunity was simple:  the country in question posed the most severe terrorist finance and anti-corruption risk possible.  From 2001 through 2022, Iraq and Afghanistan exemplified this trend.

771.    Given LM Ericsson's status as a publicly traded company whose shares trade in America, LM Ericsson and Ericsson knew that LM Ericsson's and Ericsson AB's ability to keep profiting from Ericsson's enterprise-wide corruption scheme, including their protection payments to FTOs arising thereunder, depended upon LM Ericsson's and Ericsson AB's ability to manage the vast U.S.-linked Dodd-Frank-whistleblower risk arrayed against LM Ericsson given its

criminal conduct in Iraq, Afghanistan, and elsewhere from 2001 through 2022. As a result, ever since the SEC's Dodd-Frank whistleblower rules took effect on August 12, 2011, LM Ericsson's and Ericsson AB's ability to protect their ability to profit from illicit payment strategies, like Ericsson AB's choice to purchase protection from FTOs by making protection payments to them, has depended on suppressing whistleblowers in the United States and avoiding U.S. law enforcement.

772. LM Ericsson and Ericsson AB also actively managed their U.S.-related whistleblower risk arising from Ericsson's top-down corruption model and associated payments to FTOs like al-Qaeda as Ericsson AB's cost of doing business in "virgin" telecom markets like Iraq and Afghanistan.

773. From 2011 through 2022, LM Ericsson and Ericsson AB also knew that Ericsson Inc.'s former employees in America could utilize the U.S. legal system's robust legal protections for whistleblowers, for which America stood alone amongst the Western legal world, as the only jurisdiction in which the government offers potential 8- and 9-figure "bounty" awards to incentivize disclosures.

774. LM Ericsson and Ericsson Inc. attempted to manage the risks described above by routinely deploying Ericsson Inc. to threaten former Ericsson Inc. employees inside the United States to minimize the chance that LM Ericsson and Ericsson Inc. would get caught.

### 4. Börje Ekholm

775. Ekholm in particular played a critical role in Defendants' obstruction of U.S. counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Among other things, Ekholm approved Ericsson's overall strategy, which facilitated protection payments to Islamic State in Iraq, and the related obstruction of U.S. counterterrorism operations thereafter.

776.     Rafiah Ibrahim, Ericsson's head of the Middle East and Africa regions and member of LM Ericsson's Executive Leadership Team since 2017, had personal knowledge of Ericsson's illicit activities in Iraq and played an active role in key aspects of them.  In March 2019, while Ericsson's outside counsel from Simpson Thacher was conducting an internal investigation of Ericsson's corruption and the DOJ/SEC investigation was nearing its end, Ericsson announced that Ibrahim would be leaving her position as regional head for Middle East and Africa (and her post on LM Ericsson's Executive Leadership Team) to become a strategic "advisor" to Ekholm beginning on August 31, 2019—even though no replacement for her had yet been identified.  Although dressed up as a mere personnel change and perhaps even a promotion for Ibrahim, Ekholm's move to make Ibrahim one of his "advisors" was recognized by some industry insiders as an obvious "euphemism for 'gardening leave'".  It is clear in hindsight that Ekholm made that decision with knowledge of at least some of Ericsson's illegal conduct in Iraq (as well as Ibrahim's culpability for that conduct).

777.     On information and belief, Ibrahim is still employed by LM Ericsson as an "advisor" to Ekholm.  Ekholm most likely decided not to fire Ibrahim to conceal from the U.S. Government Ericsson's illegal activities in Iraq.  Ekholm was laser-focused on finalizing Ericsson's dealings with DOJ and SEC so Ericsson could "close this legacy chapter" and "move forward."  Had Ericsson cut Ibrahim loose rather than paying her to assume a fake role as Ekholm's personal strategic advisor (without being on the same continent as the person she was advising), she undoubtedly would have told the U.S. Government where all of Ericsson's bodies were buried.  This would have jeopardized Ericsson's ongoing settlement negotiations with the DOJ and SEC and potentially exposed Ericsson to fines and penalties even larger than those under discussion at the time.

778.    Although plaintiffs allege that Ekholm and other Ericsson executives knew about their payments to terrorists in Iraq much earlier, and that Ekholm knew while he was on LM Ericsson's Board prior to his appointment as CEO in 2017, Ekholm admitted publicly that he knew of the illegal payments in Iraq as early as 2018, which prompted Simpson Thacher's internal investigation in 2019.

779.    In the wake of Simpson Thacher's final report leaking to ICIJ, Ekholm has conveniently claimed in public that in 2019 he had instructed certain Ericsson officials to "disclose fully [the report's findings] to the DOJ" but that others at Ericsson decided against this following an "internal process." Ekholm had many incentives to portray himself in a favorable light at that time; it was just one week until Ericsson's annual shareholder meeting where shareholders would vote on, among other things, whether to maintain the existing board members (including Ekholm) and whether to approve Ekholm's proposed compensation for the year ahead, and whether to discharge Ekholm from personal liability related to the Iraqi scandal. And proxy firms were recommending to shareholders that they vote to remove Ekholm as CEO. However, if Ekholm's claim to have given instruction is true, it is an admission that Ekholm recognized the imperative to share this information about Ericsson's terrorist payoffs in Iraq with the U.S. Government, but that Ericsson deliberately withheld that information in the hopes that it would stay under wraps and that Ekholm was on board with that decision.

### 5.    Rafiah Ibrahim

780.    As alleged *supra*, Simpson Thacher uncovered evidence during the course of its internal investigation that Ibrahim was directly involved with many of Ericsson's corrupt payments in Iraq, including to FTOs. Simpson Thacher conducted this investigation around the same time that the DOJ and SEC were beginning to wrap up their investigations of Ericsson concerning similar types of corrupt payments in other countries. Upon learning of STB's

discovery of a limited subset of Ibrahim's conduct as Head of Middle East and Africa, CEO Börje Ekholm sought to remove Ibrahim from her role while disincentivizing her from cooperating with law enforcement authorities, including the U.S. Government, and possibly spilling the tea on Ericsson's dirty deeds in Iraq (and elsewhere).  Thus, rather than abruptly firing this long-tenured Ericsson executive outright—which would have raised red flags (and potentially jeopardized Ericsson's ability to renew lucrative business with key customers in her region)—Ekholm and Ibrahim reached their own "sham" agreement in early 2019:  On August 31, 2019, Ibrahim would "voluntarily" step down as Head of Ericsson's Middle East and Africa Region and become an "advisor" to Ekholm—essentially a "no-show" job for which she would be handsomely compensated—and Ibrahim would remain within the Ericsson tent and not tell the U.S. where the bodies were buried.

781.    Ericsson and Ekholm engineered this arrangement so that Ibrahim's departure would be announced in mid-March 2019 as a mere redeployment that would not take effect until nearly six months later—on August 31, 2019.  Rolling out the announcement this way was strategic on several fronts.  First, because Ibrahim's departure as Middle East/Africa Market Head was not effective immediately, Ericsson avoided raising suspicions that the move was driven by Ibrahim's potential involvement in criminal activity or other misconduct severe enough to necessitate an abrupt change.  Second, by announcing that Ibrahim would move into the role of an advisor to Ekholm, Ericsson created a narrative that could be publicly spun as a "promotion" and that would, at the very least, counteract any implication that Ibrahim was engaging in criminal behavior.  (After all, why would a CEO publicly emphasizing his company's newfound commitment to compliance publicly announce appointing a corrupt executive as a personal advisor?)   Third, by removing Ibrahim from LM Ericsson's Executive

Team, her name would no longer be featured in Ericsson's Annual Reports (or other SEC

filings), and her compensation would no longer need to be disclosed publicly.[161]  More

important, however, was the fact that by making Ibrahim an "advisor", the mere fact of her

continued employment by Ericsson (and any change in that status) would no longer be readily

verifiable by the public.  And lastly, consistent with Ericsson's foundational commitment to

putting profits above all else, allowing Ibrahim to remain as Ericsson's Head of Middle East and

Africa region empowered her to use her relationships with the region's largest telecom

companies one last time to finalize a handful of new and lucrative long-term deals for Ericsson—

including a massive contract with Asiacell for network expansion and optimization in Iraq that

Ericsson announced on July 11, 2019.

782.    By agreeing to this deal, Ibrahim also became an indispensable participant in

Ericsson's strategy of obstructing the U.S. Government's investigation of Ericsson and

concealment of material information regarding FTO activities in Iraq from the U.S. Government.

## D. Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States

783.    LM Ericsson's and Ericsson AB's ability to reach into the United States was both

the initial but for cause, and turbocharger thereafter, of Defendants' operational assistance to al-

Qaeda, al-Qaeda-in-Iraq, and Islamic State though Ericsson's obstruction of U.S.

counterterrorism operations from at least 2015 through at least 2022.  LM Ericsson's routine

---

[161] Ericsson's Annual Reports disclosed individual compensation for members of LM Ericsson's Board of Directors and for the CEO.  The compensation for the other 14 members of LM Ericsson's Executive Team was not broken out individually but was reported in aggregate form. Nevertheless, certain shareholders and certainly LM Ericsson's Board of Directors likely had more visibility into the Executive Team's compensation than provided in the Annual Reports alone.

communications inside the United States, mostly, on information and belief in Washington, D.C., enabled additional terrorist violence by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by concealing Ericsson's payments to the terrorists and thus depriving the U.S. government of the intelligence, investigative leads, and network understanding it needed to attack the protection rackets Ericsson financed. If LM Ericsson had not reached into the United States as it did, it would not have been able to obstruct U.S. counterterror efforts as it did.

784.   Ericsson's ability to conceal its illegal protection payments to FTOs was, in part, based on the credibility and favor that Ericsson Inc. had built up, on behalf of Defendants, by interfacing and working with the U.S. Government on national security issues over the course of several years.  Specifically, following LM Ericsson's January 2012 acquisition of New Jersey-based Telcordia Technologies, Ericsson had effectively acquired a seat on the U.S. National Security Telecommunications Advisory Committee ("NTSAC") that had been occupied by Telcordia's CEO, Mark Greenquist, since January 2011.

785.   The NSTAC is comprised of up to 30 senior executives from the U.S. telecommunications industry and was established to provide the President, through the Secretary of Homeland Security, with information and advice regarding national security and cybersecurity issues arising from domestic and global communications infrastructure, new communications technologies, and the ever-changing threat environment, among other things.

786.   After gaining that toehold on the NTSAC through its Telcordia acquisition, Ericsson achieved full and direct access when President Obama appointed the chairman of Ericsson Inc., Angel Ruiz, to the NTSAC in 2013, where he remained through at least 2018. Angel Ruiz was not merely the top brass at Ericsson Inc.; he was also a member of LM Ericsson's 15-person Executive Leadership Team.  Accordingly, LM Ericsson was able to have

one of the key members of its leadership team regularly interfacing with the highest levels of the U.S. Government on some of the nation's most sensitive national security issues.

787.   LM Ericsson's ability to earn the U.S. Government's trust and the attendant credibility it afforded Ericsson as a trusted advisor/partner to the U.S. not only enabled Ericsson's concealment of its corrupt conduct in Iraq (and the related counterterrorism implications) but proved quite lucrative.  As just one example, in 2014, the Department of Defense purchased a "miliary communications system" from Ericsson AB for $35.1 million in connection with Operation Inherent Resolve in Iraq.  Ironically, this allowed Ericsson to profit from the U.S. military's effort to defeat the al-Qaeda-in-Iraq and Islamic State terrorists--which effort was necessitated, in large part, by the very protection payments Ericsson made over the course of many years that allowed those FTOs to grow and thrive.

788.   United States counterterrorism operations concerning Iraq, Afghanistan, Syria, and Turkey often featured a transnational component with a heavy Washington, D.C. element. This reflected the heavy centralization of stakeholders relevant to Iraq, Afghanistan, Syria, and Turkey in Washington, D.C., including, but not limited to:

a.   **Washington, D.C.-Based U.S. Government Agencies**, including the U.S. Department of Justice, U.S. Department of State, U.S. Agency for International Development, U.S. Department of the Treasury, and U.S. Department of Commerce;

b.   **Washington, D.C.-Based International Organizations**, including the World Bank and IFC;

c.   **Washington, D.C.-Based Iraq- and Afghanistan-Focused Think Tanks**, including, but not limited to, the Foundation for Defense of Democracies and CSIS; and

d.   **Washington, D.C.-Based Media**, including, but not limited to:  (i) Washington, D.C.-headquartered media including, but not limited to, the *Washington Post* and *Washington Times*; (ii) Washington, D.C.-located news bureaus or reporters for mainstream media outlets, including, but not limited to, ABC News, the Associated Press, Bloomberg, CBS News, Fox News, the *New York Times*, *Politico*, and the *Wall Street Journal*; and (iii) Washington, D.C.-located strategic communications professionals.

789.    Given Washington, D.C.'s central status to the U.S. government's whole-of-effort counterterrorism policy, the U.S. government's counterterrorism operations that targeted the al-Qaeda, al-Qaeda-in-Iraq, and Islamic State transnational terrorist networks, financiers, and logisticians, and operatives that directly funded, armed, and staffed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks against Americans in Iraq, Syria, Turkey, and Afghanistan from 2004 through 2022 typically depended upon the close cooperation – including robust information sharing – between an array of Washington, D.C.-located U.S. government components.  These included, but were not limited to, the:

a.    **U.S. Department of Justice National Security Division**, which was at all times part of Main Justice and located at 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530 ("National Security Division");

b.    **U.S. Attorney's Office for the District of Columbia**, which was at all times located at 555 Fourth Street, NW Washington, D.C. 20001 ("USAO-DC");

c.    **U.S. Department of Justice FCPA Unit**, which was at all times part of the Fraud Section of DOJ's Criminal Division and located at: (i) 950 Constitution Ave., NW, Washington, D.C. 20530; and (ii) 1400 New York Ave., NW, Bond Building--4th Floor, Washington, D.C. 20005 ("DOJ FCPA Unit");

d.    **U.S. Federal Bureau of Investigation Washington Metropolitan Field Office**, which was at all times located at 601 4th St NW, Washington, D.C. 20535 ("FBI Washington Field Office" or "WFO");

e.    **U.S. Securities and Exchange Commission FCPA Unit**, which was at all times located at 100 F Street, NE, Washington, D.C. 20549 ("SEC FCPA Unit");

f.    **U.S. Department of the Treasury Office of Terrorism and Financial Intelligence**, which was at all times located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220 ("Treasury Office of Terrorism and Financial Intelligence"); and

g.    **U.S. Department of State Bureau of Counterterrorism**, which was at all times located at 2201 C Street NW, Washington, DC 20520 ("State Bureau of Counterterrorism").

790.    Mr. Ekholm, who resided (and still resides) in the United States at all relevant times while serving as LM Ericsson's CEO, was physically present in the United States while personally participating in Ericsson's obstructive conduct.

791.    Ms. Ibrahim purposefully availed herself of contacts in the United States when she entered into the arrangement with Ericsson and Ekholm to nominally serve as the latter's "advisor" because he resided in the United States at all relevant times between 2019 and the present.

**E.    Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Aided And Abetted The Terrorists' Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, And Afghanistan**

792.    Each of Defendants' obstructive acts set forth in this section impaired then-ongoing American counterterrorism operations specifically designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by affirmatively lying to the U.S. government about core facts relevant to American counterterrorism in Iraq, Syria, Turkey, and Afghanistan.  Among other reasons, Defendants impaired the U.S. government's counterterrorism efforts regarding:

**a.**    the existence and extent of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's telecom-facing protection money rackets;

**b.**    the identities of key intermediaries who operationalized such rackets on behalf of Western companies, including Ericsson;

**c.**    such intermediaries' corresponding al-Qaeda, al-Qaeda-in-Iraq, and Islamic State points of contact;

**d.**    the protection-money related tactics, techniques, and procedures followed by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; and

**e.**    al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's preferred methods of value transfer and communication in such FTOs' telecoms-facing protection rackets.

793.    When Ericsson obstructed U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq (inclusive of its alias, Jabhat al-Nusra), and Islamic State, Ericsson provided

critical operational assistance to these FTO's terrorist attacks against Americans in Iraq, Syria, Turkey, and Afghanistan, including Plaintiffs.

## V.   DEFENDANTS FRAUDULENTLY CONCEALED THEIR ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, THE TALIBAN, AND ISLAMIC STATE

794.   From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. provided vital cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who facilitated attacks against Plaintiffs in Iraq, Syria, Turkey, and Afghanistan by breaching Defendants' legal obligations to, *inter alia*, the United States, LM Ericsson's shareholders, and Plaintiffs, to speak truthfully concerning its relationships with counterparties, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; Ekholm did so from 2017 until at least 2022 while serving as LM Ericsson's CEO.

795.   From 2003 through at least February 15, 2022, Ericsson actively and fraudulently concealed its illicit transactions with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State alleged herein to cloak its illegal activities.

796.   While facets of Defendants' scheme were eventually detected – in part – by the United States government, *see infra* IV.C, such detection did not reveal Defendants' decision to purchase security from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for at least fifteen (15) years from at least 2004 through at least 2019.

797.   From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely structured illicit transactions to conceal their protection payments in books-and-records, including, but not limited to, through Defendants': (i) illicit transactions with and through intermediaries, including their strategic partners, consultants, and contractors; (ii) use of slush funds and cash payoffs; and (iii) creation and maintenance of deliberately deficient internal controls.

798.    From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. regularly provided cover and concealment to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection money rackets in Iraq and Syria by issuing public statements that fraudulently assured, *inter alia*, U.S., European, and Middle Eastern governments, LM Ericsson's shareholders, and Plaintiffs, that LM Ericsson, Ericsson AB, and Ericsson Inc. (i) followed a rigorous compliance policy; (ii) were subject to terrorism-related risks, while concealing Ericsson's protection payments; and (iii) were cooperating fully with the U.S. government's investigation of Ericsson's illicit payments.  LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, and Ekholm's routine provision of such unlawful cover and concealment aid to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria through Defendants' false public statements from 2003 through 2022 included, but were not limited to:

a.      On June 22, 2004, Ericsson Inc. represented to LM Ericsson's shareholders: "Integrity and ethics has always been a significant part in the way Ericsson conducts business. Ericsson continues to further strengthen this through its Code of Business Ethics and Conduct, which is aimed toward all its employees."[162]

b.      On April 11, 2014, LM Ericsson represented to its shareholders that: (i) LM Ericsson adhered to "a solidified approach to responsible business including rigorous compliance processes"; (ii) LM Ericsson "emphasi[zed]" that "conducting business responsibly takes a full value chain perspective," "begins with supply chain[,] and extends through Ericsson's own operations including the sales process"; and (iii) "we are focused on building a strong foundation for corporate responsibility within the company."[163]

c.      On May 13, 2014, LM Ericsson—acting through its Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald—represented to its shareholders that: "Globally, [corruption] is a huge impediment to doing business in many parts of the world. When you have corrupt societies you also, in general, would have, for example, greater human rights abuses and many other problems … We have a zero tolerance to corruption of the [C]ompany, and so we just put a huge focus on this. We don't want to be involved in the wrong kind of business. It doesn't mean that we're perfect or any company is perfect, but it means we're putting a focus on this, and all of

---

[162] Ericsson Inc., *Press Release, Ericsson's Leading Technology Contributes Significantly to Global Sustainable Development*, *published in* Business Wire (June 22, 2004).
[163] LM Ericsson, *Press Release: Ericsson Emphasizes Responsible Business, Energy and Technology for Good in 2013* (Apr. 11, 2014).

our employees know that this is not the way we're going to do business. So, we have a code of business ethics, and every one of our 114,000 employees is required to acknowledge that they have read and understand this code and the requirements and the principles that we set forth in the code. … Why is it important globally? Because this is really dragging and holding societies down, holding people back, holding back development. … So, we decided to do the human rights impact assessment, and we worked together with Shift to do that. We're just completing that now. It was a quite a huge learning experience. … [T]he main learning with the U.N. guiding principles is really when companies traditionally would look at human rights impacts, [they] would traditionally look at the risks to themselves or to their brand about being present in the market. The new U.N. guiding principles are about the impact on people, the local stakeholders, the local communities. It's not so much like what is Ericsson's risk. Of course, we look at that as well, but we also look at potential negative human rights impact on people, basically. … One huge accomplishment was to get the top-level executive team and the CEO to really see the value and the need to be active in this area and see the benefits of it."[164]

**d.**    In June 2016, LM Ericsson—via its CEO, Hans Vestberg—fraudulently represented that: at LM Ericsson, "[r]educing corruption," "fighting crime and terrorism," and "strengthening and improving the equity of fiscal policy," were "core" to achieving the "[Sustainable Development Goals]" to which LM Ericsson professed to adhere.[165]

**e.**    On March 19, 2017, LM Ericsson and Ericsson Inc. jointly published a statement from LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Ms. Weidman-Grunewald, which fraudulently represented that, with respect to corporate social responsibility, Ericsson was "Turning intentions into impact," and that: "Ericsson's deep-rooted commitment to the [Sustainable Development Goals] is well documented. Technology for Good is the concept we work with every day to address sustainable development challenges like … humanitarian issues, [and] human rights … We recently launched our 23rd Sustainability & Corporate Responsibility Report and are turning our intentions into impact in a number of ways."[166]

**f.**    On September 18, 2018, Ericsson AB (including through Rafiah Ibrahim, Head of Ericsson Middle East and Africa) represented to LM Ericsson's shareholders that Ericsson engaged "[i]n an effort to make quality secondary education more accessible in Iraq" purportedly reflected Ericsson's ongoing "work[]" in "Iraq to leverage" "our

---

[164] Heather Clancy, *How She Leads: Elaine Weidman-Grunewald, Ericsson*, Greenbiz, (May 13, 2014), https://tinyurl.com/eh3jr2xj.
[165] Hans Vestberg, *quoted in* LM Ericsson, *ICT and SDGs*, at 7, 18-19, 29.
[166] LM Ericsson and Ericsson Inc., *Taking Action On The Sustainable Development Goals* (May 12, 2016) (quoting Ms. Weidman-Grunewald), https://www.ericsson.com/en/blog/2016/5/taking-action-on-the-sustainable-development-goals.

employees to make a positive impact" in recognition, as Ms. Ibrahim stated, of Ericsson's purported efforts to ensure that "girl[s]" in Iraq could "receive [a] quality education."[167]

**g.**   On July 11, 2019, LM Ericsson represented to its shareholders that: "Under [LM Ericsson's] agreement [with Asiacell], Ericsson will provide network design and optimization as well as expansion services … Ericsson will also offer round-the-clock network monitoring, problem restoration and performance enhancement services."[168]

**h.**   On December 6, 2019, LM Ericsson represented to its shareholders that: (i) "The resolution relates to historical FCPA breaches ending Q1 2017"; (ii) "In parallel to the investigations, [LM Ericsson] has since 2016, together with external expert advisors, conducted a comprehensive review of the Company's anti-corruption program …[and] has been taking significant steps to improve its Ethics and Compliance program"; (iii) "Pursuant to the resolutions, Ericsson has agreed to continue enhancing its internal controls and its compliance program"; and (iv) "Reaching a resolution with the US authorities allows us to close this legacy chapter" and "now move forward …"[169]

---

[167] LM Ericsson, *Press Release: Ericsson and Zain Bring 'Connect to Learn' Education Initiative to Iraq* (Sept. 18, 2018). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement was accurate only because LM Ericsson concealed Defendants' gigantic, regular protection payments to Islamic State—which Defendants had been making to ISIS specifically for the more than four years since its February 2014 inception by the time this statement—which LM Ericsson knew, through its own personnel and agents on the ground as well as U.S. government and media reports, directly funded ISIS's rampage against schools for women and girls throughout Iraq, which was the signature issue that Islamic State opposed above nearly all else. LM Ericsson could not accurately describe its true relationship to schools for women and girls in Iraq – i.e., that LM Ericsson was responsible for funding the people blowing them up, burning them down, and murdering everyone inside – so LM Ericsson concealed such fact from its disclosures, including this statement.

[168] LM Ericsson, *Press Release: Asiacell Selects Ericsson Services for Superior User Experiences in Iraq* (July 11, 2019). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement omitted Ericsson's key service to Asiacell as the leader and orchestrator of protection money payments made on both Ericsson's and Asiacell's behalf. LM Ericsson's service as Asiacell's protection money partner was a core service (albeit an illegal one) that LM Ericsson provided to Asiacell.  This statement fraudulently concealed such fact.

[169] LM Ericsson, *Press Release: Ericsson Reaches Resolution on U.S. FCPA Investigations* (Dec. 6, 2019).

i.    On March 3, 2020, LM Ericsson represented to its shareholders that "[w]e have … a significant proportion of our sales to emerging markets in the … Middle East" and "[o]ur extensive operations are subject to additional risks, including … acts of terrorism."[170]

799.    Each of the statements in the previous paragraph fraudulently concealed Ericsson's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by addressing LM Ericsson's purported operational risks from terrorism in the Middle East while concealing Ericsson's payoffs to terrorists in Iraq, the implications of those payoffs, and/or the true nature of the services Ericsson provided to its Iraqi customers like Korek and Asiacell.

800.    LM Ericsson, Ericsson AB, and Ericsson Inc. also combined as One Ericsson, or the "Ericsson Group" to participate in events, and coordinate shared statements, that were designed to conceal, and did conceal, Defendants' nearly two-decade-long-campaign of protection payments and logistical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

801.    Defendants pursued a "One Ericsson"-inspired strategy of issuing combined open statements published at high-profile international events in the United States – in which Defendants participated as the "Ericsson Group" – that concealed Ericsson's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

802.    Defendants' use of events in the United States that promoted adherence to the U.N.'s Sustainable Development Goals – which the signers, including Defendants, touted as a group of "17 Goals to Transform Our World" (the "Sustainable Development Goals" or "SDGs") – illustrates how Defendants operationalized the cover and concealment they afforded to al-

---

[170] LM Ericsson, *2019 Annual Report*, at 127 (Mar. 3, 2020). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because LM Ericsson described risks from terrorism without revealing that LM Ericsson's behavior had worsened such risk, by providing a dependable, large-scale, stream of income to terrorists in LM Ericsson's key Middle Eastern markets. This statement fraudulently concealed such fact.

Qaeda, al-Qaeda-in-Iraq, and Islamic State.  U.N. Sustainable Development Goal 16 (or "SDG

16") specifically committed its backers to "target[ing]" conduct intended to, inter alia, protect

Americans (and others) against terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State

– the three FTOs that dominated the attention of the U.N. at all times:

<center>[Sustainable Development] Goal 16 [T]argets</center>

**16.1** Significantly reduce all forms of violence and related death rates everywhere
<center>***</center>
**16.3** Promote the rule of law at the national and international levels and ensure
equal access to justice for all
**16.4** By 2030, significantly reduce illicit financial and arms flows, strengthen the
recovery and return of stolen assets and combat all forms of organized crime
**16.5** Substantially reduce corruption and bribery in all their forms
**16.6** Develop effective, accountable and transparent institutions at all levels
<center>***</center>
**16.A** Strengthen relevant national institutions, including through international
cooperation, for building capacity at all levels, in particular in developing
countries, to prevent violence and combat terrorism and crime[171]

803.    Defendants were aware, through their statements regarding Sustainable

Development Goal 16's anti-corruption and counterterrorism goals, that Ericsson's protection

payments and obstruction of U.S. counterterrorism operations facilitated attacks against

Americans by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.[172]

804.    On September 24, 2014, Defendants were the only corporate sponsor of an

coordinated an open letter published in New York in which the participants professed their

---

[171] United Nations, *Sustainable Development Goal 16: Promote Just, Peaceful and Inclusive Societies* (2014), https://tinyurl.com/ycx9mahf.

[172] For example, according to LM Ericsson:  (i) "the 2030 Agenda for Sustainable Development includes 17 Sustainable Development Goals (SDGs) and 169 associated targets," ICTs and SDGs, at 18; (ii) "In addition to ongoing development priorities …, [the new SDGs] set out a broad range of interconnected economic, social and environmental objectives including more peaceful and inclusive societies," *id.*; (iii)  LM Ericsson supported "achieving at least 10 of the SDGs in the following areas: … Reducing corruption, fighting crime and terrorism and strengthening and improving the equity of fiscal policy." *Id.* at 29.

commitment to all of the Sustainable Development Goals, including SDG 16's anti-corruption and counterterrorism goals (the "Ericsson Group Open Letter").[173]  The Ericsson Group Open Letter provided, in part, as follows:

> We, the under-signed, believe transparent, accountable and inclusive institutions are vital. … [and that] [w]e should also join forces to implement anti-corruption measures … Corruption thrives in every corner of the world and in countries of every income level. …   Now more than ever we must act to enshrine good governance within the sustainable development goals. Please join us. …
> **SIGNATORIES …   Ericsson Group**[174]

805.    The Ericsson Group Open Letter was the result of a high-profile event in the United States, which one or more senior Ericsson executives, including Vice President for Sustainability and Corporate Responsibility Elaine Weidman-Grunewald, attended. Notably, of the 25 signatories on the original Open Letter published in the United States on September 24, 2014, Ericsson was the ***only*** major multinational corporate signatory:  all the others were nonprofits.[175] In so doing, Defendants cynically transformed their purported support for the Sustainable Development Goals into a highly effective smokescreen that covered and concealed Ericsson's company-wide embrace of payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – the three FTOs that were always the U.N.'s greatest counterterrorism focus.

---

[173] Ericsson Group, et al., *Opening Statement From The Event: "Ending Poverty: Why Strong, Accountable Institutions Matter," 24 September 2014, New York* (Sept. 24, 2014), https://tinyurl.com/mu9ybz3y ("Ericsson Group Open Letter").

[174] Ericsson Group Open Letter, (emphasis in original).

[175] Aside from "Ericsson Group," the other signatories to the Open Letter as originally published in the United States on September 24, 2014 were:  (1) Article 19; (2) CAFOD; (3) Civicus; (4) FUNDAR; (5) Gemawan; (6) Global Organization of Parliamentarians Against Corruption; (7) Human Rights First Rwanda Association; (8) Interaction; (9) Institute for State Effectiveness; (10) Kemitraan; (11) Namati; (12) Partnership for Governance Reform; (13) Pattiro; (15) Plan UK; (16) Ploughshare Group; (17) Publish What You Fund; (18) Publish What You Pay Indonesia; (19) Restless Development; (20) Rights Rwanda; (21) Safer World; (22) Save the Children; (23) Transparency International Indonesia; (24) Transparencia Mexicana; (25) Transparency International; and (26) United Nations Association of the USA.

806.   Notably, Defendants published the Ericsson Group Open Letter at the same time – Fall 2014 – when Defendants were simultaneously serving as one of Islamic State's largest multinational corporate financial partners and financiers. This timing was a feature, not a bug, of Ericsson's efforts to conceal ISIS's protection rackets, and Defendants' participation therein.

807.   After 2014, Defendants repeatedly returned to Ericsson's purported adherence to the Sustainable Development Goals even while they flagrantly defiled them.  On May 12, 2016, for example, LM Ericsson publicly reiterated Defendants' purported adherence to all the Sustainable Development Goals, which included anti-corruption and counterterrorism.  After LM Ericsson observed that "[j]oint research between Ericsson and the Earth Institute at Columbia University highlights ICT's role in accelerating achievement of the United Nations Sustainable Development Goals by 2030," LM Ericsson represented that, with respect to the U.N.'s "Sustainable Development Goals," Ericsson was "[t]urning intentions **into impact**" because "Ericsson's **deep-rooted commitment to the SDGs**" – necessarily including SDG 16's anti-corruption and counterterrorism goals "is **well documented**."[176]

808.   In June 2016, LM Ericsson again repeated its public assurances that it was committed to adhering to all the Sustainable Development Goals, which included SDG 16's Goals relating to anti-corruption and counterterrorism, doing so in a public report, titled *ICTs and SDGs*, which LM Ericsson jointly published in the United States alongside its co-author, The Earth Institute, of Columbia University.[177]

---

[176] Elaine Weidman-Grunewald, LM Ericsson, *Taking Action On The Sustainable Development Goals* (May 12, 2016), https://www.ericsson.com/en/blog/2016/5/taking-action-on-the-sustainable-development-goals.

[177] Hans Vestberg, LM Ericsson, *quoted in* LM Ericsson and The Earth Institute, Columbia University, *ICTs and SDGs, How Information and Communications Technology Can Accelerate Action on the Sustainable Development Goals, Final Report*, at 7 (June 2016) ("[C]ompanies like

809.    After LM Ericsson published ICTs and SDGs, LM Ericsson appears to have scrubbed *ICTs and SDGs* from Ericsson's websites.[178] On information and belief, LM Ericsson did so as a reflection of Defendants' consciousness of guilt regarding Defendants' aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State and associated knowledge that *ICTs and SDGs* comprised relevant evidence concerning Ericsson's aid to such FTOs. Among other reasons, Ericsson's understanding of its terrorism-related criminal and civil exposure is the most plausible explanation for why LM Ericsson would put so much effort into ICTs and SDGs in the summer of 2016 only to essentially discard it a few years later.[179]

810.    Until at least February 15, 2022, when Ericsson publicly admitted to much of the corrupt conduct alleged herein, none of the Plaintiffs had any knowledge of Defendants' violations alleged herein.  Further, until recently, Plaintiffs could not have discovered, by the exercise of reasonable diligence, that Defendants engaged in the violations alleged herein because Defendants actively and fraudulently concealed these violations to cloak their illegal activities.  Defendants fraudulently concealed their illegal activities, as alleged herein, by, *inter*

---

Ericsson are working with others to achieve shared societal goals and collectively tackle global challenges. … In the late 1890s our founding father, Lars Magnus Ericsson coined the phrase that "access to communication is a basic human need." Today, this underpins our vision of being a relevant and responsible driver of positive change by using Technology for Good. As an industry leader, our ideas, technology and people have had real impact, helping to transform lives, industries and society as a whole. As the world embarks on the ambitious journey of achieving the 17 Sustainable Development Goals (SDGs), it is our responsibility to work with other stakeholders to extend the benefits of communication by ensuring they are affordable and accessible to all. … The report builds on the work of the Broadband Commission for Sustainable Development, a forum Ericsson has been deeply engaged in since its launch in 2010."), https://tinyurl.com/3p92wr64.

[178] Plaintiffs have not located any Ericsson-related website in which *ICTs and SDGs* can be located.

[179] About two months after LM Ericsson published *ICTs and SDGs*, on September 28, 2016, Congress enacted JASTA over President Obama's veto.  There was no comparable legislative enactment during this period concerning the FCPA.

*alia*, making false and misleading entries in their books and records, filing false and/or misleading documents with the U.S. government, and issuing false press releases, reports, and other statements concerning, *inter alia*, their compliance program.

811.    Ericsson also deployed its counsel at Simpson Thacher to conceal its conduct. On information and belief, a Simpson Thacher team lead by DC-based partner Cheryl Scarboro began representing LM Ericsson beginning in 2013 (or early 2014 at the latest).  Ms. Scarboro joined Simpson Thacher in June 2011 after spending 19 years at the SEC, where she "had a hand in every major FCPA investigation" conducted by the SEC and also "worked closely with the Justice Department's FCPA team."  That extensive experience caused the Wall Street Journal to refer to her as ***the*** "SEC's FCPA guru."  During her later years at the SEC, she spent a great deal of time leading FCPA investigations into illicit payments made by many companies to the Iraqi government to win contracts under the U.N.'s Oil-For-Food Program.

812.    Given the sheer volume of countries listed in prior media reports concerning allegations of bribery by Ericsson and the number of countries in which the SEC appeared to be investigating, the real possibility of enterprise-wide corruption at Ericsson could not be ignored. Simpson Thacher should have neither advised LM Ericsson nor acquiesced in LM Ericsson's instruction to exclude those jurisdictions from any internal investigations into corrupt payments and related possible FCPA violations once Simpson Thacher became aware of Ericsson's own "list" of 15 *additional countries* not being investigated by the SEC or DOJ where there was evidence of possible corrupt Ericsson activity (which was no later than 2018), and given Ericsson's business activity in war-torn Middle Eastern countries—particularly Iraq and Afghanistan, both of which were widely known to have endemic corruption problems.

813.    The publicized and well-known connections between endemic corruption in Iraq

and Afghanistan and connections between that corruption and terrorist financing presented

extreme risks for Ericsson's business in those countries, requiring investigation—if not from the

outset of the probe then at any number of times before LM Ericsson and the DOJ finalized and

executed their DPA.[180]  Given Ms. Scarboro's specific experience concerning bribery and

corruption in Iraq under the Oil-For-Food Program, the failure to seriously investigate Iraq is

even more stunning.

814.    Simpson Thacher's representation of LM Ericsson in connection with the SEC

and DOJ FCPA probes, including the internal investigation(s), was not truly independent but

instead appears to have been beholden to the interests of LM Ericsson's Executive Leadership

Team and shareholders—producing a "captive" investigation that was controlled at all times by

LM Ericsson while it was, literally, on a transnational white collar crime spree.  Moreover, the

internal investigation itself appears to have been conducted in large part by Ericsson's in-house

compliance team with the report being prepared "with the help of Simpson Thacher."  And on

information and belief, Simpson Thacher did not implement any type of independent reporting

---

[180] *See*, *e.g.*, Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit*-- (Feb. 1, 2005), https://tinyurl.com/4b78zs5e ("[W]e know that financial subterfuge was at the heart of how Saddam and his cronies skirted international financial restrictions and the United Nations Oil for Food Program (OFF). … This abuse of the international financial system and of the OFF program . . . may also now be part of the financial backing that now fuels the Iraqi insurgency and terrorism inside Iraq.").  *See also* Section VI.C.1 *infra* (describing, respectively, allegations in ATA lawsuit captioned *Abecassis v. Oscar S. Wyatt, Jr.*, No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), and allegations in JASTA lawsuit captioned *Atchley v. AstraZeneca UK Ltd.*, No. 17-cv-02136 (D.D.C. Oct. 17, 2017).

structure designed to encourage Ericsson employees (including possible whistleblowers) to voluntarily report to Simpson Thacher serious corporate misconduct without fear of reprisal.

815.    Moreover, over the course of the probes, Simpson Thacher had preexisting and ongoing representations of LM Ericsson and/or Ericsson Inc. in several litigations.[181]

816.    Nor was the internal investigation comprehensive.  As the ICIJ reporters themselves observed:

> The internal review, while damning, often fails to reach specific conclusions and suggests an incomplete investigation into some of the most explosive allegations, including that payments were made to terrorists. Internal investigators didn't interview officials of either the main transport firm moving Ericsson equipment through ISIS territory or the subcontractors the company relied on to work in ISIS-held Mosul, for example.

ICIJ, *Ericsson List*.  This lack of comprehensiveness was likely a byproduct of Simpson Thacher not conducting the investigation itself but instead purporting to merely oversee Ericsson's investigation of its own potentially illegal payments.

817.    Lastly, the conclusions reached in Simpson Thacher's report based on Ericsson's internal investigation lacked credibility.  Many of the "findings" were written in the passive voice to obfuscate the culpability of particular Ericsson personnel.  Other findings were obvious examples of Simpson Thacher pulling punches.  For example, the report appeared to treat Ericsson's use of intermediaries as a basis to "conclude" that no Ericsson employees were "directly involved" even though Ericsson conducted its illegal business using intermediaries for exactly that reason.  Similarly, Simpson Thacher's reporting ignored the notorious protection

---

[181] *See, e.g.*, *Siti-Sites.com, Inc. v. Verizon Communications, Inc.*, No. 1:10-cv-03751 (S.D.N.Y.); *True Position, Inc. v. LM Ericsson Tel. Co.*, No. 2:11-cv-04574 (E.D. Pa.).

money relationships between Iraqi Kurds and Islamic State, which then permitted Simpson Thacher to downplay the seriousness of Defendants' payments to their Kurdish agents.

818.    All of these problems with the internal investigation and related concealment of corrupt payments (including to terrorists) from the SEC and DOJ were deliberate, part of the plan all along.  Indeed, Simpson Thacher touted as early as 2015 (on information and belief) the great job it was doing for Ericsson in its marketing materials:

> [T]the Firm convinced the SEC to drop certain issues from its ongoing investigation" of a "global telecommunications company . . . regarding alleged payments to government officials in various countries in violation of the FCPA.

Simpson Thacher's and LM Ericsson's active concealment continued through 2019, as further suggested by the suspect timing of Simpson Thacher's final report, which was dated December 11, 2019—just days after LM Ericsson and the DOJ executed and publicly released their DPA. This sequencing was likely aimed at providing LM Ericsson and its executives some measure of protection for not having shared it with the United States before its probes were concluded.

819.    Defendants' conduct as alleged herein was wrongfully concealed and carried out in a manner that was intended to, and did, preclude detection.

## VI.    DEFENDANTS KNEW THEY WERE AIDING AND ABETTING ATTACKS ON AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE

### A.    Defendants' Conduct Suggests That They Were Aware Their Protection Payments And Obstruction Of United States Counterterrorism Operations Aided And Abetted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Attacks Against Americans

820.    The manner in which all Defendants acted to avoid discovery of their protection payments and other aid to FTOs strongly supports the inference that they were aware at all relevant times that their conduct was unlawful and that it aided and abetted terrorists.

821.    *First*, the Corporate Defendants and Mr. Ekholm retaliated against whistleblowers while promoting (or at a minimum, retaining) those who were instrumental to Ericsson's corrupt

payments and other value transfers to terrorists.  As alleged, in mid-2014, Roger Antoun, an Ericsson manager for one of Asiacell's Iraq projects had suggested invoking force majeure in its Iraq customer contracts in mid-2014 due to recent surges in Islamic State violence and control of certain territory.  He was fired in January 2019 for certain conduct related to an "uncontrolled slush fund" set up through Ericsson subcontractors that Ericsson determined may have been used to make payments to terrorists, while others who were more directly responsible for illegal payments to third parties—like Tarek Saadi and Rafiah Ibrahim—were kept on.  What is more, when asked directly about Ericsson's failure to terminate some of the most culpable individuals responsible for what was leaked in the ICIJ press reports, LM Ericsson deflected.  All of this shows that the Corporate Defendants and Mr. Ekholm wished to deter people from speaking out about serious misconduct while keeping the most culpable persons whose loyalty was not in question on side.

822.   *Second*, as alleged, the 2019 agreement between Mr. Ekholm and Ms. Ibrahim to prevent her from spilling the beans to the U.S. government (and possibly other law enforcement authorities) about the illegal conduct that she oversaw as Ericsson's Head of the Middle East and Africa market area (and possibly in other regions before 2014) suggests that the Individual Defendants (as well as the Corporate Defendants) were all aware of how their illegal conduct may have aided and abetted notorious Middle East terrorist groups.  As alleged, even Ericsson's announcement of Ms. Ibrahim's "transition" was deliberately structured in a manner to avoid raising public suspicion that she was responsible for staggering misconduct.

823.   *Third*, over the entire course of DOJ's and SEC's investigations into Ericsson's illegal third party payments from 2013 through December 2019, LM Ericsson actively concealed from DOJ and SEC information about its internal investigation into Ericsson's illegal payments

in Iraq (and 14 other countries), including "possible" payments to al-Qaeda-in-Iraq and Islamic State, before entering a guilty plea (for Ericsson's Egypt subsidiary), settling with the SEC, and entering into a DPA with DOJ—all while purporting to be fully cooperative and transparent with U.S. law enforcement.

824.    *Fourth*, all Defendants continued to conceal any whisper of their illegal Iraq payments after the conclusion of the SEC and DOJ probes into Ericsson's corrupt payment schemes through February 2022, until they had to address them when parts of Simpson Thacher's final investigative "report" leaked to reporters.  DOJ has publicly taken the position that LM Ericsson breached its ongoing obligations to the U.S. government under the DPA by having concealed the existence of that investigation and the findings set forth therein (representing the second time in roughly two years DOJ has accused LM Ericsson of breaching the DPA).  Having apparently recognized just how problematic its conduct has been, LM Ericsson voluntarily agreed on December 14, 2022, to remain under the supervision of an independent monitor for a full fourth year (even though the monitorship required by Ericsson's agreements with DOJ and SEC would have concluded by the end of 2022).

825.    *Fifth*, even as late as 2022, the Corporate Defendants were requiring departing employees to sign confidentiality agreements that failed to clearly inform their employees that nothing in those agreements would preclude them from (or punish them for) sharing relevant information with law enforcement or other governmental authorities.

826.    *Sixth*, as alleged, almost everything about LM Ericsson's retention of Simpson Thacher with respect to the SEC and DOJ FCPA probe, including the way in which Ericsson's/Simpson Thacher's internal investigation was conducted, the "conclusions" reached in the final report, and the circumstances surrounding the preparation of that report, all suggest

that Defendants wanted to bury, conceal, and/or minimize any evidence of Ericsson's illegal conduct in Iraq.

**B.      Defendants Knew They Operated In A Hyper-Corrupt Environment In Which Corporations Commonly Made Protection Payments To Terrorists**

827.     Defendants knew they operated in a business environment in Iraq that posed extreme terrorist finance risks because Iraq was hyper-corrupt, and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments as the cost of doing business. These conditions were always obvious to Defendants.

828.     Defendants knew that the facts throughout this section applied with equal force to business transactions made throughout Iraq, including in northern Iraq (including Mosul and Erbil), central Iraq (including Baghdad), and western Iraq (including Anbar).

829.     LM Ericsson, Ericsson AB, and Ericsson Inc. are sophisticated companies that specialize in performing work in high-risk countries like Iraq.  Given Ericsson's integrated business model in which Ericsson AB and Ericsson Inc. serve as divisions of LM Ericsson, and the contractual role they undertook to monitor the local security environment, Defendants each monitored open-source reporting on the risks of operating in Iraq, Syria, and other similarly risky places they did business.  As part of those efforts, Defendants' standard practice necessarily included conducting basic research on the local market and the mechanics of local subcontracting.  Even cursory research of that nature would have uncovered the reports and statements alleged in this Section IV, or other similar reports.

830.     On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations below, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Defendants' officers, employees, and agents in the United States, Sweden, and Iraq, Defendants' corporate

security departments in all three countries, and Defendants' in-house sales, legal, and compliance teams, all of whom would have regularly received the reports, or similar ones, referenced herein.

831.    Defendants' management, and their compliance, legal, and corporate security departments, also subscribed to intelligence reporting services that further alerted them to the link between their corrupt contracting practices and terrorist finance.  For example, Strategic Forecasting Inc., popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world. Stratfor regularly reported on protection payments in Iraq, including by directly emailing Defendants copies of media reports.

832.    On information and belief, based on purported Stratfor subscription lists (as published online), one or more executives, employees, or agents of Defendant LM Ericsson, and one or more executives, employees, or agents of Defendants Ericsson AB and Ericsson Inc. had access to Stratfor's intelligence services when those messages were transmitted.  The recipient list included at least five (5) employees of Defendants who regularly received the type of updates alleged above.

### 1.    Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt

833.    From 2000 through 2022, Defendants' senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that Iraq was a hyper-corrupt business environment in which payoffs were routine and where it was unusual for a major transaction to move forward *without* an illicit payment.

834.    **United States government reports**, including those by the Department of Defense ("DOD"), Special Inspector General for Iraq Reconstruction (or "SIGIR"), and Lead

Inspector General for Operation Inherent Resolve (or "LIGOIR"), alerted Defendants that they operated in a hyper-corrupt environment in which the risk of financial crime was extreme.[182]

835.   **Terrorism scholars** also routinely reported that corruption in Iraq was endemic and impacted the specific areas in which Ericsson conducted business.  On July 1, 2009, for example, the U.S. Army War College published *Criminals, Militias, and Insurgents: Organized Crime in Iraq*, an extensive analysis of the nexus between corruption and terrorist finance in Iraq that was authored by terrorist finance scholar Dr. Phil Williams,[183] which reported that:

---

[182] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Oct. 30, 2005) ("Corruption was endemic in the prior regime, and its legacy of corruption still burdens the country."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 21 (Dec. 2006) ("[C]orruption is rampant."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 4, 129 (Jan. 30, 2007) ("Corruption continues to plague Iraq. … Corruption continues to limit the ability … to manage reconstruction efforts and key areas of economic policy. …   Transparency International ranks Iraq 161st of 163 countries measured."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 5, 99 (Apr. 30, 2007) ("SIGIR has repeatedly observed that corruption is a significant impediment … funds have been subject to improper diversion. … Because of the deteriorating security …, sectarian political climate, and outdated laws, anticorruption experts believe that opportunities for corruption have increased."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 147 (Apr. 30, 2008) ("[T]he World Bank listed Iraq as … lacking corruption controls."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2008 Report to Congress*, at 5 (Jan. 9, 2009) ("Corruption in Iraq remains a significant problem."); Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Jan. 30, 2009) ("[General Raymond Odierno:] Corruption is still a huge problem across the board … [that] will take quite a long time to solve it. … [C]orruption is worse now in Iraq than it has been since the 2003 invasion.") (quoting, inter alia, General Ray Odierno, Commander of U.S. Forces – Iraq); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at 11 (Jan. 29, 2010) ("One of Iraq's primary economic challenges going forward is … endemic corruption … [that] increased risk to both the investment capital and the business model.").
[183] Dr. Phil Williams, *Criminals, Militias, and Insurgents: Organized Crime in Iraq* (U.S. Army War College July 1, 2009), https://tinyurl.com/5yab72a8. In the Forward, Douglas C. Lovelace, Jr., explained that, given "the vulnerability of conflict and post-conflict situations to organized crime" and the inextricable linkage between such crime and terrorism in Iraq, Afghanistan, and

a. "The legacy of Saddam Hussein, the debilitating consequences of sanctions, … and the rise of anomic conditions after [2003], perpetuated a culture of corruption."[184]

b. "[T]he U.S. presence brought with it a massive injection of cash for reconstruction, much of which was handled … ad hoc … with little oversight. The reconstruction program provided enormous opportunities for corporate malfeasance on the U.S. side. … The result was that Iraq rapidly metamorphosed into one of the most corrupt countries in the world. According to Transparency International's Corruption Perceptions Index for 2007, Iraq was ranked number 178, below Haiti, and above only Somalia and Myanmar."[185]

c. "[C]orruption in Iraq is both pervasive and endemic [and] … corruption is both top down and bottom up, coming from within government and from outside. It is both a political and economic condition on the one side, and an instrument of criminal organizations, militias, insurgents, and terrorists and their sympathizers and associates on the other."[186]

d. "The various forms of corruption in Iraq … [includes] criminal corruption. Critically, corruption is not only a condition characterizing governments and bureaucracies but also an instrument used by criminal organizations to advance their illicit business interests and protect the illicit markets in which they operate. The use of corruption as an instrument, of course, is much easier where direct and factional corruption is endemic."[187]

836.    In 2010, the National Defense University publication *Prism* published another analysis by Dr. Williams concerning the nexus between organized crime and terrorism in Iraq.[188]

Dr. Williams reported, among other things, that:

a. "The development of a 'political-criminal nexus' [in Iraq] mirrored that in many other parts of the world … [and] undermined U.S. interests [in Iraq.]"[189]

---

other conflict areas, protecting Americans in such places "require[d]" "a holistic … strategy in which security, development, and the rule of law complement[ed] one another."  *Id*. at vii.
[184] *Id*. at 199.
[185] *Id*. at 199-200. Of course, Iraq was near the top of the corruption index even before the 2003 invasion.  For example, the Oil-for-Food scandal was the largest collective FCPA scandal of all time.  But after 2003, Iraq regularly occupied one of the top three slots.
[186] *Id*. at 207.
[187] *Id*. at 208-09.
[188] Dr. Phil Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, Prism, Vol. 1, No. 2, Published by Institute for National Strategic Security, National Defense University (2010), https://tinyurl.com/4f6x8nra.
[189] *Id*. at 61.

b.  "[T]he injection of large amounts of money for economic reconstruction without adequate control or oversight and no plan for effective disbursement exacerbated both crime and corruption [in Iraq]."[190]

c.  "Reconstruction moneys tempted … U.S. corporations and contractors [to engage in corruption]—many of which performed abysmally in terms of task completion. Reconstruction was vital but its implementation, in spite of all the efforts of the [SIGIR], facilitated and encouraged the growth of corruption and organized crime."[191]

837.  **Media reports** regularly alerted Defendants that Iraq was endemically corrupt and large deals there usually involved big payoffs.[192]  Indeed, reports routinely alerted Defendants that Iraq's telecommunications sector in particular was endemically corrupt throughout both the Saddam and post-Saddam eras.  In 2004, for example, a *Washington Times* article concerning telecoms companies in Iraq reported, among other things, that:

---

[190] *Id.*

[191] *Id.*

[192] *E.g.*, Rod Nordland and Michael Hirsh, *The $87 Billion Money Pit; It's The Boldest Reconstruction Project Since The Marshall Plan. And We Cannot Afford To Fail. But Where Are The Billions Really Going?*, Newsweek (Nov. 3, 2003) (cover story) ("American companies are barred by law from paying bribes … abroad. But Iraq is still largely a lawless place. And one company director for a British firm … in Baghdad says that makes all the difference. 'I've never seen corruption like this by expatriate businessmen. It's like a feeding frenzy,' he says. … One prominent Iraqi businessman said he was told he'd have to raise his bid by $750,000 to get a major contract, so long as he kicked back that amount to the contractor's rep. … *Newsweek* witnessed such behavior directly: An Iraqi-Anglo joint venture did a relatively small job in the magazine's Baghdad bureau. When a final price had been agreed, the company's Iraqi manager said, 'Shall we add a commission of 10 percent?' Commission? 'Well, you would keep that of course,' he said. In other words, a kickback. When *Newsweek* declined, he said, 'You're the first one who didn't want a commission.'"), 2003 WLNR 3489142; John Heilprin, *Army Probes Wide-Ranging Contractor Fraud*, Associated Press, *republished in* Intelligencer (Jan. 28, 2007) ("From high-dollar fraud to conspiracy to bribery and bid rigging, Army investigators have opened up to 50 criminal probes involving battlefield contractors in the war in Iraq and the U.S. fight against terrorism…"), 2007 WLNR 2014425; Dave Zweifel (Editor Emeritus of *The Capital Times*), Editorial, *War Profiteers Work Their Schemes In Iraq*, Capital Times (Mar. 10, 2008) ("American corporations have long taken advantage of the nation's taxpayers in a time of war, and the war that our country is fighting in Iraq is no exception. … [The] *Chicago Tribune* outlined just how pervasive war profiteering is … [today] in [Iraq] …To put it mildly, []contractors don't give the U.S. and its taxpayers discounts … War is a good time to make money and that's exactly what military contractors do.  … There's gold in them thar battlefields."), 2008 WLNR 4748217.

a.    The Iraqi government "is investigating whether illegal payoffs were made to secure cell phone contracts …, said [L. Paul] Bremer [former head of the CPA]."

b.    "Mr. Bremer ordered the cell phone contract investigation after receiving a memorandum [] from John A. Shaw, the [D]eputy [U]ndersecretary of [D]efense for [I]nternational [T]echnology [S]ecurity, who said the contracts should be revoked because of fraud."

c.    "Mr. Shaw states in a June 14 memorandum to [Mr. Bremer] that an investigation by his office has uncovered 'fraud on the Ministry of Communications by Orascom, Atheer and AsiaCell,' three companies that … won cell phone licenses for three regions of Iraq."

d.    "A [U.S. government] report … states that … bribes [were used] to secure cell phone contracts worth $500 million. … [A U.S. government] report states that payments were made to two Iraqi officials, two British contractors and two American officials as part of the fix.  Pentagon investigators have said bribes of up to $11.5 million were paid to Iraqis and other foreign nationals to win the contracts for the three companies …"

e.    "Mr. Bremer said corruption remains a major problem in Iraq[:] … '[C]orruption in the Iraqi system … [is] a serious problem… [a]nd institutionalized.'"

f.    "Mr. Bremer … also said the U.N. [O]il-for-[F]ood program was corrupt 'throughout.' Contracts for that program, which was designed to provide humanitarian goods to Saddam's regime, included 10 percent to 19 percent 'kickers' that were payoffs."[193]

838.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants as to the hyper-corrupt nature of the Iraqi business environment in which they did business.

### 2.    Defendants Knew Corruption In Iraq Was Inextricably Connected To Terrorism

839.    Defendants knew that their corrupt payments in Iraq foreseeably aided terrorists. From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) knew that corruption in Iraq, like that which Defendants practiced as a matter

---

[193]   Bill Gertz, *Iraq Probing Cell Phone Deals Reported Payoffs By Saddam Ally Under Scrutiny*, Washington Times (July 8, 2004), 2004 WLNR 812238.

of strategy, was always inextricably linked to terrorist violence given the unique features of the
Iraqi business, political, and terrorist context.

840.    **United States government reports** alerted Defendants that corrupt practices in
Iraq foreseeably aided terrorists there.  On August 10, 2006, for example, President George W.
Bush publicly observed that "corruption" "impedes our efforts to" "combat" anti-American
"terrorism."[194] Also in 2006, the Department of Defense warned that "[i]t is increasingly difficult
to distinguish [criminals'] activities from those committed by insurgent and terrorist groups who
are also engaged in kidnappings, extortion, murder, and other illegal behavior," and that
"criminal activity … is an increasingly important source of funding for insurgent and terrorist
groups."[195]  Other reports repeatedly alerted Defendants to similar effect.[196]

---

[194] President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006).
[195] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, November 2006 Report to
Congress*, at 5 (Nov. 30, 2006).
[196] *E.g.*, President George W. Bush, Proclamation No. 7750, 69 Fed. Reg. 2287 (Jan. 14, 2004)
("I have determined that … persons who have committed, participated in, or are beneficiaries of
corruption… [foreseeably risked] serious adverse effects on … the security of the United States
against … terrorism."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special
Inspector General for Iraq Reconstruction*, at 7 (Apr. 30, 2006) ("Corruption is another form of
insurgency in Iraq."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq,
November 2006 Report to Congress*, at 5 (Nov. 30, 2006) ("Iraq … must effectively deal with
militias … However, a range of … factions that pursue their own interests through the use of …
extortion, bribery, and corruption is threatening accomplishment of these actions."); Stuart W.
Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for
Iraq Reconstruction*, at Introduction, 9 (July 30, 2007) ("SIGIR views" "the endemic corruption"
"in Iraq" "as a 'second insurgency.'"  "According to the U.S. Embassy's Anti-Corruption
Strategy, the endemic corruption problem in Iraq … funds illegal actors and activities, including
terrorism[.]"); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2008
Report to Congress*, at 6 (Mar. 7, 2008) ("Corruption, in the form of extortion, theft and bribery,
is rampant in parts of the [Government of Iraq] and business sector. Corruption in the …
transport industries is [] linked to the financing of extremists."); Stuart W. Bowen, Jr., *Quarterly
Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 32 (Apr. 30,
2008); The White House, *National Security Strategy* 38, 49 (May 2010) ("[P]ervasive corruption
is a …severe impediment to development and global security. … Transnational criminal threats
… cross borders[,]… subverting government institutions through corruption and harming

841.    **Media reports** and **terrorism scholars** also routinely reported that corruption in Iraq was inextricably linked to terrorist violence.  In 2009, for example, Dr. Williams' study published by the U.S. Army War College reported that "[c]orruption in Iraq also often leads to or entails violence, which is not always characteristic of corruption elsewhere."[197]  Indeed, "[c]orruption in Iraq is [] closely related to violence: both are instruments of criminal organizations and are typically used by these organizations as part of their risk management strategies."[198]  As a result, according to Dr. Williams, "corruption, organized crime, and insurgent and militia violence become difficult to disentangle analytically, let alone physically disrupt. One American official averred that 'corruption funds the insurgency, so there you have a very real threat to the new state.'"[199]  In 2010, likewise, Dr. Williams reported that "[c]orruption in Iraq was [] integrally related to violence."[200]  In 2014, similarly, *Thomson Reuters* published an analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez regarding the nexus

---

[American] citizens worldwide. … The crime-terror nexus is a serious concern as terrorists use criminal networks for logistical support and funding."); U.S. Dep't of Justice and Securities and Exchange Commission, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 2-3 (Nov. 14, 2012) ("The Costs of Corruption … [C]orruption [] undercuts good governance and impedes U.S. efforts to… combat … terrorism across the globe."); U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 26-27 (Aug. 24, 2015) ("The U.S. government has observed that numerous terrorist organizations worldwide engage in criminal activity to fund their organizations and operations. Globally, [al-Qaeda], [Islamic State], [and] the Haqqani Network …, for example, are known to be financed … by proceeds derived from … extortion. … [B]oth criminal organizations and terrorist groups continue to develop international networks and establish alliances. … [L]ooking forward, … the risk that [terrorist groups] will collaborate with [] criminal organizations increases. Collaboration can serve as a force multiplier for both criminal and terrorist groups, bolstering their capabilities, strengthening their infrastructure, and increasing their wealth.").
[197] Williams, *Criminals, Militias, and Insurgents*, at 208.
[198] *Id*. at 210.
[199] *Id*. at 211.
[200] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 48-49.

between Iraqi corruption and Islamic State violence and the "convergence between commodities and terrorism":

> [a] common feature in many conflict zones is the weakening of the society's value system. Any kind of person is involved in every kind of business. This generalized break down of values is particularly true for the territory controlled by the Islamic State. For nearly thirty years people in the region have been involved in various forms of black market and smuggling activities, first to get around the dictatorships in the region, then to circumvent the Oil-For-Food program in the 90s, and today to ensure funding of the Islamic State.[201]

842.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that corruption in Iraq was inextricably tied to terrorist violence.

### 3.   Defendants Knew They Did Business In Geographies That Were Insecure And Targeted By Terrorists

843.   From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that their Iraq-related business required transactions in Iraq and transportation using Iraqi, Turkish, and Syrian routes that were specifically targeted by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

844.   Defendants also knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State targeted companies and individuals associated with the United States specifically because they wanted to be paid protection money in larger amounts and specifically in U.S. dollars – the currency of choice for every FTO in Iraq and Afghanistan.

845.   **United States government reports and statements** alerted Defendants that their Iraqi business was conducted in an insecure environment and that their transportation and

---

[201] Jean-Charles Brisard and Damien Martinez, *Islamic State: The Economy-Based Terrorist Funding*, at 6 (Thomson Reuters Accelus Oct. 2014), https://tinyurl.com/2d26cvxx (hereinafter, "Brisard and Martinez").

logistics networks were specifically at high risk for illicit payments.  In 2007, for example, the
SIGIR reported that, "Security continues to pose a significant threat to reconstruction in" the
"transportation and communications" "sector" "in Iraq," including "telecommunications."[202]

846.    **Media reports** and **terrorism scholars** alerted Defendants that their business
required transportation through terrorist-controlled or contested areas.  In 2007, for example, the
*Associated Press* reported that while "[t]he threat from al-Qaida … has been significantly
reduced," its allies had "established 'almost mafia-like presence' in some areas" like Baghdad
according to "the top U.S. commander in Iraq," "Gen. David Petraeus," who "stressed" that "al-
Qaida remains a very dangerous and very lethal enemy of Iraq."[203]

847.    In 2009, similarly, Dr. Williams's report published by the U.S. Army War
College also identified insecure Iraqi geographies – which overlapped with areas where
Defendants conducted business – that were notoriously targeted by Sunni terrorists like al-
Qaeda-in-Iraq (and later, Islamic State) for protection money payments from Western
corporations, and their partners, consultants, and subcontractors:

a.    "[O]rganized crime did not suddenly arise from the chaos of invasion and occupation but
had deep roots in an authoritarian and corrupt state subject to international sanctions."[204]

b.    "[T]he actions of the international community in the 1990s unintentionally widened and
intensified the scope of organized crime and the illicit economy. By 2003 all the
conditions for an upsurge of organized crime were present; the toppling of the regime
provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit
transfer strategies, and notorious intermediaries who make the entire corruption economy
work – including those who facilitate protection payments to terrorists."[205]

---

[202] Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector
General for Iraq Reconstruction*, at 103 (July 30, 2007).
[203] Associated Press, *Petraeus: Al-Qaida Presence in Baghdad Has Been 'Significantly Reduced'*
(Oct. 28, 2007) (internal quotations omitted), https://tinyurl.com/hr58hszp.
[204] Williams, *Criminals, Militias, and Insurgents*.
[205] *Id.* at xi (emphasis added).

c.  "An additional factor" that facilitated al-Qaeda-in-Iraq's criminal terrorist finance strategies "was 'the collapse of road security,' especially in the Sunni triangle."[206]

d.  "Parasitic taxes on commerce, reconstruction, and the transportation of oil (whether it is part of the licit trade or stolen and diverted) are highly profitable."[207] "Extortionists have few, if any, start-up costs, especially if they already have a reputation for violence; payments tend to be recurring; and, in Iraq, the number of businesses which could be targeted grew as the reconstruction process gradually became more effective."[208]

e.  "In …2004, as opposition in Iraq developed into a full-blown insurgency, the occupying forces lost control of the highways. This allowed insurgents to extort money from contractors (both American and Iraqi) involved in [] reconstruction [], and from [] truck drivers, whether carrying legal loads such as … reconstruction materials or engaged in theft and smuggling. For Sunni insurgents, the legality or illegality of the load was irrelevant. Indeed, they not only subjected drivers to extortion, but confiscated 'a portion of the … goods transported through the areas they control' as a tax for safe passage. One contractor noted that the insurgents would sometimes 'hijack a truck…' to illustrate their power and establish their credibility.  Gradually, however, the process became institutionalized and, as with extortion elsewhere, the threat itself was sufficient."[209]

f.  "[E]xtortion and skimming are [] pervasive [and] … are real moneymakers in Iraq."[210]

g.  "Profits were clearly extensive, enduring, and highly lucrative" to "violent actors in Iraq's post-Hussein conflict milieu."[211]

h.  "[M]ilitias—because they provide protection to particular segments of the population— have enormous opportunities for both extortion and black market activities. Markets in Baghdad resemble those in Moscow in the 1990s when even small market stallholders were required to make protection payments—often under the guise of ostensibly legitimate fees—in return for which they were allowed to continue selling."[212]

848.  In 2010, a National Defense University publication, *Prism*, published another analysis by Dr. Williams in which he reported, among other things, that

U.S. operational units appreciated the organized crime component … As early as July 2004, Marine commanders were acknowledging that it was difficult to overemphasize the importance of organized crime in the insurgency. . . . The

---

[206] *Id*. at 125.
[207] *Id*. at 159.
[208] *Id*.
[209] *Id*. at 158.
[210] *Id*. at 162.
[211] *Id*.
[212] *Id*. at 158.

perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties.[213]

849.     Similar reports were published over the next decade.  In 2015, for example, Dr. Jonathan Schanzner of the Foundation for Defense of Democracies reported that the Turkish government "allowed extremists of various stripes to go in" to Iraq and Syria and "it's actually created a security problem on the other side of the Turkish border" in Iraq and Syria where "there is infrastructure there representing Nusra front, ISIS, other Salafi and jihadi groups."[214]

850.     From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that they did business in Middle Eastern geographies in which terrorists extracted protection money.

####     4.     Defendants Knew Multinational Corporations' Illicit Transactions In, Or Relating To, Iraq, Afghanistan, Syria, And Turkey Were Routinely Designed To Route Protection Payments To Al-Qaeda And Islamic State Branches Operating In The Middle East

851.     From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents), knew that multinational corporations' illicit transactions in, or relating to, Iraq, Afghanistan, Syria, and Turkey were routinely designed to route protection payments to al-Qaeda-affiliated and Islamic State-affiliated terrorists in geographies, like Iraq, Syria, Turkey, and Afghanistan, where they posed a severe threat.

---

[213] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 55.
[214] Dr. Jonathan Schanzer (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *House Financial Services Committee hearing on Task Force to Investigate Terrorism Financing* (Apr. 22, 2015), 2015 WLNR 12099026.

852.   **United States government reports** alerted Defendants that their illicit Iraq-related transactions foreseeably caused protection money to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  In April and August 2010, for example, DOD reported that "[d]espite" its "serious … losses, [al-Qaeda-in-Iraq] is still capable of conducting" attacks and "continues its efforts to gain funds through widespread extortion efforts."[215]

853.   **Media reports** alerted Defendants that multinational corporations doing business in or near terrorist-contested geographies routinely facilitated protection payments to terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq.  Such reports included, but were not limited to:

a.   _St. Louis Post-Dispatch_, October 1999:  "Businessmen are still aiding bin Laden … [and] are continuing to transfer tens of millions of dollars … U.S. intelligence officials [said] the payments are 'protection money'…"[216]

b.   _Scotsman_, September 2001:  "al-Qaeda … runs an international network of up to 80 front companies in more than 50 countries … Financial backing for al-Qaeda's terrorist activities [inter alia] comes from 'protection money' …."[217]

c.   _Newsweek_, May 2008:  "Al Qaeda in Iraq is no stranger to racketeering. The group has long raised money through [criminal] activities … The group's spies also … tell Al Qaeda leaders about businesses own[ed] [by high profile persons in Iraq] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses."[218]

d.   _American Forces Press Service_, October 2009:  "[A] Mosul-based al-Qaida in Iraq cell leader … served as the former extortion ringleader for the region … [and was] suspected of extorting money from companies in Mosul.  … the [] team found and apprehended a

---

[215] U.S. Dep't of Defense, _Measuring Stability and Security in Iraq, March 2010 Report to Congress_, at 34 (Apr. 29, 2010); _see also_ U.S. Dep't of Defense, _Measuring Stability and Security in Iraq, June 2010 Report to Congress_, at 35-36 (Aug. 20, 2010).
[216] St. Louis Post-Dispatch, _World_ (Oct. 29, 1999), 1999 WLNR 931817.
[217] Ilona Amos, _Spotlight Put On Bin Laden Links With UK_, Scotsman (Sept. 17, 2001), 2001 WLNR 2379387.
[218] Lennox Samuels, _Al Qaeda In Iraq Ramps Up Its Racketeering_, Newsweek (May 20, 2008), https://tinyurl.com/4ezvphc9.

man suspected of using extortion money to fund attacks … [who was] alleged to be closely associated with extortion network members operating in northern Iraq."[219]

e.   *Australian*, December 2010:  "[T]he Commission on Wartime Contracting said … billion[s] in U.S. funds were lost to waste and fraud in Iraq … over a decade through lax oversight of contractors, poor planning, and payoffs to … insurgents."[220]

f.   *CBS News*, August 2014:  "Much of the funding for [] Islamic State… is coming from extortion … a counterterrorism source told CBS News … primarily from citizens of European countries, including employees of corporations who quietly pay … the source told CBS News…."[221]  "A CBS News report … reveals that a Scandinavian corporation recently paid [] $70,000 … and it is this method that ISIS is gathering funds."[222]

g.   *Telegraph*, September 2016:  "Lafarge allegedly paid taxes to ISIL to protect its cement making business in Syria … [and agreed] to pay taxes to [Islamic State] in return for continuing its operations in Syria. … [LaFarge] bought the site in 2007 before beginning operations there in 2011.  *Le Monde* reported in June that it had seen letters sent by Lafarge managers in Syria 'revealing arrangements that Lafarge made with the jihadist group to continue production until September 19, 2014.'  …  [A] 'pass stamped with an ISIL stamp and endorsed by ISIL's finance chief in the Aleppo region' proves [LaFarge] had struck a deal with ISIL to allow for free circulation of its goods …"[223]

854.   Media reports alerted Defendants that when telecommunications companies that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like Defendants – engaged in illicit transactions as the cost of doing business, such activity routinely was intended to cause protection payments to reach terrorists using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

a.   *Washington Post*, November 2007:  "A good way to prepare for operations in Iraq is to watch … 'The Sopranos,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in

---

[219] American Forces Press Service, *Iraqis Arrest Bombing Suspects in Baghdad*, Defense Department Documents (Oct. 26, 2009), 2009 WLNR 21347934.

[220] Hugh Tomlinson and Giles Whittell, *Pentagon Billions Probed; War On Terror Mired In Graft*, Australian (Dec. 29, 2010), 2010 WLNR 25535341.

[221] CBS News, *"Multiple Kidnappings For Ransom" Funding ISIS, Source Says* (Aug. 21, 2014), https://tinyurl.com/ymv4r77v.

[222] CBS News (Washington, D.C.), *CBS News: 'Multiple Kidnappings For Ransom' Bring ISIS Funding* (Aug. 21, 2014), https://tinyurl.com/an8v4r7b.

[223] Henry Samuel, *Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To Isil' And Environmental Concerns*, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.

central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the group 'gets a lot of money through extortion….' … The racketeering operations extended to nearly every type of business in [Mosul], including … a cellphone company, which paid the insurgents $200,000 a month."[224]

**b.**   _Times Record News_, August 2008:  "[T]he Taliban [] expand[ed] 'their extortion campaign, [and] demand[ed] that businesses pay 'protection money' … [T]here were several cell phone companies operating in [] Afghanistan, the Taliban went to the … companies and offered not only 'protection,' but damage to a competitor, for a price.'"[225]

**c.**   _Agence France Presse_, September 2012:  "'Revenue extorted from nationwide enterprises such as … mobile telephone operators … goes to the Taliban Financial Commission which answers to the Taliban leadership,' said the report. . . .  'Estimates of Taliban income from contracts funded by the United States and other overseas donors range from 10 percent to 20 percent of the total, usually by the Taliban agreeing protection money with the contractor or demanding a cut.'"[226]

**d.**   _Canadian Press_, June 2013: "[In] Mosul and the surrounding countryside, … al-Qaida was never really routed … Michael Knights, an analyst … who closely follows regional security issues, said al-Qaida in Iraq has long generated cash from businesses … through extortion of large firms such as mobile phone companies."[227]

**e.**   _Independent_, October 2013:  "Al-Qa'ida is once again making ground attacks on cities like Fallujah … The same is true of … Mosul …, where ISIS is reported to levy protection money on everybody from the local green-grocer to satellite phone … companies – bringing in monthly revenue of $8m."[228]

**f.**   _Business Insider_, December 2015:  "ISIS … pulls in hundreds of millions of dollars from 'taxing' … those who live in the territory the group controls in Iraq and Syria.  ISIS is thought to make as much as $800 million or $900 million from residents and businessmen in its territory, American and European officials [said] … [T]he militants have created a complex financial system to extract as much money as possible from individuals and businesses. ISIS charges import taxes, rent for businesses, fines for

---

[224] Amit R. Paley, _Iraqis Joining Insurgency Less for Cause Than Cash_, Wash. Post (Nov. 20, 2007).
[225] Times Record News, _Anatomy Of Terror_ (Aug. 21, 2008), 2008 WLNR 31329261.
[226] Agence France Presse, _Taliban Made $400mn In 2011 From Taxes, Extortion: UN_ (Sept. 11, 2012), https://www.nation.co.ke/news/world/Taliban-made--400-mn/1068-1504748-w0sl0a/index.html.
[227] Sameer N. Yacoub and Adam Schreck, _Spreading Shakedowns and Distrust of Authorities Embolden Al-Qaida in Iraq's Restive Mosul_, Canadian Press (June 20, 2013).
[228] Patrick Cockburn, _As Syria Disintegrates, So Too Does Iraq_, Independent (Oct. 29, 2013), 2013 WLNR 27123183.

breaking laws, utility bills, and income tax. … ISIS' 'Office of Resources' controls the group's … operations … [relating to] … mobile-phone companies …"[229]

855.     **Terrorism scholars** alerted Defendants that their transactions posed a severe risk of routing protection payments to terrorists. Dr. Williams's 2009 study, for example, was published by the U.S. Army War College and documented an extensive analysis of protection rackets operated by terrorists in Iraq – including the key role played by intermediaries in lubricating the entire protection money economy there.[230]  Dr. Williams reported, *inter alia*, that:

a.     "As one observer notes: 'AQI in certain parts of Iraq is basically running protection rackets … and engaging in criminality.'"[231]

b.     "One businessman involved in construction noted that there were two options: 'one, they give you the contract for a price but then you have to provide your own security; the other deal is that for a certain percentage of the contract they will provide you with gunmen.'"[232] "In his last four contracts, the businessman had paid $500,000 in bribes."[233]

c.     "In [Diyala] Province in July 2007, AQI … extorted about $3,000 from a local sheikh almost in passing."[234] "Much more has probably been obtained from white collar criminals in Mosul who reportedly have also been targeted by AQI."[235]

d.     "Larger businesses are also subject to extortion and generally find it preferable to make payoffs than to incur the risks and costs associated with resistance."[236]

e.     "As one military spokesman notes, '[t]he racketeering operations extended to nearly every type of business in the city, including a Pepsi plant, cement manufacturers, and a cellphone company, which paid the insurgents $200,000 a month.'"[237]

---

[229] Pamela Engel, *ISIS Has Found A Huge Money-Making Method That Is 'Impervious To Sanctions And Air Raids',* Business Insider (Dec. 2, 2015).

[230] Williams, *Criminals, Militias, and Insurgents*.

[231] *Id.* at 232-33.

[232] *Id.* at 160.

[233] *Id*.

[234] *Id*. at 233.

[235] *Id*.

[236] *Id*. at 158.

[237] *Id*.

f.     "For contractors and subcontractors, of course, these payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[238]

g.     "Knowing that extortion payments are required for the movement of supplies and people, contractors inflated their bids accordingly."[239]

h.     "Extortion from contractors involved in construction projects also had a debilitating impact, increasing the costs of most projects and offering opportunities for diversion of funds to insurgent groups."[240]

856.     In 2010, the National Defense University published another analysis by Dr. Williams concerning terrorist protection rackets in Iraq.[241]  Among other things, Dr. Williams reported that, with respect to "the range of criminal activities perpetrated by … political groups using crime to fund their cause":

> Extortion (and its less malevolent concomitant, protection) became pervasive. And the reconstruction efforts multiplied the opportunities. Large amounts of money for reconstruction were poured into Iraq with inadequate oversight … Iraqis were awarded contracts with protection money almost invariably built in, some of which went to … the insurgency.[242]

857.     Similarly, in 2014, *Thomson Reuters* published its analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez, which detailed Islamic State's continuation of al-Qaeda-in-Iraq's protection money operation and warned the multinational corporations who subscribe to *Thomson Reuters* (owner of, *inter alia*, Westlaw) that illicit transactions in Iraq foreseeably facilitated protection money payments to Islamic State:

a.     "In its quest to establish administrative and civil control over its conquered territory, the [Islamic State] has implemented taxes on a variety of commercial activities. In Mosul alone, [Islamic State] is believed to raise US$8 million in taxes each month. Such taxes include the following:
    — a tax on all goods;

---

[238] *Id*. at 159.
[239] *Id*.
[240] *Id*. at 259.
[241] Williams, *Criminals, Militias, and Insurgents*, at 259.
[242] *Id*. at 48-49.

&mdash; a tax on telecommunication companies;
&mdash; a tax on cash withdrawals from bank accounts;
&mdash; a 5% tax collected for social welfare and other public purposes on all salaries;
&mdash; a road tax of US$200 in Northern Iraq;
&mdash; an US$800 custom tax per truck entering Iraq …;
&mdash; a tax on looting archeological sites (20% in Aleppo, 50% in Raqqa); and
&mdash; a protection tax for non-Muslim communities (known as jizya).”[243]

b.      “In total, the extortion/tax system imposed in areas under its control in Iraq and Syria could generate as much as US$30 million per month for [Islamic State], or US$360 million a year.”[244]

c.      “Today these methods of funding by extortion are common to many different terrorist groups across the globe. However, in the case of the Islamic State, there is a relative ingenuity in imposition of these new taxes. In the short term, Western groups already operating in the area could find themselves exposed to this pernicious funding mechanism and thereby constrained by the payment of protection money.

d.      “It is known that the Islamic State not only gets its funding from [*inter alia*, taxation], but that it has diversified from the known traditional avenues, and is using more unusual methods to generate its funds. This is the risk that the compliance community must face on a daily basis, not only dealing with a large majority of known risks (conventional terrorism financing for some countries, for certain entities).”[245]

e.      “The compliance community has a clear idea of the inherent risks … Various criminal cases including those linked to bribery has [sic] prompted companies … to take action and put in place measures and processes to both increase control over, and to mitigate their exposure to these risks. The emergence of the Islamic State…, and the necessity to identify its financing channels is proving to be a stress test for [] compliance teams.”[246]

858.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that corporations’ illicit transactions in, or relating to, Iraq, Afghanistan, Syria, and Turkey were routinely designed to route protection payments to the branches of terrorist groups operating there.

---

[243] Brisard and Martinez, at 5.
[244] *Id*.
[245] *Id*.
[246] *Id*. at 7.

### 5.   Defendants Knew Al-Qaeda's And Islamic State's Terrorist Campaigns In Iraq And Afghanistan Were Inextricably Linked

859.   Defendants knew that al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's integrated global terrorist campaigns against the United States linked Iraq and Afghanistan.

860.   Indeed, the close and intimate relationship between al-Qaeda and Islamic State terrorists in Iraq and Afghanistan has been repeatedly made clear to the public (and Defendants) since the mid-2000s.  Both groups, and their branches, in both countries, viewed the Iraq and Afghanistan terrorist campaigns against America as part of the same integrated effort to drive the United States out of the Middle East.

861.   United States government reports and statements alerted Defendants as to the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq, and the similarly inextricable connection between Islamic State "core" in Iraq and Syria and Islamic State's "branch" in Afghanistan and Pakistan.  For starters, U.S. military documents confirmed the vital nature of the Iraq/Afghanistan linkage.  For example, according to a report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies": "[r]eflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

862.   The cornerstones of U.S. counterterrorism policy, as reported by the State Department annually from 2006 through at least 2010, included the recognitions that:  (i) "[a]l-Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East,

Southeast Asia, Africa, and Europe who continue working to carry out future attacks against U.S. interests."[247]

863.    Consensus intelligence assessments prepared by the U.S. government known as National Intelligence Estimates (each, an "NIE") also confirmed the intimate relationship between al-Qaeda and its most important subsidiary branch, al-Qaeda-in-Iraq.  In 2006, for example, a published NIE concerning al-Qaeda and al-Qaeda-in-Iraq determined, among other things, that:

a.    "Al-Qa'ida, now merged with Abu Mus'ab al-Zarqawi's network, is exploiting the situation in Iraq to attract new recruits and donors and to maintain its leadership role."

b.    "Bin Ladin, [] al-Zawahiri, and al-Zarqawi," were "particularly" "key [al-Qaeda] leaders," whose loss "in rapid succession, probably would cause [AQ] to fracture…"

c.    "[T]he Iraq jihad is shaping a new generation of terrorist leaders and operatives; perceived jihadist success there would inspire more fighters to continue the struggle elsewhere. The Iraq conflict has become the 'cause celebre' for jihadists, … cultivating supporters for the global jihadist movement."

d.    "Zarqawi … could broaden his popular appeal and present a global threat. The increased role of Iraqis in managing the operations of al-Qaida in Iraq might lead veteran foreign jihadists to focus their efforts on external operations."

864.    In 2007, the United States published another NIE that assessed, *inter alia*:

a.    "Al-Qa'ida is and will remain the most serious terrorist threat …, as its central leadership continues to plan high-impact plots, while pushing others in extremist Sunni communities to mimic its efforts and to supplement its capabilities. We assess the group has protected or regenerated key elements … including: a safehaven in the Pakistan Federally Administered Tribal Areas (FATA), operational lieutenants, and its top leadership."

---

[247] U.S. Dep't of State, *Country Reports on Terrorism 2005* at 218 (Apr. 2006); *see also* U.S. Dep't of State, *Country Reports on Terrorism 2006* at 270 (Apr. 2007) (same); *U.S. Dep't of State, Country Reports on Terrorism 2007* at 299 (Apr. 2008) (same); U.S. Dep't of State, *Country Reports on Terrorism 2008* at 318 (Apr. 2009) (same); U.S. Dep't of State, *Country Reports on Terrorism 2009* at 275 (Aug. 2010) (same).

b.  "[A]l-Qa'ida will continue to enhance its capabilities … through greater cooperation with regional terrorist groups. Of note, we assess that al-Qa'ida will [] seek to leverage the contacts and capabilities of al-Qa'ida in Iraq [], its most visible and capable affiliate …"

c.  "[I]ts association with AQI helps al-Qa'ida to energize the broader Sunni extremist community, raise resources, and to recruit and indoctrinate operatives…."

865.   The United Nations' al-Qaeda/Taliban/Islamic State experts[248] concurred – publicly.  For example, the U.N. Security Council's al-Qaeda sanctions monitoring team reported in 2006, among other things, that "[t]he Taliban have also continued to benefit from a close relationship with Al-Qaida and related foreign groups."

866.   Al-Qaeda's leadership agreed.  From 2003 through 2022, al-Qaeda's and al-Qaeda-in-Iraq's respective leaders (and later Islamic State's leadership) viewed Iraq and Afghanistan as a single linked campaign against the American "Crusaders."  Such FTOs' approach ignored geographic boundaries with respect to their operations in these two countries – facilitated throughout by Iran's IRGC, which permitted al-Qaeda and its branches to operate a land bridge connecting Iraq and Afghanistan through Iran.

867.   From 2001 through his death in 2011, Osama bin Laden's public statements similarly confirmed al-Qaeda's and al-Qaeda-in-Iraq's view that attacks against Americans in Iraq and Afghanistan were part of the same terrorist campaign.

868.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State inextricably linked their campaigns in Iraq and Afghanistan together.

---

[248] Reflecting their common heritage, for most of the relevant period, the same or a substantially related United Nations sanctions regime governed al-Qaeda, the Taliban (including its Haqqani Network), al-Qaeda-in-Iraq, Jabhat al-Nusra, and Islamic State.

C.   **Defendants Knew Their Illicit Transactions Aided Terrorist Attacks By Causing Financial Assistance To Flow To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Protection Payments To Them**

869.   Defendants knew that they were supplying funding to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were intent on attacking Americans in Iraq, Syria, Turkey, and Afghanistan.  That Defendants chose to funnel their illicit payments through partners, consultants, and contractors, *infra* VI.C.1, slush funds, *infra* VI.C.2, and deliberately deficient internal controls, *infra* VI.C.3, only heightens their culpability.  Defendants intentionally used the contracting process to insulate themselves from the illicit payments on paper, but that process – offloading responsibility to local partners, consultants, and contractors several layers removed – was simply their technique for encouraging the payments while avoiding detection and accountability.  The protection payments may often have been physically delivered by an intermediary, but Defendants knew they were occurring and purposefully orchestrated them. That is because Defendants could only obtain their desired business outcome by ensuring that their money actually reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Had Defendants' partners, consultants, and contractors spent the money on some other legitimate purpose, rather than directing it to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants would not have obtained the security benefit they wanted.

870.   From 2004 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) knew that Defendants' illicit transactions in Iraq foreseeably caused protection money to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Plaintiffs' allegations exclusively concern Ericsson's understanding of the foreseeable terrorist finance risks posed by Defendants' *illicit* Iraq-related transactions. Plaintiffs do not allege that Ericsson knew their Iraq-related conduct foreseeably aided terrorists targeting the United States

from 2004 through 2022 merely because Defendants did business in Iraq during this time.

Instead, Plaintiffs' allegations in this Part IV focus on Ericsson's knowledge that ***illicit*** Iraq-related transactions throughout this period foreseeably aided terrorists.

871.    Defendants knew their illicit Iraq-related transactions facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

872.    From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that illicit transactions pursued by Western corporate and contracting parties were typically designed to cause U.S. dollars to flow to terrorists in Iraq, including al-Qaeda and al-Qaeda-in-Iraq (from 2004 through 2014) and Islamic State (from 2014 through at least 2022), in the form of protection money routed through transactions that were often plainly illicit on their face.  Because al-Qaeda, al-Qaeda-in-Iraq, and Islamic State always openly demanded the money – and because local agents usually paid it through relatively straightforward, albeit highly illegal, means – Western companies on the ground in Iraq were widely aware of the practice.  Defendants were sophisticated companies with billions of dollars in revenues at stake in Iraq.  They knew this prevailing understanding that their illicit Iraq-related transactions were foreseeably flowing to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

873.    Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's own public statements alerted Defendants that their illicit Iraq-related transactions would be used to facilitate murderous attacks on Americans. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State openly proclaimed that the protection money was for terrorism.  The demands for payments, which al-Qaeda, al-Qaeda-in-

Iraq, and Islamic State themselves tied to their insurgencies, alerted Defendants to the connection between the payments and terrorist violence.

874.    Defendants' illicit transactions were also the fruits of Defendants' negotiation of their payments in circumstances that left no doubt about whom they were financing.  With respect to the large-scale payments negotiated directly with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, LM Ericsson, Ericsson AB, and Ericsson Inc. (or their agents) met with high-level representatives acting on behalf of such terrorist groups who openly represented their respective Financial Commissions (each maintained one).  The payments to local al-Qaeda, al-Qaeda-in-Iraq, and Islamic State regional cell leaders likewise occurred via negotiations with cell leaders who openly identified as al-Qaeda, al-Qaeda-in-Iraq, and Islamic State members.  Given the al-Qaeda- and Islamic State-controlled or contested geographies in which Defendants operated, Defendants assuredly knew that the intermediaries they were paying off through their illicit Iraqi transactions worked for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

875.    Al-Qaeda and Islamic State memorialized their respective protection rackets (al-Qaeda, through AQI, from 2004 through 2014, Islamic State from 2014 through at least 2022) in documents that further notified Defendants that they were financing terrorists.  Most prominently, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State often conveyed their demands for protection payments in so-called "Night Letters."  Night Letters – whose name comes from their frequent delivery during the night – were documents on official al-Qaeda, al-Qaeda-in-Iraq, or Islamic State letterhead bearing the relevant group's insignia.  Although Night Letters could convey a variety of threats, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commonly sent them to companies to demand protection payments.  Night Letters were a staple of the terrorist playbook, widespread in Iraq, particularly in areas controlled by al-Qaeda or Islamic State, and were one of

the principal means through which al-Qaeda and Islamic State communicated their demands for protection money to companies, including Defendants.

876.    Similarly, after effecting the illicit transactions that routed protection payments, companies regularly received so-called "tax receipts" from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, so they would have documentation proving they had paid their dues to the terrorists.  For example, Islamic State's Financial Commission, following the al-Qaeda playbook, "has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies" paid to their "protection racket."[249]  And those tax receipts – like the Night Letters – appeared on Islamic State letterhead and made clear on their face that protection money was intended for Islamic State's benefit.  On information and belief, Defendants or their agents received Night Letters and tax receipts from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in connection with their projects in Iraq.

877.    Defendants did not believe – nor was it true – that their protection payments were necessary for them to avoid imminent death or serious bodily injury.  After 2004, al-Qaeda and Islamic State typically did not extract protection payments by physically confronting companies and threatening immediate violence; rather, the threats were often vaguer and future-looking. Many times, those threats were directed at Defendants' equipment or projects, rather than their personnel.  Given the non-immediate nature of the threats, Defendants could have notified the U.S. government of al-Qaeda's and Islamic State's protection rackets and tried to enlist the military's aid in responding.  But rather than avail themselves of such options, Defendants decided that the simplest (and most profitable) option was to pursue the illicit transactions

---

[249] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 12 (Feb. 2015), https://tinyurl.com/5b98bmbh

necessary to make or facilitate the payments that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State demanded.

878.    Indeed, Defendants knew that their large, regular protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State strengthened such FTOs' racketeering enterprise both through funding its operation and by generally causing dramatic inflation in the prices – and associated terrorist finance extracted by the FTOs – attendant to the illicit economy in Iraq.  As a result, Defendants' large-scale protection money payments had a multiplier effect for the terrorists, by raising the price of the economic activity generally. Ericsson's conduct therefore perversely made it so that only large multinational corporations could consistently secure reliable protection money arrangements with these FTOs, because for everyone else, the prices were often too high due to the inflation caused by Defendants (and their multinational peer companies). Thus, Defendants knew that their conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire protection money racket while simultaneously (b) causing dramatic price inflation, pricing out people at the lower end of the new illicit economy Defendants helped birth and sustain.

879.    Although Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to such FCPA violations. Whether or not Defendants technically violated the FCPA or their contractual obligations to their U.S. and Iraqi customers, their transactions with an intermediary with the specific intent of routing protection money directly to terrorist groups targeting the United States – which intermediaries flowed Defendants' resources through to their intended terrorist recipients – supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with U.S. dollars, sourced from U.S. transactions processed by U.S. banks in the U.S., and valuable

U.S. free goods, including valuable American high-tech communications systems that provided encrypted communication capabilities and doubled as cash-equivalents in Iraq, like the iPads that Ericsson regularly sourced from the United States and used as cash equivalents in its corrupt transactions in the Middle East—all of which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to fund attacks against Americans in Iraq, Afghanistan, Syria, and Turkey.

880.    While each of the above items on its own alerted Defendants, specific aspects of their illicit transactions and corrupt business practices also further alerted them that they were facilitating the flow of protection payments to terrorists, including, but not limited to, Defendants' corrupt payments in Iraq involving: (1) illicit transactions with strategic partners, consultants, and contractors; (2) slush funds; and (3) intentionally deficient internal controls.

### 1.    Defendants Knew Their Illicit Transactions With Iraq-Related Intermediaries Caused Protection Payments To Flow To Terrorists

881.    Defendants knew, and intended, that their illicit transactions with their partners, consultants, and contractors were designed to, and would, facilitate protection payments through such intermediaries on behalf of Defendants.

882.    Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-described partners (like Asiacell), consultants (like al-Awsat), and security, transportation, and logistics contractors (like SLS and Cargo Iraq) would conceal their regular protection payments to terrorists.

883.    Defendants knew their illicit transactions with intermediaries facilitated protection payments to FTOs because (at a minimum) Defendants' employees and agents in Iraq – who were from Iraq, operated businesses in Iraq, and lived in Iraq for decades – knew it to be true.

884.    Defendants knew that the excessive fees they illicitly routed to their intermediary partners, consultants, and contractors were red flags for unlawful payments.[250]

885.    Defendants knew that their inability to document the services provided by their intermediary partners, consultants, and contractors was a red flag that such intermediaries were illicitly passing value along to third parties, i.e., the terrorists.[251]

886.    Defendants knew that a substantial percentage of corrupt value they helped flow to their intermediaries reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For example, as one Iraqi company officer publicly explained in 2007, the "contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage" – so that of every $1 million he received, $500,000 was flowed through to the FTOs.[252]

887.    **United States federal criminal prosecutions** alerted Defendants that their illicit transactions through intermediaries facilitated protection payments to terrorists. On March 19,

---

[250] *See*, *e.g.*, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 22 ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

[251] *Id*. at 60 ("DOJ's and SEC's FCPA enforcement actions demonstrate that third parties, including agents, consultants, and distributors, are commonly used to conceal the payment of bribes … in international business transactions. Risk-based due diligence is particularly important with third parties … some guiding principles always apply. First, … companies should understand the qualifications and associations of its third-party partners … The degree of scrutiny should increase as red flags surface. Second, companies should have an understanding of the business rationale for including the third party in the transaction … [and] should understand the role of and need for the third party and ensure that the contract terms specifically describe the services to be performed [and] … payment terms … Moreover, companies may want to confirm and document that the third party is actually performing the work for which it is being paid and that its compensation is commensurate with the work being provided. Third, companies should undertake some form of ongoing monitoring of third-party relationships.").

[252] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

2007, for example, Chiquita Brands International, Inc. ("Chiquita"), a multinational banana supplier, pleaded guilty in this District to having provided material support to the United Self-Defense Forces of Colombia ("AUC") in Colombia.[253] Chiquita had routed protection payments to the AUC – then designated as a Specially Designated Global Terrorist – "through various intermediaries," and had falsely accounted for them as "security payments."[254] Chiquita later argued that it paid AUC protection money "under threat of violence," but DOJ responded that the "payments were illegal and could not continue."[255] It thus charged Chiquita with (and Chiquita pleaded guilty to) the federal crime of transacting with a Specially Designated Global Terrorist.[256] In so doing, Chiquita admitted that "[f]or several years Chiquita paid [an FTO] by check through various intermediaries[,]" it "recorded these payments in its corporate books and records as 'security payments' or payments for 'security' or 'security services'" but "never received any actual security services in exchange for the payments."[257]

888.     In DOJ's 2007 press release announcing Chiquita's plea deal, an Assistant Attorney General declared: "Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations… Thanks to … this prosecution, that funding stream is now dry and corporations are on notice that they cannot make protection payments to terrorists."[258] The U.S. Attorney for this District further warned: "Funding a terrorist

---

[253] *See* Plea Agreement, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. filed Mar. 19, 2007), Dkt. 11.

[254] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007) ("*Chiquita Brands International Pleads Guilty*").

[255] *Id.*

[256] *See* 50 U.S.C. §§ 1701, 1705; 31 C.F.R. §§ 594.201(a), 594.701(c); Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).

[257] *Chiquita Brands International Pleads Guilty*.

[258] *Id.*

organization can never be treated as a cost of doing business…  American businesses must take note that payments to terrorists are of a whole different category.  They are crimes."[259]

889.    On information and belief, Defendants were aware of the *Chiquita* settlement and the U.S. government's clear message that it considered protection payments illegal.  The settlement received extensive scrutiny among the international business community and was the subject of recurring media coverage.  Media outlets describing the settlement included *United Press International* on March 14, 2007, the *Washington Times* on March 19, 2007, the *Associated Press* on March 20, 2007, and the *Washington Post* on August 2, 2007.[260]

890.    **United States government reports** alerted Defendants that their illicit transactions through intermediaries foreseeably aided terrorists. In 2011, for example, the Final Report of the U.S. Congress' Commission on Wartime Contracting in Iraq and Afghanistan documented to Congress (and Defendants) that:

> Another significant cost of overseas-contingency contracting is diversion—payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects. … In Iraq and Afghanistan, significant … issues include: … diversion of contract funding to the insurgency … In Iraq and Afghanistan, U.S. funds have been diverted to insurgents … as a cost of doing business … While there is no official estimate of the amount of U.S. funds diverted to insurgents, it certainly comes to a significant percentage of a project's cost. … Because they directly strengthen the insurgency, diverted funds pose far more danger than other kinds of waste and have a disproportionately adverse impact on the U.S. effort.[261]

---

[259] *Id.*
[260] *See* United Press Int'l, *Chiquita To Pay $25M For Terrorist Payoffs* (Mar. 14, 2007); Matt Apuzzo, *Chiquita Pleads Guilty To Doing Business With Terrorists*, Assoc. Press (Mar. 20, 2007); *Chiquita Pleads To Protection Payoffs*, Wash. Times (Mar. 19, 2007); Carol D. Leonnig, *In Terrorism-Law Case, Chiquita Points to U.S.*, Wash. Post (Aug. 2, 2007).
[261] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting: Controlling Costs, Reducing Risks*, at 32, 70, 73-74 (Aug. 2011).

891.    The Commission on Wartime Contracting's finding was widely reported in the

media.  As the *Boston Globe* summarized, for example, "[t]he final report by the Commission on

Wartime Contracting found at least $31 billion has been lost during the past decade through lax

oversight of contractors, poor planning, and payoffs to … insurgents in … Iraq."[262]  The

Associated Press and others also published similar reports.[263]

892.    In 2012, DOJ and SEC jointly warned sophisticated multinational corporations,

like Ericsson, that "DOJ's and SEC's FCPA enforcement actions demonstrate that third parties,

including agents, consultants, and distributors, are commonly used to conceal [] [corrupt]

payment[s]" "in [] business transactions,"[264] and such "corruption" "impedes U.S. efforts to"

"combat … terrorism."[265]

893.    In 2018, public reports submitted to Congress by the Lead Inspector General for

Operation Inherent Resolve highlighted the extreme terrorist finance risks posed by illicit

transactions in Iraq and alerted Defendants, among other things, that:

a.    "ISIS … generate[d] income from extortion, taxation, and illicit trafficking activities,"
      facilitated by "middlemen who engaged in transactions with the group."[266]

b.    "The [FBI] reported that while ISIS did not appear to have links to transnational criminal
      organizations, it was involved with income-generating crimes and as a result had formed
      connections with preexisting smuggling and black market networks in the region."[267]

---

[262] Stephanie Ebbert, *Brown Returns From US War Zone; Reservist Trained In Afghanistan*,
Boston Globe (Sept. 2, 2011), 2011 WLNR 17388152.
[263] *See*, *e.g.*, Richard Lardner, *AP Exclusive: Up To $60B In War Funds Said Wasted*, AP Online
(Aug. 30, 2011) ("As much as $60 billion in U.S. funds has been lost to waste and fraud in Iraq
and Afghanistan over the past decade through lax oversight of contractors, poor planning and
payoffs to warlords and insurgents, an independent panel investigating U.S. wartime spending
estimates.").
[264] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 60.
[265] *Id*. at 2-3.
[266] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve,
*Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018).
[267] *Id*.

c.      An "unstable security situation" near Syria's border with Iraq "raised the risk that
combatants might divert humanitarian assistance," and "the risks of humanitarian
assistance being diverted to armed groups … included … imposition of taxes, duties, and
fees on USAID implementers and beneficiaries; [and al-Qaeda-affiliated terrorists']
control of local councils and [contractor's] camp management that assist USAID
implementers identify eligible beneficiaries."[268]

894.    **European government reports** also alerted Defendants that their illicit

transactions with, or through, intermediaries were designed to route protection payments to

terrorists. The European Parliament's 2017 report concerning Islamic State's terrorist finance

strategies, for example, alerted Defendants that, with respect to the protection money operation

created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, "[t]he case of

the Swiss … conglomerate LafargeHolcim" was "typical of" the al-Qaeda-in-Iraq/Islamic State

protection money "*modus operandi*" in geographies the terrorists controlled."[269]

895.    The history, media, and litigation attendant to multinational corporations' illicit

payments to Iraqis revealed by the **United Nations' Oil-for-Food Program scandal** from 1998

to 2003 alerted Defendants that their intermediaries were foreseeably paying protection money to

terrorists on Defendants' behalf.  The Oil-for-Food scandal alerted Defendants that

intermediaries often served as conduits for illicit payments in Iraq by no later than 2005, when

the scandal was already a major matter subject to multiple investigations worldwide, including

several by U.S. authorities.[270] Through their knowledge of the Oil-for-Food scandal, Defendants

---

[268] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve,
Report to the United States Congress, July 1, 2018–September 30, 2018*, at 55 (Nov. 5, 2018).
[269] European Parliament, Directorate-General for External Policies, Policy Department, *The
Financing of the 'Islamic State' in Iraq and Syria (ISIS)*, at 11 (Sept. 2017),
https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as
did the European Parliament, that Islamic State followed the same protection money-related
tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.
[270] *See*, *e.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector
General for Iraq Reconstruction*, at 111 (Jan. 30, 2006) ("GAO, other congressional
investigators, the Defense Intelligence Agency Iraq Survey Group, and others have reported that

knew that the routing of programmatic illicit payments to violent actors in Iraq through notorious intermediaries in Iraq, Lebanon, Syria, and Jordan was a universal feature of Iraqi society during the five years immediately preceding the U.S. invasion in 2003.

896.    The Oil-for-Food scandal alerted Defendants that the use of sham consulting deals to route payments was a signature strategy in the Iraqi corruption playbook, and that such notorious use of intermediaries to route illicit payments in Iraq under the Oil-for-Food program birthed a worldwide scandal and was, at all relevant times, the largest collective FCPA scandal in U.S. history.[271] In 2012, for example, a joint report by DOJ and SEC noted in 2012, "SEC charged [a] former CEO … for his role in schemes to bribe Iraqi[s] … in connection with the United Nations Oil-For-Food Programme and to bribe Iraqi[s] … to purchase the company's fuel additives," for which "the company used false invoices and sham consulting contracts to support large bribes that were passed on to foreign officials through an agent, and the bribes were

---

Iraq gained billions in illicit revenues through smuggling and corruption [under the U.N. Oil-for-Food program]."); Stuart W. Bowen, Jr., Special Inspector General for Iraq Reconstruction, *Hard Lessons: The Iraq Reconstruction Experience*, at 6 (Feb. 2, 2009) ("[B]eneath the sanctions and authorized oil sales, an illicit economy flourished [under Oil-for-Food]. Institutionalized corruption infected both the government and the supporting UN programs, spawning powerful criminal elements within Iraq.").

[271] Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505 (D.D.C. Aug. 23, 2007), ECF No. 1; Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862 (D.D.C. May 11, 2009), ECF No. 1; Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448 (D.D.C. Mar. 17, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Daimler AG*, No. 10-cv-00473 (D.D.C. Mar. 22, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258 (D.D.C. July 27, 2010), ECF No. 1; Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648 (D.D.C. Sept. 29, 2010), ECF No. 1; Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686 (D.D.C. Apr. 8, 2011), ECF No. 1; Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, No. 11-cr-00099-RBW (D.D.C. Apr. 8, 2011), ECF No. 1-1; Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733 (S.D. Tex. Nov. 26, 2013), ECF No. 4.

mischaracterized as legitimate commissions and travel fees in the company's books and records."[272]

897.    The Oil-for-Food scandal alerted Defendants to the prominent role that universal taxes or kickbacks played in illicit Iraqi dealings because Defendants knew that Saddam's regime imposed a 10% After Sales Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[273]   The Oil-for-Food scandal alerted Defendants that the recipients of illicit payments in Iraq ordinarily collected these payments from multinational corporations – ostensibly to pay for consulting services but in reality functioned as an illicit source of cash flow for Saddam's regime that was free of U.N. oversight. Defendants knew that, according to the Volcker Commission, recipients of illicit payments in Iraq sometimes collected their payoffs without memorializing them in a contract; the "ten percent fee" was often paid "without labeling it an 'after-sales-service' fee or without inserting an after-sales-service provision in the applicable contract."[274] Defendants also knew that multinational corporations typically concealed illicit payments on their books by routing them through third-party intermediaries, like "consultants" or suppliers who acted as their sales agents in Iraq.

898.    The Oil-for-Food scandal also alerted Defendants that Western companies routed these corrupt payments to Saddam's regime through notorious intermediaries even though the public purpose of the international sanctions program (which such transactions, like Defendants'

---

[272] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 44 n.5.
[273] Paul A. Volcker et al., *Manipulation of the Oil-for-Food Programme by the Iraqi Regime*, at 276 (Oct. 27, 2005) (the "Volcker Report").  The Volcker Report was a 623-page report by the Volcker Commission, a U.N.-commissioned Independent Inquiry Committee led by former U.S. Federal Reserve Chair Paul Volcker.
[274] *Id.* at 249.

here, circumvented) was to choke off Saddam's ability to finance terrorist activities.[275] In fact, it was widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers through the Oil-for-Food Program to finance international terrorist attacks.[276]  Indeed, public reports concerning Iraq's Oil-For-Food scandal from Congress, media outlets, third-party watchdogs, and non-governmental organizations from 2004 through 2007 further alerted Defendants that their suspicious payments to intermediaries in Iraq, Syria, Jordan, and Lebanon relating to "trucking," "shipping," "logistics," "security," and "commissions" – among other classic Iraqi euphemisms – foreseeably enabled anti-American terrorist finance because that was exactly what had recently happened under Saddam.[277]

899.    **Anti-Terrorism Act litigation** alerted Defendants that their illicit transactions with fronts or intermediaries in geographies at an elevated risk for terrorist finance, including Iraq, foreseeably facilitated protection payments to terrorists on Defendants' behalf.

900.    On March 12, 2008, American victims of FTO-affiliated kidnappers in Colombia sued Chiquita, the iconic American banana company, for making protection payments to the

---

[275] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[276] *See*, *e.g.*, Cynthia R. Fagen, *Iraq's Oil for Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), https://tinyurl.com/3t9fha7u; Statement of Chairman Henry Hyde, *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), https://tinyurl.com/59ncafjx; David Marr, *Report Ties Iraq Terrorism To Payoffs*, Sydney Morning Herald (Oct. 6, 2006) (prominent multinational corporation's "kickbacks to Saddam Hussein" during the "oil for food scandal," which the company and its intermediaries "disguised as trucking fees," "may have financed terrorism"), 2006 WLNR 26874182.

[277] *See generally id.*

terrorist group FARC. *See* Compl. ¶¶ 1-2, *Julin et al. v. Chiquita Brands Int'l, Inc.*, No. 08-cv-

20641 (S.D. Fla. Mar. 12, 2008), ECF No. 1. Among other things, plaintiffs alleged that:

a.    "In order to disguise the payments, and ensure their continued and undetected flow to
      FARC, Chiquita and/or Banadex [Chiquita's wholly owned subsidiary] at times placed
      false names and non-existent employees on their payroll, providing those funds on local
      paydays to regional FARC commanders." *Id.* ¶ 192.

b.    "Chiquita assisted … FARC terrorists on how to create front[s] … Through this
      deception, Chiquita … continue[d] its secret practice of covertly channeling funds to
      FARC, [and] was also able to mislead regulators, auditors, or anyone else examining
      Chiquita and Banadex's books-and-records.  [Chiquita] could point to the false front[s]
      … to (falsely) record its payments to FARC as legitimate [] expenses." *Id.* ¶ 193.

c.    "Chiquita also drew up fictitious contracts with legitimate, operating organizations, or
      alternatively overvalued existing contracts it maintained with such organizations, for the
      express purpose of burying (in its bookkeeping) its secret payments to FARC." *Id.* ¶ 194.

      901.    On January 2, 2009, American victims of attacks committed by FTOs funded by

Saddam during Oil-for-Food sued defendants who allegedly routed illicit payments to Iraqis to

secure lucrative Iraqi business. *See* Compl. ¶¶ 1-2, *Abecassis et al. v. Oscar S. Wyatt, Jr., et al.*,

No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), ECF No. 3.  Plaintiffs alleged, *inter alia*, that:

a.    "Defendants provided illegal, financial and material support for known terrorists" funded
      by Iraqi sponsors of terrorism during the Saddam era by routing value "through third-
      party intermediaries at inflated prices …, knowing that part of the [] price was being used
      to pay illegal surcharges and kickbacks" that financed terrorism. *Id.* ¶¶ 1, 4.

b.    "To conceal these illegal surcharge payments, [Defendant] … deposit[ed] millions of
      dollars in a bank account controlled by [the Iraqi terrorist sponsor] at the Jordan National
      Bank in Amman, Jordan." *Id.* ¶ 171.

c.    "To conceal these illegal surcharge payments, [Defendant] agreed to pay [its business
      partner] inflated commission[s] … on the original []transactions, with knowledge and
      expectation that the [business partner] would then make the surcharge payments to the
      [Iraqi terrorist sponsor]." *Id.* ¶ 175.

d.    "[Defendant] purchased [goods] from … third parties, knowing that premiums paid to the
      third parties were used to pay illegal surcharges and kickbacks to [the Iraqi terrorist
      sponsor]." *Id.* ¶ 177.

902.   On October 17, 2017, American victims of attacks committed by Iraqi terrorists funded by illicit payments to the terrorist-controlled Iraqi Ministry of Health ("MOH") sued supply companies who allegedly, *inter alia*, made corrupt payments to the terrorist-controlled Ministry. *See* Compl. ¶¶ 1-2, *Atchley et al. v. AstraZeneca UK Ltd., et al.*, No. 17-cv-02136 (D.D.C. Oct. 17, 2017), ECF No. 1.[278]  Among other things, plaintiffs alleged that:

a.   "The distribution stage presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. The standard Kimadia [i.e., the MOH entity responsible for procurement of imported drugs and medical supplies] sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery. Meeting these conditions required the sign-off of multiple MOH officials, including the Kimadia Deputy Director General of Imports, individual warehouse managers, and members of the Facilities Protection Service nominally providing 'security' for the shipments. As detailed in the *Contract Management* article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process." *Id*. ¶ 155.

b.   "Like Saddam had done under Oil-for-Food, the [Iraqi terrorists] also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales 'services,' 'warranties,' 'equipment donations,' 'contractual facilities,' 'maintenance,' and 'training.' Corrupt payments through sham services agreements was the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH." *Id*. ¶ 156.

c.   "The inventory stage similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers. Kimadia's standard sales contract imposed steep penalties on companies whose goods did 'not comply with specifications' (e.g., failed MOH testing) or went 'missing.' That gave the Facilities Protection Service, whose members guarded MOH warehouses, significant leverage over medical-goods suppliers: if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (e.g., by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in

---

[278] Plaintiff Martha Looney is also a Plaintiff in *Atchley*—also on account of a terrorist attack on her son, Andrew R. Looney, albeit a different one not at issue in this action.  In *Atchley*, Ms. Looney's claim is based on a Jaysh al-Mahdi bomb attack in Iraq on August 17, 2007, which severely injured then-PFC Looney.  Following substantial rehab and a promotion to Sergeant, then-SGT Looney deployed to Afghanistan and was killed in a suicide attack on June 21, 2010. Ms. Looney's claim in this action arises from that later attack. Sparacino PLLC and undersigned counsel, Ryan R. Sparacino, serves as co-counsel for Plaintiffs in *Atchley*.

the contract. That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers." *Id*. ¶ 157.

d.   "Defendants' … sham 'training' and 'travel' expenses … functioned as a slush fund for cash payments to [] Jaysh al-Mahdi agents." *Id*. ¶ 160.[279]

903.   On January 4, 2022, the United States Court of Appeals for the D.C. Circuit decisively rejected every core legal argument advanced by the defendants in *Atchley*, broadly ruling that corrupt payments to terrorists in Iraq, including protection payments, supported liability under the ATA.[280] Defendants knew about the D.C. Circuit's *Atchley* ruling, which received significant media coverage,[281] and further incentivized Defendants to continue concealing their corrupt payoffs to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – which Ericsson continued doing until its internal documents leaked about six weeks later.

904.   Defendants knew about plaintiffs' corruption- and protection money-related ATA allegations in *Chiquita*, *Abecassis*, and *Atchley*, which alerted Defendants that their own illicit transactions through intermediaries foreseeably caused protection payments to flow to terrorists on Defendants' behalf.  Defendants knew about these ATA lawsuits because, among other reasons, such cases were widely covered in the media, relevant to Defendants' business, and

---

[279] In *Atchley*, the intermediary question concerned Defendants' allegedly intentional use of buffers, like consultants from Lebanon and Jordan and local Iraqi "scientific bureaus," to route payoffs to terrorists who controlled the Iraqi Ministry of Health; the intermediary question in *Atchley* was not properly whether the Iraqi Ministry of Health was an intermediary because the D.C. Circuit determined the Ministry was no longer an independent intermediary once, as alleged, it had been taken over and instrumentalized by Jaysh al-Mahdi.

[280] *See generally Atchley et al. v. AstraZeneca UK Ltd., et al.*, 22 F.4th 204 (D.C. Cir. 2022).

[281] *See*, *e.g.*, Andrew C. Nichols, Esq. (Charis Lex P.C.), *D.C. Circuit Continues Its War On Acronyms*, DC Circuitry (Jan. 11, 2022) ("Last week, the D.C. Circuit revived the claims of victims of terrorist attacks in Iraq against U.S. [] companies and their foreign suppliers, who allegedly secured [] contracts by paying off the terrorists."); *see also* Mike Scarcella, *Update 1-U.S. Court Revives Lawsuit Against Pfizer, Others On Iraq Terrorism Funding Claims*, Reuters Gulf Financial News (Jan. 4, 2022); Khorri Atkinson, *DC Circ. Revives Terror-Funding Case Against AstraZeneca*, Law360 (Jan. 4, 2022); Ross Todd, *Litigator of the Week: Kellogg Hansen's Josh Branson Revives an Anti-Terrorism Act Suit Against Big Pharma Companies*, AmLaw Litigation Daily (Jan. 7, 2022).

known to Defendants' employees and agents, including, but not limited to, Defendants' legal, sales, management, and compliance personnel in Iraq, Sweden, and the United States.

905.    **Media reports** and **terrorism scholars** alerted Defendants that their illicit transactions through intermediaries were foreseeably routing protection payments to terrorists on Defendants' behalf.  In 2007, for example, *McClatchy* published a blockbuster report by Hannah Allam, who led the Cairo desk of its award-winning Middle East bureau, which stated that illicit transactions associated with Western companies operating in Iraq were invariably designed and used to flow protection money through intermediaries to al-Qaeda and al-Qaeda-in-Iraq on behalf of such Western companies, which payments, in turn, financed terrorist attacks against Americans in the Middle East.[282] Ms. Allam and *McClatchy* reported, *inter alia*, that:

a.      "Iraq's deadly insurgent groups have financed their war against U.S. troops in part with hundreds of thousands of dollars in U.S. rebuilding funds that they've extorted from Iraqi contractors in Anbar province."

b.      "The payments, in return for the insurgents' allowing supplies to move and construction work to begin, have taken place since the earliest projects in 2003, Iraqi contractors, politicians and interpreters involved in reconstruction efforts said."

c.      "A fresh round of rebuilding spurred by the U.S. military's recent alliance with some Anbar tribes -- 200 new projects are scheduled -- provides another opportunity for militant groups such as al-Qaida in Iraq to siphon off more U.S. money, contractors and politicians warn."

d.      "An [United States] embassy spokesman" in Baghdad "said … that 'in terms of contracting practices, we have checks and balances in our [U.S. government] contract awarding system to prevent any irregularities from occurring. Each contracted company is responsible for providing security for the project.'"

e.      "Providing that security is the source of the extortion, Iraqi contractors say. A U.S. company with a reconstruction contract hires an Iraqi subcontractor to haul supplies along insurgent-ridden roads. The Iraqi contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage."

---

[282] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

f.      "One Iraqi official said the arrangement makes sense for insurgents. By granting safe passage to a truck loaded with $10,000 in goods, they receive a 'protection fee' that can buy more weapons and vehicles."

g.      "Sometimes the insurgents take the goods, too."

h.      "Suleiman … displayed a stack of photos [that] … showed crumbling, half-finished structures overgrown with weeds and surrounded by patchworks of electrical wires. He blamed such failures on …'[t]hose responsible for these projects' … [who gave] money to al-Qaida. Frankly, gunmen control contracting in Anbar,' he said."

i.      "None of the Iraqi contractors agreed to speak on the record -- they risk losing future U.S. contracts and face retaliation from insurgent groups. Some of the Iraqis interviewed remain in Fallujah or Ramadi on the U.S. payroll; others had fled to Arab countries and Europe after they deemed the business too risky. "'I put it right in my contracts as a line item for 'logistics and security,'' said one Iraqi contractor who is still working for a major American company with several long-term projects in Anbar. 'The Americans think you're hiring a security company, but how you execute it is something else entirely. This is how it's been working since Day One.'"

j.      "One Iraqi contractor who is working on a U.S.-funded rebuilding project in the provincial capital of Ramadi said he faced two choices when he wanted to bring in a crane, heavy machinery and workers from Baghdad: either hire a private security company to escort the supplies for up to $6,000 a truck, or pay off locals with insurgent connections. He chose the latter, and got $120,000 for a contract he estimates to be worth no more than $20,000. 'The insurgents always remind us they're there,' the contractor said. 'Sometimes they hijack a truck or kidnap a driver and then we pay and, if we're lucky, we get our goods returned. It's just to make sure we know how it works.' 'Insurgents control the roads,' he added. 'Americans don't control the roads -- and everything from Syria and Jordan goes through there.'"

k.      "An Iraqi who used to work as an interpreter for Titan Corp., the U.S. company that supplies local interpreters to U.S. forces in Iraq, said he witnessed countless incidents of insurgents shaking down contractors during the two years he spent as a translator on a U.S. military base in Anbar.  He said he was stunned when, from early 2004 to his departure in summer 2006, a parade of sheiks with known insurgent connections were awarded contracts worth hundreds of thousands of dollars."

l.      "Fawzi Hariri, a member of the Iraqi Cabinet and head of the government's Anbar Reconstruction Committee, said some U.S. rebuilding funds certainly have gone into insurgents' pockets …"[283]

---

[283] *Id.*

906.    *McClatchy*'s report received widespread coverage and republication.[284]  A week

later, one newspaper's editorial board – in a piece titled "'Insurgent tax'" – noted Ms. Allam's

"telling report" "about the inextricable circumstances burdening the American mission in Iraq,"

in which "she relayed how Iraqi insurgents have financed their operations, including attacks on

American troops, with American money extorted from Iraqi contractors."[285] With respect to the

question of "[h]ow" "the extortion work[ed]," the same editorial stated the following:

> American companies hire Iraqi subcontractors to help with reconstruction
> projects. Those subcontractors supply their own security. They do so by paying
> off Iraqi insurgents with protection money. … This "insurgent tax" isn't cheap.
> One Iraqi contractor explained … that he sets his price knowing that 50 percent or
> more will go to insurgents. The result is doubly damaging. Reconstruction
> proceeds more slowly, as money gets diverted. … [and] the cash fuels the
> insurgency … as weapons and soldiers flow into Iraq. …  [T]he violence has
> generated an economy of its own, American money sustaining the insurgents.[286]

907.    From 2004 through 2022, similar reports published by the media and terrorism

scholars alerted Defendants that their illicit transactions with intermediaries were foreseeably

routing protection payments to terrorists.  Such reports included, but were not limited to:

a.    *Courier Mail*, November 2005:  "The [] Opposition [] demanded a royal commission into
      alleged kickbacks paid by the Australian Wheat Board to Saddam …  AWB … paid
      almost $300 million to Jordanian company Alia to truck wheat into Iraq under the UN's
      [O]il-for-[F]ood program …Alia … channelled the money back to the regime. Despite
      Alia increasing the cost of transporting wheat into Iraq by 400 per cent in four years,
      AWB has insisted it was an unwitting pawn of Saddam. … [Future Australian Prime

---

[284] *See, e.g.*, Hannah Allam, *Militants Extort Rebuilding Funds; Iraqi Contractors Pay
'Insurgent Tax' with U.S. Money Earmarked for Infrastructure*, Myrtle Beach Sun News (Aug.
27, 2007), 2007 WLNR 16672127; Hannah Allam, *Militants Siphon Off Rebuilding Funds*, News
& Observer (August 27, 2007), 2007 WLNR 16691310; Hannah Allam, *Conflict In Iraq:
Insurgents Use Extorted U.S. Money to Fight Troops; Through Extortion, Anti-American
Insurgents are Obtaining Some of the Money Intended for the U.S. Rebuilding Effort in Iraq*,
Miami Herald (August 27, 2007), 2007 WLNR 16667609; Hannah Allam, *Iraqi Militants Taking
a Cut of Contract Funds / Insurgents Extort Money for Safe Passage of Goods, Workers Report*,
Houston Chronicle (Aug. 27, 2007), 2007 WLNR 16732391.
[285] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.
[286] *Id.*

Minister] Kevin Rudd said ... [that] under UN sanctions … Australian companies … [caused] '$300 million to be paid illegally to Saddam …' he said. 'This slush fund is still available to the Iraqi insurgency and poses a continuing threat to [] troops in Iraq.'"[287]

**b.**     Dr. Phil Williams, July 2009:  "By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[288] "For contractors and subcontractors, of course, [protection] payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[289] "While the scale of extortion is impossible to determine, in a culture where baksheesh and 'fixers' have long been necessary and in which the United States has spent enormous amounts on reconstruction, it is almost certainly in the millions of dollars."[290] "[T]he appropriation of organized crime methodologies by key Iraqi power centers increased the resilience of insurgents, terrorists, and militias."[291]  Thus, "analysis [must] be broadened to include targets beyond those groups directly attacking U.S. forces. Financiers, facilitators, and criminal groups working with insurgents also need to be on the target list."[292]

**c.**     Jean-Charles Brisard and Damien Martinez, October 2014:  "[I]t is very likely that, given the amounts involved, … anti-money laundering teams and specialized suppliers are well positioned to identify dubious middlemen. It has emerged that the [Islamic State] is making use of the old networks put in place by the Baath Party to circumvent the Iraq Oil-For-Food program."[293] "[I]f organizations across the globe do not take steps to conduct a thorough assessment of all of the possible [terrorist finance] risks, they could find themselves engaged in the financing structure of one of the most violent terrorist groups in the world. …  There is a consensus among compliance officers today that the Islamic State is a clear and present danger … Islamic State is making use of well-established facilitators and money laundering networks, some of which were set up decades ago, to take care of the financial side of the organization … All this information placed end to end should in theory be able to highlight every dubious situation, commercial transaction or operation.[294]

**d.**     _Newsweek_, November 2014:  "At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of

---

[287] Steven Wardill, _Full Probe Demanded Into Wheat Contracts_, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.

[288] Williams, _Criminals, Militias, and Insurgents_, at xi.

[289] _Id_. at 159.

[290] _Id_.

[291] _Id_. at 262.

[292] _Id_. at 263.

[293] Brisard and Martinez, at 7.

[294] _Id_. at 9-10.

financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS also depends on the steady income it extracts from private donors, the heavy taxation and extortion it levies on its captive population … The …extortion that go[es] toward funding ISIS's day-to-day operations provide[s] a steady cash flow, [former governor of Nineveh province Atheel] al-Nujaifi says. … [E]xtortion, … [] help fund[s] ISIS's day-to-day operations …"[295]

e.    _Telegraph_, September 2016:  "Lafarge allegedly paid taxes to ISIL … [and] has been accused of making arrangements with [Islamic State] … In order to keep making cement Lafarge bought licences from and paid taxes to ISIL middle-men …."[296]

f.    _Construction Europe_, April 2017:  "Swiss-listed cement firm LafargeHolcim has been asked to divulge any relationship it has had with militant groups … follow[ing] recent allegations that senior executives … agreed to pay protection money to [] terrorist organisations. …  An inquiry into Lafarge[] … has been opened by prosecutors in Paris, and French human rights groups have filed a lawsuit, alleging the firm had 'business relations' with ISIS.  While already admitting that 'significant errors of judgement' were made at the plant, which was evacuated in 2014, … LafargeHolcim said, 'The local company provided funds to third parties to work out arrangements with a number of... armed groups, including sanctioned parties, in order to maintain operations."[297]

g.    _Globe and Mail_, June 2018:  "France has put cement giant LafargeHolcim under formal investigation over allegations of terrorist financing … [based on] allegations that Lafarge paid the Islamic State and other terrorist groups in Syria more than US$15-million between 2011 and 2014 for supplies and assurances they wouldn't attack the company's new plant … [E]ight former Lafarge executives, including two former [CEOs], have been put under formal investigation over allegations of terrorist financing. … [T]he FBI has launched an investigation. … 'The activities of Lafarge … are a perfect illustration of how multinationals can fuel conflicts …,' said Miriam Saage-Maass, legal director at ECCHR. … Lafarge executives were determined to keep [] operating as the country's civil war escalated and other western companies pulled out. … Lafarge executives often disguised the payments as 'donations' and relied on a pair of intermediaries, including a [] consultant, to make the payments to rebel groups. The relationship between the company and [Islamic State] became so formalized, [ISIS] issued travel permits to Lafarge workers and the company paid a 10-percent 'tax' to the terrorists."[298]

---

[295] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, _How Does ISIS Fund Its Reign of Terror?_, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

[296] Henry Samuel, _Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To ISIL' And Environmental Concerns_, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.

[297] Construction Europe, _Syria Questions For LafargeHolcim: Possible Terrorist Links Investigated At Swiss-Based Company After "Significant Errors Of Judgement" Were Made_ (Apr. 1, 2017), 2017 WLNR 13774661.

[298] Paul Waldie, _Lafarge Under Investigation In France Over Allegations Of Terrorist Financing_, Globe and Mail (June 29, 2018), 2018 WLNR 19862585.

908.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that also alerted Defendants that their illicit transactions involving intermediaries were foreseeably designed and used to route protection payments to terrorists on Defendants' behalf.

909.    Indeed, in addition to alerting Defendants that their illicit Iraq-related transactions with intermediaries were routinely used to route illicit payments to terrorists, from 2004 through 2022, sources like those described throughout this section alerted Defendants that each of their specific intermediary "buffer" tactics foreseeably routed protection payments to terrorists, including Ericsson's reliance upon: (a) Iraq-headquartered companies that LM Ericsson touted as a "partner," like Asiacell and Korek; (b) Iraqi, Jordanian, or Lebanese consultants, like al-Awsat; and (c) security, transportation, logistics contractors, like SLS and Cargo Iraq.

### a.    Defendants Knew Their Illicit Transactions With Iraqi Partners Caused Protection Payments To Flow To Terrorists

910.    Defendants knew their illicit transactions with their Iraqi partners, like Asiacell and Korek, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.  Several Confidential Witnesses confirm this point.  According to Colonel Romeo, for example any major international company operating in Iraq would have known that any transport checkpoint not staffed by Coalition forces was run by "the bad guys" and that any money paid to them for passage "isn't going to pay for holidays . . . but instead they are using the money to further fund the insurgency for things like weapons and IED."  Any ethically run company "should turn around."

911.    **Media reports** alerted Defendants that illicit transactions involving Iraq-headquartered companies that operated in areas where al-Qaeda or Islamic State-affiliated

terrorists were present – like the Defendants' "partners" Asiacell and Korek – routinely were for

purposes of routing protection payments to such terrorists as the cost of doing business using

mechanisms like those used by Defendants in Iraq.  Such reports included, but were not limited

to:

a.    *Knight Ridder*, November 2005:  "Ahmed, a [] resident with long-standing ties to local
      insurgent groups, … said businesses … had been paying local insurgents protection
      money, as much as $70,000 a month. Al-Qaida in Iraq demanded the money.  'Al-Qaida
      said they needed the money to operate….' he said."[299]

b.    *New York Times*, December 2013:  "The United States is quietly … combat[ting] an
      explosion of violence by a Qaeda-backed insurgency that is gaining territory in both
      western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely
      self-financing. … In Mosul, most of the security force members who are not from the
      area have left the city, and Al Qaeda controls whole sections of territory."[300]

c.    *Australian Broadcasting Corporation*, January 2014:  "In … Mosul ISIS nets upwards of
      $8 million a month by extorting taxes from local businesses, according to the US-based
      Council on Foreign Relations (CFR)."[301]

d.    *NPR*, April 2014:  "In Mosul, the extortionists prey on thousands with regular demands
      and threats. The story of one small business owner shows how it works.  Tawfik ran a
      computer shop in Mosul until last year. … He says he left Mosul after an anonymous
      caller demanded about $114,000 for jihad, or holy war … Several other people
      interviewed said the problem of extortion is entrenched and ongoing."[302]

e.    *Daily Mail*, June 2014:  "According to the Council on Foreign Relations, ISIS was
      already extorting taxes from Mosul businesses before its takeover…"[303]

---

[299] Mohammed Al Dulaimy (Knight Ridder Foreign Service), *Al-Qaida in Iraq, Local Insurgents at Odds*, *republished in* St. Paul Pioneer Press (Nov. 13, 2005), 2005 WLNR 18333033.

[300] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

[301] Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014), 2014 WLNR 425449.

[302] Alice Fordham, *For Extremists In Syria, Extortion Brings Piles Of Cash From Iraq*, NPR (Apr. 21, 2014), https://tinyurl.com/5ejx25y7.

[303] Michael Seamark, *Jihadi Terror Group PLC*, Daily Mail (June 19, 2014), 2014 WLNR 16625914.

912.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their Iraqi partners were foreseeably making protection payments to terrorists on Defendants' behalf.

> **b.    Defendants Knew Their Illicit Transactions In Iraq With Local Consultants Caused Protection Payments To Flow To Terrorists**

913.    Defendants knew their illicit transactions with their Middle Eastern consultants, like al-Awsat, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

914.    **Media reports** alerted Defendants that their illicit transactions with their Iraqi, Jordanian, and Lebanese consultants, including Kurdish intermediaries affiliated with the then-head of Kurdistan's regional government, Mahsoud Barzani – like those who served as Defendants' agents in Iraq – foreseeably aided terrorists because such consultants notoriously had longstanding protection arrangements with Sunni terrorists, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Therefore, Defendants' illicit transactions involving such consultants raised multiple red flags for possible protection payments.  On top of the reports above, such media reports also included:

a.    _UPI_, July 2014:  "Prime Minister Nouri al-Maliki …, in a nationally televised broadcast …, blamed Kurds for allegedly protecting insurgents in their capital city of Erbil and for allowing the militant group Islamic State to use Erbil as a base of operations."[304]

b.    _Newsweek_, November 2014:  "Interviews with Iraqi, Kurdish, European, Syrian and American government officials, analysts and intelligence agents sketch a portrait of ISIS's robust, sprawling, and efficient financial operation. … At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS is probably getting

---

[304] Ed Adamczyk, _Kurds Pull Out of Iraqi Government, Except for Parliament Members_, UPI NewsTrack (July 11, 2014).

help from its oil-rich neighbors … [D]espite their hostility to ISIS, the Kurds in Iraq, Turkey and Syria have all done deals with ISIS, often through middlemen.  … The regional Kurdish government in Iraq recently arrested some of its own citizens along with a number of Kurdish politicians and security officials for acting as intermediaries … on behalf of ISIS. … [and] ISIS members [] infiltrated Erbil, Iraqi Kurdistan's capital…."[305]

c.   *Foreign Affairs*, December 2014.  "ISIS' enemies are getting richer from [Islamic State-related] trade, too: Kurdish part-time smugglers who facilitate ISIS' oil sales can earn up to $300,000 each month. A Kurdish newspaper recently published a list of people involved with ISIS … The list includes individuals with the last names of several Kurdish ruling families ... Kurdish facilitators also provide goods to ISIS, including trucks, gas cylinders (for cooking and heating), gasoline, and other necessary commodities."[306]

d.   *Carnegie Council*, March 2015:  "It seemed … ISIS would be content to own Mosul. There was an understanding [] between [] ISIS … and Masoud Barzani, [] president of the Kurdistan regional government, that [ISIS] would not attack the Kurds."[307]

e.   *New York Times*, November 2015:  "'[T]he United States and its allies have concentrated their efforts on trying 'to stop [ISIS] from getting access to the financial system' … That has also proved to be difficult. The Islamic State trades with individuals and businesses in the countries it is fighting, selling … to Kurds in Iraq …, among others."[308]

915.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their illicit transactions with, or through, their Iraq-related consultants were likely routing protection payments to terrorists on Defendants' behalf.

---

[305] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

[306] Louise Shelley, *How ISIS Makes Bank*, Nat'l Herald Trib. (Pakistan) (Dec. 3, 2014), 2014 WLNR 34092636 (republication of article published by *Foreign Affairs* (subscription)).

[307] David L. Phillips (*Author of The Kurdish Spring: A New Map of the Middle East*), *quoted in* Carnegie Council Transcripts and Articles (Blog), *The Kurdish Spring: A New Map Of The Middle East* (Mar. 20, 2015), 2015 WLNR 8346795.

[308] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, N.Y. Times (Nov. 29, 2015).

c.    **Defendants Knew Their Illicit Transactions with Security, Transportation, and Logistics Contractors in Iraq, Syria, Jordan, Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to Flow to Terrorists**

916.    Defendants knew their illicit transactions with their Iraq, Syria, Jordan, Turkey, Qatar, U.A.E., and Lebanon-based security, transportation, and logistics contractors, like SLS and Cargo Iraq, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.  Through such persons and media coverage, Defendants knew that, like the *Associated Press* reported in 2006, "[t]he route to Jordan and Syria goes through Anbar province, a stronghold of Sunni insurgents."[309]

917.    **Media reports** and **terrorism scholars** alerted Defendants that illicit transactions involving security contractors that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like the ones Defendants used – routinely routed protection payments to such terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq.  Such reports included, but were not limited to:

a.    *Akron Beacon Journal*, September 2007:  "American companies" "suppl[ied] their own security" "[and by] paying off Iraqi insurgents with protection money" "[resulting in] American money sustaining the insurgents."[310]

b.    *Los Angeles Times*, September 2010:  "The report, released [] by the inspector general of the U.S. Agency for International Development, says subcontractors hired to protect a development project near Jalalabad may have paid more than $5 million to the militants through local authorities. . . . The report says local authorities often demand a 20% 'protection tax' in such circumstances.  Under those deals – along the lines of extortionist protection rackets in the U.S. – the Taliban … promises that they won't attack … their equipment and won't try to halt the contract work…."[311]

---

[309] Sameer N. Yacoub, *Sectarian Divisions Change Baghdad's Image As A City Of Religious Coexistence,* AP Worldstream (July 3, 2006).

[310] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.

[311] Paul Richter, *Audit:  U.S. Government Funds May Have Gone To Taliban*, L.A. Times (Sept. 30, 2010).

c.   _Christian Science Monitor_, October 2010:  "The Senate investigation also turned up mounting evidence to suggest that largely unmonitored Pentagon contracts with private security companies … may also be lining the pockets of Taliban insurgents who agree not to attack convoys in exchange for cash.  'If you want to know the driving force of corruption in Afghanistan, it's not Afghan culture,' warns Anthony Cordesman, a security specialist at the Center for Strategic and International Studies in Washington.  'It's American contracting.'"[312]

918.   Media reports and terrorism scholars also alerted Defendants that their illicit transactions with their transportation and logistics service providers – like the ones Defendants used – operating in areas where al-Qaeda or Islamic State-affiliated terrorists were present likely operated to route protection money to terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq.  Such reports included, but were not limited to:

a.   _Inter Press Service_, September 2008:  "Often … logistics companies have to pay protection money … In one route, between the capitals of Kandahar and Urozgan provinces [in Afghanistan], contractors pay millions in protection money …"[313]

b.   Dr. Phil Williams, July 2009:  "Truckers" "pa[id] $500 for protection money [per truck]."[314] "Truckers were willing to cooperate with 'smuggling gangs, pay bribes or use forged papers … [and] the whole process was lubricated by pervasive corruption …"[315] "The going rate for allowing [] trucks to pass was typically $500. The huge volume of truck traffic made the practice highly lucrative. With rail and air service inoperable in most of the country, many areas, especially Baghdad, relied on truck convoys for basic goods and reconstruction materials. The dilemma for transportation services was multiple tolls in different locations exacted by different actors—although for those involved … there was often enough money to cover all these tolls."[316]

c.   _Washington Post_, March 2010:  "The essential question, said an American executive …, is 'whether you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S. military or contractors."[317]

---

[312] Anna Mulrine, _Rogue Security Companies Threaten US Gains In Afghanistan War_, Christian Sci. Monitor (Oct. 21, 2010).
[313] Anand Gopal, _Afghanistan:  Subsidised Fuel Trail Winds Back To Pakistan_, Inter Press Service (Sept. 30, 2008).
[314] Williams, _Criminals, Militias, and Insurgent_s, at 84-85.
[315] _Id_. at 85.
[316] _Id_. at 158-59.
[317] Karen DeYoung, _Afghan Corruption: How To Follow The Money?_, Wash. Post (Mar. 29, 2010).

d.  *Al Jazeera America*, December 2013:  "[S]ince the U.S. military withdrawal in 2011 … violent attacks have sharply increased. … The number of dead so far this year now rivals 2006 and 2007 figures, when sectarian fighting was at its most feverish … The majority of the recent attacks have been carried out …, primarily, by a branch of Al-Qaeda that has folded in Al-Qaeda in Iraq with its affiliates in Syria to become known as Al-Qaeda in Iraq and Syria (AQIS). The group continues to absorb fighters filing across the 400-mile border the two countries share. … 'Going back to 2006 is the major fear,' [said] Michael Knights, a research fellow at the Washington Institute for Near East Policy … Also solidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local support in cities … where Iraqi security forces have failed to gain a foothold. 'Since 2010 AQIS has been self-funding through organized crime rackets involving … protection payments from large Iraqi companies, plus trucking …' Knights said."[318]

e.  *Newsweek*, November 2014:  "ISIS applies a 'tax' to all goods imported to or exported from the city. ISIS even 'taxes' groups providing genuine humanitarian aid in its own war zone. 'ISIS taxes people transporting nearly anything,' says one Lebanese intelligence officer. …"[319]

f.  *Washington Post*, December 2014:  "Islamic State … provid[ed] … a salary of up to $1,100 per month … for each fighter's family. The largesse is funded with … the extortion of truckers and others who cross Islamic State territory."[320]

g.  Louise Shelley, September 2015:  "Terrorists … exploit supply chains. … [T]errorists in border areas tax the cross-border flow of goods. … Terrorists share a major concern of legitimate businesses supply chains—as they need to ensure the safe and timely delivery of goods without disruption. … Terrorists make substantial money by controlling supply chains … as well as by taxing … others that pass through borders or territory that they control. The ability to tax the transit of commodities is one key to their financing. Organized crime groups' extortion of trade has been known for a significant period, which is why they are so deeply involved in ports and the trucking industry. Yet terrorist groups on many different continents also profit from exploiting supply chains and taxing trade. … Terrorists often generate revenues by taxing the supply chains that move legitimate … products across territory they control. Through corruption … terrorist groups … bolster their own in key border areas, ports, and other transport hubs. Therefore, they have learned from organized crime the importance of controlling territory

[318] Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013), https://tinyurl.com/5k57c4vx.
[319] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.
[320] Kevin Sullivan and Karla Adam, *Hoping To Create A New Society, The Islamic State Recruits Entire Families*, WashingtonPost.com (Dec. 25, 2014), 2014 WLNR 36516895.

and have capitalized on the corporate world's need to move commodities long distances in the increasingly globalized economy."[321]

919.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their illicit transactions with, and through, their security, transportation, and logistics service providers were likely making protection payments to terrorists on Defendants' behalf.

### 2.    Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-Based Protection Payments To Flow To Terrorists, And Intended For Their Officers, Employees, Agents, Partners, Consultants, And Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists

920.    Defendants knew that their strategy to generate hard-to-trace, off-the-books cash sources through uncontrolled slush funds for their illicit Iraq-related transactions caused USD-based protection payments to terrorists.

### a.    Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists

921.    Defendants knew their use of uncontrolled Iraqi slush funds would help them conceal their regular protection payments to terrorists. Defendants knew their Iraqi slush funds facilitated cash-based protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

922.    **United States government reports** alerted Defendants that their uncontrolled slush funds foreseeably enabled money laundering that was vital to terrorist finance because

---

[321] Louise Shelley, *quoted in* SEC Wire, *George Mason University Founder and Director, Terrorism, Transnational Crime and Corruption Center Louise Shelley, Prepared Testimony Before the House Financial Service Committee Hearing on Could America Do More? An Examination of U.S. Efforts to Stop the Financing of Terror* (Sept. 9, 2015).

slush funds provided the untraceable cash that intermediaries acting for terrorists required to make illicit protection payments.  In November 2006, for example, a senior DOJ official publicly observed that "[s]hell corporations and nominees are widely used mechanisms to launder the proceeds from crime, particularly bribery (e.g. to build up slush funds). The ability for competent authorities to obtain and share information regarding the identification of companies and their beneficial owner(s) is therefore essential … for preventing … money laundering."[322]

923.    **Media reports** alerted Defendants that terrorists operating in high-risk environments routinely depended upon uncontrolled slush funds maintained by their funders. Such reports included, but were not limited to:

a.    *United Press International*, April 2002:  "Slush funds are not a sovereign prerogative. Multinationals, banks, corporations, religious organizations, political parties, and even non-governmental organizations salt away some of their revenues and profits in undisclosed accounts, usually in offshore havens. …  [P]added invoices, sham contracts, fictitious loans, interest accruing on holding accounts, back to back transactions with related entities [were] all [types of transactions] used to funnel money to the slush funds. Such funds are often set up to cover for illicit and illegal self-enrichment, embezzlement, or tax evasion. … BBVA's payments to [terrorist group] ETA may have been a typical payment of protection fees. Both terrorists and organized crime put slush funds to bad use. They get paid from such funds, and maintain their own."[323]

b.    *Hindustan Times*, February 2003:  "Delhi Police will interrogate … Abdul Gani Bhat for his alleged role in funding terrorist organisations with slush funds … from Pakistan."[324]

c.    *National Post*, February 2004:  "Israel's raids may … chok[ed] off the slush funds used to underwrite terrorism, [and] … help stanch the flow of … blood."[325]

---

[322] Stuart G. Nash (U.S. Associate Deputy Attorney General), *Lack of Ownership Information for Suspect Incorporations Companies – Part 2, Testimony Before the Senate Homeland Security and Governmental Affairs Permanent Investigations Committee*, Congressional Testimony via FDCH (Nov. 15, 2006) (cleaned up), 2006 WLNR 19827292.
[323] Sam Vaknin (UPI Senior Business Correspondent), *Analysis: Slush Funds - Part 2*, UPI North American News (Apr. 23, 2002).
[324] Sudhi Ranjan Sen and Vibha Sharma, *Bhat to be Questioned on Terror Funding*, Hindustan Times (Feb. 11, 2003), 2003 WLNR 111300.
[325] Nat'l Post (Canada), Editorial, *Follow the Shekel*s (Feb. 26, 2004), 2004 WLNR 10998196.

d.   *Courier Mail*, November 2005:  "[Future Australian Prime Minister] Kevin Rudd [said]: '[S]lush fund[s] … available to the Iraqi insurgency [] pose[] a … threat to [] troops.'"[326]

e.   *Australian*, July 2006:  "Crown prosecutor Mark Dean detailed lurid accounts of jihadi training camps, terror slush funds, secret meetings and bomb-making recipes …"[327]

f.   *Daily Telegraph*, August 2006:  "[A] Saudi anti-corruption drive … recogni[zed] that the slush funds associated with other Saudi arms contracts have helped finance terrorism."[328]

g.   *Indo-Asian News Service*, June 2009:  "With slush funds being increasingly used for financing terrorism, Indian financial institutions are planning to increase investment in their anti-money laundering systems, a survey by … KPMG has found."[329]

h.   *Assam Tribune*, March 2011:  "Much of the slush-money stashed away in foreign banks is linked to illegal transactions in narcotics and hawala money-laundering, not to mention obvious terror links … [reflected by] the proliferation of slush-funds abroad …."[330]

i.   *Telegraph*, December 2012:  "[M]ilitant groups … are getting involved in [] lucrative … trade and the slush funds earned is a major source of 'sustaining insurgency'."[331]

j.   *AllAfrica.com English*, October 2015:  "[Nigerian] President Muhammadu Buhari's charge to the international community … to strengthen mechanisms for dismantling havens for proceeds of corruption … appropriately advertises the receiving countries of illicit fund flows as equally promoters of corruption. … [M]any of the receiver-countries, mostly in the western world, are coming to terms with the fact that uncontrolled movement of slush funds is at the heart of heightening global … terrorism …"[332]

924.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their Iraqi slush funds foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

[326] Steven Wardill, *Full Probe Demanded Into Wheat Contracts*, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.
[327] Cameron Stewart, *Laughs Turn Cold as Prosecution Puts Case*, Australian (July 25, 2006), 2006 WLNR 12749446.
[328] Roland Gribben, *Defence BAE Lands Arms Deal For A New Generation*, Daily Telegraph (Aug. 19, 2006), 2006 WLNR 14368620.
[329] Indo-Asian News Service, *Financial Sector to Strengthen Anti-Money Laundering Systems* (June 18, 2009).
[330] Assam Tribune, Editorial, *Shameful Negligence* (Mar. 14, 2011), 2011 WLNR 5028725.
[331] Wasim Rahman, *Plea to Check Illegal Mining*, Telegraph (India) (Dec. 5, 2012), 2012 WLNR 25931403.
[332] AllAfrica.com English, *On Havens for Slush Funds* (Oct. 15, 2015).

      **b.**     **Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit Iraqi Transactions Would Facilitate Covert Protection Payments To Terrorists**

925.    Defendants knew that terrorists craved access to cash – particularly U.S. dollars, the currency of choice for terrorists worldwide.  Indeed, the riskier the operation, the more important for it to be paid fully in cash.

926.    **United States government reports** alerted Defendants that bulk U.S. dollar cash payments and associated cash smuggling was a key strategy to route payments to terrorists.  The following are just a few examples of such reports:

a.    Treasury Department, 2005:  "[O]nce funds are raised for insurgent groups, they must be transported … and disbursed within Iraq.  … [T]he physical transportation of cash into Iraq [and] … [r]eliance on currency for transactions … carries significant risks with respect to insurgency financing."[333]

b.    The White House, 2006:  "Funds … provide the fungible, easily transportable means to secure all other forms of material support necessary to the survival and operation of terrorist organizations. Our enemies raise funds through a variety of means, including soliciting contributions from supporters; operating businesses, NGOs, and charitable fronts; and engaging in criminal activity such as … extortion … They transfer funds through several mechanisms, including … cash couriers … Effective disruption of funding sources and interdiction of transfer mechanisms can help our partners and us to starve terrorist networks of the material support they require."[334]

c.    Treasury Department, 2015:  "Combined with the widespread demand for U.S. currency globally, multiple terrorist groups, including AQ and its affiliates, ISIL, Al-Shabaab, Hizballah, and FARC, will continue to use cash smuggling as a less efficient alternative for moving funds globally."[335] "The use of cash is attractive to criminals mainly because of its anonymity, portability, liquidity and lack of audit trail. According to the surveyed cases, since 2007, 18 [terrorist finance]-related prosecutions in the United States have in some way involved the use of cash to transfer funds to terrorist organizations. These

---

[333] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658. The U.S. government addressed this program on or about 2005 through its facilitation of electronic banking throughout Iraq, which obviated Defendants' need to rely upon cash.  *Id.*
[334] The White House, *National Strategy for Combating Terrorism*, at 12 (Feb. 2006).
[335] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 56 (Aug. 24, 2015).

cases have involved various FTOs, including core AQ, AQ in Iraq (the predecessor organization to ISIL), AQAP, Al-Shabaab, Hizballah, and FARC."[336]

d.   Treasury Department, 2015:  "People use cash for a variety of reasons, including because it has no fee per transaction, it is readily available and accepted worldwide for consumers, is confidential, cannot be hacked, and does not run out of battery power. Unlike electronic transfers of funds, cash does not leave a digital trace. … The same characteristics that make cash dependable and portable to everyday consumers are also attractive to criminals. …  Recognizing that using cash for unexplained large consumer or commercial purchases can be an indicator of illicit activity, and the initial U.S. AML/CFT statute imposed a cash reporting requirement to mitigate against this risk."[337]

e.   LIGOIR, May 2020:  "Treasury and the [U.N.] both reported that ISIS primarily uses cash … funds within and out of Syria and Iraq and through neighboring countries."[338]

927.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their use of cash in Iraq foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

### 3.   Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Help Conceal Their Protection Payments To Terrorists

928.   Defendants also knew their intentionally deficient internal controls were a feature, not a bug, and were purpose-built to facilitate and conceal Ericsson's corrupt payments, including its protection payments to terrorists.

929.   Defendants knew their intentionally deficient internal controls facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business there, and lived there for decades – knew such fact to be true.

---

[336] *Id*. at 54-55.
[337] U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing, Report to Congress*, at 23 (2020).
[338] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20 (May 13, 2020).

930.     Defendants also knew their practice of facilitating payments without clear beneficiaries facilitated protection payments to terrorists because Defendants' employees and agents in Iraq knew such fact to be true.

931.     **United States government reports** alerted Defendants that their practice of facilitating illicit payments without clear beneficiaries was a tactic used to conceal terrorist finance.  Such reports and statements included, but were not limited to:

a.    <u>Treasury Department, September 2006</u>:  "[D]onors are encouraged to … consider[] protective measures to prevent … abuse by terrorists. … [E]ffective internal controls … can prevent … terrorist financing …".[339]  "When supplying [] resources …, fiscal responsibility on the part of a [payor] should include: ... determining that the potential grantee of … contributions has the ability to … protect the resources from … exploitation by terrorist organizations and/or their support networks …"[340]

b.    <u>DOJ and SEC, November 2012</u>:  "Effective policies and procedures require an in-depth understanding of the company's business model, including its products and services, third-party agents, customers, government interactions, and industry and geographic risks. Among the risks that a company may need to address include the … use of third parties; gifts, travel, and entertainment expenses; … donations; and facilitating and expediting payments. … [Routine corporate internal controls] systems can be a good way to …, if properly implemented, prevent[] and detect[] potential FCPA violations."[341]

c.    <u>LIGOIR, May 2018</u>:  "An ongoing USAID OIG investigation found that employees of a U.S.-based nongovernmental organization knowingly diverted USAID-funded food kits to a militant organization operating in northern Syria … employees of the non-governmental organization … submitted falsified beneficiary lists to USAID to conceal the [terrorists]' participation in the … program."[342]

d.    <u>Senate Finance Committee, December 2020</u>:  "A [] robust and fundamentally sound system of screening and vetting is needed to [ensure] that contributions made to [an entity in a high risk terrorist environment] are not funding illicit organizations."[343]

---

[339] U.S. Dep't of the Treasury, *U.S Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities*, at 2-3 (Sept. 2006).
[340] *Id*. at 8.
[341] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 48.
[342] Lead Inspector Gen. for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 69 (May 5, 2018).
[343] U.S. Senate Finance Committee Oversight & Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

932.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their intentionally deficient internal controls were a tactic to conceal their protection payments.

**D.    Defendants Knew Their Obstruction Of United States Counterterrorism Operations Provided Operational Assistance To Al-Qaeda And The Taliban**

933.    From 2013 through 2022, LM Ericsson's and Ericsson AB's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) and cross-functional compliance and legal personnel in the United States knew that Defendants' lies to counterterrorism-facing components of the United States government, including DOJ and the FBI, foreseeably obstructed U.S. government counterterrorism operations targeting the same protection networks about which Defendants lied to the United States.

**1.    Defendants Knew Their Conduct Obstructed U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State**

934.    Defendants knew their false communications to the United States government, including DOJ and FBI, obstructed U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

935.    From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that the United States pursued a whole-of-government approach to post-9/11 counterterrorism in the Middle East, that DOJ and FBI keyed such efforts by sharing actionable evidence and intelligence with on-the-ground U.S. counterterrorism personnel in Iraq, Syria, and Afghanistan, and that companies that lie to DOJ about their payments to al-Qaeda, al-

Qaeda-in-Iraq, and Islamic State impede U.S. counterterrorism operations by depriving U.S. counterterrorism personnel in the Middle East – both DOJ and FBI, as well as others using information shared by DOJ and FBI – of vital information concerning al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection networks, including, but not limited to:

a.    identities of the associated terrorist operatives, intermediaries, and financiers associated with the protection network;

b.    demands made by the terrorists operating the protection network;

c.    location of the terrorists operating the protection network;

d.    modality of value transfer, including the currency, used by the protection network;

e.    means of communication, including phone numbers, emails, and in-person cutouts, used by the protection network;

f.    bank account details associated with the terrorist or their intermediary cutout for the protection network; and

g.    pattern-of-life information about the above-described persons associated with protection networks, upon which U.S. counterterrorism operators depended for successful raids of suspected terrorists.

936.    Western companies on the ground in Iraq were widely aware of the reality that the more information the United States government had concerning terrorism threats, the more effectively the U.S. could protect its citizens from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq, Syria, Turkey, and Afghanistan. Defendants were sophisticated companies with billions of dollars in revenues at stake in Iraq, which was the paradigmatic example of this point. They knew this prevailing understanding that lies to DOJ and FBI concerning their involvement with al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks in Iraq were foreseeably obstructing U.S. government counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

937.    Defendants' obstruction of U.S. counterterrorism operations was also the fruit of Defendants' lies to DOJ and FBI in circumstances that left no doubt about whom they were aiding.  LM Ericsson, Ericsson AB, Ericsson Inc., and Ekholm (or their agents) met with U.S. counterterrorism-facing U.S. law enforcement, including, but not limited to, the DOJ FCPA Unit and the FBI, who openly acted on behalf of the United States and as part of an integrated response to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through DOJ's and FBI's participation in Iraq-facing counterterrorism efforts, fusion cells, threat finance cells, and similar cross-departmental counterterrorism operations.

938.    Defendants knew, and intended, that their lies to DOJ and FBI concerning their involvement in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks would obstruct U.S. counterterrorism investigations into the very terrorist networks with which Defendants were profitably collaborating and Defendants intended to accomplish such obstruction in order to allow Defendants' participation in the terrorists' protection money racket – and associated outsized profits for Defendants – to continue.

939.    Defendants also consciously avoided investigating Ericsson's conduct in the geographies that posed the greatest risk specifically for terrorist finance in order to conceal the truth about Ericsson's knowing participation in al-Qaeda, al Qaeda-in-Iraq, and Islamic State protection rackets.  Instead, Ericsson later boasted that it persuaded the United States against investigating Ericsson's conduct in such geographies.  This sequence of events confirms that Ericsson *intended* to conceal its conduct in the geographies that Ericsson's outside counsel later boasted at having successfully shielded from government scrutiny.

940.    Defendants knew that Ericsson was one of the largest multinational corporations operating in all of Iraq, Iran, Syria, Afghanistan, Pakistan, Turkey, and Lebanon, and Defendants

also knew that Ericsson was the only major multinational corporations (other than Lafarge S.A.) to continue to maintain an on-the-ground-presence inside of Islamic State's caliphate from 2014 through 2017.  Armed with such knowledge, Defendants knew that their information concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq offered significant value to U.S. counterterrorism operations against those terrorists in the Middle East.  Defendants therefore knew that their decision to lie to DOJ would degrade the quality of the information DOJ shares with its associated U.S. government fusion cell partners, and increase the effectiveness, resiliency, and profitability of the FTOs' protection networks and associated financial, logistics, and personnel aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State acts of terrorism against Americans in the Middle East.   1

      941.    Although Defendants' obstruction-based assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to conduct that violated investigative disclosure -related statutes, e.g., 18 U.S.C. § 1001 (false statements). Whether or not Defendants technically violated U.S.C. § 1001 or a similar obstruction-related criminal prohibition, their lies to DOJ and FBI with the specific intent of concealing information about al-Qaeda, al-Qaeda-in-Iraq, and Islamic State's protection networks, and Defendants' participation therein, supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with vital communications, operations, logistics, and intelligence assistance, sourced from U.S. communications received by U.S. law enforcement in Washington, D.C., all of which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to fund attacks against Americans in Iraq, Afghanistan, Syria, and Turkey.

      **2.    Defendants Knew Their Obstruction Of U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq,**

**And Islamic State Aided Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State Aided Attacks Against Americans**

942.   Defendants knew their provision of operational aid, cover, and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State regarding such FTOs' protection rackets aided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks against Americans because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

943.   **United States government reports and statements** alerted Defendants that their cover and concealment of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks undermined U.S. government counterterrorism efforts in Iraq, Syria, Turkey, and Afghanistan.  For example, DOJ and SEC repeatedly communicated to Ericsson that their cover and concealment of illicit payments could harm U.S. national security by facilitating terrorism when DOJ and SEC published the FCPA Resource Guide in 2012, which documented DOJ's and SEC's views that companies that concealed corrupt payments foreseeably aided terrorists.

944.   From 2003 through 2022, the U.S. government published other reports and statements that similarly alerted Defendants that their provision of cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs' ability to attack Americans in Iraq, Syria, Turkey, and Afghanistan.[344]

---

[344] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* Dep't of the Treasury, Testimony of Juan Carlos Zarate, Assistant Secretary, *Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, Before the Senate Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs* (Nov. 15, 2004), https://tinyurl.com/bdd6ykzw; Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e; Ambassador Henry A. Crumpton, Coordinator for Counterterrorism, U.S. Dep't of State, *The Role of Public and Private Partnerships in the Global War on Terrorism; Remarks to the 5th Annual International Counterterrorism Conference: Public and Private Partnerships; Washington, D.C.* (Apr. 20, 2006), https://2001-2009.state.gov/s/ct/rls/rm/2006/64977.htm; Under Secretary for Terrorism and Financial Intelligence Stuart Levey, U.S. Dep't of the Treasury, Press Release,

945.   U.S. government reports also specifically emphasized the importance of obtaining accurate information from the private sector to the U.S. government's ability to mitigate the terrorist finance and logistics risks that specifically arise when foreign telecom companies do business in ultra-high-risk geographies, like Iraq.  For example, according to a White House statement of U.S. counterterrorism strategy in 2018:

> Terrorists cannot sustain their operations without [information technology]. The United States and our partners … in the private sector must, therefore, prevent terrorists from using [information technologies sourced from the United States] while safeguarding these resources for legitimate use. To accomplish this, we will increase information-sharing with the private sector …[345]

946.   **International organizations** and **terrorism scholars** also alerted Defendants to these risks.  For example, according to the 2016 Global Terrorism Index (published in 2016):

> Since the publication of the 2015 Global Terrorism Index (GTI), the … emphasis on engaging the private sector in [Preventing Violent Extremism] is a welcome one, and there are obvious reasons to do so. … DO NO HARM … [M]ost important[ly], the private sector must make every effort to Do No Harm. Companies, as well as those institutions and structures engaging them (civil

---

*Under Secretary for Terrorism and Financial Intelligence Stuart Levey Testimony* (Apr. 1, 2008), https://home.treasury.gov/news/press-releases/hp898; LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* U.S. House of Representatives, *Tracking And Disrupting Terrorist Financial Networks: A Potential Model For Interagency Success?*, Hearing, House Committee on Armed Services, Terrorism, Unconventional Threats and Capabilities Subcommittee (Mar. 11, 2009); Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Dep't of the Treasury), quoted in U.S. Dep't of the Treasury, Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations (Sept. 6, 2011), https://home.treasury.gov/news/press-releases/tg1287; FBI Director James B. Comey, *quoted in* FBI, *Homeland Threats And The FBI's Response; Statement For The Record Before The Senate Committee On Homeland Security And Governmental Affairs* (Nov. 14, 2013), https://tinyurl.com/2s4z78t8; Ambassador Samantha Power (U.S. Permanent Representative to the U.N.), *Samantha Power: Putting ISIS Out Of Business*, CNN Wire (Dec. 17, 2015), https://tinyurl.com/46tswhph; Marshall Billingslea, *Opening Statement Of The Nominee For Assistant Secretary Of The Treasury For Terrorist Financing*, U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 16, 2017), https://tinyurl.com/4brujnkv.
[345] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

society and governments) must be held accountable and must engage responsibly. This means not only engaging with reputable businesses and business sectors to abstain from corrupt practices, but also focusing on the outcomes of that engagement. … Vetting: … we had better be sure of who we are working with. Equally as important as knowing who our partners are, is knowing who their partners are. … There is a real concern that if the wrong company or an unethical company is engaged, the risk is to do more harm to a community than good.[346]

947.     **Terrorism scholars** alerted Defendants that their concealment of their payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs by undermining United States counterterrorism policy, which relied upon complete, and truthful information from multinational corporations conducting business in areas at severe risk for terrorist finance, like Defendants.  In 2014, for example, terrorism scholar Louise Shelley observed that:

> The effort to counter ISIS should also involve Western businesses. The cigarette industry follows the ebb and flow of the illicit cigarette trade. Energy and pharmaceutical companies monitor the movement of their commodities in the region. Transport companies have insights into the dynamics of illicit trade, and insurance companies have insights into kidnapping. That is why public-private partnerships are key. Corporations can share the information they already collect on illicit trade routes, smuggling shipments, and key facilitators. They can also warn consumers not to purchase the counterfeit and smuggled commodities that fund terrorism. For now, the government response to ISIS has not taken the business community enough into account. But without such cooperation, Washington cannot hope to successfully counter the nimble ISIS.[347]

948.     In 2016, similarly, terrorism scholar Celina Realuyo, Professor of Practice at National Defense University, publicly testified before Congress that:

> In the post-9/11 world, we have witnessed how "following the money trail" has enhanced our efforts to counter the threats around the world. Since international financial flows are not controlled or managed by governments, public-private partnerships with the many facets of the financial services industry are essential in combating threats … terrorist financing … Governments no longer enjoy a monopoly on national security or the use of force as they did in the past; therefore, they need to adopt a "whole of society" approach … ISIL relies heavily

---

[346] Amy E. Cunningham and Khalid Koser, *Why Preventing Violent Extremism Is The Private Sector's Business*, 2016 Global Terrorism Index Report (2016), https://tinyurl.com/4e5c7ybe.

[347] Shelley, *How ISIS Makes Bank*.

on extortion and the levying of "taxes" on local populations under its control …
The contemporary threat posed by ISIL to global security has been empowered by
a dangerous convergence of terrorism and crime that generates significant income
for the group. The systematic practice of "taxation," … provide vital resources for
the group's military, financial, recruitment, and propaganda campaigns. …
Unilateral, individual country efforts are not enough to counter terrorist financing
and money laundering. Our international financial system is far more
interconnected and interdependent than ever before. International cooperation
between the public and private sectors is therefore paramount.[348]

949.    In 2019, terrorism scholar Stephen Tankel, Assistant Professor in the School of

International Service at American University, published an analysis that also observed the central

role of accurate private sector information to the effectiveness of American counterterrorism

efforts against al-Qaeda- and Islamic State-affiliated terrorists worldwide:

[T]here are almost four times as many Sunni Islamist militants operating in 2018
as there were on 9/11. … [T]he movement's ongoing strength stems in large part
from the fragile nature of the states in which the majority of its adherents operate
… across parts of South and Central Asia … where … [m]any of these
governments are poorly run and corrupt … [W]hen it comes to terrorists' use of
technology … the need for public- private partnerships and international
collaboration is even greater. Governments, multinational organisations and
alliances, and the private sector must come together … to combat[] jihadists
locally and globally.[349]

950.    **International organizations** also alerted Defendants that concealment and cover

are essential to the effectiveness of terrorists' ability to maximize their cash flows from illicit

sources.  For example, Transparency International confirmed in a 2014 report that "transparency,

accountability, and countercorruption …initiatives also depend heavily on the active

involvement of other actors, such as government, business, and civil society, to ensure that

---

[348] Celina Realuyo, *Stopping Terrorist Financiers*, Written Statement Before the House Fin.
Servs. Comm. Terrorism Financing Task Force, CQ Congressional Testimony (June 23, 2016).
[349] Stephen Tankel, *How Jihadists Went 'Glocal' And What To Do About It – Analysis*, Eurasia
Review (Nov. 6, 2019), https://tinyurl.com/mwv7xa67.

checks and balances are in place and adhered to."[350]  Similarly, a report published by the FATF in 2015 also alerted Defendants that Islamic State's ability to maximize ISIS cash flow from its protection rackets in Iraq and Syria – and attendant ability to fund attacks that killed Americans – substantially depended upon the cover and concealment afforded to the key nodes of ISIS's protection networks in Iraq and Syria.[351]

951.   **Media reports** alerted Defendants that their cover and concealment of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks undermined U.S. government counterterrorism efforts in Iraq, Syria, Turkey, and Afghanistan. Such reports included, but were not limited to:

a.   *Congressional Quarterly Today*, March 2009:  "[S]elf-supporting terrorist groups have been increasingly drawn to crime, from petty credit card fraud to global drug cartels to finance training and activities. [U.S. Army Lieutenant General] David P. Fridovich, director of special operations for Special Operations Command, emphasized how Defense Departments efforts to cooperate with other government entities and the private sector have been integral to terrorism finance prevention strategy in Iraq and Afghanistan. 'To us, it means very simply that DoD, no matter how we may adjust and organize, by ourselves, will fail to eliminate these networks,' Fridovich said. 'We must

---

[350] Transparency International UK, Defense and Security Programme, *Corruption Threats & International Missions*, at 11-13 (2014), https://tinyurl.com/2m54yzxj.

[351] FATF Report, *Financing Of The Terrorist Organisation Islamic State In Iraq And The Levant (ISIL)* (Feb. 2015) ("ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as bank looting, extortion, control of oil fields and refineries, and robbery of economic assets and illicit taxation of goods and cash that transit territory where ISIL operates … ISIL manages a sophisticated extortion racket by robbing, looting, and demanding a portion of the economic resources in areas where it operates, which is similar to how some organized crime groups generate funds. This vast range of extortion, including everything from fuel and vehicle taxes to school fees for children, is done under the auspices of providing notional services or 'protection.' … The need for greater international co-operation between countries to combat the ISIL threat is without question. … For example, law enforcement agencies should continue to leverage their international working relationships [with public sector and private sector partners] to proactively identify and develop investigative leads involving illicit money flows related to terrorism and/or terrorist groups such as ISIL. … Discussions should include the sharing of best practices for detecting and investigating individuals who are illicitly financing ISIL."), https://tinyurl.com/3hnjz2wm.

work not only within our own interagency but with the coalition, other partner nations and the private sector.'"[352]

b.   _Inside the Pentagon_, March 2009:  "One of the key ways that SOCOM fulfills its 'synchronization' responsibilities is to host gatherings -- twice a year -- of roughly 100 counterthreat finance analysts, investigators and case agents from the combatant commands, as well as the Treasury, State, and Homeland Security departments, the FBI, the Drug Enforcement Agency and officials from Britain, Australia and Canada. Representatives from the private sector are also invited, [LTG David P. Fridovich, Director of Special Operations (Threat Operations Team) for U.S. Special Operations Command (SOCOM)] said. 'This has become the premier forum for U.S. government threat finance [information] exchange,' according to [LTG Fridovich's] testimony. 'Exchange with the coalition, and the private sector has been especially informative as we learn better how to deal with the rapidly developing cutting edge financial technologies like Internet and cell phone money transfers.'"[353]

952.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that their fraudulent concealment of their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs by obstructing American counterterrorism efforts.

**E.   Defendants Knew Their Facilitation Of Al-Qaeda's And The Taliban's Attacks On Communications Networks Provided Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban in Afghanistan**

**1.   Defendants Knew Their Conduct Facilitated Al-Qaeda's And The Taliban's Manipulation Of Networks In Afghanistan**

953.   Ericsson was aware of the widespread threat of terrorist violence throughout Afghanistan.  On October 18, 2014, for example, Ericsson AB's President of North Middle East Region, Tarek Saadi, publicly stated, in sum and substance, that Ericsson was bullish on Afghanistan – despite decades of conflict and the fact that the Taliban still controlled large parts

---

[352] LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), _quoted in_ Daniel Fowler, Caitlin Webber and Rob Margetta, _Several Hearings Highlight Persistent Threat of Worldwide Terrorism_, Congressional Quarterly Today (Mar. 11, 2009).
[353] Inside the Pentagon, _New DOD, Treasury Team To Disrupt Taliban_, Al Qaeda Funding (Mar. 19, 2009).

of the country – because Ericsson was observing significant growth in MTN's mobile and mobile

data traffic in Afghanistan.

954.    Defendants also knew, per a statement released by MTN Group in 2008, that

"MTN Group" was "monitoring threats to its Afghanistan operation closely."[354]  Defendants

knew that MTN intended to respect the Taliban's "need" to shut down cellular networks:

> The MTN Group is aware of reports of the Taliban communicating a need for
> mobile operations to be suspended at certain times during the night in sensitive
> areas.  We are evaluating the situation and liaising with our executives and
> relevant authorities in Afghanistan.  The MTN Group does not expect this to have
> a material impact on its operations in Afghanistan.  No further details can be
> made available at this stage.[355]

955.    As explained above, MTN Group made the decision – and instructed its

subsidiary – to comply with the Taliban's demands.  *See supra* Part IV.F.2.  MTN Group also

approved its subsidiary's practice of making payments to Taliban insurgents.  *See supra* Part

IV.F.1.  Those decisions had a substantial connection to the United States for the reasons

explained below.

> **2.    Defendants Knew Their Facilitation Of Al-Qaeda's And The
> Taliban's Manipulation Of Communications Networks In
> Afghanistan Aided Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State
> Aided Attacks Against Americans**

956.    Defendants knew that their assistance to the Taliban aided their attacks against

Americans because the Taliban publicly stated as much to the international media.

957.    Defendants also knew such facts were true based on Defendants' own employees

and agents on the ground in Iraq and Afghanistan, who knew such fact to be true.

---

[354] *MTN Concerned By Afghanistan Threats*.

[355] *Id.*

F.    **Defendants Knew Al-Qaeda's Role**

1.    **Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States**

958.    Defendants knew that al-Qaeda waged a global terrorist campaign against the United States in which al-Qaeda and its branches and allies in Iraq, Afghanistan, Syria, and elsewhere attacked Americans to drive the United States out of the Middle East.

959.    Defendants knew about al-Qaeda's global terrorist campaign against the United States, including its key focus on attacking Americans in Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

960.    **United States government reports** alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States.  The U.S. government long recognized the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq.  For starters, U.S. military documents confirmed the vital nature of the relationship.  For example, according to a declassified report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies."  "Reflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

961.    United States counterterrorism policy also recognized, as cornerstones of the U.S. strategy against al-Qaeda and al-Qaeda-in-Iraq, that (i) "[a]l-Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, and Europe who

continue working to carry out future attacks against U.S. interests."[356] Other U.S. government

reports confirmed the inextricable ties between al-Qaeda's operations in Iraq and Afghanistan.[357]

962.    **Media reports** alerted Defendants to the globally interconnected nature of al-

Qaeda's campaign against the United States.[358]

---

[356] U.S. Dep't of State, *Country Reports on Terrorism 2005* at 218 (Apr. 2006); *see also* U.S. Dep't of State, *Country Reports on Terrorism 2006* at 270 (Apr. 2007); *U.S. Dep't of State, Country Reports on Terrorism 2007* at 299 (Apr. 2008); U.S. Dep't of State, *Country Reports on Terrorism 2008* at 318 (Apr. 2009); U.S. Dep't of State, *Country Reports on Terrorism 2009* at 275 (Aug. 2010).

[357] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2005* at 217 ("al-Qaida's top leaders continue to plot and direct terror attacks worldwide … Over the past four years, al-Qaida, its affiliates and those inspired by the group were also involved in many anti-U.S. or anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 1-2, 4, 34 (Dec. 2006) ("Iraq is vital to regional and even global stability, and is critical to U.S. interests. … It is now a base of operations for international terrorism, including al Qaeda. … Al Qaeda is responsible for … some of the more spectacular acts: suicide attacks, large truck bombs, and attacks on significant religious or political targets. Al Qaeda in Iraq is now largely Iraqi-run and composed of Sunni Arabs. Foreign fighters—numbering an estimated 1,300—play a supporting role or carry out suicide operations. Al Qaeda's goals include … driving the United States out of Iraq. … As one Iraqi official told us, 'Al Qaeda is now a franchise in Iraq, like McDonald's.' Left unchecked, al Qaeda in Iraq could continue to incite violence … A chaotic Iraq could provide a still stronger base of operations for terrorists who seek to act regionally or even globally. Al Qaeda will portray any failure by the United States in Iraq as a significant victory that will be featured prominently as they recruit for their cause in the region and around the world. Ayman al-Zawahiri, deputy to Osama bin Laden, has declared Iraq a focus for al Qaeda: they will seek to expel the Americans and then spread 'the jihad wave to the secular countries neighboring Iraq.'"); David S. Cohen (Under Secretary for Terrorism and Financial Intelligence, Treasury Dep't), *quoted in* U.S. Dep't of the Treasury, *Remarks of Under Secretary for Terrorism and Financial Intelligence David Cohen before the Center for a New American Security on "Confronting New Threats in Terrorist Financing"*, (Mar. 4, 2014) ("al-Qa'ida 'core' [] spawned numerous affiliates that recruit[ed] their own jihadists, organize[d] their own operations, and raise[d] their own funds"), https://home.treasury.gov/news/press-releases/jl2308.

[358] *E.g.*, Newsweek, *Terror Goes Global*, *republished by* PR Newswire, *International And Asia Highlights And Exclusives - February 19, 2001 Issue* (Feb. 11, 2001) ("[Newsweek] COVER: 'Terror Goes Global' … Intelligence officials tell Newsweek that they believe … Al Qaeda [] is trying to forge ties with Hizbullah, Hamas and Palestinian Islamic Jihad. … Increasingly linked by the Internet, Islamic extremists are on the move and in contact with each other … Bin Laden's movement has gone as transnational as any global corporation."); Kathy Gill, *OBL Death Is*

963.     **Terrorism scholars** also alerted Defendants to the globally interconnected nature

of al-Qaeda's campaign against the United States, including, but not limited to:

a.     <u>Dr. Matthew Levitt, 2003:</u>  "Al-Qaeda successfully built an entrenched and sophisticated
international logistical and financial support network of the kind that eventually
facilitated the attacks of September 11."[359]

b.     <u>Professor Jimmy Gurulé 2008</u>:  "Since the September 11, 2001 terrorist attacks, al Qaeda
emerged as the head of a global Islamist terror movement, comprised of dozens of deadly
jihadist groups" and "[s]everal members of the al Qaeda terror movement [were]
designated as FTOs."[360] "[Al-Qaeda] used its substantial financial resources to establish
links, leverage support and maintain the loyalty of more than 20 militant jihadist groups
globally" and "provided financial assistance to these terrorist surrogates to underwrite
specific jihadi operations, purchase weapons, and train thousands of their members at al
Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[361]

c.     <u>Dr. Leah Farrall, 2011</u>:  "When the pressure on al Qaeda eased between 2003 and 2006,
because the United States was focusing less on Afghanistan, the group was able to
regenerate its capacity and intensify its planning for global operations. But the U.S. drone
campaign against al Qaeda in Pakistan's tribal areas has again put pressure on it, and the
group has [] tapped … its franchises, particularly AQI. In 2008, for example, it asked
AQI to carry out attacks against Danish interests in retaliation for a Danish newspaper's
publication of cartoons … When subsidiaries do carry out attacks outside their territories,
al Qaeda requires that they be conducted within set parameters. For example, al Qaeda
heavily encourages suicide attacks and repeated strikes on preapproved classes of targets,
such as public transportation, government buildings, and vital infrastructure. Once a

---

*Symbolic*, Moderate Voice (May 2, 2011) ("*Foreign Affairs* noted … Al Qaeda is stronger today
than when it carried out the 9/11 attacks. Accounts that contend that it is on the decline treat the
central al Qaeda organization separately from its subsidiaries and overlook its success in
expanding its power and influence through them."), 2011 WLNR 8478998; Alan Clendenning,
*Terror 'Franchises' A Huge Risk*, Associated Press, *republished by* Herald News (May 19, 2011)
("They … send bombs to the United States from Yemen and mount bloody attacks in Iraq and
Pakistan. These homegrown terror groups worldwide are informally dubbed al-Qaida franchises.
… Rohan Gunaratna, who heads the Center for Political Violence and Terrorism Research …,
predicted that al-Qaida and the franchises are 'likely to pose an enduring threat in the foreseeable
future.' Al-Qaida now has about 10 major franchises, although the Afghanistan-Pakistan group
has splintered into smaller and more dangerous ones. Al-Qaida provides ideological inspiration
and sometimes direct training and funding. The franchises have goals within their own regions
but also international aspirations, which include U.S. … targets."), 2011 WLNR 9988400.
[359] Dr. Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on
Post-Modern Terrorism (Sept. 8, 2003), https://tinyurl.com/5pdjpkza.
[360] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism*
89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé").
[361] *Id*. at 73.

location has been authorized, the branch and the franchises are free to pursue plots against it. But al Qaeda still emphasizes the need to consult the central leadership before undertaking large-scale plots, plots directed against a new location or a new class of targets, and plots utilizing a tactic that has not been previously sanctioned …"[362]

**d.** <u>Professor Daniel Byman, 2012</u>:  "From the start, … al-Qa'ida was unusual: it was both a group with its own agenda and operations, as well as a facilitator for other terrorist groups. So al-Qa'ida in the 1990s carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen and, at the same time, acted as 'quartermaster for jihad,' … Thus, from its inception, al-Qa'ida was immensely concerned with its relationship with outside groups. While, traditionally, groups with a similar mindset who operate in the same theater as one another compete fiercely for money and recruits, for al-Qa'ida, the attitude was different. Al-Qa'ida did still compete with other Salafi-jihadist groups, but at the same time, it believed that its own mission entailed furthering their aims. In order to fulfill this mission, it trained fighters from these other groups and undertook propaganda efforts on behalf of their causes."[363] "Al-Qa'ida has always been both a group with its own agenda and a facilitator of other terrorist groups. This meant that it not only carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen throughout the 1990s, but it helped other jihadist groups with funding, training, and additional logistical essentials. … After September 11, 2001, this process of deepening its relationship with outside groups took off, and today a number of regional groups bear the label 'al-Qa'ida' in their name, along with a more local designation. Some of the most prominent affiliates include al-Qa'ida of Iraq (AQI) …"[364] "While there are clear benefits for an affiliate in linking with al-Qa'ida, there are also rewards for the al-Qa'ida core: • Mission Fulfillment and Reach. Having a diverse array of affiliates helps al-Qa'ida extend its reach … • Relevance. Especially since 9/11, … [s]ome of the most notorious "al-Qa'ida" attacks attempted since 9/11 have in fact been carried out by affiliate groups. • Logistics. Beyond the ability to carry out attacks, affiliates offers al-Qa'ida access to their media resources, recruiters, and other core parts of their organizations. • Hardened Fighters. Since its inception, al-Qa'ida has sought members who are experienced and dedicated. Many of the affiliates who come to al-Qa'ida do so with just such a cadre."[365]

**e.** <u>Juan Zarate, 2013</u>: "Treasury's [counterterrorism] strategy … aimed at targeting networks of key financial actors and nodes in the terrorist support system.  The point was … to make it harder for individuals who were financing terrorists … Our analyses therefore focused on the networks of actors and institutions providing the financial

---

[362] Leah Farrall (Former Senior Counterterrorism Intelligence Analyst with the Australian Federal Police), *How Al Qaeda Works: What the Organization's Subsidiaries Say About Its Strength*, Foreign Affairs (Mar. 1, 2011), 2011 WLNR 29001382.

[363] Daniel Byman (Saban Ctr. for Mid. E. Policy at the Brookings), *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at 3 (Aug. 2012), https://tinyurl.com/m4nuskbs.

[364] *Id*. at iv.

[365] *Id*. at v.

backbone to terrorist enterprises.  Interestingly, we found that there were all-purpose financiers who would give to multiple causes—'polyterror' supporters."[366]

f.  <u>Thomas Joscelyn, 2013</u>:  "The 9/11 commission … pointed [out that] very early on, [] more than two decades ago, … bin Laden [] employed a strategy of … planting seeds in a variety of countries to try and hopefully cultivate … affiliates or branches. … in some spectacular ways, these efforts have actually worked. … al-Qaida's core is not confined … to Afghanistan and Pakistan.  … [b]ased on al-Qaida's literature, including a … published letter from [] al-Zawahiri is that [Afghanistan and Pakistan are] basically where [al-Qaeda's] general command is actually headquartered, and they have a series of committees and advisers surrounding [] al-Zawahiri.  But the general command dispatches operatives around the globe to oversee their interests,… [with] specific operatives who … are in touch with the general command, who have been dispatched by the general command, and they're operating in places such as Egypt, Libya, Syria, Yemen, Sinai …, across the globe, basically. … [R]ecent evidence [suggests] that al-Qaida in Iraq … considered dispatching operatives to launch [an] attack in … the U.S."[367]

964.    The same information sources described throughout this section alerted

Defendants that al-Qaeda and al-Qaeda-in-Iraq's terrorist campaign against the United States

posed a severe terrorism risk in the central, northern, and western Iraqi geographies in which

Defendants conducted business.  Examples of such reports include, but are not limited to:

a.  <u>Iraq Study Group, December 2006</u>:  "Four of Iraq's eighteen provinces are highly insecure—Baghdad, Anbar, Diyala, and Salah ad Din. … In Anbar, the violence is attributable to the Sunni insurgency and to al Qaeda …"[368]

b.  <u>DOD, March 2007</u>:  "Violence in Baghdad, Diyala, and Balad is characterized by sectarian competition for power and influence between AQI and JAM, principally through murders, executions, and high-profile bombings."[369]  "Violence in Anbar is characterized by Sunni insurgents and AQI attacks against Coalition forces."[370]

---

[366] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*").

[367] Thomas Joscelyn (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.

[368] The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 6 (Dec. 2006).

[369] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress*, at 14 (Mar. 2, 2007).

[370] *Id.*

c.    DOD, September 2007:  "Although Irbil, Dahuk and Sulaymaniyah are generally stable, AQI maintains a presence in those areas and there is some evidence that AQI is increasingly targeting the region. Attacks on infrastructure, such as roads and bridges, have increased …, likely in an effort to hinder … Coalition forces' mobility and undermine local confidence in … Coalition forces' ability to protect them. For example, the Sarahah Highway Bridge (south of Kirkuk), which was destroyed on June 2, [2007,] was a key conduit for transportation between the southern and northern provinces."[371]

d.    DOD, September 2008:  "AQI and affiliated Sunni insurgent groups … remain active in the North, particularly in Ninewa and Tamim Provinces, where the possibility of Kurdish annexation of Ninewa districts and Kirkuk is a polarizing issue."[372]

e.    DOD, January 2010:  "AQI remains the most active and violent group in Iraq and initiates the vast majority of [high profile attacks] in areas such as Anbar Province, Mosul, Kirkuk, Diyala, and Baghdad."[373]

f.    SIGIR, January 2010:  "DoD reports that the al-Qaeda in Iraq (AQI) terrorist network … appear[s] to be targeting mixed urban areas—including those in Ninewa, Tameem, Diyala, and Baghdad provinces …"[374]

965.    Defendants also knew that al-Qaeda facilitated attacks involving the Taliban, including its Haqqani Network, in Afghanistan, given the topic's wide coverage in mainstream media outlets.  The following are just a few examples of such reports:

a.    On June 30, 2005, the *Boston Globe* quoted General David Barno, former head of the US military in Afghanistan, who predicted "that most of the [Taliban] would collapse in the coming 'year or so,' leaving behind a 'small hard-core remnant . . . which is essentially a wholly owned subsidiary of Al Qaeda.'"[375]

b.    On May 30, 2007, the *Washington Times* reported that "[t]he Taliban has merged its propaganda and field operations with those of the global al Qaeda network led by Osama bin Laden" and "[t]he Taliban have changed immensely in the last year due to the mentoring they are getting from leading Arab jihadists in Pakistan with al Qaeda, both in

---

[371] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2007 Report to Congress*, at 23 (Sept. 14, 2007).

[372] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2008 Report to Congress*, at 27 (Sept. 26, 2008).

[373] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at vii (Jan. 29, 2010).

[374] Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 41 (Jan. 30, 2010).

[375] Victoria Burnett, *17 Aboard Downed Copter Feared Dead*, Boston Globe (June 30, 2005), 2005 WLNR 10289401.

the realm of battlefield tactics and media operations, … [and] are doing what works in Iraq and often succeeding… Before his [] death …, the Taliban's military commander, Mullah Dadullah, claimed that the Taliban's planning and operations were one and the same with those of al Qaeda. Afghan officials also said the Taliban's suicide bombing attacks in Kabul and other large cities were approved in advance by senior al Qaeda operatives in Pakistan. 'The Taliban is now an integral part of an internationalized jihad,' said Waheed Mujda, an Afghan writer who served as a deputy minister in the Taliban's government between 1997 and 2001."[376]

**c.**     On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[377]

**d.**     On December 3, 2009, Secretary of State Hillary Clinton testified publicly that the U.S. government viewed al-Qaeda and the Taliban "not as separate independent operators" but "as part of a syndicate of terrorism."[378]

**e.**     On December 15, 2009, the *Wall Street Journal* quoted Admiral Mullen as saying that U.S. officials were "deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[379]

**f.**     On January 5, 2010, the *Wall Street Journal* reported in a front-page article that the December 30, 2009, attack on Camp Chapman was carried out by a bomber working with al-Qaeda, and that the Taliban had claimed responsibility for it.[380]

**g.**     On January 21, 2010, Secretary of Defense Robert Gates stated publicly that al-Qaeda and the Taliban "had formed a 'syndicate' of terrorist groups," and that the Taliban was one of the "factions" that was "working under the umbrella of Al Qaeda."[381]

**h.**     On January 18, 2011, the *Long War Journal* reported that "the Taliban and al Qaeda are known to have conducted a joint operation against [] Bagram Airfield" that consisted of a "complex assault [] launched late at night" against a U.S. airbase involving "[h]eavily armed fighters, including at least four fighters wearing suicide vests."[382]

---

[376] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Washington Times (May 30, 2007), 2007 WLNR 10111354.

[377] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[378] S. Hr'g 111-479, at 24.

[379] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[380] Siobhan Gorman et al., *CIA Blast Blamed on Double Agent*, Wall St. J. (Jan. 6, 2010).

[381] Wash. Post, *Gates Casts Qaeda As Terror Syndicate* (Jan. 21, 2010).

[382] Bill Roggio, *Senior German Al Qaeda Leader Killed In Afghanistan*, Long War J. (Jan. 19, 2011), https://tinyurl.com/k9cd3tpe.

i.    On May 28, 2011, the *Washington Post* reported that Secretary Clinton said the goal of United States talks with the Taliban was "to split the Taliban from al-Qaeda."[383]

j.    On April 30, 2012, the *Guardian* reported: "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign.  In particular, it contributes military expertise to the spectacular attacks organised out of Waziristan, it sends groups of fighters from there to the front lines and it inspires."[384]

k.    On October 21, 2015, an opinion piece in the *New York Times* described Zawahiri's "oath of fealty" to Mullah Mansour, who was the Taliban's Supreme Leader from July 2015 until his death in May 2016.[385]

966.    Defendants also knew that al-Qaeda and its progeny prized their safe haven in Afghanistan and would likely deploy their terrorist resources there.  As terrorism scholar Colin P. Clarke observed, "[w]ithin the broader jihadi universe, al-Qaeda existed as a central node and maintained connections, linkages, and alliances with a diverse array of groups, including the Afghan Taliban."[386] According to Dr. Clarke, "[i]n many ways, Afghanistan, despite its geographic location outside of the Middle East and North Africa, has served as one of the, if not the, most critical hubs in the global jihad over the past four decades. It is a place that militants have continually returned to, even after other conflicts have drawn them away."[387]

967.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda waged a globally integrated terrorist campaign against the United States.

---

[383] Karen DeYoung, *Clinton Sees 'Turning Point' After Brief Visit to Pakistan*, Wash. Post (May 28, 2011).

[384] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).

[385] Thomas Joscelyn & Bill Roggio, *Are We Losing Afghanistan Again?*, N.Y. Times (Oct. 21, 2015).

[386] Dr. Colin P. Clarke, *After the Caliphate: The Islamic State & the Future Terrorist Diaspora* 24 (Polity 2019).

[387] *Id.*

2.     **Defendants Knew Protection Payments Aided Al-Qaeda**

a.     **Defendants Knew Their Cash-Based Protection Payments Aided Al-Qaeda**

968.     Defendants knew protection payments aided al-Qaeda's operations worldwide because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

969.     **United States government reports and statements** alerted Defendants that their protection payments in Iraq aided al-Qaeda's worldwide campaign, including, but not limited to:

a.     Treasury Department, 2005:  "[T]he Zarqawi Network … use[s] a variety of classic al Qaida-type terrorist financing mechanisms, including: * Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in Syria, Lebanon, Jordan, Iran, and Europe; * Criminal activities, such as … extortion …."[388]

b.     U.S. Army, November 2010:  "al Qaeda in Iraq … remain a threat, and they remain dangerous … [and remain] part of the [al-Qaeda] network …[,] [which] includes al Qaeda's ability to … plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money.  … al Qaeda continues to change its tactics and how it adapts.  … they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of [Iraq]."[389]

c.     Treasury Department, 2015:  "GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [al-Qaeda] requires significant funding. While the cost of an individual terrorist attack can be quite low, maintaining a terrorist organization requires large sums. Organizations require significant funds to create and maintain an infrastructure of organizational support, to sustain an ideology of terrorism through propaganda, and to finance the ostensibly legitimate activities needed to provide a veil of legitimacy for terrorist organizations. As deceased AQ financial chief Sa'd Al-Masri put it: 'without money, jihad stops.' Although financial activities can vary significantly among different terrorist groups, several areas of commonality exist. … 1. *CRIMINAL ACTIVITY*[.] Terrorist groups engage in a range of criminal activity to raise needed funds. Extensive revenue from … criminal activities such as extortion have permitted AQ

---

[388] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658.
[389] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

affiliates and other terrorist groups to generate significant revenue. … [E]xploitation of local populations … has become a key revenue source for numerous terrorist groups worldwide. … this form of pseudo-sovereignty-based fundraising has spread to other un- or under-governed territories around the world, most recently Iraq and Syria."[390]

970.    U.S. government reports also alerted Defendants that their protection payments in the form of "free goods," comprised of high-tech communications technologies donated to terrorists through Ericsson's uncontrolled Iraqi slush funds and intermediary partners, consultants, and contractors—which Defendants sometimes facilitated as an in-kind alternative to cash-based protection payments—also aided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For example, according to a White House statement of U.S. counterterrorism strategy in 2018:

> The technological advances of the past century have created an interconnected world in which it is easier than ever to quickly move people, funding, material, and information across the globe. The backbone of this interconnected system is information technology—largely created and facilitated by the United States Government and private industry—that is increasingly enabling faster transactions of all kinds across the world. Terrorists use these same publicly available technologies to command and control their organizations and to plot attacks, travel, and abuse the global financial system to raise funds and procure weapons, materiel, and basic necessities. Terrorists cannot sustain their operations without these resources. The United States[,] … [a]round the globe, [] will promote effective enforcement of legislation and policies aimed at protecting … communication industries.[391]

971.    **Media reports** alerted Defendants that protection money payments in Iraq aided al-Qaeda's operations worldwide.  The media routinely reported that al-Qaeda doctrine emphasized the extraction of protection money as a core fundraising tactic from the late 1990s through 2004. Such reports included, but were not limited to:

---

[390] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015).
[391] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

a.    _Agence France Press_, October 1998:  "[B]in Laden has … exhausted his own [] fortune, … and now depends on donations [and] … protection money to finance his operations."[392]

b.    _Washington Post_, September 2001:  "The legend of … bin Laden is that of … a business-savvy nomad who has used … a constellation of companies to finance a global network … Ever since his days as a student of economics and finance …, bin Laden has shown a special affinity for raising and managing money. … Bin Laden has built upon those sources and methods to finance his terrorism. … Bin Laden's organization draws large amounts of money from … 'protection money' …, a former senior U.S. official said."[393]

c.    _Sunday Mail_, September 2001:  "Severing the financial arteries that feed [] bin Laden's war machine has become a priority… Intelligence sources believe … [b]usinessmen throughout the Middle East … [were] paying millions of dollars in protection money."[394]

d.    _Mirror (UK)_, October 2001:  "[B]in Laden has bought off the Taliban by giving them [] 70 million and is said to own and operate the vicious regime. The terrorist leader has been secretly funding Mullah Omar Muhammad and his leaders … The money bin Laden gives the Taliban comes from businesses … and protection money from … firms to ensure he keeps his activities in their area to a minimum."[395]

e.    _Herald (Glasgow, Scotland)_, October 2001:  "US government sources told the Washington Post that the CIA has concluded that bin Laden 'owns and operates' the Taliban. … The [Post] was told the money [bin Laden provides to the Taliban] comes from three primary sources: legal and illegal businesses or front companies bin Laden operates; protection payments he receives from … companies…; and entities that are masked as charities."[396]

---

[392] Agence France Presse English Wire, _Osama Bin Laden Gets Money From Saudi Royalty: US Intelligence_ (Oct. 10, 1998).

[393] Robert O'Harrow Jr., David S. Hilzenrath, and Karen DeYoung, _Bin Laden's Money Takes Hidden Paths To Agents of Terror; Records Hint at Complex Financial Web_, Washington Post (Sept. 21, 2001), 2001 WLNR 13158661.

[394] Sunday Mail (Australia), _War On Terror; The World Waits; The Money Trail_ (Sept. 23, 2001), 2001 WLNR 5323188.

[395] Andy Lines, _War On Terror: Battlefront: Pounds 70 M It's Honey Money To Aid Taliban, Mirror (UK)_ (Oct. 12, 2001), 2001 WLNR 9358733. On information and belief, most of the referenced payments in this source were primarily denominated in U.S. dollars and/or facilitated by U.S. dollar-denominated transactions, and the Mirror's reference to pounds was merely a conversion by the journalist for its intended U.K. audience.

[396] Kay Jardine, _West Is 'Thirsty for Bloodshed'_, Herald (Glasgow, Scotland) (Oct. 12, 2001), 2001 WLNR 3862913.

f.   *APA (English News Service)*, October 2001:  "An Austrian economics professor …, Prof. Friedrich Schneider said … between ten and 20 per cent of Al Qaida's income came from 'classical' criminal activities such as …'protection money'."[397]

g.   *Cleveland Plain Dealer*, November 2001:  "[B]in Laden" "co-opted" "other terror groups … [and] … [h]is … protection rackets … have been exceedingly lucrative."[398]

h.   *Associated Press*, February 2002:  "[A]n al-Qaida training manual aimed at teaching Osama bin Laden's followers the best ways to kill thousands of people and spread fear in the United States … [known as the] 11-volume 'Manual of Afghan Jihad' … offers advice on how to raise funds for covert operations through extortion."[399]

i.   *PA News*, December 2003:  "[A]l Qaida operatives levy a 'tax' on shipments as they pass borders or areas under the terror network's influence, in Iran, Pakistan, Turkmenistan and other countries."[400]

j.   *BBC International Reports (Europe)*, October 2004:  "[T]he merging of organized crime and terrorism is a new phenomenon.  BND President Hanning assumes 'that terrorist structures, such as … Al-Qa'idah, finance their fight through the extortion of protection money as well as direct involvement in drug-trafficking.' "[401]

972.   From 2004 through 2014, media reports regularly alerted Defendants that their protection payments in Iraq directly benefited al-Qaeda's worldwide operations.  The following are just a few examples of such media reports:

a.   *Cleveland Plain Dealer*, October 2006:  "There simply are not enough coalition forces in Iraq to be everywhere to impose security. Al-Qaida operatives … seem to be running their own protection rackets …"[402]

b.   *New York Times*, November 2006:  "The insurgency in Iraq is now self-sustaining financially, raising tens of millions of dollars a year from … [inter alia] …  crimes …, a

---

[397] APA (English News Service), *Economics Professor Says Al Qaida Backed By 4.85 Billion Dollars* (Oct. 25, 2001), 2001 WLNR 130475.

[398] Elizabeth Sullivan, *How To Turn A Terrorist Into A Has-Been*, Cleveland Plain Dealer (Nov. 19, 2001), 2001 WLNR 11203968.

[399] Hamza Hendawi, *Al-Qaida Manual Pushes Mass Fatalities Visibility*, Associated Press, *republished in* Wichita Eagle (Feb. 2, 2002), 2002 WLNR 1319548.

[400] Mark Sage, *Bin Laden 'Funding Terror Through Drugs'*, PA News (Dec. 29, 2003).

[401] BBC International Reports (Europe), *German Intelligence Chief Says Bin-Ladin Still Alive* (Oct. 10, 2004).

[402] Cleveland Plain Dealer, Opinion, *No Honey Coating Only Hard Choices Lie Ahead In Violence-Torn Iraq; It's Time To Explain Them Honestly To The American People* (Oct. 25, 2006), 2006 WLNR 18536168.

classified United States government report has concluded.  [I]ts most surprising conclusion: '… terrorist and insurgent groups in Iraq may have surplus funds with which to support other terrorist organizations outside of Iraq.'"[403]

c.  *Los Angeles Times*, June 2007:  "By January [2007], the Islamic State's proclamations appeared on walls and were circulated in leaflets [in Iraq]. … 'They issued laws and decrees like a real state,' said [an Iraqi victim] ….  Papers demanding protection money were sent to homes [and] Al Qaeda backers flexed their muscle …"[404]

d.  *National Public Radio*, July 2007:  "[Peter Bergen stated:] '… al-Qaida in Iraq is beginning to finance al-Qaida central in the Afghan-Pakistan border, because al-Qaida in Iraq is making a lot of money from … from protection money … and is now, financially, a quite viable organization.'"[405]

e.  *Reuters News*, September 2007:  "[V]igorous fund-raising from protection rackets … helped keep al Qaeda active."[406]

f.  *Reuters News*, December 2007:  "Iraq has pulled back from the brink of civil war, but recent security gains are fragile and still reversible, the top U.S. commander in Iraq, General David Petraeus, said … Petraeus said he viewed Sunni Arab al Qaeda as the main enemy in Iraq… MAFIA RACKETS[.] Petraeus said most attacks were carried out by al Qaeda in northern Iraq, … He said al Qaeda had turned to 'mafia-style' rackets to finance its operations …. Shi'ite militias were involved in similar rackets."[407]

g.  *Associated Press*, March 2008:  "The suicide bombers who have killed 10,000 people in Iraq, including hundreds of American troops, usually … come from outside Iraq. … 'Al-Qaida recruits these people from the Middle East and North Africa, hitting them at the most vulnerable time of the life,' said [a] senior [U.S.] analyst[] … The demand for many foreign fighters begins in places such as the dingy back streets of teeming Iraqi cities such as of northern Mosul – where al-Qaida still holds sway. An al-Qaida cell decides it needs two suicide bombers. They put in an order which is funded by money made through racketeering, extortion and kidnapping. That request travels to Damascus and to

---

[403] John F. Burns and Kirk Semple, *U.S. Finds Iraq Insurgency Has Funds to Sustain Itself*, N.Y. Times (Nov. 26, 2006).

[404] Ned Parker, *The Conflict In Iraq: Baghdad Neighborhood Purged*, Los Angeles Times (June 27, 2007), 2007 WLNR 12080034.

[405] Peter Bergen, *quoted in* NPR Talk of the Nation, *A Closer Look at al-Qaida in Iraq* (July 23, 2007), 2007 WLNR 14086129.

[406] William Maclean, *Refile-Analysis-Algeria Rebel Attacks Test Govt Security Policy*, Reuters News (Sept. 23, 2007).

[407] Ross Colvin, *Petraeus: Iraq Security Fragile, Gains Reversible*, Reuters News (Dec. 29, 2007).

the facilitators and recruiters training young men in North Africa and Saudi Arabia. Three months later, the bomber is delivered, military investigators and officials say."[408]

h.   *Reuters Gulf Financial News*, August 2011:  "Al Qaeda has resurfaced in former Iraqi strongholds … [and has] been carrying out bolder attacks…  Mosul, is seen as one of the last urban strongholds of al Qaeda in Iraq … [Al Qaeda in Ninewa Province] funds operations through extortion …"[409]

i.   *Economist*, November 2013:  "al-Qaeda is … making its presence heavily felt, collecting protection money to help pay for its operations.  … [Iraqi Prime Minister Maliki's] aides stress that 'al-Qaeda is a common threat to everyone.' Indeed, a group responsible for many of the recent … bombings, [ISIS], gives its allegiance to al-Qaeda."[410]

j.   *New York Times*, December 2013:  "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Qaeda's regional affiliate, the Islamic State in Iraq and Syria, has become a potent force in northern and western Iraq. … [S]aid Michael Knights, an expert on Iraqi security …[:] … 'There is one place in the world where Al Qaeda can run a major affiliate without fear of a U.S. drone or air attack, and that is in Iraq and Syria.' … Using extortion … the Qaeda affiliate is largely self-financing."[411]

973.   **Terrorism scholars** alerted Defendants that their protection payments aided al-

Qaeda.  For example, in 2009, Dr. Williams reported that "the proceeds from protection fees …

strengthened nonstate groups and provided resources for their continued challenge to the

Baghdad government."[412] According to Dr. Williams, "al-Qaeda" "need funding and are unlikely

to remain aloof when others are making money, either legally or through illicit activities" and

thus "even if they are not directly involved they are almost certainly imposing some kind of tax

or demanding a slice of the profits in return for allowing the trade to operate."[413]

---

[408] Patrick Quinn (Associated Press), *US Military Study Of Iraq Detainees Provides Insights Into The Motivations Of Foreign Fighters*, AP Worldstream (Mar. 15, 2008) (emphasis added).
[409] Rania El Gamal, Suadad al-Salhy, Jim Loney, and Ruth Pitchford, *Analysis–Iraq Al-Qaeda Regroups, Shi'ite Militias Threaten*, Reuters Gulf Financial News (Aug. 28, 2011).
[410] Economist, *Civil Strife In Iraq: Going All Wrong* (Nov. 2, 2013), 2013 WLNR 27433452.
[411] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).
[412] Williams, *Criminals, Militias, and Insurgents*, at 161.
[413] *Id*. at 177.

974.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that protection payments aided al-Qaeda's terrorist campaign against the United States.

**b.    Defendants Knew "Free Goods"-Based Protection Payments Aided Al-Qaeda**

975.    Defendants' above-described knowledge applied equally to Defendants' "free goods" payments of cell phones to al-Qaeda.  At all times, Defendants knew that al-Qaeda prioritized obtaining U.S.-origin cell phones for their unique operational benefits to the terrorists.

976.    In the decades after 9/11, press reports regularly alerted Defendants to al-Qaeda's desire to source U.S.-origin phones to facilitate attacks against Americans in Afghanistan.  On June 20, 2003, for example, the *Boston Globe* reported that al-Qaeda operative "Iyman Faris" "pleaded guilty to providing material support to terrorists and conspiracy to provide support" and admitted that he "attended an Al Qaeda training camp in Afghanistan," and, thereafter, "transported a cache of money and cellular phones for Al Qaeda" in "Afghanistan for use by bin Laden's fighters."[414]  A few months later, the *Associated Press* reported that "[p]rosecutors" stated that "Faris" "assisted al-Qaeda's work" when he "traveled to Pakistan and Afghanistan" and "carr[ied] out low-level missions for [al-Qaeda] terrorists" by, among other things, "provid[ing]" "cell phones and cash to al-Qaeda members."[415]

---

[414] Amber Mobley, *U.S. Citizen Admits Planning Al Qaeda Attack Trains and a Bridge Allegedly on Hit List*, Boston Globe (June 20, 2003), 2003 WLNR 3428108; see Derrill Holly, 20 years for alleged bridge plot;

[415] Derrill Holly, *20 Years For Alleged Bridge Plot; Iyman Faris, 34, Tried to Withdraw a Guilty Plea; Prosecutors Say He Assisted Al-Qaeda's Work*, Associated Press, *reprinted in* Philadelphia Inquirer (October 29, 2003), 2003 WLNR 14764150.

977.    In later years, similar media reports documented al-Qaeda's continuing efforts to source communications technologies, cell phones, and similar dual-use weapons from the United States. For example, on June 7, 2010, it was widely reported that a "federal grand jury" "charged a Texas man with attempting to provide al Qaeda with global positioning instruments, cell phones and a restricted publication on U.S. weapons in Afghanistan."[416]

978.    Indeed, media reports specifically alerted Defendants that al-Qaeda's strategy for its joint cells with the Taliban in Afghanistan relied on cell phones as detonators for al-Qaeda's signature calcium ammonium nitrate ("CAN") fertilizer bombs.[417]

979.    Such reports also alerted Defendants that al-Qaeda's reliance upon iconic American communications technologies deepened in the late 2000s, not unlike the knowledge, communications security, and communications efficiency benefits, among others, familiar to most smartphone users after the iPhone revolutionized the space in the late 2000s.

### 3.    Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq

980.    Defendants knew protection payments aided al-Qaeda-in-Iraq because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

981.    **United States government reports** alerted Defendants that their protection payments aided al-Qaeda-in-Iraq.[418]

---

[416]  David C. Morrison, *Behind the Lines: Our Take on the Other Media's Homeland Security Coverage*, CQ Homeland Security (June 7, 2010), 2010 WLNR 11991958.

[417] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009).

[418] *E.g.*, Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("The financing networks of the Iraqi insurgency are complex and diverse.  Insurgents draw on both external financing and on internal Iraqi sources of funds and materiel.  For example, … jihadist groups use … Criminal activities, such as …

982.    **Media reports** alerted Defendants that protection payments provided vital

funding that aided al-Qaeda-in-Iraq's operations in Iraq, Syria, and Afghanistan.[419]

---

extortion …"), https://home.treasury.gov/news/press-releases/js2658; U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to*, at 34 (Apr. 29, 2010) ("AQI … continues its efforts to gain funds through widespread extortion efforts."); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010) (same); American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010) ("In … Mosul, Iraqi soldiers and U.S. advisors searched … for a suspected AQI member believed to extort money from [] transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in the deaths or arrests of at least six suspected senior AQI leaders believed to greatly contribute to funding the terrorist group by their involvement in a highly-organized extortion … ring based in Mosul. … The six … include the overall AQI commander of northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion … network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"), 2010 WLNR 6913562; Julia McQuaid, Jonathan Schroden, Pamela G. Faber, P. Kathleen Hammerberg, Alexander Powell, Zack Gold, David Knoll, and William Rosenau, *Independent Assessment of U.S. Government Efforts against Al-Qaeda, CNA Report Pursuant to Section 1228 of the 2015 National Defense Authorization Act*, at 175 (Oct. 2017) ("AQI/ISI relied on a variety funding streams. In the runup to the founding of AQI … As of 2009, AQI was essentially self-financing, supporting itself through crimes such as extortion …").
[419] *E.g.*, Pamela Hess (UPI Pentagon Correspondent), *Analysis: Zen and The Art of Counterinsurgency*, UPI News (July 29, 2004) ("It is tough to overemphasize the importance of organized crime in the insurgency, Marine commanders say. Millions of dollars flow through the country daily in an unofficial economy and have for the past decade. The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties."); Bilal A. Hibab, *Iraq's Disappearing Oil*, Wilson Quarterly (Sept. 2006) ("A web of corruption and criminality [] is helping to destabilize Iraq, … and financing the country's slide toward chaos … [Al-Qaeda-in-Iraq] [i]nsurgents [in Mosul] attack Iraqi [transportation targets] … in part to force the government to rely on trucks … who usually pay protection money to the insurgents."); Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007) ("On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network … [who allegedly extracted] protection money from local contractors and us[ed] the funds to finance al Qaeda in Iraq activities."); Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008) ("AQI is … increasingly turning to crime to help finance its deadly operations. … Al Qaeda in Iraq is no stranger to racketeering … [and] long raised money through [crime] … The haul from these

983.     **Terrorism scholars** alerted Defendants that their protection payments aided al-

Qaeda-in-Iraq worldwide.  Examples of such reports include, but are not limited to:

a.     <u>Professor Robert Looney, 2005</u>:  "[T]he convergence of large segments of the Iraqi
insurgency with elements of organized crime … [and] the insurgency's subtle shift
toward increased reliance on criminal activity has implications that are … important for
the Iraqi economy. Increased criminal activity is effectively stifling attempts to expand
the formal sector. … [A] successful attack on criminal activity in Iraq is as important in
determining the country's future as the outcome of the current anti-insurgency campaign.
One might even venture to say they are largely one and the same. … Insidious criminal
activity is not new to Iraq. In fact, as recent revelations coming out of the United Nations
Oil for Food scandal show, criminal activity has long been pervasive in all areas of Iraqi
society, from the highest levels of official power to the lowly smuggler trying to eke out

---

illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection'
payments from legitimate businesses. … That money helped AQI purchase arms, pay salaries
and bribes and stage attacks."), https://tinyurl.com/4ezvphc9; Andrew E. Kramer, *Iraqi
Christians' Secret: Protection Money To Insurgents*, International Herald Tribune (June 26,
2008) ("[P]rotection money … grew into a source of financing for [al-Qaeda-in-Iraq].
[Protection payments] thus became a secret, shameful and extraordinary complication …
'People deny it, people say it's too complex, and nobody in the international community does
anything about it,' said Andrew White, the Anglican vicar of Baghdad. … [M]any … in Iraq
paid … knowing full well the money would be used for bombs and weapons to take the lives of
others."), 2008 WLNR 11985310; Pamela Hess (Associated Press), *US: Iraqi Fighters Extort,
Kidnap to Raise Funds*, AP DataStream (July 29, 2008) ("Al-Qaida in Iraq is increasingly
embracing extortion … to finance its operations ... [by] demanding protection money of local
businesses."); AP Alert - Business, *Iraqis Arrest Numerous Terrorism Suspects* (Oct. 14, 2009)
("[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based
in … Mosul. … targeted … those who own or work at construction sites and local businesses …
Extortionists then use the [] money to fund terrorist attacks …"); Associated Press, *Iraqi Forces
Arrest 2 Al-Qaida Suspects*, AP Alert – Terrorism (Sept. 2, 2010) ("Iraqi forces … searched …
for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money from …
contractors and … transportation workers in order to fund terrorist operations …"); Kerry
Murphy (Australian Immigration Lawyer and Arabic Scholar), *What's Eating Syria And Iraq*,
Eureka Street (June 17, 2014) ("The capture of … Mosul by [AQI] is a major concern not just
for Iraq but for the whole Middle East. … Although Zarqawi was killed…, AQI continued. In
towns where it had control or influence, it demanded mafia-style protection payments which
helped fund its operations in Iraq and more recently in Syria."), https://tinyurl.com/y98ah99f;
Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013)
("[S]olidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local
support in cities … where Iraqi security forces have failed to gain a foothold.  'Since 2010 AQIS
has been self-funding through organized crime rackets involving … protection payments from
large Iraqi companies, plus trucking, smuggling and real estate portfolios,' [Michael] Knights
said."), https://tinyurl.com/5k57c4vx.

an existence during the period of sanctions in the 1990s. … With segments of the insurgency's financial needs matching or in some cases overriding its political motivations, an increasing amount of time and effort of these groups is devoted to creating 'in house' criminal capabilities. …. Complicating matters is the near impossibility of establishing effective anti-crime programs in an environment of rampant corruption. … Transparency International [] ranks Iraq as the most corrupt country in the Middle East …, with the country's corruption actually worsening between 2003 and 2004. Instability, high unemployment and corruption have created a volatile mix that is ideal for organized crime. … In this environment, Western intelligence agencies are becoming increasingly worried about the systematic strengthening of ties between terrorists and organized crime. … The current wave of crime and insurgent activity creates, and is in turn supported by, an increasingly sophisticated criminal economy."[420]

**b.**   Douglas Lovelace, 2009:  "[T]he insurgency [in Iraq] was strengthened and sustained by criminal activities," "including" "extortion" aided by "the critical role played by corruption in facilitating and strengthening organized crime," through which "al-Qaeda in Iraq … used criminal activities to fund their campaigns of political violence."[421]

**c.**   Dr. Phil Williams, 2009 and 2010:  "[A] large volume of such" "protection" "payments" … "became a significant revenue source [for anti-American terrorists in post-Saddam Iraq].[422] "Terrorist organizations … use organized crime activities as a funding mechanism. … in Iraq … criminal activities were used … by insurgents … seeking to enhance their resource bases and prosecute their campaigns of violence more effectively. …  [E]xtortion … helped to fund much of the violence in Iraq. Extortion was highly profitable partly because of the scale of reconstruction and partly because of the loss of security on Iraqi roads. … Foreign fighters and jihadis groups, especially al-Qaeda in Iraq (AQI), exploited various criminal activities to augment their financial base. … Extortion … [was one of AQI's] core funding activities. …  AQI's criminal activities continue to finance its resistance in and around Mosul. …"[423] "[I]t is important to emphasize that organized crime in Iraq is not something separate from the insurgency, the sectarian conflicts, or the activities of AQI; rather, it is interwoven with these other organizations and activities, … creating negative but very powerful synergistic effects."[424] "[A] critical

---

[420] Robert E. Looney (Professor of National Security Affairs at the U.S. Naval Postgraduate School), *The Business of Insurgency: The Expansion of Iraq's Shadow Economy*, National Interest (Oct. 1, 2005), 2005 WLNR 29354864.

[421] Douglas C. Lovelace, Jr., *Foreward* ("Lovelace, Jr., *Foreward*"), *published in* Williams, *Criminals, Militias, and Insurgents*, at vii-viii.

[422] Williams, *Criminals, Militias, and Insurgents*, at 236.

[423] Lovelace, Jr., *Foreward*, at ix-xvi. Shiite terrorists also practiced protection rackets. *See, e.g.*, *id.* at xv ("Shiite militias, especially Jaish-Al-Mahdi (JAM), have been among the most powerful and important groups engaged in organized crime in Iraq—although how much has been carried out under the direct control of the organization and how much by rogue factions is uncertain. [] [C]riminal activities [that] provided Mahdi Army members with important revenue streams[] [included] extortion and protection…").

[424] Williams, *Criminals, Militias, and Insurgents*, at 13.

component of organized crime in Iraq was the appropriation of criminal methods by … jihadis … In many respects this was a familiar pattern. Groups as diverse as the Irish Republican Army, Liberation Tigers of Tamil Eelam, and Revolutionary Armed Forces of Colombia had long used criminal activities as a funding mechanism. For jihadi groups, especially AQI, criminal activities became a critical source of revenue. … Extortion [was among AQI's] … core funding activities."[425] "Organized crime in Iraq in the months and years after March 2003 … finance[ed] the violent opposition to the occupation forces. … In 2008, the capacity to generate funds through criminal activities enabled al Qaeda in Iraq (AQI) to continue resisting [] the U.S. military."[426]

984.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that protection payments aided al-Qaeda-in-Iraq's terrorist campaign against the United States.

### 4.    Defendants Knew Al-Qaeda-In-Iraq Aided Al-Qaeda

985.    Defendants always knew their aid to al-Qaeda-in-Iraq also aided al-Qaeda. For example, as Dr. Kenneth Katzman, a Congressional Research Service Middle East specialist, observed in 2008, "[t]he links between AQ-I and Al Qaeda's central leadership might be tightening, but they are not new."[427]  The same types of sources referenced throughout this section also alerted Defendants that al-Qaeda-in-Iraq specifically worked with the Taliban, including its Haqqani Network.  For example, Haqqani scholar Anand Gopal reported in 2009, that "[t]he Haqqanis pioneered the use of suicide attacks in Afghanistan, an import from Al Qaeda in Iraq."[428]

986.    **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda, including al-Qaeda's operations and allies in Afghanistan and

---

[425] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, , at 51.
[426] *Id*. at 47.
[427] Kenneth Katzman (Specialist in Middle Eastern Affairs), CRS Report for Congress, *Al Qaeda in Iraq: Assessment and Outside Links*, at 17 (Aug. 15, 2008), https://tinyurl.com/2p8smj4d.
[428] Anand Gopal, *The Most Deadly US Foe in Afghanistan*, Christian Science Monitor (May 31, 2009), 2009 WLNR 10378180.

Pakistan. For example, according to Dr. Katzman, "on July 24, 2007, President Bush devoted much of a speech to the argument that AQ-I is closely related to Al Qaeda's central leadership" and "noted the following details, including":

a.   "In 2004, Zarqawi formally joined Al Qaeda and pledged allegiance to bin Laden. Bin Laden then publicly declared that Zarqawi was the 'Prince of Al Qaeda in Iraq.' President Bush stated that, according to U.S. intelligence, Zarqawi had met both bin Laden and Zawahiri. He asserted later in the speech that, according to U.S. intelligence, AQ-I is a 'full member of the Al Qaeda terrorist network.'"

b.   "After Zarqawi's death, bin Laden sent an aide named Abd al-Hadi al-Iraqi to help Zarqawi's successor, al-Masri, but al-Iraqi was captured before reaching Iraq."

c.   "That a captured AQ-I leader, an Iraqi named Khalid al-Mashhadani, had told U.S. authorities that Baghdadi was fictitious. In July 2007, Brig. Gen. Bergner, a U.S. military spokesman, told journalists that Mashhadani is an intermediary between al-Masri and bin Laden and Zawahiri."

d.   "That AQ-I is the only insurgent group in Iraq 'with stated ambitions to make the country a base for attacks outside Iraq.' Referring to the November 9, 2005, terrorist attacks on hotels in Zarqawi's native Jordan, President Bush said AQ-I 'dispatched terrorists who bombed a wedding reception in Jordan.' Referring to an August 2005 incident, he said AQ-I 'sent operatives to Jordan where they attempted to launch a rocket attack on U.S. Navy ships' docked at the port of Aqaba."[429]

987.   The United States government regularly published other reports and statements alerting Defendants that al-Qaeda-in-Iraq aided al-Qaeda.[430]

---

[429] Katzman, CRS Report for Congress, *Al Qaeda in Iraq: Assessment and Outside Links*, at 17-18.

[430] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2004* at 7 (Apr. 2005) ("The apparent mergers or declarations of allegiance of groups such as Abu Mus'ab al-Zarqawi's organization with al-Qa'ida suggest that al-Qa'ida is looking to leverage the capabilities and resources of key regional networks and affiliates — a trend that al-Qa'ida could also use to try to support new attacks in the United States and abroad."); The White House, *Press Release: The Rest of the Story: The NIE Reflects Previous Statements About the War on Terror* (Sept. 26, 2006) ("Terrorists Consider Iraq 'The Central Battlefield' In The War On Terror … [and have] made clear that the most important front in their struggle against America is Iraq – the nation bin Laden has declared the 'capital of the Caliphate.' Hear the words of bin Laden: … 'The most… serious issue today for the whole world is this Third World War… [that] is raging in [Iraq].' … For al Qaeda, Iraq … is the central battlefield where the outcome of this struggle will be decided.'"), https://tinyurl.com/swccct8y.

988.     **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted

Defendants to the close relationship between al-Qaeda-in-Iraq and al-Qaeda-backed and

affiliated terrorists in Afghanistan and Pakistan.  In 2006, for example, the U.N.'s al-

Qaeda/Taliban sanctions team reported that "[t]he Taliban" "continued to benefit from a close

relationship with Al-Qaida and related foreign groups." [431] The U.N. regularly published similar

reports between 2005 and 2021.

989.     **Media reports** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda,

including al-Qaeda's operations and allies in Afghanistan and Pakistan.[432]

990.     **Terrorism scholars** also alerted Defendants that al-Qaeda-in-Iraq aided al-

Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan.[433]

---

[431] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).

[432] *E.g.*, Robert J. Caldwell, *Our Enemy, The Face Of Evil*, San Diego Union-Tribune (June 27, 2004) ("Zarqawi and his estimated 2,000 armed terrorists in Iraq are subsidiaries of the global al-Qaeda network. Their hate-filled ideology and savage methods are indistinguishable from the devil's brew that produced 9/11."), 2004 WLNR 16950014; Allan Massie, *Focus: Fight Terrorism, But Don't Make Things Worse By Calling It A War*, Scotsman (Sept. 7, 2006) ("Al-Qaeda, or its subsidiary connection, is active in Iraq, in Afghanistan and in the Afghan-Pakistan borderlands."), 2006 WLNR 15488717.

[433] *E.g.*, Peter Bergen, *After the War in Iraq: What Will the Foreign Fighters Do?*, *published in Bombers, Bank Accounts, & Bleedout*, at 110-12 ("[A]n Iraqi al-Qa'ida operative, Khalid al Mashadani, [] told his interrogators that he had acted as a conduit between the top leaders of al-Qa`ida in Iraq and bin Ladin and Zawahiri. … Mashadani revealed that there was 'a flow of strategic direction, of prioritization of messaging and other guidance that comes from the Al-Qa'ida senior leadership to the Al-Qa'ida in Iraq leadership. … AQI Attacks Outside of Iraq [were foreseeable because] … AQI [was] the only Iraqi insurgent group that ha[d] attacked American targets outside of the country, and ha[d] repeatedly said it plan[ned] to attack the United States itself."); Bombers, Bankers, & Bleedout, at 9, 12 ("AQI is increasingly linked to al-Qa`ida's senior leaders. AQI did not exist before the US invasion, but the organization has grown progressively more integrated with al-Qa`ida Central, especially following Abu Mus'ab al-Zarqawi's death. … "Al-Qa'ida in Iraq demand[ed] our attention because it remain[ed] a tactical threat to American troops and, even in decline, ha[d] the potential to spread violence beyond Iraq's borders."); Daniel Byman, *The Resurgence of al Qaeda in Iraq, Testimony Before the Joint Hearing of the Terrorism, Nonproliferation, and Trade Subcommittee and the Middle*

991.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their aid to al-Qaeda-in-Iraq foreseeably aided al-Qaeda's "core" in Afghanistan and Pakistan.  Indeed, as set forth below, these and other sources alerted Defendants to four ways that Qaeda operatives in Iraq aided their counterparts in Afghanistan: (a) funding; (b) fighters; (c) training; and (d) logistics.

### a.    Defendants Knew Al-Qaeda-In-Iraq Funded Al-Qaeda

992.    From 2003 through 2022, Defendants knew that al-Qaeda-in-Iraq funded al-Qaeda's operations in Afghanistan and Pakistan.

993.    **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. For example, Brigadier General Jeffrey Buchanan publicly stated in 2010 that, with respect to "al Qaeda, … al Qaeda in Iraq … remain[ed]  … [a]nd [al-Qaeda-in-Iraq was a] part of [al-Qaeda's] network," which meant that AQI's Iraq capabilities augmented "al Qaeda's … ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money. … [A]l Qaeda continues to change its tactics and how it adapts … they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of [Iraq].[434]

---

*East and North Africa Subcommittee of the House Committee on Foreign Affairs*, *republished by* Brookings Institution (Dec. 12., 2013) ("AQI [was] perhaps the most important Al Qaeda affiliate. …  Indeed, not only ha[d] it been responsible for the deaths of thousands of Iraqis, it ha[d] sponsored jihadist insurgents next door in Syria and played a significant role in bringing groups like Al Qaeda in the Islamic Maghreb into the Al Qaeda fold.") https://tinyurl.com/2p9hhy4x.

[434] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

994.    **Media reports** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. On July 26, 2007, for example, the media reported that a recent "National Intelligence Estimate" published by "all 16 U.S. intelligence agencies produced after painstaking review" determined that "al-Qaida [was] almost as strong as it was just before Sept. 11, 2001," "identifie[d] al-Qaida in Iraq (AQI) as the terrorist organization's 'most visible and capable affiliate,'" and noted that while "[t]he public version" of the National Intelligence Estimate did not "say so, [] AQI has raised significant money through criminal activities and [] now subsidiz[ed] al-Qaida central."[435]

995.    **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. Examples included, but were not limited to:

a.    <u>Daniel Byman, 2012</u>:  "al-Qa'ida[] … has sought financial help from affiliates and charged potential recruits for training."[436]

b.    <u>Dr. Matthew Levitt, 2014</u>:  "ISIS … was financially self-sufficient for about eight years as a terrorist and insurgent group before committing itself to running a proto-state. … AQI was financially independent by virtue of engaging in tremendously successful criminal activity enterprises domestically within Iraq. … Ayman al-Zawahiri … ask[ed] Zarqawi for money … when international efforts to target al Qaeda's financial channels were taking their toll on al Qaeda's coffers."[437]

996.    Defendants' knowledge that al-Qaeda-in-Iraq funded al-Qaeda in Afghanistan extended specifically to their own protection payments because Defendants knew that al-Qaeda relied upon al-Qaeda-in-Iraq's protection rackets in Iraq to fund al-Qaeda's operations after 9/11.

---

[435] Porterville Recorder (California), *Editorial: An Increasing Threat From Al-Qaida: U.S.: Terror Group Has Regrouped In Pakistan, And Its Iraq Affiliate Is Raising Money, Gaining Expertise* (July 26, 2007), 2007 WLNR 14301976.

[436] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at 34.

[437] Dr. Matthew Levitt, *quoted in House Financial Services Committee Hearing "Terrorist Financing and the Islamic State." Testimony by Matthew Levitt, Director of the Stein Program on Counterterrorism and Intelligence, The Washington Institute for Near East Policy*, *republished in* U.S. Congressional News (Nov. 13, 2014), 2014 WLNR 32049841.

For example, as al-Qaeda scholar Professor Daniel Byman of Georgetown University and the Brookings Institution explained, "[t]he documents discovered in Bin Laden's compound in Abbottabad suggests that the Al Qaeda core is now relying on affiliates for funding, rather than the other way around.  Affiliates, in turn, often engage in crime, … to gain money."[438]

997.    Defendants also knew that their financial aid to al-Qaeda also aided the Haqqani Network.  Media reports, for example, alerted Defendants that al-Qaeda and its branches, including al-Qaeda-in-Iraq, funded and logistically sustained the Haqqanis.[439]

998.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda-in-Iraq funded al-Qaeda's "core" in Afghanistan and Pakistan.

### b.    Defendants Knew Al-Qaeda-In-Iraq Terrorists Served Al-Qaeda In Afghanistan, Pakistan, And The Persian Gulf

999.    Defendants always knew that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells.

1000.  **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells.  Examples of such reports include, but are not limited to:

---

[438] Daniel L. Byman, *Al Qaeda, the Islamic State, and the Global Jihadist Movement: What Everyone Needs to Know* 196-97 (Oxford Univ. Press 2015).
[439] *See, e.g.*, Anand Gopal, *The Most Deadly US Foe in Afghanistan*, Christian Science Monitor (May 31, 2009) ("Officials say the Haqqanis use money from Al Qaeda-linked sources … to finance their operations."), 2009 WLNR 10378180.

a.   The White House, September 2006:  "Fighters with experience in Iraq are a potential source of leadership for jihadists pursuing these tactics."[440]

b.   Congressional Research Service, August 2008:  "[T]here are indications that ['Al Qaeda in Iraq (AQ-I)'] leaders are relocating from Iraq to join Al Qaeda leaders believed to be in remote areas of Pakistan, near the Afghanistan border. … [I]f accurate, [this] could suggest that AQ-I now perceives Afghanistan as more fertile ground than is Iraq to attack U.S. forces. The relocation of AQ-I leaders to Pakistan could also accelerate the perceived strengthening of the central Al Qaeda organization."[441] "[R]eports of significant AQ-I relocations to the Pakistan tribal areas bordering Afghanistan … suggest that the links are tightening between AQ-I and Al Qaeda's central leadership as represented by Osama bin Laden and Ayman al-Zawahiri. Both Al Qaeda leaders are widely believed to be hiding in areas of Pakistan near the border with Afghanistan, and many assessments since 2007 say that Al Qaeda is enjoying increasing freedom of movement and action in the border regions. If Al Qaeda's ranks are now augmented by an influx of AQ-I fighters from [] Iraq …, it could be argued that Al Qaeda's overall capabilities to … undermine U.S. efforts [in] Afghanistan, have been increased."[442]

c.   Senator Richard Lugar, October 2009:  "[T]he National Intelligence Strategy … explains that violent extremists, quote, 'are planning to use terrorism …to attack the United States. Working in a number of regions, these groups aim to … attack U.S. strategic partners and otherwise challenge U.S. interests worldwide,' … This network of extremist Al Qaida cohorts has sprung up across the globe, and its affiliates have aligned their actions and rhetoric with the core Al Qaida leadership in Pakistan to gain notoriety and financing. The largest Al Qaida affiliate, … remains Al Qaida in Iraq. Some of its foreign fighters are returning home to local terrorist branches. … These and other extremists … are connected to a Pakistan core and its nexus of training, planning and operations."[443]

d.   State Department, June 2020:  "Although al-Qa'ida in Afghanistan and Pakistan has been seriously degraded, key figures among AQ's global leadership, as well as its regional affiliate al-Qa'ida in the Indian Subcontinent (AQIS), continued to operate from remote locations in the region that historically served as safe havens."[444]

---

[440] The White House, *Press Release: The Rest of the Story: The NIE Reflects Previous Statements About the War on Terror* (Sept. 26, 2006), https://tinyurl.com/swccct8y.

[441] Kenneth Katzman (Specialist in Middle Eastern Affairs), *CRS Report for Congress, Al Qaeda in Iraq: Assessment and Outside Links*, at CRS-8 (Aug. 15, 2008), https://tinyurl.com/2p8smj4d.

[442] *Id*. at CRS-17.

[443] Senator Richard Lugar (R-IN), *quoted in* CQ-Roll Call Political Transcriptions, *Sen. John Kerry Holds a Hearing on Al Qaida in Afghanistan* (Oct. 7, 2009) (cleaned up), 2009 WLNR 31263570.

[444] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 148 (June 2020).

1001.   **United Nations al-Qaeda/Taliban sanctions monitoring team reports** alerted

Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in

Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells. In 2006,

for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban"

"continued to benefit from a close relationship with Al-Qaida and related foreign groups" with

al-Qaeda-supplied "non-Afghans" "found fighting alongside the Taliban, or operating in

supporting cells."[445] In 2008, similarly, the same U.N. sanctions team published another report

that referenced the relocation of al-Qaeda-in-Iraq terrorists to al-Qaeda core in Afghanistan and

Pakistan and concluded that "foreign fighters, mainly Uzbeks and Arabs, some of whom may

have arrived recently from Iraq [i.e., redeployed al-Qaeda-in-Iraq operatives] … appear to be

playing an increasingly important role as advisers" to the Taliban and, through such role, made a

key "contribut[ion] to [the Taliban's] success" against Americans in Afghanistan.[446]

1002.   **Media reports** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly

redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint

al-Qaeda/Taliban cells. Examples include, but are not limited to:

a.   <u>Ottawa Citizen</u>, February 2006:  "Al-Qaeda militants are moving from Iraq to
Afghanistan to fight with the Taliban, officials said yesterday, after the capture of several
suspected foreign guerrillas. Authorities in Nimroz province reported the arrest of four
men, three Kashmiri Pakistanis and an Iraqi, in an ominous escalation of the threat to
NATO forces. … [T]he Iraqi has admitted to being part of a group of al-Qaeda-linked
fighters dispatched from Iraq to fight western forces, including Canadians, in
Afghanistan. If true, the revelation would show how al-Qaeda is channelling terror back
to the country its leadership was forced to flee after the September 2001 attacks in the
United States. … 'There is a big group coming from Iraq,' said the Nimroz governor
Ghulam Dusthaqir Azad. 'They're linked to al-Qaeda and fought against U.S. forces in

---

[445] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).
[446] U.N. Security Council, *Eighth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 22 (May 14, 2008).

Iraq. They have been ordered to come here. Many are suicide bombers.' … The captured Iraqi … was part of a group of 17 militants travelling individually from Iraq to Afghanistan. 'We handed him over to the anti-terrorism department and they have made several arrests based on information from him,' said Mr. Azad."[447]

b.    *NPR*, September 2006:  "CHADWICK: You talk about the tactics employed in Iraq … and say that indeed you foresee these tactics spreading to central Asia and that the war on terror is observed by fighters in all these areas who are learning from one another. Mr. RASHID: That's very true. … with the Taliban … this current offensive that they have launched against NATO troops in southern Afghanistan, we are seeing quite phenomenally new tactics: brilliant ambushes, the use of explosive devices, suicide bombings. Now a lot of this seems to have come from Iraq."[448]

c.    *ABC News*, July 2008:  "DAVID MUIR (ABC NEWS): … General David Petraeus, said [] that he now sees signs that some al Qaeda fighters are retreating from Iraq and refocusing on Afghanistan. … What are you hearing on the ground [in Afghanistan]? JIM SCIUTTO (ABC NEWS): … US commanders are seeing evidence of that, both in the east and in the south, so are Afghans reporting seeing more foreign fighters, particularly Arab fighters on this side of the border. … Senator Obama's visit today to Jalalabad was telling. Jalalabad is on the Pakistan border and it is Pakistan that both the US and Afghanistan blame for giving refuge to the Taliban and al Qaeda."[449]

d.    *New York Post*, July 2008:  "After intense US assaults, al Qaeda may be considering shifting focus to its original home base in Afghanistan, where American casualties are running higher than in Iraq, the top US commander in Iraq said yesterday. 'We do think that there is some assessment ongoing as to the continued viability of al Qaeda's fight in Iraq,' Gen. David Petraeus said. Whatever the result, Petraeus said no one should expect al Qaeda to give up entirely in Iraq."[450]

e.    *Providence Journal*, August 2008:  "[M]uch of the fighting has shifted from Iraq to Afghanistan. Combat has sharpened in the latter as al-Qaida retreats from Iraq. The flow of foreign jihadists to Iraq has shrunk as more travel to Afghanistan to support al-Qaida and the Taliban. According to Brian Glyn Williams, who researches jihadist Web sites at West Point, 'Iraq is seen as a defeat. The image of Afghanistan is seen as a more pristine jihad.' As U.S. casualties decline in Iraq (13 were killed in July), and as political stability

---

[447] Tom Coghlan, *Afghans Arrest Iraqi Sent In By Al-Qaeda: Link Suspected, But Never Proved; Detainee Admits Ties To Terror Group*, Ottawa Citizen (Feb. 3, 2006), 2006 WLNR 26438455.
[448] Ahmed Rashid, *quoted in* NPR Day to Day, *Has U.S. Already Lost Round One in 'War on Terror'?* (Rashid, *Has U.S. Already Lost Round One*) (Sept. 13, 2006), 2006 WLNR 22951747.
[449] ABC World News Saturday, *World News Tonight Saturday* (July 19, 2008), 2008 WLNR 13596167.
[450] N.Y. Post, *Iraqi Qaeda in 'Afghan Retreat'* (July 20, 2008), 2008 WLNR 13673888.

and reconciliation there grow, American soldiers have become four times more likely to be killed in combat in Afghanistan than in Iraq."[451]

f.   _Reuters_, December 2008:   "The [alleged U.S.] document said [former Pakistani ISI Lieutenant-General Hamid] Gul had knowledge of the relocation of al Qaeda fighters from Iraq to the Pakistan-Afghan border region this year ..."[452]

1003.   **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells. Examples of such reports include, but are not limited to:

a.   Ahmed Rashid, 2006:   "NATO has told me that there is traffic in men ... between Iraq and Afghanistan. ... So there's now a kind of cross-fertilization going on, which, of course, is very, very dangerous."[453]

b.   Peter Bergen, Joseph Felter, Vahid Brown, and Jacob Shapiro, 2008:   "There is a strong risk of blowback from Iraq. Relatively small numbers of Jihadis will 'bleedout' to fight elsewhere, but they will likely be very dangerous individuals. ... Foreign fighters in Iraq have also acquired a number of useful skills that can be used in future terrorist operations, including massive use of suicide tactics, organizational skills, propaganda, covert communication, and innovative improvised explosive device (IED) tactics. Some AQI fighters that have already trickled out of Iraq have bolstered violent movements in Saudi Arabia and Lebanon. This trend will likely continue. ... [F]ighters are most likely to join established Jihadi groups in areas of weak government control, such as Afghanistan."[454]

c.   Michael Lieberman, 2009:   "Bygones were bygones by 2007, when, after retreating from Iraq, al Qaeda was met with open arms back in Afghanistan. As Abdel Bari Atwan (who, like Bergen, has had the pleasure of interviewing bin Laden) notes, 'the alliance between [al Qaeda] and the Taliban is currently stronger than it has ever been.'"[455]

d.   Professor Daniel Byman, 2012:   "[A] group may choose to affiliate with al-Qa'ida [because] ...• A Haven. One of the most important determinants of a terrorist group's success is whether it has a haven from which to operate. Al-Qa'ida ran training camps, operated safe houses, and otherwise established a large infrastructure in support of terror. These facilities were an attractive resource for groups looking for a safe environment. ...

---

[451] Providence Journal, _Editorial - Shift Toward Afghanistan_ (Aug. 7, 2008), 2008 WLNR 31970104.
[452] Simon Cameron-Moore, _Pakistan Ex-Spy Chief: US Wants Him On Terror List_, Reuters News (Dec. 7, 2008).
[453] Rashid, _Has U.S. Already Lost Round One_.
[454] _Bombers, Bankers, & Bleedout_, at 7.
[455] Michael Lieberman (Fellow, Truman National Security Project), _Al Qaeda and the Taliban Still Tied in a Knot_, Moderate Voice (Dec. 17, 2009), 2009 WLNR 25404336.

• Common Defense. Because groups share havens, training facilities, and so on with al-Qa'ida, when these locations are targeted …, the groups join al-Qa'ida in fighting back."[456]

**e.**     Dr. Seth Jones, 2013:  "[A]l-Qaida in Iraq [] regenerate[d] … [and] al-Qaida in Iraq … establish[ed] Jabhat al-Nusra in Syria.  Those were two … devastating steps in that region that the U.S. withdrawal from Iraq at least allowed.  … [T]hat means that … Afghanistan … will be quite important … an active al-Qaida presence up in Kunar, Nuristan and Nangarhar provinces, … create[s] the possibility for a re-establishment of the organization in an area that it does have local allies."[457]

**f.**     Professor Daniel Byman, 2013:  "AQI-linked conflict is at the heart of the problem of spillover in the Middle East. What happens in Iraq does not stay in Iraq: it has already helped infect Syria, and the furies unleashed by the conflict shape the politics of Iran, Saudi Arabia, Turkey, and other states. ... The spillover may even go beyond the Middle East."[458]

1004.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda-in-Iraq operatives regularly deployed to serve al-Qaeda's "core" in Afghanistan and Pakistan.

### c.     Defendants Knew al-Qaeda-In-Iraq Provided Key Training to Al-Qaeda and the Taliban

1005.   Defendants always knew that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists, and their Taliban allies (including the Haqqani Network) in Afghanistan and Pakistan. According to Peter Bergen, "al Qaeda" facilitated training in Iraq by Sunni terrorists for al-Qaeda's allies in Afghanistan, "the senior leadership of the Taliban and al

---

[456] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at iv-v.

[457] Seth Jones (RAND Corp.), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.

[458] Daniel L. Byman, *The Resurgence of al Qaeda in Iraq, Testimony Before the Joint Hearing of the Terrorism, Nonproliferation, and Trade Subcommittee and the Middle East and North Africa Subcommittee of the House Committee on Foreign Affairs*, *republished by* Brookings Institution (Dec. 12., 2013), https://tinyurl.com/2p9hhy4x.

Qaeda have morphed together ideologically and tactically," and "al Qaeda has learned from Iraq, and the Taliban have learned from the playbook in Iraq."[459]

1006.   Defendants knew that al-Qaeda-in-Iraq trained al-Qaeda and Taliban terrorists through "live fire" training exercises in Iraq.

1007.   **United Nations al-Qaeda/Taliban sanctions monitoring team reports** alerted Defendants that al-Qaeda-in-Iraq provided vital training to al-Qaeda and Taliban (including Haqqani Network) terrorists in Afghanistan, Pakistan, and Iraq.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban's" "close relationship with Al-Qaida and related foreign groups" were the route through which "Al-Qaida attack techniques have [] become more evident in Afghanistan, with at least 56 suicide bombings  between 1 January and 27 July 2006, compared with 21 in all 2005, and only 10 between September 2001 and December 2004."[460] Moreover, the U.N. reported, "[n]ew explosive devices are now used in Afghanistan within a month of their first appearing in Iraq."[461]  Indeed, reported the U.N., "there have been reports of" "Taliban" from "Afghanistan/Pakistan" "training in [] Iraq."[462] The U.N. regularly published similar reports between 2005 and 2021.

1008.   **Media reports** alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists and their Taliban allies (including the Haqqani Network) in Afghanistan and Pakistan. Examples include, but are not limited to:

a.      *Philadelphia Inquirer*, April 2006:  "Islamic extremists in Iraq are providing military training and other assistance to Taliban and al-Qaeda fighters from eastern and southern Afghanistan and Pakistan's tribal areas, U.S. intelligence officials [said] … Pakistanis

---

[459] Peter Bergen, *Assessing the Fight Against Al-Qaeda: Hearing Before the Permanent Select Committee on Intelligence* (Apr. 9, 2008), https://tinyurl.com/bdzdsrbb.
[460] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).
[461] *Id*.
[462] *Id*.

and Afghans are receiving military training in Iraq; Iraqi fighters have met with Afghan and Pakistani extremists in Pakistan; and extremists in Afghanistan increasingly are using homemade bombs, suicide attacks and other tactics honed in Iraq, said U.S. intelligence officials and others who track the issue. Several Afghan and Pakistani 'exchange students' volunteered to join the fight against American and Iraqi forces in Iraq, but they were told to return to Afghanistan and Pakistan to train others there, two U.S. intelligence officials said. … Seth Jones, a specialist on Afghanistan … said: '…[T]here is absolutely no question that the partial evidence strongly suggests that there have been increasing contacts between Afghan insurgents and Iraqi insurgents either in Iraq itself or in Pakistan; the trail is going in both directions.' Extremists traveling to or from Iraq mostly are making their way on routes used by drug traffickers and smugglers through Pakistan's province of Baluchistan … and southern Iran … Tactics that have proved effective in Iraq, especially homemade bombs, suicide and car bombs, and secondary ambushes … increasingly are being used in Afghanistan … 'Everybody accepts that there has been a qualitative shift in the sophistication of these attacks,' said Marvin Weinbaum, a former State Department intelligence expert who is now at the Middle East Institute."[463]

b.  *Xinhua News Agency*, April 2007:  "An al-Qaida-related group in Iraq said … that [Iraq] has become 'a university of terrorism' in an audio recording posted [online]. Abu Omar al-Baghdadi … said …, '[O]ne of the (enemy) devils was right in saying that if Afghanistan was a school of terror, then Iraq is a university of terrorism.'"[464]

c.  *Washington Times*, May 2007:  "[The Taliban] gleaned [lessons] from … skills honed in Iraq. … al Qaeda's trusted Arabs have resumed their roles as military trainers and media advisers for the Taliban … al Qaeda trainers [] facilitate travel for Afghan militants who move between Afghanistan and Iraq and regularly 'wave' to each other over the Internet. In one recent video, Abu Laith al-Libi, a senior Libyan trainer for the Taliban in Afghanistan, sends a message of encouragement to Iraqi insurgents from an al Qaeda and Taliban training base inside Afghanistan."[465]

d.  *South China Morning Post*, October 2016:  "Pakistan and Afghanistan are no strangers to veteran jihadis. Both hosted militants who fought for al-Qaeda against US occupation forces in Iraq between 2003 and 2006. … Zarqawi[] lived in the Pakistani city of Peshawar for nine years prior to [9/11]. Hand-picked Afghan and Pakistani militants from groups allied with al-Qaeda subsequently undertook 'live training' tours of Iraq under the tutelage of al-Zarqawi … and others who have since assumed positions of responsibility

[463] Jonathan S. Landay and John Walcott, *Insurgents in Iraq Exporting Tactics; They Are Training Taliban and al-Qaeda fighters, Intelligence Officials Said. Violence Could Escalate in Afghanistan, Complicating U.S. Withdrawal Plans*, Philadelphia Inquirer (Apr. 1, 2006).
[464] Xinhua News Agency, *Militant Group Says Iraq "University of Terrorism"* (Apr. 17, 2007).
[465] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Wash. Times (May 30, 2007), 2007 WLNR 10111354.

in [Islamic State]. While there, they learnt new tactics and skills – notably the use of [IEDs] and suicide bombs – and introduced them in Afghanistan … in 2005."[466]

1009.   **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists and their Taliban allies (including the Haqqani Network) in Afghanistan and Pakistan. Such reports included, but were not limited to:

a.   Ahmed Rashid, 2006:  "Iraqi/al-Qaida members have come to Afghanistan to train the Taliban here."[467]

b.   Peter Bergen, 2008 and 2009:  "Ability to Export Tactical Innovation[.] … Iraqi suicide and IED tactics are exported from Iraq into the Afghan theater against US … forces. These tactics were learned both by copycatting the Iraqi insurgency and by sending Jihadis to Iraq for on-the-job training. The Taliban has increasingly adopted suicide attacks, [IEDs], and the beheadings of hostages—all techniques that al-Qa'ida perfected in Iraq.  Mullah Dadullah, a key Taliban commander … in 2006 … noted, 'we have 'give and take' relations with the mujahidin in Iraq.' Suicide operations … became prevalent in 2005 after the Taliban saw their success in Iraq.  Members of al-Qa'ida Central such as Abdul Hadi al-Iraqi, Omar al-Farouq and Hassan Ghul have been captured or killed either in Iraq or travelling there."[468] "Al Qaida has influenced the Taliban ideologically and tactically to a very great degree. The reason that we're having an epidemic of suicide attacks and beheadings of hostages and IED attacks is because the Taliban sent people to Iraq to learn from the insurgency, and they copy-catted the insurgency."[469]

1010.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that al-Qaeda-in-Iraq regularly provided essential training to serve al-Qaeda's "core" and the Taliban, including its Haqqani Network, in Afghanistan and Pakistan.

---

[466] Tom Hussain (Pakistan Affairs Analyst), *In Old Stomping Grounds, Reasons To Be Fearful*, South China Morning Post (October 30, 2016), 2016 WLNR 33357299.
[467] Rashid, *Has U.S. Already Lost Round One*.
[468] Peter Bergen, *After the War in Iraq: What Will the Foreign Fighters Do?*, *published in Bombers, Bank Accounts, & Bleedout*, at 112.
[469] Peter Bergen, *quoted in* CQ-Roll Call Political Transcriptions, *Sen. John Kerry Holds a Hearing on Al Qaida in Afghanistan* (Oct. 7, 2009) (cleaned up), 2009 WLNR 31263570.

**d.    Defendants Knew Al-Qaeda-In-Iraq Provided Key Logistical
Aid To Al-Qaeda**

1011.   Defendants always knew that al-Qaeda-in-Iraq terrorists regularly provided key

logistical aid to al-Qaeda "core" terrorists in Afghanistan and Pakistan.

1012.   **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted

Defendants that al-Qaeda-in-Iraq provided key logistical aid to al-Qaeda "core" in Afghanistan

and Pakistan.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that

"[t]he Taliban" "continued to benefit from a close relationship with Al-Qaida and related foreign

groups" with al-Qaeda supplied "non-Afghans" "found fighting alongside the Taliban, or

operating in supporting cells."[470]

1013.   **Media reports** and **terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq

terrorists regularly provided key logistical aid to al-Qaeda "core" terrorists in Afghanistan and

Pakistan.  In 2006, for example, NPR interviewed terrorism scholar Ahmed Rashid, who

explained that it was "very true," with respect to "the tactics employed in Iraq and in south

Lebanon and elsewhere," that one should "foresee these tactics spreading to central Asia [i.e.,

Afghanistan and Pakistan] and that the war on terror [was] observed by fighters in all these areas

who are learning from one another" because "there [was] traffic in … materials between Iraq and

Afghanistan … [and] cross-fertilization."[471] In 2008, similarly, terrorism scholar Professor

Daniel Byman reported that al -Qaeda-in-Iraq's "[l]ogistics" "offer[ed] al-Qa'ida access to [al-

Qaeda-in-Iraq's] media resources, recruiters, and other core parts of their organizations."[472]

---

[470] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring
Team* ¶ 11 (Sept. 20, 2006).
[471] Rashid, *Has U.S. Already Lost Round One*.
[472] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at v.

1014.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that al-Qaeda-in-Iraq regularly provided key logistical aid to al-Qaeda's "core" in Afghanistan and Pakistan.

### G.   Defendants Knew Islamic State's Role

#### 1.   Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States

1015.   Defendants knew that Islamic State waged a global terrorist campaign against the United States in which Islamic State attacked Americans in Iraq, Syria, Afghanistan, and elsewhere to drive the United States out of the Middle East.

1016.   Defendants knew about Islamic State's global terrorist campaign against the United States, including its key focus on Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

1017.   Defendants also knew that Islamic State terrorists in Iraq and Syria would foreseeably redeploy to Afghanistan.[473]

1018.   **United States government reports** alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States while Islamic State acted as a caliphate from 2014 through 2017.[474]

---

[473] *See*, *e.g.*, Clarke, *After the Caliphate: The Islamic State & the Future Terrorist Diaspora*, at 24.

[474] *See*, *e.g.*, The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Islamic State … poses a clear threat to the people of Iraq and Syria, … the broader Middle East, as well as U.S. persons, allies and interests in the region.  Left unchecked, ISIL could pose a growing threat beyond the region …"), http://tinyurl.com/6yce8e3z; Office of the Director of National Intelligence, *Counterterrorism Guide: Islamic State of Iraq and the Levant (ISIL)* (2015) (In June 2014, ISIL unilaterally declared the establishment of an Islamic caliphate and called on all Muslims to pledge allegiance to the group. Since then, ISIL has announced the establishment of eight provinces outside of Iraq

1019.   Throughout Islamic State's "caliphate" era from 2014 through 2017, U.S. government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business.[475]

1020.   Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.[476]

---

and Syria, including in Afghanistan and Pakistan …"), https://tinyurl.com/yckhbv89; U.S. Dep't of State, *Country Reports on Terrorism 2016* at 8 (July 2017) ("ISIS attacks outside its territorial strongholds in Iraq, Syria, and Libya were an increasingly important part of its terrorism campaign in 2016. Most of these attacks took place in countries where ISIS has a declared branch, such as Afghanistan …."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2017– September 30, 2017*, at 26 (Nov. 3, 2017) ("ISIS: Global Reach[.] … Several of the affiliates have acquired funding, weapons, recruitment, and tactics from core ISIS. …ISIS-associated groups were also active in … Afghanistan ...").

[475] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2015* at 178-79 (June. 2016) ("Iraq witnessed a continued surge of terrorist activity in 2015, primarily as a result of the actions of [] Islamic State …, which has occupied large areas of the country since early 2014. … Terrorist groups continued to mount a large number of attacks throughout the country."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2016–December 31, 2016*, at 8 (Feb. 2, 2017) ("[W]hile fighting in Iraq and Syria centered on the battles for Mosul and Raqqah, ISIL militants continued insurgent activity outside of those areas in both countries. For example, ISIL militants reactivated networks in Anbar province and carried out suicide attacks near Karbala in southern Iraq and at checkpoints leading to Fallujah and Amiriyal al-Fallujah."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 47 (May 6, 2017) ("ISIS's [recent] activity signaled that [it] was transitioning … to an insurgency … In Iraq, ISIS's insurgent activity consisted of harassing attacks and suicide bombings in the central and western parts of [Iraq]. … ISIS continued to use IED and VBIED attacks … in Baghdad … [and] suicide and VBIED attacks in Anbar …").

[476] *E.g.*, The White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 2018) ("ISIS remains … the primary transnational terrorist threat to the United States … ISIS retains the financial and material resources and expertise to launch external attacks—including against United States interests—and its senior leaders continue to call for attacks against the United States. The group's global reach remains robust, with eight official branches … regularly conducting terrorist and insurgent operations across Africa, Asia, Europe,

1021.   Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business. Such reports included, but were not limited to:

a.   State Department, September 2018:  "ISIS remained a terrorist threat … and continued to carry out suicide, hit-and-run, and other asymmetric attacks throughout [Iraq]."[477]

b.   State Department, October 2019:  "Reverting to clandestine tactics following its loss of territory, ISIS … sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, in particular. Although ISIS maintained the capability to conduct deadly terrorist attacks in Iraq, these attacks resulted in fewer casualties in 2018 than in 2017."[478]

c.   State Department, June 2020:  "ISIS continued to present a serious threat to Iraqi stability … ISIS sought to reestablish support among populations in Ninewa, Kirkuk, Diyala,

---

and the Middle East."); U.S. Dep't of State, *Country Reports on Terrorism 2018* at 9 (Oct. 2019) ("ISIS's global presence evolved with affiliates and networks conducting attacks in the Middle East, South and East Asia, and Africa. Additionally, battle-hardened terrorists headed home from the war zone in Syria and Iraq or traveled to third countries, posing new dangers."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021) ("Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2021–December 31, 2021*, at 23 (Feb. 8, 2022) ("ISIS-Core Leads a Global Organization[.] … ISIS-Core leaders in Iraq and Syria continued to manage the group as a global caliphate, maintaining an element in Iraq and Syria dedicated to overseeing the group's branches around the world. Since 2014, ISIS has incorporated existing jihadist groups or upstart elements into its global organization, expanding into the Arabian Peninsula, South … Asia, Eurasia, Turkey, and Africa. … ISIS leaders provided the group's branches with guidance, media support, and funding.").

[477] U.S. Dep't of State, *Country Reports on Terrorism 2017* at 229 (Sept. 2018).

[478] U.S. Dep't of State, *Country Reports on Terrorism 2018* at 117 (Oct. 2019).

Salah ad Din, and Anbar provinces, especially in the areas of disputed control between the Kurdistan Regional Government (KRG) and the federal government …"[479]

d.    <u>LIGOIR, November 2020</u>:  "Kirkuk province consistently ranks as one of the most violent provinces in Iraq … The northern Iraqi province, parts of which are claimed by both the central Iraqi government and the semi-autonomous Kurdistan Regional Government (KRG), remains a focal point of ISIS's rural insurgency in Iraq. Both the territorial dispute and the sectarian divide in Kirkuk aid ISIS's survival in [Kirkuk]'s challenging physical terrain. … ISIS [] survive[s] as a lingering insurgency in Kirkuk. … ISIS remains most prevalent in the rural and mountainous regions of southern Kirkuk, where [ISIS] is organized in small insurgent cells. In particular, ISIS exploits the rugged terrain of the Hamrin, Qarachokh, and Makhmour Mountains for safe haven and to evade counterterrorism forces …. Similarly, ISIS uses valleys in [Kirkuk] … to launch mostly small-scale attacks, including ambushes, IED attacks, and small-arms fire that target local security elements, civilians, and infrastructure. … ISIS frequently intimidates, coerces, and kidnaps local civilian and tribal leaders [in Kirkuk] … to obtain resources."[480]

e.    <u>LIGOIR, May 2021</u>:  "ISIS remained entrenched in rural areas throughout Iraq and retains freedom of movement, particularly in rugged mountain and desert regions … ISIS continued to exploit ethnic, sectarian, and political tensions… ISIS fighters in Iraq continued to operate in small, mobile cells that primarily conduct simple hit-and-run attacks … ISIS regularly targeted infrastructure, security and military positions, and civilians … ISIS focused its activity during the quarter in Anbar, Diyala, Kirkuk, and Salah ad Din provinces, and in areas surrounding Baghdad and Mosul. … ISIS continues to use the permeable border between Iraq and Syria to smuggle members and affiliates to safe havens it has established in rural and permissive areas, where it can conceal its operations and leaders, avoid security patrols, and intimidate the local population."[481]

f.    <u>State Department, December 2021</u>:  "Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."[482] "While ISIS remains unable to control territory and its leadership ranks have been significantly degraded, the group remains a serious threat to U.S. interests, security in the region, and beyond. In Iraq and Syria, ISIS fighters continued to wage a low-level insurgency, seeking to destabilize the region, recruit new members, and regain territory.

---

[479] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 117 (June 2020).

[480] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2020–September 30, 2020*, at 20 (Nov. 3, 2020).

[481] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 16 (May 4, 2021).

[482] U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021).

… Beyond Iraq and Syria, ISIS branches, networks, and supporters across the Middle East and North Africa remained active, including in the Arabian Peninsula, Libya, the Sinai Peninsula, Tunisia, and Yemen."[483] "Despite its territorial defeat, ISIS continued to conduct operations on a smaller scale, particularly in the North and West [of Iraq], including rural areas … ISIS sought to reestablish footholds in Anbar, Diyala, Kirkuk, Ninewa, and Salah al-Din provinces, especially in the areas of disputed control between the Kurdistan Regional Government and the federal government."[484]

1022.   **Terrorism scholars** alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.  For example, terrorism scholar Katherine Bauer reported in 2018 that Islamic State's "most significant recent attacks have been traced back to groups or 'provinces' operating outside of Syria and Iraq."[485]

1023.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that Islamic State waged a globally integrated terrorist campaign against the United States.

### 2.    Defendants Knew Protection Payments Aided Islamic State

1024.   Defendants knew protection payments aided Islamic State because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

1025.   **United States government reports** alerted Defendants that their protection payments aided Islamic State's caliphate from 2014 through 2017.[486]

---

[483] *Id*. at 112.

[484] *Id*. at 120.

[485] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing*, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance, at 4 (Sept. 7, 2018), http://tinyurl.com/mter35be.

[486] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2014* at 354, 9, 171 (June 2015) ("ISIL receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … ISIL … use[d] … criminal activities to raise funds for operational purposes. … ISIL earned up to several million dollars per month through its [] extortion networks … In 2014, ISIL derived income from [*inter alia*] … extortion, illegal 'taxation,' … and foreign donations. … [T]he United States used sanctions to ensure that banks,

1026.   Similar U.S. government reports alerted Defendants that their protection

payments aided Islamic State's "global insurgency" from 2018 through 2022.[487]

---

companies, and citizens across the world did not engage in financial transactions with ISIL.");
Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve,
Quarterly Report to the United States Congress, April 1, 2015–June 30, 2015*, at 46 (Aug. 24,
2015) ("ISIL … use[d] … criminal activities to raise funds for operational purposes. Much of
ISIL's funding, … was [] gathered in Iraq and Syria. ISIL earned up to several million dollars
per month through its [] extortion networks …"); Lead Inspector General for Overseas
Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to
the United States Congress, September 30, 2015*, at 58, 61, 63, 64-5 (Nov. 25, 2015) ("ISIL …
derives most of its revenue from its control of territory[,] [including] extortion/taxation … ISIL's
funds come from several key sources[,] [including] … taxes and extortion from the occupied
territories … Most of these constitute a 'sophisticated extortion racket[] … [R]eceipts that
confirm ISIL is collecting a 20% 'khums tax' … and that the tax collections are being enforced
across the territory it controls. … ISIL also requires local populations in those territories to pay it
a percentage of any salary (largely paid in cash). ISIL further imposes 'taxes' on all types of
business activities. … ISIL 'stands to profit from taxing all of the sources of revenue to the tune
of hundreds of millions of dollars per year.'"); Lead Inspector General for Overseas Contingency
Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress,
October 1, 2015−December 31, 2015*, at 70-72 (Feb. 16, 2016) ("ISIL's extortion [] and taxation
… have funded its military machine for years. … ISIL's administrative apparatus enables it to
generate revenue through taxation … and the collection of fees for everything [including] sales
of goods … [O]il is second only to taxation and extortion as a source of income for ISIL."); U.S.
Dep't of State, *Country Reports on Terrorism 2015* at 6 (June. 2016) ("ISIL relies heavily on
extortion and the levying of 'taxes' on local populations under its control …"); Lead Inspector
General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United
States Congress, January 1, 2017–March 31, 2017*, at 45-46 (May 6, 2017) ("ISIS continued to
be able to finance operations in Iraq and Syria … ISIS generates the majority of its revenue from
… taxes [] and extortion …"); U.S. Dep't of State, *Country Reports on Terrorism 2016* at 408
(July 2017) ("ISIS receives most of its funding from a variety of businesses and criminal
activities … in Iraq and Syria … include[ing] … extortion …"); Lead Inspector General for
Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States
Congress, April 1, 2017–June 30, 2017*, at 23 (Aug. 3, 2017) ("Coalition airstrikes also killed
[ISIS] financial facilitators … and destroyed several ISIS cash storage facilities in Iraq and Syria.
Fawaz al-Rawi and Samir Idris were accused of moving millions of dollars for the ISIS network.
However, … ISIS still generates millions of dollars … from illegal taxation and extortion …").
[487] *E.g.*, U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit
Financing*, at 25 (2018) ("ISIS derives most of its revenue from … the extortion and taxation of
civilian populations and economies in Iraq and Syria … However, ISIS also receives limited
financial support from within the United States. … U.S.-based individuals have raised or
solicited funds specifically for the group itself. These funds are often derived from legitimate
sources as well as from small-scale criminal activity. ISIS financiers and supporters abroad also

1027. **Financial Action Task Force ("FATF") reports** alerted Defendants that protection money payments played a key role in financing Islamic State's operations around the

send funds to other ISIS supporters or regional affiliates in foreign jurisdictions that may be routed through the U.S. financial system and may seek to procure sensitive or controlled goods from U.S.-based companies."); U.S. Dep't of State, *Country Reports on Terrorism 2017* at 304, 132 (Sept. 2018) ("ISIS received most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … In 2017, the Government of Iraq … continued to dismantle ISIS's financial activity and safeguard its financial institutions from exploitation by ISIS. Iraq enforced a national directive to prohibit financial transactions with banks and financial companies located in ISIS-controlled areas. It … prohibited … companies located in ISIS-held areas and those suspected of illicit activity from accessing U.S. banknotes … Iraq also barred ISIS financial facilitators … from Iraq's financial system and froze all of their assets."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2018–December 31, 2018*, at 21-22, 31 (Feb. 4, 2019) ("[T]he bulk of ISIS financial and military resources is generated in Iraq and Syria, … ISIS branches worldwide contribute varying degrees of support to the ISIS leadership … ISIS continued to extort money from both individuals and construction companies seeking to rebuild destroyed infrastructure. … ISIS could insert operatives into the reconstruction effort to siphon off money. … Extortion remains a major source of income for [ISIS] … Independent analysts also suggested that ISIS would likely seek to extort companies engaged in reconstruction in Iraq, and would also insert operatives into reconstruction entities to divert funds to terrorist activities. … [A]part from these efforts, ISIS in Iraq gains revenue from [inter alia] … taxation …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2019–December 31, 2019*, at 41 (Feb. 4, 2020) ("ISIS Generates Revenue Even After Loss of Territory … ISIS continues to generate revenue by [*inter alia*]… extortion, and … front companies."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20, 51 (May 13, 2020) ("[E]ven with its territorial defeat, ISIS continues to generate funds in Syria through extortion … and the use of front companies. … ISIS is increasingly brazen in its revenue-producing activities in Iraq and Syria. … ISIS members [] openly extort[] …. ISIS [is] able to move more freely [and] extort protection money …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 15 (May 4, 2021) ("ISIS generated revenue from extortion, … and moves resources to its safe havens and to operatives throughout Iraq. … ISIS used similar fundraising tactics in Syria, targeting civilian businesses … for possible utilization as front companies."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

world, including in Iraq, Syria, Turkey, and Afghanistan.  For example, the FATF published guidance concerning Islamic State terrorist finance in February 2015, which concluded, among other things, that:

a.   "[F]unding is central and critical to [Islamic State's] activities. … ISIL's primary sources of revenue … include … extortion … Cutting off these vast revenue streams is … [an] opportunity … to defeat this terrorist organisation."[488]

b.   "ISIL is operating in vast swathes of land across Syria and northern Iraq, allowing ISIL to exploit the local population and material resources through extortion … ISIL takes advantage of the resources in this domain, … taxing local economies. … ISIL obtains the vast majority of its revenues through local criminal and extortion activities …"[489]

c.   "ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as … extortion, … illicit taxation of goods and cash that transit territory where ISIL operates; … (3) donations …"[490]

d.   "ISIL manages a sophisticated extortion racket by … demanding a portion of the economic resources … [like] how … organized crime groups generate funds. This vast range of extortion, including everything from … vehicle taxes to school fees …, is done under the auspices of providing notional services or 'protection.'"[491]

e.   "ISIL has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies paid."[492]

f.   "Trade of goods and transfers of cash into and out of ISIL-held territory has been significantly disrupted due to the weak security environment. However, according to industry contacts and press reporting, some trade of goods has persisted, as have cash transfers necessary for financing this trade. ISIL is able to impose levies on all goods transiting territory where it operates. ISIL has reportedly imposed specific taxes on the movement of goods in parts of Iraq where it operates, including a road tax of 200 USD in northern Iraq and an 800 USD 'customs' tax on trucks entering Iraq …"[493]

g.   "Some delegations identified terrorist financing risks regarding wire transfers from charitable foundations to conflict zones or areas where ISIL operates. Other risks identified include … raising funds for recipients in a third country which are or are

---

[488] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 5 (Feb. 2015), https://tinyurl.com/5b98bmbh.
[489] *Id*. at 10.
[490] *Id*. at 12.
[491] *Id*.
[492] *Id*.
[493] *Id*. at 17.

suspected to be part of an organisation [] that engages in violent … activities. These risks are enhanced when the source of the funds and purpose of the transaction is not known or cannot be verified. These instances include transactions not listing any reference or using generic terms such as 'other', 'services' and 'goods'. In some cases, public appeals for donations have not correlated with the organisations' stated purpose (e.g. educational, health care or humanitarian relief)."[494]

h.      "ISIL[] will always require funds for operational support and to meet broad organisational requirements. … This report … identif[ied] the most important sources of ISIL funding, particularly … extortion …"[495]

1028.   **Media reports** alerted Defendants that protection payments aided Islamic State.

In 2014, for example, *Forbes* analyzed Islamic State's tax rules, which alerted Defendants that

their protection payments directly financed anti-American terrorism:

a.      "Initially, [ISIS] depended on outright violence to raise cash. But as ISIS made the transition to [Islamic State], its revenue extraction became more sophisticated. … ISIL enforced taxes on a variety of commercial activities, including telecommunications companies that had relay towers in ISIL-controlled zones."

b.      "The *New York Times* [] noted the extent to which ISIS is regularizing its … tax process. … 'Many … received official receipts stamped with the ISIS logo … These forms of taxation … increasingly carry the trappings of regularized tax collection."[496]

1029.   In 2015, the *New York Times* reported the typical experience of any businesses

operating inside Islamic State-controlled territory:

a.      "Three times a month, Mohammad al-Kirayfawai hands $300 to fighters from the Islamic State for the privilege of driving his refrigerated truck full of ice cream and other perishables from Jordan to a part of Iraq where the militants are firmly in charge.  The fighters who man the border post treat the payment as an import duty, not a bribe. They even provide a stamped receipt, with the logo and seal of the Islamic State, that Mr. Kirayfawai, 38, needs for passing through other checkpoints on his delivery route."

b.      "Across wide expanses of Syria and Iraq, [] Islamic State … has set up a predatory and violent bureaucracy that wrings every last American dollar … it can from those who live under its control or pass through its territory."

---

[494] *Id*. at 19.

[495] *Id*. at 32.

[496] Joseph Thorndike, *How ISIS Is Using Taxes To Build A Terrorist State*, Forbes (Aug. 18, 2014), https://tinyurl.com/5c3wa2ap.

c.    "Islamic State[] … exact[ed] tolls and traffic tickets; rent for government buildings; utility bills for water and electricity; taxes on income, crops and cattle; and fines for smoking or wearing the wrong clothes."

d.    "'They fight in the morning and they tax in the afternoon,' said Louise Shelley, … of the Terrorism, Transnational Crime and Corruption Center at George Mason University."

e.    "[A]s Western and Middle Eastern officials have gained a better understanding of the Islamic State's finances over the past year, a broad consensus has emerged that its biggest source of cash appears to be the people it rules, and the businesses it controls."

f.    "Inside that territory, [] Islamic State … has taken over the legitimate revenue collection operations of the governments it has usurped. And it has … extract[ed] as much as it can from the people, businesses and property it now controls."

g.    "Another Islamic State department, the Diwan al-Rikaz, or the Office of Resources, oversees … a long list of other businesses now controlled by the militants. It operates … mobile phone companies … skimming revenues from all of them."

h.    "The Islamic State also demands a cut of the revenues earned by small businesses. 'We either pay in [goods] or cash, it depends on the production,' said Tarek, a Syrian …"

i.    "Officials of the so-called caliphate dislike the term 'tax,' preferring the Islamic term '*zakat*,' which refers to the alms Muslims are required to pay. Although the norm would be 2.5 percent of a person's wealth under typical interpretations of Islamic law, the militants are taking 10 percent, justifying the high rate by saying they are a 'nation in a time of war,' according to a citizen journalist in Raqqa …"

j.    "Islamic State is extracting as much as $800 or $900 million, possibly more, from residents or businessmen inside the territory it controls."

k.    "[U.S. government] [o]fficials assume that the Islamic State must be circulating the money it collects back out into the regional and global financial system since there have not been signs of the kind of rampant inflation that could result from a large influx of currency into a relatively small economy closed off from the surrounding markets."[497]

1030.   From 2014 through 2017, similar media reports alerted Defendants that protection payments aided Islamic State during its caliphate era.[498]

---

[497] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, New York Times (Nov. 29, 2015).

[498] *E.g.*, Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014) ("In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses …"), 2014 WLNR 425449; APS Diplomat Operations in Oil Diplomacy, *Ninewah Autonomy Efforts & Petroleum*

*Projects* (Mar. 3, 2014) ("Said to have an IRGC-run base in Iran near Iraq's north-eastern province of Diyala, the ISIS extorts money from business owners in Mosul, helping to fund its activities in Iraq and Syria. … The tactical alliance between the IRGC and the ISIS is one of the strange things despite the fact that the Neo-Salafi group is killing many Iraqi Shi'ite Arabs …"), 2014 WLNR 5861825; Guy Taylor, *Al-Baghdadi, A Brutal Contender For Bin Laden's Mantle, Emerges In Iraq*, Washington Times (June 13, 2014) ("Under al-Baghdadi's leadership, ISIL's strategy has involved … running 'protection rackets' … in northern Iraq. [] [T]he mafia-style tactics may bring in piles of local cash …"), 2014 WLNR 15982987; Der Spiegel Staff, *The New Face of Terror ISIS; Rise Pushes Iraq to Brink*, *reprinted in* Yerepouni Daily News (Lebanon) (June 26, 2014) ("[F]unding comes from … protection money extorted in Mosul and other Sunni cities in Iraq."), 2014 WLNR 17314098; Lee Smith and Hussain Abdul-Hussain, *On The Origin Of ISIS*, Weekly Standard (Sept. 8, 2014) ("Nor are ISIS's money-raising schemes especially novel in the Middle East. … [one of ISIS's … main source[s] … is taxation …"), 2014 WLNR 38032996; Steven Mufson, *Islamic State Fighters Drawing On Oil Assets For Funding And Fuel*, WashingtonPost.com (Sept. 16, 2014) ("Islamic State has obtained revenue by imposing tariffs, [and] exacting protection money …"), 2014 WLNR 25578145; Economist Intelligence Unit, *MENA Politics: The Pushback*, EIU ViewsWire (March 23, 2015) ("[Islamic State] is left with … extortion and taxes levied in the name of *zakat*, Islamic alms."), 2015 WLNR 8488485; Worcester Telegram & Gazette (MA), Editorial, *Our View: Time to Lead* (Dec. 6, 2015) ("ISIS has grown into the world's most dangerous terrorist organization, financed - some say $50 million per month - by [inter alia] … taxes, tolls and extortion from the people living within or entering its borders."), 2015 WLNR 36138427; Senate Armed Services Committee, Advance Questions for General Joseph L. Votel, U.S. Army Nominee for Commander, U. S. Central Command, Targeted News Service, *Gen. Votel Testifies at Hearing on Nomination to be Commander, U.S. Central Command* (Mar. 9, 2016) ("General Joseph L. Votel" "testi[fied] [that]" "Mosul will remain [Islamic State's] finance hub as [Islamic State] likely will increasingly rely on extortion and tax revenue streams ..."); CNN: Early Start, *Trump Escalates War on News Media; Clinton Returns to California to Fight Sanders; Fierce Fighting in Falluja. Aired 4:30-5a* (June 1, 2016) ("ISIS still has a $2 billion empire thanks in part to new taxes. That's according to a new report from the Center for the Analysis of Terrorism, which … says ISIS made $2.4 billion in 2015. … the main reason why is taxes."), 2016 WLNR 16677887; Pioneer, *ISIS Down, Not Out: Ways To Kill It* (July 9, 2016) ("ISIS first occupied significant stretches of territory in Iraq and Syria … It has raised its finances quite skilfully by … engaging in … extortion, [and] levying of taxes, in territories held by it."), 2016 WLNR 20848601; Patrick Wintour, *Saudi Arabia Must Do More To Prevent Secret Funding Of ISIS, MPs Say*, Guardian (July 12, 2016) ("In a report on … ISIS finances, the [U.K. Parliament] claims [ISIS] in Iraq and Syria is increasingly desperate for more money, … resorting to 'gangsterism and protection rackets' disguised as taxation."), 2016 WLNR 21120198; Vivian Salama, Associated Press, *reprinted in* Canadian Press, *As Territory Shrinks, IS Group Looks For New Money Sources* (Oct. 19, 2016) ("[Former Treasury official Daniel] Glaser said … Islamic State … generated some $30 million per month … from taxation and extortion in 2015. Hisham al-Hashimi, an expert on IS…, said [Islamic State] currently makes about $4 million per month from taxes in Mosul alone. Al-Hashimi said the group charges a 4 per cent income tax on salaries less than $600 per month, and 5 per cent on monthly salaries between $600 and $1,000."); Karen

1031.   From 2018 through 2022, similar media reports alerted Defendants that protection payments aided Islamic State during its post-caliphate global insurgency era.[499]

1032.   **Terrorism scholars** further alerted Defendants that their protection payments aided Islamic State.[500]

---

DeYoung and Philip Rucker, *Trump Summons Muslim Nations To Confront 'Islamic Terror Of All Kinds'*, WashingtonPost.com (May 21, 2017) ("Islamic State … has largely funded itself through [inter alia] extortion and taxes … in Syria and Iraq …"), 2017 WLNR 15782138.

[499] *E.g.*, Jonathan Walker, *Source Of Terror Group's Millions Uncovered In New Report By North MP; Oil, Tax, And Trade Key To Daesh*, Sunday Sun (Apr. 29, 2018) ("ISIS raised billions of pounds from [inter alia] … taxing millions of residents …  ISIS used a number of lucrative revenue streams to finance its operations across the globe …  In recent years [Islamic State] has attempted to make up for the loss of oil revenue by extracting money from the people living in the remaining territory it controls. Almost everything was taxed, including cash withdrawals, salaries, and roads. It also charged a 'protection' tax for non-Islamic residents."), 2018 WLNR 13011934; Ellen Ioanes, *Here's What's Left Of ISIS — And Why They Still Pose A Major Threat*, Business Insider (Aug. 27, 2019) ("[J]ust because ISIS no longer has a caliphate, that doesn't mean it doesn't have influence or power in the places it once controlled — and that it's not still incredibly dangerous. … In both Iraq and Syria, ISIS is making money by … [*inter alia*] extorting civilians, and skimming funds off rebuilding contracts …").

[500] Jean-Charles Brisard and Damien Martinez (Al-Qaeda Scholars), *Islamic State: The Economy-Based Terrorist Funding*, at 5 (Thomson Reuters Accelus Oct. 2014) ("Since its inception, the [Islamic State] has relied on" "criminal activity to fund its activities, targeting businessmen, local politicians and clerics, in addition to foreign nationals."), https://tinyurl.com/2d26cvxx; Professor Jimmy Gurulé, *quoted in House Financial Services Committee Hearing on "Terrorist Financing and the Islamic State"; Testimony by Jimmy Gurule, Law Professor, Notre Dame Law School*, *republished in* U.S. Congressional News (Nov. 13, 2014) ("ISIS is primarily self-funded. … illicit taxation systems are also a significant source of income for ISIS.  …The … ATA could be used against … [persons] that knowingly transfer funds … to … ISIS."), 2014 WLNR 32049937; *Foundation for Defense of Democracies Vice President, Research Jonathan Schanzer, Prepared Testimony Before the House Financial Services Committee Hearing On Task Force To Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing*, *republished in* SEC Wire (Apr. 22, 2015) ("[O]ne dominant trend we continue to observe: the intersection of terrorism and crime.  Designated terrorist groups … rather easily [] exploit[] existing businesses and levying oppressive taxes and tolls on the populations they dominate. The Islamic State, for example, extracts taxes …"); *Center For Strategic And International Studies Senior Adviser Mr. Juan C. Zarate, Prepared Testimony Before The House Financial Services Committee Hearing On Task Force TO Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing, As Released By The Committee*, *republished in* SEC Wire (Apr. 22, 2015) ("Islamic State is able to tax … the local population - raising taxes and fees as pressure mounts… This model of financing

1033.   From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements similarly that alerted Defendants that their protection payments aided Islamic State's terrorist campaign.

### 3.   Defendants Knew Islamic State's Core In Iraq And Syria Facilitated Attacks By Islamic State's Branch In Afghanistan

1034.   Defendants always knew that Islamic State, like al-Qaeda, pursued a globally interconnected campaign against the United States, and therefore that Defendants' aid to Islamic State's "core" in Iraq and Syria facilitated attacks by Islamic State's "branch" in Afghanistan.

1035.   From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that Islamic State's "core" in Iraq and Syria facilitated attacks against Americans by Islamic State's "branch" in Afghanistan and Pakistan.  Indeed, as set forth below, reports by the U.S. government, media, terrorism scholars, and international organizations alerted Defendants to at least two ways that Islamic State's "core" in Iraq and Syria aided attacks by Islamic State's "branch" in Afghanistan and Pakistan: (a) funding; and (b) fighters.

### a.   Defendants Knew Islamic State's "Core" Funded Islamic State's Branch In Afghanistan

1036.   Defendants always knew that Islamic State's "core" in Iraq and Syria funded the operations of Islamic State's "branch" in Afghanistan and Pakistan.

---

is not new. For years, al Qaida in Iraq had … extorted … to raise money …"); Peter R. Neumann, *Don't Follow The Money: The Problem With The War On Terrorist Financing*, Foreign Affairs (July 1, 2017) ("[O]nly one thing can truly revolutionize a terrorist group's finances: the seizure of territory. Until 2013, ISIS made most of its money from protection rackets, Iraq's illicit economy, and, to a much lesser extent, foreign donations. But in 2013 and 2014, the group captured vast swaths of … eastern Syria and northern Iraq. By mid-2014, when ISIS declared its caliphate, some six million to eight million people lived under its rule.  The group's finances skyrocketed … ISIS collects taxes, charges fees, and levies tariffs on trade; the group's 2014 revenues from such measures exceeded $300 million."), 2017 WLNR 22264271.

1037.   **U.S. government reports** alerted Defendants that Islamic State's "core" in Iraq and Syria funded the operations of Islamic State's "branch" in Afghanistan.[501]

1038.   Indeed, United States government reports and statements alerted Defendants that their protection payments to Islamic State in Iraq foreseeably aided Islamic State's attacks in Afghanistan.[502]

---

[501] U.S. Office of the Director of National Intelligence, *ISIL Finances: Future Scenarios*, at 17 (Aug. 1, 2016) ("ISIL will need to transfer funding to its affiliates abroad."); U.S. State Dep't, *Country Reports on Terrorism 2016* at 409 (July 2017) ("Funding and External Aid: ISIS-K receives some funding from ISIS."); U.S. State Dep't, *Country Reports on Terrorism 2017* at 305 (Sept. 2018) ("Funding and External Aid: ISIS-K receives some funding from ISIS. Additional funds come from taxes and extortion on the local population and businesses."); U.S. State Dep't, *Country Reports on Terrorism 2018* at 294 (Oct. 2019) ("Funding and External Aid: ISIS-K receives some funding from ISIS. Additional funds come from illicit criminal commerce, taxes, and extortion on the local population and businesses."); Gregory Sullivan (Audit Director, Treasury Department), *Memorandum for Department of Defense Lead Inspector General, Subject: Operation Inherent Resolve - Summary of Work Performed by the Department of the Treasury Related to Terrorist Financing, ISIS, and Anti-Money Laundering for First Quarter Fiscal Year 2021*, at 4 (Jan. 4, 2021) (ISIS continued to move funds in and out of Iraq and Syria, often relying on ISIS facilitators in Turkey and in other financial centers … [ISIS] continued to transfer funds in Iraq and Syria and internationally using money services businesses … located throughout Iraq, Syria, and Turkey."), http://tinyurl.com/erxfykay; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2021–September 30, 2021*, at 23 (Nov. 4, 2021) (ISIS continued to move funds in and out of Iraq and Syria, often relying on ISIS facilitators in Turkey and in other financial centers … [ISIS] continued to transfer funds in Iraq and Syria and internationally using money services businesses … located throughout Iraq, Syria, and Turkey.").

[502] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015) ("GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [Islamic State] requires significant funding. … ISIL [] operates sophisticated extortion rackets throughout Iraq and Syria, including extracting payments for the use of public highways … Through these schemes, ISIL can receive upwards of several million dollars a month of revenue."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2016–September 30, 2016*, at 44 (Nov. 4, 2016) ("To make up the funding gap, ISIL has increasingly resorted to … arbitrary tax increases, which now serve as ISIL's primary source of income. Outside of Iraq and Syria, ISIL continued to operate in concert with local extremist Sunni groups. … In Afghanistan, ISIL elements are active in eastern provinces."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018) ("ISIS continued to generate income from extortion[] [and] taxation, … Arms dealers and

1039.   **Media reports** alerted Defendants that that Islamic State's "core" relied upon

protection money income in Iraq and Syria to fund Islamic State's "branch" operations in

Afghanistan.[503]

---

other middlemen who engaged in transactions with the group told reporters that the group had
transferred as much as $400 million out of Iraq …"); Lead Inspector General for Overseas
Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July
1, 2018–September 30, 2018*, at 45-46, 3 (Nov. 5, 2018) ("ISIS remained able to generate
revenue from [inter alia] … extortion and taxes … and external donations. It also continued to
draw on cash reserves. Overall, … a 'reduced, covert version' of ISIS will survive in Iraq and
Syria and will maintain a presence in neighboring countries and affiliates in multiple countries,
including Afghanistan … [A]t least some of ISIS's bureaucratic structures remained intact, and
ISIS continued to derive revenue from … extortion, and cash reserves."); U.S. Dep't of State,
*Country Reports on Terrorism 2018* at 292 (Oct. 2019) ("ISIS received most of its funding from
a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion
… ISIS continues to generate revenue from criminal activities and provides financial support to
its network of global branches …"); U.S. Dep't of State, *Country Reports on Terrorism 2020* at
275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria
… include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as
hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. …
ISIS continues to generate revenue from criminal activities through its many clandestine
networks in Iraq and Syria and provides significant financial support and guidance to its network
of global branches …").
[503] Pamela Engel, *A Top US General Picked Apart Donald Trump's ISIS Policy*, Business Insider
(Aug. 13, 2015); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021)
("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing]
extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of
millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues
to generate revenue from criminal activities through its many clandestine networks in Iraq and
Syria and provides significant financial support and guidance to its network of global branches
…"); Tom Brooks-Pollock, *Paris Attacks: Where Does ISIS Get Its Money And Weapons From?
Where Does ISIS Get Its Money, Guns And Bombs, Both In Europe And In The Middle East?*,
Independent Online (Nov. 19, 2015) ("Where does ISIS get its money, guns and bombs, both in
Europe and in the Middle East? … To a large extent ISIS is now funding itself – through …
[*inter alia*] extortion, [and] taxes …"), 2015 WLNR 34405923; Julianne Geiger, *Is ISIS Back?*,
SyndiGate, *reprinted in* Yerepouni Daily News (Oct. 21, 2019) ("Through its extortion …
'subsidiar[y]', ISIS threatened commercial enterprises primarily in eastern Syria and western
Iraq in sophisticated protection rackets. … ISIS … 'taxes' netted ISIS around $800 million
annually … Taxes included everything from 'welfare' and 'salary' taxes to road taxes, customs
taxes for trucks entering Iraq at Syrian checkpoints; non-Muslim protection taxes, and a long list
of others. The thing is, ISIS doesn't rely on territory for its economic survival today. It's raised
enough to invest and stash away. … In part, that's because its surviving leadership may have

1040.   **Terrorism scholars** alerted Defendants that funds paid to Islamic State's "core" in Iraq and Syria foreseeably aided the operations of Islamic State's "branch" in Afghanistan and Pakistan. In 2018, for example, terrorism scholar Katherine Bauer reported that "[t]he Islamic State's recognition of franchises in eight countries across the Middle East [including Afghanistan] … in November 2014, raised concerns that … [Islamic State] core in Syria and Iraq would share both its wealth and its fundraising expertise with its new affiliates."[504]

1041.   From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that payments to Islamic State's "core" foreseeably financed Islamic State's "branch" in Afghanistan and Pakistan.

### b.   Defendants Knew Fighters from Islamic State's "Core" Served Islamic State's Branch In Afghanistan

1042.   Defendants always knew that Islamic State "core" fighters also regularly redeployed to Islamic State's "branch" in Afghanistan and Pakistan, which Islamic State "core" established with its fighters in the first instance and used as a safe haven for its fighters thereafter, who, like their al-Qaeda cousins, melted into existing Islamic State cells.

---

smuggled as much as $400 million in cash and gold out of Iraq and Syria. [ISIS]'s extended network will seek to launder this money through front companies in the region … Since the defeat, [ISIS] is raising money through … extortion …"), 2019 WLNR 31720287; Sanjeev Sharma, *Zakat Payments Being Redirected Towards ISIL Affiliates*, Indo-Asian News Service (Feb. 8, 2022) ("Global affiliates of ISIL … raise funds through a variety of methods, including extortion, [and] illicit taxation … ISIL leadership exerts sufficient operational control over its reserves to allow the transfer of significant sums to certain affiliates abroad. … ISIL-K has received in the low hundreds of thousands of dollars from [] ISIL core … ISIL core is assessed to have allocated in excess of $500,000 for the support of ISIL-K.").
[504] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance*, at 3 (Sept. 7, 2018), http://tinyurl.com/mter35be.

1043.  **U.S. government reports and statements** alerted Defendants that Islamic State "core" fighters also regularly redeployed to Islamic State's "branch" in Afghanistan.[505]

1044.  From 2014 through 2022, Defendants were alerted that their Islamic State's "core" deployed fighters from Iraq and Syria to Islamic State's "branch" in Afghanistan and Pakistan by other reports regularly published by the U.S. government and media.

## VII.  DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL

### A.  Defendants Provided Support Tailored To The Violence At Issue Here

1045.  Defendants' aid was tailored to the specific violence at issue: Defendants provided U.S. dollars which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State required to finance their terrorist campaigns in Iraq, Afghanistan, Syria, and Turkey.

1046.  Money supplied the lifeblood of the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq and Islamic State.  Financing gave these FTOs the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Americans; and to maintain the vast operational infrastructure needed to sustain the global campaign, including their key regional branches, in Iraq, Afghanistan, Syria, and Turkey.[506] As Representative Ted

---

[505] *E.g.*, U.S. State Dep't, *Country Reports on Terrorism 2017* at 8 (Sept. 2018) ("ISIS … and [its] affiliates have … adjusted to heightened counterterrorism pressure in Iraq, Syria, Afghanistan, Libya, Somalia, Yemen, and elsewhere. … [T]he return or relocation of foreign terrorist fighters from the battlefield has contributed to a growing cadre of experienced, sophisticated, and connected terrorist networks, which can plan and execute terrorist attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2018–September 30, 2018*, at 46 (Nov. 5, 2018) ("DoD and the United Nations expressed concern about the presence of foreign ISIS fighters in Syria. … Many fighters, it said, have melted into the local population, while others remain in hiding in neighboring countries. … [M]any fighters had made their way to Afghanistan."); U.S. State Dep't, *Country Reports on Terrorism 2018* at 161-62 (Oct. 2019) ("Countries in Central Asia remained concerned about the potential spillover of terrorism from Afghanistan, as well as the potential threat posed by the return of individuals from Central Asia who traveled to Iraq or Syria to fight with terrorist groups, including ISIS.").

[506] Given Islamic State's assumption of al-Qaeda-in-Iraq's protection money operation, including AQI's tactics techniques, and procedures, the points in this section apply equally to ISIS.

Poe, Chair of the U.S. House of Representatives Subcommittee on Terrorism, stated in 2015, "[t]ime and time again we are reminded of the massive damage that terrorists cause even with just a little money" – "precisely why our government" has "been tasked with stemming the flow of money to terrorist groups."  Simply put, according to Congressman Poe, "[w]hen we can separate the terrorists from their money, lives can be saved." Defendants did the opposite.

1047.   Ericsson's conduct aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprises.  The very nature of the protection-money demands – backed by violent threats conveyed by the same al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were waging a vicious campaign against the United States in Iraq and Afghanistan – ensured a close connection between the payments and subsequent al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks on Americans.  Such attacks were a foreseeable, if not necessary, consequence of Defendants' payments.  When Defendants paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection money, they were not lessening the overall risk of terrorist violence; they were paying al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to redirect their attacks to other targets.  One prevailing slogan among private-security contractors in Afghanistan captured the mentality that prevailed in Iraq:  contractors often said, "you want them to fight Big Army [*i.e.*, the U.S. Army] before they fight you."  Defendants' payments accomplished exactly that.  They paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to attack Coalition forces rather than Defendants' own businesses.

1048.   Defendants' protection payments supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with an important stream of revenue that was used to finance and facilitate those FTOs' terrorist attacks against Americans in Iraq, Afghanistan, Syria, and Turkey. Defendants' protection payments, which created an income stream overseen directly by leadership of each

group, gave al-Qaeda, al-Qaeda-in-Iraq, and Islamic State fungible resources that were vital to their ability to sustain al-Qaeda's and Islamic State's respective terrorist enterprises.  For that reason, the Commission on Wartime Contracting observed that, "[i]n Iraq and Afghanistan, significant … issues include[d]" "diversion of contract funding to the insurgency" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects" "as a cost of doing business" at "a significant percentage of a project's cost[,]" which caused "U.S. funds" "[i]n Iraq and Afghanistan" to be "diverted to insurgents" and "directly strengthen[ed] the insurgency" such that Defendants caused "a disproportionate adverse impact on the U.S. effort" to combat terrorism in both countries.

1049.   Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State institutionalized control of their protection money revenue.  The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State promulgated rules and regulations dictating to local field commanders how to collect (and spend) protection money from foreign businesses. The money flowed both ways – from local commanders up to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's respective financial commissions for use by such FTOs' central leadership, and conversely from the leadership back down to local commanders for use in the field in Iraq, Afghanistan, Syria, and Turkey. That discipline allowed protection money collected from all over Iraq and Syria to finance al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist machine in Iraq, Syria, and Afghanistan.

1050.   Defendants' protection payments similarly financed the Haqqani Network. Defendants' payments to al-Qaeda aided the Haqqani Network because al-Qaeda was a key

Haqqani Network financier and specifically funded Haqqani Network suicide and IED operations, among others.

1051.   Protection payments supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with the means to buy weapons and explosives for use in terrorist attacks.  Weapons capable of killing and injuring Americans cost money, and Defendants' protection payments provided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and the Haqqani Network (through al-Qaeda), with a potent and reliable source of funding to cover the cost of their globalized terrorist campaigns targeting the United States in Iraq, Afghanistan, Syria, and Turkey.

1052.   Protection money payments, like those made by Defendants, delivered the budget surplus to al-Qaeda-in-Iraq, and later Islamic State "core," that was the direct, but-for cause of (a) al-Qaeda-in-Iraq's substantial financial transfers to al-Qaeda's "core" in Afghanistan and Pakistan from 2004 through 2014, and Islamic State core's transfers to Islamic State's branches in Afghanistan and Pakistan from 2014 through 2022; and (b) al-Qaeda's and al-Qaeda-in-Iraq's ability to consistently attract the best terrorist "talent" from 2004 through 2014, and Islamic State's similar recruitment ability from 2014 through 2022.

1053.   With respect to finance, the sheer volume of Defendants' protection payments allowed al-Qaeda and al-Qaeda-in-Iraq to generate large budget surpluses that funded al-Qaeda and al-Qaeda-in-Iraq attacks from 2004 through at least 2016, and allowed Islamic State "core" in Iraq and Syria to generate large budget surpluses that funded Islamic State's operations during its caliphate era (2014-2017) and during its post-caliphate, global insurgency era (2018-2022). Among other things, such surpluses gave al-Qaeda, al-Qaeda-in-Iraq, and Islamic State vital "rainy day" money that funded attacks well after Defendants' payments, which such FTOs used to fund their operations and strategic redeployments, such as when al-Qaeda-in-Iraq personnel

transferred to Afghanistan from 2006 through 2014, or when Islamic State's core created and operated Islamic State's branch in Afghanistan and Pakistan from 2016 through 2022.

1054.   With respect to talent, al-Qaeda-in-Iraq (and later, Islamic State) leveraged budget power to outspend rival Sunni insurgents as al-Qaeda-in-Iraq consolidated its grip on the entire Sunni insurgency in Iraq (which tactic Islamic State replicated a decade later).  Al-Qaeda-in-Iraq generally paid its rank-and-file members around $40-$50 per month (in the 2000s) and $100 per month (in the 2010s, as did Islamic State) and paid its mid-level fighters – the center of gravity for al-Qaeda's terrorist campaign in Iraq – around $200-$400 per month (as did Islamic State). Al-Qaeda-in-Iraq's and Islamic State's respective budget surpluses due to their protection money riches, however, allowed al-Qaeda-in-Iraq and ISIS commanders to win the struggle for terrorist talent by outspending all challengers and going up to $1,000 per month per fighter; the next-closest Sunni insurgent group, in contrast, could not afford to spend more than $250.  To put that in context, Iraq's soldiers and police were paid about $150 a month.

1055.   Al-Qaeda-in-Iraq's and Islamic State's budget surpluses also funded bonuses that incentivized attacks against Americans in Iraq including rewards of:  $10 per day for spies who supported attacks with intelligence; $100 to $200 for a successful IED attack; $500 to $700 for destroying an American vehicle; and $7,000 for shooting down a helicopter.

1056.   The effect of protection payments was especially pronounced because they enabled al-Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders to pay recruits who fought against the Coalition in Iraq and Afghanistan for financial (rather than ideological) reasons.  Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders typically operated on thin margins and faced constant pressure to raise enough money both to pay fighters and to launch attacks. Protection money was essential to fulfilling both needs.  Had Defendants refused to pay and cut

off that source of revenue, it would have forced al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commanders to, as one U.S. official put it, "deci[de] between paying and feeding [their] troops and launching attacks." Defendants' payments freed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commanders from that choice and enabled them to retain their fighters while continuing with well-funded attacks on Coalition forces in Iraq and Afghanistan.

1057.   This financial link applied to protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in all their types.  Due to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's fundraising apparatus, cash payments to local commanders (or the FTO's Financial Commission) flowed to the FTO's leadership for use wherever the terrorists decided to focus their resources.

1058.   Protection payments by Western multinational corporations like Ericsson supplied one of the most quantitatively significant sources of terrorist finance for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For each FTO, protection payments were always one of the top two fundraising tactics, and for most of al-Qaeda-in-Iraq's and Islamic State's existence, protection money ranked number one. The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.

1059.   Protection payments also strengthened al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by allowing such FTOs to diversify their income.  For designated terrorist groups subject to crippling international sanctions, diversification was critical because it offered al-Qaeda, al-Qaeda-in-Iraq, and Islamic State a degree of financial resiliency that made each less susceptible to American counterterrorism efforts.  That is why, as the U.S. military began to successfully interdict al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's other revenue sources (such as oil smuggling), al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied increasingly on their burgeoning protection rackets.  That stream of protection money – particularly from larger, well-

financed corporations, including Corporate Defendants – supplied reliable funding for the FTOs and, almost as importantly, offered insurance against the risk of other funding sources drying up on a moment's notice.

1060.   Protection payments from Western companies, including Corporate Defendants, were also qualitatively material to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprise because of their unique link to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's leadership.  Unlike funding from other sources (such as smaller businesses) that were more often spent locally, Corporate Defendants' protection payments generally flowed up al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's organizational chain – or were made directly to top-level al-Qaeda, al-Qaeda-in-Iraq, or ISIS institutions – and supplied fungible U.S. dollars that leadership could use wherever it saw fit.  In addition, the payments often conferred intelligence benefits to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by providing details about U.S. government, military, and contractor operations in the area.  Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's high-level commanders then used the money and intelligence supplied by Defendants to finance their campaign against the United States in Iraq, Afghanistan, Syria, and Turkey.

1061.   Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's top-down organizational hierarchy ensured that protection money collected locally in one province or country helped to finance al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operations throughout the country or in other key theaters – including areas miles away from the site of the payment.  That was a core reason why al-Qaeda, al-Qaeda-in-Iraq, and Islamic State moved to institutionalize the collection of protection money from large firms, including Corporate Defendants; rather than have commanders spend their protection money locally, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directed the funds into the group's central coffers for use on a nationwide, or even global scale.

Accordingly, Defendants' payments did not merely fund attacks in the immediate areas of their projects; al-Qaeda's, al-Qaeda-in-Iraq's, and ISIS's process for redistributing those payments made sure that they financed terrorism throughout Iraq, Afghanistan, Syria, and Turkey.

**B.      The Amount Of Protection Money, Fraudulent Concealment Of Defendants' Relationship With Terrorists, And Obstruction Of United States Counterterrorism Operations, Were All Significant**

1062.   As explained above, money is the lifeblood of terrorism—especially for al-Qaeda and its progeny, al-Qaeda-in-Iraq and Islamic State. And as the United States explained in a criminal case targeting a member of al-Qaeda's Syndicate in Afghanistan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."

1063.   Each year from 2004 through at least 2014, Ericsson caused at least several million U.S. dollars in terrorist finance to flow to al-Qaeda (which funded al-Qaeda's and the Haqqani Network's attacks, and also funded al-Qaeda's aid to al-Qaeda-in-Iraq), and at least several million U.S. dollars in terrorist finance to flow to al-Qaeda-in-Iraq (which funded al-Qaeda-in-Iraq's attacks and its aid to al-Qaeda and the Haqqani Network).  From 2014 through at least 2019, Ericsson caused at least several million dollars in terrorist finance to flow to Islamic State (which funded Islamic State's attacks).

1064.   From 2004 through 2022, Defendants' protection payments likely served as one of the largest funding sources for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

1065.   Although al-Qaeda, al-Qaeda-in-Iraq, and Islamic State needed a large amount of money to sustain their terrorist campaign as a whole, each individual attack required less. Although estimates vary, each group often paid many of its rank-and-file fighters $40-$50 per month (during the 2000s) and about $100 per month (during the 2010s), while mid-level

commanders were paid between $200-$400 per month. As for many of the signature al-Qaeda-inspired IED types (used by all three FTOs), they usually cost a mere $100 to make.

1066.   At those rates, even a single protection payment of $2,000 to al-Qaeda, al-Qaeda-in-Iraq, or Islamic State could finance substantial terrorist violence: in Afghanistan, Iraq, and Syria. A $2,000 payment made in 2007 to al-Qaeda or al-Qaeda-in-Iraq could put twenty terrorists (at $50 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs.[507] Even in the late 2010s, after rank-and-file salaries doubled to $100, a $2,000 payment made in 2017 to Islamic State could put ten terrorists (at $100 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs. Or the terrorists could spend their $2,000 to purchase large quantities of bomb components.  For example, $2,000 could purchase roughly 60 bags of calcium ammonium nitrate ("CAN") fertilizer, which terrorist bombmakers could convert into enough explosive material for approximately 260 large CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat an American armored vehicle) or 650 smaller CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat American body armor). Defendants regularly facilitated protection payments that were many orders of magnitude higher. Those payments materially strengthened the ability of al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to finance the attacks that killed and injured Plaintiffs and their loved ones.

1067.   U.S. government studies confirm the dramatic impact that even marginal financial contributions produced for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  For example, one 2010 study by DOD concluded that there was a statistically significant relationship between al-

---

[507] In Iraq, Afghanistan, Syria, and Turkey, the costs per fighter, rifle, IED, and suicide bomb were substantially similar.

Qaeda-in-Iraq terrorist finance, on the one hand, and successful AQI attacks against targets in Iraq, on the other, concluding that each successful attack in Iraq required an approximately $2,700 expenditure from al-Qaeda-in-Iraq. Indeed, this $2,700 figure was conservative, as another methodology projected a cost of approximately $1,200 per attack. The same study concluded that even marginal reductions in al-Qaeda-in-Iraq's terrorist funds corresponded with a statistically significant reduction in AQI's successful terrorist attacks.

1068.   Al-Qaeda generally agreed.  In 2010, for example, al-Qaeda publicly boasted in an English language publication that, by al-Qaeda's own accounting, a complex transnational al-Qaeda bomb attack against U.S. targets could be funded for as little as one "$4,200" payment.

1069.   Ericsson's successful and purposeful concealment of their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through February 15, 2022, was also significant—not only with respect to its duration, but also in terms of the amount of effort required to avoid detection or discovery of those illegal payments and the benefit realized by those FTOs from the lack of governmental detection (most notably, by the U.S.) of Defendants' illegal payments and other value transfers to terrorists.

## C.   Defendants Had Culpable Mental States

1070.   Defendants had highly culpable mental states because LM Ericsson, Ericsson AB, and Ericsson Inc. occupied sophisticated positions as, respectively, one of the world's largest, most well-connected companies, that company's primary operating company in Iraq and Afghanistan, and its U.S. subsidiary, and knew full well that their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would aid anti-American terrorism. Indeed, according to leaked Ericsson documents, Ericsson knew that merely doing business in Iraq "may in itself pose significant political, financial and legal risks and requires diligent controls." Thus, Ericsson's decision to pay al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was highly culpable.

416

1071.   Defendants' robust culpability is also demonstrated by LM Ericsson's pattern and practice of rewarding its in-house terrorist financiers while retaliating against whistleblowers. After they approved aiding Islamic State, for example, LM Ericsson named Ms. Ibrahim a senior vice president in 2017, and she became an advisor to its CEO, Defendant Ekholm, in 2019.  Mr. Moubarak, for his part, was promoted to Iraq country manager in 2019.  On information and belief, both remain employed by LM Ericsson to this day.  In contrast, Ericsson fired whistleblower Roger Antoun in 2019.  Such disparate treatment between involved employees also demonstrated Defendants' intent to seek profit rather than prevent terrorist finance or even follow basic compliance norms.

1072.   Defendants' behavior was especially culpable because a substantial portion of the payments – i.e., those from 2013 through on or about at least December 2019 – occurred while LM Ericsson was in active discussions with the U.S. government (first SEC, and later DOJ as well) in which Ericsson pledged good corporate citizenship, cooperation, and respect for anti-corruption while simultaneously scheming to route protection payments to al-Qaeda and al-Qaeda-in-Iraq (from 2013 through February 2014) and Islamic State (from February 2014 until LM Ericsson's DPA in December 2019).

1073.   Indeed, LM Ericsson has a longstanding history of directly lying about its bribery schemes when confronted, only admitting the truth after all its avenues of escape are closed.  A 2016 exchange that occurred in one of Sweden's leading newspapers, *Dagens Nyheter*, offers but one example of this longstanding Ericsson tactic:

> Former executives with … Ericsson say the firm shelled out tens of millions of dollars in bribes between 1998 and 2001, [] Swedish media reported … A former executive … handed the [SEC] documents relating to the alleged kickbacks, *Dagens Nyheter* daily and Swedish public radio SR said. "Enormous sums were sent via Zurich from the company headquarters in Sweden to secret recipients around the world," *Dagens Nyheter* said … The newspaper said the biggest bribes

<div align="center">417</div>

included 1.4 billion kronor (140 million euros, $150 million), sent to bank accounts in Malaysia, and 763 million kronor sent to Poland, via the British offshore banking haven of Jersey. … Denying any wrongdoing, Ericsson said the radio documentary reported on a period when the company used commercial agents to a greater extent 15-20 years ago. "Ericsson has, just like many other companies that are active in the international market, used commercial agents," the spokeswoman told AFP. "This work approach can be attractive as it can be more cost effective than building a large local sales organisation," she said, adding that the group only has "a few agency agreements left" in countries where it's a requirement. …. Quoted by Dagens Nyheter, [Ericsson] said Wednesday it never found "any evidence that bribes were allegedly paid."[508]

As demonstrated by LM Ericsson's subsequent guilty plea, LM Ericsson's response to *Dagens Nyheter*, as reported above, was replete with lies: Ericsson denied that it operated a global corruption scheme (a lie); Ericsson implied that it no longer relied upon consultants who served as cutouts to route bribes (another lie); and Ericsson implied that its reason for using consultants as buffers in high-risk jurisdictions was to "be more cost effective" (a material omission because, while bribery was more cost effective than honest sales, it remained illegal).

1074.   LM Ericsson and Ericsson AB were also culpable because they were anti-corruption recidivists.

**D.    Defendants Had A Close Relationship To The Tortfeasors**

1075.   Each Defendant had close relationships to the relevant tortfeasors. LM Ericsson and Ericsson AB, through their own personnel and their Iraqi partners, consultants, and contractors, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Ericsson Inc., through LM Ericsson and Ericsson AB, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

1076.   LM Ericsson, Ericsson AB, and Ericsson Inc. also structured their transactions with knowledge of the closeness of their relationship to the tortfeasor. Defendants' attempts to

---

[508] Ilgin Karlidag, *Ex-Ericsson Executives Tell Of Massive Bribery: Report*, Agence France Presse English Wire (Nov. 23, 2016).

interpose intermediaries between themselves and the al-Qaeda, al-Qaeda-in-Iraq, and Islamic

State operatives to whom Defendants' protection money was ultimately paid only highlights the

closeness of Defendants' relationship to the tortfeasors.

### E.    The Duration Of Support Was Long

1077.   Defendants facilitated the flow of protection payments to al-Qaeda and its

progeny for at least fifteen years. Ericsson aided al-Qaeda and al-Qaeda-in-Iraq from at least

2004 through at least 2015. Ericsson aided Islamic State from at least 2014 through at least 2019.

Indeed, even Ekholm candidly admitted to the *Financial Times*, "I don't think the bad conduct

[in Iraq] changed on January 16, 2017."

1078.   Defendants also obstructed U.S. counterterrorism policy for nearly a decade.

From at least 2014 through 2022, Ericsson actively lied to the U.S. government in a manner

calculated to impede American counterterrorism efforts by concealing the details of the

protection racket in which they participated, the payments they had made, and the associated

logistics – all of which was actionable information of the sort upon which American

counterterrorism strategy depended.

### VIII.   ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ USED DEFENDANTS' ASSISTANCE TO COMMIT ACTS OF INTERNATIONAL TERRORISM THAT KILLED AND INJURED PLAINTIFFS IN IRAQ, SYRIA, TURKEY, AND AFGHANISTAN

### A.    Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In Iraq, Syria, Turkey, And Afghanistan From At Least 2014 Through At Least 2021

1079.   Islamic State committed, planned, and authorized the attacks in Iraq, Syria, Turkey,

and Afghanistan that killed or injured Plaintiffs and their loved ones there from at least 2014

through at least 2021.

1080.   The U.S. government issued one or more reports to Congress that concluded that Islamic State executed each of the attacks against Plaintiffs herein.

**B.     Al-Qaeda Polyterrorists Facilitated Al-Qaeda's Acts Of International Terrorism In Iraq, Afghanistan, Pakistan, Syria, and Turkey And Helped Commit The Acts Of International Terrorism That Injured Plaintiffs**

1081.   Al-Qaeda relied heavily upon multi-hatted terrorists – known as **"polyterrorists"** to accomplish each of the four modalities of circular value transfer between Iraq/Syria and Afghanistan/Pakistan – funds, personnel, training, and logistics, *see supra* III.A.6.

1082.   For al-Qaeda, al-Qaeda-in-Iraq, and the Taliban, polyterrorists who served as members of more than one terrorist organization – *e.g.*, a terrorist who served in both al-Qaeda and the Taliban's Haqqani Network – typically played transnational roles and fueled the interconnections between al-Qaeda's core in Afghanistan and Pakistan and al-Qaeda's branches, al-Qaeda-in-Iraq and its Syrian alias, Jabhat al-Nusra.

1083.   As another manifestation of its multinational corporate-inspired approach to terror, al-Qaeda core routinely shared polyterrorist finance facilitators and logistics specialists, ratlines,[509] as well as safe houses, with operatives from its branches in Iraq, Syria, and Afghanistan, including al-Qaeda-in-Iraq (in Iraq, Syria, Afghanistan, and Pakistan), Jabhat al-Nusra (in Syria), and with the Taliban, including its Haqqani Network (in Afghanistan, Pakistan, the U.A.E., Iraq, and Syria).

---

[509] A "ratline" is comprised of the combination of a vetted and safe covert transport route between two key terrorist geographies (e.g., a route that permits terrorists to move people between Afghanistan and Iraq), safehouses throughout such route, and facilitators who enable the flow of personnel, goods, and communications throughout such route.  It is a universal truth for every FTO that such FTOs' "ratlines" serve as an enormously valuable asset to the FTO, analogous in some respects (in value terms) to the value a company derives from its vital, hard-to-replicate trade secrets.  As such, the sharing of ratlines between FTOs represented an enormously important, and valuable, form of value transfer between FTOs, including value transfer between al-Qaeda and al-Qaeda-in-Iraq.

1084.   Al-Qaeda's and its branches' reliance on polyterrorists after 9/11 was another reflection of al-Qaeda's franchise-approach to terrorism.  At all times, al-Qaeda's and its branches' terrorist enterprise benefited from al-Qaeda operatives who were polyterrorists.  By design, Pakistan-based al-Qaeda operatives were often members of other al-Qaeda branches, most commonly, al-Qaeda-in-Iraq (in Iraq and Syria) or al-Qaeda affiliates like the Haqqani Network and Lashkar-e-Taiba (in Afghanistan and Pakistan).  Typically, al-Qaeda's and its affiliates' polyterrorist operatives or agents served al-Qaeda's transnational terrorist activities in support of attacks against Americans in Afghanistan, Iraq, Syria, and other al-Qaeda-targeted areas.  Some examples of al-Qaeda's most important polyterrorists include the following.

### 1.   Abu Musab al-Zarqawi

1085.   Abu Musab al-Zarqawi was a Jordanian national and a known senior member of al-Qaeda since the 1990s who founded and originally led al-Qaeda-in-Iraq. Until his death, Zarqawi was a notorious anti-American terrorist who, among other things, was known to have personally decapitated at least one American hostage in Iraq on camera.

1086.   Zarqawi was an al-Qaeda polyterrorist who served as a member of, among other groups, al-Qaeda and al-Qaeda-in-Iraq. Introduced to bin Laden in 1998, Zarqawi rose quickly through the ranks.  By 2000, Zarqawi had established himself as al-Qaeda's most indispensable terrorist operator and was a critical al-Qaeda leader in Afghanistan.  In 2001, Zarqawi took the oath of allegiance to al-Qaeda and to Osama bin Laden personally.  Written by bin Laden himself, Zarqawi declared: "I recall the commitment to God, in order to listen to and obey my superiors, who are accomplishing this task with energy, difficulty, and giving of self, and in order that God may protect us so God's words are the highest and his religion victorious." Zarqawi adhered to this oath until his death in 2006.

1087.   By the summer of 2001, Zarqawi was a well-known senior al-Qaeda operative, and was equally well-versed in every aspect of the al-Qaeda terrorist playbook that he later imported into Iraq.  Indeed, he was so well-established that a 30-page guide to al-Qaeda in Afghanistan for new recruits specifically identified Zarqawi as one of the al-Qaeda leaders there who could be contacted by recruits for aid regarding religious, logistical, or lodging needs.

1088.   Less than a year after joining al-Qaeda, Zarqawi had so demonstrated his terrorist talent and trustworthiness that he was permitted to establish, with al-Qaeda's financial and logistical support, his own al-Qaeda training camp near the border with Iran in Herat, Afghanistan.  After he set up al-Qaeda's camp in Herat, Zarqawi regularly traveled between Herat and Kabul on behalf of al-Qaeda.  Herat was known then (and now) as a key site of terrorist activity, as the hub that opens the way to Iraqi Kurdistan through Iran.  Zarqawi frequently travelled via Iran between Herat, Afghanistan and Iraqi Kurdistan to secure al-Qaeda's survival after 9/11.  Bin Laden correctly anticipated that the United States would expel al-Qaeda and its Taliban protectors from Afghanistan after 9/11 and planned for a "progressive redeployment" of al-Qaeda to two locations: Pakistan (where bin Laden and Zawahiri planned to regroup) and Iraqi Kurdistan (where bin Laden contemplated Zarqawi would regroup).

1089.   During the U.S. invasion of Afghanistan in the months after 9/11, it became apparent to al-Qaeda that it needed to strategically redeploy to Pakistan, Iran, and Iraq.  Al-Qaeda instructed Zarqawi to flee Afghanistan through Iran into Iraq to set up al-Qaeda-in-Iraq. Zarqawi did so in early 2002 once he eluded capture by American forces and obtained urgent medical care in an escape that was organized by Iran. Soon after, at the direction of al-Qaeda core and with the aid of IRGC leader Qassem Soleimani, Zarqawi founded what became al-Qaeda-in-Iraq.

1090.   By the onset of the U.S. presence in Iraq in 2003, Zarqawi turned al-Qaeda-in-Iraq into the primary Sunni terrorist threat against Americans there by working with al-Qaeda to mobilize the coalition of anti-American Sunni terrorists in Iraq under al-Qaeda's banner – carried in Iraq by al-Qaeda-in-Iraq – and conducting a series of mass-casualty strikes against prominent U.S. and international targets in Iraq in 2003.

1091.   On September 24, 2003, the United States and United Nations both designated Zarqawi as a terrorist based upon his relationship with al-Qaeda.  Both designations recognized Zarqawi's al-Qaeda membership, the global nature of Zarqawi's network, and the key terrorist threat that Zarqawi and al-Qaeda posed to Americans in Iraq.  Among other things, the Treasury Department determined that Zarqawi and his al-Qaeda-affiliated terrorists "[m]aintain[ed] contacts throughout Europe, the Middle-East, and Western Asia - in Pakistan, Iran, Yemen, Iraq, Malaysia, Afghanistan" and "acted for or on behalf of Al-Qaeda."

1092.   Until his death in 2006, Zarqawi and the al-Qaeda terrorists he led in Iraq targeted Americans.  According to Zarqawi, "[t]he Americans" were al-Qaeda's first "enemy" because they "are the most cowardly of God's creatures" and "are an easy quarry, praise be to God. We ask God to enable us to kill and capture them to sow panic among those behind them …."

1093.   On June 7, 2006, Zarqawi was killed in an American military strike.  In his comments thereafter, President Bush stated that Zarqawi's death was "a severe blow to al Qaeda, and … a significant victory in the war on terror."

### 2.   Sulayman Khalid Darwish

1094.   At all relevant times, Sulayman Khalid Darwish was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Darwish provided financial and material support to both as a key al-Qaeda and al-Qaeda-in-Iraq fundraiser and recruiter.

1095.   On January 25, 2005, the United States designated Darwish as a Specially
Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly
stated, among other things, that Darwish: enabled "cash flows to the Iraqi insurgency and al
Qaida"; "was designated … for providing financial and material support to the al-Zarqawi
Network and al Qaida"; was a " terrorist financier" who "support[ed] Zarqawi, who has launched
violent acts against [U.S.] troops"; was part of "the financial backbone of the Iraqi insurgency
and al Qaida"; was "a member of the Advisory (Shura) Council of the Zarqawi organization and
served as one of Zarqawi's operatives"; was "involved in fundraising and recruiting for the
organization"; was "a close associate of Zarqawi and one of the most prominent members of the
Zarqawi Network in Syria"; "received training on Zarqawi's orders in the following areas:
weapons, topography, artillery training, electronics training, explosives production and the use of
explosives" "[w]hile in Afghanistan"; "received training in Afghanistan, Iran, Turkey and
Lebanon in document forging and is considered an expert in preparing forged documents for the
Zarqawi Network"; "handle[d] mostly financial issues for Zarqawi, collecting, and distributing
funds for him" including "donations of $10,000-$12,000 to Zarqawi in Iraq every 20-25 days";
and "was essential to recruiting and dispatching terrorist operatives … for operations [],
particularly [in] Iraq. For example, Darwish contacted jihadists who had been in Afghanistan and
who were, by 2004, scattered in different countries; he recruited among these jihadists for
fighters to join Zarqawi in Iraq."

1096.   On January 25, 2005, the United Nations followed the U.S. lead and designated
Darwish pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime.

1097.   On October 26, 2008, Darwish was killed by a U.S. military strike in Syria.

### 3.    Muhsin al-Fadhli

1098.   From the early 2000s until his death in 2015, Muhsin al-Fadhli was a veteran al-Qaeda polyterrorist who served as a member of al-Qaeda and al-Qaeda-in-Iraq. In that polyterrorist role, Fadhli served as a key Persian Gulf-based leader for al-Qaeda and al-Qaeda-in-Iraq and a major facilitator for Zarqawi personally. Fadhli supported Iraq-based al-Qaeda and al-Qaeda-in-Iraq operatives to facilitate attacks against U.S. forces. Fadhli also served as one of al-Qaeda's and al-Qaeda-in-Iraq's Iran-based facilitators and helped enable the free flow of al-Qaeda operatives, funds, and material between Afghanistan, Pakistan, Iran, Iraq, and Syria.

1099.   On February 15, 2005, the United States designated Fadhli as a Specially Designated Global Terrorist based on Fadhli's service as an operative for al-Qaeda and al-Qaeda-in-Iraq.[510]  Announcing the designation, the Treasury Department publicly stated, among other things, that Fadhli "was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network and al Qaida" because, among other things, Fadhli was "helping to finance the Iraqi insurgency, as well as al Qaida," provided "financial ties" that "the al-Zarqawi Network depend[ed] on to perpetrate acts of horror and violence," was "an al Qaida leader in the Gulf countries," "fought alongside the Taliban and al Qaida in Afghanistan where he served as a bodyguard and second-in-command for an al Qaida leader," "fought against Russian forces in Chechnya, where he trained in the use of firearms, antiaircraft guns and explosives," was among the select few al-Qaeda operatives who "in early September, 2001, … received forewarning that U.S. interests would be struck," and his "support for terrorism extend[ed] to Iraq where he … provid[ed] support to fighters against U.S. … forces

and [was] considered a major facilitator connected to the brutal terrorist, Abu Musab al-Zarqawi," including "solidify[ing] the support of key financial backers sponsoring attacks," through "tapes … showing evidence of successful attacks in Iraq."

1100.   On February 17, 2005, the United Nations followed the U.S. lead and sanctioned Fadhli pursuant to paragraphs U.N. Security Council Resolution 1526 (2004) based upon his status as a key operative for al-Qaeda and al-Qaeda-in-Iraq and his being associated with al-Qaeda, Osama bin Laden or the Taliban for participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of Al-Qaida.  In so doing, the U.N. made findings consistent with those made by the United States in its SDGT designation.

1101.   On October 18, 2012, the United States government announced a $7 million bounty on Fadhli under its Rewards for Justice program.  In so doing, the U.S. determined, among other things, that Fadhli: "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network," was "wanted by Saudi authorities" and "authorities in Kuwait" "in connection with [his] terrorist activities," had "replaced Ezedin Abdel Aziz Khalil (better known as Yasin al-Suri) as al-Qaida's senior facilitator and financier in Iran," "was among the few trusted al-Qaida leaders who received advance notification that terrorists would strike the United States on September 11, 2001," "led" "Al-Qaida elements in Iran" that were "working to move fighters and money through Turkey to support al-Qaida-affiliated elements in Syria," "assisted al-Qaida in moving multiple operatives from Pakistan via Iran and Turkey to destinations in Europe, North Africa, and Syria, and [was] believed likely to continue moving experienced al-Qaida operatives to reinforce and gain influence in these areas."

1102.   On July 8, 2015, Fadhli was killed in an American airstrike in Syria, after being deployed there by al-Qaeda core to play a similar role to the one he played in Iraq the decade prior.  Announcing the strike, the Department of Defense stated, among other things, that "Muhsin al-Fadhli" was "a longtime al-Qaida operative" and "a senior al-Qaida facilitator who was among the few trusted al-Qaida leaders who received advance notification of the Sept. 11, 2001, terrorist attacks," whose "death" "degrade[d] and disrupt[ed] ongoing external operations of al-Qaida against the United States."

### 4.      Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri)

1103.   Abu Hamza al-Muhajir, aka Abu Ayyub al-Masri ("Masri"), was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Masri provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Masri was an al-Qaeda core member who learned his terrorist tradecraft at al-Qaeda camps in Afghanistan.  Masri was also a long-standing confidante of Ayman al-Zawahiri, having been one of Zawahiri's best students (and a former member of Zawahiri's organization Egyptian Islamic Jihad before its merger with al-Qaeda in the 1990s).  Among other roles he served for al-Qaeda core, Masri coordinated all al-Qaeda jihad volunteer operations from Europe and the Middle East before al-Qaeda deployed him from Afghanistan to Iraq to assume the executive officer position under Zarqawi. His *nom de guerre* meant "Abu Hamza, the Migrant," referencing his transnational role and identity.

1104.   In 2006, Masri replaced Zarqawi as leader (*emir*) of al-Qaeda-in-Iraq, which role he continued to serve until his own death in 2010.  As a Zawahiri lieutenant, Masri's elevation to emir of al-Qaeda-in-Iraq reinforced al-Qaeda's control of al-Qaeda-in-Iraq.  Like Zarqawi, Masri pledged allegiance to al-Qaeda in his own personal capacity and in his role as leader of al-Qaeda-in-Iraq.

1105.   On April 18, 2010, Masri was killed in a U.S. military strike. Commenting on the event, General Raymond Odierno, commander of U.S. Forces-Iraq, stated that Masri's death was "potentially the most significant blow to al Qaeda in Iraq since the beginning of the insurgency" because Masri directly linked al-Qaeda-in-Iraq to al-Qaeda "core" in Afghanistan and represented "the foreign element of al Qaeda that was established here," i.e., in Iraq.

### 5.   Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani

1106.   Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani, aka Abu Shaheen, was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Mashhadani provided logistical and material support to both groups.

1107.   From 2003 through at least 2007, Mashhadani served as the highest-ranking Iraqi in al-Qaeda core's senior management team in Afghanistan and Pakistan and played a key role helping al-Qaeda and al-Qaeda-in-Iraq fulfill bin Laden's vision of bringing all al-Qaeda-affiliated groups into a unified jihadi structure. Mashhadani helped Zarqawi and his successor, Masri, create a truly integrated terrorist force in Iraq through a global jihadist collective commanded by al-Qaeda but with local Iraqis being given leading roles due to their knowledge of the terrain. Mashhadani's efforts also helped al-Qaeda and al-Qaeda-in-Iraq vertically integrate key operations, including their suicide bombing network, to maximize the potency of their attacks against Americans in Iraq.

1108.   On July 4, 2007, Mashhadani was captured by U.S. forces during a raid in Mosul. Announcing the capture, the Department of Defense observed that Mashhadani served as a link between al-Qaeda core and al-Qaeda-in-Iraq. According to Brigadier General Kevin Bergner, who served as the U.S. military's spokesperson in Iraq at the time:  Mashhadani was the highest-ranking Iraqi in the al-Qaeda in Iraq leadership when captured; Mashhadani carried messages from bin Laden and Zawahri to the head of al-Qaeda in Iraq, Masri; Mashhadani admitted to

interrogators that al-Qaeda's global leadership provided "directions," and "continue[d] to provide a focus for operations" and "continue[d] to flow foreign fighters into Iraq, foreign terrorists," all to facilitate al-Qaeda's terrorist campaign against America there through al-Qaeda-in-Iraq; and Mashhadani's role demonstrated that there was "a clear connection between al-Qaida in Iraq and al-Qaida senior leadership outside Iraq," because "[w]hat we've learned from not just from the capture of al-Mashhadani but from other al-Qaida operatives is that there [was] a flow of strategic directions of prioritization, of messaging and other guidance that [came] from al-Qaida senior leadership to the al-Qaida in Iraq leadership."

### 6.   Sirajuddin Haqqani

1109.   Sirajuddin Haqqani (globally known as, and in this complaint, "Siraj") was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, including al-Qaeda core, and the Taliban, including its Haqqani Network, and provided financial and material support to both. Siraj was the son of bin Laden's long-standing ally, mentor, and protector, Jalaluddin Haqqani, who until 9/11 was the most iconic Islamist terrorist in Afghanistan and Pakistan (and a close second to bin Laden after 9/11). Siraj grew up observing his father play a leadership role coordinating more than half a dozen separate Islamist insurgent groups that had all united in an alliance to drive the Soviet Union out of Afghanistan. Like the phenomenon of the children of professional coaches going into coaching themselves because they grew up marinating in the profession, and becoming great coaches as a result, Siraj's unparalleled biography and personal networks made him a key hub of al-Qaeda/Taliban terror.

1110.   On September 13, 2007, the United Nations sanctioned Sirajuddin Haqqani pursuant to the U.N.'s al-Qaeda-Taliban sanctions regime. In its designation, the U.N. concluded, among other things, that Siraj "participat[ed] in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on

behalf or in support of" "the Taliban" and "Al-Qaida"; "recruit[ed] for" or "otherwise

support[ed] acts or activities of" "the Taliban" and "Al-Qaida"; was "one of the most prominent,

influential, charismatic and experienced leaders within the Haqqani Network … and [had] been

one of the major operational commanders of the network since 2004"; was "a key conduit for

terrorist operations in Afghanistan and supporting activities in the Federally Administered Tribal

Areas of Pakistan."

1111.   By 2008, Sirajuddin Haqqani was simultaneously: (1) a senior al-Qaeda operative,

leader, and attack planner, who served as the most important member of al-Qaeda's military

council (essentially, its terrorist planning committee); (2) the Haqqani Network's top operative,

attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would

eventually make him its number two leader (Deputy Emir).

1112.   Sirajuddin Haqqani's service on al-Qaeda's military council – publicly confirmed

by U.S. intelligence – necessarily means that Sirajuddin Haqqani swore an oath of allegiance to

al-Qaeda, because al-Qaeda only permitted sworn al-Qaeda members to serve on its councils.

1113.   On February 29, 2008, the United States designated Sirajuddin Haqqani a

Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S.

nationals or the national security, foreign policy, or economy of the United States," and in 2012,

the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the

Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura."

1114.   Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with

the Haqqani Network and the rest of the Taliban. Indeed, U.S. officials have described him as

al-Qaeda's top facilitator in Afghanistan.

1115.   Other than Osama bin Laden, Sirajuddin Haqqani was the single most important al-Qaeda leader in Afghanistan and Pakistan after 9/11.  By joining al-Qaeda management, Sirajuddin achieved a level of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the terrorists' campaign.

1116.   Sirajuddin Haqqani was also, like his father, famously pragmatic in service of his extremism.  Siraj was willing to do deals and make trades with people, groups, and governments he disdained if it would help al-Qaeda and the Taliban, including its Haqqani Network, kill more Americans in Afghanistan.

1117.   Sirajuddin Haqqani was the most important transnational Syndicate leader and played a vital role in harmonizing the various strategies and tactics, as well as promoting network efficiencies.  Thus, for example, if an al-Qaeda-in-Iraq operative needed secure travel into Afghanistan's Paktika Province (a Haqqani Network stronghold), he could contact someone from the Haqqani clan and make the necessary arrangements.

1118.   By the mid-2000's, Sirajuddin Haqqani had also spearheaded the emergence of a network of al-Qaeda training camps in North Waziristan, Pakistan, which leveraged the services of dual-hatted Arab al-Qaeda/al-Qaeda-in-Iraq terrorists (often colloquially referred to as the "Arabs") who imported bomb-related lessons learned from Iraq.

1119.   According to a declassified 2008 Defense Intelligence Agency intelligence report, "[Sirajuddin] Haqqani" was "affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan," including "an AQ training center in Miram Shah Dand"; "an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah"; "[a]n AQ training facility called 'Shaki Masood'; and "[a]nother AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan."

According to the same DIA report, at least several hundred "Arabs" – i.e., dual-hatted al-Qaeda/al-Qaeda-in-Iraq polyterroristsreceive[d] training there (NFI).

1120.   In spring 2010, Sirajuddin Haqqani publicly embraced his status as a member and leader of both al-Qaeda and the Talban during an interview that was widely disseminated around the world.  In the interview, the questioner asked Siraj whether the "mujahideen who emigrate[d] to the land of the Khorasan" – meaning al-Qaeda's foreign fighters in Afghanistan – "form[ed] any obstacle or burden on the Afghan people." In response, Sirajuddin noted that al-Qaeda's foreign fighters "enlighten the road for [fighters from Taliban Afghanistan and Pakistan] and they resist against the cross worshippers by cooperating with us and us with them in one trench."

1121.   In June 2010, an al-Qaeda memorandum sent to bin Laden himself documented Sirajuddin's terrorist operations in Afghanistan and Pakistan on behalf of al-Qaeda.

1122.   In 2011, Sirajuddin Haqqani published and distributed 10,000 copies of a book he authored that encouraged Islamists to follow al-Qaeda's ways, praised al-Qaeda because it "terrifie[d]" its foes, and endorsed attacks against the United States worldwide.

1123.   When Plaintiffs and/or their family members were attacked by al-Qaeda in Iraq and Afghanistan between 2005 and 2016, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda (including its subsidiaries like al-Qaeda-in-Iraq), the Taliban (including its Haqqani Network), and the IRGC (including Hezbollah and the Qods Force).

1124.   When Plaintiffs and/or their family members were attacked by al-Qaeda in Iraq and Afghanistan between 2005 and 2017, Sirajuddin Haqqani served as the top Syndicate polyterrorist responsible for coordinating key transnational-facing aspects of al-Qaeda's terrorist

campaign in Afghanistan and, in coordinating with other al-Qaeda and affiliated terrorists worldwide.

1125.   To this day, Sirajuddin Haqqani remains a senior member of al-Qaeda and a terrorist wanted by the United States for murder.[511]

### 7.    Shaykh Aminullah (Fazeel-A-Tul Shaykh Abu Mohammed Ameen Al-Peshawari)

1126.   Fazeel-A-Tul Shaykh Abu Mohammed Ameen Al-Peshawari, aka "Shaykh Aminullah" (in this complaint, "Shaykh Aminullah") was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, including al-Qaeda core, the Taliban, and Lashkar-e-Taiba, and provided financial and material support to all three.

1127.   On June 29, 2009, the United Nations designated Shaykh Aminullah, pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime, under paragraphs 1 and 2 of U.N. Security Council Resolution 1822 (2008), for participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of al-Qaeda, supplying, selling or transferring arms and related materiel to al-Qaeda; recruiting for or otherwise supporting acts or activities of al-Qaeda. In so doing, the U.N. determined, *inter alia*, that Shaykh Aminullah, as the leader of the Ganj Madrassah in Peshawar, Pakistan: (i) "provided assistance including funding and recruits to the Al-Qaida [] network as of early 2008"; (ii) "also provided funding, explosive suicide vests and other resources to the Taliban"; (iii) "also began a campaign to support Al-Qaida and Taliban militants

---

[511] For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans. Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the terrorists' successful campaign on Kabul in August 2021.  Today, Sirajuddin Haqqani serves as the terrorist responsible for the "Islamic Emirate of Afghanistan's" borders and guns, while his uncle Khalil, and brothers, have responsibilities relevant to intelligence and information.

in Pakistan." The U.N. also found that "[a]s of 2006, Al-Peshawari was providing monetary compensation to families of Al-Qaida and Taliban fighters killed in Afghanistan and was involved in Taliban recruiting activities."

1128.   On July 1, 2009, the United States designated Shaykh Aminullah a Specially Designated Global Terrorist based upon his status as an al-Qaeda/Taliban polyterrorist.  In so doing, the U.S. determined, *inter alia*, that Shaykh Aminullah: (i) "provid[ed] assistance, including funding and recruits, to the al Qaida network"; (ii) "provided funding and other resources to the Taliban, including explosive vests and other resources and actively facilitated the activities of anti-Coalition militants operating in Afghanistan by raising money in support of terrorist activities"; (iii) "beg[a]n a campaign to support militants in Pakistan."  In addition, the U.S. determined that, "[a]s of 2007, [Shaykh Aminullah] was responsible for recruiting fighters and suicide bombers and for the acquisition of funds and equipment for militants in Afghanistan" and "also provided monetary compensation to families of fighters killed in Afghanistan and has been involved in anti-Coalition militia recruiting activities."

1129.   To this day, Shaykh Aminullah remains on the FBI's Most Wanted List as a polyterrorist member and/or supporter of al-Qaeda, the Taliban, and Lashkar-e-Taiba.[512]

### 8.     Khalil Haqqani

1130.   Khalil Haqqani was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, including al-Qaeda core, and the Taliban, including its Haqqani Network, and provided financial and material support to both. Khalil was Sirajuddin Haqqani's uncle and Jalaluddin Haqqani's brother (Jalaluddin was bin Laden's long-standing ally, mentor, and protector).  Like

---

[512] According to the FBI, "Shaykh Aminullah is wanted for questioning in connection with providing material support to Al Qaeda, the Taliban and anti-coalition militias, with the aid of a Pakistan-based terrorist group, Lashkar-e-Tayyiba (LeT)."

his nephew Siraj, Khalil's biography and personal networks made him a key hub of al-Qaeda and Taliban terror.

1131.   On February 9, 2011, the United States designated Khalil Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" based upon Khalil Haqqani's status as a polyterrorist who "act[ed] for or on behalf of the Taliban, [] provid[ed] support to al-Qa'ida and [] act[ed] for or on behalf of Sirajuddin Haqqani."  Moreover, according to the United States government, "Khalil [Haqqani] has also acted on behalf of al-Qa'ida (AQ) and has been linked to AQ terrorist operations. In 2002, he deployed fighters to reinforce AQ elements in Paktia Province, Afghanistan."

1132.   On February 9, 2011, the United Nations also designated Khalil Haqqani pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime, under paragraph 2 of U.N. Security Council Resolution 1904 (2009), in recognition of his status as a key al-Qaeda/Taliban polyterrorist. With respect to al-Qaeda, the U.N. determined that Khalil Haqqani: (i) "acted on behalf of Al-Qaida [] and has been linked to its military operations"; and (ii) "deployed fighters to reinforce AQ elements in Paktia Province, Afghanistan" "[i]n 2002." With respect to the Taliban, the U.N. determined that Khalil Haqqani: (i) was "a senior member of the Haqqani Network"; (ii) "provide[d] support to the Taliban and the Haqqani Network operating in Afghanistan"; (iii) "was one of several people responsible for the detention of enemy prisoners captured by the Taliban"; and (iv) had "taken orders for Taliban operations from Sirajuddin Haqqani."

1133.   To this day, Khalil Haqqani remains a senior member of al-Qaeda and a terrorist wanted by the United States for murder.[513]

### 9.   Ahmed Jan Wazir

1134.   From the mid-2000s until late 2013, Ahmed Jan Wazir was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role he provided financial and material support to both. In 2008, al-Qaeda and the Taliban (including its Haqqani Network) jointly appointed Wazir to lead their combined cell in Ghazni Province, Afghanistan.  Thereafter, Wazir served as an operative for al-Qaeda and the Taliban, including its Haqqani Network, until his death in late 2013. Wazir led a joint al-Qaeda/Taliban cell based in Ghazni, which committed attacks against Americans in Ghazni and in Kabul (the latter as a part of the Kabul Attack Network).

1135.   On June 21, 2011, the U.S. designated Wazir as an Specially Designated Global Terrorist.

1136.   On January 6, 2012, the United Nations followed the U.S. lead and designated Wazir under its al-Qaeda/Taliban sanctions regime.  In its designation, the U.N. observed that "Taliban and Al-Qaida militants appointed Ahmed Jan Wazir as a Taliban commander in Ghazni Province" "[i]n 2008" and, among other things, that Wazir: served as a "[k]ey commander of the Haqqani Network"; "[a]ct[ed] as deputy, spokesperson and advisor for Haqqani Network senior leader Sirajuddin Jallaloudine Haqqani"; "[l]iaise[d] with the Taliban Supreme Council"; had "travelled abroad" "with senior Haqqani Network members to the Gulf"; "[l]iaise[d] with and

---

[513] For more than a decade, and continuing through to today, Khalil Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans. Along with his nephews, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Khalil Haqqani helped spearhead the terrorists' successful campaign on Kabul in August 2021.  Today, Khalil Haqqani serves in a cabinet-level role for the "Islamic Emirate of Afghanistan," and is responsible for, *inter alia*, targeting Taliban enemies.

provide[d] Taliban commanders in Ghazni … with money, weapons, communications equipment and supplies"; "conduct[ed] meetings on behalf of the Haqqani Network"; "represented the Haqqani Network at the Taliban's shura and has served as a conduit between the Haqqani Network and the Taliban in Ghazni Province, Afghanistan"; and "provided" other terrorists "in Ghazni Province with money and supplies, including weapons and communications equipment."

1137.   On November 21, 2013, Wazir was killed by an American strike in Ghazni.

### 10.    Ezedin Abdel Aziz Khalil (aka Yasin al-Suri)

1138.   At all relevant times, Ezedin Abdel Aziz Khalil (aka Yasin al-Suri) was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khalil provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Khalil served as a key Iran-based facilitator for al-Qaeda and al-Qaeda-in-Iraq.

1139.   On July 28, 2011, the United States designated Khalil as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Khalil: was  "a prominent Iran-based al-Qa'ida facilitator, operating under an agreement between al-Qa'ida and the Iranian government" who led a "key" "al-Qa'ida network" in "Iran" "since 2005" that "serve[d] as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia" and was "a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan" that "al-Qa'ida" operated pursuant to the "secret deal" between "Iran" and "al-Qa'ida" that "allow[ed] [al-Qa'ida] to funnel funds and operatives through [Iran's] territory" and "much-needed support" to "al-Qa'ida's senior leadership";  "move[d] money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of al-Qa'ida senior leaders"; "collected funding from various donors and fundraisers throughout the Gulf and is responsible for moving significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq"; and

"facilitated the travel of extremist recruits for al-Qa'ida from the Gulf to Pakistan and Afghanistan via Iran."

### 11.    Umid Muhammadi

1140.    At all relevant times, Umid Muhammadi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Muhammadi provided financial and material support to both groups. Among other roles, Muhammadi was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq.

1141.    On July 28, 2011, the United States designated Muhammadi as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Muhammadi: was "an al-Qa'ida facilitator and key supporter of al-Qa'ida in Iraq (AQI)"; "petitioned Iranian officials on al-Qa'ida's behalf"; had "been involved in planning multiple attacks in Iraq"; had "trained extremists in the use of explosives"; and had "received training in Afghanistan on the use of rockets and chemicals."

### 12.    Sangeen Zadran

1142.    Sangeen Zadran was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role Zadran provided financial and material support to al-Qaeda and the Taliban from the late 2000s until his death in 2013. Zadran proudly and publicly identified as an al-Qaeda "brother" – i.e., an al-Qaeda member.  In September 2009, al-Qaeda's media wing, Sahab, published an interview with Zadran in which he explained that his relationship with al-Qaeda was the same as his relationship with the Taliban.[514]

---

[514] Zadran stated: "Al-Qaeda and Taliban all are Muslims and we are united by the brotherhood of Islam. We do not see any difference between Taliban and Al-Qaeda, for we all belong to the religion of Islam. Sheikh Osama has pledged allegiance to … Mulla Muhammad Umar and has reassured his leadership again and again. There is no difference between us, for we are united by Islam and the Sharia governs us."

1143.   On August 16, 2011, the United States designated Zadran as a Specially Designated Global Terrorist.  Announcing the designation, the State Department publicly stated, among other things, that Zadran: was "the Shadow Governor for Paktika Province, Afghanistan and a commander of the Haqqani Network"; "help[ed] lead fighters in attacks across Southeastern Afghanistan"; was "believed to have planned and coordinated the movement of hundreds of foreign fighters into Afghanistan," i.e., al-Qaeda; was "connected to many [IED] attacks"; and "act[ed] as a senior lieutenant to Haqqani Network leader Sirajuddin Haqqani."

1144.   On September 5, 2013, Zadran was killed by a U.S. military strike in Pakistan.

### 13.    Mustafa Hajji Muhammad Khan

1145.   Mustafa Hajji Muhammad Khan was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khan provided financial and material support to both from 2003 until his death in 2012. Among other roles, Khan was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq, in which role he enabled the movement of fighters and funds amongst Iraq, Afghanistan, Pakistan and the Persian Gulf.

1146.   On March 14, 2011, the United Nations sanctioned Khan pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime.  According to the U.N.'s designation, among other things, "Mustafa Hajji Muhammad Khan" was "an Al-Qaida [] facilitator, courier and operative since at least 2003" and "serve[d] as a representative of the Al-Qaida leadership to the former head of Al-Qaida in Iraq [], … Abu Musab al-Zarqawi."

1147.   On September 7, 2011, the United States designated Khan as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Khan: "acted as an al-Qa'ida facilitator, courier and operative since at least 2003"; "facilitated activities for senior Pakistan-based al-Qa'ida operatives"; had "also been active in facilitating the travel of al-Qa'ida members, including escorting an

individual to meet with another al-Qa'ida member in 2009"; "recruited a facilitator" "[o]n al-Qa'ida's behalf," "who helped [Khan] move people and money between Gulf countries and Pakistan"; "helped al-Qa'ida reestablish logistic support networks in Pakistan"; and "served as a messenger between al-Qa'ida and former al-Qa'ida in Iraq leader Abu Musab al-Zarqawi."

1148.   On October 1, 2012, Khan was killed in a U.S. military strike in Pakistan.

### 14.   Adel Radi Saqr al-Wahabi al-Harbi

1149.   At all relevant times, Adel Radi Saqr al-Wahabi al-Harbi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Harbi provided financial and material support to both. Among other roles, Harbi served al-Qaeda and al-Qaeda-in-Iraq through his role as Muhsin al-Fadhli's deputy. In such capacity, Harbi connected al-Qaeda operatives in Iraq and Afghanistan.

1150.   On October 18, 2012, the United States designated Harbi as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Harbi was a "key member of an al-Qa'ida network operating in Iran and led by Iran-based al-Qa'ida facilitator Muhsin al-Fadhli" and "serve[d] as the deputy to al-Fadhli," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf of al-Qa'ida" by helping "operate a core pipeline that moves al-Qa'ida money and fighters through Iran to support al-Qa'ida activities in South Asia," was "believed to have sought funds to support al-Qa'ida attacks," and "travel[ed] to Afghanistan to join al-Qa'ida and provid[ed] technical support … to the terrorist group" "[b]efore joining the Iran-based al-Qa'ida network."

1151.   On October 18, 2012, the United States government announced a $5 million bounty on Harbi under its Rewards for Justice program.  In so doing, the U.S. determined, among other things, that Harbi was "an Iran-based al-Qaida facilitator and deputy to al-Fadhli" who "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida

terrorist network," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf

of al-Qaida," "sought funds to support al-Qaida attacks," and was "wanted by Saudi authorities"

for "traveling to Afghanistan to join al-Qaida and providing technical support" to it.

1152.   Harbi currently facilitates al-Qaeda operations from his haven in Iran.

### 15.   Abdul Rauf Zakir

1153.   Abdul Rauf Zakir was an al-Qaeda polyterrorist who operated as a member of al-

Qaeda and the Taliban's Haqqani Network, in which role Zakir provided financial and material

support to al-Qaeda and the Taliban, including its Haqqani Network, from the late 2000s until his

death prior to 2020.  Among other roles, Zakir was a key lieutenant of Sirajuddin Haqqani

(himself an al-Qaeda polyterrorist) and a facilitator for al-Qaeda and the Haqqani Network.

1154.   On November 5, 2012, the U.S. designated Zakir as an Specially Designated

Global Terrorist.  Announcing the designation, the State Department observed, among other

things, that Zakir was "the chief of suicide operations for the Haqqani Network and the

operational commander in Kabul, Takhar, Kunduz, and Baghlan Provinces, Afghanistan"; Zakir

was "responsible for the Haqqani Network's training program, which include[d] instruction in

small arms, heavy weapons, and basic [IED] construction"; Zakir "approached Haqqani Network

leader Sirajuddin Haqqani in 2008, requesting financial aid in exchange for expanding the

group's influence and operations into northern Afghanistan"; and Zakir had "become a trusted

associate and confidant of Sirajuddin" and was "involved in many … high-profile suicide

attacks."

1155.   On November 5, 2012, the United Nations followed the U.S. lead and designated

Zakir under the U.N.'s al-Qaeda/Taliban sanctions regime.  In its designation, the U.N.

recognized, among other things, the same facts noted by the United States when it designated

Zakir as an SDGT.

1156.   At some point between 2017 and 2019 (the exact date is a secret), Zakir was killed in an American airstrike targeting al-Qaeda operatives in Ghazni Province, Afghanistan who were embedded with the Taliban, including its Haqqani Network.  Zakir was killed alongside other al-Qaeda operatives, including Zakir's protectee:  Hamza bin Laden, the son and senior male heir of Osama bin Laden.  By the time Hamza was killed, he was a key al-Qaeda terrorist in his own right, designated by the U.S. as an SDGT on January 5, 2017.

### 16.      Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni

1157.   At all relevant times, Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Juhni provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Juhni performed various logistics and leadership functions for al-Qaeda in Afghanistan and Pakistan, including arranging the payment of funds, passing messages and arranging meetings for senior al-Qaeda figures.  In 2013, al-Qaeda assigned Juhni to al-Qaeda-in-Iraq, and Juhni relocated from Pakistan to Syria to support al-Qaeda efforts in Syria.  During this time, he maintained an affiliation with al-Qaeda's leadership in Afghanistan and Pakistan.

1158.   On May 14, 2014, the United States designated Juhni as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department stated, among other things, that Juhni was "designated for acting for or on behalf of al-Qa'ida"; had "performed various administrative duties for al-Qa'ida, including arranging the payment of funds, passing messages, and arranging meetings for senior al-Qa'ida figures"; "provided logistical support to al-Qa'ida in Afghanistan" "[b]etween 2006 and 2009"; "was responsible for al-Qa'ida's communications courier network in Waziristan in late 2008, and by mid-2009, was in charge of al-Qa'ida administrative affairs for several areas in North and South Waziristan"; "served on al-Qa'ida's Central Shura Council and as the al-Qa'ida Chief of Security responsible for

counterintelligence"; "traveled to Syria accompanied by several individuals to … support al-Qa'ida efforts in Syria" while "he maintained an affiliation with al-Qa'ida leadership in the Federally Administered Tribal Areas of Pakistan."

### 17.    Abd al-Rahman Mustafa al-Qaduli

1159.   At all relevant times, Abd al-Rahman Mustafa al-Qaduli was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Qaduli provided financial and material support to both. Qaduli was an Islamic cleric who lived in Northern Iraq.  He joined Al-Qaeda in 2004, and rapidly rose through the ranks, working with al-Qaeda leader Zarqawi and eventually becoming al-Qaeda's liaison for operations with Afghanistan and Pakistan, in which capacity he coordinated between al-Qaeda's leadership and its branch in Iraq.

1160.   On May 14, 2014, the United States designated Qaduli as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Qaduli: "joined al-Qa'ida in 2004 under the command of now-deceased AQI leader Abu Musab al-Zarqawi and served as Zarqawi's deputy and the AQI emir of Mosul, Ninawa Province, Iraq"; "was an assistant to al-Zarqawi while in al-Qa'ida and previously served as AQI's representative to al-Qa'ida senior leadership in Pakistan"; and "traveled … to Pakistan on behalf of al-Zarqawi to conduct an interview, which was then to be provided to al-Qa'ida leaders in Afghanistan."

### 18.    Abu Afghan al-Masri

1161.   Abu Afghan al-Masri was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra, in which role Abu Afghan al-Masri provided financial and material support to all three groups. Among other roles, he was a key facilitator for al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra. Like al-Qaeda leader Ayman al-Zawahiri, Abu

Afghan al-Masri was an Egyptian who originally joined al-Qaeda in Afghanistan.  While serving al-Qaeda in Afghanistan, Abu Afghan al-Masri facilitated ties to terrorist groups operating throughout the Middle East, including groups responsible for attacking U.S. forces in Afghanistan and Iraq. After the conflict erupted in Syria, al-Qaeda "core" redeployed Abu Afghan al-Masri to Syria to facilitate al-Qaeda-in-Iraq's expansion in Syria, and to convert Syria into another haven from which al-Qaeda could launch attacks against the United States.

1162.   On November 18, 2016, U.S. forces killed Abu Afghan al-Masri in an airstrike in Syria.  Commenting on the event, the Department of Defense publicly stated that "Abu Afghan al-Masri" was "a senior Al Qaeda leader" who "originally joined Al Qaeda in Afghanistan [and] later moved to its Syrian affiliate"; "had ties to terrorist groups operating throughout Southwest Asia, including groups responsible for attacking U.S. and coalition forces in Afghanistan and those plotting to attack the West"; "had a senior leadership role in Al Qaeda"; "helped organize Al Qaeda activities and was directly affiliated with senior [Qaeda] leaders" in Afghanistan"; and was so important that his "removal from the battlefield represent[ed] another blow to Al Qaeda in Syria and demonstrate[ed] continued U.S. determination to target Al Qaeda leaders wherever they pose[d] a threat to the U.S."

IX.   **ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, TURKEY, AND AFGHANISTAN AS PART OF ISLAMIC STATE'S AND AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST**

A.   **Islamic State Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East**

1163.   On February 3, 2014, al-Qaeda-in-Iraq split from al-Qaeda core and Jabhat al-Nusra and asserted its identity as ISIS, which was led by former al-Qaeda/al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi.

1164.   On June 29, 2014, Abu Bakr al-Baghdadi announced from Mosul – long Islamic State's Iraq headquarters – that the group known as al-Qaeda-in-Iraq and ISIS was now a caliphate that would henceforth be known as "Islamic State."

1165.   Powered by its rapid expansion and burgeoning protection rackets in Iraq and Syria, Islamic State quickly established a branch in Afghanistan, using at least hundreds of Islamic State fighters from Iraq, as well as substantial Islamic State resources from Iraq.

1166.   Since its formation in 2014, Islamic State has sought to expel Americans from the Middle East through a campaign of terrorist violence targeting Americans worldwide, all of which was in service of Islamic State's existence as a purported "caliphate" dedicated to propagating its radical Salafist Sunni terrorist ideology. David S. Cohen, Under Secretary for Terrorism and Financial Intelligence at the Treasury Department, publicly stated in 2014 that Islamic State "terrorists have slaughtered thousands of innocent people" and "threaten[ed "American personnel and facilities in Iraq," and "could ultimately pose a direct threat to [U.S.] citizens … outside of the Middle East."

1167.   The U.S. State Department designated Islamic State's predecessor, al-Qaeda-in-Iraq, as an FTO on December 17, 2004, and it has maintained that designation ever since, which

has at all times applied to Islamic State. The U.S. State Department has also designated Islamic State's branches as FTOs.  On January 14, 2016, for example, the U.S. designated Islamic State's Afghanistan branch, known as Islamic State's Khoroson Province or "ISIS-K" as an FTO.

1168.   In the summer of 2014, Islamic State rapidly surged throughout Iraq.  On June 10, 2014, it completed its seizure of long-standing al-Qaeda-in-Iraq/Islamic State stronghold Mosul in Ninewa Province.  On June 11, 2014, Islamic State seized Tikrit. On June 18, 2014, the Iraqi government formally requested that the United States military conduct strikes against Islamic State terrorists in Iraq. On June 21, 2014, Islamic State seized three pivotal towns touching upon key Iraqi transportation routes from Turkey, Jordan, and Syria to the rest of Iraq, including the strategic border crossing between Syria's Deir Ezzor Province and Iraq. On August 2, 2014, Islamic State conquered the towns of Sinjar and Zumar, which forced thousands of Yazidi civilians to flee. On August 3, 2014, Islamic State captured the strategically critical Mosul Dam, and a few weeks later, Islamic State completed its seizure of Raqqa province in Syria.

1169.   On August 7, 2014, President Obama announced an escalation of the American military response to Islamic State, including airstrikes designed to weaken Islamic State's ability to terrorize civilians, including Yazidis, in the vicinity of Sinjar, Iraq. The U.S. counterterrorism campaign against Islamic State would eventually be known as Operation Inherent Resolve.

1170.   About six weeks later, on September 22, 2014, Islamic State spokesman Abu Muhammad al-Adnani called for attacks on U.S. citizens around the world in retaliation for Operation Inherent Resolve.

1171.   By the end of October 2014, Islamic State had seized control of territory in Iraq and Syria equal in size to the United Kingdom, and in which more than ten million people resided.  Such geographies included Aleppo, Raqqah and Deir es-Zor governorates in Syria, and

Anbar, Diyala, Ninewa, and Salah al-Din Provinces in Iraq.  As a result, Islamic State's profile and power were a first in the history of contemporary terrorism, and Islamic State exercised authority over a wide array of industrial and commercial activities in Iraq and Syria.

1172.   Powered by its protection rackets and afforded ample freedom of movement through their deal with Iraqi Kurdish leaders, *supra* II.A.1.b, Islamic State continued its advance in Iraq and Syria during the rest of 2014 through most of 2016.

1173.   In 2016, Islamic State ranked as the world's deadliest terrorist organization, having carried out more than 1,400 attacks that killed more than 7,000 people that year.

1174.   On October 16, 2016, U.S.-supported Iraqi forces began their attempt to expel Islamic State from Mosul.  The resulting campaign would last more than eight months and entail intense waves of terrorist attacks by Islamic State.

1175.   On June 29, 2017, the Iraqi government declared victory over Islamic State in the final major contested sector in Mosul, and Iraqi Prime Minister Haider al-Abadi officially declared victory over Islamic State in Mosul ten days later.  Within weeks, Islamic State was also defeated in its Syrian redoubt in Raqqa.

1176.   By 2017, Islamic State's spread to Afghanistan—and the corresponding threat posed by the spread of its terror networks—was undeniable.  On April 13, 2017, the U.S. military responded to that threat by deploying the largest non-nuclear weapon in the U.S. arsenal, and colloquially known as the "the mother of all bombs" (or "MOAB") against tunnels and caves that were used by Islamic State in Afghanistan, which killed dozens of Islamic State terrorists there. On April 27, 2017, Abdul Hasib, the leader of Islamic State's branch in Afghanistan, was killed in a joint U.S.-Afghan special forces raid in Nangarhar Province.

1177.   Islamic State was undeterred, however, and it retaliated with its own attacks, setting off a series of retaliatory counterstrikes and violence. On May 3, 2017, Islamic State executed a suicide bombing attack that targeted a NATO convoy traveling on a civilian thoroughfare in Kabul, Afghanistan, which killed and maimed dozens of civilians. On June 15, 2017, Islamic State publicly announced that it had seized the complex of caves in Tora Bora, Afghanistan, upon which al-Qaeda had infamously relied in its escape from American forces in late 2001. On July 14, 2017, the U.S. military reported that it had killed Islamic State's head in Afghanistan, Abu Sayed, in an airstrike on Islamic State's Afghanistan stronghold in Kunar. On July 31, 2017, Islamic State attacked the Iraqi embassy in Kabul, Afghanistan, killing two and injuring three. On August 10, 2017, U.S. forces killed several senior Islamic State terrorists in Afghanistan, including Islamic State's emir there Abdul Rahman, in an airstrike.

1178.   In December 2017, Islamic State's caliphate in Iraq substantially collapsed, as most Islamic State terrorists melted away to either resume their more traditional insurgent tactics in Iraq and Syria (where there were more nearly 10,000 Islamic State operatives or supporters as of early 2018), or, alternatively, re-deploy to Afghanistan (where Islamic State was still experiencing rapid growth). Many chose the latter.

1179.   On October 26, 2019, American special forces killed Islamic State's leader, Abu Bakr al-Baghdadi, in a U.S. raid in Idlib, Syria. Five days later, Islamic State confirmed Baghdadi's death and announced Ibrahim al Hashemi al-Qurayshi as his successor.

**B.    Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks, Infrastructure, Ideology, Tactics, Techniques, And Procedures, And Followed Al-Qaeda's Model As A Globally Integrated Terror Network That Facilitated Cooperation Between Islamic State Branches**

1180.   Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to,

448

Islamic State's:  (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) following al-Qaeda's multinational corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.

1.     **Islamic State Emulated Al-Qaeda**

1181.   Islamic State self-identified as the heir to bin Laden's legacy.

1182.   Islamic State relied upon al-Qaeda and al-Qaeda-in-Iraq operatives who switched allegiance to Islamic State to fuel its rapid growth.

1183.   Islamic State copied (or otherwise absorbed) al-Qaeda's:  hatred of the United States and targeting of Americans in the Middle East to drive the U.S. from the region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures.

1184.   Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe houses, logistics pipelines, facilitators, and protection rackets (including the associated relationships with business and their agents) in Iraq and Syria.

1185.   Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of its predecessor, al-Qaeda-in-Iraq.  For example, Islamic State's finance apparatus was structurally similar to that of al-Qaeda-in-Iraq, and Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars.

1186.   Islamic State was devoted to the al-Qaeda-in-Iraq protection money framework and strategy.  Like its predecessor, Islamic State relied upon protection money payments from

449

Ericsson and other Western corporations and contractors.  As Under Secretary Cohen publicly explained in in 2014, Islamic State "mimic[ked]" "AQI's extortion networks" in order to finance its attacks.  Indeed, leveraging al-Qaeda in Iraq's experience running protection rackets, Islamic State extracted protection payments even in territories that it did not control.

1187.   Like al-Qaeda and al-Qaeda-in-Iraq, Islamic State also embraced the use of polyterrorists.  Indeed, Islamic State professed to be *even more willing* than other organizations to embrace such terrorists, as Islamic State attempted to position itself as a "catchall" pan-Islamist organization that welcomed the involvement of terrorists from other groups, whom Islamic State used to further augment their ranks through "hybridized" cells.

### 2.   Islamic State Operated As An Integrated Global Network

1188.   Like al-Qaeda, Islamic State operated as a globally integrated terrorist network, led by a "core" but operationalized by terrorists in dozens of countries, including branches throughout the Middle East.

1189.   Terrorists from Islamic State's "core" in Iraq and Syria committed attacks against Americans in Iraq, Syria, and Afghanistan, and on a few occasions in Europe and Africa.

1190.   Islamic State's globally integrated network was always led by Islamic State's emir, who was also known as the "caliph" at certain times.

1191.   Under Islamic State's globally integrated approach, every Islamic State terrorist associated with any Islamic State branch pledged allegiance to the emir, who was sometimes known as the caliph.

### 3.   Islamic State Followed A Multi-National Corporate Model

1192.   Islamic State generally embraced, often to the letter, al-Qaeda's and al-Qaeda-in-Iraq's multinational corporate-inspired governance and business models, including al-Qaeda's

use of branches, its command-and-control system, organizational structures, and ideological mission.

1193.   Islamic State also continued al-Qaeda-in-Iraq's tactic of undercutting their competition in the illicit marketplace, *e.g.*, by competing on "price" by providing security at a cheaper rate than any legal alternative, as well as all illegal alternatives like another competing route that transited through Shia terrorist-controlled territory.

1194.   Confiscated Islamic State terrorist training manuals revealed that Islamic State, like al-Qaeda-in-Iraq, aimed to build out a formal and centralized terrorist-run state, supported by an array of administrative functions that focused on collecting "taxes" from companies with business interests in Islamic State's territory and creating terrorist training camps to grow Islamic State's caliphate beyond Iraq and Syria, with a particular emphasis on Afghanistan.

1195.   Islamic State's "Military Council" was charged with the defense of the Caliphate, i.e., conducting terrorist attacks against America and its Iraqi allies.

1196.   Islamic State's "Fighters Assistance Council" used Islamic State revenues from Iraq and Syria to fund foreign fighters and to flow such fighters between Islamic State's Iraq/Syria core and its branch in Afghanistan.

1197.   Islamic State had a sophisticated, well-developed, and complex financial structure. Islamic State's Finance Council was a cabinet -level entity that managed Islamic State's revenue and expenditures derived from illicit proceeds from occupation of territory, including from its protection rackets and illicit taxation of goods and cash that transited territory where Islamic State operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and even had a "Chief Financial Officer" to manage it all.  Islamic State's Finance Council oversaw the financial infrastructure of the organization and managed

Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated multiple "taxation offices" replete with financial auditors.

### C. Al-Qaeda And Al-Qaeda-in-Iraq Committed, Planned, And Authorized the Attacks That Injured Plaintiffs In Iraq And Syria From 2005 Through 2013

1198.   Al-Qaeda and al-Qaeda-in-Iraq committed, planned, and authorized the attacks that killed or injured Plaintiffs and their loved ones in Iraq and Syria from 2005 through 2013.

1199.   Bin Laden always viewed al-Qaeda as the leader of a terrorist joint venture in which al-Qaeda led a broader anti-American jihadist coalition.  As a result, while al-Qaeda sometimes committed attacks itself, it most often acted through its Iraqi branch: al-Qaeda-in-Iraq.

1200.   In Iraq, al-Qaeda and al-Qaeda-in-Iraq posed a consistent threat from 2004 through 2014 and continued to operate out of their strongholds in Anbar, Ninewa, and Diyala provinces, from which al-Qaeda-in-Iraq continued to threaten Americans in most of Iraq.

1201.   From 2007 through 2014, al-Qaeda and al-Qaeda-in-Iraq committed nearly all the IED and suicide bomb attacks against Americans in Anbar Province, including its capital, Ramadi, and Ninewa province, including its capital, Mosul.

1202.   Al-Qaeda-in-Iraq (and later Islamic State) also maintained notorious cells in and around two other key Iraqi provinces:  Baghdad Province, where the terrorists targeted Americans in the capital city, Baghdad, and Diyala Province, where the terrorists targeted Americans in order to secure their own supply lines.  In 2006, for example, al-Qaeda-in-Iraq leader Abu Musab al-Zarqawi was killed in Diyala Province.

1203.   With respect to Baghdad, al-Qaeda-in-Iraq maintained several strongholds in the northern and western parts of Baghdad, including the notorious al-Qaeda bastion in the city's Dora neighborhood.

1204.   From 2007 through 2014, al-Qaeda-in-Iraq (and later Islamic State) accounted for nearly all the terrorist attacks committed against Americans in Baghdad Province and Diyala Province, other than those which were committed by joint cells of Shiite terrorists comprised of Lebanese Hezbollah and Jaysh al-Mahdi.[515]

1205.   Al-Qaeda-in-Iraq deployed a sophisticated suicide bombing network that relied upon terrorist assets and personnel in Iraq, Syria, Afghanistan, Pakistan, Iran, and elsewhere in order to commit attacks against Americans in Iraq and Syria.  Through facilitators in each country, al-Qaeda-in-Iraq sustained a pipeline of foreign-born suicide bombers for use in Iraq from 2004 through 2014.

1206.   A host of sources documented how al-Qaeda-in-Iraq was responsible for approximately ninety percent (90%) of all suicide bomb attacks committed against Americans in Iraq from 2003 through present.  Among others, the U.S. government concluded that al-Qaeda-in-Iraq was responsible for nearly all the suicide bomb attacks that occurred in Iraq between 2005 and 2008.  These trends continued at all relevant times.  On information and belief, al-Qaeda-in-Iraq and Islamic State are collectively responsible for every successful suicide attack committed against Americans in Iraq and Syria between 2005 and 2022.

1207.   Al-Qaeda-in-Iraq's internal assessments were even higher:  analyzing his first nine months of jihad against Americans in Iraq in a January 2004 letter, Zarqawi claimed credit on

---

[515] While al-Qaeda-in-Iraq and Jaysh al-Mahdi contested overlapping parts of Baghdad Province and Diyala Province, the specific geographies and attack types favored by these terrorist groups make their attacks easily distinguishable.  In general, AQI relied upon suicide bomb attacks and large ammonium-nitrate-fertilizer-based IEDs, while Jaysh al-Mahdi relied upon specialized IEDs known as explosively formed penetrators, complex attacks, and 107mm rockets provided by Hezbollah.  With respect to geographies, AQI targeted Americans in Sunni strongholds in Baghdad like Dora in western Baghdad, while Jaysh al-Mahdi targeted Americans in Shiite strongholds in Baghdad like Rustamiyah in eastern Baghdad.

behalf of al-Qaeda-in-Iraq for nearly all the suicide attacks against Americans in Iraq, boasting that "[w]e have been the key for all the suicide missions that have taken place, except in the north."

1208.   Al-Qaeda-in-Iraq applied – and improved upon, to the betterment of al-Qaeda-in-Iraq and al-Qaeda core – al-Qaeda's suicide bombing-related tactics, techniques, and procedures. For example, al-Qaeda and al-Qaeda-in-Iraq both followed procedures designed to indoctrinate the suicide bomber before the attack by making them a member of the organization.  For example, al-Qaeda and al-Qaeda-in-Iraq policy called for the FTO to formally initiate the suicide bomber by having the bomber make the FTO a formal promise – often in the form of a written suicide bombing contract – to blow himself or herself up in the FTO's martyrdom operation targeting Americans in Iraq on behalf of al-Qaeda and al-Qaeda-in-Iraq.

### D.   Al-Qaeda Committed, Planned, and Authorized the Attacks that Injured Plaintiffs in Afghanistan From at Least 2006 through at Least 2017, Which Were Facilitated By Al-Qaeda-In-Iraq

1209.   Al-Qaeda committed, planned, and authorized the attacks that killed and injured Plaintiffs and their loved ones in Afghanistan from at least 2006 through at least 2017, which were facilitated by al-Qaeda-in-Iraq's provision of funding, fighters, training, and logistical aid to al-Qaeda "core" in Afghanistan and Pakistan from at least 2006 through 2014.

1210.   Since 9/11, and continuing through the present, Al-Qaeda led the Syndicate and worked jointly with its inseparable ally, the Taliban, with whom al-Qaeda had been essentially fused since before 9/11 and have remained so ever since.  The overlap between the organizations meant that al-Qaeda often played a key role in Taliban and Haqqani Network attacks.

1211.   Al-Qaeda's and the Taliban's close relationship continued long after 9/11.  In the years since, it has become clear that the al-Qaeda and Taliban organizations have been fused together:  al-Qaeda terrorists have often worked in close conjunction with Taliban terrorists and the affiliated Haqqani Network and Kabul Attack Network.  In May 2007, Taliban official

Mullah Dadullah said, "[W]e and al-Qaeda are as one."  By the end of 2009, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly, noting that "[w]e are deeply concerned about the growing level of collusion between the Taliban and al Qaeda." And as Lieutenant General Ronald L. Burgess, Jr. reported in a February 2010 Hearing of the Senate Select Committee on Intelligence, "al Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."

1212.   Often, individual Taliban leaders, like Sirajuddin Haqqani, are also members of al-Qaeda.  For example, in late 2011 or early 2012 the Taliban appointed al-Qaeda member Shaykh Aminullah, *supra* IV.B.7, as the head of the Taliban's Peshawar Regional Military Shura, which was responsible for attacks in northern and eastern Afghanistan.  In fact, many terrorist operatives were members of both al-Qaeda and Taliban (including its Haqqani Network). Those "dual-hatted" terrorists directly committed many of the attacks that killed and injured Plaintiffs and their loved ones.

1213.   Between 2007 and 2016, al-Qaeda terrorists committed attacks alongside Taliban terrorists, including some of the attacks that killed or injured Plaintiffs or their family members, while operating as part of joint al-Qaeda/Taliban cells.  For example, on July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Nuristan Province, killing nine American soldiers, including Gunnar W. Zwilling, Israel Garcia, Jason D. Hovater, Jason M. Bogar, Jonathan P. Brostrom, Pruitt A. Rainey, and Jonathan R.C. Benton.  Members of each of those soldier's families are Plaintiffs.

1214.   Al-Qaeda and the Taliban, including its Haqqani Network, maintained joint cells throughout Afghanistan, primarily operating in (i) the "N2KL" provinces, (ii) the provinces around Afghanistan's capital, Kabul, and (iii) the "P2K" provinces.  Every pre-2017

Afghanistan-based attack described herein was committed by a joint al-Qaeda/Taliban cell operating in one of those three geographies or by a suicide bomber.  The attacks committed by suicide bombers involved al-Qaeda—as part of a joint cell or, at a minimum, on the bombmaking side—given al-Qaeda's heavy involvement in nearly all suicide bombings in Afghanistan between 2007 and 2016.

1215.  **Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) N2KL Provinces, which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the Taliban, and Lashkar-e-Taiba maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The polyterrorists who ran these joint cells included:

(i)     **Shaykh Aminullah**, *supra* IV.B.7, who provided essential financial, logistical, and operational support to attacks committed by joint al-Qaeda/Taliban cells in N2KL.

(ii)    **Farouq al-Qahtani**, al-Qaeda's emir for eastern Afghanistan who supported the Syndicate's insurgency against U.S. forces and their allies in Afghanistan.

(iii)   **Sakhr al-Taifi**, al-Qaeda's number two in Afghanistan, who, according to ISAF, embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against" "coalition troops throughout eastern Afghanistan," and "supplie[d] weapons and equipment to insurgents."

(iv)    **Mufti Assad**, an al-Qaeda network and "insurgent leader who, according to ISAF, controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who" "train[ed] [] insurgents on how to construct and use [IEDs]."

(v)     **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces.

(vi)    **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks.

(vii)  **Abu Ikhlas al-Masri**, an al-Qaeda commander who helped coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture in December 2010.

(viii)  **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who, according to ISAF, "coordinated attacks against coalition forces," throughout Kunar Province, "conducted training" and helped terrorists with "weapons procurement".

(ix)  **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who, according to DOD, directed al-Qaeda operations in Kunar Province, with specific responsibility for "planning attacks against" "coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" facilitated by his "network" of Taliban terrorists.

(x)  **Fatah Gul**, an al-Qaeda facilitator who, according to ISAF, "ran terrorist training camps where insurgents learned how to conduct [IED] attacks" in the N2KL area.

1216.   From 2006 through 2014, a substantial number of highly trained al-Qaeda-in-Iraq terrorists, including leaders, financiers, bombmakers, and logisticians, redeployed to the joint al-Qaeda/Taliban cells in N2KL in Afghanistan in their capacity as members of al-Qaeda, which augmented such N2KL joint cells' (and Haqqani Pakistani cells') fighting power, finance, logistics, attack planning, IED, and suicide campaigns in Afghanistan.

1217.   **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city. This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including its Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing terrorist attacks, each of which executed the Syndicate's CAN fertilizer bomb campaign in Kabul Attack Network-related provinces. Dual-hatted al-Qaeda/Taliban terrorists who ran the cells included: (i) Sirajuddin Haqqani, *supra* IV.B.6; (ii) Khalil Haqqani, *supra* IV.B.8; (iii) Shaykh Aminullah, *supra* IV.B.7; and (iv) Ahmed Jan Wazir, *supra* IV.B.9.

1218.   From 2006 through 2014, a substantial number of highly trained al-Qaeda-in-Iraq terrorists, including leaders, financiers, bombmakers, and logisticians, redeployed to the joint al-Qaeda/Taliban cells comprising the Kabul Attack Network in their capacity as members of al-

Qaeda, which augmented such joint cells' fighting power, finance, logistics, attack planning, IED, and suicide campaigns in Afghanistan.

1219.   **Paktia, Paktika, and Khost Provinces ("P2K") Provinces.** Like its N2KL Provinces, the "P2K Provinces" (or "P2K") were a strategically critical area that historically served as a Haqqani stronghold and also operated as a "traditional al-Qaeda safe haven[]."[516]

1220.   Al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism in P2K, each of which executed the Syndicate's CAN fertilizer bomb and suicide campaign in Afghanistan. The dual-hatted al-Qaeda/Taliban polyterrorists who led these P2K-related joint cells included: (i) Sirajuddin Haqqani, *supra* IV.B.6; (ii) Khalil Haqqani, *supra* IV.B.8; (iii) Sangeen Zadran, *supra* IV.B.12; and (iv) Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani), a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under Siraj's protection.

1221.   From 2006 through 2014, a substantial number of highly trained al-Qaeda-in-Iraq terrorists, including leaders, financiers, bombmakers, and logisticians, redeployed to the joint al-Qaeda/Taliban cells in P2K in Afghanistan—leveraging a network of Sirajuddin Haqqani-operated safe houses, training camps, madrassas, and IED and suicide bomb factories in the Haqqani's historic havens in Pakistan, which supported their attacks in P2K—in their capacity as members of al-Qaeda, which augmented such P2K joint cells' (and Haqqani Pakistani cells') fighting power, finance, logistics, attack planning, IED, and suicide campaigns in Afghanistan.

1222.   Al-Qaeda's leadership of the Syndicate and co-location with the Taliban in Afghanistan through joint al-Qaeda/Taliban cells reflected the degree to which al-Qaeda and the

---

[516] *Resilient al-Qaeda* at 11-12.

Taliban became fully and operationally intertwined.  As India's Permanent Representative to the United Nations explained in describing the al-Qaeda-Taliban "syndicate of terrorism," both groups were by 2011 "ideologically and operationally fused."  By the fall of 2009, noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less as a single entity.  The signs of this are everywhere."

1223.   The Taliban and al-Qaeda have remained intimately intertwined.  For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day.  When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada. Zawahiri himself was killed in 2022 while sheltering at one of Sirajuddin Haqqani's safehouses in Kabul.

1224.   Each of the below attack types was an act of international terrorism committed by al-Qaeda and the Taliban, including its Haqqani Network, aided by al-Qaeda-in-Iraq.

a.    **Kabul Attack Network Attacks.**  Al-Qaeda polyterrorist Sirajjudin Haqqani planned and authorized the Syndicate attacks that targeted Kabul – which Sirajuddin Haqqani personally viewed as a tactical priority – that were committed by joint al-Qaeda/Taliban (including Haqqani Network)/Lashkar-e-Taiba cells known as the Kabul Attack Network, including such joint cell's IED and suicide bomb attacks in Kabul and the surrounding provinces.

b.    **Fertilizer Bomb Attacks.**  Al-Qaeda, through al-Qaeda polyterrorist Sirajjudin Haqqani and others, planned and authorized the Syndicate's fertilizer bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's strategy for:  (i) sourcing fertilizer; (ii) purchasing and transporting fertilizer; (iii) operating al-Qaeda bombmaking factories hosted at Sirajuddin's personal network of joint al-Qaeda-Haqqani Network terrorist camps in Pakistan; and (iv) deploying fertilizer bombs as IEDs and suicide bombs to attack Americans in Afghanistan.

c.    **Suicide Bomber Attacks.**  Al-Qaeda polyterrorists, including Sirajuddin Haqqani, *supra* IV.B.6, and Shaykh Aminullah, *supra* IV.B.7, planned and authorized al-Qaeda's suicide bombing campaign, including, but not limited to, al-Qaeda's and the Taliban's shared strategy for:  (i) planning the targets for suicide bomber attacks in Afghanistan; (ii) sourcing suicide bombers through al-Qaeda's and the Taliban's long-standing allies; and (iii) coordinating the "suicide bomber infrastructure" of camps, madrassas, ratlines, and

safehouses, which relied heavily upon al-Qaeda and Taliban resources and polyterrorists like Sirajuddin Haqqani and Shaykh Aminullah.

d.     **Kidnapping Attacks.**  Al-Qaeda polyterrorist Sirajuddin Haqqani, *supra* IV.B.6, planned and authorized al-Qaeda and Haqqani Network kidnapping attacks, including the attack against Kevin King, who is a Plaintiff in this case.

1225.   On top of the myriad forms of support detailed above, al-Qaeda also jointly planned and authorized terrorist attacks that the Taliban carried out.  Those joint planning sessions often occurred in meetings in which al-Qaeda, the Taliban, and other members of the al-Qaeda-Taliban syndicate (such as Lashkar-e-Taiba) would confer about particular geographies and targets to attack.  The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan.  In observing that this superstructure formed an Afghan-Pakistani "Syndicate," a former CIA analyst and White House advisor documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."  Those intimate connections enhanced the lethality of the overall anti-American insurgency.

## X.      THE ISLAMIC STATE ATTACKS

### The August 26, 2021 Suicide Attack In Afghanistan (Jared Schmitz and Nicole Gee Families)

1226.   On August 26, 2021, a suicide bomber deployed by Islamic State, an FTO, detonated a suicide bomb at Abbey Gate outside of Kabul International Airport in Kabul, Afghanistan (the "August 26, 2021 Attack").  Islamic State planned and authorized the August 26, 2021 Attack.

1227.   The Haqqani Network (an FTO and part of the Taliban) also jointly committed the August 26, 2021 Attack alongside Islamic State.  The Haqqani Network did so in two ways.

1228.   *First*, the Haqqani Network committed the August 26, 2021 Attack because such Attack was part of a broader Haqqani Network terrorist attack campaign that specifically intended for the Haqqani Network, acting on the Syndicate's behalf, to facilitate Islamic State attacks against Americans by freeing Islamic State prisoners in Afghanistan so long as they vowed to kill Americans.  As set forth below, the Haqqani Network committed the Attack by releasing the Islamic State terrorist from prison, and then redirecting the Islamic State terrorist towards Americans in Afghanistan by forcing such person to either join the Taliban or, alternatively, to go out on their own pursuant to a pledge to kill Americans.

1229.   Before the August 26, 2021 Attack, the Haqqani Network conducted a wave of terrorist attacks against the Afghan governmental prisons and detention facilities that housed al-Qaeda, Taliban, and Islamic State terrorists, which the Syndicate described as its "Breaking the Walls" campaign, the stated purpose of which was to unleash anti-American terrorists who were detained at the time by the government of Afghanistan with the support of the United States.

1230.   Pursuant to its Breaking the Walls campaign, the Haqqani Network attacked an Afghan government detention facility and released all the terrorists who were detained inside.

When the Haqqani Network did so, it required that each terrorist pledge to either support the Taliban or, if they were unwilling to do so, at least vow to join up with Islamic State or another terrorist group in order to attack their shared enemy in Afghanistan, the Americans. On information and belief, the Haqqani Network did not permit any peaceful "option C" in this equation—the only acceptable option for fighting age males was to join and fight.

1231.   When the Haqqani Network conducted its Breaking the Walls campaign, it specifically intended to cause the release of Islamic State terrorists who would then target the United States and Afghan governments.

1232.   The Haqqani Network helped Islamic State through its Breaking the Walls campaign notwithstanding certain disagreements between al-Qaeda and the Taliban, on one hand, and Islamic State, on the other. Indeed, the Haqqani Network and Islamic State shared many common networks and relationships in Afghanistan, and it was not uncommon for Afghan terrorist operatives or supporters to support both FTOs or for their fighters to collaborate with both FTOs to further the shared cause of killing Americans to drive the United States out of the Afghanistan. Whatever differences may exist between the Taliban and Islamic State, such disagreements did not deprive the Haqqani Network of its specific intent to unleash Islamic State terrorists on America in Afghanistan through its Breaking the Walls campaign. This reflected Sirajuddin Haqqani's long-standing "enemy of my enemy is my friend" pragmatism, combined with his overriding hatred of the American presence in Afghanistan above all else.

1233.   Accordingly, The Haqqani Network's attacks during its "Breaking the Walls" Campaign were designed to, and did in fact, cause waves of additional terrorist attacks by Islamic State, al-Qaeda, and the Taliban by flooding Afghanistan with thousands of hardened, anti-American jihadists just as the United States was beginning to wind down its presence.

1234.  The Haqqani Network's Breaking the Walls campaign was a direct, but-for cause of the August 26, 2021 Attack because the Haqqani Network freed the individual Islamic State terrorist who detonated the bomb during the August 26, 2021 Attack.

1235.  The August 26, 2021 Attack was part and parcel of the Haqqani Network's "Breaking the Walls" campaign and was the intended consequence of such campaign. The August 26, 201 Attack accomplished the objective of the Haqqani Network's Breaking the Walls Campaign by causing Islamic State terrorists who were released by the Taliban to inflict catastrophic terrorist violence upon Americans in Afghanistan.

1236.  *Second*, on information and belief, the Haqqani Network also committed the August 26, 2021 Attack alongside Islamic State by directly facilitating the movements of Islamic State's driver/attacker on the ground in Kabul on the date of the Attack in a manner designed to help Islamic State place a bomb (i.e., the suicide car bomb and ISIS terrorist in the vehicle carrying it, who was functionally part of the bomb as well) close enough to the intended American targets to ensure that the bomb's detonation would accomplish the Haqqani Network's and Islamic State's mutually shared objective for the attack:  kill Americans in Kabul through a catastrophic suicide bomb attack of the variety historically favored by both FTOs.

1237.  Plaintiffs' belief is based on a range of factors, including, but not limited to, substantial informed discussion amongst Taliban experts concerning the likelihood of Haqqani Network involvement, the highly suspect nature of the Attack with respect to the attacker's ability to navigate a gauntlet of Haqqani Network checkpoints in Kabul, and the Attack's consistency with their broader Breaking the Walls campaign led by the Haqqani Network.

1238.  The Islamic State terrorist who drove the suicide car bomb that detonated during the August 26, 2021 Attack successfully navigated a gauntlet of Haqqani Network checkpoint in

Kabul in a manner that one or more experts has described to Plaintiffs as being highly suggestive of active Haqqani Network facilitation (i.e., Haqqani Network intentionally permitted the ISIS terrorist pass while knowing they had a bomb and intended to use it down the road) rather than passive Haqqani Network operational failure (i.e., Haqqani Network failing to detect a heavily loaded down car that showed substantial indicia of being a suicide car bomb, which the Haqqani Network operatives manning the checkpoint would readily discern given the Haqqani Network's precise expertise in suicide car bomb tactics, techniques, and procedures).

1239.   On information and belief, the Haqqani Network directly caused the August 26, 2021 Attack by actively facilitating the suicide bomber's movement towards their intended American targets, which enabled the Attack and directly caused the resulting deaths of Plaintiffs' loved ones.  The Haqqani Network did so in order to permit the Islamic State terrorist who detonated the bomb during the August 26, 2021 Attack to advance past the Haqqani Network's checkpoints in Kabul and carry out the Attack by getting close enough to the victims of the Attack, including Plaintiffs, so that the Attack would cause all the resulting injuries.

1240.   The Haqqani Network's motivation to commit the Attack alongside Islamic State was simple:  the Haqqani Network intended to kill Americans as way to insult the United States upon America's exit from Afghanistan.  Such outcome was a personal obsession of Sirajuddin Haqqani, who desired what he believed would be perceived in Islamist circles as an iconic humiliation for Americans on their way out, along with the iconic photos to go with it.[517]

---

[517] As another example of this objective in action, near in time to the August 26, 2021 attack, Sirajuddin Haqqani's personal detachment, known as Badri 313, staged a photo intended to humiliate America by comparing the Haqqani Network's conquest of Kabul with the U.S. Marines who raised the flag atop Mount Suribachi during the Battle of Iwo Jima in World War II.  *See* The Telegraph, *Taliban Mocks US By Recreating The Famous Picture Of Soldiers Raising The Stars And Stripes On Iwo Jima* (Aug. 26, 2021), https://tinyurl.com/5x8erwch.

1241.   The August 26, 2021 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1242.   **Lance Corporal Jared M. Schmitz** served in Afghanistan as a member of the U.S. Marine Corps.  LCpl Schmitz was injured in the August 26, 2021 Attack.  LCpl Schmitz died on August 26, 2021 as a result of injuries sustained during the August 26, 2021 Attack.

1243.   LCpl Schmitz was a U.S. national at the time of the attack and his death.

1244.   Plaintiff Mark Schmitz is the father of LCpl Schmitz and a U.S. national.

1245.   Plaintiff Suzanne Schmitz is the mother of LCpl Schmitz and a U.S. national.

1246.   Plaintiff Cameron Schmitz is the brother of LCpl Schmitz and a U.S. national.

1247.   Plaintiff E.S., by and through her next friend Mark Schmitz, is the minor sister of LCpl Schmitz and a U.S. national.

1248.   Plaintiff A.S., by and through her next friend Mark Schmitz, is the minor sister of LCpl Schmitz and a U.S. national.

1249.   Plaintiff Jaclyn Schmitz is the stepmother of LCpl Schmitz and a U.S. national.

1250.   Plaintiff Travis Avenvili-Frkovic is the stepbrother of LCpl Schmitz and a U.S. national.

1251.   As a result of the August 26, 2021 Attack and LCpl Schmitz's injuries and death, each member of the Schmitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Schmitz's society, companionship, and counsel.

1252.   As a result of the August 26, 2021 Attack, LCpl Schmitz was injured in his person and/or property. The Plaintiff members of the Schmitz Family are the survivors and/or heirs of LCpl Schmitz and are entitled to recover for the damages LCpl Schmitz sustained.

1253.   **Sergeant Nicole Gee** served in Afghanistan as a member of the U.S. Marine Corps. Sgt. Gee was injured in the August 26, 2021 Attack.  Sgt. Gee died on August 26, 2021 as a result of injuries sustained during the August 26, 2021 Attack.

1254.   Sgt. Gee was a U.S. national at the time of the attack and her death.

1255.   Plaintiff Richard Herrera is the father of Sgt. Gee and a U.S. national.

1256.   As a result of the August 26, 2021 Attack and Sgt. Gee's injuries and death, each member of the Gee Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt. Gee's society, companionship, and counsel.

1257.   As a result of the August 26, 2021 Attack, Sgt. Gee was injured in her person and/or property. The Plaintiff members of the Gee Family are the survivors and/or heirs of Sgt. Gee and are entitled to recover for the damages Sgt. Gee sustained.

### The November 22, 2012 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Syria (James Foley Family)

1258.   **James W. Foley** served in Syria as a journalist. On November 22, 2012, Mr. Foley was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Syria.  Thereafter, Mr. Foley was held hostage for nearly two years (first detained by AQI, and then detained by Islamic State after AQI became Islamic State in February 2014).  Islamic State terrorists beheaded Mr. Foley on or about August 19, 2014.

1259.   Mr. Foley was kidnapped by al-Qaeda-in-Iraq, held hostage by al-Qaeda-in-Iraq and Islamic State, and murdered by Islamic State.

1260.   The kidnapping attack on Mr. Foley was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  Mr. Foley was held hostage by Islamic State and executed by Islamic State.

1261.   Mr. Foley's kidnapping, subsequent confinement, torture, and beheading would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, the terrorists kidnapped a civilian who was not engaged in hostilities, and the terrorists murdered an unarmed civilian.

1262.   Mr. Foley was a U.S. national at the time of the kidnapping and his murder.

1263.   Plaintiff Diane Foley is the mother of Mr. Foley and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Foley's estate.

1264.   Plaintiff John W. Foley is the father of Mr. Foley and a U.S. national.

1265.   Plaintiff Lieutenant Colonel John E. Foley is the brother of Mr. Foley and a U.S. national.

1266.   Plaintiff Mark Foley is the brother of Mr. Foley and a U.S. national.

1267.   Plaintiff Kathryn Simpson is the sister of Mr. Foley and a U.S. national.

1268.   Plaintiff Michael Foley is the brother of Mr. Foley and a U.S. national.

1269.   As a result of the November 22, 2012 kidnapping, and 635 days as a hostage during which he was tortured before he was murdered in 2014, each member of the Foley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Foley's society, companionship, and counsel.

1270.   As a result of the November 22, 2012 kidnapping, and 635 days as a hostage during which he was tortured before he was murdered in 2014, Mr. Foley was injured in his person and/or property. The Plaintiff members of the Foley Family are the survivors and/or heirs of Mr. Foley and are entitled to recover for the damages Mr. Foley sustained.

### The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Syria (Kayla Mueller Family)

1271.   **Kayla J. Mueller** served in Syria as a humanitarian aid worker. On August 4, 2013, Ms. Mueller was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Syria.  Thereafter, Ms. Mueller was held hostage for nearly two years (first detained by AQI, and then detained by Islamic State after AQI became Islamic State in February 2014).  Islamic State terrorists held Ms. Mueller hostage until she died while in their captivity on or about 2015.

1272.   Ms. Mueller was kidnapped by al-Qaeda-in-Iraq, held hostage by al-Qaeda-in-Iraq and Islamic State, and died while in Islamic State captivity as a direct and foreseeable consequence of its kidnapping and hostage taking of her.

1273.   During her captivity, Ms. Mueller was held as a "sex slave" by her captors and was repeatedly raped by Islamic State leader Abu Bakr al-Baghdadi.[518]

1274.   The kidnapping attack on Ms. Mueller was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  The hostage-taking (and continued detention) of Ms. Mueller was committed, planned, and authorized by Islamic State, which directly caused Ms. Mueller's death on or about 2015.

1275.   Ms. Mueller's kidnapping, subsequent confinement, rape, torture, and death would have violated the laws of war if these terrorists were subject to them because, among other reasons,

---

[518] Rukmini Callimachi, "ISIS Held Kayla Mueller, U.S. Aid Worker, as Sex Slave Before Fatal Airstrike," N.Y. Times (Aug. 14, 2015), https://tinyurl.com/2p8v52yd.

the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists kidnapped a civilian who was not engaged in hostilities.

1276.   Ms. Mueller was a U.S. national at the time of the kidnapping and her murder.

1277.   Plaintiff Richard Mueller II is the father of Ms. Mueller and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of Ms. Mueller's estate.

1278.   Plaintiff Marsha Mueller is the mother of Ms. Mueller and a U.S. national.

1279.   Plaintiff Eric Mueller is the brother of Ms. Mueller and a U.S. national.

1280.   As a result of the August 4, 2013 kidnapping, and more than 500 days as a hostage during which she was tortured before she was murdered in 2015, each member of the Mueller Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Mueller's society, companionship, and counsel.

1281.   As a result of the August 4, 2013 kidnapping, and more than 500 days as a hostage during which she was tortured before she was murdered in 2015, Ms. Mueller was injured in her person and/or property. The Plaintiff members of the Mueller Family are the survivors and/or heirs of Ms. Mueller and are entitled to recover for the damages she sustained.

**The August 4, 2013 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Syria (Steven Sotloff Family)**

1282.   **Steven J. Sotloff** served in Syria as a journalist. On August 4, 2013, Mr. Sotloff was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Syria.  Thereafter, Mr. Sotloff was held hostage for more than a year (by AQI until 2014, and by Islamic State thereafter).  Islamic State terrorists beheaded Mr. Sotloff on September 2, 2014.

1283.   Mr. Sotloff was kidnapped by al-Qaeda-in-Iraq, held hostage by al-Qaeda-in-Iraq and Islamic State, and murdered by Islamic State.

1284.   The kidnapping attack on Mr. Sotloff was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  Mr. Sotloff was held hostage by Islamic State and executed by Islamic State.

1285.   Mr. Sotloff's kidnapping, subsequent confinement, torture, and beheading would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, the terrorists kidnapped a civilian who was not engaged in hostilities, and the terrorists murdered an unarmed civilian.

1286.   Mr. Sotloff was a U.S. national at the time of the kidnapping and his murder.

1287.   Plaintiff Arthur Sotloff is the father of Mr. Sotloff and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of Mr. Sotloff's estate.

1288.   Plaintiff Shirley Sotloff is the mother of Mr. Sotloff and a U.S. national.

1289.   Plaintiff Lauren Sotloff is the sister of Mr. Sotloff and a U.S. national.

1290.   As a result of the August 4, 2013 kidnapping, and 394 days as a hostage during which he was tortured before he was murdered in 2014, each member of the Sotloff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sotloff's society, companionship, and counsel.

1291.   As a result of the August 4, 2013 kidnapping, and 394 days as a hostage during which he was tortured before he was murdered in 2014, Mr. Sotloff was injured in his person

and/or property. The Plaintiff members of the Sotloff Family are the survivors and/or heirs of Mr. Sotloff and are entitled to recover for the damages Mr. Sotloff sustained.

### The January 1, 2017 Mass Shooting Attack In Turkey (William J. Raak)

1292.   On January 1, 2017, an Islamic State sleeper operative named Abdulkadir Masharipov committed a mass shooting attack that targeted civilians partying at a nightclub in Istanbul, Turkey known to be frequented by Americans (the "January 1, 2017 Attack").

1293.   Islamic State, an FTO, planned and authorized the January 1, 2017 Attack. Specifically, after becoming an Islamic State member and pledging allegiance to Abu Bakr al-Baghdadi and approximately one year before the January 1, 2017 Attack, Masharipov was ordered by an Islamic State emir in Raqqa, Syria, to travel to Turkey, establish himself, and await further orders.  Masharipov testified at his trial that an Islamic State emir instructed him via messaging app on December 25, 2016, to launch an attack in Istanbul on New Year's Eve.  Masharipov further claimed that while in Istanbul, an Islamic State member gave him an AK-47 assault rifle, six loaded magazines, and three stun grenades.  Moreover, just two months before the January 1, 2017 Attack, Islamic State leader Abu Bakr al-Baghdadi called for war against Turkey, declaring to Islamic State members as follows:  "Turkey entered the zone of your operations, so attack it, destroy its security, and sow horror within it.  Put it on your list of battlefields."

1294.   The January 1, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack indiscriminately targeted civilians and neither wore uniforms nor otherwise identified themselves as enemy combatants.

1295.   **William J. Raak** was present at the nightclub during the January 1, 2017 Attack, which severely injured Mr. Raak.  Mr. Raak was hit by one of Masharipov's rounds, which entered Mr. Raak's body at his hip, ripped through the tissue of his leg, and lodged in his knee.  After

being shot, Mr. Raak watched Masharipov stalk the club floor and execute other wounded victims, while trying to figure out how to avoid being murdered himself.  Mr. Raak endured surgery and physical therapy to treat the physical damage to his leg that occurred during the January 1, 2017 Attack.  Moreover, the January 1, 2017 Attack caused Mr. Raak to suffer substantial economic harm; during Mr. Raak's convalescence from his gunshot wound, the business he owns in the defense industry had a critical government certification lapse, which prevented his business from continuing to work directly with the major defense contractors to whom his business had supplied parts for the previous decade.

1296.   Plaintiff Mr. Raak was a U.S. national at the time of the attack, and remains one today.

1297.   As a result of the January 1, 2017 Attack, Mr. Raak has also experienced severe mental anguish and emotional pain and suffering.

**The April 29, 2017 IED Attack In Iraq (Weston Lee Family)**

1298.   On April 29, 2017, Islamic State detonated an IED in Ninewa, Iraq (the "April 29, 2017 Attack").  Islamic State, an FTO, planned and authorized the April 29, 2017 Attack.

1299.   The April 29, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1300.   **First Lieutenant Weston C. Lee** served in Iraq as a member of the U.S. Army.  1LT Lee was injured in the April 29, 2017 Attack.  1LT Lee died on April 29, 2017 as a result of injuries sustained during the April 29, 2017 Attack.

1301.   1LT Lee was a U.S. national at the time of the attack and his death.

1302.   Plaintiff Aldene Lee is the mother of 1LT Lee and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of 1LT Lee's estate.

1303.   As a result of the April 29, 2017 Attack and 1LT Lee's injuries and death, each member of the Lee Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Lee's society, companionship, and counsel.

1304.   As a result of the April 29, 2017 Attack, 1LT Lee was injured in his person and/or property. The Plaintiff members of the Lee Family are the survivors and/or heirs of 1LT Lee and are entitled to recover for the damages 1LT Lee sustained.

**The January 16, 2019 Suicide Attack In Syria (Ghadir Taher Family)**

1305.   On January 16, 2019, a suicide bomber deployed by Islamic State, an FTO, detonated a suicide bomb at a restaurant in Manbij, Syria (the "January 16, 2019 Attack").  Islamic State planned and authorized the January 16, 2019 Attack.

1306.   The January 16, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1307.   **Ghadir Taher** served in Syria as a translator for the U.S. government.  Ms. Taher was injured in the January 16, 2019 Attack.  Ms. Taher died on January 16, 2019 as a result of injuries sustained during the January 16, 2019 Attack.

1308.   Ghadir Taher was a U.S. national at the time of the attack and her death.

1309.   Plaintiff Amina Shaheen is the mother of Ms. Taher and a naturalized U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Ghadir Taher's estate.

1310.   Plaintiff Kawa Mahmoud Aziz Talabani is the stepfather of Ms. Taher and a U.S. national. Mr. Talabani lived in the same household as Ms. Taher for a substantial period and considered Ms. Taher the functional equivalent of a biological daughter.

1311.   As a result of the January 16, 2019 Attack and Ghadir Taher's injuries and death, each member of the Taher Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Taher's society, companionship, and counsel.

1312.   As a result of the January 16, 2019 Attack, Ghadir Taher was injured in her person and/or property. The Plaintiff members of the Taher Family are the survivors and/or heirs of Ghadir Taher and are entitled to recover for the damages Ms. Taher sustained.

## XI.   THE AL-QAEDA AND AL-QAEDA-IN-IRAQ ATTACKS IN IRAQ AND SYRIA

### The January 13, 2005 IED Attack In Ninewa (Brian A. Mack Family)

1313.   On January 13, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Ninewa, Iraq (the "January 13, 2005 Attack").  The January 13, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1314.   The January 13, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1315.   **Sergeant First Class Brian A. Mack** served in Iraq as a member of the U.S. Army. SFC Mack was injured in the January 13, 2005 Attack. SFC Mack died on January 13, 2005 as a result of injuries sustained during the January 13, 2005 Attack.

1316.   SFC Mack was a U.S. national at the time of the attack and his death.

1317.   Plaintiff Lisa Mack is the widow of SFC Mack and a U.S. national.

1318.   Plaintiff Ashley Mack is the daughter of SFC Mack and a U.S. national.

1319.   As a result of the January 13, 2005 Attack and SFC Mack's injuries and death, each member of the Mack Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Mack's society, companionship, and counsel.

1320.   As a result of the January 13, 2005 Attack, SFC Mack was injured in his person and/or property.  The Plaintiff members of the Mack Family are the survivors and/or heirs of SFC Mack and are entitled to recover for the damages SFC Mack sustained.

**The January 26, 2005 Complex Attack In Al Anbar (Jonathan Bowling Family)**

1321.   On January 26, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED and rocket propelled grenades in Al Anbar, Iraq (the "January 26, 2005 Attack"). The January 26, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1322.   The January 26, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1323.   **Corporal Jonathan W. Bowling** served in Iraq as a member of the U.S. Marine Corps. Cpl Bowling was injured in the January 26, 2005 Attack.  Cpl Bowling died on January 26, 2005 as a result of injuries sustained during the January 26, 2005 Attack.

1324.   Cpl Bowling was a U.S. national at the time of the attack and his death.

1325.   Plaintiff Robin Feron is the mother of Cpl Bowling and a U.S. national.

1326.   Plaintiff Darrell Bowling is the father of Cpl Bowling and a U.S. national.

1327.   Plaintiff Brooke Wexler is the sister of Cpl Bowling and a U.S. national.

1328.   Plaintiff Ashley Nogueira is the sister of Cpl Bowling and a U.S. national.

1329.   As a result of the January 26, 2005 Attack and Cpl Bowling's injuries and death, each member of the Bowling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Bowling's society, companionship, and counsel.

1330.   As a result of the January 26, 2005 Attack, Cpl Bowling was injured in his person and/or property.  The Plaintiff members of the Bowling Family are the survivors and/or heirs of Cpl Bowling and are entitled to recover for the damages Cpl Bowling sustained.

**The February 16, 2005 Car Bomb Attack In Ninewa (Adam Plumondore Family)**

1331.   On February 16, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated a car bomb in Ninewa, Iraq (the "February 16, 2005 Attack").  The February 16, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1332.   The February 16, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1333.   **Sergeant Adam J. Plumondore** served in Iraq as a member of the U.S. Army. SGT Plumondore was injured in the February 16, 2005 Attack.  SGT Plumondore died on February 16, 2005 as a result of injuries sustained during the February 16, 2005 Attack.

1334.   SGT Plumondore was a U.S. national at the time of the attack and his death.

1335.   Plaintiff Elfriede Plumondore is the mother of SGT Plumondore and a U.S. national.

1336.   Plaintiff Daniel Plumondore is the father of SGT Plumondore and a U.S. national.

1337.   As a result of the February 16, 2005 attack and SGT Plumondore's injuries and death, each member of the Plumondore Family has experienced severe mental anguish,

emotional pain and suffering, and the loss of SGT Plumondore's society, companionship, and counsel.

1338.   As a result of the February 16, 2005 attack, SGT Plumondore was injured in his person and/or property.  The Plaintiff members of the Plumondore Family are the survivors and/or heirs of SGT Plumondore and are entitled to recover for the damages SGT Plumondore sustained.

### The February 17, 2005 IED Attack In Ninewa (Frank Bustamante Hernandez Jr. Family)

1339.   On February 17, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Ninewa, Iraq (the "February 17, 2005 Attack").  The February 17, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1340.   The February 17, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1341.   **Sergeant Frank B. Hernandez Jr.** served in Iraq as a member of the U.S. Army. SGT Hernandez was injured in the February 17, 2005 Attack. SGT Hernandez died on February 17, 2005 as a result of injuries sustained during the February 17, 2005 Attack.

1342.   SGT Hernandez was a U.S. national at the time of the attack and his death.

1343.   Plaintiff Mary Hernandez is the mother of SGT Hernandez and a U.S. national.

1344.   Plaintiff Frank Hernandez Sr. is the father of SGT Hernandez and a U.S. national.

1345.   Plaintiff Jessica Hernandez is the sister of SGT Hernandez and a U.S. national.

1346.   Plaintiff Mary Susan Hernandez is the sister of SGT Hernandez and a U.S. national.

1347.   As a result of the February 17, 2005 Attack and SGT Hernandez's injuries and death, each member of the Hernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hernandez's society, companionship, and counsel.

1348.   As a result of the February 17, 2005 Attack, SGT Hernandez was injured in his person and/or property. The Plaintiff members of the Hernandez Family are the survivors and/or heirs of SGT Hernandez and are entitled to recover for the damages SGT Hernandez sustained.

**The February 19, 2005 Suicide Attack In Baghdad (Adam M. Malson Family)**

1349.   On February 19, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a suicide bomber attack in Baghdad, Iraq (the "February 19, 2005 Attack").  The February 19, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1350.   The February 19, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1351.   **First Lieutenant Adam M. Malson** served in Iraq as a member of the U.S. Army. 1LT Malson was injured in the February 19, 2005 Attack.  1LT Malson died on February 19, 2005 as a result of injuries sustained during the February 19, 2005 Attack.

1352.   1LT Malson was a U.S. national at the time of the attack and his death.

1353.   Plaintiff Debra Malson is the mother of 1LT Malson and a U.S. national.

1354.   Plaintiff Ben Malson Jr. is the father of 1LT Malson and a U.S. national.

1355.   Plaintiff David Malson is the brother of 1LT Malson and a U.S. national.

1356.   Plaintiff Amy Fly is the sister of 1LT Malson and a U.S. national.

1357.   As a result of the February 19, 2005 Attack and 1LT Malson's injuries and death, each member of the Malson Family has experienced severe mental anguish and emotional pain and suffering, and the loss of 1LT Malson's society, companionship, and counsel.

1358.   As a result of the February 19, 2005 Attack, 1LT Malson was injured in his person and/or property.  The Plaintiff members of the Malson Family are the survivors and/or heirs of 1LT Malson and are entitled to recover for the damages 1LT Malson sustained.

**The February 22, 2005 IED Attack In Al Anbar (Merlin German Family)**

1359.   On February 22, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "February 22, 2005 Attack").  The February 22, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1360.   The February 22, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1361.   **Sergeant Merlin German** served in Iraq as a member of the U.S. Marine Corps. Sgt German was injured in the February 22, 2005 Attack.  Sgt German died on April 11, 2008 as a result of injuries sustained during the February 22, 2005 Attack.

1362.   Sgt German was a U.S. national at the time of the attack and his death.

1363.   Plaintiff Ariel German is the sister of Sgt German and a U.S. national.

1364.   As a result of the February 22, 2005 Attack and Sgt German's injuries and death, each member of the German Family has experienced severe mental anguish and emotional pain and suffering, and the loss of Sgt German's society, companionship, and counsel.

1365.   As a result of the February 22, 2005 Attack, Sgt German was injured in his person and/or property.  The Plaintiff members of the German Family are the survivors and/or heirs of Sgt German and are entitled to recover for the damages Sgt German sustained.

**The February 24, 2005 IED Attack In Saladin (Daniel G. Gresham Family)**

1366.   On February 24, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Saladin, Iraq (the "February 24, 2005 Attack").  The February 24, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1367.   The February 24, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1368.   **Staff Sergeant Daniel G. Gresham** served in Iraq as a member of the U.S. Army. SSG Gresham was injured in the February 24, 2005 Attack. SSG Gresham died on February 24, 2005 as a result of injuries sustained during the February 24, 2005 Attack.

1369.   SSG Gresham was a U.S. national at the time of the attack and his death.

1370.   Plaintiff Julie Gresham is the sister of SSG Gresham and a U.S. national.

1371.   Plaintiff Elizabeth Start is the sister of SSG Gresham and a U.S. national.

1372.   As a result of the February 24, 2005 Attack and SSG Gresham's injuries and death, each member of the Gresham Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Gresham's society, companionship, and counsel.

1373.   As a result of the February 24, 2005 Attack, SSG Gresham was injured in his person and/or property. The Plaintiff members of the Gresham Family are the survivors and/or heirs of SSG Gresham and are entitled to recover for the damages SSG Gresham sustained.

**The February 27, 2005 IED Attack In Al Anbar (Richard B. Gienau Family)**

1374.   On February 27, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "February 27, 2005 Attack"). The February 27, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1375.   The February 27, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1376.   **Second Lieutenant Richard B. Gienau** served in Iraq as a member of the Iowa U.S. Army National Guard. 2LT Gienau was injured in the February 27, 2005 Attack. 2LT Gienau died on February 27, 2005 as a result of injuries sustained during the February 27, 2005 Attack.

1377.   2LT Gienau was a U.S. national at the time of the attack and his death.

1378.   Plaintiff Debbee Way is the mother of 2LT Gienau and a U.S. national.

1379.   Plaintiff Richard Gienau is the father of 2LT Gienau and a U.S. national.

1380.   As a result of the February 27, 2005 Attack and 2LT Gienau's injuries and death, each member of the Gienau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 2LT Gienau's society, companionship, and counsel.

1381.   As a result of the February 27, 2005 Attack, 2LT Gienau was injured in his person and/or property. The Plaintiff members of the Gienau Family are the survivors and/or heirs of 2LT Gienau and are entitled to recover for the damages 2LT Gienau sustained.

**The March 4, 2005 IED Attack In Al Anbar (Stephen M. McGowan Family)**

1382.   On March 4, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "March 4, 2005 Attack").  The March 4, 2005 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

1383.   The March 4, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1384.   **Corporal Stephen M. McGowan** served in Iraq as a member of the U.S. Army. CPL McGowan was injured in the March 4, 2005 Attack.  CPL McGowan died on March 4, 2005 as a result of injuries sustained during the March 4, 2005 Attack.

1385.   CPL McGowan was a U.S. national at the time of the attack and his death.

1386.   Plaintiff Bobbie McGowan is the mother of CPL McGowan and a U.S. national.

1387.   As a result of the March 4, 2005 Attack and CPL McGowan's injuries and death, each member of the McGowan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL McGowan's society, companionship, and counsel.

1388.   As a result of the March 4, 2005 Attack, CPL McGowan was injured in his person and/or property.  The Plaintiff members of the McGowan Family are the survivors and/or heirs of CPL McGowan and are entitled to recover for the damages CPL McGowan sustained.

**The March 28, 2005 IED Attack In Salah Ad Din (Michael E. Green Family)**

1389.   On March 28, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Salah ad Din, Iraq (the "March 28, 2005 Attack"). The March 28, 2005 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

1390.   The March 28, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1391.   **Private 1st Class Michael E. Green** served in Iraq as a member of the U.S. Marine Corps. PFC Green was injured in the March 28, 2005 Attack.  The attack severely wounded PFC Green, who suffered a right arm above-elbow amputation, right leg tissue wound, patellofemoral syndrome (pain around kneecap) for both right and left legs, tendonitis in the right shoulder, and PTSD. As a result of the March 28, 2005 Attack and his injuries, PFC Green has experienced severe physical and emotional pain and suffering.

1392.   Plaintiff PFC Green was a U.S. national at the time of the attack and remains one to this day.

1393.   Plaintiff Melanie Green is the mother of PFC Green and a U.S. national.

1394.   Plaintiff Steven Green is the brother of PFC Green and a U.S. national.

1395.   As a result of the March 28, 2005 Attack and PFC Green's injuries, each member of the Green Family has experienced severe mental anguish and emotional pain and suffering.

**The April 4, 2005 Bomb Attack In Al Anbar (Jeremiah C. Kinchen Family)**

1396.   On April 4, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated a bomb in Al Anbar, Iraq (the "April 4, 2005 Attack"). The April 4, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1397.   The April 4, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1398.   **Lance Corporal Jeremiah C. Kinchen** served in Iraq as a member of the U.S. Marine Corps Reserve. LCpl Kinchen was injured in the April 4, 2005 Attack. LCpl Kinchen died on April 4, 2005 as a result of injuries sustained during the April 4, 2005 Attack.

1399.   LCpl Kinchen was a U.S. national at the time of the attack and his death.

1400.   Plaintiff Jeanie Kinchen is the mother of LCpl Kinchen and a U.S. national.

1401.   Plaintiff James Kinchen Jr. is the father of LCpl Kinchen and a U.S. national.

1402.   Plaintiff Amie Meredith is the sister of LCpl Kinchen and a U.S. national.

1403.   As a result of the April 4, 2005 Attack and LCpl Kinchen's injuries and death, each member of the Kinchen Family has experienced severe mental anguish and emotional pain and suffering, and the loss of LCpl Kinchen's society, companionship, and counsel.

1404.   As a result of the April 4, 2005 Attack, LCpl Kinchen was injured in his person and/or property. The Plaintiff members of the Kinchen Family are the survivors and/or heirs of LCpl Kinchen and are entitled to recover for the damages LCpl Kinchen sustained.

### The April 28, 2005 IED Attack In Ninewa (Eric W. Morris, Ricky W. Rockholt, Jr., and William A. Edens Families)

1405.   On April 28, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "April 28, 2005 Attack").  The April 28, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1406.   The April 28, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1407.   **Sergeant Eric W. Morris** served in Iraq as a member of the U.S. Army.  SGT Morris was injured in the April 28, 2005 Attack.  SGT Morris died on April 28, 2005 as a result of injuries sustained during the April 28, 2005 Attack.

1408.   SGT Morris was a U.S. national at the time of the attack and his death.

1409.   Plaintiff Jolene Morris is the widow of SGT Morris and a U.S. national.

1410.   As a result of the April 28, 2005 attack and SGT Morris's injuries and death, each member of the Morris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Morris's society, companionship, and counsel.

1411.   As a result of the April 28, 2005 attack, SGT Morris was injured in his person and/or property.  The Plaintiff members of the Morris Family are the survivors and/or heirs of SGT Morris and are entitled to recover for the damages SGT Morris sustained.

1412.   **Specialist Ricky W. Rockholt Jr.** served in Iraq as a member of the U.S. Army. SPC Rockholt was injured in the April 28, 2005 Attack.  SPC Rockholt died on April 28, 2005 as a result of injuries sustained during the April 28, 2005 Attack.

1413.   SPC Rockholt was a U.S. national at the time of the attack and his death.

1414.   Plaintiff Sherry Rockholt is the mother of SPC Rockholt Jr. and a U.S. national.

1415.   Plaintiff Jason Rockholt is the brother of SPC Rockholt Jr. and a U.S. national.

1416.   As a result of the April 28, 2005 attack and SPC Rockholt's injuries and death, each member of the Rockholt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rockholt's society, companionship, and counsel.

1417.   As a result of the April 28, 2005 attack, SPC Rockholt was injured in his person and/or property.  The Plaintiff members of the Rockholt Family are the survivors and/or heirs of SPC Rockholt and are entitled to recover for the damages SPC Rockholt sustained.

1418.   **First Lieutenant William A. Edens** served in Iraq as a member of the U.S. Army. 1LT Edens was injured in the April 28, 2005 Attack. 1LT Edens died on April 28, 2005 as a result of injuries sustained during the April 28, 2005 Attack.

1419.   1LT Edens was a U.S. national at the time of the attack and his death.

1420.   Plaintiff Christina Linden is the widow of 1LT Edens and a U.S. national.

1421.   As a result of the April 28, 2005 Attack and 1LT Edens's injuries and death, each member of the Edens Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Edens's society, companionship, and counsel.

1422.   As a result of the April 28, 2005 Attack, 1LT Edens was injured in his person and/or property. The Plaintiff members of the Edens Family are the survivors and/or heirs of 1LT Edens and are entitled to recover for the damages 1LT Edens sustained.

**The May 1, 2005 Suicide Attack In Baghdad (Derrick J. Lutters Family)**

1423.   On May 1, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a suicide vehicle borne IED ("VBIED") attack in Baghdad, Iraq (the "May 1, 2005 Attack").  The May 1, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1424.   The May 1, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1425.   **Sergeant Derrick J. Lutters** served in Iraq as a member of the Kansas U.S. Army National Guard. SGT Lutters was injured in the May 1, 2005 Attack.  SGT Lutters died on May 1, 2005 as a result of injuries sustained during the May 1, 2005 Attack.

1426.   SGT Lutters was a U.S. national at the time of the attack and his death.

1427.   Plaintiff Ronald Lutters is the father of SGT Lutters and a U.S. national.

1428.   As a result of the May 1, 2005 Attack and SGT Lutters's injuries and death, each member of the Lutters Family has experienced severe mental anguish and emotional pain and suffering, and the loss of SGT Lutters's society, companionship, and counsel.

1429.   As a result of the May 1, 2005 Attack, SGT Lutters was injured in his person and/or property.  The Plaintiff members of the Lutters Family are the survivors and/or heirs of SGT Lutters and are entitled to recover for the damages SGT Lutters sustained.

**The May 10, 2005 IED Attack In Al Anbar (Samuel T. Castle Family)**

1430.   On May 10, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "May 10, 2005 Attack"). The May 10, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1431.   The May 10, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1432.   **Staff Sergeant Samuel T. Castle** served in Iraq as a member of the U.S. Army. SSG Castle was injured in the May 10, 2005 Attack. SSG Castle died on May 10, 2005 as a result of injuries sustained during the May 10, 2005 Attack.

1433.   SSG Castle was a U.S. national at the time of the attack and his death.

1434.   Plaintiff Jimmy Castle is the father of SSG Castle and a U.S. national.

1435.   As a result of the May 10, 2005 Attack and SSG Castle's injuries and death, each member of the Castle Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Castle's society, companionship, and counsel.

1436.   As a result of the May 10, 2005 Attack, SSG Castle was injured in his person and/or property. The Plaintiff members of the Castle Family are the survivors and/or heirs of SSG Castle and are entitled to recover for the damages SSG Castle sustained.

**The May 28, 2005 IED Attack In Ninewa (Phillip N. Sayles Family)**

1437.   On May 28, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Ninewa, Iraq (the "May 28, 2005 Attack").  The May 28, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1438.   The May 28, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1439.   **Specialist Phillip N. Sayles** served in Iraq as a member of the U.S. Army.  SPC Sayles was injured in the May 28, 2005 Attack.  SPC Sayles died on May 28, 2005 as a result of injuries sustained during the May 28, 2005 Attack.

1440.   SPC Sayles was a U.S. national at the time of the attack and his death.

1441.   Plaintiff Pearl Sayles is the mother of SPC Sayles and a U.S. national.

1442.   Plaintiff Joseph Sayles is the brother of SPC Sayles and a U.S. national.

1443.   Plaintiff Wesley Sayles is the brother of SPC Sayles and a U.S. national.

1444.   As a result of the May 28, 2005 Attack and SPC Sayles's injuries and death, each member of the Sayles Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Sayles's society, companionship, and counsel.

1445.   As a result of the May 28, 2005 Attack, SPC Sayles was injured in his person and/or property.  The Plaintiff members of the Sayles Family are the survivors and/or heirs of SPC Sayles and are entitled to recover for the damages SPC Sayles sustained.

**The June 1, 2005 IED Attack In Al Anbar (Phillip C. Edmundson Family)**

1446.   On June 1, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 1, 2005 Attack"). The June 1, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1447.   The June 1, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1448.   **Corporal Phillip C. Edmundson** served in Iraq as a member of the U.S. Army. CPL Edmundson was injured in the June 1, 2005 Attack. CPL Edmundson died on June 1, 2005 as a result of injuries sustained during the June 1, 2005 Attack.

1449.   CPL Edmundson was a U.S. national at the time of the attack and his death.

1450.   Plaintiff Annie Edmundson is the mother of CPL Edmundson and a U.S. national.

1451.   Plaintiff Robert Edmundson is the father of CPL Edmundson and a U.S. national.

1452.   As a result of the June 1, 2005 Attack and CPL Edmundson's injuries and death, each member of the Edmundson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Edmundson's society, companionship, and counsel.

1453.   As a result of the June 1, 2005 Attack, CPL Edmundson was injured in his person and/or property. The Plaintiff members of the Edmundson Family are the survivors and/or heirs of CPL Edmundson and are entitled to recover for the damages CPL Edmundson sustained.

**The June 9, 2005 IED Attack in Al Anbar (Brad D. Squires Family)**

1454.   On June 9, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "June 9, 2005 Attack").  The June 9, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1455.   The June 9, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1456.   **Corporal Brad D. Squires** served in Iraq as a member of the U.S. Marine Corps Reserve.  Cpl Squires was injured in the June 9, 2005 Attack.  Cpl Squires died on June 9, 2005 as a result of injuries sustained during the June 9, 2005 Attack.

1457.   Cpl Squires was a U.S. national at the time of the attack and his death.

1458.   Plaintiff Bruce Squires is the father of Cpl Squires and a U.S. national.

1459.   As a result of the June 9, 2005 attack and Cpl Squires's injuries and death, each member of the Squires Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Squires's society, companionship, and counsel.

1460.   As a result of the June 9, 2005 attack, Cpl Squires was injured in his person and/or property.  The Plaintiff members of the Squires Family are the survivors and/or heirs of Cpl Squires and are entitled to recover for the damages Cpl Squires sustained.

**The June 10, 2005 IED Attack In Al Anbar (Andrew J. Kilpela Family)**

1461.   On June 10, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 10, 2005 Attack"). The June 10, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1462.   The June 10, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1463.   **Lance Corporal Andrew J. Kilpela** served in Iraq as a member of the U.S. Marine Corps. LCpl Kilpela was injured in the June 10, 2005 Attack. LCpl Kilpela died on June 10, 2005 as a result of injuries sustained during the June 10, 2005 Attack.

1464.   LCpl Kilpela was a U.S. national at the time of the attack and his death.

1465.   Plaintiff Cheryl Kilpela is the mother of LCpl Kilpela and a U.S. national.

1466.   Plaintiff Michael Kilpela is the father of LCpl Kilpela and a U.S. national.

1467.   As a result of the June 10, 2005 Attack and LCpl Kilpela's injuries and death, each member of the Kilpela Family has experienced severe mental anguish and emotional pain and suffering, and the loss of LCpl Kilpela's society, companionship, and counsel.

1468.   As a result of the June 10, 2005 Attack, LCpl Kilpela was injured in his person and/or property. The Plaintiff members of the Kilpela Family are the survivors and/or heirs of LCpl Kilpela and are entitled to recover for the damages LCpl Kilpela sustained.

**The June 11, 2005 IED Attack In Al Anbar (Larry R. Arnold Sr. Family)**

1469.   On June 11, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 11, 2005 Attack"). The June 11, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1470.   The June 11, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1471.   **Sergeant Larry R. Arnold Sr.** served in Iraq as a member of the Mississippi U.S. Army National Guard. SGT Arnold was injured in the June 11, 2005 Attack. SGT Arnold died on June 11, 2005 as a result of injuries sustained during the June 11, 2005 Attack.

1472.   SGT Arnold was a U.S. national at the time of the attack and his death.

1473.   Plaintiff JoAnn Arnold is the sister of SGT Arnold and a U.S. national.

1474.   Plaintiff Janet Brandes is the sister of SGT Arnold and a U.S. national.

1475.   Plaintiff Beverly Hicks is the sister of SGT Arnold and a U.S. national.

1476.   As a result of the June 11, 2005 Attack and SGT Arnold's injuries and death, each member of the Arnold Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Arnold's society, companionship, and counsel.

1477.   As a result of the June 11, 2005 Attack, SGT Arnold was injured in his person and/or property.  The Plaintiff members of the Arnold Family are the survivors and/or heirs of SGT Arnold and are entitled to recover for the damages SGT Arnold sustained.

**The June 15, 2005 IED Attack In Al Anbar (Chad B. Maynard Family)**

1478.   On June 15, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 15, 2005 Attack").  The June 15, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1479.   The June 15, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1480.   **Lance Corporal Chad B. Maynard** served in Iraq as a member of the U.S. Marine Corps.  LCpl Maynard was injured in the June 15, 2005 Attack.  LCpl Maynard died on June 15, 2005 as a result of injuries sustained during the June 15, 2005 Attack.

1481.   LCpl Maynard was a U.S. national at the time of the attack and his death.

1482.   Plaintiff Gene Maynard is the father of LCpl Maynard and a U.S. national.

1483.   As a result of the June 15, 2005 Attack and LCpl Maynard's injuries and death, each member of the Maynard Family has experienced severe mental anguish and emotional pain and suffering, and the loss of LCpl Maynard's society, companionship, and counsel.

1484.   As a result of the June 15, 2005 Attack, LCpl Maynard was injured in his person and/or property.  The Plaintiff members of the Maynard Family are the survivors and/or heirs of LCpl Maynard and are entitled to recover for the damages LCpl Maynard sustained.

### The June 16, 2005 Complex Attack Involving IED In Al Anbar (Octavio Sanchez Family)

1485.   On June 16, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "June 16, 2005 Attack"). The June 16, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1486.   The June 16, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1487.   **Sergeant Octavio Sanchez** served in Iraq as a member of the U.S. Marine Corps. On June 16, 2005, Sgt Sanchez was severely injured in the June 16, 2005 Attack, which severely wounded Sgt Sanchez, who suffered 67% body surface area burns with 66% of them being third degree burns, an amputated right hand, hearing loss in his right ear, anxiety attacks, and depression. Sgt Sanchez has had to undergo several surgeries, including skin grafts, amputation, and reconstructive surgery.  As a result of the June 16, 2005 Attack and his injuries, Sgt Sanchez has experienced severe physical and emotional pain and suffering.

1488.   Plaintiff Sgt Sanchez was a U.S. national at the time of the attack and remains one to this day.

1489.   Plaintiff Jacob Sanchez is the son of Sgt Sanchez and a U.S. national.

1490.   As a result of the June 16, 2005 Attack and Sgt Sanchez's injuries, each member of the Sanchez Family has experienced severe mental anguish and emotional pain and suffering.

**The June 23, 2005 Suicide Attack In Al Anbar (Ramona M. Valdez Family)**

1491.   On June 23, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "June 23, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 23, 2005 Attack.

1492.   The June 23, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1493.   **Corporal Ramona M. Valdez** served in Iraq as a member of the U.S. Marine Corps.  Cpl Valdez was injured in the June 23, 2005 Attack.  Cpl Valdez died on June 23, 2005 as a result of injuries sustained during the June 23, 2005 Attack.

1494.   Cpl Valdez was a U.S. national at the time of the attack and her death.

1495.   Plaintiff Estefani Valdez is the sister of Cpl Valdez and a U.S. national.

1496.   As a result of the June 23, 2005 Attack and Cpl Valdez's injuries and death, each member of the Valdez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Valdez's society, companionship, and counsel.

1497.   As a result of the June 23, 2005 Attack, Cpl Valdez was injured in her person and/or property.  The Plaintiff members of the Valdez Family are the survivors and/or heirs of Cpl Valdez and are entitled to recover for the damages Cpl Valdez sustained.

**The July 14, 2005 IED Attack In Al Anbar (Christopher D. Winchester Family)**

1498.   On July 14, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "July 14, 2005 Attack").  The July 14, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1499.   The July 14, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1500.   **Corporal Christopher D. Winchester** served in Iraq as a member of the U.S. Marine Corps.  Cpl Winchester was injured in the July 14, 2005 Attack.  Cpl Winchester died on July 14, 2005 as a result of injuries sustained during the July 14, 2005 Attack.

1501.   Cpl Winchester was a U.S. national at the time of the attack and his death.

1502.   Plaintiff Gail Williams is the mother of Cpl Winchester and a U.S. national.

1503.   Plaintiff Allison Murphy is the sister of Cpl Winchester and a U.S. national.

1504.   As a result of the July 14, 2005 Attack and Cpl Winchester's injuries and death, each member of the Winchester Family has experienced severe mental anguish and emotional pain and suffering, and the loss of Cpl Winchester's society, companionship, and counsel.

1505.   As a result of the July 14, 2005 Attack, Cpl Winchester was injured in his person and/or property.  The Plaintiff members of the Winchester Family are the survivors and/or heirs of Cpl Winchester and are entitled to recover for the damages Cpl Winchester sustained.

**The July 14, 2005 IED Attack In Al Anbar (Tricia L. Jameson Family)**

1506.   On July 14, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "July 14, 2005 Attack"). The July 14, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1507.   The July 14, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1508.   **Sergeant First Class Tricia L. Jameson** served in Iraq as a member of the Nebraska U.S. Army National Guard. SFC Jameson was injured in the July 14, 2005 Attack. SFC Jameson died on July 14, 2005 as a result of injuries sustained during the July 14, 2005 Attack.

1509.   SFC Jameson was a U.S. national at the time of the attack and her death.

1510.   Plaintiff Patricia Jameson is the mother of SFC Jameson and a U.S. national.

1511.   Plaintiff Robert Jameson is the brother of SFC Jameson and a U.S. national.

1512.   As a result of the July 14, 2005 Attack and SFC Jameson's injuries and death, each member of the Jameson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Jameson's society, companionship, and counsel.

1513.   As a result of the July 14, 2005 Attack, SFC Jameson was injured in her person and/or property.  The Plaintiff members of the Jameson Family are the survivors and/or heirs of SFC Jameson and are entitled to recover for the damages SFC Jameson sustained.

**The July 27, 2005 IED Attack In Saladin (Edward L. Myers Family)**

1514.   On July 27, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Saladin, Iraq (the "July 27, 2005 Attack").  The July 27, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1515.   The July 27, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1516.  **Specialist Edward L. Myers** served in Iraq as a member of the U.S. Army.  SPC Myers was injured in the July 27, 2005 Attack.  SPC Myers died on July 27, 2005 as a result of injuries sustained during the July 27, 2005 Attack.

1517.  SPC Myers was a U.S. national at the time of the attack and his death.

1518.  Plaintiff Imojean Myers is the widow of SPC Myers and a U.S. national.

1519.  Plaintiff Rebekah Myers is the daughter of SPC Myers and a U.S. national.

1520.  Plaintiff Charlotte Myers-Dick is the mother of SPC Myers and a U.S. national.

1521.  Plaintiff Thomas Dick is the stepfather of SPC Myers and a U.S. national. Mr. Dick lived in the same household as SPC Myers for a substantial period and considered SPC Myers the functional equivalent of a biological son.

1522.  As a result of the July 27, 2005 Attack and SPC Myers's injuries and death, each member of the Myers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Myers's society, companionship, and counsel.

1523.  As a result of the July 27, 2005 Attack, SPC Myers was injured in his person and/or property.  The Plaintiff members of the Myers Family are the survivors and/or heirs of SPC Myers and are entitled to recover for the damages SPC Myers sustained.

**The August 1, 2005 Suicide Attack In Al Anbar (James R. Graham III Family)**

1524.  On August 1, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "August 1, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the August 1, 2005 Attack.

1525.  The August 1, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1526.   **Sergeant James R. Graham III** served in Iraq as a member of the U.S. Marine Corps Reserve.  Sgt Graham was injured in the August 1, 2005 Attack.  Sgt Graham died on August 1, 2005 as a result of injuries sustained during the August 1, 2005 Attack.

1527.   Sgt Graham was a U.S. national at the time of the attack and his death.

1528.   Plaintiff Katrina Graham is the mother of Sgt Graham and a U.S. national.

1529.   Plaintiff James Graham II is the father of Sgt Graham and a U.S. national.

1530.   As a result of the August 1, 2005 Attack and Sgt Graham's injuries and death, each member of the Graham Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Graham's society, companionship, and counsel.

1531.   As a result of the August 1, 2005 Attack, Sgt Graham was injured in his person and/or property.  The Plaintiff members of the Graham Family are the survivors and/or heirs of Sgt Graham and are entitled to recover for the damages Sgt Graham sustained.

### The August 3, 2005 IED Attack In Al Anbar (Aaron H. Reed and Nicholas W. B. Bloem Families)

1532.   On August 3, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "August 3, 2005 Attack").  The August 3, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1533.   The August 3, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1534.   **Lance Corporal Aaron H. Reed** served in Iraq as a member of the U.S. Marine Corps Reserve.  LCpl Reed was injured in the August 3, 2005 Attack.  LCpl Reed died on August 3, 2005 as a result of injuries sustained during the August 3, 2005 Attack.

1535.   LCpl Reed was a U.S. national at the time of the attack and his death.

1536.   Plaintiff Sara Duvall is the mother of LCpl Reed and a U.S. national.

1537.   Plaintiff Matthew Reed is the brother of LCpl Reed and a U.S. national.

1538.   Plaintiff Jill Parmeter is the stepsister of LCpl Reed and a U.S. national. Ms. Parmeter lived in the same household as LCpl Reed for a substantial period and considered LCpl Reed the functional equivalent of a biological brother.

1539.   Plaintiff Larry Duvall is the stepfather of LCpl Reed and a U.S. national. Mr. Duvall lived in the same household as LCpl Reed for a substantial period and considered LCpl Reed the functional equivalent of a biological son.

1540.   As a result of the August 3, 2005 Attack and LCpl Reed's injuries and death, each member of the Reed Family has experienced severe mental anguish and emotional pain and suffering, and the loss of LCpl Reed's society, companionship, and counsel.

1541.   As a result of the August 3, 2005 Attack, LCpl Reed was injured in his person and/or property.  The Plaintiff members of the Reed Family are the survivors and/or heirs of LCpl Reed and are entitled to recover for the damages LCpl Reed sustained.

1542.   **Lance Corporal Nicholas W.B. Bloem** served in Iraq as a member of the U.S. Marine Corps. LCpl Bloem was injured in the August 3, 2005 Attack. LCpl Bloem died on August 3, 2005 as a result of injuries sustained during the August 3, 2005 Attack.

1543.   LCpl Bloem was a U.S. national at the time of the attack and his death.

1544.   Plaintiff Alcides Bloem Jr. is the father of LCpl Bloem and a U.S. national.

1545.   As a result of the August 3, 2005 Attack and LCpl Bloem's injuries and death, each member of the Bloem Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Bloem's society, companionship, and counsel.

1546.   As a result of the August 3, 2005 Attack, LCpl Bloem was injured in his person and/or property. The Plaintiff members of the Bloem Family are the survivors and/or heirs of LCpl Bloem and are entitled to recover for the damages LCpl Bloem sustained.

### The August 12, 2005 Complex Attack Involving An IED In Al Taqqadum (Larry A. Stilwell Family)

1547.   On August 12, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Taqqadum, Iraq (the "August 12, 2005 Attack").  The August 12, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1548.   The August 12, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1549.   **Mr. Larry A. Stilwell** served in Iraq as a civilian contractor working for KBR.  Mr. Stilwell was injured in the August 12, 2005 Attack.  Mr. Stilwell died on August 12, 2005 as a result of injuries sustained during the August 12, 2005 Attack.

1550.   Mr. Stilwell was a U.S. national at the time of the attack and his death.

1551.   Plaintiff Ryan Stilwell is the son of Mr. Stilwell and a U.S. national.

1552.   Plaintiff Rachel Vera is the daughter of Mr. Stilwell and a U.S. national.

1553.   Plaintiff Jimmy Stilwell is the brother of Mr. Stilwell and a U.S. national.

1554.   As a result of the August 12, 2005 Attack and Mr. Stilwell's injuries and death, each member of the Stilwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Stilwell's society, companionship, and counsel.

1555.   As a result of the August 12, 2005 Attack, Mr. Stilwell was injured in his person and/or property.  The Plaintiff members of the Stilwell Family are the survivors and/or heirs of Mr. Stilwell and are entitled to recover for the damages Mr. Stilwell sustained.

**The August 18, 2005 IED Attack In Saladin (Jeremy W. Doyle, Nathan K. Bouchard, Timothy J. Seamans Families)**

1556.   On August 18, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Saladin, Iraq (the "August 18, 2005 Attack"). The August 18, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1557.   The August 18, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1558.   **Staff Sergeant Jeremy W. Doyle** served in Iraq as a member of the U.S. Army. SSG Doyle was injured in the August 18, 2005 Attack. SSG Doyle died on August 18, 2005 as a result of injuries sustained during the August 18, 2005 Attack.

1559.   SSG Doyle was a U.S. national at the time of the attack and his death.

1560.   Plaintiff Debra Grove is the mother of SSG Doyle and a U.S. national.

1561.   Plaintiff Cameron Mann is the sister of SSG Doyle and a U.S. national.

1562.   Plaintiff Dale Grove is the stepfather of SSG Doyle and a U.S. national. Mr. Grove lived in the same household as SSG Doyle for a substantial period and considered SSG Doyle the functional equivalent of a biological son.

1563.   As a result of the August 18, 2005 Attack and SSG Doyle's injuries and death, each member of the Doyle Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Doyle's society, companionship, and counsel.

1564.   As a result of the August 18, 2005 Attack, SSG Doyle was injured in his person and/or property. The Plaintiff members of the Doyle Family are the survivors and/or heirs of SSG Doyle and are entitled to recover for the damages SSG Doyle sustained.

1565.   **Sergeant Nathan K. Bouchard** served in Iraq as a member of the U.S. Army. SGT Bouchard was injured in the August 18, 2005 Attack. SGT Bouchard died on August 18, 2005 as a result of injuries sustained during the August 18, 2005 Attack.

1566.   SGT Bouchard was a U.S. national at the time of the attack and his death.

1567.   Plaintiff John Bouchard is the father of SGT Bouchard and a U.S. national.

1568.   As a result of the August 18, 2005 Attack and SGT Bouchard's injuries and death, each member of the Bouchard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Bouchard's society, companionship, and counsel.

1569.   As a result of the August 18, 2005 Attack, SGT Bouchard was injured in his person and/or property. The Plaintiff members of the Bouchard Family are the survivors and/or heirs of SGT Bouchard and are entitled to recover for the damages SGT Bouchard sustained.

1570.   **Private 1st Class Timothy James Seamans** served in Iraq as a member of the U.S. Army.  PFC Seamans was injured in the August 18, 2005 Attack.  PFC Seamans died on August 18, 2005 as a result of injuries sustained during the August 18, 2005 Attack.

1571.   PFC Seamans was a U.S. national at the time of the attack and his death.

1572.   Plaintiff Monica Seamans is the mother of PFC Seamans and a U.S. national.

1573.   Plaintiff David Seamans is the father of PFC Seamans and a U.S. national.

1574.   Plaintiff Ashley Knapp is the sister of PFC Seamans and a U.S. national.

1575.   As a result of the August 18, 2005 attack and PFC Seamans's injuries and death, each member of the Seamans Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Seamans's society, companionship, and counsel.

1576.   As a result of the August 18, 2005 attack, PFC Seamans was injured in his person and/or property.  The Plaintiff members of the Seamans Family are the survivors and/or heirs of PFC Seamans and are entitled to recover for the damages PFC Seamans sustained.

**The August 21, 2005 IED In Al Anbar (Adam Kisielewski Family)**

1577.   On August 21, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "August 21, 2005 Attack"). The August 21, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1578.   The August 21, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1579.   **Sergeant Adam Kisielewski** served in Iraq as a member of the U.S. Marine Corps. Sgt Kisielewski was injured in the August 21, 2005 Attack.  The attack severely wounded Sgt Kisielewski, who suffered a double amputation of the left arm and right leg.  As a result of the August 21, 2005 Attack and his injuries, Sgt Kisielewski has experienced severe physical and emotional pain and suffering.

1580.   Plaintiff Sgt Kisielewski was a U.S. national at the time of the attack and remains one to this day.

1581.   As a result of the August 21, 2005 Attack and Sgt Kisielewski's injuries, each member of the Kisielewski Family has experienced severe mental anguish and emotional pain and suffering.

**The August 22, 2005 IED Attack In Al Anbar (Ramon Romero Family)**

1582.   On August 22, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "August 22, 2005 Attack").  The August 22, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1583.   The August 22, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1584.   **Private First Class Ramon Romero** served in Iraq as a member of the U.S. Marine Corps.  PFC Romero was injured in the August 22, 2005 Attack.  PFC Romero died on August 22, 2005 as a result of injuries sustained during the August 22, 2005 Attack.

1585.   PFC Romero was a U.S. national at the time of the attack and his death.

1586.   Plaintiff Juan Romero is the father of PFC Romero and a U.S. national.

1587.   Plaintiff Maria Romero is the mother of PFC Romero and a U.S. national.

1588.   Plaintiff Yajaira Romero is the sister of PFC Romero and a U.S. national.

1589.   Plaintiff Bernardo Romero is the brother of PFC Romero and a U.S. national.

1590.   As a result of the August 22, 2005 Attack and PFC Romero's injuries and death, each member of the Romero Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Romero's society, companionship, and counsel.

1591.   As a result of the August 22, 2005 Attack, PFC Romero was injured in his person and/or property.  The Plaintiff members of the Romero Family are the survivors and/or heirs of PFC Romero and are entitled to recover for the damages PFC Romero sustained.

**The August 22, 2005 IED Attack In Saladin (Victoir P. Lieurance Family)**

1592.   On August 22, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Saladin, Iraq (the "August 22, 2005 Saladin Attack").  The August 22, 2005 Saladin Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1593.   The August 22, 2005 Saladin Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1594.   **Staff Sergeant Victoir P. Lieurance** served in Iraq as a member of the Tennessee U.S. Army National Guard. SSG Lieurance was injured in the August 22, 2005 Saladin Attack. SSG Lieurance died on August 22, 2005 as a result of injuries sustained during the August 22, 2005 Saladin Attack.

1595.   SSG Lieurance was a U.S. national at the time of the attack and his death.

1596.   Plaintiff Penny Lieurance is the widow of SSG Lieurance and a U.S. national.

1597.   Plaintiff Chase Lieurance is the son of SSG Lieurance and a U.S. national.

1598.   Plaintiff Damien Lieurance is the son of SSG Lieurance and a U.S. national.

1599.   Plaintiff Jonette Lieurance is the sister of SSG Lieurance and a U.S. national.

1600.   As a result of the August 22, 2005 Saladin Attack and SSG Lieurance's injuries and death, each member of the Lieurance Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Lieurance's society, companionship, and counsel.

1601.   As a result of the August 22, 2005 Saladin Attack, SSG Lieurance was injured in his person and/or property.  The Plaintiff members of the Lieurance Family are the survivors

and/or heirs of SSG Lieurance and are entitled to recover for the damages SSG Lieurance sustained.

### The August 25, 2005 IED Attack In Al Anbar (Trevor J. Diesing Family)

1602.   On August 25, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "August 25, 2005 Attack"). The August 25, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1603.   The August 25, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1604.   **Sergeant First Class Trevor J. Diesing** served in Iraq as a member of the U.S. Army. SFC Diesing was injured in the August 25, 2005 Attack. SFC Diesing died on August 25, 2005 as a result of injuries sustained during the August 25, 2005 Attack.

1605.   SFC Diesing was a U.S. national at the time of the attack and his death.

1606.   Plaintiff Lori Diesing is the widow of SFC Diesing and a U.S. national.

1607.   As a result of the August 25, 2005 Attack and SFC Diesing's injuries and death, each member of the Diesing Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Diesing's society, companionship, and counsel.

1608.   As a result of the August 25, 2005 Attack, SFC Diesing was injured in his person and/or property. The Plaintiff members of the Diesing Family are the survivors and/or heirs of SFC Diesing and are entitled to recover for the damages SFC Diesing sustained.

**The August 26, 2005 IED Attack In Al Anbar (Ivica Jerak Family)**

1609.    On August 26, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "August 26, 2005 Attack").   The August 26, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1610.    The August 26, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1611.    **Master Sergeant Ivica Jerak** served in Iraq as a member of the U.S. Army.   MSG Jerak was injured in the August 26, 2005 Attack.   MSG Jerak died on August 26, 2005 as a result of injuries sustained during the August 26, 2005 Attack.

1612.    MSG Jerak was a U.S. national at the time of the attack and his death.

1613.    Plaintiff Hyesuk Jerak is the widow of MSG Jerak and a U.S. national.

1614.    As a result of the August 26, 2005 Attack and MSG Jerak's injuries and death, each member of the Jerak Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Jerak's society, companionship, and counsel.

1615.    As a result of the August 26, 2005 Attack, MSG Jerak was injured in his person and/or property.   The Plaintiff members of the Jerak Family are the survivors and/or heirs of MSG Jerak and are entitled to recover for the damages MSG Jerak sustained.

**The August 26, 2005 Complex Attack Involving An IED In Al Anbar (Mark H. Beyers Family)**

1616.    On August 26, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "August 26, 2005 Attack"). The August 26, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1617.  The August 26, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1618.  **Private 1st Class Mark H. Beyers** served in Iraq as a member of the U.S. Army. PFC Beyers was injured in the August 26, 2005 Attack.  The attack severely wounded PFC Beyers, who suffered a right shoulder amputated above the collar bone, large hole in his scapula, right leg below the knee amputation, punctured lung, lacerated spleen and liver, three-four feet of colon removed, lacerations to head/face, and endured 40 surgeries in three months. As a result of the August 26, 2005 Attack and his injuries, PFC Beyers has experienced severe physical and emotional pain and suffering.

1619.  Plaintiff PFC Beyers was a U.S. national at the time of the attack and remains one to this day.

1620.  Plaintiff Denise Beyers is the wife of PFC Beyers and a U.S. national.

1621.  As a result of the August 26, 2005 Attack and PFC Beyers's injuries, each member of the Beyers Family has experienced severe mental anguish, emotional pain and suffering.

**The September 9, 2005 IED Attack In Salah Ad Din (David W. Bronson Family)**

1622.  On September 9, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Salah ad Din, Iraq (the "September 9, 2005 Attack"). The September 9, 2005 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

1623.  The September 9, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1624.   **Sergeant David Wilson Bronson** served in Iraq as a member of the U.S. Marine Corps. Sgt Bronson was injured in the September 9, 2005 Attack. The attack severely wounded Sgt Bronson, who suffered severe injuries to the left side of his head and left arm, left leg below the knee amputation, TBI, multiple facial scars, shrapnel in the left lung, gunshot wound to right knee, loss of hearing in the left ear, chronic pain, memory loss, nightmares, and PTSD. As a result of the September 9, 2005 Attack and his injuries, Sgt Bronson has experienced severe physical and emotional pain and suffering.

1625.   Plaintiff Sgt Bronson was a U.S. national at the time of the attack and remains one to this day.

1626.   As a result of the September 9, 2005 Attack and Sgt Bronson's injuries, each member of the Bronson Family has experienced severe mental anguish and emotional pain and suffering.

### The September 19, 2005 Complex Attack Involving IED In Al Anbar (Michael Egan Family)

1627.   On September 19, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "September 19, 2005 Attack").  The September 19, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1628.   The September 19, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1629.  **Sergeant Michael Egan** served in Iraq as a member of the U.S. Army.  Sgt Egan was injured in the September 19, 2005 Attack.  Sgt Egan died on September 19, 2005 as a result of injuries sustained during the September 19, 2005 Attack.

1630.  Sgt Egan was a U.S. national at the time of the attack and his death.

1631.  Plaintiff Maria Egan is the widow of Sgt Egan and a U.S. national.

1632.  Plaintiff Samantha Egan is the daughter of Sgt Egan and a U.S. national.

1633.  As a result of the September 19, 2005 attack and Sgt Egan's injuries and death, each member of the Egan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Egan's society, companionship, and counsel.

1634.  As a result of the September 19, 2005 attack, Sgt Egan was injured in his person and/or property.  The Plaintiff members of the Egan Family are the survivors and/or heirs of Sgt Egan and are entitled to recover for the damages Sgt Egan sustained.

### The September 20, 2005 Complex Attack Involving An IED In Salah Ad Din (Sascha Grenner-Case Family)

1635.  On September 20, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Salah ad Din, Iraq (the "September 20, 2005 Attack").  The September 20, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1636.  The September 20, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1637.  **Mr. Sascha Grenner-Case** served in Iraq as a civilian contractor working for Kellogg, Brown & Root, Inc.  Mr. Grenner-Case was injured in the September 20, 2005 Attack.

Mr. Grenner-Case died on September 20, 2005 as a result of injuries sustained during the September 20, 2005 Attack.

1638.   Mr. Grenner-Case was a U.S. national at the time of the attack and his death.

1639.   Plaintiff Karen Grenner-Case is the widow of Mr. Grenner-Case and a U.S. national.

1640.   Plaintiff Troy Grenner-Case is the son of Mr. Grenner-Case and a U.S. national.

1641.   Plaintiff Myra Bardo is the stepdaughter of Mr. Grenner-Case and a U.S. national. Ms. Bardo lived in the same household as Mr. Grenner-Case for a substantial period and considered Mr. Grenner-Case the functional equivalent of a biological father.

1642.   As a result of the September 20, 2005 attack and Mr. Grenner-Case's injuries and death, each member of the Grenner-Case Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Grenner-Case's society, companionship, and counsel.

1643.   As a result of the September 20, 2005 attack, Mr. Grenner-Case was injured in his person and/or property.  The Plaintiff members of the Grenner-Case Family are the survivors and/or heirs of Mr. Grenner-Case and are entitled to recover for the damages Mr. Grenner-Case sustained.

**The October 3, 2005 IED Attack In Al Anbar (Bryan W. Large Family)**

1644.   On October 3, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 3, 2005 Attack").  The October 3, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1645.   The October 3, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1646.   **Sergeant Bryan W. Large** served in Iraq as a member of the U.S. Army.  SGT Large was injured in the October 3, 2005 Attack. SGT Large died on October 4, 2005 as a result of injuries sustained during the October 3, 2005 Attack.

1647.   SGT Large was a U.S. national at the time of the attack and his death.

1648.   Plaintiff Kylie Fogle is the daughter of SGT Large and a U.S. national.

1649.   Plaintiff Larry Large is the father of SGT Large and a U.S. national.

1650.   Plaintiff Michelle Lever is the sister of SGT Large and a U.S. national.

1651.   Plaintiff Devan Eutin is the stepdaughter of SGT Large and a U.S. national. Ms. Eutin lived in the same household as SGT Large for a substantial period and considered SGT Large the functional equivalent of a biological father.

1652.   As a result of the October 3, 2005 Attack and SGT Large's injuries and death, each member of the Large Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Large's society, companionship, and counsel.

1653.   As a result of the October 3, 2005 Attack, SGT Large was injured in his person and/or property.  The Plaintiff members of the Large Family are the survivors and/or heirs of SGT Large and are entitled to recover for the damages SGT Large sustained.

**The October 6, 2005 IED Attack In Al Anbar (Daniel M. McVicker Family)**

1654.   On October 6, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 6, 2005 Attack").  The October 6, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1655.   The October 6, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive

detonation system indiscriminately placed civilians at risk.

1656.   **Lance Corporal Daniel Morgan McVicker** served in Iraq as a member of the U.S.

Marine Corps.  LCpl McVicker was injured in the October 6, 2005 Attack.  LCpl McVicker died

on October 6, 2005 as a result of injuries sustained during the October 6, 2005 Attack.

1657.   LCpl McVicker was a U.S. national at the time of the attack and his death.

1658.   Plaintiff Mark McVicker is the father of LCpl McVicker and a U.S. national.

1659.   Plaintiff Carey Meissner is the mother of LCpl McVicker and a U.S. national.

1660.   Plaintiff Mollie Handy is the sister of LCpl McVicker and a U.S. national.

1661.   Plaintiff Irma McVicker is the stepmother of LCpl McVicker and a U.S. national.

Ms. McVicker lived in the same household as LCpl McVicker for a substantial period and

considered LCpl McVicker the functional equivalent of a biological son.

1662.   Plaintiff Edward Ricci is the stepbrother of LCpl McVicker and a U.S. national.

Mr. Ricci lived in the same household as LCpl McVicker for a substantial period and considered

LCpl McVicker the functional equivalent of a biological brother.

1663.   As a result of the October 6, 2005 Attack and LCpl McVicker's injuries and

death, each member of the McVicker Family has experienced severe mental anguish and

emotional pain and suffering, and the loss of LCpl McVicker's society, companionship, and

counsel.

1664.   As a result of the October 6, 2005 Attack, LCpl McVicker was injured in his

person and/or property.  The Plaintiff members of the McVicker Family are the survivors and/or

heirs of LCpl McVicker and are entitled to recover for the damages LCpl McVicker sustained.

**The October 8, 2005 Complex Attack Involving An IED In Al Anbar (Kade L. Hinkhouse Family)**

1665.   On October 8, 2005, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "October 8, 2005 Attack"). The October 8, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1666.   The October 8, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1667.   **Staff Sergeant Kade L. Hinkhouse** served in Iraq as a member of the U.S. Army. SSgt Hinkhouse was injured in the October 8, 2005 Attack.  The attack severely wounded SSgt Hinkhouse, who suffered a right leg above-knee amputation, collapsed lungs, numerous shrapnel scars, surgical procedures including one to insert a large plastic plate in his skull, TBI, short term memory loss, and depression.  As a result of the October 8, 2005 Attack and his injuries, SSgt Hinkhouse has experienced severe physical and emotional pain and suffering.

1668.   Plaintiff SSgt Hinkhouse was a U.S. national at the time of the attack, and remains one to this day.

1669.   Plaintiff Richard Hinkhouse is the father of SSgt Hinkhouse and a U.S. national.

1670.   Plaintiff Susan Hinkhouse is the mother of SSgt Hinkhouse and a U.S. national.

1671.   As a result of the October 8, 2005 Attack and SSgt Hinkhouse's injuries, each member of the Hinkhouse Family has experienced severe mental anguish and emotional pain and suffering.

**The October 10, 2005 IED Attack In Al Anbar (Leon M. Johnson Family)**

1672.   On October 10, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 10, 2005 Attack"). The October 10, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1673.   The October 10, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1674.   **Sergeant Leon M. Johnson** served in Iraq as a member of the U.S. Army. SGT Johnson was injured in the October 10, 2005 Attack. SGT Johnson died on October 10, 2005 as a result of injuries sustained during the October 10, 2005 Attack.

1675.   SGT Johnson was a U.S. national at the time of the attack and his death.

1676.   Plaintiff Shalonda Johnson is the widow of SGT Johnson and a U.S. national.

1677.   Plaintiff Deionne Johnson is the daughter of SGT Johnson and a U.S. national.

1678.   Plaintiff Leon Johnson Jr. is the son of SGT Johnson and a U.S. national.

1679.   As a result of the October 10, 2005 Attack and SGT Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Johnson's society, companionship, and counsel.

1680.   As a result of the October 10, 2005 Attack, SGT Johnson was injured in his person and/or property.  The Plaintiff members of the Johnson Family are the survivors and/or heirs of SGT Johnson and are entitled to recover for the damages SGT Johnson sustained.

### The October 15, 2005 IED Attack In Al Anbar (Thomas H. Byrd and Richard A. Hardy Families)

1681.   On October 15, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 15, 2005 Attack"). The October 15, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1682.   The October 15, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1683.   **Specialist Thomas H. Byrd** served in Iraq as a member of the U.S. Army. SPC Byrd was injured in the October 15, 2005 Attack. SPC Byrd died on October 15, 2005 as a result of injuries sustained during the October 15, 2005 Attack.

1684.   SPC Byrd was a U.S. national at the time of the attack and his death.

1685.   Plaintiff Julia Byrd is the mother of SPC Byrd and a U.S. national.

1686.   As a result of the October 15, 2005 Attack and SPC Byrd's injuries and death, each member of the Byrd Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Byrd's society, companionship, and counsel.

1687.   As a result of the October 15, 2005 Attack, SPC Byrd was injured in his person and/or property.  The Plaintiff members of the Byrd Family are the survivors and/or heirs of SPC Byrd and are entitled to recover for the damages SPC Byrd sustained.

1688.   **Specialist Richard A. Hardy** served in Iraq as a member of the U.S. Army. SPC Hardy was injured in the October 15, 2005 Attack. SPC Hardy died on October 15, 2005 as a result of injuries sustained during the October 15, 2005 Attack.

1689.   SPC Hardy was a U.S. national at the time of the attack and his death.

1690.   Plaintiff Doris Hardy is the mother of SPC Hardy and a U.S. national.

1691.   As a result of the October 15, 2005 Attack and SPC Hardy's injuries and death, each member of the Hardy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hardy's society, companionship, and counsel.

1692.   As a result of the October 15, 2005 Attack, SPC Hardy was injured in his person and/or property. The Plaintiff members of the Hardy Family are the survivors and/or heirs of SPC Hardy and are entitled to recover for the damages SPC Hardy sustained.

**The October 17, 2005 IED Attack In Salah Ad Din (Darren D. Howe Family)**

1693.   On October 17, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Salah ad Din, Iraq (the "October 17, 2005 Attack").   The October 17, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1694.   The October 17, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1695.   **Specialist Darren D. Howe** served in Iraq as a member of the U.S. Army. SPC Howe was injured in the October 17, 2005 Attack. SPC Howe died on November 3, 2005 as a result of injuries sustained during the October 17, 2005 Attack.

1696.   SPC Howe was a U.S. national at the time of the attack and his death.

1697.   Plaintiff Nakia Howe is the widow of SPC Howe and a U.S. national.

1698.   Plaintiff Gary-Dean Howe is the son of SPC Howe and a U.S. national.

1699.   Plaintiff Shaye-MaLeigh Howe is the daughter of SPC Howe and a U.S. national.

1700.   Plaintiff Alexander Klaus is the brother of SPC Howe and a U.S. national.

1701.   As a result of the October 17, 2005 attack and SPC Howe's injuries and death, each member of the Howe Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Howe's society, companionship, and counsel.

1702.   As a result of the October 17, 2005 attack, SPC Howe was injured in his person and/or property.  The Plaintiff members of the Howe Family are the survivors and/or heirs of SPC Howe and are entitled to recover for the damages SPC Howe sustained.

**The October 20, 2005 IED Attack In Al Anbar (Steven W. Szwydek Family)**

1703.   On October 20, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 20, 2005 Attack").  The October 20, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1704.   The October 20, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1705.   **Lance Corporal Steven W. Szwydek** served in Iraq as a member of the U.S. Marine Corps.  LCpl Szwydek was injured in the October 20, 2005 Attack.  LCpl Szwydek died on October 20, 2005 as a result of injuries sustained during the October 20, 2005 Attack.

1706.   LCpl Szwydek was a U.S. national at the time of the attack and his death.

1707.   Plaintiff Wallace Szwydek is the father of LCpl Szwydek and a U.S. national.

1708.   Plaintiff Nancy Szwydek is the mother of LCpl Szwydek and a U.S. national.

1709.   As a result of the October 20, 2005 Attack and LCpl Szwydek's injuries and death, each member of the Szwydek Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Szwydek's society, companionship, and counsel.

1710.   As a result of the October 20, 2005 Attack, LCpl Szwydek was injured in his person and/or property.  The Plaintiff members of the Szwydek Family are the survivors and/or heirs of LCpl Szwydek and are entitled to recover for the damages LCpl Szwydek sustained.

**The October 21, 2005 IED Attack In Al Anbar (Benny G. Cockerham III Family)**

1711.   On October 21, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 21, 2005 Attack"). The October 21, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1712.   The October 21, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1713.   **Corporal Benny G. Cockerham III** served in Iraq as a member of the U.S. Marine Corps. Cpl Cockerham was injured in the October 21, 2005 Attack. Cpl Cockerham died on October 21, 2005 as a result of injuries sustained during the October 21, 2005 Attack.

1714.   Cpl Cockerham was a U.S. national at the time of the attack and his death.

1715.   Plaintiff Jill Cockerham is the mother of Cpl Cockerham and a U.S. national.

1716.   Plaintiff Benny Cockerham Jr. is the father of Cpl Cockerham and a U.S. national.

1717.   As a result of the October 21, 2005 Attack and Cpl Cockerham's injuries and death, each member of the Cockerham Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Cockerham's society, companionship, and counsel.

1718.   As a result of the October 21, 2005 Attack, Cpl Cockerham was injured in his person and/or property.  The Plaintiff members of the Cockerham Family are the survivors and/or heirs of Cpl Cockerham and are entitled to recover for the damages Cpl Cockerham sustained.

**The October 29, 2005 IED Attack In Ninewa (Brandon L. Dale Family)**

1719.   On October 29, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "October 29, 2005 Attack"). The October 29, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1720.   The October 29, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1721.   **Corporal Brandon Lamar Dale** served in Iraq as a member of the U.S. Army. Cpl Dale was injured in the October 29, 2005 Attack.  The attack severely wounded Cpl Dale who suffered an amputation of the left leg above the knee, broken tibia and fibula of the right leg, fused big toes and nerve damage in the right foot and leg, tinnitus, and PTSD. As a result of the October 29, 2005 Attack and his injuries, Cpl Dale has experienced severe physical and emotional pain and suffering.

1722.   Plaintiff Cpl Dale was a U.S. national at the time of the attack and remains one to this day.

1723.   As a result of the October 29, 2005 Attack and Cpl Dale's injuries, each member of the Dale Family has experienced severe mental anguish, emotional pain and suffering.

**The October 29, 2005 IED Attack In Al Anbar (Michael P. Hodshire Family)**

1724.   On October 29, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 29, 2005 Attack"). The October 29, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1725.   The October 29, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1726. **Sergeant Michael P. Hodshire** served in Iraq as a member of the U.S. Marine Corps. Sgt Hodshire was injured in the October 29, 2005 Attack. Sgt Hodshire died on October 30, 2005 as a result of injuries sustained during the October 29, 2005 Attack.

1727. Sgt Hodshire was a U.S. national at the time of the attack and his death.

1728. Plaintiff Kimberly Boyd is the sister of Sgt Hodshire and a U.S. national.

1729. As a result of the October 29, 2005 Attack and Sgt Hodshire's injuries and death, each member of the Hodshire Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Hodshire's society, companionship, and counsel.

1730. As a result of the October 29, 2005 Attack, Sgt Hodshire was injured in his person and/or property. The Plaintiff members of the Hodshire Family are the survivors and/or heirs of Sgt Hodshire and are entitled to recover for the damages Sgt Hodshire sustained.

**The November 1, 2005 IED Attack In Al Anbar (Allan M. C. Espiritu Family)**

1731. On November 1, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 1, 2005 Attack"). The November 1, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1732. The November 1, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1733. **Petty Officer Second Class Allan M.C. Espiritu** served in Iraq as a member of the U.S. Navy. PO2 Espiritu was injured in the November 1, 2005 Attack. PO2 Espiritu died on November 1, 2005 as a result of injuries sustained during the November 1, 2005 Attack.

1734.   PO2 Espiritu was a U.S. national at the time of the attack and his death.

1735.   Plaintiff Alvin Espiritu is the father of PO2 Espiritu and a U.S. national.

1736.   As a result of the November 1, 2005 Attack and PO2 Espiritu's injuries and death, each member of the Espiritu Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO2 Espiritu's society, companionship, and counsel.

1737.   As a result of the November 1, 2005 Attack, PO2 Espiritu was injured in his person and/or property. The Plaintiff members of the Espiritu Family are the survivors and/or heirs of PO2 Espiritu and are entitled to recover for the damages PO2 Espiritu sustained.

**The November 3, 2005 IED Attack In Diyala (Kyle B. Wehrly Family)**

1738.   On November 3, 2005, al-Qaeda and al-Qaeda-in-Iraq committed IED in Diyala, Iraq (the "November 3, 2005 Attack").  The November 3, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1739.   The November 3, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1740.   **Sergeant First Class Kyle B. Wehrly** served in Iraq as a member of the Illinois U.S. Army National Guard.  SFC Wehrly was injured in the November 3, 2005 Attack.  SFC Wehrly died on November 3, 2005 as a result of injuries sustained during the November 3, 2005 Attack.

1741.   SFC Wehrly was a U.S. national at the time of the attack and his death.

1742.   Plaintiff Nita Cross is the mother of SFC Wehrly and a U.S. national.

1743.   As a result of the November 3, 2005 Attack and SFC Wehrly's injuries and death, each member of the Wehrly Family has experienced severe mental anguish and emotional pain and suffering, and the loss of SFC Wehrly's society, companionship, and counsel.

1744.   As a result of the November 3, 2005 Attack, SFC Wehrly was injured in his person and/or property.  The Plaintiff members of the Wehrly Family are the survivors and/or heirs of SFC Wehrly and are entitled to recover for the damages SFC Wehrly sustained.

**The November 9, 2005 IED Attack In Al Anbar (Patrick J. Myers Family)**

1745.   On November 9, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 9, 2005 Attack"). The November 9, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1746.   The November 9, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1747.   **Corporal  Patrick J. Myers** served in Iraq as a member of the U.S. Marine Corps. Cpl Myers was injured in the November 9, 2005 Attack.  The attack severely wounded Cpl Myers who suffered double above-the-knee amputations, TBI, spinal injury and broken back, two collapsed lungs, and PTSD.  As a result of the November 9, 2005 Attack and his injuries, Cpl Myers has experienced severe physical and emotional pain and suffering.

1748.   Plaintiff Cpl Myers was a U.S. national at the time of the attack and remains one to this day.

1749.   Plaintiff Mindy Myers is the wife of Cpl Myers and a U.S. national.

1750.   Plaintiff Alek Le is the son of Cpl Myers and a U.S. national.

1751.   Plaintiff Landon Le is the son of Cpl Myers and a U.S. national.

1752.   As a result of the November 9, 2005 Attack and Cpl Myers's injuries, each member of the Myers Family has experienced severe mental anguish, emotional pain and suffering.

**The November 10, 2005 IED Attack In Al Anbar (Daniel F. Swaim Family)**

1753.   On November 10, 2005, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "November 10, 2005 Attack").  The November 10, 2005 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

1754.   The November 10, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1755.   **Lance Corporal Daniel F. Swaim** served in Iraq as a member of the U.S. Marine Corps.  LCpl Swaim was injured in the November 10, 2005 Attack.  LCpl Swaim died on November 10, 2005 as a result of injuries sustained during the November 10, 2005 Attack.

1756.   LCpl Swaim was a U.S. national at the time of the attack and his death.

1757.   Plaintiff Rebecca Swaim is the mother of LCpl Swaim and a U.S. national.

1758.   Plaintiff Michael Swaim is the father of LCpl Swaim and a U.S. national.

1759.   As a result of the November 10, 2005 attack and LCpl Swaim's injuries and death, each member of the Swaim Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Swaim's society, companionship, and counsel.

1760.   As a result of the November 10, 2005 attack, LCpl Swaim was injured in his person and/or property.  The Plaintiff members of the Swaim Family are the survivors and/or heirs of LCpl Swaim and are entitled to recover for the damages LCpl Swaim sustained.

**The November 15, 2005 Suicide Attack In Al Anbar (Nickolas D. Schiavoni Family)**

1761.   On November 15, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "November 15, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the November 15, 2005 Attack.

1762.   The November 15, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1763.   **Lance Corporal Nickolas D. Schiavoni** served in Iraq as a member of the U.S. Marine Corps.  LCpl Schiavoni was injured in the November 15, 2005 Attack.  LCpl Schiavoni died on November 15, 2005 as a result of injuries sustained during the November 15, 2005 Attack.

1764.   LCpl Schiavoni was a U.S. national at the time of the attack and his death.

1765.   Plaintiff Stephany Kern is the mother of LCpl Schiavoni and a U.S. national.

1766.   Plaintiff David Schiavoni is the father of LCpl Schiavoni and a U.S. national.

1767.   As a result of the November 15, 2005 Attack and LCpl Schiavoni's injuries and death, each member of the Schiavoni Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Schiavoni's society, companionship, and counsel.

1768.   As a result of the November 15, 2005 Attack, LCpl Schiavoni was injured in his person and/or property.  The Plaintiff members of the Schiavoni Family are the survivors and/or heirs of LCpl Schiavoni and are entitled to recover for the damages LCpl Schiavoni sustained.

**The November 16, 2005 IED Attack In Al Anbar (Daniel L. Gubler Family)**

1769.   On November 16, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 16, 2005 Attack"). The November 16, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1770.  The November 16, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1771.  **Sergeant First Class Daniel L. Gubler** served in Iraq as a member of the Utah U.S. Army National Guard. SFC Gubler was injured in the November 16, 2005 Attack.  The attack severely wounded SFC Gubler, who suffered the transhumeral loss of his left arm, blindness in his right eye, TBI, a fractured skull, and multiple shrapnel wounds in his legs, face, and arm.  As a result of the November 16, 2005 Attack and his injuries, SFC Gubler has experienced severe physical and emotional pain and suffering.

1772.  Plaintiff SFC Gubler was a U.S. national at the time of the attack and remains one to this day.

1773.  As a result of the November 16, 2005 Attack and SFC Gubler's injuries, SFC Gubler has experienced severe mental anguish and emotional pain and suffering.

**The November 24, 2005 IED Attack In Al Anbar (Javier A. Villanueva Family)**

1774.  On November 24, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 24, 2005 Attack").  The November 24, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1775.  The November 24, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1776.   **Specialist Javier A. Villanueva** served in Iraq as a member of the U.S. Army.  SPC Villanueva was injured in the November 24, 2005 Attack.  SPC Villanueva died on November 24, 2005 as a result of injuries sustained during the November 24, 2005 Attack.

1777.   SPC Villanueva was a U.S. national at the time of the attack and his death.

1778.   Plaintiff Christine Lebron is the mother of SPC Villanueva and a U.S. national.

1779.   As a result of the November 24, 2005 Attack and SPC Villanueva's injuries and death, each member of the Villanueva Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Villanueva's society, companionship, and counsel.

1780.   As a result of the November 24, 2005 Attack, SPC Villanueva was injured in his person and/or property.  The Plaintiff members of the Villanueva Family are the survivors and/or heirs of SPC Villanueva and are entitled to recover for the damages SPC Villanueva sustained.

### The December 1, 2005 IED Attack In Al Anbar (Brent A. Adams, John M. Homason, and Anthony T. McElveen Families)

1781.   On December 1, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "December 1, 2005 Attack"). The December 1, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1782.   The December 1, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1783.   **Sergeant First Class Brent A. Adams** served in Iraq as a member of the Pennsylvania U.S. Army National Guard. SFC Adams was injured in the December 1, 2005 Attack. SFC Adams died on December 1, 2005 as a result of injuries sustained during the December 1, 2005 Attack.

1784.   SFC Adams was a U.S. national at the time of the attack and his death.

1785.   Plaintiff Barbara Benard is the mother of SFC Adams and a U.S. national.

1786.   Plaintiff John Benard Jr. is the stepfather of SFC Adams and a U.S. national. Mr. Benard lived in the same household as SFC Adams for a substantial period and considered SFC Adams the functional equivalent of a biological son.

1787.   As a result of the December 1, 2005 Attack and SFC Adams's injuries and death, each member of the Adams Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adams's society, companionship, and counsel.

1788.   As a result of the December 1, 2005 Attack, SFC Adams was injured in his person and/or property. The Plaintiff members of the Adams Family are the survivors and/or heirs of SFC Adams and are entitled to recover for the damages SFC Adams sustained.

1789.   **Lance Corporal John M. Holmason** served in Iraq as a member of the U.S. Marine Corps. LCpl Holmason was injured in the December 1, 2005 Attack. LCpl Holmason died on December 1, 2005 as a result of injuries sustained during the December 1, 2005 Attack.

1790.   LCpl Holmason was a U.S. national at the time of the attack and his death.

1791.   Plaintiff Mark Comfort is the stepfather of LCpl Holmason and a U.S. national. Mr. Comfort lived in the same household as LCpl Holmason for a substantial period and considered LCpl Holmason the functional equivalent of a biological son.

1792.   As a result of the December 1, 2005 Attack and LCpl Holmason's injuries and death, each member of the Holmason Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Holmason's society, companionship, and counsel.

1793.   As a result of the December 1, 2005 Attack, LCpl Holmason was injured in his person and/or property.  The Plaintiff members of the Holmason Family are the survivors and/or heirs of LCpl Holmason and are entitled to recover for the damages LCpl Holmason sustained.

1794.   **Corporal Anthony T. McElveen** served in Iraq as a member of the U.S. Marine Corps.  Cpl McElveen was injured in the December 1, 2005 Attack.  Cpl McElveen died on December 1, 2005 as a result of injuries sustained during the December 1, 2005 Attack.

1795.   Cpl McElveen was a U.S. national at the time of the attack and his death.

1796.   Plaintiff Thomas McElveen is the father of Cpl McElveen and a U.S. national.

1797.   As a result of the December 1, 2005 attack and Cpl McElveen's injuries and death, each member of the McElveen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl McElveen's society, companionship, and counsel.

1798.   As a result of the December 1, 2005 Attack, Cpl McElveen was injured in his person and/or property.  The Plaintiff members of the McElveen Family are the survivors and/or heirs of Cpl McElveen and are entitled to recover for the damages Cpl McElveen sustained.

**The December 7, 2005 IED Attack In Al Anbar (Travis Greene Family)**

1799.   On December 7, 2005, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "December 7, 2005 Attack"). The December 7, 2005 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1800.   The December 7, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1801.   **Corporal Travis Greene** served in Iraq as a member of the U.S. Marine Corps. Cpl Greene was injured in the December 7, 2005 Attack. The attack severely wounded Cpl Greene,

who suffered a double amputation of both legs. As a result of the December 7, 2005 Attack and his injuries, Cpl Greene has experienced severe physical and emotional pain and suffering.

1802.   Plaintiff Cpl Greene was a U.S. national at the time of the attack and remains one to this day.

1803.   As a result of the December 7, 2005 Attack and Cpl Greene's injuries, Cpl Greene has experienced severe mental anguish and emotional pain and suffering.

**The December 9, 2005 Suicide Attack In Baghdad (Adrian N. Orosco Family)**

1804.   On December 9, 2005, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Baghdad, Iraq (the "December 9, 2005 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the December 9, 2005 Attack.

1805.   The December 9, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1806.   **Sergeant Adrian N. Orosco** served in Iraq as a member of the U.S. Army.  SGT Orosco was injured in the December 9, 2005 Attack.  SGT Orosco died on December 9, 2005 as a result of injuries sustained during the December 9, 2005 Attack.

1807.   SGT Orosco was a U.S. national at the time of the attack and his death.

1808.   Plaintiff Noe Orosco Sr. is the father of SGT Orosco and a U.S. national.

1809.   As a result of the December 9, 2005 Attack and SGT Orosco's injuries and death, each member of the Orosco Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Orosco's society, companionship, and counsel.

1810.   As a result of the December 9, 2005 Attack, SGT Orosco was injured in his person and/or property.  The Plaintiff members of the Orosco Family are the survivors and/or heirs of SGT Orosco and are entitled to recover for the damages SGT Orosco sustained.

**The February 6, 2006 IED Attack In Al Anbar (Brandon S. Schuck Family)**

1811.   On February 6, 2006, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 6, 2006 Attack").  The February 6, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1812.   The February 6, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1813.   **Corporal Brandon S. Schuck** served in Iraq as a member of the U.S. Marine Corps.  Cpl Schuck was injured in the February 6, 2006 Attack.  Cpl Schuck died on February 6, 2006 as a result of injuries sustained during the February 6, 2006 Attack.

1814.   Cpl Schuck was a U.S. national at the time of the attack and his death.

1815.   Plaintiff Megan Cash is the widow of Cpl Schuck and a U.S. national.

1816.   Plaintiff G.S., by and through his next friend Megan Cash, is the minor son of Cpl Schuck. He is a U.S. national.

1817.   As a result of the February 6, 2006 attack and Cpl Schuck's injuries and death, each member of the Schuck Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Schuck's society, companionship, and counsel.

1818.   As a result of the February 6, 2006 attack, Cpl Schuck was injured in his person and/or property.  The Plaintiff members of the Schuck Family are the survivors and/or heirs of Cpl Schuck and are entitled to recover for the damages Cpl Schuck sustained.

### The February 25, 2006 Complex Attack Involving An IED In Al Anbar (Daniel M. Jacobs Family)

1819.   On February 25, 2006, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "February 25, 2006 Attack"). The February 25, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1820.   The February 25, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1821.   **Corporal Daniel M. Jacobs** served in Iraq as a member of the U.S. Army. Cpl Jacobs was injured in the February 25, 2006 Attack.  The attack severely wounded Cpl Jacobs, who suffered multiple partial digit amputations on his left hand, below the knee amputation of his left leg, amputation of his fourth and fifth toes of his right foot, right foot reconstruction with a metatarsal strain, arthritis in his right knee, phantom pain of missing his left leg, spine fracture of the L3, arthritis from L4-S1, ligament avulsion in the neck, head and face TMJ, shrapnel in his nose and sinus cavity, possible additional amputation of his right foot, mid foot fusion, calcaneal osteotomy in his right ankle, torn meniscus, right forearm bone shattered, shrapnel removed from his right hand, punctured right eardrum, TBI, migraines, and PTSD.  As a result of the February 25, 2006 Attack and his injuries, Cpl Jacobs has experienced severe physical and emotional pain and suffering.

1822.   Plaintiff Cpl Jacobs was a U.S. national at the time of the attack and remains one to this day.

1823.   As a result of the February 25, 2006 Attack and Cpl Jacobs's injuries, each member of the Jacobs Family has experienced severe mental anguish and emotional pain and suffering.

**The March 7, 2006 IED Attack In Al Anbar (Justin R. Martone Family)**

1824.   On March 7, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "March 7, 2006 Attack").  The March 7, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1825.   The March 7, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1826.   **Gunnery Sergeant Justin R. Martone** served in Iraq as a member of the U.S. Marine Corps.  GySgt Martone was injured in the March 7, 2006 Attack.  GySgt Martone died on March 7, 2006 as a result of injuries sustained during the March 7, 2006 Attack.

1827.   GySgt Martone was a U.S. national at the time of the attack and his death.

1828.   Plaintiff Paulette Martone is the mother of GySgt Martone and a U.S. national.

1829.   Plaintiff Agostine Martone Jr. is the father of GySgt Martone and a U.S. national.

1830.   As a result of the March 7, 2006 Attack and GySgt Martone's injuries and death, each member of the Martone Family has experienced severe mental anguish and emotional pain and suffering, and the loss of GySgt Martone's society, companionship, and counsel.

1831.   As a result of the March 7, 2006 Attack, GySgt Martone was injured in his person and/or property.  The Plaintiff members of the Martone Family are the survivors and/or heirs of GySgt Martone and are entitled to recover for the damages GySgt Martone sustained.

**The March 7, 2006 IED Attack In Ninewa (Ricky Salas Jr. Family)**

1832.   On March 7, 2006, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "March 7, 2006 Attack").   The March 7, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1833.   The March 7, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1834.   **Private 1st Class Ricky Salas Jr.** served in Iraq as a member of the U.S. Army. PFC Salas was injured in the March 7, 2006 Attack.  PFC Salas died on March 7, 2006 as a result of injuries sustained during the March 7, 2006 Attack.

1835.   PFC Salas was a U.S. national at the time of the attack and his death.

1836.   Plaintiff April Baca-Salas is the widow of PFC Salas and a U.S. national.

1837.   Plaintiff Jordan Salas is the daughter of PFC Salas and a U.S. national.

1838.   Plaintiff J.S., by and through his next friend April Baca-Salas, is the minor son of PFC Salas. He is a U.S. national.

1839.   Plaintiff Brenda Robertson is the mother of PFC Salas and a U.S. national.

1840.   Plaintiff Roger Salas is the brother of PFC Salas and a U.S. national.

1841.   Plaintiff Daniel Salas is the brother of PFC Salas and a U.S. national.

1842.   Plaintiff Melissa Gutierrez is the sister of PFC Salas and a U.S. national.

1843.   As a result of the March 7, 2006 attack and PFC Salas's injuries and death, each member of the Salas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Salas's society, companionship, and counsel.

1844.   As a result of the March 7, 2006 attack, PFC Salas was injured in his person and/or property.  The Plaintiff members of the Salas Family are the survivors and/or heirs of PFC Salas and are entitled to recover for the damages PFC Salas sustained.

**The March 23, 2006 IED Attack In Al Anbar (Brock A. Beery Family)**

1845.   On March 23, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "March 23, 2006 Attack"). The March 23, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1846.   The March 23, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1847.   **Staff Sergeant Brock A. Beery** served in Iraq as a member of the Kentucky U.S. Army National Guard. SSG Beery was injured in the March 23, 2006 Attack. SSG Beery died on March 23, 2006 as a result of injuries sustained during the March 23, 2006 Attack.

1848.   SSG Beery was a U.S. national at the time of the attack and his death.

1849.   Plaintiff Pamela Beery is the mother of SSG Beery and a U.S. national.

1850.   Plaintiff Roger Beery is the father of SSG Beery and a U.S. national.

1851.   Plaintiff Tobey Beery is the brother of SSG Beery and a U.S. national.

1852.   Plaintiff Joel Beery is the brother of SSG Beery and a U.S. national.

1853.   As a result of the March 23, 2006 Attack and SSG Beery's injuries and death, each member of the Beery Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Beery's society, companionship, and counsel.

1854.   As a result of the March 23, 2006 Attack, SSG Beery was injured in his person and/or property. The Plaintiff members of the Beery Family are the survivors and/or heirs of SSG Beery and are entitled to recover for the damages SSG Beery sustained.

**The April 11, 2006 Suicide Attack In Al Anbar (Kenneth D. Hess Family)**

1855.   On April 11, 2006, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Al Anbar, Iraq (the "April 11, 2006 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 11, 2006 Attack.

1856.   The April 11, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1857.   **Sergeant Kenneth D. Hess** served in Iraq as a member of the U.S. Army.  SGT Hess was injured in the April 11, 2006 Attack.  SGT Hess died on April 11, 2006 as a result of injuries sustained during the April 11, 2006 Attack.

1858.   SGT Hess was a U.S. national at the time of the attack and his death.

1859.   Plaintiff April Hess is the widow of SGT Hess and a U.S. national.

1860.   Plaintiff Katherine Meeks is the mother of SGT Hess and a U.S. national.

1861.   As a result of the April 11, 2006 Attack and SGT Hess's injuries and death, each member of the Hess Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hess's society, companionship, and counsel.

1862.   As a result of the April 11, 2006 Attack, SGT Hess was injured in his person and/or property.  The Plaintiff members of the Hess Family are the survivors and/or heirs of SGT Hess and are entitled to recover for the damages SGT Hess sustained.

**The April 28, 2006 IED Attack In Al Anbar (Edward G. Davis III Family)**

1863.   On April 28, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "April 28, 2006 Attack"). The April 28, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1864.   The April 28, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1865.   **Sergeant Edward G. Davis III** served in Iraq as a member of the U.S. Marine Corps. Sgt Davis was injured in the April 28, 2006 Attack. Sgt Davis died on April 28, 2006 as a result of injuries sustained during the April 28, 2006 Attack.

1866.   Sgt Davis was a U.S. national at the time of the attack and his death.

1867.   Plaintiff Preina Davis is the widow of Sgt Davis and a U.S. national.

1868.   Plaintiff Alyssa Davis is the daughter of Sgt Davis and a U.S. national.

1869.   Plaintiff Edward Davis IV is the son of Sgt Davis and a U.S. national.

1870.   Plaintiff Priscilla Sandoval Smith is the stepdaughter of Sgt Davis and a U.S. national. Ms. Sandoval Smith lived in the same household as Sgt Davis for a substantial period and considered Sgt Davis the functional equivalent of a biological father.

1871.   As a result of the April 28, 2006 Attack and Sgt Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Davis's society, companionship, and counsel.

1872.   As a result of the April 28, 2006 Attack, Sgt Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of Sgt Davis and are entitled to recover for the damages Sgt Davis sustained.

**The April 28, 2006 IED Attack In Al Anbar (Lea R. Mills Family)**

1873.   On April 28, 2006, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 28, 2006 Attack").  The April 28, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1874.   The April 28, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1875.   **Sergeant Lea R. Mills** served in Iraq as a member of the U.S. Marine Corps.  Sgt Mills was injured in the April 28, 2006 Attack.  Sgt Mills died on April 28, 2006 as a result of injuries sustained during the April 28, 2006 Attack.

1876.   Sgt Mills was a U.S. national at the time of the attack and his death.

1877.   Plaintiff Keesha Mills is the widow of Sgt Mills and a U.S. national.

1878.   Plaintiff Delores Mills is the mother of Sgt Mills and a U.S. national.

1879.   Plaintiff Robert Mills is the father of Sgt Mills and a U.S. national.

1880.   Plaintiff Parker Mills is the brother of Sgt Mills and a U.S. national.

1881.   As a result of the April 28, 2006 attack and Sgt Mills's injuries and death, each member of the Mills Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Mills's society, companionship, and counsel.

1882.   As a result of the April 28, 2006 attack, Sgt Mills was injured in his person and/or property.  The Plaintiff members of the Mills Family are the survivors and/or heirs of Sgt Mills and are entitled to recover for the damages Sgt Mills sustained.

**The May 1, 2006 IED Attack In Al Anbar (Cory L. Palmer Family)**

1883.   On May 1, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "May 1, 2006 Attack").  The May 1, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1884.   The May 1, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1885.   **Corporal  Cory Leonard Palmer** served in Iraq as a member of the U.S. Marine Corps.  Cpl Palmer was injured in the May 1, 2006 Attack.  Cpl Palmer died on May 6, 2006 as a result of injuries sustained during the May 1, 2006 Attack.

1886.   Cpl Palmer was a U.S. national at the time of the attack and his death.

1887.   Plaintiff Danna Palmer Mills is the mother of Cpl Palmer and a U.S. national.

1888.   As a result of the May 1, 2006 attack and Cpl Palmer's injuries and death, each member of the Palmer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Palmer's society, companionship, and counsel.

1889.   As a result of the May 1, 2006 attack, Cpl Palmer was injured in his person and/or property.  The Plaintiff members of the Palmer Family are the survivors and/or heirs of Cpl Palmer and are entitled to recover for the damages Cpl Palmer sustained.

**The May 6, 2006 IED Attack In Al Anbar (Leon B. Deraps Family)**

1890.   On May 6, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "May 6, 2006 Attack"). The May 6, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1891.   The May 6, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1892.   **Lance Corporal Leon B. Deraps** served in Iraq as a member of the U.S. Marine Corps. LCpl Deraps was injured in the May 6, 2006 Attack.  LCpl Deraps died on May 6, 2006 as a result of injuries sustained during the May 6, 2006 Attack.

1893.   LCpl Deraps was a U.S. national at the time of the attack and his death.

1894.   Plaintiff Dale Deraps is the father of LCpl Deraps and a U.S. national.

1895.   Plaintiff Regina Baepler is the sister of LCpl Deraps and a U.S. national.

1896.   Plaintiff Dawn Cassil is the sister of LCpl Deraps and a U.S. national.

1897.   Plaintiff Cedar Deraps is the brother of LCpl Deraps and a U.S. national.

1898.   Plaintiff Shanti Johnson is the sister of LCpl Deraps and a U.S. national.

1899.   As a result of the May 6, 2006 Attack and LCpl Deraps's injuries and death, each member of the Deraps Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Deraps's society, companionship, and counsel.

1900.   As a result of the May 6, 2006 Attack, LCpl Deraps was injured in his person and/or property. The Plaintiff members of the Deraps Family are the survivors and/or heirs of LCpl Deraps and are entitled to recover for the damages LCpl Deraps sustained.

**The June 4, 2006 IED Attack In Baghdad (Paul E. Haines Family)**

1901.   On June 4, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Baghdad, Iraq (the "June 4, 2006 Attack"). The June 4, 2006 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

1902.   The June 4, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1903.   **Corporal Paul E. Haines** served in Iraq as a member of the U.S. Army. Cpl Haines was injured in the June 4, 2006 Attack.  The attack severely wounded Cpl Haines, who suffered a TBI, a fractured skull, bleeding in his skull, moderate brain damage, a broken left orbital socket, a broken upper and lower jaw, shattered cheek bones, loss of his left eye, broken collar bones, multiple broken ribs, punctured lungs, 12 shattered vertebrae, shattered left hip and pelvis, abdominal bleeding, multiple surgeries, PTSD, and anxiety.  As a result of the June 4, 2006 Attack and his injuries, Cpl Haines has experienced severe physical and emotional pain and suffering.

1904.   Plaintiff Cpl Haines was a U.S. national at the time of the attack and remains one to this day.

1905.   Plaintiff Ronda Haines is the wife of Cpl Haines and a U.S. national.

1906.   Plaintiff Karen Haines is the mother of Cpl Haines and a U.S. national.

1907.   As a result of the June 4, 2006 Attack and Cpl Haines's injuries, each member of the Haines Family has experienced severe mental anguish and emotional pain and suffering.

**The June 5, 2006 IED Attack In Al Anbar (Jaime S. Jaenke Family)**

1908.   On June 5, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 5, 2006 Attack").  The June 5, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1909.   The June 5, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1910.   **Petty Officer Second Class Jaime S. Jaenke** served in Iraq as a member of the U.S. Navy.  HM2 Jaenke was injured in the June 5, 2006 Attack.  HM2 Jaenke died on June 5, 2006 as a result of injuries sustained during the June 5, 2006 Attack.

1911.   HM2 Jaenke was a U.S. national at the time of the attack and his death.

1912.   Plaintiff Susan Jaenke is the mother of HM2 Jaenke and a U.S. national.

1913.   As a result of the June 5, 2006 Attack and HM2 Jaenke's injuries and death, each member of the Jaenke Family has experienced severe mental anguish and emotional pain and suffering, and the loss of HM2 Jaenke's society, companionship, and counsel.

1914.   As a result of the June 5, 2006Attack, HM2 Jaenke was injured in his person and/or property.  The Plaintiff members of the Jaenke Family are the survivors and/or heirs of HM2 Jaenke and are entitled to recover for the damages HM2 Jaenke sustained.

**The June 9, 2006 IED Attack In Al Anbar (Brent B. Zoucha Family)**

1915.   On June 9, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 9, 2006 Attack").  The June 9, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1916.   The June 9, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1917.   **Lance Corporal Brent B. Zoucha** served in Iraq as a member of the U.S. Marine Corps.  LCpl Zoucha was injured in the June 9, 2006 Attack.  LCpl Zoucha died on June 9, 2006 as a result of injuries sustained during the June 9, 2006 Attack.

1918.   LCpl Zoucha was a U.S. national at the time of the attack and his death.

1919.   Plaintiff Rita Zoucha is the mother of LCpl Zoucha and a U.S. national.

1920.   Plaintiff Sherri Laska is the sister of LCpl Zoucha and a U.S. national.

1921.   As a result of the June 9, 2006 attack and LCpl Zoucha's injuries and death, each member of the Zoucha Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Zoucha's society, companionship, and counsel.

1922.   As a result of the June 9, 2006 attack, LCpl Zoucha was injured in his person and/or property.  The Plaintiff members of the Zoucha Family are the survivors and/or heirs of LCpl Zoucha and are entitled to recover for the damages LCpl Zoucha sustained.

### The June 16, 2006 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Baghdad Province (Kristian Menchaca Family)

1923.   **Private First Class Kristian Menchaca** served in Iraq as a member of the U.S. Army. On June 16, 2006, PFC Menchaca was taken hostage by al-Qaeda-in-Iraq in a kidnapping attack in Yusufiyah, an al-Qaeda-in-Iraq stronghold in Baghdad Province, Iraq. Thereafter, PFC Menchaca was held hostage for at least several days, during which time al-Qaeda-in-Iraq brutally tortured PFC Menchaca, before eventually murdering him at some point prior to June 21, 2006.

1924.   The kidnapping attack on PFC Menchaca was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  PFC Menchaca was held hostage by al-Qaeda-in-Iraq and executed by al-Qaeda-in-Iraq.

1925.   PFC Menchaca's kidnapping, subsequent confinement, torture, and murder would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists murdered an unarmed captive.

1926.   PFC Menchaca was a U.S. national at the time of the kidnapping and his murder.

543

1927.   Plaintiff Christina Menchaca is the widow of PFC Menchaca and a U.S. national. She brings claims in both her personal capacity and her co-representative capacity on behalf of PFC Menchaca's estate.

1928.   Plaintiff Pedro Menchaca is the father of PFC Menchaca and a U.S. national.

1929.   Plaintiff Maria Guadalupe Vasquez is the mother of PFC Menchaca and a U.S. national.

1930.   Plaintiff Julio Menchaca is the brother of PFC Menchaca and a U.S. national.  He brings claims in both his personal capacity and his co-representative capacity on behalf of PFC Menchaca's estate.

1931.   As a result of the June 16, 2006 kidnapping, and subsequent days as a hostage during which PFC Menchaca was tortured before he was murdered in 2006, each member of the Menchaca Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Menchaca's society, companionship, and counsel.

1932.   As a result of the June 16, 2006 kidnapping, and subsequent days as a hostage during which PFC Menchaca was tortured before he was murdered in 2006, PFC Menchaca was injured in his person and/or property. The Plaintiff members of the Menchaca Family are the survivors and/or heirs of PFC Menchaca and are entitled to recover for the damages PFC Menchaca sustained.

**The June 17, 2006 IED Attack In Al Anbar (Johnathan L. Benson Family)**

1933.   On June 17, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 17, 2006 Attack"). The June 17, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1934.   The June 17, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1935.   **Corporal Johnathan L. Benson** served in Iraq as a member of the U.S. Marine Corps. Cpl Benson was injured in the June 17, 2006 Attack.  Cpl Benson died on September 9, 2006 as a result of injuries sustained during the June 17, 2006 Attack.

1936.   Cpl Benson was a U.S. national at the time of the attack and his death.

1937.   Plaintiff Marjorie Benson is the mother of Cpl Benson and a U.S. national.

1938.   Plaintiff Steven Benson is the father of Cpl Benson and a U.S. national.

1939.   As a result of the June 17, 2006 Attack and Cpl Benson's injuries and death, each member of the Benson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Benson's society, companionship, and counsel.

1940.   As a result of the June 17, 2006 Attack, Cpl Benson was injured in his person and/or property. The Plaintiff members of the Benson Family are the survivors and/or heirs of Cpl Benson and are entitled to recover for the damages Cpl Benson sustained.

**The June 27, 2006 IED Attack In Baghdad (Jeremy S. Jones Family)**

1941.   On June 27, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Baghdad, Iraq (the "June 27, 2006 Attack").  The June 27, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1942.   The June 27, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1943.   **Corporal Jeremy S. Jones** served in Iraq as a member of the U.S. Army.  Cpl Jones was injured in the June 27, 2006 Attack.  Cpl Jones died on June 27, 2006 as a result of injuries sustained during the June 27, 2006 Attack.

1944.   Cpl Jones was a U.S. national at the time of the attack and his death.

1945.   Plaintiff Anthony Jones is the son of Cpl Jones and a U.S. national.

1946.   Plaintiff Diane Jones is the mother of Cpl Jones and a U.S. national.

1947.   Plaintiff Abbi Carreto is the sister of Cpl Jones and a U.S. national.

1948.   As a result of the June 27, 2006 Attack and Cpl Jones's injuries and death, each member of the Jones Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Jones's society, companionship, and counsel.

1949.   As a result of the June 27, 2006 Attack, Cpl Jones was injured in his person and/or property.  The Plaintiff members of the Jones Family are the survivors and/or heirs of Cpl Jones and are entitled to recover for the damages Cpl Jones sustained.

**The June 27, 2006 IED Attack In Al Anbar (Jacque J. Keeslar Family)**

1950.   On June 27, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 27, 2006 Attack"). The June 27, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1951.   The June 27, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1952.   **Sergeant First Class Jacque J. Keeslar** served in Iraq as a member of the U.S. Army. SFC Keeslar was injured in the June 27, 2006 Attack.  The attack severely wounded SFC

Keeslar, who suffered amputations of both legs.  As a result of the June 27, 2006 Attack and his injuries, SFC Keeslar has experienced severe physical and emotional pain and suffering.

1953.   Plaintiff SFC Keeslar was a U.S. national at the time of the attack and remains one to this day.

1954.   Plaintiff Vanessa Keeslar is the wife of SFC Keeslar and a U.S. national.

1955.   As a result of the June 27, 2006 Attack and SFC Keeslar's injuries, each member of the Keeslar Family has experienced severe mental anguish and emotional pain and suffering.

**The June 29, 2006 Small Arms Fire Attack In Ninewa (Bryan C. Luckey Family)**

1956.   On June 29, 2006, al-Qaeda and al-Qaeda-in-Iraq committed a small arms fire attack in Ninewa, Iraq (the "June 29, 2006 Attack").  The June 29, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1957.   The June 29, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1958.   **Sergeant Bryan C. Luckey** served in Iraq as a member of the U.S. Army.  Sgt Luckey was injured in the June 29, 2006 Attack.  Sgt Luckey died on June 29, 2006 as a result of injuries sustained during the June 29, 2006 Attack.

1959.   Sgt Luckey was a U.S. national at the time of the attack and his death.

1960.   Plaintiff Catherine Luckey is the widow of Sgt Luckey and a U.S. national.

1961.   As a result of the June 29, 2006 Attack and Sgt Luckey's injuries and death, each member of the Luckey Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Luckey's society, companionship, and counsel.

1962.   As a result of the June 29, 2006 attack, Sgt Luckey was injured in his person and/or property.  The Plaintiff members of the Luckey Family are the survivors and/or heirs of Sgt Luckey and are entitled to recover for the damages Sgt Luckey sustained.

**The July 2, 2006 IED Attack In Al Anbar (Justin L. Noyes Family)**

1963.   On July 2, 2006, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "July 2, 2006 Attack").  The July 2, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1964.   The July 2, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1965.   **Sergeant Justin L. Noyes** served in Iraq as a member of the U.S. Marine Corps. Sgt Noyes was injured in the July 2, 2006 Attack.  Sgt Noyes died on July 2, 2006 as a result of injuries sustained during the July 2, 2006 Attack.

1966.   Sgt Noyes was a U.S. national at the time of the attack and his death.

1967.   Plaintiff Stacy Bridges is the mother of Sgt Noyes and a U.S. national.

1968.   Plaintiff Mark Noyes is the father of Sgt Noyes and a U.S. national.

1969.   As a result of the July 2, 2006 attack and Sgt Noyes's injuries and death, each member of the Noyes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Noyes's society, companionship, and counsel.

1970.   As a result of the July 2, 2006 attack, Sgt Noyes was injured in his person and/or property.  The Plaintiff members of the Noyes Family are the survivors and/or heirs of Sgt Noyes and are entitled to recover for the damages Sgt Noyes sustained.

**The July 12, 2006 IED Attack In Al Anbar (Jerry A. Tharp Family)**

1971.  On July 12, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "July 12, 2006 Attack").  The July 12, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1972.  The July 12, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1973.  **Petty Officer First Class Jerry A. Tharp** served in Iraq as a member of the U.S. Naval Reserve.  PO1 Tharp was injured in the July 12, 2006 Attack.  PO1 Tharp died on July 12, 2006 as a result of injuries sustained during the July 12, 2006 Attack.

1974.  PO1 Tharp was a U.S. national at the time of the attack and his death.

1975.  Plaintiff Gayle Tharp is the widow of PO1 Tharp and a U.S. national.

1976.  Plaintiff Donna Tharp is the mother of PO1 Tharp and a U.S. national.

1977.  Plaintiff Karen Tharp is the sister of PO1 Tharp and a U.S. national.

1978.  As a result of the July 12, 2006 Attack and PO1 Tharp's injuries and death, each member of the Tharp Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO1 Tharp's society, companionship, and counsel.

1979.  As a result of the July 12, 2006 Attack, PO1 Tharp was injured in his person and/or property.  The Plaintiff members of the Tharp Family are the survivors and/or heirs of PO1 Tharp and are entitled to recover for the damages PO1 Tharp sustained.

**The August 22, 2006 IED Attack In Al Anbar (Paul J. Darga Family)**

1980.   On August 22, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "August 22, 2006 Attack"). The August 22, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1981.   The August 22, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1982.   **Chief Petty Officer Paul J. Darga** served in Iraq as a member of the U.S. Navy. CPO Darga was injured in the August 22, 2006 Attack. CPO Darga died on August 22, 2006 as a result of injuries sustained during the August 22, 2006 Attack.

1983.   CPO Darga was a U.S. national at the time of the attack and his death.

1984.   Plaintiff John Darga is the father of CPO Darga and a U.S. national.

1985.   As a result of the August 22, 2006 Attack and CPO Darga's injuries and death, each member of the Darga Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Darga's society, companionship, and counsel.

1986.   As a result of the August 22, 2006 Attack, CPO Darga was injured in his person and/or property. The Plaintiff members of the Darga Family are the survivors and/or heirs of CPO Darga and are entitled to recover for the damages CPO Darga sustained.

**The August 30, 2006 IED Attack In Al Anbar (Joshua R. Hanson Family)**

1987.   On August 30, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "August 30, 2006 Attack").  The August 30, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1988.   The August 30, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1989.   **Staff Sergeant Joshua R. Hanson** served in Iraq as a member of the Minnesota U.S. Army National Guard. SSG Hanson was injured in the August 30, 2006 Attack. SSG Hanson died on August 30, 2006 as a result of injuries sustained during the August 30, 2006 Attack.

1990.   SSG Hanson was a U.S. national at the time of the attack and his death.

1991.   Plaintiff Kathleen Hanson is the mother of SSG Hanson and a U.S. national.

1992.   Plaintiff Robert Hanson is the father of SSG Hanson and a U.S. national.

1993.   As a result of the August 30, 2006 Attack and SSG Hanson's injuries and death, each member of the Hanson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Hanson's society, companionship, and counsel.

1994.   As a result of the August 30, 2006 Attack, SSG Hanson was injured in his person and/or property. The Plaintiff members of the Hanson Family are the survivors and/or heirs of SSG Hanson and are entitled to recover for the damages SSG Hanson sustained.

**The September 3, 2006 IED Attack In Ninewa (Richard J. Henkes II Family)**

1995.   On September 3, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Ninewa, Iraq (the "September 3, 2006 Attack").  The September 3, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

1996.   The September 3, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1997.  **Sergeant First Class Richard Joseph Henkes II** served in Iraq as a member of the U.S. Army.  SFC Henkes was injured in the September 3, 2006 Attack.  SFC Henkes died on September 3, 2006 as a result of injuries sustained during the September 3, 2006 Attack.

1998.   SFC Henkes was a U.S. national at the time of the attack and his death.

1999.   Plaintiff Christine Stanton is the mother of SFC Henkes and a U.S. national.

2000.   As a result of the September 3, 2006 Attack and SFC Henkes's injuries and death, each member of the Henkes Family has experienced severe mental anguish and emotional pain and suffering, and the loss of SFC Henkes's society, companionship, and counsel.

2001.   As a result of the September 3, 2006 Attack, SFC Henkes was injured in his person and/or property.  The Plaintiff members of the Henkes Family are the survivors and/or heirs of SFC Henkes and are entitled to recover for the damages SFC Henkes sustained.

**The September 4, 2006 IED Attack In Al Anbar (Christopher Walsh Family)**

2002.   On September 4, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "September 4, 2006 Attack").  The September 4, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2003.   The September 4, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2004.   **Petty Officer Second Class Christopher Walsh** served in Iraq as a member of the U.S. Naval Reserve.  HM2 Walsh was injured in the September 4, 2006 Attack.  HM2 Walsh died on September 4, 2006 as a result of injuries sustained during the September 4, 2006 Attack.

2005.   HM2 Walsh was a U.S. national at the time of the attack and his death.

2006.   Plaintiff Maureen Walsh is the mother of HM2 Walsh and a U.S. national.

552

2007.   Plaintiff Meghan Turner is the sister of HM2 Walsh and a U.S. national.

2008.   Plaintiff Joseph Walsh is the brother of HM2 Walsh and a U.S. national.

2009.   Plaintiff Patrick Walsh is the brother of HM2 Walsh and a U.S. national.

2010.   Plaintiff Erin Watson is the sister of HM2 Walsh and a U.S. national.

2011.   As a result of the September 4, 2006 attack and HM2 Walsh's injuries and death, each member of the Walsh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of HM2 Walsh's society, companionship, and counsel.

2012.   As a result of the September 4, 2006 attack, HM2 Walsh was injured in his person and/or property.  The Plaintiff members of the Walsh Family are the survivors and/or heirs of HM2 Walsh and are entitled to recover for the damages HM2 Walsh sustained.

**The September 13, 2006 Suicide Attack In Baghdad (Marcus A. Cain Family)**

2013.   On September 13, 2006, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Baghdad, Iraq (the "September 13, 2006 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 13, 2006 Attack.

2014.   The September 13, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2015.   **Corporal Marcus A. Cain** served in Iraq as a member of the U.S. Army.  CPL Cain was injured in the September 13, 2006 Attack.  CPL Cain died on September 13, 2006 as a result of injuries sustained during the September 13, 2006 Attack.

2016.   CPL Cain was a U.S. national at the time of the attack and his death.

2017.   Plaintiff Leroy Cain Jr. is the father of CPL Cain and a U.S. national.

2018.   As a result of the September 13, 2006 Attack and CPL Cain's injuries and death, each member of the Cain Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cain's society, companionship, and counsel.

2019.   As a result of the September 13, 2006 Attack, CPL Cain was injured in his person and/or property.  The Plaintiff members of the Cain Family are the survivors and/or heirs of CPL Cain and are entitled to recover for the damages CPL Cain sustained.

**The September 13, 2006 IED Attack In Al Anbar (Jeffrey P. Shaffer Family)**

2020.   On September 13, 2006, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "September 13, 2006 Attack").  The September 13, 2006 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

2021.   The September 13, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2022.   **Specialist Jeffrey P. Shaffer** served in Iraq as a member of the U.S. Army.  SPC Shaffer was injured in the September 13, 2006 Attack.  SPC Shaffer died on September 13, 2006 as a result of injuries sustained during the September 13, 2006 Attack.

2023.   SPC Shaffer was a U.S. national at the time of the attack and his death.

2024.   Plaintiff Melissa Adams is the mother of SPC Shaffer and a U.S. national.

2025.   Plaintiff Addrin Adams is the brother of SPC Shaffer and a U.S. national.

2026.   As a result of the September 13, 2006 attack and SPC Shaffer's injuries and death, each member of the Shaffer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Shaffer's society, companionship, and counsel.

2027.  As a result of the September 13, 2006 attack, SPC Shaffer was injured in his person and/or property.  The Plaintiff members of the Shaffer Family are the survivors and/or heirs of SPC Shaffer and are entitled to recover for the damages SPC Shaffer sustained.

**The September 16, 2006 IED Attack In Al Anbar (David S. Roddy Family)**

2028.  On September 16, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "September 16, 2006 Attack").  The September 16, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2029.  The September 16, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2030.  **Petty Officer Second Class David S. Roddy** served in Iraq as a member of the U.S. Navy.  PO2 Roddy was injured in the September 16, 2006 Attack.  PO2 Roddy died on September 16, 2006 as a result of injuries sustained during the September 16, 2006 Attack.

2031.  PO2 Roddy was a U.S. national at the time of the attack and his death.

2032.  Plaintiff Robert Roddy Jr. is the son of PO2 Roddy and a U.S. national.

2033.  As a result of the September 16, 2006 attack and PO2 Roddy's injuries and death, each member of the Roddy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PO2 Roddy's society, companionship, and counsel.

2034.  As a result of the September 16, 2006 attack, PO2 Roddy was injured in his person and/or property.  The Plaintiff members of the Roddy Family are the survivors and/or heirs of PO2 Roddy and are entitled to recover for the damages PO2 Roddy sustained.

**The October 6, 2006 IED Attack In Al Anbar (John E. Hale Family)**

2035.   On October 6, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 6, 2006 Attack").  The October 6, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2036.   The October 6, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2037.   **Lance Corporal John E. Hale** served in Iraq as a member of the U.S. Marine Corps.  LCpl Hale was injured in the October 6, 2006 Attack.  LCpl Hale died on October 6, 2006 as a result of injuries sustained during the October 6, 2006 Attack.

2038.   LCpl Hale was a U.S. national at the time of the attack and his death.

2039.   Plaintiff Phillip Hale is the father of LCpl Hale and a U.S. national.

2040.   As a result of the October 6, 2006 attack and LCpl Hale's injuries and death, each member of the Hale Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Hale's society, companionship, and counsel.

2041.   As a result of the October 6, 2006 attack, LCpl Hale was injured in his person and/or property.  The Plaintiff members of the Hale Family are the survivors and/or heirs of LCpl Hale and are entitled to recover for the damages LCpl Hale sustained.

**The October 6, 2006 IED Attack In Al Anbar (Stephen F. Johnson Family)**

2042.   On October 6, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 6, 2006 Attack").  The October 6, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2043.   The October 6, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2044.   **Lance Corporal Stephen F. Johnson** served in Iraq as a member of the U.S. Marine Corps. LCpl Johnson was injured in the October 6, 2006 Attack. LCpl Johnson died on October 6, 2006 as a result of injuries sustained during the October 6, 2006 Attack.

2045.   LCpl Johnson was a U.S. national at the time of the attack and his death.

2046.   Plaintiff Eliza Bacot is the sister of LCpl Johnson and a U.S. national.

2047.   As a result of the October 6, 2006 Attack and LCpl Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish and emotional pain and suffering, and the loss of LCpl Johnson's society, companionship, and counsel.

2048.   As a result of the October 6, 2006 Attack, LCpl Johnson was injured in his person and/or property.  The Plaintiff members of the Johnson Family are the survivors and/or heirs of LCpl Johnson and are entitled to recover for the damages LCpl Johnson sustained.

### The October 9, 2006 IED Attack In Al Anbar (Jon E. Bowman and Shelby J. Feniello Families)

2049.   On October 9, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 9, 2006 Attack"). The October 9, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2050.   The October 9, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2051.   **Lance Corporal Jon Eric Bowman** served in Iraq as a member of the U.S. Marine Corps. LCpl Bowman was injured in the October 9, 2006 Attack. LCpl Bowman died on October 9, 2006 as a result of injuries sustained during the October 9, 2006 Attack.

2052.   LCpl Bowman was a U.S. national at the time of the attack and his death.

2053.   Plaintiff Jill Puckett is the mother of LCpl Bowman and a U.S. national.

2054.   Plaintiff Ashley Bellot is the sister of LCpl Bowman and a U.S. national.

2055.   As a result of the October 9, 2006 Attack and LCpl Bowman's injuries and death, each member of the Bowman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Bowman's society, companionship, and counsel.

2056.   As a result of the October 9, 2006 Attack, LCpl Bowman was injured in his person and/or property. The Plaintiff members of the Bowman Family are the survivors and/or heirs of LCpl Bowman and are entitled to recover for the damages LCpl Bowman sustained.

2057.   **Private First Class Shelby James Feniello** served in Iraq as a member of the U.S. Marine Corps.  PFC Feniello was injured in the October 9, 2006 Attack.  PFC Feniello died on October 9, 2006 as a result of injuries sustained during the October 9, 2006 Attack.

2058.   PFC Feniello was a U.S. national at the time of the attack and his death.

2059.   Plaintiff Richard Feniello is the father of PFC Feniello and a U.S. national.

2060.   As a result of the October 9, 2006 Attack and PFC Feniello's injuries and death, each member of the Feniello Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Feniello's society, companionship, and counsel.

2061.   As a result of the October 9, 2006 Attack, PFC Feniello was injured in his person and/or property. The Plaintiff members of the Feniello Family are the survivors and/or heirs of PFC Feniello and are entitled to recover for the damages PFC Feniello sustained.

**The October 17, 2006 Sniper Attack In Al Anbar (Joshua L. Booth Family)**

2062.   On October 17, 2006, al-Qaeda and al-Qaeda-in-Iraq committed a sniper attack in Al Anbar, Iraq (the "October 17, 2006 Attack").  The October 17, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2063.   The October 17, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2064.   **First Lieutenant Joshua L. Booth** served in Iraq as a member of the U.S. Marine Corps.  1stLt Booth was injured in the October 17, 2006 Attack.  1stLt Booth died on October 17, 2006 as a result of injuries sustained during the October 17, 2006 Attack.

2065.   1stLt Booth was a U.S. national at the time of the attack and his death.

2066.   Plaintiff Erica Booth is the widow of 1stLt Booth and a U.S. national.

2067.   Plaintiff G.B., by and through her next friend Erica Booth, is the minor daughter of 1stLt Booth. She is a U.S. national.

2068.   Plaintiff T.B., by and through his next friend Erica Booth, is the minor son of 1stLt Booth. He is a U.S. national.

2069.   Plaintiff Debra Booth is the mother of 1stLt Booth and a U.S. national.

2070.   As a result of the October 17, 2006 Attack and 1stLt Booth's injuries and death, each member of the Booth Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1stLt Booth's society, companionship, and counsel.

2071.   As a result of the October 17, 2006 Attack, 1stLt Booth was injured in his person and/or property.  The Plaintiff members of the Booth Family are the survivors and/or heirs of 1stLt Booth and are entitled to recover for the damages 1stLt Booth sustained.

**The October 18, 2006 IED Attack In Diyala (Daniel A. Brozovich Family)**

2072.   On October 18, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Diyala, Iraq (the "October 18, 2006 Attack"). The October 18, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2073.   The October 18, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2074.   **Sergeant First Class Daniel A. Brozovich** served in Iraq as a member of the U.S. Army. SFC Brozovich was injured in the October 18, 2006 Attack.  SFC Brozovich died on October 18, 2006 as a result of injuries sustained during the October 18, 2006 Attack.

2075.   SFC Brozovich was a U.S. national at the time of the attack and his death.

2076.   Plaintiff Mary Brozovich is the widow of SFC Brozovich and a U.S. national.

2077.   Plaintiff Ryan Brozovich is the son of SFC Brozovich and a U.S. national.

2078.   As a result of the October 18, 2006 Attack and SFC Brozovich's injuries and death, each member of the Brozovich Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Brozovich's society, companionship, and counsel.

2079.   As a result of the October 18, 2006 Attack, SFC Brozovich was injured in his person and/or property. The Plaintiff members of the Brozovich Family are the survivors and/or heirs of SFC Brozovich and are entitled to recover for the damages SFC Brozovich sustained.

**The October 21, 2006 IED Attack in Al Anbar (Nathan R. Elrod Family)**

2080.   On October 21, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "October 21, 2006 Attack").  The October 21, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2081.   The October 21, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2082.   **Lance Corporal Nathan R. Elrod** served in Iraq as a member of the U.S. Marine Corps.  LCpl Elrod was injured in the October 21, 2006 Attack.  LCpl Elrod died on October 21, 2006 as a result of injuries sustained during the October 21, 2006 Attack.

2083.   LCpl Elrod was a U.S. national at the time of the attack and his death.

2084.   Plaintiff Teresa Elrod is the mother of LCpl Elrod and a U.S. national.

2085.   Plaintiff Timothy Elrod is the father of LCpl Elrod and a U.S. national.

2086.   Plaintiff Shannon Eury is the sister of LCpl Elrod and a U.S. national.

2087.   As a result of the October 21, 2006 attack and LCpl Elrod's injuries and death, each member of the Elrod Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Elrod's society, companionship, and counsel.

2088.   As a result of the October 21, 2006 attack, LCpl Elrod was injured in his person and/or property.  The Plaintiff members of the Elrod Family are the survivors and/or heirs of LCpl Elrod and are entitled to recover for the damages LCpl Elrod sustained.

**The November 1, 2006 IED Attack In Kirkuk (Daniel J. Alderman Family)**

2089.   On November 1, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Kirkuk, Iraq (the "November 1, 2006 Attack"). The November 1, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2090.   The November 1, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2091.   **Sergeant Daniel Jameson Alderman** served in Iraq as a member of the U.S. Army. SGT Alderman was injured in the November 1, 2006 Attack.  The attack severely wounded SGT Alderman, who suffered a left below-the-knee leg amputation, right leg trauma and nerve damage, PTSD, TBI, tinnitus, and right shoulder damage. As a result of the November 1, 2006 Attack and his injuries, SGT Alderman has experienced severe physical and emotional pain and suffering.

2092.   Plaintiff SGT Alderman was a U.S. national at the time of the attack and remains one to this day.

2093.   Plaintiff A.A., by and through her next friend Daniel Alderman, is the minor daughter of SGT Alderman. She is a U.S. national.

2094.   Plaintiff A.A., by and through her next friend Daniel Alderman, is the minor daughter of SGT Alderman. She is a U.S. national.

2095.   As a result of the November 1, 2006 Attack and SGT Alderman's injuries, each member of the Alderman Family has experienced severe mental anguish, emotional pain and suffering.

**The November 2, 2006 IED Attack in Al Anbar (Luke B. Holler Family)**

2096.   On November 2, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 2, 2006 Attack").  The November 2, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2097.   The November 2, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2098.   **Lance Corporal Luke Benjamin Holler** served in Iraq as a member of the U.S. Marine Corps Reserve.  LCpl Holler was injured in the November 2, 2006 Attack.  LCpl Holler died on November 2, 2006 as a result of injuries sustained during the November 2, 2006 Attack.

2099.   LCpl Holler was a U.S. national at the time of the attack and his death.

2100.   Plaintiff Ruth Holler is the mother of LCpl Holler and a U.S. national.

2101.   Plaintiff John Holler Jr. is the father of LCpl Holler and a U.S. national.

2102.   Plaintiff Joseph Holler is the brother of LCpl Holler and a U.S. national.

2103.   As a result of the November 2, 2006 attack and LCpl Holler's injuries and death, each member of the Holler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Holler's society, companionship, and counsel.

2104.   As a result of the November 2, 2006 attack, LCpl Holler was injured in his person and/or property.  The Plaintiff members of the Holler Family are the survivors and/or heirs of LCpl Holler and are entitled to recover for the damages LCpl Holler sustained.

**The November 5, 2006 IED Attack In Al Anbar (Jose A. Galvan Family)**

2105.   On November 5, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 5, 2006 Attack").  The November 5, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2106.   The November 5, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2107.   **Corporal Jose Aureliano Galvan** served in Iraq as a member of the U.S. Marine Corps. Cpl Galvan was injured in the November 5, 2006 Attack. Cpl Galvan died on November 5, 2006 as a result of injuries sustained during the November 5, 2006 Attack.

2108.   Cpl Galvan was a U.S. national at the time of the attack and his death.

2109.   Plaintiff Leticia Romo is the mother of Cpl Galvan and a U.S. national.

2110.   Plaintiff Jesse Vega is the stepfather of Cpl Galvan and a U.S. national. Mr. Vega lived in the same household as Cpl Galvan for a substantial period and considered Cpl Galvan the functional equivalent of a biological son.

2111.   As a result of the November 5, 2006 Attack and Cpl Galvan's injuries and death, each member of the Galvan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Galvan's society, companionship, and counsel.

2112.   As a result of the November 5, 2006 Attack, Cpl Galvan was injured in his person and/or property. The Plaintiff members of the Galvan Family are the survivors and/or heirs of Cpl Galvan and are entitled to recover for the damages Cpl Galvan sustained.

**The November 11, 2006 Complex Attack Involving An IED In Al Anbar (Jace A. Badia Family)**

2113.   On November 11, 2006, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "November 11, 2006 Attack"). The November 11, 2006 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

2114.   The November 11, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2115.   **Private 1st Class Jace A. Badia** served in Iraq as a member of the U.S. Marine Corps. PFC Badia was injured in the November 11, 2006 Attack. The attack severely wounded PFC Badia, who suffered a traumatic comminuted fracture of left tibia and fibula with a transfemoral above the knee amputation.  As a result of the November 11, 2006 Attack and his injuries, PFC Badia has experienced severe physical and emotional pain and suffering.

2116.   Plaintiff PFC Badia was a U.S. national at the time of the attack and remains one to this day.

2117.   Plaintiff K.B., by and through her next friend Jace Badia, is the minor daughter of PFC Badia. She is a U.S. national.

2118.   As a result of the November 11, 2006 Attack and PFC Badia's injuries, each member of the Badia Family has experienced severe mental anguish, emotional pain and suffering.

**The November 22, 2006 IED Attack In Al Anbar (Heath D. Warner Family)**

2119.   On November 22, 2006, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "November 22, 2006 Attack").  The November 22, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2120.   The November 22, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2121.   **Private Heath Douglas Warner** served in Iraq as a member of the U.S. Marine Corps.  Pvt Warner was injured in the November 22, 2006 Attack.  Pvt Warner died on November 22, 2006 as a result of injuries sustained during the November 22, 2006 Attack.

2122.   Pvt Warner was a U.S. national at the time of the attack and his death.

2123.   Plaintiff Melissa Warner is the mother of Pvt Warner and a U.S. national.

2124.   Plaintiff Scott Warner is the father of Pvt Warner and a U.S. national.

2125.   Plaintiff Ashton Warner is the brother of Pvt Warner and a U.S. national.

2126.   As a result of the November 22, 2006 Attack and Pvt Warner's injuries and death, each member of the Warner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Pvt Warner's society, companionship, and counsel.

2127.   As a result of the November 22, 2006 Attack, Pvt Warner was injured in his person and/or property.  The Plaintiff members of the Warner Family are the survivors and/or heirs of Pvt Warner and are entitled to recover for the damages Pvt Warner sustained.

**The November 28, 2006 IED Attack In Al Anbar (Jon-Erik Loney Family)**

2128.   On November 28, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 28, 2006 Attack").  The November 28, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2129.   The November 28, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2130.   **Corporal  Jon-Erik Loney** served in Iraq as a member of the U.S. Army.  CPL Loney was injured in the November 28, 2006 Attack.  CPL Loney died on November 28, 2006 as a result of injuries sustained during the November 28, 2006 Attack.

2131.   CPL Loney was a U.S. national at the time of the attack and his death.

2132.   Plaintiff Violet Kaylor is the mother of CPL Loney and a U.S. national.

2133.   Plaintiff Jim Kaylor is the stepfather of CPL Loney and a U.S. national. Mr. Kaylor lived in the same household as CPL Loney for a substantial period and considered CPL Loney the functional equivalent of a biological son.

2134.   As a result of the November 28, 2006 Attack and CPL Loney's injuries and death, each member of the Loney Family has experienced severe mental anguish and emotional pain and suffering, and the loss of CPL Loney's society, companionship, and counsel.

2135.   As a result of the November 28, 2006 Attack, CPL Loney was injured in his person and/or property.  The Plaintiff members of the Loney Family are the survivors and/or heirs of CPL Loney and are entitled to recover for the damages CPL Loney sustained.

**The November 29, 2006 IED Attack In Al Anbar (Chad Watson Family)**

2136.   On November 29, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "November 29, 2006 Attack"). The November 29, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2137.   The November 29, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2138.   **Corporal Chad Watson** served in Iraq as a member of the U.S. Marine Corps. Cpl Watson was injured in the November 29, 2006 Attack.  The attack severely wounded Cpl Watson, who suffered an amputation of his right leg above the knee.  As a result of the November 29, 2006 Attack and his injuries, Cpl Watson has experienced severe physical and emotional pain and suffering.

2139.   Plaintiff Cpl Watson was a U.S. national at the time of the attack and remains one to this day.

2140.   As a result of the November 29, 2006 Attack and Cpl Watson's injuries, each member of the Watson Family has experienced severe mental anguish, emotional pain and suffering.

**The December 1, 2006 IED Attack In Al Anbar (Robert L. Love Jr. Family)**

2141.   On December 1, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "December 1, 2006 Attack").  The December 1, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2142.   The December 1, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2143.   **Staff Sergeant Robert L. Love Jr.** served in Iraq as a member of the U.S. Army. SSG Love was injured in the December 1, 2006 Attack. SSG Love died on December 1, 2006 as a result of injuries sustained during the December 1, 2006 Attack.

2144.   SSG Love was a U.S. national at the time of the attack and his death.

2145.   Plaintiff Robert Love Sr. is the father of SSG Love and a U.S. national.

2146.   Plaintiff Evelyn Ford is the sister of SSG Love and a U.S. national.

2147.   As a result of the December 1, 2006 Attack and SSG Love's injuries and death, each member of the Love Family has experienced severe mental anguish and emotional pain and suffering, and the loss of SSG Love's society, companionship, and counsel.

2148.   As a result of the December 1, 2006 Attack, SSG Love was injured in his person and/or property.  The Plaintiff members of the Love Family are the survivors and/or heirs of SSG Love and are entitled to recover for the damages SSG Love sustained.

**The December 11, 2006 IED Attack In Al Anbar (Clinton J. Miller Family)**

2149.   On December 11, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "December 11, 2006 Attack").  The December 11, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2150.   The December 11, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2151.   **Lance Corporal Clinton J. Miller** served in Iraq as a member of the U.S. Marine Corps.  LCpl Miller was injured in the December 11, 2006 Attack.  LCpl Miller died on December 11, 2006 as a result of injuries sustained during the December 11, 2006 Attack.

2152.   LCpl Miller was a U.S. national at the time of the attack and his death.

2153.   Plaintiff Kerby Miller is the father of LCpl Miller and a U.S. national.

2154.   Plaintiff Kim Miller is the stepmother of LCpl Miller and a U.S. national. Ms. Miller lived in the same household as LCpl Miller for a substantial period and considered LCpl Miller the functional equivalent of a biological son.

2155.   As a result of the December 11, 2006 Attack and LCpl Miller's injuries and death, each member of the Miller Family has experienced severe mental anguish and emotional pain and suffering, and the loss of LCpl Miller's society, companionship, and counsel.

2156.   As a result of the December 11, 2006 Attack, LCpl Miller was injured in his person and/or property.  The Plaintiff members of the Miller Family are the survivors and/or heirs of LCpl Miller and are entitled to recover for the damages LCpl Miller sustained.

**The December 24, 2006 IED Attack In Al Anbar (Stephen L. Morris Family)**

2157.   On December 24, 2006, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "December 24, 2006 Attack").  The December 24, 2006 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2158.   The December 24, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2159.   **Lance Corporal Stephen L. Morris** served in Iraq as a member of the U.S. Marine Corps.  LCpl Morris was injured in the December 24, 2006 Attack.  LCpl Morris died on December 24, 2006 as a result of injuries sustained during the December 24, 2006 Attack.

2160.   LCpl Morris was a U.S. national at the time of the attack and his death.

2161.   Plaintiff Lloyd Morris Jr. is the father of LCpl Morris and a U.S. national.

2162.   As a result of the December 24, 2006 attack and LCpl Morris's injuries and death, each member of the Morris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Morris's society, companionship, and counsel.

2163.   As a result of the December 24, 2006 attack, LCpl Morris was injured in his person and/or property.  The Plaintiff members of the Morris Family are the survivors and/or heirs of LCpl Morris and are entitled to recover for the damages LCpl Morris sustained.

**The January 5, 2007 IED Attack In Al Anbar (Patrick R. Russell Family)**

2164.   On January 5, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "January 5, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 5, 2007 Attack.

2165.   The January 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2166.   **Sergeant Patrick R. Russell** served in Iraq as a member of the U.S. Army. SGT Russell was injured in the January 5, 2007 Attack.  The attack severely wounded SGT Russell, who suffered shrapnel injuries from pelvis to shin, and a collapsed lung, resulting in continued breathing problems and subsequent anxiety attacks due to inability to breathe. As a result of the January 5, 2007 Attack and his injuries, SGT Russell has experienced severe physical and emotional pain and suffering.

2167.   Plaintiff SGT Russell was a U.S. national at the time of the attack, and remains one today.

2168.   Plaintiff Elizabeth Russell is the wife of SGT Russell and a U.S. national.

2169.   Plaintiff J.R., by and through her next friend Patrick Russell, is the minor daughter of SGT Russell. She is a U.S. national.

2170.   Plaintiff Kaie Kinmon-Russell is the son of SGT Russell. He is a U.S. national.

2171.   As a result of the January 5, 2007 Attack and SGT Russell's injuries, each member of the Russell Family has experienced severe mental anguish, emotional pain and suffering.

**The January 15, 2007 IED Attack In Ninewa (John E. Cooper Family)**

2172.   On January 15, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "January 15, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 15, 2007 Attack.

2173. The January 15, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2174. **Staff Sergeant John E. Cooper** served in Iraq as a member of the U.S. Army. SSG Cooper was injured in the January 15, 2007 Attack. SSG Cooper died on January 15, 2007 as a result of injuries sustained during the January 15, 2007 Attack.

2175. SSG Cooper was a U.S. national at the time of the attack and his death.

2176. Plaintiff Susan West is the sister of SSG Cooper and a U.S. national.

2177. Plaintiff Sherri Springate is the sister of SSG Cooper and a U.S. national.

2178. As a result of the January 15, 2007 Attack and SSG Cooper's injuries and death, each member of the Cooper Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cooper's society, companionship, and counsel.

2179. As a result of the January 15, 2007 Attack, SSG Cooper was injured in his person and/or property. The Plaintiff members of the Cooper Family are the survivors and/or heirs of SSG Cooper and are entitled to recover for the damages SSG Cooper sustained.

**The January 19, 2007 IED Attack In Ninewa (Russell P. Borea Family)**

2180. On January 19, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "January 19, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 19, 2007Attack.

2181. The January 19, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2182.  **Sergeant First Class Russell P. Borea** served in Iraq as a member of the U.S. Army.  SFC Borea was injured in the January 19, 2007 Attack.  SFC Borea died on January 19, 2007 as a result of injuries sustained during the January 19, 2007 Attack.

2183.  SFC Borea was a U.S. national at the time of the attack and his death.

2184.  Plaintiff Christopher Borea is the brother of SFC Borea and a U.S. national.

2185.  Plaintiff Kim Borea is the sister of SFC Borea and a U.S. national.

2186.  As a result of the January 19, 2007 Attack and SFC Borea's injuries and death, each member of the Borea Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Borea's society, companionship, and counsel.

2187.  As a result of the January 19, 2007 Attack, SFC Borea was injured in his person and/or property.  The Plaintiff members of the Borea Family are the survivors and/or heirs of SFC Borea and are entitled to recover for the damages SFC Borea sustained.

**The January 20, 2007 IED Attack In Al Anbar (Jeffrey D. Bisson Family)**

2188.  On January 20, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "January 20, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 20, 2007 Attack.

2189.  The January 20, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2190.  **Specialist Jeffrey D. Bisson** served in Iraq as a member of the U.S. Army.  SPC Bisson was injured in the January 20, 2007 Attack.  SPC Bisson died on January 20, 2007 as a result of injuries sustained during the January 20, 2007 Attack.

2191.  SPC Bisson was a U.S. national at the time of the attack and his death.

2192.   Plaintiff Andrew Bisson is the son of SPC Bisson and a U.S. national.

2193.   Plaintiff Lauralee Bisson is the mother of SPC Bisson and a U.S. national.

2194.   Plaintiff Richard Bisson is the father of SPC Bisson and a U.S. national.

2195.   Plaintiff Christopher Bisson is the brother of SPC Bisson and a U.S. national.

2196.   As a result of the January 20, 2007 Attack and SPC Bisson's injuries and death, each member of the Bisson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bisson's society, companionship, and counsel.

2197.   As a result of the January 20, 2007 Attack, SPC Bisson was injured in his person and/or property.  The Plaintiff members of the Bisson Family are the survivors and/or heirs of SPC Bisson and are entitled to recover for the damages SPC Bisson sustained.

**The January 26, 2007 IED Attack In Diyala (Alan R. Johnson Family)**

2198.   On January 26, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "January 26, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 26, 2007 Attack.

2199.   The January 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2200.   **Major Alan R. Johnson** served in Iraq as a member of the U.S. Army Reserve. MAJ Johnson was injured in the January 26, 2007 Attack.  MAJ Johnson died on January 26, 2007 as a result of injuries sustained during the January 26, 2007 Attack.

2201.   MAJ Johnson was a U.S. national at the time of the attack and his death.

2202.   Plaintiff Victoria Johnson is the widow of MAJ Johnson and a U.S. national.

2203.   As a result of the January 26, 2007 Attack and MAJ Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Johnson's society, companionship, and counsel.

2204.   As a result of the January 26, 2007 Attack, MAJ Johnson was injured in his person and/or property.  The Plaintiff members of the Johnson Family are the survivors and/or heirs of MAJ Johnson and are entitled to recover for the damages MAJ Johnson sustained.

**The February 8, 2007 IED Attack In Al Anbar (Ross A. Clevenger Family)**

2205.   On February 8, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 8, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 8, 2007 Attack.

2206.   The February 8, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2207.   **Sergeant Ross A. Clevenger** served in Iraq as a member of the U.S. Army Reserve. SGT Clevenger was injured in the February 8, 2007 Attack.  SGT Clevenger died on February 8, 2007 as a result of injuries sustained during the February 8, 2007 Attack.

2208.   SGT Clevenger was a U.S. national at the time of the attack and his death.

2209.   Plaintiff Brandon Clevenger is the brother of SGT Clevenger and a U.S. national.

2210.   Plaintiff Nancy Clevenger is the stepmother of SGT Clevenger and a U.S. national. Ms. Clevenger lived in the same household as SGT Clevenger for a substantial period and considered SGT Clevenger the functional equivalent of a biological son.

2211.   As a result of the February 8, 2007 Attack and SGT Clevenger's injuries and death, each member of the Clevenger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Clevenger's society, companionship, and counsel.

2212.   As a result of the February 8, 2007 Attack, SGT Clevenger was injured in his person and/or property.  The Plaintiff members of the Clevenger Family are the survivors and/or heirs of SGT Clevenger and are entitled to recover for the damages SGT Clevenger sustained.

**The February 11, 2007 IED Attack In Al Anbar (Russell A. Kurtz Family)**

2213.   On February 11, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 11, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 11, 2007 Attack.

2214.   The February 11, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2215.   **Sergeant Russell A. Kurtz** served in Iraq as a member of the U.S. Army.  SGT Kurtz was injured in the February 11, 2007 Attack.  SGT Kurtz died on February 11, 2007 as a result of injuries sustained during the February 11, 2007 Attack.

2216.   SGT Kurtz was a U.S. national at the time of the attack and his death.

2217.   Plaintiff Roger Kurtz is the father of SGT Kurtz and a U.S. national.

2218.   Plaintiff Stephanie Kurtz is the sister of SGT Kurtz and a U.S. national.

2219.   As a result of the February 11, 2007 Attack and SGT Kurtz's injuries and death, each member of the Kurtz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kurtz's society, companionship, and counsel.

2220.  As a result of the February 11, 2007 Attack, SGT Kurtz was injured in his person and/or property.  The Plaintiff members of the Kurtz Family are the survivors and/or heirs of SGT Kurtz and are entitled to recover for the damages SGT Kurtz sustained.

### The February 14, 2007 IED Attack In Diyala (Carl L. Seigart and Ronnie G. Madore Jr. Families)

2221.  On February 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "February 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 14, 2007 Attack.

2222.  The February 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2223.  **Sergeant Carl L. Seigart** served in Iraq as a member of the U.S. Army.  SGT Seigart was injured in the February 14, 2007 Attack.  SGT Seigart died on February 14, 2007 as a result of injuries sustained during the February 14, 2007 Attack.

2224.  SGT Seigart was a U.S. national at the time of the attack and his death.

2225.  Plaintiff Darlene Seigart is the mother of SGT Seigart and a U.S. national.

2226.  As a result of the February 14, 2007 Attack and SGT Seigart's injuries and death, each member of the Seigart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Seigart's society, companionship, and counsel.

2227.  As a result of the February 14, 2007 Attack, SGT Seigart was injured in his person and/or property.  The Plaintiff members of the Seigart Family are the survivors and/or heirs of SGT Seigart and are entitled to recover for the damages SGT Seigart sustained.

2228.  **Specialist Ronnie Gene Madore Jr.** served in Iraq as a member of the U.S. Army.

2229.   SPC Madore was injured in the February 14, 2007 Attack.  SPC Madore died on February 14, 2007 as a result of injuries sustained during the February 14, 2007 Attack.

2230.   SPC Madore was a U.S. national at the time of the attack and his death.

2231.   Plaintiff Connie Madore is the mother of SPC Madore and a U.S. national.

2232.   Plaintiff Ronnie Madore is the father of SPC Madore and a U.S. national.

2233.   As a result of the February 14, 2007 Attack and SPC Madore's injuries and death, each member of the Madore Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Madore's society, companionship, and counsel.

2234.   As a result of the February 14, 2007 Attack, SPC Madore was injured in his person and/or property.  The Plaintiff members of the Madore Family are the survivors and/or heirs of SPC Madore and are entitled to recover for the damages SPC Madore sustained.

**The February 18, 2007 IED Attack In Al Anbar (Brett A. Witteveen Family)**

2235.   On February 18, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "February 18, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the February 18, 2007 Attack.

2236.   The February 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2237.   **Private First Class Brett A. Witteveen** served in Iraq as a member of the U.S. Marine Corps.  PFC Witteveen was injured in the February 18, 2007 Attack.  PFC Witteveen died on February 18, 2007 as a result of injuries sustained during the February 18, 2007 Attack.

2238.   PFC Witteveen was a U.S. national at the time of the attack and his death.

2239.   Plaintiff Richard Witteveen is the father of PFC Witteveen and a U.S. national.

2240.   Plaintiff Trent Witteveen is the brother of PFC Witteveen and a U.S. national.

2241.   Plaintiff Heather Kaufman is the sister of PFC Witteveen and a U.S. national.

2242.   As a result of the February 18, 2007 Attack and PFC Witteveen's injuries and death, each member of the Witteveen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Witteveen's society, companionship, and counsel.

2243.   As a result of the February 18, 2007 Attack, PFC Witteveen was injured in his person and/or property.  The Plaintiff members of the Witteveen Family are the survivors and/or heirs of PFC Witteveen and are entitled to recover for the damages PFC Witteveen sustained.

**The February 22, 2007 IED Attack In Al Anbar (Joshua R. Hager Family)**

2244.   On February 22, 2007, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "February 22, 2007 Attack").  The February 22, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2245.   The February 22, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2246.   **Staff Sergeant Joshua Ryan Hager** served in Iraq as a member of the U.S. Army. SSgt Hager was injured in the February 22, 2007 Attack.  SSgt Hager died on February 22, 2007 as a result of injuries sustained during the February 22, 2007 Attack.

2247.   SSgt Hager was a U.S. national at the time of the attack and his death.

2248.   Plaintiff Kris Hager is the father of SSgt Hager and a U.S. national.

2249.   As a result of the February 22, 2007 Attack and SSgt Hager's injuries and death, each member of the Hager Family has experienced severe mental anguish and emotional pain and suffering, and the loss of SSgt Hager's society, companionship, and counsel.

2250.   As a result of the February 22, 2007 Attack, SSgt Hager was injured in his person and/or property.  The Plaintiff members of the Hager Family are the survivors and/or heirs of SSgt Hager and are entitled to recover for the damages SSgt Hager sustained.

**The March 5, 2007 IED Attack In Saladin (Justin M. Estes Family)**

2251.   On March 5, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Saladin, Iraq (the "March 5, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 5, 2007 Attack.

2252.   The March 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2253.   **Staff Sergeant Justin M. Estes** served in Iraq as a member of the U.S. Army.  SSG Estes was injured in the March 5, 2007 Attack.  SSG Estes died on March 5, 2007 as a result of injuries sustained during the March 5, 2007 Attack.

2254.   SSG Estes was a U.S. national at the time of the attack and his death.

2255.   Plaintiff Diane Salyers is the mother of SSG Estes and a U.S. national.

2256.   Plaintiff Kelli Winkler is the sister of SSG Estes and a U.S. national.

2257.   Plaintiff Norma Estes is the sister of SSG Estes and a U.S. national.

2258.   As a result of the March 5, 2007 Attack and SSG Estes's injuries and death, each member of the Estes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Estes's society, companionship, and counsel.

2259.   As a result of the March 5, 2007 Attack, SSG Estes was injured in his person and/or property.  The Plaintiff members of the Estes Family are the survivors and/or heirs of SSG Estes and are entitled to recover for the damages SSG Estes sustained.

**The March 17, 2007 IED Attack In Diyala (Benjamin L. Sebban Family)**

2260.   On March 17, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "March 17, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 17, 2007 Attack.

2261.   The March 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2262.   **Sergeant First Class Benjamin L. Sebban** served in Iraq as a member of the U.S. Army.  SFC Sebban was injured in the March 17, 2007 Attack.  SFC Sebban died on March 17, 2007 as a result of injuries sustained during the March 17, 2007 Attack.

2263.   SFC Sebban was a U.S. national at the time of the attack and his death.

2264.   Plaintiff Daniel Sebban is the brother of SFC Sebban and a U.S. national.

2265.   As a result of the March 17, 2007 Attack and SFC Sebban's injuries and death, each member of the Sebban Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Sebban's society, companionship, and counsel.

2266.   As a result of the March 17, 2007 Attack, SFC Sebban was injured in his person and/or property.  The Plaintiff members of the Sebban Family are the survivors and/or heirs of SFC Sebban and are entitled to recover for the damages SFC Sebban sustained.

**The March 23, 2007 IED Attack In Al Anbar (Greg N. Riewer Family)**

2267.   On March 23, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "March 23, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 23, 2007 Attack.

2268.   The March 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2269.   **Staff Sergeant Greg N. Riewer** served in Iraq as a member of the U.S. Army National Guard.  SSG Riewer was injured in the March 23, 2007 Attack.  SSG Riewer died on March 23, 2007 as a result of injuries sustained during the March 23, 2007 Attack.

2270.   SSG Riewer was a U.S. national at the time of the attack and his death.

2271.   Plaintiff Janice Riewer is the mother of SSG Riewer and a U.S. national.

2272.   Plaintiff Richard Riewer is the father of SSG Riewer and a U.S. national.

2273.   As a result of the March 23, 2007 Attack and SSG Riewer's injuries and death, each member of the Riewer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Riewer's society, companionship, and counsel.

2274.   As a result of the March 23, 2007 Attack, SSG Riewer was injured in his person and/or property.  The Plaintiff members of the Riewer Family are the survivors and/or heirs of SSG Riewer and are entitled to recover for the damages SSG Riewer sustained.

**The April 4, 2007 IED Attack In Baghdad (Joseph H. Cantrell IV Family)**

2275.   On April 4, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "April 4, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 4, 2007 Attack.

2276.   The April 4, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2277.  **Corporal Joseph H. Cantrell IV** served in Iraq as a member of the U.S. Army. CPL Cantrell was injured in the April 4, 2007 Attack.  CPL Cantrell died on April 4, 2007 as a result of injuries sustained during the April 4, 2007 Attack.

2278.  CPL Cantrell was a U.S. national at the time of the attack and his death.

2279.  Plaintiff Sondra Adkins is the mother of CPL Cantrell and a U.S. national.

2280.  Plaintiff Joseph Cantrell III is the father of CPL Cantrell and a U.S. national.

2281.  As a result of the April 4, 2007 Attack and CPL Cantrell's injuries and death, each member of the Cantrell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cantrell's society, companionship, and counsel.

2282.  As a result of the April 4, 2007 Attack, CPL Cantrell was injured in his person and/or property.  The Plaintiff members of the Cantrell Family are the survivors and/or heirs of CPL Cantrell and are entitled to recover for the damages CPL Cantrell sustained.

### The April 7, 2007 IED Attack In Diyala (Jonathan D. Grassbaugh, Levi K. Hoover, and Rodney L. McCandless Families)

2283.  On April 7, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "April 7, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 7, 2007 Attack.

2284.  The April 7, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2285.  **Captain Jonathan D. Grassbaugh** served in Iraq as a member of the U.S. Army. CPT Grassbaugh was injured in the April 7, 2007 Attack.  CPT Grassbaugh died on April 7, 2007 as a result of injuries sustained during the April 7, 2007 Attack.

2286.   CPT Grassbaugh was a U.S. national at the time of the attack and his death.

2287.   Plaintiff Patricia Grassbaugh is the mother of CPT Grassbaugh and a U.S. national.

2288.   As a result of the April 7, 2007 Attack and CPT Grassbaugh's injuries and death, each member of the Grassbaugh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Grassbaugh's society, companionship, and counsel.

2289.   As a result of the April 7, 2007 Attack, CPT Grassbaugh was injured in his person and/or property.  The Plaintiff members of the Grassbaugh Family are the survivors and/or heirs of CPT Grassbaugh and are entitled to recover for the damages CPT Grassbaugh sustained.

2290.   **Specialist Levi K. Hoover** served in Iraq as a member of the U.S. Army.  SPC Hoover was injured in the April 7, 2007 Attack.  SPC Hoover died on April 7, 2007 as a result of injuries sustained during the April 7, 2007 Attack.

2291.   SPC Hoover was a U.S. national at the time of the attack and his death.

2292.   Plaintiff Belinda Brewster is the mother of SPC Hoover and a U.S. national.

2293.   As a result of the April 7, 2007 Attack and SPC Hoover's injuries and death, each member of the Hoover Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hoover's society, companionship, and counsel.

2294.   As a result of the April 7, 2007 Attack, SPC Hoover was injured in his person and/or property.  The Plaintiff members of the Hoover Family are the survivors and/or heirs of SPC Hoover and are entitled to recover for the damages SPC Hoover sustained.

2295.   **Private First Class Rodney L. McCandless** served in Iraq as a member of the U.S. Army.  PFC McCandless was injured in the April 7, 2007 Attack.  PFC McCandless died on April 7, 2007 as a result of injuries sustained during the April 7, 2007 Attack.

2296.   PFC McCandless was a U.S. national at the time of the attack and his death.

2297.   Plaintiff Chassity McCandless is the sister of PFC McCandless and a U.S. national.

2298.   Plaintiff Ronald Sumner is the brother of PFC McCandless and a U.S. national.

2299.   As a result of the April 7, 2007 Attack and PFC McCandless's injuries and death, each member of the McCandless Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McCandless's society, companionship, and counsel.

2300.   As a result of the April 7, 2007 Attack, PFC McCandless was injured in his person and/or property.  The Plaintiff members of the McCandless Family are the survivors and/or heirs of PFC McCandless and are entitled to recover for the damages he sustained.

### The April 14, 2007 IED Attack In Al Anbar (Brandon L. Wallace and Joshua A. Schmit Families)

2301.   On April 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 14, 2007 Attack.

2302.   The April 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2303.   **Sergeant Brandon L. Wallace** served in Iraq as a member of the U.S. Army.  SGT Wallace was injured in the April 14, 2007 Attack.  SGT Wallace died on April 14, 2007 as a result of injuries sustained during the April 14, 2007 Attack.

2304.   SGT Wallace was a U.S. national at the time of the attack and his death.

2305.   Plaintiff Robin Wallace is the mother of SGT Wallace and a U.S. national.

2306.   Plaintiff Rickey Wallace is the father of SGT Wallace and a U.S. national.

2307.   Plaintiff Sarah Wallace is the sister of SGT Wallace and a U.S. national.

2308.   Plaintiff Rachel Tucker is the sister of SGT Wallace and a U.S. national.

2309.   As a result of the April 14, 2007 Attack and SGT Wallace's injuries and death, each member of the Wallace Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Wallace's society, companionship, and counsel.

2310.   As a result of the April 14, 2007 Attack, SGT Wallace was injured in his person and/or property.  The Plaintiff members of the Wallace Family are the survivors and/or heirs of SGT Wallace and are entitled to recover for the damages SGT Wallace sustained.

2311.   **Sergeant Joshua A. Schmit** served in Iraq as a member of the U.S. Army. SGT Schmit was injured in the April 14, 2007 Attack.  SGT Schmit died on April 14, 2007 as a result of injuries sustained during the April 14, 2007 Attack.

2312.   SGT Schmit was a U.S. national at the time of the attack and his death.

2313.   Plaintiff Kimberly Schmit is the mother of SGT Schmit and a U.S. national.

2314.   As a result of the April 14, 2007 Attack and SGT Schmit's injuries and death, each member of the Schmit Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schmit's society, companionship, and counsel.

2315.   As a result of the April 14, 2007 Attack, SGT Schmit was injured in his person and/or property.  The Plaintiff members of the Schmit Family are the survivors and/or heirs of SGT Schmit and are entitled to recover for the damages SGT Schmit sustained.

**The April 23, 2007 IED Attack In Al Anbar (Brice A. Pearson, Kenneth E. Locker Jr., and Michael J. Rodriguez Families)**

2316.   On April 23, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 23, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 23, 2007 Attack.

2317.   The April 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2318.   **Sergeant Brice A. Pearson** served in Iraq as a member of the U.S. Army. SGT Pearson was injured in the April 23, 2007 Attack.  SGT Pearson died on April 23, 2007 as a result of injuries sustained during the April 23, 2007 Attack.

2319.   SGT Pearson was a U.S. national at the time of the attack and his death.

2320.   Plaintiff Leslie White is the mother of SGT Pearson and a U.S. national.

2321.   Plaintiff Jeremy Pearson is the brother of SGT Pearson and a U.S. national.

2322.   As a result of the April 23, 2007 Attack and SGT Pearson's injuries and death, each member of the Pearson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Pearson's society, companionship, and counsel.

2323.   As a result of the April 23, 2007 Attack, SGT Pearson was injured in his person and/or property.  The Plaintiff members of the Pearson Family are the survivors and/or heirs of SGT Pearson and are entitled to recover for the damages SGT Pearson sustained.

2324.   **Staff Sergeant Kenneth E. Locker Jr.** served in Iraq as a member of the U.S. Army.  SSG Locker was injured in the April 23, 2007 Attack.  SSG Locker died on April 23, 2007 as a result of injuries sustained during the April 23, 2007 Attack.

2325.   SSG Locker was a U.S. national at the time of the attack and his death.

2326.   Plaintiff Kenneth Locker Sr. is the father of SSG Locker and a U.S. national.

2327.   Plaintiff Carmon Petters is the sister of SSG Locker and a U.S. national.

2328.   As a result of the April 23, 2007 Attack and SSG Locker's injuries and death, each member of the Locker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Locker's society, companionship, and counsel.

2329.   As a result of the April 23, 2007 Attack, SSG Locker was injured in his person and/or property.  The Plaintiff members of the Locker Family are the survivors and/or heirs of SSG Locker and are entitled to recover for the damages SSG Locker sustained.

2330.   **Specialist Michael J. Rodriguez** served in Iraq as a member of the U.S. Army. SPC Rodriguez was injured in the April 23, 2007 Attack.  SPC Rodriguez died on April 23, 2007 as a result of injuries sustained during the April 23, 2007 Attack.

2331.   SPC Rodriguez was a U.S. national at the time of the attack and his death.

2332.   Plaintiff Lorie Southerland is the mother of SPC Rodriguez and a U.S. national.

2333.   As a result of the April 23, 2007 Attack and SPC Rodriguez's injuries and death, each member of the Rodriguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rodriguez's society, companionship, and counsel.

2334.   As a result of the April 23, 2007 Attack, SPC Rodriguez was injured in his person and/or property.  The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SPC Rodriguez and are entitled to recover for the damages SPC Rodriguez sustained.

### The April 27, 2007 IED Attack In Salah Ad Din (Craig S. Hall Family)

2335.   On April 27, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Salah ad Din, Iraq (the "April 27, 2007 Attack"). The April 27, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2336.   The April 27, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2337.   **Sergeant Craig S. Hall** served in Iraq as a member of the U.S. Marine Corps. Sgt Hall was injured in in the April 27, 2007 Attack.  The attack severely wounded Sgt Hall, who suffered a left leg below-knee amputation; broken tibia, fibula, and heel of his left leg which resulted in a below-the-knee amputation; TBI; tinnitus; hip pain; and PTSD.  As a result of the April 27, 2007 Attack and his injuries, Sgt Hall has experienced severe physical and emotional pain and suffering.

2338.   Plaintiff Sgt Hall was a U.S. national at the time of the attack and remains one to this day.

2339.   Plaintiff Daniel Hall is the son of Sgt Hall and a U.S. national.

2340.   As a result of the April 27, 2007 Attack and Sgt Hall's injuries, each member of the Hall Family has experienced severe mental anguish and emotional pain and suffering.

### The April 27, 2007 Complex Attack Involving An IED In Al Anbar (Guillermo Castillo-Rivera Family)

2341.   On April 27, 2007, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Al Anbar, Iraq (the "April 27, 2007 Al Anbar Attack"). The April 27, 2007 Al Anbar Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2342.   The April 27, 2007 Al Anbar Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2343.  **Corporal Guillermo Castillo-Rivera** served in Iraq as a member of the U.S. Army. Cpl Castillo-Rivera was injured in theApril 27, 2007 Al Anbar Attack.  The attack severely wounded Cpl Castillo-Rivera, who suffered a left above the knee amputation, the loss of part of his right leg, vision loss, broken jaw, fractured skull, PTSD and related conditions.  As a result of the April 27, 2007 Al Anbar Attack and his injuries, Cpl Castillo-Rivera has experienced severe physical and emotional pain and suffering.

2344.  Plaintiff Cpl Castillo-Rivera was a U.S. national at the time of the attack and remains one to this day.

2345.  As a result of the April 27, 2007 Al Anbar Attack and Cpl Castillo-Rivera's injuries, each member of the Castillo-Rivera Family has experienced severe mental anguish, emotional pain and suffering.

**The April 28, 2007 IED Attack In Al Anbar (Theodore M. Cothran Jr. Family)**

2346.  On April 28, 2007, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "April 28, 2007 Attack"). The April 28, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2347.  The April 28, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2348.  **Private 1st Class Theodore M. Cothran Jr.** served in Iraq as a member of the U.S. Marine Corps. PFC Cothran was injured in the April 28, 2007 Attack.  The attack severely wounded PFC Cothran, who suffered an amputation of right finger, surgery of another right finger, nerve damage of hand, shoulder injury requiring surgery, broken leg, headaches, muscle leg

damage, depression, anxiety, nightmares, and insomnia. As a result of the April 28, 2007 Attack and his injuries, PFC Cothran has experienced severe physical and emotional pain and suffering.

2349.   Plaintiff PFC Cothran was a U.S. national at the time of the attack, and remains one to this day.

2350.   Plaintiff Elena Cothran is the mother of PFC Cothran and a U.S. national.

2351.   Plaintiff Theodore Cothran Sr. is the father of PFC Cothran and a U.S. national.

2352.   Plaintiff Antoinette Cothran Hebert is the sister of PFC Cothran and a U.S. national.

2353.   As a result of the April 28, 2007 Attack and PFC Cothran's injuries, each member of the Cothran Family has experienced severe mental anguish, emotional pain and suffering.

**The May 5, 2007 IED Attack In Al Anbar (Ronny Porta Family)**

2354.   On May 5, 2007, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "May 5, 2007 Attack"). The May 5, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2355.   The May 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2356.   **Sergeant Ronny Porta** served in Iraq as a member of the U.S. Army. Sgt Porta was injured in the May 5, 2007 Attack.  The attack severely wounded Sgt Porta, who suffered burns on over 97% of his body and the total amputation of his right arm. As a result of the burns, Sgt Porta had 128 surgeries to repair the damage.  As a result of the May 5, 2007 Attack and his injuries, Sgt Porta has experienced severe physical and emotional pain and suffering.

2357.   Plaintiff Sgt Porta was a U.S. national at the time of the attack and remains one to this day.

2358.   Plaintiff Natali Porta is the sister of Sgt Porta and a U.S. national.

2359.   As a result of the May 5, 2007 Attack and Sgt Porta's injuries, each member of the Porta Family has experienced severe mental anguish and emotional pain and suffering.

**The May 6, 2007 IED Attack In Diyala (Jason R. Harkins Family)**

2360.   On May 6, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "May 6, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 6, 2007 Attack.

2361.   The May 6, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2362.   **Sergeant Jason R. Harkins** served in Iraq as a member of the U.S. Army. SGT Harkins was injured in the May 6, 2007 Attack.  SGT Harkins died on May 6, 2007 as a result of injuries sustained during the May 6, 2007 Attack.

2363.   SGT Harkins was a U.S. national at the time of the attack and his death.

2364.   Plaintiff April Harkins is the mother of SGT Harkins and a U.S. national.

2365.   Plaintiff Robert Harkins Jr. is the father of SGT Harkins and a U.S. national.

2366.   As a result of the May 6, 2007 Attack and SGT Harkins's injuries and death, each member of the Harkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Harkins's society, companionship, and counsel.

2367.   As a result of the May 6, 2007 Attack, SGT Harkins was injured in his person and/or property.  The Plaintiff members of the Harkins Family are the survivors and/or heirs of SGT Harkins and are entitled to recover for the damages SGT Harkins sustained.

### The May 12, 2007 Kidnapping Attack, And Subsequent Hostage Taking, Torture, And Murder In Baghdad Province (Alex Jimenez and Byron Fouty Families)

2368.   On May 12, 2007, al-Qaeda and al-Qaeda-in-Iraq conducted a complex attack in an al-Qaeda-in-Iraq stronghold in Baghdad Province, Iraq during which at least two U.S. soldiers, **Staff Sergeant Alex R. Jimenez** and **Specialist Byron W. Fouty**, were kidnapped, held hostage, tortured, and ultimately murdered (the "May 12, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 12, 2007 Attack.

2369.   The May 12, 2007 Attack, and subsequent hostage taking, torture, and murder of SSG Jimenez and SPC Fouty was planned and authorized by al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.  SSG Jimenez and SPC Fouty were held hostage by al-Qaeda-in-Iraq and executed by al-Qaeda-in-Iraq.

2370.   The May 12, 2007 Attack, and SSG Jimenez's and SPC Fouty's kidnapping, subsequent confinement, torture, and murders would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists murdered an unarmed captive.

2371.   On May 12, 2007, SSG Jimenez and SPC Fouty were taken hostage by al-Qaeda and al-Qaeda-in-Iraq during the May 12, 2007 Attack. Thereafter, SSG Jimenez and SPC Fouty remained in captivity as hostages and were brutally tortured by al-Qaeda-in-Iraq, before it eventually murdered them both at some point prior to the recovery of their remains on July 8, 2008, which is the official date of death under Department of Defense regulations..

2372.   SSG Jimenez was a U.S. national at the time of the kidnapping and his murder.

2373.   Plaintiff Yaderlin Jimenez is the widow of SSG Jimenez and a U.S. national. She brings claims in both her personal capacity and her co-representative capacity on behalf of SSG Jimenez's estate.

2374.   Plaintiff Ramon D. Jimenez is the father of SSG Jimenez and a U.S. national.

2375.   Plaintiff Maria Duran is the mother of SSG Jimenez and a U.S. national.

2376.   Plaintiff Andy J. Jimenez is the brother of SSG Jimenez and a U.S. national.

2377.   Plaintiff Irving Jimenez is the brother of SSG Jimenez and a U.S. national.

2378.   Plaintiff Andy D. Jimenez is the brother of SSG Jimenez and a U.S. national.  He brings claims in both his personal capacity and his co-representative capacity on behalf of SSG Jimenez's estate.

2379.   Plaintiff Bryant Jimenez is the brother of SSG Jimenez and a U.S. national.

2380.   Plaintiff Alexander Vargas is the brother of SSG Jimenez and a U.S. national.

2381.   As a result of the May 12, 2007 Attack, and subsequent days as a hostage during which SSG Jimenez was tortured before he was murdered in 2007, each member of the Jimenez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Jimenez's society, companionship, and counsel.

2382.   As a result of the May 12, 2007 Attack, and subsequent days as a hostage during which SSG Jimenez was tortured before he was murdered in 2007, SSG Jimenez was injured in his person and/or property. The Plaintiff members of the Jimenez Family are the survivors and/or heirs of SSG Jimenez and are entitled to recover for the damages SSG Jimenez sustained.

2383.   SPC Fouty was a U.S. national at the time of the kidnapping and his murder.

2384.   Plaintiff Sarah Haverlock is the sister of SPC Fouty and a U.S. national.

2385.   Plaintiff Ronald Fouty solely in his representative capacity on behalf of the estate of Mickey Fouty (SPC Fouty's father). Mickey Foutey was a U.S. national who was alive when SPC Fouty was murdered.

2386.   Plaintiff Hilary North is the mother of SPC Fouty and a U.S. national.

2387.   Plaintiff Gordon Dibler Jr. is the stepfather of SPC Fouty and a U.S. national.  He brings claims in both his personal capacity and his representative capacity on behalf of SPC Fouty's estate.

2388.   As a result of the May 12, 2007 Attack, and subsequent days as a hostage during which SPC Fouty was tortured before he was murdered in 2007, each member of the Fouty has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fouty's society, companionship, and counsel.

2389.   As a result of the May 12, 2007 Attack, and subsequent days as a hostage during which SPC Fouty was tortured before he was murdered in 2007, SPC Fouty was injured in his person and/or property. The Plaintiff members of the Fouty Family are the survivors and/or heirs of SPC Fouty and are entitled to recover for the damages SPC Fouty sustained.

### The May 17, 2007 Complex Attack Involving An IED In Baghdad (Aaron D. Gautier Family)

2390.   On May 17, 2007, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Baghdad, Iraq (the "May 17, 2007 Attack").  The May 17, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2391.   The May 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2392.  **Corporal Aaron D. Gautier** served in Iraq as a member of the U.S. Army.  Cpl Gautier was injured in the May 17, 2007 Attack.  Cpl Gautier died on May 17, 2007 as a result of injuries sustained during the May 17, 2007 Attack.

2393.  Cpl Gautier was a U.S. national at the time of the attack and his death.

2394.  Plaintiff Tina Houchins is the mother of Cpl Gautier and a U.S. national.

2395.  Plaintiff Daniel Gautier is the father of Cpl Gautier and a U.S. national.

2396.  As a result of the May 17, 2007 Attack and Cpl Gautier's injuries and death, each member of the Gautier Family has experienced severe mental anguish and emotional pain and suffering, and the loss of Cpl Gautier's society, companionship, and counsel.

2397.  As a result of the May 17, 2007 Attack, Cpl Gautier was injured in his person and/or property.  The Plaintiff members of the Gautier Family are the survivors and/or heirs of Cpl Gautier and are entitled to recover for the damages Cpl Gautier sustained.

**The May 18, 2007 IED Attack In Baghdad (Anselmo Martinez III Family)**

2398.  On May 18, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "May 18, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 18, 2007 Attack.

2399.  The May 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2400.  **Sergeant Anselmo Martinez III** served in Iraq as a member of the U.S. Army.  SGT Martinez was injured in the May 18, 2007 Attack.  SGT Martinez died on May 18, 2007 as a result of injuries sustained during the May 18, 2007 Attack.

2401.  SGT Martinez was a U.S. national at the time of the attack and his death.

2402.   Plaintiff Anselmo Martinez Jr. is the father of SGT Martinez and a U.S. national.

2403.   Plaintiff Galdina Ibarra is the sister of SGT Martinez and a U.S. national.

2404.   As a result of the May 18, 2007 Attack and SGT Martinez's injuries and death, each member of the Martinez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Martinez's society, companionship, and counsel.

2405.   As a result of the May 18, 2007 Attack, SGT Martinez was injured in his person and/or property.  The Plaintiff members of the Martinez Family are the survivors and/or heirs of SGT Martinez and are entitled to recover for the damages SGT Martinez sustained.

**The May 22, 2007 IED Attack In Baghdad (Robert J. Montgomery Jr. Family)**

2406.   On May 22, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "May 22, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 22, 2007 Attack.

2407.   The May 22, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2408.   **Sergeant Robert J. Montgomery Jr.** served in Iraq as a member of the U.S. Army. SGT Montgomery was injured in the May 22, 2007 Attack.  SGT Montgomery died on May 22, 2007 as a result of injuries sustained during the May 22, 2007 Attack.

2409.   SGT Montgomery was a U.S. national at the time of the attack and his death.

2410.   Plaintiff Micah Montgomery is the brother of SGT Montgomery and a U.S. national.

2411.   As a result of the May 22, 2007 Attack and SGT Montgomery's injuries and death, each member of the Montgomery Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

2412.   As a result of the May 22, 2007 Attack, SGT Montgomery was injured in his person and/or property.  The Plaintiff members of the Montgomery Family are the survivors and/or heirs of SGT Montgomery and are entitled to recover for the damages he sustained.

### The May 28, 2007 IED Attack In Diyala (James E. Summers III, Kile G. West, and Zachary D. Baker Families)

2413.   On May 28, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "May 28, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the May 28, 2007 Attack.

2414.   The May 28, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2415.   **Corporal James E. Summers III** served in Iraq as a member of the U.S. Army. CPL Summers was injured in the May 28, 2007 Attack.  CPL Summers died on May 28, 2007 as a result of injuries sustained during the May 28, 2007 Attack.

2416.   CPL Summers was a U.S. national at the time of the attack and his death.

2417.   Plaintiff Michael Summers is the brother of CPL Summers and a U.S. national.

2418.   As a result of the May 28, 2007 Attack and CPL Summers's injuries and death, each member of the Summers Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Summers's society, companionship, and counsel.

2419.   As a result of the May 28, 2007 Attack, CPL Summers was injured in his person and/or property.  The Plaintiff members of the Summers Family are the survivors and/or heirs of CPL Summers and are entitled to recover for the damages CPL Summers sustained.

2420.   **First Lieutenant Kile G. West** served in Iraq as a member of the U.S. Army. 1LT West was injured in the May 28, 2007 Attack.  1LT West died on May 28, 2007 as a result of injuries sustained during the May 28, 2007 Attack.

2421.   1LT West was a U.S. national at the time of the attack and his death.

2422.   Plaintiff Nanette West is the mother of 1LT West and a U.S. national.

2423.   Plaintiff Clark West is the father of 1LT West and a U.S. national.

2424.   Plaintiff Kara West is the sister of 1LT West and a U.S. national.

2425.   Plaintiff Kelli Anderson is the sister of 1LT West and a U.S. national.

2426.   Plaintiff Carter West is the brother of 1LT West and a U.S. national.

2427.   As a result of the May 28, 2007 Attack and 1LT West's injuries and death, each member of the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT West's society, companionship, and counsel.

2428.   As a result of the May 28, 2007 Attack, 1LT West was injured in his person and/or property.  The Plaintiff members of the West Family are the survivors and/or heirs of 1LT West and are entitled to recover for the damages 1LT West sustained.

2429.   **Corporal Zachary D. Baker** served in Iraq as a member of the U.S. Army.  CPL Baker was injured in the May 28, 2007 Attack.  CPL Baker died on May 28, 2007 as a result of injuries sustained during the May 28, 2007 Attack.

2430.   CPL Baker was a U.S. national at the time of the attack and his death.

2431.   Plaintiff Christina Baker is the widow of CPL Baker and a U.S. national.

2432.   As a result of the May 28, 2007 Attack and CPL Baker's injuries and death, each member of the Baker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Baker's society, companionship, and counsel.

2433.   As a result of the May 28, 2007 Attack, CPL Baker was injured in his person and/or property.  The Plaintiff members of the Baker Family are the survivors and/or heirs of CPL Baker and are entitled to recover for the damages CPL Baker sustained.

**The June 2, 2007 IED Attack In Saladin (Dariek E. Dehn Family)**

2434.   On June 2, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Saladin, Iraq (the "June 2, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 2, 2007 Attack.

2435.   The June 2, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2436.   **Sergeant Dariek E. Dehn** served in Iraq as a member of the U.S. Army.  SGT Dehn was injured in the June 2, 2007 Attack.  SGT Dehn died on June 2, 2007 as a result of injuries sustained during the June 2, 2007 Attack.

2437.   SGT Dehn was a U.S. national at the time of the attack and his death.

2438.   Plaintiff David Dehn Jr. is the brother of SGT Dehn and a U.S. national.

2439.   As a result of the June 2, 2007 Attack and SGT Dehn's injuries and death, each member of the Dehn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dehn's society, companionship, and counsel.

2440.   As a result of the June 2, 2007 Attack, SGT Dehn was injured in his person and/or property.  The Plaintiff members of the Dehn Family are the survivors and/or heirs of SGT Dehn and are entitled to recover for the damages SGT Dehn sustained.

**The June 2, 2007 IED Attack In Ninewa (Jeremiah D. Costello Family)**

2441.   On June 2, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "June 2, 2007 Ninewa Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 2, 2007 Ninewa Attack.

2442.   The June 2, 2007 Ninewa Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2443.   **Corporal Jeremiah D. Costello** served in Iraq as a member of the U.S. Army. CPL Costello was injured in the June 2, 2007 Ninewa Attack.  CPL Costello died on June 2, 2007 as a result of injuries sustained during the June 2, 2007 Ninewa Attack.

2444.   CPL Costello was a U.S. national at the time of the attack and his death.

2445.   Plaintiff Lillian Costello is the daughter of CPL Costello and a U.S. national.

2446.   Plaintiff Debra Springman is the mother of CPL Costello and a U.S. national.

2447.   As a result of the June 2, 2007 Ninewa Attack and CPL Costello's injuries and death, each member of the Costello Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Costello's society, companionship, and counsel.

2448.   As a result of the June 2, 2007 Ninewa Attack, CPL Costello was injured in his person and/or property.  The Plaintiff members of the Costello Family are the survivors and/or heirs of CPL Costello and are entitled to recover for the damages CPL Costello sustained.

**The June 14, 2007 IED Attack In Al Anbar (David K. Lind Family)**

2449.   On June 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "June 14, 2007 Attack"). The June 14, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2450.   The June 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2451.   **Sergeant First Class David K. Lind** served in Iraq as a member of the U.S. Marine Corps. SFC Lind was injured in the June 14, 2007 Attack.  The attack severely wounded SFC Lind, who suffered a bi-lateral leg amputation (right leg above knee, left leg below knee), a broken finger, TBI, and PTSD. As a result of the June 14, 2007 Attack and his injuries, SFC Lind has experienced severe physical and emotional pain and suffering.

2452.   Plaintiff SFC Lind was a U.S. national at the time of the attack and remains one to this day.

2453.   Plaintiff Catherine Jackman is the mother of SFC Lind and a U.S. national.

2454.   Plaintiff Bradley Lind is the brother of SFC Lind and a U.S. national.

2455.   As a result of the June 14, 2007 Attack and SFC Lind's injuries, each member of the Lind Family has experienced severe mental anguish, emotional pain and suffering.

**The June 14, 2007 IED Attack In Al Anbar (Sigifredo Apodaca Family)**

2456.   On June 14, 2007, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Al Anbar, Iraq (the "June 14, 2007 Attack"). The June 14, 2007 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2457.   The June 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2458.   **Private 1st Class Sigifredo Apodaca** served in Iraq as a member of the U.S. Marine Corps. PFC Apodaca was injured in the June 14, 2007 Attack. The attack severely wounded PFC Apodaca, who suffered a left upper extremity fracture with surgery, amputation of left third finger, head injury, TBI, PTSD, and tinnitus.  As a result of the June 14, 2007 Attack and his injuries, PFC Apodaca has experienced severe physical and emotional pain and suffering.

2459.   Plaintiff PFC Apodaca was a U.S. national at the time of the attack, and remains one to this day.

2460.   Plaintiff Vanita Apodaca is the mother of PFC Apodaca and a U.S. national.

2461.   Plaintiff Manuel Apodaca is the father of PFC Apodaca and a U.S. national.

2462.   Plaintiff Saul Apodaca is the brother of PFC Apodaca and a U.S. national.

2463.   Plaintiff Debra Apodaca is the sister of PFC Apodaca and a U.S. national.

2464.   Plaintiff Alexia Felix is the sister of PFC Apodaca and a U.S. national.

2465.   As a result of the June 14, 2007 Attack and PFC Apodaca's injuries, each member of the Apodaca Family has experienced severe mental anguish and emotional pain and suffering.

**The June 19, 2007 IED Attack In Diyala (Darryl W. Linder Family)**

2466.   On June 19, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "June 19, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 19, 2007 Attack.

2467.   The June 19, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2468.  **Corporal Darryl W. Linder** served in Iraq as a member of the U.S. Army.   CPL Linder was injured in the June 19, 2007 Attack.  CPL Linder died on June 19, 2007 as a result of injuries sustained during the June 19, 2007 Attack.

2469.  CPL Linder was a U.S. national at the time of the attack and his death.

2470.  Plaintiff Darryl Linder is the father of CPL Linder and a U.S. national.

2471.  As a result of the June 19, 2007 Attack and CPL Linder's injuries and death, each member of the Linder Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Linder's society, companionship, and counsel.

2472.  As a result of the June 19, 2007 Attack, CPL Linder was injured in his person and/or property.  The Plaintiff members of the Linder Family are the survivors and/or heirs of CPL Linder and are entitled to recover for the damages CPL Linder sustained.

**The July 17, 2007 IED Attack In Saladin (Patrick L. Wade Family)**

2473.  On July 17, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Saladin, Iraq (the "July 17, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 17, 2007 Attack.

2474.  The July 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2475.  **Chief Petty Officer Patrick L. Wade** served in Iraq as a member of the U.S. Navy. CPO Wade was injured in the July 17, 2007 Attack.  CPO Wade died on July 17, 2007 as a result of injuries sustained during the July 17, 2007 Attack.

2476.   CPO Wade was a U.S. national at the time of the attack and his death.

2477.   Plaintiff Shirley Wade is the mother of CPO Wade and a U.S. national.

2478.   Plaintiff Gary Wade is the brother of CPO Wade and a U.S. national.

2479.   As a result of the July 17, 2007 Attack and CPO Wade's injuries and death, each member of the Wade Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO Wade's society, companionship, and counsel.

2480.   As a result of the July 17, 2007 Attack, CPO Wade was injured in his person and/or property.  The Plaintiff members of the Wade Family are the survivors and/or heirs of CPO Wade and are entitled to recover for the damages CPO Wade sustained.

### The July 24, 2007 IED Attack In Diyala (Matthew R. Zindars and Robert A. Lynch Families)

2481.   On July 24, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "July 24, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 24, 2007 Attack.

2482.   The July 24, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2483.   **Corporal Matthew R. Zindars** served in Iraq as a member of the U.S. Marine Corps. Cpl Zindars was injured in the July 24, 2007 Attack.  Cpl Zindars died on July 24, 2007 as a result of injuries sustained during the July 24, 2007 Attack.

2484.   Cpl Zindars was a U.S. national at the time of the attack and his death.

2485.   Plaintiff Lynn Zindars is the mother of Cpl Zindars and a U.S. national.

2486.   Plaintiff Kenneth Zindars is the father of Cpl Zindars and a U.S. national.

2487.   As a result of the July 24, 2007 Attack and Cpl Zindars's injuries and death, each member of the Zindars Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Zindars's society, companionship, and counsel.

2488.   As a result of the July 24, 2007 Attack, Cpl Zindars was injured in his person and/or property.  The Plaintiff members of the Zindars Family are the survivors and/or heirs of Cpl Zindars and are entitled to recover for the damages Cpl Zindars sustained.

2489.   **Lance Corporal Robert A. Lynch** served in Iraq as a member of the U.S. Marine Corps.  LCpl Lynch was injured in the July 24, 2007 Attack.  LCpl Lynch died on July 24, 2007 as a result of injuries sustained during the July 24, 2007 Attack.

2490.   LCpl Lynch was a U.S. national at the time of the attack and his death.

2491.   Plaintiff Michael Lynch III is the brother of LCpl Lynch and a U.S. national.

2492.   As a result of the July 24, 2007 Attack and LCpl Lynch's injuries and death, each member of the Lynch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Lynch's society, companionship, and counsel.

2493.   As a result of the July 24, 2007 Attack, LCpl Lynch was injured in his person and/or property.  The Plaintiff members of the Lynch Family are the survivors and/or heirs of LCpl Lynch and are entitled to recover for the damages LCpl Lynch sustained.

**The July 26, 2007 IED Attack In Diyala (Michael A. Baloga Family)**

2494.   On July 26, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "July 26, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 26, 2007 Attack.

2495.   The July 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2496.   **Private Second Class Michael A. Baloga** served in Iraq as a member of the U.S. Army.  PV2 Baloga was injured in the July 26, 2007 Attack.  PV2 Baloga died on July 26, 2007 as a result of injuries sustained during the July 26, 2007 Attack.  PV2 Baloga was a U.S. national at the time of the attack and his death.

2497.   Plaintiff Linda Baloga is the stepmother of PV2 Baloga and a U.S. national.  Ms. Baloga lived in the same household as PV2 Baloga for a substantial period and considered PV2 Baloga the functional equivalent of a biological son.

2498.   As a result of the July 26, 2007 Attack and PV2 Baloga's injuries and death, each member of the Baloga Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Baloga's society, companionship, and counsel.

2499.   As a result of the July 26, 2007 Attack, PV2 Baloga was injured in his person and/or property.  The Plaintiff members of the Baloga Family are the survivors and/or heirs of PV2 Baloga and are entitled to recover for the damages PV2 Baloga sustained.

**The August 1, 2007 IED Attack In Ninewa (Travis S. Bachman Family)**

2500.   On August 1, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED attack in Ninewa, Iraq (the "August 1, 2007 Attack"). The August 1, 2007 Attack was planned and authorized by FTOs, al-Qaeda, and al-Qaeda-in-Iraq.

2501.   The August 1, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2502.   **Sergeant 1st Class Travis Scott Bachman** served in Iraq as a member of the U.S. Army National Guard. SFC Bachman was injured in the August 1, 2007 Attack. SFC Bachman died on August 1, 2007 as a result of injuries sustained during the August 1, 2007 Attack.

2503.   SFC Bachman was a U.S. national at the time of the attack and his death.

2504.   Plaintiff Amber Bachman Wilson is the widow of SFC Bachman and a U.S. national.

2505.   Plaintiff Tyler Bachman is the son of SFC Bachman and a U.S. national.

2506.   Plaintiff K.B., by and through her next friend Amber Bachman Wilson, is the minor daughter of SFC Bachman. She is a U.S. national.

2507.   As a result of the August 1, 2007 Attack and SFC Bachman's injuries and death, each member of the Bachman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Bachman's society, companionship, and counsel.

2508.   As a result of the August 1, 2007 Attack, SFC Bachman was injured in his person and/or property. The Plaintiff members of the Bachman Family are the survivors and/or heirs of SFC Bachman and are entitled to recover for the damages SFC Bachman sustained.

**The August 11, 2007 IED Attack In Baghdad (William D. Scates Family)**

2509.   On August 11, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "August 11, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the August 11, 2007 Attack.

2510.   The August 11, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2511.   **Staff Sergeant William D. Scates** served in Iraq as a member of the U.S. Army. SSG Scates was injured in the August 11, 2007 Attack.  SSG Scates died on August 11, 2007 as a result of injuries sustained during the August 11, 2007 Attack.

2512.   SSG Scates was a U.S. national at the time of the attack and his death.

2513.   Plaintiff Shannon Owens is the sister of SSG Scates and a U.S. national.

2514.   As a result of the August 11, 2007 Attack and SSG Scates's injuries and death, each member of the Scates Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Scates's society, companionship, and counsel.

2515.   As a result of the August 11, 2007 Attack, SSG Scates was injured in his person and/or property.  The Plaintiff members of the Scates Family are the survivors and/or heirs of SSG Scates and are entitled to recover for the damages SSG Scates sustained.

**The August 30, 2007 IED Attack In Ninewa (Daniel E. Scheibner Family)**

2516.   On August 30, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "August 30, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the August 30, 2007 Attack.

2517.   The August 30, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2518.   **Sergeant First Class Daniel E. Scheibner** served in Iraq as a member of the U.S. Army.  SFC Scheibner was injured in the August 30, 2007 Attack.  SFC Scheibner died on August 30, 2007 as a result of injuries sustained during the August 30, 2007 Attack.

2519.   SFC Scheibner was a U.S. national at the time of the attack and his death.

2520.   Plaintiff Ann Scheibner is the widow of SFC Scheibner and a U.S. national.

2521.   Plaintiff Tyler Scheibner is the son of SFC Scheibner and a U.S. national.

2522.   Plaintiff Louise Scheibner is the mother of SFC Scheibner and a U.S. national.

2523.   Plaintiff Diane Cottrell is the sister of SFC Scheibner and a U.S. national.

2524.   Plaintiff David Scheibner is the brother of SFC Scheibner and a U.S. national.

2525.   As a result of the August 30, 2007 Attack and SFC Scheibner's injuries and death, each member of the Scheibner Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Scheibner's society, companionship, and counsel.

2526.   As a result of the August 30, 2007 Attack, SFC Scheibner was injured in his person and/or property.  The Plaintiff members of the Scheibner Family are the survivors and/or heirs of SFC Scheibner and are entitled to recover for the damages SFC Scheibner sustained.

### The September 7, 2007 IED Attack In Ninewa (Jason J. Hernandez Family)

2527.   On September 7, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "September 7, 2007 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 7, 2007 Attack.

2528.   The September 7, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2529.   **Corporal Jason J. Hernandez** served in Iraq as a member of the U.S. Army.  CPL Hernandez was injured in the September 7, 2007 Attack.  CPL Hernandez died on September 7, 2007 as a result of injuries sustained during the September 7, 2007 Attack.

2530.   CPL Hernandez was a U.S. national at the time of the attack and his death.

2531.   Plaintiff John Hernandez is the father of CPL Hernandez and a U.S. national.

2532.   Plaintiff Angela Hernandez is the sister of CPL Hernandez and a U.S. national.

2533.   As a result of the September 7, 2007 Attack and CPL Hernandez's injuries and death, each member of the Hernandez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Hernandez's society, companionship, and counsel.

2534.   As a result of the September 7, 2007 Attack, CPL Hernandez was injured in his person and/or property.  The Plaintiff members of the Hernandez Family are the survivors and/or heirs of CPL Hernandez and are entitled to recover for the damages CPL Hernandez sustained.

**The September 11, 2007 IED Attack In Kirkuk (Brett R. Wolf Family)**

2535.   On September 11, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Kirkuk, Iraq (the "September 11, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 11, 2007 Attack.

2536.   The September 11, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2537.   **Sergeant Brett R. Wolf** served in Iraq as a member of the U.S. Army. SGT Wolf was injured in the September 11, 2007 Attack.  The attack severely wounded SGT Wolf, who suffered a bilateral above the knee amputation with distal femur, complete paralysis of right ulnar nerve, broken elbow now fused at 90-degree angle, traumatic brain injury, multiple facial fractures, spleen removal, left ear hearing loss, posttraumatic osteoarthritis, joint dysfunction with limitation of motion, migraines, residual scarring throughout, bilateral left hip flexion contracture with left thigh retaining shrapnel, and bilateral right hip flexion contracture.

2538.   Plaintiff SGT Wolf was a U.S. national at the time of the attack, and remains one today.

2539.   As a result of the September 11, 2007 Attack and his injuries, SGT Wolf has experienced severe mental anguish and severe physical and emotional pain and suffering.

**The September 14, 2007 IED Attack In Baghdad (Christopher M. McCloud Family)**

2540.   On September 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "September 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 14, 2007 Attack.

2541.   The September 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2542.   **Private First Class Christopher M. McCloud** served in Iraq as a member of the U.S. Army.  PFC McCloud was injured in the September 14, 2007 Attack.  PFC McCloud died on September 14, 2007 as a result of injuries sustained during the September 14, 2007 Attack.

2543.   PFC McCloud was a U.S. national at the time of the attack and his death.

2544.   Plaintiff Sheena McCloud is the widow of PFC McCloud and a U.S. national.

2545.   Plaintiff Aidan McCloud is the son of PFC McCloud and a U.S. national.

2546.   Plaintiff L.M., by and through his next friend Sheena McCloud, is the minor son of PFC McCloud. He is a U.S. national.

2547.   As a result of the September 14, 2007 Attack and PFC McCloud's injuries and death, each member of the McCloud Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McCloud's society, companionship, and counsel.

2548.   As a result of the September 14, 2007 Attack, PFC McCloud was injured in his person and/or property.  The Plaintiff members of the McCloud Family are the survivors and/or heirs of PFC McCloud and are entitled to recover for the damages PFC McCloud sustained.

**The September 18, 2007 IED Attack In Diyala (Nicholas P. Olson Family)**

2549.   On September 18, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "September 18, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 18, 2007 Attack.

2550.   The September 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2551.   **Corporal Nicholas P. Olson** served in Iraq as a member of the U.S. Army.  CPL Olson was injured in the September 18, 2007 Attack.  CPL Olson died on September 18, 2007 as a result of injuries sustained during the September 18, 2007 Attack.

2552.   CPL Olson was a U.S. national at the time of the attack and his death.

2553.   Plaintiff M.O., by and through her next friend Kevin Harrington, is the minor daughter of CPL Olson. She is a U.S. national.

2554.   Plaintiff Raymond Olson is the father of CPL Olson and a U.S. national.

2555.   As a result of the September 18, 2007 Attack and CPL Olson's injuries and death, each member of the Olson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Olson's society, companionship, and counsel.

2556.   As a result of the September 18, 2007 Attack, CPL Olson was injured in his person and/or property.  The Plaintiff members of the Olson Family are the survivors and/or heirs of CPL Olson and are entitled to recover for the damages CPL Olson sustained.

**The October 14, 2007 IED Attack In Baghdad (Justin S. Monschke Family)**

2557.   On October 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Baghdad, Iraq (the "October 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the October 14, 2007 Attack.

2558.   The October 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2559.   **Sergeant First Class Justin S. Monschke** served in Iraq as a member of the U.S. Army.  SFC Monschke was injured in the October 14, 2007 Attack.  SFC Monschke died on October 14, 2007 as a result of injuries sustained during the October 14, 2007 Attack.

2560.   SFC Monschke was a U.S. national at the time of the attack and his death.

2561.   Plaintiff Ashley Monschke is the daughter of SFC Monschke and a U.S. national.

2562.   Plaintiff Patty Jett is the mother of SFC Monschke and a U.S. national.

2563.   As a result of the October 14, 2007 Attack and SFC Monschke's injuries and death, each member of the Monschke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Monschke's society, companionship, and counsel.

2564.   As a result of the October 14, 2007 Attack, SFC Monschke was injured in his person and/or property.  The Plaintiff members of the Monschke Family are the survivors and/or heirs of SFC Monschke and are entitled to recover for the damages SFC Monschke sustained.

**The October 24, 2007 IED Attack In Ninewa (Robin L. Towns Sr. Family)**

2565.   On October 24, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "October 24, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the October 24, 2007 Attack.

2566.   The October 24, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2567.   **Sergeant First Class Robin L. Towns Sr.** served in Iraq as a member of the U.S. Army National Guard.  SFC Towns was injured in the October 24, 2007 Attack.  SFC Towns died on October 24, 2007 as a result of injuries sustained during the October 24, 2007 Attack.

2568.   SFC Towns was a U.S. national at the time of the attack and his death.

2569.   Plaintiff Shelia Towns is the widow of SFC Towns and a U.S. national.

2570.   As a result of the October 24, 2007 Attack and SFC Towns's injuries and death, each member of the Towns Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Towns's society, companionship, and counsel.

2571.   As a result of the October 24, 2007 Attack, SFC Towns was injured in his person and/or property.  The Plaintiff members of the Towns Family are the survivors and/or heirs of SFC Towns and are entitled to recover for the damages SFC Towns sustained.

**The November 14, 2007 IED Attack In Diyala (Kenneth R. Booker Family)**

2572.   On November 14, 2007, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "November 14, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the November 14, 2007 Attack.

2573.   The November 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2574.   **Sergeant Kenneth R. Booker** served in Iraq as a member of the U.S. Army. SGT Booker was injured in the November 14, 2007 Attack.  SGT Booker died on November 14, 2007 as a result of injuries sustained during the November 14, 2007 Attack.

2575.   SGT Booker was a U.S. national at the time of the attack and his death.

2576.   Plaintiff Charles Booker is the father of SGT Booker and a U.S. national.

2577.   Plaintiff Brenda Booker is the stepmother of SGT Booker and a U.S. national. Ms. Booker lived in the same household as SGT Booker for a substantial period and considered SGT Booker the functional equivalent of a biological son.

2578.   As a result of the November 14, 2007 Attack and SGT Booker's injuries and death, each member of the Booker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Booker's society, companionship, and counsel.

2579.   As a result of the November 14, 2007 Attack, SGT Booker was injured in his person and/or property.  The Plaintiff members of the Booker Family are the survivors and/or heirs of SGT Booker and are entitled to recover for the damages SGT Booker sustained.

**The December 20, 2007 Suicide Attack In Diyala (Jeremy E. Ray Family)**

2580.   On December 20, 2007, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Diyala, Iraq (the "December 20, 2007 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the December 20, 2007 Attack.

2581.   The December 20, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2582.   **First Lieutenant Jeremy E. Ray** served in Iraq as a member of the U.S. Army. 1LT Ray was injured in the December 20, 2007 Attack.  1LT Ray died on December 20, 2007 as a result of injuries sustained during the December 20, 2007 Attack.

2583.   1LT Ray was a U.S. national at the time of the attack and his death.

2584.   Plaintiff Deborah Ray is the mother of 1LT Ray and a U.S. national.

2585.   Plaintiff Walter Ray is the father of 1LT Ray and a U.S. national.

2586.   As a result of the December 20, 2007 Attack and 1LT Ray's injuries and death, each member of the Ray Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Ray's society, companionship, and counsel.

2587.   As a result of the December 20, 2007 Attack, 1LT Ray was injured in his person and/or property.  The Plaintiff members of the Ray Family are the survivors and/or heirs of 1LT Ray and are entitled to recover for the damages 1LT Ray sustained.

**The January 5, 2008 IED Attack In Diyala (Jason F. Lemke Family)**

2588.   On January 5, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "January 5, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 5, 2008 Attack.

2589.   The January 5, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2590.   **Corporal Jason F. Lemke** served in Iraq as a member of the U.S. Army. CPL Lemke was injured in the January 5, 2008 Attack.  CPL Lemke died on January 5, 2008 as a result of injuries sustained during the January 5, 2008 Attack.

2591.   CPL Lemke was a U.S. national at the time of the attack and his death.

2592.   Plaintiff Jill Frederiksen is the sister of CPL Lemke and a U.S. national.

2593.   As a result of the January 5, 2008 Attack and CPL Lemke's injuries and death, each member of the Lemke Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Lemke's society, companionship, and counsel.

2594.   As a result of the January 5, 2008 Attack, CPL Lemke was injured in his person and/or property.  The Plaintiff members of the Lemke Family are the survivors and/or heirs of CPL Lemke and are entitled to recover for the damages CPL Lemke sustained.

### The January 9, 2008 IED Attack In Diyala (Jonathan K. Dozier, Matthew I. Pionk, and Zachary W. McBride Families)

2595.   On January 9, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "January 9, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 9, 2008 Attack.

2596.   The January 9, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2597.   **Sergeant First Class Jonathan K. Dozier** served in Iraq as a member of the U.S. Army.  SFC Dozier was injured in the January 9, 2008 Attack.  SFC Dozier died on January 9, 2008 as a result of injuries sustained during the January 9, 2008 Attack.

2598.   SFC Dozier was a U.S. national at the time of the attack and his death.

2599.   Plaintiff Martha Cabe is the mother of SFC Dozier and a U.S. national.

2600.   As a result of the January 9, 2008 Attack and SFC Dozier's injuries and death, each member of the Dozier Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Dozier's society, companionship, and counsel.

2601.   As a result of the January 9, 2008 Attack, SFC Dozier was injured in his person and/or property.  The Plaintiff members of the Dozier Family are the survivors and/or heirs of SFC Dozier and are entitled to recover for the damages SFC Dozier sustained.

2602.   **Sergeant First Class Matthew I. Pionk** served in Iraq as a member of the U.S. Army.  SFC Pionk was injured in the January 9, 2008 Attack.  SFC Pionk died on January 9, 2008 as a result of injuries sustained during the January 9, 2008 Attack.

2603.   SFC Pionk was a U.S. national at the time of the attack and his death.

2604.   Plaintiff Melanie Pionk is the widow of SFC Pionk and a U.S. national.

2605.   Plaintiff Brandon Pionk is the son of SFC Pionk and a U.S. national.

2606.   Plaintiff Ashley Pionk is the daughter of SFC Pionk and a U.S. national.

2607.   Plaintiff Dillon Pionk is the son of SFC Pionk and a U.S. national.

2608.   Plaintiff Sandra Pionk is the mother of SFC Pionk and a U.S. national.

2609.   Plaintiff Duane Pionk is the father of SFC Pionk and a U.S. national.

2610.   Plaintiff Joshua Pionk is the brother of SFC Pionk and a U.S. national.

2611.   As a result of the January 9, 2008 Attack and SFC Pionk's injuries and death, each member of the Pionk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Pionk's society, companionship, and counsel.

2612.   As a result of the January 9, 2008 Attack, SFC Pionk was injured in his person and/or property.  The Plaintiff members of the Pionk Family are the survivors and/or heirs of SFC Pionk and are entitled to recover for the damages SFC Pionk sustained.

2613.   **Sergeant Zachary W. McBride** served in Iraq as a member of the U.S. Army.  SGT McBride was injured in the January 9, 2008 Attack.  SGT McBride died on January 9, 2008 as a result of injuries sustained during the January 9, 2008 Attack.

2614.   SGT McBride was a U.S. national at the time of the attack and his death.

2615.   Plaintiff Laura McBride is the mother of SGT McBride and a U.S. national.

2616.   Plaintiff Marshall McBride is the father of SGT McBride and a U.S. national.

2617.   Plaintiff Sarah Lambert is the sister of SGT McBride and a U.S. national.

2618.   As a result of the January 9, 2008 Attack and SGT McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT McBride's society, companionship, and counsel.

2619.   As a result of the January 9, 2008 Attack, SGT McBride was injured in his person and/or property.  The Plaintiff members of the McBride Family are the survivors and/or heirs of SGT McBride and are entitled to recover for the damages SGT McBride sustained.

### The January 28, 2008 IED Attack In Ninewa (Evan A. Marshall, James E. Craig, and Joshua A.R. Young Families)

2620.   On January 28, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "January 28, 2008 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the January 28, 2008 Attack.

2621.   The January 28, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2622.   **Corporal Evan A. Marshall** served in Iraq as a member of the U.S. Army.  CPL Marshall was injured in the January 28, 2008 Attack.  CPL Marshall died on January 28, 2008 as a result of injuries sustained during the January 28, 2008 Attack.

2623.   CPL Marshall was a U.S. national at the time of the attack and his death.

2624.   Plaintiff Sheila Marshall is the mother of CPL Marshall and a U.S. national.

2625.   Plaintiff Andrew Marshall is the father of CPL Marshall and a U.S. national.

2626.   As a result of the January 28, 2008 Attack and CPL Marshall's injuries and death, each member of the Marshall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Marshall's society, companionship, and counsel.

2627.   As a result of the January 28, 2008 Attack, CPL Marshall was injured in his person and/or property.   The Plaintiff members of the Marshall Family are the survivors and/or heirs of CPL Marshall and are entitled to recover for the damages CPL Marshall sustained.

2628.   **Sergeant James E. Craig** served in Iraq as a member of the U.S. Army.   SGT Craig was injured in the January 28, 2008 Attack.   SGT Craig died on January 28, 2008 as a result of injuries sustained during the January 28, 2008 Attack.

2629.   SGT Craig was a U.S. national at the time of the attack and his death.

2630.   Plaintiff Natalie Jackson is the widow of SGT Craig and a U.S. national.

2631.   Plaintiff Phyllis Craig is the mother of SGT Craig and a U.S. national.

2632.   Plaintiff Joel Sexton-Craig is the father of SGT Craig and a U.S. national.

2633.   Plaintiff Rachael Putman is the sister of SGT Craig and a U.S. national.

2634.   Plaintiff Menesia Spade is the sister of SGT Craig and a U.S. national.

2635.   Plaintiff Kelly Inman is the sister of SGT Craig and a U.S. national.

2636.   As a result of the January 28, 2008 Attack and SGT Craig's injuries and death, each member of the Craig Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Craig's society, companionship, and counsel.

2637.   As a result of the January 28, 2008 Attack, SGT Craig was injured in his person and/or property.   The Plaintiff members of the Craig Family are the survivors and/or heirs of SGT Craig and are entitled to recover for the damages SGT Craig sustained.

2638.  **Private First Class Joshua A.R. Young** served in Iraq as a member of the U.S. Army.  PFC Young was injured in the January 28, 2008 Attack.  PFC Young died on January 28, 2008 as a result of injuries sustained during the January 28, 2008 Attack.

2639.  PFC Young was a U.S. national at the time of the attack and his death.

2640.  Plaintiff Brandi Yanez is the sister of PFC Young and a U.S. national.

2641.  As a result of the January 28, 2008 Attack and PFC Young's injuries and death, each member of the Young Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Young's society, companionship, and counsel.

2642.  As a result of the January 28, 2008 Attack, PFC Young was injured in his person and/or property.  The Plaintiff members of the Young Family are the survivors and/or heirs of PFC Young and are entitled to recover for the damages PFC Young sustained.

### The January 28, 2008 Complex Attack Involving An IED In Ninewa (Brandon A. Meyer Family)

2643.  On January 28, 2008, al-Qaeda and al-Qaeda-in-Iraq committed a complex attack involving an IED in Ninewa, Iraq (the "January 28, 2008 Attack").  The January 28, 2008 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2644.  The January 28, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2645.  **Specialist Brandon Abbott Meyer** served in Iraq as a member of the U.S. Army. SPC Meyer was injured in the January 28, 2008 Attack.  SPC Meyer died on January 28, 2008, as a result of injuries sustained during the January 28, 2008 Attack.

2646.  SPC Meyer was a U.S. national at the time of the attack and his death.

2647.   Plaintiff Eugenia Meyer is the mother of SPC Meyer and a U.S. national.

2648.   Plaintiff Terry Meyer is the father of SPC Meyer and a U.S. national.

2649.   As a result of the January 28, 2008 Attack and SPC Meyer's injuries and death, each member of the Meyer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Meyer's society, companionship, and counsel.

2650.   As a result of the January 28, 2008 Attack, SPC Meyer was injured in his person and/or property.  The Plaintiff members of the Meyer Family are the survivors and/or heirs of SPC Meyer and are entitled to recover for the damages SPC Meyer sustained.

**The March 10, 2008 Suicide Bomb Attack In Baghdad (Scott A. McIntosh Family)**

2651.   On March 10, 2008, al-Qaeda and al-Qaeda-in-Iraq committed a suicide bomber attack in Baghdad, Iraq (the "March 10, 2008 Attack").  The March 10, 2008 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2652.   The March 10, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2653.   **Corporal Scott Alexander McIntosh** served in Iraq as a member of the U.S. Army.  Cpl McIntosh was injured in the March 10, 2008 Attack.  Cpl McIntosh died on March 10, 2008 as a result of injuries sustained during the March 10, 2008 Attack.

2654.   Cpl McIntosh was a U.S. national at the time of the attack and his death.

2655.   Plaintiff Alexander McIntosh is the father of Cpl McIntosh and a U.S. national.

2656.   As a result of the March 10, 2008 Attack and Cpl McIntosh's injuries and death, each member of the McIntosh Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl McIntosh's society, companionship, and counsel.

2657.   As a result of the March 10, 2008 Attack, Cpl McIntosh was injured in his person and/or property.  The Plaintiff members of the McIntosh Family are the survivors and/or heirs of Cpl McIntosh and are entitled to recover for the damages Cpl McIntosh sustained.

**The March 10, 2008 IED Attack In Diyala (Phillip R. Anderson and Torre R. Mallard Families)**

2658.   On March 10, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "March 10, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 10, 2008 Attack.

2659.   The March 10, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2660.   **Sergeant Phillip R. Anderson** served in Iraq as a member of the U.S. Army.  SGT Anderson was injured in the March 10, 2008 Attack.  SGT Anderson died on March 10, 2008 as a result of injuries sustained during the March 10, 2008 Attack.

2661.   SGT Anderson was a U.S. national at the time of the attack and his death.

2662.   Plaintiff Kenneth Anderson is the father of SGT Anderson and a U.S. national.

2663.   As a result of the March 10, 2008 Attack and SGT Anderson's injuries and death, each member of the Anderson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Anderson's society, companionship, and counsel.

2664.   As a result of the March 10, 2008 Attack, SGT Anderson was injured in his person and/or property.  The Plaintiff members of the Anderson Family are the survivors and/or heirs of SGT Anderson and are entitled to recover for the damages SGT Anderson sustained.

2665.   **Captain Torre R. Mallard** served in Iraq as a member of the U.S. Army.  CPT Mallard was injured in the March 10, 2008 Attack.  CPT Mallard died on March 10, 2008 as a result of injuries sustained during the March 10, 2008 Attack.

2666.   CPT Mallard was a U.S. national at the time of the attack and his death.

2667.   Plaintiff Robin Mallard is the mother of CPT Mallard and a U.S. national.

2668.   Plaintiff Mose Mallard III is the father of CPT Mallard and a U.S. national.

2669.   Plaintiff Terrence Mallard is the brother of CPT Mallard and a U.S. national.

2670.   As a result of the March 10, 2008 Attack and CPT Mallard's injuries and death, each member of the Mallard Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Mallard's society, companionship, and counsel.

2671.   As a result of the March 10, 2008 Attack, CPT Mallard was injured in his person and/or property.  The Plaintiff members of the Mallard Family are the survivors and/or heirs of CPT Mallard and are entitled to recover for the damages CPT Mallard sustained.

**The March 30, 2008 IED Attack In Al Anbar (William G. Hall Family)**

2672.   On March 30, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "March 30, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the March 30, 2008 Attack.

2673.   The March 30, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2674.   **Lieutenant Colonel William G. Hall** served in Iraq as a member of the U.S. Marine Corps. LtCol Hall was injured in the March 30, 2008 Attack.  LtCol Hall died on March 30, 2008 as a result of injuries sustained during the March 30, 2008 Attack.

2675.   LtCol Hall was a U.S. national at the time of the attack and his death.

2676.   Plaintiff Xiomara Hall is the widow of LtCol Hall and a U.S. national.

2677.   Plaintiff G.H., by and through her next friend Xiomara Hall, is the minor daughter of LtCol Hall. She is a U.S. national.

2678.   Plaintiff Mildred Hall is the mother of LtCol Hall and a U.S. national.

2679.   Plaintiff Dolores Wilson is the sister of LtCol Hall and a U.S. national.

2680.   Plaintiff Margie Bell is the sister of LtCol Hall and a U.S. national.

2681.   Plaintiff Xavier Arias is the stepson of LtCol Hall and a U.S. national.  Mr. Arias lived in the same household as LtCol Hall for a substantial period and considered LtCol Hall the functional equivalent of a biological father.

2682.   Plaintiff Cristian Arias is the stepson of LtCol Hall and a U.S. national.  Mr. Arias lived in the same household as LtCol Hall for a substantial period and considered LtCol Hall the functional equivalent of a biological father.

2683.   As a result of the March 30, 2008 Attack and LtCol Hall's injuries and death, each member of the Hall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LtCol Hall's society, companionship, and counsel.

2684.   As a result of the March 30, 2008 Attack, LtCol Hall was injured in his person and/or property.  The Plaintiff members of the Hall Family are the survivors and/or heirs of LtCol Hall and are entitled to recover for the damages LtCol Hall sustained.

**The April 14, 2008 IED Attack In Al Anbar (Dean D. Opicka Family)**

2685.   On April 14, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "April 14, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 14, 2008 Attack.

2686.   The April 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2687.   **Lance Corporal Dean D. Opicka** served in Iraq as a member of the U.S. Marine Corps Reserve. LCpl Opicka was injured in the April 14, 2008 Attack.  LCpl Opicka died on April 14, 2008 as a result of injuries sustained during the April 14, 2008 Attack.

2688.   LCpl Opicka was a U.S. national at the time of the attack and his death.

2689.   Plaintiff Donna Opicka is the mother of LCpl Opicka and a U.S. national.

2690.   Plaintiff Daniel Opicka is the brother of LCpl Opicka and a U.S. national.

2691.   As a result of the April 14, 2008 Attack and LCpl Opicka's injuries and death, each member of the Opicka Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Opicka's society, companionship, and counsel.

2692.   As a result of the April 14, 2008 Attack, LCpl Opicka was injured in his person and/or property.  The Plaintiff members of the Opicka Family are the survivors and/or heirs of LCpl Opicka and are entitled to recover for the damages LCpl Opicka sustained.

**The April 21, 2008 IED Attack In Salah Ad Din (Adam J. Kohlhaas Family)**

2693.   On April 21, 2008, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Salah ad Din, Iraq (the "April 21, 2008 Attack").  The April 21, 2008 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2694.   The April 21, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2695.   **Sergeant Adam J. Kohlhaas** served in Iraq as a member of the U.S. Army.  Sgt Kohlhaas was injured in the April 21, 2008 Attack.  Sgt Kohlhaas died on April 21, 2008 as a result of injuries sustained during the April 21, 2008 Attack.

2696.   Sgt Kohlhaas was a U.S. national at the time of the attack and his death.

2697.   Plaintiff Henry Kohlhaas is the father of Sgt Kohlhaas and a U.S. national.

2698.   As a result of the April 21, 2008 Attack and Sgt Kohlhaas's injuries and death, each member of the Kohlhaas Family has experienced severe mental anguish and emotional pain and suffering, and the loss of Sgt Kohlhaas's society, companionship, and counsel.

2699.   As a result of the April 21, 2008 Attack, Sgt Kohlhaas was injured in his person and/or property.  The Plaintiff members of the Kohlhaas Family are the survivors and/or heirs of Sgt Kohlhaas and are entitled to recover for the damages Sgt Kohlhaas sustained.

**The June 25, 2008 IED Attack In Ninewa (Alejandro A. Dominguez Family)**

2700.   On June 25, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Ninewa, Iraq (the "June 25, 2008 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the June 25, 2008 Attack.

2701.   The June 25, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2702.   **Sergeant Alejandro A. Dominguez** served in Iraq as a member of the U.S. Army. SGT Dominguez was injured in the June 25, 2008 Attack.  SGT Dominguez died on June 25, 2008 as a result of injuries sustained during the June 25, 2008 Attack.

2703.   SGT Dominguez was a U.S. national at the time of the attack and his death.

2704.   Plaintiff Isaijah Ortiz is the son of SGT Dominguez. He is a U.S. national.

2705.   Plaintiff Elia Dominguez is the mother of SGT Dominguez and a U.S. national.

2706.   Plaintiff Antonio Dominguez is the father of SGT Dominguez and a U.S. national.

2707.   Plaintiff Elia Ortiz is the sister of SGT Dominguez and a U.S. national.

2708.   As a result of the June 25, 2008 Attack and SGT Dominguez's injuries and death, each member of the Dominguez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dominguez's society, companionship, and counsel.

2709.   As a result of the June 25, 2008 Attack, SGT Dominguez was injured in his person and/or property.  The Plaintiff members of the Dominguez Family are the survivors and/or heirs of SGT Dominguez and are entitled to recover for the damages he sustained.

**The September 24, 2008 Suicide Attack In Diyala (Michael J. Medders Family)**

2710.   On September 24, 2008, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Diyala, Iraq (the "September 24, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the September 24, 2008 Attack.

2711.   The September 24, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2712.   **Captain Michael J. Medders** served in Iraq as a member of the U.S. Army. CPT Medders was injured in the September 24, 2008 Attack.  CPT Medders died on September 24, 2008 as a result of injuries sustained during the September 24, 2008 Attack.

2713.   CPT Medders was a U.S. national at the time of the attack and his death.

2714.   Plaintiff Katherine Shrader is the sister of CPT Medders and a U.S. national.

2715.   As a result of the September 24, 2008 Attack and CPT Medders's injuries and death, each member of the Medders Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Medders's society, companionship, and counsel.

2716.   As a result of the September 24, 2008 Attack, CPT Medders was injured in his person and/or property.  The Plaintiff members of the Medders Family are the survivors and/or heirs of CPT Medders and are entitled to recover for the damages CPT Medders sustained.

**The November 14, 2008 IED Attack In Al Anbar (Aaron M. Allen Family)**

2717.   On November 14, 2008, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Al Anbar, Iraq (the "November 14, 2008 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the November 14, 2008 Attack.

2718.   The November 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2719.   **Corporal Aaron M. Allen** served in Iraq as a member of the U.S. Marine Corps. Cpl Allen was injured in the November 14, 2008 Attack.  Cpl Allen died on November 14, 2008 as a result of injuries sustained during the November 14, 2008 Attack.

2720.   Cpl Allen was a U.S. national at the time of the attack and his death.

2721.   Plaintiff Mary Allen is the mother of Cpl Allen and a U.S. national.

2722.   As a result of the November 14, 2008 Attack and Cpl Allen's injuries and death, each member of the Allen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cpl Allen's society, companionship, and counsel.

2723.   As a result of the November 14, 2008 Attack, Cpl Allen was injured in his person and/or property.  The Plaintiff members of the Allen Family are the survivors and/or heirs of Cpl Allen and are entitled to recover for the damages Cpl Allen sustained.

**The December 4, 2008 Suicide Attack In Ninewa (John J. Savage Family)**

2724.   On December 4, 2008, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Ninewa, Iraq (the "December 4, 2008 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the December 4, 2008 Attack.

2725.   The December 4, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2726.   **Sergeant John J. Savage** served in Iraq as a member of the U.S. Army. SGT Savage was injured in the December 4, 2008 Attack.  SGT Savage died on December 4, 2008 as a result of injuries sustained during the December 4, 2008 Attack.

2727.   SGT Savage was a U.S. national at the time of the attack and his death.

2728.   Plaintiff John Savage is the father of SGT Savage and a U.S. national.

2729.   As a result of the December 4, 2008 Attack and SGT Savage's injuries and death, each member of the Savage Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Savage's society, companionship, and counsel.

2730.   As a result of the December 4, 2008 Attack, SGT Savage was injured in his person and/or property.  The Plaintiff members of the Savage Family are the survivors and/or heirs of SGT Savage and are entitled to recover for the damages SGT Savage sustained.

**The March 14, 2009 IED Attack In Ninewa (Matthew A. Jordan Family)**

2731.   On March 14, 2009, al-Qaeda and al-Qaeda-in-Iraq committed an IED attack in Ninewa, Iraq (the "March 14, 2009 Attack"). The March 14, 2009 Attack was planned and authorized by FTOs, al-Qaeda and al-Qaeda-in-Iraq.

2732.   The March 14, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2733.   **Sergeant Matthew A. Jordan** served in Iraq as a member of the U.S. Army. Sgt Jordan was injured in the March 14, 2009 Attack.  The attack severely wounded Sgt Jordan, who suffered a right leg below-the-knee amputation, TBI, nerve issues, PTSD, and anxiety.  Sgt Jordan's injuries prevent him from driving or showering normally.  As a result of the March 14, 2009 Attack and his injuries, Sgt Jordan has experienced severe physical and emotional pain and suffering.

2734.   Plaintiff Sgt Jordan was a U.S. national at the time of the attack and remains one to this day.

2735.   Plaintiff Katelynn Jordan is the wife of Sgt Jordan and a U.S. national.

2736.   Plaintiff O.J., by and through her next friend Katelynn Jordan, is the minor daughter of Sgt Jordan. She is a U.S. national.

2737.   As a result of the March 14, 2009 Attack and Sgt Jordan's injuries, each member of the Jordan Family has experienced severe mental anguish and emotional pain and suffering.

### The April 10, 2009 Suicide Attack In Ninewa (Bryan E. Hall, Edward W. Forrest Jr., Gary L. Woods Jr., and Jason G. Pautsch Families)

2738.   On April 10, 2009, a suicide bomber deployed by al-Qaeda and al-Qaeda-in-Iraq detonated a suicide bomb in Ninewa, Iraq (the "April 10, 2009 Attack"). Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the April 10, 2009 Attack.

2739.   The April 10, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2740.   **Sergeant First Class Bryan E. Hall** served in Iraq as a member of the U.S. Army. SFC Hall was injured in the April 10, 2009 Attack.  SFC Hall died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

2741.   SFC Hall was a U.S. national at the time of the attack and his death.

2742.   Plaintiff Rachel Hall is the widow of SFC Hall and a U.S. national.

2743.   Plaintiff A.H., by and through her next friend Rachel Hall, is the minor daughter of SFC Hall. She is a U.S. national.

2744.   As a result of the April 10, 2009 Attack and SFC Hall's injuries and death, each member of the Hall Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Hall's society, companionship, and counsel.

2745.   As a result of the April 10, 2009 Attack, SFC Hall was injured in his person and/or property.  The Plaintiff members of the Hall Family are the survivors and/or heirs of SFC Hall and are entitled to recover for the damages SFC Hall sustained.

2746.   **Sergeant Edward W. Forrest Jr.** served in Iraq as a member of the U.S. Army. SGT Forrest was injured in the April 10, 2009 Attack.  SGT Forrest died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

2747.   SGT Forrest was a U.S. national at the time of the attack and his death.

2748.   Plaintiff Stephanie Forrest is the widow of SGT Forrest. and a U.S. national.

2749.   Plaintiff B.F., by and through his next friend Stephanie Forrest, is the minor son of SGT Forrest. He is a U.S. national.

2750.   Plaintiff J.F., by and through his next friend Stephanie Forrest, is the minor son of SGT Forrest. He is a U.S. national.

2751.   As a result of the April 10, 2009 Attack and SGT Forrest's injuries and death, each member of the Forrest Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Forrest's society, companionship, and counsel.

2752.   As a result of the April 10, 2009 Attack, SGT Forrest was injured in his person and/or property.  The Plaintiff members of the Forrest Family are the survivors and/or heirs of SGT Forrest and are entitled to recover for the damages SGT Forrest sustained.

2753.   **Staff Sergeant Gary L. Woods Jr.** served in Iraq as a member of the U.S. Army. SSG Woods was injured in the April 10, 2009 Attack.  SSG Woods died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

2754.   SSG Woods was a U.S. national at the time of the attack and his death.

2755.   Plaintiff Becky Johnson is the mother of SSG Woods and a U.S. national.

2756.   Plaintiff Britteny Woods is the sister of SSG Woods and a U.S. national.

2757.   As a result of the April 10, 2009 Attack and SSG Woods's injuries and death, each member of the Woods Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Woods's society, companionship, and counsel.

2758.   As a result of the April 10, 2009 Attack, SSG Woods was injured in his person and/or property.  The Plaintiff members of the Woods Family are the survivors and/or heirs of SSG Woods and are entitled to recover for the damages SSG Woods sustained.

2759.   **Corporal Jason G. Pautsch** served in Iraq as a member of the U.S. Army. CPL Pautsch was injured in the April 10, 2009 Attack.  CPL Pautsch died on April 10, 2009 as a result of injuries sustained during the April 10, 2009 Attack.

2760.   CPL Pautsch was a U.S. national at the time of the attack and his death.

2761.   Plaintiff Josef Pautsch is the brother of CPL Pautsch and a U.S. national.

2762.   As a result of the April 10, 2009 Attack and CPL Pautsch's injuries and death, each member of the Pautsch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Pautsch's society, companionship, and counsel.

2763.   As a result of the April 10, 2009 Attack, CPL Pautsch was injured in his person and/or property.  The Plaintiff members of the Pautsch Family are the survivors and/or heirs of CPL Pautsch and are entitled to recover for the damages CPL Pautsch sustained.

**The July 21, 2010 IED Attack In Diyala (Michael L. Runyan Family)**

2764.   On July 21, 2010, al-Qaeda and al-Qaeda-in-Iraq detonated an IED in Diyala, Iraq (the "July 21, 2010 Attack").  Al-Qaeda and al-Qaeda-in-Iraq, both FTOs, planned and authorized the July 21, 2010 Attack.

2765.   The July 21, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2766.   **First Lieutenant Michael L. Runyan** served in Iraq as a member of the U.S. Army. 1LT Runyan was injured in the July 21, 2010 Attack.  1LT Runyan died on July 21, 2010 as a result of injuries sustained during the July 21, 2010 Attack.

2767.   1LT Runyan was a U.S. national at the time of the attack and his death.

2768.   Plaintiff Alex Runyan is the brother of 1LT Runyan and a U.S. national.

2769.   As a result of the July 21, 2010 Attack and 1LT Runyan's injuries and death, each member of the Runyan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Runyan's society, companionship, and counsel.

2770.   As a result of the July 21, 2010 Attack, 1LT Runyan was injured in his person and/or property.  The Plaintiff members of the Runyan Family are the survivors and/or heirs of 1LT Runyan and are entitled to recover for the damages 1LT Runyan sustained.

### The December 31, 2012 Kidnapping Attack, And Subsequent Hostage Taking And Torture, In Aleppo, Syria (Matthew Schrier)

2771.   Al-Qaeda-in-Iraq also acted through its (and al-Qaeda's) Syrian alias and affiliate, Jabhat al-Nusra, meaning the "Victory Front."  Jabhat al-Nusra was at all times an al-Qaeda branch and subsidiary and served as al-Qaeda's and al-Qaeda-in-Iraq's alias in Syria at all times in the case of al-Qaeda, and until 2014 in the case of al-Qaeda-in-Iraq.

2772.   As the Syrian branch, subsidiary, and alias for al-Qaeda and al-Qaeda-in-Iraq, Jabhat al-Nusra shared the same objective as al-Qaeda and al-Qaeda-in-Iraq:  killing Americans and others who opposed al-Qaeda's agenda of driving the United States out of Iraq so al-Qaeda could impose sharia law on the country.

2773.   Jabhat al-Nusra depended upon al-Qaeda-in-Iraq as a key source of funding for Jabhat al-Nusra from the latter's inception in 2010 until 2014.  During this period, payments to al-Qaeda-in-Iraq in Iraq also funded Jabhat al-Nusra in Syria.

2774.   From 2010 through 2014, al-Qaeda-in-Iraq relied upon al-Qaeda and al-Qaeda-in-Iraq funds, logistical networks, and operatives to establish and sustain Jabhat al-Nusra, which was itself an alias of both FTOs, and a percentage of the funds and operatives that benefited al-Qaeda or al-Qaeda-in-Iraq flowed through to facilitate the operations of Jabhat al-Nusra.

2775.   The U.S. State Department designated Jabhat al-Nusra as an FTO on December 11, 2012, and it has maintained that designation ever since. Notably, Jabhat al-Nusra was designated as an alias for al-Qaeda-in-Iraq (itself an FTO at the time).

2776.   At all times, the United Nations' al-Qaeda sanctions regime has identified Jabhat al-Nusra as an al-Qaeda affiliate.

2777.   In 2014, Jabhat al-Nusra split from al-Qaeda-in-Iraq after the latter's split from al-Qaeda.

2778.   From its formation through 2014, Jabhat al-Nusra remained an al-Qaeda-in-Iraq alias, branch, and subsidiary, and Jabhat al-Nusra terrorists swore allegiance to al-Qaeda-in-Iraq leadership.

2779.   From its formation through 2021, Jabhat al-Nusra remained an al-Qaeda alias, branch, and subsidiary, and Jabhat al-Nusra terrorists swore allegiance to al-Qaeda.

2780.   **Plaintiff Matthew Schrier** served in Syria as a journalist. On December 31, 2012, Mr. Schrier was taken hostage in a kidnapping attack in Aleppo, Syria.  Mr. Schrier was held hostage for 211 days before escaping to his freedom.[519]

2781.   The attack was committed by Jabhat al-Nusra, a designated FTO at the time, with material support and resources from al-Qaeda and al-Qaeda-in-Iraq, designated FTOs at the time.

2782.   The attack was planned and authorized by Jabhat al-Nusra, al-Qaeda, and al-Qaeda-in-Iraq, designated FTOs at the time.

2783.   Mr. Schrier's kidnapping, subsequent confinement, and torture would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists kidnapped a civilian who was not engaged in hostilities.

2784.   Mr. Schrier was a U.S. national at the time of the kidnapping and remains one today.

2785.   As a result of the December 31, 2012 kidnapping, and 211 days as a hostage during which he was tortured, Mr. Schrier has experienced severe mental anguish, emotional pain and suffering, and was injured in his person and/or property.

## XII.   THE AL-QAEDA ATTACKS IN AFGHANISTAN

### The August 11, 2006 Complex Attack In Nuristan (James P. White Jr. Family)

2786.   On August 11, 2006, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Nuristan, Afghanistan (the "August 11, 2006 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision

---

[519] Mr. Schrier is, on information and belief, the only American hostage taken by an al-Qaeda-affiliated group to have escaped confinement.

of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 11, 2006 Attack.

2787.   The August 11, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2788.   **Private First Class James P. White Jr.** served in Afghanistan as a member of the U.S. Army.  PFC White was injured in the August 11, 2006 Attack.  PFC White died on August 11, 2006 as a result of injuries sustained during the August 11, 2006 Attack.

2789.   PFC White was a U.S. national at the time of the attack and his death.

2790.   Plaintiff James White Sr. is the father of PFC White and a U.S. national.

2791.   As a result of the August 11, 2006 Attack and PFC White's injuries and death, each member of the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC White's society, companionship, and counsel.

2792.   As a result of the August 11, 2006 Attack, PFC White was injured in his person and/or property.  The Plaintiff members of the White Family are the survivors and/or heirs of PFC White and are entitled to recover for the damages PFC White sustained.

**The September 8, 2006 Suicide Attack In Kabul (Robert J. Paul Family)**

2793.   On September 8, 2006, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide car bomb attack in Kabul, Afghanistan (the "September 8, 2006 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 8, 2006 Attack.

2794.   The September 8, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2795.   **Staff Sergeant Robert J. Paul** served in Afghanistan as a member of the U.S. Army Reserve.   SSG Paul was injured in the September 8, 2006 Attack.   SSG Paul died on September 8, 2006 as a result of injuries sustained during the Attack.

2796.   SSG Paul was a U.S. national at the time of the attack and his death.

2797.   Plaintiff Sheldon Paul is the father of SSG Paul and a U.S. national.

2798.   As a result of the September 8, 2006 Attack and SSG Paul's injuries and death, each member of the Paul Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Paul's society, companionship, and counsel.

2799.   As a result of the September 8, 2006 Attack, SSG Paul was injured in his person and/or property.   The Plaintiff members of the Paul Family are the survivors and/or heirs of SSG Paul and are entitled to recover for the damages SSG Paul sustained.

**The October 31, 2006 IED Attack In Nuristan (Douglas E. Sloan Family)**

2800.   On October 31, 2006, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nuristan, Afghanistan (the "October 31, 2006 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.   Al-Qaeda planned and authorized the October 31, 2006 Attack.

2801.   The October 31, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2802.   **Major Douglas E. Sloan** served in Afghanistan as a member of the U.S. Army. MAJ Sloan was injured in the October 31, 2006 Attack.  MAJ Sloan died on October 31, 2006 as a result of injuries sustained during the October 31, 2006 Attack.

2803.   MAJ Sloan was a U.S. national at the time of the attack and his death.

2804.   Plaintiff Wendy Sloan is the mother of MAJ Sloan and a U.S. national.

2805.   Plaintiff Emory Sloan is the father of MAJ Sloan and a U.S. national.

2806.   Plaintiff James Sloan is the brother of MAJ Sloan and a U.S. national.

2807.   As a result of the October 31, 2006 Attack and MAJ Sloan's injuries and death, each member of the Sloan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Sloan's society, companionship, and counsel.

2808.   As a result of the October 31, 2006 Attack, MAJ Sloan was injured in his person and/or property.  The Plaintiff members of the Sloan Family are the survivors and/or heirs of MAJ Sloan and are entitled to recover for the damages MAJ Sloan sustained.

### The July 23, 2007 IED Attack In Kabul (Adam J. Davis, Michael S. Curry Jr., and Travon T. Johnson Families)

2809.   On July 23, 2007, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "July 23, 2007 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda, an FTO, planned and authorized the July 23, 2007 Attack.

2810.   The July 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2811.   **Specialist Adam J. Davis** served in Afghanistan as a member of the U.S. Army. SPC Davis was injured in the July 23, 2007 Attack.  SPC Davis died on July 23, 2007 as a result of injuries sustained during the July 23, 2007 Attack.

2812.   SPC Davis was a U.S. national at the time of the attack and his death.

2813.   Plaintiff Tracy Carrico is the mother of SPC Davis and a U.S. national.

2814.   Plaintiff Timothy Davis is the father of SPC Davis and a U.S. national.

2815.   Plaintiff Stephanie Bova is the sister of SPC Davis and a U.S. national.

2816.   As a result of the July 23, 2007 Attack and SPC Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Davis's society, companionship, and counsel.

2817.   As a result of the July 23, 2007 Attack, SPC Davis was injured in his person and/or property.  The Plaintiff members of the Davis Family are the survivors and/or heirs of SPC Davis and are entitled to recover for the damages SPC Davis sustained.

2818.   **First Sergeant Michael S. Curry Jr.** served in Afghanistan as a member of the U.S. Army. 1SG Curry was injured in the July 23, 2007 Attack.  1SG Curry died on July 23, 2007 as a result of injuries sustained during the July 23, 2007 Attack.

2819.   1SG Curry was a U.S. national at the time of the attack and his death.

2820.   Plaintiff Lavette Curry is the sister of 1SG Curry and a U.S. national.

2821.   Plaintiff Niki Martin is the sister of 1SG Curry and a U.S. national.

2822.   As a result of the July 23, 2007 Attack and 1SG Curry's injuries and death, each member of the Curry Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1SG Curry's society, companionship, and counsel.

2823.   As a result of the July 23, 2007 Attack, 1SG Curry was injured in his person and/or property.  The Plaintiff members of the Curry Family are the survivors and/or heirs of 1SG Curry and are entitled to recover for the damages 1SG Curry sustained.

2824.   **Sergeant Travon T. Johnson** served in Afghanistan as a member of the U.S. Army. SGT Johnson was injured in the July 23, 2007 Attack.  SGT Johnson died on July 23, 2007 as a result of injuries sustained during the July 23, 2007 Attack.

2825.   SGT Johnson was a U.S. national at the time of the attack and his death.

2826.   Plaintiff Billie Shotlow is the mother of SGT Johnson and a U.S. national.

2827.   Plaintiff Michael Shotlow is the stepfather of SGT Johnson and a U.S. national. Mr. Shotlow lived in the same household as SGT Johnson for a substantial period and considered SGT Johnson the functional equivalent of a biological son.

2828.   As a result of the July 23, 2007 Attack and SGT Johnson's injuries and death, each member of the Johnson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Johnson's society, companionship, and counsel.

2829.   As a result of the July 23, 2007 Attack, SGT Johnson was injured in his person and/or property.  The Plaintiff members of the Johnson Family are the survivors and/or heirs of SGT Johnson and are entitled to recover for the damages SGT Johnson sustained.

**The January 7, 2008 IED Attack In Nangarhar (Ryan J. Newell Family)**

2830.   On January 7, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "January 7, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda, an FTO, planned and authorized the January 7, 2008 Attack.

2831.   The January 7, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2832.   **Sergeant Ryan J. Newell** served in Afghanistan as a member of the U.S. Army. SGT Newell was injured in the January 7, 2008 Attack.  The attack severely wounded SGT Newell, who lost both legs, and now suffers from a traumatic brain injury, post-traumatic stress disorder, hearing loss, and tinnitus.  As a result of the January 7, 2008 Attack and his injuries, SGT Newell has experienced severe mental anguish and severe physical and emotional pain and suffering.

2833.   Plaintiff SGT Newell was a U.S. national when attacked, and remains one today.

**The January 14, 2008 Complex Attack In Kabul (Thor D. Hesla Family)**

2834.   On January 14, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving suicide bombing, small arms fire, and grenades in Kabul Province, Afghanistan (the "January 14, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda, an FTO, planned and authorized the January 14, 2008 Attack.

2835.   The January 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2836.   **Thor D. Hesla** worked in Afghanistan as a civilian contractor for BearingPoint Management & Technology Consultants, contracting with USAID.  Mr. Hesla was injured in the January 14, 2008 Attack.  Mr. Hesla died on January 14, 2008 as a result of injuries sustained during the January 14, 2008 Attack.

2837.   Mr. Hesla was a U.S. national at the time of the attack and his death.

2838.   Plaintiff Maren Hesla is the sister of Mr. Hesla, a U.S. national, and a resident of this District.

2839.   As a result of the January 14, 2008 Attack and Mr. Hesla's injuries and death, each member of the Hesla Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hesla's society, companionship, and counsel.

2840.   As a result of the January 14, 2008 Attack, Mr. Hesla was injured in his person and/or property.  The Plaintiff members of the Hesla Family are the survivors and/or heirs of Mr. Hesla and are entitled to recover for the damages Mr. Hesla sustained.

**The May 20, 2008 IED Attack In Ghazni (Jeffrey F. DePrimo Family)**

2841.   On May 20, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "May 20, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda, an FTO, planned and authorized the May 20, 2008 Attack.

2842.   The May 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2843.   **First Lieutenant Jeffrey F. DePrimo** served in Afghanistan as a member of the U.S. Army National Guard.  1LT DePrimo was injured in the May 20, 2008 Attack.  1LT DePrimo died on May 20, 2008 as a result of injuries sustained during the May 20, 2008 Attack.

2844.   1LT DePrimo was a U.S. national at the time of the attack and his death.

2845.   Plaintiff Helen DePrimo is the mother of 1LT DePrimo and a U.S. national.

2846.   Plaintiff Joseph DePrimo is the father of 1LT DePrimo and a U.S. national.

2847.   Plaintiff Jodi Calabro is the sister of 1LT DePrimo and a U.S. national.

2848.   Plaintiff Danielle Fediw is the sister of 1LT DePrimo and a U.S. national.

2849.   As a result of the May 20, 2008 Attack and 1LT DePrimo's injuries and death, each member of the DePrimo Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT DePrimo's society, companionship, and counsel.

2850.   As a result of the May 20, 2008 Attack, 1LT DePrimo was injured in his person and/or property.  The Plaintiff members of the DePrimo Family are the survivors and/or heirs of 1LT DePrimo and are entitled to recover for the damages 1LT DePrimo sustained.

**The May 31, 2008 IED Attack In Nangarhar (James M. Finley Family)**

2851.   On May 31, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "May 31, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 31, 2008 Attack.

2852.   The May 31, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2853.   **Specialist James M. Finley** served in Afghanistan as a member of the U.S. Army. SPC Finley was injured in the May 31, 2008 Attack.  SPC Finley died on May 31, 2008 as a result of injuries sustained during the May 31, 2008 Attack.

2854.   SPC Finley was a U.S. national at the time of the attack and his death.

2855.   Plaintiff Gerald Finley is the father of SPC Finley and a U.S. national.

2856.   Plaintiff Jennifer Lefors is the sister of SPC Finley and a U.S. national.

2857.   Plaintiff John Finley is the brother of SPC Finley and a U.S. national.

2858.   Plaintiff Joshua Finley is the brother of SPC Finley and a U.S. national.

2859.   As a result of the May 31, 2008 Attack and SPC Finley's injuries and death, each member of the Finley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Finley's society, companionship, and counsel.

2860.   As a result of the May 31, 2008 Attack, SPC Finley was injured in his person and/or property.  The Plaintiff members of the Finley Family are the survivors and/or heirs of SPC Finley and are entitled to recover for the damages SPC Finley sustained.

### The July 13, 2008 Complex Attack In Nuristan (Gunnar W. Zwilling, Israel Garcia, Jason D. Hovater, Jason M. Bogar, Jonathan P. Brostrom, Pruitt A. Rainey, Jonathan R.C. Benton Families)

2861.   On July 13, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Nuristan Province, Afghanistan (the "July 13, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 13, 2008 Attack.

2862.   The July 13, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2863.   **Corporal Gunnar W. Zwilling** served in Afghanistan as a member of the U.S. Army.  CPL Zwilling was injured in the July 13, 2008 Attack.  CPL Zwilling died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

2864.   CPL Zwilling was a U.S. national at the time of the attack and his death.

2865.   Ms. Kathy Lay is the personal representative of Kurt Zwilling, who is the father of CPL Zwilling. She brings this claim in her representative capacity on behalf of Mr. Zwilling's estate. Ms. Lay is a U.S. national.

2866.   Plaintiff Alexander Zwilling is the brother of CPL Zwilling and a U.S. national.

2867.   As a result of the July 13, 2008 Attack and CPL Zwilling's injuries and death, each member of the Zwilling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Zwilling's society, companionship, and counsel.

2868.   As a result of the July 13, 2008 Attack, CPL Zwilling was injured in his person and/or property.  The Plaintiff members of the Zwilling Family are the survivors and/or heirs of CPL Zwilling and are entitled to recover for the damages CPL Zwilling sustained.

2869.   **Sergeant Israel Garcia** served in Afghanistan as a member of the U.S. Army. SGT Garcia was injured in the July 13, 2008 Attack.  SGT Garcia died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

2870.   SGT Garcia was a U.S. national at the time of the attack and his death.

2871.   Plaintiff Lesly Garcia is the widow of SGT Garcia and a U.S. national.

2872.   Plaintiff Maricruz Garcia Velasquez is the mother of SGT Garcia and a U.S. national.

2873.   Plaintiff Victor Garcia is the father of SGT Garcia and a U.S. national.

2874.   Plaintiff Ramsses Garcia is the brother of SGT Garcia and a U.S. national.

2875.   As a result of the July 13, 2008 Attack and SGT Garcia's injuries and death, each member of the Garcia Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Garcia's society, companionship, and counsel.

2876.   As a result of the July 13, 2008 Attack, SGT Garcia was injured in his person and/or property.  The Plaintiff members of the Garcia Family are the survivors and/or heirs of SGT Garcia and are entitled to recover for the damages SGT Garcia sustained.

2877.   **Specialist Jason D. Hovater** served in Afghanistan as a member of the U.S. Army. SPC Hovater was injured in the July 13, 2008 Attack.  SPC Hovater died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

2878.   SPC Hovater was a U.S. national at the time of the attack and his death.

2879.   Plaintiff Jenna Vanosdale is the widow of SPC Hovater and a U.S. national.

2880.   As a result of the July 13, 2008 Attack and SPC Hovater's injuries and death, each member of the Hovater Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Hovater's society, companionship, and counsel.

2881.   As a result of the July 13, 2008 Attack, SPC Hovater was injured in his person and/or property.  The Plaintiff members of the Hovater Family are the survivors and/or heirs of SPC Hovater and are entitled to recover for the damages SPC Hovater sustained.

2882.   **Corporal Jason M. Bogar** served in Afghanistan as a member of the U.S. Army. CPL Bogar was injured in the July 13, 2008 Attack.  CPL Bogar died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

2883.   CPL Bogar was a U.S. national at the time of the attack and his death.

2884.   Plaintiff Carlene Cross is the mother of CPL Bogar and a U.S. national.

2885.   Plaintiff Michael Bogar is the father of CPL Bogar and a U.S. national.

2886.   Plaintiff Carise Martindale is the sister of CPL Bogar and a U.S. national.

2887.   Plaintiff Micael Gauger is the sister of CPL Bogar and a U.S. national.

2888.   As a result of the July 13, 2008 Attack and CPL Bogar's injuries and death, each member of the Bogar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Bogar's society, companionship, and counsel.

2889.   As a result of the July 13, 2008 Attack, CPL Bogar was injured in his person and/or property.  The Plaintiff members of the Bogar Family are the survivors and/or heirs of CPL Bogar and are entitled to recover for the damages CPL Bogar sustained.

2890.   **First Lieutenant Jonathan P. Brostrom** served in Afghanistan as a member of the U.S. Army. 1LT Brostrom was injured in the July 13, 2008 Attack.  1LT Brostrom died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

2891.   1LT Brostrom was a U.S. national at the time of the attack and his death.

2892.   Plaintiff Jase Brostrom is the son of 1LT Brostrom and a U.S. national.

2893.   Plaintiff Mary Brostrom is the mother of 1LT Brostrom and a U.S. national.

2894.   Plaintiff David Brostrom is the father of 1LT Brostrom and a U.S. national.

2895.   Plaintiff Blake Brostrom is the brother of 1LT Brostrom and a U.S. national.

2896.   As a result of the July 13, 2008 Attack and 1LT Brostrom's injuries and death, each member of the Brostrom Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Brostrom's society, companionship, and counsel.

2897.   As a result of the July 13, 2008 Attack, 1LT Brostrom was injured in his person and/or property.  The Plaintiff members of the Brostrom Family are the survivors and/or heirs of 1LT Brostrom and are entitled to recover for the damages 1LT Brostrom sustained.

2898.   **Corporal Pruitt A. Rainey** served in Afghanistan as a member of the U.S. Army. CPL Rainey was injured in the July 13, 2008 Attack.  CPL Rainey died on July 13, 2008 as a result of injuries sustained during the July 13, 2008 Attack.

2899.   CPL Rainey was a U.S. national at the time of the attack and his death.

2900.   Plaintiff Renda Riggins is the mother of CPL Rainey and a U.S. national.

2901.   As a result of the July 13, 2008 Attack and CPL Rainey's injuries and death, each member of the Rainey Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Rainey's society, companionship, and counsel.

2902.   As a result of the July 13, 2008 Attack, CPL Rainey was injured in his person and/or property.  The Plaintiff members of the Rainey Family are the survivors and/or heirs of CPL Rainey and are entitled to recover for the damages CPL Rainey sustained.

2903.   **Staff Sergeant Jonathan R.C. Benton** served in Afghanistan as a member of the U.S. Army.  SSG Benton was injured in the July 13, 2008 Attack.  The attack severely wounded SSG Benton, who now suffers from traumatic brain injury, spinal injury, and nerve damage, among other severe injuries.  As a result of the July 13, 2008 Attack and his injuries, SSG Benton has experienced severe physical and emotional pain and suffering.

2904.   Plaintiff SSG Benton was a U.S. national at the time of the attack, and remains one today.

2905.   Plaintiff Elizabeth Benton is the wife of SSG Benton and a U.S. national.

2906.   Plaintiff H.B., by and through her next friend Elizabeth Benton, is the minor daughter of SSG Benton. She is a U.S. national.

2907.   Plaintiff S.B., by and through her next friend Elizabeth Benton, is the minor daughter of SSG Benton. She is a U.S. national.

2908.   Plaintiff G.B., by and through her next friend Elizabeth Benton, is the minor daughter of SSG Benton. She is a U.S. national.

2909.   As a result of the July 13, 2008 Attack and SSG Benton's injuries, each member of the Benton Family has experienced severe mental anguish, emotional pain and suffering.

651

**The August 1, 2008 IED Attack In Kunar (Jair De Jesus Garcia Family)**

2910.   On August 1, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "August 1, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 1, 2008 Attack.

2911.   The August 1, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2912.   **Private E1 Jair De Jesus Garcia** served in Afghanistan as a member of the U.S. Army.  PV1 Garcia was injured in the August 1, 2008 Attack.  PV1 Garcia died on August 1, 2008 as a result of injuries sustained during the August 1, 2008 Attack.

2913.   PV1 Garcia was a U.S. national at the time of the attack and his death.

2914.   Plaintiff Maria Avneri is the mother of PV1 Garcia and a U.S. national.

2915.   Plaintiff Eduardo Garcia is the brother of PV1 Garcia and a U.S. national.

2916.   Plaintiff Jacob Avneri is the stepfather of PV1 Garcia and a U.S. national.  Mr. Avneri lived in the same household as PV1 Garcia for a substantial period and considered PV1 Garcia the functional equivalent of a biological son.

2917.   As a result of the August 1, 2008 Attack and PV1 Garcia's injuries and death, each member of the Garcia Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV1 Garcia's society, companionship, and counsel.

2918.   As a result of the August 1, 2008 Attack, PV1 Garcia was injured in his person and/or property.  The Plaintiff members of the Garcia Family are the survivors and/or heirs of PV1 Garcia and are entitled to recover for the damages PV1 Garcia sustained.

**The August 22, 2008 IED Attack In Ghazni (Brian E. Studer Family)**

2919.   On August 22, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "August 22, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 22, 2008 Attack.

2920.   The August 22, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2921.   **Staff Sergeant Brian E. Studer** served in Afghanistan as a member of the U.S. Army.  SSG Studer was injured in the August 22, 2008 Attack.  SSG Studer died on August 22, 2008 as a result of injuries sustained during the August 22, 2008 Attack.

2922.   SSG Studer was a U.S. national at the time of the attack and his death.

2923.   Plaintiff Crystal DeLeo is the sister of SSG Studer and a U.S. national.

2924.   As a result of the August 22, 2008 Attack and SSG Studer's injuries and death, each member of the Studer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Studer's society, companionship, and counsel.

2925.   As a result of the August 22, 2008 Attack, SSG Studer was injured in his person and/or property.  The Plaintiff members of the Studer Family are the survivors and/or heirs of SSG Studer and are entitled to recover for the damages SSG Studer sustained.

**The September 11, 2008 IED Attack In Nangarhar (Jacob R. Lerner Family)**

2926.   On September 11, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nangarhar Province, Afghanistan (the "September 11, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training,

and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 11, 2008 Attack.

2927.  The September 11, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2928.  **Specialist Jacob R. Lerner** served in Afghanistan as a member of the U.S. Army. SPC Lerner was injured in the September 11, 2008 Attack.  The attack severely wounded SPC Lerner, who endured amputation of his left leg below the knee.  As a result of the September 11, 2008 Attack and his injuries, SPC Lerner has experienced severe mental anguish and severe physical and emotional pain and suffering.

2929.  Plaintiff SPC Lerner was a U.S. national at the time of the attack, and remains one today.

### The September 20, 2008 IED Attack In Kunar (Nathan M. Cox Family)

2930.  On September 20, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "September 20, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 20, 2008 Attack.

2931.  The September 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2932.   **Staff Sergeant Nathan M. Cox** served in Afghanistan as a member of the U.S. Army. SSG Cox was injured in the September 20, 2008 Attack.  SSG Cox died on September 20, 2008 as a result of injuries sustained during the September 20, 2008 Attack.

2933.   SSG Cox was a U.S. national at the time of the attack and his death.

2934.   Plaintiff Hannah Cox is the sister of SSG Cox and a U.S. national.

2935.   As a result of the September 20, 2008 Attack and SSG Cox's injuries and death, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cox's society, companionship, and counsel.

2936.   As a result of the September 20, 2008 Attack, SSG Cox was injured in his person and/or property.  The Plaintiff members of the Cox Family are the survivors and/or heirs of SSG Cox and are entitled to recover for the damages SSG Cox sustained.

**The October 14, 2008 IED Attack In Kunar (Cory J. Bertrand Family)**

2937.   On October 14, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "October 14, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 14, 2008 Attack.

2938.   The October 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2939.   **Specialist Cory J. Bertrand** served in Afghanistan as a member of the U.S. Army. SPC Bertrand was injured in the October 14, 2008 Attack.  SPC Bertrand died on October 14, 2008 as a result of injuries sustained during the October 14, 2008 Attack.

2940.   SPC Bertrand was a U.S. national at the time of the attack and his death.

2941.   Plaintiff Charlotte Allen is the mother of SPC Bertrand and a U.S. national.

2942.   Plaintiff Matthew Allen is the stepfather of SPC Bertrand and a U.S. national. Mr. Allen lived in the same household as SPC Bertrand for a substantial period and considered SPC Bertrand the functional equivalent of a biological son.

2943.   Plaintiff Austin Nelams is the brother of SPC Bertrand and a U.S. national.

2944.   As a result of the October 14, 2008 Attack and SPC Bertrand's injuries and death, each member of the Bertrand Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bertrand's society, companionship, and counsel.

2945.   As a result of the October 14, 2008 Attack, SPC Bertrand was injured in his person and/or property.  The Plaintiff members of the Bertrand Family are the survivors and/or heirs of SPC Bertrand and are entitled to recover for the damages SPC Bertrand sustained.

**The October 27, 2008 Suicide Attack In Baghlan (Kevin D. Grieco Family)**

2946.   On October 27, 2008, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Baghlan Province, Afghanistan (the "October 27, 2008 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 27, 2008 Attack.

2947.   The October 27, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2948.   **Staff Sergeant Kevin D. Grieco** served in Afghanistan as a member of the U.S. Army National Guard.  SSG Grieco was injured in the October 27, 2008 Attack.  SSG Grieco died on October 27, 2008 as a result of injuries sustained during the October 27, 2008 Attack.

2949.   SSG Grieco was a U.S. national at the time of the attack and his death.

2950.   Plaintiff Linda Grieco is the mother of SSG Grieco and a U.S. national.

2951.   Plaintiff Ralph Grieco is the father of SSG Grieco and a U.S. national.

2952.   Plaintiff Jennifer Burch is the sister of SSG Grieco and a U.S. national.

2953.   As a result of the October 27, 2008 Attack and SSG Grieco's injuries and death, each member of the Grieco Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Grieco's society, companionship, and counsel.

2954.   As a result of the October 27, 2008 Attack, SSG Grieco was injured in his person and/or property.  The Plaintiff members of the Grieco Family are the survivors and/or heirs of SSG Grieco and are entitled to recover for the damages SSG Grieco sustained.

**The January 17, 2009 IED Attack In Kabul (Simone A. Robinson Family)**

2955.   On January 17, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "January 17, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 17, 2009 Attack.

2956.   The January 17, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2957.   **Sergeant Simone A. Robinson** served in Afghanistan as a member of the U.S. Army National Guard.  SGT Robinson was injured in the January 17, 2009 Attack.  SGT Robinson died on March 1, 2009 as a result of injuries sustained during the January 17, 2009 Attack.

2958.   SGT Robinson was a U.S. national at the time of the attack and her death.

2959.   Plaintiff Regina Byther is the mother of SGT Robinson and a U.S. national.

2960.   Plaintiff N.W., by and through her next friend Regina Byther, is the minor daughter of SGT Robinson. She is a U.S. national.

2961.   As a result of the January 17, 2009 Attack and SGT Robinson's injuries and death, each member of the Robinson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Robinson's society, companionship, and counsel.

2962.   As a result of the January 17, 2009 Attack, SGT Robinson was injured in her person and/or property.  The Plaintiff members of the Robinson Family are the survivors and/or heirs of SGT Robinson and are entitled to recover for the damages SGT Robinson sustained.

**The January 18, 2009 IED Attack In Kabul (Jesse W. Watson Family)**

2963.   On January 18, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "January 18, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 18, 2009 Attack.

2964.   The January 18, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2965.   **Specialist Jesse W. Watson** served in Afghanistan as a member of the U.S. Army. On January 18, 2009, SPC Watson was injured in the January 18, 2009 Attack.  The attack severely wounded SPC Watson, who now suffers from PTSD, depressive disorder, and traumatic brain injury.  As a result of the January 18, 2009 Attack and his injuries, SPC Watson has experienced severe mental anguish and severe physical and emotional pain and suffering.

2966.   SPC Watson was a U.S. national at the time of the attack, and remains one today.

2967.   As a result of the January 18, 2009 Attack and SPC Watson's injuries, each member of the Watson Family has experienced severe mental anguish, emotional pain and suffering.

**The May 20, 2009 IED Attack In Kabul (Roslyn L. Schulte Family)**

2968.   On May 20, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "May 20, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 20, 2009 Attack.

2969.   The May 20, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2970.   **First Lieutenant Roslyn L. Schulte** served in Afghanistan as a member of the U.S. Air Force.  1stLt Schulte was injured in the May 20, 2009 Attack.  1stLt Schulte died on May 20, 2009 as a result of injuries sustained during the Attack.

2971.   1stLt Schulte was a U.S. national at the time of the attack and her death.

2972.   Plaintiff Susie Schulte is the mother of 1stLt Schulte and a U.S. national.

2973.   Plaintiff Robert Schulte is the father of 1stLt Schulte and a U.S. national.

2974.   Plaintiff Todd Schulte is the brother of 1stLt Schulte, a U.S. national, and a resident of this District.

2975.   As a result of the May 20, 2009 Attack and 1stLt Schulte's injuries and death, each member of the Schulte Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1stLt Schulte's society, companionship, and counsel.

2976.   As a result of the May 20, 2009 Attack, 1stLt Schulte was injured in her person and/or property.  The Plaintiff members of the Schulte Family are the survivors and/or heirs of 1stLt Schulte and are entitled to recover for the damages 1stLt Schulte sustained.

**The May 26, 2009 Suicide Attack In Kapisa (Mark E. Stratton II Family)**

2977.   On May 26, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kapisa Province, Afghanistan ("May 26, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 26, 2009 Attack.

2978.   The May 26, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2979.   **Lieutenant Colonel Mark E. Stratton II** served in Afghanistan as a member of the U.S. Air Force.  Lt Col Stratton was injured in the May 26, 2009 Attack.  Lt Col Stratton died on May 26, 2009 as a result of injuries sustained during the Attack.

2980.   Lt Col Stratton was a U.S. national at the time of the attack and his death.

2981.   Plaintiff Janice York is the mother of Lt Col Stratton and a U.S. national.

2982.   Plaintiff Michael Stratton is the brother of Lt Col Stratton and a U.S. national.

2983.   Plaintiff Deborah Young is the stepmother of Lt Col Stratton and a U.S. national. Ms. Young lived in the same household as Lt Col Stratton for a substantial period and considered Lt Col Stratton the functional equivalent of a biological son.

2984.   Plaintiff Steven Stratton is the brother of Lt Col Stratton and a U.S. national.

2985.   Plaintiff Franklin Little is the brother of Lt Col Stratton and a U.S. national.

2986.   As a result of the May 26, 2009 Attack and Lt Col Stratton's injuries and death, each member of the Stratton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Lt Col Stratton's society, companionship, and counsel.

2987.   As a result of the May 26, 2009 Attack, Lt Col Stratton was injured in his person and/or property.  The Plaintiff members of the Stratton Family are the survivors and/or heirs of Lt Col Stratton and are entitled to recover for the damages Lt Col Stratton sustained.

**The July 24, 2009 Complex Attack In Nuristan (Justin D. Coleman Family)**

2988.   On July 24, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Nuristan Province, Afghanistan (the "July 24, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 24, 2009 Attack.

2989.   The July 24, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2990.   **Specialist Justin D. Coleman** served in Afghanistan as a member of the U.S. Army. SPC Coleman was injured in the July 24, 2009 Attack.  SPC Coleman died on July 24, 2009 as a result of injuries sustained during the July 24, 2009 Attack.

2991.   SPC Coleman was a U.S. national at the time of the attack and his death.

2992.   Plaintiff Dean Coleman is the father of SPC Coleman and a U.S. national.

2993.   As a result of the July 24, 2009 Attack and SPC Coleman's injuries and death, each member of the Coleman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Coleman's society, companionship, and counsel.

2994.   As a result of the July 24, 2009 Attack, SPC Coleman was injured in his person and/or property.  The Plaintiff members of the Coleman Family are the survivors and/or heirs of SPC Coleman and are entitled to recover for the damages SPC Coleman sustained.

**The August 21, 2009 Complex Attack In Kunar (Matthew L. Ingram Family)**

2995.   On August 21, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving an IED and small arms fire in Kunar Province, Afghanistan (the "August 21, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 21, 2009 Attack.

2996.   The August 21, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the IED's passive detonation system indiscriminately placed civilians at risk.

2997.   **Sergeant Matthew L. Ingram** served in Afghanistan as a member of the U.S. Army.  SGT Ingram was injured in the August 21, 2009 Attack.  SGT Ingram died on August 21, 2009 as a result of injuries sustained during the August 21, 2009 Attack.

2998.   SGT Ingram was a U.S. national at the time of the attack and his death.

2999.   Plaintiff Holly Ingram is the widow of SGT Ingram and a U.S. national.

3000.   Plaintiff C.A.I., by and through her next friend Holly Ingram, is the minor daughter of SGT Ingram. She is a U.S. national.

3001.   As a result of the August 21, 2009 Attack and SGT Ingram's injuries and death, each member of the Ingram Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ingram's society, companionship, and counsel.

3002.   As a result of the August 21, 2009 Attack, SGT Ingram was injured in his person and/or property.  The Plaintiff members of the Ingram Family are the survivors and/or heirs of SGT Ingram and are entitled to recover for the damages SGT Ingram sustained.

**The September 30, 2009 Suicide Attack In Khost (Alex French IV Family)**

3003.   On September 30, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Khost Province, Afghanistan (the "September 30, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 30, 2009 Attack.

3004.   The September 30, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3005.   **Staff Sergeant Alex French IV** served in Afghanistan as a member of the U.S. Army National Guard.  SSG French was injured in the September 30, 2009 Attack.  SSG French died on September 30, 2009 as a result of injuries sustained during the September 30, 2009 Attack.

3006.   SSG French was a U.S. national at the time of the attack and his death.

3007.   Plaintiff Gwendolyn French is the mother of SSG French and a U.S. national.

3008.   Plaintiff Laquitta French is the sister of SSG French and a U.S. national.

3009.   As a result of the September 30, 2009 Attack and SSG French's injuries and death, each member of the French Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG French's society, companionship, and counsel.

3010.   As a result of the September 30, 2009 Attack, SSG French was injured in his person and/or property.  The Plaintiff members of the French Family are the survivors and/or heirs of SSG French and are entitled to recover for the damages SSG French sustained.

**The October 16, 2009 IED Attack In Ghazni (Anthony G. Green Family)**

3011.   On October 16, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "October 16, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 16, 2009 Attack.

3012.   The October 16, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3013.   **Sergeant Anthony G. Green** served in Afghanistan as a member of the U.S. Army National Guard.  SGT Green was injured in the October 16, 2009 Attack.  SGT Green died on October 16, 2009 as a result of injuries sustained during the October 16, 2009 Attack.

3014.   SGT Green was a U.S. national at the time of the attack and his death.

3015.   Plaintiff Patricia Green is the mother of SGT Green and a U.S. national.

3016.   Plaintiff Almuth Green Jr. is the father of SGT Green and a U.S. national.

3017.   Plaintiff Jesse Green is the brother of SGT Green and a U.S. national.

3018.   As a result of the October 16, 2009 Attack and SGT Green's injuries and death, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Green's society, companionship, and counsel.

3019.   As a result of the October 16, 2009 Attack, SGT Green was injured in his person and/or property.  The Plaintiff members of the Green Family are the survivors and/or heirs of SGT Green and are entitled to recover for the damages SGT Green sustained.

**The October 25, 2009 IED Attack In Laghman (Brandon K. Steffey Family)**

3020.   On October 25, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "October 25, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 25, 2009 Attack.

3021.   The October 25, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3022.   **Specialist Brandon K. Steffey** served in Afghanistan as a member of the U.S. Army.  SPC Steffey was injured in the October 25, 2009 Attack.  SPC Steffey died on October 25, 2009 as a result of injuries sustained during the October 25, 2009 Attack.

3023.   SPC Steffey was a U.S. national at the time of the attack and his death.

3024.   Plaintiff Andrea Steffey is the widow of SPC Steffey and a U.S. national.

3025.   Plaintiff A.G.S., by and through her next friend Andrea E. Steffey, is the minor daughter of SPC Steffey. She is a U.S. national.

3026.   Plaintiff Rachel Humpf is the mother of SPC Steffey and a U.S. national.

3027.   Plaintiff Dennis Steffey is the father of SPC Steffey and a U.S. national.

3028.   Plaintiff Heather Jackson is the sister of SPC Steffey and a U.S. national.

3029.   Plaintiff David Humpf is the stepfather of SPC Steffey and a U.S. national.  Mr. Humpf lived in the same household as SPC Steffey for a substantial period and considered SPC Steffey the functional equivalent of a biological son.

3030.   As a result of the October 25, 2009 Attack and SPC Steffey's injuries and death, each member of the Steffey Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Steffey's society, companionship, and counsel.

3031.   As a result of the October 25, 2009 Attack, SPC Steffey was injured in his person and/or property.  The Plaintiff members of the Steffey Family are the survivors and/or heirs of SPC Steffey and are entitled to recover for the damages SPC Steffey sustained.

**The November 19, 2009 Suicide Attack In Zabul (John J. Cleaver Family)**

3032.   On November 19, 2009, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Zabul Province, Afghanistan (the "November 19, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 19, 2009 Attack.

3033.   The November 19, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3034.   **Staff Sergeant John J. Cleaver** served in Afghanistan as a member of the U.S. Army. SSG Cleaver was injured in the November 19, 2009 Attack.  SSG Cleaver died on November 19, 2009 as a result of injuries sustained during the November 19, 2009 Attack.

3035.   SSG Cleaver was a U.S. national at the time of the attack and his death.

3036.   Plaintiff Kim Sola is the widow of SSG Cleaver and a U.S. national.

3037.   Plaintiff Collin Cleaver is the son of SSG Cleaver and a U.S. national.

3038.   Plaintiff Aidan Cleaver is the son of SSG Cleaver and a U.S. national.

3039.   As a result of the November 19, 2009 Attack and SSG Cleaver's injuries and death, each member of the Cleaver Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Cleaver's society, companionship, and counsel.

3040.   As a result of the November 19, 2009 Attack, SSG Cleaver was injured in his person and/or property.  The Plaintiff members of the Cleaver Family are the survivors and/or heirs of SSG Cleaver and are entitled to recover for the damages SSG Cleaver sustained.

**The December 30, 2009 Suicide Attack In Khost (Dane C. Paresi, Harold Brown Jr., and Jeremy J. Wise Families)**

3041.   On December 30, 2009, a joint cell comprised of al-Qaeda (an FTO), the Taliban (including its Haqqani Network), and the Pakistani Taliban committed a suicide bombing attack in Khost Province, Afghanistan (the "December 30, 2009 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 30, 2009 Attack.

3042.   The December 30, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3043.   **Dane C. Paresi** worked in Afghanistan as a civilian government contractor working for Xe Services. Mr. Paresi was injured in the December 30, 2009 Attack.  Mr. Paresi died on December 30, 2009 as a result of injuries sustained during the December 30, 2009 Attack.

3044.   Mr. Paresi was a U.S. national at the time of the attack and his death.

3045.   Plaintiff Mindylou Paresi is the widow of Mr. Paresi and a U.S. national.

3046.   Plaintiff Elizabeth Paresi is the daughter of Mr. Paresi and a U.S. national.

3047.   Plaintiff Janet Paresi is the mother of Mr. Paresi and a U.S. national.

3048.   Plaintiff Terry Paresi is the brother of Mr. Paresi and a U.S. national.

3049.   Plaintiff Santina Cartisser is the sister of Mr. Paresi and a U.S. national.

3050.   Plaintiff Alexandra VandenBroek is the stepdaughter of Mr. Paresi and a U.S. national. Ms. VandernBroek lived in the same household as Mr. Paresi for a substantial period and considered Mr. Paresi the functional equivalent of a biological father.

3051.   As a result of the December 30, 2009 Attack and Mr. Paresi's injuries and death, each member of the Paresi Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Paresi's society, companionship, and counsel.

3052.   As a result of the December 30, 2009 Attack, Mr. Paresi was injured in his person and/or property.  The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for the damages Mr. Paresi sustained.

3053.   **Harold Brown Jr.** worked in Afghanistan as a civilian government contractor working for the CIA.  Mr. Brown was injured in the December 30, 2009 Attack.  Mr. Brown died on December 30, 2009 as a result of injuries sustained during the December 30, 2009 Attack.

3054.   Mr. Brown was a U.S. national at the time of the attack and his death.

3055.   Plaintiff Barbara Brown is the mother of Mr. Brown and a U.S. national.

3056.   Plaintiff Harold Brown Sr. is the father of Mr. Brown and a U.S. national.

3057.   Plaintiff Paula Rich is the sister of Mr. Brown and a U.S. national.

3058.   Plaintiff Regina Brown is the sister of Mr. Brown and a U.S. national.

3059.   As a result of the December 30, 2009 Attack and Mr. Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brown's society, companionship, and counsel.

3060.   As a result of the December 30, 2009 Attack, Mr. Brown was injured in his person and/or property.  The Plaintiff members of the Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for the damages Mr. Brown sustained.

3061.   **Jeremy J. Wise** worked in Afghanistan as a civilian government contractor working for Xe Services.  Mr. Wise was injured in the December 30, 2009 Attack.  Mr. Wise died on December 30, 2009 as a result of injuries sustained during the December 30, 2009 Attack.

3062.   Mr. Wise was a U.S. national at the time of the attack and his death.

3063.   Plaintiff Dana Bernhardt is the widow of Mr. Wise and a U.S. national.

3064.   Plaintiff Mary L. Wise is the mother of Mr. Wise and a U.S. national.

3065.   Plaintiff Mary H. Wise is the sister of Mr. Wise and a U.S. national.

3066.   Plaintiff Ethan Prusinski is the stepson of Mr. Wise and a U.S. national.  Mr. Prusinski lived in the same household as Mr. Wise for a substantial period and considered Mr. Wise the functional equivalent of a biological father.

3067.   As a result of the December 30, 2009 Attack and Mr. Wise's injuries and death, each member of the Wise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Wise's society, companionship, and counsel.

3068.   As a result of the December 30, 2009 Attack, Mr. Wise was injured in his person and/or property.  The Plaintiff members of the Wise Family are the survivors and/or heirs of Mr. Wise and are entitled to recover for the damages Mr. Wise sustained.

**The March 16, 2010 Suicide Attack In Helmand (Allen R. Thomas Family)**

3069.   On March 16, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bomb attack in Helmand Province, Afghanistan (the "March 16, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the March 16, 2010 Attack.

3070.   The March 16, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3071.   **Staff Sergeant Allen R. Thomas** served in Afghanistan as a member of the U.S. Army.  On March 16, 2010, SSG Thomas was severely injured in the March 16, 2010 Attack, which, among other things, took out his left lung, collapsed his right lung, left him with burns down his back and chest tubes to help him breath, as well as traumatic brain injury and post-traumatic stress disorder. After years of rehabilitation, SSG Thomas died by suicide during a PTSD episode on September 29, 2013 as a result of injuries sustained during the March 16, 2010 Attack.

3072.   SSG Thomas was a U.S. national at the time of the attack and his death.

3073.   Plaintiff Danica Thomas is the widow of SSG Thomas and a U.S. national.

3074.   Plaintiff L.T., by and through her next friend Danica Thomas, is the minor daughter of SSG Thomas. She is a U.S. national.

3075.   As a result of the March 16, 2010 Attack and SSG Thomas's injuries and death, each member of the Thomas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Thomas's society, companionship, and counsel.

3076.   As a result of the March 16, 2010 Attack, SSG Thomas was injured in his person and/or property.  The Plaintiff members of the Thomas Family are the survivors and/or heirs of SSG Thomas and are entitled to recover for the damages SSG Thomas sustained.

**The June 7, 2010 IED Attack In Kunar (Blaine E. Redding Family)**

3077.   On June 7, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "June 7, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 7, 2010 Attack.

3078.   The June 7, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3079.   **Specialist Blaine E. Redding** served in Afghanistan as a member of the U.S. Army. SPC Redding was injured in the June 7, 2010 Attack.  SPC Redding died on June 7, 2010 as a result of injuries sustained during the June 7, 2010 Attack.

3080.   SPC Redding was a U.S. national at the time of the attack and his death.

3081.   Plaintiff Blaine Redding is the father of SPC Redding and a U.S. national.

3082.   As a result of the June 7, 2010 Attack and SPC Redding's injuries and death, each member of the Redding Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Redding's society, companionship, and counsel.

3083.   As a result of the June 7, 2010 Attack, SPC Redding was injured in his person and/or property.  The Plaintiff members of the Redding Family are the survivors and/or heirs of SPC Redding and are entitled to recover for the damages SPC Redding sustained.

**The June 21, 2010 Suicide Attack In Kunar (Andrew R. Looney Family)**

3084.   On June 21, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bomb attack in Kunar Province, Afghanistan (the "June 21, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.   Al-Qaeda planned and authorized the June 21, 2010 Attack.

3085.   The June 21, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3086.   **Sergeant Andrew R. Looney** served in Afghanistan as a member of the U.S. Army.  SGT Looney was injured in the June 21, 2010 Attack.  SGT Looney died on June 21, 2010 as a result of injuries sustained during the June 21, 2010 Attack.

3087.   SGT Looney was a U.S. national at the time of the attack and his death.

3088.   Plaintiff Martha Looney is the mother of SGT Looney and a U.S. national.

3089.   As a result of the June 21, 2010 Attack and SGT Looney's injuries and death, each member of the Looney Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Looney's society, companionship, and counsel.

3090.   As a result of the June 21, 2010 Attack, SGT Looney was injured in his person and/or property.  The Plaintiff members of the Looney Family are the survivors and/or heirs of SGT Looney and are entitled to recover for the damages SGT Looney sustained.

**The June 25, 2010 Complex Attack In Kunar (Jared C. Plunk Family)**

3091.   On June 25, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Kunar

Province, Afghanistan (the "June 25, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 25, 2010 Attack.

3092.   The June 25, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3093.   **Specialist Jared C. Plunk** served in Afghanistan as a member of the U.S. Army. SPC Plunk was injured in the June 25, 2010 Attack.  SPC Plunk died on June 25, 2010 as a result of injuries sustained during the June 25, 2010 Attack.

3094.   SPC Plunk was a U.S. national at the time of the attack and his death.

3095.   Plaintiff Glenda Willard is the mother of SPC Plunk and a U.S. national.

3096.   Plaintiff Michelle Hock is the sister of SPC Plunk and a U.S. national.

3097.   Plaintiff Jordan Plunk is the brother of SPC Plunk and a U.S. national.

3098.   Plaintiff Ranee Massoni is the sister of SPC Plunk and a U.S. national.

3099.   Plaintiff Justin Plunk is the brother of SPC Plunk and a U.S. national.

3100.   As a result of the June 25, 2010 Attack and SPC Plunk's injuries and death, each member of the Plunk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plunk's society, companionship, and counsel.

3101.   As a result of the June 25, 2010 Attack, SPC Plunk was injured in his person and/or property.  The Plaintiff members of the Plunk Family are the survivors and/or heirs of SPC Plunk and are entitled to recover for the damages SPC Plunk sustained.

**The July 10, 2010 Complex Attack In Kunar (Carlos J. Negron Sr. and Shaun M. Mittler Families)**

3102.   On July 10, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving a rocket propelled grenade and small arms fire in Kunar Province, Afghanistan (the "July 10, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 10, 2010 Attack.

3103.   The July 10, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3104.   **Specialist Carlos J. Negron Sr.** served in Afghanistan as a member of the U.S. Army.  SPC Negron was injured in the July 10, 2010 Attack.  SPC Negron died on July 10, 2010 as a result of injuries sustained during the July 10, 2010 Attack.

3105.   SPC Negron was a U.S. national at the time of the attack and his death.

3106.   Plaintiff Marta Torres is the mother of SPC Negron and a U.S. national.

3107.   Plaintiff Gabriel Negron is the father of SPC Negron and a U.S. national.

3108.   Plaintiff Marvin Negron is the brother of SPC Negron and a U.S. national.

3109.   Plaintiff Jose Negron is the brother of SPC Negron and a U.S. national.

3110.   Plaintiff Maribel Negron is the sister of SPC Negron and a U.S. national.

3111.   As a result of the July 10, 2010 Attack and SPC Negron's injuries and death, each member of the Negron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Negron's society, companionship, and counsel.

3112.   As a result of the July 10, 2010 Attack, SPC Negron was injured in his person and/or property.  The Plaintiff members of the Negron Family are the survivors and/or heirs of SPC Negron and are entitled to recover for the damages SPC Negron sustained.

3113.   **Staff Sergeant Shaun M. Mittler** served in Afghanistan as a member of the U.S. Army.  SSG Mittler was injured in the July 10, 2010 Attack.  SSG Mittler died on July 10, 2010 as a result of injuries sustained during the July 10, 2010 Attack.

3114.   SSG Mittler was a U.S. national at the time of the attack and his death.

3115.   Plaintiff Cristine Mittler is the daughter of SSG Mittler and a U.S. national.

3116.   Plaintiff Joyce Turner is the mother of SSG Mittler and a U.S. national.

3117.   Plaintiff Terry Mittler is the father of SSG Mittler and a U.S. national.

3118.   Plaintiff Alexander Mittler is the brother of SSG Mittler and a U.S. national.

3119.   Plaintiff Misty Barclay is the sister of SSG Mittler and a U.S. national.

3120.   As a result of the July 10, 2010 Attack and SSG Mittler's injuries and death, each member of the Mittler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mittler's society, companionship, and counsel.

3121.   As a result of the July 10, 2010 Attack, SSG Mittler was injured in his person and/or property.  The Plaintiff members of the Mittler Family are the survivors and/or heirs of SSG Mittler and are entitled to recover for the damages SSG Mittler sustained.

**The August 17, 2010 IED Attack In Kunar (Benjamen G. Chisholm Family)**

3122.   On August 17, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "August 17, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 17, 2010 Attack.

3123.   The August 17, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3124.   **Private First Class Benjamen G. Chisholm** served in Afghanistan as a member of the U.S. Army.  PFC Chisholm was injured in the August 17, 2010 Attack.  PFC Chisholm died on August 17, 2010 as a result of injuries sustained during the August 17, 2010 Attack.

3125.   PFC Chisholm was a U.S. national at the time of the attack and his death.

3126.   Plaintiff Linda Reynolds is the mother of PFC Chisholm and a U.S. national.

3127.   Plaintiff Glenn Chisholm is the father of PFC Chisholm and a U.S. national.

3128.   Plaintiff Karma Chisholm is the stepmother of PFC Chisholm and a U.S. national. Ms. Chisholm lived in the same household as PFC Chisholm for a substantial period and considered PFC Chisholm the functional equivalent of a biological son.

3129.   As a result of the August 17, 2010 Attack and PFC Chisholm's injuries and death, each member of the Chisholm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Chisholm's society, companionship, and counsel.

3130.   As a result of the August 17, 2010 Attack, PFC Chisholm was injured in his person and/or property.  The Plaintiff members of the Chisholm Family are the survivors and/or heirs of PFC Chisholm and are entitled to recover for the damages PFC Chisholm sustained.

**The October 4, 2010 IED Attack In Kabul (Karl A. Campbell Family)**

3131.   On October 4, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "October 4, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 4, 2010 Attack.

3132.   The October 4, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3133.   **Sergeant Karl A. Campbell** served in Afghanistan as a member of the U.S. Army. SGT Campbell was injured in the October 4, 2010 Attack.  SGT Campbell died on October 4, 2010 as a result of injuries sustained during the October 4, 2010 Attack.

3134.   SGT Campbell was a U.S. national at the time of the attack and his death.

3135.   Plaintiff Audrey Campbell is the mother of SGT Campbell and a U.S. national.

3136.   Plaintiff Arthur Campbell is the father of SGT Campbell and a U.S. national.

3137.   Plaintiff Tina Campbell is the sister of SGT Campbell and a U.S. national.

3138.   As a result of the October 4, 2010 Attack and SGT Campbell's injuries and death, each member of the Campbell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Campbell's society, companionship, and counsel.

3139.   As a result of the October 4, 2010 Attack, SGT Campbell was injured in his person and/or property.  The Plaintiff members of the Campbell Family are the survivors and/or heirs of SGT Campbell and are entitled to recover for the damages SGT Campbell sustained.

**The November 5, 2010 IED Attack In Ghazni (Blake D. Whipple Family)**

3140.   On November 5, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "November 5, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 5, 2010 Attack.

3141.   The November 5, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3142.   **Specialist Blake D. Whipple** served in Afghanistan as a member of the U.S. Army. SPC Whipple was injured in the November 5, 2010 Attack.  SPC Whipple died on November 5, 2010 as a result of injuries sustained during the November 5, 2010 Attack.

3143.   SPC Whipple was a U.S. national at the time of the attack and his death.

3144.   Plaintiff Kimberley Whipple is the mother of SPC Whipple and a U.S. national.

3145.   Plaintiff David Whipple is the father of SPC Whipple and a U.S. national.

3146.   Plaintiff Sean Whipple is the brother of SPC Whipple and a U.S. national.

3147.   Plaintiff Brian Clyburn is the brother of SPC Whipple and a U.S. national.

3148.   As a result of the November 5, 2010 Attack and SPC Whipple's injuries and death, each member of the Whipple Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Whipple's society, companionship, and counsel.

3149.   As a result of the November 5, 2010 Attack, SPC Whipple was injured in his person and/or property.  The Plaintiff members of the Whipple Family are the survivors and/or heirs of SPC Whipple and are entitled to recover for the damages SPC Whipple sustained.

**The December 5, 2010 Suicide Attack In Paktia (Nicholas J. Aleman Family)**

3150.   On December 5, 2010, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing insider attack in Paktia Province, Afghanistan (the "December 5, 2010 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 5, 2010 Attack.

678

3151.   The December 5, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3152.   **Sergeant Nicholas J. Aleman** served in Afghanistan as a member of the U.S. Marine Corps.  Sgt Aleman was injured in the December 5, 2010 Attack.  Sgt Aleman died on December 5, 2010 as a result of injuries sustained during the December 5, 2010 Attack.

3153.   Sgt Aleman was a U.S. national at the time of the attack and his death.

3154.   Plaintiff Jose Aleman is the father of Sgt Aleman and a U.S. national.

3155.   Plaintiff Stephanie Hager is the sister of Sgt Aleman and a U.S. national.

3156.   As a result of the December 5, 2010 Attack and Sgt Aleman's injuries and death, each member of the Aleman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Aleman's society, companionship, and counsel.

3157.   As a result of the December 5, 2010 Attack, Sgt Aleman was injured in his person and/or property.  The Plaintiff members of the Aleman Family are the survivors and/or heirs of Sgt Aleman and are entitled to recover for the damages Sgt Aleman sustained.

**The February 27, 2011 IED Attack In Ghazni (Kristopher J. Gould Family)**

3158.   On February 27, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "February 27, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 27, 2011 Attack.

3159.   The February 27, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3160.  **Sergeant Kristopher J. Gould** served in Afghanistan as a member of the U.S. Army. SGT Gould was injured in the February 27, 2011 Attack.  SGT Gould died on February 27, 2011 as a result of injuries sustained during the February 27, 2011 Attack.

3161.   SGT Gould was a U.S. national at the time of the attack and his death.

3162.   Plaintiff Ann Gould is the mother of SGT Gould and a U.S. national.

3163.   Plaintiff James Gould is the father of SGT Gould and a U.S. national.

3164.   Plaintiff Julianna Symkowiak is the sister of SGT Gould and a U.S. national.

3165.   As a result of the February 27, 2011 Attack and SGT Gould's injuries and death, each member of the Gould Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gould's society, companionship, and counsel.

3166.   As a result of the February 27, 2011 Attack, SGT Gould was injured in his person and/or property.  The Plaintiff members of the Gould Family are the survivors and/or heirs of SGT Gould and are entitled to recover for the damages SGT Gould sustained.

**The April 13, 2011 IED Attack In Laghman (Donald L. Nichols Family)**

3167.   On April 13, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "April 13, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 13, 2011 Attack.

3168.   The April 13, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3169.  **Specialist Donald L. Nichols** served in Afghanistan as a member of the U.S. Army National Guard.  SPC Nichols was injured in the April 13, 2011 Attack.  SPC Nichols died on April 13, 2011 as a result of injuries sustained during the April 13, 2011 Attack.

3170.  SPC Nichols was a U.S. national at the time of the attack and his death.

3171.  Plaintiff Roger Poock is the stepfather of SPC Nichols and a U.S. national.  Mr. Poock lived in the same household as SPC Nichols for a substantial period and considered SPC Nichols the functional equivalent of a biological son.

3172.  Plaintiff Becky Poock is the mother of SPC Nichols and a U.S. national.

3173.  As a result of the April 13, 2011 Attack and SPC Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

3174.  As a result of the April 13, 2011 Attack, SPC Nichols was injured in his person and/or property.  The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

**The April 16, 2011 Suicide Attack In Laghman (Charles L. Adkins Family)**

3175.  On April 16, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Laghman Province, Afghanistan (the "April 16, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 16, 2011 Attack.

3176.  The April 16, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3177.   **Sergeant First Class Charles L. Adkins** served in Afghanistan as a member of the U.S. Army.  SFC Adkins was injured in the April 16, 2011 Attack.  SFC Adkins died on April 16, 2011 as a result of injuries sustained during the April 16, 2011 Attack.

3178.   SFC Adkins was a U.S. national at the time of the attack and his death.

3179.   Plaintiff Sheila Good is the mother of SFC Adkins and a U.S. national.

3180.   Plaintiff Charles Adkins is the father of SFC Adkins and a U.S. national.

3181.   Plaintiff Velvet Adkins is the stepmother of SFC Adkins and a U.S. national.  Ms. Adkins lived in the same household as SFC Adkins for a substantial period and considered SFC Adkins the functional equivalent of a biological son.

3182.   As a result of the April 16, 2011 Attack and SFC Adkins's injuries and death, each member of the Adkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adkins's society, companionship, and counsel.

3183.   As a result of the April 16, 2011 Attack, SFC Adkins was injured in his person and/or property.  The Plaintiff members of the Adkins Family are the survivors and/or heirs of SFC Adkins and are entitled to recover for the damages SFC Adkins sustained.

### The June 4, 2011 IED Attack In Laghman (Brett P. Benton and Devin A. Snyder Families)

3184.   On June 4, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "June 4, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 4, 2011 Attack.

3185.   The June 4, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3186.   **Brett P. Benton** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone.  Mr. Benton was injured in the June 4, 2011 Attack.  Mr. Benton died on June 4, 2011 as a result of injuries sustained during the June 4, 2011 Attack.

3187.   Mr. Benton was a U.S. national at the time of the attack and his death.

3188.   Plaintiff Bethany Benton is the widow of Mr. Benton and a U.S. national.

3189.   As a result of the June 4, 2011 Attack and Mr. Benton's injuries and death, each member of the Benton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Benton's society, companionship, and counsel.

3190.   As a result of the June 4, 2011 Attack, Mr. Benton was injured in his person and/or property.  The Plaintiff members of the Benton Family are the survivors and/or heirs of Mr. Benton and are entitled to recover for the damages Mr. Benton sustained.

3191.   **Sergeant Devin A. Snyder** served in Afghanistan as a member of the U.S. Army.  SGT Snyder was injured in the June 4, 2011 Attack.  SGT Snyder died on June 4, 2011 as a result of injuries sustained during the June 4, 2011 Attack.

3192.   SGT Snyder was a U.S. national at the time of the attack and her death.

3193.   Plaintiff Dineen Snyder is the mother of SGT Snyder and a U.S. national.

3194.   Plaintiff Edward Snyder is the father of SGT Snyder and a U.S. national.

3195.   Plaintiff Natasha Snyder is the sister of SGT Snyder and a U.S. national.

3196.   Plaintiff Damien Snyder is the brother of SGT Snyder and a U.S. national.

3197.   As a result of the June 4, 2011 Attack and SGT Snyder's injuries and death, each member of the Snyder Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Snyder's society, companionship, and counsel.

3198.   As a result of the June 4, 2011 Attack, SGT Snyder was injured in her person and/or property.  The Plaintiff members of the Snyder Family are the survivors and/or heirs of SGT Snyder and are entitled to recover for the damages SGT Snyder sustained.

**The July 31, 2011 IED Attack In Kunar (William B. Gross Paniagua Family)**

3199.   On July 31, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "July 31, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 31, 2011 Attack.

3200.   The July 31, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3201.   **Sergeant William B. Gross Paniagua** served in Afghanistan as a member of the U.S. Army.  SGT Gross Paniagua was injured in the July 31, 2011 Attack.  SGT Gross Paniagua died on July 31, 2011 as a result of injuries sustained during the July 31, 2011 Attack.

3202.   SGT Gross Paniagua was a U.S. national at the time of the attack and his death.

3203.   Plaintiff Felicia Gross Paniagua is the foster sister of SGT Gross Paniagua and a U.S. national.  Ms. Gross Paniagua lived in the same household as SGT Gross Paniagua for a substantial period and considered SGT Gross Paniagua the functional equivalent of a biological brother.

3204.   Plaintiff Socorro Gross Paniagua is the mother of SGT Gross Paniagua and a U.S. national.

3205.   Plaintiff Carlos Gross Rios Sr. is the father of SGT Gross Paniagua and a U.S. national.

3206.   Plaintiff Carlos Gross Paniagua is the brother of SGT Gross Paniagua and a U.S. national.

3207.   As a result of the July 31, 2011 Attack and SGT Gross Paniagua's injuries and death, each member of the Gross Paniagua Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

3208.   As a result of the July 31, 2011 Attack, SGT Gross Paniagua was injured in his person and/or property.  The Plaintiff members of the Gross Paniagua Family are the survivors and/or heirs of SGT Gross Paniagua and are entitled to recover for the damages he sustained.

**The September 25, 2011 IED Attack In Laghman (Francisco J. Briseño-Alvarez Jr. Family)**

3209.   On September 25, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Laghman Province, Afghanistan (the "September 25, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 25, 2011 Attack.

3210.   The September 25, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3211.  **Specialist Francisco J. Briseño-Alvarez Jr.** served in Afghanistan as a member of the U.S. Army National Guard. SPC Briseño-Alvarez was injured in the September 25, 2011 Attack.  SPC Briseño-Alvarez died on September 25, 2011 as a result of injuries sustained during the September 25, 2011 Attack.

3212.  SPC Briseño-Alvarez was a U.S. permanent resident and a member of the U.S. armed forces at the time of the attack and his death.

3213.  Plaintiff Francisco Briseño Gutierrez is the father of SPC Briseño-Alvarez and a U.S. national.

3214.  Plaintiff Luis Briseño Alvarez is the brother of SPC Briseño-Alvarez and a U.S. national.

3215.  As a result of the September 25, 2011 Attack and SPC Briseño-Alvarez's injuries and death, each member of the Briseño-Alvarez Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

3216.  As a result of the September 25, 2011 Attack, SPC Briseño-Alvarez was injured in his person and/or property.  The Plaintiff members of the Briseño-Alvarez Family are the survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages he sustained.

### The October 29, 2011 Suicide Attack In Kabul (David E. Cabrera, James M. Darrough, and Christopher R. Newman Families)

3217.  On October 29, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul Province, Afghanistan (the "October 29, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 29, 2011 Attack.

3218.   The October 29, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3219.   **Lieutenant Colonel David E. Cabrera** served in Afghanistan as a member of the U.S. Army.  LTC Cabrera was injured in the October 29, 2011 Attack.  LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the October 29, 2011 Attack.

3220.   LTC Cabrera was a U.S. national at the time of the attack and his death.

3221.   Plaintiff August Wildman is the widow of LTC Cabrera and a U.S. national.

3222.   Plaintiff Maxwell Cabrera is the son of LTC Cabrera and a U.S. national.

3223.   Plaintiff R.X.C., by and through his next friend August Wildman, is the minor son of LTC Cabrera. He is a U.S. national.

3224.   Plaintiff Corbin Cabrera is the son of LTC Cabrera and a U.S. national.

3225.   Plaintiff Gillian Cabrera is the daughter of LTC Cabrera and a U.S. national.

3226.   Plaintiff Ronald Hopkins is the brother of LTC Cabrera and a U.S. national.

3227.   Plaintiff Suzanne Martinez is the sister of LTC Cabrera and a U.S. national.

3228.   Plaintiff JD Prosser is the sister of LTC Cabrera and a U.S. national.

3229.   Plaintiff Robert Cabrera is the foster father of LTC Cabrera and a U.S. national. Mr. Cabrera lived in the same household as LTC Cabrera for a substantial period and considered LTC Cabrera the functional equivalent of a biological son.

3230.   Plaintiff Daniel Cabrera is the foster brother of LTC Cabrera and a U.S. national. Mr. Cabrera lived in the same household as LTC Cabrera for a substantial period and considered LTC Cabrera the functional equivalent of a biological brother.

3231.   Plaintiff Gloria Trelfa is the foster sister of LTC Cabrera and a U.S. national.  Ms. Trelfa lived in the same household as LTC Cabrera for a substantial period and considered LTC Cabrera the functional equivalent of a biological brother.

3232.   Plaintiff Robert Rivera is the foster brother of LTC Cabrera and a U.S. national.  Mr. Rivera lived in the same household as LTC Cabrera for a substantial period and considered LTC Cabrera the functional equivalent of a biological brother.

3233.   David Bean is the foster brother of LTC Cabrera and a U.S. national.  Mr. Bean lived in the same household as LTC Cabrera for a substantial period and considered LTC Cabrera the functional equivalent of a biological brother.

3234.   As a result of the October 29, 2011 Attack and LTC Cabrera's injuries and death, each member of the Cabrera Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Cabrera's society, companionship, and counsel.

3235.   As a result of the October 29, 2011 Attack, LTC Cabrera was injured in his person and/or property.  The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

3236.   **Sergeant James M. Darrough** served in Afghanistan as a member of the U.S. Army.  SGT Darrough was injured in the October 29, 2011 Attack.  SGT Darrough died on October 29, 2011 as a result of injuries sustained during the October 29, 2011 Attack.

3237.   SGT Darrough was a U.S. national at the time of the attack and his death.

3238.   Plaintiff Robert Darrough is the father of SGT Darrough and a U.S. national.

3239.   Plaintiff Judith Darrough is the stepmother of SGT Darrough and a U.S. national.  Ms. Darrough lived in the same household as SGT Darrough for a substantial period and considered SGT Darrough the functional equivalent of a biological son.

3240.  As a result of the October 29, 2011 Attack and SGT Darrough's injuries and death, each member of the Darrough Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Darrough's society, companionship, and counsel.

3241.  As a result of the October 29, 2011 Attack, SGT Darrough was injured in his person and/or property.  The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

3242.  **Staff Sergeant Christopher R. Newman** served in Afghanistan as a member of the U.S. Army.  SSG Newman was injured in the October 29, 2011 Attack.  SSG Newman died on October 29, 2011 as a result of injuries sustained during the October 29, 2011 Attack.

3243.  SSG Newman was a U.S. national at the time of the attack and his death.

3244.  Plaintiff Donald Newman Sr. is the grandfather of SSG Newman and a U.S. national.  Mr. Newman lived in the same household as SSG Newman for a substantial period and considered SSG Newman the functional equivalent of a biological son.

3245.  Plaintiff Amanda Newman is the widow of SSG Newman and a U.S. national.

3246.  As a result of the October 29, 2011 Attack and SSG Newman's injuries and death, each member of the Newman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Newman's society, companionship, and counsel.

3247.  As a result of the October 29, 2011 Attack, SSG Newman was injured in his person and/or property.  The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

**The December 11, 2011 IED Attack In Kunar (Charles S. Ligon Family)**

3248.  On December 11, 2011, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "December 11, 2011 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and

logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 11, 2011 Attack.

3249.   The December 11, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3250.   **Specialist Charles S. Ligon** served in Afghanistan as a member of the U.S. Army. SPC Ligon was injured in the December 11, 2011 Attack.  The attack severely wounded SPC Ligon, who lost his left leg above the knee, sustained shrapnel to the right leg with open tibia and fibula fractures, a left open eye globe rupture, left tympanic membrane rupture with traumatic brain injury, and peppering and burns to the left hand.  As a result of the December 11, 2011 Attack and his injuries, SPC Ligon has experienced severe mental anguish and severe physical and emotional pain and suffering.

3251.   SPC Ligon was a U.S. national at the time of the attack, and remains one today.

3252.   As a result of the December 11, 2011 Attack and SPC Ligon's injuries, each member of the Ligon Family has experienced severe mental anguish, emotional pain and suffering.

**The April 3, 2012 IED Attack In Kunar (Christopher L. Brown Family)**

3253.   On April 3, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kunar Province, Afghanistan (the "April 3, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 3, 2012 Attack.

3254.   The April 3, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3255.   **Staff Sergeant Christopher L. Brown** served in Afghanistan as a member of the U.S. Army.  SSG Brown was injured in the April 3, 2012 Attack.  SSG Brown died on April 3, 2012 as a result of injuries sustained during the April 3, 2012 Attack.

3256.   SSG Brown was a U.S. national at the time of the attack and his death.

3257.   Plaintiff Ariell Taylor is the widow of SSG Brown and a US national.  She brings claims in both her personal capacity and her representative capacity on behalf of SSG Brown's estate.

3258.   As a result of the April 3, 2012 Attack and SSG Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Brown's society, companionship, and counsel.

3259.   As a result of the April 3, 2012 Attack, SSG Brown was injured in his person and/or property.  The Plaintiff members of the Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

### The April 4, 2012 Suicide Bombing Attack In Faryab (Nicholas J. Rozanski, Christopher J. Rosebrock, and David W.H. Lau Families)

3260.   On April 4, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bomb attack in Faryab Province, Afghanistan (the "April 4, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 4, 2012 Attack.

3261.   The April 4, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3262.  **Captain Nicholas J. Rozanski** served in Afghanistan as a member of the U.S. Army National Guard.  CPT Rozanski was injured in the April 4, 2012 Attack.  CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the April 4, 2012 Attack.

3263.  CPT Rozanski was a U.S. national at the time of the attack and his death.

3264.  Plaintiff Alex Rozanski is the brother of CPT Rozanski and a U.S. national.

3265.  As a result of the April 4, 2012 Attack and CPT Rozanski's injuries and death, each member of the Rozanski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Rozanski's society, companionship, and counsel.

3266.  As a result of the April 4, 2012 Attack, CPT Rozanski was injured in his person and/or property.  The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

3267.  **Captain Christopher J. Rosebrock** served in Afghanistan as a member of the U.S. Army National Guard. CPT Rosebrock was injured in the April 4, 2012 Attack.  The attack severely wounded CPT Rosebrock, who suffered a shattered radius of the left arm, a concussion, blown eardrums, disfiguring shrapnel wounds, and traumatic brain injury.  As a result of the April 4, 2012 Attack and his injuries, CPT Rosebrock has experienced severe mental anguish and severe physical and emotional pain and suffering.

3268.  CPT Rosebrock was a U.S. national when attacked, and remains one today.

3269.  As a result of the April 4, 2012 Attack and CPT Rosebrock's injuries, each member of the Rosebrock Family has experienced severe mental anguish, emotional pain and suffering.

3270.   **Sergeant First Class David W.H. Lau** served in Afghanistan as a member of the U.S. Army National Guard.  SFC Lau was injured in the April 4, 2012 Attack, and suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings.  As a result of the Attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

3271.   Plaintiff SFC Lau was a U.S. national when attacked, and remains one today.

3272.   Plaintiff Hamide Lau is the wife of SFC Lau and a U.S. national.

3273.   Plaintiff M.L., by and through her next friend David Lau, is the minor daughter of SFC Lau. She is a U.S. national.

3274.   Plaintiff K.L., by and through his next friend David Lau, is the minor son of SFC Lau. He is a U.S. national.

3275.   Plaintiff Alexander Lau is the son of SFC Lau and a U.S. national.

3276.   Plaintiff Vivian Perry is the mother of SFC Lau and a U.S. national.

3277.   Plaintiff Jammie Smith is the sister of SFC Lau and a U.S. national.

3278.   Plaintiff Michelle Rauschenberger is the sister of SFC Lau and a U.S. national.

3279.   Plaintiff Leroy Lau Jr. is the brother of SFC Lau and a U.S. national.

3280.   Plaintiff Holly Abraham is the sister of SFC Lau and a U.S. national.

3281.   As a result of the April 4, 2012 Attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

**The April 22, 2012 IED Attack In Ghazni (Michael J. Metcalf Family)**

3282.   On April 22, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "April 22, 2012 Attack"), which

was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the April 22, 2012 Attack.

3283.   The April 22, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3284.   **Private First Class Michael J. Metcalf** served in Afghanistan as a member of the U.S. Army.  PFC Metcalf was injured in the April 22, 2012 Attack.  PFC Metcalf died on April 22, 2012 as a result of injuries sustained during the April 22, 2012 Attack.

3285.   PFC Metcalf was a U.S. national at the time of the attack and his death.

3286.   Plaintiff Kimberly Metcalf is the mother of PFC Metcalf and a U.S. national.

3287.   Plaintiff Clarence Metcalf is the father of PFC Metcalf and a U.S. national.

3288.   As a result of the April 22, 2012 Attack and PFC Metcalf's injuries and death, each member of the Metcalf Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Metcalf's society, companionship, and counsel.

3289.   As a result of the April 22, 2012 Attack, PFC Metcalf was injured in his person and/or property.  The Plaintiff members of the Metcalf Family are the survivors and/or heirs of PFC Metcalf and are entitled to recover for the damages PFC Metcalf sustained.

### The May 7, 2012 IED Attack In Ghazni (Chase S. Marta and Jacob M. Schwallie Families)

3290.   On May 7, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "May 7, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 7, 2012 Attack.

3291.   The May 7, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3292.   **Specialist Chase S. Marta** served in Afghanistan as a member of the U.S. Army. SPC Marta was injured in the May 7, 2012 Attack.  SPC Marta died on May 7, 2012 as a result of injuries sustained during the May 7, 2012 Attack.

3293.   SPC Marta was a U.S. national at the time of the attack and his death.

3294.   Plaintiff Karyn Stone is the mother of SPC Marta and a U.S. national.

3295.   Plaintiff Lawrence Marta is the father of SPC Marta and a U.S. national.

3296.   Plaintiff Taylor Marta is the sister of SPC Marta and a U.S. national.

3297.   As a result of the May 7, 2012 Attack and SPC Marta's injuries and death, each member of the Marta Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Marta's society, companionship, and counsel.

3298.   As a result of the May 7, 2012 Attack, SPC Marta was injured in his person and/or property.  The Plaintiff members of the Marta Family are the survivors and/or heirs of SPC Marta and are entitled to recover for the damages SPC Marta sustained.

3299.   **Sergeant Jacob M. Schwallie** served in Afghanistan as a member of the U.S. Army. SGT Schwallie was injured in the May 7, 2012 Attack.  SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the May 7, 2012 Attack.

3300.   SGT Schwallie was a U.S. national at the time of the attack and his death.

3301.   Plaintiff Sarah Schwallie is the mother of SGT Schwallie and a U.S. national.

3302.   Plaintiff Thomas Schwallie is the father of SGT Schwallie and a U.S. national.

3303.   As a result of the May 7, 2012 Attack and SGT Schwallie's injuries and death, each member of the Schwallie Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Schwallie's society, companionship, and counsel.

3304.   As a result of the May 7, 2012 Attack, SGT Schwallie was injured in his person and/or property.  The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

**The May 20, 2012 Suicide Attack In Uruzgan (Ryan G. Timoney Family)**

3305.   On May 20, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Uruzgan Province, Afghanistan (the "May 20, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 20, 2012 Attack.

3306.   The May 20, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3307.   **Captain Ryan G. Timoney** served in Afghanistan as a member of the U.S. Army. CPT Timoney was injured in the May 20, 2012 Attack.  The attack severely wounded CPT Timoney, who lost his left leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty.  As a result of the May 20, 2012 Attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

3308.   Plaintiff CPT Timoney was a U.S. national when attacked, and remains one today.

3309.   Plaintiff Diane Timoney is the mother of CPT Timoney and a U.S. national.

3310.   Plaintiff Gregory Timoney is the father of CPT Timoney and a U.S. national.

3311.   As a result of the May 20, 2012 Attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**The June 1, 2012 Complex Attack In Khost (Vincent J. Ellis Family)**

3312.   On June 1, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost Province, Afghanistan (the "June 1, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 1, 2012 Attack.

3313.   The June 1, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3314.   **Private First Class Vincent J. Ellis** served in Afghanistan as a member of the U.S. Army.  PFC Ellis was injured in the June 1, 2012 Attack.  PFC Ellis died on June 4, 2012 as a result of injuries sustained during the June 1, 2012 Attack.

3315.   PFC Ellis was a U.S. national at the time of the attack and his death.

3316.   Plaintiff Julie Ellis is the mother of PFC Ellis and a U.S. national.

3317.   Plaintiff Brian Ellis is the father of PFC Ellis and a U.S. national.

3318.   Plaintiff Vanessa Anzures is the sister of PFC Ellis and a U.S. national.

3319.   Plaintiff Victor Ellis is the brother of PFC Ellis and a U.S. national.

3320.   As a result of the June 1, 2012 Attack and PFC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Ellis's society, companionship, and counsel.

3321.   As a result of the June 1, 2012 Attack, PFC Ellis was injured in his person and/or property.  The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

**The July 8, 2012 IED Attack In Ghazni (Nathan J. Rimpf Family)**

3322.   On July 8, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Ghazni Province, Afghanistan (the "July 8, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 8, 2012 Attack.

3323.   The July 8, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3324.   **First Lieutenant Nathan J. Rimpf** served in Afghanistan as a member of the U.S. Army. 1LT Rimpf suffered injuries from the July 8, 2012 Attack, including the loss of left leg below the knee and right leg above the knee, and partial paralysis of right scapula.  As a result of the July 8, 2012 Attack and his injuries, 1LT Rimpf has experienced severe mental anguish and severe physical and emotional pain and suffering.

3325.   Plaintiff 1LT Rimpf was a U.S. national at the time of the attack, and remains one today.

**The August 8, 2012 Suicide Attack In Kunar (Kevin J. Griffin Family)**

3326.   On August 8, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kunar Province, Afghanistan (the "August 8, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.   Al-Qaeda planned and authorized the August 8, 2012 Attack.

3327.   The August 8, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3328.   **Command Sergeant Major Kevin J. Griffin** served in Afghanistan as a member of the U.S. Army.   CSM Griffin was injured in the August 8, 2012 Attack.   CSM Griffin died on August 8, 2012 as a result of injuries sustained during the August 8, 2012 Attack.

3329.   CSM Griffin was a U.S. national at the time of the attack and his death.

3330.   Plaintiff Sheila Ristaino is the sister of CSM Griffin and a U.S. national.

3331.   Plaintiff Shawn Griffin is the brother of CSM Griffin and a U.S. national.

3332.   Plaintiff Carol Griffin is the stepmother of CSM Griffin and a U.S. national. Ms. Griffin lived in the same household as CSM Griffin for a substantial period and considered CSM Griffin the functional equivalent of a biological son.

3333.   Plaintiff Daniel Griffin is the stepbrother of CSM Griffin and a U.S. national.   Mr. Griffin lived in the same household as CSM Griffin for a substantial period and considered CSM Griffin the functional equivalent of a biological brother.

3334.   Plaintiff Matt Griffin is the brother of CSM Griffin and a U.S. national.

3335.   As a result of the August 8, 2012 Attack and CSM Griffin's injuries and death, each member of the Griffin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CSM Griffin's society, companionship, and counsel.

3336.   As a result of the August 8, 2012 Attack, CSM Griffin was injured in his person and/or property.  The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

**The August 11, 2012 IED Attack In Helmand Province (Mark G. Worley Family)**

3337.   On August 11, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Helmand Province, Afghanistan (the "August 11, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 11, 2012 Attack.

3338.   The August 11, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3339.   **Sergeant Mark G. Worley** served in Afghanistan as a member of the U.S. Army. SGT Worley suffered injuries in the August 11, 2012 Attack, including an amputation of his right leg below the knee, nerve damage in his left leg with dropfoot, and a deep laceration to his right forearm.  As a result of the August 11, 2012 Attack and his injuries, SGT Worley has experienced severe physical and emotional pain and suffering.

3340.   Plaintiff SGT Worley was a U.S. national at the time of the attack, and remains one to this day.

3341.   Plaintiff Mona Betzen is the mother of SGT Worley and a U.S. national.

3342.   Plaintiff Gregory Worley is the father of SGT Worley and a U.S. national.

3343.   Plaintiff James Worley is the brother of SGT Worley and a U.S. national.

3344.   Plaintiff Cody Worley is the brother of SGT Worley and a U.S. national.

3345.   As a result of the August 11, 2012 Attack and SGT Worley's injuries, each member of the Worley Family has experienced severe mental anguish, emotional pain and suffering.

### The September 1, 2012 Complex Attack In Ghazni (Jeremie S. Border and Jonathan P. Schmidt Families)

3346.   On September 1, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan (the "September 1, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the September 1, 2012 Attack.

3347.   The September 1, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3348.   **Staff Sergeant Jeremie S. Border** served in Afghanistan as a member of the U.S. Army. SSG Border was injured in the September 1, 2012 Attack. SSG Border died on September 1, 2012 as a result of injuries sustained during the September 1, 2012 Attack.

3349.   SSG Border was a U.S. national at the time of the attack and his death.

3350.   Plaintiff Mary Border is the mother of SSG Border and a U.S. national.

3351.   Plaintiff Katherine Abreu-Border is the sister of SSG Border and a U.S. national.

3352.   Plaintiff DeLaynie Peek is the sister of SSG Border and a U.S. national.

3353.   As a result of the September 1, 2012 Attack and SSG Border's injuries and death, each member of the Border Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Border's society, companionship, and counsel.

3354.   As a result of the September 1, 2012 Attack, SSG Border was injured in his person and/or property.  The Plaintiff members of the Border Family are the survivors and/or heirs of SSG Border and are entitled to recover for the damages SSG Border sustained.

3355.   **Staff Sergeant Jonathan P. Schmidt** served in Afghanistan as a member of the U.S. Army. SSG Schmidt was injured in the September 1, 2012 Attack.  SSG Schmidt died on September 1, 2012 as a result of injuries sustained during the September 1, 2012 Attack.

3356.   SSG Schmidt was a U.S. national at the time of the attack and his death.

3357.   Plaintiff Natalie Schmidt is the widow of SSG Schmidt and a U.S. national.

3358.   Plaintiff A.L.S., by and through his next friend Natalie Schmidt, is the minor son of SSG Schmidt. He is a U.S. national.

3359.   Plaintiff Lee Ann Schmidt is the mother of SSG Schmidt and a U.S. national.

3360.   Plaintiff Phillip Schmidt is the father of SSG Schmidt and a U.S. national.

3361.   Plaintiff Brandon Schmidt is the brother of SSG Schmidt and a U.S. national.

3362.   As a result of the September 1, 2012 attack and SSG Schmidt's injuries and death, each member of the Schmidt Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schmidt's society, companionship, and counsel.

3363.   As a result of the September 1, 2012 attack, SSG Schmidt was injured in his person and/or property.  The Plaintiff members of the Schmidt Family are the survivors and/or heirs of SSG Schmidt and are entitled to recover for the damages SSG Schmidt sustained.

### The September 15, 2012 Complex Attack In Helmand Province (Bradley W. Atwell And Christopher K. Raible Families)

3364.   On September 15, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan (the "September 15, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 15, 2012 Attack.

3365.   The September 15, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3366.   **Sergeant Bradley W. Atwell** served in Afghanistan as a member of the  U.S. Marine Corps. Sgt Atwell was injured in the September 15, 2012 Attack. Sgt Atwell died on September 15, 2012 as a result of injuries sustained during the September 15, 2012 Attack.

3367.   Sgt Atwell was a U.S. national at the time of the attack and his death.

3368.   Plaintiff Cheryl Atwell is the mother of Sgt Atwell and a U.S. national.

3369.   Plaintiff Erin Riedel is the sister of Sgt Atwell and a U.S. national.

3370.   As a result of the September 15, 2012 attack and Sgt Atwell's injuries and death, each member of the Atwell Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Atwell's society, companionship, and counsel.

3371.   As a result of the September 15, 2012 attack, Sgt Atwell was injured in his person and/or property.  The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

3372.   **Lieutenant Colonel Christopher K. Raible** served in Afghanistan as a member of the U.S. Marine Corps.  LtCol Raible was injured in the September 15, 2012 Attack.  LtCol Raible died on September 15, 2012 as a result of injuries sustained during the September 15, 2012 Attack.

3373.   LtCol Raible was a U.S. national at the time of the attack and his death.

3374.   Plaintiff Lona Gambone is the sister of LtCol Raible and a U.S. national.

3375.   As a result of the September 15, 2012 attack and LtCol Raible's injuries and death, each member of the Raible Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LtCol Raible's society, companionship, and counsel.

3376.   As a result of the September 15, 2012 attack, LtCol Raible was injured in his person and/or property.  The Plaintiff members of the Raible Family are the survivors and/or heirs of LtCol Raible and are entitled to recover for the damages LtCol Raible sustained.

### The September 26, 2012 Suicide Attack In Logar (Jonathan A. Gollnitz and Orion N. Sparks Families)

3377.   On September 26, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Logar Province, Afghanistan (the "September 26, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 26, 2012 Attack.

3378.   The September 26, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3379.   **Sergeant Jonathan A. Gollnitz** served in Afghanistan as a member of the U.S. Army. SGT Gollnitz was injured in the September 26, 2012 Attack.   SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the September 26, 2012 Attack.

3380.   SGT Gollnitz was a U.S. national at the time of the attack and his death.

3381.   Plaintiff L.D., by and through his next friend Bridgett DeHoff, is the minor son of SGT Gollnitz. He is a U.S. national.

3382.   Plaintiff Kirk Gollnitz is the brother of SGT Gollnitz and a U.S. national.

3383.   Plaintiff Tyler Gollnitz is the brother of SGT Gollnitz and a U.S. national.

3384.   As a result of the September 26, 2012 Attack and SGT Gollnitz's injuries and death, each member of the Gollnitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gollnitz's society, companionship, and counsel.

3385.   As a result of the September 26, 2012 Attack, SGT Gollnitz was injured in his person and/or property.   The Plaintiff members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

3386.   **Staff Sergeant Orion N. Sparks** served in Afghanistan as a member of the U.S. Army.  SSG Sparks was injured in the September 26, 2012 Attack.  SSG Sparks died on September 26, 2012 as a result of injuries sustained during the September 26, 2012 Attack.

3387.   SSG Sparks was a U.S. national at the time of the attack and his death.

3388.   Plaintiff Jan Hurnblad Sparks is the mother of SSG Sparks and a U.S. national.

3389.   Plaintiff Garry Sparks is the father of SSG Sparks and a U.S. national.

3390.   Plaintiff Erik Sparks is the brother of SSG Sparks and a U.S. national.

3391.   Plaintiff Zachary Sparks is the brother of SSG Sparks and a U.S. national.

3392.   Plaintiff Jane Sparks is the stepmother of SSG Sparks and a U.S. national.  Ms. Sparks lived in the same household as SSG Sparks for a substantial period and considered SSG Sparks the functional equivalent of a biological son.

3393.   As a result of the September 26, 2012 Attack and SSG Sparks's injuries and death, each member of the Sparks Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Sparks's society, companionship, and counsel.

3394.   As a result of the September 26, 2012 Attack, SSG Sparks was injured in his person and/or property.  The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

### The September 30, 2012 IED Attack In Kandahar Province (Cameron J. Stuart Family)

3395.   On September 30, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "September 30, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 30, 2012 Attack.

3396.   The September 30, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3397.   **Sergeant Cameron J. Stuart** served in Afghanistan as a member of the U.S. Army. SGT Stuart suffered injuries in the September 30, 2012 Attack, including severe damage to his left leg, which required several reconstructive surgeries.  As a result of the September 30, 2012 Attack and his injuries, SGT Stuart has experienced severe physical and emotional pain and suffering.

3398.   Plaintiff SGT Stuart was a U.S. national at the time of the attack, and remains one to this day.

3399.   Plaintiff Katy Stuart is the wife of SGT Stuart and a U.S. national.

3400.   As a result of the September 30, 2012 Attack and SGT Stuart's injuries, each member of the Stuart Family has experienced severe mental anguish, emotional pain and suffering.

**The October 1, 2012 Suicide Attack In Khost (Jeremy F. Hardison Family)**

3401.   On October 1, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack by an individual wearing an Afghan police uniform in Khost Province, Afghanistan (the "October 1, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 1, 2012 Attack.

3402.   The October 1, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3403.   **Sergeant Jeremy F. Hardison** served in Afghanistan as a member of the U.S. Army National Guard. SGT Hardison was injured in the October 1, 2012 Attack.  SGT Hardison died on October 1, 2012 as a result of injuries sustained during the October 1, 2012 Attack.

3404.   SGT Hardison was a U.S. national at the time of the attack and his death.

3405.   Plaintiff Jerry Hardison is the father of SGT Hardison and a U.S. national.

3406.   Plaintiff Justina Hardison is the sister of SGT Hardison and a U.S. national.

3407.   As a result of the October 1, 2012 Attack and SGT Hardison's injuries and death, each member of the Hardison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hardison's society, companionship, and counsel.

3408.   As a result of the October 1, 2012 Attack, SGT Hardison was injured in his person and/or property.  The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

**The October 13, 2012 IED Attack In Zabul Province (Brittany B. Gordon Family)**

3409.   On October 13, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Zabul Province, Afghanistan (the "October 13, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 13, 2012 Attack.

3410.   The October 13, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3411.   **Specialist Brittany B. Gordon** served in Afghanistan as a member of the U.S. Army.  SPC Gordon was injured in the October 13, 2012 Attack.  SPC Gordon died on October 13, 2012 as a result of injuries sustained during the October 13, 2012 Attack.

3412.   SPC Gordon was a U.S. national at the time of the attack and his death.

3413.   Plaintiff Cedric Gordon is the father of SPC Gordon and a U.S. national.

3414.   Plaintiff Adrian Sherrod is the brother of SPC Gordon and a U.S. national.

3415.   Plaintiff Conchetta Diaz is the sister of SPC Gordon and a U.S. national.

3416.   Plaintiff Cedric Gordon Sr. is the brother of SPC Gordon and a U.S. national.

3417.   As a result of the October 13, 2012 attack and SPC Gordon's injuries and death, each member of the Gordon Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gordon's society, companionship, and counsel.

3418.   As a result of the October 13, 2012 attack, SPC Gordon was injured in his person and/or property.  The Plaintiff members of the Gordon Family are the survivors and/or heirs of SPC Gordon and are entitled to recover for the damages SPC Gordon sustained.

**The October 22, 2012 IED Attack In Kandahar Province (Edward W. Klein Family)**

3419.   On October 22, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 22, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the October 22, 2012 Attack.

3420.   The October 22, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3421.   **Major Edward W. Klein** served in Afghanistan as a member of the U.S. Army. MAJ Klein suffered injuries in the October 22, 2012 Attack, including the loss of both legs above the knee, his right arm, and three fingers on his left hand.  As a result of the October 22, 2012 Attack and his injuries, MAJ Klein has experienced severe physical and emotional pain and suffering.

3422.   Plaintiff MAJ Klein was a U.S. national at the time of the attack, and remains one to this day.

709

**The November 3, 2012 IED Attack In Paktia Province (Ryan P. Jayne Family)**

3423.   On November 3, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Paktia Province, Afghanistan (the "November 3, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.   Al-Qaeda planned and authorized the November 3, 2012 Attack.

3424.   The November 3, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3425.   **Specialist Ryan P. Jayne** served in Afghanistan as a member of the U.S. Army Reserve.  SPC Jayne was injured in the November 3, 2012 Attack.  SPC Jayne died on November 3, 2012 as a result of injuries sustained during the Attack.

3426.   SPC Jayne was a U.S. national at the time of the attack and his death.

3427.   Plaintiff Sherry Skeens is the mother of SPC Jayne and a U.S. national.

3428.   Plaintiff Paul Jayne is the father of SPC Jayne and a U.S. national.

3429.   Plaintiff Adam Jayne is the brother of SPC Jayne and a U.S. national.

3430.   Plaintiff Garrett Skeens is the brother of SPC Jayne and a U.S. national.

3431.   Plaintiff Ayzia Jayne is the sister of SPC Jayne and a U.S. national.

3432.   Plaintiff Z.S., by and through her next friend Kent Skeens, is the minor sister of SPC Jayne. She is a U.S. national.

3433.   Plaintiff Trent Skeens is the brother of SPC Jayne and a U.S. national.

3434.   Plaintiff Kent Skeens is the stepfather of SPC Jayne and a U.S. national. Mr.
Skeens lived in the same household as SPC Jayne for a substantial period and considered SPC
Jayne the functional equivalent of a biological son.

3435.   As a result of the November 3, 2012 attack and SPC Jayne's injuries and death,
each member of the Jayne Family has experienced severe mental anguish, emotional pain and
suffering, and the loss of SPC Jayne's society, companionship, and counsel.

3436.   As a result of the November 3, 2012 attack, SPC Jayne was injured in his person
and/or property.  The Plaintiff members of the Jayne Family are the survivors and/or heirs of
SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

### The November 16, 2012 Complex Attack In Paktika Province (Joseph A. Richardson Family)

3437.   On November 16, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban
committed a complex attack involving an IED and small arms fire in Paktika Province,
Afghanistan (the "November 16, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's
provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-
Qaeda planned and authorized the November 16, 2012 Attack.

3438.   The November 16, 2012 Attack would have violated the laws of war if these
terrorists were subject to them because, among other reasons, the terrorist(s) who committed the
attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the
IED's passive detonation system indiscriminately placed civilians at risk.

3439.   **Sergeant Joseph A. Richardson** served in Afghanistan as a member of the U.S.
Army.  SGT Richardson was injured in the November 16, 2012 Attack.  SGT Richardson died on
November 16, 2012 as a result of injuries sustained during the Attack.

3440.   SGT Richardson was a U.S. national at the time of the attack and his death.

3441.   Plaintiff Cassie Richardson is the sister of SGT Richardson and a U.S. national.

3442.   As a result of the November 16, 2012 attack and SGT Richardson's injuries and death, each member of the Richardson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Richardson's society, companionship, and counsel.

3443.   As a result of the November 16, 2012 attack, SGT Richardson was injured in his person and/or property.  The Plaintiff members of the Richardson Family are the survivors and/or heirs of SGT Richardson and are entitled to recover for the damages he sustained.

**The November 18, 2012 IED Attack In Helmand Province (Dale W. Means Family)**

3444.   On November 18, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Helmand Province, Afghanistan (the "November 18, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 18, 2012 Attack.

3445.   The November 18, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3446.   **Lance Corporal Dale W. Means** served in Afghanistan as a member of the U.S. Marine Corps.  LCpl Means was injured in the November 18, 2012 Attack.  LCpl Means died on November 18, 2012 as a result of injuries sustained during the November 18, 2012 Attack.

3447.   LCpl Means was a U.S. national at the time of the attack and his death.

3448.   Plaintiff John Means is the father of LCpl Means and a U.S. national.

3449.   As a result of the November 18, 2012 attack and LCpl Means's injuries and death, each member of the Means Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LCpl Means's society, companionship, and counsel.

3450.   As a result of the November 18, 2012 attack, LCpl Means was injured in his person and/or property.  The Plaintiff members of the Means Family are the survivors and/or heirs of LCpl Means and are entitled to recover for the damages LCpl Means sustained.

**The December 15, 2012 IED Attack In Kabul (Mark H. Schoonhoven Family)**

3451.   On December 15, 2012, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "December 15, 2012 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 15, 2012 Attack.

3452.   The December 15, 2012 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3453.   **Staff Sergeant Mark H. Schoonhoven** served in Afghanistan as a member of the U.S. Army. SSG Schoonhoven was injured in the December 15, 2012 Attack.  SSG Schoonhoven died on January 20, 2013 as a result of injuries sustained during the December 15, 2012 Attack.

3454.   SSG Schoonhoven was a U.S. national at the time of the attack and his death.

3455.   Plaintiff Tammie Schoonhoven is the widow of SSG Schoonhoven and a U.S. national.

3456.   Plaintiff A.R.S., by and through her next friend Tammie Schoonhoven, is the minor daughter of SSG Schoonhoven. She is a U.S. national.

3457.   Plaintiff A.M.S., by and through her next friend Tammie Schoonhoven, is the minor daughter of SSG Schoonhoven. She is a U.S. national.

3458.   Plaintiff Deborah Schoonhoven is the mother of SSG Schoonhoven and a U.S. national.

3459.   Plaintiff Christopher Schoonhoven is the brother of SSG Schoonhoven and a U.S. national.

3460.   Plaintiff Sheeshta Perry is the stepdaughter of SSG Schoonhoven and a U.S. national.  Ms. Perry lived in the same household as SSG Schoonhoven for a substantial period and considered SSG Schoonhoven the functional equivalent of a biological father.

3461.   As a result of the December 15, 2012 Attack and SSG Schoonhoven's injuries and death, each member of the Schoonhoven Family has experienced severe mental anguish, emotional pain and suffering, and the loss of his society, companionship, and counsel.

3462.   As a result of the December 15, 2012 Attack, SSG Schoonhoven was injured in his person and/or property.  The Plaintiff members of the Schoonhoven Family are the survivors and/or heirs of SSG Schoonhoven and are entitled to recover for the damages he sustained.

**The February 22, 2013 IED Attack In Helmand Province (Jonathan D. Davis Family)**

3463.   On February 22, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Helmand Province, Afghanistan (the "February 22, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 22, 2013 Attack.

3464.   The February 22, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3465.   **Staff Sergeant Jonathan D. Davis** served in Afghanistan as a member of the U.S. Marine Corps.  SSgt Davis was injured in the February 22, 2013 Attack.  SSgt Davis died on February 22, 2013 as a result of injuries sustained during the Attack.

3466.   SSgt Davis was a U.S. national at the time of the attack and his death.

3467.   Plaintiff Helena Davis is the widow of SSgt Davis and a U.S. national.

3468.   Plaintiff C.D., by and through his next friend Helena Davis, is the minor son of SSgt Davis. He is a U.S. national.

3469.   As a result of the February 22, 2013 attack and SSgt Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Davis's society, companionship, and counsel.

3470.   As a result of the February 22, 2013 attack, SSgt Davis was injured in his person and/or property.  The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

**The March 11, 2013 Insider Attack In Wardak (Rex L. Schad Family)**

3471.   On March 11, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an insider attack in Wardak, Afghanistan (the "March 11, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the March 11, 2013 Attack.

3472.   The March 11, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3473.   **Staff Sergeant Rex L. Schad** served in Afghanistan as a member of the U.S. Army. SSG Schad was injured in the March 11, 2013 Attack.  SSG Schad died on March 11, 2013 as a result of injuries sustained during the March 11, 2013 Attack.

3474.   SSG Schad was a U.S. national at the time of the attack and his death.

3475.   Plaintiff Colleen Whipple is the mother of SSG Schad and a U.S. national.

3476.   As a result of the March 11, 2013 Attack and SSG Schad's injuries and death, each member of the Schad Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Schad's society, companionship, and counsel.

3477.   As a result of the March 11, 2013 Attack, SSG Schad was injured in his person and/or property.  The Plaintiff members of the Schad Family are the survivors and/or heirs of SSG Schad and are entitled to recover for the damages SSG Schad sustained.

### The March 17, 2013 IED Attack In Kandahar Province (Samuel R. Shockley Family)

3478.   On March 17, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "March 17, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the March 17, 2013 Attack.

3479.   The March 17, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3480.   **Staff Sergeant Samuel R. Shockley** served in Afghanistan as a member of the U.S. Army.  SSG Shockley was injured in the March 17, 2013 Attack. The attackseverely wounded

SSG Shockley, who lost both legs above the knee, lost his middle finger and index finger on his right hand, required a skin graft on his right arm from his elbow to his wrist, and lost a testicle. As a result of the March 17, 2013 Attack and his injuries, SSG Shockley has experienced severe physical and emotional pain and suffering.

3481.   Plaintiff SSG Shockley was a U.S. national when attacked, and remains so today.

3482.   As a result of the March 17, 2013 Attack and SSG Shockley's injuries, each Shockley Family member has experienced severe mental anguish, emotional pain and suffering.

**The April 6, 2013 Suicide Attack In Zabul (Anne T. Smedinghoff Family)**

3483.   On April 6, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Zabul Province, Afghanistan (the "April 6, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the April 6, 2013 Attack.

3484.   The April 6, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3485.   **Anne T. Smedinghoff** served in Afghanistan as a U.S. Foreign Service Officer working for the U.S. Department of State.

3486.   Ms. Smedinghoff was injured in the April 6, 2013 Attack. Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the April 6, 2013 Attack.

3487.   Ms. Smedinghoff was a U.S. national at the time of the attack and her death.

3488.   Plaintiff Mary Smedinghoff is the mother of Ms. Smedinghoff and a U.S. national.

3489.   Plaintiff Thomas Smedinghoff is the father of Ms. Smedinghoff and a U.S. national.

3490.   Plaintiff Regina Smedinghoff is the sister of Ms. Smedinghoff and a U.S. national.

3491.   Plaintiff Joan Smedinghoff is the sister of Ms. Smedinghoff and a U.S. national.

3492.   Plaintiff Mark Smedinghoff is the brother of Ms. Smedinghoff and a U.S. national.

3493.   As a result of the April 6, 2013 Attack and Ms. Smedinghoff's injuries and death, each member of the Smedinghoff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Smedinghoff's society, companionship, and counsel.

3494.   As a result of the April 6, 2013 Attack, Ms. Smedinghoff was injured in her person and/or property.  The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages she sustained.

### The May 4, 2013 IED Attack In Kandahar (Brandon J. Landrum, Brandon J. Prescott, Francis G. Phillips IV, Kevin Cardoza, and Thomas P. Murach Families)

3495.   On May 4, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 4, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 4, 2013 Attack.

3496.   The May 4, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3497.   **First Lieutenant Brandon J. Landrum** served in Afghanistan as a member of the U.S. Army.  1LT Landrum was injured in the May 4, 2013 Attack.  1LT Landrum died on May 4, 2013 as a result of injuries sustained during the Attack.

3498.   1LT Landrum was a U.S. national at the time of the attack and his death.

3499.   Plaintiff Miranda Landrum is the widow of 1LT Landrum and a U.S. national.

3500.   Plaintiff G.L., by and through his next friend Miranda Landrum, is the minor son of 1LT Landrum. He is a U.S. national.

3501.   Plaintiff B.L., by and through her next friend Miranda Landrum, is the minor daughter of 1LT Landrum. She is a U.S. national.

3502.   Plaintiff Janet Landrum is the mother of 1LT Landrum and a U.S. national.

3503.   Plaintiff James Landrum is the father of 1LT Landrum and a U.S. national.

3504.   As a result of the May 4, 2013 attack and 1LT Landrum's injuries and death, each member of the Landrum Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Landrum's society, companionship, and counsel.

3505.   As a result of the May 4, 2013 attack, 1LT Landrum was injured in his person and/or property.  The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages he sustained.

3506.   **Specialist Brandon J. Prescott** served in Afghanistan as a member of the U.S. Army.  SPC Prescott was injured in the May 4, 2013 Attack.  SPC Prescott died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack.

3507.   SPC Prescott was a U.S. national at the time of the attack and his death.

3508.   Plaintiff Tracey Prescott is the mother of SPC Prescott and a Canadian citizen residing in California.

3509.   Plaintiff Jacob Prescott is the brother of SPC Prescott and a U.S. national.

3510.   Plaintiff Aaron Prescott is the brother of SPC Prescott and a U.S. national.

3511.   Plaintiff Joshua Prescott is the brother of SPC Prescott and a U.S. national.

3512.   Plaintiff Joseph Prescott is the father of SPC Prescott and a U.S. national.

3513.   As a result of the May 4, 2013 attack and SPC Prescott's injuries and death, each member of the Prescott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Prescott's society, companionship, and counsel.

3514.   As a result of the May 4, 2013 attack, SPC Prescott was injured in his person and/or property.  The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

3515.   **Staff Sergeant Francis G. Phillips IV** served in Afghanistan as a member of the U.S. Army.  SSG Phillips was injured in the May 4, 2013 Attack.  SSG Phillips died on May 4, 2013 as a result of injuries sustained during the Attack.

3516.   SSG Phillips was a U.S. national at the time of the attack and his death.

3517.   Plaintiff Christine Phillips is the widow of SSG Phillips and a U.S. national.

3518.   Plaintiff S.P., by and through her next friend Christine Phillips, is the minor daughter of SSG Phillips. She is a U.S. national.

3519.   As a result of the May 4, 2013 attack and SSG Phillips's injuries and death, each member of the Phillips Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Phillips's society, companionship, and counsel.

3520.   As a result of the May 4, 2013 attack, SSG Phillips was injured in his person and/or property.  The Plaintiff members of the Phillips Family are the survivors and/or heirs of SSG Phillips and are entitled to recover for the damages SSG Phillips sustained.

3521.   **Specialist Kevin Cardoza** served in Afghanistan as a member of the U.S. Army. SPC Cardoza was injured in the May 4, 2013 Attack.  SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack.

3522.   SPC Cardoza was a U.S. national at the time of the attack and his death.

3523.   Plaintiff Maria Cardoza is the mother of SPC Cardoza and a U.S. national.

3524.   Plaintiff Ramiro Cardoza Sr. is the father of SPC Cardoza and a U.S. national.

3525.   Plaintiff Ramiro Cardoza Jr. is the brother of SPC Cardoza and a U.S. national.

3526.   As a result of the May 4, 2013 attack and SPC Cardoza's injuries and death, each member of the Cardoza Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Cardoza's society, companionship, and counsel.

3527.   As a result of the May 4, 2013 attack, SPC Cardoza was injured in his person and/or property.  The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and are entitled to recover for the damages SPC Cardoza sustained.

3528.   **Specialist Thomas P. Murach** served in Afghanistan as a member of the U.S. Army.  SPC Murach was injured in the May 4, 2013 Attack.  SPC Murach died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack.

3529.   SPC Murach was a U.S. national at the time of the attack and his death.

3530.   Plaintiff Chet Murach is the father of SPC Murach and a U.S. national.

3531.   Plaintiff William Murach is the brother of SPC Murach and a U.S. national.

3532.   As a result of the May 4, 2013 attack and SPC Murach's injuries and death, each member of the Murach Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Murach's society, companionship, and counsel.

3533.   As a result of the May 4, 2013 attack, SPC Murach was injured in his person and/or property.  The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

### The May 14, 2013 IED Attack In Kandahar (Mitchell K. Daehling, William J. Gilbert, and Adam S. Hartswick Families)

3534.   On May 14, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 14, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 14, 2013 Attack.

3535.   The May 14, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3536.   **Specialist Mitchell K. Daehling** served in Afghanistan as a member of the U.S. Army.  SPC Daehling was injured in the May 14, 2013 Attack.  SPC Daehling died on May 14, 2013 as a result of injuries sustained during the May 14, 2013 Attack.

3537.   SPC Daehling was a U.S. national at the time of the attack and his death.

3538.   Plaintiff Samantha McNamara is the widow of SPC Daehling and a U.S. national.

3539.   Plaintiff Brenda Daehling is the mother of SPC Daehling and a U.S. national.

3540.   Plaintiff Kirk Daehling is the father of SPC Daehling and a U.S. national.

3541.   Plaintiff Adam Daehling is the brother of SPC Daehling and a U.S. national.

3542.   Plaintiff Kayla Daehling is the sister of SPC Daehling and a U.S. national.

3543.   As a result of the May 14, 2013 attack and SPC Daehling's injuries and death, each member of the Daehling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Daehling's society, companionship, and counsel.

3544.   As a result of the May 14, 2013 attack, SPC Daehling was injured in his person and/or property.  The Plaintiff members of the Daehling Family are the survivors and/or heirs of SPC Daehling and are entitled to recover for the damages SPC Daehling sustained.

3545.   **Specialist William J. Gilbert** served in Afghanistan as a member of the U.S. Army.  SPC Gilbert was injured in the May 14, 2013 Attack.  SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the May 14, 2013 Attack.

3546.   SPC Gilbert was a U.S. national at the time of the attack and his death.

3547.   Plaintiff Joanna Gilbert is the mother of SPC Gilbert and a U.S. national.

3548.   Plaintiff Jessica Benson is the sister of SPC Gilbert and a U.S. national.

3549.   As a result of the May 14, 2013 attack and SPC Gilbert's injuries and death, each member of the Gilbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilbert's society, companionship, and counsel.

3550.   As a result of the May 14, 2013 attack, SPC Gilbert was injured in his person and/or property.  The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

3551.   **Sergeant Adam S. Hartswick** served in Afghanistan as a member of the U.S. Army.  SGT Hartswick was injured in the May 14, 2013 Attack.  The attack severely wounded SGT Hartswick, who suffered double above-knee amputations, traumatic brain injury, bilateral perforated eardrums, broken hip, amputation of right index finger, partial amputation of right

thumb, and muscle avulsion of right forearm.  As a result of the May 14, 2013 Attack and his injuries, SGT Hartswick has experienced severe physical and emotional pain and suffering.

3552.   Plaintiff SGT Hartswick was a U.S. national when attacked, and remains so today.

3553.   As a result of the May 14, 2013 Attack and SGT Hartswick's injuries, each Hartswick Family member has experienced severe mental anguish, emotional pain and suffering.

**The May 16, 2013 Suicide Attack In Kabul (Angel Roldan Jr. Family)**

3554.   On May 16, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul, Afghanistan (the "May 16, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the May 16, 2013 Attack.

3555.   The May 16, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk.

3556.   **Angel Roldan Jr.** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Roldan was injured in the May 16, 2013 Attack.  Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the May 16, 2013 Attack.

3557.   Mr. Roldan was a U.S. national at the time of the attack and his death.

3558.   Plaintiff Lieselotte Roldan is the widow of Mr. Roldan and a U.S. national.

3559.   Plaintiff Matthias Roldan is the son of Mr. Roldan and a U.S. national.

3560.   Plaintiff Angel Roldan is the son of Mr. Roldan and a U.S. national.

3561.   Plaintiff Samantha Roldan is the daughter of Mr. Roldan and a U.S. national.

3562.   As a result of the May 16, 2013 Attack and Mr. Roldan's injuries and death, each member of the Roldan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Roldan's society, companionship, and counsel.

3563.   As a result of the May 16, 2013 Attack, Mr. Roldan was injured in his person and/or property.  The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

**The June 2, 2013 IED Attack In Nimruz Province (Sean W. Mullen Family)**

3564.   On June 2, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nimruz Province, Afghanistan (the "June 2, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 2, 2013 Attack.

3565.   The June 2, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3566.   **Warrant Officer Sean W. Mullen** served in Afghanistan as a member of the U.S. Army.  WO1 Mullen was injured in the June 2, 2013 Attack.  WO1 Mullen died on June 2, 2013 as a result of injuries sustained during the Attack.

3567.   WO1 Mullen was a U.S. national at the time of the attack and his death.

3568.   Plaintiff Nancy Mullen is the widow of WO1 Mullen and a U.S. national.

3569.   Plaintiff Miriam Mullen is the mother of WO1 Mullen and a U.S. national.

3570.   Plaintiff William Mullen is the father of WO1 Mullen and a U.S. national.

3571.   As a result of the June 2, 2013 attack and WO1 Mullen's injuries and death, each member of the Mullen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of WO1 Mullen's society, companionship, and counsel.

3572.   As a result of the June 2, 2013 attack, WO1 Mullen was injured in his person and/or property.  The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.

**The June 18, 2013 Rocket Attack In Parwan (Robert W. Ellis Family)**

3573.   On June 18, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a rocket attack in Parwan, Afghanistan (the "June 18, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 18, 2013 Attack.

3574.   The June 18, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3575.   **Specialist Robert W. Ellis** served in Afghanistan as a member of the U.S. Army. SPC Ellis was injured in the June 18, 2013 Attack.  SPC Ellis died on June 18, 2013 as a result of injuries sustained during the June 18, 2013 Attack.

3576.   SPC Ellis was a U.S. national at the time of the attack and his death.

3577.   Plaintiff Joelle Ellis is the mother of SPC Ellis and a U.S. national.

3578.   Plaintiff John Ellis is the father of SPC Ellis and a U.S. national.

3579.   Plaintiff James Ellis is the brother of SPC Ellis and a U.S. national.

3580.   As a result of the June 18, 2013 Attack and SPC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Ellis's society, companionship, and counsel.

3581.   As a result of the June 18, 2013 Attack, SPC Ellis was injured in his person and/or property.  The Plaintiff members of the Ellis Family are the survivors and/or heirs of SPC Ellis and are entitled to recover for the damages SPC Ellis sustained.

**The June 23, 2013 IED Attack In Paktika (Brandon Korona Family)**

3582.   On June 23, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Paktika Province, Afghanistan (the "June 23, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 23, 2013 Attack.

3583.   The June 23, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3584.   **Sergeant Brandon Korona** served in Afghanistan as a member of the U.S. Army. SGT Korona was injured in the June 23, 2013 Attack.  The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below knee amputation in 2017, a fractured right ankle, and a traumatic brain injury.  As a result of the June 23, 2013 Attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

3585.   Plaintiff SGT Korona was a U.S. national when attacked, and remains one today.

3586.   As a result of the June 23, 2013 Attack and SGT Korona's injuries, each member of the Korona Family has experienced severe mental anguish, emotional pain and suffering.

**The July 15, 2013 Attack Involving A Recoilless Rifle In Paktia (Sonny C. Zimmerman Family)**

3587.   On July 15, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an attack involving a recoilless rifle in Paktia, Afghanistan (the "July 15, 2013 Attack"),

which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the July 15, 2013 Attack.

3588.   The July 15, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3589.   **Staff Sergeant Sonny C. Zimmerman** served in Afghanistan as a member of the U.S. Army. SSG Zimmerman was injured in the July 15, 2013 Attack. SSG Zimmerman died on July 16, 2013 as a result of injuries sustained during the July 15, 2013 Attack.

3590.   SSG Zimmerman was a U.S. national at the time of the attack and his death.

3591.   Plaintiff Michelle Zimmerman is the mother of SSG Zimmerman and a U.S. national.

3592.   Plaintiff Chris Zimmerman is the father of SSG Zimmerman and a U.S. national.

3593.   Plaintiff Baily Zimmerman is the sister of SSG Zimmerman and a U.S. national.

3594.   As a result of the July 15, 2013 Attack and SSG Zimmerman's injuries and death, each member of the Zimmerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Zimmerman's society, companionship, and counsel.

3595.   As a result of the July 15, 2013 Attack, SSG Zimmerman was injured in his person and/or property. The Plaintiff members of the Zimmerman Family are the survivors and/or heirs of SSG Zimmerman and are entitled to recover for the damages SSG Zimmerman sustained.

**The July 23, 2013 IED Attack In Wardak (Nickolas S. Welch and Rob L. Nichols Families)**

3596.   On July 23, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Wardak Province, Afghanistan (the "July 23, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 23, 2013 Attack.

3597.   The July 23, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3598.   **Specialist Nickolas S. Welch** served in Afghanistan as a member of the U.S. Army. SPC Welch was injured in the July 23, 2013 Attack.  SPC Welch died on August 6, 2013 as a result of injuries sustained during the July 23, 2013 Attack.

3599.   SPC Welch was a U.S. national at the time of the attack and his death.

3600.   Plaintiff Lorria Welch is the mother of SPC Welch and a U.S national.

3601.   Plaintiff Barry Welch is the father of SPC Welch and a U.S national

3602.   Plaintiff Zackary Welch is the brother of SPC Welch and a U.S national.

3603.   As a result of the July 23, 2013 attack and SPC Welch's injuries and death, each member of the Welch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Welch's society, companionship, and counsel.

3604.   As a result of the July 23, 2013 attack, SPC Welch was injured in his person and/or property.  The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

3605.   **Specialist Rob L. Nichols** served in Afghanistan as a member of the U.S. Army. SPC Nichols was injured in the July 23, 2013 Attack.  SPC Nichols died on July 23, 2013 as a result of injuries sustained during the July 23, 2013 Attack.

3606.   SPC Nichols was a U.S. national at the time of the attack and his death.

3607.   Plaintiff Bruce Nichols is the father of SPC Nichols and a U.S. national.

3608.   Plaintiff Jeanne Nichols is the stepmother of SPC Nichols and a U.S. national. Ms. Nichols lived in the same household as SPC Nichols for a substantial period and considered SPC Nichols the functional equivalent of a biological son.

3609.   Plaintiff Molly Nichols is the sister of SPC Nichols. She is a U.S. national.

3610.   As a result of the July 23, 2013 attack and SPC Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

3611.   As a result of the July 23, 2013 attack, SPC Nichols was injured in his person and/or property.  The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

**The July 30, 2013 Indirect Fire Attack In Logar (Nicholas B. Burley Family)**

3612.   On July 30, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an indirect fire attack in Logar, Afghanistan (the "July 30, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 30, 2013 Attack.

3613.   The July 30, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3614.   **Specialist Nicholas B. Burley** served in Afghanistan as a member of the U.S. Army.  SPC Burley was injured in the July 30, 2013 Attack.  SPC Burley died on July 30, 2013 as a result of injuries sustained during the July 30, 2013 Attack.

3615.   SPC Burley was a U.S. national at the time of the attack and his death.

3616.   Plaintiff Tammy Olmstead is the mother of SPC Burley and a U.S. national.

3617.   Plaintiff William Burley is the father of SPC Burley and a U.S. national.

3618.   Plaintiff Dan Olmstead is the stepfather of SPC Burley and a U.S. national. Mr. Olmstead lived in the same household as SPC Burley for a substantial period and considered SPC Burley the functional equivalent of a biological son.

3619.   Plaintiff Michael Collins is the brother of SPC Burley and a U.S. national.

3620.   As a result of the July 30, 2013 Attack and SPC Burley's injuries and death, each member of the Burley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Burley's society, companionship, and counsel.

3621.   As a result of the July 30, 2013 Attack, SPC Burley was injured in his person and/or property.  The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

**The August 12, 2013 IED Attack In Logar (James T. Wickliff Chacin Family)**

3622.   On August 12, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Logar Province, Afghanistan (the "August 12, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 12, 2013 Attack.

3623.   The August 12, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3624.   **Specialist James T. Wickliff Chacin** served in Afghanistan as a member of the U.S. Army.  SPC Wickliff Chacin was injured in the August 12, 2013 Attack.  SPC Wickliff Chacin died on September 20, 2013 as a result of injuries sustained during the August 12, 2013 Attack.

3625.   SPC Wickliff Chacin was a U.S. national at the time of the attack and his death.

3626.   Plaintiff Martha Smith is the mother of SPC Wickliff Chacin and a U.S. national.

3627.   Plaintiff Thomas Wickliff is the father of SPC Wickliff Chacin and a U.S. national.

3628.   Plaintiff Michelle Rotelli is the sister of SPC Wickliff Chacin and a U.S. national.

3629.   As a result of the August 12, 2013 attack and SPC Wickliff Chacin's injuries and death, each Wickliff Chacin Family member has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Wickliff Chacin's society, companionship, and counsel.

3630.   As a result of the August 12, 2013 attack, SPC Wickliff Chacin was injured in his person and/or property.  The Plaintiff members of the Wickliff Chacin Family are the survivors and/or heirs of SPC Wickliff Chacin and are entitled to recover for the damages he sustained.

### The September 21, 2013 Insider Attack In Paktia (Joshua J. Strickland and Liam J. Nevins Families)

3631.   On September 21, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an insider attack in Paktia, Afghanistan (the "September 21, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 21, 2013 Attack.

3632.   The September 21, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3633.   **Sergeant Joshua J. Strickland** served in Afghanistan as a member of the U.S. Army.  SGT Strickland was injured in the September 21, 2013 Attack.  SGT Strickland died on September 21, 2013 as a result of injuries sustained during the September 21, 2013 Attack.

3634.   SGT Strickland was a U.S. national at the time of the attack and his death.

3635.   Plaintiff Garrett Funk is the brother of SGT Strickland and a U.S. national.

3636.   As a result of the September 21, 2013 Attack and SGT Strickland's injuries and death, each member of the Strickland Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Strickland's society, companionship, and counsel.

3637.   As a result of the September 21, 2013 Attack, SGT Strickland was injured in his person and/or property.  The Plaintiff members of the Strickland Family are the survivors and/or heirs of SGT Strickland and are entitled to recover for the damages SGT Strickland sustained.

3638.   **Sergeant First Class Liam J. Nevins** served in Afghanistan as a member of the U.S. Army.  SFC Nevins was injured in the September 21, 2013 Attack.  SFC Nevins died on September 21, 2013 as a result of injuries sustained during the September 21, 2013 Attack.

3639.   SFC Nevins was a U.S. national at the time of the attack and his death.

3640.   Plaintiff William Nevins is the father of SFC Nevins and a U.S. national.

3641.   As a result of the September 21, 2013 Attack and SFC Nevins's injuries and death, each member of the Nevins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Nevins's society, companionship, and counsel.

3642.   As a result of the September 21, 2013 Attack, SFC Nevins was injured in his person and/or property.  The Plaintiff members of the Nevins Family are the survivors and/or heirs of SFC Nevins and are entitled to recover for the damages SFC Nevins sustained.

**The September 26, 2013 IED Attack In Wardak (Seth T. Wakeling Family)**

3643.   On September 26, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Wardak Province, Afghanistan (the "September 26, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 26, 2013 Attack.

3644.   The September 26, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3645.   **Specialist Seth T. Wakeling** served in Afghanistan as a member of the U.S. Army. SPC Wakeling was injured in the September 26, 2013 Attack. The attack severely wounded SPC Wakeling, including by causing the amputation of his left leg below the knee, and other severe injuries.  As a result of the Attack and his injuries, SPC Wakeling has experienced severe physical and emotional pain and suffering.

3646.   Plaintiff SPC Wakeling was a U.S. national when attacked, and remains so today.

3647.   Plaintiff Adriana Wakeling is the wife of SPC Wakeling and a U.S. national.

3648.   As a result of the September 26, 2013 Attack and SPC Wakeling's injuries, each Wakeling Family member has experienced severe mental anguish, emotional pain and suffering.

**The September 26, 2013 Insider Attack In Paktia (Thomas A. Baysore Jr. Family)**

3649.   On September 26, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an insider attack in Paktia, Afghanistan (the "September 26, 2013 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the September 26, 2013 Attack.

3650.   The September 26, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3651.   **Staff Sergeant Thomas A. Baysore Jr.** served in Afghanistan as a member of the U.S. Army.  SSG Baysore was injured in the September 26, 2013 Attack.  SSG Baysore died on September 26, 2013 as a result of injuries sustained during the September 26, 2013 Attack.

3652.   SSG Baysore was a U.S. national at the time of the attack and his death.

3653.   Plaintiff Angela Kahler is the sister of SSG Baysore and a U.S. national.

3654.   As a result of the September 26, 2013 Attack and SSG Baysore's injuries and death, each member of the Baysore Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Baysore's society, companionship, and counsel.

3655.   As a result of the September 26, 2013 Attack, SSG Baysore was injured in his person and/or property.  The Plaintiff members of the Baysore Family are the survivors and/or heirs of SSG Baysore and are entitled to recover for the damages SSG Baysore sustained.

**The October 6, 2013 IED Attack In Kandahar (Cody J. Patterson and Joseph M. Peters Families)**

3656.   On October 6, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 6, 2013 Attack"),

which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the October 6, 2013 Attack.

3657.    The October 6, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3658.    **Specialist Cody J. Patterson** served in Afghanistan as a member of the U.S. Army. SPC Patterson was injured in the October 6, 2013 Attack. SPC Patterson died on October 6, 2013 as a result of injuries sustained during the Attack.

3659.    SPC Patterson was a U.S. national at the time of the attack and his death.

3660.    Plaintiff Nancy Wilson is the mother of SPC Patterson and a U.S. national.

3661.    As a result of the October 6, 2013 attack and SPC Patterson's injuries and death, each member of the Patterson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Patterson's society, companionship, and counsel.

3662.    As a result of the October 6, 2013 attack, SPC Patterson was injured in his person and/or property. The Plaintiff members of the Patterson Family are the survivors and/or heirs of SPC Patterson and are entitled to recover for the damages SPC Patterson sustained.

3663.    **Sergeant Joseph M. Peters** served in Afghanistan as a member of the U.S. Army. SGT Peters was injured in the October 6, 2013 Attack. SGT Peters died on October 6, 2013 as a result of injuries sustained during the Attack.

3664.    SGT Peters was a U.S. national at the time of the attack and his death.

3665.    Plaintiff Ashley Peters is the widow of SGT Peters and a U.S. national.

3666.   Plaintiff G.P., by and through his next friend Ashley Peters, is the minor son of SGT Peters. He is a U.S. national.

3667.   Plaintiff Deborah Peters is the mother of SGT Peters and a U.S. national.

3668.   Plaintiff Dennis Peters is the father of SGT Peters and a U.S. national.

3669.   As a result of the October 6, 2013 attack and SGT Peters's injuries and death, each member of the Peters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Peters's society, companionship, and counsel.

3670.   As a result of the October 6, 2013 attack, SGT Peters was injured in his person and/or property.  The Plaintiff members of the Peters Family are the survivors and/or heirs of SGT Peters and are entitled to recover for the damages SGT Peters sustained.

**The January 17, 2014 Complex Attack In Kabul (Alexis L. Kamerman Family)**

3671.   On January 17, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving a suicide bomber and gunmen in Kabul Province, Afghanistan (the "January 17, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 17, 2014 Attack.

3672.   The January 17, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3673.   **Alexis L. Kamerman** worked in Afghanistan as a civilian educator with American University of Afghanistan. Ms. Kamerman was injured in the January 17, 2014 Attack.  Ms. Kamerman died on January 17, 2014 as a result of injuries sustained during the Attack.

3674.   Ms. Kamerman was a U.S. national at the time of the attack and her death.

3675.   Plaintiff Alison Pohn is the mother of Ms. Kamerman and a U.S. national.

3676.   Plaintiff John McCarthy is the stepfather of Ms. Kamerman and a U.S. national. Mr. McCarthy lived in the same household as Ms. Kamerman for a substantial period and considered Ms. Kamerman the functional equivalent of a biological daughter.

3677.   As a result of the January 17, 2014 Attack and Ms. Kamerman's injuries and death, each member of the Kamerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Kamerman's society, companionship, and counsel.

3678.   As a result of the January 17, 2014 Attack, Ms. Kamerman was injured in her person and/or property.  The Plaintiff members of the Kamerman Family are the survivors and/or heirs of Ms. Kamerman and are entitled to recover for the damages Ms. Kamerman sustained.

### The February 10, 2014 IED Attack In Kabul (Michael A. Hughes and Paul E. Goins Jr. Families)

3679.   On February 10, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kabul Province, Afghanistan (the "February 10, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 10, 2014 Attack.

3680.   The February 10, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3681.   **Mr. Michael A. Hughes** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Hughes was injured in the February 10, 2014 Attack. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the Attack.

3682.   Mr. Hughes was a U.S. national at the time of the attack and his death.

3683.   Plaintiff Daniel Hughes is the brother of Mr. Hughes and a U.S. national.

3684.   Plaintiff Kristine Zitny is the sister of Mr. Hughes and a U.S. national.

3685.   Plaintiff Kathleen Alexander is the sister of Mr. Hughes and a U.S. national.

3686.   Plaintiff Patricia Hughes is the sister of Mr. Hughes and a U.S. national.

3687.   As a result of the February 10, 2014 Attack and Mr. Hughes's injuries and death, each member of the Hughes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hughes's society, companionship, and counsel.

3688.   As a result of the February 10, 2014 Attack, Mr. Hughes was injured in his person and/or property.  The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

3689.   **Paul E. Goins Jr.** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Goins was injured in the February 10, 2014 Attack.  Mr. Goins died on February 10, 2014 as a result of injuries sustained during the February 10, 2014 Attack.

3690.   Mr. Goins was a U.S. national at the time of the attack and his death.

3691.   Plaintiff Patricia Goins is the widow of Mr. Goins and a U.S. national.

3692.   Plaintiff Paul Goins III is the son of Mr. Goins and a U.S. national.

3693.   Plaintiff Janice Caruso is the stepdaughter of Mr. Goins and a U.S. national.  Ms. Caruso lived in the same household as Mr. Goins for a substantial period and considered Mr. Goins the functional equivalent of a biological father.

3694.   Plaintiff Dana Rainey is the stepdaughter of Mr. Goins and a U.S. national.  Ms. Rainey lived in the same household as Mr. Goins for a substantial period and considered Mr. Goins the functional equivalent of a biological father.

3695.   Plaintiff Emmitt Burns is the stepson of Mr. Goins and a U.S. national. Mr. Burns lived in the same household as Mr. Goins for a substantial period and considered Mr. Goins the functional equivalent of a biological father.

3696.   As a result of the February 10, 2014 Attack and Mr. Goins's injuries and death, each member of the Goins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Goins's society, companionship, and counsel.

3697.   As a result of the February 10, 2014 Attack, Mr. Goins was injured in his person and/or property.  The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

### The February 15, 2014 Complex Attack In Helmand Province (Aaron C. Torian Family)

3698.   On February 15, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving an IED and small arms fire in Helmand Province, Afghanistan (the "February 15, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the February 15, 2014 Attack.

3699.   The February 15, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the IED's passive detonation system indiscriminately placed civilians at risk.

3700.   **Master Sergeant Aaron C. Torian** served in Afghanistan as a member of the U.S. Marine Corps.  MSgt Torian was injured in the February 15, 2014 Attack.  MSgt Torian died on February 15, 2014 as a result of his injuries from the February 15, 2014 Attack.

3701.   MSgt Torian was a U.S. national at the time of the attack and his death.

740

3702.   Plaintiff Esta Smith is the mother of MSgt Torian and a U.S. national.

3703.   Plaintiff Joe Torian is the father of MSgt Torian and a U.S. national.

3704.   Plaintiff Nathan Torian is the brother of MSgt Torian and a U.S. national.

3705.   Plaintiff Jimmy Smith is the stepfather of MSgt Torian and a U.S. national. Mr. Smith lived in the same household as MSgt Torian for a substantial period and considered MSgt Torian the functional equivalent of a biological son.

3706.   Plaintiff Emily Torian is the sister of MSgt Torian and a U.S. national.

3707.   As a result of the February 15, 2014 attack and MSgt Torian's injuries and death, each member of the Torian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Torian's society, companionship, and counsel.

3708.   As a result of the February 15, 2014 attack, MSgt Torian was injured in his person and/or property.  The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

**The June 2, 2014 Small Arms Fire Attack In Nangarhar (Jason B. Jones Family)**

3709.   On June 2, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a small arms fire attack in Nangarhar, Afghanistan (the "June 2, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the June 2, 2014 Attack.

3710.   The June 2, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3711.   **Captain Jason B. Jones** served in Afghanistan as a member of the U.S. Army. CPT Jones was injured in the June 2, 2014 Attack.  CPT Jones died on June 2, 2014 as a result of injuries sustained during the June 2, 2014 Attack.

3712.   CPT Jones was a U.S. national at the time of the attack and his death.

3713.   Plaintiff Joseph Jones Jr. is the father of CPT Jones and a U.S. national.

3714.   As a result of the June 2, 2014 Attack and CPT Jones's injuries and death, each member of the Jones Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Jones's society, companionship, and counsel.

3715.   As a result of the June 2, 2014 Attack, CPT Jones was injured in his person and/or property.  The Plaintiff members of the Jones Family are the survivors and/or heirs of CPT Jones and are entitled to recover for the damages CPT Jones sustained.

**The August 12, 2014 IED Attack In Kandahar (Alberto D. Diaz Family)**

3716.   On August 12, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 12, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 12, 2014 Attack.

3717.   The August 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3718.   **Specialist Alberto D. Diaz** served in Afghanistan as a member of the U.S. Army. SPC Diaz was injured in the August 12, 2014 Attack.  The attack severely wounded SPC Diaz, who suffered severe brain injuries and facial damage requiring complete right side facial reconstruction, and also suffers from PTSD, chronic fatigue syndrome, chronic pain, social anxiety, panic attacks, hearing loss, and tremors.  As a result of the August 12, 2014 Attack and his injuries, SPC Diaz has experienced severe physical and emotional pain and suffering.

3719.   Plaintiff SPC Diaz was a U.S. national when attack, and remains one today.

3720.   Plaintiff Kayla Diaz is the wife of SPC Diaz and a U.S. national.

3721.   Plaintiff N.J.D., by and through his next friend Kayla Diaz, is the minor son of SPC Diaz. He is a U.S. national.

3722.   Plaintiff N.J.D., by and through her next friend Kayla Diaz, is the minor daughter of SPC Diaz. She is a U.S. national.

3723.   Plaintiff Frances Diaz is the mother of SPC Diaz and a U.S. national.

3724.   Plaintiff Maximo Diaz is the father of SPC Diaz and a U.S. national.

3725.   Plaintiff Anthony Diaz is the brother of SPC Diaz and a U.S. national.

3726.   Plaintiff Matthew Diaz is the brother of SPC Diaz and a U.S. national.

3727.   As a result of the August 12, 2014 Attack and SPC Diaz's injuries, each member of the Diaz Family has experienced severe mental anguish, emotional pain and suffering.

**The August 24, 2014 Suicide Attack In Nangarhar (Carey G. Duval Family)**

3728.   On August 24, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Nangarhar Province, Afghanistan (the "August 24, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 24, 2014 Attack.

3729.   The August 24, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3730.   **Captain Carey G. DuVal** served in Afghanistan as a member of the U.S. Army. CPT DuVal was injured in the August 24, 2014 Attack.  The attack severely wounded CPT DuVal,

who suffered an amputation of his right hand, broken right ulna, right elbow, right humerus, and right femur, and a loss of 20% of his right quadricep.  As a result of the August 24, 2014 Attack and his injuries, CPT DuVal has experienced severe mental anguish and severe physical and emotional pain and suffering.

3731.   Plaintiff CPT DuVal was a U.S. national when attacked, and remains one today.

3732.   As a result of the August 24, 2014 Attack and his injuries, CPT DuVal has experienced severe mental anguish and severe physical and emotional pain and suffering.

**The November 24, 2014 IED Attack In Kabul (Joseph W. Riley Family)**

3733.   On November 24, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a vehicle-borne IED attack in Kabul Province, Afghanistan (the "November 24, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the November 24, 2014 Attack.

3734.   The November 24, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3735.   **Specialist Joseph W. Riley** served in Afghanistan as a member of the U.S. Army. SPC Riley was injured in the November 24, 2014 Attack.  SPC Riley died on November 24, 2014 as a result of injuries sustained during the November 24, 2014 Attack.

3736.   SPC Riley was a U.S. national at the time of the attack and his death.

3737.   Plaintiff Michelle Riley is the mother of SPC Riley and a U.S. national.

3738.   Plaintiff Rodney Riley is the father of SPC Riley and a U.S. national.

3739.   As a result of the November 24, 2014 Attack and SPC Riley's injuries and death, each member of the Riley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Riley's society, companionship, and counsel.

3740.   As a result of the November 24, 2014 Attack, SPC Riley was injured in his person and/or property.  The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

**The December 12, 2014 IED Attack In Parwan (Wyatt J. Martin Family)**

3741.   On December 12, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a command wire-detonated IED attack in Parwan Province, Afghanistan (the "December 12, 2014 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 12, 2014 Attack.

3742.   The December 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

3743.   **Specialist Wyatt J. Martin** served in Afghanistan as a member of the U.S. Army. SPC Martin was injured in the December 12, 2014 Attack.  SPC Martin died on December 12, 2014 as a result of injuries sustained during the Attack.

3744.   SPC Martin was a U.S. national at the time of the attack and his death.

3745.   Plaintiff Julie Martin is the mother of SPC Martin and a U.S. national.

3746.   Plaintiff Brian Martin is the father of SPC Martin and a U.S. national.

3747.   Plaintiff Catherine Martin is the sister of SPC Martin and a U.S. national.

3748.   Plaintiff Elizabeth Martin is the sister of SPC Martin and a U.S. national.

3749.   As a result of the December 12, 2014 Attack and SPC Martin's injuries and death, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Martin's society, companionship, and counsel.

3750.   As a result of the December 12, 2014 Attack, SPC Martin was injured in his person and/or property.  The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

### The August 22, 2015 Suicide Attack In Kabul (Corey J. Dodge, Richard P. McEvoy, and Barry D. Sutton Families)

3751.   On August 22, 2015, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul Province, Afghanistan (the "August 22, 2015 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 22, 2015 Attack.

3752.   The August 22, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3753.   **Corey J. Dodge** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone. Mr. Dodge was injured in the August 22, 2015 Attack.  Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

3754.   Mr. Dodge was a U.S. national at the time of the attack and his death.

3755.   Plaintiff Kelli-Jo Dodge is the widow of Mr. Dodge and a U.S. national.

3756.   Plaintiff B.C.D., by and through his next friend Kelli-Jo Dodge, is the minor son of Mr. Dodge. He is a U.S. national.

3757.   Plaintiff P.A.D., by and through her next friend Kelli-Jo Dodge, is the minor daughter of Mr. Dodge. She is a U.S. national.

3758.   As a result of the August 22, 2015 Attack and Mr. Dodge's injuries and death, each member of the Dodge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Dodge's society, companionship, and counsel.

3759.   As a result of the August 22, 2015 Attack, Mr. Dodge was injured in his person and/or property.  The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

3760.   **Richard P. McEvoy** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l.  Mr. McEvoy was injured in the August 22, 2015 Attack.  Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

3761.   Mr. McEvoy was a U.S. national at the time of the attack and his death.

3762.   Plaintiff Kathleen McEvoy is the widow of Mr. McEvoy and a U.S. national.

3763.   Plaintiff Patrick McEvoy is the son of Mr. McEvoy and a U.S. national.

3764.   Plaintiff Michelle McEvoy is the daughter of Mr. McEvoy and a U.S. national.

3765.   Plaintiff Janice Proctor is the mother of Mr. McEvoy and a U.S. national.

3766.   Plaintiff Luann Varney is the sister of Mr. McEvoy and a U.S. national.

3767.   As a result of the August 22, 2015 Attack and Mr. McEvoy's injuries and death, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. McEvoy's society, companionship, and counsel.

3768.   As a result of the August 22, 2015 Attack, Mr. McEvoy was injured in his person and/or property.  The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

3769.   **Barry D. Sutton** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone. Mr. Sutton was injured in the August 22, 2015 Attack.  Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

3770.   Mr. Sutton was a U.S. national at the time of the attack and his death.

3771.   Plaintiff Summer Sutton is the daughter of Mr. Sutton and a U.S. national.

3772.   Plaintiff Erin Goss is the daughter of Mr. Sutton and a U.S. national.

3773.   Plaintiff Harriet Sutton is the mother of Mr. Sutton and a U.S. national.

3774.   Plaintiff Wendy Shedd is the sister of Mr. Sutton and a U.S. national.

3775.   Plaintiff Trecia Hood is the sister of Mr. Sutton and a U.S. national.

3776.   Plaintiff Freddie Sutton is the brother of Mr. Sutton and a U.S. national.

3777.   As a result of the August 22, 2015 Attack and Mr. Sutton's injuries and death, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sutton's society, companionship, and counsel.

3778.   As a result of the August 22, 2015 Attack, Mr. Sutton was injured in his person and/or property.  The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

**The December 21, 2015 Suicide Attack In Parwan (Chester J. McBride III Family)**

3779.   On December 21, 2015, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Parwan Province, Afghanistan (the "December 21, 2015 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the December 21, 2015 Attack.

3780.   The December 21, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3781.   **Staff Sergeant Chester J. McBride III** served in Afghanistan as a member of the U.S. Air Force.  SSgt McBride was injured in the December 21, 2015 Attack.  SSgt McBride died on December 21, 2015 as a result of injuries sustained during the December 21, 2015 Attack.

3782.   SSgt McBride was a U.S. national at the time of the attack and his death.

3783.   Plaintiff Annie McBride is the mother of SSgt McBride and a U.S. national.

3784.   Plaintiff Chester McBride Sr. is the father of SSgt McBride and a U.S. national.

3785.   As a result of the December 21, 2015 Attack and SSgt McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt McBride's society, companionship, and counsel.

3786.   As a result of the December 21, 2015 Attack, SSgt McBride was injured in his person and/or property.  The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

**The January 5, 2016 Complex Attack In Helmand (Matthew Q. McClintock Family)**

3787.   On January 5, 2016, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire in Helmand Province, Afghanistan (the "January 5, 2016 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 5, 2016 Attack.

3788.   The January 5, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3789.  **Sergeant First Class Matthew Q. McClintock** served in Afghanistan as a member of the U.S. Army National Guard.  SFC McClintock was injured in the January 5, 2016 Attack. SFC McClintock died on January 5, 2016 as a result of injuries sustained during the January 5, 2016 Attack.

3790.  SFC McClintock was a U.S. national at the time of the attack and his death.

3791.  Plaintiff Alexandra McClintock is the widow of SFC McClintock and a U.S. national.

3792.  Plaintiff D.M., by and through his next friend Alexandra McClintock, is the minor son of SFC McClintock. He is a U.S. national.

3793.  Plaintiff Joyce Paulsen is the mother of SFC McClintock and a U.S. national.

3794.  Plaintiff George McClintock III is the father of SFC McClintock and a U.S. national.

3795.  As a result of the January 5, 2016 Attack and SFC McClintock's injuries and death, each member of the McClintock Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC McClintock's society, companionship, and counsel.

3796.  As a result of the January 5, 2016 Attack, SFC McClintock was injured in his person and/or property.  The Plaintiff members of the McClintock Family are the survivors and/or heirs of SFC McClintock and are entitled to recover for the damages he sustained.

### The August 7, 2016 Kidnapping, Subsequent Hostage Taking, And Torture In Kabul Province And Pakistan (Kevin King Family)

3797.  On August 7, 2016, a joint cell comprised of FTOs, al-Qaeda and the Haqqani Network, acting together as the Kabul Attack Network, committed a kidnapping at gunpoint in Kabul Province, Afghanistan (the "King Kidnapping Attack"), which was facilitated by al-Qaeda-

in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the King Kidnapping Attack.

3798.   The King Kidnapping Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3799.   **Kevin King** served in Afghanistan as a civilian professor teaching at American University of Afghanistan.  On August 7, 2016, Mr. King was injured in a kidnapping at gunpoint attack in Kabul Province, and he was held hostage for years thereafter. The King Kidnapping Attack severely wounded Mr. King, who was tortured, beaten, malnourished, and experienced a broad range of life-altering ailments thereafter, which injuries were caused by the repeated torture and beatings Mr. King sustained at the hands of Sirajuddin Haqqani's personal terrorist henchmen from the Haqqani Network. As a result of the King Kidnapping Attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering.

3800.   Plaintiff King was a U.S. national when attacked, and remains one to this day.

3801.   Plaintiff Stephanie Miller is the sister of Mr. King and a U.S. national.

3802.   As a result of the King Kidnapping Attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

### The June 10, 2017 Insider Attack In Nangarhar (Dillon C. Baldridge and William M. Bays Families)

3803.   On June 10, 2017, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an insider attack in Nangarhar, Afghanistan (the "June 10, 2017 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the June 10, 2017 Attack.

3804.   The June 10, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3805.   **Sergeant Dillon Christopher Baldridge** served in Afghanistan as a member of the U.S. Army.  SGT Baldridge was injured in the June 10, 2017 Attack.  SGT Baldridge died on June 10, 2017 as a result of injuries sustained during the Attack.

3806.   SGT Baldridge was a U.S. national at the time of the attack and his death.

3807.   Plaintiff Christopher Baldridge is the father of SGT Baldridge and a U.S. national.

3808.   Plaintiff E.B., by and through his next friend Christopher Baldridge, is the minor brother of SGT Baldridge. He is a U.S. national.

3809.   Plaintiff L.B., by and through his next friend Christopher Baldridge, is the minor brother of SGT Baldridge. He is a U.S. national.

3810.   Plaintiff S.B., by and through her next friend Christopher Baldridge, is the minor sister of SGT Baldridge. She is a U.S. national.

3811.   Plaintiff Jessie Baldridge is the stepmother of SGT Baldridge and a U.S. national. Ms. Baldridge lived in the same household as SGT Baldridge for a substantial period and considered SGT Baldridge the functional equivalent of a biological son.

3812.   As a result of the June 10, 2017 Attack and SGT Baldridge's injuries and death, each member of the Baldridge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Baldridge's society, companionship, and counsel.

3813.   As a result of the June 10, 2017 Attack, SGT Baldridge was injured in his person and/or property.  The Plaintiff members of the Baldridge Family are the survivors and/or heirs of SGT Baldridge and are entitled to recover for the damages SGT Baldridge sustained.

3814.   **Sergeant William Marshall Bays** served in Afghanistan as a member of the U.S. Army. SGT Bays was injured in the June 10, 2017 Attack. SGT Bays died on June 10, 2017 as a result of injuries sustained during the June 10, 2017 Attack.

3815.   SGT Bays was a U.S. national at the time of the attack and his death.

3816.   Plaintiff Jasmin Bays is the widow of SGT Bays and a naturalized U.S. national.

3817.   Plaintiff April Bays is the mother of SGT Bays and a U.S. national.

3818.   Plaintiff Timothy Bays is the father of SGT Bays and a U.S. national.

3819.   Plaintiff Brenda Griner is the sister of SGT Bays and a U.S. national.

3820.   Plaintiff Lindsay Redoutey is the sister of SGT Bays and a U.S. national.

3821.   Plaintiff Julia Steiner is the stepdaughter of SGT Bays and a Permanent Resident of the United States. Ms. Steiner lived in the same household as SGT Bays for a substantial period and considered SGT Bays the functional equivalent of a biological father.

3822.   Plaintiff L.S., by and through her next friend Jasmin Bays, is the minor stepdaughter of SGT Bays. She is a U.S. national.

3823.   Plaintiff M.S., by and through her next friend Jasmin Bays, is the minor stepdaughter of SGT Bays. She is a U.S. national.

3824.   As a result of the June 10, 2017 Attack and SGT Bays's injuries and death, each member of the Bays Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Bays's society, companionship, and counsel.

3825.   As a result of the June 10, 2017 Attack, SGT Bays was injured in his person and/or property.  The Plaintiff members of the Bays Family are the survivors and/or heirs of SGT Bays and are entitled to recover for the damages SGT Bays sustained.

**The July 3, 2017 Indirect Fire Attack In Helmand (Hansen B. Kirkpatrick Family)**

3826.   On July 3, 2017, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an indirect fire attack in Helmand, Afghanistan (the "July 3, 2017 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 3, 2017 Attack.

3827.   The July 3, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3828.   **Private First Class Hansen B. Kirkpatrick** served in Afghanistan as a member of the U.S. Army.  PFC Kirkpatrick was injured in the July 3, 2017 Attack.  PFC Kirkpatrick died on July 3, 2017 as a result of injuries sustained during the July 3, 2017 Attack.

3829.   PFC Kirkpatrick was a U.S. national at the time of the attack and his death.

3830.   Plaintiff Anngel Norkist is the mother of PFC Kirkpatrick and a U.S. national.

3831.   Plaintiff William Newnham is the stepfather of PFC Kirkpatrick and a U.S. national. Mr. Newnham lived in the same household as PFC Kirkpatrick for a substantial period and considered PFC Kirkpatrick the functional equivalent of a biological son.

3832.   Plaintiff Hart Norkist is the brother of PFC Kirkpatrick and a U.S. national.

3833.   Plaintiff Aujza Norkist is the sister of PFC Kirkpatrick and a U.S. national.

3834.   As a result of the July 3, 2017 Attack and PFC Kirkpatrick's injuries and death, each member of the Kirkpatrick Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kirkpatrick's society, companionship, and counsel.

3835.   As a result of the July 3, 2017 Attack, PFC Kirkpatrick was injured in his person and/or property.  The Plaintiff members of the Kirkpatrick Family are the survivors and/or heirs of PFC Kirkpatrick and are entitled to recover for the damages PFC Kirkpatrick sustained.

### The August 2, 2017 Suicide Attack In Kandahar (Christopher Harris and Karim Hakimyar Families)

3836.   On August 2, 2017, a joint cell comprised of an FTO, al-Qaeda, and the Taliban, including its Haqqani Network (an FTO) committed a suicide bombing attack that deployed a suicide vehicle borne-IED (or "VBIED") in Kandahar Province, Afghanistan (the "August 2, 2017 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical aid to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the August 2, 2017 Attack.

3837.   The August 2, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3838.   **Specialist Christopher M. Harris** served in Afghanistan as a member of the U.S. Army.  SPC Harris was injured in the August 2, 2017 Attack.  SPC Harris died on August 2, 2017 as a result of injuries sustained during the August 2, 2017 Attack.

3839.   SPC Harris was a U.S. national at the time of the attack and his death.

3840.   Plaintiff Susan Kolean is the mother of SPC Harris and a U.S. national.

3841.   Plaintiff Brittany Harris is the widow of SPC Harris and a U.S. national.

3842.   As a result of the August 2, 2017 Attack and SPC Harris's injuries and death, each member of the Harris Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Harris's society, companionship, and counsel.

3843.   As a result of the August 2, 2017 Attack, SPC Harris was injured in his person and/or property.  The Plaintiff members of the Harris Family are the survivors and/or heirs of SPC Harris and are entitled to recover for the damages SPC Harris sustained.

3844.   **Karim Hakimyar** worked in Afghanistan as a government contractor for MEP/VOLCOM.  Mr. Hakimyar was injured was injured in the August 2, 2017 Attack.  The attack severely wounded Mr. Hakimyar, who suffers from continuing concussion and TBI symptoms, including dizziness, depression, anxiety, and PTSD.  As a result of the August 2, 2017 Attack and his injuries, Mr. Hakimyar has experienced severe physical and emotional pain and suffering.

3845.   Plaintiff Karim Hakimyar was a U.S. national at the time of the attack, and remains one to this day.

3846.   Plaintiff Zara Karim is the wife of Karim Hakimyar and a U.S. national.

3847.   Plaintiff S.K., by and through his next friend Karim Hakimyar, is the minor son Karim Hakimyar. He is U.S. national.

3848.   As a result of the August 2, 2017 Attack and Mr. Hakimyar's injuries, each member of the Hakimyar Family has experienced severe mental anguish, emotional pain and suffering.

**The January 14, 2019 Suicide Attack In Kabul (Manoharan P. Kamaleson Family)**

3849.   On January 14, 2019, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Kabul, Afghanistan (the "January 14, 2019 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the January 14, 2019 Attack.

3850.   The January 14, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

3851.  **Mr. Manoharan P. Kamaleson** worked in Afghanistan as a civilian chief operating officer with First MicroFinance Bank.  Mr. Kamaleson was injured in the January 14, 2019 Attack.  Mr. Kamaleson died on January 14, 2019 as a result of injuries sustained during the January 14, 2019 Attack.

3852.  Mr. Kamaleson was a U.S. national at the time of the attack and his death.

3853.  Plaintiff Nicole Kamaleson is the widow of Mr. Kamaleson and a U.S. national.

3854.  Plaintiff Cedric Kamaleson is the son of Mr. Kamaleson and a U.S. national.

3855.  Plaintiff Barclay Kamaleson is the son of Mr. Kamaleson and a U.S. national.

3856.  Plaintiff Cade Kamaleson is the son of Mr. Kamaleson and a U.S. national.

3857.  Plaintiff Sunderraj Kamaleson is the brother of Mr. Kamaleson and a U.S. national.

3858.  As a result of the January 14, 2019 Attack and Mr. Kamaleson's injuries and death, each member of the Kamaleson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Kamaleson's society, companionship, and counsel.

3859.  As a result of the January 14, 2019 Attack, Mr. Kamaleson was injured in his person and/or property.  The Plaintiff members of the Kamaleson Family are the survivors and/or heirs of Mr. Kamaleson and are entitled to recover for the damages Mr. Kamaleson sustained.

**The July 13, 2019 Small Arms Fire Attack In Faryab (James G. Sartor Family)**

3860.  On July 13, 2019, a joint cell comprised of an FTO, al-Qaeda, and the Taliban, as directly assisted by the Islamic Revolutionary Guards Corps ("IRGC"), including the IRGC's Qods Force ("Qods Force"), combined together to commit a small arms fire attack in Faryab, Afghanistan (the "July 13, 2019 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.

3861.   The July 13, 2019 Attack was jointly committed by: (i) an al-Qaeda-Taliban cell; and (ii) the IRGC and its subordinate unit, the Qods Force (both FTOs).  On information and belief, the Haqqani Network participated in the July 13, 2019 Attack on behalf of the Taliban. On information and belief, the joint al-Qaeda-Taliban (Haqqani Network) cell supplied the terrorist who fired the weapon in the Attack, and the IRGC and Qods Force provided specific intelligence about American activities in Faryab that facilitated the Attack.[520]

3862.   The July 13, 2019 Attack was planned by al-Qaeda, the Haqqani Network, the IRGC, and the Qods Force.

3863.   The July 13, 2019 Attack was authorized by al-Qaeda.

---

[520] In 2019, the IRGC and Qods Force were active in Faryab, where this Attack occurred, and operated a broad network of Qods Force terrorists who sought to facilitate the Syndicate's expulsion of the United States from Afghanistan as well as the movement of al-Qaeda operatives between Afghanistan/Pakistan and Iraq through the land bridge provided by the IRGC, for which Faryab was a key stop along the way.  Consequently, the IRGC and Qods Force worked closely with al-Qaeda and the Taliban in Faryab throughout 2019.

Plaintiffs believe that the July 13, 2019 Attack bears substantial indicia of an attack that was directly aided by substantial, pre-attack intelligence planning and coordination of a nature consistent with the intelligence information that FTOs could usually only secure in 2019 through terrorists directly supported by a nation-state sponsor of terrorism, e.g., sophisticated intelligence operations involving a range of data sources designed to tracking movements of U.S. personnel.

Plaintiffs believe that the Haqqani Network likely participated in the July 13, 2019 Attack because, *inter alia*, substantial indicia of nation-state intelligence support behind the July 13, 2019 Attack also suggests that the Taliban's participation in the Attack would have most likely included, in substantial part, the Haqqani Network because the Haqqani Network was the Taliban's most "elite" terrorist force, and the Taliban primarily relied upon the Haqqani Network to represent the Taliban in transnational terrorist attacks involving other groups outside the Taliban.  For example, on December 30, 2009, al-Qaeda and the Taliban, acting jointly with the Pakistani Taliban, conducted a combined suicide attack on Forward Operating Base Chapman that killed seven Americans on December 30, 2009, including Mr. Harold Brown, Jr., Mr. Dane Clark Paresi, and Mr. Jeremy Jason Wise, whose family members are Plaintiffs in this case. With respect to that 2009 attack, the Defense Intelligence Agency determined the Taliban's participation in the attack was comprised of the Haqqani Network's substantial and direct participation in the financial, logistical, and operational details of the attack itself.

3864.   The July 13, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3865.   **Sergeant Major James G. Sartor** served in Afghanistan as a member of the U.S. Army.  SGM Sartor was injured in the July 13, 2019 Attack.  SGM Sartor died on July 13, 2019 as a result of injuries sustained during the July 13, 2019 Attack.

3866.   SGM Sartor was a U.S. national at the time of the attack and his death.

3867.   Plaintiff Mary Pryor-Patterson is the mother of SGM Sartor and a U.S. national.

3868.   Plaintiff Crista Brooner is the sister of SGM Sartor and a U.S. national.

3869.   As a result of the July 13, 2019 Attack and SGM Sartor's injuries and death, each member of the Sartor Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGM Sartor's society, companionship, and counsel.

3870.   As a result of the July 13, 2019 Attack, SGM Sartor was injured in his person and/or property.  The Plaintiff members of the Sartor Family are the survivors and/or heirs of SGM Sartor and are entitled to recover for the damages SGM Sartor sustained.

**The July 29, 2019 Insider Attack In Kandahar (Brandon Kreischer Family)**

3871.   On July 29, 2019, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an insider attack involving small arms fire in Kandahar, Afghanistan (the "July 29, 2019 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 29, 2019 Attack.

3872.   The July 29, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3873.   **Private First Class Brandon Kreischer** served in Afghanistan as a member of the U.S. Army.  PFC Kreischer was injured in the July 29, 2019 Attack.  PFC Kreischer died on July 29, 2019 as a result of injuries sustained during the July 29, 2019 Attack.

3874.   PFC Kreischer was a U.S. national at the time of the attack and his death.

3875.   Plaintiff Grace Kreischer is the widow of PFC Kreischer and a U.S. national.

3876.   Plaintiff C.K., by and through his next friend Grace Kreischer, is the minor son of PFC Kreischer. He is a U.S. national.

3877.   Plaintiff Brianne Barlow is the mother of PFC Kreischer and a U.S. national.

3878.   Plaintiff Jason Barlow is the stepfather of PFC Kreischer and a U.S. national. Mr. Barlow lived in the same household as PFC Kreischer for a substantial period and considered PFC Kreischer the functional equivalent of a biological son.

3879.   Plaintiff Sage Saladin is the stepbrother of PFC Kreischer and a U.S. national. Mr. Saladin lived in the same household as PFC Kreischer for a substantial period and considered PFC Kreischer the functional equivalent of a biological brother.

3880.   As a result of the July 29, 2019 Attack and PFC Kreischer's injuries and death, each member of the Kreischer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kreischer's society, companionship, and counsel.

3881.   As a result of the July 29, 2019 Attack, PFC Kreischer was injured in his person and/or property.  The Plaintiff members of the Kreischer Family are the survivors and/or heirs of PFC Kreischer and are entitled to recover for the damages PFC Kreischer sustained.

**The July 29, 2019 Insider Attack In Kandahar (Michael I. Nance Family)**

3882.   On July 29, 2019, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an insider attack involving small arms fire in Kandahar, Afghanistan (the "July 29, 2019 Attack"), which was facilitated by al-Qaeda-in-Iraq's provision of funding, personnel,

training, and logistical support to al-Qaeda and the Taliban.  Al-Qaeda planned and authorized the July 29, 2019 Attack.

3883.   The July 29, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

3884.   **Specialist Michael I. Nance** served in Afghanistan as a member of the U.S. Army. SPC Nance was injured in the July 29, 2019 Attack.  SPC Nance died on July 29, 2019 as a result of injuries sustained during the July 29, 2019 Attack.

3885.   SPC Nance was a U.S. national at the time of the attack and his death.

3886.   Plaintiff ShuShawndra Gregoire is the mother of SPC Nance and a U.S. national.

3887.   Plaintiff J.G., by and through his next friend ShuShawndra Gregoire, is the minor brother of SPC Nance. He is a U.S. national.

3888.   Plaintiff John Damian Gregoire Sr. is the stepfather of SPC Nance and a U.S. national. Mr. Gregoire lived in the same household as SPC Nance for a substantial period and considered SPC Nance the functional equivalent of a biological son.

3889.   Plaintiff L.G., by and through her next friend John Gregoire Sr., is the minor stepsister of SPC Nance and a U.S. national.  L.G. lived in the same household as SPC Nance for a substantial period and considered SPC Nance the functional equivalent of a biological brother.

3890.   As a result of the July 29, 2019 Attack and SPC Nance's injuries and death, each member of the Nance Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nance's society, companionship, and counsel.

3891.   As a result of the July 29, 2019 Attack, SPC Nance was injured in his person and/or property.  The Plaintiff members of the Nance Family are the survivors and/or heirs of SPC Nance and are entitled to recover for the damages SPC Nance sustained.

## CLAIMS FOR RELIEF

## COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants: Aiding and Abetting Liability, Attack Predicate]

3892.   Plaintiffs incorporate their factual allegations above.  Count One is brought on behalf of all Plaintiffs.

3893.   The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed, planned, and authorized by al-Qaeda and al-Qaeda-in-Iraq or Islamic State, which the United States designated FTOs under 8 U.S.C. § 1189 since 1999, 2004, and 2004, respectively.

3894.   The terrorist attacks committed, planned, and authorized by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States.  In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

3895.   Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks appear to have been intended to: (a) intimidate or coerce the civilian populations of Iraq, Afghanistan, Syria, Turkey, the United States, and other Coalition nations; (b) influence the policy of the U.S.,

Iraqi, Turkish, then-existing Afghan, and other Coalition governments by intimidation and coercion; and (c) affect the conduct of the U.S., Iraqi, Turkish, then-existing Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

3896.   Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

3897.   Defendants aided and abetted and knowingly provided substantial assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – and aided and abetted and knowingly provided substantial assistance to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's attacks on Plaintiffs – by:

(a) making, or causing to be made, cash payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed those attacks;

(b) transferring important technology that both facilitated and financed those attacks; and

(c) obstructing United States counterterrorism policy through their fraudulent concealment of those protection payments and technology transfers to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for fifteen years.

3898.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed, planned, and/or authorized by al-Qaeda, al-Qaeda-in-Iraq, and/or Islamic State.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3899.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State, and to those organizations' terrorist attacks.

3900.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages, and the costs of this action, including their attorneys' fees.

### COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]

3901.   Plaintiffs incorporate their factual allegations above.  Count Two is brought solely on behalf of the Islamic State Victim Plaintiffs.[521]

3902.   From 2014 through 2022, terrorists from Islamic State conspired with others to conduct and maintain Islamic State as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Iraq, Syria, Turkey, Afghanistan, and elsewhere in the Middle East.  Throughout that time, Islamic State was a group of associated individuals that functioned as a continuing unit, and Islamic State's express purpose at all times included violence against, and the expulsion of, Americans in Iraq, Syria, Turkey, and Afghanistan.  Islamic State engaged in, and its activities affected, foreign commerce.

3903.   From 2014 through 2022, Abu Bakr al-Baghdadi and other terrorists employed by or associated with Islamic State (including without limitation Abu Muhammad al-Adnani, Abdul Hasib, Abu Sayed, Abdul Rahman, Ibrahim al Hashemi al-Qurayshi, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of Islamic State as an enterprise by engaging in a campaign to expel Americans from Iraq, Syria, Turkey, and Afghanistan through crime and anti-American violence (the "Islamic State Campaign").

3904.   Specifically, Abu Bakr al-Baghdadi and other terrorists employed by or associated with Islamic State conducted and participated in the conduct of Islamic State's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include

---

[521] The Islamic State Victim Plaintiffs are set forth in Section X *supra.*

murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  The same terrorists also maintained interests in and control of Islamic State (and conspired to do so) through this pattern of racketeering activity.

3905.   The Islamic State Campaign was an act of international terrorism.  It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States.  The Islamic State Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Iraq, Turkey, and Afghanistan, (b) to influence the policy of the U.S., Iraqi, Turkish, Afghan, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Turkish, Afghan, and other governments by mass destruction, assassination, and kidnapping.

3906.   The Islamic State Campaign occurred primarily outside the territorial jurisdiction of the United States.

3907.   The Islamic State Campaign was committed, planned, and/or authorized by Islamic State, which the U.S. has designated as an FTO under 8 U.S.C. § 1189 since 2004.

3908.   The Islamic State Victim Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Islamic State Campaign.  Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Abu Bakr al-Baghdadi and other terrorists associated with Islamic State conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of Islamic State. The Islamic State Victim Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Islamic State Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3909.   Defendants aided and abetted and knowingly provided substantial assistance to Islamic State, its members, and the Islamic State Campaign.  Defendants did so by making payments to Islamic State that financed the Islamic State Campaign, including the campaign's terrorist attacks, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to Islamic State as it prosecuted the Islamic State Campaign.

3910.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to Islamic State, and to the Islamic State Campaign.

3911.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), the Islamic State Victim Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]

3912.   Plaintiffs incorporate their factual allegations above.  Count Three is brought solely on behalf of the Iraq-Syria Plaintiffs.[522]

3913.   From at least 2004 through at least 2014, terrorists from al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra conspired with Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani and others to conduct and maintain al-Qaeda-in-Iraq and, beginning in 2012, al-Qaeda-in-Iraq's alias Jabhat al-Nusra, as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Iraq and Syria.  Throughout that time, al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra was a group of associated individuals that functioned as a continuing unit, and al-Qaeda's, al-Qaeda-in-Iraq's, and Jabhat al-Nusra's express purpose at all times included violence against, and the expulsion of, Americans in Iraq and Syria.  Al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra engaged in, and its activities affected, foreign commerce.

3914.   From at least 2004 through at least 2014, Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani, and other terrorists employed by or associated with al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra (including without limitation Sulayman Khalid Darwish, Muhsin al-Fadhli, Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri), Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani (aka Abu Shaheen), Ezedin Abdel Aziz Khalil (aka Yasin al-Suri), Umid Muhammadi, Mustafa Hajji Muhammad Khan, Adel Radi Saqr al-Wahabi al-Harbi, Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni, Abd al-Rahman Mustafa al-Qaduli, Abu Afghan al-Masri, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra as an

---

[522] The Iraq-Syria Plaintiffs are set forth in Section XI *supra*.

enterprise by engaging in a campaign to expel Americans from Iraq and Syria through crime and anti-American violence (the "al-Qaeda-Iraq-Syria Campaign").

3915.   Specifically, Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani, and other terrorists employed by or associated with the Taliban, al-Qaeda, and al-Qaeda-in-Iraq conducted and participated in the conduct of al-Qaeda's and the Taliban's shared affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

3916.   The al-Qaeda-Iraq-Syria Campaign was an act of international terrorism.  It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States.  The al-Qaeda-Iraq-Syria Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of the United

States, Iraq, and other nations, (b) to influence the policy of the U.S., Iraqi, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, and other governments by mass destruction, assassination, and kidnapping.

3917.   The al-Qaeda-Iraq-Syria Campaign occurred primarily outside the territorial jurisdiction of the United States.

3918.   The al-Qaeda-Iraq-Syria Campaign was committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by al-Qaeda-in-Iraq, which the United States has likewise designated since 2004.

3919.   The Iraq-Syria Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the al-Qaeda-Iraq-Syria Campaign.  Specifically, the attacks that injured the Iraq-Syria Plaintiffs were part of the pattern of racketeering activity through which Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani and other terrorists associated with al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the al-Qaeda-Iraq-Syria Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3920.   Defendants aided and abetted and knowingly provided substantial assistance to al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra, such FTOs' members, and the al-Qaeda-Iraq-Syria Campaign.  Defendants did so by making payments to al-Qaeda and al-Qaeda-in-Iraq that financed the al-Qaeda Iraq-Syria Campaign, including al-Qaeda's, al-Qaeda-in-Iraq's, and Jabhat al-Nusra's terrorist attacks in Iraq and Syria, and by obstructing U.S. counterterrorism efforts to

provide cover and concealment to al-Qaeda and al-Qaeda-in-Iraq as both FTOs prosecuted the al-Qaeda-Iraq-Syria Campaign.

3921.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra, and to the al-Qaeda Iraq-Syria Campaign.

3922.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), the Iraq-Syria Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT FOUR:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]

3923.   Plaintiffs incorporate their factual allegations above.  Count Four is brought solely on behalf of the Afghanistan Plaintiffs.[523]

3924.   From at least 2005 through at least 2016, terrorists from al-Qaeda, al-Qaeda-in-Iraq, and the Taliban conspired with Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani and others to conduct and maintain al-Qaeda and the Taliban as a shared terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan and Pakistan, i.e., the Syndicate.  Throughout that time, al-Qaeda, al-Qaeda-in-Iraq, and the Taliban was a group of associated individuals that functioned as a continuing unit, i.e., the Syndicate, and al-Qaeda's, al-Qaeda-in-Iraq's, and the Taliban's express purpose at all times included violence against, and the expulsion of, Americans in Afghanistan.  Al-Qaeda, al-Qaeda-in-Iraq, and the Taliban engaged in, and its activities affected, foreign commerce.

3925.   From at least 2005 through at least 2016, Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani, and other terrorists employed by or associated with al-

---

[523] The Afghanistan Plaintiffs are set forth in Section XII *supra*.

Qaeda, al-Qaeda-in-Iraq, and the Taliban (including without limitation Jalaluddin Haqqani, Ahmed Jan Wazir, Sangeen Zadran, Mullah Baradar, Mawlawi Ahmad Bilal, Abdul Rauf Zakir, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of al-Qaeda, al-Qaeda-in-Iraq, and the Taliban as an enterprise, i.e., the Syndicate, by engaging in a campaign to expel Americans from Afghanistan through crime and anti-American violence (the "al-Qaeda-Taliban Campaign").

3926.   Specifically, Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani, and other terrorists employed by or associated with the Taliban, al-Qaeda, and al-Qaeda-in-Iraq conducted and participated in the conduct of al-Qaeda's and the Taliban's shared affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

3927.   The al-Qaeda-Taliban Campaign was an act of international terrorism.  It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control

of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States.  The al-Qaeda-Taliban Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

3928.   The al-Qaeda-Taliban Campaign occurred primarily outside the territorial jurisdiction of the United States.

3929.   The al-Qaeda-Taliban Campaign was committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

3930.   The Afghanistan Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the al-Qaeda-Taliban Campaign.  Specifically, the attacks that injured the Afghanistan Plaintiffs were part of the pattern of racketeering activity through which Osama bin Laden, Mullah Omar, Abu Musab al-Zarqawi, Sirajuddin Haqqani and other terrorists associated with al-Qaeda, al-Qaeda-in-Iraq, and the Taliban conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of al-Qaeda and the Taliban's shared operations, i.e., the Syndicate.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the al-Qaeda-Taliban Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3931.   Defendants aided and abetted and knowingly provided substantial assistance to al-Qaeda, al-Qaeda-in-Iraq, and the Taliban, such FTOs' members, and the al-Qaeda-Taliban Campaign.  Defendants did so by making payments to al-Qaeda and al-Qaeda-in-Iraq that financed the al-Qaeda-Taliban Campaign, including al-Qaeda's terrorist attacks in Afghanistan as well as funding al-Qaeda-in-Iraq terrorists who trained the Taliban, including its Haqqani Network, at al-Qaeda's instruction. Defendants also obstructed U.S. counterterrorism efforts to provide cover and concealment to al-Qaeda and al-Qaeda-in-Iraq as both FTOs prosecuted the al-Qaeda-Taliban Campaign.

3932.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to al-Qaeda, al-Qaeda-in-Iraq, and the Taliban, and to the al-Qaeda-Taliban Campaign.

3933.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), the Afghanistan Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT FIVE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
### [All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate]

3934.   Plaintiffs incorporate their factual allegations above.  Count Five is brought on behalf of all Plaintiffs.

3935.   Defendants provided material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in violation of 18 U.S.C. § 2339A.  They did so by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks in Iraq, Syria, Turkey, and Afghanistan, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as such FTOs targeted Americans in Iraq, Syria, Turkey, and Afghanistan.

Defendants' payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  Defendants' obstruction of U.S. counterterrorism efforts for al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's benefit also provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the obstruction), which likewise qualified as material support.

3936.   Defendants knew that their material support would be used by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs.  Those acts by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.  Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

3937.   Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United

States, Iraq, Afghanistan, Turkey, and other nations, (b) to influence the policy of the U.S., Iraqi, Afghan, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Afghan, Turkish, and other governments by mass destruction, assassination, and kidnapping.

3938.   Defendants' provision of material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State occurred primarily outside the territorial jurisdiction of the United States.

3939.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3940.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing material support and resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, knowing that those organizations would use that support to prepare for or carry out violations of U.S. terrorism laws.

3941.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT SIX:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants:  Primary Liability, 18 U.S.C. § 2339B Predicate]**

3942.   Plaintiffs incorporate their factual allegations above.  Count Six is brought on behalf of all Plaintiffs.

3943.   LM Ericsson, Ericsson AB, and Ericsson Inc. provided material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in violation of 18 U.S.C. § 2339B.  Defendants did so by making cash and in-kind payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and by

obstructing U.S. counterterrorism efforts to provide cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as such FTOs targeted Americans in Iraq, Syria, Turkey, and Afghanistan.  Defendants' protection payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  Defendants' obstruction of U.S. counterterrorism efforts for al-Qaeda's al-Qaeda-in-Iraq's and Islamic State's benefit also provided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with a service; assistance derived from scientific, technical or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the obstruction), all of which likewise qualified as material support.  Defendants further disguised the nature of its support, in further violation of 18 U.S.C. § 2339B.

3944.   The United States has designated al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as an FTO under 8 U.S.C. § 1189 since 1999 (in the case of al-Qaeda) and 2004 (in the case of al-Qaeda-in-Iraq and Islamic State).  At all times since that designation, Defendants knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State were each a designated FTO and/or that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State had engaged in acts of terrorism against the United States.

3945.   Defendants' conduct, by providing material support to a designated FTO, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, Afghanistan, Iraq, Turkey, and other nations, (b) to influence the policy of the U.S., Afghan, Iraqi, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, Iraqi, Turkish, and other governments by mass destruction, assassination, and kidnapping.

3946.   Defendants' provision of material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State occurred primarily outside the territorial jurisdiction of the United States.

3947.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing material support and resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, knowing that those organizations were designated FTOs and that they engaged in terrorist acts.

3948.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct, which proximately caused Plaintiffs' injuries by providing FTOs with the resources and concealment they needed to carry out the terrorist attacks that injured Plaintiffs.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3949.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT SEVEN:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate]**

3950.   Plaintiffs incorporate their factual allegations above.  Count Seven is brought on behalf of all Plaintiffs.

3951.   Defendants, by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed the al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A). Defendants knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at

18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

3952.   Defendants, by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed the al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B). Defendants knew or recklessly disregarded that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's purpose was to intimidate the U.S., Iraqi, Turkish, and Afghan populations and to compel the U.S. and allied governments to effect a withdrawal of U.S. forces from Iraq, Syria, Turkey, and Afghanistan.

3953.   Defendants' provision of funds to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, Iraq, Turkey, Afghanistan, and other nations, (b) to influence the policy of the U.S., Iraqi, Turkish, Afghan, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Turkish, Afghan, and other governments by mass destruction, assassination, and kidnapping.

3954.   Defendants' provision of funds to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State occurred primarily outside the territorial jurisdiction of the United States.

3955.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing funds to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

3956.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

3957.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

3958.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

3959.   Plaintiffs request that the Court:

(a)     Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)     Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)     Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)     Award Plaintiffs prejudgment interest; and

(e)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  January XX, 2023[524]

Respectfully submitted,

/s/ Ryan R. Sparacino

Ryan R. Sparacino (D.C. Bar No. 493700)
Geoffrey P. Eaton (D.C. Bar No. 473927)
Eli J. Kay-Oliphant (D.C. Bar No. 503235)
Tejinder Singh (D.C. Bar No. 1012396)
Shuman Sohrn (admitted *Pro Hac Vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
tejinder.singh@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*

---

[524] This Corrected First Amended Complaint was filed pursuant to agreement of the Parties and this Court's Order dated [XXXX] (Dkt. No. XXX), and comprises corrections to Plaintiffs' First Amended Complaint filed on December 20, 2022.