**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK SCHMITZ, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ERICSSON INC., ERICSSON AB, TELEFONAKTIEBOLAGET LM ERICSSON, RAFIAH IBRAHIM, and BÖRJE EKHOLM, <br><br> *Defendants*. | Case No. 1:22-cv-02317 |

**PLAINTIFFS' OPPOSITION**
**TO DEFENDANT BÖRJE EKHOLM'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

i

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ........................................................................................................................... 1

LEGAL STANDARD ..................................................................................................................... 2

ARGUMENT ................................................................................................................................... 2

    I.    Plaintiffs State An Aiding And Abetting Claim Against Ekholm .............................. 2

        A. Plaintiffs plausibly allege that Ekholm aided and abetted terrorist attacks by approving protection payments to Islamic State. ........................................................ 3

        B. Plaintiffs plausibly allege that Ekholm aided and abetted terrorist attacks by concealing Ericsson's payments to Islamic State from the U.S. Government ........... 6

        C. Plaintiffs plausibly allege that Defendant Ekholm was "generally aware" that he engaged in illegal activity that foreseeably aided the terrorists. ............................... 8

        D. Ekholm's assistance to Islamic State was "knowing" and "substantial" enough to justify liability for all three attacks during his tenure. ............................................. 10

    II.   Plaintiffs State A Direct Liability Claim Against Ekholm. ...................................... 10

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................................ 2

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022) ............................................ 2, 13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 4

*Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*,
    436 F. Supp. 3d 354 (D.D.C. 2010) ........................................................................................... 2

*In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1315-16 (S.D. Fla. 2018) .................. 12

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) ..................................................................... 6, 8

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ............................................................ 6, 8

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) ....................................................... 11

*Twitter, Inc.* v. *Taamneh,* No. 21-1496, 2023 WL 3511531 (May 18, 2023) ................. 2, 3, 10, 11

*United States ex rel. Vermont Nat'l Telephone Co. v. Northstar Wireless, LLC*,
    34 F.4th 29 (D.C. Cir. 2022) ........................................................................................................ 7

**Statutes**

18 U.S.C. § 2331(1) ................................................................................................................................ 11

18 U.S.C. § 2339A ................................................................................................................................. 11

18 U.S.C. § 2339B ................................................................................................................................. 11

18 U.S.C. § 2339C ................................................................................................................................. 11

## INTRODUCTION

Defendant Börje Ekholm was CEO of LM Ericsson from 2017 through the present. During that period, Plaintiffs allege that he personally approved protection payments to Islamic State terrorists in Iraq and affirmatively concealed that misconduct from U.S. government investigators, thereby allowing the illegal payments—and the terrorist attacks they funded—to continue. Three of the attacks alleged here—which killed three Americans and left behind 10 grieving loved ones— occurred during his tenure as CEO and are traceable to his assistance. The protection payments he approved funded Islamic State operations in Iraq, Syria, and Afghanistan, where the Plaintiffs' loved ones were killed, and his misrepresentations and omissions about those payments allowed the money to flow for years after the U.S. government would have shut them down.

These allegations, taken as true, state plausible ATA claims against Ekholm. His assertion that Plaintiffs "added [him] as a defendant 'simply because he is the CEO,'" ECF 45 at 3, ignores detailed factual allegations that plausibly implicate him personally. Those allegations include, for example, a witness who will testify that "top management" at LM Ericsson oversaw the company's Iraq operations and "approved" Ericsson's decision to "bribe[ ] … terrorist organizations" in Iraq during Ekholm's tenure as the company's top manager, and "wanted to hide" those bribes "from DOJ+SEC+IRS during their penalty negotiations up to the signing of the DPA in December 6, 2019"; that the same witness will testify that "top management" knew about the results of Ericsson's investigation into its Iraq malfeasance no later than 2019 and that Ekholm specifically should have disclosed it; and the U.S. government has accused Ericsson of concealing its Iraq bribery campaign from its investigation of Ericsson's worldwide corrupt practices. First Amended Complaint ("FAC") ¶¶746-47; *see also* ¶¶775-79.[1] Whether these allegations are sufficient to prove Ekholm's

---

[1] Unless otherwise indicated, all paragraph references are references to the FAC.

1

liability is a question for the jury; that they are plausible is enough to require that his Motion to Dismiss be denied.

## LEGAL STANDARD

In considering a motion to dismiss for failure to state a claim, the court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged' … constru[ing] [the] complaint liberally in the plaintiff's favor." *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 436 F. Supp. 3d 354, 357-58 (D.D.C. 2020) (citations omitted). A claim is "facially plausible when the pleaded factual content 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. at 357 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a 'probability requirement,'" requiring only "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citations omitted).

## ARGUMENT

**I.    Plaintiffs State An Aiding And Abetting Claim Against Ekholm.**

Under the ATA, "a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 220 (D.C. Cir. 2022) (citations omitted); *Twitter, Inc.* v. *Taamneh,* No. 21-1496, 2023 WL 3511531, at *8 (May 18, 2023) (citations omitted). Here, Plaintiffs allege that Ekholm engaged in multiple illegal activities, including approving unlawful payments to Islamic State and concealing that conduct from the United States and others. Both making payments to a virulently anti-American foreign terrorist organization and concealing that fact from the American government foreseeably risked terrorist attacks by that organization. This is exactly the kind of "affirmative and culpable

2

misconduct" that the Supreme Court recently confirmed is appropriate for ATA liability. *Twitter*, 2023 WL 3511531, at *17.

### A. Plaintiffs plausibly allege that Ekholm aided and abetted terrorist attacks by approving protection payments to Islamic State.

Plaintiffs allege that Defendant Ekholm, who joined LM Ericsson's board of directors in 2006 and became CEO on January 16, 2017, aided and abetted terrorist attacks by "personally facilitat[ing] Defendants' protection payments" to the terrorists throughout his tenure. ¶¶29, 261, 462. As Ekholm admits, the FAC alleges on multiple occasion that he "approved" payments to the Islamic State. *E.g.*, ¶¶502, 512, 775. As Plaintiffs explain in their opposition to the Defendants' joint motion to dismiss, knowingly paying off terrorists constitutes substantial assistance to those terrorists' foreseeable terrorist attacks. *See* ECF 52 at 22-38.[2] Approving (that is, authorizing) such payments is indistinguishable from physically making the payments; both acts are fundamental to the assistance.

The only question under Rule 8 is whether Plaintiffs have pled facts sufficient to make the allegation that Ekholm approved the payments "plausible." *E.g., Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). They have. Plaintiffs allege, for example, that Ericsson's "C-suite," including Ekholm, "oversaw Ericsson's transactions in Iraq." ¶262. They cite a Confidential Witness "with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments," who confirms that LM Ericsson's "top management" "approved" Ericsson's decision to "bribe[] … terrorist organizations" in Iraq during Ekholm's tenure as CEO. ¶746; *see also* ¶294 (Confidential Witness stating that Ericsson's and Ericsson AB's "top management had … approved" protection payments to al-Qaeda, al-Qaeda-in-Iraq, and

---

[2] This brief responds directly to arguments raised in Defendant Ekholm's separate motion to dismiss (ECF 45). Plaintiffs incorporate by reference the arguments contained in their opposition (ECF 52) to the Defendants' primary motion to dismiss (ECF 44).

3

Islamic State). The same Confidential Witness explained that C-suite involvement in the company's systematic program of graft and bribery pervaded the entire enterprise, explaining that "the 'Tone-of-the-Top' management style at the Corporate level" sustained an "unofficial policy for, and willingness to, issu[e] and authoriz[e] payment orders" documenting Ericsson's bribes "in writing for most confidential [and] obscure payments to so called 'commercial agents'" in order to obscure illegal bribes." ¶268. The ubiquity of "top management" involvement in "issuing and authorizing" illegal payments generally is sufficient to support a plausible inference that Ekholm—the embodiment of Ericsson's "top management" from 2017-22—personally authorized such payments in Iraq.

Ekholm's approval of the payments, together with Plaintiffs' other allegations of his involvement, supports a plausible inference of his participation. Finally, in early 2022, "LM Ericsson's shareholders voted not to discharge Ekholm from [personal] liability arising from Ericsson's alleged conduct in Iraq." ¶29. LM Ericsson's willingness to allow Ekholm to face personal liability for Iraq-related misconduct supports the inference that Ekholm was personally involved in approving that misconduct.

These allegations, individually and together, are more than sufficient to support Plaintiffs' allegations against Ekholm. Ekholm's motion to dismiss largely fails to grapple with them. He complains that only one attack during Mr. Ekholm's tenure occurred in Iraq, suggesting that protection payments in Iraq could not have assisted the attacks in Afghanistan. ECF 45 at 5. But the FAC explains at length how Islamic State terrorists in Iraq funneled protection payments to their fellow terrorists in Syria and Afghanistan. *See* ¶¶602-14, 628-31. Ekholm ignores those

allegations.³ He objects that that the FAC "never alleges a single protection payment approved by Mr. Ekholm or any types or even categories of protection payments he supposedly approved," ECF 45 at 6, but this is not a fraud case that requires pleading with such particularity. Anyway, the FAC is clear that Ekholm approved protection payments during the period 2017-2022, and that the recipient of protection payments during that period was the Islamic State. Nothing more is required to satisfy Rule 8.

    Finally, Ekholm argues that "Plaintiffs' allegation that Mr. Ekholm 'facilitated Defendants' protection payments to al-Qaeda and its progeny' in Iraq' … cannot be squared with repeated allegations that al-Qaeda and al-Qaeda-in-Iraq ceased extracting protection payments in Iraq in 2014, several years before Mr. Ekholm became CEO of LM Ericsson." ECF 45 at 7. There is no contradiction: the quoted passage is a general allegation that *all* the Defendants (not just Ekholm) approved payments to "al-Qaeda *and its progeny* in Iraq and Afghanistan." Al-Qaeda's "progeny" in Iraq after 2014 included Islamic State. *E.g.*, ¶419 (explaining that companies made protection payments "to al-Qaeda … or its progeny like ISIS"), ¶691 (referring to "al-Qaeda and its progeny, including al-Qaeda-in-Iraq and Islamic State"); *see generally* ¶¶3, 48, 88 n.9, 129-30, 135 (explaining how al-Qaeda in Iraq became Islamic State in 2013). All the alleged protection payments made in Iraq after 2014—necessarily including those approved by Ekholm during his 2017-22 tenure as CEO—were directed to the Islamic State. *E.g.,* ¶195.

---

³ Ekholm huffs that "Neither the Court nor Mr. Ekholm should have to hunt through a nearly 800-page complaint to locate allegations relevant to Plaintiffs' claims against Mr. Ekholm." ECF 45 at 6. But the allegations supporting the use of Iraq funds to support Afghan terrorism are hardly buried: the FAC includes boldface headings stating that "Islamic State Funds Raised In Iraq And Syria Funded Islamic State Attacks In Iraq, Syria, And Afghanistan" and that "Islamic State Terrorists In Iraq Provided Key Logistical Aid To Islamic State's Branch In Afghanistan And Pakistan." Both headings, and similar ones relating to al-Qaeda and al-Qaeda-in-Iraq, appear in the FAC's table of contents.

5

## B. Plaintiffs plausibly allege that Ekholm aided and abetted terrorist attacks by concealing Ericsson's payments to Islamic State from the U.S. Government.

Plaintiffs allege that Ekholm helped to conceal Ericsson's payments to Iraqi terrorists from U.S. Government investigators. *E.g.*, ¶¶261, 687-88, 738, 741, 746(c), 776-77, 780, 782, 821, 1071. Such conduct would constitute as much "substantial assistance" as the payments themselves. ¶¶3897(c); *e.g.*, *In re Sharp Int'l Corp.*, 403 F.3d 43, 50–51 (2d Cir. 2005) ("Substantial assistance may only be found where the alleged aider and abettor … helps conceal" the unlawful act (quotation omitted); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) (citing *In re Sharp*)).

Ekholm's concealment took multiple forms, including falsely "represent[ing] to DOJ … that Defendants were fully cooperating with the United States' then-ongoing criminal and civil anti-corruption investigation" (¶738), and making "materially false representations to, *inter alia*, the DOJ National Security Division, DOJ FCPA Unit, SEC FCPA Unit, and FBI, that obstructed such U.S. counterterrorism authorities' investigations and intelligence concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria" (¶741). Ekholm's personal involvement in these misrepresentations is plausible: he was based in the United States and was the leader of the "top management" that a confidential witness reports "wanted to hide" Ericsson's payments to Islamic State "from DOJ+SEC+IRS" prior to execution of the 2019 DPA. ¶¶29, 512, 746, 790. In addition, Plaintiffs allege that Ekholm "promot[ed]" Defendant Ibrahim to be his "special adviser," rather than firing her for her gross misconduct in Iraq, to "disincentiviz[e] her from cooperating with law enforcement authorities, including the U.S. Government. ¶¶777, 780.

Ekholm's contentions (ECF 45 at 9) notwithstanding, the FAC explains in detail how this campaign of concealment obstructed U.S. counterterrorism efforts. Ericsson "knew who was soliciting money on behalf of terrorists; knew which subcontractors were funneling corrupt

6

payments to the terrorists; and knew which geographies were focal points for terrorists – but instead of disclosing that information, Ericsson held it close for its own benefit." ¶20. This conduct "was in direct conflict with the position of the U.S. government and terrorism scholars, who have long emphasized that public-private cooperation is a key tool in the U.S. government's counterterrorism strategy to protect American lives." *Id*.; see also ; *see also* ¶¶695-704. Just as cooperation aids counterterrorism, "[t]he corollary is equally true: corporate obstruction aids the FTOs' terrorist attacks against Americans." *Id*.

Ekholm's complaint that Plaintiffs do not identify "what counterterrorism operations he allegedly obstructed, [or] what false statements he allegedly made" is beside the point: no such particularity is needed under Rule 8, which requires only allegations that, "accepted as true, state a claim to relief that is plausible on its face." *United States ex rel. Vermont Nat'l Telephone Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 38 (D.C. Cir. 2022). Allegations that Ekholm prevented the U.S. government from learning information material to counterterrorist operations in Iraq are entirely plausible: DOJ is actively investigating Ericsson for "multiple breaches of its settlement agreements for failing to disclose … that it had paid bribes to ISIS to gain access to transport routes in Iraq," ¶365, and (as noted) Ekholm has admitted his close involvement in the investigation from which those bribes were concealed. ¶777. These plausible allegations, taken as true, state a claim under established aiding-and-abetting law. *E.g.*, *In re Sharp Int'l*, 403 F.3d at 50–51; *Lerner,* 459 F.3d at 295.

Finally, Ekholm's assertion (at 10) that Plaintiffs' concealment claims only relate to attacks occurring after December 2019 (when Ericsson's internal investigation was purportedly completed) is incorrect. Ericsson's campaign of obstruction began no later than 2013, ¶2, and Ekholm is alleged to have participated in that campaign from 2017-2022, ¶¶512, 629. As Ekholm

7

concedes, three of the alleged Islamic State attacks occurred during that period. ECF 45 at 5. In any event, as Ekholm also concedes, one attack *did* occur after the completion of the Iraq report in December 2019. *Id.* 10. That the attack occurred in Afghanistan does not undermine Plaintiffs' claim: the FAC explains in detail how Islamic State's protection payments in Iraq funded the group's attacks in Afghanistan, *see* ¶¶602-14, 628-31. Ekholm's concealment of information about those payments impeded U.S. efforts to shut them down, allowing the flow of cash to Afghanistan to continue. If Ekholm wishes to argue that the connection between Ekholm's conduct and the attack is insufficient to support liability, he may do so at trial. The claim is at least plausible, and nothing more is required at this stage.

### C. Plaintiffs plausibly allege that Defendant Ekholm was "generally aware" that he engaged in illegal activity that foreseeably aided the terrorists.

As Plaintiffs explain in their opposition to Defendants' joint motion to dismiss, there is no question that *Ericsson* was "generally aware" of its participation in overall illegal activities in Iraq; the company has admitted as much. ECF 52 at 24-27. There should be no question that Plaintiffs have adequately alleged Ekholm's awareness, either. As set forth above, Plaintiffs have alleged that Ekholm personally approved the protection payments that his company made in Iraq and personally acted to conceal those payments from U.S. authorities. His actions necessarily required knowledge of those illegal activities.

Ekholm's arguments against "general awareness" simply ignore Plaintiffs' allegations that, for example, Ekholm's "C-suite" oversaw Ericsson's conduct in Iraq and that a witness with first-hand knowledge confirms that LM Ericsson's "top management" "approved" Ericsson's decision to "bribe[ ] … terrorist organizations" in Iraq during Ekholm's tenure as CEO. ¶¶262, 296, 746. If, as Plaintiffs allege, "top management" knew that it was paying bribes to Islamic State, it is plausible to infer that Ekholm, the CEO, was among those who knew it. Actual knowledge of

8

assistance to an FTO is necessarily sufficient to satisfy the "general awareness" requirement. Similarly, Ekholm's motion ignores Plaintiffs' allegations that he actively lied to U.S. government officials about Ericsson's bribery campaign in Iraq. The act of concealing Ericsson's misconduct raises a plausible inference that Ekholm was aware of its illegality, and there is no question that making illegal payments in Islamic State-controlled parts of Iraq foreseeably risked terrorist attacks.

In addition, Ekholm's promotion of Ibrahim to "special adviser" status in July 2019 supports the inference that he was aware of her misconduct and "decided not to fire Ibrahim to conceal from the U.S. Government Ericsson's illegal activities in Iraq." ¶778. Ericsson's negotiations with DOJ and SEC were ongoing at that time, and Ekholm and Ericsson were actively concealing their Iraq bribes from those agencies. As the FAC explains, if "Ericsson [had] cut Ibrahim loose rather than paying her to assume a fake role as Ekholm's personal strategic advisor (without being on the same continent as the person she was advising), she undoubtedly would have told the U.S. Government where all of Ericsson's bodies were buried," thus "jeopardiz[ing] Ericsson's ongoing settlement negotiations with the DOJ and SEC and potentially expos[ing] Ericsson to fines and penalties even larger than those under discussion at the time." ¶778. The allegation that Ibrahim's "promotion" was a tactical effort to prevent her from spilling the beans to the U.S. government is supported by third parties, who observed that her new status as special advisor appeared to be a "euphemism for gardening leave," that is, removal from the workforce while remaining on the payroll. ¶776.

Ekholm's professed confusion about the import of these allegations is unconvincing: to the extent that, as Plaintiffs allege, Ibrahim's "promotion" to the position of Ekholm's advisor was a pretext intended to keep her under the company's control and away from prying U.S. investigators,

it supports the inference that Ekholm knew about Ibrahim's illegal conduct in Iraq and sought actively to conceal it. That inference is sufficient to support "general awareness" at this stage.

### D. Ekholm's assistance to Islamic State was "knowing" and "substantial" enough to justify liability for all three attacks during his tenure.

Eckholm's motion does not address the "knowing and substantial assistance" element or the *Halberstam* factors that (both before and after *Twitter*) provide the relevant legal framework. The analysis of those factors provided in Plaintiffs' primary opposition brief (ECF 52 at 32-38) applies equally here. Like his company's, Ekholm's assistance was both "knowing" and "substantial": he knew that he was approving unlawful payments to terrorists, and those payments "provided millions in U.S. dollars to the[] FTOs each year," including at least the first two years of his tenure as CEO.  ¶¶192, 363, 430, 462, 469-70, 484-85, 502, 512.  He actively misled U.S. officials about the existence and nature of those payments, allowing the assistance to continue flowing for at least several years. These are the kinds of "systemic and intentional" acts of assistance to Islamic State that justify liability for all three attacks committed by that group during Ekholm's tenure as CEO. *Twitter*, 2023 WL 3511531, at *2; *see also id*. at *12-13.

## II. Plaintiffs State A Direct Liability Claim Against Ekholm.

Primary ATA liability arises when a defendant's conduct constitutes "international terrorism" and causes injury to a U.S. national. 18 U.S.C. § 2333(a); *see Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 270 & n.1 (D.C. Cir. 2018) ("*Owens IV*") (describing elements). "International terrorism" includes activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States," and that "appear to be intended" to "influence the policy of a government by intimidation or coercion" or "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1). Plaintiffs have sufficiently alleged all the elements of a claim against Ekholm.

***Predicate Criminal Acts.*** An "act of international terrorism" must involve a criminal act. 18 U.S.C. § 2331(l)(A). Plaintiffs allege that Ekholm committed three such acts: providing material support to terrorists (18 U.S.C. § 2339A); providing material support to FTOs (18 U.S.C. § 2339B) and financing terrorism (18 U.S.C. § 2339C). *See* ¶¶3935-41 (§2339A), 3942-49 (§2339B),[4] 3950-57 (§2339C). Ekholm's material support of and financing for terrorism took the form of authorizing protection payments to Islamic State and concealing those payments from the U.S. government, as discussed *supra*. There is no question that making or authorizing protection payments to an FTO constitutes "material support for terrorism" under §§2339A and 2339B and "financing terrorism" under §2339C. *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1315-16 (S.D. Fla. 2018). The French construction materials company Lafarge just pled guilty to providing material support for doing exactly that. ¶369.

Ekholm makes no attempt to dispute Plaintiffs' allegations that he committed these criminal acts, except to repeat his claim that his approval and concealment of illegal protection payments are inadequately alleged. ECF 45 at 12-13. Plaintiffs have explained why that claim is incorrect, and Ekholm has offered no other basis to support his motion.

***"Dangerous to Human Life" and "Intended to Coerce a Population or Influence a Government."*** The ATA requires that the defendant's criminal act be "violent or dangerous to human life" and that it "appear to be intended" to achieve a terrorist aim. 18 U.S.C. §2331(1)(B).

---

[4] Ekholm correctly notes that ¶3943 omits Ekholm from the list of Defendants alleged to have violated §2339B. ECF 45 at 12-13. The omission was inadvertent, as the remainder of Count Six repeatedly demonstrates. After the first sentence of ¶3943, every paragraph in Count Six refers to "Defendants," a group defined to include Ekholm. *See* ¶¶3943-49 and ¶1. To eliminate any doubt, ¶3947 expressly alleges that "[e]ach Defendant, including the Corporate Defendants *and the Individual Defendants*, knowingly played a role in providing material support and resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, knowing that those organizations were designated FTOs and that they engaged in terrorist acts."

Plaintiffs' opposition to Defendants' joint motion to dismiss explains in detail why paying terrorists and concealing those payments from responsible authorities satisfy these requirements. ECF 52 at 43-44. Ekholm's motion offers no basis for concluding otherwise, confining its discussion of these issues to a single conclusory sentence denying liability. ECF 45 at 13. No additional response is required here.

*Proximate Causation.* To plead proximate cause, Plaintiffs must allege "some reasonable connection" between Defendants' conduct and their injuries. *Atchley,* 22 F.4th at 226. Here too, Plaintiffs' opposition to the joint motion to dismiss sets forth the necessary connection between protection payments in Iraq and concealment of those payments to the attacks on Plaintiffs. ECF 52 at 45-46. Here too, Ekholm offers nothing but a conclusory sentence denying causation. ECF 45 at 13-14. Ekholm's motion fails for the same reasons the primary motion fails.

## CONCLUSION

For all the reasons given, Plaintiffs respectfully request that Defendant Ekholm's Motion to Dismiss be DENIED.

Dated:  June 2, 2023

                                                       Respectfully submitted,

                                                      */s/ Eli J. Kay-Oliphant*

                                                      Eli J. Kay-Oliphant (D.C. Bar No. 503235)
                                                      Ryan R. Sparacino (D.C. Bar No. 493700)
                                                      Sparacino PLLC
                                                      1920 L Street, NW, Suite 835
                                                      Washington, D.C. 20036
                                                      Tel: (202) 629-3530

                                                      eli.kay-oliphant@sparacinopllc.com
                                                      Ryan.sparacino@sparacinopllc.com

                                                      *Counsel for Plaintiffs*